1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
-------------------------------:
                               :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                        :
              Plaintiffs,      :
                               : Case No. 1:14-cv-1611
     vs.                       :
                               :
                               :
COX ENTERPRISES, INC., et al., :
              Defendants.      :
-------------------------------:
```


HEARING ON MOTIONS


June 26, 2015


Before:  John F. Anderson, Mag. Judge


APPEARANCES:

John M. Caracappa, Paul Gennari, and Walter D. Kelley, Jr.,
Counsel for the Plaintiffs

Brian D. Buckley and Craig C. Reilly,
Counsel for the Defendants

1          NOTE:  The case is called to be heard at 10:52 a.m.

2     as follows:

3          THE CLERK:  BMG Rights Management (US) LLC, et al.

4     versus Cox Enterprises, Inc., et al., civil action number

5     14-cv-1611.

6          MR. KELLEY:  Good morning, Your Honor.  Walter Kelley

7     on behalf of plaintiffs.  With me are John Caracappa and Paul

8     Gennari.  Mr. Caracappa is going to argue.

9          THE COURT:  Okay.

10         MR. REILLY:  Good morning, Your Honor.  Craig Reilly

11    for the Cox defendants, together with my co-counsel Brian

12    Buckley.  And then from Cox itself, Stephanie Allen-Wang.

13         THE COURT:  Okay.  And who is going to argue, Mr.

14    Reilly?

15         MR. REILLY:  Mr. Buckley will, Your Honor.

16         THE COURT:  Okay.  Well, Mr. Buckley, let me first,

17    before we get into the argument phase, I hope you brought to

18    Ms. Frazier's attention my order that she not be telling people

19    to send me letters.

20         MR. BUCKLEY:  Absolutely, Your Honor.  As soon as we

21    got your order, it was communicated to Cox.  Is that what you

22    mean, to the client?

23         THE COURT:  Yes.

24         MR. BUCKLEY:  Yes, absolutely.

25         THE COURT:  I mean, you know, you say you're not

1    providing people with legal advice, and then your provide them

2    with bad legal advice.  That is, you say:  We can't provide you

3    with any legal advice, but you should send letters to the

4    magistrate judge involved in the case.  That's bad legal

5    advice.

6                And, you know, you need to make sure that I don't

7    start getting any more letters from any of your customers

8    having been referred to send me letters from someone in the

9    legal department at Cox.  Is that clear?

10               MR. BUCKLEY:  It's very clear, Your Honor.  I

11   apologize for that.  It was part of what I had hoped at the

12   last hearing to clarify what the process was going to be, and

13   we made a mistake.  And I apologize.

14               THE COURT:  Well, you know, the Clerk of the Court,

15   file it with the court, something like that.  But the idea that

16   you're suggesting to someone that they mail letters to a

17   judicial officer, isn't the way things are done in the Eastern

18   District of Virginia.

19               MR. BUCKLEY:  And we apologize, Your Honor.

20               THE COURT:  It may be done differently in Atlanta or

21   something like, but, you know, you've got to know the ball

22   field you're playing in, and -- okay.

23               Well, we've got a number of different motions.  I

24   think the -- I will take them up in a little bit different

25   order than they were filed in because I think it may be easier

4

1    to just get through a couple of them, and then deal with the

2    others.

3              The motion to compel Rightscorp.  My understanding is

4    that with a representation that all of the Steele documents

5    have been produced, the only issue there has to do with the

6    source code, is that -- am I correct on that?

7              MR. BUCKLEY:  With the caveat, Your Honor, that we

8    just want to understand that we've received all of the

9    responsive Steele documents.  And with that understanding, or

10   at least with that certification from plaintiffs, that should

11   be a nonissue.

12             THE COURT:  All right.  Well, on the source code

13   issue -- and you saw in their opposition they're talking

14   about -- well, you know, talking about all code that relates to

15   particular functions that are done, is not really realistic.

16             I mean, there are certain areas in which you've

17   outlined where, you know, certain components can be identified.

18   And I think you pointed out one that they may have

19   misidentified.  And they said, here it is, and you looked and

20   found out that it was there.

21             But my concern has to do with the way that you've --

22   you know, all code that connects to, reads, or so-and-so that

23   does such and such, all code that does so and so, as opposed

24   to, you know, what is the source code for a particular routine

25   or something like that.

1          And I think you understand the position they're in.

2    And that if I order them to produce all the code and there is

3    an extraneous piece of code that goes from, you know, one

4    routine to another that then goes to another routine, that that

5    code is related to an execution.

6          So, I mean, I understand your need to want to make

7    sure that you've got all the source code, but I'm also

8    concerned about the way that you have this worded as to all

9    code relating to certain things.

10         So help me figure out a way to get you what you want

11   but not put them in a jam by doing that.

12         MR. BUCKLEY:  Your Honor, and that's fair.  And this

13   is not intended to be a gotcha exercise so we can say later,

14   oh, you were told to give us every line of code and you failed

15   to do that.

16         It really is an attempt to understand what we've

17   already received and to get an unequivocal statement that the

18   specific things we've asked for have been produced, which we

19   have not been able to get.  So that's really the bigger issue.

20         If we could get a statement based on somebody with

21   knowledge, like if it's Mr. Boswell, fine.  What we need is a

22   statement that the things that we've identified have been

23   produced.  And if they have, then there's nothing more to argue

24   about.

25         The issue we've had is that we've had -- we've been

1  given that representation before and it's turned out not to be

2  true.  So some of the things we've identified are specific

3  files.  They were able to respond on a couple of them and say,

4  oh, it's named something else.  So on those, that should be

5  easy.

6          On the other, and particularly the categories that

7  you're focussed on, Your Honor, where it says all the code that

8  relates to a particular function, obviously our experts are

9  going to look at that code, they are looking at that code.  If

10 we get a representation from the plaintiffs based on somebody

11 who knows that the code related to those functions has been

12 produced, then I don't think there is anything left to argue

13 about.

14          THE COURT:  Okay.  All right.  Let me hear from the

15 plaintiffs on this.  First as to the Steele documents.

16          MR. CARACAPPA:  Yes, Your Honor.  I can represent

17 that after a reasonable search, to the best of my knowledge,

18 all of those Steele documents have been produced.

19          THE COURT:  Well, I want to understand what

20 reasonable is and based on your knowledge.  Is this somebody

21 saying, I think I've done it all?  Or is this somebody -- I

22 mean, I want a representation, not a somebody told me

23 something.

24          And, you know, we're not going to be playing games in

25 this case.  And, you know, either you're going to represent

1    that they've been all produced or you're going to represent --

2    or you're not going to represent it.

3            So you're the person who's here to respond to this

4    motion.  You're the one who's charged with doing what you need

5    to do on behalf of your clients.

6            So the question is, have all of the nonprivileged

7    documents that were discussed in the Steele deposition, have

8    they been produced?

9            MR. CARACAPPA:  All the documents that were discussed

10   in the Steele deposition that Cox asked for that are the

11   subject of this motion have been produced, yes.

12           THE COURT:  Okay.  Okay.  What about the source code?

13           MR. CARACAPPA:  With respect to the source code, I

14   think it's an unfair representation that we have not been

15   producing the code or we have produced it piecemeal.

16           We made it available for inspection months ago.  And

17   there have been times where Cox has said to us, we can't find

18   File X or File Y or File Z.  In some of those instances we

19   said, it's named something else, here it is.

20           In others of those -- in other instances we've said,

21   okay, we'll produce that module because we have not yet

22   produced it.

23           So when Cox came to us with this list, we need

24   confirmation that all these things have been produced, we said,

25   our client is on vacation, they get back on Friday, we will

1    confirm with them on Friday that all of this has been produced.

2    If it hasn't, we will produce it.

3           It has been our procedure that as soon as we find out

4    something is not produced, we produce it within two days, three

5    at the most.  And that's exactly what we plan to do here.  We

6    have a call scheduled with the client today to either confirm

7    to Cox that all this code has been produced.  Or if it hasn't,

8    to produce the module.

9           Cox wanted the representation last week.  Our client

10   was on vacation, so we spoke to our expert.  And our expert

11   said, it seems to all be here.  So that's the representation we

12   gave him, with the caveat that we have to speak to the client

13   on Friday to confirm.

14          THE COURT:  All right.  Well, I want you to speak to

15   the client today.  Make a representation.  And if the

16   representation is, we have to produce additional material, I

17   want it done by 5 o'clock on Tuesday.

