1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                         :
             Plaintiffs,        :
                                : Case No. 1:14-cv-1611
     vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,  :
             Defendants.        :
--------------------------------:
```

HEARING ON MOTIONS

July 17, 2015

Before:  John F. Anderson, Mag. Judge

<u>APPEARANCES</u>:

John M. Caracappa and Walter D. Kelley, Jr.,
Counsel for the Plaintiffs

Brian D. Buckley and Craig C. Reilly,
Counsel for the Defendants

2

```
 1              NOTE:  The case is called to be heard at 10:14 a.m.
 2     as follows:
 3              THE CLERK:  BMG Rights Management (US) LLC, et al.
 4     versus Cox Enterprises, Inc., et al., civil action number
 5     14-cv-1611.
 6              MR. KELLEY:  Good morning, Your Honor.  Walter Kelley
 7     on behalf of BMG Management.  With me today are John Caracappa.
 8     And sitting behind us here is Mr. Boswell, who is a
 9     representative of Rightscorp.  Mike Allan with the Steptoe &
10     Johnson firm.  And Stephanie Roberts with the Steptoe & Johnson
11     firm.
12              I will be arguing the advice of counsel motion to
13     compel, as well as the Rule 30(b)(6) deposition motion to
14     compel.
15              Mr. Caracappa will address the motion involving
16     source code and those other items.
17              THE COURT:  Okay.
18              MR. KELLEY:  By the way, Mr. Reilly is up --
19              THE COURT:  Yeah, I heard he has another matter, so
20     it's --
21              MR. BUCKLEY:  Your Honor, Brian Buckley with Fenwick
22     & West for the defendants.  And Mr. Reilly is upstairs on the
23     8th floor, but is going to come back down when he's done.
24              THE COURT:  Okay, thank you.
25              All right.  Well, counsel, I've read all of the
```

3

1    pleadings and all of the motions and the exhibits as well.  So

2    I don't need to have a lot going back and forth on what was

3    said in the pleadings, but I do think it is appropriate to have

4    argument on -- and I guess I have three substantive motions and

5    three motions to seal.  I'll just go ahead and take care of the

6    motions to seal first, and that way we won't have that -- is

7    anybody here filing any objections or want to note any

8    objections to filing any of these documents under seal?

9              It doesn't appear that anybody is objecting.

10             And I was hoping I was clear the last time we were

11   here about when you're filing stuff under seal, that I need to

12   have a copy of the redacted version and the unredacted version

13   delivered to me so that I can compare the two.  I got the

14   unredacted versions, but never got a copy of the redacted

15   versions.  So that the way that I ended up going through and

16   looking at the things was a little bit more complicated than it

17   otherwise would have needed to be.

18             I just want to say on all these motions to seal that

19   I am going to go ahead and grant them, but in the context of

20   everything that I've looked at and -- I mean, I don't think

21   that there was a single item that I'm sealing at this point in

22   time that would satisfy the higher standard.

23             So I think the parties need to understand that the

24   telephone script is not something that would meet the

25   compelling governmental interest.  That the process that is

4

1    followed by Cox as far as its multistep process, I would need

2    much more to persuade me that it would satisfy the higher

3    standard that would be appropriate on a motion to seal on a

4    dispositive motion.

5           But on this, a motion to compel, I do think it's

6    appropriate for me to go ahead, given that there is no

7    objection by any of the parties, I will grant the three motions

8    to seal those matters.

9           I am going to take up the scope of the waiver issue

10   first, I think that's probably the most substantive motion.  Or

11   the one that is going to take the longest or needs a little bit

12   more fleshing out from me to make sure that I understand it.

13          And that really -- in my mind, Mr. Kelley, I want you

14   to know, it has two parts.  The first part is the scope of the

15   waiver.  And the second part is the appropriateness of the

16   privilege log given the waiver that has taken place as to some

17   items.  So I want to be able to address both of those in ruling

18   on the motion.

19          So let's talk about the scope of the waiver first.

20          MR. KELLEY:  Okay, we'll start with that.  I think

21   there are a couple of things to keep in mind here.  Number one,

22   by doing the waiver, Cox has interjected this issue into the

23   case about the good faith reliance on the opinion of counsel.

24          And the second key thing that frames it --

25          THE COURT:  And the issue that they're saying that is

1    is that -- and I think we can use the term "blacklisting"

2    because that seems to now be in the public record even though

3    --

4            MR. KELLEY:  Yeah, that's now okay.

5            THE COURT:  That now appears to be okay.  You know,

6    the blacklisting based on the opinion that they're relying on

7    in this case is that a lawyer, their general counsel or

8    somebody in their general counsel's office, gave them advice

9    that notices that contain settlement demands or other kinds of

10   demands for payment do not comply with the standards of the

11   DMCA.

12           MR. KELLEY:  The spirit is the term of art.

13           THE COURT:  Right, it says, the spirit.  So that it

14   doesn't comply with that.  And so we don't -- we can ignore

15   them.  Okay.  That was the advice that was given that they're

16   relying on.

17           MR. KELLEY:  Right.  And that has two components to

18   it, which I think is very important.  There is the what, which

19   is, we can reject these letters.  And then there is the why.

20   And the why is what's really crucial here for purposes of doing

21   the cross-examinations.  The why is because it's not within the

22   spirit of the DMCA.

23           And as we set forth in our papers, this was done

24   without any case law support.  There is no textual support for

25   it.  We put the whole text of the DMCA in the opening brief.

6

1    There wasn't any written analysis of trying to get from A to B.

2    There wasn't any consultation with specialist outside counsel

3    or anything.  I think Mr. Cadenhead said he might have talked

4    to somebody, but couldn't remember who.

5          And so, the why is really what's important here.  Now

6    when Mr. Cadenhead gets up on the stand and he starts saying,

7    well, you know, I did this because it was within the spirit of

8    the DMCA, obviously whoever cross-examines him, hopefully me,

9    will start going into the way he did -- went about it, the lack

10   of support.  The correctness of the opinion.  And then, and

11   this is also very important, the motivation in coming up with

12   the opinion.

13         This isn't a situation where you have a completely

14   independent outside firm that is retained to give a

15   noninfringement opinion, for example, or an invalidity opinion.

16   This is an in-house guy who is as much a businessman as he is a

17   lawyer.  And he is coming up with excuses for Cox to basically

18   not do what the DMCA requires it to do.  Yet Cox still wants to

19   have the benefit of the DMCA safe harbor.

20         So why did he not do all of this?  What is the spirit

21   of the DMCA in other contexts?  And we list those eight, nine,

22   different things, the unwritten semipolicies that have the

23   effect of eviscerating the written policy.

24         What's the spirit of the DMCA here?  He was involved

25   in all of those policies that seem to undercut the written

7

1    policy.  What was the spirit here?  What was the spirit there?

2    How do you go about --

3            THE COURT:  But those aren't items on which Cox based

4    its actions on the notices sent by your client, right?

5            MR. KELLEY:  No, but they remain very relevant to the

6    issue about good faith reliance on the opinion of counsel.

7            THE COURT:  Well, help me understand.  That's where

8    I'm confused.  And let's just take it in its context, one that

9    I think probably we both are a little bit more familiar with, a

10   patent infringement case.

11           You get an opinion that a patent is not valid and is

12   not infringed given by a lawyer.  Do you then get to have every

13   opinion that that lawyer has issued about every other patent

14   and -- every other patent as to infringement or invalidity to

15   see whether, you know, that lawyer, he or she, is doing what

16   needs to be done in order to properly do an analysis of the

17   patent statutes?

18           MR. KELLEY:  You mean completely unrelated --

19           THE COURT:  Sure, like --

20           MR. KELLEY:  You know, like stuff the guy has done in

21   years past?

22           THE COURT:  Or, you know, maybe even patents in the

23   same field, but not the patent that is being asserted in that

24   lawsuit.

25           MR. KELLEY:  No.  But if you're talking about -- I

8

1    think a more apt analogy would be patents of the same client

2    that are within the same family and looking at those.  Did he

3    look at those in the course of rendering this opinion?  That's

4    one difference.

5            The second difference is in the situation that you

6    talked about, you're talking about some guy at an outside firm

7    who has been given this as a discrete task.  That is not what

8    we have here.  We have an in-house counsel who is involved

9    every step of the way in framing policies that are not one-offs

10   in the example you gave, but part and parcel of a continuum of

11   how it is that Cox will do things that is not part of their

12   published policy.

13           Now, you might ask, why does it matter since

14   Rightscorp never got through the gate?

15           THE COURT:  Right.

16           MR. KELLEY:  And there are two reasons there that

17   that matters.  Number one, if the Court, Judge O'Grady

18   ultimately rules that there was no basis for the blacklisting,

19   that there was no legal basis for it, does that mean the case

20   is over?  No, because they're not going to stipulate that their

21   policy was unreasonable and, hence, outside the DMCA.  All this

22   other stuff continues on and will be argued.

23           The second thing is the seven or eight additional

24   steps that we talked about go to the state of mind about

25   reasonable reliance on his opinion.

1        THE COURT:  Well, no one has said that he has given a

2    legal opinion as to whether those other seven or eight steps

3    are legal or not, right?

4        MR. KELLEY:  Well, what we -- the record shows that

5    he was involved in formulating those policies.

6        THE COURT:  Right.

7        MR. KELLEY:  And that's cited in our opening brief.

8    And Cox doesn't dispute it at all.

9        So, you know, they haven't -- we don't know whether

10   he did or didn't because we -- to use a Donald Rumsfeld phrase,

11   we don't know what we don't know.  Without seeing the

12   documents, we don't know whether he did or not.  But we know he

13   was involved.

14       THE COURT:  And so, your motion is asking for the

15   analysis of any notices of copyright infringement on the Cox

16   network?

17       MR. KELLEY:  It's.

18       THE COURT:  That --

19       MR. KELLEY:  No, it's slightly more constrained than

20   that.  It's asking for all documents that bear upon the spirit

21   of the DMCA, which is Mr. Cadenhead's articulated reason for

22   making the decision that he did, or the opinion, or whatever

23   one wants to call it.  And that includes how it is that you

24   treat notices of copyright infringement.

25       So again, it's the what and the why.  And our motion

1    goes to the why.  And what they want to do is limit it to the

2    what.  He only gave, you know -- we only announced an opinion

3    on one of these nine steps.  And so, therefore, we're entitled

4    to hide the why as to the other eight.

5        THE COURT:  All right.  So a lawyer gives an opinion

6    on a patent and in there says, the overall purpose of the

7    patent statutes is to provide incentives for inventors to

8    invent.

9        MR. KELLEY:  Okay.

10        THE COURT:  Okay.  You then think that if he gives an

11    opinion as to the validity of a patent, that every other

12    opinion relating to whether there is a -- the purpose behind

13    the patent statute is to provide incentives for inventors to

14    invent would be relevant?

15        MR. KELLEY:  No, not -- but you're talking about --

16    no, the difference is related and unrelated.  If you're talking

17    about within the same family, and obviously that's a very

18    generalized statement, but within the same family, it would be.

19        And if the guy is an in-house counsel dealing with

20    the IP portfolio of this company on a regular basis, then his

21    view and how it is that he has applied it in the past as to the

22    incentives of the patent law to invent, I think certainly would

23    be relevant.

24        Now, you're using the example of a discrete outside

25    guy sitting in a law office at Merchant & Gould or somewhere

