UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP<br><br>Plaintiffs,<br><br>v.<br><br>COX ENTERPRISES, INC., COX COMMUNICATIONS INC., COXCOM, LLC.<br>Defendants. | Case No. 1:14-cv-1611(LOG/JFA) |

## REPORT OF BARBARA FREDERIKSEN-CROSS

EXHIBIT A  EXCERPTS OF REPORT

## IV. LEGAL STANDARD

**Direct infringement**

11. It is my understanding that direct infringement requires proof of ownership of the copyrighted works and that a defendant unlawfully copied the copyrighted works. *See Bldg. Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 578 (4th Cir. 2013); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). I am informed that a direct infringer has been characterized as "one who 'trespasses into [the copyright owner's] exclusive domain' established in § 106 of the Copyright Act. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (citing *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 432–33, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)).

12. I have been informed that the upload and download of copyrighted musical works on the internet without permission from the copyright owner constitutes direct infringement. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) ("Both uploading and downloading copyrighted material are infringing acts. The former violates the copyright holder's right to distribution, the latter the right to reproduction."); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("a majority of Napster users use the service to download and upload copyrighted music.... And by doing that, it constitutes—the uses constitute direct infringement of plaintiffs' musical compositions, recordings.") and ("Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3). Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights. Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights."))

**Contributory Infringement**

13. I have been informed that for a claim based on secondary liability—such as vicarious or contributory infringement— a plaintiff must first establish that direct infringement has been committed a third party. *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 149 (S.D.N.Y. 2009) (citing *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir.1998)).

EXHIBIT A  EXCERPTS OF REPORT

14. I have been informed that contributory copyright infringement exists when "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996). It is my understanding that the knowledge requirement for contributory liability requires that the secondary infringer "know or have reason to know" of direct infringement. *See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004*, 1020 (9th Cir. 2001).

**Vicarious Infringement**

15. I have been informed that vicarious copyright infringement imposes liability when a defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005) ("one infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."). I have been informed that a financial benefit exists "where the availability of infringing material "acts as a 'draw' for customers." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).

## V. STRUCTURE OF THIS REPORT

16. For the convenience of the reader, I have structured this report to first provide a summary of my opinions, followed by an overview of technology and terminology relevant to this case. Later sections of the report provide my findings with respect to the Rightscorp system, and the COX system. The final section of my report discusses the infringement data that Rightscorp has collected for COX Subscribers and provides my conclusions with respect to this data and the ability of the COX system to respond to Rightscorp Infringement notices and Requests for termination.

17. It is my understanding that discovery is still ongoing and that in the course of this litigation additional evidence may be produced and depositions taken. This report does not therefore contain the entirety of my opinions, and I reserve the right to provide a supplement to this report with additional analysis and explanation as needed to address any further discovery produced by the parties.

EXHIBIT A  EXCERPTS OF REPORT

CONTAINS HIGHLY CONFIDENTIAL INFORMATION – ATTORNEYS' EYES ONLY

## VI. SUMMARY OF MY OPINIONS

18. Based on my analysis to date, I have formed the following opinions:

- The Rightscorp system effectively identifies online copyright infringers who use the BitTorrent file sharing protocol.

- The Rightscorp methodology is well developed, and provides accurate detection of peer-to-peer file sharing activity of copyrighted works (an "infraction"), including accurate determination that the shared file is the actual copyrighted work at issue.

- The Rightscorp System prepares and sends accurate Infringement Notice emails to ISPs, including COX, which reflects the information associated with each infraction, including the IP address, date, identification of the copyrighted work, and port number.

- The Rightscorp system has emailed COX over 2.5 million Infringement notices relating to over 160,000 COX IP addresses that were being used to share copies of Plaintiffs' Asserted works at issue in this case.

- The Rightscorp system has emailed COX weekly Termination Requests relating to COX IP addresses that continued to offer copies of Plaintiffs protected works even after COX received infringement notices for those IP addresses. The termination request email identifies the number of Infringement Notices Rightscorp has previously provided COX, the count of IP Address/Port combinations addressed associated with the prior Infringement Notices, and reminds COX of its obligation pursuant to 17 U.S.C. § 512(i)(1)(a) to adopt, reasonably implement, and inform its subscribers and account holders who are repeat infringers. The termination notice attaches a file with the details of the claimed infringements, including the IP address, port, and date/time the infringement occurred.

- COX has the ability to forward Infringement Notices to subscribers whose email address is known to COX.

- COX has the ability to suspend and/or terminate subscribers who are repeat infringers, even when the subscriber's email is not known to COX. These

EXHIBIT A   EXCERPTS OF REPORT

capabilities include automatic suspensions generated by the COX Abuse Ticket System and also manual suspensions or terminations.

- COX deliberately blocks the Infringement Notices sent by Rightscorp.
- COX has also admitted that COX does not forward any Rightscorp-produced notices to its subscribers.
- Cox has the ability to easily generate and send its own notices to its subscribers that correspond to the infringement notices it received/receives from Rightscorp for COX subscribers, but COX has not done so. As a result, no notices have been sent to COX subscribers for Rightscorp complaints since at least the point in time when COX began to block Rightscorp-produced Infringement Notices from entering the CATS system.
- COX has failed to take action on Rightscorp-produced Termination Requests, which provide COX with additional notice of its subscriber's infringing activity.

REMAINING TEXT ON PAGE REDACTED

EXHIBIT A  EXCERPTS OF REPORT