**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, <br><br> Plaintiff, <br><br> v. <br><br> COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, <br><br> Defendants. | )<br>)<br>)<br>)  Case No. 1:14-cv-1611 (LOG/JFA)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF COX'S MOTION**
**FOR EVIDENTIARY SANCTIONS BASED ON**
**SPOLIATION OF RIGHTSCORP SOURCE CODE AND OTHER EVIDENCE**

**REDACTED VERSION SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

**INTRODUCTION** .......................................................................... **1**

**BACKGROUND FACTS** ............................................................... **2**

    I.     RIGHTSCORP'S EARLY NOTICES TO COX ............... **2**

    II.    PLANNING AND PREPARATION TO SUE COX ......... **4**

    III.   RIGHTSCORP'S MISLEADING AND MANIPULATIVE
          SOURCE CODE PRODUCTION .............................. **10**

    IV.   DESTRUCTION OF RIGHTSCORP SOURCE CODE ..... **13**

    V.    RIGHTSCORP'S DESTRUCTION OF AUDIO RECORDINGS
          AND CALL RECORDS .......................................... **20**

**AUTHORITY AND ARGUMENT** ................................................ **22**

    I.     RIGHTSCORP'S SPOLIATION OF ITS SOURCE CODE .. **24**

    II.    RIGHTSCORP'S SPOLIATION OF ITS CALL LOGS AND
          AUDIO RECORDINGS ........................................ **28**

**CONCLUSION** ............................................................................ **30**

## <u>INTRODUCTION</u>

The Cox Defendants respectfully move this Court for an order granting certain preclusive evidentiary sanctions based on the willful failure of Plaintiffs and their agent, Rightscorp, Inc., to preserve critical evidence in anticipation of this litigation and even after it commenced.

According to Plaintiffs' First Amended Complaint, this lawsuit for secondary copyright infringement is predicated entirely on Rightscorp's "technological system that identifies actual infringements and the perpetrators of these infringements." Doc. 16, ¶ 2.  Allegedly, "[s]ince 2012, Plaintiffs, through their agent, using this system, have notified Internet service providers ('ISPs') of specific instances of first-time and repeat copyright infringement committed by their account holders." *Id*.  And it is this "system" that allegedly identified the infringements on Cox's network, and generated the notices to Cox, for which Plaintiffs now seek hundreds of millions in damages.  But what Plaintiffs' complaint omits is that this advanced "technological system" ***no longer exists***.  Despite actively and secretly planning this lawsuit against Cox for nearly ***two years***, and ███████████████████████████████████ ██████████████ in case the reliability of its systems were ever in question, Rightscorp destroyed ***every historical version*** of its mythical "technological system."  As such, it is literally impossible for Cox, this Court, the jury, or even Plaintiffs' own experts to know how the Rightscorp systems functioned at any point in time prior to July 2015 (when the current version of the Rightscorp code was finally all produced).  Moreover, it is impossible for Cox to test or rebut Plaintiffs' sweeping claims about the capabilities of Rightscorp's "technological system" when it supposedly detected the copyright infringements at issue in this suit.

Similarly, Rightscorp touts as a fundamental part of its business model ████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████ There is strong circumstantial evidence that those practices ████████████ ████████████████████ The script that Rightscorp's phone agents follow makes clear

that consumers are threatened, bullied, and misled into paying Rightscorp's settlement demands, regardless of whether those consumers engaged in any infringing conduct.

Under the well-established law of the Fourth Circuit and this district, the Court has the inherent power and the obligation to address spoliation of critical evidence, so that the party failing to preserve such evidence does not unfairly benefit from that improper conduct. As discussed in detail below, the only way to prevent extreme and irreparable prejudice to Cox is to prevent Plaintiffs and Rightscorp (1) from relying on any evidence of how Rightscorp's systems operated or generated notices prior to July 2015, and (2) from denying the harsh realities of how Rightscorp's phone agents communicate with consumers who contact Rightscorp.

## **BACKGROUND FACTS**

### I.   **RIGHTSCORP'S EARLY NOTICES TO COX**

Cox is the third-largest cable and broadband company in the United States, serving approximately six million residential and business customers. Cox receives thousands of complaints per day, both from third parties and from Cox subscribers, about various forms of alleged abuse on its network, most of which are submitted by email to "abuse@cox.net." Cox has developed a sophisticated computer system — the Cox Abuse Tracking System, or "CATS" — that processes complaints received through "abuse@cox.net."

Most of the abuse complaints received by CATS are notices of alleged copyright infringement sent pursuant to the provisions of the Digital Millennium Copyright Act (DMCA). Cox works with copyright holders to automate the DMCA notice process. The copyright holder agrees to format its notices to provide the identifying information listed in the DMCA. In exchange, Cox configures CATS to automatically process notices from those copyright holders and forward those notices to implicated Cox subscribers. Cox has a well-established "graduated response" system to deal with subscribers who receive multiple abuse complaints, and to terminate those subscribers' Internet accounts when appropriate. Over 97% of the DMCA notices Cox receives are processed in this cooperative, automated fashion.

At least as early as 2010, a handful of copyright holders or their agents began sending notices that included threats and payment demands aimed at Cox subscribers.  With input from its in-house and outside legal counsel, Cox determined that such notices were not intended to alleviate copyright infringement, but instead to unfairly coerce payments from consumers.  Because those threatening notices were not consistent with the spirit, intent, or letter of the DMCA, Cox adopted a policy of refusing to participate in those particular copyright holders' schemes by forwarding such notices to Cox customers.  Such complainants are "blacklisted," meaning that Cox will not forward their notices until the complainant amends the notices to conform to the DMCA, including removal of objectionable threats or demands.

In March 2011, Rightscorp sent its first notices of alleged copyright infringement to Cox.  (Those notices were not sent on behalf of Plaintiffs, who had not yet retained Rightscorp as their agent.)  Cox immediately flagged the Rightscorp notices because they contained aggressive threats and demands for payment.  An example of those early notices is attached as Exhibit 1 to the Declaration of Brian D. Buckley ("Buckley Dec.") filed in support of this motion.  Rightscorp's notices declared that the subscriber's account had been used to illegally download music.  The notices claimed that the subscriber could be liable for $150,000 per act of infringement, as well as attorneys' fees, costs, and other unspecified damages.  And the notices expressly implicated Cox in Rightscorp's threats: the first line, right below "Dear Sir or Madam," read "Your ISP has forwarded you this notice."  And three lines below that: "Your ISP service could be suspended if this matter is not resolved."  *Id*.

