# EXHIBIT 56

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF VIRGINIA
 3
 4   BMG RIGHTS MANAGEMENT    :   NO. 1:14-cv-1611
 5   (US) LLC, and ROUND      :   (LOG/JFA)
 6   HILL MUSIC LP            :
 7   Plaintiffs               :
 8        vs.                 :
 9   COX ENTERPRISES,         :
10   INC., COX                :
11   COMMUNICATIONS, INC.,    :
12   COXCOM, LLC              :
13   Defendants
14
15
16           Videotaped deposition of TERRENCE
17   MCGARTY, PH.D., taken at the law offices of
18   Steptoe & Johnson, 1330 Connecticut Avenue NW,
19   Washington, DC, commencing at 9:28 a.m. before
20   Ryan K. Black, Registered Professional Reporter,
21   Certified Livenote Reporter and Notary Public,
22   Friday, August 7, 2015.
23
24
25   PAGES 1 - 200
```

Page 1

```
 1   APPEARANCES:
 2
 3   STEPTOE & JOHNSON LLP
 4   By:  WILLIAM G. PECAU, ESQ.
 5   1330 Connecticut Avenue NW
 6   Washington, DC  20036
 7   202.439.3000
 8   wpecau@steptoe.com
 9   Representing the Plaintiffs
10
11   FENWICK & WEST LLP
12   By: ARMEN N. NERCESSIAN, ESQ.
13        DAVID L. HAYES, ESQ.
14   555 California Street
15   12th Floor
16   San Francisco, CA  94104
17   415.875.2388
18   anercessian@fenwick.com
19   dhayes@fenwick.com
20   Representing the Defendants
21
22   ALSO PRESENT:
23        Miko Goodhill, Video Specialist
24        Bill Rosenblatt - Giant Steps
25        Eric Dunn, Fenwick Summer Associate
```

```
 1                THE VIDEOGRAPHER:  We are now on
 2   record.  Please note that the microphones are
 3   sensitive and may pick up whispering and private
 4   conversations.  Please turn off all cell phones
 5   or place them away from the microphones, as
 6   they can interfere with the deposition audio.
 7   Recording will continue until all parties agree
 8   to go off record.
 9                My name is Miko Goodhill, representing
10   Veritext.  The date today is Friday, August 7th,
11   2015, and the time is approximately 9:28 a.m.
12                This deposition is being held at
13   Steptoe & Johnson, located at 1330 Connecticut
14   Avenue Northwest, Washington, D.C. 20036, and is
15   being taken by counsel for the defense.
16                The caption of the case is BMG
17   Rights Management, Incorporated, versus Cox
18   Enterprises.
19                This case is filed in the United
20   States District Court for the Eastern District
21   of Virginia, Case Number 1:14-cv-1611 (LOG/JFA).
22                The name of the witness today is
23   Terrence McGarty.
24                At this time the attorneys present in
25   the room and/or attending remotely will identify
```

```
 1  themselves and the parties that they represent.
 2            MR. NERCESSIAN:  This is Armen
 3  Nercessian, of Fenwick & West, representing the
 4  defendants.  With me are my colleague, David
 5  Hayes, and our summer associate, Eric Dunn.
 6            Also attending is Bill Rosenblatt.
 7            THE VIDEOGRAPHER:  Okay.
 8            MR. PECAU:  Will Pecau.  I'm with
 9  the firm of Steptoe & Johnson, representing the
10  plaintiffs, BMG and Round Hill.
11            THE VIDEOGRAPHER:  Our court reporter,
12  Mr. Ryan Black, representing Veritext, will
13  swear in the witness and we can proceed.
14                         *  *  *
15  Whereupon --
16            TERRENCE MCGARTY, PH.D.,
17  called to testify, having been first duly sworn
18  or affirmed, was examined and testified as
19  follows:
20                      EXAMINATION
21  BY MR. NERCESSIAN:
22      Q.   Good morning, Mr. McGarty.
23      A.   Good morning.
24      Q.   In a moment, I'm going to hand you
25  the reports you submitted in connection with
```

Page 7

