# EXHIBIT 57

1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2

3    BMG RIGHTS MANAGEMENT  : NO. 1:14-cv-1611
     (US) LLC, and ROUND    : (LOG/JFA)
4    HILL MUSIC LP,         :
     Plaintiffs             :
5                           :
          vs.               :
6                           :
     COX ENTERPRISES,       :
7    INC., COX              :
     COMMUNICATIONS, INC.,  :
8    COXCOM, LLC,           :
     Defendants             :
9

10                      *   *   *

11            MONDAY, AUGUST 10, 2015

12                      *   *   *

13        Videotaped deposition of RALPH OMAN

14   taken at the law offices of Steptoe &

15   Johnson, 1330 Connecticut Avenue NW,

16   Washington, DC, commencing at 9:39 a.m.

17   before Debbie Leonard, Registered Diplomate

18   Reporter, Certified Realtime Reporter.

19

20

21

22

23

24

25

                                        Page 1

```
 1    APPEARANCES:
 2
           STEPTOE & JOHNSON LLP
 3         By:  PAUL A. GENNARI, ESQ.
           1330 Connecticut Avenue NW
 4         Washington, DC 20036
           (202) 429-3000
 5         pgennari@steptoe.com
           Representing the Plaintiffs
 6
 7         FENWICK & WEST LLP
           By:  ANDREW P. BRIDGES, ESQ.
 8              GUINEVERE JOBSON, ESQ.
                DAVID L. HAYES, ESQ.
 9              ARMEN NERCESSIAN, ESQ.
           555 California Street
10         12th Floor
           San Francisco, California 94104
11         (415) 875-2300
           abridges@fenwick.com
12         gjobson@fenwick.com
           dhayes@fenwick.com
13         anercessian@fenwick.com
           Representing the Defendants
14
15
16
     ALSO PRESENT:
17
18         Mikko Goodhill, Certified Legal Video
           Specialist
19
20
21
22
23
24
25
```

Page  2

```
 1                    THE VIDEOGRAPHER:   We are now
 2          on record.
 3                    Please note that the
 4          microphones are sensitive and may pick
 5          up whispering and private
 6          conversations.
 7                    Please turn off all cell phones
 8          or place them away from the
 9          microphones, as they can interfere
10          with the deposition audio.
11                    Recording will continue until
12          all parties agree to go off the
13          record.
14                    My name is Mikko Goodhill,
15          representing Veritext.  The date today
16          is Monday, August 10th, 2015, and the
17          time is approximately 9:39 a.m.
18                    This deposition is being held
19          at Steptoe & Johnson located at 1330
20          Connecticut Avenue Northwest,
21          Washington, D.C., 20036 and is being
22          taken by counsel for the defense.
23                    The caption of this case is BMG
24          Rights Management LLC, et al., versus
25          Cox Enterprises, Incorporated.  The
```

Page 6

1              case is filed in the United States

2         District Court for the Eastern

3         District of Virginia, case

4         number 1:14-cv-1611 (LOG/JFA).

5              The name of the witness today

6         is Ralph Oman.

7              At this time, the attorneys

8         present in the room can identify the

9         parties they represent.

10             MR. BRIDGES:  This is Andrew

11        Bridges of Fenwick & West representing

12        the defendants.  And with me from my

13        right are Guinevere Jobson, Armen

14        Nercessian, and David Hayes.

15             MR. GENNARI:  Paul Gennari of

16        Steptoe & Johnson for the plaintiffs

17        and for Mr. Oman.

18             THE VIDEOGRAPHER:  Okay.  All

19        right.  Our court reporter, Debbie

20        Leonard, representing Veritext, will

21        swear in the witness and we can

22        proceed.

23                  *   *   *

24             RALPH OMAN,

25    having been first duly sworn, testified as

                                   Page 7

```
 1    follows:
 2                        *   *   *
 3                     EXAMINATION
 4                        *   *   *
 5    BY MR. BRIDGES:
 6           Q.     Good morning, Mr. Oman.
 7           A.     Good morning, Mr. Bridges.
 8           Q.     You've been deposed many times,
 9    correct?
10           A.     Yes.
11           Q.     Approximately how many times?
12           A.     Probably 25 or 30 times.
13           Q.     And you've had time to meet
14    with counsel to prepare for today's
15    deposition?
16           A.     Yes.
17           Q.     Approximately -- strike that.
18                  What did you do to prepare for
19    today's deposition?
20           A.     To prepare for the deposition,
21    I reviewed my expert report.  I went through
22    the exhibits, not as thoroughly as I did in
23    preparing the report, but I went through
24    them.  And I reviewed the other documents
25    that I've cited in my report.  And I
```

Page 8

```
1    those conversations throughout the process."
2               Aren't the WIPO 1996 treaties
3    often referred to as the Internet treaties?
4         A.    They are.  That's where I must
5    have misspoke.  There were two tracks going,
6    one of them the WIPO, for updating the Berne
7    Convention, starting in 1886 [sic] through
8    1993 when I left, and at that point those
9    negotiations for the updating of the Berne
10   Convention were put aside and they focused
11   exclusively on the -- well, actually, it's
12   more complicated than that, but for
13   simplicity's sake, let me say that they
14   focused on the Internet issues, they focused
15   on folklore, and they focused on
16   broadcasters, all part of the update of the
17   Berne Convention.
18              But at that point I stepped
19   aside.  Bruce Lehman became head of the US
20   delegation, who was the Commissioner of
21   Patents and Trademarks at that time,
22   L-E-H-M-A-N.  And they put aside the
23   broadcasters treaty, they put aside
24   protection of folklore, and they went forward
25   on the Internet treaties.
```

Page 89

1            So I was not the head of the US

2    delegation during the final stages of that

3    negotiation which adopted the Internet

4    treaties.

