UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, <br><br> Plaintiff, <br><br> v. <br><br> COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, <br><br> Defendants. | Case No. 1:14-cv-1611 (LOG/JFA) |

**DECLARATION OF RANDALL J. CADENHEAD IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Randall J. Cadenhead, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney at law and a member of the Bars of the State of Georgia and Florida. I earned my law degree *cum laude* at the University Of Georgia School Of Law in 1979, where I served as an editor of the Georgia Law Review.

2. I practiced law from 1979 until the end of 2013, when I retired. During my retirement from practice I have served as Adjunct Professor at the Emory University School of Law. During my practice I helped lead a number of professional and charitable organizations.

3. I began my career as an associate at the law firm of Smith, Cohen, Ringel, Kohler & Martin from 1979 until 1981. From 1982 to 2002 I served in various positions in the legal department of Southern Bell and its successor, BellSouth Corporation, a regional Bell operating company. In those roles I advised the company on litigation and regulatory issues, numerous transactions, real estate, intellectual property, and corporate governance. From 1995 to 2002 I was Associate General Counsel, with principal responsibility for the BellSouth Advertising and Publishing unit, itself a $2 billion publishing company. I was personally responsible for mergers

and acquisitions, corporate compliance, major litigation, intellectual property, transactional matters and FCC and state regulatory proceedings. In that period, I also developed and personally represented BellSouth's successful Internet directory subsidiary. During that time I worked extensively on, and became very familiar with, copyright issues and in particular the provisions of the Copyright Act pertaining to online service providers (namely, the Online Copyright Infringement Liability Limitation Act, part of the Digital Millennium Copyright Act, 17 U.S.C. § 512).

4. In 2002 I joined Cox Communications as its privacy counsel. In that position I was responsible for privacy of customer records and communications as well as for issues of data security.

5. In that role at Cox Communications I had oversight of the Customer Abuse (later the Customer Safety) Department. I will refer to that department as the "Customer Safety Team" or "Safety Team." That team oversees many different aspects of customer safety, terms of use, acceptable use policies, interactions with law enforcement, interactions with persons or entities that bring certain alleged network or computing threats or vulnerabilities to our attention, and interactions with copyright owners or their agents regarding notifications of claimed infringement.

6. In my role at Cox Communications I had responsibility for advising the company about its methods and procedures for addressing notifications of claimed copyrights, the graduated response process by which Cox Communications implemented its policy of terminating in appropriate circumstances account holders or subscribers of the Cox system and network who had prompted repeated claims of infringement. I reviewed and approved the Methods and Procedures manuals that the department prepared, and I consulted with members of the team about a variety of practices and actions that required guidance that the manuals did not provide.

7. To my knowledge, no copyright owner or agent has ever provided Cox Communications with any information that a court had adjudicated a Cox account holder as someone who had repeatedly committed copyright infringement.

8. Before my retirement, I was the lawyer at Cox with chief responsibility for

directing the Customer Safety Team in addressing difficult or unusual communications regarding claimed copyright infringement. I also advised the team as the need arose about close decisions as to these issues. The members of that team consulted me on a regular, often daily, basis.

9. My work advising the Safety Team required a familiarity with copyright law and in particular certain provisions of the Copyright Act pertaining to online service providers in 17 U.S.C. § 512 (the Online Copyright Infringement Liability Limitation Act, part of the Digital Millennium Copyright Act or DMCA). I had gained that familiarity in my earlier work as a lawyer at BellSouth. Cox is an online service provider that transmits, routes, or provides connections for material through the system or network that Cox controls and operates. Section 512(a) provides a safe harbor to service providers like Cox if they meet the requirements of sections 512(a) and 512(i).

10. Section 512(c) of the Copyright Act, also part of the Online Copyright Infringement Liability Limitation Act and the DMCA, provides a similar safe harbor for a different category of online service providers, namely those that store material at the direction of users. That category includes "hosting" companies of various sorts, such as YouTube, Facebook, and Twitter. Section 512(c) provides for an interplay of actions and responsibilities of copyright claimants and storage service providers in the application of the safe harbor rules. It provides a list of necessary elements for a copyright holder or its agent to include in a notification of claimed infringement of specific material or activity. A valid notification from a copyright holder or agent provides the opportunity for a service provider expeditiously to remove or disable access to material or activity in order to qualify for the safe harbor under section 512(c).

