**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,      ) <br> ) <br> ) <br>Plaintiff,      ) <br> ) <br>v.      ) <br> ) <br>COX ENTERPRISES, INC., COX <br>COMMUNICATIONS, INC., and <br>COXCOM, LLC,      ) <br> ) <br> ) <br>Defendants.      ) <br> ) | Case No. 1:14-cv-1611 (LOG/JFA) |

**DECLARATION OF JASON JABEK IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**REDACTED VERSION SOUGHT TO BE SEALED**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,<br><br>               Plaintiff,<br><br>     v.<br><br>COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)  Case No. 1:14-cv-1611 (LOG/JFA)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF JASON ZABEK IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Jason Zabek, submit this declaration pursuant to 28 U.S.C. § 1746:

1.      I am the Manager of Customer Abuse Operations at Cox Communications, Inc.  I submit this declaration in support of Defendants' Motion for Summary Judgment.  I have personal knowledge of the facts in this declaration.

2.      I have been the Manager of Customer Abuse Operations for approximately five years.  Before that, I held a number of different positions at Cox.  I was first employed by Cox in 1991 as a customer service representative and held that position for approximately six years.  As a customer service representative, I was the first point of contact for incoming customer service calls and either helped resolve account holders' questions or transferred them to the appropriate department.  In approximately 1997, I changed jobs and was a payroll administrator for Cox outside sales representatives.  After approximately two years in that position, I became a Field Service Representative.  In that role, I went to account holders' homes to install their cable modems and to trouble-shoot problems they were having with their Internet connections.  I showed

account holders and their families how to connect to the internet, install software, use search engines, and how to use email programs.

3.      After approximately two years as a Field Serve Representative, I became a Cox Business Support Representative and assisted Cox business account holders with technical or other difficulties they were having with their service.

4.      I was a Business Support Representative for approximately four years and then, in approximately 2006, joined the Customer Abuse Team (also called the "Customer Safety Team" or the "Safety Team") as a Level I Abuse Engineer.  Approximately three years later, I became Lead Abuse Engineer.

5.      In 2010, I received a promotion to my current position as Manager of Customer Abuse Operations.  As Manger of Customer Abuse Operations, I manage two employees, Andrew Thompson and Joseph Sikes, who are both Abuse Engineers.  I supervise their daily workload, conduct meetings, answer questions, and review their performance.  I also interact with other departments to protect the safety and integrity of the Cox network.

### The Customer Safety Team

6.      The Customer Safety Team is primarily responsible for the enforcement of the Cox Acceptable Use Policy.  The Acceptable Use Policy is part of our agreement with our Internet account holders and governs the ways in which account holders are authorized to use, or prohibited from using, our services.  We are also responsible for addressing various forms of abuse on the Cox network.  The issues (also called "abuse types") that we handle range from the highly dangerous, like botnets and malware that threaten the network and account holders, to more routine matters such as open wireless connections.  Among the many other challenges we face are phishing scams (trickery to gain access to personal information), denial of service (DOS)  attacks, security breaches compromising account holder personally identifiable information, spam, and

2

claims of copyright infringement.  The team works hard to maintain Internet security and security

for our account holders by educating them on how to keep their systems safe.

   7.  Given the variety of different kinds of complaints Cox receives, the team focuses its

efforts by taking into account the level of perceived threat to the network, immediacy of the threat,

relative volume of complaints and a variety of other factors.  Our motto reflects this balance:

"Protect the Network from our Customers; Protect our Customers from the Internet; Protect the

Internet from our Customers."  Specifically, the Safety Team works to process complaints

effectively and equitably.  It also works collaboratively with customer service representatives at

different levels of responsibility (Tier 1, Tier 2, Technical Operations Center (TOC) and National

Support Center (NSC)[1] to educate account holders how to curb the actions or conditions that lead

to complaints.  The Safety Team meets weekly, both internally and with Technical Operations

Center and National Support Center, to discuss and address unusual complaints, new potential

threats or abuse types, staffing issues, changes in policy, possible improvements to procedures, and

any other issues that arise.

