**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **BMG RIGHTS MANAGEMENT** ) | |
| **(US) LLC, and ROUND HILL** ) | |
| **MUSIC LP** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No.  1:14-cv-1611 (LOG/JFA) |
| ) | |
| **COX COMMUNICATIONS, INC. and** ) | |
| **COXCOM, LLC** ) | |
| ) | |
| Defendants. ) | |
| ) | |

**[REDACTED] MEMORANDUM IN SUPPORT OF**
**BMG RIGHTS MANAGEMENT (US) LLC AND ROUND HILL MUSIC LP'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel:  (202) 540-7157
September 21, 2015                           Fax:  (202) 540-7201

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

UNDISPUTED MATERIAL FACTS ......................................................................................2

    A.    BMG and Round Hill Own Copyrights in the Musical Compositions at Issue .............................................................................................................................2

    B.    BMG and Round Hill Seek to Reduce Theft of their Intellectual Property............5

    C.    Cox's Handling of Notifications of Copyright Infringement ..................................5

    D.    Cox's Graduated Response Policy...........................................................................8

    E.    Cox's Policy from 2010 to Fall 2012.....................................................................10

    F.    Cox's Policy from Fall 2012 to Present..................................................................12

LEGAL STANDARD..............................................................................................................16

ARGUMENT ..........................................................................................................................17

I.    PLAINTIFFS OWN THE COPYRIGHTS AT ISSUE ...................................................17

    A.    Copyright Registrations Naming BMG or its Predecessors as Claimants Establish Ownership of the Copyrighted Works ...................................................17

    B.    Plaintiffs' Evidence of Chain of Title from a Copyright Claimant Establishes Ownership as a Matter of Law............................................................18

    C.    Cox Lacks Standing to Contest Ownership ...........................................................20

II.    COX IS NOT ENTITLED TO "SAFE HARBOR" PROTECTION UNDER THE DMCA......................................................................................................................21

    A.    Cox Cannot Take Advantage of the DMCA Safe Harbor Because It Refuses to Accept or Act on Notifications of Copyright Infringement ................23

    B.    Cox Cannot Take Advantage of the DMCA Safe Harbor Because its Policy and Practice Is *Not* to Terminate Repeat Infringers...................................25

        1.    Cox "Terminations" Were Not "For Real" Until the Fall of 2012 ............25

        2.    Cox Has Not Established or Implemented a Policy to Terminate Repeat Infringers in Appropriate Circumstances Since Fall 2012............26

    C.    Cox Cannot Take Advantage of the DMCA Safe Harbor Because it Has Failed to Terminate Known, Flagrant Repeat Copyright Infringers......................29

CONCLUSION........................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*ALS Scan v. RemarQ Communities*,
  239 F.3d 619 (4th Cir. 2001) ............................................................................30

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)........................................................................................16

*Arista Records v. Lime Group*,
  No. 06 CV 5936, 2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) ............................20

*Billy-Bob Teeth v. Novelty*,
  329 F.3d 586 (7th Cir. 2003) .........................................................................20, 21

*Capital Concepts v. The Mountain Corp.*,
  No. 3:11-cv-0036, 2012 U.S. Dist. LEXIS 182874 (W.D. Va. Dec. 30, 2012)......................21

*Capitol Records v. Escape Media Group*,
  No. 12-CV-6646 AJN, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015)...................26

*Columbia Picture Industries v. Fung*,
  710 F.3d 1020 (2d Cir. 2013)...........................................................................22

*Disney Enterprises v. Hotfile Corp.*,
  No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ......................23, 24, 25, 28

*Eden Toys v. Florelee Undergarment Co.*,
  697 F.2d 27 (2d Cir.1982)...............................................................................21

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) .......................................................................23, 24

*In re Aimster Copyright Litigation*,
  252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003) ............................27

*In re Charter Communications*,
  393 F. 3d 771 (8th Cir. 2005) .........................................................................30

*MOB Music Publishing. v. Zanzibar on the Waterfront*,
  698 F. Supp. 2d 197 (D.D.C. 2010) .................................................................17

*Montgomery County Association of Realtors v. Realty Photo Master*,
  878 F. Supp. 804 (D. Md. 1995) .....................................................................19

*Perfect 10 v. CCBill*,
  488 F.3d 1102 (9th Cir. 2007) .......................................................................21, 22, 29

*Perfect 10 v. Cybernet Ventures*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ........................................................29

*Rosen v. Global Net Access*,
   No. CV 10-2721, 2014 WL 2803752 (C.D. Cal. June 20, 2014) ...........................................28

*SCO Group v. Novell*,
   578 F. 3d 1201 (2d Cir. 2009)........................................................20

*Tacori Enterprises v. Rego Manufacturing*,
   No. 1:05CV2241, 2008 WL 4426343 (N.D. Ohio Sept. 25, 2008) ........................................20

*Thomas v. Artino*,
   723 F. Supp. 2d 822 (D. Md. 2010) ........................................................18

*Universal Furniture International v. Collozione Europa USA*,
   618 F.3d 417 (4th Cir. 2010) ........................................................17, 18

*Warner/Chappell Music, Inc. v. Blue Moon Ventures*,
   2011 WL 662691 (M.D. Tenn. Feb. 14, 2011) ........................................................20

*X-It Products v. Kidde Portable Equipment*,
   155 F. Supp. 2d 577 (E.D. Va. 2001) ........................................................17, 18, 21

STATUTES

Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512 ........................................... passim

17 U.S.C. § 101........................................................19

17 U.S.C. § 106........................................................18, 19, 20

17 U.S.C. § 201........................................................17

17 U.S.C. § 201(d) ........................................................18, 19

17 U.S.C. § 201(d)(2) ........................................................20

17 U.S.C. § 410(c) ........................................................17

17 U.S.C. § 501(b) ........................................................17

17 U.S.C. § 512(i) ........................................................1, 21, 25, 26

17 U.S.C. § 512(i)(1)(A) ........................................................21, 25

LEGISLATIVE MATERIALS

H.R. Rep. 105-551(II) ........................................................22

S. Rep. 105-190..................................................................................................................22, 30

**RULES**

Fed. R. Civ. P. 56...............................................................................................................16

**BOOKS AND ARTICLES**

4 *Nimmer on Copyright* § 13.01[A] (2015) ....................................................................20

3 *Nimmer on Copyright* § 13.01[A] (1993) ....................................................................19

# INTRODUCTION

Plaintiffs BMG Rights Management (US), LLC, ("BMG") and Round Hill Music, LP, ("Round Hill") move for partial summary judgment that they own or have exclusive rights to the works at issue and that Defendants Cox Communications, Inc., and CoxCom, LLC, (together "Cox") do not meet the requirements of "safe harbor" protection from liability for copyright infringement under the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512.

