UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP <br><br> Plaintiffs, <br><br> v. <br><br> COX COMMUNICATIONS, INC., COXCOM, LLC <br> Defendants. | Case No. 1:14-cv-1611(LOG/JFA) <br><br> REDACTED VERSION |

**MEMORANDUM IN SUPPORT OF BMG RIGHTS MANAGEMENT (US) LLC AND ROUND HILL MUSIC LLC'S MOTION FOR EVIDENTIARY SANCTIONS BASED ON SPOLIATION OF DEFENDANTS' USER RECORDS AND RELATED EVIDENCE**

Plaintiffs BMG Rights Management (US) LLC and Round Hill Music LP ("Plaintiffs") respectfully submit this Memorandum in Support of the Motion for Evidentiary Sanctions Based on Spoliation of Defendants' User Records and Related Evidence.

**INTRODUCTION**

A significant percentage of Cox's subscriber base is engaged in the widespread theft of copyrighted content. Cox's practice and policy is to ignore the use of its system for this rampant theft. Cox has known for years that this practice and policy would lead to litigation. In fact, Cox aids and abets this theft by ignoring more than 95% of the infringement notices it receives through blacklisting and other means. For the 5% of the infringement notices that Cox decides to "accept," Cox follows policies and procedures designed to appear to comply with the safe

1

harbor requirements of the DMCA, while allowing repeat copyright infringers to continue their infringing activity and to continue paying fees to Cox.

These facts are confirmed by dozens of internal documents, replete with references to the likelihood of litigation with copyright holders and the need for the safety of the DMCA safe harbor. These documents show that Cox fully expected, and for some, wanted to be sued. There is no question that Cox's discussions with legal counsel and its efforts to preserve the DMCA safe harbor litigation defense demonstrate that Cox has been preparing for this litigation for years. Cox's "preparation" for litigation, however, also involved the systematic and intentional destruction of subscriber information. This subscriber information is information that only Cox possesses and that Cox now brazenly maintains is critical and necessary to this case.

Specifically, Cox assigns IP addresses to its high-speed internet subscribers. Those IP addresses serve as the identification and location information by which computers communicate over the internet. Thus, when Rightscorp or another copyright owner or agent identifies an internet user infringing copyrighted works using BitTorrent or another file sharing method, it does so via the computer's IP address. Cox, as the ISP, is the gatekeeper of its subscriber information, and only Cox can match that IP address with the name and address of the direct infringing subscriber.

It is undisputed that Cox systematically destroys the ***only*** evidence identifying the direct infringing subscriber by name. And it is undisputed that Cox continued to destroy this information even after the filing of the complaint. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Incredibly, Cox now seeks summary judgment based on Plaintiffs' failure to introduce evidence

of subscriber names –the very evidence that Cox admits it has destroyed. A spoliation finding is appropriate, and Cox should not benefit from its intentional destruction of what Cox believes is critical evidence.

## BACKGROUND

### I. COX'S ANTICIPATION OF POSSIBLE LITIGATION

#### A. Cox's Abuse Group Is Designed to Preserve the Safe Harbor Defense for an Expected Infringement Litigation

For years, Cox has anticipated litigation over its subscribers' use of its network to steal copyrighted material. Cox has established an abuse group whose responsibilities included addressing copyright infringement by its subscribers and for establishing policies and procedures that Cox believes would place it within the DMCA safe harbor if and when it is sued.[1] Cox's effort to preserve the DMCA safe harbor defense speaks volumes as to its anticipation of litigation.

The directive of Cox's abuse group is clear: appear to comply with DMCA safe harbor protocol so it is available when the inevitable infringement case is filed, but take no real action against flagrant repeat infringers because taking such action would hurt Cox's business. ▇ ▇ ▇ ▇ ▇ (See Roberts Decl. Ex. 9 at 12; Ex. 10 at 12.) Despite the label, ▇ ▇ Cox's abuse group manager instructed his team that ▇

---

[1] Plaintiffs do not believe that the efforts undertaken by Cox qualify Cox for safe harbor under the DMCA, but that is not at issue in this motion.



but that (Roberts Decl. Ex. 14 at 1; *see also* Ex. 12 at 1 ( )) Cox used the word only so that it would appear DMCA compliant. Cox but then Roberts Decl. Ex. 11.) Abuse manager Zabek wrote: " (Roberts Decl. Ex. 13.)

