**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, | ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:14-cv-1611 (LOG/JFA)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**R<small>EDACTED</small> N<small>ON</small>-C<small>ONFIDENTIAL</small> V<small>ERSION</small>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ......................................................................... 4

ARGUMENT ....................................................................................................................... 8

I.      THERE IS NO EVIDENCE OF UNDERLYING DIRECT INFRINGEMENTS. ... 8

     A.     There is No Evidence That Any Cox Account Holder Personally
Committed Any Infringements Through a Cox Account. ............................. 8

     B.     There is No Evidence of Affirmative Conduct by Anyone Using Cox's
Service That Infringed Upon Plaintiffs' Rights. .......................................... 10

     C.     Plaintiffs Cannot Invoke a Vague Concept of "Making Available" as a
Substitute for Section 106(3)'s Requirements. ............................................ 10

           1.     No Interpretation of the 1996 WIPO Copyright Treaty Justifies
Distortion of the Statutory Text of 106(3). ...................................... 12

           2.     Most Courts Reject the Theory That a Vague "Making
Available" of a Copyrighted Work Violates Section 106(3). .......... 13

           3.     Even Under Plaintiffs' Overbroad Theory, There is No Evidence
That Any Cox Account Holder or User "Made Available" Works
at Issue. ........................................................................................... 14

II.     THERE IS NO EVIDENCE THAT COX HAS COMMITTED CONTRIBUTORY
INFRINGEMENT. ................................................................................................... 15

     A.     The Legal Standard for Contributory Infringement ..................................... 15

     B.     There is No Evidence of Any Clear Expression or Affirmative Steps by
Cox to Induce Copyright Infringements by Its Account Holders. ............... 16

     C.     Cox Did Not Materially Contribute to Infringements with Knowledge of
Actual, Specific Infringements. ................................................................... 17

           1.     Cox Has No Knowledge of Actual, Specific Infringements. ............ 18

           2.     Plaintiffs Cannot Show "Willful Blindness" as an End-Run
Around Cox's Lack of Actual Knowledge of Specific
Infringements.................................................................................... 20

III.    NO EVIDENCE SUPPORTS COX'S VICARIOUS LIABILITY. ......................... 21

     A.     The Legal Standard for Vicarious Liability for Copyright Infringement .... 21

# TABLE OF CONTENTS
## (Continued)

**Page**

B.    Plaintiffs Cannot Establish That Cox Controls or Supervises Alleged Infringements of Their Copyrights on the Cox Network. ............................23

C.    Cox Has No Direct Financial Interest in Exploitation of Plaintiffs' Works. ...........................................................................................................25

IV.    PLAINTIFFS' UNCLEAN HANDS BAR THEIR CLAIMS.................................27

A.    Plaintiffs Embraced Rightscorp and Turned a Blind Eye to Its Misconduct....................................................................................................28

B.    Trying to Catch Infringers, Rightscorp Itself Reproduced Thousands of Sound Recordings Without Authorization of Their Copyright Owners. ......29

V.    PLAINTIFFS FAILED TO MITIGATE THEIR ALLEGED DAMAGES.............30

A.    Rightscorp's Refusal to Delete Extortionate Language Is the Source of the Dispute and Prevented Cox from Processing Plaintiffs' Notices...........30

B.    Plaintiffs Failed to Take Simple Steps Against Sources of Alleged Infringements Because They Relied on Those Sources to Generate Claims. .........................................................................................................30

CONCLUSION ....................................................................................................................30

# TABLE OF AUTHORITIES

Page(S)

**Cases**

*ABC, Inc. v. PrimeTime 24, Joint Venture*,
   17 F. Supp. 2d 478 (M.D.N.C. 1998) ...................................................................27

*In re Aimster Copyright Litig.*,
   252 F. Supp. 334 F.3d (7th Cir. 2003) ...........................................................20, 21

*Atlantic Recording Corp. v. Howell*,
   554 F. Supp. 2d 976 (D. Ariz. 2008) .............................................................11, 13

*Banff Ltd. v. Limited, Inc.*,
   869 F. Supp. 1103 (S.D.N.Y. 1994)..........................................................22, 23, 24

*Bossalina v. Lever Bros.*,
   No. 0086-02158, 1988 WL 60572 (4th Cir. May 31, 1988)...................................30

*Capitol Records, Inc. v. MP3tunes, LLC*,
   821 F. Supp. 2d 627 (S.D.N.Y. 2011).................................................................10

*Capitol Records, Inc. v. Thomas*,
   579 F. Supp. 2d 1210 (D. Minn. 2008).........................................................12, 13

*Columbia Pictures Indus. Inc., v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ...........................................................................16

*Costar Grp. Inc. v. LoopNet, Inc.*,
   164 F. Supp. 2d 688 (D. Md. 2001), *aff'd on other grounds* 373 F.3d 544 (4th
   Cir. 2004) .....................................................................................................18, 19

*CoStar Grp., Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) .....................................................................8, 10, 18

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ..........................................................................25

*EMI April Music, Inc. v. White*,
   618 F. Supp. 2d 497 (E.D. Va. 2009) .............................................................23, 25

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2nd Cir. 1971)..........................................................................18

*Hard Drive Prods., Inc. v. Does 1-30*,
   No. 2:11-cv-00345, 2011 WL 2634166 (E.D. Va. July 1, 2011).............................9

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
  118 F.3d 199 (4th Cir. 1997) .............................................................13, 14

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
  43 F. Supp. 3d 644, 663 (E.D. Va. 2014) ..........................................23, 25

*Lenz v. Universal Music Corp.*,
  No. 13-16106, 2015 WL 5315388 (9th Cir. Sept. 14, 2015) ............14, 29

*Little Mole Music v. Spike Inv.*,
  720 F. Supp. 751 (W.D. Mo. 1989) ........................................................23

*London-Sire Records, Inc. v. Doe 1*,
  542 F. Supp. 2d 153 (D. Mass. 2008) .........................................9, 10, 13

*Luvdarts, LLC v. AT&T Mobility*, LLC,
  710 F.3d 1068 (9th Cir. 2013) .........................................................23, 24

*Malibu Media, LLC v. Does 1-5*,
  No. 12 CIV. 2950, 2012 WL 2001968 (S.D.N.Y. June 1, 2012)..............9

*Malibu Media, LLC v. Guastaferro*,
  No. 1:14-cv-01544, 2015 WL 4603065 (E.D. Va. July 28, 2015)....27, 30

*Malibu Media, LLC v. John Does 1 through 10*,
  No. 2:12-cv-03623-ODW, 2012 WL 5382304 (C.D. Cal. June 27, 2012) .............15

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)................................................................15, 16, 17, 18

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*,
  991 F.2d 426 (8th Cir. 1993) ...........................................................11, 13

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
  284 F.3d 505 (4th Cir. 2002) ...........................................................23, 25

*Obolensky v. G.P. Putnam's Sons*,
  628 F. Supp. 1552 (S.D.N.Y. 1986), *aff'd*,
  795 F.2d 1005 (2d Cir. 1986).................................................................11

*Perfect 10, Inc., v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ............................................16, 23, 24, 25

*Perfect 10, Inc. v. Giganews, Inc.*,
  No. CV 11-07098, 2014 WL 8628031, at *4 (C.D. Cal. Nov. 14, 2014)...............25

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Perfect 10, Inc. v. Giganews, Inc.*,
No. CV 11-07098-AB, 2014 WL 8628034 (C.D. Cal. Nov. 14, 2014) ...................................25

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
494 F.3d 788 (9th Cir. 2007) ........................................................................................23, 25

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
907 F. Supp. 1361 (N.D. Cal. 1995) .....................................................................8, 10, 18, 26

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
316 F.2d 304 (2d Cir. 1963)..........................................................................................22, 23, 25

*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*,
761 F. Supp. 2d 367 (E.D. Va. 2011) .......................................................................................8

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)..................................................................................................................21

*Tempo Music, Inc. v. Myers*,
407 F.2d 503 (4th Cir 1969) ...................................................................................................27

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
No. 11 CIV. 8407, 2015 WL 1873098 (S.D.N.Y. Apr. 23, 2015).........................................30

*United States v. Diaz*,
864 F.2d 544 (7th Cir. 1988) ..................................................................................................20

*VPR Internationale v. Does 1-1017*,
No. 11-2068, 2011 WL 8179128 (C.D. Ill. Apr. 29, 2011) .....................................................9

*WorldCom, Inc. v. Boyne*,
68 Fed. App'x 447 (4th Cir. 2003) ..........................................................................................27

**Statutes**

17 U.S.C. § 101..........................................................................................................................11

17 U.S.C. § 106.................................................................................................................. *passim*

17 U.S.C. § 501............................................................................................................................8

17 U.S.C. § 512 (The Online Copyright Infringement Liability Limitation Act,
part of the Digital Millenium Copyright Act)................................................................. *passim*

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 56 .............................................................................................................7

WIPO Copyright Treaty, Article 6, "Right of Distribution" .........................................................12

WIPO Copyright Treaty, Article 8, "Right of Communication to the Public" ........................12, 13

## INTRODUCTION

Cox Communications, Inc., and CoxCom, LLC ("Cox") are leading providers of cable and Internet service to consumers and businesses across the United States.  Confident in the vigor of their efforts to work with copyright holders in curbing copyright infringements, the integrity of their dealings with copyright holders and account holders, and their innocence with respect to the accusations Plaintiffs and Rightscorp have leveled against them, they ask the Court for complete summary judgment in their favor because no evidence supports any element of Plaintiffs' claims.

