UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  1:14-cv-1611(LOG/JFA) |
| COX COMMUNICATIONS, INC., COXCOM, LLC | ) ) ) | |
| Defendants. | ) ) | |

**BMG RIGHTS MANAGEMENT (US) LLC AND ROUND HILL MUSIC LP'S SUPPLEMENTAL BRIEFING REGARDING COX'S MOTION FOR EVIDENTIARY SANCTIONS BASED ON SPOLIATION OF RIGHTSCORP SOURCE CODE**

Pursuant to Order No. 291, Plaintiffs BMG Rights Management (US) LLC and Round Hill Music LP ("Plaintiffs") respectfully submit this Supplemental Briefing in Opposition to Cox's Motion for Evidentiary Sanctions Based on Spoliation of Rightscorp Source Code.

**I.      INTRODUCTION**

The Rightscorp System consists of three main modules: (1) Infringement Finder, which identifies ISPs' subscribers who make available and distribute copyrighted works (2) SampleIt2, which downloads a full copy of the infringed work from the subscriber and (3) Infringement Notices, which sends notices of infringement informing ISPs that their subscribers have infringed specified copyrights.

In 2013, Plaintiffs' then consulting expert, Ms. Frederiksen-Cross was asked to evaluate Rightscorp's system for detecting and sampling infringement.  To perform this task, she reviewed Rightscorp's Infringement Finder and SampleIt2 modules as they existed in 2013 to evaluate Rightscorp's process and methodology.  As explained in the accompanying declarations

1

of Ms. Frederiksen-Cross ("BFC Decl.") and Greg Boswell (Rightscorp's lead code developer) ("Boswell Decl."), the core functionality of these modules did not change during the relevant time period. Cox's expert agrees. Other than attorney argument, Cox has no evidence to suggest otherwise.

Cox's simplex argument is that because Rightscorp did not obtain a version control system for its business, the Court should dismiss Plaintiffs' case against Cox. The law does not support this position. And, even if the Court finds that the failure to obtain and implement a version control system resulted in an inability to document every change, whether relevant or not, any sanction should be limited. This is because Rightscorp did not have the requisite culpability, and Cox suffered no prejudice.

## II.     THE HEART OF THE RIGHTSCORP SYSTEM

### A.     The Heart of the Rightscorp System Is Infringement Finder and SampleIt2

The Infringement Finder module is the most important module of the Rightscorp System. Infringement Finder finds subscribers on an ISP network, such as Cox's network, who have uploaded or are offering to seed a full copy of copyrighted works. Rightscorp begins its infringement detection process by storing a list of its clients' copyrighted works in a database. The Rightscorp System searches for and ingests *.torrent files into the database that include its clients' copyrighted works. Each of the *.torrent files contains a unique hash value, which is used as a fingerprint. After the *.torrent files are verified (discussed below), using the unique hash value of the *.torrent files, the Rightscorp System contacts the torrent trackers to determine which peers are offering copyrighted works in the associated torrent and then contacts those peers to determine if the peer is offering the copyrighted works. Infringement Finder then collects certain information from that subscriber, including the IP address of the computer, the port of the computer, the date and time the file is being offered, and the file (infringing copy of

the copyrighted work) being offered. The Rightscorp system then assigns an infringement or an infraction ID to this data and stores the data in a database. As described, this is this core functionality of the Infringement Finder (herein after referred to as "Infringement Finder Core Functionality.") The Infringement Finder Core Functionality has not changed.

Using the data compiled by Infringement Finder, SampleIt2 is used to collect a complete copy of the copyrighted work being distributed by a subscriber and stores a copy of the copyrighted work on a server. This functionality is the "SampleIt2 Core Functionality." Rightscorp implemented SampleIt2 and collected full copies of the Plaintiffs' works in this case for seven months – between February 2014 and August 2014. During this time period, Rightscorp collected more than 700,000 infringing copies of Plaintiffs' works that were illegally distributed by Cox's subscribers. Boswell Decl., ¶ 9. The SampleIt2 Core Functionality has not changed.

### B. The Heart of the Rightscorp System Has Not Changed

As the Court is aware, Plaintiffs are seeking damages in this case from February 2012[1] through November 26, 2014. Throughout this time period, the Infringement Finder Core Functionality remained the same – it detected peers that were uploading and distributing Rightscorp's clients' copyrighted works in the *same way*. Boswell Decl., ¶ 7; BFC Decl., ¶ 7. Any changes to the Infringement Finder made between 2013 and 2015 did not relate to this core functionality but instead, related to improvements in the speed of the code, error tracking, and the removal of comments. Boswell Decl., ¶ 12; BFC Decl., ¶ 7.

