# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

|  |  |  |
|---|---|---|
| **BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP** | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  1:14-cv-1611 (LO/JFA) |
| **COX COMMUNICATIONS, INC. and COXCOM, LLC** | ) ) ) | **REDACTED PUBLIC VERSION** |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel:  (202) 540-7157
Fax:  (202) 540-7201

CRAIN LAW GROUP, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia 30601
Tel. (706) 548-0970
Fax: (706) 369-8869

October 13, 2015

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF ADDITIONAL MATERIAL FACTS ("SAF") ...............................................2

    A.    The BitTorrent Protocol .................................................................................2

    B.    Cox Subscribers Use BitTorrent to Infringe Plaintiffs' Copyrights ........................3

    C.    Cox Deletes or Blocks Rightscorp's Notices of Infringement in Order to Avoid Learning of Specific Infringements on Its System ......................................5

    D.    Cox Has the Power to Terminate Known Infringers but Chooses Instead to Preserve its Revenue Stream......................................................................7

ARGUMENT ........................................................................................................................9

I.    COX SUBSCRIBERS HAVE INFRINGED PLAINTIFFS' COPYRIGHTS ...................9

    A.    Plaintiffs Have Caught Thousands of Cox Subscribers Infringing their Copyrights over the Cox Network .....................................................................9

    B.    Cox Subscribers Have Infringed Plaintiffs' Copyrights by Making the Works Available Without Authorization ..............................................................11

    C.    Cox Subscribers Infringed Plaintiffs Copyrights by Actually Disseminating the Asserted Works .........................................................................13

    D.    The Copyright Act Protects Digital Material Objects as Well as Physical Material Objects.......................................................................................14

II.    COX IS LIABLE AS A CONTRIBUTORY COPYRIGHT INFRINGER......................15

    A.    Knowledge of and Material Contribution to Copyright Infringement Makes a Defendant Liable for that Infringement......................................................15

    B.    Cox Knew of and Was Willfully Blind to its Subscribers' Infringement of Plaintiffs' Copyrights...................................................................................17

        1.    Cox Knew or Had Reason to Know of the Infringement...........................17

        2.    Cox Was Willfully Blind to the Infringement of Plaintiffs' Works ..........20

    C.    Cox Materially Contributed to Its Subscribers' Infringement of Plaintiffs' Copyrights............................................................................................22

III.    COX IS VICARIOUSLY LIABLE FOR ITS SUBSCRIBERS' INFRINGEMENT OF PLAINTIFFS' COPYRIGHTS....................................................................22

    A.    Cox Has the Ability to Supervise the Infringing Activity .....................................23

    B.    Cox Directly Benefited from its Subscribers' Use of BitTorrent to Infringe ........25

IV.    PLAINTIFFS DO NOT HAVE UNCLEAN HANDS AND DID NOT FAIL TO MITIGATE THEIR DAMAGES.......................................................................28

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A&M Records v. Napster,*
   239 F.3d 1004 (9th Cir. 2001) ........................................................................ passim

*Arista Records v. Greubel,*
   453 F. Supp. 2d 961 (N.D. Tex. 2006) ...................................................................12

*Arista Records v. Lime Group,*
   784 F. Supp. 2d 398 (S.D.N.Y. 2011)......................................................10, 23, 28

*Arista Records v. Lime Group,*
   No. 06 CV 5936, 2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) ......................14, 29

*Arista Records v. Usenet.com,*
   633 F. Supp. 2d 124 (S.D.N.Y. 2009).............................................................. passim

*Atlantic Recording Corp. v. Howell,*
   554 F. Supp. 2d 976 (D. Ariz. 2008) ....................................................................14

*Capitol Records v Escape Media Group,*
   2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ................................................ passim

*Capitol Records v. MP3Tunes,*
   48 F. Supp. 3d 703 (S.D.N.Y. 2014).....................................................................22

*Capitol Records v. MP3tunes,*
   No. 07 Civ. 9931, 2013 WL 1987225 (S.D.N.Y. May 14, 2013)...........................19

*Columbia Pictures Industries v. Fung,*
   710 F.3d 1020 (9th Cir. 2013) .......................................................................10, 14

*Corbis Corp. v. Amazon,*
   351 F. Supp. 2d 1090 (W.D. Wash. 2004).............................................................17

*Costar Group v. Loopnet,*
   164 F. Supp. 2d 688 (D. Md. 2001) ......................................................................16

*CoStar Group v. LoopNet,*
   373 F.3d 544 (4th Cir. 2004) ...............................................................................15

*Diversey v. Schmidly,*
   738 F.3d 1196 (10th Cir. 2013) ............................................................................11

*Ellison v. Robertson,*
   357 F.3d 1072 (9th Cir. 2004) ...........................................................17, 18, 22, 25

*EMI April Music v. White,*
  618 F. Supp. 2d 497 (E.D. Va. 2009) ..................................................................25

*Fonovisa v. Cherry Auction,*
  76 F.3d 259 (9th Cir. 1996) ..................................................................... passim

*Gershwin Publishing v. Columbia Artists Management,*
  443 F.2d 1159 (2d Cir. 1971)...................................................................15, 16, 17

*Global-Tech Appliances v. SEB,*
  563 U.S. 754 (2011)...............................................................................20

*Hotaling v. Church of Christ of Latter-Day Saints,*
  118 F.3d 199 (4th Cir. 1997) ...................................................................11, 12

*Humphreys & Partners Architects v. Lessard Design,*
  43 F. Supp. 3d 644, 663 (E.D. Va. 2014) ............................................................15

*In re Aimster Copyright Litigation,*
  334 F.3d 643 (7th Cir. 2003) ...............................................................10, 16, 19, 20

*In re Uwimana,*
  274 F.3d 806 (4th Cir. 2001) ...................................................................29

*JTH Tax v. H&R Block Eastern Tax Services,*
  128 F. Supp. 2d 926 (E.D. Va. 2001) ..............................................................29

*London-Sire Records v. Doe I,*
  542 F. Supp. 2d 153 (D. Mass. 2008) ..............................................................14

*MGM v. Grokster,*
  545 U.S. 913 (2005)...........................................................................10, 15, 16, 17

*Nelson-Salabes v. Morningside Development,*
  284 F.3d 505 (4th Cir. 2002) ...................................................................22

*Perfect 10 v. Amazon,*
  508 F.3d 1146 (9th Cir. 2007) ...............................................................16, 17, 22, 23

*Perfect 10 v. Cybernet Ventures,*
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ...........................................................17

*Perfect 10 v. Visa International Service Association,*
  494 F.3d 788 (9th Cir. 2007) ...................................................................24

*Positive Black Talk v. Cash Money Records,*
  394 F.3d 357 (5th Cir. 2004) ...................................................................30

*Sega Enterprises v. MAPHIA,*
   857 F. Supp. 679 (N.D. Cal. 1994) ..................................................................10

*Seoul Broadcasting System International v. Ro,*
   No. 1:09CV433, 2011 WL 3207024 (E.D. Va. 2011) .........................................20

*SNC-Lavalin America v. Alliant Techsystems,*
   858 F. Supp. 2d 620 (W.D. Va. 2012) ..............................................................30

*Sony BMG Music Entertainment v. Doe,*
   No. 5:08-CV-109-H, 2009 WL 5252606 (E.D.N.C. Oct. 21, 2009)......................12

*Tempo Music v. Myers,*
   407 F.2d 503 (4th Cir 1969) ..........................................................................29

*Timpco v. Implementation Services,*
   No. 1:08-cv-1481, 2010 WL 3925117 (S.D. Ind. Sept. 29, 2010)........................11

*Universal Studios Production v. Bigwood,*
   441 F. Supp. 2d 185 (D. Me. 2006) .................................................................11

*Viacom International v. YouTube,*
   676 F.3d 19 (2d Cir. 2012)........................................................................20, 25

*Warner Bros. Records v. Payne,*
   No. W-06-CA-051, 2006 WL 2844415 (W.D. Tex. Jul. 17, 2006)......................12

*WorldCom v. Boyne,*
   68 Fed. App'x 447 (4th Cir. 2003) ..................................................................29

## STATUTES

17 U.S.C. § 101........................................................................................................15

17 U.S.C. § 106.................................................................................................11, 13

17 U.S.C. § 506........................................................................................................12

