**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,<br><br>                        Plaintiff,<br><br>      v.<br><br>COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC,<br><br>                        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 1:14-cv-1611 (LOG/JFA) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**


**NON-CONFIDENTIAL PUBLIC VERSION**

## TABLE OF CONTENTS

**Page**

### Contents

INTRODUCTION ........................................................................................................................ 1

RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS ......................................................... 2

DEFENDANTS' STATEMENT OF FACTS ............................................................................... 12

LEGAL STANDARD .................................................................................................................. 12

ARGUMENT ............................................................................................................................... 13

    I.    AMPLE EVIDENCE SUPPORTS, AND INDEED ESTABLISHES, COX'S ELIGIBILITY FOR THE SAFE HARBOR UNDER SECTION 512(**a**) ................................................................................... 13

        A.    Cox Adopted, and Informs Account Holders of, a Repeat Infringer Termination Policy. ................................................................... 13

        B.    Cox Vigorously and Reasonably Implements Its Policy. ............................ 14

               1.    Cox Goes Beyond Terminating Repeat Infringers: It Acts on Good-Faith Allegations of Claimed Infringement. ......................... 15

               2.    Cox's Refusal to Accept Rightscorp's Extortionate and Bad-Faith Notices Does Not Undermine Cox's Reasonable Implementation. 16

               3.    Cox Applies a Graduated Response Process to Allegations of Copyright Infringements over Its System ......................................... 18

               4.    Taken as a Whole, Cox's Procedures Are Reasonable. ................... 20

        C.    Plaintiffs' Mischaracterizations Do Not Defeat Cox's Safe Harbor. ........... 21

    II.    PLAINTIFFS HAVE NOT CONCLUSIVELY PROVED OWNERSHIP. ............ 22

        A.    Cox May Defend the Element of Plaintiffs' Ownership. ............................. 23

        B.    Plaintiffs Cannot Conclusively Prove Ownership. ....................................... 23

               1.    Round Hill Does Not Own Any Exclusive Rights to Asserted Works ................................................................................................. 24

               2.    BMG's Copyright Registrations Do Not Conclusively Establish BMG's Ownership of "Category 1" works. ..................................... 25

3.      Plaintiffs' Copyright Registrations Do Not Conclusively Prove
        Ownership of "Category 2" Works...................................................27

4.      BMG Has Not Proved Ownership of "Category 3" Works. ............28

CONCLUSION ...................................................................................................................30

## INTRODUCTION

Ample evidence shows that Cox deserves a safe harbor under Section 512 of the Copyright Act.  Plaintiffs extract 27 communications out of over 7,500 in five years, and distort the context or draw false conclusions, to weave a deceptive impression of impropriety by Cox.  Dec. of Andrew P. Bridges in Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Bridges Dec.") ¶ 2.

The DMCA promotes cooperation between service providers and copyright holders to curb copyright infringement.  Cox is a "conduit" service provider, namely one that provides connections and transmits data for customers over the Internet.  Conduits have the most flexible DMCA safe harbor, Section 512(a).  It has only two conditions, in Section 512(i).  Cox established a repeat infringer termination policy to meet the condition at issue here.  Cox also developed a "graduated response" system for handling notifications of claimed infringement within its abuse and safety department.  It provided warnings, suspensions, and termination of accounts in response to mere accusations, not adjudications, of infringement.  Cox used standard procedures, automation, and dedicated staff to carry out its graduated response process to help curb infringements.

Rightscorp and Plaintiffs tried to abuse Cox's system.  Rightscorp sells shady services to copyright holders.  It shakes down ISP customers for money without regard to actual liability, and it tries to enlist ISPs in its scheme.  Cox explained it would not accept Rightscorp's wrongful notices and asked Rightscorp to fix its notices.  Rightscorp refused, instead dumping thousands of notices per day on Cox.  As a result, Cox blocked Rightscorp's notices.  This suit is Rightscorp's retribution, with Plaintiffs' complicity, for Cox's refusal to participate in Rightscorp's scheme.

Plaintiffs fail conclusively to prove their ownership.  Evidently nervous about ownership problems, Plaintiffs argue that Cox lacks the right to defend against the ownership element that Plaintiffs must prove.  As a fallback, BMG also argues that copyright registrations alone prove

1

ownership, but  Faced with these severe ownership problems, Plaintiffs, Oz-like, say "pay no attention to the facts behind the registration." The Court should deny Plaintiffs' motion and award partial summary judgment on both issues to Cox as a non-moving party.

## RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

### Introductory Comments and Objections

Cox objects to Plaintiffs' statement in its entirety because it does not identify specific facts. Instead, it is an extended argument in which Plaintiffs combine incomplete quotations, juxtapose unrelated points, rely on characterizations instead of evidence, and make assertions without support in order to weave a deceptive narrative.[1] Plaintiffs also have treated the use of words or phrases in documents as "facts" while misleadingly extracting those words or phrases from the documents. For example, in P25, Plaintiffs misleadingly combine in an ostensible quotation statements by two different persons. In other instances, Plaintiffs juxtapose material from different sources and contexts to create a misleading appearance of a connection. Much of Plaintiffs' statement also consists of argumentative conclusions. For these reasons, Cox disputes most of the statement.

Where Plaintiffs rely on depositions, Cox preserves and reasserts the objections appearing in the transcripts. Cox objects to the Briggs declaration as lacking evidence of Mr. Briggs' personal knowledge of many matters, including facts before he began working at BMG (in June 2013) and facts pertaining to companies other than BMG. FRE 602. Cox also objects to opinion

---

[1] Evidence of this narrative tactic appears in the use of introductory transitions in Plaintiffs' numbered statements such as "thus" in P43, P65, and P67; "for example" in P47, "however" in P51, "even then," in P59, "in particular" in P46, and "during this time period" in P19 (which implicitly refers to and relies on the paragraph before that).

testimony in the Briggs' declaration.  FRE 701, 702.  Cox further objects to the Briggs declaration

as impermissibly testifying to the content of documents (FRE 1002), containing hearsay (about

facts he heard from others), and relying upon documents that contain hearsay (FRE 802) or that

Mr. Briggs has not authenticated (FRE 901).  Cox objects to Exhibits 19, 24, 26-28, 32, and 34-37

of the Theodore declaration because they contain hearsay (FRE 802).  Cox also objects to Exhibits

13, 14, 19, 20, 24, 26-28, 32, and 34-37 of the Theodore declaration because they lack foundation

with respect to the propositions for which Plaintiffs use them.  Plaintiffs also failed competently to

authenticate Exhibits 27, 28, 34-37, and 45 of the Theodore declaration (FRE 901).

     Given the length of Plaintiffs' statement and the number of "facts" in it, Cox does not have

space to identify all bases for its challenges to each one.  Cox's mention of some flaws does not

mean that they are the only flaws or that Cox waives other defects in each "fact."

**<u>Plaintiffs' Statement of Fact 1 (P1):</u>** Disputed.



Dkt. 315 ("Gillis

Dec."). ¶ 5, Ex. RH1.

*Id.* at Ex. RH2; RH 3.

**<u>P2:</u>** Disputed.  Cox does not dispute that Plaintiffs assert 1,422 works in this motion, 43 fewer

songs than Plaintiffs assert in this suit.  *Compare* Appendices A1-A102 of Dkt. 314 ("Briggs

Dec.") and Appendices A1-A5 of Gillis Dec. *with* Dkt. 250, Exs. 4-7.  Cox disputes the claim that

Plaintiffs own, co-own, or exclusively administer each of the works in light of the entire record.  It

is not possible to address all 1422 works in this one "fact" in a 30-page document.  Moreover,

Plaintiffs' exclusive administration of the works is immaterial.

