**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **BMG RIGHTS MANAGEMENT** | ) | |
| **(US) LLC, and ROUND HILL** | ) | |
| **MUSIC LP** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:14-cv-1611 (LO/JFA) |
| | ) | |
| **COX COMMUNICATIONS, INC. and** | ) | **PUBLIC VERSION** |
| **COXCOM, LLC** | ) | **REDACTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel:  (202) 540-7157
Fax:  (202) 540-7201

CRAIN LAW GROUP, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia 30601
Tel. (706) 548-0970
October 20, 2015                    Fax: (706) 369-8869

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................2

I.    PLAINTIFFS HAVE PROVED OWNERSHIP OF THE WORKS AT ISSUE .................2

    A.    BMG Is the Owner of the Copyrights Where BMG Is a Listed Claimant..............3

    B.    BMG Owns Copyrights Listing its Predecessors as Claimants .............................4

    C.    BMG Purchased Copyrights from the Registered Claimants .................................6

    D.    Round Hill Music LP Has Exclusive Rights to Sue on the Round Hill
        Copyrights.......................................................................................................7

II.   COX DOES NOT QUALIFY FOR A DMCA SAFE HARBOR.......................................9

    A.    Cox's Policy Is Not to Terminate Repeat Infringers So That It Does Not
        Lose Subscriber Revenue.................................................................................9

    B.    Cox's Failure to Act on Proper Notices of Infringement Deprives It of Any
        DMCA Safe Harbor .......................................................................................15

CONCLUSION......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*A&M Records v. Napster*,
   239 F.3d 1004 (9th Cir. 2001) .............................................................................................19

*ALS Scan v. RemarQ Communities*,
   239 F. 3d 619 (4th Cir. 2001) ...................................................................................14, 17, 20

*Arista Records v. Lime Group*,
   No. 06 CV 5936, 2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) .............................................6

*Arista Records v. Usenet*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009).................................................................................14

*Billy-Bob Teeth v. Novelty*,
   329 F.3d 586 (7th Cir. 2003) ...............................................................................................8

*Bouchat v. Baltimore Ravens Football Club*,
   346 F.3d 514 (4th Cir. 2003) ...............................................................................................2

*Capitol Records v. Escape Media Group*,
   No. 12-CV-6646 AJN, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015)..............................15, 19

*Carol Barnhart v. Economy Cover Corp.*,
   773 F.2d 411 (2d Cir. 1985)..................................................................................................4

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................................2, 12

*Complex Systems v. ABN Ambro Bank*,
   979 F. Supp. 2d 456 (S.D.N.Y. 2013)..................................................................................2, 4

*Datatech Enterprises v. FF Magnat*,
   No. C 12-04500 CRB, 2013 WL 1007360 (N.D. Cal. Mar. 13, 2013)...................................12

*Disney Enterprises v. Hotfile Corp.*,
   No. 11-20427-CIV, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013).......................................13

*Durham Industries v. Tomy Corp.*,
   630 F.2d 905 (2d Cir. 1980)..................................................................................................4

*Effects Associates v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) .............................................................................................5, 6

*Ellison v. Robertson*,
   357 F. 3d 1072 (9th Cir. 2004) ...........................................................................16, 17, 18, 19

*Entertainment Research Group v. Genesis Creative Group*,
122 F.3d 1211 (9th Cir. 1997) ........................................................................................4

*Ganz Brothers Toys v. Midwest Importers of Cannon Falls*,
834 F. Supp. 896 (E.D. Va 1993) ...................................................................................3

*Gardner v. Beale*,
998 F.2d 1008 (4th Cir. 1993) ........................................................................................2

*Imperial Residential Design v. Palms Development Group*,
70 F.3d 96 (11th Cir. 1995) ............................................................................................9

*In re Aimster Copyright Litigation*,
334 F.3d 643 (7th Cir. 2003) ........................................................................................15

*In re Napster Copyright Litigation*,
191 F. Supp. 2d 1087 (N.D. Cal. 2002) ..........................................................................5

*Lone Ranger Television v. Program Radio Corp.*,
740 F.2d 718 (9th Cir. 1984) ..........................................................................................5

*M. Kramer Manufacturing v. Andrews*,
783 F.2d 421 (4th Cir. 1986) ..........................................................................................3

*Marya v. Warner/Chappell Music*,
No. 2:13-cv-04460-GHK, Dkt. No. 244 at *40 (C.D. Cal. Sept. 22, 2015) ...............9

*Mellencamp v. Riva Music*,
698 F. Supp. 1154 (S.D.N.Y. 1988)................................................................................6

*MGM v. Grokster*,
545 U.S. 913 (2005)................................................................................................15, 16

*Montgomery County Association of Realtors v. Realty Photo Master Corp.*,
878 F. Supp. 804 (D. Md. 1995), *aff'd mem.*, 91 F.3d 132 (4th Cir. 1996)...............5

*National Association for Stock Car Auto Racing v. Scharle*,
356 F. Supp. 2d 515 (E.D. Pa. 2005) ..........................................................................6, 8

*Perfect 10 v. CCBill*,
488 F.3d 1102 (9th Cir. 2007) ................................................................................ passim

*Perfect 10 v. Cybernet Ventures*,
213 F. Supp. 2d 1146 (C.D. Cal. 2002) ............................................................12, 13, 15

*Perfect 10 v. Giganews*,
993 F. Supp. 2d 1192 (C.D. Cal. 2014) ........................................................................19

*SCO Group v. Novell*,
   578 F.3d 1201 (10th Cir. 2009) ............................................................6

*Tacori Enterprises v. Rego Manufacturing*,
   No. 1:05CV2241, 2008 WL 4426343 (N.D. Ohio Sept. 25, 2008) ...........................................8

*Universal Furniture International v. Collezione Europa USA*,
   618 F.3d 417 (4th Cir. 2010) ............................................................3, 4, 5

*Yash Raj Films (USA) v. Kumar*,
   No. 05-CV-3811(FB)(KAM), 2006 WL 3257215 (E.D.N.Y. Nov. 9, 2006) ...........................3

STATUTES

17 U.S.C. § 512 ................................................................................. passim

LEGISLATIVE MATERIALS

H.R. Rep. 105–551(II) ............................................................14, 15

S. Rep. 105–190 ............................................................14, 15, 16

BOOKS AND ARTICLES

4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.01[A] .............................5

**INTRODUCTION**

Cox's Opposition is long on rhetoric but short on evidence that might create a genuine issue of material fact as to Plaintiffs' ownership of the works at issue or Cox's failure to terminate known, repeat copyright infringers as required to fall within a DMCA "safe harbor."

