# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP<br><br>    Plaintiffs,<br><br>v.<br><br>COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., COXCOM, LLC<br><br>    Defendants.<br><br>    . | CASE NO.  1:14-cv-1611(LOG/JFA)<br><br><br><br>**REPLY OF DR. STEPHEN M. NOWLIS TO THE REPORT OF MR. HAL PORET** |

1

I, Dr. Stephen M. Nowlis, state as follows:

## BACKGROUND AND PURPOSE OF THE SURVEY

1.  I was asked by counsel for the plaintiffs in the lawsuit entitled BMG Rights Management (US) LLC and Round Hill Music LP v. Cox Enterprises, Inc. et al. to review and respond to the report submitted by Hal Poret on July 10, 2015, in which he responds to my Expert Report dated June 12, 2015.  My response appears below.  Please see Appendix A which lists the documents I reviewed.
2.  Mr. Poret opines that the survey I conducted did not measure the proper issue.  In particular, he says that the survey did not measure why the survey respondents subscribe to Cox Internet service.  Yet, the main survey question unambiguously asks the respondents the reason they subscribe to Cox Internet service, as follows:

    "Which, if any, of the following are reasons *why you subscribe to Cox Internet service*?" (emphasis in italics added)

    Thus, Mr. Poret's criticism of the survey, that it does not ask respondents why they subscribe to Cox Internet service, is simply contrary to the exact wording of the question the respondents were, in fact, asked.
3.  Mr. Poret also opines that the survey does not distinguish between (1) what factors caused customers to specifically select Cox as their Internet Service provider, and (2) what Cox subscribers use the Internet for.  To the contrary, the survey does distinguish between these two issues.  One of the initial screening questions was "Which, if any, of the following Internet activities do you personally do in your current residence?"  This question measures activities that Cox subscribers use the Internet for.  In contrast, the main survey question asks, "Which, if any, of the following are reasons *why you subscribe to Cox Internet service*?" (emphasis added).  This question measures the issue of what factors cause customers to subscribe to Cox Internet service.

2

4. Mr. Poret theorizes that it is not possible that a large percent of consumers would subscribe to Cox Internet service because, for example, they like to use search engines or engage in social networking.  Yet, in fact, if a consumer were not able to engage in these activities when using Cox Internet service (such as if they could no longer use search engines) this clearly would likely affect their decision to subscribe to Cox Internet service.  Similarly, if consumers were not able to download or upload free digital music from sites such as ThePirateBay, the survey results would similarly show that this would also likely affect their decision to subscribe to Cox Internet service.[1]  The results of the survey I conducted show that a value of the Cox Internet service to a substantial number of its subscribers lies in providing access to infringing music through sites such as ThePirateBay, and that this availability through Cox Internet service acts as a draw to its customers to use that service.

5. Mr. Poret also discusses an FCC working paper which included a survey which studies why consumers switch from or stick with their Internet service provider.[2]  He opines that the results from the FCC survey that are reported in the FCC working paper cast doubt on the results of the survey that I conducted, because the FCC survey supposedly found that consumers think about other factors that should have been addressed in the survey that I conducted.

6. However, the FCC working paper focuses on why people switch from one Internet service provider to another one, as opposed to why they subscribe to an Internet Service provider, which was the focus of the survey I conducted, and is the relevant issue.  In addition, note that the FCC paper is simply a working paper and it has not been published, meaning it has not withstood peer review.[3]  In fact, the FCC said on its website that it "asked outside experts to peer-review this paper."[4]  One of those peer reviewers was Dr. Janice A. Hauge, as associate professor of economics at the University

---

[1] In addition, I want to point out that both Mr. Poret and I agree that my Control questions did a good job of picking up any potential survey "noise" and thus we both seem to agree that it allows for a proper calculation of the net result (59.6%), regardless of how we interpret this result.
[2] https://apps fcc.gov/edocs_public/attachmatch/DOC-303264A1.pdf
[3] I am heavily involved in the peer review of consumer research as an Associate Editor at the *Journal of Marketing Research*, and as an Editorial Review Board member at the *Journal of Consumer Research*, the *Journal of Consumer Psychology*, the *Journal of Marketing*, and *Marketing Letters*.
[4] https://www.fcc.gov/encyclopedia/peer-review-broadband-decisions-working-paper

of North Texas. Dr. Hauge made the following criticisms about the FCC paper, which the FCC posted on its website:

> Understanding what people do once online is important to understanding what drives consumers to switch (or remain with) a provider. My comments on the [FCC] working paper should be viewed in light of the fact that potentially valuable questions were not included in the [FCC] survey and therefore data [about what people do online] is not available for analysis.
>
> The title of the paper, "Broadband Decisions: What drives consumers to switch – or stick with – their broadband Internet provider" implies a more inclusive analysis of options. To examine this question more fully, it is appropriate to consider usage patterns (in terms of time) and online activities (for example do respondents use home Internet primarily for social functions such as e-mail, for entertainment functions, or for business functions such as banking). The ways in which respondents use home Internet seem critical to their willingness to switch or not switch providers. This information was not asked about in the [FCC] survey and therefore cannot be included in the [FCC] paper. It might be worth mentioning in the paper, however, that these activities are expected to influence consumption choices.

7. Thus, Dr. Hauge notes that the FCC survey does not measure how online activities (such as e-mail, social functions, or downloading free digital music through sites such as ThePirateBay) influence the decision to switch, even though she believes these online activities should have been measured in the FCC survey, because she believes they do in fact influence consumer choices. And, in the survey that I conducted these activities are measured, which Dr. Hauge believes are important determinants of consumer choice of an Internet Service provider, which thus agrees with my opinion and contradicts the opinion of Mr. Poret.

8. Furthermore, the most important reason given by respondents in the FCC survey for switching Internet Service providers was that they wanted a "faster or higher performance Internet connection." And, the reason for wanting a faster or higher performance Internet connection would likely be to use the Internet for various purposes, including the downloading or uploading of free digital music through sites such as ThePirateBay. Indeed, a 2012 Cox survey found that 21% of its Internet subscribers said that a faster Internet speed would be a benefit because it would allow for faster downloading of

4

music,[5] and 37% of its Internet subscribers said that a faster Internet speed would be a benefit because it would allow for faster uploading of pictures, music, movies, etc.[6]  In sum, Mr. Poret cites the FCC survey to try to show that my survey is somehow defective, but when we take a closer look at the FCC survey and peer-reviewed comments about it that were invited by the FCC, the survey I conducted in fact addresses deficiencies of the FCC survey and thus the survey I conducted does provide important information about why consumers subscribe to Cox Internet service.

9.   Mr. Poret further opines that the results from the survey I conducted are "severely overstated" because of the number of respondents who said they did not download or upload free music through sites such as ThePirateBay in the first place.  Yet, as I pointed out in my original Export Report dated June 12, 2015,[7] "My survey also finds that 16.1% of Cox Internet service subscribers download or upload free digital music through sites such as ThePirateBay (in response to survey question S8). This figure is very similar to an NPD Group report that 19% of U.S. Internet subscribers downloaded free music from P2P services in 2008, and a RIAA report which said this figure was 20% in 2003. In addition, Cox has a section on its website titled 'Peer-to-Peer Networks Information' where it notes that 'There are different types and uses for P2P networks….Among the most common uses of some P2P networks is the sharing of music, movies, software programs, and other copyrighted materials.'"  Thus, as I indicated in my Expert Report, 16% of Cox customers download or upload free digital music through sites such as ThePirateBay, which is a very similar figure to what other independent research has found.[8]  Only these respondents were asked the main survey question, which was, "Which, if any, of the following are reasons *why you subscribe to Cox Internet service*?" (emphasis in italics added).  In other words, the 84% of respondents who do not engage in this activity were not asked the main survey question, because of the need to focus only on customers who engage in this activity and then see what percent of them said this activity is a reason for subscribing to Cox.  In sum, Mr. Poret opines that the results from the survey I conducted are vastly overstated, but I make it clear in my Expert Report, and

---

[5] COX_BMG00219206.
[6] COX_BMG00219205.
[7] Footnote 2 of that report.
[8] A Cox survey from 2012 found that 54% of its Internet subscribers reported that they either sometimes or often download music. (COX_BMG00219279)

5

10. I reiterate that here, that the survey results are in fact focused only on those who engage in the activity in the first place, so as to determine if this activity is a reason for subscribing to Cox.