18          MR. CARACAPPA:  Yes, Your Honor.

19          THE COURT:  Okay.  So, you know, talk to the client.

20   Get back to them.  If there is anything else that needs to be

21   produced, it needs to be produced by 5 o'clock on Tuesday.

22          MR. CARACAPPA:  Okay, Your Honor.  Thank you.

23          THE COURT:  Okay.

24          MR. CARACAPPA:  Yes.

25          THE COURT:  All right.  So that should take care of

1    that one.

2         Now, the motion to compel as to the plaintiffs.

3    Let's take it up with the documents relating to communications

4    and the relationships with Rightscorp.

5         What remains at issue in that part of this motion?

6         MR. BUCKLEY:  So to be clear, we're not asking them

7    to scorch the earth.  What we were told on the 18th when we

8    conferred was that there are documents in plaintiffs'

9    possession that relate in some way to Rightscorp.  They were

10   collected, they were reviewed, and then the plaintiffs went

11   through and cherry-picked what they were going to provide to

12   us.  And as we understand it, that cherry-picking was documents

13   that relate to Rightscorp generally, and I don't know what

14   means exactly, and documents that relate to Rightscorp with

15   respect to Cox.

16        What we said was, we're entitled to see what you have

17   that relates to Rightscorp.  And if that's documents, for

18   example, that relate to Rightscorp vis-à-vis some other ISP,

19   not Cox, that is certainly discoverable and I think potentially

20   highly relevant, the relationships between plaintiffs and

21   Rightscorp, and not just Cox, but other ISPs.

22        And so, all we've asked for is whatever is not

23   privileged, give us the Rightscorp information that you already

24   collected.  And so far they have declined to do that.

25        THE COURT:  Let's deal with that issue, and then I'll

1    deal with the financial information.

2              MR. CARACAPPA:  Thank you, Your Honor.

3              So Rightscorp has produced all -- sorry.  Copyright

4    holders have produced all documents generally related to

5    Rightscorp.  And what that means is, if copyright holders had a

6    correspondence or a conversation with Rightscorp about, for

7    example, how does your software work, how do you figure out how

8    people infringe on the network, all of that stuff has been

9    produced.

10             If copyright holders have corresponded with

11   Rightscorp regarding Cox, all of that has been produced.

12             Documents that have been withheld are documents --

13             THE COURT:  Why would you -- well, why would you

14   necessarily have documents relating to correspondence between

15   copyright holders and Rightscorp?  That's what you just said

16   you produced, right?

17             MR. CARACAPPA:  Yes.  Well, Rightscorp has

18   correspondence related to the copyright holders.  Right?

19             THE COURT:  Right, right.

20             MR. CARACAPPA:  So the copyright holders may ask

21   Rightscorp, what do you do, how do these -- how did these

22   things work?  All of that has been produced.

23             THE COURT:  And all of that is in the possession of

24   the plaintiffs?

25             MR. CARACAPPA:  It's either been produced as it

1  exists in the possession of the plaintiffs, or as it existed in

2  the possession of Rightscorp.  So it has been produced by one

3  of those entities.

4         THE COURT:  All right.  Well, I mean, the motion to

5  compel that I'm dealing with right now is a motion to compel

6  against the plaintiffs.

7         MR. CARACAPPA:  Yes.

8         THE COURT:  So I need to understand what the issue is

9  far as the documents that are in the possession, custody, or

10 control of the plaintiffs that would be responsive to the

11 document requests that have been served.

12        And, you know, honestly, the responses, the written

13 responses that you provide don't really give the impression

14 that you're withholding anything other than privileged

15 information.  And it sounds like you're parsing out more than

16 just privileged information in your responses to the documents

17 that you've provided, is that right?

18        MR. CARACAPPA:  Yes, Your Honor.  The documents that

19 we have related to non-Cox ISPs -- or non-Cox Internet service

20 providers, Verizon, for example, that stuff is not relevant.

21 And we objected on the grounds of relevance.

22        And during the meet and confer process it came out

23 that we were withholding it, and we weren't hiding it, but they

24 asked us, what are you withholding?  We said, these are the

25 things we're withholding as not being relevant.  Cox seems to

1    disagree.

2            We don't understand the relevance of that

3    information.  If they're asking us to produce the notice

4    letters, for example --

5            THE COURT:  Well, why would Cox have -- and this is

6    where I got confused.  Okay.  And talking about your clients,

7    and I guess -- I'm talking about the plaintiffs, not just your

8    clients, because I guess you're also representing Rightscorp.

9    But this document request goes to the plaintiffs.

10           MR. CARACAPPA:  Yes.

11           THE COURT:  Why would your plaintiffs necessarily

12   have information that is between Rightscorp and other entities

13   other than you?

14           MR. CARACAPPA:  They would -- they would have

15   information as between Rightscorp and other ISPs.  So my client

16   works with Rightscorp to address infringers not just on the Cox

17   network, but on other networks.

18           THE COURT:  Right.  But the infringers -- so anything

19   that Rightscorp gets, they send to you, typically?

20           MR. CARACAPPA:  Not -- I don't know the answer to

21   that question.  I don't think that's necessarily true, not

22   everything, no.

23           THE COURT:  Why isn't your clients' relationship with

24   other Internet service providers at least relevant to the

25   issues involved in this case?

1    MR. CARACAPPA:  We don't feel that Cox has been able

2  to explain how.  What's relevant to the issue in this case is

3  Cox and the infringement on its network.  We don't understand

4  how the infringement on other networks is relevant.

5    In addition, we're not quite sure exactly what Cox

6  wants us to produce.  They want us to produce the notice

7  letters we've sent to other people on non-Cox networks?  We're

8  not quite sure how that's relevant, and it would involve

9  producing millions of other notice letters.

10    So we're trying to understand how the additional

11  information they need they think is relevant.  And the only

12  thing they can say is, well, it's relevant to the agency

13  relationship.

14    And, one, we don't necessarily think it is relevant

15  to the agency relationship.  But even if it is, we're not sure

16  how the agency relationship is relevant to any of the issues in

17  the case.

18    THE COURT:  Well, certainly the agency relationship

19  -- your having them act on your behalf by sending these

20  notices, right?  I mean, so the agency relationship has to be

21  at least relevant or a part of this case.

22    MR. CARACAPPA:  And let me rephrase.  We think the

23  documents we've produced already establish that.

24    THE COURT:  Establish it, right.  I understand that

25  part.

1          MR. CARACAPPA:  Okay.

2          THE COURT:  All right.  All right, well, let me go

3    back and hear from the defendant as to the relevancy other -- I

4    mean, other than relationships with other ISPs --

5          MR. BUCKLEY:  Right, Your Honor.  So there -- I'm

6    sorry.

7          THE COURT:  And I'm, you know -- I think some broad

8    information as to maybe relevancy, or who they deal with other

9    ISPs, but every single notice letter that was sent to Verizon,

10   I mean --

11         MR. BUCKLEY:  We do not want that information, Your

12   Honor.  This is not relationships with other ISPs.  The issue

13   is relationships between plaintiffs, which Mr. Caracappa refers

14   to as copyright holders, which sometimes muddies things,

15   plaintiffs, and Rightscorp.

16         So we have gotten part of that universe of documents,

17   but there is another part of that universe, which is

18   relationships between plaintiffs and Rightscorp that are not

19   specific to Cox.  And the question is how could that

20   potentially be relevant.  Let me give you one example.

21         So we believe -- and this is me talking and this is

22   the way that we view the case, but we believe and the evidence

23   I think is going to show that plaintiffs and Rightscorp picked

24   Cox as their target for this lawsuit.  And it's possible that

25   they were careful about their communications, plaintiffs and

1   Rightscorp, so that they didn't prejudice their claims in this

2   lawsuit or there wasn't something discoverable in this lawsuit

3   that they didn't want out there.  They may not have been as

4   careful with respect to say Verizon.

5         So maybe there is an agreement between plaintiffs and

6   Rightscorp that relates to Verizon that says something very

7   different than what they're saying in this suit.  Maybe there

8   are communications between plaintiffs and Rightscorp about

9   Verizon that undermine what they're saying in this lawsuit.  We

10  don't know.

11        What we do know is there is a universe of a documents

12  that are not privileged that relate directly to the

13  relationship between plaintiffs and Rightscorp, which is at the

14  heart of this lawsuit as Your Honor just observed, and that we

15  have not been provided.