1  like that.  What we're talking about here is a guy who is in

2  the trenches every day, he wears a lawyer's hat, but he also

3  wears a businessman's hat, and he is making calls on these

4  unwritten semipolicies and helping to design them every step of

5  the way.

6          That's what we're trying to get at and understand and

7  to us to attack the methodology, the conclusion, and the

8  motivation for coming up with this kind out-of-the-sky notion

9  of what's in the DMCA, what's the spirit of the DMCA.  I don't

10  know what I could tell you what the spirit of anything is.  I

11  certainly wonder whether Congress has a spirit in terms of what

12  it's trying to do in laws.

13          THE COURT:  Well, your motion says:  Is what Cox

14  believes is the spirit of the DMCA, including, but not limited

15  to, any analysis of any notices of copyright infringement on

16  the Cox network.

17          MR. KELLEY:  Right.

18          THE COURT:  So, I mean, that's including any analysis

19  of any -- so legal opinions as to any analysis of any notices

20  of copyright infringement on the Cox network.

21          MR. KELLEY:  With the modifier of what's within the

22  spirit of the DMCA.

23          THE COURT:  Well, you know --

24          MR. KELLEY:  That's how it's phrased, I think.

25          THE COURT:  Well, I mean, it says:  Including but not

1    limited to.  So it would include any analysis of any notices.

2            MR. KELLEY:  Right.  It would also include other

3    things that were considered to be within or without the spirit

4    of the DMCA.  But we, frankly, don't know what those are at

5    this point.  It's only the notices that we have anything

6    tangible to work with.

7            And if it weren't this continuum of policies, I would

8    agree with you that things are afield, but it's clear that

9    these things all work in tandem.  And what we're trying to do

10   is to understand the why and be in a position to cross-examine

11   when he gets up on the stand and wants the jury to believe it's

12   okay because a lawyer said it was okay.

13           THE COURT:  Well, why are you going to get to

14   anything other than the blacklisting part at the trial of this

15   case?

16           MR. KELLEY:  Because they have produced a report by a

17   fellow named Rosenblat that goes through their graduated

18   response policy and talks about how great it is.

19           And besides that, the fact that we got boxed out on

20   the initial thing does not mean that they're going to concede,

21   if that's -- if blacklisting is found to be improper, they're

22   not going to concede that their DMCA -- or that their policy is

23   not adequate under the DMCA.  They're going to point to the

24   written policy and say, here, see, this is good, we've got

25   Rosenblat here to talk about how this is best in class.  It

1    doesn't die with blacklisting.

2            Now, if they're willing to stipulate that the whole

3    DMCA dies with blacklisting, that's a different matter.  I

4    haven't seen that stipulation forthcoming yet.

5            The second thing is, it still goes to the issue of

6    willfulness, willful infringement, and the state of mind, did

7    they rely in good faith on this opinion.

8            THE COURT:  On that opinion.

9            MR. KELLEY:  On that opinion.

10            THE COURT:  That opinion that --

11            MR. KELLEY:  And all of this other stuff informs that

12    opinion.  And the whole bundle of things that he gave on these

13    DMCA evasions goes to whether or not the reliance was in good

14    faith or was this just a put-up job.

15            THE COURT:  Okay.  Well, all right, what about the

16    appropriateness of the privilege log?

17            MR. KELLEY:  What I put in there -- and this is an

18    area, frankly, I've never really been sure what the answer was.

19    There are two things here.  Number one, descriptions.  The rule

20    says it has to be sufficient in order to be able to figure out

21    whether what's being withheld is properly withheld.

22            They use generic descriptions.  We've used generic

23    descriptions.  And I have some sympathy for that, frankly,

24    because when you're dealing -- they've withheld about 3,000

25    documents under a claim of privilege.  It's a big burden

14

1    putting those things together.

2            But when you -- but the kind of all-encompassing,

3    like customer abuse, or infringement issue, or something like

4    that, that obviously covers things that are both inside and

5    outside of the waiver.

6            Now, they have the burden of producing a log that

7    allows us to figure out what's inside and outside the waiver.

8    And they haven't done that.

9            And so, you know, I don't know how we go about doing

10   it given the descriptions we have.  Everything changed with the

11   waiver.

12           THE COURT:  And the privilege logs were, from my

13   review, they were produced prior to the waiver actually

14   being -- the privilege logs were dated May 14.  And the answers

15   to interrogatories that said they were waiving the privilege

16   were several days after that, is that --

17           MR. KELLEY:  Yes.  And I think that the interrogatory

18   answer in which they said they were going to do the waiver,

19   May 8 sticks in my mind.  So it's roughly contemporaneous.  But

20   it might not --

21           THE COURT:  Well, actually, I think the answer to the

22   interrogatory -- the first one was in April where they said

23   we're not waiving.

24           MR. KELLEY:  Right.

25           THE COURT:  And then the answer to the interrogatory

1    that came out, that was May 19.

2                MR. KELLEY:  Okay, then it was before.

3                THE COURT:  Well, privilege logs were served.  Then

4    the waiver was made the following week.

5                MR. KELLEY:  Okay.

6                THE COURT:  And so -- all right.  Let me hear from

7    Cox's counsel.

8                MR. BUCKLEY:  So, Your Honor, I think you hit the

9    nail right on the head and used the analogy I was going to use,

10   which is to the patent cases.  That's where most of these

11   waiver cases appear.  And the principle there is you figure out

12   what the advice is.  And in the patent context, it's relatively

13   easy, it's either you're not infringing this patent, or this

14   patent is invalid, or both.  The waiver applies to that advice

15   and all embodiments good and bad.

16                So the notion of the selective waiver is, I have this

17   universe of documents and I produce the good ones and I hold

18   the bad ones.  That's the sword and shield concept.  That is

19   not going on here.

20                The advice that we are relying on is Mr. Cadenhead's

21   advice that notices that contain settlement demands are not

22   within the spirit of the DMCA.  That's the advice.

23                We have produced the documents that relate to that

24   advice good and bad.  And they are not all good, you've seen

25   some of them, they are not all good, but we have not held back

16

1    the bad ones.

2         THE COURT:  I mean, honestly, the documents I have

3    seen don't provide any legal analysis.  They only provide a

4    statement that you don't need to do something or -- I mean, I

5    haven't seen anything that provides any legal analysis.

6         MR. BUCKLEY:  And that's part of Mr. Kelley's point,

7    right?  How do you analyze what the spirit of a statute is?

8         We have produced the documents that relate to that.

9    And the rest of that is in Mr. Cadenhead's head.  So they

10   deposed him for an entire day and they asked him about that at

11   great length, and he testified about it at great length.

12        And on the stand, Mr. Kelley told you all these

13   things he wants to be able to do when he cross-examine's Mr.

14   Cadenhead on the stand, he is going to be able to do all those

15   things.  If he wants to show that that conclusion was wrong,

16   that it was unfounded, that he didn't base it on anything, he

17   just pulled it out of the air, they can make all of those

18   arguments.  They have made all those arguments.

19        That has nothing to do with the waiver issue.  The

20   waiver issue is very specific.  What was the advice?  Did you

21   produce the documents that embody that advice, good and bad?

22   And we did.  So we do not have a selective waiver issue here.

23        As to all of the other stuff that goes to our

24   graduated response system, how we deal with the DMCA, they can

25   also explore all of that and they have with many, many of our

1  witnesses, including Mr. Cadenhead.

2         So we're not hiding behind Mr. Cadenhead's advice, as

3  to which we have waived.  That's a very specific issue.  When

4  you get in a notice that looks like a Rightscorp notice, do you

5  have to forward it on?  And Mr. Cadenhead provided some advice

6  to folks on that.

7         We have not only produced his e-mails that talk about

8  that, we've also produced other e-mails where that advice is

9  contained, where it was passed on by other Cox representatives,

10  those people who have been questioned about that advice.  So we

11  clearly do not have a selective waiver issue here.

12         What they are attacking is not the scope of the

13  waiver.  What they are attacking is the advice itself.  What

14  advice is Cox relying on?  And they want to expand that.  They

15  want to force us to waive our privilege as to all advice that

16  relates to any DMCA notice, any copyright notice we've ever

17  received and how we handle those notices.  That's what they

18  want the scope to be, understandably.  I'm sure they would love

19  to explore that.  I'm sure Mr. Kelley would love to look at

20  every document that's on our privilege log.

21         But we did not waive the privilege as to all of that

22  subject matter.  We waived it on a very specific point.

23         And candidly, Your Honor, we did that in order to

24  tell the story, to explain why folks at Cox, who are now being

25  vilified, who are now being painted as bad actors, who are now

1    being portrayed as people who hate the DMCA, to explain why we

2    weren't forwarding those notices.

3            Now, if they want to attack the basis for that and

4    say it was unfounded, they have the freedom to do that, they

5    have lots of documents that they can rely on, they are already

6    making all of those arguments.  That really, frankly, has

7    nothing to do with the waiver or the scope of the waiver.

8            So I think -- and I have a sense, Your Honor, that

9    your instinct is where I'm headed.  Which is, this is a narrow

10   bit of advice, it may or may not be sound advice, but as to the

11   documents that relate to it, they have those documents.

12           So then you get to the issue of the privilege log.

13   We produced updated privilege logs.  We did this in a series.

14   We did -- I think we did three different versions.

15           The ultimate version of the privilege logs, and I

16   will confirm this, I'm 99 percent sure, doesn't include any of

17   the documents as to which we waived.  We took those off the

18   log.  So by definition, all of the documents on the privilege

19   log are outside the waiver.

20           THE COURT:  Well, no, but who knows that?

21           MR. BUCKLEY:  I know -- Your Honor, I know that.

22           THE COURT:  Wait.  But the log doesn't reflect that.

23           MR. BUCKLEY:  Your Honor, neither does their log.

24           THE COURT:  Well, they haven't waived the privilege.

25   You've decided to waive the privilege in a respect.  And it's

19

1    your obligation to then produce a log that indicates what you

2    are withholding and the basis for it.

3         And withholding something because of attorney/client

4    privilege doesn't work anymore because you've waived the

5    attorney/client privilege as to some issues.

6         And so, you know, why you think a generic description

7    of withholding something based on attorney/client privilege is

8    appropriate now that you have waived part of the

9    attorney/client privilege, I don't understand.

10        MR. BUCKLEY:  Your Honor, every log makes a

11   representation that this document is protected, it's

12   privileged, or it's work product.  Every log says that.

13        So I don't frankly trust these folks very much, and I

14   suspect there are documents on their privilege log that aren't

15   within the scope of any privilege or any work product

16   protection at all, but that's not a basis to ask you to go

17   behind that log.  To do what?  To do an in camera review of

18   every document they've logged to make sure they're not playing

19   games?  Every log has that ambiguity in it.

20        And what I'm telling you is, the logs we've provided

21   do not include the documents that are subject to the scope of

22   the waiver.  They don't believe that, but there is no basis for

23   them not to believe that.

24        THE COURT:  You don't say that in the log.  There is

25   nothing in the log that reflects that you have gone --

20

1          MR. BUCKLEY:  So we --

2          THE COURT:  -- through and have made, you know -- it

3     just reflects attorney/client privilege.

4          MR. BUCKLEY:  Well, I'm representing to you that we

5     have.  And if what we need to do is produce a revised log that