After receiving the first batch of Rightscorp notices, Cox responded and began communicating with Rightscorp.  During the summer of 2011, Cox repeatedly indicated that it would not process Rightscorp's notices unless and until they conformed to the letter and spirit of the DMCA.  On September 21, 2011, in response to yet another overture from Rightscorp, Cox's in-house counsel sent a letter to Rightscorp.  Buckley Dec., Ex. 2.  That letter stated clearly that Cox does not accept or forward notices that contain settlement demands, because they are

outside the scope of the DMCA, but if Rightscorp simply amended its notices, Cox would forward those notices. *Id.*

Rightscorp would not abandon its shakedown scheme, because that scheme is the backbone of Rightscorp's business model. On January 9, 2012, Rightscorp sent yet another solicitation to Cox. Buckley Dec., Ex. 3. Rightscorp acknowledged that Cox was not forwarding the Rightscorp notices, and proposed a "cooperative solution to this problem that stops short of termination" of subscribers. Rightscorp proposed that Cox forward Rightscorp's threatening notices, suspend those Cox subscribers, and reinstate the subscribers after they paid Rightscorp's ransom demand. If Cox went along, Rightscorp would be "satisfied with Cox's level of compliance." *Id.* That letter made clear that Rightscorp did not, in fact, *want* subscribers' Internet access to be terminated — instead, Rightscorp wanted those subscribers to pay a ransom (using Cox as the primary enforcer). That transparent motive reinforced Cox's decision to blacklist Rightscorp until it changed its notices.

## II.   PLANNING AND PREPARATION TO SUE COX

Unbeknownst to Cox, even while these early communications were ongoing, Rightscorp was already lining up plaintiffs in order to sue Cox.



Buckley Dec., Ex. 4.

Buckley Dec., Ex. 5. As set forth below, discovery in this case has revealed that Rightscorp and Plaintiffs almost immediately began discussing litigation against Cox and, with the assistance of the Steptoe & Johnson firm, actively planned this lawsuit for at least *20 months* before it was filed.

BMG has withheld several hundred communications and documents in this case on the basis of attorney-client privilege or work-product immunity. In BMG's first privilege log,

4

entries 234 and 235 are email communications among BMG personnel dated March 7, 2012, just three months after BMG engaged Rightscorp as its agent.  The description for those privileged communications is: "Email correspondence with in-house counsel of BMG containing and reflecting legal advice *concerning the initiation of the lawsuit*."  Buckley Dec., Ex. 6 at 24-25 (emphasis added).  Entry 236 on the same log is another such communication, regarding "initiation of the lawsuit," dated April 3, 2012.  *Id*. at 25.  BMG's logs reflect privileged communications through 2013, and then hundreds of such communications — with both Rightscorp personnel and Steptoe & Johnson attorneys — through 2014, leading up to the filing of this lawsuit.  *Id*. (*passim*).[1]

Rightscorp's privilege logs confirm that, from at least early 2012, Rightscorp and Plaintiffs were planning to sue Cox.  Rightscorp's first privilege log reflects communications with legal counsel, beginning in March 2011 and continuing into June 2011, specifically regarding Rightscorp's interactions with Cox.  Buckley Dec., Ex. 8 at 1-5.  Then, according to the log, on January 10, 2012, Rightscorp had privileged communications with outside counsel regarding "pre-suit investigation and/or preparation."  *Id*. at 9 (entry 74).  Those "pre-suit" communications continued in 2012 (see, for example, entries 82, 88), and then became intensive and routine starting in February 2013.  *Id*. at 11.[2]  According to Rightscorp's logs, its "pre-suit investigation and/or preparation," and its work "in anticipation of litigation" continued steadily through 2013, into 2014, and until this lawsuit was eventually filed in November 2014.  *See*

---

[1]  As early as February 2013, Round Hill's first privilege log also reflects communications regarding litigation strategy.  Buckley Dec., Ex. 7 at 1.  And Entry 5, dated September 24, 2013, identifies "[e]mail correspondence with outside counsel, and Round Hill's agent concerning *the initiation of the lawsuit*."  *Id*. (emphasis added).

[2]  Steptoe blocked Cox's ability to fully explore Rightscorp's and Plaintiffs' plans to sue Cox by instructing witnesses not to answer questions on that topic.  For example, Steptoe instructed or cautioned Rightscorp's Chief Technology Officer, Robert Steele, not to answer questions regarding when Rightscorp began contemplating litigation against Cox.  *See* Buckley Dec., Ex. 10 (Steele dep. trans. excerpts) at 162:15-164:24; 185:6-186:13.  Steptoe also instructed Keith Hauprich, in-house counsel for BMG, not to answer questions regarding when BMG first considered suing Cox.  *See* Buckley Dec., Ex. 11 (Hauprich dep. trans. excerpts) at 265:4-17.

*generally* Buckley Dec., Exs. 8 and 9.  In all, Rightscorp withheld well over 200 documents and communications, from 2012 through 2014, related to its plans to sue Cox.  *Id.*

In March 2013, Rightscorp and its counsel (Steptoe) retained a source-code expert, Barbara Frederiksen-Cross, the same code expert Plaintiffs are relying on in this litigation. (Plaintiffs concealed Ms. Frederiksen-Cross's prior engagement, and the fact that she had Rightscorp code in her possession, until very late in the discovery process — more on that below.)  According to Plaintiffs: "In 2013, Ms. Frederiksen-Cross was retained by Steptoe & Johnson LLP to perform a technical review of Rightscorp's system for detecting infringement. This technical review included a review of Rightscorp's system architecture and implementation. … ***The scope of Ms. Frederiksen-Cross' engagement also contemplated a potential written expert report in the event that a lawsuit was filed against an ISP***."  Buckley Dec., Ex. 12 (emphasis added).[3]  (As discussed below, other evidence makes clear that ISP was Cox.)

Plaintiffs and Rightscorp withheld ***all*** communications with Ms. Frederiksen-Cross, and ***all*** notes taken and documents created by Ms. Frederiksen-Cross, in connection with her 2013 engagement, on privilege and work-product grounds.  Plaintiffs produced a privilege log for Ms. Frederiksen-Cross identifying 150 privileged or work-product documents.  Buckley Dec., Ex. 13.  The first communication on the log occurred on March 25, 2013, and apparently related to "attorney work product concerning Rightscorp code prepared in anticipation of potential litigation."  According to the log, for the remainder of 2013, Ms. Frederiksen-Cross had routine communications (many per month) with Steptoe, Rightscorp, and BMG regarding the Rightscorp code, expressly "***in anticipation of potential litigation***."  *Id.* (passim) (emphasis added).

Cox deposed Ms. Frederiksen-Cross on August 12, 2015.  She testified regarding, among other things, the scope of her 2013 engagement by Steptoe/Rightscorp.  Ms. Frederiksen-Cross

---

[3]  In her reply report, submitted on July 24, 2015, Ms. Frederiksen-Cross stated that she was retained by *Rightscorp*.  She subsequently submitted a "Corrected" version of the report, changing that statement to claim that her 2013 engagement was with Steptoe & Johnson.  That change obviously was in service of Plaintiffs' goal to extend privilege and work-product protection to all of Ms. Frederiksen-Cross's prior work.

acknowledged her understanding ██████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████  Buckley Dec., Ex. 14 (Frederiksen-Cross dep.

trans. excerpts) at 77:11-17 (emphasis added).  She also testified that ████████████

████████████████████████████████████████████████████

████████████████████████  *Id.* at 80:6-15.  When she was asked ██████████████

████████████████████████████████████████████████████

██████████████████████  Ms. Frederiksen-Cross equivocated:



*Id.* at 79:17-80:2 (emphasis added).