```
 1                MR. PECAU:  Objection.  It's vague.
 2                THE WITNESS:  As a matter of course of
 3    its provision of services to those customers?
 4    BY MR. NERCESSIAN:
 5        Q.   I'm asking for your opinion of
 6    whether it would be proper to detect whether a
 7    particular customer goes to the Google site on a
 8    particular day.
 9                MR. PECAU:  Again, I object.
10                THE WITNESS:  To some degree, this
11    starts to walk onto the internet neutrality
12    space, and I've opined on that extensively, all
13    right?  And the FCC's approach is that ISPs can
14    do things appropriate for network management,
15    but not getting themselves into the sticky
16    wicket of what a customer is actually doing.
17                So I've gone on the record of
18    saying that both inbound and outbound network
19    management is appropriate, but deciding who goes
20    where at what and when is less than appropriate.
21    BY MR. NERCESSIAN:
22        Q.   And does that network management that
23    you opine is appropriate allow Cox to control
24    subscriber activity?
25                MR. PECAU:  Objection; vague.
```

Page 111

```
 1                THE WITNESS:  As I've said on prior
 2     occasions, Cox has the ultimate control.  They
 3     could turn the switch off.  So when I use the
 4     term control, I mean they can either allow the
 5     customer to continue doing X or stop it, period.
 6     BY MR. NERCESSIAN;
 7          Q.    Short of disabling access, can Cox
 8     control any computer using a subscriber's
 9     network?
10          A.    Not to my knowledge --
11                MR. PECAU:  I object.
12                THE WITNESS:  Sorry.
13                MR. PECAU:  I object to the question.
14                You can answer.
15                THE WITNESS:  Not to my knowledge.
16     BY MR. NERCESSIAN:
17          Q.    Short of disabling internet access,
18     can Cox control what an individual user of a
19     subscriber's network downloads from the
20     internet?
21          A.    Can -- let me see if I can understand
22     the question.
23                Can Cox actively intercept what
24     a customer is receiving from the internet,
25     ascertain what it is and then intervene and
```

```
 1   prevent that customer from receiving that
 2   information?
 3        Q.   If that's how you understand it,
 4   but my -- my question was, short of disabling
 5   internet access, can Cox control what any
 6   individual user of a subscriber's network
 7   downloads from the internet?
 8        A.   The can control is a difficult
 9   question to answer, because, you know, the NSA
10   can do a lot of things.  If Cox went and bought
11   some NSA equipment, it could do a lot of things,
12   all right, so ...
13        Q.   Have you seen any evidence that Cox
14   has --
15             MR. PECAU:  Wait a minute.  I don't
16   think -- can you let him answer the question?
17             THE WITNESS:  Yeah.
18             So when you say, can control, I
19   don't know what you mean, all right?  So I'm
20   -- it would be pure speculation.  You'd have
21   to be more specific as to can control incoming
22   packets.
23             You mean, can Cox go out and come up
24   with a system to control incoming packets from
25   anywhere to a customer?
```

Page 113

```
 1   BY MR. NERCESSIAN:
 2        Q.   I am using the word control as you use
 3   it in Paragraph 5 here.
 4        A.   And the way I meant it in Paragraph 5
 5   is, they can cut the service.  That's it.
 6        Q.   That's all they can do?
 7        A.   That's what they can -- well, no,
 8   that's what they can do.  I did not say that's
 9   all they could do.  They could actually put
10   equipment, potentially, at the front end and do
11   exactly what is being done in a lot of spook
12   networks, but there would be a hoot and holler
13   over that and probably a justified one, all
14   right?  So they don't do that as a matter of
15   course.
16             Could they do things?  They could do a
17   lot of things, all right?  As a matter of course
18   of acceptable business practice, do they do it?
19   No.  But control, absolutely.  Cut them off.
20             MR. PECAU:  It's 12:30.
21             MR. NERCESSIAN:  I just want to finish
22   this line of questioning.
23             MR. PECAU:  Okay.
24   BY MR. NERCESSIAN:
25        Q.   Does Cox have the ability -- strike
```

Page 114

1  that.
2           Have you seen any evidence that Cox
3  has the ability to stop a user of a subscriber's
4  network from violating Cox's Acceptable Use
5  Policy before any violation occurs?
6           MR. PECAU:  I object to the form of
7  the question.
8           THE WITNESS:  It's a hypothetical.  I
9  mean, does Cox --
10 BY MR. NERCESSIAN:
11    Q.   No, it's not.  I'm asking if you've
12 seen any evidence.
13    A.   I'm sorry.  Are you saying can Cox --
14           MR. PECAU:  Are you arguing with the
15 witness?
16           THE WITNESS:  -- can Cox prevent
17 somebody from doing something not even knowing
18 -- before it's done?
19 BY MR. NERCESSIAN:
20    Q.   That's my question.
21    A.   Can Cox prevent somebody from doing
22 something before it's already done?  There was
23 a movie about that, but I -- I couldn't see how
24 Cox, without foreknowledge, can prevent an
25 action.

Page 115