5            Q.    By "the Internet treaties,"

6    you're referring to the 1996 copyright treaty

7    and the -- is it Performances and Phonograms

8    Treaty or did I get it backwards?  Is it --

9            A.    No.  The WCT -- WIPO Copyright

10    treaty and the WPPT.  The WIPO Phonograms --

11    Performances and Phonograms Treaty.  You had

12    it right.

13                    *   *   *

14            (Exhibit Oman-4 marked for

15        identification.)

16                    *   *   *

17    BY MR. BRIDGES:

18            Q.    Okay.  Exhibit 4 is a copy of

19    the WIPO Copyright treaty, which you've just

20    been referring to; is that correct?

21            A.    Yes.

22            Q.    And in paragraph 11 of your

23    report, you start out by saying, "I have also

24    been a frequent delegate to the meetings at

25    the WIPO in Geneva, including the series of

                                        Page 90

1    meetings that culminated in the 1996
2    diplomatic conference that modernized the
3    Berne Convention and resulted in the passage
4    of the Digital Millennium Copyright Act of
5    1998 in the United States," correct?
6            A.      Yes.
7            Q.      Is the treaty in Exhibit 4 one
8    step that resulted in the passage of the
9    Digital Millennium Copyright Act of 1998 in
10   the United States?
11           A.      There were other factors but
12   this was one of the factors that resulted in
13   the passage of the DMCA.
14           Q.      And you were a frequent
15   delegate to the meetings that led to the WIPO
16   Copyright treaty in Exhibit 4?
17           A.      Yes.
18           Q.      Your phrase is "I have also
19   been a frequent delegate."  Who delegated you
20   to attend those meetings?
21           A.      I was part of the composers
22   delegation.
23           Q.      Composers delegation?
24           A.      Yes.
25           Q.      And by composers, do you mean

                              Page 91

1    songwriters?

2          A.      Songwriters.  I also was

3    representing the -- if I recall correctly,

4    the American Bar Association.

5          Q.      So who else was in the

6    composers delegation for the WIPO Copyright

7    treaty negotiations?

8          A.      The general counsel of BMI, the

9    general counsel of ASCAP, the president of

10   ASCAP actually was there on one occasion, a

11   famous songwriter herself.

12               And the international component

13   was there as well.  The representative from

14   GEMA, the German collecting rights society,

15   G-E-M-A.  We had the head of CISAC.  It's in

16   French, but let me try to translate it.  The

17   Confederation -- International Confederation

18   of Societies of Authors and Composers,

19   C-I-C-A-C [sic].

20         Q.      In the process leading up to

21   the enactment of the Digital Millennium

22   Copyright Act, I think you said you did not

23   give any testimony before Congress; is that

24   correct?

25         A.      That's correct.

Page 92

```
 1              with.
 2      BY MR. BRIDGES:
 3              Q.      Do you understand whether
 4      making available requires any transmission --
 5      strike that.
 6                      Do you understand whether
 7      making a work available over the Internet
 8      requires any transmission at all?
 9                      MR. GENNARI:  Objection.  Vague
10              and ambiguous.  Outside the scope of
11              his report.
12                      THE WITNESS:  In my opinion,
13              no.
14      BY MR. BRIDGES:
15              Q.      What part of Section 106 does
16      making available -- strike that.
17                      Is it your contention that
18      making a work available violates copyright
19      law?
20              A.      Yes.
21              Q.      Is it your opinion that making
22      something available violates some part of
23      Section 106?
24              A.      I should have qualified that.
25      Making it available without authorization
```

Page 187

1    violates 106 of the copyright law,

2    specifically the distribution right.

3            Q.    What types of -- strike that.

4                  Does -- in your view, does

5    making something available on the Internet

6    violate any other subsections of Section 106?

7            A.    Not -- not to -- I'd say the

8    answer is no, although under certain

9    circumstances I can imagine the reproduction

10   right also being implicated.

11           Q.    How?

12           A.    I don't know.

13           Q.    So when you say -- earlier you

14   said making it available without

15   authorization violates Section 106 of the

16   copyright law, specifically the distribution

17   right.  You were referring to Section 106(3),

18   correct?