11. In contrast to section 512(c), section 512(a) does not state any notification or handling requirements for a service provider like Cox, and it does not require a service provider to remove or disable access to infringing material or activity. That is because "conduit" transmission services as Cox provides to most account holders do not store any material for users or provide a site for their users' activities. Nevertheless, Cox provided a mechanism for copyright holders and their agents to communicate with Cox about claimed infringements taking place using Cox's

3

network services. It asked copyright holders and their agents for the same information that is necessary for a valid notification under section 512(c) because most commercial copyright holders and their agents are familiar with the elements of section 512(c)(3) notifications and routinely provide that information to service providers when giving notice of an alleged infringement.

12. Shortly after joining Cox in 2003 as Privacy Counsel, I took responsibility for legal matters related to the DMCA, including supervision of the graduated response system and the infringement complaint handling process. The subject both related to my privacy responsibilities and was also an area I had studied and provided advice concerning during my time at BellSouth, so it was appropriate for me to assume that role.

13. I quickly observed the seriousness with which Cox treated copyright complaints and DMCA matters and saw how Cox had developed automated tools to handle -- both rapidly and fairly -- the significant volume of notices of alleged infringement it received. At a time when many Internet companies still received and forwarded notices using the U.S. mail, Cox was able to receive and deliver notices electronically and had developed its own specialized computer program, called the "Cox Abuse Tracking System" (CATS), for tracking and managing notices and other "abuse" issues. The automated system was able to receive notices, establish whether they met the basic requirements of the DMCA, forward those notices to the appropriate Cox account holder at whose online address the alleged infringements were supposedly taking place, take certain automated progressive steps of action against alleged infringers, and track the notices that its account holders received. Use of the automated system allowed representatives in the Safety Team to spend much of their time interacting directly with customers, who were often confused as to why they had received a notice of infringement. Part of our process was a series of graduated response steps to reinforce with customers the importance of correcting issues related to copyright infringement. These steps began with communications through email or browser intercepts, included suspension of service when warranted, and ultimately culminated in appropriate cases with termination of a customer's Internet service.

14. Over time, the volume of notices grew as copyright holders began to send large

numbers of automated notices. It was apparent that large copyright holders and their agents often had no human involvement to verify the accuracy of the holder's claims. We worked regularly with companies that sent notices, often assisting them in streamlining the process so that we could manage the highest number of notices possible while still being able to deal personally with our customers to educate them about copyright issues and assist them in corrective actions when needed. Cox also pioneered website tools to help educate customers on how to prevent copyright infringement.

15.  Cox gained a leading reputation among ISPs in dealing with DMCA issues. According to reports and other information I received from peer companies, Cox was consistently able to handle a larger number of notices than many other ISPs with much larger customer bases. We even offered our CATS system to other ISPs to help them automate their efforts, some of whom chose to use the system.

16.  As the number of notices that Cox received grew into the millions annually, Cox found that it could not handle the volume of customer interactions that these notices generated without an enormous increase in staff. As a result, we developed reasonable limits on the number of automated notices we could accept from copyright holders. In many cases, Cox negotiated an agreement on those limits with the notice senders. In setting these limits, we offered to help the senders prioritize their notices, so that they would receive the greatest effect.

17.  For many years, Cox was the rare (in fact the *only*, to my knowledge based on communications with others) Internet company with a reputation of terminating customers who failed to take corrective steps in response to repeated notices of copyright infringement. Even though many other ISPs adopted our graduated response steps in one form or another, most were reluctant to impose this level of remedial action and I believe that many still do not do so today.