   8.  The Residential Abuse Ticket Handling Procedures, sometimes referred to as the

"Methods and Procedures" or "M&Ps," describes how Cox handles different abuse types.  We

refer to the steps for handling complaints as the "Graduated Response Procedure," which includes

actions taken by customer service representatives and automated actions taken by the Cox Abuse

Tracking System (referred to as "CATS").  Our Acceptable Use Policy provides that if an account

holder receives multiple abuse complaints, Cox may suspend or eventually terminate the account

---

[1] Tier 1is the first level of customer service representatives.  They answer routine questions and often reroute more specialized questions to the appropriate department.  Tier 2 representatives have more specialized training, including how to handle basic questions relating to notices of copyright infringement.  The Technical Operations Center is a small team of more senior customer service representatives (currently six), who address the most complex or serious circumstances of customers who receive multiple abuse complaints.  The National Support Center focuses on answering questions from Business account holders.

holder's Internet service.

9.      **Exhibit 1** is a copy of the current Methods and Procedures, which describe the sequence of notices and service suspensions to which an account holder is subject before possible termination of the account holder's Internet account.  Pages 10 to 13 of Exhibit 1 outline the process for addressing complaints of copyright infringement.  As a general matter, ████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████

10.      Over time, the procedures outlined in the Methods and Procedures have changed to reflect our evolving understanding of the best way to engage with and educate account holders to curb alleged abuse, including adjustments based on our increasing ability to automate the processing of complaints through CATS.

**Cox Works with Complainants to Automate Processing of Their Complaints.**

11.      Individuals or entities that have a complaint about acts on Cox's network, including

allegations of copyright infringements, can email abuse@cox.net.  CATS automatically monitors

that inbox, pulls emails from that inbox into its system, looks for a Cox IP address, attempts to

identify the abuse type, and creates what we refer to as a "ticket."  When a new complainant

submits a complaint, CATS opens a ticket for that complaint and a customer service representative

handles it manually.  The customer service representative either works directly with the

complainant to resolve the issue or attempts to identify the account holder associated with the

complaint and to forward the complaint to that account holder, along with the appropriate Cox

cover email message.  The cover email that Cox sends depends on the abuse type identified in the

complaint.  **Exhibit 2** is a compilation of form emails that Cox may send to account holders

depending on the situation.

        12.     Many copyright holders or their agents send multiple complaints to Cox.  After a

complainant's first complaint, the Safety Team works with that complainant if necessary to format

notices properly for automatic processing by CATS.  By automating the notice process. Cox is able

to process a much higher volume of abuse complaints than it could ever process manually and to

provide a more prompt and efficient response to complainants.  Generally, working with a new

copyright complainant to automate the notice process involves ensuring that the complaint notices

properly identify a Cox IP address, have a valid digital signature, and contain the required elements

of information required by Cox in a form parsable by CATS.  *See* Exhibit 1 above at p. 10.

        13.     Once Cox has validated notices from a given complainant for automation, CATS

automatically ingests each complaint notice, associates the notice with a Cox IP address if possible,

creates a ticket, and automatically sends the account holder associated with the IP address the

complaint notice along with the appropriate Cox cover email.  *See* Exhibit 2.  Cox's ability to

automate complaint notices, in particular allegations of copyright infringement (which are the most

common abuse type), allows Cox to forward a higher number of notices onto account holders,

while still interacting personally with customers who receive multiple complaints to educate them about the actions that may have given rise to the complaints and to assist them in corrective actions when needed (as I address further below).  Cox forwards hundreds of thousands of notices of alleged copyright infringement per year.

14.     Occasionally, copyright complainants send Cox notices that include non-standard language that does not conform to Cox's notice requirements, such as settlement demands or marketing offers aimed at Cox customers.  Beginning in 2010, Cox began receiving occasional copyright infringement notices that included demands that Cox customers make payments in order to settle or resolve the alleged complaints, accompanied by threatening language regarding the risks to the customer, including the potential loss of Internet service.  When we first began receiving such notices, the Safety Team engaged with in-house legal counsel Randy Cadenhead to seek advice about the notices.  Mr. Cadenhead advised that Cox should decline to forward such notices to Cox customers, because those notices did not properly aim at curbing copyright infringement but instead aimed at coercing payments from Cox customers through threats of loss of Internet service by Cox if the customer did not pay the sender of the notice.  Internally, Cox considered such complaints to be a form of blackmail or extortion of our account holders, in which we were not willing to participate.  **Exhibit 3** is an example of communications in 2010 reflecting our discussions regarding treatment of notices containing settlement demands and threats of loss of internet service.