Plaintiffs have submitted certified copies of copyright registrations identifying BMG or its predecessors as owners of 1034 of the 1,422 musical compositions at issue in this motion. Those registrations are *prima facie* evidence of ownership and, because Cox has no contrary evidence, establish ownership as a matter of law.  For the remaining 388 works, Plaintiffs have supplied copyright registrations and agreements reflecting the transfer of ownership from the copyright registrants to BMG and Round Hill, along with declarations attesting to the chain of title under those agreements.  Cox has neither evidence to rebut this showing nor standing to challenge the assignment of the copyrights to Plaintiffs.  Accordingly, summary judgment should be granted regarding ownership of the works at issue.

Summary judgment should also be granted on Cox's DMCA "safe harbor" defense.  To benefit from the limitations on liability found in the DMCA, a service provider bears the burden to show that it "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of . . . repeat infringers" who use the network to steal intellectual property.  17 U.S.C. § 512(i).  Yet, the undisputed evidence shows that Cox's policy is ***not*** to terminate repeat infringers.

For several years, Cox had an "under the table" policy of purporting to terminate repeat infringers while actually retaining them as high speed internet customers.  The "terminations" were in name only as Cox immediately reactivated these infringers without ever cancelling their

accounts.  Cox personnel explained that these ███████████████████████████

██████████████████████████████████ Statement of Undisputed Material

Facts ("SUMF") 40-41.  As a matter of law, Cox's fake "terminations" do not satisfy the DMCA.

Later, Cox modified its policy so that ████████████████████████████████████

█████████████████████████████ SUMF 50.  At the same time, however, Cox ██████

terminating customers for copyright violations in all but a small handful of cases, most of which

also ███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ As a matter of

law, allowing known, repeat, flagrant infringers to continue to use the network does not satisfy

the DMCA's requirement of an appropriate repeat infringer termination policy.

Cox also put in place a system to ██████████████████ millions of copyright

infringement notices without taking any action against the infringing subscriber – a practice that

itself places Cox outside the DMCA safe harbor.  Asked whether it was proper to impose such

limits on DMCA notices, the Cox manager responsible for policing copyright infringement and

other forms of subscriber abuse responded: ████████████████ SUMF 23.  Cox's ████████████

approach to copyright infringement precludes Cox from enjoying a DMCA safe harbor defense.

## UNDISPUTED MATERIAL FACTS

### A.    BMG and Round Hill Own Copyrights in the Musical Compositions at Issue

1.    Plaintiffs BMG and Round Hill own, publish, administer, and license copyrights

in musical compositions on behalf of themselves and many artists.  9/21/15 Declaration of

Robert Briggs ("Briggs Decl.") ¶ 2; 9/21/15 Declaration of Neil Gillis ("Gillis Decl.") ¶ 2.

2.    At issue in this motion are 1422 works, 1398 of which are owned, co-owned

and/or exclusively administered or by BMG and 24 of which are owned, co-owned and/or

exclusively administered by Round Hill (together the "Asserted Works").  They are listed in Appendices A1-A102 to the Briggs Declaration and Appendices A1-A5 to the Gillis Declaration. Briggs Decl. ¶¶ 5-125; Gillis Decl. ¶¶ 4-11.

3.      All of the Asserted Works are registered with the United States Copyright Office. Certified copies of the copyright registrations are attached as Exhibits B1-B934 to the Briggs and Exhibits C1-C22 to Gillis Declarations.

4.      For each of the Asserted Works listed in Briggs Declaration Appendices A1-A7 and A13, BMG, in its formal corporate name or a fictitious d/b/a name, is named as a claimant on the certified registration certificates from the Copyright Office.  Those certificates are attached as Exhibits B1-B137, B391, and B934 to the Briggs Declaration.  Briggs Decl. ¶¶ 5-12.

5.      For each of the Asserted Works listed in Appendices A8-A12 to the Briggs Declaration, Chrysalis Music Holdings, Inc., Chrysalis Music Group, Inc., or Chrysalis Music Publishing, LLC, in their formal corporate name or a fictitious d/b/a name, is named as a claimant on the certified registration certificates from the Copyright Office.  Briggs Decl. ¶¶ 14-21.  Those certificates are attached as Exhibits B138-B390 and B933 to the Briggs Declaration.

6.      BMG merged with Chrysalis Music Group, Inc., and Chrysalis Music Holdings, Inc., thereby acquiring the assets of those entities, including ownership rights in the Asserted Works listed in Appendices A8-A12 to the Briggs Declaration.  Briggs Decl. ¶¶ 14-21; Exs. 1-3.

7.      For each of the Asserted Works listed in Appendices A14-A19 to the Briggs Declaration, 315 Music LLC or Cherry Lane Music Publishing Company, Inc., in their formal corporate name or a fictitious d/b/a name, is named as a claimant on the registration certificates from the Copyright Office.  Briggs Decl. ¶¶ 22-29.  Those certificates are attached as Exhibits B392-B437 and B932 to the Briggs Declaration.

8.      BMG merged with 315 Music LLC and Cherry Lane Music Publishing Company, Inc., thereby acquiring the assets of those entities, including ownership rights in the Asserted Works in Appendices A14-A19 to the Briggs Declaration.  Briggs Decl. ¶¶ 22-29 & Exs. 3-6.

9.      For each of the Asserted Works listed in Appendices A20-A33 and A36 to the Briggs Declaration, Bug Music Inc., Hitco Music Publishing LLC, Windswept Holdings LLC, in their formal corporate name or a fictitious d/b/a name, is listed as a claimant on the registration certificates from the Copyright Office.  Briggs Decl. ¶¶ 30-40.  Those certificates are attached as Exhibits B438-B700 and B704 to the Briggs Declaration.

10.     BMG merged with Bug Holdings, Inc. and Bug Music Inc., thereby acquiring the assets of those entities, including ownership rights in the Asserted Works in Appendices A20-A33 and A36 to the Briggs Declaration.  Briggs Decl. ¶¶ 30-40 & Exs. 7-12.

11.     BMG acquired an ownership right in each of those Asserted Works listed in Appendices A35 and A37-A102 from a copyright claimant through Songwriter Purchase, Publishing, Co-publishing, and/or Exclusive Administration Agreements.  Briggs Decl. ¶¶ 41-125 & Exs. 8-9, 13-105.  The certified registration certificates naming the copyright claimants for those works are attached as Exhibits B702-B703 and B705-B931 to the Briggs Declaration.

12.     Round Hill Music, LLC, is named as a copyright claimant on the Copyright Office registration certificates for the Asserted Works listed Appendix A1 to the Gillis Declaration.  Gillis Decl. ¶ 5. Those certificates are Exhibits C1 and C2 to the Gillis Declaration.