Cox has been actively seeking to develop safe-harbor defenses to copyright infringement litigations it knew it would one day face.

### B. Cox Expected to Face This Litigation Since 2011

Cox also anticipated specific litigation related to the millions of infringement notices sent by Plaintiffs' agent Rightscorp. When Rightscorp first began sending Cox infringement notices in 2011, Cox immediately "blacklisted" Rightscorp. This "blacklisting" meant that Cox deleted or blocked all of Rightscorp's notices that it received on behalf of Plaintiffs and others without addressing the substance of the letter. (*See, e.g.,* Dkt. 306 (Cox MSJ) at 2.) Since then, Cox has ignored every single one of the well over ***22 million*** copyright infringement notices sent to Cox by Rightscorp. Anticipating litigation, Cox's counsel stated in emails, without a single case or statute for support that, because Rightscorp includes a settlement offer in its infringement notices, the notices are not in the "spirit of the DMCA." And, Cox blacklisted all notices from Rightscorp.[2] (*See* Roberts Decl. Ex. 17; *see also* (*See, e.g.,* Dkt. 306 (Cox MSJ) at 2 ("Cox

---

[2] Cox cited no authority to completely ignore the copyright infringements by its subscribers brought to its attention through those infringement notices, and it has provided no support for its interpretation of the "spirit" of the DMCA.

4

repeatedly told Rightscorp that, if Rightscorp would take the offensive language out of the notices, Cox would accept, process, and forward the notices.").) Cox's counsel provided these statements for one reason, and one reason only - so that when Cox was sued, it could rely on this "opinion of counsel" to defend this "blacklisting" policy.

Cox has been aware since at least 2011 that it could face litigation for its blacklisting of Rightscorp. In March 2011, Jason Zabek, Cox's Manager of Customer Abuse Operations, sent an email concerning Rightscorp and its infringement notices stating ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Roberts Decl. Ex. 16.) In June 2011, Cox employee Leah P'Simer sent Zabek an email ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Roberts Decl. Ex. 19.) Zabek responded, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*Id.*)

Cox has not reviewed or taken any action in response to copyright infringement notices sent by Rightscorp since March 14, 2011 and ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Roberts Decl. Ex. 22 at 9-10 (3d Supp'l Response to Interrog. 3); Ex. 18 at 1-2; Ex. 7 (Beck Tr.) at 341:1-343:22.) This is despite the fact that Cox's entire purpose in instituting an infringement policy was to prepare for litigation and establish a safe-harbor defense under the DMCA.

### C. Cox Continued To Ignore Rampant Infringement and Continued to Expect Litigation Through 2014

Despite the ongoing effort of its abuse group to preserve the safe harbor defense for litigation and its knowledge that it would very likely face litigation by a Rightscorp client, Cox continued to ignore more than 95% of infringement notices it receives. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Roberts Decl. Ex. 8 (Vredenburg Tr.) at 328:16, 345:12-347:14; Ex. 6 (Carothers Tr.) at 57:17-58:18; Ex. 17 at 1; Ex. 5 (Zabek Tr.) at 130:6-131:12.) Together, these categories account for more than 95% of infringement notices sent to Cox. Dkt. 324, SUMF 63-65.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Roberts Decl. Ex. 17 at 2; Ex. 5 (Zabek Tr.) at 297:3-298:1.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Roberts Decl. Ex. 15.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Roberts Ex. 21 at 25-27 (1st Supp'l Response to Interrog. 8); Ex. 23 at COX_BMG00203302-03.) This is despite the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6

▇▇▇ (Roberts Decl. Ex. 22 at 12-16 (3d Supp'l Response to Interrog. 5)).