Rightscorp (OTC:RIHT) has called itself a "copyright monetization" business.  It enlisted Plaintiffs to sue Cox for two reasons:  (1) to prove Rightscorp's business model and (2) to support that model of delivering "found money" to companies like Plaintiffs by making bad-faith accusations of BitTorrent-based copyright infringement against Internet account holders with threats that the holders will lose Internet access unless they pay money to Rightscorp.

Plaintiff Round Hill Music LP is a private equity firm that manages investment partnerships.  Several of its partnerships own stakes in other companies that acquired portfolios of interests (often partial) of musical composition copyrights.  Round Hill enhances those investments by monetizing its funds' assets, as in this case.  ████████████████████

Plaintiff BMG Rights Management US (LLC) is a unit of the German Bertelsmann media empire.  A private company, Bertelsmann owned a major stake in Napster during the late 1990s. BMG claims to own copyrights in a small percentage of the musical composition copyrights at issue in this case; it claims to "manage" musical composition copyrights of other owners.

Rightscorp, however, is the central character in this story.  Rightscorp makes money by (1) threatening litigation against Internet account holders on behalf of other companies; (2) enticing account holders who receive its threats to pay low-dollar settlement amounts to resolve a first

claim of infringement; (3) harassing those persons for additional money through spam, robocalls, and fraudulent telephone calls; and (4) keeping half the money it collects.

Rightscorp has been Plaintiffs' agent for all relevant purposes here. Its principals are the key witnesses for Plaintiffs. It produced the overwhelming bulk of documents in the case. Plaintiffs entrusted Rightscorp with the making of litigation threats and demands against consumers, and securing settlements, but otherwise washed their hands of its actions and turned a blind eye. They made no effort to review the accuracy, validity, or propriety of Rightscorp's actions. Plaintiffs' only "due diligence" was to watch money flowing to them from Rightscorp.

Rightscorp claims its software and system can observe infringing music files on the computers of persons using the BitTorrent protocol and software for Internet file sharing. Its software automatically sends Internet service providers (ISPs) millions of accusations of copyright infringement relating to IP addresses that ISPs assign to their account holders. It demands the ISPs forward the accusatory notices to account holders. Rightscorp's business depends on reaching account holders to threaten them, even if the account holders themselves have not committed any infringements (as may occur for numerous reasons especially with open wireless networks).

Cox refused to accept or forward Rightscorp's notices to its customers, for a simple reason: those notices demanded that Cox's customers *pay money to Rightscorp to avoid losing their Internet service from Cox.* The notices also contained links that took customers to a web page at which the customers would surrender their personal information – information that Rightscorp exploited to barrage consumers with spam and robocalls – without safeguards against abuse. The notices suggested that Cox was abetting Rightscorp's scheme. In fact, Rightscorp had offered Cox a cut of the proceeds if it had joined Rightscorp's scheme. Cox turned Rightscorp down.

Cox repeatedly told Rightscorp that, if Rightscorp would take the offensive language out of

the notices, Cox would accept, process, and forward the notices.  To Rightscorp, Cox politely

called the offensive language "settlement" language, while Cox employees candidly termed

Rightscorp's notices "extortion" and "blackmail."  Cox considered Rightscorp's notices as outside

the "spirit of the DMCA," the Digital Millennium Copyright Act, which provides mechanisms for

copyright claimants and service providers to work jointly against copyright infringements.

Rightscorp refused to change the notices because its revenue depended not on curbing

infringement but on threatening to cut off of consumers' Internet service.  Cox refused to accept

Rightscorp's notices and added Rightscorp to its spam blacklist when Rightscorp began flooding

Cox with improper notices.  This lawsuit stems from Rightscorp's refusal to alter improper notices.

Rightscorp's practices were not just shady: they were also shoddy.  Rightscorp's notices

were false; its process, unreliable.  Rightscorp personnel admitted ███████████████████

███████████████████████████████████████.  Its personnel also admitted

Rightscorp did not know whether Cox account holders had actually committed infringements when

it sent notices with infringement accusations threatening a cutoff of Internet service.  That didn't

matter to Plaintiffs.  For them, getting money from scared consumers was good enough.

Plaintiffs have sued Cox for contributory copyright infringement and vicarious liability

arising from alleged direct infringements by Cox account holders or other users of the Cox

network.  Cox seeks summary judgment on five grounds:  (1) there is no evidence of any relevant

actual direct infringement;  (2) there is no evidence of contributory infringement;  (3) there is no

evidence to show any type of relationship between Cox and actual infringers that justifies vicarious

liability;  (4) Plaintiffs have unclean hands;  and (5) Plaintiffs failed to mitigate their damages.[1]

---

[1] Cox also has protection under the safe harbor of section 512(a) of the Copyright Act, but that
provision merely limits *remedies* that apply to *infringers*.  Because there is no basis for Cox's
substantive liability, Cox need not address the safe harbor in this motion.

## STATEMENT OF UNDISPUTED FACTS

1.      Rightscorp acted as Plaintiffs' agent for copyright enforcement, interactions with recipients of notices of alleged infringement, and this litigation.  Dkt. 16 ¶¶ 21-23, 30, 34, 38-39; Declaration of Andrew P. Bridges ("Bridges Dec.") ¶ 4(b),(x),(z), Exs. 2, 15; ¶ 5(c)-(d), (j), Ex. 17; ¶ 6(a),(e), Ex. 21; Exs. 65-66.

2.      There is no evidence showing actual direct infringement of Plaintiffs' copyright interests in any work at issue by any Cox account holder or user on the Cox system or network. Bridges Dec. ¶ 4(i), Ex. 2; ¶ 6(k), Ex. 21; ¶ 8(g)-(i),(k), Ex. 29; ¶ 10(b), Ex. 36; ¶ 12, Ex. 42; *see also* Declaration of Christopher T. Rucinski ("Rucinski Dec.") ¶¶ 18, 20, 29.

3.      There is no evidence that any Cox user infringed Plaintiffs' copyright in any work at issue by reproducing any work in copies or phonorecords through the Cox system or network.

4.      There is no evidence of any distribution of any material object embodying any work at issue by any Cox account holder or user on the Cox system or network.  Bridges Dec. ¶ 5(i), Ex. 17; ¶ 7(a), Ex. 22; ¶ 13(g), Ex. 43; *see also* Rucinski Dec. ¶¶18, 20, 29.

5.      There is no evidence of distribution of any form of work by sale or other transfer of ownership, or by rental, lease, or lending by any Cox account holder or user of the Cox system or network.  Bridges Dec. ¶ 5(i), Ex. 17; ¶ 7(a), Ex. 22; ¶ 13(f), Ex. 43; ¶ 17(c), (i), Ex. 57.

6.      There is no evidence of any transmission of any work at issue from any Internet Protocol ("IP") address associated with a Cox account other than to Rightscorp.

7.      Rightscorp initiated all the transmissions to it and reproductions by it (downloads) of files pertaining to Plaintiffs' works from IP addresses associated with a Cox account.  Bridges Dec. ¶ 8(e), (n)-(o), Ex. 29; ¶ 13(f), Ex. 43; *see also* Rucinski Dec. ¶ 29.

8.      There is no evidence Cox intentionally induced or encouraged infringement of

Plaintiffs' copyrights by clear expression or other affirmative steps.  Bridges Decl. ¶ 5(l), Ex. 17.

9.      There is no evidence that Cox induced, caused, or materially contributed to any infringements of Plaintiffs' copyrights in any works at issue with actual, specific knowledge of those infringements.  Bridges Decl. ¶ 5(k), Ex. 17; ¶ 7(c), Ex. 22; ¶ 8(d), (f), (h)-(i), (k), Ex. 29.

10.     Rightscorp's notices, which it asked Cox to forward to Cox's account holders, threatened the account holders that they may lose Internet service unless they settled demands. Bridges Dec. ¶ 5(a)-(b), (d), (q), Exs. 17-19; ¶ 6(a), (q), Exs. 21, 21B; ¶ 10(d), Exs. 36, 38; *see also* Declaration of Randall J. Cadenhead ("Cadenhead Dec.") ¶ 22, Ex. 1.

11.     Cox informed Rightscorp it considered notices to Cox account holders with settlement demands improper and outside the spirit of the Digital Millennium Copyright Act. Cadenhead Dec. ¶¶ 19, 22-23, Exs. 2-7; Zabek Dec. ¶ 17, Ex. 5; ¶ 19, Ex. 7.