For example, Rightscorp changed the IP address of a server because the IP address of the server changed. Boswell Decl., ¶ 12. Rightscorp added a new function in the 2015 code to improve performance by checking a local cache for the identity of the ISP rather than looking up

---

[1] Rightscorp first began sending infringement notices on behalf of Plaintiffs in February 2012.

the ISP for the IP address each time, as it did in 2013 and prior to that time. BFC Decl., ¶ 11. Rightscorp also removed and/or modified lines printed out in response to an error, which helps a programmer observe what the program is doing in the event of an error. *Id.* None of these changes affected the Infringement Finder Core Functionality. Rightscorp's Infringement Finder continued to detect peers that were uploading and distributing Rightscorp's clients' copyrighted works in the same way. Boswell Decl., ¶ 12; BFC Decl., ¶ 7.

The *only* even arguably relevant change to the Infringement Finder Core Functionality relates to the verification of the torrent files, when Rightscorp loads new works into its monitoring system. Ex. 1, Boswell Dep. Tr. at 468:14-16. Until early 2014, Rightscorp manually verified the torrent by listening to the songs in the torrent and verifying that their clients' works were contained in that torrent. On November 20, 2013, the verification process was automated using a third-party software program Audible Magic and later using both Audible Magic and AcoustID. Ex. 2, Boswell Dep. Tr. at 164:11-25; Ex. 5, Frederiksen report, ¶ 71.[2]

For SampleIt2, the relevant time period is from February 2014 to August 2014 because it was during this time period when Rightscorp collected over 700,000 full file samples that were distributed to the Internet world by Cox's subscribers. Boswell Decl., ¶ 9. Plaintiffs plan to use these hundreds of thousands of full file samples in support of their claims. As with Infringement Finder, Rightscorp did not change the core functionality of SampleIt2 from February 2014 through August 2014. Boswell Decl., ¶ 10. In fact, Rightscorp did not make any changes to SampleIt2 from February 2014 thought August 2014. *Id.* Additionally, the changes to the code between 2013 and 2015 relate to removing comments in the code and rearranging the order of

---

[2] Without material changes to Infringement Finder, Cox creates a red herring by focusing on a 10% bitfield module that was implemented after the complaint was filed and has no bearing on the issues in this case.

the code to streamline processing.  Boswell Decl., ¶ 12; BFC Decl., ¶ 7.  Rightscorp also changed the IP address of a server, which did not impact the processing of infringements.  BFC Decl., ¶ 12.  SampleIt2 continued to download full file samples of songs distributed by Cox subscribers on the BitTorrent network in the same way.[3]

Tellingly, Cox has not cited to a single piece of record evidence that any change to the code affected the core functionality of the Rightscorp system.  It merely resorts to conjecture and argument. There simply is no material change to the Rightscorp system in the relevant time period. Therefore, no sanctions should be issued.  *See, Treppel v. Biovail Corp.*, 249 F.R.D. 111, 123 (S.D.N.Y 2008) (denying sanctions because relevance was not proven.)

### III. NO SANCTIONS ARE WARRANTED, AND IF SANCTIONS ARE IMPOSED THEY SHOULD BE MINIMAL AND CONGRUENT WITH THE ABSENCE OF MATERIALITY AND BAD INTENT

#### A. Any Choice of Sanctions Should Proportional Based on Materiality, Culpability and Prejudice

In cases in which spoliation occurs before or during litigation, courts look for potential remedies in the form of discovery or evidentiary sanctions.  Notably, discovery sanctions are not punitive in nature, but rather are used to ensure compliance with discovery. *Robinson v. Transamerica Ins. Co.,* 368 F.2d 37, 39 (10th Cir. 1966).  "[T]he choice of sanctions should be guided by the "'concept of proportionality' between offense and sanction." *U.S. v. Philip Morris U.S.A. Inc.*, 327 F. Supp. 2d 21, 25 (D.D.C. 2004) (citing *Shea v. Donohoe Construction Co., Inc.*, 795 F.2d 1071, 1077 (D.C. Cir. 1986).  Several factors may be used to ensure that, if warranted, the chosen remedy is fair and equitable.  These include, for example,

---

[3] Rightscorp's system also includes an Infringement Notice module, which looks up the infringement data collected by the Infringement Finder module and sends an infringement notice to an ISP.  This module's functionally has not changed since 2011.  Boswell Decl., ¶¶ 12, 13.  The only change to this module is to the text of the notices that were sent.  Ex. 2, Boswell Tr. at 212:8-213:6. In all events, Cox has the notices and is aware of any changes.