## BOOKS AND ARTICLES

2 *Nimmer on Copyright* § 8.11 (2015)................................................................12, 15

3 *Nimmer on Copyright* § 12.04 (2015).....................................................................16

*Restatement (Third) of Foreign Relations* § 114 (1987)...............................................13

Peter S. Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute in
   the Internet Age*
   59 Copyright Society USA 1, 67 (2011)..............................................................12

# FACT CORRELATION TABLE

The following table correlates the paragraph numbers of Cox's "undisputed" facts with the paragraphs in which they are denied or admitted in Statement of Additional Material Facts in this Opposition.

| Cox "Undisputed" Fact (Dkt No. 346 at 4-7) | Responsive Fact Paragraph in Plaintiffs' Opposition | Admitted or Denied |
|---|---|---|
| Cox Fact 1 | 5 | Admitted in part |
| Cox Fact 2 | 9-11 | Denied |
| Cox Fact 3 | 9-11 | Denied |
| Cox Fact 4 | 9-11 | Denied |
| Cox Fact 5 | 9-11 | Denied |
| Cox Fact 6 | 9-11 | Denied |
| Cox Fact 7 | 10 | Denied |
| Cox Fact 8 | 15 | Admitted for this motion only |
| Cox Fact 9 | 15-16 | Denied |
| Cox Fact 10 | 18 | Denied in Part |
| Cox Fact 11 | 18 | Admitted |
| Cox Fact 12 | 20 | Denied |
| Cox Fact 13 | 15 n.3 | Denied |
| Cox Fact 14 | 15 n.3 | Admitted |
| Cox Fact 15 | 16 | Denied |
| Cox Fact 16 | 15 | Denied |
| Cox Fact 17 | 3-4 | Admitted |
| Cox Fact 18 | 3-4 | Admitted |
| Cox Fact 19 | 6 | Admitted |
| Cox Fact 20 | 7 n.2 | Denied |
| Cox Fact 21 | 7-8 | Denied |
| Cox Fact 22 | 8 | Admitted |
| Cox Fact 23 | 15 | Denied |
| Cox Fact 24 | 15 | Denied |
| Cox Fact 25 | 23 | Denied |
| Cox Fact 26 | 25-28 | Denied |
| Cox Fact 27 | 23 | Denied |
| Cox Fact 28 | 8 | Admitted |
| Cox Fact 29 | 8 | Admitted |
| Cox Fact 30 | 5 n.1 | Admitted |

## INTRODUCTION

Cox is liable for its decision to permit and to profit from its subscribers' rampant use of its network to steal Plaintiffs' copyrighted music through an online sharing protocol known as BitTorrent.  Over ten percent of Cox subscribers admit that the opportunity to obtain free music via BitTorrent is a reason that they subscribe to Cox.  Because Cox ███████████████████ █████  it turned a blind eye to their use of BitTorrent to infringe.  Cox deleted millions of notices of infringement of the works at issue and continued to allow its infringing subscribers to share Plaintiffs' musical compositions over its network.  Cox had the power to terminate subscribers for copyright infringement.  But Cox kept infringing subscribers online so that it could avoid ███████████  That makes Cox liable for contributory and vicarious infringement.

In a desperate bid to avoid liability, Cox makes one baseless argument after another.  Cox denies that there is evidence of uploads or downloads by users of its network, though Plaintiffs' downloaded over 100,000 copies of the infringed works from those same users and though multiple Cox subscribers have been caught sharing the *same unique torrents*.  Cox denies that its subscribers infringe any copyright when they make Plaintiffs' works available to the public, in the face of statute, treaty, and controlling Fourth Circuit precedent to the contrary.  Cox complains that Plaintiffs have not proven infringement against specific individuals, though the point of secondary liability is to relieve copyright plaintiffs of the need to pursue thousands of cases against individual infringers.  And Cox asserts that infringement must be through a physical medium, though a host of decisions apply the Copyright Act to online file sharing.

As to secondary liability, Cox denies that it knew of or was willfully blind to specific infringements, though it deleted every single notice that Plaintiffs sent regarding infringement of the works at issue in this litigation.  Cox denies that it supervises its subscribers, though it tracks

their (partial) history of infringement through a graduated response system and reserves the right

to terminate repeat infringers.  And Cox denies that it obtains a financial benefit from infringing

subscribers though survey evidence shows that highly profitable customers are drawn to Cox by

the opportunity to infringe and though Cox's internal documents reflect that whether infringing

subscribers ██████████████████████ is ██████████████████ of the decision

to allow them to remain online.  Cox's motion for summary judgment should be denied.

### STATEMENT OF ADDITIONAL MATERIAL FACTS ("SAF")

**A.     The BitTorrent Protocol**

1.      BitTorrent is a file sharing protocol that has become the major channel for theft of

copyrighted music and film.  One recent study found that 99.97% of non-pornographic content

on BitTorrent was infringing.  Declaration of Michael J. Allan ("Allan Decl.") Ex. 29 at 30.

2.      BitTorrent works by bundling one or more music, video, or other files into

"torrents" that can be shared using a BitTorrent software program or "client."  Each torrent has

its own unique "hash" value that identifies the torrent and serves as a digital "fingerprint."  *See*

October 12, 2015 Declaration of Barbara Frederiksen-Cross ("BFC Decl.") Ex. 2 ¶¶ 30-40.

3.      A torrent consists of the underlying music or video files and an associated

*.torrent file, containing the metadata that allows the specific content files to be shared reliably.

This metadata includes information that (1) identifies the constituent music or video files;

(2) specifies one or more third-party servers or "trackers" that manage connections among the

individual users or "peers" sharing the torrent; and (3) specifies the torrent's own unique

identifying "hash" value.  *Id*. ¶¶ 40-42.

4.      Once a torrent has been created, the *.torrent file must be uploaded to a torrent

index website such as the Pirate Bay or Kickass Torrents.  From those websites, any internet user

can search for and download the *.torrent file.  The *.torrent file opens in a BitTorrent software

program or "client" that uses the metadata to contact the "tracker," seek out other "peers," and

join the "swarm" of peers sharing the file.  The BitTorrent client will begin downloading and

uploading the content files identified in the *.torrent file from and to many other peers

simultaneously.  Peers in a swarm facilitate this process by telling each other what pieces of the

torrent they have and what pieces they still need.  Once a peer has finished downloading, he

continues to upload the torrent to other users as a "seeder" of the torrent until he closes his

BitTorrent client or otherwise stops sharing.  Cox facts 17 and 18 are admitted.  *Id*. ¶¶ 40-42.

### B.   Cox Subscribers Use BitTorrent to Infringe Plaintiffs' Copyrights

5.     Plaintiffs' copyrighted musical works are widely shared without authorization

using BitTorrent.  Plaintiffs hired Rightscorp to identify instances of infringement, to send out

notices of that infringement to individual infringers and to internet service providers, and to

negotiate settlements with infringing users.  Cox fact 1 is admitted in part.[1]  *See* Allan Decl.

Ex. 3 (Gillis Tr.) at 83:11-84:16 & Ex. 4 (Hauprich Tr.) at 290:21-291:14.

6.     Rightscorp's software searches torrent index websites for *.torrent files that

appear to contain Plaintiffs' copyrighted works and then verifies that the torrent actually contains

those works.  For those torrents that contain Plaintiffs' copyrighted works, Rightscorp's software

contacts the tracker to find peers offering the torrent (and the copyrighted works within).

Rightscorp's software then contacts the peer to determine if it has 100% of the torrent payload,

including all of the music files contained within.  If verified, Rightscorp records the date and

time, the IP address of the peer, the port on the peer's computer through which the connection

---

[1] Cox fact 30 is admitted.  Many indexing websites and trackers are located abroad and do not comply with requests to remove infringing material.  *See, e.g.*, http://goo.gl/OowoHQ.

was made, the *.torrent file's unique hash value, and the identity of the copyrighted works infringed.  *See* BFC Decl. Ex. 2 ¶¶ 44-57.  Cox fact 19 is admitted.