**P3:**  Disputed to the extent the documentation does not confirm this statement; some documents (such as Gillis Dec., Exs. C1 & C2) are incomplete.  Because some registration certificates do not include the works for which Plaintiffs assert them, *see, e.g.*, Briggs Dec. Exs. B195, B807, this unitary "fact" ("All of the asserted works…") is false.  It is also Plaintiffs' burden to show that each registration identifies a work that Plaintiffs claim, not a different work having the same title.

**P4, P5:**  Undisputed (subject to Cox's introduction and objection).

**P6:**  Disputed.  The documents for the BMG-Chrysalis transaction do not identify works BMG acquired and do not establish that BMG owns works in Appendices A8-A12 to Briggs Dec.

**P7:**  Disputed.  315 Music LLC or Cherry Lane Music Publishing Company, Inc., or any proved predecessor of Plaintiffs, is not a claimant on the registration in Exhibit B403 to Briggs Dec.

**P8:**  Disputed.  The documents reflecting BMG's transaction with 315 Music LLC and Cherry Lane Music Publishing Company do not identify works BMG acquired and therefore do not conclusively establish that BMG owns the works in Appendices A14-A19 to Briggs Dec.

**P9:**  Disputed.  Bug Music Inc., Hitco Music Publishing LLC, or Windswept Holdings LLC, or any predecessor Plaintiffs have conclusively proved, is not a claimant on the registrations in Exhibits B468, 568, 587, and 704 to Briggs Dec.  "Bug Music" is *handwritten* on the certificate in Exhibit B468 and there is no evidence that Bug Music is a claimant on the genuine registration.

**P10:**  Disputed.  Documents reflecting BMG's transaction with Bug Music Inc. do not identify works BMG acquired and do not establish that BMG owns works in Appendix A20 to Briggs Dec.

**P11:**  Disputed.  BMG's agreements with other copyright claimants largely do not identify songs BMG acquired and therefore do not prove BMG acquired ownership of works in the following Appendices to Briggs Dec.: A37, A40, A42, A44-A46, A48-A52, A54, A57-A60, A62-A64, A66,

A73, A74, A76, A77, A79, A83-A89, A91, A95-A98, A100-A104.  BMG's exclusive administration of the works is immaterial.

**P12:**  Disputed.  Round Hill Music, LLC is not a claimant in Gillis Dec. Exs. C1, C2.

**P13:**  Disputed.  Plaintiffs lack competent evidence that they obtained ownership rights in the works in Gillis Declaration Appendix A3.  *See* Gillis Dec. at ¶ 9.  Cox also objects to RH7 because it contains hearsay (FRE 802), impermissibly attempts to establish the content of documents (FRE 1002), and lacks foundation on the proposition for which Plaintiffs use it.

**P14:**  Disputed.  ████████████████████████████████████████████
████████████████████████████████████████  Gillis Dec., Ex. RH2; RH 3.

**P15:**  Disputed.  Rightscorp engineered a lawsuit then enlisted BMG and Round Hill as plaintiffs. Bridges Dec. ¶ 5, Ex. 9. Cox objects to Plaintiffs' evidence because it contains hearsay (FRE 802).

**P16:**  Disputed.  The notices (1) did not specifically and definitely identify infringements; (2) did not identify allegedly infringed musical compositions, only sound recordings; and (3) frequently lacked statements that Rightscorp was acting on behalf of an *owner of an infringed right*.  Dkt. 16 at ¶ 2, 14; Dkt.311 at ¶ 4(a), Ex. 2; ¶ 7(e) ; Ex. 22; *see also, e.g.,* Dkt. 311, ¶ 4(a) Ex. 2; ¶ 5(b), Ex. 17, 19; ¶ 10(d), Ex. 36, 38.  The excerpts of Theodore Ded., Exs. 2 and 5 lack foundation and contain legal opinions.

**P 17, 18, 19:**  Undisputed (subject to Cox's introductory comment and objection).

**P20:**  Disputed, incomplete and misdescribes evidence.  *Compare to* Dec. of Brent Beck in Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Beck Dec.")  ¶¶ 5-11.

**P21:**  Disputed.  Cox takes no further customer-facing action on that ticket but works with complainants in order to assist the complainants in curing the defects in the notices.  Dec. of Jason Zabek in Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Zabek Dec.) ¶ 34.

**P22**: Disputed. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    Beck Dec. ¶¶ 9-11; Zabek Dec. ¶¶ 27-29.

**P23**: Disputed, incomplete, and mischaracterizes document. *Compare to* Beck Dec. ¶ 22, Ex. 7;

Zabek Dec. ¶ 36, Ex. 14.

**P24**: Disputed. Because of Rightscorp's abusive flood of improper notices, Cox does not receive

notices from Rightscorp. Cox strives to persuade blacklisted senders to cure the improprieties and

explains it will accept proper notices. Beck Dec. ¶¶ 17-23, Exs. 5-7; *see* Zabek Dec. ¶¶ 26, 31-35.

**P25**: Disputed, incomplete, combines and misattributes statements appearing in document, and

otherwise mischaracterizes document. *Compare to* Beck Dec. ¶ 18, Ex. 5.

**P26**: Disputed. Rightscorp is the only complainant Cox has blocked at the mail server level

because of Rightscorp's bad-faith flooding of Cox's system with improper notices and its obstinate

refusal to fix the wrongful notices. Beck Dec. ¶ 21; Zabek Dec. ¶ 35.

**P27**: Disputed, incomplete, and misleading. Cox attempted to get Rightscorp to send proper

notices, but Rightscorp refused. Zabek Dec. ¶¶ 32, 35. Plaintiffs purport to be quoting Cox's

supplemental response to Plaintiffs' Interrogatory No. 3, but they alter the quote. Dkt. 362 at 9-10.

Cox preserved personally identifiable information of account holders for whom Cox had abuse

tickets, including holders of accounts associated with Rightscorp notices for which CATS (Cox

Abuse Tracking System) generated tickets. *See* Beck Dec. ¶ 14.

**P28**: Disputed, incomplete, and misleading. Rightscorp sent *no* proper "notices" to Cox, and its

notices never identified actual infringements. *See* Beck Dec. ¶ 17, 19, 23, Ex. 6. Rightscorp

produced 13,449,792 Rightscorp notices (Bridges Dec. ¶ 3) and have expressly disavowed reliance

on anything resulting from notices it generated or sent after they filed suit. *See* Dkt. 345 at 7, n. 4.

6

**P29:**  Disputed, incomplete, and mischaracterizes abundant evidence including Rightscorp's

extortion, blackmail, and violation of the spirit of the DMCA.  Dec. of Randall Cadenhead in

Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Cadenhead Dec.") ¶¶ 3, 19; *cf.* Dkt.

320.

**P30:**  Disputed, incomplete, and mischaracterizes evidence.  The entire document speaks for itself,

and deposition testimony provided the context.  Bridges Dec. ¶ 15, Ex. 27.

**P31:**  Disputed and mischaracterizes evidence.  ███████████████████████████

███████████████████████  Beck Dec. ¶¶ 8-15.  In addition, Cox notifies complainants and seeks

cooperation in curing defects.  *Id*. at ¶ 9, 17; Zabek Dec. ¶¶ 26-29.  The deposition excerpt

Plaintiffs cite does not support their point.  *See* Theodore Dec., Ex. 2 at 130:6-131:12.

**P32:**  Disputed, incomplete, and misleading.  *See* Dkt. 321 at 4-11.

**P33:**  Disputed and misleading.  Cox handles allegations and cannot make legal determinations;

the notices do not identify account holders as actual infringers.  *See* Zabek Dec. ¶ 25.