Plaintiffs submitted certified copyright registrations identifying themselves or their predecessors as owners of 1034 of the 1421 works at issue and, for the remaining works, submitted agreements documenting chain of title from the original claimant named on the copyright registrations.  Cox offers no contrary evidence, only unsupported attorney argument.  As a matter of law, that is not enough.  Absent actual evidence to the contrary, chain of title to the certified copyright registrants establishes ownership.

Cox also submits no evidence that it has established and reasonably implemented a repeat infringer termination policy as required for its DMCA safe harbor defense.  Nowhere does Cox produce evidence to counter the deposition testimony and documentary record showing that it does not terminate known, repeat infringers and that its claim to do so is a sham.  Cox does not contradict the admissions by its abuse staff that, for almost two years, its "terminations" were not ███████ because it promptly █████████ subscribers "terminated" for copyright infringement. Cox does not dispute that it failed to terminate customers its abuse staff knew and acknowledged to be ██████████████  Cox admits that it will not consider a subscriber for termination until he is the target of ██████ notices of infringement within a ████████████ and that it does not count hundreds of thousands of DMCA-compliant notices that exceed ██████████████ are otherwise filtered out.  Applying this policy, Cox has allowed repeat infringers to remain online while they continue to ignore repeated warnings to stop infringing.  Any one of its practices is sufficient to deprive Cox of safe harbor protection under the DMCA.

**ARGUMENT**

**I.     PLAINTIFFS HAVE PROVED OWNERSHIP OF THE WORKS AT ISSUE**

Plaintiffs provided conclusive – and unrebutted – evidence that they own the works at issue in the form of (1) copyright registrations showing Plaintiff BMG as the original claimant; (2) copyright registrations showing Plaintiffs' predecessors as original claimants along with merger agreements demonstrating Plaintiffs' acquisition of their predecessors' rights and assets; and (3) copyright registrations showing an original claimant, along with agreements documenting the transfer of rights from the original claimant to Plaintiffs or their predecessors. Plaintiffs also provided declarations attesting to their ownership of the works at issue.

Cox fails to raise any issue of material fact concerning Plaintiffs' ownership of these works.  In place of evidence, Cox relies on attorney conjecture.  But the law is clear that a party opposing summary judgment must "set forth specific facts."  *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 525 (4th Cir. 2003).  In particular, a "party seeking to contest ownership must put forward specific evidence that rebuts the presumption of validity which attaches to a duly issued registration."  *Complex Systems v. ABN Ambro Bank*, 979 F. Supp. 2d 456, 470 (S.D.N.Y. 2013).  "Neither unsupported speculation, nor evidence that is merely colorable . . . will suffice to defeat a summary judgment motion."  *Bouchat*, 346 F.3d at 522.

Nor must Plaintiffs prove the absence of any ownership issue by demonstrating title, without reference to copyright registrations, back to the original author.  Summary judgment "does not require . . . evidence that proves absence of genuine issue of material fact."  *Gardner v. Beale*, 998 F.2d 1008, at *1 (4th Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Plaintiffs have submitted dispositive evidence and competent, unrebutted, affidavit testimony establishing ownership.  Summary judgment should be granted.

### A.    BMG Is the Owner of the Copyrights Where BMG Is a Listed Claimant

Cox admits that there is "a rebuttable presumption" that BMG owns the 220 copyrights at issue for which BMG is listed on the registrations.  Dkt. 398 ("Opp.") at 25.  This presumption is sufficient to establish BMG's ownership as a matter of law.  *See, e.g.*, *Universal Furniture International v. Collezione Europa USA*, 618 F.3d 417, 429 (4th Cir. 2010); *Ganz Brothers Toys v. Midwest Importers of Cannon Falls*, 834 F. Supp. 896, 900 (E.D. Va 1993) (citing *M. Kramer Manufacturing v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986)); *Yash Raj Films (USA) v. Kumar*, No. 05-CV-3811(FB)(KAM), 2006 WL 3257215, at *1 (E.D.N.Y. Nov. 9, 2006).

Cox has previously admitted to this Court that it has no evidence to rebut the statutory presumption of ownership.  Dkt. No. 249 at 2 (noting that the evidentiary record "ma[k]e[s] it impossible for Cox to rebut the presumption").  And, indeed, Cox submits no such evidence with its brief.  Cox offers no declarations, no documents, and no evidence of any other kind.

Instead, Cox points to the testimony of BMG's 30(b)(6) witness, Robert Briggs.  According to Cox, Mr. Briggs admitted that BMG did not verify ownership before registering songs with the copyright office.  Opp. at 26-27.  But Cox badly mischaracterizes Mr. Briggs's testimony.  Cox asked Mr. Briggs broad questions unrelated to any particular copyright, much less the works at issue in this case.  *See* 10/20/15 Declaration of Stephanie Roberts ("Roberts Decl.") Ex. 1 at 22:1-23:19.  Mr. Briggs testified that he did not know exactly what was done in specific instances but that registrations are submitted based on an agreement that gives BMG the rights to register the work – "on an understanding that there is an active agreement with th[e] writer or client . . . that gives us the right to file that registration."  *Id*. at 23:7-24.