11. Mr. Poret also opines that the survey I conducted is flawed because he posits that the survey questions do not distinguish between copyright infringement and permissible downloading and uploading of free digital music. However, Mr. Poret admits that the question asked to measure this, whether someone "Download[s] or upload[s] free digital music – *through sites such as ThePirateBay, KickAssTorrents, Torrentz, etc.*" (emphasis in italics added), indeed does specifically mention downloading or uploading from sites that do offer infringing songs. Mr. Poret speculates that respondents "*may* simply have selected this choice because they 'download or upload free [non-infringing] digital music' and this was the only answer choice they were offered that seemed to cover that scenario." (emphasis in italics added). Of course, this is pure speculation on Mr. Poret's part. He offers this conjecture, that respondents will simply ignore a large section of the wording of a response option, without any type of support.

12. In addition, the survey respondents were reminded, right before they answered the main survey question ("Which, if any, of the following are reasons why you subscribe to Cox Internet service?"), that "It is very important that you do not guess." (this was also underlined on the survey itself). Furthermore, the respondents were provided with a clear "Don't Know/Unsure" response option, which they of course could have chosen if they did not understand the response in question ("Download[s] or upload[s] free digital music – through sites such as ThePirateBay, KickAssTorrents, Torrentz, etc.") or if they had any doubts about how to interpret it.

13. Mr. Poret hypothesizes that respondents did not read the response option as it was actually written ("Download[s] or upload[s] free digital music – through sites such as ThePirateBay, KickAssTorrents, Torrentz, etc."), but thought it referred to downloading or uploading of free digital music in general (which I disagree with). He further hypothesizes that the choice of this response would signify that respondents were downloading or uploading free non-infringing music, rather than free infringing music.

6

He tries to support his supposition with an article that he cited about how some free music download sites offer free legal downloads.[9] This article says:

> "The Internet has made it easy to freely download just about any song you want, but *frankly, illegally downloading music just isn't an option if you're the honest type* looking to support the artists, labels, and retailers who distribute it…..Thankfully, there are still a host of excellent websites that allow you to legally download and locally store your music free of charge. Most of the sites are *void of familiar, mainstream artists such as Ed Sheeran and the infamous T-Swift*, but if you look in the right places, you'll still probably manage to find a few select hits from a couple of big names. *Most cater to independent artists that have yet to make it big* — whether talking retro R&B, new-age electronica, or outlaw country — but that doesn't necessarily mean it's not good music. It just *rarely garners resounding, Billboard-topping acclaim*." (emphasis in italics added)

13. Thus, it is clear from this article that such sites simply cannot and do not compete with sites such as ThePirateBay which offer free infringing music. In addition, the literature indicates that the majority of music that is downloaded from free sites is infringing music, rather than non-infringing music.[10] Indeed, an independent study found that BitTorrent is the most used file sharing program worldwide to download and upload free content such as music, and all of the most popular music content available was copyrighted and shared illegitimately.[11]

14. Furthermore, as I noted above, Cox has a section on its own website titled "Peer-to-Peer Networks Information" where it notes that "There are different types and uses for P2P networks….Among the most common uses of some P2P networks is the sharing of music, movies, software programs, and other copyrighted materials." Thus, Cox itself recognizes that consumers who use P2P sites, such as ThePirateBay, to download free music are likely downloading infringing songs, and not free songs that can be legitimately downloaded for free.

---

[9] http://www.digitaltrends.com/music/best-free-and-legal-music-download-sites

[10] For example, in the report "Sizing the Piracy Universe" by David Price (September 2013), Mr. Price notes, "As the data in this section demonstrates, hundreds of millions of internet users employ bittorrent each month to share content and the vast majority of that usage is infringing, downloading pirated films, television episodes, games, software, books, and music. Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month, a total of 204.9m users," p. 18. See also the article, "Most Illegally Downloaded Music of 2013 Revealed," http://www.gigwise.com/news/87243/the-most-illegally-downloaded-music-artists-of-2013-revealed.

[11] Technical Report: An Estimate of Infringing Use of the Internet, January 2011.

7

Dated:  July 24, 2015

_____

Stephen M. Nowlis, Ph.D.

8