16        I think what -- and relevance isn't the standard.

17  Discoverability is the standard.  And I think absolutely that

18  information is discoverable.  Whether it ultimately ends up

19  being relevant or part of the case is not the issue.

20        THE COURT:  So -- all right.  Go back and help me

21  understand, whatever the relationship that the plaintiffs may

22  have with Rightscorp as to Verizon --

23        MR. BUCKLEY:  Right.

24        THE COURT:  How does that bear on the claims that the

25  plaintiffs are bringing against Cox in this case?

1          MR. BUCKLEY:  So plaintiffs' theory is that when they

2     send notices to Cox -- when Rightscorp sends notice to Cox that

3     include settlement language, we have an obligation to forward

4     those notices to our subscribers.  And if we don't do that,

5     we're guilty of contributory infringement.

6          And when we went back to Rightscorp and said, we're

7     happy to forward proper notices, just remove the settlement

8     language, they refused.

9          What if, for example, their relation -- Rightscorp

10    and plaintiffs' relationship with Verizon is very different?

11    What if they send a different kind of notice to Verizon?  Or

12    what if they sent settlement notices to Verizon and when

13    Verizon pushed back, Rightscorp said, okay, we'll change the

14    notice, we'll fix the language?

15         I think that would be probative.  I think Your Honor

16    might be interested in knowing that, so might the jury be

17    interested in knowing that.

18         THE COURT:  It's still what your obligations are,

19    right?  I mean, are you required to do it or aren't you

20    required to do it under the law?  And they don't have to treat

21    every single customer the exact -- or every single entity the

22    exact same way.

23         MR. BUCKLEY:  And that may be true as a legal matter,

24    Your Honor, but that doesn't mean that this information isn't

25    potentially probative and isn't discoverable.

```
 1              And it may also be that the agency relationship
 2    between plaintiffs and Rightscorp as it relates to Cox is
 3    unique in some way.  And I think we're entitled --
 4              THE COURT:  And so --
 5              MR. BUCKLEY:  -- to explore that.
 6              THE COURT:  But again, so what if it is unique?  I
 7    mean, how does that, when push comes to shove, how does that
 8    bear on anything that has to do with a claim or defense in this
 9    case?
10              MR. BUCKLEY:  So if --
11              THE COURT:  As long as there is a relationship, and
12    it's a valid relationship, and they have agency, and they are
13    doing things that are within the realm of the law, if they do
14    something differently against another entity, I'm not sure how
15    that has any bearing on a claim or defense in this case.
16              MR. BUCKLEY:  Your Honor, respectfully, if the
17    plaintiffs and Rightscorp picked Cox out as a target and their
18    -- and essentially set Cox up for this lawsuit.  Right?
19    They've been sending notices into a black box for three years
20    and waiting to suit.  If they are treating other ISPs
21    differently, if they are telling other ISPs you actually don't
22    have an obligation to forward a notice that looks like this, or
23    you're not liable for contributory infringement just because
24    somebody on your network might be infringing -- whether that is
25    ultimately determinative on the legal issue is not, in my view
```

1  -- that is not the issue here.  And it certainly, I believe,

2  certainly would be probative and certainly be interesting to a

3  jury if Cox was set up, essentially, for this lawsuit in a way

4  that other ISPs have not.

5       And plaintiffs are large organizations, lots of

6  copyrights, and for some reason they chose Cox and they handled

7  Cox in a particular way and the notices to Cox in a particular

8  way.  We're entitled to explore that.

9       And it may be ultimately that the relationship with

10  Verizon isn't relevant, and maybe none of that comes in at

11  trial, but we don't know.  Until we see what those documents

12  are, and they have been collected, they are sitting there, easy

13  to produce, until we see them, we won't know whether they are

14  relevant or not.

15       THE COURT:  Well, sitting there and easy to produce

16  are two different things.

17       MR. BUCKLEY:  Fair enough.  I don't mean to be glib

18  about that.  Production takes time.  But the point is, they've

19  been collected and then were cherry-picked.  Plaintiffs decided

20  unilaterally what was interesting to us, what was relevant to

21  us, what we were entitled to see.  And there is a set of

22  documents sitting there that they collected and decided weren't

23  relevant.  And I think that's a determination for Cox to make

24  or for Your Honor to make, but we haven't seen the documents.

25       THE COURT:  Okay.  What -- all right, let me go back

1  and hear from the plaintiff.

2          What documents haven't you produced that relate to

3  your relationship with Rightscorp?

4          MR. CARACAPPA:  Sure, Your Honor.  Let me just make

5  one point before I answer that question.

6          I think they don't have the standard quite correct.

7  They still have to prove relevance.  They can't just ask for

8  documents and look at them and say, well, I'll look at them and

9  then argue relevance later.

10          They don't have to necessarily prove admissibility,

11  but they certainly have to prove to the Court that the

12  information --

13          THE COURT:  Well, if you wrote Verizon and told

14  Verizon, this is not contributory copyright infringement,

15  that's an admission, right?  You don't need to send these

16  notices, we don't believe it's contributory copyright

17  infringement, but we really wish you would.

18          MR. CARACAPPA:  Well, to be clear, we told Cox in the

19  notice letters that they don't have an obligation to forward

20  these settlement offers on to their customers.

21          So, again, as Your Honor pointed out, we don't think

22  any correspondence with Verizon or Comcast relate to Cox's

23  liability for what Cox is doing in this case and pursuant to

24  the law.  What other people do or what we do with other people

25  is entirely irrelevant.

1          Now, to your --

2          THE COURT:  Not if you've made admissions to them

3    that are different than the claims you're making here.  I mean,

4    if you have indicated to them, we do not believe X and we will

5    not pursue a claim for X, and then you turn around and you do

6    that here, that would be relevant, wouldn't it?

7          MR. CARACAPPA:  Arguably, yes, that would be

8    relevant.  I am not aware of any documents like that in this

9    case.

10         THE COURT:  Well, no, I'm sure you're not, but --

11   well, tell me, tell me what we're talking about as far as --

12   and we're not talking about the notices that were sent or

13   things like that.

14         What do we have -- what do you have that relates to

15   the relationship between the plaintiff here and Rightscorp that

16   you've withheld -- I guess it has to do with Verizon and

17   Comcast?

18         MR. CARACAPPA:  Discussions about Verizon and

19   Comcast, for example, yes.  And the notice letters --

20         THE COURT:  Well, the notice --

21         MR. CARACAPPA:  -- that relate to other people.

22         THE COURT:  Right.

23         MR. CARACAPPA:  So outside that, discussions as they

24   relate to Verizon and Comcast, for example.  So non-Cox ISPs.

25   I don't know standing here today the universe of those

1    documents.

2              THE COURT:  Well, you know, I'm persuaded now I think

3    by the defendants' argument that they do have -- certainly not

4    the notice letters, and I don't think you want to produce them

5    or they want to get them.  But I do think, given the nature of

6    the case at this stage in the discovery, I can't say that it

7    wouldn't be discoverable information.

8              So I am going to require you provide the other

9    documents relating to the relationship between Rightscorp and

10   the plaintiffs that are not solely related to Cox to be

11   produced.

12             The other -- I guess so now let's get to the other

13   one that I thought was going to be the more difficult one.  I

14   thought that one was going to be fairly easy.

15             But this one, the financial information, I take it

16   that the defendants' argument there is that actual damages are

17   a factor that come into play in making a determination as to

18   where in the range of statutory damages the amount should be

19   set, is that basically it?

20             MR. BUCKLEY:  Yeah, that's exactly right, Your Honor.

21   That's exact right.

22             THE COURT:  And what is it that you have now and what

23   is it that you think that you would need in order to get --

24   and, you know, we're not talking about down to the last penny

25   kind of thing.

1            MR. BUCKLEY:  Right.

2            THE COURT:  We have to talk about the practical

3    aspects of, you know, what really -- what would your expert

4    need in order to come up with some information as opposed to

5    each and every invoice as to profit, loss, overheard, those

6    kinds of things.

7            MR. BUCKLEY:  No, we don't.  You're right, Your

8    Honor, we don't want or need that sort -- that granular level

9    of detail.

10            What we've been provided so far, however, is for BMG

11    top level revenue associated with particular copyrighted works

12    and not even the entire universe of works that are being

13    asserted in the case.

14            And for Round Hill, similarly a top line revenue

15    number for each work, not all the works, and for Round Hill not

16    even broken down by year.  So just work and dollar amount.