6     includes -- that adds to every one of those entries the

7     statement, "not including documents or not related to documents

8     that are related to the spirit of the DMCA," or "not a document

9     that is within the scope of the waiver," we can do that.  That

10    seems like a, frankly, ridiculous exercise to me, but what I'm

11    telling you is --

12         THE COURT:  Well, why do you say that?  Someone

13    receiving this log looks at this log and they see that you have

14    asserted privileges based on the attorney/client privilege.

15         MR. BUCKLEY:  Yes.

16         THE COURT:  You have now, after producing this log,

17    waived part of the attorney/client privilege.

18         MR. BUCKLEY:  Right.

19         THE COURT:  And part of what I'm dealing with is how

20    much of that you have waived.  But there is nothing on this log

21    that indicates whether it is within the part that was waived or

22    not within the part that was waived.

23         MR. BUCKLEY:  Because the documents within the waiver

24    aren't on the log.  So what would you like me to -- Your Honor,

25    tell me what you want to put in those descriptions and we'll do

1   it.  We're going to produce a new document where every

2   description has some standardized language that says, this is

3   not subject to the waiver.

4              THE COURT:  Well, I --

5              MR. BUCKLEY:  Which gets them nowhere.  It is going

6   to be another form of standardized description that tells them,

7   this is a privileged or work product document that relates to

8   these things.  And if we need to add, "and is not subject to

9   the waiver," I'm happy to do that.

10             It seems like we could just put that across the top

11  of the log, doesn't include any documents within the scope of

12  the waiver, it seems like a simpler way to handle it, but I am

13  representing to you from the podium that those documents are

14  not on the log.

15             THE COURT:  You've looked at all of these documents?

16             MR. BUCKLEY:  Pardon me, I am sorry, Your Honor?

17             THE COURT:  You have looked at all of these

18  documents?

19             MR. BUCKLEY:  Me personally?  No, I have not.

20             THE COURT:  Well, then how can you make a

21  representation?  How can you come into court and say you're

22  representing that all of these documents aren't within whatever

23  the scope of the waiver is that I decide.

24             MR. BUCKLEY:  Well, Your Honor, this is going to be

25  an issue for later parts of the morning too.  We all work in

22

1    teams.  I have colleagues who I trust who helped put this log

2    together.  I talked to those folks.  And that log does not

3    include the documents that are subject to the waiver.  If we

4    need to go --

5            THE COURT:  This log was produced --

6            MR. BUCKLEY:  I don't believe that's the most updated

7    version of the log.

8            THE COURT:  Well --

9            MR. BUCKLEY:  But we'll -- Your Honor, we will

10   amendment it to say whatever you want it to say.  So --

11           THE COURT:  No, you know, I want it to say what you

12   are required to say, not what I want it to say.  And you are

13   required to provide enough information for the party receiving

14   it to determine whether it is within -- whether the privilege

15   can or should be challenged.

16           And, you know, certainly now that you have waived

17   attorney/client privilege as to some respects, they get a

18   document that says, I'm withholding this based on the

19   attorney/client privilege, they have the right to come in and

20   challenge each and every document.  And you haven't said

21   anywhere on this privilege log that this document isn't within

22   that set of the privilege that you say you have now waived.

23           MR. BUCKLEY:  Okay, Your Honor, we will do that.  And

24   I feel compelled to note that we are going to be back here, I

25   assume, arguing that our amended descriptions are also not

1    sufficient.  Because what they are going to say is, this is a

2    document that is privileged or work product for these reasons

3    and not within the scope of Cox's waiver.

4            So we will do that, we will produce a new amended

5    log.

6            THE COURT:  Well, but I --

7            MR. BUCKLEY:  I would just rather address it now than

8    have us go through the exercise, produce it for the other side,

9    have them complain that it's not sufficient, file another

10   motion, we're back here arguing again.  I would rather

11   understand what it is we should do.

12           And, frankly, we've put this question to Mr. Kelley

13   multiple times too, and he won't -- he won't give us an

14   example.  We say, what's sufficient?  I don't know what's

15   sufficient, just redo your log.

16           So we will redo the log, but I suspect we are going

17   to be back here.

18           THE COURT:  Well, you know, and I -- this is an issue

19   that you have made for yourself by waiving a portion of the

20   privilege.

21           MR. BUCKLEY:  That's fair.

22           THE COURT:  And, you know, the idea that their log is

23   more generic, I understand that argument, but that argument

24   really doesn't fly now that you have voluntarily waived a

25   portion of the privilege.  And you need to be more specific as

24

1    to what it is, what the documents are that you're now

2    withholding, and not just a blanket attorney/client privilege.

3              MR. BUCKLEY:  That's right, we will do that, Your

4    Honor.

5              THE COURT:  All right.  Well -- and that's going to

6    need to be for both the documents and the redactions too.  So

7    for all the privilege logs.

8              All right, Mr. Kelley, I will hear back from you on

9    the scope issue though.

10             MR. KELLEY:  Let me ask one -- can I say one thing

11   about the privilege log issue?  I don't think it's sufficient

12   just to put in there a coda that says, this is not within the

13   scope of the waiver.  The rule says that we have to be able to

14   identify the subject matter.

15             And so, depending upon what you rule is the scope of

16   the waiver, you know, it would be like termination, or DMCA

17   equals reactivate, or something that gives us a sense of these

18   unwritten semipolicies, what we're talking about here.

19             The way it is now, it just says, copyright

20   infringement.  That doesn't tell us anything about figuring out

21   whether things fall on the left or the right side of whatever

22   line it is you determine is appropriate.

23             THE COURT:  If they represent that it is unrelated to

24   whatever I eventually say the scope is --

25             MR. KELLEY:  Yeah.

1          THE COURT:  So attorney/client privilege or

2    communications, advice of counsel, unrelated to whatever that

3    is, why isn't that sufficient?

4          MR. KELLEY:  How do we make a judgment as to whether

5    what they're representing is true?

6          THE COURT:  Well, tell me why would you think it

7    would be any better if they said, attorney/client privilege

8    relating to the number of notices that can be done in a day?

9          MR. KELLEY:  Because that tells me where in the

10   continuum it is.

11         THE COURT:  But, you know, how do you know that's

12   true?  Just like how do you know that the other one isn't true?

13         MR. KELLEY:  I don't, I have to take their word for

14   the description, but at least it gives me something to assess.

15         What's the point of the rule if you're just saying --

16   talking about a written description of the document.  It's not

17   identification of the privilege.  It's the written description

18   of the document that allows the reader to make a judgment on it

19   that's important there.

20         I mean, why even have a description if you're just

21   going to say attorney/client and we're going to accept it

22   wholesale?

23         Now, do I know what customer abuse entails?  Not

24   really.  It's so generic, but I -- you know, we're willing to

25   live with it under the circumstances.  But as I read the rule,

1   it has to have some meaningful function for me to exercise when

2   I read the privilege log.  Otherwise, why bother?  You know,

3   we'll both just submit declarations that say, we have done it

4   right.

5           Now, as far as the substance of it, we're back to the

6   what and the why again.  And what Mr. Buckley has argued very

7   eloquently is, hey, we've just got to tell them the what.

8   Blacklisting is blacklisting, you know why we did it.  No, we

9   really didn't have any opinion, we just, you know, had

10  horseback things.

11          We've got to get into the why.  We're going to have a

12  jury sitting in the box over here that aren't lawyers.  And we

13  can all sit here with our training and years of experience and

14  know that this ain't much of an opinion and shouldn't be given

15  very much weight.  The jury isn't going to know that.  They're

16  going to think that something that came out of the mouth of a

17  lawyer is like two tablets of stone coming down from Mount

18  Sinai, it must be correct.

19          So we're going to, in doing the cross-examining, what

20  we're going to have to do is say, hey, look, spirit of the

21  DMCA, you did this over here and that was in the spirit of the

22  DMCA, and that wasn't consistent with what you did with respect

23  to blacklisting.

24          It's the why that really is going to form the basis

25  of the cross-examination.  And you can't take a continuum of

27

1    policies that an in-house lawyer has been involved in drafting

2    and say, all right, well, we're just going to do as to one, but

3    not as to the others even though everything is proceeding on

4    the same rationale for doing it.

5           That's why we think that the scope of the waiver

6    should be all of the unwritten semipolicies as they reflect to

7    the spirit of the DMCA, which is the articulated reason here.

8           THE COURT:  Okay.  Well, this is an above-average

9    legal issue that I deal with, I'll just put it that way.  It's

10   interesting and has been well briefed and well argued.

11          But I think that the proper approach to this is

12   looking at the advice that was actually relied upon in this

13   case.  And the advice that was relied upon in this case had to

14   do with whether the -- from in-house counsel informing his

15   client that they didn't need to process these notices because

16   they had a demand for payment, or settlement, or whatever in

17   there.  And it's that advice that is going to be challenged

18   here.

19          The idea that going beyond that to look at other

20   advice that he may or may not have given and challenging that

21   other advice, even if it's related to copyright infringement,

22   or the spirit of the DMCA, that really isn't a defining term.

23   I mean, he talks about the spirit of the DMCA, but, you know,

24   we're talking about the advice that he gave as to whether that

25   statute requires Cox to do something and, you know, he made an

1   opinion.

2          You know, he is going to have to -- or Cox is going

3   to have to justify the reliance upon that opinion.  And, you

4   know, whether the other factors come in or not as to if you had

5   gotten through that gate, what would have happened, I'm not

6   sure those will really be a significant part of the trial given

7   that the gate here was the blacklisting issue.

8          But I'm finding that the scope of the waiver is

9   limited to the advice that was given as to the blacklisting,

10  and doesn't go beyond that.  So I'm not going to require them

11  to produce additional information.

12         But I am going to require them to supplement their

13  privilege log.  I do think -- you know, I think lawyers

14  typically, and judges as well, acknowledge that privilege logs

15  can be very difficult, and that generic things in the setting

16  of what you all had done before the waiver would probably have

17  passed muster, but we're in a different situation where you

18  agree to a carve-out of the waiver, or when you agree to a

19  carve-out of the privilege and assert -- you waive that in some

20  ways.  And you've got to be more specific in what you're going

21  to do.

22         So I am going to grant the motion in part and deny it

23  in part, but I am going to require it and require that a

24  supplemental log be produced.

25         All right.  Let's take up the motion to compel

1    against Rightscorp next.

2              MR. BUCKLEY:  I'm sorry, Your Honor, which one?

3              THE COURT:  The motion to compel against Rightscorp.

4              What is the current status of the source code?

5              MR. BUCKLEY:  I wish I knew.  So a little bit of

6    background first.  I won't repeat everything that's in the

7    briefs.  So what we knew when we had filed the -- when we filed

8    the motion was that we had belatedly received what we at least

9    view as not only a critical, probably the most critical file.

10             THE COURT:  It's a file that wasn't used for the

11   notices that were sent, but it was a limitation that wasn't in

12   place when the notices were prepared and sent to Cox, am I

13   right on that or not?

14             MR. BUCKLEY:  We don't know.

15             THE COURT:  You don't know.