Ms. Frederiksen-Cross's testimony on that point is not credible.  Plaintiffs recently

produced Ms. Frederiksen-Cross's invoices in connection with her 2013 engagement.  Those

invoices, including the initial one dated July 3, 2013, are all denoted expressly as in reference to

██████████████████████████████████████████  *See* Buckley Dec., Ex. 15 (emphasis

added).  Thus, despite the concerted effort by Plaintiffs, Rightscorp, Steptoe, and their hired

expert to prevent Cox from exploring the nature and details of Ms. Frederiksen-Cross's earlier

engagement, the Frederiksen-Cross invoices plainly reveal that it was in furtherance of the

planned lawsuit against Cox, just as the privilege log descriptions for that engagement confirm.

Ms. Frederiksen-Cross's analysis of the Rightscorp code, in connection with ██████

███████████████████████████████████  continued into 2014.  Her last invoice from that

period was dated March 6, 2014, for services rendered through February 28, 2014.  *See* Buckley

Dec., Ex. 15.  And the latest communications identified on the Frederiksen-Cross privilege log

(identified as correspondence with Michael Allan from Steptoe) occurred on January 3, 2014.

*See* Buckley Dec., Ex. 13 at 15 (entries 114-115).

Armed with whatever they learned about the Rightscorp code from Ms. Frederiksen-Cross's analysis, Rightscorp, Steptoe, and Plaintiffs continued their secret preparations to sue Cox.  As noted above, there are hundreds of communications reflected on the BMG, Round Hill, and Rightscorp privilege logs, throughout 2014, related to this litigation.  But Plaintiffs were not able to shield all relevant documents from discovery.  ████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████  *See* Buckley Dec., Ex. 16.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███  Mr. Sabec then made the following telling statement:

████████████████████████████████████████████████████████

*Id*. (emphasis added).  Thus, Rightscorp was not only planning to sue Cox, but was actively concealing that fact to avoid a preemptive strike by Cox.

█████████████████████████████████████████████████████

█████████████████████████████████████  Buckley Dec., Ex. 18.  ████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████



*Id*. at 4 (emphasis added).

*Id*. at 1 (emphasis added).

After nearly two years of secret preparation, this lawsuit was filed on November 26, 2014. On December 10, 2014, Plaintiffs filed their First Amended Complaint (Doc. 16), which is the operative complaint in this case.  The communications identified above make clear that, from the very beginning, Rightscorp was the driving force behind this lawsuit.  But if there were any lingering doubt on that subject, it is dispelled by Mr. Sabec's communications shortly *after* the suit was filed.

Buckley Dec., Ex. 19 (emphasis added).

Buckley Dec., Ex. 20 (emphasis added).[4] ended

---

[4]  Indeed, Mr. Sabec also took a personal and petty pleasure in filing this suit.

Mr. Sabec expressed hope that

Buckley Dec., Ex. 22.

███████████████████ (emphasis added).  Thus, as least as much as Plaintiffs (if not more so), Rightscorp is the true party-in-interest here.

### III.   RIGHTSCORP'S MISLEADING AND MANIPULATIVE SOURCE CODE PRODUCTION

On or about February 6, 2015, Cox served on Rightscorp a subpoena requesting, among other things, all the source code associated with Rightscorp's systems for purportedly detecting copyright infringement and sending notices in connection with that infringement.  Rightscorp did not object to or resist producing that code; in fact, Rightscorp and Plaintiffs have never denied that Rightscorp's detection software is critical evidence at the heart of this case.  On May 26, 2015, Rightscorp made its first production of source code by uploading it to an escrow computer for review by Cox's code experts.  Despite representations from Steptoe that Rightscorp was producing "all the code," the May 26 production was relatively limited and had obvious deficiencies that were immediately identified by Cox's experts.

On May 28, 2015, Cox's counsel sent a letter to Steptoe with respect to the deficient code production.  Buckley Dec., Ex. 23.  Cox's letter identified eight significant categories of code missing from the Rightscorp production, all of which were central and critical to Rightscorp's systems for purportedly detecting infringement.  *Id.*  For example, Rightscorp withheld the code responsible for (1) identifying which files to access in a .torrent file, (2) collecting and ingesting copyrighted content, and (3) creating signature fingerprint identifiers for such content during ingestion (among many other core functions).  *Id.*  In response to the demands in Cox's May 28 letter, Rightscorp produced a substantial number of additional code files.  There is no dispute that those files were highly relevant because, in her initial report, Plaintiffs' code expert, Ms. Frederiksen-Cross, relied almost entirely on files *withheld* by Rightscorp until they were *identified and demanded by Cox*.

As Rightscorp continued to "dribble out" the relevant source code — while its counsel, Steptoe, repeatedly and stridently asserted (falsely, as it turns out) that Cox had "all the code" — Cox and its code experts continued to identify key files that were still missing.  On June 11, 2015, Cox deposed Rightscorp's CTO, Mr. Steele; he testified regarding ██████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ but which had never previously been identified as such.  On June 15, 2015, Cox's counsel sent another letter to Steptoe.  Buckley Dec., Ex. 24. That letter demanded ██████████████████████████████████ and also listed various categories of code that were still missing from the Rightscorp production.  *Id.*

On June 19, 2015, Cox was forced to file its first motion to compel with respect to the Rightscorp source code (Doc. 95).  That motion sought, among other things, the specific code categories and files identified in Cox's June 15 letter, and a representation to both Cox and the Court that all the Rightscorp code had, in fact, been produced.  On June 26, 2015, the Court held a hearing on Cox's motion and made various rulings from the bench requiring, *inter alia*, Rightscorp to produce all remaining source code, including the specific missing files identified by Cox's experts, by no later than June 30, 2015.  As discussed below, Rightscorp and Steptoe egregiously failed to comply with the Court's order.

On July 3, 2015, Cox deposed Greg Boswell.  Mr. Boswell is the software engineer who Mr. Steele (Rightscorp's CTO) identified as the best source of knowledge and information about the Rightscorp code.  Rightscorp designated Mr. Boswell on several technical Rule 30(b)(6) topics, including Topic 2: "The design, development, testing, modification, and evaluation by any person of the software Rightscorp uses to identify alleged infringers of copyrighted material."  Mr. Boswell's testimony revealed several troubling things.  Mr. Boswell testified that a module existed in Rightscorp's code that changed the threshold requirement that triggers the sending of Rightscorp's threatening notices to alleged "infringers," an issue that is at the very heart of this case.  Cox and its experts had never received any such module.  When confronted on that point, Steptoe insisted that the module had already been produced to Cox.  True to form, that representation was flatly false, which Cox's experts promptly confirmed.

On July 7, 2015, *five weeks* after the initial (deficient) production of Rightscorp code, Steptoe finally produced to Cox the critical file (called "FullFilesBeing.txt") implementing the "bitfield threshold" that powers the very process by which Rightscorp claims to identify repeat

infringers, *i.e.*, perhaps the single code function closest to the heart of this case.  Cox reviewed the critical missing file and realized that there was yet *more code*, related to invoking the functionality of "FullFilesBeing.txt," that still had not been produced.  On July 9, 2015, Steptoe produced an additional file related to the implementation of FullFilesBeing.txt and the lower bitfield threshold.  The same day, Steptoe sent a letter repeating the still-false mantra that "all of the relevant code has been produced to Cox."  Buckley Dec., Ex. 25.