```
 1   goes beyond well anything I know about, so ...
 2   BY MR. NERCESSIAN:
 3       Q.   Would it be proper, in your opinion,
 4   for an ISP to look into packets of its customers
 5   to determine whether a customer was conducting,
 6   participating in or otherwise facilitating a
 7   pyramid or other illegal soliciting scheme?
 8       A.   As I had indicated --
 9            MR. PECAU:  Objection; relevance.
10            Go ahead.
11            THE WITNESS:  As I had indicated this
12   morning, I was opining on internet neutrality
13   about eight years ago, where I took a very
14   strong position that, other than network
15   management functionalities, looking at headers,
16   that, indeed, the ISPs should not examine the
17   content or manage the traffic accordingly.  So
18   the current internet neutrality position taken
19   by the FCC is relatively compliant with some of
20   the papers that we had written in an earlier
21   phase.
22   BY MR. NERCESSIAN:
23       Q.   Do you still believe those expressed
24   positions?
25       A.   Do I what?
```

Page 176

```
 1                MR. PECAU:  What?
 2      BY MR. NERCESSIAN:
 3          Q.   Do you still believe those positions
 4      you previously expressed regarding net
 5      neutrality?
 6                MR. PECAU:  Objection.  Outside the
 7      scope of his --
 8                THE WITNESS:  My position --
 9                MR. PECAU:  -- testimony, and
10      overly-broad and vague.
11                THE WITNESS:  My position on net
12      neutrality was fairly simple, and that is that
13      the ISP should not be selective, based upon the
14      traffic that's coming in, all right, and sorting
15      it out to end users, nor do so on the outbound.
16      I had no opinion.  The carrier could charge as
17      much as it wanted for access use, all right?  It
18      could examine the headers and other elements for
19      network management purposes, but it could not
20      become a selector of content, which means the
21      position stands.
22      BY MR. NERCESSIAN:
23          Q.   And according to that position, it
24      would be improper to block BitTorrent traffic;
25      is that correct?
```

Page 177

```
 1                MR. PECAU:  Objection.
 2                THE WITNESS:  According to that
 3   position, it would be inappropriate to
 4   arbitrarily and capriciously block any traffic
 5   in or out of the network without evidence to the
 6   contrary that the -- something was happening,
 7   okay?  I always assumed that, in the event that
 8   illegal activity was going on, that's supra to
 9   the rights of transmission back and forth.
10   BY MR. NERCESSIAN:
11        Q.   Would it also be inappropriate to
12   throttle BitTorrent traffic, in your opinion?
13                MR. PECAU:  Objection.
14                THE WITNESS:  Again, in -- in
15   -- consistent with what I wrote in 2008,
16   which I still stand by, is that all traffic
17   should be handled equally and fairly, in a
18   nondiscriminatory manner, and that the IP can
19   examine headers for traffic management and
20   network management purposes.  But in terms of
21   discriminating against users, I was strongly
22   opposed to that.
23   BY MR. NERCESSIAN:
24        Q.   I want to call your attention,
25   Mr. McGarty, to --
```

```
 1                C E R T I F I C A T E
 2
 3       I do hereby certify that the aforesaid
 4   testimony was taken before me, pursuant to
 5   notice, at the time and place indicated; that
 6   said deponent was by me duly sworn to tell the
 7   truth, the whole truth, and nothing but the
 8   truth; that the testimony of said deponent was
 9   correctly recorded in machine shorthand by me
10   and thereafter transcribed under my supervision
11   with computer-aided transcription; that the
12   deposition is a true and correct record of the
13   testimony given by the witness; and that I am
14   neither of counsel nor kin to any party in said
15   action, nor interested in the outcome thereof.
16
17       WITNESS my hand and official seal this
18   10th day of August 2015.
19
20
                         [signature]
21                       Ryan K. Black
22
23
24
25
                                          Page 200
```