19           A.    Yes.

20                 MR. GENNARI:   Objection.

21           Misstates his prior testimony.

22   BY MR. BRIDGES:

23           Q.    What does a copyright holder

24   have the exclusive right to distribute under

25   Section 106(3) of the Copyright Act?

                              Page 188

```
 1                A.      The -- do we have a copy of
 2      106?
 3                Q.      I'm just asking based on your
 4      expertise right now.  And we can look at it
 5      later --
 6                A.      I'd prefer to go to the
 7      document.
 8                Q.      I understand that.  But just
 9      based on your residual knowledge --
10                A.      I won't answer.
11                Q.      Sorry?
12                A.      I won't answer without the
13      document in front of me.
14                Q.      I'd like everything you can
15      tell me about what a copyright owner has the
16      right to distribute under Section 106(3)
17      before we turn to the statute.
18                     MR. GENNARI:  Asked and
19             answered.  He's already explained to
20             you he's not comfortable answering
21             legal questions about statutes without
22             the statute in front of him, and if
23             you can offer him the courtesy and
24             give him the courtesy -- if you'd
25             like, I can get him the document
```

Page 189

```
 1              myself, Section 106 of the statute.
 2                      THE WITNESS:   With all due
 3              respect, I have difficulty
 4              understanding you when you've got your
 5              hand in front of your mouth.
 6      BY MR. BRIDGES:
 7              Q.      Okay.  So I'll say -- thank
 8      you.
 9                      I'd like everything you can
10      tell me about what a copyright owner has the
11      right to distribute under Section 106(3)
12      before we turn to the statute.
13                      MR. GENNARI:   Same objection.
14                      THE WITNESS:   Well, this is a
15              very complicated legal issue,
16              actually.  I think you probably
17              appreciate that.  And I would be
18              reluctant to voice an opinion on it in
19              a very nuanced area of the law in
20              which there are conflicts in the
21              circuits and not clarity that would --
22              we'd hope to have in this area of the
23              law.
24      BY MR. BRIDGES:
25              Q.      Well, just -- just based on
```

Page 190

1    your understanding of the statute and the

2    statutory language, please tell me everything

3    you can about what the statute says about

4    what a copyright owner has the right to

5    distribute, the exclusive right to

6    distribute, under Section 106(3) of the

7    Copyright Act.

8                    MR. GENNARI:  Same objection.

9          He's not a memory test.  You're asking

10         him specific language about the

11         statute without giving it to him to

12         see in front of him, and he's already

13         asked for it.  So the objection

14         stands.

15                    THE WITNESS:  I say again, I'm

16         sorry.  This is a very complicated

17         area of the law.  I've not had the

18         opportunity to review the provisions

19         you're talking about in the law.  And

20         I would -- I would prefer not to

21         answer that, tell you at this point

22         all I know about the subject, since I

23         might miss something important.

24    BY MR. BRIDGES:

25              Q.    So just tell me the -- and I

                                          Page 191

1    respect that.   What do you recall now about
2    what is important about the particular things
3    that a copyright owner has the right to
4    distribute in Section 106(3) of the Copyright
5    Act?
6                    MR. GENNARI:   Same objections.
7    BY MR. BRIDGES:
8         Q.      And if you want to add things
9    in later, that's fine.
10        A.      And if I want to --
11        Q.      Add more later, that's fine.
12   I'm just asking what you know sitting here
13   are the things that Section 106(3) says that
14   the copyright owner has the exclusive right
15   to distribute.
16                   MR. GENNARI:   Same objections.
17                   THE WITNESS:   You're -- the
18           preamble to 106 is very important, and
19           you've not mentioned that.
20   BY MR. BRIDGES:
21        Q.      Well, I understand that.   So if
22   you -- if that helps you add to your answer,
23   that's fine.   But I'm focusing on 106(3), and
24   you can add from the preamble.   But what are
25   the things that you think are important in

                                        Page 192

1    Section 106(3) that the Copyright Act gives

2    the exclusive right to the copyright holder

3    to distribute?  What are the things that the

4    copyright holder has that exclusive right to

5    distribute?

6                    MR. GENNARI:  Same objection.

7            It's about time you put the statute in

8            front of him, I would think.

9                    THE WITNESS:  In the online

10           environment, a copy of a sound

11           recording.

12   BY MR. BRIDGES:

13           Q.    What else?

14           A.    That's all I can think of off

15   the top of my head.

16           Q.    And what types of transactions

17   does Section 106(3) give the copyright holder

18   the exclusive right to engage in, in

19   distributing objects?

20                   MR. GENNARI:  Same objection.

21           Asking him to answer a question

22           without the statute in front of him,

23           which he's already asked for.

24                   THE WITNESS:  I would prefer

25           not to answer that without refreshing

                                        Page 193

```
 1            my recollection.
 2     BY MR. BRIDGES:
 3            Q.      Well, what -- and that's fine,
 4     but I'd like to understand what your
 5     recollection is now, and then we can refresh
 6     it later.
 7                    What is your recollection now
 8     about the types of transactions with respect
 9     to distribution that the copyright owner has
10     the exclusive right over?
11                MR. GENNARI:   Same objections.
12            And outside the scope of his report.
13                    THE WITNESS:   The negotiations
14            that led up to the adoption of the
15            Internet treaties and the United
16            States participated actively in that
17            proceeding, and required -- the
18            diplomatic conference decided that
19            they would authorize the making
20            available right.
21                    The United States delegation
22            was of the view that the distribution
23            right in American law, in US law,
24            would cover all of our obligations
25            under the -- under the treaties in
```

                                        Page 194

1              Register of Copyrights, who is here as

2              an expert on copyright law generally,

3              about the very type of infringement

4              that he seems to believe is at the

5              heart of this case.