18.  Around 2010, Cox received an invitation to join in cross-industry talks out of which the Copyright Alert System of the Center for Copyright Information eventually grew. That system arose from a series of negotiations that the New York Attorney General Andrew Cuomo arranged between major Internet service providers, including Cox, and representatives of

the entertainment industry. Cox actively participated in those discussions but ultimately decided not to participate in the Copyright Alert System for several reasons: (a) Cox already had in place an advanced and robust process and system for handling copyright complaints; (b) Cox's process and system actually resulted in terminations of alleged repeat infringers, unlike the Copyright Alert System, which never provided for terminations; (c) Cox had invested a large amount of time and money into setting up its process and system, including developing sophisticated software to support it; and (d) the new Copyright Alert System involved a complex and costly administrative system that did not justify the high cost in light of these other factors.

19. In time, a new and aggressive enforcement industry began to use the DMCA notification process not to reduce the incidence of infringements but to make money through threats that customers would lose Internet service if they did not pay the enforcers money. One of these efforts took the form of sending notices with references to an instance of alleged infringement by someone accessing the Internet at a particular time from a particular IP (Internet Protocol) address then demanding, from the holder of the account assigned to that IP address at that time, a monetary payment to avoid losing Internet service. I reviewed multiple notices from several different enforcement agents using such threats. These extra-legal threats of loss of Internet service and accompanying demands for money to avoid such loss relied on improper threats and incomplete and inadequate facts and claims, and therefore were, in my judgment, more like Internet scams, similar to extortion and possibly "phishing" (the solicitation of personal information through deception). Based upon my study of the DMCA and its legislative history, I concluded that these threats and demands were not consistent with either the letter or spirit of the DMCA and the safe harbor thereunder as it might apply to Cox. For this reason, we informed these parties, including Rightscorp, that we would not accept their notices unless they agreed to remove the demands for payment and the threats of action that Cox supposedly would take absent such payment. I discussed this decision within the Legal Department and with management. As a further step, I also sought and obtained confirmation from outside counsel expert in the DMCA concerning the decision. While there was a consensus on the decision, I

6

considered it ultimately mine to make and I was, and remain, confident that it was the proper one.

20. One company from which Cox received this type of improper communications was Copyright Enforcement Group, which also went under the name CEG-TEK. I instructed Cox personnel to refuse to process CEG-TEK's notices that contained the improper threat/payment language. We communicated that fact to CEG-TEK with the further statement that, if CEG-TEK changed the notices to remove the offensive language, Cox would resume processing its notices in accordance with its graduated response system. CEG-TEK cured the problem, and Cox began processing CEG-TEK's notices again.

21. There were several other enforcement agents that refused to cure similar improper and offensive problems with the notices that Cox called to their attention. One of them was a company called PayArtists. I understand that Robert Steele of Rightscorp previously had a business relationship with PayArtists.

22. The most prolific and difficult of all enforcement agents we encountered was Rightscorp, which also went by the name Digital Rights Corp. Our staff in both the Customer Safety Team and the Legal Department received a variety of communications from Rightscorp either demanding or asking that we process its notices of alleged infringement, which involved forwarding to our account holders communications that Rightscorp directed to such account holders rather than to Cox, and which communications contained improper and offensive statements that Cox might terminate Internet service to the account holder if a payment was not made to Rightscorp . A copy of a 2011 notice from Rightscorp is Exhibit 1 to this declaration.

23. Both I and others at Cox repeatedly explained to Rightscorp, as we had explained to other companies, that we would not accept notices with that kind of offensive language that was outside the scope of the law. Examples of communications that went back and forth between Cox (including me) and Rightscorp are Exhibits 2 through 7.

24. When it became clear that Rightscorp would not alter its objectionable notices, in March 2011 I advised the Customer Safety Team that Rightscorp's notices were not proper, that

7

Cox should not forward them to account holders, and that CATS should "blacklist" and automatically delete complaint notices from Rightscorp. When it began to flood Cox with thousands of those notices, the Customer Safety Team discussed with me the burdens on the CATS system posed by a flood of notices on which Cox would take no action, including jeopardizing the ability of the CATS system to process proper notices from other rights holders. The Safety Team advised that the volume of notices was so high that it threatened to harm its ability to handle legitimate notices from copyright holders and agents. Based on these discussions, in October 2011, I approved blocking Rightscorp's emails at the mail server level to prevent Cox's email system from receiving the bodies of Rightscorp's improper notices and clogging the CATS system with items we had determined Cox would not act upon.