<u>**Cox's Treatment of Rightscorp's Notices**</u>

15.     On March 9, 2011, Rightscorp (using the name Digital Rights Corp.) began sending notices of claimed copyright infringement to abuse@cox.net.  **Exhibit 4** is a compilation exhibit of examples of the notices Rightscorp sent to Cox on March 9, 2011.  Those notices stated: "Your ISP has forwarded you this notice.  This is not spam.  Your ISP account has been used to download,

6

upload or offer for upload copyrighted content in a manner that infringes on the rights of the copyright owner. Your ISP service could be suspended if this matter is not resolved. You could be liable for up to $150,000 per infringement in civil penalties...We represent the copyright owner. This notice is an offer of settlement. If you click on the link below and login to the Rightscorp, Inc. automated settlement system, for $10.00 per infringement, you will receive a legal release from the copyright owner."

16.     Because the notices from Rightscorp contained threats and monetary demands, and based on the guidance the Safety Team had received from our counsel Randy Cadenhead, we flagged the initial notices from Rightscorp for review and we did not forward them to account holders. After internal discussion, the Safety Team concluded that Rightscorp's notices were not proper and we should not forward them to account holders.

17.     That same day, I sent an email to the return address on the notices notifying Rightscorp that "Cox Communications does not accept nor process infringement notices that contain settlement offers. Please remove the links to the settlement offers from your notices and [sic] will gladly process them." On March 15, 2011, I followed up on my initial email. **Exhibit 5** contains a copy of that email string.

18.     I had several conversations with Mr. Cadenhead regarding Rightscorp's' notices, and he confirmed that Cox should not process those notices because of their nature. Based on Mr. Cadenhead's advice, I instructed the CATS administrator, Brent Beck, to configure CATS automatically to delete complaint notices from Rightscorp without taking any customer-facing action. Internally, we often refer to that process as "blacklisting," and we have blacklisted complainants other than Rightscorp on the same basis. **Exhibit 6** is an email string where I conveyed to Mr. Beck the decision to blacklist the Rightscorp notices.

19.     During the weeks that followed, I corresponded with Rightscorp's Robert Steele.

7

Despite my repeated requests, Rightscorp refused to amend its complaints to remove the offending threats and settlement demands.  **Exhibit 7** is an email string showing that Rightscorp instead continued to ask us to alter our process so that Cox would forward Rightscorp notices to our account holders, then temporarily suspend the account holder's service, but only until the account holder made a payment to Rightscorp.

20.     Eventually, Mr. Cadenhead took over communications with Rightscorp.

21.     In October 2011, Rightscorp began flooding the abuse@cox.net inbox with thousands of notices, as many as 24,000 in one day, which severely burdened CATS's processing capability and impeded our ability efficiently to process proper notices.  The Safety Team considered Rightscorp's actions hostile and retaliatory.  **Exhibit 8** is an email exchange between members of the Safety Team discussing the sudden volume increase and its negative effect on CATS.

22.     Based on this drastic increase in the volume of Rightscorp notices, I discussed with Mr. Cadenhead whether we could block Rightscorp's emails at the mail server level so that those notices would not flood the abuse@cox.net inbox with notices that we would not process.  Mr. Cadenhead approved that approach.  At my request, the HIS Messaging Operations Department, which manages the Cox mail servers, then blocked emails from Rightscorp at the server level, so that the abuse@cox.net inbox no longer accepted them.  **Exhibit 9** is an email reflecting my request to Mr. Cadenhead, his approval, and the Messaging Operations Department's implementation of that request.

**How the Customer Safety Team Works to Educate Account Holders**

23.     When a Cox account holder receives notice of an abuse complaint, including complaints alleging copyright infringement, that customer may call Cox's customer service department. In fact, as discussed above, under our Graduated Response Procedure, after ▮▮▮▮

8

███████████████ a customer must contact Cox and speak to a customer service representative in order to reactivate the customer's Internet access.