13.     Round Hill Music, LLC, obtained ownership rights in each of the Asserted Works listed in Gillis Declaration Appendices A2-A5 through an assignment from a copyright claimant listed on the registration certificate from the Copyright Office.  Gillis Decl. ¶¶ 7-11 & Exs. RH4-RH7.  The certified registrations for those works are Exhibits C3-C22 to the Gillis Declaration.

- 4 -

14.     Round Hill Music, LLC, transferred and assigned its ownership rights in the Asserted Works listed in Appendices A1-A5 to the Gillis Declaration to Round Hill Music Royalty Fund, which gave Plaintiff Round Hill Music, LP, the sole right to manage, administer and exploit those works.  Gillis Decl. ¶ 6 & Exs. RH1-RH3.

**B.      BMG and Round Hill Seek to Reduce Theft of their Intellectual Property**

15.     BMG and Round Hill retained Rightscorp to send Cox (and other internet service providers) notices identifying instances in which their high-speed internet subscribers were using BitTorrent to infringe the Asserted Works.  *See* 9/21/15 Declaration of Jeffrey M. Theodore ("Theodore Decl.") Ex. 6 at 83:11-84:16 & Ex. 7 at 290:21-291:14.

16.     The Rightscorp infringement notices include (1) a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed, (2) an identification of the copyrighted work claimed to have been infringed, (3) identification of the material that is claimed to be infringing or to be the subject of infringing activity; (4) information reasonably sufficient to permit the service provider to contact the complaining party, (5) a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law, and (6) a statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.  *See* Theodore Decl. Ex. 2 (Zabek Tr.) at 317:20-321:17; Ex. 5 (Cadenhead Tr.) at 194:21-196:16; Ex. 27; Ex. 28; Ex. 36; & Ex. 37.

**C.      Cox's Handling of Notifications of Copyright Infringement**

17.     Since 2001, Cox's abuse department has handled copyright infringement as well as other forms of subscriber misconduct, such as spam, hacking, excessive bandwidth usage, and malware.  Theodore Decl. Ex. 1 (Sikes Tr.) at 10:1-13:2, 17:3-13, 51:5-16; Ex. 11 at 4-7.

18.     Jason Zabek has been Cox's Manager of Abuse Operations for the past five years.

*See* Theodore Decl. Ex. 2 (Zabek Tr.) at 13:6-18, 29:15-30:4, 34:8-21, 43:1-6.

19.     During this time period, Cox has used an automated abuse tracking system known

as CATS to track and process notices of copyright infringement received from copyright owners,

such as BMG, or their agents, such as Rightscorp (referred to as "complainants").  *See* Theodore

Decl. Ex. 39 at 12-13 (1st Supp'l Response to Interrog. 4); Ex. 1 (Sikes Tr.) at 38:5-41:5.

20.     As a result of a

 Theodore Decl.

Ex. 2 (Zabek Tr.) at 106:11-107:2.

21.     If Cox deems a copyright infringement notice to be invalid under the DMCA,

. Theodore Decl.

Ex. 39 at 12 (1st Supp'l Response to Interrog. 4).

22.     Cox places a

Cox notifies the complainant that the notice

. *See* Theodore Decl. Ex. 39 at 13 (1st Supp'l Response to Interrog. 4); Ex.

42 at 7 (Response to Interrog. 23); Ex. 2 (Zabek Tr.) at 292:7-16, 294:4-1; Ex. 1 (Sikes Tr.) at

126:19-127:13, 130:6-131:12; Ex. 8 (Vredenburg Tr.) at 328:16-21; Ex. 26 at 1.

23.

Theodore Decl. Ex. 26 at 2; Ex. 2 (Zabek Tr.) at 297:3-298:1.

24.     In addition to imposing ████████ notices from all copyright owners, Cox has blacklisted certain copyright owners. ████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *See* Theodore Decl. Ex. 2 at 139:18-143:14; Ex. 41 at 12-13 (3d Supp'l Response to Interrog. 5).

25.     ██████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ Theodore Decl. Ex. 59; Ex. 1 (Sikes Tr.) at 191:13-16.

26.     For some blacklisted complainants, including Rightscorp, Cox has ████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Theodore Decl. Ex. 41 at 12-13 (3d Supp'l Response to Interrog. 5); Ex. 2 (Zabek Tr.) at 339:4-340:22.

27.     In March 2011, Rightscorp began sending Cox notices of copyright infringement. Since March 14, 2011, Cox has ██████████████████████████████████████

██████████████████████████████████████████████. Thus, since March 14, 2011, Cox has not reviewed or taken any action in response to copyright infringement notices sent by Rightscorp and has done ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████" Theodore Decl. Ex. 41 at 9-10 (3d Supp'l Response to Interrog. 3); Ex. 29 at 1-2; Ex. 4 (Beck Tr.) at 341:1-343:22.

28.     In total, Cox has blacklisted or blocked over 22 million Rightscorp notices of infringement.  9/21/15 Declaration of Gregory Boswell ("Boswell Decl.") ¶ 3.

29.     Cox's explanation for blocking copyright infringement notices from Rightscorp is that ███████████████████████████████████████████████████

███████████████████████   *See* Theodore Decl. Ex. 26 at 1, Ex. 31 at 1; Ex. 2 (Zabek Tr.) at 314:8-315:5, 325:1-329:12; Ex. 5 (Cadenhead Tr.) at 28:20-29:13, 96:3-18.  Cox claims these notices are not in the "spirit" of the DMCA.  Theodore Decl. Ex. 5 at 77:5-78:5, 117:2-124:22.

30.     Senior lead abuse engineer Joseph Sikes explained, "████████████████████

███████████████████████████████████████████████████████

████████████████   (i.e., Rightscorp).  Theodore Decl. Ex. 32 at 1; Ex. 1 (Sikes Tr.) at 14:13-14.

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████   *Id*.; Theodore Decl. Ex. 3 (Carothers Tr.) at 7:1-8:18, 264:22-267:1.

31.     ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

████████   Theodore Decl. Ex. 8 (Vredenburg Tr.) at 328:16, 345:12-347:14; Ex. 3 (Carothers Tr.) at 57:17-58:18; Ex. 26 at 1; Ex. 2 (Zabek Tr.) at 130:6-131:12.  Together, these categories account for more than 95% of infringement notices sent to Cox.  SUMF 63-65.

**D.      Cox's Graduated Response Policy**

32.     Cox's "written abuse ticket-handling procedures" set out its "policies and procedures" for taking action on copyright notices ██████████████████████████████████

████████████████████████████████████████████████

████   Theodore Decl. Ex. 39 at 9-10; Ex. 17 at 2; Ex. 2 (Zabek Tr.) at 162:7-22.

33.   Cox employs a multi-step, "graduated response" process for copyright infringement, involving an escalating series of actions based on the number of times within the preceding ██████ that a subscriber has been named in copyright infringement notices accepted by Cox.  Theodore Decl. Ex. 17 at 2, 10-13.