Cox claimed that the notices from blacklisted senders could be deleted for violating the "spirit of the DMCA," though Cox cited no authority to completely ignore the copyright infringements by its subscribers brought to its attention through those infringement notices. Specifically, senior lead abuse engineer Joseph Sikes explained in 2014, "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Roberts Ex. 20 at 1; Ex. 4 (Sikes Tr.) at 14:13-14.) Matt Carothers, Cox's principal security architect and formerly the manager of Cox's abuse department, responded, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Roberts Ex. 20 at 1; Roberts Decl. Ex. 6 (Carothers Tr.) at 7:1-8:18, 264:22-267:1.)

## II. COX DESTROYED SUBSCRIBER RECORDS UNTIL AFTER THE COURT ORDERED COX TO PRODUCE THE INFORMATION CONTAINED WITHIN THOSE RECORDS

Cox has systematically deleted evidence of infringement from its systems at least since 2010, continuing the practice even after Plaintiffs filed this lawsuit and even after Plaintiffs moved to compel production of this exact evidence. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Cox did so despite the fact that this evidence

is the only means for Plaintiffs to identify the Cox subscribers who have infringed their copyrights.[3]

As part of its business, Cox's systems create DHCP logs, which are records of the identity of the subscriber who has been assigned a particular IP address at any given time. Cox acknowledges that "DHCP logs are the most direct method to connect a particular IP address with a particular subscriber at a particular date and time." (Dkt. 107 at 5.) Yet, Cox kept these DHCP logs for only ▮▮▮▮▮ (*See Id.*; Roberts Decl. Ex. 7, Beck Tr. at 102:6-103:21.) Cox had this policy prior to the filing of this complaint, and Cox continued to delete the DHCP logs even after Plaintiffs filed the complaint. (Roberts Decl. Ex. 22 at 9-10 (3d Supp'l Response to Interrog. 3).) In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*) Cox ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.) Cox has never explained how it could not recognize the relevance of the records even by the time Plaintiffs moved to compel the very information contained within those records.

### III. COX BRAZENLY CLAIMS PLAINTIFFS CANNOT SUSTAIN THEIR CASE WITHOUT THE EVIDENCE IT DESTROYED

Despite its ongoing practice of deleting all records linking specific IP addresses to specific Cox subscribers, during the course of this litigation Cox has made evident its intention to use as part of its defense the absence of just this data. (*See* Roberts Decl. Ex. 3 (Boswell Dep.

---

[3] Plaintiffs do not agree with Cox that the identification of individual subscribers is necessary to prove direct infringement. Because Cox has taken that position in defense to Plaintiffs' claims, though, Cox should not be permitted to benefit from its affirmative deletion of the information.

Tr.) at 113:10-114:8, 120:2-11.) Focusing on Rightscorp's (and thus Plaintiffs') inability to identify specific Cox subscribers as infringers, Cox's attorney asked, "So what Cox subscribers does Rightscorp have actual knowledge of having personally engaged in infringing activities over the Cox network?" (Roberts Decl. Ex. 3 (Boswell Dep. Tr.) at 122:23-25.) Rightscorp's witness explained that Rightscorp has "no information on Cox subscribers," but rather identifies IP addresses from which infringing activity has taken place. (*See id.* at 123:2-15.) Cox's attorney continued asking questions focused on the fact that Rightscorp (and thus Plaintiffs) cannot identify which person is infringing Plaintiffs' copyrights by simply identifying an IP address from which infringement is facilitated. (*See generally Id.* at 120:2-14, 122:15-123:3.) This is precisely why Plaintiffs moved the court in May 2015 to compel Cox to produce DHCP log data, and the Court's recognition of the importance of this data is evident in granting that motion. (Dkts. 69, 72, 78.)

      Cox now has moved for summary judgment partially based on the absence of evidence linking specific Cox subscribers to instances of infringement. (*See* Dkt. 306 (Cox MSJ).) Cox asserts in its September 21 motion that Plaintiffs "***cannot tie IP addresses to specific infringers***." (Dkt. 306 at 9 (Cox MSJ) (emphasis added).) Plaintiffs cannot do this because Cox destroyed the records linking IP addresses to specific Cox subscribers. It is Cox that stymied Plaintiffs' attempts to identify with specificity the individual infringers, not Plaintiffs' failure to act or seek such discovery. (Dkt. 306 at 9 (Cox MSJ).) Still Cox seeks dismissal based on Plaintiffs' inability to access information Cox affirmatively destroyed.