12.     Cox informed Rightscorp it would not accept notices that contained settlement language; it also informed Rightscorp that it *would* accept notices that omitted that language and were otherwise compliant with Cox's requirements for notices.  Bridges Dec. ¶ 13(l), Exs. 43, 46; Cadenhead Dec. ¶¶ 19, 23, 28, Exs. 2, 4-7; Zabek Dec. ¶ 17, Ex. 5; ¶ 19, Ex. 7.

13.     Rightscorp attempted to get Cox to suspend Internet service of account holders whom Rightscorp threatened until the account holders settled with Rightscorp.  Bridges Dec. ¶ 13(m), Exs. 43, 47; Cadenhead Dec. ¶¶ 26-27, Exs. 9-10.

14.     Rightscorp suggested it would offer Cox a share of revenues from settlements from Cox account holders if Cox would collaborate with Rightscorp by forwarding Rightscorp's notices.  Bridges Dec. ¶ 13(k), (n)-(o), Exs. 43, 45, 48; Cadenhead Dec. ¶¶ 26-27, Exs. 9-10.

15.     There is no evidence that a Cox representative ever accessed the Rightscorp ISP "dashboard."  Bridges Dec. ¶ 4(e), Ex. 2; ¶ 7(d), Ex. 22; ¶ 8(d), Ex. 29; ¶ 13(q), Ex. 43.

16.     When Rightscorp sent notices, Rightscorp did not know whether the holders of the Cox assigned IP addresses at times of the alleged infringements had actually committed the alleged infringements.  Bridges Dec. ¶ 8(h), (j)-(k), Ex. 29; ¶ 13(t), Ex. 43.

17.     A torrent payload may contain hundreds of files, including non-music files (e.g., image files, PDFs).  Bridges Dec. ¶ 8(b), (j), Ex. 29; *see* Rucinski Dec. ¶¶ 9, 10, 19, Ex. 8.

18.     A .torrent file contains "metadata" that BitTorrent applications use to contact the tracker of a swarm (and identify which peers are participating in that swarm) and to share pieces of that torrent payload with other peers in that swarm; a .torrent file does not itself contain material such as songs.  Bridges Dec. ¶ 13(b), Ex. 43; Rucinski Dec. ¶ 9.

19.     Rightscorp obtains .torrent files from websites, including aggregators like KickassTorrents, and it associates those .torrent files with torrent payloads that contain files embodying works that Rightscorp monitors; Rightscorp will commonly associate a .torrent file with multiple works that it monitors.  Bridges Ex. 55 at ¶ 50; Rucinski Dec. ¶ 15.

20.     Rightscorp's current software generates notices if a peer announces it is offering 10% or more of a payload, whether or not the portion corresponds to works Rightscorp monitors; upon detecting that a peer announces that it offers 10% or more of a payload, the software will generate one notification of claimed infringement for each work it has monitored within the complete payload without taking any step to verify the peer actually offered or transmitted each specific work.  Bridges Dec. ¶ 8(a), (f), Ex. 29; ¶ 15(e)-(g), Ex. 54; Rucinski Dec. ¶¶ 20, 21.

21.     When Rightscorp sent notices, it had not verified files by downloading them from the IP addresses associated with Cox account holders; it merely concluded that a computer at the IP address may have had sound recording files available for transmission upon request.  Bridges Dec. ¶¶ 15(b), (e), (f), Ex. 54;  Rucinski Dec. ¶¶ 17-23.

22.     There is no evidence that any court has ruled that any Cox account holder whom Plaintiffs accuse is a copyright infringer.  Bridges Decl. ¶¶22-23, Exs. 65, 66.

23.     Rightscorp's notices did not specify particular infringements: they alleged that someone associated with a particular IP address at a particular time had engaged in one or more of three possibilities:  a download, an upload, or an offer for upload.  Bridges Dec. ¶ 5(a)-(b), (r), Exs. 17-20; ¶ 6(q), Ex. 21B; ¶ 7(k), Exs. 22-24; ¶ 8(l)-(m), Exs. 29-34; ¶ 10(d), Exs. 36, 38.

24.     Rightscorp's notices typically identified the works allegedly infringed by giving a file name of a sound recording file and by title and recording artist of the sound recording.  *Id.*

25.     There is no evidence of any relationship, other than a normal vendor-customer relationship, between Cox and any person alleged to have committed infringements of plaintiffs' claimed copyrights in the works through the Cox system or network.

26.     There is no evidence that Cox has any direct financial interest in infringements of Plaintiffs' claimed copyrights by any person whom Plaintiffs allege to have committed the infringements through the Cox system or network.  Bridges Dec. ¶ 5(n), Ex. 17.

27.     There is no evidence that Cox has the right and ability to supervise and control alleged infringements of Plaintiffs' copyrights by persons over the Cox system or network.

28.     When Rightscorp downloaded files from IP addresses associated with Cox accounts for purposes of this case, the files contained sound recordings of performances of Plaintiffs' compositions.  Bridges Dec. ¶ 8(e), (n), (o), Ex. 29; Rucinski Dec. ¶¶ 18, 24-26.

29.     At the time Rightscorp downloaded sound recordings that Rightscorp associated with Plaintiffs' musical compositions at issue, it reproduced those sound recordings in copies or phonorecords.  Bridges Dec. ¶ 8(e), (n), (o), Ex. 29; Rucinski Dec. ¶¶ 18, 24-26.

30.     There is no evidence that Plaintiffs or Rightscorp made efforts to secure the

removal of, or the disabling of access to, files on any .torrent file aggregator.  Rucinski Dec. ¶ 15.

## ARGUMENT

A plaintiff must prove ownership of a valid copyright, a violation of a Section 106 right, and facts warranting vicarious liability or contributory infringement.  *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 375 (E.D. Va. 2011).

## I.   THERE IS NO EVIDENCE OF UNDERLYING DIRECT INFRINGEMENTS.

"Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party."  *Softech*, 761 F. Supp. at 375 (internal quotations omitted).  Copyright infringement occurs where an individual "violates any of the exclusive rights of the copyright owner."  17 U.S.C. § 501(a).  Under 17 U.S.C. §§ 106(1) and 106(3), respectively, copyright owners have the exclusive rights "to reproduce the copyrighted work in copies or phonorecords" and "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."

Direct infringement "requires *conduct* by a person who causes in some meaningful way an infringement."  *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (emphasis original).  This "element of volition or causation" does not exist "where a defendant's system is merely used to create a copy by a third party."  *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.* ("Netcom"), 907 F. Supp. 1361, 1370 (N.D. Cal. 1995).  Instead, direct infringement requires "actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner."  *CoStar*, 373 F.3d at 550 (citing *Netcom*, 907 F. Supp. at 1370).

### A.   There is No Evidence That Any Cox Account Holder Personally Committed Any Infringements Through a Cox Account.

Plaintiffs base their claims on alleged uploading, downloading, or "offers to upload" of

music files that contain sound recordings of performances of the musical compositions in which

they assert copyright rights.  They claim that alleged infringers on the Cox network used software

that communicates over the Internet using the BitTorrent protocol.  *See* Dkt. 16 at ¶¶ 2, 22.  But

Plaintiffs made no effort to determine whether Cox account holders personally committed any

infringements, and they cannot tie IP addresses to specific infringers.  *See* Bridges Dec. ¶ 2; 8(g)-

(i), (k), Ex. 29; 10(b), Ex. 36; 12, Ex. 42; 13(t), Ex. 43; Rucinski Dec. ¶ 20.  Plaintiffs wrongly

argue it is "not required for [them] to prove direct infringement."  Bridges. Dec. ¶ 3, Ex. 1.

     All Plaintiffs have is data that Rightscorp generated.  *See* Dkt. 16 at ¶¶ 2, 22.  Rightscorp

cannot identify infringers because its software detects only certain conditions at a particular IP

address.  Bridges Dec. ¶ 2; 8(g)-(i), (k), Ex. 29; 10(b), Ex. 36; 12, Ex. 42; 13(t), Ex. 43; Rucinski

Dec. ¶¶ 12, 17-21.  *See London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 178 (D. Mass.

2008) (it may not be possible to identify which of numerous users infringed).  "[T]hat a copyrighted

work was illegally downloaded from a certain IP address does not necessarily mean that the owner

of that IP address was the infringer."  *Malibu Media, LLC v. Does 1-5*, No. 12 CIV. 2950, 2012 WL

2001968, at *1 (S.D.N.Y. June 1, 2012).  The infringer might be "someone in the subscriber's

household, a visitor with her laptop, a neighbor, or someone parked on the street at any given

moment."  *VPR Internationale v. Does 1-1017*, No. 11-2068, 2011 WL 8179128, at *2 (C.D. Ill.

Apr. 29, 2011).  Rightscorp says "[t]he biggest reason for filesharing is caused by an unsecured

wireless network; anyone in a close radius can obtain access."  Bridges Dec. ¶ 10(c), Exs. 36, 37.