> (1) the culpability of the spoliating party; (2) the prejudice to the non-offending party; (3) the degree of interference with the judicial process; (4) whether lesser sanctions will remedy any harm and deter future acts of spoliation; (5) whether evidence has been irretrievably lost; (6) whether there was an obligation to preserve the evidence; (7) the practical importance of the evidence; (8) the potential for abuse; (9) whether the evidence is relevant; and (10) whether sanctions will unfairly punish a party for misconduct by the attorney."

*See generally Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 534 (D. Md. 2010).

"The two most important factors in determining whether an adverse inference charge is justified are the culpability of the spoliator and the prejudice accruing to the nonspoliator." *Shaffer v. RWP Group, Inc.*, 169 F.R.D. 19, 25 (E.D.N.Y. 1996). None of these factors, let alone the two primary factors, warrant any sanction, let alone the level of sanction Cox proposes.[4]

### 1. Rightscorp's Failure to Use a Revision Control System Was Not Done in Bad Faith

Cox bases its sanctions motions solely on the fact that Rightscorp does not have a revision control system. But Cox cannot show that Rightscorp acted with the culpability necessary to justify the harsh sanctions it seeks. *See Digital Vending Servs. Int'l v. Univ. of Phoenix, Inc.*, 2013 U.S. Dist. LEXIS 145159, at *20 (E.D. Va. Oct. 3, 2013) (noting that while the Fourth Circuit recognizes negligence as a culpable state of mind, negligence cannot support significant sanctions). Rightscorp's decision not to obtain and utilize a revision control system is justified and logical; it was not done in bad faith to "hide the ball" or for some other nefarious purpose. As Greg Boswell, the lead and sole developer at Rightscorp, testified, he uses an "agile model of development where code is developed at a specific time for a specific purpose with a

---

[4] Cox maintains that the Court should 1) dismiss the case, 2) preclude the Plaintiffs from introducing any evidence of the nature of how Rightscorp's system functioned prior to July 2015, the date of the last production of source code, or 3) grant an adverse inference that the 10% bitfield code was implemented from the launch of Rightscorp's system, even though this was implemented outside the relevant period. *See* Ex. 4, Sept. 18, 2015 Hearing Tr. at 49:16-51:3. The sanctions requested by Cox are draconian, excessive, and unsupported in fact or law.

short timeframe for look ahead…[a]nd the developer develops this code as fast and as efficiently as possible to make it work as quickly as you can, and iterates through the development, and code that's [] no longer needed or used is thrown away." Ex. 1, Boswell Tr. at 340:3-14. Rightscorp did not actively change its code to delete relevant evidence; it changed the code to more efficiently run its business and in doing so, followed the normal programming methods it had used since 2011.

Under Federal Rule of Civil Procedure 37(e), on which Cox brings its motion, "absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."  Rule 37(e) coupled with Cox's inability to prove that Rightscorp intentionally – or even negligently – destroyed relevant source code, demonstrates that sanctions are not warranted in this case.  *See Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) (holding that an adverse inference requires intentional conduct, not merely negligent loss or destruction of evidence) (citing *Vodusek*, 71 F.3d at 156).

### 2. Cox Has Not Been Prejudiced Because It Could Have and Should Have Explored All Code Changes with the Sole Programmer

Cox has suffered no prejudice because Cox has had a level evidentiary playing field. Each party has access to the same set of historic source code and the same set of current source code.  Each party has had an opportunity to explore the development and function – both historic and current – of Rightscorp's system with the developer who created and maintains that system. And each party has had the opportunity to work with expert witnesses to evaluate that Rightscorp System, then to offer opinions on its function and reliability.[5]

---

[5] In contrast to cases like *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995), where one party had access to key evidence that the other party could not access due to

Because Cox has the code for Infringement Finder and SampleIt2 as they existed in 2013 and in 2015, Cox has had, and has abundantly exercised, the opportunity to evaluate any changes to the code. Cox's expert examined the snapshots of the code and opined on the changes to the Rightscorp system. After his evaluation, Cox's expert admits that the core functionality of the Rightscorp system did not substantially change between 2013 and 2015. Ex. 3, Rucinski Suppl. Report at 23 ("RC-v1 and RC-v2 [2013 versions of code] also operate in substantially the same way as RC-Current [2015 version of code], though I have noted below ways in which their operation differs.") While Mr. Rucinski does discuss the changes made to the code, none of these changes affect the Core Functionality of the Infringement Finder. *See, e.g.*, Ex. 3, Rucinski Suppl. Report at 20-35; *see also* Ex. 4, Sept. 18, 2015 Hearing Tr. at 65:24-66:4 (where Cox's counsel admits its expert's concessions).