7.     When Rightscorp records a BitTorrent peer offering 100% of a torrent containing copies of Plaintiffs' copyrighted works, Rightscorp sends a notice to the peer's ISP that the peer is infringing Plaintiffs' copyrights and provides the date, time, IP address, port, and work infringed.  October 13, 2015 Declaration of Gregory Boswell ("Boswell Decl.") ¶¶ 8-9, 16.[2]

8.     In many instances in which Rightscorp observed a BitTorrent peer offering 100% of a torrent including copies of Plaintiffs' copyrighted works, Rightscorp also downloaded full copies of the infringing music files contained in the torrent from that peer.  *See* BFC Decl. Ex. 2 ¶¶ 63-64; Boswell Decl. ¶ 11.  Where it does not download the full files, Rightscorp confirms the peer has the complete torrent by communicating with the peer using the BitTorrent protocol. Boswell Decl. ¶ 16.  Therefore, Cox fact 21 is denied.  Cox facts 22 and 28-29 are admitted.

9.     Rightscorp's records establish widespread infringement of Plaintiffs' works by Cox subscribers over the Cox network.  Up to the filing of this suit, Rightscorp identified roughly 2.5 million instances in which Cox subscribers offered one of the works at issue in this litigation over BitTorrent using their Cox internet connection.  October 13, 2015 Declaration of Robert Bardwell ("Bardwell Decl.") Ex. 1 at 5.

10.     In addition, Rightscorp downloaded more than 100,000 copies of infringed works from Cox subscribers over BitTorrent through their Cox internet connection.  *See* Allan Decl. Ex. 45.  In each instance, a BitTorrent user on Cox's network initiated the transmission of the

---

[2] For a period of time *after this suit was filed*, Rightscorp recorded infringements and issued notices in instances where the peer offered between 10 and 100 percent of the torrent. During the period in which the infringements at issue in this litigation occurred, Rightscorp only acted where the peer had 100% of the torrent.  Boswell Decl. ¶¶ 15-16.  Cox fact 20 is denied.

infringed work to Rightscorp in response to Rightscorp's request for the work, just as it would do in response to any other request from a peer.  Boswell Decl. ¶ 12.  Cox fact 7 is denied.

11.     Rightscorp identified Cox subscribers sharing torrents that contain infringing files *after* it found the corresponding *.torrent files on torrent index sites.  BFC Decl. Ex. 2 ¶¶ 56-58. Also, Rightscorp identified multiple Cox subscribers sharing the same infringing torrents bearing the same unique digital fingerprint.  Boswell Decl. ¶ 10 & Ex. 1.  Because each unique torrent with its unique hash value can have been created only once, SAF 2, this is evidence that many Cox users downloaded infringing torrents.  Based on paragraphs 9-11, Cox facts 2-6 are denied.

12.     A significant percentage of these customers are drawn to Cox's service by the opportunity to infringe.  Plaintiffs' expert Stephen Nowlis conducted a survey, which found that 16% of Cox internet subscribers "download or upload free digital music through [BitTorrent] sites such as ThePirateBay, KickAssTorrents, Torrentz, etc."  Of those 16%, over 70% agreed that the ability to do so was a reason that they subscribe to Cox. This is over ███ of Cox's subscriber base.  October 13, 2015 Declaration of Stephen Nowlis Ex. 2 at 4 n.2, 12.

13.     In online discussion boards, Cox subscribers regularly describe Cox's tolerance of infringement as a reason to subscribe to Cox.  Allan Decl. Exs. 60, 62-64, 66.

**C.     Cox Deletes or Blocks Rightscorp's Notices of Infringement in Order to Avoid Learning of Specific Infringements on Its System**

14.     Cox knew that BitTorrent accounted for as much as ██% of the upstream data transmitted over its network in some markets.  Allan Decl. Ex. 46.  Cox knew that BitTorrent was used almost exclusively to infringe.  As Cox's manager of abuse operations Jason Zabek put it, ████████████████████████████████████████ Allan Decl. Ex 42; *see also* SAF 1.  And Cox knew that Rightscorp was sending notices of Cox subscribers' infringement of its clients' copyrights.  Allan Decl. Exs. 14, 17, 18, 31.

15.     Rightscorp sent Cox 2.5 million notices of specific instances of infringement of the works at issue in this litigation by Cox subscribers using Cox's network.  Bardwell Decl. Ex. 1 at 5.  Each of those notices established that an infringing work had been obtained by a Cox user and was being offered via BitTorrent at the Cox IP address stated.  Each notice identified the date, time, port, and IP address of the infringement as well as the title of the musical composition infringed.  Allan Decl. Exs. 15, 16, 22, 23, 47, 48; *see also* Ex. 1 (Zabek Tr.) at 317:20-321:19; Ex. 2 (Cadenhead Tr.) at 196:8-16.  Cox facts 9, 16, 23, and 24 are denied.  Cox fact 8 is admitted for purposes of this motion only.[3]

16.     In addition, Rightscorp made all of the information from its notices available to Cox through a "dashboard" that could be accessed online.  That dashboard allowed Cox to search the notices and infringement records or to sort the information by IP address, infringed work, or other category of data.  *See* Allan Decl. Exs. 30, 31, 32, 34, 35 38.  The dashboard was ████ from a Cox IP address.  *See* Allan Decl. Ex. 33.  Cox facts 9 and 15 are denied.

17.     Nonetheless, Cox blacklisted Rightscorp and blocked its notices to avoid learning of individual infringing subscribers.  *See* Plaintiffs' SJ Mem. at 7-8 (Dkt. No. 324).  As Cox's abuse manager stated in an email chain regarding ████████████████████ ████████████████ Allan Decl. Ex. 41 (ellipsis in original).  Cox decided to ████████████ Allan Decl. Ex. 1 (Zabek Tr.) at 106:11-107:2.

18.     Cox asserted that the settlement offers of $20 per infringement in Rightscorp's notices fall outside "the spirit" of the DMCA.  But Cox's counsel was unable to identify any

---

[3] Rightscorp requested that Cox suspend Internet service of account holders who were repeat infringers.  Cox blacklisted Rightscorp and did not forward any Rightscorp notices to its subscribers.  Thus, Rightscorp never communicated with or threatened any Cox subscribers. Cox fact 13 is denied.  Cox fact 14 is admitted.

language in the DMCA to this effect.  Allan Decl. Ex. 2 (Cadenhead Tr.) at 118:4-124:20.  Cox

fact 10 is denied in part.  Cox fact 11 is admitted.

19.     Cox's settlement offer rule was only one of several filtering mechanisms that it

used to drastically curtail the number of infringement notices that it accepted.  For example, Cox

limited each copyright infringement complainant to ███████ notices per day.  And Cox only

acts upon ██████████████████████ ████ further infractions ██████████ are

not counted as infringements under Cox's repeat infringer policy.  *See* Allan Decl. Ex. 24 at 13,

Ex. 52 (Sikes Tr.) at 154:16-156:5, Ex. 53 at 7, Ex. 54, Ex. 65; Plaintiffs' SJ Mem. at 6, 9.

20.     Based on these limitations and others, the vast majority of Rightscorp's notices

would have gone unheeded whether or not they contained settlement offers.  For example,

Rightscorp sent Cox 9,270,458 infringement notices in the 821 days between September 2012

and November 2014.  Boswell Decl. ¶ 9.  Had Rightscorp's notices omitted the settlement offers,

Cox would still have ignored more than 98 percent of them.  Cox fact 12 is denied.

## D.     Cox Has the Power to Terminate Known Infringers but Chooses Instead to Preserve its Revenue Stream

21.     Cox does not want to be notified of infringements because it does not want to

have to terminate known, repeat infringers. ████████████████████████

and as Cox's abuse manager explained, ████████████████████████

Allan Decl. Exs. 9, 13, & 19.

22.     Cox concedes that it has the right and ability to terminate customers for copyright

infringement and claims to do so occasionally in an effort to preserve a DMCA safe harbor

defense to secondary liability for copyright infringement.  Allan Decl. Ex. 6; Ex. 24 at 25-27.

23.     Cox even tracks those infringement notices it does accept and monitors its

subscribers' record of infringement through a "graduated response" process.  Cox sends multiple

warnings, then briefly interrupts the subscriber's access to the internet until the subscriber clicks

a web link, and then has the subscriber speak with its technical operations and abuse staff.  Allan

Decl. Ex. 24 at 9-10, 13; Ex. 11 at 2, 10-13.  Therefore, Cox facts 25 and 27 are denied.