**P34:**  Disputed, incomplete, and mischaracterizes evidence.  Beck Dec. ¶¶ 5-12.  Cox retains the

entire ticket history for all account holders with CATS tickets, and Cox representatives consider all

these records when reviewing an account for termination.  Zabek Dec. ¶¶ 9(d)-(e).  The transcript

excerpt Plaintiffs cite does not support the point.  *See* Theodore Dec., Ex. 8 at 296:2-333:22.

**P35:**  Disputed, incomplete, misdescribes evidence.  Cox does not adjudicate infringements but

responds to proper complaint notices.  Zabek Dec. ¶ 25.  ████████████████████████

████████████████████████  Beck Dec. ¶ 8.

**P36:**  Disputed, incomplete, and misleading.  Cox's policy was in its Acceptable Use Policy.  This

"fact" refers to Cox's graduated response procedure for accusations.  ███████████████████

██████████████████████████████████████████████.  The statement

embeds facts in misleading characterizations.  *See* Beck Dec. ¶¶ 8, 12; Zabek Dec. ¶ 9-12.

**P37:**  Disputed, incomplete, misleading.  Cox's policy has been continuous, and there were

terminations during the period.  *See* Dkt. 318 ¶ 17.  ████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████   *See* Zabek Dec. ¶ 9-12, 14, 19-22, n. 5; Declaration of Joseph

Sikes in Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Sikes Dec.") ¶¶ 8-12.

**P38:**  Disputed, incomplete, and mischaracterizes documents.  Zabek Dec. ¶¶ 16-17, 19-21, 22, n.

5, Ex. 8; Sikes Dec. ¶ 11, n. 3.

**P39:**  Disputed, incomplete, and mischaracterizes evidence.

**P40:**  Disputed, no evidentiary basis for first sentence, incomplete, and mischaracterizes evidence.

Zabek Dec. ¶¶ 14-18, Exs. 4-7.

**P41:**  Undisputed (subject to introductory comment and objection).

**P42:**  Disputed, incomplete, and misleading.  Sikes Dec. ¶¶11-12.

**P43:**  Disputed, incomplete, and misleading.  Sikes Dec. ¶¶ 11-12.

**P44:**  Disputed, incomplete, misleading.  Sikes Dec. ¶¶ 11-12; Zabek Dec. ¶ 7, 23.

**P45:**  Disputed, incomplete, and misleading.  There is no evidence that Cox terminated account

holders for excessive bandwidth.  Beck Dec. ¶¶ 27, 28.

**P46:**  Contains *underlying* fact that is undisputed, but incomplete and misleading.  Zabek Dec.

¶¶16, Exs. 5-6; ¶¶ 20-21.

**P47:**  This is argument, not a fact.  To the extent the Court treats it as a "fact": disputed,

incomplete, misleading, and not material.  Zabek Dec. ¶¶ 14-19, Ex. 7.

**P48:**  Disputed, incomplete, compound, mischaracterizes document, and not material.  The

document pertains to a Cox Business (CB) customer acting as an ISP.  Zabek Dec. ¶¶ 7, 24, Ex. 2.

**P49:**  Disputed, incomplete, misleading, and compound "fact."  Zabek Dec. ¶¶ 19-24, Exs. 8, 9.

**P50:**  Disputed, incomplete and misleading.  Sikes Dec. ¶¶ 8-12, Ex. 9.

**P51:**  Disputed, incomplete, and mischaracterizes evidence.  Cox has always had one policy of terminating repeat infringers.  Cox terminated account holders and has continued its termination policy and graduated response procedure throughout.  *See* Zabek Dec. ¶¶ 9-14, 19; Sikes Dec. ¶¶ 7, 8, 10, 12, Exs. 2-4.

**P52:**  Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure.  *See* Zabek Dec. ¶¶ 9-13, 14-19; Beck Dec. ¶ 12, n. 7, 10.

**P53:**  Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure. ███████████████████████████████████ Zabek Dec. ¶ 9(a)-(b), 10-11; Beck Dec. ¶ 12, n.7, 10.

**P54:**  Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure.  Zabek Dec. ¶¶ 9-13. ███████████████████████ ███████████████████ "Suspension" is not similar to terms and conditions portals.  Beck Dec. ¶¶ 12(c), Ex. 3.

**P55:**  Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure.  *See* Zabek Dec. ¶¶ 9-13; Beck Dec. ¶ 12(c), Ex. 4. ████████ ████████████████████████████ Reactivation also depends on the circumstances and specific infractions of each case.  *See* Zabek Dec. ¶¶ 9(a)(e), 10-11.

**P56:**  Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure.  *See* Zabek Dec. ¶¶ 9-13; Beck Dec. ¶12(c), Ex. 4.  Cox warns account holders of a potential for termination at multiple points.  Zabek Dec. ¶ ¶ 4, 9-10. ████████ ████████████████████████████████████████ Zabek Dec. ¶10.

**P57:** Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure. *See Id*. at ¶ 9-13, 14-18; Beck Dec. ¶¶ 13-16. The transcript excerpt that Plaintiffs cite does not support the point. *See* Theodore Dec., Ex. 8 at 296:2-333:22.

**P58:** Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure. *See* Zabek Dec. ¶¶ 9-13. ███████████████████████████
███████████████ *Id*. at ¶ 10; Beck Dec. ¶ 12, n. 7, 10.

**P59:** Disputed, incomplete, misleading, and mischaracterizes Cox's termination policy and graduated response procedure. Zabek Dec. ¶ 9(f), 10-12; Sikes Dec. ¶ 12-15.

**P60:** Disputed, incomplete, and misleading. *Plaintiffs misleadingly altered the quotation. The quotation continued:* ███████████████████████████████████████
███████████████████████ Sikes Dec. ¶ 14, Ex. 11.

**P61:** Disputed, incomplete, and misleading. Plaintiffs mischaracterize the document: there is no evidence that ███████████████████████████ *See* Dkt. 317 ("Theodore Dec.") Ex. 34. *In addition, Plaintiffs misleadingly omitted the next sentence:* ███████████████████
███████████████ *See id.*

**P62:** Incomplete and misleading. The cited language includes: *"As I stated, we like to keep as many customers as we can if we can work with them closely to make sure that . . . any alleged infractions are cleared up and solved. Because again, I don't know of any business that wants to get rid of customers. But we have in the past. And when that happens, it feels like we've failed them. We haven't given them enough information to make the right decision or clean off, secure their network, whatever they have to do to stop these alleged complaints coming in."* Theodore Dec. Ex. 2 at 230:3-16.

**P63:** Disputed. Rightscorp never sent notices of actual infringement to Cox: the notices stated

that one of three possible actions had occurred (without verifying any of them), and one of those ("offer for upload") does not constitute infringement.  Beck Dec. ¶ 19, Ex. 6; Dkt. 306 pp. 10-15; *see e.g.*, Dkt. 311 ¶ 5(a) (b), Exs. 18, 19; ¶ 8(l), Ex. 30.

**P64:**  Disputed.  Rightscorp's notices were not notices of actual infringement; see response to P63.

**P65:**  Disputed.  Rightscorp's notices were not notices of actual infringement; see response to P63.

**P66:**  Undisputed, except that Cox didn't merely *claim* to terminate; it did terminate. Zabek Dec. ¶¶ 9-12, 14, 19, 22; Sikes Dec. ¶ 12-14; Cadenhead Dec. ¶¶ 10-15.

**P67:**  Disputed.  Cox does not know or adjudicate whether account holders are actual infringers. Zabek Dec. ¶ 25.  Cox acts on accusations of infringement in proper notices.  *Id*.  There is no evidence to support the claim of instances of "repeat infringement."