The cited Briggs testimony is irrelevant as well.  Even under Cox's characterization, the Briggs testimony is not evidence *against* BMG's ownership of the works at issue.  It does not show that the works are *not* owned by BMG.  Cox does not cite a single case suggesting that the

presumption of ownership depends on a claimant's diligence prior to registration.  Instead, the

presumption follows from the fact of public registration, which gives notice and allows

competing claimants to contest ownership.  *Complex Systems*, 979 F. Supp. 2d at 472.[1]  Because

no evidence suggests any owner other than BMG, which is named on the registrations, Cox

cannot rebut the presumption of ownership.[2]

### B.    BMG Owns Copyrights Listing its Predecessors as Claimants

The next set of works were registered by one of BMG's predecessors.  As legal successor

to the registrants, BMG *became* the predecessor-in-interest and can rely on predecessor's

registrations without further evidence of transfer.  *See Universal Furniture*, 618 F.3d at 429

("mergers transfer copyrights 'by operation of law' and obviate the writing requirement").

Rather than address this controlling Fourth Circuit law – which Plaintiffs cited in their

opening brief, *see* Dkt. No. 324 ("SJ Br.") at 18 n.2 – Cox invokes a California district court for

the proposition that chain of title is required.  Opp. at 27.  That is not the law in this Circuit.

Moreover, BMG submitted merger agreements documenting its acquisition of the works

from the predecessor copyright registrants.  *See* Briggs Decl. (Dkt. 314) ¶¶ 15-16, 18, 23-25, 31-

35 & Exs. 1-12.  Cox complains that the merger documents fail to specifically identify the

---

[1] As Cox itself points out, the registrations identify claimants, not owners.  Opp. at 27. That registration *establishes* ownership, and a claimant must have ownership rights.  Roberts Decl. Ex. 4, Compendium of U.S. Copyright Office Practices § 1802.1(B) (3rd ed. Dec. 2014).

[2] The absence of *any* contrary evidence renders the strength of the presumption irrelevant. Nonetheless, having failed to submit evidence to rebut the presumption of ownership, Cox attempts to minimize the strength of the presumption.  But its cases are easily distinguished; in each, the defendant overcame the presumption of validity by showing that the works were not original or had been copied from others.  *See Durham Industries v. Tomy Corp.*, 630 F.2d 905 (2d Cir. 1980) (plastic reproductions of Mickey Mouse and other Disney characters were not copyrightable); *Carol Barnhart v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir. 1985) (mannequins of human torsos were not copyrightable); *Entertainment Research Group v. Genesis Creative Group*, 122 F.3d 1211 (9th Cir. 1997) (challenging party provided evidence that articles were copied from another's work).  No such claim has been or can be made here.

individual works acquired.  But a successor copyright owner is not required to "present evidence

of the specific assets . . . acquired in the . . . merger." *Universal Furniture*, 618 F.3d at 429; *see

also Effects Associates v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("It doesn't have to be the

Magna C[]arta; a one-line pro forma statement will do."); *Lone Ranger Television v. Program

Radio Corp.*, 740 F.2d 718, 719, 721 (9th Cir. 1984) (merger transferred copyrights).[3]

      Cox also argues that a plaintiff must show chain of title not only to the registrant but to

the original author.  The prevailing law is to the contrary.  *See* 4 Melville B. Nimmer and David

Nimmer, *Nimmer on Copyright* § 13.01[A] (If a plaintiff possesses a copyright registration

certificate, "the only evidence required of the plaintiff to establish prima facie ownership . . . is

evidence of plaintiff's chain of title from the original copyright registrant.").  And Cox admits

that Fourth Circuit cases only require chain of title to the original registrant.  *See* Opp. at 28

(citing *Montgomery County Association of Realtors v. Realty Photo Master Corp.*, 878 F. Supp.

804, 809-10 (D. Md. 1995), *aff'd mem.*, 91 F.3d 132 (4th Cir. 1996)).  This rule is essential to

maintain the presumptive effect of copyright registrations; there is no reason that a registration

should lose its force because there is a subsequent transfer of title.[4]

---

[3] Cox raises specific objections as to only five of the works discussed in the Briggs
Declaration:  B403, B468, B568, B587, and B704.  Opp. at 4.  All but one of these objections are
meritless.  Exhibit B468 is an unaltered, certified copy of a registration certificate from the
Copyright Office.  That the claimant is hand-written is immaterial.  In addition, the unofficial
copyright registration lists Bug Music, BMG's predecessor, as a claimant.  *See* Roberts Decl. ¶ 4
& Ex. 3.  Exhibit B704 lists as a claimant Trio Music Co., which is a d.b.a. of Bug Music.  Dkt.
No. 314 ¶ 36.  Exhibit B568 lists as claimant Hitco South, which is a d.b.a. of Hitco Music
Publishing LLC, another BMG predecessor.  *Id*. ¶ 37.  The document attached as Exhibit B587 is
inadvertently missing two of the four pages.  The full copyright registration (a public record of
which this Court can take judicial notice) lists as a claimant Music of Windswept, a d.b.a. of
Windswept Holdings LLC, another BMG predecessor.  *See* Roberts Decl. ¶ 3 & Ex. 2.  As to
B403, BMG inadvertently failed to provide the agreements with the listed claimants in the
Briggs' declaration.  Accordingly, BMG withdraws B403.

[4] Cox relies on a stray reference to "chain of title from the listed author" in *In re Napster
Copyright Litigation*, 191 F. Supp. 2d 1087, 1101 (N.D. Cal. 2002).  Opp. at 28.  But the *Napster*

### C.      BMG Purchased Copyrights from the Registered Claimants

For the remaining 364 BMG works at issue, BMG obtained title by purchasing the works from third parties.  BMG provided complete chain title to the original registrant for each work.