17            It was -- they are not business records.  They were

18    prepared for the purposes of this litigation.  It's not

19    information that is kept in the ordinary course.  So we

20    actually have no, no business record financial information at

21    all.

22            And I think it's probably obvious that a top line

23    revenue number tells you nothing about profit.  It doesn't --

24    and you can't break it down.  There are different ways they

25    earn income from each of these works.

1           So we've actually said specifically, and we've told

2    them in correspondence, and it's also in our motion, what our

3    experts need.  And it's at page 4 of our motion, Your Honor.

4    But we need information by distribution channel.

5           So income derived from, for example, income derived

6    from physical album sales, digital downloads, streaming

7    royalties, licensing royalties.  So we can break out how the

8    revenue for each work.  You know, what comprises revenue for

9    each work.  Revenues per channel --

10          THE COURT:  Why is that necessarily needed?  I mean,

11   I take it because you're going to try and focus on the

12   downloading revenue and see how that was impacted, or what?

13          MR. BUCKLEY:  Right.  And I am certainly not a

14   financial expert, Your Honor, and some of this is, obviously,

15   information that I'm passing on that our expert is saying he

16   needs to do an actual damages analysis.  So I want to make

17   clear that on some of these I'm not the person to answer the

18   specifics.

19          But in general our -- we should be able to do our own

20   analysis of had plaintiffs chosen to pursue an actual damages

21   theory, what would it have shown.  Because the actual damages

22   inform the statutory damages issue.  It's not the only issue

23   and it doesn't have to be a one-to-one ratio, but it's one of

24   the elements.

25          So to get to actual damages, you're talking about

1    lost profits potentially.  So what is the profit that is lost

2    for a copyrighted work when a subscriber out in the universe

3    downloads it as opposed to buying it in the store.  And this is

4    just one example.

5            But to get to that, you've got to understand how is

6    the revenue that is associated with that work, how does it

7    break down?  If part of it is physical album sales, that might

8    be relevant.  But if part of it is -- and part of it is

9    streaming, that might be relevant.

10           But if part of it is licensing royalties, for

11    example, that might be totally irrelevant to determining

12    whether there was profit lost.

13           Until you have that breakdown, there is no way to

14    tell.  All we've got right now is a dollar figure per work.

15           THE COURT:  But if you get that information --

16           MR. BUCKLEY:  Yes.

17           THE COURT:  How do you -- how does that translate

18    to -- somebody downloaded some material inappropriately.  How

19    is anybody then going to know whether if that hadn't been done,

20    would that person have downloaded it?  Would they have gone to

21    the record store and bought a CD?  Would they have not done

22    anything?

23           I mean, that's the part I don't understand how

24    breaking all this channel information necessarily translates

25    into something that you necessarily need in order to figure out

1   your lost profit analysis.

2            MR. BUCKLEY:  So two responses to that, Your Honor.

3   One is, I think the first point you made is more of a causation

4   issue.  Even if you could figure out what component of a

5   particular work, what value of that is related to downloads,

6   how do you then connect the dots and say because Brian Buckley

7   illegally downloaded this, I lost this dollar amount.  That's a

8   causation issue.

9            In terms of specifically how do each of these things

10  relate to a calculation of actual damages, honestly, my expert

11  is going to tell me that.  I can't do it.  But our expert is

12  saying, I can't get to an actual damages number, whether it

13  ends up being relevant or not, unless I have more information.

14           THE COURT:  Okay.

15           MR. BUCKLEY:  And, Your Honor, I don't think the case

16  law is --

17           THE COURT:  What's the time period that you're

18  looking for for that information?

19           MR. BUCKLEY:  Three years prior to the lawsuit being

20  filed.  So it was November of 2014.  So we would go back three

21  years from that date.

22           THE COURT:  All right.  Let me hear from the

23  plaintiffs.

24           I know that's why you chose statutory damages,

25  because you didn't want to have to go through and do all the

1    stuff trying to calculate actual damages, but --

2         MR. CARACAPPA:  And because, as Your Honor noted,

3    based on the financials alone, no one is sure how they are

4    going to do it.  Because once you illegally download or upload

5    or make available for download or upload a piece of music, it

6    affects every area of distribution.  Because you don't just

7    have the people that are uploading and downloading it, but it

8    expands, and they make it available.  And you could lose not

9    only Internet sales, but you could lose streaming and record

10   sales.

11        So there isn't any way for anybody to take these

12   financials and come up with an actual damages number.

13        I do have, to the extent the Court is interested,

14   what we have produced to Cox.  Does the Court want to take a

15   look at those?

16        THE COURT:  Well, just explain it to me so that I

17   know what it is.

18        MR. CARACAPPA:  Okay.  So what did is we have the

19   song, we have the year, and we have the income generated from

20   that song.  It's my understanding it's for every copyrighted

21   issue.  If it's not, then we can go back and provide that

22   information for every copyright at issue.

23        THE COURT:  For both BMG and Round Hill?  I mean,

24   he's indicated that for Round Hill it's not broken down by

25   year.

1          MR. CARACAPPA:  That's correct, for Round Hill it is

2    not broke down by year, and we can go back and do that.

3          THE COURT:  But it's only revenue, not -- it only

4    shows the revenue per work?

5          MR. CARACAPPA:  That's correct.  It's not broken down

6    by channel, for example.

7          THE COURT:  Well, why is revenue -- I mean, obviously

8    profit is going to be less than revenue.

9          MR. CARACAPPA:  Yes.

10          THE COURT:  Why aren't they entitled to get some

11    sense as to what has been the profit for each copyrighted work

12    as opposed to merely just the revenue?

13          MR. CARACAPPA:  It's my understanding that the client

14    doesn't do that by song.  The client doesn't -- the client is a

15    business, it has profits and it has losses.  The revenue

16    generated by the songs go to its bottom line.  But by song, it

17    doesn't know how much profit or loss it has.  Obviously, the

18    songs that generate more income are more profitable for them.

19          And our issue was that the way the request is drafted

20    and what they're asking for in the motion is far broader than

21    anything that they're going to need to actually prepare an

22    actual damages analysis.

23          The revenue per channel, the units underlying the

24    revenue per channel, the metrics used, again all of that

25    information we don't think they need to perform an actual

1   damages analysis.  We think that what we provided is more than

2   enough.  And they haven't been able to explain how this

3   additional information, that level of granularity, is going to

4   inform their expert or a jury.

5              With respect to the information they ask for on

6   page 4, it's the financial data related to the overall

7   business, annual revenues, costs, expenses, incremental

8   profits, that's not even asked for in any of their document

9   requests or interrogatories.

10             THE COURT:  Let me -- 106, 107, and 108, are they in

11  the second --

12             MR. CARACAPPA:  They are Exhibit A to Cox's --

13             THE COURT:  All right, I've got it.

14             MR. CARACAPPA:  I'm sorry, they are Exhibit A to our

15  opposition.

16             THE COURT:  Well, 106, all documents evidencing your

17  loss of revenues and profits as a result of the infringements.

18             That would indicate one would have to produce

19  documents relating to revenue and profits, right?

20             MR. CARACAPPA:  The problem is:  As the result of the

21  infringements.  And that's the issue that we have with the

22  request and that's the issue that we've been talking about.

23  Which is, you can't prove a but for, but for this one download

24  we would have lost income related to the album sales, or

25  digital downloads, or streaming, or licensing.

1          MR. BUCKLEY:  Your Honor, can I make one point?

2          THE COURT:  Okay.  Thank you.

3          MR. BUCKLEY:  That may all be true, and that's our

4    problem and our expert's problem.  Plaintiffs don't have to

5    calculate any of this.  When our expert does his analysis, if

6    plaintiffs think there are issues with it, or that it's flawed,

7    or that if it's not relevant, they are obviously free to argue

8    that.

9          And it is not their burden to prove actual damages.

10   They are proceeding on a statutory damages theory and are

11   entitled to do that.

12         We, however -- and I really don't think the law is

13   ambiguous on this.  There are two Eastern District cases right

14   on point.  We have a right to prove actual damages and to

15   introduce that as part of the statutory damages analysis.

16   There is zero question that we can't do it with what we've been

17   provided.  I mean, Mr. Caracappa doesn't even dispute that.  We

18   can't do it with revenue figures.