16             MR. BUCKLEY:  And that is an absolutely critical

17   issue.  We don't know.  We don't know what was in place when

18   the notices were sent.  We don't know if we've ever reviewed

19   what was in place when the notices were sent.  We don't know

20   and don't believe that their expert has ever reviewed what was

21   in place when the notices were sent.  And we now understand

22   from deposing their personnel that there is no way to know

23   because they've been overwriting the code up until apparently

24   today.

25             So the short answer is, Your Honor, that's what we're

30

1    trying to get to the bottom of, what we've been trying to get

2    to the bottom of for a couple of months now.

3         So we knew when we filed this motion that this

4    critical file had been withheld and belatedly produced, well

5    after the date Your Honor set.  And so, we assumed that that

6    was the issue we were dealing with, although it left open

7    questions about the completeness of the production.

8         So what we learned on Wednesday when they filed their

9    brief at 4:30, and then I had a conversation with counsel at 5,

10   we learned about this other very significant issue.  Which is

11   apparently, even though we've been told there was no historical

12   code, which creates its own spoliation and other sorts of

13   problems, but that was our understanding.

14        That's not true, there apparently is historical code

15   that their expert has had in her possession.  Unclear what she

16   has or has not done with that.  We got that code in usable form

17   after 8 o'clock on Wednesday night, so we've been in the

18   process of trying to figure out what it is.  There is a few

19   things we know.  The volume is significant.  It is 60-plus

20   files, which is a substantial amount.  It's not -- I don't know

21   how it relates to how much was already produced, but it's a

22   significant portion of what was already produced.

23        It's undifferentiated.  So it's a dump, basically.

24   So we can't tell which portion of it came from Ms. Frederiksen.

25   So which portion of it is related to the discovery abuse and

1   which isn't.

2           There are files in it, and this is what I got from my

3   expert early this morning, and they're still in the process of

4   going through all this, there are files in it we have never

5   seen before.  So the question is, are those historical files

6   that no longer exist?  Are those historical files for which we

7   don't have the current version?  So we're having to sort

8   through that.

9           And even though it was represented in Rightscorp's

10  brief and Mr. Boswell put in a declaration on Wednesday saying

11  all the code is in, we got yet another production yesterday.

12          THE COURT:  What did you get yesterday?

13          MR. BUCKLEY:  Yesterday we got an additional, I think

14  it's six or seven files.  We don't yet know what they are, no

15  one has told us what they are.

16          So, Your Honor, this invocation that we have all the

17  code would be almost -- it's almost comically absurd now except

18  that it is so highly prejudicial to my compliant that it's not

19  comical at all.

20          We have no clue not only what we have, but more

21  importantly what we don't have.  And every time we're told we

22  have it all, it's categorically false.

23          So I don't know as I sit here today what we've got.

24  Even the stuff that we got over the last few days, I don't know

25  what it is.  I don't know how it relates or doesn't relate to

32

1    their expert reports.  I have no idea how it's going to relate

2    to my own experts' reports because they haven't had an

3    opportunity to digest any of it.

4           And we have to have an opportunity to question some

5    folks about this, including Mr. Boswell.  We absolutely need to

6    talk to him again.  We definitely need to talk to Mr. Steele

7    again because part of the exercise these folks have been

8    engaged in is this at the depositions.  Well, I don't know,

9    that's Mr. Steele's job, he made those decisions.  Well, I

10   don't know, that's Mr. Boswell's job, he made those decisions.

11          So there are critical issues.  For example, where did

12   this absolutely critical file, when was it in fact implemented?

13   Was it used historically?  Why was it implemented?  Every

14   witness so far has done, I don't know, not my job, on that

15   point.

16          So, Your Honor, unfortunately, and partly because

17   this is so late breaking, this is Wednesday night that we found

18   out about this, I actually don't even know the scope of the

19   problem as I stand here today.

20          THE COURT:  Well, Wednesday night you found out about

21   the consultant expert having the additional files.

22          MR. BUCKLEY:  Right.

23          THE COURT:  You knew about the other file before

24   Wednesday.

25          MR. BUCKLEY:  Right.

33

1          THE COURT:  And then you got additional files

2   yesterday --

3          MR. BUCKLEY:  Yesterday.

4          THE COURT:  -- that were not from the consultant

5   expert, but were from Rightscorp, or do you know?  The files

6   that you got yesterday.

7          MR. BUCKLEY:  The files were uploaded by Rightscorp.

8   So all the files are coming to the escrow computer, as I

9   understand it, from Rightscorp.  That's how it's getting there.

10   Some portion of those came from Ms. Frederiksen's computer, and

11   as I understand it others didn't.  And right now we don't know

12   which is which.

13          At a minimum, I need to find out, hopefully today,

14   what we got, where it came from, what it reflects, and then

15   we're going to have to continue to parse it.  We still have no

16   evidence, Your Honor, that we've ever received the code that

17   relates to the time period that matters.  That we've ever seen

18   the code that was in place when the notices were sent.  And it

19   looks to us as if we don't have that.

20          So, Your Honor, that's the situation we're in where

21   there is lots we don't know.  And so, I know you're probably

22   looking to so what's the practical solution to that, and I've

23   mentioned a couple of things.  We absolutely need to talk to

24   Mr. Boswell again, Mr. Steele again, and we're going to have to

25   have the ability to supplement our expert reports to the extent

34

1    they rely on the code because they're now completely

2    unreliable.

3              THE COURT:  All right.  What about the documents

4    issue, telephone scripts and the other documents, part of this

5    motion as well.

6              MR. BUCKLEY:  So, Your Honor, as we said in the

7    brief, there are two reasons that Rightscorp's communications

8    with consumers matter.  One is that those communications are a

9    key link in how Rightscorp itself claims it verifies

10   infringement.

11             So what Mr. Steele said when he testified was, when

12   we send these notices out, we don't know who the infringer is

13   and we don't even really know the nature of the infringement.

14   We wait for these people to call us.  And then you look at that

15   phone script and it's -- there's at least two purposes to it.

16   One is to collect information, tell us what you've been doing

17   so they can start to figure out is this really a file sharer or

18   not.  And then the other is just straight over tackle threat.

19             So, first of all, it's part of the link in their

20   process for how they supposedly verify that infringement is

21   occurring on the Internet.

22             But the second piece of it is, Cox is again being

23   vilified for not forwarding these notices.  And what we have

24   said consistently is, we had good reason not to forward these

25   notices because they are improper.  And this is --

35

1          THE COURT:  But the basis for it was, you're saying,

2     a demand for payment.  Not because they then call them up and

3     they go through a telephone script and the way that they handle

4     the calls that they got.

5          MR. BUCKLEY:  I think all of that context, Your

6     Honor, is certainly discoverable and I think ultimately

7     relevant because it does go to why were we not going to be part

8     of what we characterize as a scheme, an improper scheme.  And

9     this reflects the scheme.

10          And the issue at this point is discoverability, it's

11     not admissibility.  We may fight over whether those logs come

12     in or not, but we're entitled to see them.

13          And if part of the issue is there is 10,000 of them

14     and that's too burdensome, then let's figure out a sampling.

15     In the same way that you did with the subscriber information

16     for Cox, let's figure out a way to do a sampling that gives us,

17     you know, a fair representation of what's there.  If it's

18     really that burdensome to provide 10,000 files, we probably

19     don't need 10,000.

20          And the same with the audio recordings, give us some

21     examples.

22          But just to say it's not relevant because it doesn't

23     relate to Cox subscribers, to me is completely beside the

24     point.

25          THE COURT:  What about the telephone scripts?  I

1   mean, the 30(b)(6) deponent who was designated to testify about

2   the telephone scripts said, this one isn't current, there were

3   other versions.  And now you're being told that that version is

4   current and there aren't other versions, is that --

5           MR. BUCKLEY:  That's --

6           THE COURT:  Is that my --

7           MR. BUCKLEY:  That's right, Your Honor.  And, you

8   know, if that's the representation that we're getting from

9   counsel, that we have the current version and there are no

10  other versions, so be it.  It doesn't seem to comport with what

11  their CEO told us, but if that's the representation, I don't

12  know what else to do about that.

13          THE COURT:  Okay.  So who is going to take --

14          MR. CARACAPPA:  Thank you, Your Honor.  John

15  Caracappa.

16          So first, let me say that Mr. Boswell is here and Ms.

17  Roberts is here.  We take what we think are personal

18  allegations in their motions very seriously.

19          THE COURT:  Well, you should because I take my orders

20  very seriously, and you should take my orders very seriously.

21          MR. CARACAPPA:  Yes.

22          THE COURT:  And when I say, you have that phone call

23  and you let them know, and if you have any other source code,

24  you produce it by Tuesday, I expect you to do that.

25          Not that you not respond to them and say, I'm going

37

1    to give you more source code, we've got more coming, it's

2    coming on Tuesday, and then on Tuesday you deliver it.  I

3    really don't understand this.  And it is amazing that firms of

4    your caliber could take this so cavalier.

5          And, you know, when a District Court orders you to do

6    something, you should be doing it.  You shouldn't be saying,

7    inadvertent error.  Sorry, didn't get around to it.  Been on

8    vacation, those kinds of things.  You need to do it.  And you

9    need to do it at the time frame the Court ordered you to do it

10   in.

11         And this idea that you're still giving them source

12   code within the last 24 hours, that's just astounding.  I don't

13   see -- you know, and you can bring everybody in the company

14   here, but it's your actions that I have to look at.  And, you

15   know, it's clear to me that you didn't comply with my order.

16   And I think you have to acknowledge that, is that right?

17         MR. CARACAPPA:  Well, Your Honor, when we had a

18   discussion about the code, the Court acknowledged the nature of

19   the code and said, I'm going to make the order, but, Cox, I

20   don't want you to come back with a gotcha if there is 12 lines

21   of code out of the 17,000 lines of code that we produce that

22   wasn't produced by the deadline.

23         And that is exactly what happened.  We had produced

24   17,000 lines of code by the Court-ordered deadline.  We had

25   spent over -- Mr. Boswell and his team had spent over 100 hours

38

1    looking for the code.  Prior to that deadline, all the code

2    that we were aware of that Rightscorp had spent 100 hours

3    searching for, the code is not in one repository.  It is across

4    many repositories --

5            THE COURT:  Well, you had the code as of June 15 and

6    you didn't produce it.

7            MR. CARACAPPA:  We did.  We had --

8            THE COURT:  I mean -- so the idea that, you know, we

9    only held back some -- you had it, it was determined to be

10   responsive, it was in the law firm's possession, and they

11   didn't produce it in the timetable that I set.

12           MR. CARACAPPA:  For those --

13           THE COURT:  You know, this, I spent a hundred hours,

14   I did that, that doesn't go anywhere.  The law firm had it, it

15   didn't produce it.

16           MR. CARACAPPA:  Understood, that's correct, Your

17   Honor.  It was inadvertent, it was a mistake.

18           And to Your Honor's point about relevance, they say

19   there is no evidence that this code wasn't in place the date

20   the complaint was filed.  There is testimony by Mr. Boswell

21   that it wasn't in place the date the complaint was filed.

22           THE COURT:  When was it put in place?