On July 10, 2015, Cox was forced to file its second motion to compel with respect to the Rightscorp code (Doc. 136).  Cox sought sanctions for Rightscorp's egregious violations of the Court's June 26 order, including the right to re-depose Mr. Boswell and Mr. Steele regarding the code, and the right to submit a supplemental report from Cox's code expert.  On July 15, 2015, Rightscorp filed its response to Cox's motion, and that response (Doc. 147) included stunning new revelations.  First, Steptoe admitted (Doc. 147-4) that it had received the critical FullFilesBeing.txt file on June 15, 2015 and inexplicably failed to produce it.  Rightscorp also acknowledged that FullFilesBeing.txt is the "portion of the code that ***determined that amount of a copyrighted work a peer on a BitTorrent site has to have to be considered an infringer***."  *Id.* (emphasis added).  No component of the Rightscorp code could conceivably matter more in this case — that file sets the bitfield threshold to just 10%, which destroys any credible claim that Rightscorp's systems reliably or accurately identify infringing conduct.

Second, Rightscorp's response revealed, for the first time, that Rightscorp had failed to produce certain historical components of the code that apparently had been provided to Ms. Frederiksen-Cross in connection with her 2013 engagement.  This revelation was contrary to repeated representations from Rightscorp and Steptoe that no historical versions of the code still existed.  This was also the first time that Cox and the Court learned of Ms. Frederiksen-Cross's prior engagement by Rightscorp/Steptoe; it was not identified (at least by name) in her expert disclosures, and none of the communications related to that engagement were reflected on Plaintiffs' or Rightscorp's privilege logs.  Those deliberate omissions and obfuscations were

consistent with the campaign by Steptoe, Rightscorp, and Plaintiffs to conceal the fact that they had been actively planning this litigation against Cox for nearly two years.[5]

## IV.    DESTRUCTION OF THE RIGHTSCORP SOURCE CODE

Following an order by this Court, Cox has now re-deposed Mr. Boswell and Mr. Steele with respect to the Rightscorp code, and has also deposed Ms. Frederiksen-Cross.  Here is what Cox now knows — and, more importantly, what it does *not* know and can *never* know — about the Rightscorp code:

For the purposes of this motion, the single most critical fact is that ***Rightscorp has destroyed all historical versions of its source code***.  For reasons that remain opaque and curious at best, Rightscorp has purportedly never utilized any form of version-control software to track changes to, and iterations of, its code.  *See* Buckley Dec., Ex. 26 (Steele dep. trans. excerpts) at 47:9-14 (testifying that Rightscorp has never implemented version-control software).  Mr. Boswell, the primary author and administrator of the Rightscorp code, testified that ██████

████████████████████████████████████████████

████████████  *See* Buckley Dec., Ex. 27 (Boswell dep. trans. excerpts) at 335:16-338:1. ████

█████████████████████████ (*id.* at 338:9-13), and ████████████

████████████████████████████████████  *Id.* at 338:15-21. ████

███████████████████████████████████████████

████████████████████████  *Id.* at 335:16-338:1.  Ms.

Frederiksen-Cross agreed that ███████████████████████████

███████████████████████████  *See* Buckley Dec., Ex. 14 at 182:24-184:9.

It is strange, to say the least, that a public company whose entire business model hinges on the reliability of its proprietary software systems maintains no historical records of those

---

[5]  Rightscorp and Steptoe have never offered any logical or credible explanation for their supposedly inadvertent failure to produce the historical code in Ms. Frederiksen-Cross's possession.  After engaging and working with her for months in 2013 and into 2014, it is not believable that Steptoe would have "forgotten" Ms. Frederiksen-Cross's prior work with respect to the source code.

systems.  In fact, at the July 17 hearing on Cox's motion to compel, in response to a claim by Rightscorp's counsel that their egregious failures collecting and producing Rightscorp's source code were merely "the nature of code," the Court itself quickly disagreed:

> THE COURT:  No, this is the nature of your client's code.  This isn't the nature of the typical source code issues.  I mean, *typically source code is easily identifiable.  Changes are documented when they're made.  And a record is kept of historical code*.

July 17 Trans. at 41:15-19 (emphasis added).  And that lack of documentation is particularly odd for a company that is supposedly collecting, in Mr. Sabec's words, ██████████████

██████████████████████████████████████████

Rightscorp's destruction of its historical code is even more surprising in light of the testimony of its own expert, Ms. Frederiksen-Cross.  She testified that, ██████████████

██████████████████████████████████ . ███████████████████████

████████████████████████████████ ██████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

*See* Buckley Dec., Ex. 14 at 74:15-77:3 (emphasis added).  And yet we now know that Rightscorp retained *no* recordkeeping or audit trail with respect to its software systems.

Ms. Frederiksen-Cross went much further.  She testified that ██████████████

█████████████████████████████████████████

████████████████████████████████  Buckley Dec., Ex. 14 at 163:3-164:4.

███████████████████████████████████████████

████████████  *Id*. at 164:9-165:11, 166:4-7.  ████████████████████

████████████████████████████████████████████  *Id*.

14

at 170:18-171:6. █████████████████████████

█████████████████████ *Id.* at 171:24-173:12. ███████████████

██████████████████████████████████████████████████

*Id.* at 174:7-24. █████████████████████████████████

██████████████████████████████████████████████████

█████████████ *Id.* at 177:14-178:24. ████████████████████

████████████████████ *Id.* at 179:1-180:10.  And, to put a fine point on the issue, Ms.

Frederiksen-Cross ███████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████ *Id.* at 181:1-182:19.[6]

As a result of Rightscorp's destruction of its source code, ***it is literally impossible to
establish how the Rightscorp code operated at any particular point in time***.  Plaintiffs have
half-heartedly suggested that Mr. Boswell's general memory is evidence of historical versions of
the source code, but his own testimony belies that dubious claim.  When asked about certain
critical functions of Rightcorp's systems — for example, the process for generating notices of
alleged infringements and the process for making repeat-infringer determinations — Mr. Boswell

█████████████████████████████████████████████████████se

████████      *See* Buckley Dec., Ex. 27 at 466:18-469:24.  And Mr. Boswell tacitly acknowledged

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

*Id.* at 335:16-338:1.  He also *expressly* acknowledged █████████████████████

██████████████████████      *See, e.g.*, *id.* at 314:16-18.

---

[6]  Cox's code expert, Christopher Rucinski of Elysium Digital, LLC, confirmed how unusual it is
for Rightscorp not to track changes to its code.  In his July 31, 2015 supplemental report (issued
pursuant to the Court's July 17 sanctions rulings against Rightscorp), Mr. Rucinski concluded
that███████████████████████████████████████████████████
                                   *See* Buckley Dec., Ex. 28, ¶ 2(i).