6                     And I'm entitled to gain the

7              benefit of his expertise before I show

8              him the statute.

9      BY MR. BRIDGES:

10             Q.     So I'm asking you, Mr. Oman,

11     what types of transactions does the United

12     States Copyright Act, Section 106(3), give

13     the copyright owner the exclusive power to

14     engage in in connection with distribution of

15     certain types of things, gives him the power

16     to do or to authorize, but I'm looking for

17     what types of transactions the section

18     pertains to.

19                    MR. GENNARI:  Same objections.

20                    THE WITNESS:  I thought I

21             already gave you an example.

22     BY MR. BRIDGES:

23             Q.     I'm asking what the statute

24     says.

25                    MR. GENNARI:  Same objections.

                                        Page 198

```
 1                THE WITNESS:  I would not --
 2           without looking at the statute and any
 3           provisions that are related to it, I
 4           don't want to give you an answer off
 5           the top of my head.
 6    BY MR. BRIDGES:
 7           Q.    Can you recall any single type
 8    of transaction that Section 106(3) refers to
 9    in the context of the rights of a copyright
10    holder?
11           A.    Oh, certainly.  The sale of
12    books over the Internet.
13           Q.    Any other types of
14    transactions?
15           A.    All distributions would be
16    covered by the right to distribute.
17           Q.    Actually, doesn't --
18           A.    Well, I mean -- I overstated
19    the case.  But all of the normal transactions
20    we consider, sales online, sales in book
21    stores, sales through the mail, they would
22    all fall within the authority of the
23    copyright owner.
24           Q.    What sales did Rightscorp
25    identify in this case?
```

Page 199

1          A.     I don't know.

2          Q.     Are you aware of Rightscorp

3   identifying any sale by any Cox subscriber?

4               MR. GENNARI:   Objection.

5          Outside the scope of his report.

6               THE WITNESS:   Not that I

7          recall.

8   BY MR. BRIDGES:

9          Q.     Do you know whether

10  Rightscorp's technological system discerns

11  when a sale is made or not?

12         A.     I don't think it does.

13         Q.     What other types of

14  transactions does Section 106(3) of the

15  Copyright Act cover?

16              MR. GENNARI:   Same objections.

17  BY MR. BRIDGES:

18         Q.     Or refer to.

19         A.     I'm not prepared to answer

20  further on that topic.

21         Q.     Okay.  You -- in responding to

22  my question about Section 106, you referred

23  to discussions surrounding the relationship

24  of the US distribution right to the concept

25  of making available under the WIPO Copyright

Page 200

1    Treaty, correct?

2         A.      Correct.

3         Q.      Please turn to the WIPO

4    Copyright Treaty in Exhibit 4 and tell me to

5    which portions of the copyright treaty does

6    the US distribution right pertain?

7         A.      If you could point me in the

8    right direction, that would certainly help.

9    This is the right of distribution, Article 6?

10        Q.      Well, I'm asking you.

11        A.      Well, I didn't review this

12   provision or the document recently.  I would

13   be happy to do it.

14        Q.      Well, I believe that the right

15   of distribution is probably a right place,

16   and perhaps the right of rental in Articles 6

17   and 7.

18        A.      And the right of communication

19   to the public?

20        Q.      Well, I was going to ask you

21   about that.

22              So right of distribution, right

23   of rental, you think maybe right of

24   communication to the public?

25              MR. GENNARI:  I'm sorry.  Is

                              Page 201

```
 1              Q.     Okay.  Where -- what provisions
 2    of the WIPO Copyright Treaty are analogous to
 3    the rights of public display in Section
 4    106(5) of the US Copyright Act?  Which
 5    articles correspond to that?
 6                    MR. GENNARI:  Same objection.
 7                    THE WITNESS:  That's an issue
 8              I've not focused on, and I could give
 9              you an answer if you wanted me to
10              spend the time to review the document.
11    BY MR. BRIDGES:
12              Q.     Well, look at Article 8 and
13    tell me if that does not also correspond to
14    the right of public display under --
15                    MR. GENNARI:  Object --
16    BY MR. BRIDGES:
17              Q.     -- Section 106(5) of the
18    Copyright Act?
19                    MR. GENNARI:  Same objection.
20              You're refusing to show him the 106
21              statute and asking him to make legal
22              judgments and conclusions based on
23              documents you're unwilling to show him
24              and which he's already asked for
25              several times.
```