25. Rather than attempt to offer legal justification for its actions, Rightscorp tried different approaches. It took the position that, if Cox would not forward the notices to Cox's customers, Cox should terminate Internet service to account holders of accounts associated with certain IP addresses. Exhibit 3 is an example of such a communication Cox received from Rightscorp. Rightscorp also claimed that it was providing lists of "repeat infringers," but Rightscorp neither identified any information about adjudications of repeat infringement by any Cox customer nor provided any information that would identify Cox's account holders as having personally committed copyright infringement on a repeated basis. Exhibit 8 is an example of such a communication Cox received from Rightscorp.

26. Rightscorp even made a business proposition to Cox: Rightscorp offered Cox a share of the payments that Rightscorp received from Cox customers if Cox would participate in Rightscorp's scheme. A copy of a PowerPoint presentation that Rightscorp sent to Cox as part of that solicitation is Exhibit 9 to this declaration. In that presentation Rightscorp suggested that Cox could have a revenue share by agreeing to the scheme. (Page COX_BMG00213555).

27. Numerous communications from Rightscorp indicated that, for it, the threat of termination of our customers' services was simply for negotiating leverage with the customers. Its notices threatened that loss of Internet service from Cox could occur *if the customer did not*

*pay the demand.* In its notices, such as Exhibit 1, Rightscorp stated: "Your ISP service could be suspended if this matter is not resolved. . . . [F]or $10.00 per infringement, you will receive a legal release from the copyright owner." Even where an ISP were to terminate an account holder for repeated infringements, Rightscorp suggested that *Internet service could be restored if the customer paid the Rightscorp demand.* Exhibit 8 called for Cox to "[r]econnect the infringer when [Rightscorp] notifies [Cox] the infringement has been settled." In Exhibit 9, the PowerPoint presentation to Cox, Rightscorp said "ISP customer gets a settlement offer. Amount due escalates over time. ISPs suspend repeat infringers service until they settle." In yet another PowerPoint presentation that Rightscorp sent to Cox, a copy of which is Exhibit 10, Rightscorp stated:

*Requested compliance*

- Stage 1: Forward our email notices
- Stage 2: If no response received to first notice, implement an **http: redirect** to our notice page . . . .
- Stage 3: For Repeat infringers:
  – Temporarily suspend until they have settled
  – [Rightscorp] will send settlement confirmation once they have settled so infringer can be reconnected.

In other words, Rightscorp's entire business model was to drive revenue to itself with the potential loss of Internet service as a cudgel.

      28.    Rather than justifying Rightscorp's actions, the solicitation and the information Rightscorp presented, in my view, seemed to acknowledge that its approach was both factually faulty and outside the framework and purposes of the copyright law and the Digital Millennium Copyright Act, if not outright illegal. Cox therefore rebuffed Rightscorp's business proposition. Cox wanted to have no part of such a suspect scheme and wanted no income from it.

At all times during my employment at Cox, Cox indicated to Rightscorp that Cox *would* process Rightscorp's notices in its graduated response system *if* Rightscorp would remove the offensive

9

and improper language. Exhibits 2, 4, 6, and 7 are examples of written communications by Cox conveying that message to Rightscorp. Cox invited Rightscorp to work with Cox, fix the problem, and gain Cox's support with proper notifications. Rightscorp showed no interest in working with Cox to cure the problem, and it never approached me to discuss a resolution of the standoff. Between 2012 and the time I left Cox (at the end of 2013), I assumed that Rightscorp had backed away from its efforts and had moved on. The lawsuit in November 2014 (almost a year after I had left Cox) was a surprise to me.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of September, 2015.

Randall J. Cadenhead

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2015, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

> */s/ Craig C. Reilly*
> Craig C. Reilly (VSB No. 20942)
> 111 Oronoco Street
> Alexandria, VA  22314
> Tel:  703-549-5354
> Fax:  (703) 549-5355
> Email:  craig.reilly.@ccreillylaw.com
> *Counsel for Defendants*