24.     The first level of customer service representatives is Tier 1.  Tier 1 representatives resolve some routine customer service questions and often route calls to other groups within Cox for more specialized service needs.   For example, if a customer wants to change his or her billing address, the Tier 1 customer service representative transfers that customer to the billing department.  If a customer wants information about a notice alleging copyright infringement, the Tier 1 representative directs that customer to a Tier 2 representative who has more specialized training.  If the Tier 2 representative is unable to resolve the issue, the Tier 2 representative transfers the customer to a Technical Operations Center representative.  The Technical Operations Center is a small team of more senior customer service representatives (currently six), who address the most complex or serious circumstances of customers who receive multiple abuse complaints. Members of the Technical Operations Center may ask a member of the Safety Team (Mr. Thompson, Mr. Sikes or me) for guidance in dealing with especially difficult account holders or complex questions, and occasionally they refer such account holders to a member of the Safety Team so we may speak with the customer directly.

25.     The Methods and Procedures (Exhibit 1), instruct Cox representatives, when answering a customer service call, first to confirm they are talking to the account holder or an authorized user of the account.  The customer service representatives are instructed to then remind the account holder or authorized user that he or she may not use Cox Internet services to post, copy, transmit, or disseminate any content that infringes the copyrights of others, and that violation of the Cox Acceptable Use Policy could lead to suspension or termination of the account holder's Internet services.  *See* Exhibit 1 at p. 2 & 10.  After issuing that warning, Cox's customer service representatives (either Tier 2 or Technical Operations Center personnel) then work with the

customer to diagnose what might have led to the complaint and to remedy the problem.  This

sometimes involves identifying malware that has infected the customer's computer, or educating

the customer to remove file sharing software from his or her computer or to secure the wireless

connection.  *See* Exhibit 1 at p. 11-12 & 13.

   26.   Under Cox's Graduated Response Procedure, if a customer ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that customer must speak

with a Technical Operations Center representative in order to reactive Internet services.   The

Technical Operations Center representative informs the customer that, if Cox continues to receive

complaint notices regarding that customer's account, the account will undergo review for

termination.  *See* Exhibit 1 at 11.  Review for termination means that a Technical Operations

Center representative, often in conjunction with the Safety Team, reviews the history of complaints

against that account holder in order to ensure that Cox has done everything it can to help the

customer secure his or her Internet access, clear malware off his or her computer, and otherwise

avoid violating Cox's Acceptable Use Policy before taking the extreme measure of terminating the

customer's access to the Internet.

   27.   Cox representatives, including the Tier 2, Technical Operations Center, and

Customer Safety personnel, work hard to process abuse notices and to educate customers, most of

whom are trying to understand what gave rise to a complaint.  Cox processes a high volume of

notices from many different complainants and this can create a lot of work for my team, especially

when a complainant refuses to adhere to Cox's polices that enable us to handle complaints

efficiently and effectively in an automated process.  **Exhibit 10** is an email where I express that

frustration with the volume of notices my team handles and with Rightscorp's extortionate threats

against Cox account holders, which Cox wanted to have no part of.  I regret my flip comment,

which I made to colleagues in the abuse department of another Internet service provider.  But my

which I made to colleagues in the abuse department of another Internet service provider.  But my frustration was real: it arose from both the burdens and the abuses I have observed in how some complainants use the complaint notification process that the Digital Millennium Copyright Act has established.  Rightscorp's abuses trying to "game" the DMCA system, and its unwillingness to address Cox's concerns with its extortionate "settlement" practices, were a significant cause of my frustration at the time I sent that email in response to a query about Rightscorp.  I understand that rights holders are not happy with the notification burdens they have under the Digital Millennium Copyright Act.  The practical burdens on us to handle the notifications are also heavy, and my perception as someone both handling numerous complaints from a wide variety of complainants and working with numerous account holders to curb infringements is that bad faith practices of companies like Rightscorp who exploit the DMCA for wrongful purposes have badly twisted it.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18 day of September, 2015.

Jason Zabek

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2015, the foregoing was filed and served

electronically by the Court's CM/ECF system upon all registered users.


*Craig C. Reilly*

Craig C. Reilly (VSB No. 20942)
111 Oronoco Street
Alexandria, VA  22314
Tel:  703-549-5354
Fax:  (703) 549-5355
Email:  craig.reilly.@ccreillylaw.com

*Counsel for Defendants*