34.   To calculate a subscriber's total number of infringement notices – and thus the level of graduated response – Cox considers only accepted ████████████████  ████████████████   For example, if Cox receives one copyright notice a month for a subscriber, every month, ████████████████████████  ████████   See Theodore Decl. Ex. 8 (Vredenburg Tr.) at 296:3-333:22 & Ex. 35.  And ████  ██████████████████████████████████████████  ████████████████████████████████   Theodore Decl. Ex. 17 at 2.

35.   ████████████████████████████████████  ████████████████████████████████████████  ████████████████████████████████████████  ████████  Theodore Decl. Ex. 1 (Sikes Tr.) at 156:2-5; see also id. at 154:16-156:5.

36.   Under Cox's "graduated response" system, a subscriber's first copyright infringement notice within the previous ████████████████████████████  ████   See Theodore Decl. Ex. 39 at 13 (1st Supp'l Response to Interrog. 4).  ████████  ████████████████████████████████████████  ████████████████████████████████████   Theodore Decl. Ex. 17 at 10-12; see also SUMF 54-56.  ██████████████████

████████████████████████████████ Theodore Decl. Ex. 2 (Zabek Tr.) at 186:21-187:8.

**E.**     **Cox's Policy from 2010 to Fall 2012**

37.     Under Cox's copyright infringement policy in place between first quarter 2010 and October 2012, Cox purported to "terminate" a subscriber after that subscriber was ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ *See* Theodore Decl. Ex. 15 at 12; Ex. 16 at 12.

38.     Despite the label, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Theodore Decl. Ex. 19.

39.     ████████████████████████████████████████

████████████████████████████ Theodore Decl. Exs. 23 & 52.

40.     Cox used the word "terminate" only so that it would appear DMCA compliant. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Theodore Decl. Ex. 21.

41.     ████████████████████████████████████████

████████████████████████████████████████████   ██████

████████████████████████████████████████████████████

███████████████████████████████████ Theodore Decl. Ex. 2 (Zabek Tr.) at 221:3-224:5.

42. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ Theodore Decl.

Ex. 60; *see also* Theodore Decl. Ex. 13 at 1████████████████████████

██████████████████████████████████████████

43.    Thus, Cox did not "actually terminat[e] the service" or close customer's accounts.

Theodore Decl. Ex. 46.  Customer service representatives would████████████████████

████████████████████████████████████████ *Id.*

44.    "Termination" had a different meaning for other forms of abuse.  *See* Theodore

Decl. Ex. 2 (Zabek Tr.) at 207:14-210:20, 228:1-18, 233:3-234:15; Ex. 19 at 1; Ex. 20 at 2████

██████████████████████████████████████████████

45.    In particular, Cox permanently terminated████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

Theodore Decl. Ex. 14 at 1; *see also* Theodore Decl. Ex. 13.

46.    After each reactivation from a DMCA "termination," Cox████████████████

████████████████████████ Ex. 2 (Zabek Tr.) at 201:2-14; *see also id.* at 221:10-222:9. ████

████████████████████ Theodore Decl. Ex. 21.  "The DMCA 'counter' restarts;███████

████████████████████████████████████████ Theodore Decl.

Ex. 18; *see also* Theodore Decl. Ex. 19 ████████████████████████████

████████████████████████████████████████████████

47.     For example, one ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

48.     Even after concluding from a "conversation with [a] customer" that he █████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████ Theodore Decl. Ex. 2 (Zabek Tr.) at 283:8-19; Ex. 24. █████████████

█████████████████████████████████ *Id.*

49.     Cox continued to reactivate subscribers even after their ████DMCA

"termination."  Theodore Decl. Ex. 22 at 1-2.  Cox's abuse manager testified that ██████████

████████████████████████████████████████████████

████████ Theodore Decl. Ex. 2 (Zabek Tr.) at 263:19-22.

**F.     Cox's Policy from Fall 2012 to Present**

50.     In late 2012, Cox revised its copyright policy so that █████████████████

████████████████████████████████ Theodore Decl. Ex. 23.

51.     However, at the same time, Cox revised its policies and procedures to avoid

terminations by eliminating any requirement of termination of repeat infringers and increasing

the number of warning and suspension steps in its graduated response procedure.  Theodore

Decl. Ex. 17 at 10-13; *see also* Theodore Decl. Ex. 2 (Zabek Tr.) 180:13-184:20, 186:21-187:8.

52.     Under Cox's new policy, a Cox subscriber will be ***considered*** for termination

only if, ████████████████████ that subscriber has been the subject of ██████████ copyright

infringement notices from ███████████████████████ that met Cox's requirements and

that fell within the █████████████████. Theodore Decl. Ex. 17 at 10-12; Ex. 39 at

10-13 (1st Supp'l Responses to Interrogs. 3 & 4); Ex. 42 at 7 (Response to Interrog. 23).

53.   ███████████████████████████

████████████████████████████████████████████████

████ Theodore Decl. Ex. 17 at 11-12; Ex. 1 (Sikes Tr.) at 69:19-70:15; Ex. 2 (Zabek Tr.) at

175:22-178:8.

54.   If ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████ *See* Theodore Decl. Ex. 17 at 10-13; Ex. 4 (Beck Tr.) at 283:13-285:18,

295:2; Ex. 1 (Sikes Tr.) at 43:15-44:15, 70:12-72:16; Ex. 2 (Zabek Tr.) at 178:10-180:11.

55.   After the ████████████████████████ Cox imposes what its

personnel refer to as a "hard suspension" or a "hard walled garden," from which the subscriber

can call Cox to have a customer representative reactivate internet service.  *See* Theodore Decl.

Ex. 17 at 11-12; Ex. 1 (Sikes Tr.) at 73:13-22, 79:11-80:1.

56.   After the ████████████████, subscribers must call a "404 number" at

Cox's technical operations center in Atlanta to be reactivated.  Theodore Decl. Ex. 17 at 11-12;

Ex. 1 (Sikes Tr.) at 81:1-85:1; Ex. 8 (Vredenburg Tr.) at 133:12-36:14.  ████████████████

██████████████████████ Theodore Decl. Ex. 17 at 11-12; Ex. 1 (Sikes

Tr.) at 84:21-85:6; *see also* Ex. 10 at 2 & Ex. 1 (Sikes Tr.) at 30:20-31:6, 32:1-33:16, 35:13-36:8.

57.     Even subscribers with many infringement notices often do not reach this stage.

For example, one subscriber ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████ ██████Theodore Decl. Ex. 35 at 1-2 & Ex. 8 (Vredenburg Tr.) at 296:3-333:22.   █████████

████████████████████████████████████████████████████████████████████████████

█████████████████ Theodore Decl. Ex. 55 (listing all terminated ICOMS ids); *see also* Ex. 51.

58.     If an account does get to the ████████stage, ██████████████████████████

█████████████████████████████████████████████████████████████

████████████ Theodore Decl. Ex. 17 at 11-12.