      This Court should not reward Cox for destroying evidence. A spoliation finding is appropriate.

**LEGAL STANDARD**

"Spoliation is the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation." *Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 284 (E.D. Va. 2001). A party may be sanctioned for spoliation if the party (1) had a duty to preserve material evidence, and (2) willfully engaged in conduct resulting in the loss or destruction of that evidence, (3) at a time when the party knew, or should have known, that the evidence was or could be relevant in litigation. *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). "Recognizing acts of spoliation and punishing the spoliators is the result of judicial recognition that the 'spoliated physical evidence' is often the best evidence as to what has really occurred and that there is an inherent unfairness in allowing a party to destroy evidence and then to benefit from that conduct." *Trigon*, 204 F.R.D. at 284 (citation omitted). Accordingly, courts have broad authority to impose sanctions for spoliation ranging from dismissal to "permitting an adverse inference to be drawn against the party as a means of leveling the playing field." *Id.* at 285 (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)).

**ARGUMENT**

**I.   COX SPOLIATED RELEVANT EVIDENCE AT THE SAME TIME IT ANTICIPATED BEING SUED**

Every action Cox takes in relation to infringement allegations is aimed to keeping as many subscribers as possible while preparing a safe-harbor defense for eventual litigation. Cox has been preparing for litigation for years, and it has been preparing for – and inviting – litigation with Rightscorp's partners since 2011.

Cox has known since 2011 that its risky decision to blacklist Rightscorp was likely to lead to litigation. In fact, Cox's Manager of Customer Abuse Operations responded to early communications from Rightscorp ███████████████████████████

███████████████████████████████ (Roberts Decl. Ex. 16.) ███████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ (Roberts Decl. Ex. 20.)

Still, Cox continued deleting the only records linking Cox subscribers to the IP addresses through which infringing activity was occurring: the DHCP log data. Cox was not passively failing to collect information, but, rather, was actively deleting records it kept in the ordinary course of business after ███████████ [4] Plaintiffs cannot depose a Cox employee to learn the identities of the subscribers or seek information through other discovery. This information is simply gone. This is nothing short of textbook spoliation; "[s]poliation is the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation." *Trigon*, 204 F.R.D. at 284. Cox should be sanctioned for this behavior.

## II. COX CONTINUED TO SPOLIATE RELEVANT EVIDENCE EVEN AFTER PLAINTIFFS FILED SUIT

Cox continued to delete the data linking subscribers to particular IP addresses even after Plaintiffs filed suit for its facilitation of copyright infringement. Under its policy, Cox should have retained DHCP log data for ███████, so as of the day Plaintiffs filed their complaint, Cox would have had DHCP data for infringement taking place in the prior ███████. But when the Court ordered Cox to produce just this data for the top 250 infringers during the six month period prior to Plaintiffs filing the complaint, Cox could not do so for almost half the IP addresses. For

---

[4] Just as the plaintiff in *Vodusek* was actively preparing her affirmative litigation strategy during the period when she was responsible for the destruction of key evidence, Cox was actively preparing its defensive litigation strategy during the period when it was destroying the subscriber records at issue. *See Vodusek*, 71 F.3d 148. The *Vodusek* court imposed an adverse inference for the destruction, and Plaintiffs ask the Court to do the same to sanction Cox's active destruction of subscriber records.

11

example, in June 2015, Cox did not have the subscriber information for the person having IP address 174.65.102.18 from August 22, 2014 to October 18, 2014. (Roberts Decl. Ex. 2 (June 5, 2015 letter from B. Buckley to M. Allan) at worksheet 2, pages 38 of 41; *see also* Dkt. No. 72-4, pg. 4, line 80 (showing the dates of infringement for IP address 174.65.102.18).) The only explanation for the absence of subscriber information for this IP address (and the other 111 of 250 sought by Plaintiffs) is that Cox, following its policy of deleting records after ████████, deleted the DHCP log entry matching the subscriber to the IP address 174.65.102.18 ████████ after October 18, 2014, which would be approximately ████████ after Plaintiffs filed their complaint. Cox has offered no alternative explanation. (*See* Roberts Decl. Ex. 2 (June 5, 2015 letter from B. Buckley to M. Allan).) Cox admitted that it kept DHCP logs for only ████████ until after the Court ordered it to produce the information in May 2015. (*See* Roberts Decl. Ex. 7, Beck Tr. at 102:6-103:21; Roberts Decl. Ex. 22 at 9-10 (3d Supp'l Response to Interrog. 3).) Accordingly, the evidence shows that Cox deleted the only evidence linking specific Cox subscribers to IP addresses of infringing activities after the initiation of this litigation. Cox deleted relevant evidence during a pending litigation; Cox committed spoliation. *Trigon*, 204 F.R.D. at 284.