     Plaintiffs failed to verify whether Cox account holders had committed infringements

through subpoenas in "Doe" lawsuits and inspections of equipment.[2]  *Cf., e.g.*, *Hard Drive Prods.,

Inc. v. Does 1-30*, No. 2:11-cv-00345, 2011 WL 2634166 (E.D. Va. July 1, 2011); *London-Sire*

---

[2] Courts acknowledge "growing concern about unscrupulous tactics used by certain plaintiffs . . . to shake down the owners of specific IP addresses."  *Malibu Media*, 2012 WL 2001968, at *1.

*Records*, 542 F. Supp. 2d at 179-80.  They have only the inadequate "evidence" they began with:

Rightscorp's "notices of infringement."  Dkt. 264 at 6.  But those notices are mere allegations.

"[T]akedown notices themselves are not evidence of blatant infringement. . . ."  *Capitol Records,*

*Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 639 (S.D.N.Y. 2011).

>    **B.      There is No Evidence of Affirmative Conduct by Anyone Using Cox's Service
>            That Infringed Upon Plaintiffs' Rights.**

There is no evidence of any affirmative conduct by *any user* (not just account holders) of

Cox's services and thus Plaintiffs cannot satisfy the "element of volition or causation" for direct

infringement.  *See CoStar*, 373 F.3d at 558; *Netcom*, 907 F. Supp. at 1370.  Plaintiffs may point to

a declaration by one account holder that fails to provide any evidence of infringement using the

Cox network.  Bridges Dec. ¶ 19, Exs. 61, 62.  ███████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*

Plaintiffs have only some reproductions[3] by Rightscorp from transmissions that Rightscorp

initiated and obtained.  Rucinski Dec. ¶ 24-29.  Because there is no evidence anyone other than

Rightscorp took the initiative to make a particular transmission or reproduction, Plaintiffs cannot

show any Cox account holder or user directly infringed their reproduction rights.

>    **C.      Plaintiffs Cannot Invoke a Vague Concept of "Making Available" as a
>            Substitute for Section 106(3)'s Requirements.**

Plaintiffs have suggested they plan to rely on a vague conception of "making available,"

and on inferred "offers to upload," as violations of Section 106(3).  They seek to make bad law.

Section 106(3) places two key limitations on a copyright owner's exclusive right of

---

[3] Moreover, Rightscorp's process for sampling was unreliable.  Despite sending more than 2.5
million notices, *see* Dkt. 265 at 6, Rightscorp collected samples purportedly relating to roughly
100,000 of these notices.  Rucinski Dec. ¶ 27.  The samples that Rightscorp collected revealed
multiple errors in its software's detection process.  Rucinski Dec. ¶ 28, Exs. 18-23.

distribution to the public.  First, Section 106(3) expressly confines the right to the distribution of

certain objects, namely "copies or phonorecords."  At its core, "[t]he copyright holder's

distribution right is the right to distribute *copies*."  *Nat'l Car Rental Sys., Inc. v. Computer Assocs.

Int'l, Inc.*, 991 F.2d 426, 430 (8th Cir. 1993) (emphasis in original).  The Copyright Act, in the

definitions of Section 101, defines both "copies" and "phonorecords" as "material objects."  Some

Section 106 rights lack the "copies," or material objects, limitation.  *See* 17 U.S.C. §§ 106(4), (6).

Second, Section 106(3) specifies the transactions to which the distribution right applies:

"The scope of the term distribution is only defined within § 106(3) itself, as a 'sale or other transfer

of ownership' or a 'rental, lease, or lending' of a copy of the work."[4] *Atlantic Recording Corp. v.

Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008).  Had Congress wished to include "offers" for

those transactions within the scope of Section 106(3), it could have done so.[5]  Section 106(3)

makes clear that Congress intended not to include unconsummated transactions.

Plaintiff cannot satisfy either element of a section 106(3) violation.  There is no evidence

that any Cox user distributed any material object to the public.  Bridges Dec. ¶ 5(i), Ex. 17; ¶ 7(a),

Ex. 22; ¶ 13(g), Ex. 43.  Nor is there any evidence that any Cox account holder or user sold,

transferred ownership of, rented, leased, or lent *anything*.  Bridges Dec. at ¶ 5(i), Ex. 17; ¶ 7(a), Ex.

22; ¶ 13(f), Ex. 43; ¶ 17(c), (i), Ex. 57.  Plaintiffs urge this Court to ignore both Section 106(3)'s

express limitations, replacing statutory requirements with a standardless notion of "making

available" and advancing a construction of Section 106(3) where infringement turns on whether

Rightscorp's software *observes* a mere "offer [to] upload copyrighted content."  *See* Bridges Dec. ¶

8(a), (j), Ex. 29; ¶ 13(p), Exs. 43, 49; ¶ 15(b), (e)-(f), Ex. 54; Rucinski Dec. ¶¶ 17-23, Exs. 9-11;

---

[4] Every transaction requires a consummated "transfer" of a copy or phonorecord. *Obolensky v.
G.P. Putnam's Sons*, 628 F.Supp. 1552, 1555 (S.D.N.Y. 1986), *aff'd* 795 F.2d 1005 (2d Cir. 1986).
[5] Other provisions of the Copyright Act do exactly that.  For instance, the definition of
"publication" in Section 101 distinguishes between "distribution" and "offering to distribute."

Rucinski Dec. ¶¶ 17-23, Exs. 9-11.  Plaintiffs argue they may multiply claims not by counting transactions but by increasing the rate of observation of a status.  *Id.*  That approach is like opening a refrigerator 100 times, seeing the same egg carton each time (without looking inside it), and then claiming that it had detected 100 dozen eggs.  The Copyright Act requires much more.

### 1.     No Interpretation of the 1996 WIPO Copyright Treaty Justifies Distortion of the Statutory Text of 106(3).

Defendants expect Plaintiffs to urge expansion of the Section 106(3) right to match their distorted view of the WIPO Copyright Treaty (WCT).  The WCT calls for protection of two different rights that it defines with "making available" language.  *See* Bridges Dec. ¶ 17(a), Ex. 58 at Arts. 6, 8.  Those wanting to expand U.S. law distort the treaty as supporting an expansive "making available" right and then argue that Section 106(3) must embrace the full vagueness of "making available" in order to comply with treaty obligations.  *See, e.g.*, *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1226 (D. Minn. 2008).  The argument is wrong.  First, the WCT is not self-executing and "lack[s] any binding legal authority separate from [its] implementation through the Copyright Act."  *Id.*  Second, Section 106 already recognizes the distinct protections of Articles 6 and 8 of the WCT in multiple exclusive rights, without needing to distort Section 106(3) to embrace a nebulous conception of "making available" to correspond to both articles.

Article 6(a) of the WCT, "Right of Distribution," has the same basic contours as Section 106(3):  authors "enjoy the exclusive right of authorizing the making available to the public of the *original and copies* of their works *through sale or other transfer of ownership*."  Bridges Dec. ¶ 17(a), Ex. 58 at Art. 6 (emphases added).  The Agreed Statement to the WCT also states that Article 6's use of "original and copies" "refer[s] exclusively to fixed copies that can be put into circulation as tangible objects."  Bridges Dec. ¶ 17(a), Ex. 58 at Agreed Statement to Arts. 6 & 7.

Article 8 of the WCT, "Right of Communication to the Public," also has a "making

available" provision:  authors shall "enjoy the exclusive right of authorizing any communication to the public of their works . . . including the making available to the public of their works. . . " Bridges Dec. ¶ 17(a), Ex. 58 at Art. 8.  The public display and public performance rights of Sections 106(4), (5), and (6) correspond to that Article.  *Cf.* 17 U.S.C. §§ 106(4)-(6).  Because the "making available" concept finds an adequate home in the U.S. Copyright Act, in four distinct subsections of Section 106, Section 106(3) need not expand in order to accommodate the treaty.

### 2.     Most Courts Reject the Theory That a Vague "Making Available" of a Copyrighted Work Violates Section 106(3).

"[D]efendants cannot be liable for violating the . . . distribution right unless a 'distribution' actually occurred." *London-Sire Records*, 542 F. Supp. 2d at 169.  The "great weight of authority" agrees "[m]erely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution." *Atlantic Recording,* 554 F. Supp. 2d at 983; *accord Thomas*, 579 F. Supp. 2d at 1223-24; *Nat'l Car Rental*, 991 F.2d at 434.  This district has not considered "making available" in the file-sharing context.  The minority elsewhere cites *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997).