Cox has also taken extensive discovery on Rightscorp System but in many cases deliberately chose not to ask Rightscorp about changes to the Rightscorp. For example, Cox did not ask how the code operated in 2012. Cox asked only specific questions regarding the changes made to the SampleIt2.java code, but Cox did not ask if the changes made were relevant to the way in which Rightscorp detected or sampled infringements. Cox did not ask these questions because it does not want the evidence – that no relevant change was made to the core functionality of the code – before this court.

Cox simply has no evidence that any of the changes made to the code related to the Core Functionality of the Infringement finder and SampleIt2, and has no evidence that any of the changes made to the code are relevant to any issue in this case. Cox thus cannot prove as is required, by clear and convincing evidence, that Rightscorp willfully destroyed relevant

---

spoliation, here everyone has the same information, and each party will have an equal opportunity to present its evaluation of that evidence to the jury.

8

evidence. *See, e.g. McDonald v. Wal-Mart Stores East., LP*, Civ. No. 3:07-cv-425, 2008 U.S. Dist. LEXIS 2626, 11-13 (E.D. Va. Jan. 14, 2008).

### 3. Sanctions, if Any, Should be Limited

If a court decides to sanction a party for spoliation, the court must "impose the least harsh sanction that can provide an adequate remedy." *Victor Stanley*, 269 F.R.D. at 534 (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010)). Cox has presented no justification for dismissing this case based on Rightscorp's failure to institute a version control system and no case supports such a sanction.[6] *King v. Am. Power Conversion Corp.*, 181 Fed. Appx. 373 (4th Cir. 2006) (dismissal is appropriate only if "either (1) . . . the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) . . . the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim"). "[W]hen a proponent's intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

Further, Cox has no support for its argument that the Court should impose an adverse inference that the 10% bitfield threshold always has been in place in Rightscorp's system. The evidence in the case clearly establishes that Rightscorp did not implement the code until December 2, 2014, *after* the complaint was filed in this case. Mr. Boswell testified numerous times that this is the date when the code was implemented. Ex. 1, Boswell Tr. at 443:21-444:18. Additionally, the code itself is dated December 2, 2014. Cox has not a single piece of evidence

---

[6] Precluding Plaintiffs from introducing any evidence of the nature of how Rightscorp's system functioned prior to July 2015, the date of the last production of source code, amounts to a dismissal and is just as unwarranted as a direct dismissal.

or testimony to the contrary and has no case law to support its position that the Court should (or even could) impose an adverse inference contrary.

If the Court determines that a sanction is appropriate, Plaintiffs ask that any such sanction be limited by Rightscorp's lack of any real culpability. At worst, Rightscorp failed to act, and this failure to institute a version control system unnecessary to Rightscorp's business lead to the loss of irrelevant historic details about its source code. If the Court determines that Plaintiffs should be sanctioned because Rightscorp's failure to obtain and institute version control software under these circumstances constituted intentional conduct and prejudiced Cox, then Plaintiffs suggest that that the Court utilize one of the following instructions:

- "Version control software exists, some companies use this software, and version control software would have kept track of any changes to Rightscorp's software. The jury may consider this fact when reaching its verdict;" *or*

- "When determining whether Rightscorp identified Cox subscribers infringing the copyrighted works beginning in 2012, the jury may take into account that Rightscorp did not use a version control system and produced only source code collected in 2013 and 2015."

## IV.   CONCLUSION

For the reasons set forth above and in Plaintiffs' opposition to Cox's original motion for sanctions (Dkt. No. 264), Plaintiffs respectfully request that the Court deny Cox's motion for evidentiary sanctions.

September 29, 2015

                                        Respectfully submitted,

                                        /s/  Jeremy D. Engle
                                        Jeremy D. Engle (VSB No. 72919)

jengle@steptoe.com
Paul Gennari (VSB No. 46890)
pgennari@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
202-540-7200

*Of Counsel*

Michael J. Allan (admitted *pro hac vice*)
William G. Pecau (admitted *pro hac vice*)
John M. Caracappa (admitted *pro hac vice*)
Roger E. Warin (admitted *pro hac vice*)
Stephanie L. Roberts (admitted *pro hac vice*)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Michael O. Crain
Crain Law Group, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia 30601
Tel. (706) 548-0970
Fax: (706) 369-8869

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

        I hereby certify that on September 29, 2015, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com

        /s/  Jeremy D. Engle
        Jeremy D. Engle (VSB No. 72919)
        jengle@steptoe.com
        STEPTOE & JOHNSON, LLP
        1330 Connecticut Ave, NW
        Washington, DC 20036
        Tel.:  (202) 429-3000
        Fax:  (202) 429-3902