24.     During this process, Cox seeks to █████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████     Allan Decl. Ex. 1 (Zabek

Tr.) at 230:3-16.

25.     Cox charges monthly subscription fees to these customers.  High speed internet

customers pay Cox an average of ████ a month, not including fees for other services such as cable

or telephone.  Allan Decl. Ex. 43.  Because so many of Cox's costs are fixed, its profit margins

on every additional subscriber are extremely high.  Cox's reports a ███████████████████

for high speed internet customers.  *Id.*  Cox fact 26 is denied.

26.     To preserve this revenue, Cox does not terminate subscribers that it knows are

guilty of infringement.  By minimizing the number of infringement notices it accepts and on

which it takes action, Cox reduces the likelihood that its infringing customers will advance

through the graduated response and be subject to termination.  *See* Allan Decl. Ex. 5

(Vredenburg Tr.) at 296:3-333:22; Ex 21.  And even if a customer advances to the "termination"

stage, Cox's policy is to avoid terminating repeat infringers.  *See* Plaintiffs' SJ Mem. at 10-16.

For example, Cox's abuse manager wrote, ███████████████████████████████████

█████████████████████████████████     Allan Decl. Ex. 20.

27.     Because ████████████████████████████████ Cox ████████

████████████████████████████████████████████████████████████

███████████████████     Allan Decl. Ex. 19 at 1; Ex. 7 at 2.

28.     Even where Cox has purported to terminate customers for copyright infringement,

it has reactivated them within a day or two so that it would not lose the revenue.  Cox



Allan Decl. Ex. 12; *see*

*also* Ex. 13 (Cox                                                             ████████████

in order to                                                         Upon reactivation, Cox

gives the customer a "clean slate" and ████████████████████████

Allan Decl. Ex. 55; Plaintiffs' SJ Mem. at 11-12.

## ARGUMENT

## I.     COX SUBSCRIBERS HAVE INFRINGED PLAINTIFFS' COPYRIGHTS

### A.     Plaintiffs Have Caught Thousands of Cox Subscribers Infringing their Copyrights over the Cox Network

Plaintiffs have overwhelming evidence that Cox subscribers repeatedly use BitTorrent to

infringe Plaintiffs' copyrights over the Cox network.  Rightscorp's software identifies torrents

containing files that infringe Plaintiffs' copyrights and searches BitTorrent for users who are

sharing those torrents.  When it detects a user who is sharing infringing material, Rightscorp

records the IP address of the infringer, the port number through which the infringer is sharing the

file, the date and time of infringement, and the work infringed.  Rightscorp identified and

memorialized 2.5 million instances in which users on Cox IP addresses used the Cox network to

share infringing files over BitTorrent.  In addition, Rightscorp actually downloaded 100,000 full

copies of files infringing almost all of the works at issue in this case.  SAF 6-11.

Cox contends that the Rightscorp data is inadequate because it identifies infringers by IP

address and does not identify the individual infringer by name.  Cox Br. at 9.  Of course, only

Cox knows the names of the subscribers to whom it assigned each IP address, and Cox has

destroyed this information.  Dkt Nos. 340 at 7-8, 381 at 1.  Moreover, a plaintiff in a secondary

liability case against an internet service provider need only show that "*users* of [the defendant's]

services" have engaged in direct infringement, not each infringer's specific identity.  *Columbia*

*Pictures Industries v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) (emphasis added); *In re Aimster*

*Copyright Litigation*, 334 F.3d 643, 646 (7th Cir. 2003) (finding secondary liability where direct

infringers could conceal their true identity); *Arista Records v. Lime Group*, 784 F. Supp. 2d 398,

423-24 (S.D.N.Y. 2011) (evidence of downloads from "LimeWire users" established direct

infringement); *Sega Enterprises v. MAPHIA*, 857 F. Supp. 679, 686-87 (N.D. Cal. 1994) (direct

infringement where "unknown users" uploaded Sega games).[4]

Nor are plaintiffs required to file lawsuits or obtain judgments against individual users.

Cox Br. at 9-10.  The very reason for secondary liability is that "chasing individual consumers is

time consuming and is a teaspoon solution to an ocean problem."  *Aimster*, 334 F.3d at 645

(citation omitted).  "Recognizing the impracticability or futility of a copyright owner's suing a

multitude of individual infringers, . . . the law allows a copyright holder to sue a contributor to

the infringement instead."  *Id.*; *see also MGM v. Grokster*, 545 U.S. 913, 930-31 (2005) ("When

a widely shared service or product is used to commit infringement, it may be impossible to

enforce rights in the protected work effectively against all direct infringers, the only practical

alternative being . . . secondary liability on a theory of contributory or vicarious infringement.").[5]

---

[4] Cox relies on *direct* infringement cases against individual "Doe" defendants.  *See* Cox
Br. at 9-10.  Of course direct infringement suits against individual defendants require specific
identification, but that is irrelevant to a secondary liability suit against a service provider.

[5] Cox speculates that infringement may have been committed by non-subscribers visiting
a subscriber or poaching an unsecured wireless network.  But Cox's own abuse manager
dismissed the idea of widespread infringement by non-subscribers.  ███████████████████
██████████████████████████████████████████  Allan Decl. Ex. 27.  Instead, he saw it as a
convenient legal smokescreen: ███████████████████████████

**B.     Cox Subscribers Have Infringed Plaintiffs' Copyrights by Making the Works Available Without Authorization**

The Rightscorp data show that Cox subscribers made thousands of Plaintiffs' copyrighted works available to the world for copying millions of times without authorization.  SAF 5-11. This violated the Plaintiffs' exclusive right of distribution and constituted copyright infringement under controlling Fourth Circuit precedent.[6]

In *Hotaling v. Church of Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997), the Fourth Circuit held that "mak[ing] the work available to the . . . public" infringes the copyright holder's exclusive distribution right.  The Court rejected the defendant's argument that a violation of the distribution right requires that "the evidence would need to show that a member of the public accepted such an offer" to distribute the work.  *Id.*; *see also Diversey v. Schmidly*, 738 F.3d 1196, 1202 (10th Cir. 2013) (unauthorized making available a copyrighted work violated author's Section 106(3) right to distribute); *Timpco v. Implementation Services*, No. 1:08-cv-1481, 2010 WL 3925117, at *3 (S.D. Ind. Sept. 29, 2010) ("merely making copyrighted material *available* to others is an act of copyright infringement").

Following *Hotaling*, courts have held that "using [an online file sharing system] to make copies . . . available to thousands of people over the internet . . . violate[s] [the] exclusive right to distribute."  *Universal Studios Production v. Bigwood*, 441 F. Supp. 2d 185, 190 (D. Me. 2006);

███████████████████  Allan Decl. Ex. 49.  And whether by subscribers or otherwise, the direct infringement still occurred over the Cox network.

[6] Cox falsely claims that many of the 2.5 million instances of infringement involve situations where the subscriber had as little as ten percent of the infringing file.  Cox Br. at 14-15.  On the contrary, in every single one of those instances, the infringer made the full file available.  SAF 7.  Rightscorp did not begin logging infringements involving less than the full file until after this litigation was filed.  *Id.*  None of those are at issue in this case.  Nor can Cox's conclusory assertions regarding the reliability of Rightscorp's software, Cox Br. at 15, justify summary judgment in the face of competent testimony to the contrary.  BFC Decl. Ex. 2 ¶ 135.

accord *Arista Records v. Greubel*, 453 F. Supp. 2d 961, 970-971 (N.D. Tex. 2006) (invoking the "seminal" *Hotaling* decision); *Warner Bros. Records v. Payne*, No. W-06-CA-051, 2006 WL 2844415, at *3 (W.D. Tex. Jul. 17, 2006).  And courts in this Circuit recognize, in the context of online file sharing, that "the Fourth Circuit has interpreted distribution to include not only actual dissemination, but also making a protected work available to the public."  *Sony BMG Music Entertainment v. Doe*, No. 5:08-CV-109-H, 2009 WL 5252606, at *4 (E.D.N.C. Oct. 21, 2009).[7]

This interpretation of "distribution" is consistent with other sections of the Copyright Act, which expressly state that "the distribution of a work" may be accomplished by "making it available on a computer network accessible to members of the public."  17 U.S.C. § 506(a)(1)(C); *see also id*. §§ 101 & 106(3) (defining "right of exclusive publication" to include the "offering to distribute copies").  It is also the view of definitive treatises.  "The distribution right . . . extends to the offer to the general public to make a work available for distribution . . . . No consummated act of actual distribution need be demonstrated . . . ."  *Nimmer on Copyright* § 8.11 [B][4][d] (2015); *see generally id*. § 8.11 [A], [B] (term "distribute" was intended to broaden publication rights, which historically "encompassed the offering of copyrighted works to the public," and to account for possible future encroachment on the rights of copyright holders by technical changes).  "Thus, to prove violation of copyright's distribution right, a copyright owner need merely show that a copyrighted work has been placed in a share folder that is accessible to the public."  Peter S. Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute in the Internet Age*, 59 Copyright Society USA 1, 67 (2011).