**P68:**  Not material.  Subject to Cox's introductory comment and objection, undisputed.

**P69:**  Disputed, incomplete, and misleading.  There is no evidence that Cox has actual, specific knowledge of repeat infringements.  The document Plaintiffs cite does not establish that fact. *Moreover, Plaintiffs misleadingly omitted the final piece of the thread:* ██████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  Theodore Dec. Ex. 47; *see also* Sikes Dec. ¶¶13, Ex. 10.

**P70:**  Incomplete:  *the document that is the source of the quotation continues:* ███████████ █████████████████████████████████████████  Theodore Dec. Ex. 49.

**P71:**  Disputed, incomplete, and misleading.  The procedures in Theodore Dec. Ex. 17 cover a wide variety of behaviors and conditions.  Cox is *not* in a position to adjudicate infringement. Zabek Dec. ¶ 25.  Cox does not insist on adjudications of actual infringements but applies its graduated response process to mere allegations.  *Id*.  There is no evidence of actual terminations

11

during the relevant time period, for exceeding bandwidth allocation.  Beck Dec. ¶ 27-29, Ex. 8.

## DEFENDANTS' STATEMENT OF FACTS

**Defendants' Statement of Fact No. 72 (D72):**  Cox is a service provider within the meaning of Section 512(k)(1)(A) that engages in activities that Section 512(a) describes.  Dec. of Linda J. Trickey in Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Trickey Dec.") ¶ 4.

**D73**:  There is no evidence that the Copyright Office investigated or independently verified ownership of the copyrights by the claimants in the registrations that Plaintiffs assert.

**D74**:  Cox informs account holders that copyright infringement violates its Acceptable Use Policy and that Cox may terminate accounts for violations.  Trickey Dec. ¶5, Exs. 1-3.

**D75**:  Rightscorp's notices identifying IP addresses do not establish that Cox account holders having those IP addresses have engaged in infringements.  *See* Zabek Dec. ¶¶15, 18.

**D76**:  Cox works with complainants to cure improprieties in their notices of alleged copyright infringement so that it can process and forward those notices via CATS.  Zabek Dec. ¶ 26.

**D77**:  Rightscorp's notices of alleged copyright infringement do not identify any specific definite infringement.  Dkt. 311 ¶ 4(a) Ex. 2; ¶ 5(b), Ex. 17, 19; ¶ 10(d), Ex. 36, 38.

**D78**:  Cox takes action on 100 percent of non-blacklisted notices it receives.  Beck Dec. ¶¶ 5-12.

**D79**:  Cox has terminated accounts who have been the subject of multiple complaints of copyright infringement.  Zabek Dec. ¶¶ 9-12, 14, 19, 22; Sikes Dec. ¶ 12-14; Cadenhead Dec. ¶¶ 10-15.

**D80**:  Cox has not terminated account holders for excessive bandwidth during the relevant time period.  Beck Dec. ¶ 27-29, Ex. 8; Dkt. 318, ¶ 17.

## LEGAL STANDARD

The Court knows the summary judgment standard.  On the safe harbor, Plaintiffs must show that no facts support Cox and that there is no dispute of material fact in their favor.  On

ownership, Plaintiffs have the burden of proof on, and therefore must conclusively establish, ownership to gain partial summary judgment.  Where all material facts support Cox, as they do here, Cox may, and should, obtain partial summary judgment as the non-moving party.

## ARGUMENT

## I.   AMPLE EVIDENCE SUPPORTS, AND INDEED ESTABLISHES, COX'S ELIGIBILITY FOR THE SAFE HARBOR UNDER SECTION 512(a).

The safe harbors in Section 512[2] identify four categories of activities that qualify for a safe harbor if a service provider meets the conditions for that safe harbor.[3]  Plaintiffs concede that Cox is a service provider under Section 512(k)(1)(A) of the Copyright Act, and they sue Cox for activities within the description of the "conduit" Section 512(a) safe harbor.

Subsection (a) has the fewest conditions, and the widest latitude, of the Section 512 safe harbors.  Only two conditions apply:  (1) the provider must adopt, notify account holders or subscribers of, and reasonably implement a policy for terminating, in appropriate circumstances, subscribers and account holders who are repeat infringers; and (2) the provider must accommodate and not interfere with "standard technical measures."  17 U.S.C. § 512(i).  Plaintiffs concede that Cox meets the second condition.[4]  Instead Plaintiffs focus on the first condition.

### A.   Cox Adopted, and Informs Account Holders of, a Repeat Infringer Termination Policy.

Cox's policy is within its Acceptable Use Policy ("AUP"): account holders may not use the

---

[2] For ease of reference, Cox includes the full text of Section 512 of the Copyright Act (the Online Copyright Infringement Liability Limitation Act, part of the Digital Millennium Copyright Act), 17 U.S.C. § 512, in a Statutory Appendix to this brief.

[3] The safe harbors limit remedies and are relevant only if a service provider is otherwise an infringer:  "a noninfringer doesn't need a safe harbor."  *Flava Works, Inc., v. Gunter*, 689 F.3d 754, 750 (7th Cir. 2012).  As a noninfringer, Cox does not need a safe harbor yet qualifies for it anyway.

[4] Indeed, the evidence conclusively shows that Cox meets this condition.  Trickey Dec. ¶ 4; Rosenblatt Dec. ¶¶ 34-38.

Cox Internet service "to post, copy, transmit, or disseminate any content that infringes the …

copyrights … of any party."  Trickey Dec. ¶5, Exs. 1-3.  "Violation of any term of this AUP may

result in the immediate suspension or termination" of the account holder's service or the account

itself.  *Id*.  Cox's policy is to terminate account holders for violations of its AUP, including repeat

infringements, in appropriate circumstances.  *Id*.  Both Cox's subscriber agreement and its terms

on its website incorporate by reference Cox's AUP, making the AUP applicable to all residential

Internet account holders.  *Id*.  Thus Cox unquestionably adopted the policy and informs its account

holders of the policy.[5]  The real focus of the debate is on the implementation of Cox's policy.

> **B.     Cox Vigorously and Reasonably Implements Its Policy.**

Congress did not impose specific standards for implementation of a policy, leaving it to

service providers to adapt to the circumstances.  *Perfect 10, Inc. v. CCBill*, 488 F.3d 1102 (9th Cir.

2007).  Section 512(a) makes no provision for notices, unlike subsections (b) through (d).  That is

because conduit services cannot readily stop infringements that merely flow through their services,

unlike (for example) hosting services that store material for users.[6]  *See* Decl. of William

Rosenblatt in Opp'n to Plaintiffs' Partial Mtn. for Summary Judgment ("Rosenblatt Dec.") ¶16-17.

Cox nevertheless set up a strong process to address claims of infringement over its system.

---

[5] Consistent with industry practice and the law, Cox does not publish the steps of the process by which it implements this policy.  "The statute does not … require the service provider to reveal its decision-making criteria… [It] need only put users on notice that they face exclusion from the service if they repeatedly violate copyright laws."  *Corbis Corp. v. Amazon.com, Inc.,* 351 F. Supp. 2d 1090, 1102 (W.D. Wa. 2004) (abrogated on other grounds); *see also* Rosenblatt Dec. ¶ 78.

[6] Unlike the explicit instructions in Section 512(c)(3)(A), "an ISP performing a function described in § 512(a), such as transmitting e-mails, instant messages, or files sent by an Internet user from his computer to that of another Internet user, cannot be sent an effective § 512(c)(3)(A) notification." *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1234-37 (D.C. Cir. 2003).  The notice and take-down provision in Sections 512(b)-(d) are absent from Section 512(a) because, consistent with the transmission functions conduits provide: there is nothing for the ISP to "take down."