Cox argues that not all of the agreements in BMG's chain of title specify each copyrighted work.  Opp. at 29.  But Cox does not cite a single case holding that this level of specificity is required.  On the contrary, "[m]entioning the [work] by name is irrelevant." *National Association for Stock Car Auto Racing v. Scharle*, 356 F. Supp. 2d 515, 524 (E.D. Pa. 2005).  "Section 204(a), by its terms, imposes only the requirement that a copyright transfer be in writing and signed by the parties from whom the copyright is transferred; it does not on its face impose any heightened burden of clarity or particularity."  *SCO Group v. Novell*, 578 F.3d 1201, 1212 (10th Cir. 2009); *see also Effects Associates* 908 F.2d at 557 (pro-forma statement of transfer suffices).  Thus, it is perfectly appropriate for an agreement to transfer "all musical compositions" or other similar category of works.  *See Mellencamp v. Riva Music*, 698 F. Supp. 1154, 1155 (S.D.N.Y. 1988) (referencing a written publishing agreement in which singer transferred worldwide copyrights in and to all works to be composed during the term of the agreement).  Declaration testimony specifying the works covered by each agreement is sufficient is sufficient to establish ownership.  *See Arista Records v. Lime Group*, No. 06 CV 5936, 2011 WL 1641978, at *4-5 (S.D.N.Y. Apr. 29, 2011).

Cox also alleges that certain agreements corresponding to the works listed in Appendices A76, A77, A89, A95, and A101 fail to identify the claimant from which BMG acquired the copyrights.  Opp.at 30.  These assertions are not correct.  As to A76 and A77, Hee Bee Dooinit Music and Heebeedooinit Music are d.b.a.s of Quincy Jones, as described in the agreement

plaintiffs proved ownership by showing a registration certificate and chain of title from the listed claimant to the plaintiff.  *Id.*  That is exactly what Plaintiffs have done in this case.

between Quincy Jones and BMG predecessor Cherry Lane.  *See* Briggs Decl. ¶ 97 & Ex. 34 at 30.[5]  As to A89, the first page of the agreement lists the claimant, Tentative Music.  *See id.* Ex. 86 at 1.  As to A95, the agreement is between Eugene Lenardo and BMG.  *See id.* Ex. 92 at 1. Cox has no basis to dispute Mr. Briggs' attestation that "Eugene Lenardo" is the full name of claimant Geno Lenardo.  *See id.* ¶ 117.  As to A101, the claimant, In Thee Face, is specifically named in the agreement.  *See id.* Ex. 100 at 1.

    Cox's evidentiary attack on the Briggs Declaration and the assignment agreements it attaches is also meritless.  Mr. Briggs is the Vice President of Copyright Administration at BMG. Briggs Decl. ¶ 3.  He is "tasked with, among other things, understanding BMG's rights in the copyrights it owns, how those rights were acquired and how, if applicable, those rights have been maintained."  *Id.* ¶ 3.  Mr. Briggs learned the facts and familiarized himself with the agreements in his declaration as part of his official duties and in connection with making his declaration.  *Id.* ¶ 4.  The agreements Mr. Briggs attests to are business records that are maintained in the normal course.  These agreements qualify as business records under F.R.E. 803(6) and are an exception to the hearsay rule.  Accordingly, Cox's objections to the Briggs Declaration are without merit.

### D. Round Hill Music LP Has Exclusive Rights to Sue on the Round Hill Copyrights

    The Round Hill copyrights are owned by a partnership, Round Hill Music Royalty Fund, LP (the "Fund").[6]  Cox concedes that Plaintiff Round Hill Music LP is the Copyright

---

[5] Briggs Decl. ¶ 97 inadvertently refers to Exhibits 18 and 19 as the Quincy Jones agreements.  The proper exhibit numbers are correctly attested to in paragraphs 66 and 67 of the Briggs Declaration.

[6] Contrary to Cox's assertion, Opp. at 5, Round Hill Music LLC, which transferred title to the Fund, is named as the claimant on the Round Hill registrations.  "Round Hill Music," which appears on the registrations, refers to Round Hill Music, LLC.  Dkt. No. 315 ¶ 5 & Exs. C1, C2.  Also contrary to Cox's assertion, Opp. at 4, the asserted works are listed on the face of the registrations.  *See id.*

Administrator of the Fund's copyrights, but nonetheless challenges its standing to bring suit for their infringement.  Opp. at 24-25.  Cox's argument misunderstands the relevant agreements.

The Fund's Limited Partnership Agreement states that  10/20/15

Declaration of Joshua Gruss ("Gruss Decl.") ¶ 2 & Ex. B at 32; Gillis Decl. (Dkt. 315) Ex. RH2 at 33.

Gruss Decl. ¶ 3 & Ex. A; Gillis Decl. Ex. RH3.  Plaintiff Round Hill Music LP was given

Gruss Decl. ¶ 2 & Ex. A at 1; Gillis Decl. Ex. RH3 at 1.  That includes

Gruss Decl. ¶ 3 (quoting Limited Partnership

Agreement).  Thus, Plaintiff has exclusive ownership rights to administer and exploit the copyrights of the Partnership, including the copyrights in this case.  Gruss Decl. ¶ 3.

Cox's attempt to challenge Round Hill's internal administration of its copyrights is legally untenable as well.  As Plaintiffs explained in their opening brief, "an alleged third-party infringer," such as Cox, "lacks standing . . . to challenge the validity of [an] assignment . . . in an attempt to avoid liability."  *Tacori Enterprises v. Rego Manufacturing*, No. 1:05CV2241, 2008 WL 4426343, at *10 (N.D. Ohio Sept. 25, 2008).  The copyright assignment laws are "designed to resolve disputes among copyright owners and transferees," and "ensure[] that the creator of a work will not give away his copyright inadvertently."  *Billy-Bob Teeth v. Novelty*, 329 F.3d 586, 592 (7th Cir. 2003); *NASCAR*, 356 F. Supp. 2d at 523.  They are not intended to allow a third-party such as Cox to supplant copyright holders' understanding of their own corporate documents.  "[W]here there is no dispute between the copyright owner and the transferee about

the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement." *Imperial Residential Design v. Palms Development Group*, 70 F.3d 96, 99 (11th Cir. 1995).