19         So we have to have some additional detail.  And the

20   question is just what additional detail.  And we've identified

21   pretty specifically what our expert needs.  It should not be --

22   and again, I don't want to, I don't want to be glib about the

23   burden here, but this is a very significant case with

24   significant damages involved, going and collecting this

25   information and providing it in the scope of all of the

1    discovery that's occurred in this case should not be relatively

2    that burdensome.

3          THE COURT:  I mean, I read in -- I can't remember

4    which one of the two cases that I read that you've cited, I

5    think it was the Dae Han Video Production one that I pulled up

6    and read, the older one, it talks -- and my recollection of

7    that case, and it was yesterday evening, was not that you prove

8    what actual damages are, but it has to be some overall general

9    relationship or some ballpark figure dealing with actual

10   damages.  Not that you are going to be coming in and proving

11   what actual damages are, or that you're entitled to do that, or

12   that that's necessary.

13         Am I -- did I --

14         MR. BUCKLEY:  Well, what the cases say, Your Honor,

15   is that when you're considering statutory damages, you

16   actually -- one of the two Eastern District cases actually says

17   you start with actual damages.

18         So I don't think there is any dispute about that.  So

19   then the question is just, how do you calculate actual damages?

20   And again, that's not plaintiffs' problem or Your Honor's

21   problem, we have to figure that out.  Cox has to figure it out.

22   And we have hired an expert to do that.

23         But in order to compare actual damages to statutory

24   damages, somebody has to calculate actual damages, and we're

25   going to take on the burden of doing that, but we need the data

1    to do it.

2            THE COURT:  By copyright you plan to do that?

3            MR. BUCKLEY:  We will try.  And they have a financial

4    expert who will look at what our expert does and I'm sure try

5    to poke holes in it.  And they will claim that his methodology

6    is flawed, and we will have an argument about that, but we're

7    entitled under the law to give it a try.  And the case law says

8    that when it comes time to actually consider damages, the Court

9    needs to take actual damages into account.  So somebody has to

10   try.

11           THE COURT:  What information does the plaintiff

12   actually have that relates to the damages calculation?  On a

13   per channel basis and then about -- you know, I assume you

14   don't keep documents as to each revenue minus operating income

15   and things like that for each copyrighted work?

16           MR. CARACAPPA:  That's right, we don't.

17           THE COURT:  How is it that the records are kept or

18   the books kept for each of the two plaintiffs here?

19           MR. CARACAPPA:  Let me rephrase the question

20   slightly.

21           THE COURT:  Okay.

22           MR. CARACAPPA:  I'm not exactly sure how the records

23   --

24           THE COURT:  It was probably poorly phrased, and I

25   understand.  No, I --

1          MR. CARACAPPA:  I'm not exactly sure how the records

2    are kept, but what they can do is they can break the copyrights

3    down by channel.  So they can do physical album sales, digital

4    downloads, streaming royalties, and licensing royalties.  And

5    they can do that, it's my understanding, per copyright by year

6    for both BMG and Round Hill.

7          THE COURT:  Okay.  So that's revenue?

8          MR. CARACAPPA:  That is revenue --

9          THE COURT:  Revenue for each copyright?

10         MR. CARACAPPA:  Yes.

11         THE COURT:  Okay.  Are there -- and I take it the

12   portfolio for the overall revenue for each of these entities

13   comes from many more copyrights than just those that are

14   involved in this lawsuit?

15         MR. CARACAPPA:  Yes, Your Honor.

16         THE COURT:  But if you knew the percentage of what

17   this revenue is and the overall revenue, and you wanted to

18   ballpark something, you could just assign -- if it's 20 percent

19   here, 20 percent of the operating expenses, to come up with

20   what ballpark would be, the actual profits per -- all right.

21         Do they keep -- I take it they would have to keep

22   operating -- do an overall business level sheet of revenues,

23   operating expenses, and profit, is that right?

24         MR. CARACAPPA:  Yes, Your Honor, they do have that

25   information generally with respect to the company --

1          THE COURT:  Company, all right.

2          MR. CARACAPPA:  -- not with respect to individual

3    copyrights.

4          THE COURT:  All right.  What I'm going to do -- you

5    know, I tell you, if I have them produce all this information

6    and you decide I'm going to just ignore it, I'm going to award

7    costs for them to do this.

8          I mean, you're asking for it.  I'm not going to have

9    them go off and do this fishing expedition to get you a bunch

10   of information and then you just sit back and laugh about it.

11         I mean, you've represented to the Court that you've

12   got an expert and that your expert is going to put in the time

13   and effort and money to coming up with an actual damages

14   calculation.  And I'm not going to have them go off and do this

15   just because you think it might be relevant, and then you get

16   it and you decide, I don't want to use it.  Okay.  If you do

17   that, you're going to pay for it.

18         MR. BUCKLEY:  I understand, Your Honor.  And I commit

19   to you that that is absolutely not what this is about.  We are

20   going to use the information.  This is not a fishing

21   expedition.  And we are certainly not going to just sit back

22   and laugh that we imposed a burden on the plaintiffs.  That's

23   not what this is about.

24         THE COURT:  All right.  Well, I'm going to have them

25   produce the information on a per channel basis and overall

1   company profit/loss information, operating expenses.

2            So that hopefully once you get your portion of the

3   revenue from these copyrighted works during the time period,

4   you can look at the portion of the revenue from the entire

5   company and, you know, do -- your expert can come up with some

6   type of analysis as to, you know, what share of the operating

7   expenses and things and hopefully come up with some sort of a

8   ballpark as to what the profit would have been for that based

9   on the revenues per channel and overall revenue and profit from

10  the company.

11           All right.  So that will take care of that motion to

12  compel.

13           The motion to seal, let's deal with that one next.  I

14  don't really understand why any of the information that you're

15  asking to be filed under seal should be under seal.

16           You know, I went back and just -- if this case ends

17  up having a lot of material that you are going to try and file

18  under seal other than identifying information of subscribers,

19  at some point we're going to have to deal with that issue, but

20  the idea that ISP numbers are changed and information kept for

21  a certain period of time, what is commercially sensitive,

22  confidential, or whatever about that information that it

23  shouldn't be in the public record?  Or that, you know, certain

24  records aren't kept after a certain period of time?

25           I went through -- and let me just -- I am going back

1   to my -- the only way that the Court can really make a

2   determination on a motion to seal is to know what's being

3   sealed or what's being requested to be sealed and what is being

4   filed in the public record.  So the only way -- I mean, and

5   what I'm asking is that when you file something under seal or

6   do that, I need to get also a paper copy of the redacted

7   version, not just a paper copy of what's filed under seal, so

8   that I can easily go back and, you know, just flip through and

9   compare the two.

10          I did it on online, I pulled the pleading up and saw

11  that of the materials that you all had, there are two pages in

12  which I understand that you've made redactions, pages 6 and 7.

13  And then I think, if I looked at it correctly, that you were

14  trying to seal Exhibits E, F, and G.

15          So let's just look at the plaintiffs' response to

16  defendants' motion for instructions, page 6, the first

17  paragraph that appears I believe is one that was redacted from

18  the public version.  And I think part of this is because the

19  deposition transcript may have been designated confidential.

20          And I guess this is really Cox's responsibility to

21  explain to me why that information shouldn't be in the public

22  record, the information that's in the first full paragraph on

23  page 6.

24          MR. CARACAPPA:  Why we designated it, Your Honor was

25  exactly correct, it's because the deposition --

1          THE COURT:  Deposition --

2          MR. CARACAPPA:  Transcripts were designated

3    confidential.  We felt it was Cox's confidential information

4    that we were doing our best to protect when we filed the

5    motion.

6          MR. BUCKLEY:  And we appreciate that.  We appreciate

7    them trying to be sensitive about that.  This particular

8    paragraph does not need to be redacted.

9          THE COURT:  Okay.  All right.  Turning to page 7.

10   The last sentence in the carry-over paragraph I believe was

11   redacted in the public version -- in the public version.  And

12   again, I assume that was based on -- that's part of the --

13         MR. BUCKLEY:  Your Honor, the last sentence of the

14   last full paragraph on the page?

15         THE COURT:  Yes.  Starts off with:  Not.

16         MR. BUCKLEY:  That does not need to be redacted.

17         THE COURT:  All right.  And then the next paragraph

18   where it says -- I believe the redaction starts on the second

19   line:  And.  Then it's redacted for five words.  So the

20   redaction goes from:  And.  And then the public version starts

21   back at:  For the 2.5 million Cox customers.