23           MR. CARACAPPA:  It was put in place after the

24   complaint was filed.

25           THE COURT:  When?

1          MR. CARACAPPA:  December 2, 2014.  That's in the code
2     itself.  Had they looked at the code, had their expert looked
3     at the code -- I can't read code, this is what I was told.  It
4     says in the code it was put in place after the complaint was
5     filed.
6          So we're not saying we withheld it on the basis of
7     relevance.  It was a mistake.  But for Cox to come up and say,
8     this is the most relevant portion of the code, is just
9     disingenuous.
10          THE COURT:  What did you produce yesterday?
11          MR. CARACAPPA:  With respect to the documents that
12     were produced --
13          THE COURT:  Code.  Let's talk about the code first.
14          MR. CARACAPPA:  Yes, yes.  So there are two separate
15     sets.  So the first set is code that was in the possession of
16     Ms. Frederiksen.
17          Now, Ms. Frederiksen was retained by Steptoe in 2013
18     as a consultant.  Apparently during that retention, code was
19     sent from Rightscorp to Steptoe.  Steptoe didn't look at the
20     code, didn't download the code, didn't keep a copy.  And that
21     went to Ms. Frederiksen.  And that was in Ms. Frederiksen's
22     possession.
23          Fast forward a year, we had not spoken to Ms.
24     Frederiksen.  We had retained here for this case.  That's the
25     2013 code.  We did not withhold it.  Discovery is still

40

1   ongoing.  We understand the Court order.  And there was no --

2          THE COURT:  So -- all right.  There is code within

3   your possession, custody, or control.  Your expert in this case

4   has code.  That code is -- and the code is owned by Rightscorp.

5          MR. CARACAPPA:  Yes.

6          THE COURT:  And that expert has it within her

7   possession, custody, or control.

8          MR. CARACAPPA:  Yes.

9          THE COURT:  I ordered you to produce all the code by

10  a certain date.  That code was within your possession, custody,

11  or control, and you still didn't produce it.

12         MR. CARACAPPA:  To the extent -- yes.  To the extent

13  that Ms. Frederiksen is within the custody and control of

14  Rightscorp -- and we didn't search her as a custodian.  This is

15  a unique circumstance --

16         THE COURT:  She is your expert.  The same law firm

17  hired her twice.

18         MR. CARACAPPA:  We produced --

19         THE COURT:  Two years ago and this year.

20         MR. CARACAPPA:  Yes, that's --

21         THE COURT:  The same company.

22         MR. CARACAPPA:  All those are correct, Your Honor.

23  And we offered to produce Mr. Boswell again to speak about the

24  11 lines of code that were mistakenly withheld.  They have not

25  deposed Ms. Frederiksen.  They can talk to Ms. Frederiksen

41

1    about the code.  We have offered to produce Mr. Boswell again

2    to talk about the code that Ms. Frederiksen produced.

3            THE COURT:  So what was produced yesterday?

4            MR. CARACAPPA:  What was produced yesterday was the

5    code in 2013 and some additional files.  The problem is that we

6    don't know what all the code is.  We're scouring everything.

7            As an example, what was produced yesterday was

8    accounting code.  We're trying to produce all the code that is

9    relevant to the infringements of the copyrights at issue on the

10   Cox network.

11           The accounting code isn't relevant at all to that

12   issue, but Cox keeps asking for more.  And we keep trying to

13   figure, what else is it that we have that we can produce?

14           So, again, this is the nature of code.  And --

15           THE COURT:  No, this is the nature of your client's

16   code.  This isn't the nature of the typical source code issues.

17   I mean, typically source code is easily identifiable.  Changes

18   are documented when they're made.  And a record is kept of

19   historical code.

20           And you're saying your client doesn't do any of that,

21   right?

22           MR. CARACAPPA:  So I think it's fair to say my client

23   doesn't do most of that.  And this is a small company, and this

24   isn't a large company where I can produce it like I can produce

25   Microsoft Office.  I wish that were the case.  But because the

42

1    technology is always changing, their code is always changing.

2              For example, if they're trying to find a file on

3    BitTorrent, BitTorrent changes its code.  So Rightscorp has to

4    change its code in order to be able to keep up with the

5    technology.  And that's the nature of this small company.

6              And what we're trying to do is be as forthcoming with

7    the Court as possible.  I understand about the 11 lines and I

8    understand about Ms. Frederiksen, and what we're trying to do

9    is produce everything we can that Cox wants as quickly as

10   possible.

11             THE COURT:  What about the other documents?  Am I

12   right that your 30(b)(6) deponent on the telephone script issue

13   comes in and testifies that this isn't the current version,

14   that there are other versions?

15             MR. CARACAPPA:  No, Your Honor, that's --

16             THE COURT:  Okay.

17             MR. CARACAPPA:  What he said was he didn't know.  And

18   the reason he didn't know is because what Rightscorp did was

19   they changed the demand from $20 to $30, and he didn't know

20   whether the script had been updated.  So he didn't know whether

21   there were additional versions of the script.

22             There are three different attorneys at Steptoe &

23   Johnson that had five different conversations with three

24   different people at Rightscorp to confirm that there are no

25   additional versions of the scripts.

43

1          THE COURT:  This is the guy that you have put forward
2    as speaking for the company on that issue.  And he comes in and
3    says, he thinks there are other versions?
4          MR. CARACAPPA:  I think he said -- again, he didn't
5    know.  He didn't say he thinks there was other versions.  He
6    said --
7          THE COURT:  Well, he said he didn't think this was a
8    current version.
9          MR. CARACAPPA:  I don't know the exact words, I don't
10   have the transcript right in front of me.  But speaking to the
11   witness last night, he said he didn't know whether there were
12   additional versions of the script.  And the only reason he said
13   that was because of this change between $20 and $30.  So he
14   wasn't sure if the script had been updated to reflect that
15   change.
16         We spoke to him.  We spoke to Mr. Steele.  We spoke
17   to Mr. Zabek.  They searched their e-mails, the computer.
18   There were no hard copies.  There is no file cabinet.  Nobody
19   has any knowledge or awareness that there was another version
20   of the script.
21         I had those conversations, another partner at my firm
22   had those conversations, and there was an associate that had
23   those conversations, they totaled five.  In addition to the
24   deposition prep.
25         THE COURT:  All right.  What about the audio files

1   and logs?

2          MR. CARACAPPA:  So the audio files --

3          THE COURT:  I understand your argument that that may

4   not have been a part of the order that I entered and that you

5   may not be facing sanctions, but why shouldn't you be ordered

6   to produce that information?

7          MR. CARACAPPA:  So as the Court noted, none of that

8   stuff is relevant to their decision to blacklist Rightscorp.

9   And what they say is, well, all of this information is relevant

10  because this is stuff that they did, and this is why we based

11  our decision to blacklist Rightscorp.  If they want to limit

12  their request to everything before 2011, which is when they

13  made that decision, I think that's a fair argument.

14         But they're asking for voice recordings of things

15  that are occurring now with non-Cox subscribers on copyrights

16  that are not at issue in the case.  And there is just

17  absolutely no relevance to those communications at all to any

18  issue.

19         And what they want to do is they want to look at them

20  and they want to use those to inflame the jury and say, see

21  what bad people Rightscorp are.  None of that has anything to

22  do with their decision to blacklist Rightscorp in 2011.  We

23  believe that's the relevant time frame.

24         THE COURT:  What is in your possession, custody, or

25  control that relates to that time period?

1          MR. CARACAPPA:  I don't know, Your Honor, I would

2    have to check with the client.  I don't know whether there are

3    any voice recordings during that time period or not.

4          But to the extent that's relevant, that's the

5    relevant time period.

6          THE COURT:  Who knows?

7          MR. CARACAPPA:  It's likely Mr. Zabek.  It's likely

8    Mr. Zabek, Your Honor.  And we can call him today.

9          THE COURT:  I mean, it would be very convenient for

10   you to suggest to me to make an order that then comes in and

11   then you say, well, we don't have any.  So, I mean, I --

12         MR. CARACAPPA:  I don't think --

13         THE COURT:  The idea that you're coming in and

14   saying, we'll produce everything that's up to 2011 or up until

15   this, you know, and then ha, ha, ha, there aren't any, you

16   know, that's -- I would have thought you would have at least

17   had -- if you were going to be making that suggestion to the

18   Court, that you would have known whether there were or weren't

19   any responsive documents.

20         MR. CARACAPPA:  I understand.  I understand, Your

21   Honor.  I don't think there are any.  I don't know.  I don't

22   want my words to be used against me.

23         I have no understanding that there are any or that

24   that was Rightscorp's practice at the time, but that's the

25   relevant time frame.  And I think that's the relevant argument.

46

1    Anything that they knew or could have known about Rightscorp's

2    practices when they decided to blacklist us, we concede is

3    discoverable.

4            And if there are any phone scripts, or phone logs, or

5    voice recordings at that time, we will produce them.  I don't

6    think they exist, but I don't know.  But Cox has not

7    established the relevance of anything after the date that they

8    decided to blacklist us.

9            THE COURT:  Okay.  All right, I will hear from --

10           MR. BUCKLEY:  So --

11           THE COURT:  Let's go back to the time period and

12   address that issue of anything up until the decision was made

13   to blacklist them in 2011.

14           MR. BUCKLEY:  So I think there are a couple of

15   problems with that, Your Honor.  So Rightscorp continued to

16   communicate with Cox at least through the end of 2013, and

17   we've provided some of those communications to you.  They

18   continued to come back and continued to send notices, millions

19   of them.  Excuse me.  And, of course, are criticizing us for

20   not revisiting the blacklisting issue.  And each time they came

21   back to us, they said, you know, there is still a chance here.

22           So I don't think that 2011 is the cutoff.  At a

23   minimum, it ought to go through 2013 because we've got

24   communications in November of 2013 from Rightscorp.

25           I think that's particularly true if it turns out

1  there aren't any logs from prior to that time.  Because I

2  disagree that we don't have the right to show, both explore and

3  show Rightscorp's business model.  Rightscorp's business model

4  is on trial here and will be with the jury.  And what we are

5  saying in response to, well, you didn't forward our notices,

6  is, yeah, and for good reason.

7      So I don't think the temporal cutoff is an

8  appropriate one.  And they are -- they are certainly not

9  limiting their arguments about Rightscorp's systems to what

10  they were doing in 2011.  They're saying, here is how we

11  currently verify infringement.  This is a piece of that.  They

12  apparently verify infringement in part by coaxing people into

13  calling them.

14      So I disagree.  Certainly I think this material is

15  discoverable.  We can argue later about whether it's admissible

16  or not, but I think it's certainly discoverable.

17      As I said before, if a sampling is appropriate, so be

18  it.  I don't know that we need all 10,000 logs, but I think

19  that sampling should be across a time frame, again particularly

20  if the older time frame, if it's an old set, that's not fair.

21      THE COURT:  The November 2013, is that the last --

22  and I don't remember the dates of the letters, and I'm trying

23  to find those exhibits.

24      MR. BUCKLEY:  And we didn't give you a complete set,

25  Your Honor.  I believe, and I'll confirm that the last

48

1   communication we know of was in November of 2013.  I don't

2   believe there were any in 2014, but I can confirm that.

3            THE COURT:  The presentation that was made with the

4   PowerPoint, was that -- do you recall when that was?

5            MR. BUCKLEY:  There was one in early 2011, and then

6   there is a later communication in 2013 where they reforward it.

7   And I would have to go -- I don't have the dates in my head, I

8   would have to go back and confirm them.

9            THE COURT:  Okay.  The first one I think was in 2011.

10            MR. BUCKLEY:  Yes, early 2011, I think February