With respect to prior versions of the Rightscorp software systems, not only is Ms. Frederiksen-Cross's memory of no help, it further muddies already murky waters.  As noted above, in her 2013 engagement, Ms. Frederiksen-Cross ██████████████████████ ████████████████████████████████████ She admitted in her deposition that ████████ ██████████████████████████████████████████ .  Instead, ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████  Buckley Dec., Ex. 14 at 23:17-24:24. ████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████  *Id*. at 83:3-16; 221:13-226:14.  In other words, a key assumption of Ms. Frederiksen-Cross's 2013 analysis was that ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████  .  *That is not true*.  ██████████████████████████████████████ ████████████████████████████  Buckley Dec., Ex. 26 at 47:20-48:25.  ██████████████ ████████████████████████████  Buckley Dec., Ex. 29 at 247:23-250:14.  But Ms. Frederiksen-Cross testified that ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████  Buckley Dec., Ex. 14 at 221:13-226:14.[7]

In her reply report, which was issued after the 2013 historical code in her possession mysteriously surfaced, Ms. Frederiksen-Cross claimed that the 2013 Rightscorp code and manual processes (as she understood them) were "functionally equivalent" to the current version of the code.  But in her deposition, Ms. Frederiksen-Cross admitted that her statement meant only that



---

[7]  For obvious reasons, as these truths came to light at her deposition, Ms. Frederiksen-Cross was forced to back-track.  Recognizing that Rightscorp's system never operated as was represented to her in 2013, Ms. Frederiksen-Cross instead characterized the process of sampling files as ██ ████████████████████████████████ and admitted that ████████████████████████████ ████████████████████████████████  Buckley Dec., Ex. 14 at 102:6-103:6.



Buckley Dec., Ex. 14 at 53:14-56:25, 60:9-63:12.  In other words, the purported "function" of Rightscorp's systems has always been to detect infringement and generate notices (a particularly unscientific and unhelpful observation).  But Ms. Frederiksen-Cross's understanding that

*Id*. at 40:10-42:12; 60:9-63:12.

*Id*.  Instead, she simply took Mr. Steele's word regarding the "accuracy" (whatever that might mean) of the historical code and processes.

Meanwhile, Mr. Steele pointed to Mr. Boswell as the person most knowledgeable regarding the actual structure and operation of the Rightscorp code.  *See, e.g.*, Buckley Dec., Ex. 10 at 129:15-23; 187:8-16.  And, as noted, Mr. Steele denied making various representations on which Ms. Frederiksen-Cross purportedly relied.  Ultimately, Ms. Frederiksen-Cross candidly admitted that

Buckley Dec., Ex. 14 at 207:2-208:1 (emphasis added).

In sum, it is gross understatement to call the collective memory of Mr. Boswell, Mr. Steele, and Ms. Frederiksen-Cross regarding past versions of the Rightscorp code "unreliable."  And the problems created by Rightscorp's destruction of its historical source code are not academic and not trivial.  That spoliation of the only reliable evidence makes it impossible for Cox to either test or rebut the operation of Rightscorp's systems with respect to absolutely core and critical functions of those systems.

The most stark example of that reality is the FullFilesBeing.txt file responsible for automating the 10% bitfield threshold.  The existence and, more importantly, *timing* of the use of that 10% threshold could not be more relevant — under that low threshold, Rightscorp's system

identifies an allegedly infringing file, and sends an infringement notice, if the system detects that a peer is offering just *10%* of the *entire* torrent payload of which the allegedly infringing file may be only a part.  Rightscorp claims that its system historically relied on a *100%* threshold (*i.e.*, only identified an infringement if a peer offered the entire torrent payload).  The FullFilesBeing.txt file was produced to Cox, for the first time, on July 7, 2015.  To collect those files, Mr. Boswell testified that ███████████████████████████████████ hen ████████████████  Buckley Dec., Ex. 27 at 442:14-22.  The result of that process, of course, was to destroy any metadata associated with the original file, making it impossible to verify when the file was first created or implemented.  (Mr. Boswell used that same process for <u>all</u> of the stored procedures and database events collected in this case, thereby destroying any metadata associated with that code produced to Cox.)

Rightscorp claims that the procedure contained in the FullFilesBeing.txt file was first implemented on December 2, 2014.[8]  But the only "evidence" to support that date is the testimony of Mr. Boswell.  ███████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████
████████████████  Buckley Dec., Ex. 27 at 443:21-445:20.  Because that date was input *manually*, it could be either inadvertently erroneous or deliberately falsified.  Moreover, Mr. Boswell acknowledged that █████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████  *Id*. at 443:21-445:20.  It is also possible that the 10% bitfield threshold had previously been automated, but that automation was temporarily disabled (perhaps to coincide with the filing of this lawsuit), and then re-enabled.

---

[8]  The December 2 date appears to have been selected because it conveniently fell two weeks *after* this lawsuit was filed, a point on which Plaintiffs lean heavily to argue that the 10% bitfield threshold is somehow "irrelevant."  But Plaintiffs' Amended Complaint, which is the operative pleading in this suit, was filed on *December 10, 2014*.  Thus, even by Rightscorp's account, at the time of the filing of the operative complaint, the 10% bitfield threshold was also operative.

There is no way to determine if or how the FullFilesBeing.txt file was being implemented prior to December 2, 2014 (even assuming that date is reliable), because Rightscorp covered its tracks.

 The peculiarities regarding the FullFilesBeing.txt file and the 10% bitfield threshold do not end there.  According to her invoices, █████████████████████████████ ████████████████████████████████████████████████████ Dec., Ex. 15. Ms. Frederiksen-Cross submitted her opening report on June 19, 2015, and the FullFilesBeing.txt file conspicuously was <u>not</u> included in the code that Ms. Frederiksen-Cross reviewed.  She testified that, ███████████████████████████████████████████████████████ ████████████.  Buckley Dec., Ex. 14 at 260:4-261:9.  But according to Rightscorp, that file was implemented on December 2, 2014, and provided to Steptoe for production on June 15, 2015 (over a week before Ms. Frederiksen-Cross issued her report).

 Ms. Frederiksen-Cross ██████████████████████████████████ █████████████████████████████████████ Buckley Dec., Ex. 14 at 262:19-263:23.  █████████████████████████████████████████████ his ████████████████████████████ *Id*. at 268:7-25.  She acknowledged that ████████████████████████████████████████████████████████████ ████████████████ *Id*.  She recognized that ███████████████████████ ██████████████████████████████████████████████████████████ ███████████████ t" (*id*. at 269:23-271:19), but ████████████████████ ████████████████████████ *Id*. at 272:8-20.  Finally, Ms. Frederiksen-Cross admitted that, ████████████████████████████████████████████████ █████████████████████████████████████████████████████████ §

██████████████████ *Id*. at 286:20-287:8 (emphasis added).[9]



---

[9]  Cox's code expert, Mr. Rucinski, LLC, confirmed the same conclusion.  In his supplemental report, Mr. Rucinski noted that ███████████████████████████████████ ████████████████████████████████████████████████████████ and ███████████████████████████████████████████████████████████████

There are many other material differences between how the Rightscorp code currently operates and how it supposedly operated before the lawsuit was filed, *i.e.*, when the alleged acts of infringement underpinning this lawsuit were purportedly detected by Rightscorp's systems.[10] But Cox has no way to understand, test, or evaluate those apparent differences, because it is impossible to reliably establish how Rightscorp's systems historically operated.