Veritext Legal Solutions
866 299-5127

```
 1                    THE WITNESS:   Article 8, does
 2          it refer -- does it also incorporate
 3          the exclusive rights that are in
 4          Section 106(5) of the US Copyright
 5          Act?
 6   BY MR. BRIDGES:
 7          Q.      Right.   Relating to public
 8   display.
 9          A.      Making them available, and
10   we're talking about copyrighted works, not
11   works covered by neighboring rights?   We're
12   talking about --
13          Q.      Copyrighted works.
14          A.      -- copyrighted works.   That
15   would bear on it as well.
16          Q.      So Article 8 would correspond
17   to the Section 106(5) right of public display
18   of a copyright holder under the --
19          A.      In my opinion, yes, though I've
20   not studied that issue in detail.   It's never
21   been a controversy I focused on.
22          Q.      What about articles -- sorry.
23   What about -- strike that.
24                  Does Article 8 also correspond
25   to Sections 106(4) and 106(6) of the
```

Page 209

1    Copyright Act relating to public performances

2    and the right of public performance under the

3    Copyright Act?

4             MR. GENNARI:  Same objections.

5         Outside the scope of his report.  The

6         documents would speak for themselves,

7         if we could see them.

8             THE WITNESS:  The right of

9         public performance, the right of a

10        sound recording to enjoy a public

11        performance right for digital

12        transmissions of its works?

13   BY MR. BRIDGES:

14        Q.    And a right of public

15   performance of an audiovisual work under

16   Section 106(4).  Do those rights of public

17   performance correspond to the right of

18   communication to the public in Article 8 of

19   the WIPO Copyright Treaty?

20             MR. GENNARI:  Same objections.

21        Calls for a legal conclusion.  Outside

22        the scope of his report.

23             THE WITNESS:  The works, again,

24        you're referred to just a second ago?

25   BY MR. BRIDGES:

                              Page 210

1           Q.      Audiovisual works or sound

2    recordings or --

3           A.      Sound recordings, of course,

4    wouldn't be covered by the WCT.

5           Q.      Why not?

6           A.      Because they're neighboring

7    rights.

8           Q.      So the WIPO Copyright Treaty

9    does not have a bearing on rights relating to

10   sound recordings?

11          A.      Not unless you're talking about

12   the underlying music.

13          Q.      Okay.  So the WIPO Copyright

14   Treaty does relate to the right of public

15   performance of musical compositions?

16          A.      Yes.

17          Q.      And that right of public

18   performance would correspond to the

19   Article 8, right of communication to the

20   public, in the --

21          A.      That's my understanding, but

22   I've not studied this issue recently at any

23   depth.

24          Q.      Please show me where in the

25   WIPO Copyright Treaty it refers to the right

Page 211

1    of making available?

2         A.    I'm not sure it does.  I've not

3    parsed out the language, but certainly when

4    they talked about these articles, they were

5    talking about rights of authors as we

6    understand them.

7         Q.    And Article 6 is the right of

8    distribution, right?

9              MR. GENNARI:  Same objections.

10   BY MR. BRIDGES:

11        Q.    That's what it says here?

12        A.    Yes.

13        Q.    That's the title of Article 6,

14   "The Right of Distribution"?

15        A.    Yes.

16        Q.    Article 7 is "The Right of

17   Rental," correct?  Correct?

18        A.    That's what it says.

19        Q.    And Article 8 is "The Right of

20   Communication to the Public" --

21        A.    Right.

22        Q.    -- right?

23              Do you notice that in the right

24   of distribution in Section -- in Article 8 --

25   strike that.

Page 212

```
 1                    Do you notice that in the right
 2      of distribution in Article 6 it indicates
 3      the -- it uses the phrase "making available"?
 4            A.      You're asking me to confirm
 5      that it says "making available"?
 6            Q.      Yes.
 7            A.      Yes.
 8            Q.      And it says, "Authors of
 9      literary and artistic works shall enjoy the
10      exclusive right of authorizing the making
11      available to the public of the original and
12      copies of their works through sale or other
13      transfer of ownership," right?
14            A.      Right.
15            Q.      What -- based on your
16      involvement in the diplomatic activities
17      leading up to the formation of the treaty,
18      what did you understand "original and copies"
19      to mean?
20                    MR. GENNARI:   Objection.
21            Outside the scope of his report.
22                    THE WITNESS:   I don't recall
23            the precise meaning of those terms.
24            There could be a technical
25            explanation.   There could be an
```

Page 213

1          explanation vis-à-vis the Berne
2          Convention.  I'm not entirely sure at
3          this point.
4    BY MR. BRIDGES:
5          Q.      Do you recall whether there's a
6    correspondence between the meaning of the
7    word "copies" in Article 6 of the WIPO
8    Copyright Treaty and the meaning of "copies"
9    in Section 101 of the Copyright Act and the
10   meaning of "copies" as used in Section 106(3)
11   of the Copyright Act?
12              MR. GENNARI:  Same objection.
13         Outside the scope of his report.
14              THE WITNESS:  There may be a
15         connection, but I don't recall at this
16         point whether there was a direct
17         correlation during the negotiation of
18         the provision.
19   BY MR. BRIDGES:
20         Q.      And you see the phrase "through
21   sale or other transfer of ownership" --
22         A.      I see that.
23         Q.      -- in Article 6?
24         A.      Yes.
25         Q.      Do you understand that to --

Page 214

1    those to be two types of -- strike that.