59.     Even then, there is no requirement of termination.  Nor do the abuse procedures

contain ████████████████████████████████████specify the circumstances in which

termination is appropriate.  Theodore Decl. Ex. 17 at 11-12; Ex. 2 (Zabek Tr.) at 181:17-184:1.

60.     Because ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████ Theodore Decl. Ex. 33 at 1; Ex. 12 at 2.

61.     ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Theodore Decl. Ex. 34.

62.     ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████ Theodore Decl. Ex. 2 (Zabek Tr.) at 198:3-16; *see also* *id*. at 230:3-16.

63.     Between September 2012 and November 2014, when this lawsuit was filed, Cox accepted ████ DMCA complaints into CATS and received an additional ████ copyright infringement notices from █████████████████████████████ ████████ Theodore Decl. Ex. 41 at 12-16 (3d Supp'l Response to Interrog. 5).  During that same period, Cox was sent another ████ infringement notices from Rightscorp that it ████████████████████ along with an unknown number of ████████ from other senders.  *See* Boswell Decl. ¶ 4; Theodore Decl. Exs. 57 & 58 at 1-2.  Together, that is at least ██████ total notices of infringement sent to Cox.

64.     During that same period, Cox issued ██████ warnings and suspensions to subscribers as a result of copyright infringement notices, each of whom was the subject of a █████████████████████ Theodore Decl. Ex. 39 at 25-27.

65.     Thus, Cox acted on fewer than five percent of the copyright infringement notices it was sent between September 2012 and November 2014.  SUMF 63-64.

66.     Cox claims to have terminated █ subscribers in response to DMCA notices between September 2012 and November 2014 – fewer than ████████ a month, ████████ █████████████████.[1]  Theodore Decl. Ex. 39 at 25-27 (1st Supp'l Response to Interrog. 8); Theodore Decl. Ex. 55 at 302-03.

---

[1] ████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
██████████████████████████████ Theodore Decl. Ex. 39 at 25-27.

████████

67.     Thus, for ██████ instances of repeat infringement that Cox acted upon between September 2012 and November 2014, ████████████████████████████████████████.

68.     While Cox has not produced the full abuse ticket histories for the twenty-two subscribers allegedly terminated, ████████████████████████████████

████████████████████     *See* Theodore Decl. Ex. 56 at 3566-3741.

69.     Cox did not terminate subscribers for whom it had actual, specific knowledge of repeat infringement. ████████████████████████████████████

████████████████████████████████████████Theodore Decl. Ex. 47.

70.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████Theodore Decl. Ex. 49; *see also* Exs. 22, 24, 25, 34, 43, 44, 45, 50, 51, 53, 54.

71.     Cox applied a substantially more stringent termination policy to other forms of abuse, such as excessive ████████████  ████████████████████████

████████████████████████████████████████████

████████████████████████ Theodore Decl. Ex. 17 at 6.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact so that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49, 252 (1986) ("mere existence of a scintilla of evidence . . . insufficient").  At the summary judgment stage, the evidence must be viewed in the light most favorable to the nonmoving party.  *Id*. at 255.

**ARGUMENT**

I.     **PLAINTIFFS OWN THE COPYRIGHTS AT ISSUE**

Plaintiffs have standing to sue on the works at issue because they own the copyrights either as original copyright holders or as transferees of exclusive rights protected by the copyrights.  *See* 17 U.S.C. § 201.  The "owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b); *see also X-It Products v. Kidde Portable Equipment*, 155 F. Supp. 2d 577, 603 (E.D. Va. 2001) (The "copyright owner, or the owner of exclusive rights under the copyright . . . has standing to bring an action for infringement of those rights.").

BMG or its predecessors are listed on the copyright registrations for 1,034 of the 1,422 works at issue in this motion.  SUMF 4-10.  Those registrations are sufficient to establish plaintiffs' ownership of the copyrighted works.  For the remaining 388 works, on which BMG and Round Hill were not the original copyright registrants, plaintiffs have submitted the original copyright registrations and written agreements that reflect the transfer of ownership to BMG and Round Hill.  SUMF 11-14.  Moreover, as a third-party to the copyrights, Cox lacks standing to challenge plaintiffs' ownership or the adequacy of the agreements to transfer title.

   A.     **Copyright Registrations Naming BMG or its Predecessors as Claimants Establish Ownership of the Copyrighted Works**

Copyright registrations are "prima facie evidence" of "the facts stated in the certificate."  17 U.S.C. § 410(c).  That includes ownership.  *See Universal Furniture International v. Collozione Europa USA*, 618 F.3d 417, 428 (4th Cir. 2010) ("A certificate of registration issued by the Copyright Office is 'prima evidence of the validity of the copyright and of the facts stated in the certificate' such as ownership."); *MOB Music Publishing. v. Zanzibar on the Waterfront*, 698 F. Supp. 2d 197, 202 (D.D.C. 2010) (copyright registrations constitute *prima facie* proof of a

valid copyright).  Thus, certificates of ownership stand as "uncontradicted evidence that Plaintiff

owns the copyright" where the defendant offers no evidence of its own.  *Thomas v. Artino*, 723

F. Supp. 2d 822, 830 (D. Md. 2010).

Here, BMG is listed on the copyright certificates attached as Exhibits B1-B137, B391

and B934 to the Briggs Declaration.  Those copyright certificates correspond to the works listed

on Appendices A1-A7 and A13.  SUMF 4.  Predecessors of BMG are listed on the certificates

attached as Exhibits B138-B390, B392- B700, B704, and B932-B933 to the Briggs Declaration,

which correspond to the works listed on Appendices A8-A12, A14-33, and A36.  SUMF 5-10.[2]

Because the "Copyright Act expressly provides that a copyright registration certificate . . .

constitutes prima facie evidence of ownership of a valid copyright," this establishes BMG's

ownership of the works Appendices A1-A33 and A36.  *X-It Products*, 155 F. Supp. 2d at 609.

### B.       Plaintiffs' Evidence of Chain of Title from a Copyright Claimant Establishes Ownership as a Matter of Law

BMG and Round Hill obtained exclusive rights in the remaining works at issue by

purchasing or otherwise acquiring copyrights or portions of the copyrights from third parties.

"The ownership of a copyright may be transferred in whole or in part by any means of

conveyance or by operation of law" and "[a]ny of the exclusive rights comprised in a copyright,

including any subdivision of any of the rights specified by section 106, may be transferred . . .

and owned separately."  17 U.S.C. § 201(d).  Transfer of ownership may occur via "an

assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation

of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is

---

[2] The merger and acquisition agreements reflecting the predecessor-successor relationships are Exhibits 1-12 to the Briggs Declaration.  SUMF 5-10.  Moreover, "mergers transfer copyrights 'by operation of law' and obviate the writing requirement."  *Universal Furniture*, 618 F. 3d at 429 (citations omitted).

limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101. Once any of the exclusive rights have been transferred, "[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." 17 U.S.C. § 201(d).