### III. COX ADMITS THE RELEVANCE OF THE DELETED INFORMATION BY SEEKING TO USE ITS ABSENCE AS A DEFENSE

Incredibly, Cox is actively seeking to use this spoliation of evidence to its advantage.[5] Specifically, and in seeking dismissal of this litigation, Cox claims that "[t]here is no evidence that any Cox account holder personally committed any infringement through a Cox account." (Dkt. 306 at 9 (Cox MSJ).) But Cox itself intentionally destroyed the records linking IP

---

[5] Cox's position as to Plaintiffs' alleged lack of evidence of infringement by Cox's subscribers highlights its knowledge of the value of exactly the information it spoliated: the information identifying those subscribers.

addresses to these individual subscribers. Cox should not be permitted to destroy the only evidence linking IP addresses to individual subscribers, then to use the unavailability of evidence Cox destroyed as a defense. Cox should be sanctioned for this spoliation because it had a duty to preserve material evidence related to this lawsuit and willfully continued in the destruction of DHCP log data even after the initiation of the lawsuit, *i.e.,* during a time when Cox knew that such log data was relevant to the litigation. *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013).

## IV.  APPROPRIATE SANCTIONS FOR COX'S ONGOING SPOLIATION

The evidence in this litigation shows that Cox has implemented its limited infringement policies in an attempt to fall within the DMCA safe harbor when it faces litigation. Cox saves evidence supporting its claim to such a safe harbor while deleting anything that might show the continued presence of repeat infringers on its network or that might make it easier to prove infringement. Cox is the gatekeeper between copyright owners and infringing Cox subscribers, so there is no way for Plaintiffs to get information about subscribers' identities except through Cox. Cox destroyed this information during the time period it was preparing for litigation (and even after Plaintiffs filed this complaint), and Cox now argues that Plaintiffs cannot prove their case because they do not have the very evidence Cox destroyed.

Because of Cox's deletion of relevant subscriber records linking individual subscribers to IP addresses, Plaintiffs do not have the evidence necessary to identify every Cox subscriber who has infringed their copyrights or exactly how many individual infringers have been using Cox's system during the relevant timeframe. Cox seeks to use to its advantage its destruction of evidence linking IP addresses to the millions of individual subscribers Rightscorp has identified. Instead, the Court should issue the following adverse inference: for all accounts for which Cox

has not produced subscriber information linked to a specific IP address, Cox may not assert that Plaintiffs cannot prove infringement by Cox users of the copyrighted works as identified in Rightscorp infringement notices on the ground that the IP addresses are not tied to specific infringers. *Trigon*, 204 F.R.D. at 285 (Courts have broad authority to impose sanctions for spoliation ranging from dismissal to "permitting an adverse inference to be drawn against the party as a means of leveling the playing field." (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)).

In addition, Plaintiffs ask the Court for an adverse inference that Robert Bardwell's expert statistical analysis of the IP addresses from which infringing activity has taken place is correct. Because IP addresses for a single subscriber may change over time, Plaintiffs anticipated that Cox would argue that for a given sequence of infringing activity on a single IP address, Plaintiffs could not attribute those infringements to a specific subscriber. Of course, if Cox had not destroyed the personal records, this question would not even be posed because the subscriber (*i.e.*, repeat infringer) for each sequence of infringements would be known.