*Hotaling* turned on unique facts.  A library had made unauthorized copies of a work that it sent to branches. *Id.* at 201.  When a copyright holder complained, the library destroyed many of the copies. *Id.* at 201-202.  A potentially unauthorized copy remained in the library's collection, but the library did not keep any record of lending it. *Id.*  By the time copyright holders sued, the district court held the statute of limitations barred a claim for violation of the distribution right because there was no evidence of actual lending of the copy during the limitations period. *Id.* at 202.  On appeal, the Fourth Circuit reversed, ruling 2-1 that "a library distributes a published work . . . when it places an unauthorized copy of the work in its collection, includes the copy in its catalog or index system, and makes the copy available to the public." *Id.* at 201.  The conclusion

flowed from a concern that "[w]ere this not to be considered distribution within the meaning of §

106(3), a copyright holder would be prejudiced by a library that does not keep records of public

use, and the library would unjustly profit by its own omission." *Id.* at 203.

Hotaling did not announce any rule of general application, and the unique facts that led to

the *Hotaling* court's decision do not exist here.  In *Hotaling* there was no dispute that the defendant

actually created and distributed unauthorized *material objects,* "copies," embodying the work at

issue.  *See id.* at 201-202.  No such evidence exists here.  Bridges Dec. ¶ 5(i), Ex. 17; ¶ 7(a), Ex.

22; ¶ 13(g), Ex. 43; *see also* Rucinski Dec. ¶¶ 18, 20, 29.  Evidentiary concerns underpinning the

*Hotaling* decision are also missing here.  Whereas the defendant in *Hotaling* "did not record public

use" of the unauthorized copy, depriving plaintiffs of the ability to show actual instances of

lending, *see* 118 F.3d at 203, the Plaintiffs have been in a position to gather information about

alleged infringement, even if they chose not to.  *Hotaling* cannot justify Plaintiffs' failure to

investigate.   "[T]he pressing crush of voluminous infringing content that copyright holders face in

a digital age" in no way "excuse[s] a failure to comply with the procedures outlined by Congress."

*See Lenz v. Universal Music Corp.*, No. 13-16106, 2015 WL 5315388, at *1, *7 (9th Cir. Sept. 14,

2015).  While *Lenz* addressed *notifications* , this point applies forcefully to *proof of infringements.*

### 3.  Even Under Plaintiffs' Overbroad Theory, There is No Evidence That Any Cox Account Holder or User "Made Available" Works at Issue.

In any event, Plaintiffs cannot show Cox account holders or users "made available" their

works to the public..  Rightscorp's current software will generate a notice for *every* monitored song

supposedly in a torrent payload *if a user's BitTorrent client software (a "peer") indicates that it is*

*"offering" only ten percent of the overall torrent payload*.  Bridges Dec. ¶ 8(a), (f), Ex. 29; ¶ 15(b),

(d)-(g), Ex. 54; Rucinski Dec. ¶¶ 20-21.  That means that, for at least some of the "[m]ore than 2.5

million of [the] notice letters [that Plaintiffs maintain] relate to Plaintiffs' asserted, copyrighted

works in this case," *see* Dkt. 264 at 6, Rightscorp issues allegations of infringement even if a peer *does not possess specific allegedly infringing content. See id.*; *see also* Rucinski Dec. ¶¶ 30-31. The shoddiness of Rightscorp's system is no surprise.   Rightscorp makes money by scaring account holders and demanding payments, for which any legal advice to the consumers would be more expensive than the payments, whether or not the evidence it collects is accurate: the more notices it sends, the more money it makes.[6]  *See* Bridges Dec. ¶ 4(l), Ex. 2; ¶ 5(d), Ex. 17; ¶ 10(c), Exs. 36-37; ¶ 14(a), Ex. 53.  Plaintiffs did not validate Rightscorp's system and practices, even though Plaintiffs depend completely upon Rightscorp for their evidence of alleged infringements. *See* Bridges Dec. ¶ 4(b)-(g), (j)-(k), (x), Exs. 2, 4; ¶ 5(c), (e)-(g), (j), Ex. 17; ¶ 6(a)-(c), (f)-(g), Ex. 21; ¶ 7(r), Ex. 22.  Plaintiffs' representatives cared little whether Rightscorp targets, and collects payment, from consumers who are innocent.  *See* Bridges Dec. ¶ 4(g)-(h), (l), Ex.2; ¶ 5(d), (f), Ex. 17; ¶ 6(a), Ex. 21..  Neither Rightscorp nor Plaintiffs have an incentive to use an accurate system.

By any standard, Plaintiffs' evidence falls short of what Section 106(3) requires.  "The federal courts are not cogs in a plaintiff's copyright-enforcement business model," and this Court should not indulge "what is essentially an extortion scheme."  *See Malibu Media, LLC v. John Does 1 through 10*, No. 2:12-cv-03623-ODW, 2012 WL 5382304, at *4 (C.D. Cal. June 27, 2012).

## II.    THERE IS NO EVIDENCE THAT COX HAS COMMITTED CONTRIBUTORY INFRINGEMENT.

### A.    The Legal Standard for Contributory Infringement

A defendant "infringes contributorily by intentionally inducing or encouraging direct infringement" by a third party.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  *Grokster* requires "active steps . . . to encourage direct infringement such as advertising an infringing use or instructing how to engage in an infringing use, [which] show an

---

[6] ███████████████████████████████████████████████████████
████████████████████████████ Bridges Dec. ¶ 13(b), Ex. 43.

affirmative intent that the product be used to infringe . . ." *Id*. at 936.  *Grokster* clarified (1)

contributory liability requires intent to induce or encourage infringement and mere knowledge

that infringement may occur is not enough; and (2) where a product is capable of substantial non-

infringing uses, intent does not arise from knowledge the product is used for infringement.

*Grokster,* 545 U.S. at 933.  While some interpret *Grokster* as creating a distinct inducement

theory, the Court was clear: *Grokster* is the contributory standard.  545 U.S. at 936-37.

> **B.     There is No Evidence of Any Clear Expression or Affirmative Steps by Cox
> to Induce Copyright Infringements by Its Account Holders.**

*Grokster* holds that contributory liability arises where a defendant provides a product or

service "with the object of promoting its use to infringe copyrights, as shown by clear expression

or other affirmative acts to foster infringement." *Grokster*, 545 U.S. at 936-37, *accord, Columbia*

*Pictures Indus. Inc., v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013).  The *Grokster* defendants had

"clearly voiced the objective that recipients use it to download copyrighted works, and each took

active steps to encourage infringement." *Grokster*, 545 U.S. at 924.  A plaintiff must establish a

defendant "'communicated an inducing message to . . . users,' usually as an 'advertisement or

solicitation that broadcasts a message designed to stimulate others to commit violations.'" *Id*. at

937.  A court must find defendant knowingly takes steps that are substantially certain to result in

direct infringement." *Perfect 10, Inc., v. Amazon.com, Inc.,* 508 F.3d 1146, 1171 (9th Cir. 2007)

(applying *Grokster*).

Plaintiffs cannot establish that Cox took any active steps to foster infringement or

demonstrated an intent that its account holders engage in copyright infringement on its network.  In

fact, Mr. Gillis, Round Hill's corporate witness, testified that ███████████████████████

████████████████████████████████████████████████ Bridges Dec. ¶ 5(l), Ex.

17. ██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████  Bridges Dec. ¶7 (f), Ex. 22.  But these

are not Cox's "clear expression[s] or other affirmative steps to foster infringement."

To the contrary, the undisputed record reflects that Cox takes active steps to *discourage* copyright infringement.  Cox's Terms of Service and Acceptable Use Policy prohibit copyright infringement.  Declaration of Linda J. Trickey in Support of Defendants' Motion for Summary Judgment ("Trickey Dec.") ¶¶ 9-14, Exs. 2-5.  Cox's Graduated Response Procedure educates account holders how to curb the acts that leads to complaints.  Declaration of Jason Zabek in Support of Defendants' Motion for Summary Judgment ("Zabek Dec.") ¶¶ 8-10, 23-26, Ex.1 .  And Cox terminates, in appropriate circumstances, account holders who are repeatedly accused of infringement, following its Graduated Response Procedure.  Trickey Dec. ¶¶15-17.

Plaintiffs evidently intend to rely on an angry Cox employee's email exchange with personnel of another ISP regarding handling of Rightscorp's complaints, in which the employee wrote to another ISP "F the DMCA!!!."  But the employee was expressing frustration with both the volume of work his team faced and with Rightscorp's extortionate threats against Cox customers, not an intent to encourage infringement.  Zabek Dec. ¶ 27, Ex. 10.  His venting statements to another ISP, not customers, do not show an unlawful purpose by Cox to induce infringement.

**C.    Cox Did Not Materially Contribute to Infringements with Knowledge of Actual, Specific Infringements.**

Because their contributory infringement claim fails under *Grokster*, Plaintiffs may argue that an older formulation of contributory infringement should apply instead, namely that "one

---

[7] Plaintiffs claim that they and their agent provided Cox with access to an online dashboard that contained and summarized the notices Rightscorp tried to send to Cox in the form of a website that Plaintiffs invited Cox to access.  *See* Dkt. 16 ¶ 23.  Cox never accessed it.

who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2nd Cir. 1971); *see also Costar Grp. Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001) (applying *Gershwin*), *aff'd on other grounds* 373 F.3d 544 (4th Cir. 2004). While *Grokster* supplanted the earlier *Gershiwn* formulation, even under *Gershwin* Plaintiffs' claim fails as a matter of law.