---

[7] Cox's attempt to distinguish *Hotaling*, Cox Br. at 14, confirms its application here. Like the defendant in *Hotaling*, Cox has not used the tools at its disposal, such as ████████, to record actual transmissions of infringing works by its subscribers over its network.

Interpreting the Copyright Act to prohibit "making available" copyrighted works without authorization is also essential to comport with the nation's obligations under the WIPO Copyright Treaty, which requires member states to recognize the rights of making available. *See Restatement (Third) of Foreign Relations* § 114 (1987) ("Where fairly possible a United States statute is to be construed so as not to conflict with . . . an international agreement of the United States."). Indeed, Congress considered amending the Copyright Act on this point but concluded that it was unnecessary because "making available" is recognized under current law. As the Register of Copyrights noted in a letter to Congress, "making [a work] available for other users of [a] peer to peer network to download . . . constitutes an infringement of the exclusive distribution right, as well as the production right." Allan Decl. Ex. 50. Thus, "Congress determined that it was not necessary to add any additional rights to Section 106 . . . to implement the [Treaty's] 'making available' right." *Id.*

**C.      Cox Subscribers Infringed Plaintiffs Copyrights by Actually Disseminating the Asserted Works**

In any event, the evidence shows that significant uploads and downloads of Plaintiffs copyrighted works actually have occurred over Cox's network. First, Plaintiffs' agent Rightscorp has detected multiple Cox subscribers with the *same* infringing torrent available on their computers *after* it located that same torrent on torrent indexing websites such as the Pirate Bay. Because each torrent is unique, with a unique identifying hash code, those Cox subscribers must themselves have downloaded the torrents at issue. SAF 11.

Second, Rightscorp has actually downloaded over seven hundred thousand full copies of copyrighted works from Cox subscribers using Cox's systems, including over 100,000 full copies of the works at issue in this case. SAF 10. "Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and

distribution of a plaintiff's work." *Arista Records v. Lime Group*, No. 06 CV 5936, 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) (citations omitted).

Third, a factfinder can infer that the works at issue were actually shared from the evidence that they were made available. Even, the few P2P cases Cox cites in support of its "making available" argument permit the inference that dissemination actually took place. *See, e.g., London-Sire Records v. Doe I*, 542 F. Supp. 2d 153, 169 (D. Mass. 2008) ("where the defendant has completed all the necessary steps for a public distribution, a reasonable fact finder may infer that the distribution *actually took place*); *accord Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983-984 (D. Ariz. 2008) ("[E]vidence [of] ma[king] . . . available" "support[s] an inference that the copy was likely transferred to a member of the public").

Here, Plaintiffs have established that Cox's subscribers have been connected to P2P networks using BitTorrent in such a way as to allow the public to make copies of their copyrighted works. SAF 8-9. In fact, Plaintiffs' expert has detected Cox subscribers uploading and downloading portions of works to and from her computer during her testing of the Rightscorp software. BFC Decl. ¶ 4 & Ex. 4-5. Over sixteen percent of Cox subscribers download free music using BitTorrent from sites like the Pirate Bay, and studies have found that nearly all music files shared on BitTorrent are infringing. SAF 1, 12. A reasonable jury could conclude that distribution actually took place. *See Fung*, 710 F.3d at 1034 (finding direct infringement where statistical sampling showed high percentage of infringing content).

**D.    The Copyright Act Protects Digital Material Objects as Well as Physical Material Objects**

Finally, Cox argues that there is no evidence of copying by its subscribers because they are not distributing physical objects like phonorecords or CDs. But a copyright owner's exclusive distribution rights extend to all copies of its works, not just those fixed in physical

- 14 -

objects.  Cox truncates the definition of "copies," which include anything "fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101.  That includes the digital files Cox's subscribers make available to the world.

Cox cites no case supporting its position that "copies" do not include digital copies, and there is no such case.  *See Nimmer on Copyright* § 8.11 D4[a][i] ("no court has held to the contrary on this issue").  By contrast, hundreds of cases – many cited in this brief – have found that distribution of digital copies without permission constitutes infringement.

## II.    COX IS LIABLE AS A CONTRIBUTORY COPYRIGHT INFRINGER

### A.    Knowledge of and Material Contribution to Copyright Infringement Makes a Defendant Liable for that Infringement

"[U]nder a contributory infringement theory, 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another' is also liable for the infringement."  *Humphreys & Partners Architects v. Lessard Design*, 43 F. Supp. 3d 644, 663 (E.D. Va. 2014) (quoting *CoStar Group v. LoopNet*, 373 F.3d 544, 550 (4th Cir. 2004)).  This doctrine, requiring knowledge of and material contribution to infringement, originated in *Gershwin Publishing v. Columbia Artists Management*, 443 F.2d 1159, 1162 (2d Cir. 1971), and has become the controlling test for contributory infringement.

Cox argues that the Supreme Court's decision in *MGM v. Grokster*, 545 U.S. 913 (2005), supplanted the traditional *Gershwin Publishing* test for contributory infringement with a rule that requires not just *contribution* to but intentional *inducement* of infringement.  *See* Cox Br. at 15-16.  But Cox is unable to cite a single case adopting this reading of *Grokster*, under which it would have silently overruled forty years of contributory infringement case law.  Subsequent decisions have concluded either that *Grokster* elaborates on one *prong* of contributory

infringement doctrine – inducement – or creates a new strain of secondary liability for induced infringement. *See* 3 Nimmer on Copyright § 12.04(A)(4)(b), (5)(a). Thus, post-*Grokster* cases uniformly continue to impose contributory infringement liability where a defendant knows of and materially contributes to infringement. *See id*.

This is consistent with *Grokster* itself, which does not purport to supplant existing law and never suggests that inducement is the sole ground for contributory infringement. *See* 545 U.S. at 934-35 (noting that prior doctrine "was never meant to ***foreclose*** rules of fault-based liability derived from the common law" (emphasis added)). Instead, *Grokster* endorses *Gershwin Publishing* and its "doctrines of secondary liability" as "well established in the law" and frames the inducement holding as an application of the *Gershwin* doctrine. *Id*. at 930-31.

This is confirmed by the *Grokster* concurrences, in which six Justices applied the non-inducement strands of contributory liability (though they split three-three on their application to the Grokster software). *See id*. at 942-49 (Ginsburg, J., concurring); *id*. at 949-66 (Breyer, J., concurring).[8] While the unanimous majority opinion addressed only inducement, at least six members of the Court did not agree that inducement supplants pre-existing theories of contributory infringement.

Cox cites *Perfect 10 v. Amazon*, 508 F.3d 1146, 1171 (9th Cir. 2007). But that decision makes clear that the traditional "tests for contributory liability are consistent with the rule set

---

[8] The six concurring Justices disagreed as to whether the software had a substantial non-infringing use. Lack of a substantial non-infringing use allows a court to impute knowledge of infringement where a defendant releases its product into the stream of commerce and thus loses control over downstream use. *See A&M Records v. Napster*, 239 F.3d 1004, 1020 (9th Cir. 2001); *Aimster*, 334 F.3d at 648; *Arista Records v. Usenet.com*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009); *Costar Group v. Loopnet*, 164 F. Supp. 2d 688, 697 (D. Md. 2001). That issue is not relevant to this litigation, where Cox has actual and constructive knowledge of copyright infringement on a service that it provides to subscribers on an ongoing basis. *See id*.

forth in *Grokster*" and reaffirms the "general rule" that "'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'" *Id*. (quoting *Gershwin Publishing*, 443 F.2d at 1162). Thus, a service provider may "be held contributorily liable if it had knowledge that infringing [] images were available using its search engine, could take simple measures to prevent further damage to [the] copyrighted works, and failed to take such steps." *Id*. at 1172.