### 1.   Cox Goes Beyond Terminating Repeat Infringers: It Acts on Good-Faith Allegations of Claimed Infringement.

Cox's policy applies to *infringers* in accordance with Section 512(i).  David Nimmer explained that, in implementing a repeat infringer termination policy, it is reasonable for an ISP to rely upon court adjudications of infringement by account holders if it lacks actual knowledge that they are repeat infringers.  *See generally* David Nimmer, "*Repeat Infringers*," 52 J. Copyright Soc'y USA 167 (2005).  It would be reasonable for an ISP to follow Nimmer and insist on adjudications of infringement: determinations of infringement are factually complex and require legal assessment, and ISPs are not in a position to make legal judgments.  *See Corbis*, 351 F. Supp. 2d at 1105.  Moreover, infringement judgments require more information than notifications contain, and service providers need not monitor their services or affirmatively seek facts indicating infringements.  *See* 17 U.S.C. § 512(m).  BMG's Deputy General Counsel, discussing copyright lawsuits against BMG when the shoe is on the other foot, conceded that ██████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████  Bridges Dec.¶ 7(e), Ex. 14.

Moreover, Plaintiffs have no evidence that Cox ever received proof of *repeat* infringements by any Cox account holders.  Trickey Dec. ¶¶ 6-7.  Rightscorp's notices fell far short.  *See* Beck Dec. Ex. 6.  As Cox explained in its own summary judgment motion, Rightscorp's notices did not give Cox actual knowledge of *any* infringements by account holders.  Dkt. 306 at pp. 18-19.  Cox is unaware that any court has held a Cox account holder to be an infringer, much less a repeat infringer.  Trickey Dec. ¶ 6-7.  If Cox knew of such an adjudication, Cox would terminate an account holder.  *Id.* at ¶ 7.  In any event, while Cox could insist on an *adjudication* before terminating an account holder, as a matter of choice and not obligation, Cox applies its process to

mere *accusations* involving its accounts.  Trickey Dec. ¶ 5; *see also* Rosenblatt Dec. ¶¶ 20-22.

Having gone beyond the requirements for a termination policy, Cox could set standards for how it

would accept notices of claimed infringement.

In response to earlier notices from other companies that used threatening language and

made monetary demands, Cox decided not to accept or forward those improper notices.  Dkt. 320

¶¶ 19-24; Dkt. 321 ¶¶ 14-20.  When Cox receives improper notices, it promptly asks the

complainant for changes to meet Cox's reasonable criteria.  Dkt. 320 ¶¶ 19-24; 321 ¶¶ 15-20.

Once a complainant complies, Cox accepts its future notices.  Dkt.  312 ¶¶ 11-14; Trickey Dec. ¶¶

18-21; Beck Dec. ¶¶ 5-12, 17.

### 2. Cox's Refusal to Accept Rightscorp's Extortionate and Bad-Faith Notices Does Not Undermine Cox's Reasonable Implementation.

Plaintiffs pretend that Cox's treatment of Rightscorp's notices was a defect in Cox's

implementation of its policy.  But Cox's handling of Rightscorp's notices was entirely reasonable

and consistent with its practice of handling similar notices.  Rosenblatt Dec. ¶¶ 67-121.[7]

Cox works well with many copyright holders and their agents.  But it considered

Rightscorp's notices improper, as involving extortion and blackmail.  Cadenhead Dec. ¶ 3; Dkt.

321 ¶¶ 15-20.  Cox consulted with its in-house counsel Randall Cadenhead, who had experience

with the DMCA.  Dkt. 320 at ¶ 9.  Mr. Cadenhead determined that Rightscorp's notices did not

comply with the "spirit of the DMCA," which calls for cooperation to curb infringement.  *Id*. at 19-

28.  Cox therefore refused to accept the notices and communicated that fact diplomatically to

Rightscorp.  *Id*.  Cox asked Rightscorp to fix the notices, but Rightscorp stubbornly refused.  *Id*.

Instead, Rightscorp started flooding Cox with wrongful notices, including over 24,000 in one day,

---

[7] ████████████████████████████████████████████████████
████████████████████████████████████  *See* Bridges Dec., Exs.3-8; *see also* Rosenblatt ¶ 17, 89.

which led Cox to block Rightscorp's notices at the e-mail server level.  Beck Dec. ¶ 21.

Rightscorp appeared uninterested in curbing infringement; instead it exploits fears of loss of Internet service in shaking down account holders, who may in fact not be infringers, for payments too small to drive account holders to lawyers for a defense.  Rightscorp's telephone script shows how Rightscorp bullies consumers.  Bridges Dec. ¶ 10(a), Ex. 21. ██████████

████████████████████████████████████████████████████████████████████████

████████████████████████  Bridges Dec. ¶ 5(a), Ex. 2; ¶ 7 (d), Ex. 14. ████████████

While Rightscorp was the only complainant that Cox had to block at the mail server level, because it flooded Cox with massive numbers of improper notices, Cox also refused to accept similar notices from other agents.  Beck Dec. ¶¶1-21.  One other was PayArtists, where Rightscorp's principals had previously worked.  Rightscorp's principals thus knew Cox's position on the improper notices before they founded Rightscorp.  *Id*. at ¶ 18; Dkt. 320 at ¶ 21.

Plaintiffs rely on *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004), to argue that Cox allows notices to "fall into a vacuum."  *Ellison* held there was a triable issue of fact as to whether the ISP lacked an effective notification procedure.  *Id.*  The complainant in *Ellison* did not learn that the ISP failed to act, and he had no means of contacting the ISP.  *See id*. at 1072, 1077.  In contrast, Cox has a system with a valid email address that accepts and acts on proper notices.  Zabek Dec. ¶ 26; Beck Dec. ¶¶ 3, 5-12, 17 .  Cox notified Rightscorp why it would not accept or process its notices.  Zabek Dec. ¶ 32, Ex. 13, *see also*, Dkt. 321 at ¶¶ 15-22.  And Cox takes action on 100 percent of non-blacklisted notices.  Beck Dec. ¶¶ 5-12.  This case is worlds apart from *Ellison.*

3.      **Cox Applies a Graduated Response Process to Allegations of Copyright Infringements over Its System.**

Cox has a robust and largely automated[8] "graduated response" process for addressing

allegations of copyright infringement over its system.  Zabek Dec. ¶¶ 8-11, 13. ███████

██████ █████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████  Zabek Dec. ¶¶ 5, 9, 11, Ex.

1. ████████████████████████████████████████████████████  Beck

Dec. ¶ 12. ██████████████████████████████████  Bridges Dec. ¶ 14(b), Ex. 26.

████████████████████████████████████████████████████████████

████████████████████████████████  Zabek Dec. Ex. 11, ¶¶ 9, 10, 11.

While Section 512 (a) does not call for notifications by complainants or their processing by ISPs,

Cox asks for information that a different provision, Section 512(c)(3), specifies, because that is

widely familiar.  Dkt. 320, ¶ 10-11; Zabek Dec. ¶¶ 5, 26, Ex. 1.

---

[8] To process and forward notices of alleged copyright infringement to its account holders, Cox uses its proprietary automated software system CATS (Cox Abuse Tracking System).  Zabek Dec. ¶ 5; Beck Dec. ¶ 3-15; Rosenblatt Dec. ¶¶ 42-66.  CATS automatically extracts information from complaints, identifies the account with the IP address at the relevant time, and creates a "ticket." Dkt. 321 at ¶ 11 .  Beck Dec. ¶¶ 5-9. ███████████████████████████████████████
███████████████  Beck Dec. ¶ 12.  CATS allows Cox to process many more notices of claimed infringement than it otherwise could.  Beck. Dec. ¶ 4; Dkt. 320 at ¶ 13-15.