In response, Cox cites *Marya v. Warner/Chappell Music*, No. 2:13-cv-04460-GHK, Dkt. No. 244 at *40 (C.D. Cal. Sept. 22, 2015). But in *Marya* there was no agreement whatsoever, written or oral, transferring the works at issue. The court held that a third-party had standing where there was no transfer agreement of any kind. *See id*. That holding is inapplicable to Cox's effort to rewrite Plaintiffs' own corporate agreements. Those vest in Plaintiff the right to bring suit on the Round Hill works at issue, and Cox lacks standing to challenge them.

## II.     COX DOES NOT QUALIFY FOR A DMCA SAFE HARBOR

### A.     Cox's Policy Is Not to Terminate Repeat Infringers So That It Does Not Lose Subscriber Revenue

Cox's Opposition papers do not contest the core of Plaintiffs' case for summary judgment on Cox's safe harbor defense. As Plaintiffs explained in their opening brief, the evidence shows that Cox has maintained an elaborate and long-running policy of pretending to terminate subscribers for repeat copyright infringement but not actually doing so. Cox's brief ignores its policy between ██████████ of promptly ████████████████ "terminated" for copyright infringement. Cox does not dispute that since ████ it has failed to terminate subscribers its abuse staff knew to be repeat infringers, including many who *admitted* to Cox's abuse staff that they had repeatedly infringed. And Cox is unable to identify a single subscriber who was actually terminated for repeat copyright infringement during the entire period at issue. Cox's failure to terminate repeat infringers precludes it from invoking a safe harbor defense under the DMCA. *See Perfect 10 v. CCBill*, 488 F.3d 1102, 1109-10 (9th Cir. 2007).



For the first period, between ██████████████, Cox's policy of ████████████ subscribers "terminated" for repeat infringement is not genuinely in dispute. *See* SJ Br. Facts (SUMF) 37-43. Cox's contemporaneous documents establish conclusively that "██████████ ████████████████████████████████████ Theodore Decl. (Dkt. 317) Exs. 23, 52. In its brief, Cox does not address this policy other than to assert "during the relevant period its policy has always been to terminate account holders in appropriate circumstances." Opp. at 22. And Cox's declarants avoid denying its 2010-2012 ██████████ policy through careful use of the present tense. *See* Zabek Decl. (Dkt. 397) ¶¶ 19-22 ████████████████████████████ ██████████████. Cox does not identify *a single subscriber* who was terminated for repeat copyright infringement and ██████████ between ██████████████ nor does it argue that terminating and ██████████████ a subscriber satisfies the DMCA.

Next, Cox admits that, upon repealing this ██████████, it drastically reduced the number of "terminations" for repeat copyright infringement and that, in almost every situation where Cox has terminated, ████████████████████████████████████ ████████████████ SUMF 66, 68 & Cox Responses. Cox's internal documents reflect that ██████████ is the key to its copyright termination decisions. *See* Theodore Decl. Ex. 48 (noting a ████████████████████████. As Senior Lead Abuse Engineer Sikes explained, whether ████████████████████████ ████████████████████████████████████ ██████████████ Theodore Decl. Ex. 14. Cox does not even attempt to argue that terminating repeat infringers only where they are a financial burden on Cox satisfies the DMCA.

Cox also has nothing to say about its abuse staff's repeated, explicit decisions not to terminate known, acknowledged repeat infringers. As Plaintiffs showed in its opening brief,

emails among Cox's abuse staff are replete with references to known infringers who Cox

declined to terminate.  SJ Br. at 12, 14, 16, 29-30.  Cox's abuse manager was ████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Theodore Decl. Ex.

24.  Cox declined to terminate a customer its abuse staff considered a ███████████

██████████████████ Theodore Decl. Ex. 45.  Cox did not terminate a customer it

acknowledged was ███████████████████████████████████████████████

██████████████████ Theodore Decl. Ex. 47.  Instead, Cox advised him to ████████████

*Id.*  Cox declined to terminate a customer who ████████████████ Theodore Decl. Ex. 49.

Rather than deny that it failed to terminate acknowledged repeat infringers, Cox

complains that Plaintiffs failed to quote the rote assertions, found in several of the emails, that

██████████████████████████ *See* Cox Responses to SUMF 60, 61, 69, 70.  But Cox ████████

██████████████████████████ *See* Theodore Decl. Exs. 55, 56.[7]  Cox's pretense that it would

██████████████████████ was just another facet, like its ████████████████, of Cox's sham

effort to qualify for a DMCA safe harbor without actually terminating subscribers.  *See* SUMF

40-41.  Indeed, one of these subscribers, who Cox's abuse staff reactivated ████████████████

because he ████████████████████████████████████████████████████████████████

---

[7] Without claiming to have terminated any of the repeat infringers identified in these emails, Cox accuses Plaintiffs of "conjecture and hyperbole" as to their fate.  Opp. at 22.  Of course, it is Cox that refused to produce full abuse histories and it is Cox that bears the burden to establish its eligibility for a safe harbor defense by showing that it terminates subscribers.  Even so, no conjecture is required – not one of these subscribers or their abuse ticket numbers can be found on the list of terminated subscribers Cox did produce.  *See* Theodore Decl. Exs. 55, 56.