22         MR. BUCKLEY:  Your Honor, that also does not need to

23   be redacted.  I feel compelled to add, we don't agree with

24   these statements, but they don't --

25         THE COURT:  No, I understand that.  I'm not asking

1   that -- you know, part of this is to make sure that the record

2   is as it should be in the public domain.

3          Exhibit D -- I'm sorry, Exhibit E.  Yeah, Exhibit E,

4   which is the -- a portion of the deposition transcript of Mr.

5   Beck and a portion of the deposition transcript of Mr. Sikes.

6   And I'm only dealing with the single page as to both, and not

7   indicating that any of the other matters may not have

8   confidential information that should be under seal if it ever

9   does get filed.

10          But I am just curious as to whether there is anything

11   in --

12          MR. BUCKLEY:  Your Honor, I don't believe that the

13   transcript excerpts in Exhibit E need to be sealed.

14          THE COURT:  Then Exhibit F.

15          MR. CARACAPPA:  Your Honor, I think that's our notice

16   letter.  We don't need that to be sealed.

17          THE COURT:  Okay.  Then Exhibit G, this appears to be

18   e-mails back and forth between Cox and DigitalRights.  I mean,

19   is that --

20          MR. CARACAPPA:  I don't think either party requests

21   that the Court seal that.

22          THE COURT:  I'm pretty sure it was filed under seal

23   though.

24          MR. CARACAPPA:  It was, and it was mainly -- it was

25   mainly because --

1          THE COURT:  It's marked confidential.

2          MR. CARACAPPA:  It was marked confidential, exactly.

3          THE COURT:  All right.  Well, I'm going to go

4   ahead -- and I appreciate people marking things confidential

5   and being sensitive to that, but I think under the

6   circumstances none of the information that was filed in this

7   response necessarily meets the standard of filing under seal.

8          So I'm going to ask you to refile the document in the

9   public record.

10          MR. CARACAPPA:  Yes, Your Honor.

11          THE COURT:  So take out the --

12          MR. CARACAPPA:  And we apologize for not providing

13   the Court with a comparison that we --

14          THE COURT:  No, believe me, you're not the only one

15   who doesn't do it.  It just makes my life a lot easier when

16   it's done.  And hopefully we're not going to be having a lot of

17   sealed information.  But I'm just telling you that if we do end

18   up doing that, it is much easier to have everything that gets

19   filed, the public version and the sealed version, a copy of it

20   to look at.

21          MR. CARACAPPA:  Understood, thank you.

22          THE COURT:  All right.  So now, you know, I made a

23   problem, and I admit it, it was part of my fault, is what we

24   did when we were here before.  And part of it, honestly, I had

25   no sense as to how many of these IP addresses may have been

1    changed or how frequently they got changed.

2           I mean, my limited experience in this has been that

3    those are pretty consistent for people who have service, that

4    they keep the IP addresses.  And apparently there has been a

5    lot of transition going on, either customers coming in, going

6    out, or the IP addresses get changed a lot.

7           The thing that concerned me the most in the, you

8    know, back and forth on this was what efforts can we take to

9    identify who the subscriber was during the stated time period

10   in which the alleged infringement took place?

11          I mean, I know -- is that something that Cox is able

12   to do or not able to do?  I mean, there was, you know, some

13   back and forth about, you know, now we're all worried because

14   there have been 100 and some that can't be identified.

15          And what are you able to do and what have you done in

16   that regard so far?

17          MR. BUCKLEY:  So Cox spent a lot of time actually

18   trying to make that determination and was able, was able to

19   connect the IP addresses to a historical subscriber during the

20   relevant historical period for 139 of the 250 IP addresses.

21          And the way they were able to do that was by going

22   back to this CAT system, which is the system that they used to

23   take in potential abuse complaints and forward them on to

24   subscribers.  And they were able to go back through their

25   records and match IP addresses with subscribers.

1              They were not able to do that for 111 of the 250 just

2    based on there not being records there that make that

3    connection.  And we really have run down every option that we

4    can think of to try to do that, and we're not able to do it for

5    the 111.

6              THE COURT:  Well, the information that you provided

7    for the IP addresses, the 250, that was information as to who

8    had the IP address at what point in time?

9              MR. BUCKLEY:  So there are two -- there are two

10   categories.  We were able to identify all of the current

11   subscribers, current as of the date of your order.

12             THE COURT:  Right.

13             MR. BUCKLEY:  With the exception of one IP address

14   that wasn't assigned.  But for the other 249 we knew who the

15   subscriber was at that point in time and we sent them notices.

16             Then for the same 250, we went back to the periods

17   that are listed in Exhibit 4 and did our best to identify who

18   those historical subscribers were.

19             THE COURT:  And those were the 139?

20             MR. BUCKLEY:  And that's the 139, right.  So we've

21   produced PII for 338 people.  So more than the 250 sampling

22   that we were originally looking at.  338 folks have now had

23   their PII disclosed.

24             THE COURT:  Of the 250 that you identified that had

25   those IP addresses at the time the order was entered --

1         MR. BUCKLEY:  Right.

2         THE COURT:  -- or thereabouts, is there any way to

3    establish when that IP address was assigned to that particular

4    person or to that subscriber?

5         MR. BUCKLEY:  I believe the answer to that is yes.

6    For the current subscribers, we would be able to determine when

7    that subscriber obtained that particular IP address.

8         THE COURT:  So, I mean --

9         MR. BUCKLEY:  We could provide that information.  It

10   may not be very useful, again, because of the way these things

11   are assigned and how dynamic they really are.

12        THE COURT:  Well, I mean, it may be useful and -- you

13   know, I'm not trying to run anybody's case for them, but if

14   Sally's name shows up as one of the 250, and she got that IP

15   address from Cox's records a month ago, and the infringement

16   that is showing up as being a problem was five months ago, they

17   may not necessarily decide to spend the time and effort to go

18   talk to Sally.

19         I mean, they want to try and get, I assume, to the

20   extent that they feel like it's necessary to go one more level

21   down, to talk to the subscriber who actually had that IP

22   address at the time of the alleged downloads, right?

23         So just -- and I'm not -- I know you're not the

24   technical person behind all this, how dynamic are these IP

25   addresses?  I mean, what is the general rule or how is it

1   generally followed?  Does it vary from region to region?  Is it

2   something that Cox normally does that, you know, they assign

3   new IP addresses every three weeks, six weeks, a month,

4   whatever?

5          Is there a standard that gets applied here?

6          MR. BUCKLEY:  I can speak to it generally.  And there

7   are some standards, and it does vary a bit by region at a top

8   level as to how IP addresses get assigned, but the dynamic

9   piece of it and the fact that they turn over frequently, it

10  relates to this.

11         So the lease for an IP address lasts for 24 hours.

12  It is continually updated.  Which means the person maintains

13  their IP address unless something intervenes to cut off that

14  lease.  But there are a number of different things that can

15  cause that, including if somebody shuts their router off and

16  turns it back on, something is wrong -- and, you know, you've

17  probably done this.  Something is wrong with the router, so you

18  turn it off.  When you turn it back on, you're going to get a

19  new IP address.  If there is a power outage, you're going to

20  get a new IP address.

21         So it is absolutely true that some people keep their

22  routers on and their computers on and they maintain their IP

23  address for months at a time.  It is more common, however, that

24  those IP addresses do turn over and they don't typically last

25  months at a time.

1        So here, for example, of the 139 historical folks we

2    were able to identify and the 250 current folks, there are only

3    29 people who had their IP address at the historical period and

4    still have it today.

5        So if that helps you.  In that six-month period,

6    there was 80 percent turnover.  I'm probably wrong on that

7    percentage, I'm trying to do it off the top, but something in

8    that range.

9        THE COURT:  Okay.  All right.  Well, the issue, you

10   know, and it isn't part of what this motion is, but what

11   records are kept and how they were kept for the IP addresses is

12   something that at some point probably is going to end up having

13   to get addressed.  Because, you know -- but as of now, you've

14   been able to identify 139 of the 250 by the time period in

15   which the alleged downloads took place, is that right?

16       MR. BUCKLEY:  That's right, attached to the time

17   periods identified in Plaintiff's Exhibit 4.

18       THE COURT:  4?

19       MR. BUCKLEY:  Right.

20       THE COURT:  All right.  There were a number of people

21   who communicated with Cox who haven't filed something with the

22   court.