11   maybe.  It was before they began sending their notices in

12   March.

13            THE COURT:  And then there was the -- I do recall

14   there being the communications about it would really be in your

15   best interests to do something.  Okay.

16            MR. BUCKLEY:  And those continued.  They would come

17   back every three to six months and try again.  And that went at

18   least through 2013.

19            THE COURT:  Okay.  So tell me what it is that you

20   think you need to do in order to get the source code issue

21   straight, other than have the opportunity to depose -- and is

22   it both Mr. Boswell and Mr. Steele, or just Mr. Boswell on the

23   source code issue?

24            MR. BUCKLEY:  We need them both because there are

25   issues where they each say the other is the knowledgeable

49

1    person.

2         THE COURT:  Okay.  Anything else on the source code

3    issue?

4         MR. BUCKLEY:  So the expert reports is a significant

5    issue.  And I believe that if we -- I apologize for chuckling

6    about it, but if we can get a representation that we now have

7    the code and that there is not more coming, I believe that our

8    experts can analyze it and can put in supplemental reports by

9    the 31st.  And then that's before their depositions, so they

10   can still be questioned about those opinions at their

11   deposition.

12        THE COURT:  Okay.

13        MR. BUCKLEY:  And then, Your Honor, the last piece,

14   which relates to that information we've recently learned about

15   Ms. Frederiksen, I think we now need fact discovery from her.

16   We served on her today, and she accepted service today, of a

17   subpoena for documents that relate to her prior engagement and

18   to her current work.

19        But we need to get those documents and that

20   information quickly.  We can't -- you know, we can't wait two

21   weeks to get it, or it's not going to be any use to us.

22        So I would appreciate an order that anything that

23   relates to her work, any other factual information documents

24   that she has, that we get those within a week.

25        THE COURT:  What does her CV indicate?  Anything

1  about that?

2          MR. BUCKLEY:  It doesn't -- I apologize, I didn't

3  mean to cut you off.  It doesn't reference this engagement

4  specifically.  There is an entry on the CV that I think might

5  be an anonymized entry that might be intended to refer to this

6  engagement, but I don't know that.  It certainly was not

7  disclosed to us in a clear way where we understood what was

8  going on.

9          THE COURT:  When is her deposition scheduled?

10          MR. BUCKLEY:  The 12th.

11          THE COURT:  The 12th.  Okay.  Let me hear from -- can

12  you get them that information within a week?  Or consult --

13  information relating to her prior consultancy, at least what

14  the scope of that was and --

15          MR. CARACAPPA:  The prior consultancy with Steptoe

16  that we talked about earlier?  Yes, we're --

17          THE COURT:  With Steptoe on behalf of Rightscorp.  I

18  mean, am I -- with Steptoe in which she obtained a copy of the

19  source code from Rightscorp.

20          MR. CARACAPPA:  Yes.  And just to be clear, when we

21  say, the source code, I don't know whether it was all the

22  source code or a portion.  I understand it was only a portion.

23  Of the three main modules, she only obtained two of them.

24  That's what was in the 2013 production.  So just so the record

25  is clear.

51

1          But, yes, we are in the process of searching for and

2     will produce all the documents that she received from

3     Rightscorp, and we should be able to do that by Friday.

4          THE COURT:  All right.  Well, I mean, they also get

5     to know what the scope of her consultancy was, maybe not, you

6     know, what -- some description as to what she was hired to do

7     and why she was given access to that source code.  I want them

8     to have that before the deposition so they can look at it and

9     be prepared to, you know, question her about that at her

10     deposition.  And they will be able to do that at her

11     deposition.  Okay?

12          MR. CARACAPPA:  So just so I'm clear, how does the

13     Court want us to provide that?  You would like us -- her to

14     provide a description of the prior consulting engagement?

15          THE COURT:  I think -- and I don't know what the

16     subpoena is that you may have served on her yesterday or

17     whatever, but, you know, they're entitled to know why she got

18     that source code, when she got that source code, what she was

19     asked to do with that source code, and the purpose behind her

20     doing that.

21          You know, and I want them to know that information by

22     next Friday so that they can take that into consideration and

23     be prepared to depose her on the 12th knowing that information.

24          MR. CARACAPPA:  Understood, Your Honor.  There may be

25     some privilege issues there, but from what you've just

1  mentioned, standing here today, I don't think that that's

2  privileged and I don't think it's a problem providing that

3  information.

4         THE COURT:  All right.  Well, this -- you know, this

5  source code issue, and to a lesser extent the document issues,

6  are very troublesome.  I don't know any other way at this point

7  in time of how to deal with it other than to give them more

8  time with the people to question them about things.

9         And honestly, if I find out at a later point in time

10  that this is still not complete, you know, there may be

11  evidence limiting sanctions put into place.

12         And so, I mean, this is -- this is very significant

13  for your client.

14         MR. CARACAPPA:  We understand.

15         THE COURT:  To make sure that this gets taken care of

16  in a full, complete, and responsible manner.  Or your ability

17  to proceed in this case very well may be limited in a very

18  substantial way.

19         MR. CARACAPPA:  I understand, Your Honor.

20         THE COURT:  All right.  Do you think four hours is

21  still going to be enough on the source code?  Or given the new

22  historical source code, do you think you'll need more than

23  that?

24         MR. BUCKLEY:  Your Honor, I think we should have four

25  hours with each.  I don't know that we'll need to use all that

53

1  time, but if we get four with Boswell and four with Steele,

2  that should be sufficient.

3         THE COURT:  Okay.  All right, would that also include

4  the time that you would need to question them about the

5  telephone scripts?

6         MR. BUCKLEY:  Your Honor, on the scripts, my

7  understanding is that Mr. Steele is the individual who knows

8  the most about that, but that's because Mr. Zabek indicated

9  that.  If we had a couple additional hours with Mr. Steele to

10  address the phone logs, that's fine, as long as he's prepared

11  to answer questions.  If he's their 30(b)(6) designee, so be

12  it, he just needs to be prepared.

13         THE COURT:  Okay.  Well, on the source code issue,

14  I'm going to require both Mr. Boswell and Mr. Steele to sit for

15  another deposition.  And if in preparing them it appears that

16  there is, you know, going to be finger pointing, you know, you

17  may need to have them both sitting in a deposition and there be

18  a question asked for a 30(b)(6) deponent, and then they confer

19  and respond.  You know, I don't want this finger pointing, one

20  versus the other.

21         So, you know, questions are going to be asked and

22  they need to be answered, and you need to be prepared to get

23  the answer and have the answer presented in the deposition.

24         And, you know, I've got to tell you, every question

25  doesn't have to be objected to.  It is astounding reading these

1   deposition transcripts.  I bet 90 percent of the questions

2   there was an objection to.  And I assume it just becomes

3   background noise at some point.  But when you're reading a

4   transcript, it isn't background noise.

5          And, I mean, I've read all the transcripts that you

6   all have produced here, and it just astounds me at how even the

7   most basic questions can prompt an objection to the form or

8   something like that.  You know, you don't need to do that, it

9   just wastes the record, it wastes time.

10          But I'm going to require Mr. Boswell and Mr. Steele

11  both to sit for another four hours of deposition.  I'm going to

12  require a 30(b)(6) deponent to be prepared to testify as to the

13  telephone scripts and the court reporter things for 90 minutes.

14  I don't think you're going to need more than 90 minutes, and

15  whoever it is can do that.

16          On the phone logs and recordings, I'm going to have

17  you produce things, anything up to November 2013.  So if you

18  have them, you're going to need to produce them.  If you don't

19  have them, you need to explain why you don't have them.  But I

20  think that may be the appropriate time frame, and hopefully

21  there will be at least some for them to go there.

22          So on that motion, I'm granting it, requiring the

23  depositions of both Mr. Boswell and Mr. Steele, and a

24  deposition for the 30(b)(6) deponent for you to designate who,

25  it could be Steele or it could be somebody else, but they need

1    to be prepared to testify for another 90 minutes on that issue.

2              And, you know, you need to get the story straight as

3    to -- you know, are there other versions of the phone script or

4    not?  And have someone prepared to testify and explain why

5    there may have been some confusion one way or the other on the

6    record under oath.

7              All right.  So that's going to take care of that

8    motion.

9              MR. BUCKLEY:  Your Honor, on the supplemental expert

10   reports --

11             THE COURT:  Oh, I'm sorry.  The supplemental expert

12   report, I'm going to give you until July 31 to have your

13   experts provide a supplemental report.  You know, and they'll

14   end up being deposed, I take it, the second week in August or

15   is --

16             MR. BUCKLEY:  We have them scheduled over a number of

17   dates, but we'll make sure that it's after their reports.

18             THE COURT:  Okay.  All right.  So they'll have until

19   July 31 to supplement their reports, to write their reports.

20             All right.  The last one is the 30(b)(6).  That's

21   back to you, Mr. Kelley?

22             MR. KELLEY:  It is.

23             THE COURT:  Okay.  All right.  So, you know, one of

24   your arguments is, we're doing this all for new discovery, new

25   discovery and, you know, it's a moving target.  But I don't

56

1    quite understand how that applies to some of these seven topics

2    that you put in there.

3              Topic 46:  The factual basis for each of your

4    defenses that Cox asserted in its answer to the amended

5    complaint on pages 5 through 7.  That answer to the amended

6    complaint was filed on January 20, 2015.

7              Why wasn't that part of either the first or second

8    30(b)(6) notice?

9              MR. KELLEY:  Not having drafted the notices, I can't

10   tell you for sure.  I can tell you probably because documents

11   produced since then have made it particularly relevant.

12             And in that regard, I've got a little chart here.

13   Since the substantial completion date, Cox has produced about

14   12,000 pages of documents, the most recent being July 14.

15             I mean, it really -- stuff comes in and out of this

16   case at an amazing speed.  And we're all doing it in a

17   compressed time frame.

18             And so, things are just -- they're popping into

19   relevance in a way that they weren't before.

20             THE COURT:  So you didn't think that their defenses

21   were relevant until recently?

22             MR. KELLEY:  The defenses are always relevant.  Some

23   are more relevant than others.  A lot of that stuff is

24   boilerplate.

25             THE COURT:  Well, that's not what you put in here.  I

57

1    mean, you want all of them.

2         MR. KELLEY:  Oh, sure, we always ask for all.

3         THE COURT:  All right.  Well, let's go through them,

4    topic 41.  You've got three areas there.  I understand the

5    first one.

6         I don't understand what it is that you have got on

7    the second:  The identity of the customers with whose account

8    each IP address was associated at the time the infringement as

9    identified in the infringement notices.

10        MR. KELLEY:  The IP address.

11        THE COURT:  So you sent a million notices, and you

12   want a 30(b)(6) deponent to come in and testify as to who the

13   customers were for each of those million notices that you sent?

14        MR. KELLEY:  I think all of that's been limited down

15   to the 250 after we've done all this motions practice.  And

16   obviously we have the --

17        THE COURT:  Well, that's --

18        MR. KELLEY:  -- all the personal identifier stuff

19   that we've gone through.

20        THE COURT:  Well, but, I'm looking at your topic now.

21        MR. KELLEY:  Yeah, it's overbroad.

22        THE COURT:  The topic says:  What, if any, actions

23   Cox took, and the dates on which such actions were taken, to

24   preserve the infringement notices that Rightscorp sent to Cox.

25        I assume that's a pretty basic --

58