## V.      RIGHTSCORP'S DESTRUCTION OF AUDIO RECORDINGS AND CALL RECORDS

Rightscorp's CEO, Mr. Sabec, was deposed on July 7 and 8, 2015. He testified with respect to a "phone agent's script" utilized by Rightscorp agents when they speak with consumers who Rightscorp has accused of copyright infringement. *See* Buckley Dec., Ex. 30 (Sabec dep. trans. excerpts) at 133; Buckley Dec., Ex. 31 (phone script). Mr. Sabec also identified the existence of phone logs from Rightscorp's call center, including both Salesforce records memorializing communications between call center employees and consumers, <u>and</u> audio recordings of some of those communications. In its July 10, 2015 motion to compel (Doc. 136), Cox sought copies of those phone logs and recordings. In its opposition (Doc. 147), Rightscorp claimed to have "approximately 10,000 phone logs."

At the July 17 hearing on Cox's motion, the Court ordered Rightscorp to produce call logs and audio recordings of Rightscorp's phone agents' communications with consumers, for the time-frame up to November 2013. The Court also ordered Rightscorp to make another



Buckley Dec., Ex. 28, ¶ 18. But as Mr. Rucinski noted (consistent with Ms. Frederiksen-Cross's testimony), ██████████████████████ *Id.*

[10] For example, █████████████████████████████████████ Buckley Dec., Ex. 27 (Boswell) at 470:14-18. ████████████████ Buckley Dec., Ex. 26 (Steele) at 31:25-32:13. Ms. Frederiksen-Cross admitted that ██████████████████████████ ong ██████ Buckley Dec., Ex. 14 at ████████ But Cox is precluded from exploring the full extent of the flaws in Rightscorp's manual processes because the code is gone.

Rule 30(b)(6) witness available for 90 minutes to address Rightscorp's phone-agent practices. On July 24, 2015, Rightscorp's counsel sent Cox's counsel a letter. Buckley Dec., Ex. 32. The letter claimed that Rightscorp had "searched the Salesforce.com system and was unable to locate any call logs prior to December 2013." With respect to the audio recordings, the letter indicated that Rightscorp had "located calls" from prior to December 2013, but "is unable to play the audio recordings on the system or play the audio recordings after they are downloaded." *Id.*

On August 7, 2015, Cox filed another motion (Doc. 191) seeking to compel Rightscorp to produce call logs and audio recordings from after November 2013, in light of the lack of any useable evidence from prior to that time. In its opposition, Rightscorp again asserted that it had "approximately 10,000 phone logs stored in Rightscorp's database," but refused to produce any. *See* Doc. 220 at 4. With respect to the audio logs, Rightscorp claimed that the "electronic files for the audio recordings … ***appear corrupt*** and contain no data." *Id.* at 3 (emphasis added). On August 14, 2015, the Court denied Cox's motion for additional logs and recordings. The Court did, however, allow Cox to conduct the previously ordered 90-minute deposition.

On August 21, 2015, Rightscorp made Mr. Sabec available in a Rule 30(b)(6) capacity to testify regarding the phone logs. He refused to answer, *and Rightscorp's counsel instructed him not to answer*, any questions regarding Rightscorp's phone-agent practices after November 2013, claiming that those questions were "outside the scope of the deposition." *E.g.*, Buckley Dec., Ex. 33 (Sabec 8/21/15 dep. trans. excerpts) at 22:9-23:8. Cox does not believe the Court placed any temporal limitations on the subject matter of the 90-minute deposition (which, again, was a discovery sanction for Rightscorp's prior discovery abuses) — as such, Steptoe's instructions were improper and further thwarted Cox's ability to explore Rightscorp's phone-agent practices. Mr. Sabec nevertheless provided some surprising and troubling revelations.

With respect to the Salesforce.com call logs, Mr. Sabec testified that ███████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████ Buckley Dec., Ex. 33 at 21:19-22:3. Rightscorp conspicuously failed to identify that

fact to Cox or the Court in any of the prior briefing or hearings.  It also renders the statement in Steptoe's July 24 letter — *i.e.*, that Rightscorp "searched the Salesforce.com system and was unable to locate any call logs prior to December 2013"— deceptive on its face, because ███ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████  *Id.* at 58-65.

   With respect to the audio recordings, Mr. Sabec described the process Rightscorp undertook to download those recordings from Rightscorp's █████████████."  After over 15 minutes of misleading testimony about supposed errors or oddities in the downloading process, Mr. Sabec finally admitted that there ██████████████████  Buckley Dec., Ex. 33 at 49:15.  To the contrary, ███████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████  *Id.* at 49:18-50:10.  Contrary to the prior representations of Rightscorp and Steptoe, the audio recordings were not "corrupt" — they were, according to Mr. Sabec, ██████ and ████████████████████████████████████  *Id.*  Pressed on when he learned ████████████████████████████  Mr. Sabec admitted ████████████████████████████████████████████  *Id.* at 65:6-13. And yet Rightscorp's briefing (Doc. 220 at 3) identified the files as "corrupt."

## AUTHORITY AND ARGUMENT

   The seminal spoliation case in this district is *Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277 (E.D. Va., 2001).  *Trigon* sets forth a thorough discussion of what constitutes spoliation of evidence, and the Court's inherent authority to fashion remedies to address spoliation.  As it relates to this case, *Trigon* reflects a few key principles: "Spoliation is the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation."  *Id.* at 284. "It has long been the rule that spoliators should not be able to benefit from their wrongdoing," and therefore "all things are presumed against a despoiler or wrongdoer."  *Id.*  "Recognizing acts of spoliation and punishing the spoliators is the result of judicial recognition that the 'spoliated

physical evidence' is often the best evidence as to what has really occurred and that there is an inherent unfairness in allowing a party to destroy evidence and then to benefit from that conduct." *Id*. A district court has inherent authority to sanction spoliation, and also has "considerable discretion, including ordering dismissal, granting summary judgment, or permitting an adverse inference to be drawn against the party as a means of leveling the playing field and sanctioning the conduct of the party." *Id*. at 285 (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995)).

There is no question that the duty to "preserve potential evidence for another's use in future litigation" applies to a potential plaintiff contemplating a lawsuit, *and* to the plaintiff's agents. In *Vodusek*, the seminal Fourth Circuit spoliation case, the plaintiff sued Bayliner after her husband was killed when his boat exploded. Before filing suit, in examining the boat to analyze the cause of the explosion, the plaintiff and her expert witness "employed destructive methods which rendered many portions of the boat useless for examination by the defendants and their experts." 71 F.3d at 155. Although the expert took photographs and even videotaped his alteration of the boat, his actions "made it impossible for his own theory to be verified or for the Defendants to make a full and fair inspection to develop alternative theories based on the evidence." *Id*. The Fourth Circuit affirmed the district court's instruction to the jury that it could draw an adverse inference that the spoliated evidence was unfavorable to the plaintiff's case. *Id*. And the Fourth Circuit noted that "the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Id*. at 156.