2                    Do you understand those to be

3    the two types of events that the right of

4    distribution in Article 6 covers?

5                    MR. GENNARI:   Objection.

6         Outside the scope of his report.

7                    THE WITNESS:   Yes.

8    BY MR. BRIDGES:

9         Q.        There has to be a making

10   available to the public through sale or other

11   transfer of ownership, correct?

12        A.        That's what the words say.

13        Q.        And it has to be the making

14   available to the public of the original and

15   copies of their works through sale or other

16   transfer of ownership; so it's the right of

17   authorizing the making available to the

18   public of two categories of things, originals

19   of their works and copies of their works,

20   through two types of -- two types of

21   transactions, sales and other transfers of

22   ownership, correct?

23                    MR. GENNARI:   Objection to the

24        form.   Vague and ambiguous.   The

25        document speaks for itself.   Asked and

                                        Page 215

1              answered.

2                    THE WITNESS:   You're asking me

3         to go back 20 years and recall the

4         details.   I have not studied this

5         issue for this report, and I -- I wish

6         I had a ready answer for you, but I

7         don't.

8    BY MR. BRIDGES:

9         Q.      Okay.   Let me ask you to turn

10   to footnote 5.

11                   MR. GENNARI:   Before you ask

12        the next question, we're already past

13        an hour on the break time, so --

14                   MR. BRIDGES:   I've got maybe

15        five more minutes.

16                   MR. GENNARI:   I'd like to take

17        a break every hour if we could.

18                   MR. BRIDGES:   Sure.

19   BY MR. BRIDGES:

20        Q.      I'd ask you to look at

21   footnote 5.   It's on page 9 of 10 of

22   Exhibit 4.

23                   Did I say footnote 9?   I meant

24   to say footnote 5.   I thought that's what I

25   said.   Do you see footnote 5?

                                   Page 216

1          A.      I see footnote 5.

2          Q.      "Agreed statements concerning

3    Articles 6 and 7"?

4          A.      I see that.

5          Q.      In the context of WIPO treaty

6    making, what are agreed statements?

7          A.      Let me read them?  May I read

8    them?

9          Q.      Can you answer in general what

10   agreed statements are in the context of

11   treaties?

12         A.      Oh, yes.  They are -- it's

13   almost like legislative history, but it puts

14   the actual language of the article in some

15   sort of historic context.

16         Q.      Right.  So I'll go ahead and

17   read it as you read it.

18               "As used in these articles, the

19   expressions, copies, and original and copies,

20   being subject to the right of distribution

21   and the right of rental under the said

22   articles refer exclusively to fixed copies

23   that can be put into circulation as tangible

24   objects."

25               Do you see that?

1           A.      I see that.

2           Q.      So is it your understanding

3    that the right of distribution under the WIPO

4    Copyright Treaty includes a provision for

5    making available in Article 6, correct?   The

6    two words "making available" are in the first

7    line of Article 6?

8           A.      Yes, I see that.

9           Q.      But it's the making available

10   of original -- the original and copies in the

11   text of Article 6, and in the agreed

12   statement in footnote 5, it explains that

13   original and copies refer exclusively to

14   fixed copies that can be put into circulation

15   as tangible objects.

16              Do you see that?

17         A.      I see that.

18         Q.      Is it -- and it's your

19   understanding that all agreed that the --

20   there need be no change in US law because US

21   law conformed to the provisions of the WIPO

22   Copyright Treaty without need for amendment,

23   correct?

24              MR. GENNARI:   Objection.

25         Outside the scope of his report.

                                    Page 218

```
 1              Calls for a legal conclusion.  Vague
 2              and ambiguous.
 3                   THE WITNESS:  Let me read, if I
 4              may, Article 8, footnote 7.
 5    BY MR. BRIDGES:
 6         Q.        It says, "It is understood that
 7    the mere provision of physical facilities for
 8    enabling or making a communication does not
 9    in itself amount to communication within the
10    meaning of this treaty or the Berne
11    Convention."
12         A.        Again, without -- without going
13    back to my archives, this was almost 20 years
14    ago now, I wonder whether or not the making
15    available right in Article 8 was intended to
16    be the corresponding right that's covered by
17    the distribution right in the United States.
18         Q.        Well, it's not a making
19    available right.  It's a communication right
20    in Section -- in Article 8 of the WIPO
21    Copyright Treaty, correct?
22         A.        That's correct.
23                   MR. GENNARI:  Objection.
24              Misstates his testimony.
25                   THE WITNESS:  If I -- if I
```

                                        Page 219

1      I assume that there's a connection, but I
2      don't recollect at this point.
3              Q.      And then "phonorecord" is on
4      page 4, it starts out by saying
5      "'Phonorecords are material objects," and
6      then it goes on.  And then the final sentence
7      says, "The term 'phonorecord' includes the
8      material object in which the sounds are first
9      fixed."
10             Now let me ask you to turn
11     to -- and, actually, before I turn, are you
12     aware of any provision in the Copyright Act
13     that defines "copies" as something that is
14     not a material object?
15             MR. GENNARI:  Objection.
16         Outside the scope of his report.
17         Calls for a legal conclusion.
18             THE WITNESS:  I would have to
19         go back to the statute to verify that
20         point.
21     BY MR. BRIDGES:
22             Q.      Are you aware of any exception
23     from the definition of "copies" as material
24     objects as you sit here today?
25             MR. GENNARI:  Same objection.