As described in the Briggs and Gillis declarations, Round Hill and BMG have entered into written agreements by which they acquired exclusive rights in each of the remaining copyrights. SUMF 11-14. The Briggs and Gillis Declarations attach the copyright registrations for each of the works listed in Briggs Appendices A35, 37-A102 and Gillis Appendices A1-A5, along with agreements showing the chain of title from the party listed on the copyright registration to plaintiffs. *Id.* "If a plaintiff possesses a copyright registration certificate, 'the only evidence required of the plaintiff to establish prima facie ownership . . . is evidence of plaintiff's chain of title from the original copyright registrant.'" *Montgomery County Association of Realtors v. Realty Photo Master*, 878 F. Supp. 804, 809-10 (D. Md. 1995) (quoting 3 *Nimmer on Copyright* § 13.01[A] (1993)).

Here, plaintiffs obtained title to the works at issue through three different types of agreements. First, plaintiffs entered into asset purchase agreements, often known as Songwriter and/or Copyright Purchase Agreements, which demonstrate the transfer of ownership to BMG and Round Hill (or a predecessor-in-interest). Second, plaintiffs or their predecessors entered into Publishing and Co-Publishing Agreements, which explicitly convey in writing either one hundred percent (100%) or some smaller percentage of the entire copyright in the subject musical compositions. Finally, BMG and Round Hill entered into Exclusive Administration Agreements, which convey rights contemplated in 17 U.S.C. § 106, including the exclusive and sole right to administer, commercially exploit, and to sue for infringement of copyright in the

works at issue.  *See* 17 U.S.C. § 106; 17 U.S.C. § 201(d)(2) ("Any of the exclusive rights

comprised in a copyright, including any subdivision of any of the rights specified by section 106,

may be transferred . . . and owned separately.  The owner of any particular exclusive right is

entitled . . . to all of the protection and remedies accorded to the copyright owner by this title.").

    Each of these forms of agreement is a valid way to transfer exclusive rights in

copyrighted works.  *See Warner/Chappell Music, Inc. v. Blue Moon Ventures*, 2011 WL 662691

at *1-*6 (M.D. Tenn. Feb. 14, 2011).  Declaration testimony attaching the transfer agreements

and explaining how the agreements relate to the works at issue establishes ownership for

purposes of summary judgment.  *See Arista Records v. Lime Group*, No. 06 CV 5936, 2011 WL

1641978, at *4-5 (S.D.N.Y. Apr. 29, 2011); *Tacori Enterprises v. Rego Manufacturing*, No.

1:05CV2241, 2008 WL 4426343, at *11 (N.D. Ohio Sept. 25, 2008); *cf. SCO Group v. Novell*,

578 F. 3d 1201, 1211-13 (2d Cir. 2009).

    Plaintiffs' evidence of chain of title from the copyright registrants entitles them to

summary judgment in the absence of contrary evidence of ownership.  "Once the plaintiff has

established his ownership *prima facie*, the burden then shifts to the defendant to counter this

evidence."  4 *Nimmer on Copyright* § 13.01[A] (2015).  Here, there is no contrary evidence.

### C.    Cox Lacks Standing to Contest Ownership

    In any event, as a third party to the copyright transfers, Cox cannot challenge Plaintiffs'

ownership of the works at issue.  "[A]n alleged third-party infringer" "lacks standing . . . to

challenge the validity of [an] assignment . . . in an attempt to avoid liability."  *Tacori

Enterprises*, 2008 WL 4426343, at *10.  Because the laws governing assignment of copyrights

are "designed to resolve disputes among copyright owners and transferees," a defendant who is

not a party to the ownership transfer "simply does not hav[e] standing."  *Billy-Bob Teeth v.

Novelty*, 329 F.3d 586, 592 (7th Cir. 2003).

Here, Cox is not a party to any of the assignments at issue, none of which are disputed by BMG and Round Hill's counter-parties.  "[W]hen there is no dispute between the original copyright owner and his licensee or assignee, 'it would be anomalous to permit a third-party infringer'" to challenge ownership.  *X-It Products*, 155 F. Supp. 2d at 604 (quoting *Eden Toys v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982)); *see also Billy-Bob Teeth*, 329 F.3d at 592-93 ("[W]here there is no dispute between the copyright owner and the transferee about the status of the copyright, 'it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement.'"); *Capital Concepts v. The Mountain Corp.*, No. 3:11-cv-0036, 2012 U.S. Dist. LEXIS 182874, *24-27 (W.D. Va. Dec. 30, 2012).  Accordingly, Cox lacks standing to challenge ownership of the works at issue, and summary judgment should be entered in favor of BMG and Round Hill.

## II.   COX IS NOT ENTITLED TO "SAFE HARBOR" PROTECTION UNDER THE DMCA

The DMCA provides service providers such as Cox a safe harbor defense to claims of copyright infringement only if they adopt, implement, and publicize a policy for the termination of repeat infringers in appropriate circumstances.  To obtain safe harbor protection under the DMCA, an internet service provider must:

> ha[ve] adopted and reasonably implemented, and inform[] subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512(i)(1)(A).  This is a "threshold condition[]" "[t]o be eligible for any of the four safe harbors" in the DMCA.  *Perfect 10 v. CCBill*, 488 F.3d 1102, 1109 (9th Cir. 2007).

The purpose of Section 512(i) is to ensure that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should

know that there is a ***realistic*** threat of losing that access." H.R. Rep. 105-551(II), at 61; S. Rep. 105-190, at 62 (emphasis added).  Thus, an internet service provider must maintain a "a working notification system" through which copyright owners may provide notice of infringement, must "deal[] with DMCA-compliant notifications," and must "terminate[] users who repeatedly or blatantly infringe copyright" in "appropriate circumstances." *CCBill*, 488 F.3d at 1109-10.  It is Cox's burden to demonstrate that it falls within a DMCA safe harbor. *See Columbia Picture Industries v. Fung*, 710 F.3d 1020, 1040 (2d Cir. 2013).

Cox does not qualify for a safe harbor because, at least since 2010, it has never had nor implemented a policy to terminate repeat infringers in appropriate circumstances.  Instead, Cox has created a notification system designed to limit the circumstances in which Cox will learn of infringement on its system.  Cox has ████████████████ more than 95% of the millions of infringement notices sent to it by copyright holders without taking any action.  SUMF 19-31.