Given that this information was not available, Plaintiffs had to turn to a statistician expert. Specifically, using lists of IP addresses from which infringing activity took place, Plaintiffs' expert, Robert A. Bardwell, calculated the probability that sequences of infringement from a single IP address is attributable to a single subscriber or to multiple subscribers. (*See* Roberts Dec. Ex. 1, Corrected Bardwell Report at 4-6.) He determined that the vast majority of sequences of infringements are attributable to by individual, repeat-infringing Cox subscribers. (*Id.* at 6.) Mr. Bardwell was able to confirm the results of his statistical model for the subscriber information that Cox produced on June 5, 2015[6] pursuant to the Court's order on Plaintiffs'

---

[6] Roberts Decl. Ex. 2, June 5, 2015 Letter from Buckley to Allen.

14

motion to compel subscriber information (Dkt. 78). (*See* Roberts Decl. Ex. 24, Bardwell Reply Report at 12-19.)

Specifically, where Mr. Bardwell determined that the sequence of infringements from an IP address was from a single subscriber, the actual data provided by Cox confirmed that the IP address was assigned to a single subscriber for the time period in question. *Id.* Again, if Cox had not destroyed the subscriber records, Plaintiffs' could have simply inspected the data in the same manner to determine that a sequence of infringements was attributable to a single subscriber, and Mr. Bardwell's statistical model would not have been needed.

Because Cox has destroyed the data necessary to make that simple determination, or to confirm Mr. Bardwell's results with actual data, Plaintiffs ask the Court for an adverse inference against Cox that each sequence of infringements from a single IP address is from a single subscriber, or, in the alternative, an adverse inference against Cox accepting Bardwell's conclusions as fact.

In the alternative, Plaintiffs ask the Court to instruct the jury that Cox has destroyed and continued to destroy subscriber records that it had a duty to preserve from the time it anticipated litigation through May 2015 and that the jury can infer that this evidence was destroyed because it was adverse to the positions Cox is taking in this case.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for evidentiary sanctions. Plaintiffs ask the Court for the following adverse inference: for all accounts for which Cox has not produced subscriber information linked to a specific IP address, Cox may not assert that Plaintiffs cannot prove infringement by Cox users of the

copyrighted works as identified in Rightscorp infringement notices on the ground that the IP addresses are not tied to specific infringers.

In addition (or, at minimum, in the alternative), Plaintiffs ask the Court for an adverse inference as to any challenge to the findings of Plaintiff's expert, Robert A. Bardwell, concerning the probability that sequences of infringement from a single IP address are attributable to a single Cox subscriber. This will appropriately sanction Cox for its blatant and continuing spoliation of what Cox itself claims is key and necessary evidence of direct infringement by Cox's subscribers.

September 25, 2015

    Respectfully submitted,

    /s/ Jeremy D. Engle
    Jeremy D. Engle (VSB No. 72919)
    jengle@steptoe.com
    Paul Gennari (VSB No. 46890)
    pgennari@steptoe.com
    STEPTOE & JOHNSON, LLP
    1330 Connecticut Ave, NW
    Washington, DC 20036
    Tel.: (202) 429-3000
    Fax: (202) 429-3902

    Walter D. Kelley, Jr. (VSB No. 21622)
    HAUSFELD, LLP
    1700 K Street, NW
    Washington, DC 20006
    202-540-7200

    *Of Counsel*

    Michael J. Allan (admitted *pro hac vice*)
    William G. Pecau (admitted *pro hac vice*)
    John M. Caracappa (admitted *pro hac vice*)
    Roger E. Warin (admitted *pro hac vice*)

Margaret P. Kammerud (admitted *pro hac vice*)
Jeffrey M. Theodore (admitted *pro hac vice*)
Stephanie L. Roberts (admitted *pro hac vice*)
Elizabeth McKenzie (admitted *pro hac vice*)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

Michael O. Crain
Crain Law Group, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia  30601
Tel. (706) 548-0970
Fax: (706) 369-8869

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

   I hereby certify that on September 25, 2015, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com


              /s/  Jeremy D. Engle
              Jeremy D. Engle (VSB No. 72919)
              jengle@steptoe.com
              STEPTOE & JOHNSON, LLP
              1330 Connecticut Ave, NW
              Washington, DC 20036
              Tel.:  (202) 429-3000
              Fax:  (202) 429-3902