## 1.    Cox Has No Knowledge of Actual, Specific Infringements.

The first element of a claim under the older formulation of contributory liability is "knowledge of the infringing activity." *CoStar*, 373 F.3d at 550 quoting *Gershwin*, 443 F.2d at 1162; *Netcom,* 907 F. Supp. at 1371. Plaintiffs' only evidence that Cox had knowledge of account holders' alleged infringements is that their agent provided Cox with notices and letters requesting that Cox terminate certain account holders. Dkt. 16 at ¶¶ 21, 27-28.



Bridges Dec. ¶ 4 (g), Ex.2; ¶ 5(k), Ex. 17. ▮▮▮▮▮▮▮ *Id.* at ¶ 7(c), Ex. 22. ▮▮▮▮▮▮▮ . *Id.* at ¶ 8(h), (j), Ex. 29; ¶13(t), Ex. 43. The expert who analyzed Rightscorp's software agrees. *See* Rucinski Dec. ¶¶ 18, 21, 29, Ex. 6. Even if Cox had received the automated notices (it did not), Cox could not have obtained knowledge ▮▮▮▮▮▮▮ .

Additionally, Plaintiffs' notices of claimed infringement were fatally deficient in at least

three ways and could not have conveyed actual knowledge of actual infringements.  *See CoStar*, 164 F. Supp. 2d at 696 (a bare claim of infringement does not necessarily give rise to knowledge of an infringement).  First, ████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████   Plaintiffs do not assert claims of infringement of sound recording copyrights in this suit.  Dkt. 16 at ¶ 2, 14; Bridges Dec. ¶ 4(a), Ex.2; ¶ 7(e), Ex. 22.  Second, Rightscorp's notices did not specify the infringing conduct.  Instead they identified three possibilities by saying that someone associated with a particular IP address had engaged in one or more of three possible acts: "upload, download or offer for upload copyrighted content…", one of which (a mere offer to upload) is not an infringement.  Bridges Dec. ¶ 4(a) Ex. 2; ¶ 5(b), Ex. 17, 19; ¶ 10(d), Ex. 36, 38.  Third, Rightscorp's "repeat infringer" letters relied on a flawed methodology that counted mere *observations* by Rightscorp of limited data available from the peer's BitTorrent software program, not infringements by a Cox account holder: opening a refrigerator 100 times to see the same egg carton (without looking inside the carton), does not mean that there are 100 dozen eggs in the refrigerator, or show which eggs are present.  *See* Rucinski Dec. ¶¶ 7, 21-23, Exs.2-3, 9-11.

Even apart from these deficiencies, Rightscorp's notices do not establish Cox's actual knowledge of any alleged infringement because notices are merely allegations of infringement, the notices may contain incorrect factual information, and Cox is not in a position to validate facts and legal issues pertaining to a given claim of infringement.  There is no evidence that any of Cox's account holders has been adjudged an infringer of any asserted work or that Cox otherwise has actual knowledge of specific infringements.  Plaintiffs' contributory infringement claim fails as a matter of law.

**2.      Plaintiffs Cannot Show "Willful Blindness" as an End-Run Around Cox's Lack of Actual Knowledge of Specific Infringements.**

Plaintiffs fixate on Cox's decision to blacklist Rightscorp's extortionate notices as evidence that Cox was willfully blind to copyright infringement on its network.  Even applying this alternative theory, however, there is no evidence that Cox made its decision to blacklist Rightscorp with the intent to shield itself from knowledge of infringements on its network.  In *Aimster*, the Seventh Circuit held that "a contributory infringer does not obtain immunity by using encryption to shield itself from actual knowledge of the unlawful purposes for which the service is being used." *In re Aimster Copyright Litig.*, 252 F. Supp. 334 F.3d at 651-52 (7th Cir. 2003).  To establish willful blindness for purposes of contributory copyright infringement, a plaintiff must establish a defendant's intent to avoid knowledge of the infringing acts.  *Id.*, citing *United States v. Diaz*, 864 F.2d 544, 550-51 (7th Cir. 1988) (drug dealer could not insulate himself from knowledge of the transaction he arranged simply by absenting himself from the scene of the actual delivery).

Rather than turning a blind eye to infringements, Cox has a strong track record of working with copyright complainants to assist them in submitting proper notices of claimed infringement upon which Cox can act expeditiously.  Zabek Dec. ¶¶11-14, Exs. 1-3; Cadenhead Dec. ¶¶ 13-17, 19-21; Trickey Dec. ¶ 18-21.  For example, in 2010 the enforcement agent Copyright Enforcement Group, which also went under the name CEG-TEK, sent Cox notices that included improper language like that of Rightscorp.  On instruction of Cox's in-house legal expert, Mr. Cadenhead, the Safety Team informed CEG-TEK that Cox would not process its notices but that, if CEG-TEK changed the notices to remove the offensive language, Cox would do so.  After negotiations, CEG-TEK fixed the notices and Cox began processing its notices again.  Cadenhead ¶ 20.  In late 2013, CEG-TEK reintroduced improper language, and again Cox halted the processing of its notices explaining that the offensive language was the reason.  CEG-TEK again cured the problem and

20

Cox started processing CEG-TEK notices again.  Trickey Dec. ¶¶ 18-21.  Cox forwards hundreds

of thousands of notices to account holders per year, and it works with claimants to ensure Cox can

process and forward their notices equitably and expeditiously.  Zabek Dec. ¶ 13, Ex. 2.  Cox works

hard to educate account holders how to curb activities that are the subject of the notices.  Zabek

Dec.¶¶ 23-26.  Cox suspends, and in appropriate circumstances, terminates, account holders

accused of multiple infringements.  Trickey Dec.¶¶ 15-17; Zabek Dec. ¶¶ 8-9, 26, Ex. 1.

Cox's treatment of Rightscorp's extortionate notices was proper and does not constitute

evidence that Cox intends to hide from actual knowledge of infringement.  In fact, Cox repeatedly

offered to work with Rightscorp, asked it to remedy its improper notices, and stated on multiple

occasions that it would accept and forward proper notices.  Cadenhead Dec.¶ 22-23, Exs. 1, 2-7;

Zabek Dec. ¶¶ 15-17, 19, Exs. 4, 5, 7.  When Rightscorp refused to work with Cox and Cox

rejected Rightscorp's invitation to its extortion scheme, Rightscorp retaliated by inundating Cox

with thousands of improper notices that burdened Cox's systems and hampered its ability to

operate. Zabek Dec.¶¶ 15-22.  The reason Cox blacklisted Rightscorp was the same as in every

other instance it has blacklisted a notice sender: the presence of improper language demanding a

monetary payment from account holders and threatening loss of Internet service if the account

holder failed to comply.  Cadenhead Dec. ¶¶ 24-28, Exs. 1-4, 6-7, 9-10; Trickey Dec. ¶¶18-21.

There is thus no evidence that Cox blacklisted Rightscorp to "shield itself from actual knowledge

of the unlawful purposes for which the service is being used."  *Aimster*, 334 F.3d at 650-51.

## III.     NO EVIDENCE SUPPORTS COX'S VICARIOUS LIABILITY.

### A.     The Legal Standard for Vicarious Liability for Copyright Infringement

"Vicarious liability is imposed in virtually all areas of the law . . . ."  *Sony Corp. of Am. v.*

*Universal City Studios, Inc.,* 464 U.S. 417, 435 (1984).  The seminal case on vicarious liability in

the context of copyright law is *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963), which applied the traditional standard that rests on agency principles of respondeat superior. *Shapiro* involved a claim against a store that outsourced operation of its record department to a concessionaire, which made and sold "bootleg" records.

*Shapiro* began by acknowledging that "the normal agency rule of respondeat superior applies to copyright infringement by a *servant* within the scope of his employment." *Id.* at 308. Observing that other relationships with the hallmarks of a respondeat superior relationship may deserve the same treatment, the court went on to identify characteristics of a relationship that made it enough like an employer-employee relationship to justify imposing vicarious liability. *See id.* The court first took note of cases involving a landlord-tenant relationship, which did not entail vicarious liability. *Id.* Contrasting the landlord-tenant relationship, the court looked to dance hall cases, concluding that the case before it and the dance hall cases landed "closer on the spectrum to the employer-employee model than to the landlord-tenant model" and held the store owner vicariously liable. *Id.* The court reasoned that, based on the store's retention of ultimate supervisory rights over the concessionaire and direct financial interest in the infringement in the commission it deducted from record sales, as well as other factors, the store owner's "relationship to its infringing licensee, as well as its strong concern for the financial success of the phonograph record concession, renders it liable for the unauthorized sales of the 'bootleg' records. *Id.* at 308.