### B.    Cox Knew of and Was Willfully Blind to its Subscribers' Infringement of Plaintiffs' Copyrights

#### 1.    Cox Knew or Had Reason to Know of the Infringement

The law deems a defendant to have knowledge of infringement on its systems where it knows or has reason to know of the infringing activity. *See Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004). "The most powerful evidence of a service provider's knowledge" is an "actual notice of infringement from the copyright holder." *Corbis Corp. v. Amazon*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004).

Here, Plaintiffs sent Cox millions of notices of infringement of the works at issue in this litigation. Each of those notices was a signed statement that, under penalty of perjury, identified a copyrighted work being infringed, the date and time of the infringement, and the Cox IP address at which the infringement was occurring. It also gave Cox access to a comprehensive, searchable, sortable dashboard containing full infringement information for each infringing Cox IP address. SAF 15-16.[9] That more than suffices to give Cox knowledge or reason to know of infringement. *See Perfect 10 v. Cybernet Ventures*, 213 F. Supp. 2d 1146, 1168-69 (C.D. Cal.

---

[9] Cox did not act even when Rightscorp followed up by email to high-level Cox personnel apprising them of specific IP addresses responsible for hundreds of infringements within a three week period. *See* Allan Decl. Ex. 14; *see also* Ex. 61.

2002) (emails notifying the defendant of copyright infringement on its system established actual knowledge of infringement); *Capitol Records v Escape Media Group*, 2015 WL 1402049, at *43 (S.D.N.Y. Mar. 25, 2015) ("[T]he evidence demonstrates that Escape had knowledge of the infringing activity" based on "DMCA takedown notices of infringement it received.").

Nor can Cox avoid knowledge by blacklisting, deleting, or refusing to accept Plaintiffs' copyright infringement notices, as it has done since March of 2011.  SAF 17.  On the contrary, the failure to accept notices of infringement *prevents* Cox from obtaining summary judgment on the basis of its purported lack of knowledge.  *See Ellison*, 357 F.3d at 1077 (changing email address so as not to receive notices of infringement allows "a reasonable trier of fact" to "find that AOL had reason to know of potentially infringing activity").

Cox does not dispute that notices may satisfy the contributory infringement knowledge requirement.  Instead, it complains that Plaintiffs' infringement notices identified the works as recordings by reference to recording artists rather than as musical compositions by reference to songwriters.  Cox Br. at 19.  Here, the infringing files are sound recordings that embody the underlying musical compositions in which Plaintiffs own the copyrights.  Plaintiffs' infringement notices identify the infringing files, claim "copyrights in [the] musical compositions," and identify the title of the infringed work.  SAF 15.  Cox's counsel admitted that they were ███████ ████████████████████████.  Allan Decl. Ex. 2 (Cadenhead Tr.) at 195:9-196:16.

Cox next argues that the infringement notices could not have given Cox actual knowledge of infringement because, it claims, Plaintiffs admitted that they themselves did not have actual knowledge of infringement on the Cox network at the time they sent the notices.  Cox Br. at 18.  But Plaintiffs and Rightscorp admitted no such thing.  In the cited testimony, Plaintiffs' fact witnesses merely admitted that they personally did not know *who at Cox* was

- 18 -

aware of the infringement.  That cannot preclude Plaintiffs from proving Cox's knowledge.

Moreover, BMG's witness repeatedly testified that the notices were a basis on which Cox would

have known of the infringement.  *See* Allan Decl. Ex. 4 at 72:11-79:21.

Cox also reprises its direct infringement arguments – that the Rightscorp data shows

instances where the infringed works were made available, not actual transmissions of those

works, and that the infringement notices are "mere allegations of infringement," with no Cox

subscribers "adjudged an infringer of any asserted work."  Cox Br. at 18, 19.  As discussed

above, not only does "making available" itself infringe copyright, but Cox subscribers did

transmit infringing files.  *See* above at 11-14.  And Plaintiffs in secondary liability cases are not

required to obtain judgments against individual infringers.  "Recognizing the impracticability or

futility of a copyright owner's suing a multitude of individual infringers, . . . the law allows a

copyright holder to sue a contributor to the infringement instead."  *Aimster*, 334 F.3d at 645.

In any event, Cox's employees repeatedly acknowledged that they were aware of

widespread infringement on Cox's systems.  Plaintiffs' SJ Mem. at 12, 14, 16, 29-30.  Internal

emails with Cox's abuse team describe infringing subscribers with terms like ███████████

████████████████████████████████████████████ and "██████

████████  Decl. Exs. 24, 28, 40, 56.  They also describe conversations in which

subscribers admitted to infringing copyright.  Allan Decl. Exs. 28, 56.  That alone would satisfy

the knowledge requirement.  *See Usenet.com*, 633 F. Supp. 2d at 155 (knowledge requirement

met where users told defendant employees that they were engaged in copyright infringement);

*Capitol Records v. MP3tunes*, No. 07 Civ. 9931, 2013 WL 1987225, at *4 (S.D.N.Y. May 14,

2013) (internal communications acknowledging likely infringement is evidence of knowledge).

### 2.     Cox Was Willfully Blind to the Infringement of Plaintiffs' Works

Not only did Cox fail to terminate those subscribers it knew to be infringers, *see* Pl. MSJ

Br., Cox actively sought to avoid further knowledge of infringement of works owned by

Plaintiffs and other copyright owners.  This "willful blindness is knowledge, in copyright law . . .

as it is in the law generally."  *Aimster*, 334 F.3d at 650; *see also Viacom International v.*

*YouTube*, 676 F.3d 19, 35 (2d Cir. 2012) ("willful blindness doctrine may be applied . . . to

demonstrate knowledge or awareness of specific instances of infringement"); *Global-Tech*

*Appliances v. SEB*, 563 U.S. 754 (2011) (applying willful blindness doctrine in the induced

patent infringement context); *Seoul Broadcasting System International v. Ro*, No. 1:09CV433,

2011 WL 3207024, at *9 (E.D. Va. 2011) (defendants "are liable for contributory copyright

infringement" where they were "at the very least . . . willfully blind").

The manager of Cox's abuse group, which was responsible for responding to complaints

of copyright infringement, put it explicitly in an email to his team.  After an abuse employee

circulated an email regarding ███████████████████ ████████████████████████

███████████████



The abuse manager responded, ████████████████████████████████████████████

███████████████   Allan Decl. Ex. 41 (ellipsis in original).

Cox knew that many of its users were infringing copyright but sought to avoid specific

knowledge as much as possible in order to avoid the obligation to terminate subscribers under

the DMCA.  Jason Zabek, the manager of Cox's abuse group, acknowledged that 

Allan Decl. Ex. 10.  Cox thus sought

to avoid receiving and acting upon notices of copyright infringement.  Zabek testified that, as a

result of a

Allan Decl. Ex. 1 at 106:11-107:2.

As to the works at issue, Cox blacklisted or blocked every single notice of copyright

infringement sent by Rightscorp on behalf of Plaintiffs, in an attempt to avoid specific

knowledge of any infringement.  SAF 17-20.  Yet, Cox denies any improper motive and

contends that the blacklisting was justified because the Rightscorp notices, which asked

infringers to pay $20 for the works they had taken, were "extortionate."  Cox Br. at 21.  This

"extortion" defense is a red herring.  Not only is there nothing wrong with asking infringers to

pay a reasonable sum for the music they download and distribute, but the question at hand is

notice to **Cox**, not whether it was appropriate for Cox to forward the settlement demands on to its

customers.  Cox could have stripped any language from the notices before forwarding them on or

otherwise provided its own notice to its customers.

In fact, Cox's blacklisting of Rightscorp notices was not an effort to protect its customers

but one element of a larger scheme to avoid receiving and acting upon notice of copyright

infringement.  Even if Rightscorp had revised its notices to eliminate the settlement demands,

Cox would have accepted only                         And it would have accepted

per subscriber                         SAF 19-20.  The evidence shows that

Cox's refusal to accept notices containing settlement demands was only one of an array pretexts

by which it sought                         SAF 17-21.