[9] In 2011 and part of 2012, the process was the same ███████████████████████████████
██████████████████████████████████████████████████████████████████.
Zabek Dec. ¶ 12.  Cox made the changes because by including more steps it could better provide account holders with notice of the complaints associated with their account and with a better opportunity to cure issues that led to the complaints.  Sikes Dec. ¶¶ 8-12; *see also*, Zabek Dec. ¶ 16.

[10] █████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████  *See* Zabek Dec. ¶¶ 9(a)-(e), Ex 1.



Beck Exs. 3, 4; Zabek Dec. ¶¶ 9(c), 10, 11.

*Id.*

Zabek Dec. ¶¶ (d)-(e), 10, 11; Ex. 1.  These representatives work with account holders to identify actions that might cause complaints, explaining how to remove files, disable file-sharing, secure wireless connections, and identify malware.  *Id.*  Representatives may confer with Cox's specialized customer safety team (or "abuse team") for guidance.  *Id.*  Cox representatives remind the account holder that more complaints may result in termination.  *Id.*

If Cox continues to receive notices for an account, Cox considers whether to terminate that account, and it does so where appropriate.  *Id.* at. ¶¶ 9(f), 10-11, 14, 19, 22.  The decision requires discretion because customers' situations vary widely: some account holders do not readily understand what gave rise to complaints.  *See id.* at 9(f), 18.  Others are unsophisticated and need to talk with a representative multiple times.  Zabek Dec. ¶ 18.  Before termination, representatives, often in conjunction with the safety team, review the history of that account holder to ensure that Cox made every effort to help him secure his Internet access, remove malware, and otherwise avoid violating Cox's AUP before taking the extreme measure of termination.  *Id.* at. ¶ 9.  While Cox does actually terminate account holders, in the vast majority of cases Cox is able, through its interactive warning and suspension steps, to resolve the issues that led to complaints.  *Id.* at ¶ 24.

Plaintiffs complain that Cox has not terminated enough account holders.  Section 512(i) does not mandate termination whenever an account holder is the subject of an accusation of being a "repeat infringer."  *See Perfect 10, Inc. v. Giganews, Inc.*, 993 F. Supp. 2d 1192, 1197 (C.D. Cal.

2014) (rejecting argument that a Section 512(c) service provider did not reasonably implement repeat infringer policy because ISP terminated 46 repeat infringers since 2008).  Nor is termination the industry norm.  Rosenblatt Dec. ¶ 32-33, 68.  Nevertheless, Cox *does* terminate account holders in response to accusations of infringement.  *See* Cadenhead Dec. ¶¶ 11-17.

Plaintiffs' position reads the "in appropriate circumstances" phrase out of Section 512(i).  Section 512(i) uses that phrase but does not define it; the law allows the service provider to make its own determination.  *Perfect 10,* 488 F.3d at 1111.  Consistently with Plaintiffs' disregard for the "in appropriate circumstances" qualification, Plaintiffs' expert Terrence McGarty was not even aware of that phrase in Section 512(i).  Bridges Dec. ¶ 14(a), Ex. 26.

Of course, the true goal of Rightscorp's and Plaintiffs' scheme is not termination of repeat infringers.  That was just a pretext for a scheme to get either protection money from those wishing to avoid loss of service or ransoms from those who had lost service.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮  Dkt. 320 ¶ 27, Exs. 8, 9; Bridges Dec. ¶ 11(a), Ex. 22, 22A.

Plaintiffs cite to *Disney Enter., Inc. v. Hotfile Corp*., No. 11-20427-CIV, 2013 WL 6336286, at *10 (S.D. Fla. Sept. 20, 2013) in arguing that Cox has no system for addressing infringement.  *Hotfile*, like *Ellison*, is completely different:  Hotfile "lacked any meaningful policy to combat infringement" and had no system, procedure, or technology for keeping track of notices or tying notices to repeat infringers.  *Id*.  That is not Cox.  Cox's policy is clear.  And Cox *does* terminate account holders "in appropriate circumstances," which satisfies Section 512(i).

### 4.      Taken as a Whole, Cox's Procedures Are Reasonable.

The DMCA "permits service providers to implement a variety of procedures."  *Perfect 10,* 488 F.3d at 1109.  It does not mandate specific procedures or define "repeat infringer."

Cox's procedures are reasonable for many reasons.  First, as Cox has shown above, it acts

on accusations, not insisting on court adjudications before terminating account holders.  Second, it compares favorably with the Copyright Alert System of major ISPs, which developed after Cox had pioneered its own procedures.  Dkt. 320 ¶¶ 18; Rosenblatt Dec. ¶¶ 23-30.  Third, Cox appears to be one of the few ISPs that actually terminates account holders; Plaintiffs' expert Mr. McGarty admitted he had not seen evidence that any other ISP terminates customers based on mere allegations of infringement.  Bridges Dec. ¶14 (c), Ex. 26; Rosenblatt Dec. ¶ 33.  Fourth as Cox explained above, it works with account holders to cure the problems that led to complaints.  Fifth, Cox works with a wide variety of copyright holders and agents to facilitate efficient and streamlined handling of proper notifications.  Zabek Dec. ¶¶ 25-30.[11]

One factor that Cox considers is that systems for detecting possible infringements are not reliable.  As Cox argued in its motion for summary judgment, Rightscorp's software does not detect any infringing act.  Dkt. 306 pp. 14-15.  Automated systems cannot evaluate factors such as fair use; authorization; and whether persons other than the account holder, such as neighbors using an account holder's wireless network, may be responsible.  *See* Zabek Dec., 9 (c).  Account holders may also be victims of malware.  *Id.* ¶ 15, 18.  As many courts have observed, notices alone are not evidence of actual infringement; "the common approach for identifying … BitTorrent users … is inconclusive."  *In re Malibu Media Adult Film Copyright Infringement Cases,* No. 2:15-cv-04797, Dkt. No. 10 (E.D.N.Y. Oct. 6, 2015*); Perfect 10,* 488 F.3d at 1112.

### C.    Plaintiffs' Mischaracterizations Do Not Defeat Cox's Safe Harbor.

"Plaintiffs' characterizations of testimony are insufficient to create a genuine issue of material fact for summary judgment purposes."  *Lawrence v. IMAGINE . . . !,* 333 F. Supp. 2d 379,

---

[11] Although the Court should judge the reasonableness of implementation of a repeat infringer termination policy by evaluating the implementation as a whole, individual aspects of Cox's implementation (█████████████████████████████████████████) are also reasonable.  *See* Rosenblatt Dec. ¶¶ 84-87.

385 (D. Md. 2004)).  Plaintiffs' mischaracterizations here do not show that Cox fails to implement its policy reasonably.

Plaintiffs' assertion that Cox ignores 95% of complaints rests upon deceptive statistics that include millions of notices that Rightscorp deliberately sent knowing that Cox would never receive them.  Bridges Dec. ¶ 3.  Cox has reasonable grounds to blacklist Rightscorp and its ilk.  For non-blacklisted complainants, *Cox takes some action, although not always a customer-facing action, on 100% of copyright complaints* it receives.  Beck Dec. ¶¶ 5-12.