Nor is there any reason to think that these subscribers subsequently stopped infringing (though Cox has not produced the full ticket histories for non-terminated subscribers).  Each of these customers reached the ████████ level of Cox's graduated response despite having been warned during phone calls with Cox abuse staff at the ████████████████████████ that further violations would lead to termination.  Zabek Decl. ¶¶ 9-10.

████████████████████████████████████████ *see* Theodore Decl. Ex. 12; Roberts Decl.

Ex. 5, had gone through the same process just three weeks prior.  That time, too, Cox's abuse

staff stated that █████████████████████████████████████████████████████

Roberts Decl. Ex. 6.  As a matter of law, Cox's acknowledged failure to terminate known, repeat

infringers deprives it of a DMCA safe harbor.  *See Datatech Enterprises v. FF Magnat*, No. C

12-04500 CRB, 2013 WL 1007360, at *6 (N.D. Cal. Mar. 13, 2013) ("policy was woefully

inadequate" where plaintiff provided evidence that defendant "regularly declined to ban"

"particular users" it "learned . . . were engaged in extensive repeat infringement").

Ultimately, Cox's brief does not identify a single subscriber that it terminated for repeat

copyright infringement throughout the period at issue in this litigation.  That failure to come

forward with evidence that it terminates repeat infringers is fatal to its DMCA safe harbor

defense.  *See Celotex*, 477 U.S. at 324 ("the nonmoving party must come forward with specific

facts showing that there is a genuine issue for trial").  Cox's generalized "assert[ions] that it has

taken action against" infringers is simply not enough where it does not "stop providing its . . .

[high-speed internet] service to known infringers."  *Perfect 10 v. Cybernet Ventures*, 213 F.

Supp. 2d 1146, 1178 (C.D. Cal. 2002).  Rule 56 "mandates the entry of summary judgment"

against Cox because it has "fail[ed] . . . to establish" that it terminates repeat infringers, an

"element essential to [its] case and on which [it] will bear the burden of proof at trial."  *Id.* at

322; *see also* SJ Br. at 21-22.

Rather than provide evidence that it has an actual policy of terminating repeat infringers,

Cox argues that it need only point to the statement in its "Acceptable Use Policy" informing

subscribers that copyright infringement "may result" in suspension or termination."  *See* Opp. at

13-14.  Cox disavows, *see* Cox Response to Fact 36, the actual graduated response policy

described in its abuse ticket handling procedures, by which Cox failed to terminate known repeat infringers. Theodore Decl. Ex. 17 at 12. But Cox's own interrogatory responses identify the abuse ticket handling procedures as its termination policy. *See* Theodore Decl. Ex. 38 at 10, 22-23, 28-29 & Ex. 40 at 7, 12-13. And Cox's argument runs afoul of the Section 512 case law, which makes clear that the relevant policy is the one a defendant actually applies, notwithstanding a formal statement purporting to terminate repeat infringers. *See, e.g., Disney Enterprises v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at *23-24 (S.D. Fla. Sept. 20, 2013). In any event, the DMCA requires that Cox *reasonably implement* a termination policy by actually terminating subscribers in appropriate circumstances. 17 U.S.C. § 512(i)(A).

Cox also argues that it is up to the service provider – *i.e.*, Cox – to decide when termination is appropriate. Opp. at 14, 20. But no case supports this assertion, which would render the termination requirement meaningless and allow providers such as Cox to avoid their termination obligations with impunity. Cox cites *CCBill*, 488 F.3d at 1111, which says no such thing. *See id.* at 1114 (service provider loses safe harbor protection "if it fails to take action with regard to infringing material when it is aware of facts or circumstances from which infringing activity is apparent"). Instead, "appropriate circumstances . . . cover, at a minimum, instances where a service provider is given sufficient evidence to create actual knowledge of blatant, repeat infringement by particular users." *Cybernet Ventures*, 213 F. Supp. 2d at 1177. Cox must terminate where it knows a subscriber is a repeat infringer.

Here, Cox's own conduct shows that it failed to terminate in appropriate circumstances. For two years, Cox ▮▮▮▮▮▮▮ subscribers its own abuse staff determined were proper candidates for termination under the DMCA's repeat infringer provision. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ demonstrates that Cox did ▮▮▮▮▮▮▮▮▮▮▮ in circumstances

where it considered termination was appropriate.  Similarly, the abrupt and drastic reduction in

nominal terminations starting in ██████ – followed by an immediate, ten-fold uptick after the

filing of this litigation – shows that Cox was not terminating in "appropriate circumstances"

between ████████████████████  Cox submits no evidence to satisfy its burden of

showing that it was appropriate to terminate ██████████████ between ██████ and

██████████████ given its record of identifying ██████ appropriate circumstances each month

before and after.  In fact, Cox itself regarded many of those not terminated as ████████████

████████████████████████████████████████████████████████

SJ Br. at 16, 29-30.  Those are appropriate circumstances in which to terminate.

Finally, Cox argues – without citing a single case – that it need only terminate users who

have been *adjudicated* repeat infringers and that it is free to treat other repeat infringers as it sees

fit.  Opp. at 15-16.  On the contrary, an ISP must act whenever it has *knowledge* of repeat

infringement.  "The DMCA's protection of an innocent service provider disappears at the

moment the service provider loses its innocence, *i.e.*, at the moment it becomes aware that a third

party is using its system to infringe."  *ALS Scan v. RemarQ Communities*, 239 F. 3d 619, 625

(4th Cir. 2001); *see also Arista Records v. Usenet*, 633 F. Supp. 2d 124, 142 (S.D.N.Y. 2009)

("Defendants must not have been aware of 'red flags' indicating infringement on the part of their

users. . . . [I]f Defendants were aware of such red flags . . . they would be ineligible for the

DMCA's safe harbor provisions.").  Congress intended to discourage infringement by ensuring

that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for

the intellectual property rights of others should know that there is a realistic threat of losing that

access."  H.R. Rep. 105–551(II), at 61; S. Rep. 105–190, at 52.  The termination requirement

would be superfluous if it only applied to repeat infringers already found liable in a court of law.