23       MR. BUCKLEY:  Correct.

24       THE COURT:  I think -- and I'll hear from you, but my

25   sense is merely communicating to you and not doing something

1   with the court isn't sufficient for you to withhold any

2   information.

3          Having filed something with the court, whether it's

4   in a timely manner or not, I think I have to deal with that

5   issue.  And that my sense is that of those -- and there have

6   been several batches of ones that have come in.  And the person

7   who provided no identifying information, you know, I can't say

8   that you can't produce any information because this one could

9   be one of many.

10          MR. BUCKLEY:  Understood.

11          THE COURT:  So I think he or she has waived their

12   right to be able to have any information protected because they

13   didn't provide me with enough information to deal with the

14   situation.

15          So, overall, I think the idea -- and I can't remember

16   the exact breakdown, but there were a number of people who have

17   communicated to you who did not submit something to the Court.

18          MR. BUCKLEY:  That's right, Your Honor.  It's roughly

19   35.

20          THE COURT:  Okay.  I think you need to go ahead and

21   provide that information, and I'll order that you do that.

22   I'll put in an order saying that of those that did that, the

23   Court is hereby ordering you to provide that information.

24   Okay?

25          The ones that have submitted something to me, let's

1    talk about a process for me to make a determination on those.

2    And I want to hear from each side.

3            I mean, some of these people -- you know, I don't

4    know whether they -- an unusual group of people who have

5    submitted correspondence.  And it's always entertaining to see

6    the arguments some people make or the things that some people

7    say.

8            I mean, what I ended up doing, as you can probably

9    tell by the filing, was going through and doing my best to

10   redact anything that was of a personal identifying information

11   as to each of those, but still keeping the IP addresses to the

12   extent that we were able to correlate those without the names

13   and addresses and other information.

14           I mean, I suspect I will need to do some type of an

15   order that addresses those.  And I just want to hear what Cox's

16   position is on that and what the plaintiffs' position is on

17   whether that information should be disclosed or not or any

18   further information as to those.

19           Do you have that number?

20           MR. BUCKLEY:  There were 49 individuals who contacted

21   Cox.

22           THE COURT:  Cox.

23           MR. BUCKLEY:  And for whom we withheld PII on that

24   basis.  I believe that there are 14 individuals who have filed

25   something with the court.

1          THE COURT:  Okay.  All right.  Of which --

2          MR. BUCKLEY:  So for the remaining --

3          THE COURT:  -- 13 we can have some sort of

4   identifying information.  I think we've got the IP addresses

5   for probably 13 of those 14.

6          MR. BUCKLEY:  I believe that's correct.

7          THE COURT:  Okay.

8          MR. BUCKLEY:  And I understood Your Honor to say that

9   you are going to enter an order for the remaining 35, that we

10  need to produce that PII?

11         THE COURT:  Right.

12         MR. BUCKLEY:  Which we'll do.  So then the question,

13  I believe, is what do we do with respect to the 13 individuals

14  who have filed something and identified their IP address.  And

15  I am happy to speak to that from Cox's position if you would

16  like.

17         THE COURT:  Okay, thank you.  I will hear from you

18  first.

19         MR. BUCKLEY:  So I'm not going to reargue the motion

20  to compel, obviously.  It's Cox's position that we shouldn't

21  have been required to provide any subscriber PII.  I understand

22  that that ship has sailed.

23         But, Your Honor, the original order was, and the

24  representation from the plaintiffs was, we don't need this

25  information to prove direct infringement.  And I think at least

1    in part based on that Your Honor said, okay, so this is

2    intended to be a sampling so we can see how our IP addresses,

3    how do they turn over, who are these folks.

4          So they have now got a sampling, 338 individuals,

5    which is more than the 250 you originally identified.  And you

6    have got 14 people who took the time to send something to the

7    court and expressed what are to them at least legitimate

8    concerns about their individual or personal information being

9    disclosed.

10          I would submit that the proper approach here is to

11   not produce those folks' PII.  They have the sampling they

12   need, a broader sampling than Your Honor originally thought was

13   appropriate.  I would say for those 14, we should be ordered to

14   keep their PII protected.

15          THE COURT:  Okay.

16          MR. CARACAPPA:  So maybe I can go a little out of

17   order when compared to what I was going to do and address the

18   14 people first.

19          THE COURT:  Okay.

20          MR. CARACAPPA:  Because I think we may be able to

21   resolve this issue.  It appears that of the 14, four do not

22   have IP addresses.  Which leaves 10.  And of those 10, two of

23   them, Doe number 9 and number 17 from Exhibit 14 -- I can

24   provide the Court with more information if that is helpful on

25   that subscriber.  But two of those 10 are both current and

1   historical.  So they would be relevant to the Court's order.

2            The other eight are not what was called for by the

3   Court's order and are current subscribers who may or may not

4   have that IP address and who -- well, who apparently do have

5   that IP address, but may or may not be downloading the

6   copyrights at issue.

7            THE COURT:  Who may not have had the IP address at

8   the date identified in the exhibit?

9            MR. CARACAPPA:  Exactly.

10           THE COURT:  Okay.

11           MR. CARACAPPA:  So what I would like to do is take a

12   step back.

13           THE COURT:  Okay --

14           MR. CARACAPPA:  We don't think this problem was

15   created by the Court.  We think it was created by Cox.  We

16   think the order was crystal clear.  And the order stated that

17   Cox had to produce the personal information for the 250

18   subscribers identified in the exhibit.  And if the subscriber

19   filed something with the court by June 5, Cox could withhold

20   that information.  If they didn't, Cox had to produce it.

21           Well, in the letter that Cox sent its subscribers,

22   and that's Exhibit A to Cox's motion, it's a standard 512(h)

23   letter.  It's not a letter that was catered to the Court's

24   order.  And there are three reasons why we think that.  First,

25   it says in the first paragraph:  Please be advised that on

49

1   May 15 a civil subpoena to produce documents was received.  And

2   that's not true.

3          And then if you go to the third paragraph, it says:

4   In order to identify the defendants.  We explained to Cox and

5   to this Court that we don't need this information to identify

6   the defendants.  We need it to identify the direct infringers

7   on Cox's networks, but they're not defendants and they're not

8   going to be defendants.

9          And then Cox goes on to say:  Unless we receive

10  notification from you of your intent to file objections.  So

11  Cox is telling the subscriber, all you have to do is tell us

12  you intend to file the objection and we won't produce the

13  information.

14         So we think this is the letter that created all the

15  confusion and why the Court has received so many John Does, and

16  that there is a discrepancy between the number of documents the

17  Court has received and the number of calls that Cox has

18  received.

19         THE COURT:  So what about Exhibit B, which is

20  different than Exhibit A?

21         MR. CARACAPPA:  Hang on one second, Your Honor.

22         THE COURT:  Sure.  I mean, Exhibit A --

23         MR. CARACAPPA:  Yes, Your Honor.  It looks like one

24  was sent to the current holders of the IP addresses, and one

25  was sent to the historical holders of the IP addresses.  And

1   both letters suffer from the same problems.

2          And what they've done by sending this letter is

3   they've tainted the well.  Now none of these people want to

4   talk to us because they think that we're going to bring them

5   into the lawsuit.

6          So we didn't just want this information for

7   statistical purposes, to prove the changing of the IP

8   addresses.  But we wanted the opportunity to talk to these

9   people and ask them, for example, why do you use Cox Internet?

10  Are you drawn to the Cox Internet service because you can

11  illegally download music?

12         Now none of these people want to talk to us because

13  it says that they're going to be defendants in the lawsuit.  So

14  that's a problem we think Cox created.

15         Fast forward to the day that they were supposed to

16  provide the 250 -- the information related to the 250 IP

17  addresses.  They didn't.  They provided information with

18  respect to 122, less than half.

19         This other 250, while we appreciate it, we didn't ask

20  for it, it's not part of the Court's order.  We submit the only

21  reason they did it was to artificially inflate the numbers so

22  they could come to the Court and argue, well, we produced

23  actually more than what the Court wanted.  But we didn't give

24  them evidence that said the current subscribers of those

25  addresses is infringed.

1          So while the Court is correct, it has some relevance,

2    they're going to be used for different purposes.

3          So we now have less than half of this information.

4    We asked them on June 8 to explain why the information was

5    unavailable and to explain why they were withholding subscriber

6    information only if the subscriber contacted Cox.  They didn't

7    respond.