```
1              MR. KELLEY:  To preserve them, sure.

2              THE COURT:  Right, to preserve them.  And somebody

3    can come in and say what they did or didn't do on that.

4              MR. KELLEY:  Right.

5              THE COURT:  Then it's:  The identity of the customers

6    with whose account each IP address was associated at the time

7    of the infringement as identified in the infringement notices.

8              MR. KELLEY:  That has to be read in the context of

9    the preserve.  It's one thing to preserve the notice.  What

10   steps were taken to preserve the identity of the subscriber.

11             Because, you know, the notice just says the IP

12   address and the portal.  And as we've learned over the course

13   of the case from Mr. Buckley last time, those IP addresses

14   change.  I mean, you turn your router on and off, the IP

15   address changes.

16             So what steps were taken to preserve the identity of

17   the person at that time.  I think the answer is going to be

18   nothing.  That's one topic that will be over and done with in

19   five minutes, if my understanding of the record is correct.

20             THE COURT:  And what is DHCP lease records?  What are

21   those?

22             MR. KELLEY:  I have no idea.  Okay.  Mr. Caracappa

23   tells me those are records that Cox keeps, we think for only

24   six months, that links the identity of the subscriber to the

25   particular IP address.
```

1          There are more acronyms in this case than in a

2    military setting.

3          THE COURT:  Okay.  All right.  Topic 42 is:  The

4    corporate entity(s) responsible since January 1, 2010, for

5    providing Internet service to Cox customers.

6          Why 2010?

7          MR. KELLEY:  Probably because you had to pick some

8    place, and that seemed reasonable.

9          What that goes to is there's a little bit of a

10   question of who's responsible here.  We've got three Cox

11   defendants, and I know that they have been constantly on us to

12   try to dismiss Cox Enterprises, and we're trying to understand

13   the interrelationship.

14         As for the date, I can't give you anything more than

15   it seemed like a good starting point.

16         THE COURT:  Okay.  43:  All communications and

17   documents concerning Procera, or data or information collected

18   by or provided Procera concerning Cox.

19         MR. KELLEY:  Procera was just sent a subpoena

20   recently.  I'm not up on Procera, frankly.

21         THE COURT:  What were they doing?  I mean, what was

22   their role in this?

23         MR. BUCKLEY:  Your Honor, it's a third-party vendor

24   that collects network and data analytics that Cox uses for

25   network management.

60

1          MR. KELLEY:  I'm told that it has to do specifically

2     with BitTorrent.

3          MR. BUCKLEY:  That's basically right.  And a 30(b)(6)

4     deponent, Your Honor, Matt Carruthers, testified about Procera

5     for about two hours yesterday.  I sat in on that.

6          MR. KELLEY:  And that's an important point, is that

7     this 30(b)(6) deposition isn't over.  Part of the 30(b)(6) of

8     Cox, depositions were taken yesterday and Tuesday.  I mean,

9     just working your way through topics.

10          THE COURT:  Well, Mr. Kelley, help me understand.  If

11     you were charged with producing a deponent to come in and

12     testify on behalf of a corporation, and he or she had to

13     testify as to all communications and documents concerning a

14     company, or data or information collected by or provided to a

15     company concerning Cox, how would you go about doing that?

16          MR. KELLEY:  You do the best you can.  And I don't

17     mean to be flip because I've been in the position of trying to

18     prepare 30(b)(6) witnesses.  The trouble is, with topics that

19     are broad, you don't know how to drill in but so much.

20          Also, Rule 30(b)(6), you know, it's not the absolute

21     most knowledgeable person.  It's got to be somebody who's

22     prepared.

23          THE COURT:  Right.  So you're asking somebody to be

24     prepared to testify about every communication and every

25     document known to that company about Procera, or data or

1    information collected by or provided to Procera concerning Cox.

2              MR. KELLEY:  I can see where you think that's broad.

3              THE COURT:  And the same as with inCode, which is 44:

4    All communications and documents concerning inCode Consulting.

5              I mean, if this was your relationship with, or

6    somebody who could come in and give, you know, testimony

7    concerning a more limited range -- but to come in and ask for a

8    Court order to require somebody to be prepared to testify as to

9    all communications and documents concerning InCode Consulting,

10   I don't understand how that -- how one could really expect that

11   to be done.

12             MR. KELLEY:  Well, obviously the deposition won't

13   cover everything, but I understand your point.  As a practical

14   matter, these things are done differently than they're

15   initially written.

16             THE COURT:  Topic 45 is:  The factual basis for Cox's

17   answers to plaintiffs' interrogatories and all efforts Cox

18   undertook to provide answers.

19             Now, you've already got -- item 2 was the process by

20   which the answers to plaintiffs' interrogatories were

21   researched and prepared by Cox.

22             And you've already got 38, I think, was Cox's

23   responses to plaintiffs' interrogatories.

24             What is it that you're looking at in 45 that isn't

25   already in 2 and 38?

62

1          MR. KELLEY:  I think it's more of a belt and

2    suspenders kind of thing, frankly.  Oh, wait a minute, Ms.

3    Roberts tells me they objected to 38.

4          THE COURT:  38?

5          MR. KELLEY:  Topic number 38.

6          THE COURT:  Right.  But not number 2, which was the

7    process by which --

8          MR. KELLEY:  No, which is process as opposed to

9    substance.

10          THE COURT:  Why didn't you move to compel 38 as

11   opposed to just turning around and adding another one into a

12   third notice?

13          MR. KELLEY:  Frankly, because we're trying to do as

14   much as we can and do work-arounds whenever possible.  If we

15   filed motions on every objection, we would be in here not only

16   every Friday, but hours every Friday.

17          THE COURT:  It doesn't seem to be stopping you all,

18   but --

19          MR. KELLEY:  Well, actually --

20          THE COURT:  No, no, I understand.

21          MR. KELLEY:  Actually, we have done a lot.

22          THE COURT:  I understand.  You all have worked

23   together better than --

24          MR. KELLEY:  We've done a lot better than you might

25   think.

63

1          THE COURT:  All right.  47 is:  Communications,

2    studies, investigations, memoranda, and reports of Cox

3    concerning the potential effects on Cox's revenues, profits,

4    reputation about terminating its customers in connection with

5    copyright infringement.

6          16 is:  Communication, studies, investigations,

7    memoranda, and reports concerning the effect, results, or

8    impact of actions Cox has taken in response to infringement

9    notices.

10         And 30 is:  Communications, studies, investigations,

11   memoranda, and reports at Cox concerning potential effects of

12   Cox terminating its customers' Internet services in connection

13   with copyright infringement.

14         What's new about 47?

15         MR. KELLEY:  I think 47 is more directly related to

16   financial aspects as opposed to other more generalized aspects.

17         THE COURT:  Potential effects of terminating its

18   customers?

19         MR. KELLEY:  Wasn't that pre--

20         THE COURT:  I mean, it says -- it says, potential

21   effects, including potential effects on revenues, but it

22   doesn't -- all right.

23         MR. KELLEY:  Obviously we're not going to do

24   duplicative things.  And I understand that to be a source of

25   concern.

64