Similarly, in *Silvestri v. General Motors Corp.*, 271 F.3d 583 (2001), the plaintiff was injured in an accident when the airbag in his landlady's car (which he was driving) failed to deploy. In light of that failure, the plaintiff hired a lawyer who in turn engaged accident reconstruction experts to inspect the vehicle "in anticipation of filing a lawsuit against General Motors." *Id*. at 586. Those experts photographed and analyzed the vehicle and the crash scene, and issued reports concluding that the airbag was defective and contributed to the plaintiffs'

injuries.  *Id*. at 587.  "Notwithstanding the anticipation of litigation against General Motors, neither [the plaintiff] nor [his lawyer] took any steps to preserve the vehicle …."  *Id*.  It remained in its damaged condition for several months, but by the time the plaintiff brought suit the car had been repaired and sold.  *Id*.  After the suit was filed, General Motors' expert attempted to conduct his own analysis but was forced to rely on the limited, skewed evidence collected by the plaintiff's experts.  The trial court found that General Motor was so "highly prejudiced" by the spoliation that dismissal of the lawsuit was the only appropriate sanction.  *Id*. at 589.

The Fourth Circuit affirmed the dismissal, and in doing so made several critical observations.  <u>First</u>, the Court stated that "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."  271 F.3d at 591.  <u>Second</u>, the Court rejected the plaintiffs' argument that he did not own the vehicle and therefore had no way to preserve it: "[i]f a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence."  *Id*.  <u>Third</u>, the Court noted that in some spoliation circumstances, "dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case."  *Id*. at 593.  The principles above compel a finding that Rightscorp spoliated key evidence, and that serious sanctions are warranted and necessary.

## I.   RIGHTSCORP'S SPOLIATION OF ITS SOURCE CODE

It is beyond legitimate dispute that, beginning in 2012, Plaintiffs and Rightscorp were planning to sue Cox.  Any sliver of doubt about that fact was eliminated in March 2013 when Rightscorp/Steptoe retained Ms. Frederiksen-Cross.  According to Steptoe, that engagement contemplated an expert report "in the event that a lawsuit was filed against an ISP."  Buckley Dec., Ex. 12.  Ms. Frederiksen-Cross herself testified that she ███████████████████████ ██████████ and the communications on her privilege log (extending into March 2014) are labeled "in anticipation of potential litigation."  Buckley Dec., Exs. 14 and 13.  And we know

from Ms. Frederiksen-Cross's own invoices precisely what litigation was contemplated: ██ ████████████████████████████████ Buckley Dec., Ex. 15 (emphasis added). And by April 2014, Plaintiffs and Rightscorp were sufficiently prepared to file suit that they had drafted a full press release announcing the litigation. Buckley Dec., Ex. 16. Those plans triggered Plaintiffs' and Rightscorp's duties to "preserve potential evidence for another's use in pending or future litigation." *Trigon*, 204 F.R.D. at 284.

Nor can Plaintiffs or Rightscorp credibly dispute that the structure, operation, and reliability of Rightscorp's software systems for purportedly detecting copyright infringement are directly and critically relevant to the lawsuit they were planning. The very purpose of Ms. Frederiksen-Cross's 2013 engagement was to determine whether Rightscorp had ████ ████████████████████████████████ in the event someone (like Cox) ████████████████████████████████ Buckley Dec., Ex. 14 at 74:15-77:3. She candidly acknowledged that ████████████ ████████████████████████████████ *Id*. at 177:14-178:24. As Plaintiffs and Rightscorp were preparing to sue Cox in April 2014, Mr. Sabec himself was touting the ████████████████████ ████████████████████████████████ Buckley Dec., Ex. 16. Indeed, Plaintiffs have never even suggested that Rightscorp's source code was not foreseeably relevant evidence in this case. *See Vodusek*, 71 F.3d at 156.[11]

---

[11] For the duty of preservation to apply, it is not necessary that a potential plaintiff agree with or even anticipate the specific theories or arguments that his opponents might assert. As the *Vodusek* Court noted: "While [plaintiff's expert] may have decided that the destroyed portions of the boat were not relevant to his theory of the case, *that conclusion ignored the possibility that others might have entertained different theories to which the destroyed portions might have been relevant*. In this case, both the defendants and the district court concluded that the destroyed portions were significant to the effort to explain where and why the boat explosion occurred. Indeed, *throughout the course of this case, even [plaintiff's expert] opinion of where the explosion occurred changed several times*." 71 F.3d at 156 (emphasis added). Those observations are particularly apt in this case, because Ms. Frederiksen-Cross's opinions regarding the functionalities of the Rightscorp code have been a moving target.

Nor can Plaintiffs or Rightscorp deny that they willfully failed to preserve the Rightscorp source code.  Rightscorp could readily have implemented a free version-control system — one of the same open-source systems that Mr. Boswell used on other, less intensive coding projects — and easily preserved every historical version of the Rightscorp code.  Plaintiffs' own expert, who was previously retained to assess Rightscorp's ████████████████████████ testified that ██ ████████████████████████████████████████████████████████████ hem ██████  Buckley Dec., Ex. 14 at 174:7-24; 179:1-180:10.  In fact, Rightscorp's lack of version control and documentation is so peculiar, particularly in light of the circumstances leading up to this lawsuit, the most reasonable assumption is that the failure was a deliberate strategy to eliminate unreliable or unhelpful evidence.  *See Trigon*, 204 F.R.D. at 284 ("The spoliation inference stems from the common sense observation that ***a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence*** than a party in the same position who does not destroy the evidence.") (citation and quotation omitted) (emphasis added).

And, finally, Rightscorp and Plaintiffs' willful and inexplicable destruction of the historical code has undeniably caused substantial prejudice to Cox and thwarted its ability to properly defend this case.  Consider Plaintiffs' First Amended Complaint:

> In an effort to combat the massive pirating of their copyrighted works, Plaintiffs' agent, Rightscorp, Inc., has developed a ***technological system*** that identifies actual infringements and the perpetrators of these infringements (by IP address, port number, time, and date) by monitoring BitTorrent systems and extracting information about the infringing activity, including, *inter alia*, the IP address, internet service provider, the infringing content being uploaded or downloaded, and the suspected location of the host computer accessing BitTorrent networks. ***The system*** also has the capability to acquire entire files from the infringing host computers.  ***Since 2012, Plaintiffs, through their agent, using this system***, have notified Internet service providers ("ISPs") of specific instances of first-time and repeat copyright infringement committed by their account holders and have requested that the ISPs notify their account holders of their infringements.

Doc. 16, ¶ 2 (emphasis added).  What the Complaint omits, however, is that this miraculous "system," which Plaintiffs and their agent have been using "since 2012," ***no longer exists***.  And

it no longer exists because Plaintiffs and their agent destroyed it.  Apparently, Cox, the Court, and ultimately the jury are supposed to take at face-value Plaintiffs' allegation that this mythical "system" had all the capabilities outlined in Plaintiffs' pleading.