                                    Page 224

```
 1                    THE WITNESS:   "Copy" has -- in
 2           the context of the copyright law, has
 3           many different purposes.  For purposes
 4           of determining infringement, I'm not
 5           certain, as actually I'm certain on
 6           the other side, that you don't have to
 7           make a physical copy, in terms of
 8           something to hold in your hand, to
 9           infringe copyright.
10   BY MR. BRIDGES:
11           Q.      Of course, because one can
12   engage in a public display to infringe
13   copyright, correct?
14           A.      Well, the public performance.
15           Q.      Right.  Without creating a
16   physical copy?
17           A.      Correct.
18           Q.      So my question is, are you
19   aware of any definition from the -- strike
20   that.
21                   Are you aware of any exception
22   from the definition of "copies" as material
23   objects in the Copyright -- in the Copyright
24   Act?
25           A.      As I'm sitting -- I'm sorry.
```

Page 225

1               MR. GENNARI:  Same objections.

2               THE WITNESS:  As I'm sitting

3          here today, I can't point to one.

4    BY MR. BRIDGES:

5          Q.     Now let me ask you to turn to

6    Section 106, Exhibit 10.

7          A.     I'm looking at 106.

8          Q.     All right.  Section 106.  And

9    the preamble up there says -- the preamble at

10   the beginning of the section that you

11   referred to earlier, says, "Subject to

12   sections 107 through 122, the owner of

13   copyright under this title has the exclusive

14   rights to do and to authorize any of the

15   following:"

16               Correct?

17         A.     Correct.

18         Q.     So that means that the rights

19   set forth below that preamble in Section 106

20   are subject to various limitations and

21   exceptions in Sections 107 to 122, correct?

22               MR. GENNARI:  Objection.  Vague

23         and ambiguous.

24               THE WITNESS:  That appears to

25         be the case, if I've understood your

                                   Page 226

1              question correctly.
2     BY MR. BRIDGES:
3              Q.      And section -- and Sections 107
4     to 122 operate as limitations or boundaries
5     on the right of the copyright owner.  They
6     don't expand the right of a copyright owner.
7     Correct?
8                      MR. GENNARI:  Objection.  We
9              don't have the other sections, 107
10             through 122, in this document, do we?
11    BY MR. BRIDGES:
12             Q.      You may answer.
13                     MR. GENNARI:  In Exhibit 10?
14    BY MR. BRIDGES:
15             Q.      You may answer.
16             A.      They are limitations on the
17    exclusive rights.
18             Q.      And not expansions, correct?
19             A.      If I understand "expansions"
20    the way I think you mean it, correct.
21             Q.      Let me ask you to turn to
22    paragraph 3 of Section 106.  It says, "to
23    distribute copies or phonorecords of the
24    copyrighted work to the public by sale or
25    other transfer of ownership, or by rental,

                                      Page 227

```
 1    lease, or lending."
 2              Do you see that?
 3         A.    I see that.
 4         Q.    So please keep that in front of
 5    you.
 6              Are you aware of any facts in
 7    this case suggesting that any Cox subscribers
 8    have distributed any material objects?
 9              MR. GENNARI:  Objection.
10         Outside the scope of his report.
11              THE WITNESS:  You focus on
12         "material object," and based on that,
13         I -- I say that I'm not aware of
14         any -- any --
15              Distribution?  Was that the
16         word you used?
17    BY MR. BRIDGES:
18         Q.    Correct.
19         A.    -- distribution of a physical
20    object.
21         Q.    Are you aware of any facts
22    suggesting any Cox subscribers have sold
23    anything over the Cox network?
24         A.    I've --
25              MR. GENNARI:  Objection.
```

Page 228

```
 1                    Outside the scope of his report.
 2                         THE WITNESS:  I've not seen any
 3              evidence of sales.
 4      BY MR. BRIDGES:
 5              Q.      Have you seen any evidence of
 6      any transfers of ownership by Cox subscribers
 7      in this case?
 8                         MR. GENNARI:  Objection.
 9              Outside the scope of his report.
10                         THE WITNESS:  Again, this is an
11              area of some controversy, some
12              dispute.  Is a barter arrangement a
13              transfer of ownership?  I give you one
14              of mine if you give me one of yours.
15      BY MR. BRIDGES:
16              Q.      Have you seen any evidence of
17      any transfer --
18              A.      I would -- I would argue that
19      that is a transfer of ownership.
20              Q.      Sorry?
21              A.      I would argue that that is a
22      transfer of ownership.
23              Q.      I'm asking whether you have
24      seen evidence of any actual transfers of
25      ownership of anything by Cox subscribers in
```