Where Cox does accept notices of infringement, Cox's policy and practice has been *not* to terminate subscribers who its abuse management personnel know – and acknowledge – to be flagrant, repeat infringers.  Through September 2012, Cox did not actually terminate any repeat infringers.  To give the appearance of complying with the DMCA, Cox purported to "terminate" repeat infringers but, rather than actually terminate them,███████████████████████ ███████████  SUMF 37-49.  Starting in October 2012, Cox changed its policy so that ████ ██████████████████████████████████████████████ ███████████████████████████████████████  Between the Fall of 2012 and the filing of this litigation, ███████████████████ ████████████████████████████████████████ ████████████  Its abuse management team repeatedly allowed known, repeat

infringers to continue to use Cox's network.  SUMF 50-70.  No reasonable jury could conclude

that Cox has established and implemented a policy that ensures its subscriber are subject to a

"realistic threat" of losing internet access as a result of repeat copyright infringement.

### A. Cox Cannot Take Advantage of the DMCA Safe Harbor Because It Refuses to Accept or Act on Notifications of Copyright Infringement

At the threshold, Cox's large-scale refusal to accept notices of copyright infringement

does not satisfy the DMCA's safe harbor requirement.  "[A]llow[ing] notices of potential

copyright infringement to fall into a vacuum and to go unheeded" means "that [an ISP] had not

reasonably implemented its policy against repeat infringers."  *Ellison v. Robertson*, 357 F.3d

1072, 1080 (9th Cir. 2004).  That is exactly what Cox has done.

Cox has implemented several policies to ensure that the vast majority of copyright

infringement notices fall into a vacuum and go unheeded.  First, Cox █████████████████

███████████████████████████████████, whether or not they comply with the

DMCA.  SUMF 24-30.  That includes all 22 million notices sent by Rightscorp, which Cox

concedes identify an infringed work, infringing material, and the Cox-assigned IP address of the

infringer.  SUMF 16, 27-28.  While Cox claims that settlement offers do not comply with the

"spirit" of the DMCA, its counsel was unable to point to any language in the DMCA allowing

Cox to ████████████████████████████████████████████████████

██████████    Theodore Decl. Ex. 5 (Cadenhead Tr.) at 118:4-124:20.  These notices literally

"fall into a vacuum," *Ellison*, 357 F.3d at 1080, and Cox makes no "effort to record" those

instances of infringement, to "design its system" to determine the "identity of the users

responsible for those files," or to establish a "vehicle to receive notices of potential

infringement" from blocked senders.  *Disney Enterprises v. Hotfile Corp.*, No. 11-20427-CIV,

2013 WL 6336286, at *21 (S.D. Fla. Sept. 20, 2013); *see also* SUMF 26-27.

Even for notices Cox deems DMCA-complaint, Cox limits each copyright holder to ████

████████████████████████████████████ though Cox has 4.5 million subscribers and

receives millions of notice a year.  SUMF 22; Theodore Decl. Ex. 61.  █████████████

████████████████████, and Cox takes no action based on those notices.  SUMF 22, 31.

Cox does not count these notices against subscribers in its graduated response policy nor

consider them toward suspension and termination.  SUMF 21-34.  In other words, these notices

"go unheeded."  *Ellison*, 357 F.3d at 1080.  Asked, ███████████████████████

████████████████████████████████ SUMF 23.

In all, Cox has taken no action on more than 95% of the copyright notices that it has been

sent by copyright owners.  SUMF 31, 63-65.  Cox's own expert admitted that ██████████

████████████████████████████████████████████████████

████████████████████████████████████████ *See*

Theodore Decl. Ex. 9 (Rosenblatt Tr.) at 14:2-8.  Here, Cox does exactly that for an enormous

swathe of copyright notices, including all of the ones reflecting claims of infringement in this

litigation.  The "deliberate disregard" reflected in Cox's "practice to ignore [Rightscorp's

infringement notices] rather than act to terminate the users they were associated with" deprives it

of protection under the DMCA.  *Disney Enterprises*, 2013 WL 6336286, at *21.

Cox's policy and practice of ignoring 95% of copyright notices is the result of a

deliberate effort to reduce the volume of copyright notices it receives and must act on.  Cox

receives millions of notices of copyright infringement.  SUMF 63.  Rather than potentially

terminate large numbers of subscribers, ███████████████████████████████

████████████████████ SUMF 20.  That refusal to act on valid notices of copyright

infringement leaves Cox "unable to carry out any sort of reasonable policy" to identify and terminate repeat infringers under the DMCA. *Disney Enterprises*, 2013 WL 6336286, at *21.

**B.      Cox Cannot Take Advantage of the DMCA Safe Harbor Because its Policy and Practice Is *Not* to Terminate Repeat Infringers**

Even for the subset of copyright infringement notices that Cox does accept, Cox does not comply with Section 512(i) because it has established and implemented a policy of *not* terminating repeat infringers. *See* 17 U.S.C. § 512(i)(1)(A) (service provider must "adopt[] and reasonably implement[]" a policy of "terminat[ing] . . . repeat infringers" in "appropriate circumstances"). For over two years, Cox pretended to "terminate" copyright infringers but actually retained those "terminated" subscribers and continued to sell them internet service. Eventually Cox re-considered that approach and replaced it with policies designed and implemented to avoid terminating repeat infringers at all. Neither is adequate under the DMCA.

**1.      Cox "Terminations" Were Not "For Real" Until the Fall of 2012**

From 2010 into the Autumn of 2012, Cox's abuse department – with the concurrence of Cox's legal team – established a policy of purporting to terminate repeat infringers but in fact ███████████████████████████████████████████████████████████████

SUMF 38. Cox's abuse manager, Jason Zabek, explained that ██████████████████████████ ███████████████████████ *Id*. As a rule, customers "terminated" for copyright infringement were ██████████████████ Zabek put it succinctly: ████████████████████ *Id*.

████████████████████████████████████████

█████████████ SUMF 42. ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ SUMF 42; *see also*

Theodore Decl. Ex. 13 ███████████████████████████

██████████████████████████████████ "Terminated" customers were

█████████████████████████████████████████████

████████████ SUMF 42-43███████████████████████

██████████████████████████████████ SUMF 46-49.

Cox personnel were remarkably straightforward about this policy: ███████████

████████████████████████████████████████████████

████████████████████████████████ SUMF 40. █████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

On the contrary, Cox's fake terminations do not comply with Section 512(i).  *See Capitol Records v. Escape Media Group*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *11 (S.D.N.Y. Mar. 25, 2015) ("The Court is not aware of any authority for the proposition that something short of complete termination of a repeat infringer's account satisfies § 512(i).  Rather, the case law indicates just the opposite.").  Even Cox's expert conceded that ██████████████████████ ██████████████████████████████████████████ and that at a minimum ████████████████████████ Theodore Decl. Ex. 9 (Rosenblatt Tr.) at 31:10-32:10, 37:13-22, 39:19-22.  As a result, there can be no genuine dispute that until the Fall of 2012, Cox did not adopt or implement a policy to terminate repeat infringers within the meaning of Section 512(i).