In reaching that conclusion *Shapiro* articulated the seminal standard for vicarious liability, holding liability to be appropriate "when the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials." *Shapiro*, 316 F.2d at 307. Liability therefore rests on proof of a particular kind of relationship.

Indeed, for vicarious liability "the parties' paths must cross on a daily basis, and the

character of this intersection must be such that the party against whom liability is sought is in a position to control the personnel and activities responsible for the direct infringement." *Banff Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1109 (S.D.N.Y. 1994) (analyzing *Shapiro*).  In the context of a parent-subsidiary relationship, courts have required not just a formal business relationship, but a "*substantial* and *continuing* connection between the two [parties] with respect to the infringing acts." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 43 F. Supp. 3d 644, 663 (E.D. Va. 2014) (emphasis added).  Vicarious liability also extends to members of partnerships. *See*, *e.g. Little Mole Music v. Spike Inv.*, 720 F. Supp. 751, 755-56 (W.D. Mo. 1989) (partner jukebox managers vicariously liable for infringement).

Plaintiffs cannot establish the type of special relationship that justifies vicarious liability. Plaintiffs must prove both that (a) Cox has the right and ability to supervise and control the infringements; and (b) Cox has a direct financial interest in the direct infringements.  *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002) (applying *Shapiro*)*; EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 507 (E.D. Va. 2009); *Luvdarts, LLC v. AT&T Mobility*, LLC, 710 F.3d 1068, 1071 (9th Cir. 2013); *Amazon.com*, 508 F.3d at 1173.  Plaintiffs must show more than a vendor-customer relationship where "control" consists only of dropping the customer.  *See Perfect 10, Inc. v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 805 (9th Cir. 2007).

### B.   Plaintiffs Cannot Establish That Cox Controls or Supervises Alleged Infringements of Their Copyrights on the Cox Network.

The Fourth Circuit has articulated the control element as the defendant's "right and ability to supervise the infringing activity." *Nelson-Salabes*, 284 F.3d at 513 (citing *Shapiro* and other cases).  To be liable, a service provider must presently, not hypothetically, have the ability to supervise the direct infringements.  *Luvdarts*, 710 F.3d at 1072.  Thus, "control" requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."

*Amazon*, 508 F.3d at 1173; *see Banff*, 869 F. Supp. at 1109.   A practical inability to supervise infringements "is fatal to a claim of vicarious liability."  *See Luvdarts*, 710 F.3d at 1071-72.

There is no evidence that a principal-agent relationship exists between Cox and alleged direct infringers sufficient to trigger vicarious liability.  Cox's relationship to its ISP customers carries no "presumption that the acts of the one are intimately associated with the other."  *See Banff*, 869 F. Supp. at 1109; *see* Bridges Dec. ¶ 5(m), Ex. 17; ¶ 7(h), Ex. 22; ¶¶ 18, Exs. 2, 59-60.

More generally, there is no evidence that Cox supervises or controls the individual activities of its account holders or users on the Cox network and in fact, Cox does not.  Plaintiffs may speculate about (impractical) technological measures Cox could use to spy on its customers.  But the Court must evaluate Cox's ability to supervise and control in view of its system's "current architecture."  *See Luvdarts*, 710 F.3d at 1071 (affirming dismissal of a vicarious liability claim).  Plaintiffs' own expert conceded that, short of disabling Internet service, Cox cannot control account holders' computers.  *See* Bridges Dec. ¶ 16(a), Ex. 56.  Cox does not "throttle" (meaning slow down), or otherwise shape account holders' network traffic.  Trickey Dec. ¶ 8, something Plaintiffs' own expert admitted would be inappropriate.  Bridges Dec. ¶ 16(b), Ex. 56.  Nor does Cox monitor whether a given account holder operates an open wireless network.  Declaration of Matthew Carothers in Support of Defendants' Motion for Summary Judgment ("Carothers Dec.") ¶ 5.  Cox does not identify websites account holders or users visit; what they search for; what they transmit or receive; or the name, content, or size of a file that an account holder or user receives, including files transmitted or received through the BitTorrent protocol.  *Id.*  Further supervision by Cox would be improper in view of Cox's policies against invasive monitoring.  *See* Trickey Dec. ¶ 7-8, Ex. 1.

Plaintiffs' claim therefore rests on the theory that Cox supervises the individual infringements on its network *only* by virtue of its agreements with account holders and by its ability

to "cut the service.  That's it."  Bridges Dec. ¶ 16(a), Ex. 56.  These do not suffice.  Cox has no

ability to "*stop* [alleged] direct infringement" of Plaintiffs' works.  *See Amazon*, 508 F.3d at 1173-74

(emphasis added).  Cox's ability to shut off an account holder's service is not an "ability to directly

*control that [alleged infringing] activity*."  *Visa*, 494 F.3d at 803 (emphasis added).  And a

provider's "literal power to 'stop or limit' the infringement" through termination of service does not

alone establish "sufficient control over the actual infringing activity for vicarious liability to attach."

*Visa*, 494 F.3d at 806.  Because there is no evidence regarding Cox's present practical ability to

supervise and control infringements, Plaintiffs' vicarious liability claim fails.

### C.      Cox Has No Direct Financial Interest in Exploitation of Plaintiffs' Works.

Plaintiffs must also show that Cox has "an obvious and direct financial interest in the

exploitation of copyrighted materials."  *Shapiro*, 316 F.2d at 307; *see also Nelson-Salabes*, 284

F.3d at 513; *EMI April Music* 618 F. Supp. 2d at 507; *Amazon*, 508 F.3d at 1173.  Some courts

have alternatively framed this requirement as "a direct financial benefit" where "the availability of

infringing material acts as a 'draw' for customers."  *Ellison v. Robertson*, 357 F.3d 1072, 1078-79

(9th Cir. 2004) (internal quotations and citations omitted).  Plaintiffs must demonstrate that Cox

has "a financial interest *specifically* in the infringing activity."  *Humphreys*, 43 F. Supp. 3d at 663

(emphasis in original).  Plaintiffs must prove "a direct causal link between the infringing activities

*at issue in this case* and a direct financial benefit to" Cox.  *Perfect 10, Inc. v. Giganews, Inc.*, No.

CV 11-07098-AB, 2014 WL 8628031, at *4 (C.D. Cal. Nov. 14, 2014) (emphasis in original).

There is no evidence of a direct financial interest of Cox in infringement of Plaintiffs'

works.  Round Hill conceded that ███████████████████████████████████

███████████████████████.  Bridges Dec. ¶ 5(n), Ex. 17.  Similarly, BMG points only to

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████   Bridges Dec. ¶ 7(i)-(i), Ex. 22.  Cox's fee does not depend on, or increase because

of, infringements.  *See* Trickey Dec. ¶ 14.  Plaintiffs cannot rely on this fee as evidence of a *direct*

financial interest because the fee does not depend on the nature of the actions on Cox's network

and because there is no evidence that infringement on Cox's network enhances the value of Cox's

services to account holders or attracts new account holders.  *See Netcom*, 907 F. Supp. at 1377.

Nor is there any evidence that infringement acts as a "draw" to Cox's services for any

specific account holder.  To begin with, Plaintiffs' survey expert, Dr. Stephen Nowlis, failed to

present survey results regarding use of Cox services specifically for infringements of copyright, so

his survey is inapposite.  Plaintiffs have only *one* piece of "evidence" to offer in hopes of

establishing that infringement is a "draw" to Cox's services: they obtained a settlement and

declaration from one Cox account holder.  Bridges Dec. ¶ 18, Exs. 2, 59-60; ¶ 19, Exs. 61-62.

That lone account holder's documents show nothing: ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████   *Id*. ¶ 19(a)(c)(e), Exs. 61-62 (emphasis added).

Instead, Rightscorp ███████████████████████████████████

████████████████   In a presentation ██████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████   Cadenhead Dec. ¶

26, Ex. 9 at -213548, -213563 (emphasis added); *see also* Bridges Dec. ¶ 13(k)(o), Exs. 43, 45.

Rightscorp ████████████████████████████████████████

█████  *Id.* at ¶ 13(k), Ex. 45.  Piracy is a financial burden, not a benefit, to Cox.

Because there is no evidence to support both elements of vicarious liability and there is no evidence of a special relationship between Cox and alleged infringers, the Court should grant summary judgment against Plaintiffs on their vicarious liability claim.

## IV.   PLAINTIFFS' UNCLEAN HANDS BAR THEIR CLAIMS.

The unclean hands doctrine bars claims where there is "inequitable or wrongful conduct" by a plaintiff regarding the transaction or subject matter at issue. *WorldCom, Inc. v. Boyne,* 68 Fed. App'x 447, 451 (4th Cir. 2003).  Unclean hands may rest upon fraud, deceit, unconscionability, bad faith, or copyright infringement that is caused in part by the plaintiff or its agent. *ABC, Inc. v. PrimeTime 24, Joint Venture*, 17 F. Supp. 2d 478, 484 (M.D.N.C. 1998).