### C.     Cox Materially Contributed to Its Subscribers' Infringement of Plaintiffs' Copyrights

Though it denies knowledge of the infringement, Cox does not dispute that it materially contributed to copyright infringement by its subscribers.  Cox Br. at 21.  Cox's network constitutes the site of and facilities by which its subscribers access and share infringing content – a material contribution to copyright infringement.  *See Ellison*, 357 F.3d at 1078 (internet service provider AOL materially contributed to infringement by providing the means of access to Usenet groups through which its subscribers share infringing content); *Amazon*, 508 F.3d at 1172 (material contribution where the defendant "assists a worldwide audience of users to access infringing materials"); *Capitol Records v. MP3Tunes*, 48 F. Supp. 3d 703, 713 (S.D.N.Y. 2014) ("site and facilities for the infringing activity"); *Napster*, 239 F.3d at 1022 (same).  Indeed, Cox not only provided the facilities by which its subscribers transmitted infringing content using BitTorrent but affirmatively ███████ subscribers who had been "terminated" for copyright infringement and gave them a ███████ so that they could continue to infringe.  SAF 28.

### III.     COX IS VICARIOUSLY LIABLE FOR ITS SUBSCRIBERS' INFRINGEMENT OF PLAINTIFFS' COPYRIGHTS

A defendant may be vicariously liable where it "possessed the right and ability to supervise the infringing activity" and had an "obvious and direct financial interest" in the infringement.  *Nelson-Salabes v. Morningside Development*, 284 F.3d 505, 513 (4th Cir. 2002).  While the doctrine of vicarious liability had its *origins* in the agency relationship and *respondeat superior*, *see* Cox Br. at 20-22, the doctrine has expanded to cover any circumstance involving the necessary combination of supervision and financial interest.  "In the context of copyright law, vicarious liability extends beyond an employer/employee relationship to cases in which a defendant has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."  *Napster*, 239 F.3d at 1022 (citation omitted).

A.      Cox Has the Ability to Supervise the Infringing Activity

Cox satisfies the first prong of the test for vicarious liability because it has the legal right and ability to terminate subscribers for copyright infringement.  Cox's high speed internet acceptable use policy gives it the right to terminate customers who infringe copyright, thereby depriving them of access to the network through which they infringe.  SAF 22.

The right and ability to block access to the physical or electronic environment in which the infringement is occurring satisfies the supervision requirement.  *See Napster*, 239 F.3d at 1023 ("The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."); *Fonovisa v. Cherry Auction*, 76 F.3d 259, 262 (9th Cir. 1996) (swap meet owner deemed to "ha[ve] the ability to control the activities of vendors" for vicarious liability purposes where it "had the right to terminate vendors").  Thus, in the internet context, courts consistently have found that a service provider has the "right and ability to limit the use of its product for infringing purposes" by "denying access," *Lime Group*, 784 F. Supp. 2d at 435, where it has the contractual right to "terminate accounts" and "revoke [access] privileges," *Escape Media Group*, 2015 WL 1402049, at *42, or where it has the right "to terminate, suspend or restrict users' subscriptions thereby limiting their access to uploading or downloading."  *Usenet*, 633 F. Supp. 2d at 157.

Citing *Amazon*, 508 F.3d at 1173-74, Cox argues that the ability to terminate does not suffice.  But that case holds just the opposite.  In *Amazon*, the plaintiff could not show that Google's contracts with the infringing third-party websites empowered it to stop or limit their infringement.  *Id*.  While Google could control its own search results and its AdSense program, it could not control the conduct of third-party websites.  *Id*.  The decision expressly distinguished circumstances, such as those in *Napster* or *Fonovisa*, where customers were *using* the

defendant's services to infringe so that, through termination, the defendant had a contractual

"right to stop the vendors from selling counterfeit recordings on its premises" or "the right and

ability to prevent . . . users from engaging in the infringing activity of . . . downloading Napster

users' music files through the Napster system." *Id*. Here, too, Cox's power to terminate gives it

the ability to prevent its subscribers from using its system of cables to infringe copyright.

Cox also cites *Perfect 10 v. Visa International Service Association*, 494 F.3d 788, 805

(9th Cir. 2007), for the proposition that the power to terminate is not sufficient for vicarious

liability or, at least, that a plaintiff "must show more than a vendor-customer relationship." Cox

Br. at 23, 25. But *Visa* is inapposite. There, the plaintiffs sued vendors that processed credit

card payments to websites accused of infringement, an ancillary service that did not give the

defendant the ability to block infringers' access to the websites on which infringement occurred.

*See Visa*, 494 F.3d at 803-04. That is very different from a defendant who is the locus of

infringing activity, such as the landlord of a swap meet, the owner of a dance hall, or a high

speed internet provider which controls access to its facilities by infringing subscribers. The

distinction was essential to the holding in *Visa*. *See* 494 F.3d at 805 ("The swap meet operator in

*Fonovisa* and the software operator in *Napster* both had the right to remove individual infringers

from the very place the infringement was happening. Defendant[] [credit card processors] have

no such right."). Here, unlike in *Visa*, Cox can use its termination power to halt its subscribers'

infringement by removing their access to the network where infringement occurs.

Cox also argues that vicarious liability is improper because it does not spy on its

customers and does not monitor their internet usage. Cox Br. at 24. But vicarious liability does

not require knowledge of infringement – "lack of knowledge that the primary actor is actually

engaged in infringing activity is not a defense." *EMI April Music v. White*, 618 F. Supp. 2d 497, 507 (E.D. Va. 2009).  Rather, supervision requires only the right and ability to terminate.

Finally, Cox argues that it cannot be vicariously liable because it does not have a principal-agent relationship with its infringing subscribers.  Cox Br. at 24.  But a principal-agent relationship is not required for vicarious liability.  While the doctrine had its origins in such relationship, vicarious liability is regularly imposed in contexts involving subscribers to internet-related services, as the cases cited in this section reflect.  "Under the common law vicarious liability standard, the ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Viacom International v. YouTube*, 676 F.3d 19, 37 (2d Cir. 2012).  Here, Cox has the ability to block its infringing subscribers' access to its network, which is the mechanism by which they infringe.

### B.     Cox Directly Benefited from its Subscribers' Use of BitTorrent to Infringe

A vicarious infringer directly benefits from infringement where "the availability of infringing material acts as a 'draw' for customers." *Napster*, 239 F.3d at 1023.  For example, financial benefit arises "where infringing performances enhance the attractiveness of the venue." *Fonovisa*, 76 F.3d at 263-64.  "There is no requirement that the draw be 'substantial.'" *Ellison*, 357 F.3d at 1079.  And "the 'draw' of infringement need not be the primary, or even a significant, draw – rather, it need only be 'a' draw." *Escape Media*, 2015 WL 1402049, at *42 (quoting *Usenet.com*, 633 F. Supp. 2d at 157) (quotation marks omitted).

Here, ample evidence establishes that that the availability of infringing content via BitTorrent drew subscribers to Cox's services.  Plaintiffs' expert Stephen Nowlis conducted a survey of Cox internet subscribers.  He found that sixteen percent, "download or upload free digital music through [BitTorrent] sites such as ThePirateBay, KissAssTorrents, Torrentz, etc."

Nowlis Decl. Ex. 2 at 4 n.2; SAF 12.  Of those sixteen percent who used Cox internet service to share digital music for free, seventy percent characterized the ability to do so as a reason that they subscribed to Cox.  *Id*. at 12.  In sum, over ten percent of Cox subscribers admitted that the free sharing of digital music using BitTorrent was a reason that they subscribed to Cox.[10]

Cox's subscribers describe Cox's permissive attitude toward copyright infringement as a reason to subscribe to Cox in online fora.  One Reddit commenter recommended Cox over Verizon because it "seems to have a . . . surprisingly lax attitude to downloading/Bittorrent.  FIOS doesn't."  Allan Decl. Ex. 63 at 4.  Another commented, "I love their copyright policy because pirating is my way of shoplifting and they protect me like a Godfather. All hail Cox."  Ex. 62; *see also* Ex. 64 at 1-2 (appreciating Cox's willingness to accept "simple old man ruse" of blaming infringement on an unsecured wireless network); *see also* Ex. 66 at 1 (noting that Cox "do[es]n't act on" DMCA notices).