Plaintiffs also lean heavily on a change in Cox's reactivation procedures in 2012.  As Cox explained, during the relevant period its policy has always been to terminate account holders in appropriate circumstances.  Evolution of Cox's graduated response process did not change the policy or render its implementation unreasonable.  Sikes Dec. ¶¶ 8-12; Zabek Dec. ¶¶ 9-14, 19, 22, Ex. 9; Rosenblatt Dec. ¶¶ 67, 101-111.  The evolution made the process more effective.  *Id.*

Plaintiffs' "evidence" that Cox did not terminate known repeat infringers is nothing more than conjecture and hyperbole.  Plaintiffs rely on snippets of conversations that do not show what actions call centers actually took against accounts.  Instead, the evidence shows that Cox's process works to educate account holders to curb conditions that lead to the notices and, when all else fails, it leads to termination.  Zabek Dec. ¶¶ 9-11, 14-24.  In sum, based on the undisputed facts, Cox reasonably implements its repeat infringer termination policy and therefore deserves summary judgment establishing its entitlement to the Section 512(a) safe harbor.

## II.    PLAINTIFFS HAVE NOT CONCLUSIVELY PROVED OWNERSHIP.

Plaintiffs seek damages of up to $150,000 *per work infringed* for over 1400 works, totaling over $210 million.  They want those windfall "damages" without having to prove actual ownership of the 1,400+ works at issue and by denying Cox any right to defend against Plaintiffs' spurious

claims of ownership.  Those claims rest, in BMG's case, upon (1) unexamined copyright registrations, which BMG applied for without even verifying it had acquired the copyrights, and (2) defective chains of title and claims of mere "management" rights for many works.  Round Hill does not own a single copyright in the case yet relies upon defective claims of authorization to act for the copyright owners: it is merely an employee of copyright owners.

### A.   Cox May Defend the Element of Plaintiffs' Ownership.

Ownership is the first element of a copyright claim.  *See Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Plaintiffs argue that Cox has no "standing" to defend against that element.  The recent invalidation of Warner Chappell's copyright in the "Happy Birthday to You" lyrics addressed this same argument.  *See Marya v. Warner/Chappell Music, Inc.*, No. 2:13-cv-04460-GHK, Dkt. No. 244 (C.D. Cal. Sept. 22, 2015).  Like Plaintiffs here, Warner/Chappell made the same effort to stymie a defense to its ownership, relying on similar authorities.  Rejecting Warner/Chappell's argument, the *Marya* court held that a third party can defend against an assertion of ownership, even if the third party may lack standing to challenge the validity of an unwritten copyright assignment.  *Id.* at 40.

This Court should similarly reject Plaintiffs' evasion tactic here.  Cox does not dispute copyright transfer agreements on the basis that they lacked formality.  Instead, Cox disputes the substance, scope, and the completeness of the chain of title evinced by those agreements.  Cox must have the opportunity to defend against the threshold ownership element of Plaintiffs' claim.

### B.   Plaintiffs Cannot Conclusively Prove Ownership.

To satisfy their burden on summary judgment, Plaintiffs must conclusively prove that they own the 1,422 works they assert "in this motion."  (Plaintiffs are equivocal on how many copyrights they assert in the case.)  BMG argues it is the presumptive owner of works where its

name appears as "claimant" on a copyright registration ("Category 1").  Both BMG and Round

Hill argue they are the presumptive owners of works where their predecessors in interest appear as

claimants on registrations ("Category 2").  Finally, BMG relies on co-publishing and

administration agreements to cobble together, mostly unsuccessfully, chains of title for works that

others authored and registered ("Category 3").  BMG's evidence fails conclusively to establish its

ownership of works in all Categories.  ████████████████████████████

████████████████  As a consequence, Plaintiffs do not deserve partial summary judgment in

their favor.  Moreover, Plaintiffs have taken their best shot at proving ownership, putting

everything they have into this motion, and the Court has precluded Plaintiffs from relying on

ownership evidence they did not produce in discovery.  Dkt. 290.  But Plaintiffs have come up

short.  Because they lack proof of ownership, Cox deserves summary judgment on this issue.

## 1.      Round Hill Does Not Own Any Exclusive Rights to Asserted Works.

Only owners of an exclusive copyright right can sue for infringement.  17 U.S.C. § 501.

According to Plaintiffs, Round Hill Music LLC (*not* the same as Plaintiff Round Hill Music LP)

owned various interests in the works Round Hill asserts.  Gillis Declaration In Support of

Plaintiffs' Mtn. for Partial Summary Judgment ("Gillis Dec.") at ¶¶ 5–6.  Round Hill Music LLC

assigned all its interests in the works to Round Hill Music Royalty Fund, LP ("RHMRF").  Gillis

Dec. at ¶ 6.  At that point, Plaintiff Round Hill Music LP had no ownership interests.

According to Round Hill Music LP's President Neil Gillis, RHMRF "assigned an

ownership interest, including the sole and exclusive administration rights and right to file suit, to its

affiliate Round Hill Music, LP through the Third Amended And Restated Agreement of Limited

Partnership of Round Hill Music Royalty Fund LP, and the Management Agreement dated January

14, 2013…."  Gillis Dec. at ¶ 6.  But this grossly mischaracterizes the agreements.  ██



Gillis Dec. Ex. RH3 (Management Agt.) at 1; Ex. RH2 (Amended LP Agt.) at 6. Thus Plaintiff Round Hill Music LP was ███████████████████████████████████████████████████████ ███████████████████████████████ Because Round Hill Music LP does not own exclusive rights in any of the asserted works, it lacks standing to sue. Not only has Plaintiff Round Hill failed to prove it owns any of the asserted works, but the evidence proves the opposite. Cox deserves summary judgment on the issue of Round Hill's copyright ownership.

### 2.   BMG's Copyright Registrations Do Not Conclusively Establish BMG's Ownership of "Category 1" works.

A registration creates a rebuttable presumption of ownership. 17 U.S.C. 410(c); *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010), as amended (Aug. 24, 2010). Where other evidence casts doubt on the question, ownership cannot not be presumed. *See Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980).

Copyright registrations list "claimants," not "owners." They do not conclusively establish ownership. *Keeler Brass Co. v. Cont'l Brass Co.*, 678 F. Supp. 1185, 1187-88 (M.D.N.C. 1987). Instead, they merely create a sequence for the procedural burdens in a case. *Id.; Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 414 (2d Cir. 1985). The burden of persuasion always rests with the plaintiff, but a registration shifts the burden of production to the defendant. *See* 17 U.S.C. §410(c); *Durham Indus.*, 630 F.2d at 908; *American Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 665 (5th Cir. 1978), *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821,

826 (11th Cir. 1982).  Once defendants produce some evidence undermining ownership, the presumption vanishes and the burden shifts to Plaintiffs to prove they own the copyrights.  *See Carol Barnhart*, 773 F.2d at 414.

The burden of rebutting this presumption varies according to what the registrant seeks to establish with the registration.  *See Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668 (3d Cir. 1990).  If the debate is over a matter the Copyright Office examines closely, then the burden of negating that presumption is high.  *See, e.g., Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 707 (D. Md. 2012) *aff'd*, 722 F.3d 591 (4th Cir. 2013) (Copyright Office interpretations of copyright law entitled to *Chevron* deference).  But where the Copyright Office engages in a cursory investigation, the burden on defendants is low.  *See Carol Barnhart*, 773 F.2d at 414.  The Copyright Office affords almost no scrutiny to questions of ownership.  It "generally [] accept[s] the facts stated in the application and other registration materials" and "will not conduct its own factual investigation to confirm the truth of the statements made in the application."  *See* Compendium of U.S. Copyright Office Practices § 309.2 (3d ed. 2014).  Accordingly, "the Copyright Office's practice of summarily issuing registrations . . . counsels against placing too much weight on registrations as proof of a valid copyright." *Universal Furniture*, 618 F.3d at 428.   Thus, to shift the burden back to the copyright claimants, Defendants must simply offer *some* evidence rebutting ownership.  *See Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217-18 (9th Cir. 1997).