Cox's interpretation would undermine the doctrine of secondary copyright infringement liability, which allows copyright holders to sue enablers of infringement without the need to first litigate against hundreds or thousands of individual infringers.  *See In re Aimster Copyright Litigation*, 334 F.3d 643, 645 (7th Cir. 2003); *MGM v. Grokster*, 545 U.S. 913, 930-31 (2005). By giving every service provider a DMCA safe harbor from secondary liability unless it failed to terminate adjudicated infringers, Cox would eliminate copyright owners' ability to pursue one contributory infringer without seeking adjudications against individual subscribers.  That is not a proper interpretation of Section 512.  *See Capitol Records v. Escape Media Group*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *10 (S.D.N.Y. Mar. 25, 2015) ("[T]he DMCA's safe harbors, as with all immunities from liability, should be narrowly construed.").

Cox's adjudication requirement would also undermine Congress's purpose to give "online service providers . . . strong incentives to work with copyright holders" to prevent infringement in a "regulatory scheme in which courts are meant to play a secondary role to self-regulation."  *Cybernet Ventures*, 213 F. Supp. 2d at 1178; *see also* H.R. Rep. 105–551(II) at 49; S. Rep. 105–190 at 20.  Thus, courts have rejected the notion that adjudications are required before a provider must terminate under the DMCA.  Service providers cannot "turn a blind eye to the source of massive copyright infringement while continuing to knowingly profit, indirectly or not, from every single one of these same sources until a court orders the provider to terminate each individual account."  *Cybernet Ventures*, 213 F. Supp. 2d at 1177.

### B.     Cox's Failure to Act on Proper Notices of Infringement Deprives It of Any DMCA Safe Harbor

Not turning a "blind eye" to infringement requires a service provider to act on notices of infringement sent by copyright holders.  Though notices are not specifically discussed in Section 512(i), they are an important source of knowledge of repeat infringement for purposes of that

subsection.  *See CCBill*, 488 F.3d at 1109 (requiring "a working notification system, a procedure for dealing with DMCA-compliant notifications").  To reasonably implement a repeat infringer termination policy, a service provider must have an "effective notification procedure in place" and act on DMCA-compliant notifications so that they do not "fall into a vacuum" or "go unheeded."  *Ellison v. Robertson*, 357 F. 3d 1072, 1080 (9th Cir. 2004).

Repeated notices of copyright infringement are a highly reliable means to identify repeat infringers.  While Cox expresses concern about file sharing by neighbors over unsecured wireless networks, Opp. at 21, its policy is to require subscribers to secure their networks.  *See* Theodore Decl. Ex. 10 at 2-3.  According to Cox, by the time a subscriber reaches ▆▆▆▆▆▆▆ of Cox's graduated response, he has been instructed to secure his wireless in ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆.  Zabek ¶ 9.  Cox's abuse team has repeatedly acknowledged that the BitTorrent problem is not a product of WiFi poachers, and Cox offers no evidence that a significant percentage of infringement results from open wireless networks.  Dkt No. 389 Exs. 27, 49.  Regardless, the DMCA requires that subscribers be held responsible for infringement by others whom they permit to use their network.  *See* S. Rep. No. 105-190 at 52 n. 24 (1998) (establishing that infringing subscribers include their "household members"); Theodore Decl. Ex. 10 at 2 ("You are solely responsible for any information that is transmitted from your IP address . . . .").

Cox also speculates that notices may be inadequate if its subscribers have a fair use defense.  Opp. at 21.  But there is no credible suggestion that sharing copies of copyrighted works – which account for 99.97% of the content on BitTorrent – constitutes fair use.  *See* Dkt. 389-29 at 30; *Grokster*, 545 U.S. at 945 (file sharing of copyrighted works is not fair use).  And DMCA-compliant notices must include a declaration under penalty of perjury that the

complainant represents the copyright holder and has a good-faith belief that the content is infringing.  The DMCA provides remedies for false notices.  *See ALS Scan*, 239 F.3d at 625.  Thus, sworn notices under penalty of perjury are adequate to put a service provider on notice of repeat infringement.  *See CCBill*, 488 F.3d at 1111-12.

As with its failure to terminate, Cox does not dispute the key facts regarding its treatment of infringement notices.  Cox's declarants acknowledge that Cox ████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████  *See* SUMF 22; Beck Decl. (Dkt. 387) ¶ 10.  While Cox insists that it ████████████████████████████████████ ██████████████████████████  Opp. at 22, Cox's interrogatory responses make clear that its "action" is to █████████████████████████████████████████████████ ███████  – *i.e.*, to do nothing.  Theodore Decl. Ex. 42 at 7.  Cox also acknowledges that it █████ ████████████████████████████████████████████████  Beck Decl. ¶ 8, and that, in determining a subscribers graduated response level, ██████████████████████ ███████████.  Beck Decl. ¶ 12.  Cox also blacklists complainants whose notices contain settlement demands █████████████████████  regardless of whether the notices are otherwise compliant with the DMCA.  Beck ¶¶ 17-18.

By using these and other limitations to avoid acting on DMCA-complaint copyright notices, Cox ensured that many millions of DMCA-compliant notifications went "unheeded."  *Ellison*, 357 F.3d at 1080; *see* SUMF 63-64.  That prevented repeat infringing subscribers from advancing up its graduated response and allowed Cox to avoid acting on notice that they were repeat infringers.  The combination of Cox's filtering procedures for notices and its fourteen strike policy enabled repeat infringers to continue stealing content for years without ever being

considered for termination.  *See* SJ Br. at 14, 27.  Cox does not cite a single case holding that a

███████████ policy, much less one based on Cox's notice-handling system, satisfies the

DMCA's repeat infringer termination requirements.