8          We contacted them again on June 10, they didn't

9    respond.  It was not until the 11th on a meet and confer where

10   we explained, you know, we have to have answers to this

11   information, otherwise we're going to file something with the

12   Court.  During that conversation they said, we're going to move

13   for clarity.

14         So we figured, well, we could file two ships passing

15   in the night, or we can wait and oppose, and that's what we did

16   in our motion.

17         What we didn't know until yesterday was that they're

18   destroying this information.  Now, we think that could create a

19   big problem.  Cox brings up the fact that we said this

20   information isn't necessary to prove direct infringement.  And

21   that's correct.  We think what's relevant is the fact that

22   there is infringement occurring on the Cox network regardless

23   of who it is.

24         But what we argued during the hearing and what they

25   have shown that they are going to do in their expert report is

1    their expert is going to say, well, all of these people, these

2    150,000 people, they may be subscribers, but they may not be

3    doing the downloading.  They may have, for example, what's

4    called open WiFi.  And it may be the 97-year-old grandmother

5    has open WiFi and all the teenagers in the neighborhood are

6    congregating on her porch and illegally downloading

7    information.

8         And they're pointing to the empty chair and they're

9    saying, oh, they haven't proven that that's not open WiFi.  And

10   at the same time they're destroying the information related to

11   the 95-year-old grandma.

12        So we think they should have been preserving this

13   information since they were on notice of this issue, which was

14   back in 2012.  At a minimum, they were on notice that they

15   should have been preserving this information the day the

16   complaint was filed.  And it's not clear from their reply

17   whether or not they have preserved that information or whether

18   or not they are continuing to destroy it.

19        My last point is we think that this is a pattern.

20   They've done this with the Rightscorp notices.  We send them to

21   them, they delete them.  And they say, well, now we don't have

22   notice.  And now they're doing the same thing with respect to

23   the addresses on the Cox network.

24        So while we ask for certain relief in the brief, we

25   just found out for sure, I guess, as set forth in their motion

1   that they are in fact destroying or have destroyed this

2   information, and we do think additional briefing is warranted

3   in this case.

4            THE COURT:  Well, I'm going to deal with the issue of

5   the pending things.  And if you want to, you know, further

6   brief that issue, I think it does need further briefing before

7   I certainly make a decision on it and know what the situation

8   is.

9            MR. CARACAPPA:  Okay, Your Honor.  Thank you.

10           THE COURT:  What have you done with the 139

11  subscribers that you now know who they were at the time period

12  in which the alleged downloads occurred?

13           MR. CARACAPPA:  So I will answer that question if the

14  Court requires, but right now we submit it's work product.  We

15  are in the process of contacting them.

16           I will say that --

17           THE COURT:  All right.  The issue, as you know -- I

18  don't want to have everybody in here arguing motions and I

19  spend a lot of time doing it to get 10, 15 more names if it's

20  not something that you think is really important to your case.

21           And, you know, you got 139.  You will get a few more

22  maybe as a result of my ruling today.  And I don't know whether

23  -- how that relates to historical versus, you know, the time

24  that the information was provided.  But, you know, what -- so

25  you are making use of the ones that you currently have, I take

1   it?

2          MR. CARACAPPA:  Yes.

3          THE COURT:  And you do want more if available?

4          MR. CARACAPPA:  Yes to the first part of the

5   question.  Maybe what we can do, if it please the Court, is

6   I'll go back and I'll consult with my colleagues.  And if we

7   need more, we can request that additional difference between

8   the 137 and the 250 that the Court ordered.

9          But, yes, we are using the information that has

10  already been produced to us.

11         THE COURT:  Okay.  All right.  Okay.  Well, this will

12  probably get done in phases just because I think I'll probably

13  enter an order today, hopefully, that deals with the other two

14  motions sort of in the fashion that we normally do.

15         Just for the sake of -- I then will probably try and

16  do a separate motion that deals only with the issue of who

17  contacted Cox and who hasn't filed something with the court,

18  and ordering that those who have not filed something with the

19  court and only contacted Cox, Cox is hereby ordered to do so.

20  Just to make it a clean order for you to have in case something

21  comes up and you need it.

22         I probably won't until sometime after today enter the

23  order that deals with the other people who have filed things

24  with the court and addressing what to do with those.  I want to

25  go back and look at them one more time.

1          MR. BUCKLEY:  Could I make one factual point on that

2    issue?

3          THE COURT:  Okay.

4          MR. BUCKLEY:  So even the folks whose letters don't

5    include an IP address, it's possible that we can identify those

6    people based on other things that are in the letter as folks

7    who talked to Cox.

8          So when Your Honor goes back and tries to decide how

9    to deal with all those folks, just the fact that there is not

10   an IP address in there doesn't necessarily mean we can't tell

11   you --

12         THE COURT:  Right.  No -- --

13         MR. BUCKLEY:  -- who the person is.

14         THE COURT:  Other than 1 --

15         MR. BUCKLEY:  Who we don't -- and that one we don't

16   know.

17         THE COURT:  Right.  And I have no way of knowing that

18   one.  Everyone else, there is information of a name, address,

19   or something that could probably provide -- that I could

20   probably allow that to be filed under seal so that only counsel

21   has access to it and that only you would have access to that if

22   I decide to allow it to be opened up.

23         So I think the ones that we don't necessarily have an

24   IP address, we have some identifying information as to name,

25   and you can probably run a subscriber history record or

56

1  something for those and pull up what may have been their IP

2  address at some point in time.

3          MR. CARACAPPA:  Your Honor, one point of

4  clarification.  We have filed a response to docket number 81.

5          THE COURT:  Right.

6          MR. CARACAPPA:  The responses to docket number 88,

7  85, and 90 are to due on Monday.

8          THE COURT:  Let me just see what -- let me just get

9  my docket sheet out.

10          MR. CARACAPPA:  I think that's the rest of the John

11  Does.

12          THE COURT:  81 was the one that we don't have any

13  identifying information on.  88 is the large package of letters

14  that I consolidated into a single exhibit.  And then there was

15  -- what was the other docket number?

16          MR. CARACAPPA:  85.

17          THE COURT:  85.

18          MR. CARACAPPA:  And 90.

19          THE COURT:  Okay.

20          MR. CARACAPPA:  And I think we do have the IP address

21  for docket number 81.  The issue that exists with respect to

22  the John Doe at docket 81 is that it's current.  It's not a

23  historical subscriber.

24          MR. BUCKLEY:  And, Your Honor, there was confusion on

25  that point.  We do not believe we know who John Doe in docket

1   81 is.  Plaintiffs do seem to think they were able to connect

2   it to an IP address, and maybe we'll just need to talk about

3   how you guys got there because we can't figure it out.

4               MALE VOICE:  It was listed in the order, for docket

5   81 -- 82, supposed to be an IP address for that docket 81.

6               MR. BUCKLEY:  How is that possible?

7               MALE VOICE:  It was issued by the Court.

8               MR. BUCKLEY:  Yeah, we can talk about it.

9               THE COURT:  All right.

10              MR. BUCKLEY:  We, Cox, don't believe we can identify

11  the John Doe in docket 81.

12              THE COURT:  Okay.  Well, at least we'll be able to

13  take care of the ones that haven't filed something with the

14  Court immediately, and then I'll look at it and may -- if I

15  have issues and need some further information, I'll set up a

16  call for us to coordinate that.  Okay?

17              MR. CARACAPPA:  Thank you, Your Honor.

18              THE COURT:  Thank you, counsel.

19              MR. BUCKLEY:  Thank you, Your Honor.

20              NOTE:  The hearing concluded at 12:14 p.m.

21        -------------------------------------------------

22

23

24

25

1

2          C E R T I F I C A T E   of   T R A N S C R I P T I O N

3

4

5          I hereby certify that the foregoing is a true and

6    accurate transcript that was typed by me from the recording

7    provided by the court.  Any errors or omissions are due to the

8    inability of the undersigned to hear or understand said

9    recording.

10

11          Further, that I am neither counsel for, related to,

12    nor employed by any of the parties to the above-styled action,

13    and that I am not financially or otherwise interested in the

14    outcome of the above-styled action.

15

16

17

18

19

20                        /s/ Norman B. Linnell

21                        Norman B. Linnell

22                        Court Reporter - USDC/EDVA

23

24

25