```
 1              THE COURT:  All right, let me hear from Cox.  I
 2    understand the argument, you know, enough is enough.
 3              MR. BUCKLEY:  About the timing, right.
 4              THE COURT:  But I'm -- I want to just get to the
 5    practical part here and see if we can't just narrow some of
 6    these areas, see what the real issues are, see if they've
 7    already been covered or not.
 8              MR. BUCKLEY:  Yes, I totally understand, Your Honor.
 9              So on issue 41, we already made a designee, Brent
10    Beck, available on this topic, and they asked him about it.
11    They asked him about the logs.  They asked him about deletion
12    and preservation of Rightscorp's notices.
13              So I think that one has actually already been
14    covered.  And it's covered multiple ways in written discovery
15    requests as well.
16              THE COURT:  Well, am I right that you really didn't
17    preserve the infringement notices?
18              MR. BUCKLEY:  That's basically right.  And the ones
19    we have, we've produced.  And we've told them, this is it.
20              So they've -- you know, they have sworn discovery
21    responses saying, here are the only notices we've preserved.
22              And we've also told them about the DHCP logs.  And
23    Mr. Beck testified to that at some length.  So I think 41 is
24    covered.
25              THE COURT:  Who for the plaintiff was at Beck's
```

1    deposition?

2           MR. BUCKLEY:  Mr. Caracappa.

3           THE COURT:  Okay.  Was Beck's deposition -- what

4    didn't Beck testify to that would need to be answered as to --

5    you know, what did you do with the infringement notices?  What

6    kind of information did you keep about the identity of the

7    customers in the infringement notices and the lease records?

8           MR. CARACAPPA:  So, Your Honor, from what I recall at

9    the Beck deposition, he was not sure.  And the testimony was

10   not clear.  And the reason why we issued a lot of these new

11   topics was because of the motion on the subscribers.  And that

12   was the first time we were learning that they didn't keep any

13   of this information.

14          Now, Mr. Beck testified that generally it was kept

15   for six months.  That's testimony that I seem to recall.

16          I also seem to recall asking him, all right, if it's

17   outside of six months, what do you do?  And that's where it got

18   fuzzy.  That's where he said, well, it couldn't be easily

19   found.  And I pushed him a little bit on that and he said,

20   well, he didn't really know.

21          So after that deposition we talked about the motion

22   and we talked about identifying the subscribers.  And our

23   position is that, okay, if you're destroying the notices, you

24   at least have a duty to preserve the information related to

25   that alleged infringer.  And if the answer is here, they didn't

66

1    do that either, then I think a lot of these topics are

2    necessary as well.  But that's information that we don't fully

3    know yet.

4             And we are trying to understand the total number of

5    notices they received versus processed.  That seems to be

6    semantics to us, but it's a big issue in the case for Cox.

7    They say that they didn't process them.  They received them,

8    they just don't process them.  And that's what we're trying to

9    understand.  And information in documents that we're getting

10   and motions filed with the court, I wouldn't necessarily say it

11   changes, but it further informs our analysis.  And that's an

12   attempt to try and figure out finally, exactly what's happening

13   with all the information.

14            And from what I understand as well, they agreed to

15   amend the response to Rog 5, and they have not done so.  So

16   this is also related to that.

17            THE COURT:  To Interrogatory 5?

18            MR. CARACAPPA:  Yes, Your Honor.

19            THE COURT:  All right.

20            MR. BUCKLEY:  Your Honor, that relates to the

21   distinction that Mr. Caracappa was just speaking to of the

22   difference between a complaint that comes in to the

23   abuse@cox.net In Box as opposed to a complaint that is then

24   processed Katz.  So they have asked us to break that down.  So

25   we're going to give them a revised Rog 5 answer that shows

1    everything that came into the In Box, everything processed by

2    Katz on a monthly basis going back to January 2010, and that's

3    in process.

4             I actually don't think that relates in any way to

5    this topic.

6             THE COURT:  Because none of the ones from Rightscorp

7    got processed by Katz?

8             MR. BUCKLEY:  Right, right.  And Mr. Beck did testify

9    on these topics.  It may be that Mr. Caracappa didn't ask every

10   question he had hoped to, but Mr. Beck did testify on these.

11   And there are written discovery requests out to us on these

12   issues.

13            So they're going to get answers.  It's not that we're

14   trying to hide anything.

15            The question here, Your Honor, is do we have to prep

16   and make somebody else available in a 30(b)(6) capacity to talk

17   about these things when we've already made seven people

18   available for seven days.

19            So I think 41 is covered.

20            THE COURT:  Well, what I'm going to have you do for

21   41, I'm going to have you provide them with a written response

22   to those three questions.  Okay?

23            MR. BUCKLEY:  Certainly.

24            THE COURT:  Not produce -- and you get that written

25   response.  And it may be my understanding is a little less

68

1    clear than it needs to be.  But I think those are probably

2    pretty easy to answer from my understanding of what the process

3    has been, about what was done to preserve the notices, what was

4    done to preserve the identity of the customers who were in

5    those notices.  You didn't preserve the notices and you don't

6    know who the identities of the people were, so --

7            MR. BUCKLEY:  I agree, Your Honor.  So what I would

8    propose is I guarantee that there are discovery requests from

9    the plaintiffs to which this information is responsive.  So we

10   will provide it.  We will answer these questions --

11           THE COURT:  I want a written --

12           MR. BUCKLEY:  -- in the context of a response so that

13   it's a discovery response.

14           THE COURT:  All right.  42:  The corporate entities

15   responsible for providing the Internet service.

16           MR. BUCKLEY:  So, Your Honor, this goes to the fact

17   that Cox Enterprises, Inc., which is the parent company, has

18   been named as a defendant.  They've served a separate 30(b)(6)

19   notice on Cox Enterprises that covers this and other topics,

20   and we're going to discuss with them the contours of that and

21   how we're going to respond to it.  We've either offered to

22   provide them a declaration from somebody at CEI that addresses

23   all the issues they want to address, which seems to us the

24   simplest way to handle it.  But if we have to put somebody up

25   on a couple of topics, we'll do that.

1          This is entirely duplicative of the separate CEI

2    notice.

3          THE COURT:  Well, would the CEI notice be able to

4    provide about the relationship between all three entities?

5          MR. BUCKLEY:  Absolutely.

6          THE COURT:  All right.  Well, then I'm going to

7    require that if you can't work out the declaration issue and

8    the declaration cover that, that whoever you -- whoever is the

9    deponent for CEI needs to be able to respond to the questions

10   in topic 42.  Okay?

11         MR. BUCKLEY:  Yes.

12         THE COURT:  All right.  43, I have to -- for 43 and

13   44, I can't order someone to be prepared to produce, to talk

14   about all communications and documents concerning something.  I

15   think that's just, as worded, is just an impossible task to try

16   and get somebody to do.

17         The answers to interrogatories, what --

18         MR. BUCKLEY:  Your Honor, we already provided

19   somebody to talk about the process, but the way these are

20   worded, it's the factual basis for every discovery response

21   we've provided in the case and every defense.

22         I mean, I honestly don't know how you would even go

23   about doing this.  I don't think this is a proper 30(b)(6)

24   topic, period.

25         THE COURT:  Well, I think, you know, you're right,

70

1   it's not a specific -- it's not as specific as 30(b)(6) should

2   require -- should require somebody to do.  But the factual

3   basis for the answers in the amended complaint I think is also

4   not appropriate at this stage.  I mean, obviously the thing was

5   filed back in January.  If they wanted to ask topics about

6   specific defenses as opposed to broad ranges between pages 5

7   and 7, that might have been okay.

8           The same about any specific interrogatories, if

9   you've produced somebody in response to topic number 2 to talk

10  about the process, I think that's appropriate.

11          What about 47?

12          MR. BUCKLEY:  I think we've covered 47 too.  Your

13  Honor, I commend you for your attention to detail.  This

14  appears to me to be essentially a duplicate of a prior topic.

15          THE COURT:  Well, it is, but it isn't.  I mean, it

16  adds an additional phrase to 30.  And I guess my concern is

17  that maybe you didn't produce somebody to fully testify about

18  30, and that's why they're coming in with 47.

19          If you look at 30, it says:  Communications, studies,

20  investigations, memoranda, and reports at Cox concerning the

21  potential effects -- so it's the same as 47 up to there.

22          And then 47 adds:  Including potential effects on

23  Cox's revenues, profits, reputation among potential and actual

24  customers.

25          And then it picks up:  Of Cox terminating its

1    customers' Internet service in connection with copyright

2    infringement.

3           So 47 is the same as 30 with the exception of

4    including potential effects on revenues, profits, reputation

5    among potential and actual customers.

6           And I guess, did the person who testified as to topic

7    30, was he or she prepared to talk about the potential effects

8    on revenues, profits, and reputation among potential and actual

9    customers?

10          MR. BUCKLEY:  Certainly reputation -- that was Sidd

11   Negretti, who is a high level marketing person at Cox.

12   Certainly the reputational issues were covered.

13          What I don't recall, Your Honor, and I didn't defend

14   that deposition, is the extent to which he could speak to the

15   financial issues associated with it.

16          Our financial designee was deposed on Tuesday.  So it

17   may be that I'm not entirely understanding the gist of the

18   question.  I mean, if we terminate a customer, the consequence

19   is we lose the revenue from that customer.  Which would seem to

20   me to be obvious.  And they've argued it and their expert has

21   made that point.

22          THE COURT:  Yeah, I mean, it's no secret that they're

23   saying Cox wasn't terminating its customers for infringement

24   because every customer you terminate, there is a revenue stream

25   that is lost.  And once you get a customer, there is an

72

1    expectation of revenue coming from that customer.  And it's an

2    investment to get every new customer.

3            MR. BUCKLEY:  That's their argument.

4            THE COURT:  And so, I do think -- and, you know, that

5    47 is arguably included in 30, but if there wasn't somebody who

6    was prepared to testify concerning the financial effects, that

7    is potential effects including the financial on revenues and

8    profits, and just that person was only prepared to testify

9    about reputational, then I do think you're going to need to

10   have somebody else come in and testify as to any

11   communications, studies, investigations, memoranda, and reports

12   at Cox concerning potential revenue, profit effects --

13           MR. BUCKLEY:  So two --

14           THE COURT:  -- on terminating --

15           MR. BUCKLEY:  Sorry.

16           THE COURT:  Go ahead.

17           MR. BUCKLEY:  Two observations, Your Honor.  The way

18   this is worded, communications is broad, obviously, but

19   studies, investigations, memoranda, reports, it's document

20   focussed.

21           So I read it to mean, is there some document floating

22   around Cox that says, oh, boy, we better not terminate folks

23   because we lose revenue?

24           So I guess, first, it would be helpful to have some

25   clarification on that.

1        But maybe what we could -- what I would propose is

2   why don't I confer with the plaintiffs' counsel on this one and

3   see if I can understand where they think the gaps are.  And if

4   we need to make someone available, we will do that.

5        THE COURT:  Okay.  Well, I do think that if there are

6   studies, investigations, memoranda, or reports that were done

7   talking about, you know, this would have a significant impact

8   on our revenue stream or whatever, then I do think you need to

9   produce somebody to testify about that because it does, really

10  does fall within the potential effects category that was in the

11  earlier ones.

12       So I'm going to grant that one in part and deny it in

13  part.  Okay?

14       Okay.  I think that takes care of the issues that we

15  have addressed today.

16       MR. KELLEY:  There is one more.

17       THE COURT:  Okay.

18       MR. REILLY:  It's a -- good morning, Your Honor.

19  Craig Reilly here for Cox.

20       We had one other issue leftover from one of your

21  prior rulings about having Cox produce additional information

22  about certain of the subscribers whose objections you

23  overruled.

24       For certain of those subscribers, we went back and

25  checked, we don't know who they are, probably without looking

1   at the redacted information that they -- the full information

2   they submitted to the Court identifying themselves that was

3   then redacted in the public record when you posted the

4   objections in the ECF system.

5            Would it be possible under some sort of protective

6   order issued by the Court that Cox's counsel would be able to

7   review the unredacted versions of those objections to determine

8   the subscribers so we could provide the additional information

9   that the Court had required?

10           THE COURT:  Okay.  The short answer to that is yes.

11  Can you -- I got the impression from the last time that we had

12  this argument that Cox thought that it could correlate that

13  information based -- I mean, based on what it had already.  I

14  take it that was not right?

15           MR. REILLY:  Not entirely correct with respect to all

16  of the objectors.

17           THE COURT:  All of them.  I tell you what, identify

18  the ones that you need additional information.  I will then

19  locate and have a -- some of them you're going to be in no

20  better shape than you are now because some of them provided no

21  identifying information.  They -- you know, even John Doe with

22  no address or anything like that.  So I'm not sure that we're

23  going to be able to do -- but we can take the next step, and I

24  can provide you with a copy of everything that we have so that

25  you can then hopefully try and correlate it.  Okay?

75

1          MR. REILLY:  Thank you, Your Honor.  How should I

2    submit the list to you?  Should I contact your chambers through

3    a --

4          THE COURT:  Yes, just --

5          MR. REILLY:  -- phone call, or would you like a

6    pleading on record?

7          THE COURT:  You know, a phone call with the ones that

8    are at issue.  And then we'll look at it and then we'll let you

9    know when you can come get the additional information.  It will

10   take me awhile to find it and make sure that we have what you

11   may need.  Okay?

12         MR. REILLY:  Thank you, Your Honor.

13         THE COURT:  Okay.  Okay, I think that takes care of

14   the issues for today.  Thank you.

15         Court will be adjourned.

16         NOTE:  The hearing concluded at 12:01 p.m.

17         --------------------------------------------------

18

19

20

21

22

23

24

25

1

2          C E R T I F I C A T E  of  T R A N S C R I P T I O N

3

4

5          I hereby certify that the foregoing is a true and

6   accurate transcript that was typed by me from the recording

7   provided by the court.  Any errors or omissions are due to the

8   inability of the undersigned to hear or understand said

9   recording.

10

11          Further, that I am neither counsel for, related to,

12   nor employed by any of the parties to the above-styled action,

13   and that I am not financially or otherwise interested in the

14   outcome of the above-styled action.

15

16

17

18

19

20                    /s/ Norman B. Linnell

21                   Norman B. Linnell

22                   Court Reporter - USDC/EDVA

23

24

25