The spoliation doctrine is designed to prevent and remedy precisely this sort of litigation gamesmanship.  Rightscorp and Plaintiffs destroyed the best evidence, and the only reliable evidence, of how the Rightscorp system historically operated.  *Trigon*, 204 F.R.D. at 284.  The only remaining "evidence" of the functionalities of Rightscorp's historical systems is the collective memories of Mr. Steele, Mr. Boswell, and (to a very limited degree) Ms. Frederiksen-Cross but, as set forth in detail above, those memories are utterly biased, flawed, and unreliable.  Cox and its experts have no way to independently test or rebut Plaintiffs' theories or Ms. Frederiksen-Cross's opinions.  *See Silvestri*, 271 F.3d at 594 ("To require General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice"); *Trigon*, 204 F.R.D. at 290 ("[I]t is obvious that the effect of the spoliation of the documents here is most serious indeed.  The documents destroyed … were important in testing the substantive validity of the experts' opinions as well as the fundamental credibility of the witnesses' claims of expertise and independence.  These documents, which show in a way no other evidence can, the evolution of the experts' opinions and the influences upon them, are invaluable.").  In fact, as Ms. Frederiksen-Cross herself so aptly put it, her own understanding of the historical Rightscorp "system" is based entirely on ███████████████ ████████████████████████████████  Buckley Dec., 14 at 207:2-208:1.

The Court has essentially unfettered discretion to fashion a remedy "for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Vodusek*, 71 F.3d at 156.  If the Court is unwilling to dismiss the action, there is only one reasonable and adequate remedy here: Plaintiffs must be precluded from introducing any evidence of any nature regarding how Rightscorp's systems functioned — *i.e.*, to support the allegations in paragraph 2 of the First Amended Complaint — prior to *July 2015*, when the last critical components of the Rightscorp code were finally produced to Cox.  If Plaintiffs were

permitted to offer any evidence in support of the operation of Rightscorp's systems prior to July 2015, Cox would have no reliable, independent way to rebut that evidence.  As this district has recognized, "there is an inherent unfairness in allowing a party to destroy evidence and then to benefit from that conduct."  *Trigon*, 204 F.R.D. at 284.[12]

In summary, Rightscorp and Plaintiffs' spoliation of the code is beyond dispute.  And the only fair and adequate remedy/sanction for that spoliation is to preclude Plaintiffs from attempting to establish, for the period prior to July 2015, the existence, nature, or functions of the "technical systems" described in paragraph 2 of the First Amended Complaint.

## II.   RIGHTSCORP'S SPOLIATION OF ITS CALL LOGS AND AUDIO RECORDINGS

In addition to its failure to preserve source code, Rightscorp also destroyed the best evidence of its communications with consumers accused of copyright infringement.  Those communications are not ancillary or trivial to the issues in this case.  In fact, Rightscorp markets its communications with consumers as a key component of its business model.  For example, in a 2014 presentation regarding its business, Rightscorp claimed that it protects its clients' reputations, in part, through ██████████████████████████████████████████ ████████████████  *See* Buckley Dec., Ex. 34 at 6.  The same presentation touted Rightscorp's ████████████████████  *Id.*  More to the point, Rightscorp admits that its "technological system," described so glowingly in the First Amended Complaint, cannot in fact identify specific infringers.  For that, *Rightscorp must rely on consumers to contact Rightscorp in response to its threatening notices.  See, e.g.*, Buckley Dec., Ex. 10 (Steele) at 300:7-20; Buckley Dec., Ex. 29 (Boswell) at 120:2-121:13.  Those calls then allow Rightscorp's phone agents to collect personal information regarding Rightscorp's victims.  Moreover, BMG's representative, Mr. Hauprich,

---

[12]  The only conceivable alternative remedy/sanction would be for the Court to attempt to fashion factual presumptions about the historical operation of the Rightscorp systems.  But those presumptions would not only be highly technical and difficult to craft, but also speculative and largely arbitrary.  *Compare Silvestri*, 271 F.3d at 594-95 ("But when Silvestri presents vehicle data as his only evidence of a product defect and that data is incomplete and perhaps inaccurate, the court would have no basis for determining what facts should be taken as established.").

testified that ████████████████████████████████████████
██████████████████████████████████████ Buckley

Dec., Ex. 11 at 167:21-170:12.

Given the critical and central role of the Rightscorp call center, and the communications between its phone agents and alleged infringers, in Rightscorp's business model, it was on notice of its duty to "preserve potential evidence for another's use in pending or future litigation." *Trigon*, 204 F.R.D. at 284.  Yet Rightscorp has been desperate to keep its call center practices secret.  Rightscorp and Steptoe misled both Cox and this Court regarding the call logs — Rightscorp deliberately omitted the important fact that Rightscorp did not adopt Salesforce.com until January 2014, and that Rightscorp destroyed all call notes from prior periods.  Similarly, Rightscorp and Steptoe misled Cox and this Court regarding the audio recordings — those recordings were not "corrupted," as Rightscorp claimed; they were deleted because Rightscorp failed to provide adequate storage capacity.  And Steptoe affirmatively instructed Mr. Sabec not to answer any questions about Rightscorp's current call center practices.

The only evidence that Rightscorp has produced of its call center practices, *i.e.*, the "phone agent's script" (Buckley Dec., Ex. 31), defies any contention that Rightscorp's call center is ████ or that its agents listen to ████████████ To the contrary, the "phone agent's script" is expressly designed to threaten consumers into paying Rightscorp's ransom, no matter what explanation those consumers provide for the allegedly infringing conduct, and it relies on blatantly false statements to achieve that end.  The script misrepresents that ██████████
███████████████████████████████████
████████████████████ ████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

29

███████████████████████████████████████████████████████

██████████████████████████████████████████████████ It is little

wonder that some consumers opt to pay $20 to be free of such heavy-handed tactics.

It is a virtual certainty that Rightscorp's call logs and audio recordings confirm that consumers routinely deny having engaged in any infringement, yet are nevertheless bullied into paying, which is precisely why Rightscorp has fought so hard to resist producing those logs and recordings. The statement from *Trigon* rings particularly true here: "a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than a party in the same position who does not destroy the evidence." 204 F.R.D. at 284 (citation and quotation omitted). Because Rightscorp has completely blocked Cox's access to the best evidence of Rightscorp's call center conduct, there is only one reasonable and adequate remedy/sanction: Rightscorp must be precluded from contesting that its phone agents follow the "phone agent's script" when interacting with consumers. Rightscorp must also be precluded from denying that at least some consumers deny any infringing activity when they contact the call center.

## CONCLUSION

For the reasons set forth above, Cox respectfully requests that the Court enter appropriate evidentiary sanctions for Rightscorp's spoliation of its historical source code, and its historical call logs and audio recordings. A proposed order is submitted herewith.

Dated: August 28, 2015

Respectfully submitted,

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
TEL:    (703) 549-5354
FAX:    (703) 549-5355
E-MAIL: craig.reilly@ccreillylaw.com
*Counsel for Defendants*

*Of Counsel for Defendants*

Andrew P. Bridges (*pro hac vice*)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel:  (415) 875-2300
Fax:  (415) 281-1350
Email:  abridges@fenwick.com

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on August 28, 2015, the foregoing was filed and served electronically

by the Court's CM/ECF system upon all registered users:

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-5355
craig.reilly@ccreillylaw.com
*Counsel for Defendants*

31