                                                    Page 229

```
 1     this case.
 2                    MR. GENNARI:  Objection.
 3            Outside the scope of his report.
 4            Calls for a legal conclusion.
 5                    THE WITNESS:   No.
 6     BY MR. BRIDGES:
 7            Q.    Have you seen any evidence of
 8     any rentals by Cox subscribers in this case?
 9                    MR. GENNARI:  Same objections.
10            Outside the scope of the report.
11            Calls for a legal conclusion.
12                    THE WITNESS:   No.
13     BY MR. BRIDGES:
14            Q.    Have you seen any evidence of
15     any leases by Cox subscribers in this case?
16                    MR. GENNARI:  Same objection.
17                    THE WITNESS:  By saying no, I'm
18            saying no, since I used the word in
19            the last two questions, I'm not aware
20            of any -- any leases that were
21            negotiated by Cox subscribers.
22     BY MR. BRIDGES:
23            Q.    Are you aware of or have you
24     seen any evidence of any lending of anything
25     by Cox subscribers?
```

Page  230

1           MR. GENNARI:  Same objections.

2               THE WITNESS:  Specific evidence

3       of lending?  There could be arguments

4       made, and there probably are arguments

5       made, that exchanging information,

6       exchanging copyrighted works in a

7       peer-to-peer environment is lending,

8       but I've not seen any hard evidence of

9       that in this case.

10  BY MR. BRIDGES:

11       Q.     By any Cox subscriber?

12       A.     By a Cox subscriber.

13       Q.     When do you -- what do you

14  understand "lending" to mean?

15           MR. GENNARI:  Objection.

16       Outside the scope of the report.

17               THE WITNESS:  I would use the

18       word in its normal sense.  Letting

19       someone borrow the work and then

20       returning it.

21  BY MR. BRIDGES:

22       Q.     A transfer of possession and a

23  retrieval of possession of an item, correct?

24       A.     That would be my understanding

25  of the plain meaning of the language.

Page 231

1          Q.      And in a transfer of ownership,
2    a new owner, upon acquiring ownership, takes
3    that ownership away from the old owner who
4    loses ownership, correct, in a transfer of
5    ownership?
6                    MR. GENNARI:  Objection.  Calls
7          for a legal conclusion.  Outside the
8          scope of his report.
9                    THE WITNESS:  I'm not sure
10         ownership comes into the equation.
11   BY MR. BRIDGES:
12         Q.      Well, I'm just -- I'm just
13   looking at the term "transfer of ownership"
14   in this language.  A transfer generally
15   means, if A transfers to B and B gets it, A
16   no longer has it, correct, because it has
17   been transferred?
18                   MR. GENNARI:  Objection.
19                   THE WITNESS:  When you're
20         talking about -- I'm sorry.
21                   MR. GENNARI:  Same objections.
22         Outside the scope of the report.
23         Calls for a legal conclusion.
24                   THE WITNESS:  If you're focused
25         on physical objects, yes.

                                    Page 232

```
 1    BY MR. BRIDGES:
 2         Q.    And it's also true of
 3    intangible rights.  If I -- if I transfer to
 4    you my -- my -- the sum of $10 from my bank
 5    account to your bank account, I haven't
 6    necessarily handed you any currency.  I've
 7    simply engaged in an electronic transaction
 8    by which you have the $10 and I no longer
 9    have the $10, correct?
10              MR. GENNARI:  Objection.  Vague
11         and ambiguous.
12              THE WITNESS:  I'm hesitant to
13         respond on a hypothetical that -- it
14         sounds plausible, but there could be
15         other considerations, whether or not
16         it was a transfer of ownership, even
17         though it wasn't a $10 bill.
18    BY MR. BRIDGES:
19         Q.    I can transfer a chose in
20    action.  I can transfer you a stock
21    certificate and transfer the ownership of
22    stock that the stock certificate represents,
23    correct, and if you have it, then I no longer
24    have it, correct?
25         A.    That's a transfer of ownership
```

                                        Page 233

```
 1            C E R T I F I C A T E
 2
              I do hereby certify that I am a Notary
 3    Public in good standing, that the aforesaid
      testimony was taken before me, pursuant to
 4    notice, at the time and place indicated; that
      said deponent was by me duly sworn to tell
 5    the truth, the whole truth, and nothing but
      the truth; that the testimony of said
 6    deponent was correctly recorded in machine
      shorthand by me and thereafter transcribed
 7    under my supervision with computer-aided
      transcription; that the deposition is a true
 8    and correct record of the testimony given by
      the witness; and that I am neither of counsel
 9    nor kin to any party in said action, nor
      interested in the outcome thereof.
10
              WITNESS my hand and official seal this
11    10th day of August, 2015.
12
13
14
                    _____
15                  Debbie Leonard, RDR, CRR
                    Notary Public
16
17
18
19
20
21
22
23
24
25
                                         Page 357
```