> **2.      Cox Has Not Established or Implemented a Policy to Terminate Repeat Infringers in Appropriate Circumstances Since Fall 2012**

The same is true under the revised copyright abuse policy Cox issue in October 2012. The new policy put a halt to the fake "terminations": ████████████████████████

████████████████████████████████████████ SUMF 50.  However, it also brought Cox's

DMCA terminations to an effective halt.  ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ SUMF 66.  During the latter period, Cox received ████████

DMCA complaints and issued more than ████████████ to its subscribers.[3]  SUMF 63-64.

Cox's new policy makes it almost impossible for a repeat infringer to be terminated for

copyright violations.  *See In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 659 (N.D. Ill.

2002) ("Adopting a repeat infringer policy and then purposely eviscerating any hope that such a

policy could ever be carried out is not an 'implementation' as required by § 512(i)."), *aff'd*, 334

F.3d 643 (7th Cir. 2003).  The policy provides that a subscriber is to be "considered" for

termination only after accumulating ████████ infringement notices within a ████████

SUMF 51-59.  Accumulating so many notices is itself almost impossible because the ████████

strikes do not include ██████████████████████████████████████████████████

██████████████████████████████████████ – categories that account for more than 95%

of all notices sent to Cox.  SUMF 57, 63-65; *see also* Theodore Decl. Ex. 51.  Nor does the

revised policy contain any standards to govern termination of the rare subscriber who does reach

the "consideration" stage.  SUMF 59.  On the contrary Cox's practice is to work with each

subscriber ████████████████████████████████████████████████████

██████████████████████████SUMF 60.

As a result, Cox *claims* to have terminated at most an infinitesimal percentage of *known*

repeat infringers.  From September 2012 to November 2014, Cox received at least ████████

---

[3] Cox terminated ████████████████████████████████████████████.  SUMF 66.

DMCA complaints and sent out ███████ warnings and suspensions to subscribers.  SUMF 63-64.
Though each of those ███████ actions represents a customer's second (or greater) valid DMCA
notice within ███████, Cox claims to have terminated only ██ subscribers in response to
DMCA complaints.  SUMF 66-67.  That is not "appropriate" under the DMCA.  *See Disney
Enterprises*, 2013 WL 6336286, at *22 ("despite receiving over eight million notices for five
million users, Hotfile only terminated 43 users before the commencement of this action, for
reasons that had no apparent relation to the notices Hotfile received").

        Not only is responding to ████████████████████████████ inadequate
under the DMCA, but Cox has not produced evidence that it terminated *anyone* for repeat
copyright infringement during this time.  *See Rosen v. Global Net Access*, No. CV 10-2721, 2014
WL 2803752, at *4 (C.D. Cal. June 20, 2014) (burden on the party claiming DMCA safe harbor
to present evidence of adequate response to infringement notifications).  While Cox's
interrogatory responses claim ███████ terminations "in response to a DMCA notice(s)" in the
twenty-five months between September 2012 and November 2014, Cox has not identified or
provided ticket histories for the terminations at issue, much less produced evidence that DMCA
notices were the actual reason for any termination.  SUMF 68.  Cox did produce a 4,000 page log
listing each interaction with Cox subscribers purportedly "terminated" in response to DMCA
notices (though it refused to provide the full ticket history for those subscribers).  But the log
indicates that many of the ███████████████████████████████
██████████████████ SUMF 68.

        Internal emails within Cox's abuse department confirm ██████████████████ were an
important element of decisions to terminate repeat infringers.  Theodore Decl. Ex. 48 (██████
██████████████████████████████ As the senior lead abuse engineer

explained in a chat with another abuse engineer, " of the decision to terminate in the DMCA context. SUMF 45. In contrast to repeat copyright infringement, excessive usage is subject to a

." SUMF 71. Thus, it appears that repeat infringers were terminated extremely rare circumstances, usually involving some other form of abuse. That is not a reasonable implementation of a repeat infringer termination policy.

### C. Cox Cannot Take Advantage of the DMCA Safe Harbor Because it Has Failed to Terminate Known, Flagrant Repeat Copyright Infringers

Cox's failure to establish and reasonably implement an appropriate termination policy is reflected in its failure to terminate subscribers as to whom its abuse engineers and manager had specific knowledge of flagrant, sustained copyright infringement. Because Cox does not terminate known, blatant repeat infringers, a jury cannot conclude that Cox reasonably implemented a policy to terminate repeat infringers. *See Perfect 10 v. Cybernet Ventures*, 213 F. Supp. 2d 1146, 1177 (C.D. Cal. 2002) ("These circumstances would appear to cover, at a minimum, instances where a service provider is given sufficient evidence to create actual knowledge of blatant, repeat infringement by particular users . . . ."); *CCBill*, 488 F.3d at 1109-10 (reasonable implementation requires the service provider to "terminate[] users who repeatedly or blatantly infringe copyright").



SUMF 48. Nonetheless, he was

*Id.* This lack of concern for the DMCA is at odds with Congress's purpose to "create 'strong incentives for service providers and copyright owners to cooperate to detect and

deal with copyright infringements that take place in the digital networked environment.'"  *In re Charter Communications*, 393 F. 3d 771, 782 (8th Cir. 2005) (quoting S. Rep. 105-190, at 40).

In another email exchange, ███████████████████████████████████
████████████████████████████████████████████████████████
Theodore Decl. Ex. 45.  ███████████████████████████
████████████████████████████████████████████
█████████████████████████ *Id.*  ██████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████ *Id.*  Cox has produced no evidence that he was ever terminated.

This undisputed evidence of Cox's failure to terminate known, repeat infringers in order to preserve the revenue streams associated with their accounts opens it to liability for contributory and vicarious infringement.  The DMCA safe harbors protect only "'innocent' service providers who can prove they do not have actual or constructive knowledge of [] infringement" on their systems.  *ALS Scan v. RemarQ Communities*, 239 F.3d 619, 625 (4th Cir. 2001).  Cox does not qualify.

## CONCLUSION

For the foregoing reasons, partial summary judgment should be entered in favor of plaintiffs that they own and have standing to sue on the works at issue and that Cox has no "safe harbor" defense under the DMCA.

Respectfully submitted,

/s/ Jeremy D. Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
Paul Gennari (VSB No. 46890)
pgennari@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel:  (202) 540-7157
Fax:  (202) 540-7201


*Of Counsel*
Michael J. Allan (admitted *pro hac vice*)
William G. Pecau (admitted *pro hac vice*)
John M. Caracappa (admitted *pro hac vice*)
Roger E. Warin (admitted *pro hac vice*)
Jeffrey M. Theodore (admitted *pro hac vice*)
Stephanie L. Roberts (admitted *pro hac vice*)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Michael O. Crain
Crain Law Group, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia  30601
Tel. (706) 548-0970
Fax: (706) 369-8869

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2015, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com

/s/ Jeremy Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902