Courts have upheld the defense where a plaintiff seeks to profit from infringement or refuses to assist in addressing infringement.  In *Tempo Music, Inc. v. Myers*, the Fourth Circuit held the doctrine barred a plaintiff from recovering damages because the plaintiff's agent refused to assist defendant in avoiding infringement by identifying works defendant was allegedly infringing. *Tempo Music*, *Inc.,* 407 F.2d 503, 505-07 (4th Cir 1969).  *Cf. Malibu Media, LLC v. Guastaferro*, No. 1:14-cv-01544, 2015 WL 4603065, *3-4 (E.D. Va. July 28, 2015).

Here, Plaintiffs' total reliance on their agent Rightscorp, whose business rests on extortion and falsehoods, gives Plaintiffs unclean hands and bars their claims for relief as a matter of law. Plaintiffs failed to supervise Rightscorp and cast a blind eye toward its extortionate scheme to profit from threats to cut off Internet service.  Rightscorp even tried to enlist Cox.  Rightscorp wanted Cox to participate in its scheme not merely by suspending accounts but also by reconnecting them upon Rightscorp's receipt of settlement payments.  Cox refused to participate. *See* Cadenhead Dec. ¶ 22-28, Exs. 1-10; Bridges Dec. ¶ 13(l), (o); Exs. 43, 46.  Rightscorp and

Plaintiffs seek retribution against Cox now.  Rightscorp's misconduct directly relates to Plaintiffs' claims, which rest on Rightscorp's notices and Cox's refusal to process or forward those notices.

### A.   Plaintiffs Embraced Rightscorp and Turned a Blind Eye to Its Misconduct.

Plaintiffs gave Rightscorp free rein, performed no good-faith review of Rightscorp's processes, ████████████████████████████████████████████████

████████████████████████████████ Bridges Dec. ¶ 4(y), Exs. 2, 14: ¶ 5(d), Ex. 17.

████████████████████████████████████████████████████

████████████████████████████. Bridges Dec. ¶¶ 4(m)(w), Exs. 2, 5-13.

Rightscorp provides its enforcement agents a standard phone script for scaring consumers into paying Rightscorp's demands, no matter what explanation consumers give for their not having committed infringements.  Bridges Dec. ¶ 6(j); ¶ 9(c), Ex. 37.  The script instructs enforcers to disregard protests to continue demanding payment.  When a consumer denies infringement, the phone script instructs the enforcer to state that the consumer must obtain a police report, and that the police may "take your device and hold it for ~5 days to investigate the matter."  *Id.*  Rightscorp targets elderly and disabled consumers who are incapable of committing the infringements and who vehemently deny wrongdoing.  Bridges Dec. ¶ 6(p), Exs.21, 21(a); ¶ 13(r)-(s), Exs. 43, 50-52.

██████████████████████████████████████████████

██████████████████ Keith Hauprich, BMG's deputy general counsel who supervised BMG's relationship with Rightscorp, and who should know better, testified that ██████████████████ ██████████████████████████████████. *Id.* ¶ 6(l), Ex. 21.

█████████████████████████████████████████████

██████████████████ *Id.* ¶7(q), Ex. 22, 28; ¶ 6(p), Exs.  21, 21(a). ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████        *Id.* ¶ 6(p), Ex. 21.

There is no wonder that consumers would protest that notices were inaccurate.  Review of

Rightscorp's software for automating notifications shows that it suffered from substantial errors

and faults.  Rucinski Dec. ¶¶17-21, Exs. 4-5, 6-8, 12.  Despite flaws in its process, Rightscorp

threatens consumers into "settlements" and seeks suspension of a consumer's Internet service

while payment is outstanding.  *See* Bridges Dec. ¶ 11(a), Exs. 40, 41; ¶13(n), Exs. 43, 48.

In many instances the notices were also fraudulent, where the notices ████████

███████████████████████████████████████████████████

██████████████████   *Compare* at ¶¶ 17(a)-(b), Exs. 18-19 *with id.* at ¶ 17(p) █████████

**B.    Trying to Catch Infringers, Rightscorp Itself Reproduced Thousands of
Sound Recordings Without Authorization of Their Copyright Owners.**

In its work for Plaintiffs Rightscorp downloaded files of thousands of *sound recordings*

over the BitTorrent protocol, evidently to create evidence of infringements over Cox's network.

*Id.* ¶¶ 8(e), (n), (o), Ex. 29.  But copyrights in sound recordings are separate from copyrights in

musical compositions.  █████████████████████████████████████████

████████████████████████   *Id.* ¶ 4(a); ¶ 7(b), Exs. 2, 22.  ██████████

████████████████   Rightscorp either committed massive infringements of the

sound recording copyrights or must have relied on the fair use doctrine.  If the latter, that fact is an

admission that activity over BitTorrent may constitute fair use, but there is no evidence that

Rightscorp considered the possibility of fair use in generating millions of notices of claimed

infringement.  Because fair use is *not* infringement, Rightscorp's notices contained fraudulent

misrepresentations about detections of infringement.  *See Lenz,* No. 2015 WL 5315388, at *1, *7.

## V.      PLAINTIFFS FAILED TO MITIGATE THEIR ALLEGED DAMAGES.

The essence of failure to mitigate is that "plaintiff's damage should reasonably have been avoided by the plaintiff . . . "  *Bossalina v. Lever Bros.*, No. 0086-02158, 1988 WL 60572, *2 (4th Cir. May 31, 1988).  *See also Malibu Media,* 2015 WL 4603065, at *5; *UMG Recordings, Inc. v. Escape Media Grp., Inc.,* No. 11 CIV. 8407, 2015 WL 1873098, at *8 (S.D.N.Y. Apr. 23, 2015).

### A.      Rightscorp's Refusal to Delete Extortionate Language Is the Source of the Dispute and Prevented Cox from Processing Plaintiffs' Notices.

Cox told Rightscorp it would process its notices *only* if Rightscorp removed language demanding payments.  Cadenhead Dec. ¶ 28, Exs. 2, 4, 6, 7.  Rightscorp refused.  *Id.* at ¶ 24.  Had Rightscorp removed references to payment demands, Cox would have processed its notices and Plaintiffs would have avoided the harms they now assert against Cox.  *Id.* at ¶ 28, Exs. 2, 4, 6, 7.

### B.      Plaintiffs Failed to Take Simple Steps Against Sources of Alleged Infringements Because They Relied on Those Sources to Generate Claims.

Rightscorp's software downloads and uses .torrent files available on the Internet as part of its process.  Rucinski Dec. ¶¶  7, 9, 12, 15.  Far from seeking removal through takedown notices, Rightscorp *uses* these .torrent files and *relies on their availability* on the Internet to set up its shakedown scheme.  *See* Rucinski Dec. ¶ 15, Exs. 4-5.  The failure to mitigate damages reduces or bars entirely Plaintiffs' claims.

## CONCLUSION

There are four independent grounds for this Court to grant summary judgment to Cox.  First, no evidence supports existence of underlying direct infringements on which Plaintiffs base their claims.  Second, no evidence supports claims of either contributory infringement or vicarious liability.  Third, evidence conclusively shows Plaintiffs have unclean hands and deserve no relief.  Fourth, evidence conclusively shows Plaintiffs failed to mitigate damages.  For any one of these reasons, and indeed for all four, the Court should grant summary judgment to Cox.

Respectfully submitted,

Dated:  September 28, 2015

/s/ Craig C. Reilly
Craig C. Reilly (VSB No. 20942)
111 Oronoco Street
Alexandria, VA  22314
Tel:  (703) 549-5354
Fax:  (703) 549-2604
Email:  craig.reilly.@ccreillylaw.com

*Counsel for Defendants*

*Of Counsel for Defendants*

Andrew P. Bridges (*pro hac vice*)
David L. Hayes (*pro hac vice*)
Jedediah Wakefield (*pro hac vice*)
Guinevere L. Jobson (*pro hac vice*)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel:  (415) 875-2300
Fax:  (415) 281-1350
Email:    abridges@fenwick.com
          dhayes@fenwick.com
          jwakefield@fenwick.com
          gjobson@fenwick.com

Brian D. Buckley (*pro hac vice*)
Fenwick & West LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101
Tel:  (206) 389-4510
Fax:  (206) 389-4511
Email:    bbuckley@fenwick.com

Armen N. Nercessian (*pro hac vice*)
Ronnie Solomon (*pro hac vice*)
Ciara Mittan (*pro hac vice*)
Fenwick & West LLP
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500
Fax:  (650) 938-5200
Email:    anercessian@fenwick.com
          rsolomon@fenwick.com
          cmittan@fenwick.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2015, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

/s/ Craig C. Reilly

Craig C. Reilly (VSB No. 20942)
111 Oronoco Street
Alexandria, VA  22314
Tel:  703-549-5354
Fax:  (703) 549-5355
Email:  craig.reilly.@ccreillylaw.com

*Counsel for Defendants*

32