Cox itself regarded rapid torrent downloads as a way to provide value to subscribers.  For example, one internal Cox document describes a subscriber twitter comment that ███████ ████████████████████████████████████████████████████████ as ████████ ██████████████████████████████████████ Allan Decl. Ex. 60 at 1-2.

The monthly fees Cox charges these infringing subscribers is a direct financial benefit Cox obtains from infringement.  Cox is similar to the defendants in swap meet or flea market cases, who reaped admission fees from buyers of infringing works and rental fees from the vendors selling them.  *See Fonovisa*, 76 F.3d at 263 ("[T]he defendants reap substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly

---

[10] Cox objects that the survey did not refer specifically to infringement.  Cox Br. at 26. But the torrent sites identified are used almost exclusively for copyright infringement.  SAF 1.

from customers who want to buy the counterfeit recordings at bargain basement prices."). Because Cox's costs to maintain is network are largely fixed, it earns extremely high profit margins from every additional customer: . Allan Decl. Ex. 43. The more customers Cox attracts, the more money it will earn.

Cox benefits from BitTorrent file sharing not only by attracting customers but by upselling heavy bandwidth and data users to more expensive packages of internet service. Cox limits the bandwidth and caps the amount of data that its subscribers may consume, with higher bandwidths and data allowances available as part of more expensive service packages. Allan Decl. Ex. 58. Cox encourages high bandwidth users, *See* Allan Decl. Exs. 37 at 558; 39 at 711, 44.

In fact, Cox calibrated its DMCA termination policy so that it would retain the profitable copyright infringers while terminating unprofitable ones. As senior lead abuse engineer Joseph Sikes explained, Allan Decl. Ex. 9; *see also* Allan Decl. Ex. 8 ).

Even apart from the draw of new customers, Cox's financial incentive not to terminate infringing users satisfies the direct benefit prong of vicarious liability. *See Escape Media*, 2015 WL 1402049, at *42 ("[E]vidence of financial gain is not necessary to prove vicarious liability as long as the service provider has an economic incentive to tolerate infringing conduct."). Cox repeatedly refused to terminate – or even reactivated – known, repeat infringers in order to

preserve the revenue associated with their accounts. 

Allan Decl. Ex. 40.  Refusing to terminate another customer who had received at least ███████ infringement notices, the abuse manager instructed, ██████████████████████████████████

Allan Decl. Ex. 20.  Cox's senior lead abuse engineer summed it up:

Allan Decl. Ex. 8.  Cox tolerates infringing subscribers because more customers means more revenue.  That makes Cox vicariously liable for their infringement.  *See Escape Media*, 2015 WL 1402049, at *42.

Cox argues that it cannot have a direct financial interest in infringement because its monthly subscriber fees are flat and do not depend on any particular use of its network, including infringement.  But vicarious liability cases have expressly rejected the argument that the financial benefit must be tied to specific acts of infringement.  In the flea market cases, courts have held that the defendants' financial benefit need not be "directly tied to the sale of particular infringing items." *Fonvisa*, 76 F.3d at 263; *see also Lime Group*, 784 F. Supp. 2d at 435 ("The financial benefit need not be tied directly to sales of the infringing goods.").  Instead, flat admission fees charged to all entrants were sufficient because they also "flow[ed] directly from customers who want to buy the counterfeit recordings at bargain basement prices." *Fonovisa*, 76 F.3d at 263.  The same is true of the fees Cox charges to access its network, many of which are paid by subscribers who purchase Cox's services to download infringing files.

## IV.   PLAINTIFFS DO NOT HAVE UNCLEAN HANDS AND DID NOT FAIL TO MITIGATE THEIR DAMAGES

Cox asserts that Plaintiffs have unclean hands but has failed present evidence that (1) "plaintiff's conduct was in fact inequitable;" (2) "plaintiff's conduct directly related to the claim

which it has asserted against the defendant;" and (3) "plaintiff's conduct injured the defendant." *JTH Tax v. H&R Block Eastern Tax Services*, 128 F. Supp. 2d 926, 949 (E.D. Va. 2001) (citations omitted).  Unclean hands requires "a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." *WorldCom v. Boyne*, 68 Fed. App'x 447, 451 (4th Cir. 2003) (quoting *In re Uwimana*, 274 F.3d 806, 810 (4th Cir. 2001)).

Cox objects to Rightscorp's alleged negotiating tactics but does not cite any authority to suggest that asking infringers to pay $20 for the music they illegally download and distribute or asking Cox to terminate infringers consistent with its AUP and the DMCA might give rise to a defense of unclean hands.  Cox cites *Tempo Music v. Myers*, 407 F.2d 503 (4th Cir 1969), in which the plaintiff's agent refused to work with the defendant when it actively sought the information necessary to avoid infringement.  Here, it was Rightscorp that repeatedly sought to work with Cox but was rejected.  As Cox's abuse manager Jason Zabek explained, ███████ ███████████████████████████████████  Allan Decl. Ex. 18.

Moreover, Rightscorp's alleged negotiating tactics did not injure Cox and have nothing to do with the infringements at issue in this case.  *See JTH Tax*, 128 F. Supp. 2d at 949.  Rightscorp did not and could not communicate with any infringing Cox subscribers because Cox never forwarded Rightscorp's notices.  Thus, there is no "close nexus" between the "unethical conduct and the transactions on which [Plaintiffs] seeks relief."  *WorldCom*, 68 Fed. App'x at 451.

Cox also accuses Rightscorp of itself infringing copyrights when it downloaded sound recordings from Cox subscribers in the process of gathering evidence of infringement.  But downloading works to detect copyright infringement is not inequitable; it is an accepted means of collecting and preserving evidence of unauthorized copying.  *See Lime Group*, 2011 WL 1641978, at *7-8.  Nor does Cox, which lacks any interest in the sound recordings, have standing

to complain of such infringement.  *See Positive Black Talk v. Cash Money Records*, 394 F.3d 357, 378-79 (5th Cir. 2004).  There is no suggestion that any of the owners of the copyrights in the sound recordings have any objection to Rightscorp's collecting evidence of infringement.[11]

Cox also fails to cite a single case supporting its argument that the Court may grant summary judgment based on the alleged failure to mitigate damages.  Cox's cases simply acknowledge that such a defense may be relevant to the *calculation* of damages.  Failure to mitigate is an affirmative defense that may reduce the amount of damages a defendant must pay, not a full defense to liability.  *See SNC-Lavalin America v. Alliant Techsystems*, 858 F. Supp. 2d 620, 633 (W.D. Va. 2012).  And here, Plaintiffs seek statutory rather than actual damages.

Nor has Cox shown any failure to mitigate.  Rightscorp was entitled to seek settlements with Cox's infringing subscribers, and Cox was required to act when it received notice of infringement regardless of the extraneous material the notices may have contained.  Moreover, the evidence shows that, even if Rightscorp had removed settlement language from its notices, Cox would not have addressed the rampant infringement at issue in this litigation by terminating infringing subscribers.  SAF 19-20, 24-28; Plaintiffs' SJ Mem. at 1-30.  Sending takedown notices to websites that host *.torrent files would have been similarly futile.  Many of these websites operate abroad and flaunt their disdain for claims of copyright infringement.  There is no evidence that such a course would have mitigated Plaintiffs' damages.  SAF 5 n.1.

## CONCLUSION

For the foregoing reasons, Cox's motion for summary judgment should be denied.

---

[11] Contrary to Cox's suggestion, Br. at 29, whether Rightscorp's preservation of evidence of infringement is fair use has nothing to do with whether Cox's infringing subscribers were engaged in fair use when they downloaded copies of infringed works for their own consumption.

Respectfully submitted,

/s/ Jeremy D. Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
Paul Gennari (VSB No. 46890)
pgennari@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel: (202) 540-7157
Fax: (202) 540-7201


Of Counsel
Michael J. Allan (admitted pro hac vice)
William G. Pecau (admitted pro hac vice)
John M. Caracappa (admitted pro hac vice)
Roger E. Warin (admitted pro hac vice)
Jeffrey M. Theodore (admitted pro hac vice)
Stephanie L. Roberts (admitted pro hac vice)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Michael O. Crain
Crain Law Group, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia 30601
Tel. (706) 548-0970
Fax: (706) 369-8869

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2015, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com

/s/ Jeremy Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902