BMG relies *solely* on registrations in which its name appears as "claimant" for Category 1 works.  *See* Bridges Dec. ¶ 9(b), Ex. 19.  But testimony of BMG's own VP of Copyright and Rule 30(b)(6) witness on ownership, Robert Briggs, undermines BMG's entitlement to a presumption.



*Id.* at 23:1–14.

*Id.* at 146:14–23; 147:13–25; 148: 2–17; 149:2–17.  After the Rule 30(b)(6) deposition BMG did not change these answers of its corporate representative.

Registrations do not identify copyright owners; they identify copyright claimants.  Chain of title review is not a Copyright Office practice.  Copyright applicants (unlike patent applicants and trademark applicants) need not verify their ownership under penalty of perjury.  Here, where BMG's corporate witness confessed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ registrations cannot prove ownership.  They deserve no presumption.  BMG's confession shifts the burden back to it to prove that it actually owns works in Category 1.  But BMG cannot do so, because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 115:16-23, 116:2-4, and the Court has precluded BMG from using ownership evidence it failed to produce in discovery.  *See* Dkt. 290.  Because Plaintiffs cannot prove their Category 1 ownership, they cannot obtain summary judgment. Cox now deserves summary judgment on Category 1.

### 3. Plaintiffs' Copyright Registrations Do Not Conclusively Prove Ownership of "Category 2" Works.

Plaintiffs also rely on copyright registrations to establish their ownership of works where predecessors in interest appear as claimants on the registrations (Category 2 works).  Unlike the Category 1 works, "the existence of a copyright certificate with someone else's name on it does not vest anyone other than the author with rights to the work."  *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1101 (N.D. Cal. 2002).  Some courts require chain of title evidence back to

the original registrants.  *See, e.g., Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 809-10 (D. Md. 1995) *aff'd mem.*, 91 F.3d 132 (4th Cir. 1996).  Others require chain of title evidence going back to the original author.  *See Napster*, 191 F. Supp. 2d at 1101.  The latter decision is more sound, because it guards against the practice of using transfers to launder otherwise defective chains of title.  Under either standard, Plaintiffs must at least demonstrate chain of title to their predecessors in interest.

BMG attempts to claim title from predecessors by pointing to nine mergers or acquisitions. Briggs Dec. ¶¶ 13–41.  In eight of these cases, BMG's evidence fails to identify works it acquired. The evidence shows only that transactions occurred.  Dkt. 363, Ex. 2.  BMG therefore lacks evidence that it owns the Category 2 works and cannot rely on any presumption of ownership from its predecessors in interest.  Without conclusive evidence of which songs it acquired through mergers, BMG cannot prove that it owns the Category 2 works.

Similarly, as Cox explained earlier, ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Without more information, Round Hill Music LP cannot establish the chain of title necessary to support its claims to Category 2 works.  At this point, Cox deserves summary judgment on Category 2.

### 4.   BMG Has Not Proved Ownership of "Category 3" Works.

BMG claims it obtained exclusive rights in the remaining works by acquiring copyrights or portions of the copyrights from others (Category 3 works).  For these, BMG "need[s] to produce chain of title from the listed author" to itself to establish ownership conclusively.  *See Napster*, 191 F. Supp. 2d at 1101.  Cox has repeatedly identified deficiencies in Plaintiffs' chains of title, and

Plaintiffs have abandoned works where Cox has probed ownership.  Plaintiffs dropped over 40 works at the close of discovery; those works are missing from Plaintiffs' motion.  Plaintiffs artfully state there are 1,422 works "[a]t issue in this motion" as opposed to "in this action."  *See* P2.  By omitting works from its motion, Plaintiffs effectively acknowledge serious chain of title problems.  Those problems affect the works at issue in this motion.

For example, BMG relies on incomplete co-publication or administration agreements regarding Category 3 works.  The agreements grant BMG various rights to songs in attachments that do not exist.  *See, e.g.*, Briggs Dec. Ex. 29 (missing Annex 1); Ex. 66 (missing Attachment A).  These incomplete agreements do not establish chain of title because they do not identify the objects of a transfer.  Thus on its motion BMG has failed to establish title for works in the following appendices to the Briggs and Gillis declarations: A37, A44-A45, A46, A57-A58, A66, A73-A74, A79, A85-A87, A89, A95, A97-A98, and A102.

BMG relies on other vague agreements that also fail to identify the works.



*See, e.g.*, Briggs Dec. Exs. 23, 37.   *See, e.g.*, Briggs Dec. Ex. 93.

*See, e.g.*, Briggs Dec. Ex. 98, Ex. 105.  Each of these agreements may have transferred song rights, but they fail to identify to *which* songs they transferred rights.  BMG provides no evidence identifying works these agreements transferred; with the Court's preclusion order it is now too late for BMG to do so.  BMG has failed to establish chain of title for works in the following appendices to the Briggs declarations: A37, A40, A42, A45-A46, A48- A52, A54, A57, A59-A60, A62-A64, A66, A83-A84, A86-A89, A91, A95-A98, and A100-A104.

Finally, BMG relies on a few agreements that allegedly transferred to rights from others to BMG but those other parties appear nowhere in the agreements.  Bridges Dec. ¶¶ 16-20.  This evidence does not establish BMG's ownership of the works listed in appendices A76, A77, A89, A95, and A101 to Briggs' declaration.

Because Plaintiffs have not conclusively proved ownership of the works at issue, they do not deserve partial summary judgment.  Cox deserves summary judgment instead.

## CONCLUSION

Because the evidence supporting Cox's safe harbor is both substantial and conclusive, the Court should deny Plaintiffs' partial summary judgment motion and grant summary judgment to Cox on the safe harbor.  Because Plaintiffs have failed to prove conclusively their ownership of copyrights, and the Court has precluded them from relying on new evidence they failed to produce, the Court should deny Plaintiffs' motion and grant Cox summary judgment on ownership.

Respectfully submitted,

Dated:  October 13, 2015

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB No. 20942)
111 Oronoco Street
Alexandria, VA  22314
Tel:  (703) 549-5354
Fax:  (703) 549-5355
Email:  craig.reilly.@ccreillylaw.com

*Counsel for Defendants*

*Of Counsel for Defendants*

Andrew P. Bridges (*pro hac vice*)
David L. Hayes (*pro hac vice*)
Jedediah Wakefield (*pro hac vice*)
Guinevere L. Jobson (*pro hac vice*)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel:  (415) 875-2300
Fax:  (415) 281-1350
Email:     abridges@fenwick.com
                dhayes@fenwick.com
                jwakefield@fenwick.com
                gjobson@fenwick.com

Brian D. Buckley (*pro hac vice*)
Fenwick & West LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101
Tel:  (206) 389-4510
Fax:  (206) 389-4511
Email:     bbuckley@fenwick.com

Armen N. Nercessian (*pro hac vice*)
Ronnie Solomon (*pro hac vice*)
Ciara Mittan (*pro hac vice*)
Fenwick & West LLP
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500
Fax:  (650) 938-5200
Email:     anercessian@fenwick.com
                rsolomon@fenwick.com
                cmittan@fenwick.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2015, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

/s/ Craig C. Reilly
Craig C. Reilly (VSB No. 20942)
111 Oronoco Street
Alexandria, VA  22314
Tel:  703-549-5354
Fax:  (703) 549-5355
Email:  craig.reilly.@ccreillylaw.com

*Counsel for Defendants*