     In an effort to resist this conclusion, Cox insists that it considers notifications above the

██████████████ as part of its termination review process once a subscriber has reached

██████ of its graduated response.  Beck Decl. ¶ 13.  ████████████████████████

████████████████████████████████████████

████████████████████████  ████████████████

██████████████, Cox is ignoring notice that its subscribers are repeat infringers and

declining to take action on thousands of complaints against infringing subscribers.  That does not

satisfy the requirements of Section 512(i).  *See Ellison*, 357 F.3d at 1080.

     Cox attempts to distinguish *Ellison* because it remanded for trial rather than granting

summary judgment to the plaintiff.  Opp. at 17.  But in *Ellison* no plaintiff-side summary

judgment motion was at issue on appeal.  Cox also notes that in *Ellison*, the service provider

failed to monitor its email address for notice of infringement.  Opp. at 17.  Of course, this is

exactly what Cox has done with respect to millions of Rightscorp notices.  Nor does it matter that

Cox has a slightly more sophisticated system for ignoring DMCA-compliant notices of

infringement from other senders.  Millions of notices "go unheeded." and millions more from

blacklisted senders "fall into a vacuum."  Asked by skeptical representatives of another ISP

whether it was ok to ██████████████████████████ Cox's abuse manager

responded ████████████  Theodore Decl. Ex. 26 at 2-3.

     Cox cannot avoid the fact that many thousands of subscribers were permitted to remain

on its network despite receiving multiple notices of infringement and ignoring repeated

warnings.  Between September 2012 and November 2014, subscribers were issued ███████ warnings or suspensions, each of which reflected a subscriber's ████████  DMCA-compliant (according to Cox) notice of infringement ██████████  Theodore Decl. Ex. 39 at 25-27; Beck Decl. ¶ 12.  Yet, Cox has identified only ██ DMCA terminations.  "[T]hat hundreds or thousands of users were not stripped of their [] privileges after receiving notices of infringement" is "perhaps the strongest indicator of [Cox's] failure to terminate . . . repeat infringers in appropriate circumstances."  *Capitol Records*, 2015 WL 1402049, at *13.[8]

Rather than address its failure to act on hundreds of thousands or millions of notices of infringement from dozens of copyright holders, Cox focuses heavily on its purported reasons for ignoring Rightscorp's notices.  Opp. at 16-17.  But this is beside the point.  The adequacy of an ISP's repeat infringer termination policy under Section 512(i) does not turn on its treatment of one plaintiff's notices but on its termination policy as a whole.  *See CCBill*, 488 F.3d at 1113; *Ellison*, 357 F.3d at 1080.  Even without considering those sent by Rightscorp, Cox takes customer-facing action on only ███ percent of copyright notices and terminates only an infinitesimal percentage of the repeat infringers those notices identify.  Theodore Decl. Ex. 41 at 12-16; Theodore Decl. Ex. 39 at 25-27.[9]

In any event, Cox's treatment of Rightscorp's notices was not adequate to satisfy the DMCA's safe harbor requirements.  The DMCA requires service providers to act on all

---

[8] Cox cites *Perfect 10 v. Giganews*, 993 F. Supp. 2d 1192, 1197 (C.D. Cal. 2014), for the adequacy of its termination procedures.   But in *Giganews* there was no evidence that the defendant failed to terminate known repeat infringers.  In fact, the defendant was unable to identify many of its own users.  Here Cox faces no such difficulties.  It has sent hundreds of thousands of warnings to individual subscribers.  But it has not terminated the repeat infringers.

[9] Cox complains about the burden of responding to large numbers of notices.  Of course, if Cox terminated repeat infringers it would not receive nearly so many notices.  Regardless, "the business interests of an infringer do not trump a rights holder's entitlement to copyright protection.  *A&M Records v. Napster*, 239 F.3d 1004, 1026 (9th Cir. 2001).

substantially compliant infringement notices.  *See ALS Scan*, 239 F.3d at 625-26.  And

Rightscorp's notices complied with every written requirement in the DMCA, ███████████

████████   Theodore Decl. Ex. 5 at 195:9-196:16; *see also* SJ Br. at 5; Dkt. No. 386 at 6, 18.

That Rightscorp's notices contained settlement offers is no excuse for blocking or

blacklisting them.  The DMCA nowhere requires a copyright holder to refrain from offering or

demanding settlements from users who have stolen its intellectual property.  *See* 17 U.S.C. §

512; Theodore Decl. Ex. 5 at 118:4-124:20.  If Cox was unwilling to forward settlement offers to

its subscribers, it was free to delete the offending language, *see* Dkt. No. 352-2 ¶¶ 124-126, 140,

or otherwise notify its subscribers.  Moreover, for purposes of Cox's safe harbor defense, the

critical issue is that Rightscorp's notices provided notice *to Cox*.  Regardless of what Cox

considered appropriate to send to its subscribers, it was not free to delete notices of infringement

to avoid obtaining knowledge that would require it to terminate subscribers under the DMCA.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Partial Summary

Judgment.

Respectfully submitted,

/s/ Jeremy D. Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
Paul Gennari (VSB No. 46890)
pgennari@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel: (202) 540-7157
Fax: (202) 540-7201


Of Counsel
Michael J. Allan (admitted pro hac vice)
William G. Pecau (admitted pro hac vice)
John M. Caracappa (admitted pro hac vice)
Roger E. Warin (admitted pro hac vice)
Jeffrey M. Theodore (admitted pro hac vice)
Stephanie L. Roberts (admitted pro hac vice)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Michael O. Crain
Crain Law Group, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia 30601
Tel. (706) 548-0970
Fax: (706) 369-8869

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2015, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com

William J. Dinkin
Bill.dinkin@gmail.com

/s/ Jeremy Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902