# EXHIBIT F

Case 1:14-cv-01611-LO-JFA Document 478-6 Filed 10/23/15 Page 2 of 19 PageID# 13612

# Trademark and Deceptive Advertising SURVEYS
## Law, Science, and Design

EDITED BY
Shari Seidman Diamond
and Jerre B. Swann



ABA Section of Intellectual Property Law
AMERICAN BAR ASSOCIATION

Cover by Daniel Mazanec/ABA Publishing.

The materials contained herein represent the views of each chapter author in his or her individual capacity and should not be construed as the views of the author's firms, employers, or clients, or of the editors or other chapter authors, or of the American Bar Association or the Section of Intellectual Property Law, unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2012 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, contact the ABA Copyrights and Contracts Department by e-mail at copyright@americanbar.org or fax at 312-988-6030, or complete the online request form at http://www.abanet.org/policy/reprints.html.

Printed in the United States of America

16 15 14 13     5 4 3 2

**Library of Congress Cataloging-in-Publication Data**

Trademark and deceptive advertising surveys / edited by Shari S. Diamond and Jerre B. Swann. — 1st ed.
  p. cm.
Includes bibliographical references and index.
ISBN 978-1-61438-474-8 (print : alk. paper)
1. Trademarks—Law and legislation—United States. 2. Deceptive advertising—Law and legislation—United States. 3. Market surveys—Law and legislation—United States. 4. Market surveys—Methodology—United States. I. Diamond, Shari Seidman. II. Swann, Jerre B.
  KF3193.T725 2012
  346.7304'88—dc23

                                                            2012021640

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60654-7598.

www.ShopABA.org

# CONTENTS

| | |
|---|---:|
| **AUTHOR BIOGRAPHIES** | XI |
| **SECTION I   INTRODUCTION** | **3** |
| 1  **EDITORS' INTRODUCTION:** **SURVEYS IN MODERN LITIGATION INVOLVING TRADEMARKS AND DECEPTIVE ADVERTISING** | 3 |
| THE CHAPTERS | 6 |
| DEDICATION | 7 |
| **SECTION II   PRELIMINARY MATTERS** | **9** |
| 2  **THE USE OF PILOT TESTS AND PRETESTS IN CONSUMER SURVEYS** *By Ivan Ross* | **11** |
| INTRODUCTION | 11 |
| The Expert and the Attorney: Different Perspectives on the Value of Pilot Tests | 14 |
| An Example of the Value of Pilot Work | 16 |
| TYPICAL RESEARCH PARAMETERS STUDIED IN PILOT TESTS | 17 |
| The Questionnaire | 18 |
| Universe Specification, Sampling Issues, and Incentives | 20 |
| Mechanical, Administrative, and Logistical Considerations | 21 |
| HOW LIKELY IS IT THAT PILOT WORK WILL BE HELPFUL? | 22 |
| Piloting Usually Provides at Least Some Helpful Information | 22 |
| Circumstances in Which Pilot Work Is More Likely to Be Helpful | 23 |
| Circumstances When a Pilot Test Is Less Likely to Be Helpful | 23 |
| PILOT TEST IMPLEMENTATION CONSIDERATIONS | 24 |
| Pilot Survey Sample Size | 24 |
| How Many Parameters Can Be Evaluated at the Same Time? | 24 |
| Pilot Study Timing | 25 |
| How Many Pilot Tests? | 25 |
| CONCLUDING THOUGHTS | 25 |
| 3  **THE UNIVERSE** *By William G. Barber* | **27** |
| DETERMINING THE PROPER UNIVERSE | 28 |
| Forward Confusion | 28 |
| Reverse Confusion | 31 |
| Post-Sale Confusion | 31 |

- Distinctiveness/Strength of Senior User's Mark ... 32
- Dilution Issues ... 33
- False Advertising ... 36
- Special Rules ... 36
- ERRORS IN DEFINING THE UNIVERSE ... 39
  - Overinclusiveness ... 39
  - Underinclusiveness ... 42
  - Overinclusive and Underinclusive ... 44
  - Judicial Nit-picking ... 44
- SAMPLING AND SCREENING THE UNIVERSE ... 47
  - Sampling ... 47
  - Screening ... 48
- CONCLUSION ... 49

**SECTION III  LEGAL QUESTIONS ... 51**

**4  LIKELIHOOD OF CONFUSION ... 53**
*By Jerre B. Swann*

- EVEREADY ... 56
  - The Questionnaire and Variants ... 56
  - Categorization and Pattern Matching in an Eveready Format ... 60
  - The Confusion Factors Tested by Eveready ... 61
  - The Need for a Control Cell ... 62
  - The Scope of Eveready ... 62
- SQUIRT ... 64
  - The Questionnaire and Variants ... 64
  - Categorization and the Representativeness Heuristic ... 66
  - The Confusion Factors Tested by Squirt ... 67
  - The Need for Control Cells ... 68
  - The Scope of Squirt ... 69
- GOING BOTH WAYS ... 72
- OTHER FORMATS ... 72
- REJECTED APPROACHES ... 74
- PRINCIPAL REASONS FOR REDUCED WEIGHT/PRECLUSION OF CONFUSION STUDIES ... 75
  - Lack of Relevance, Reliability, or Objectivity ... 75
  - Distortion of the Stimulus or Its Context ... 76
- CONCLUSION ... 77

**5  SECONDARY MEANING SURVEYS ... 79**
*By Vincent N. Palladino*

- INTRODUCTION ... 79
- THE MEANING OF SECONDARY MEANING ... 81
- ASSESSING ASSOCIATION DIRECTLY ... 83
  - Isolating the Trademark or Trade Dress ... 83
  - Questions ... 85
  - Level of Association ... 90

- OTHER ATTEMPTS TO ASSESS SECONDARY MEANING DIRECTLY ... 91
  - "Who" Questions ... 91
  - "What-Word" Questions ... 92
  - "What-Name" Questions ... 93
  - Brand Awareness Questions ... 94
  - Applicability to Trade Dress ... 95
  - Reported Secondary Meaning Percentages ... 96
- INFERRING SECONDARY MEANING FROM OTHER FINDINGS ... 97
  - Genericness ... 97
  - Likelihood of Confusion ... 98
- A COMMENT ON COMMON SENSE ... 99

**6  GENERICNESS SURVEYS IN TRADEMARK DISPUTES: UNDER THE GAVEL ... 101**
*By E. Deborah Jay*

- INTRODUCTION ... 101
- THE SURVEYS IN *AMERICAN THERMOS* ... 105
- THE SURVEYS IN *E. I. DU PONT DE NEMOURS* ... 107
- THERMOS SURVEYS AFTER *AMERICAN THERMOS* ... 109
- TEFLON SURVEYS AFTER *E. I. DU PONT DE NEMOURS* ... 112
  - The Brand-Name/Common-Name Dichotomy ... 114
  - Screening Respondents ... 115
  - Question Wording ... 117
  - Frame of Reference ... 119
  - Controls ... 120
  - Rotation of Items and Response Categories ... 121
  - Survey Analysis ... 122
- ALTERNATIVES TO THE THERMOS AND TEFLON FORMATS ... 124
  - Consumer-Recognition Surveys ... 125
  - Source-Identification and Brand-Association Surveys ... 126
  - Permission or Approval Surveys ... 129
  - Statement-of-Meaning Surveys ... 129
  - Consumer Motivation Surveys ... 130
- OTHER SURVEY DESIGN AND IMPLEMENTATION ISSUES ... 131
  - The Role of Experts and Attorneys in Surveys ... 131
  - Universe Selection and Sample Size ... 131
  - Data Collection Methods and Visual Stimuli ... 136
  - Survey Reporting ... 139
- COUNTERING A GENERICNESS SURVEY ... 139
- CONCLUSION ... 143

**7A  DILUTION SURVEYS UNDER THE TRADEMARK DILUTION REVISION ACT ... 145**
*By Jerre B. Swann*

- INTRODUCTION ... 145
- RECOGNITION/AWARENESS ... 147
- ASSOCIATION ... 149

IMPAIRED DISTINCTIVENESS AS A FUNCTION OF SIMILARITY, ELEVATED FAME, SUBSTANTIALLY EXCLUSIVE USE, ASSOCIATION, AND JUNIOR USER INTENT     151
CONCLUSION     154

**7B  SURVEYS IN DILUTION CASES II**     155
*By Shari Seidman Diamond*

- FAME SURVEYS     155
- ASSOCIATION SURVEYS     157
- AFTER FAME AND ASSOCIATION     159
- CONCLUSION     161

**7C  SWANN'S REBUTTAL TO DIAMOND**     163

**8  SURVEY EVIDENCE IN FALSE ADVERTISING CASES**     167
*By Bruce P. Keller*

- WHEN SURVEYS ARE USED IN FALSE ADVERTISING     167
  - Advertisements That Are Literally False     168
  - Advertisements That Are False by Necessary Implication     172
  - Advertisements That Are Misleading     173
- CONSTRUCTION OF SURVEYS     177
  - Survey Standards     178
- WEIGHT AND ADMISSIBILITY OF SURVEY EVIDENCE     194
- CONCLUSION     197

**SECTION IV  CONTROLS**     199

**9  CONTROL FOUNDATIONS: RATIONALES AND APPROACHES**     201
*By Shari Seidman Diamond*

- INTRODUCTION     201
- THREATS TO INTERNAL VALIDITY AND SOURCES OF MEASUREMENT ERROR     203
  - Preexisting Beliefs     204
  - Yea-Saying     204
  - Guessing That Produces Random Error     205
  - Guessing That Produces Systematic Error     205
- A CLOSER LOOK AT SURVEY DESIGN WITHOUT AND WITH CONTROLS     206
  - Without Controls     206
  - With Controls     209
- CHOOSING APPROPRIATE CONTROLS     210
  - Selecting a Control That Shares Features with the Test Stimulus That Are Not at Issue     212
  - Avoiding Cues in the Control That Artificially Depress "Confusion" Responses     213
  - Selecting a Control That Is a Plausible Member of the Product Category     214
  - Avoiding a Control That Is Itself Infringing     214
- THE ROLE OF MULTIPLE CONTROLS     215
- CONCLUSION     216

**10  DESIGN ISSUES FOR CONTROLS**     217
*By Mike Rappeport*

- INTRODUCTION     217
- THE MYTH OF REPLICATION     218
- THE PROBLEM—THE INHERENT "LEADINGNESS" OF SURVEYS     219
- NOISE AND OTHER SURVEY ARTIFACTS     220
- PRECONCEPTIONS     221
- SUMMARY OF THE CHAPTER TO THIS POINT     222
- GOOD DESIGN—THE CONCEPT OF CONTROLS     223
- THE ENGINEERING NATURE OF SURVEY RESEARCH     224
- CHOOSING A CONTROL—GENERAL PRINCIPLES     225
- THE BASIC KINDS OF SURVEY CONTROL STRUCTURES     226
- THE CONTROL CELL DESIGN     227
  - The Basic Design     227
  - Uses of a Control Cell Design—False Advertising     228
  - Other Uses of a Control Cell Design     228
  - Analysis of Control Cell Designs with Multiple Controls     232
- THE SINGLE TEST STIMULUS ONE-ROOM ARRAY DESIGN     233
  - The Basic Design     233
  - Controls in Single Test Stimulus One-Room Array Designs     234
  - Use of Single Test Stimulus One-Room Array Designs     234
  - Additional Control Stimuli in Single Test Stimulus One-Room Array Designs     236
- COMPARISON ARRAY DESIGNS     236
  - The Two Basic Designs     236
  - Deciding Between a One-Room and a Two-Room Comparison Array     237
  - Selecting the Controls     238
  - Analysis in a One-Room Array     238
  - Analysis in a Two-Room Array     239
- CONCLUDING REMARKS     239

**SECTION V  OTHER METHODOLOGICAL ISSUES**     241

**11  DEMAND EFFECTS IN LIKELIHOOD OF CONFUSION SURVEYS: THE IMPORTANCE OF MARKETPLACE CONDITIONS**     243
*By Itamar Simonson and Ran Kivetz*

- ACADEMIC RESEARCH REGARDING DEMAND EFFECTS IN SOCIAL-PSYCHOLOGICAL AND BUYER-BEHAVIOR EXPERIMENTS     244
- LEADING SURVEY QUESTIONS AND DEMAND EFFECTS     246
- DEMAND EFFECT BIASES IN LIKELIHOOD OF CONFUSION SURVEYS     248
  - Monadic versus Sequential Presentation     249
  - SIMON PROPERTY GROUP V. MYSIMON     252

viii CONTENTS

| | |
|---|---:|
| KARGO GLOBAL V. ADVANCE MAGAZINE PUBLISHERS SEQUENTIAL PRESENTATION SURVEY | 255 |
| LEELANAU WINE CELLARS V. BLACK & RED, INC. | 257 |
| CONCLUSION | 259 |

**12 ARE CLOSED-ENDED QUESTIONS LEADING QUESTIONS? 261**
*By Jacob Jacoby*

| | |
|---|---:|
| INTRODUCTION | 261 |
| OPEN-ENDED QUESTIONS | 262 |
| CLOSED-ENDED QUESTIONS | 262 |
| JUDICIAL VIEWS OF CLOSED-ENDED QUESTIONS | 263 |
|    Reliability | 263 |
|    Objectivity | 264 |
|    Leadingness | 265 |
| THE VIEWS OF AUTHORITIES, LEGAL AND OTHERWISE | 266 |
|    Authorities Generally Recognized in Law | 266 |
|    The Case Law | 267 |
|    Other Authorities | 268 |
|    The Psychology Underlying Open-Ended and Closed-Ended Questions | 269 |
| WHAT MAKES A CLOSED-ENDED QUESTION A LEADING QUESTION? | 272 |
| FACTORS THAT CONVERT CLOSED-ENDED QUESTIONS INTO LEADING QUESTIONS | 273 |
|    Failure to Provide Explicit Instructions Not to Guess | 273 |
|    Failure to Provide a "Don't Know" (or Equivalent) Response Option | 274 |
|    Asking Simple Yes/No Questions | 274 |
|    Failure to Be Fair and Balanced | 274 |
| REVISITING THE EARLIER CITED COURT CRITICISMS OF CLOSED-ENDED QUESTIONS | 281 |
|    *Universal City Studios, Inc. v. Nintendo Co.* | 281 |
|    *Beneficial Corp. v. Beneficial Capital Corp.* | 282 |
|    *Scott Fetzer Co. v. House of Vacuums Inc.* | 282 |
|    *Marshall Field & Co. v. Mrs. Fields Cookies* | 283 |
|    *Gillette v. Norelco* | 283 |
| CONCLUSION | 283 |
| **EDITORS' NOTE ON CHAPTER 12** | **285** |

**13 INTERNET SURVEYS FOR EVALUATING TRADEMARK INFRINGEMENT AND DECEPTIVE ADVERTISING 287**
*By Roger Tourangeau and Shari Seidman Diamond*

| | |
|---|---:|
| INTRODUCTION | 287 |
| SURVEY RESEARCH FOR EVALUATING TRADEMARK INFRINGEMENT AND DECEPTIVE ADVERTISING | 288 |
| POTENTIAL ADVANTAGES OF THE INTERNET FOR TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS | 289 |

CONTENTS ix

| | |
|---|---:|
| NONOBSERVATION AND MEASUREMENT ERRORS IN INTERNET SURVEYS | 290 |
|    Nonobservation Errors | 292 |
|    Observation Error | 300 |
| CONCLUSION | 305 |
| **EDITORS' NOTE ON CHAPTER 13** | **307** |

**SECTION VI   RESPONSES TO SURVEY EVIDENCE   309**

**14 SURVEY PERCENTAGES IN LANHAM ACT MATTERS 311**
*By Gerald L. Ford*

| | |
|---|---:|
| INTRODUCTION | 311 |
| LIKELIHOOD OF CONFUSION SURVEYS | 313 |
| SECONDARY MEANING SURVEYS | 315 |
| GENERICNESS SURVEYS | 317 |
| FALSE ADVERTISING SURVEYS | 319 |
| FAME SURVEYS | 322 |
| LIKELIHOOD OF DILUTION SURVEYS | 324 |
|    Dilution Surveys—January 16, 1996, through March 4, 2003 | 324 |
|    Dilution Surveys—March 5, 2003, through October 6, 2006 | 324 |
|    Dilution Surveys—October 7, 2006, through December 31, 2010 | 325 |
| CONCLUSION | 326 |
| **EDITORS' NOTE ON CHAPTER 14** | **327** |

**15 THE *DAUBERT* REVOLUTION AND LANHAM ACT SURVEYS 329**
*By G. Kip Edwards*

| | |
|---|---:|
| INTRODUCTION | 329 |
| THE SUPREME COURT AND EXPERT EVIDENCE | 331 |
|    The *Daubert* Decision | 331 |
|    The *Kumho* Decision | 333 |
|    The Amendments to Rule 702 | 335 |
|    Procedural Aspects of *Daubert* | 335 |
| *DAUBERT* CHALLENGES TO LANHAM ACT SURVEY EVIDENCE | 338 |
|    Survey Universe | 340 |
|    Sample Size and Related Issues | 343 |
|    Definitions | 345 |
|    Presenting the Stimulus and Replicating Market Conditions | 346 |
|    Problems with the Survey Questions | 348 |
|    The Need for Controls | 355 |
| EXPERTS TESTIMONY UNSUPPORTED BY SURVEY EVIDENCE | 357 |
| CONCLUSION | 361 |

**16  SURVEY CRITIQUES**  363
*By Jerre B. Swann*

| | |
|---|---|
| INTRODUCTION | 363 |
| HOW A CRITIQUE SHOULD NOT BE DONE | 363 |
| IPSE DIXIT CRITIQUES PURELY AS TO TECHNICAL MATTERS SHOULD BEAR LITTLE (IF AT ALL) ON THE WEIGHT GIVEN A SURVEY | 367 |
| CRITIQUES AS TO SUBSTANTIVE FLAWS SHOULD TURN ON THE IMPACT OF THE FLAW ON RELEVANCE OR RELIABILITY, NOT ON THE LABEL ATTACHED TO THE FLAW | 371 |
| The Truly Irrelevant | 371 |
| The Substantially Irrelevant | 372 |
| The Partially Relevant | 372 |
| The Substantially Relevant | 372 |
| TRUE CANDIDATES FOR FATAL FLAW TREATMENT, WITHOUT EXTENSIVE ANALYSIS OR SUPPORTING DATA | 373 |
| A Survey Without a Control Cell or with a Fundamentally Inadequate Control Stimulus | 373 |
| A Complete Divergence "from the Conditions That Potential Purchasers Encounter in the Parties' Marketplace" Is Irrelevant | 374 |
| CONCLUSION | 375 |

**INDEX**  377

# AUTHOR BIOGRAPHIES

*William G. Barber*  Bill Barber is the managing partner of Pirkey Barber, LLP in Austin, Texas, where he specializes in trademark law. Mr. Barber was recently honored as the Best Lawyers' 2012 Austin Trademark Law Lawyer of the Year, and has been included in publications such as *The Best Lawyers in America, Chambers USA America's Leading Lawyers for Business, The International Who's Who of Trademark Lawyers, Texas Super Lawyers,* and the *World Trademark Review 1000.* Currently, he serves as President of the American Intellectual Property Law Association (2011–12), a Master of the Bench of the Austin IP Inn of Court, and is a past chair of the State Bar of Texas Intellectual Property Law Section. He is a frequent author and speaker and has testified before the United States Congress on trademark issues.

*Shari Seidman Diamond*  Shari Seidman Diamond is the Howard J. Trienens Professor of Law and Professor of Psychology at Northwestern University and a research professor at the American Bar Foundation. She has published more than 100 articles in behavioral science journals and legal publications, including the "Reference Guide on Survey Research" (1994; 2000; 2011) in the Federal Judicial Center's *Reference Manual on Scientific Evidence*. Professor Diamond practiced law at Sidley Austin in the areas of Litigation and Intellectual Property. She also taught at the University of Chicago, Harvard, and the University of Illinois at Chicago, and was editor of the *Law & Society Review* and president of the American Psychology-Law Society. She has lectured widely to scholarly and judicial audiences, and has testified in American and Canadian courts on trademark surveys and juries. Her publications on surveys and juries have been cited by federal and state courts, including the U.S. Supreme Court. Professor Diamond received the 2010 Harry Kalven, Jr. Award from the Law and Society Association, and the 1991 American Psychological Association award for Distinguished Contributions to Research in Public Policy. Her Ph.D. in social psychology is from Northwestern University and her JD is from the University of Chicago. She was elected in 2012 to the American Academy of Arts and Sciences.

*G. Kip Edwards*  G. Kip Edwards is a lawyer specializing in trademark, unfair competition and antitrust litigation. Mr. Edwards received a J.D. from the University of California School of Law (Boalt Hall) in 1971. After a year as a Teaching Fellow at Stanford Law School, Mr. Edwards joined Orrick, Herrington & Sutcliffe in San Francisco as an associate, becoming a partner of the firm in 1978. Mr. Edwards resigned from Orrick in 1995 to become a sole practitioner in Palo Alto, California. Mr. Edwards is a former member of the Editorial Board of INTA's *The Trademark*

whether the pilot test was somehow rigged or slanted *by design* to achieve that outcome. Understandably pilot tests will add the opportunity for even more "battles of the experts" at a time when some courts are already dubious of the objectivity and honesty of consumer surveys and of the experts who testify about them.

Embracing the value and acceptability of pilot testing will likely turn on whether the court and other tribunals dealing with similar issues (e.g., FTC, NAD, TTAB, etc.) adopt a more scientific perspective. Even though the *Daubert* standards were a move forward, it also follows that adoption of this perspective in the language of the *Manual for Complex Litigation*, in tomes on surveys (e.g., *McCarthy on Trademarks and Unfair Competition*), in learned articles published in the legal and psychological/marketing research literature, and so on, would be helpful.

It will be recalled that it has not been so many years since the concept of a control group found its important place in consumer survey methodology. And many attorneys still flinch at the use of the word "experiment" because they are concerned that a survey that is also (or rather) an experiment (these days, the great majority of Lanham Act consumer surveys) would be perceived as "less certain" than a survey that is not also an experiment. Fortunately, most courts understand the difference between "experiment" as in "this is untried or tentative but we'll see what happens" versus "an experimental design allows one to more clearly assess cause and effect."

Change comes to all disciplines, to some more slowly than others.

# THE UNIVERSE   3

By William G. Barber

*Courts consider the selection of the proper universe as one of the most important factors in assessing the validity of a survey as well as the weight that it should receive.*[1]

Defining the proper universe is a critical step in designing any survey[2]—including surveys used in Lanham Act cases. A survey's "universe" (also referred to as "population") is the group of people from which participants in the survey are selected, and thus is the group of people whose perceptions the survey is intended to represent. When designing a survey for a Lanham Act case, it is crucial to select a universe that corresponds with the group or groups of consumers whose state-of-mind is relevant to the particular legal issue involved in the case. As discussed in this chapter, the relevant universe for a survey in a Lanham Act case varies depending on what legal issue is being tested.

Failure to properly define the universe can have devastating consequences on the evidentiary weight given to a survey, and can even lead to its exclusion from evidence in extreme cases.[3] Errors in defining

---

1. Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 781 (W.D. Mich. 2006) *aff'd*, 502 F.3d 504 (6th Cir. 2007).
2. MANUAL FOR COMPLEX LITIGATION § 11.493 (Fed. Jud. Ctr., 4th ed. 2004); S. Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 376 n.76 (Fed. Jud. Ctr., 3d ed. 2011) (hereinafter Diamond) ("Identification of the proper target population or universe is recognized uniformly as a key element in the development of a survey."); Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) ("Selection of the proper universe is one of the most important factors in assessing the validity of a survey and the weight that it should receive because the 'persons interviewed must adequately represent the opinions which are relevant to the litigation.' Selection of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'").
3. Diamond at 377–78 ("A survey that provides information about a wholly irrelevant population is itself irrelevant. Courts are likely to exclude the survey or accord it little weight.").

the universe can be grouped into three general categories.[4] First, the universe may be overinclusive, including not only the group of consumers relevant to the legal issue being tested, but also other individuals. The weight that a court is likely to give such a survey may depend on whether sufficient data is obtained in the survey to identify those respondents in the relevant subgroup, and whether the number of respondents so identified is large enough to be statistically meaningful.

Second, the universe may be underinclusive, including only a subset of the entire group of consumers relevant to the legal issue being tested. The weight given this type of survey may depend heavily on whether the court believes the particular segment tested biased the results in favor of the party who commissioned the survey. If so, the court is likely to accord the survey little or no weight. On the other hand, if there is no showing or reason to believe that unrepresented segments of consumers would have reacted differently than those included in the survey, the court may give the survey some weight. Further, if the subset tested constitutes a relevant and distinct segment of the overall market for the applicable products or services, the court may deem the universe proper, albeit limiting the survey's relevance or effect to that particular segment.

Finally, the universe may completely miss the mark, consisting of individuals whose state-of-mind is not relevant to the legal issue being tested. For obvious reasons, these types of surveys are likely to be excluded from evidence or given no weight by the court.

## DETERMINING THE PROPER UNIVERSE

A number of legal issues involved in Lanham Act litigation lend themselves to survey evidence, because they depend upon the perception or state-of-mind of consumers of the parties' products or services. The proper universe for these surveys depends directly on which issue is in dispute, and what group of consumers is relevant to that issue. Thus, it is vital for the survey expert to understand the legal issue he or she has been asked to test, and tailor the universe as closely as possible to the relevant group of consumers.

### Forward Confusion

The classic articulation of the proper universe for determining likelihood of confusion in traditional trademark infringement cases (i.e., cases alleging "forward confusion"[5])

---

4. Some survey universes may involve a combination of these problems. For example, a universe could be overinclusive in some respects and underinclusive in others.

5. "Forward confusion" (also called "traditional confusion") is used here to refer to cases where the senior user asserts that consumers are likely to be confused that the junior user's products or services are made or sponsored by the senior user. In contrast, "reverse confusion" refers to cases where the senior user asserts that consumers are likely to be misled into believing that the senior user's products or services are made or sponsored by the junior user.

comes from *Amstar Corp. v. Domino's Pizza, Inc.*: "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."[6] The reason for this rule is clear—in cases alleging forward confusion, what is at issue is whether the junior user's mark is likely to confuse consumers. In order to fairly test that issue, one must look at those consumers likely to encounter the junior user's mark in the marketplace.[7,8]

In many trademark cases, the parties are direct competitors, selling the same types of products and services to the same types of consumers through the same trade channels and in the same geographic markets. Defining the appropriate universe in such cases is usually straightforward, since both parties' potential purchasers are essentially the same.[9] Similarly, where the junior user competes in a particular segment of the senior user's overall market, the proper universe should focus on that segment.[10] However, where the parties are not direct competitors but instead sell different types of products or services to different types of consumers, tailoring the survey universe to the junior user's market is critical.

---

6. 615 F.2d 252, 264 (5th Cir. 1980). *See also* Citizens Banking Corp. v. Citizens First Bancorp, Inc., 2007 WL 4239237 (E.D. Mich. 2007) ("[i]n a traditional case claiming 'forward' confusion, not 'reverse' confusion, the proper universe to survey is the potential buyers of the junior user's goods or services"); Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 546 (S.D.N.Y. 1991) ("In evaluating confusion in a trademark infringement case, it is important to remember that . . . the only 'relevant population' is potential purchasers of the junior user's goods or services.").

7. Note that such consumers would include not only purchasers of the junior user's products, but also the senior user's customers who later buy the junior user's products thinking they were made or sponsored by the senior user. In the post-sale confusion context, relevant consumers could also include individuals who may not purchase the junior user's products, but rather use or otherwise encounter the products purchased by others.

8. Although this principle would seem to be well established, courts sometimes get it wrong. For example, in *IDV North America, Inc. v. S&M Brands, Inc.*, 26 F. Supp. 2d 815 (E.D. Va. 1998), the owner of the mark BAILEYS for liqueurs sued the maker of "Bailey's" cigarettes. The plaintiff commissioned a survey of tobacco consumers within defendant's target geographic area, which would seem to be an entirely appropriate universe for a forward confusion survey. Nevertheless, the court believed the universe should have included consumers in the market for both parties' products (tobacco and liqueurs), and that the failure to do so "seriously undercut[] the credibility of the survey" because it (supposedly) excluded people least likely to be confused. *Id.* at 830. In other words, the court wanted a flawed universe that would have skewed the results in the defendant's favor! *See also* Schieffelin & Co. v. Jack Co. of Boca, Inc., 850 F. Supp. 232, 246 (S.D.N.Y. 1994) (court admitted plaintiff's survey targeting consumer profile for defendant's gourmet popcorn products into evidence, but stated that "the better definition of the universe in this case would have been that group of consumers who were in the market for DOM PERIGNON, or at least champagne," *i.e.*, plaintiff's product).

9. "Because in most trademark infringement cases the senior user and the junior user sell competing products, the courts have rarely needed to address the question of which market should be tested for actual confusion." Vista Food Exchange, Inc. v. Vistar Corp., 2005 WL 2371958 (E.D.N.Y. 2005); *Hutchinson*, 769 F. Supp. at 546 ("Where the senior and junior user's products are of the same kind, the population of consumers is the same."); Gross v. Bare Escentuals Beauty Inc., 90 U.S.P.Q. 2d 1448, 1456 (S.D.N.Y. 2008) (survey properly targeted "prospective purchasers of premium skincare products" sold by both parties).

10. *See, e.g.*, Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 2008 WL 4614660 (N.D. Cal. 2008) (although plaintiff used "Arcuate" stitching design on virtually all Levi's brand jeans, its survey universe was properly limited to the target market and price point of Abercrombie's allegedly infringing jeans, defined as women ages 20 to 45 who had purchased or intended to purchase jeans costing at least $75).

A good illustration of this principle is found in *National Distillers Products Co. v. Refreshment Brands, Inc.*[11] In that case, the plaintiff sold vodka under the mark TETON GLACIER, while the defendant sold vodka coolers under the mark GLACIER BAY. The plaintiff's survey universe was limited to people who indicated they drank "liquor, such as gin, rum, tequila, or vodka" at least once a month, while the defendant's survey was conducted among people "who had recently purchased or consumed a cooler product (or intended to do so)."[12] The court found that the plaintiff's universe was not properly defined, because the evidence demonstrated that the liquor and cooler markets were not coextensive.[13] On the other hand, the court found that the defendant "selected an appropriate universe, namely, cooler respondents."[14]

The *Amstar* case presents a good example of selecting the wrong universe, both geographically and by consumer demographics. Amstar alleged that the defendant's use of the mark DOMINO'S PIZZA infringed the mark DOMINO for sugar products sold in grocery stores. Amstar conducted a survey in 10 cities (8 of which had no DOMINO'S PIZZA outlets) among female heads of households primarily responsible for making food purchases. The Fifth Circuit found the survey "substantially defective" because it "neglected completely defendant's primary customers—young, single, male college students."[15] Instead, the survey focused on Amstar's primary customers. Thus, the court concluded that the proper universe was not examined.[16]

Forward confusion surveys that have similarly focused on the senior user's target market instead of that of the junior user have been routinely criticized by courts.[17] The problem is exacerbated when the universe is limited to *actual* customers of the senior user, as courts often believe this biases the results to higher levels of confusion.[18]

---

11. 198 F. Supp. 2d 474 (S.D.N.Y. 2002).
12. *Id.* at 482, 484.
13. *Id.* at 484.
14. *Id.*
15. *Amstar*, 615 F.2d at 263–64.
16. *Id.* at 264.
17. *See, e.g.,* Powerhouse Marks LLC v. Chi Hsin Impex, Inc., 2006 WL 20523 (E.D. Mich. 2006) (plaintiff operated fitness centers under the mark POWERHOUSE GYM, while defendant sold fitness equipment under the mark POWERHOUSE FITNESS; the court found plaintiff's survey population "improperly chosen and defined" because it consisted of adults who had worked out in a fitness center, club, or gym in preceding five years and the survey was conducted in malls within a 12-mile radius of three more of plaintiff's fitness centers); Vista Food Exchange, Inc. v. Vistar Corp., 2005 WL 2371958 (E.D.N.Y. 2005) (plaintiff's survey inadmissible or entitled to de minimus weight where universe was defined as people "who fall within target market characteristics of [plaintiff]" even though the parties served different tiers in food distribution chain); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 322 (S.D.N.Y.) (senior user used marks PACO and PACO RABANNE for fragrances, while junior user used marks PACO and PACO SPORTS for jeans and casual clothing; the court found that plaintiff's survey "improperly focused on the fragrance market rather than on the jeans or casual clothing market"), *aff'd,* 234 F.3d 1262 (2d Cir. 2000); Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 564 (S.D.N.Y. 1991) (the senior user was the publisher of ESSENCE Magazine, while the junior user was a rap singer who used the stage name "Essence"; court found that the senior user's survey universe was not proper because it reflected "the readership of the magazine, not the listeners of rap").
18. *See, e.g.,* Hodgdon Powder Co. v. Alliant Techsystems, Inc., 512 F. Supp. 2d 1178, 1182 (D. Kan. 2007) (excluding plaintiff's survey whose participants were limited to people who visited plaintiff's promotional booth at a single event, court noted that "the survey participants are not representative of

Senior users who limit a survey's universe to their own actual customers are obviously trying to rig the survey to produce a favorable result, thus violating the objectivity standards so fundamental to reliable survey research.

## Reverse Confusion

As discussed above, where the senior user alleges likelihood of forward confusion, the relevant universe is the junior user's potential customers. However, in cases alleging reverse confusion (i.e., that consumers would likely believe that the senior user's products or services are made or sponsored by the junior user),[19] the relevant universe is the senior user's potential customers.[20]

## Post-Sale Confusion

What is the proper universe for a survey attempting to measure post-sale confusion?[21] This question was addressed in *General Motors Co. v. Urban Gorilla LLC.* GM sued Urban Gorilla for selling "body kits" replicating GM's popular Hummer vehicles. While genuine Hummer vehicles were priced at around $140,000, Urban Gorilla's body kits sold for only around $10,000 and could be installed on a standard truck chassis to make it look like a Hummer. Because of this huge price difference, the parties' target customer groups differed dramatically; GM's target Hummer market consisted of high-income (over $200,000 per year) individuals, while Urban Gorilla targeted middle-to-lower income, former military, "do-it-yourselfers."[22] GM

---

the universe of prospective buyers because they were all familiar with plaintiff or in close proximity to plaintiff's promotional material"); Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 488 (5th Cir. 2004) (survey universe was constructed from plaintiff's customer lists, a group the court found to be "uniquely familiar with Scott Fetzer's marketing and distribution techniques").

19. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner, and thereby causes likely confusion as to the source of the senior user's goods or services." Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 474 (3d Cir. 1994).

20. *See, e.g.,* Citizens Fin. Group, Inc. v. Citizens Nat. Bank of Evans City, 383 F.3d 110, 121 (3d Cir. 2004) ("The court should limit survey evidence in reverse confusion cases to the customers of the senior user"; survey conducted outside senior user's geographic area excluded). *See also* Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994) ("Where . . . the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers.") Although this principle is certainly correct, the survey that was conducted in the *Sterling Drug* case was not properly designed to test reverse confusion, but rather tested forward confusion. In that case, the plaintiff owned the U.S. trademark rights to the mark BAYER for aspirin, while the defendant used the mark BAYER in the United States for industrial and chemical products. Plaintiff conducted a survey in which it showed shopping mall pedestrians the headquarters sign of defendant's U.S. subsidiary (Bayer USA), and 75% of respondents reported that the company shown in the sign makes aspirin. Defendant criticized this survey as focusing on the wrong universe, i.e., analgesic customers as opposed to customers of industrial and chemical products. The court incorrectly rejected this criticism, stating that the "relevant issue" in the case was reverse confusion. Although plaintiff did allege reverse confusion in the case, the survey it conducted (testing the *defendant's* mark) did not test that issue.

21. "Post-sale confusion" is the term used for confusion of someone who did not purchase the product bearing the allegedly infringing mark or trade dress, but later sees or uses the product and believes it was made or sponsored by the senior user.

22. 2010 WL 5395065 (D. Utah 2010).

Case 1:14-cv-01611-LO-JFA Document 478-6 Filed 10/23/15 Page 11 of 19 PageID# 13621

conducted a survey that included potential customers of *both* parties' products,[23] which Urban Gorilla challenged on the basis that the universe was overinclusive. Specifically, Urban Gorilla argued that only actual or potential Hummer purchasers should have been surveyed.[24]

The court rejected Urban Gorilla's criticism. "In a case like this where the main point of confusion is post sale,"[25] "those with opinions relevant to the litigation are those who are potential or actual purchasers of both the Hummer and the Urban Gorilla body kit."[26] In this author's view, the court's decision is sound policy. While potential Hummer purchasers might have a negative experience seeing or using an Urban Gorilla product post-sale and erroneously attribute that to Hummer, so might potential Urban Gorilla purchasers, which would inevitably lead to denigrating or "cheapening" the Hummer brand in the public's mind. A contrary result would open the door for junior users to sell inexpensive knock-offs of expensive goods to lower-income target markets.

## Distinctiveness/Strength of Senior User's Mark

A number of issues relating to the distinctiveness or strength of the senior user's mark can be measured by a survey. These include: (1) whether the mark is inherently distinctive (i.e., whether the mark is arbitrary or suggestive of the senior user's products or services, as opposed to descriptive or misdescriptive of them); (2) whether a mark or trade dress that is not inherently distinctive has acquired a secondary meaning; (3) whether the alleged mark is generic; and (4) the marketplace strength of the mark (i.e., how well-known it is among relevant consumers). Because all of these issues are determined by consumer perception of the senior user's mark, the universe for a survey testing any of these issues should focus on the typical group(s) of consumers to whom the senior user markets its products or services.[27]

---

23. GM's survey defined the relevant population as any "consumer who has purchased in the last three years or plans to purchase within the next three years a new or used four-wheel drive SUV with off-road capability and who is a decision maker in their household for a car, truck or SUV." *Id.*

24. *Id.*

25. *Id.* at *19.

26. *Id.* at *17.

27. *See, e.g.*, Premier Nutrition Inc. v. Organic Food Bar Inc., 86 U.S.P.Q. 2d 1344, 1351 (C.D. Cal. 2008) (survey testing genericness should have focused on senior user's "primary customers"), *aff'd*, 327 Fed. Appx. 723 (9th Cir. 2009); Nightlight Systems, Inc. v. Nitelites Franchise Systems, 2007 WL 4563873 (N.D. Ga. 2007) (because genericness centers on "the perception of the relevant consumer population for the product at issue," target population for a genericness survey is "consumers who have purchased or are likely to purchase the product at issue"); Walker & Zanger, Inc. v. Paragon Industries, Inc., 549 F. Supp. 2d 1168, 1179 (N.D. Cal. 2007) (because secondary meaning is assessed by "stand[ing] in the shoes of the *ordinary purchaser*," a survey testing secondary meaning should include "a proportionate sampling of all customers" of the senior user's class of goods); Cartier v. Samo's Sons, Inc., 2005 WL 2560382 (S.D.N.Y. 2005) (the court found that plaintiff's secondary meaning survey was properly limited to consumers who owned or were likely to purchase a fine watch valued at $2,500 or more, stating that the plaintiff "is not required to establish that *all* consumers relate the product to its producer; it need only show that a substantial segment of the relevant consumer group makes this connection"), *aff'd*, 294 Fed. Appx. 615 (2d Cir. 2008); J&J Snack Foods Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 371 (D.N.J. 2002) (where plaintiff sold frozen cookie dough products only to distributors, a survey testing whether plaintiff's mark was suggestive "should have been limited to the commercial distributors in the food service industry who may have contact with frozen dough products"). *But see*, Firefly Digital, Inc. v. Google, Inc., No. 6:10-

## Dilution Issues

### Fame

Under the federal trademark dilution statute (as well as an increasing number of state dilution statutes), the senior user must prove (among other things) that its mark is famous.[28] Trademark owners often present survey evidence to support a showing of fame. The proper universe to prove fame under the federal statute is clear. Pursuant to statutory amendments adopted in 2006, "a mark is famous if it is widely recognized by *the general consuming public of the United States* as a designation of source of the goods or services of the mark's owner."[29] It logically follows, therefore, that the universe for a survey designed to test fame under this statute should include a representative national sampling of the general consuming public.

### *Likelihood of Dilution*

The proper universe for determining likelihood of dilution is not nearly so clear. Similar to other trademark issues discussed above, logic would suggest that it should depend on which party's mark is being tested, and for what purpose.

#### *Dilution Surveys Testing the Junior User's Mark (Association Tests)*

Under the federal dilution statute, association between the junior user's mark and the senior user's mark is a fundamental prerequisite for dilution to occur.[30] Not surprisingly then, most surveys in dilution cases expose respondents to the junior user's mark and test whether they associate it with the senior user's mark.

While the federal statute makes clear that this type of association is a key step in determining the likelihood of dilution, it does not specify whose association is relevant. Is the proper inquiry, similar to testing forward confusion, whether the junior user's use is likely to cause association among its own target consumers? Or, given that the senior user's mark must be famous among the general consuming public, is the proper inquiry whether the junior user's use is likely to cause association among

---

0133, slip op. at 12 (W.D. La. July 7, 2011) (holding that for survey testing genericness and secondary meaning of plaintiff's marks, "the universe to be surveyed is not necessarily limited to the potential buyers of [plaintiff's] product. Instead, the proper universe would be broader and include the likely purchasers of both parties' products.").

28. 15 U.S.C. § 1125(c)(1).

29. 15 U.S.C. § 1125(c)(2)(A) (emphasis added).

30. The federal dilution statute provides relief if the junior user's use is likely to cause "dilution by blurring" or "dilution by tarnishment" of the senior user's famous mark. 15 U.S.C. § 1125(c)(1). "Dilution by blurring" is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," which may be determined based on a number of factors including "[a]ny actual association between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B)(vi). Similarly, "dilution by tarnishment" is defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Based on this statutory text, while association between the marks is a key concept under the Trademark Dilution Revision Act, proving that such associations have occurred or are likely to occur may not be sufficient to demonstrate likelihood of dilution because not all associations between marks impair distinctiveness or harm reputation.

ordinary consumers in general, regardless of whether or not they fall in the junior user's target market?

Although the answer is unclear in the statute, in the author's view the better approach is to focus association tests on the junior user's target audience. By definition, consumers outside that target would be unlikely to encounter the junior user's mark in the marketplace, and thus would have little opportunity to associate it with the senior user's mark. Only if people in the real world associate the junior user's mark with the senior user's would the possibility of dilution occur. Thus, an association survey testing the junior user's mark should focus on those people most likely to encounter it in the marketplace.

For example in *Nike, Inc. v. Nikepal Int'l, Inc.*,[31] the defendant used the mark NIKEPAL for laboratory testing instruments sold to analytical, environmental, and scientific labs. Nike commissioned an association survey using a universe of participants randomly selected from lists of companies that the defendant identified as its current and prospective customers, and screened them to confirm that they were the persons most responsible for ordering laboratory equipment for their businesses.[32] The court concluded that this survey established a strong degree of association between NIKEPAL and NIKE, stating:

> [Nike's] survey showed over 87% of the people in Nikepal's own customer pool associated the stimulus "Nikepal" with NIKE. The survey presents ample proof of association between the marks to support a finding that such exists in the general public.[33]

### Dilution Surveys Testing the Senior User's Mark

As discussed above, association tests (by far the most commonly used survey design in dilution cases to date) measure consumers' reactions to the *junior user's* mark. A fundamentally different approach for dilution surveys is to test the *senior user's* mark. Several such survey designs have been suggested, although no reported case has yet endorsed them.

For example, the solicitor general proposed that consumers could be shown the senior user's mark and could be asked what products or attributes they associate with that mark, or could be asked to rate a particular quality of the mark.[34] If respondents who are aware of the junior user's mark identify the senior mark with the junior user's products or attributes or rate the senior mark lower than do those respondents unaware of the junior mark, "an inference of dilution may be warranted."[35]

In another approach reported in the literature, half of the respondents in a survey were first shown some marketing materials displaying the junior user's mark, and the other half were shown the same materials except that the junior mark was replaced with a control name.[36] Several days later, the same respondents were asked whether the senior user's famous mark was used by only one company or by more than one company, and what products or services each company mentioned was known for.[37] Approximately 12 percent of the respondents who had been exposed to the junior user's mark a few days earlier associated the senior mark with both parties, while none in the control group associated the senior mark with the junior user.[38] The survey expert concluded:

> This 12% rate was considered evidence demonstrating that exposure to defendant's mark caused approximately one out of eight members of the above-mentioned universes to draw mental *associations* between that mark and plaintiff's famous mark, and, further, that these associations reduced the *distinctiveness* of plaintiff's famous mark. Whereas prior to exposure to defendant's mark, these respondents associated only one commercial entity with plaintiff's famous name, now they associated two. For these respondents, the plaintiff's name no longer called to mind just the plaintiff; *ergo*, it was no longer singular, distinctive or unique.[39]

What universe should be selected for these types of surveys? There is almost no judicial guidance to date on that question. This is most likely because the design, methodology, and execution for these types of surveys are much more complex than for association tests, and thus such surveys rarely have been attempted by litigants. In the author's view, the proper universe for these types of surveys would be either the senior user's potential customers, or people who are potential customers of both parties. All of these survey designs test perceptions about the *senior user's* mark among two groups of respondents—one group of people (a test group) who are familiar with the junior user's mark, and the other group of people (a control group) who are not familiar with the junior mark. Because the design of these surveys focuses on respondents' perception of the senior mark, the universe should likewise focus on the senior user's market.[40]

---

31. 84 U.S.P.Q. 2d 1820 (E.D. Cal. 2007).
32. *Id.* at 1824–25.
33. *Id.* at 1828. *See also*, Nat'l Pork Board v. Supreme Lobster and Seafood Co., 96 U.S.P.Q. 2d 1479, 1491–92 (T.T.A.B. 2010) (survey of seafood/fish purchasers found to be probative on whether defendant's mark used for fresh and frozen salmon was likely to cause dilution of plaintiff's mark used in connection with pork).
34. Brief for the United States as Amicus Curiae Supporting Petitioners in Part, at 22–23, Moseley v. V Secret Catalogue, Inc., 2002 WL 1378840 (U.S.).
35. *Id.*
36. J. Jacoby, *Considering the Who, What, When, Where and How of Measuring Dilution*, 24 SANTA CLARA COMPUTER & HIGH TECH. L.J. 622, 629–30 (2008).
37. *Id.* at 632.
38. *Id.* at 633.
39. *Id.* (emphasis in original).
40. *See* Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development, 955 F. Supp. 605, 617 (E.D. Va. 1997) (because the senior user's famous mark should be the focus of a dilution survey, "[i]t follows that the survey's focus on shoppers generally—in essence

### False Advertising

Similar to surveys testing forward confusion in a trademark infringement case, logic dictates that a survey testing whether an advertisement is likely to mislead or deceive consumers should focus on those consumers to whom the ad is directed (i.e., the advertiser's potential customers).[41] If different advertisements are targeted at specific segments of the consumer population, the populations and advertisements tested should reflect that segmentation (e.g., advertisements published in medical journals should be tested on physicians; those aimed at a general lay audience should be tested on laypersons).

### Special Rules

#### Distinct Subgroups

What if a party provides its products or services to more than one distinct group of consumers? The Trademark Trial and Appeal Board (TTAB) confronted this situation in *Zimmerman v. National Association of Realtors*.[42] National Association of Realtors (NAR) is the nation's largest professional association of real estate brokers and agents, whose members in turn provide services to individuals seeking to buy or sell real estate. In the *Zimmerman* case, the petitioner sought to cancel respondent NAR's registration of the collective service marks REALTOR and REALTORS covering real estate brokerage and related services on the ground of genericness. Petitioner commissioned a survey targeting *consumers* (i.e., "individuals who had consulted a real estate agent in the past year or were planning to do so in the coming year, or were planning to buy, sell or rent real estate in the next year"), while NAR commissioned one targeting *professionals* (i.e., "full-time licensed real estate agents or brokers . . . who had been licensed for at least one year"). The TTAB in essence found that, under the circumstances of this case, both of these distinct groups were relevant consumers and thus appropriate universes for a survey.

> [I]n this case, the record shows that we are faced with two distinct populations of persons whose perceptions may well be quite different. While any member of the general public who is in the market for real estate would be a prospective consumer of the listed "brokerage services," it is also clear that in the context of collective service marks, the members of the real estate profession—i.e., those who are eligible for membership in respondent—are a distinct population whose perceptions also are critical herein.[43]

The TTAB concluded that NAR's survey established that the marks continued to function as source identifying symbols "in the channels of trade where goods and/or services are directed at the population subset of real estate agents and brokers,"[44] while it rejected the petitioner's survey based on flaws in methodology unrelated to the universe. Thus, the petitions to cancel were denied.

As this case illustrates, where one party provides its products or services to more than one distinct group of people, it is perfectly proper to conduct a survey targeting any one of those groups. However, litigants should understand that the survey's relevance is correspondingly limited[45]—it will show perceptions of consumers only in the particular group tested. The result in such a case might be that the senior user's mark is found to be valid or invalid in one market but not others,[46] or that the junior user's use is likely to confuse one group of consumers but not others.

#### Purchasing Decision Makers

On a related note, there may be situations where the purchasing decision for a particular type of product is made (or influenced) by one group of people, but the products are actually purchased or used by a different group of people. One example is prescription drugs, which are selected by physicians but purchased and used by patients.[47] In these situations, the relevant universe would typically be the individuals making the purchasing decisions (or it would at least include them even if others influence those decisions).[48]

---

a cross-section of the general population—is appropriate because it is this universe of persons that comprises the market for [the senior user's] goods and services"), *aff'd*, 170 F.3d 449 (4th Cir. 1999).

41. *See, e.g.*, Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1142–43 (9th Cir. 1997) (where defendants' ads for turf grass seed and sod were directed primarily to a professional audience, "a survey directed at landscape professionals is more probative than one directed at the lay public").

42. 70 U.S.P.Q. 2d 1425 (T.T.A.B. 2004).

43. *Id.* at 1429.

44. *Id.* at 1437.

45. *Cf.* Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 303 (S.D.N.Y. 2000) (plaintiff's survey universe consisting of a trade association of health professionals "was adequate for the survey to have some weight in the genericness inquiry," although "[a]n ideal survey universe would include all potential purchasers of [plaintiff's] equipment or exercise instruction services [*i.e.*, the general public], not just professionals").

46. *See, e.g.*, Bayer Co. v. United Drug Co., 272 F. 505, 513 (S.D.N.Y. 1921) ("Aspirin" functioned as trademark among retail pharmacists, but as a generic term among the general consuming public).

47. "In trademark cases involving competing prescription drugs, the relevant consumers are physicians because patients do not choose their own prescription drugs." Pharmacia Corp. v. Alcon Laboratories, Inc., 201 F. Supp. 2d 335, 374 (D.N.J. 2002). "Prescription drugs are a unique commodity. It is the physician, not the consumer, who selects the prescription." SmithKline Beckman Corp. v. Pennex Prods. Co., 605 F. Supp. 746, 752–53 (E.D. Pa. 1985).

48. For another example of this type of situation, *see*, GLOBALAW Ltd. v. Carmon & Carmon Law Office, 452 F. Supp. 2d 1 (D.D.C. 2006). In that case, the declaratory judgment plaintiff offered a survey among lawyers practicing international law to show that the defendant's asserted mark GLOBALAW was generic for a law firm networking and referral service. The court rejected the defendant's argument that the universe should have been the "purchasing public," stating: "Clients and lawyers often rely on referrals from other lawyers when selecting firms that will be employed to provide legal services. As such, the lawyer who is aware of international legal issues is one who is more likely to be consulted for a referral on the subject and will be the one who influences the purchase of legal services, which is the very point of [defendant's] 'GLOBALAW Limited' network." *Id.* at 35. *See also*, Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta LLC, No. 1:08-cv-3033-WSD (N.D. Ga. Jan. 19, 2010) (survey universe consisting of referring doctors only probative of secondary meaning where parties receive high percentage of their patients from referrals from other doctors and direct their marketing toward referring doctors).

## Component Parts

Where a mark is used on a component part sold to downstream manufacturers, and the downstream manufacturers incorporate that part into other products that they sell to consumers under their own respective brands, the relevant universe for a survey relating to the mark used on the component part would typically be the downstream manufacturers who purchase the component part.[49] This is especially true where the mark on the component part is never seen by end users of the downstream manufacturers' products.[50] However, if the component part manufacturer advertises its mark to end users to such an extent that it creates a demand for products containing that brand of component part, then the relevant universe might also include end users.[51]

## Domain Names

The TTAB has adopted a special rule of sorts for surveys involving domain names sought to be registered as trademarks. In *In re Hotels.com L.P.*,[52] the applicant sought to register HOTELS.COM for information and reservation services relating to temporary lodging. The applicant commissioned a "Teflon" genericness survey among adults who had stayed at a hotel or motel in the past year or planned to in the next year. As is typical in "Teflon" surveys, qualifying respondents were then tested for their understanding of the difference between a "brand name" and a "common name" by having to correctly identify an example of each, and those who failed were eliminated from the survey. Although this procedure, as well as the specific universe definition used by the applicant, would seem appropriate for a genericness survey involving these types of services in general, the TTAB ruled that the universe was "totally overbroad under the circumstances of this case":

> [Applicant's expert] screened for respondents' understanding of the difference in concept between a brand name and a generic name. However, the term involved in this case also happens to be a domain name. Although we can assume that consumers will recognize HOTELS.COM as a domain name, we cannot assume that they understand the conceptual difference between a domain name and a brand name, or even recognize that there is a difference. Many consumers may automatically equate a domain name with a brand name, believing that they both serve the same function. Thus, [Applicant's expert] should have ascertained through the screening process, rather than assumed, that participants in the survey could distinguish the two concepts; and those who could not make the distinction should have been eliminated from the sample. As it stands, this universe of respondents could have viewed

---

49. Intel Corp. v. Advanced Micro Devices, Inc., 756 F. Supp. 1292, 1296 (N.D. Cal. 1991) (finding that original equipment manufacturers were the relevant universe for a genericness survey relating to computer microprocessors).
50. *Id.* at 1293.
51. *Id.* at 1295.
52. 87 U.S.P.Q. 2d 1100 (T.T.A.B. 2008), *aff'd*, 573 F.3d 1300 (Fed. Cir. 2009).

any ".com" name, regardless of the nature of the term preceding it[,] as a so-called brand name, thereby radically skewing the results of the survey in applicant's favor.[53]

Thus, at least in TTAB proceedings, the relevant universe to test genericness of a domain name is not simply ordinary consumers of the applicant's goods or services, or even ordinary consumers of the applicant's goods or services who understand the difference between brand names and common names in general. Rather, it is ordinary consumers of the applicant's goods or services who understand the difference between domain names that function as brand names and domain names that function as common names.

## ERRORS IN DEFINING THE UNIVERSE

### Overinclusiveness

By definition, a survey's universe is overinclusive if it includes not only individuals whose state-of-mind is relevant to the legal issue at hand, but also some whose state-of-mind is not. The evidentiary effect of this type of error can vary widely.

For example, sufficient demographic information may be collected during the survey so that members of the relevant group can be identified and analyzed separately from respondents not in the relevant group. In these situations, the court may still accord the survey significant weight. For example, in *Paco Sports, Ltd. v. Paco Rabanne Parfums*,[54] the senior user used the marks PACO and PACO RABANNE for fragrances, while the junior user used the mark PACO and PACO SPORT on jeans. The junior user conducted a survey of consumers in general, but at the end of the interviews asked respondents whether they purchased jeans (and fragrances), and tabulated the responses both separately and together.[55] The court found that because "the survey encompassed jeans purchasers and the results in that market were separately tabulated," the survey was "consistent with the established requirements."[56]

Similarly, in *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*,[57] the plaintiffs sued the defendant for making replicas of NFL jerseys. The plaintiffs conducted a survey and selected as the universe the entire

---

53. 87 U.S.P.Q. 2d at 1109. As is typical in "Teflon" surveys, the main questionnaire presented respondents with the mark at issue (HOTELS.COM) along with a list of other terms and asked them to identify each as a brand or common name. The board stated that at a minimum, this list of names should have included other domain names, including other combinations of a generic term with a ".com." "Then results showing recognition of such terms as generic would have made the 76% who recognized HOTELS .COM as a brand name meaningful." *Id.* at 1110. The only other domain name on the list was AMAZON .COM, which the board said was "too obvious an example of a '.com' domain name that also functions as brand name." *Id.* at 1109–10.
54. 86 F. Supp. 2d 305 (S.D.N.Y. 2000).
55. *Id.* at 321.
56. *Id.* at 323.
57. 532 F. Supp. 651 (W.D. Wash. 1982).

population of the continental United States between the ages of 13 and 65.[58] The court rejected the defendants' objection to this universe as too broad, noting that the survey was "separately projectable for the universe the defendant claims is legally relevant," i.e., NFL fans and prior purchasers of NFL replica jerseys.[59] The confusion level was even higher for respondents in this "potential purchaser" category than for respondents overall.[60] The court went on to state that "the response of the entire population is of some relevance absent a showing that potential purchasers would have a significantly different response to the survey."[61]

On the other hand, in cases where an overinclusive universe is used and the data does not include an identifiable subgroup of relevant consumers, the survey proponent is flirting with disaster. In some cases, where the universe is only slightly overbroad such that the vast majority of survey respondents are likely to be potential purchasers of the relevant goods or services, the court may let the error slide.[62] However, the most likely fate for overbroad surveys lacking sufficient data to identify relevant subgroups is to be excluded from evidence or accorded little[63] or no[64] weight by the court. Similarly, surveys drawn from an overbroad universe that includes only a very small subset of relevant purchasers are unlikely to be given much weight.[65]

A survey universe may be found overbroad based on various factors. For example, some of the respondents in the universe may not be likely to purchase the specific types of products or services at issue, may not be likely to purchase those products or services through the specific trade channels used by the relevant party, or may be outside the geographic area served by the relevant party. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*[66] illustrates some of these problems well. The parties were competing wineries located in the Leelanau Peninsula, a popular wine-producing region near Traverse City, Michigan. The plaintiff introduced a survey attempting to show likelihood of confusion between the defendants' mark Chateau de Leelanau and plaintiff's mark Leelanau Wine Cellars. Plaintiff's survey was conducted in four malls throughout Michigan (one in Traverse City, one in Grand Rapids, and two in the Detroit area) among consumers ages 21 years or older who had purchased a bottle of wine costing $5 to $14 within the past three months, or who were likely to do so within the next three months. The court found this sampling approach drew from a universe that was "significantly overbroad" because defendants' wines were sold only in their tasting rooms and on their website, and "only a tiny percentage" of consumers in the universe selected would likely purchase defendants' wines.[67] "A survey participant who purchases wine only at grocery or discount retail stores such as a Meijer or Sam's Club and who does not intend to visit and/or is unaware of defendants' tasting rooms, or even of wineries in the Leelanau Peninsula, would not

---

58. *Id.* at 657.
59. *Id.* at 658 ("Even defendant's own expert conceded that these groupings were likely potential purchasers of the NFL football jersey replicas.").
60. *Id.* at 661.
61. *Id.* at 658. A very similar situation was presented in *National Football League Properties, Inc. v. New Jersey Giants, Inc.*, 637 F. Supp. 507 (D.N.J. 1986). In that case, the defendant—attempting to exploit the anomalous situation in which the New York Giants football team played its home games in New Jersey—sold sports-related apparel bearing the words, "NEW JERSEY GIANTS." *Id.* at 509. Plaintiffs conducted a survey in shopping malls located within the Giants' area of concentrated interest, among consumers age 14 or older who had recently purchased or were likely to purchase clothing "that had a name, slogan, or picture on the front or back." *Id.* at 514. The court noted that the survey also included a sub-universe of professional football fans, which defendant's expert admitted were "more likely purchasers of defendant's products," and found that the confusion level among the sub-universe was even higher than in the entire sample. *Id.* at 575. The court concluded that the survey "was conducted in accordance with accepted principles of survey research," and was "sufficiently reliable to be admitted into evidence and accorded substantial weight." *Id.* at 517–18.
62. For example, in *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980), the defendant provided automotive repair services and parts using the mark TEXON MOTOR CENTER. Exxon conducted a survey among licensed drivers, two-thirds male, evenly divided among age groups, and employed in a wide range of occupations. *Id.* at 507. Although the survey universe should have arguably been defined more narrowly to include, *e.g.*, automobile owners only, the court concluded, "While this universe is not perfect, it is close enough so that, when combined with the format of the questions, it is clear that the survey is entitled to great weight." *Id. See also* Nat'l Park Board v. Supreme Lobster and Seafood Co., 96 U.S.P.Q. 2d 1479, 1491 (T.T.A.B. 2010) (universe of "seafood or fish" purchasers was acceptable for survey testing mark used for salmon, as applicant failed to show "that salmon eaters are so limited in their fish or seafood choices that they require a separate category."); Nightlight Systems, Inc. v. Nitelites Franchise Systems, Inc., 2007 WL 4563873 (N.D. Ga. 2007) (in a survey designed to determine whether NITE LITES was generic for low-voltage exterior home illumination systems, defendants' survey expert included homeowners who had purchased or were likely to purchase an illumination system of any voltage and were familiar with low-voltage systems "based largely on necessity due to the low incidence of homeowners who had purchased or were contemplating purchasing a low-voltage outdoor illumination system"; the court found that the universe "sufficiently defined the target population at issue," noting that "plaintiffs have provided little support indicating that a different 'survey universe' would have produced different results"); Children's Medical Center of Dallas v. Columbia Hospital at Medical City Dallas Subsidiary, L.P., 2006 WL 616000 (N.D. Tex. 2006) (survey was admitted even though universe included all adults living with a minor child, instead of only parents who make healthcare decisions for children).

63. For example, in Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259 (S.D.N.Y. 1990), Weight Watchers challenged Stouffer's ads for "Lean Cuisine" low-calorie frozen foods as false and misleading. The universe for Weight Watchers' surveys was defined as women ages 18 to 55 who had purchased frozen food entrees in the past six months and had tried to lose weight through diet and/or exercise in the past year. *Id.* at 1272. The court expressed "strong misgivings" about this universe definition, finding it "too broad" because it was not limited to consumers who had purchased a *diet* frozen entrée or had tried to lose weight through dieting as opposed to exercise. *Id.* The court suggested that this flaw could have skewed the results in Weight Watchers' favor because "[r]espondents who are not potential consumers may well be less likely to be aware of and to make relevant distinctions when reading ads than those who are potential consumers." *Id.* at 1273.
64. *See, e.g.*, Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc., 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (clothing manufacturer challenged use of similar mark by manufacturer of high-end customized motorcycles and related accessories; court granted summary judgment against clothing manufacturer, finding that its survey had "essentially no probative value because [it] did not attempt to limit the survey universe to include buyers who would be likely to purchase T-shirts and hats at motorcycle dealerships.").
65. *See, e.g.*, Macia v. Microsoft Corp., 335 F. Supp. 2d 507, 514–15 (D. Vt. 2004) (plaintiff's survey attempting to show that the mark POCKETMONEY was not descriptive for personal finance software for PDAs "does not provide strong evidence because it sampled the views of the general public rather than those known to be likely to purchase software for PDAs"), *aff'd*, 164 Fed. Appx. 17 (2d Cir. 2006).
66. 452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007).
67. *Id.* at 782.

be a potential purchaser of defendants' wine."[68] The court "declined to give the . . . survey any significant weight."[69]

The surveys presented in *Cumberland Packing Corp. v. Monsanto Co.*[70] met a similar fate. Cumberland sued Monsanto for trade dress infringement, arguing that Monsanto's boxes for Sweetmate saccharin and NutraSweet aspartame artificial sweeteners were confusingly similar to Cumberland's boxes for Sweet 'N Low saccharin and NutraTaste aspartame. Cumberland commissioned three surveys to establish likelihood of confusion, two testing Monsanto's NutraSweet box, and the third testing Monsanto's Sweetmate box.[71] The survey universe for all three surveys was defined as "users or buyers of sugar substitutes within the past six months."[72] The court found this universe overinclusive in two respects.[73] First, the court criticized the inclusion of sugar substitute "users" (as distinguished from "buyers"). Although the court acknowledged that past users are good proxies for future purchasers for some products, "in the case of sweeteners, the assumption is, to say the least, questionable."[74] Because individual packets of artificial sweeteners are available at most coffee shops and restaurants, "[a] high percentage of past users of sugar substitutes may never have purchased sugar substitutes and have no intention of doing so in the future."[75] (Note that Cumberland's trade dress claims related to the boxes the parties use to sell their sweeteners in retail stores, not the individual packets served in restaurants.) Second, the court felt that the universe for each survey should have distinguished between saccharin and aspartame users because the evidence showed there was little overlap between the two.[76] Thus, the court found "the studies flawed and the survey results untrustworthy and unreliable."[77]

### Underinclusiveness

An underinclusive universe includes a segment or segments of relevant consumers, but excludes others. These types of surveys are routinely rejected or discounted where the segment of consumers tested has specialized knowledge or characteristics likely to skew the results in favor of the party conducting the survey.[78] An obvious example

---

68. *Id.*
69. *Id.* at 790. The Sixth Circuit agreed that "the study failed to limit the respondent population to those persons likely to purchase defendant's products." 502 F.3d at 518.
70. 32 F. Supp. 2d 561 (E.D.N.Y. 1999).
71. *Id.* at 571.
72. *Id.*
73. *Id.*
74. *Id.* at 572.
75. *Id.* at 572.
76. *Id.*
77. *Id.* at 571. *See also* Premier Nutrition, Inc. v. Organic Food Bar, Inc., 86 U.S.P.Q. 2d 1344, 1357 (C.D. Cal. 2008) (defendant claimed trademark rights in phrase "organic food bar" for nutrition products; genericness survey testing people in shopping malls instead of "specialized markets for nutrition products" was objectionable because it "completely neglected [defendant's] primary customers.").
78. For example, in Pharmacia Corp. v. Alcon Laboratories, Inc., 201 F. Supp. 2d 335 (D.N.J. 2002), the plaintiff purported to survey "glaucoma medicine prescribers," but used a sampling frame that included ophthalmologists only, excluding optometrists who also prescribe glaucoma medications in all but three

is where the party commissioning the survey limits the universe to its own actual customers.[79]

Other examples include surveys limited to participants having expertise not possessed by ordinary consumers of the relevant products or services. A good discussion of this principle is found in *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*[80] In that case, Brooks claimed trademark rights in a "V" design appearing on the sides of its athletic shoes, and conducted a survey among spectators and participants at organized track meets in the Washington, D.C.–Baltimore area in an attempt to show secondary meaning in that design. The district court discounted the survey results and held that the plaintiff failed to prove secondary meaning, stating:

> Plaintiff's universe, spectators and participants at running events in the Washington, D.C. Baltimore area, is far too narrow to give a fair indication of whether the consuming public associates the "V" with Brooks' shoes. It appears that this universe was selected because Plaintiff's advertisements are directed towards serious runners and because Plaintiff's shoes have been acclaimed in running magazines. The people interviewed were those most likely to recognize the Brooks "V" rather than people whose opinions would fairly represent the opinions of consumers of athletic footwear.[81]

Where there is no showing or reason to believe that excluded segments of relevant consumers would respond significantly differently than those included in the survey, courts' reactions to an underinclusive universe tend to vary widely. Where the excluded consumers make up a sizeable proportion of the relevant universe, courts

---

states. Defendants' expert criticized this sampling frame since optometrists might be less aware of brand distinctions among medications than ophthalmologists (the latter being medical doctors). The court agreed, finding plaintiff's survey universe "suspect." *Id.* at 363. In contrast, the court approved defendants' survey, which tested both optometrists and ophthalmologists.

79. *See, e.g.,* Hodgdon Powder Co. v. Alliant Techsystems, Inc., 512 F. Supp. 2d 1178, 1181–82 (D. Kan. 2007) (excluding plaintiff's survey where universe was limited to people who visited plaintiff's promotional booth and thus "were already familiar with plaintiff or were interested in learning more about plaintiff's products"); Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477, 488 (5th Cir. 2004) (plaintiff's survey rejected where universe "consisted entirely of persons who purchased Kirby vacuum cleaners through [plaintiff]" and thus were "uniquely familiar with [plaintiff's] marketing and distribution techniques"); Fort James Corp. v. Kimberly-Clark Tissue Co., 1999 WL 966144 (N.D. Ill. 1999) ("we are somewhat wary of the possibly biased response" that a survey sample drawn only from consumers of plaintiff's product might produce); American Home Products Corp. v. Barr Laboratories, Inc., 656 F. Supp. 1058, 1070 (D.N.J.) (court gave "very little weight" to plaintiff's survey results where universe was limited to people who had used plaintiff's product within the past three months), *aff'd,* 834 F.2d 368 (3d Cir. 1987).

80. 533 F. Supp. 75 (S.D. Fla. 1981), *aff'd,* 716 F.2d 854 (11th Cir. 1983).

81. 533 F. Supp. at 80. The Eleventh Circuit affirmed, agreeing that this universe "was too narrow to be of significant probative value in determining whether Brooks' 'V' design had acquired secondary meaning among prospective purchasers of athletic type shoes." 716 F.2d at 861. *See also* Walker & Zanger, Inc. v. Paragon Industries, Inc., 549 F. Supp. 2d 1168, 1179 (N.D. Cal. 2007) (probative value of plaintiff's survey was reduced where universe included interior designers only, even though plaintiff's customers also included builders, design centers, architects, contractors, home owners, and retail customers; "interior designers are not 'retail' or 'average' customers, as they hold specialized knowledge of the tile industry").

tend to view the survey with skepticism.[82] On the other hand, where the universe is only slightly underinclusive and includes most of the relevant consumers, the court may accord the survey significant weight.[83]

## Overinclusive and Underinclusive

A survey universe can be both overinclusive and underinclusive. For example, in *Conopco, Inc. v. Cosmair, Inc.*,[84] the parties sold competing brands of high-end perfumes (referred to as "prestige fragrances"). The plaintiff conducted a likelihood of confusion survey among women between the ages of 18 and 45 who had purchased a fragrance in the past. The court found that the universe was underinclusive because it excluded all men and excluded women over age 45 "who represent a substantial portion of the total universe of the products' potential consumers," as well as being overinclusive because it was not limited to purchasers of prestige fragrances but rather included purchasers of "just any fragrance."[85] The court found that the survey's methodology was "blatantly designed to skew the survey's results in favor of confusion."[86]

## Judicial Nit-picking

Although courts should be vigilant in requiring litigants to appropriately define the universe of any survey, courts sometimes seem to take this to the extreme, overly criticizing surveys if the universe does not perfectly match their own definition of the relevant population.[87]

---

82. *See, e.g.*, Ty Inc. v. Softbelly's Inc., 353 F.3d 528, 531 (7th Cir. 2003) (survey "worthless" where universe of 13- to 18-year-old girls was "an arbitrary subset of consumers of beanbag stuffed animals").
83. *See, e.g.*, Anheuser-Busch, Inc. v. VIP Products, LLC, 2008 WL 4619702 (E.D. Mo. 2008) (excluding potential purchasers of defendant's products between the ages of 18 and 21 "had no effect on the survey because of the small segment of the population, approximately 6%, that fit in that particular category.").
84. 49 F. Supp. 2d 242 (S.D.N.Y. 1999).
85. *Id.* at 253.
86. *Id.* at 255. *See also*, Bobak Sausage Co. v. A&J Seven Bridges, Inc., No. 07-C-4718 (N.D. Ill., Apr. 26, 2010) (survey sample using random-digit dial of households in the Chicago metropolitan area was both overinclusive because it was not limited to purchasers and potential purchasers of defendant's banquet or conference facility services, and underinclusive because it excluded businesses that might purchase such services).
87. One commentator urges that, although it is imperative for survey universes to adhere as closely as possible to past and prospective consumers in the product or service category at issue, courts should allow deviations in certain circumstances. For example, in some situations it may be extremely difficult or prohibitively expensive to sample a full population of the relevant consumers. In those situations, "if the expert has sampled a (i) clearly *more accessible* and (ii) *appreciable* subset of the total universe, particularly if the subset's biases are either neutral or are adverse to the proposition espoused by the sponsoring party, criticism of the universe should go modestly to the survey's weight, not to its admissibility." Jerre B. Swann, *Surveys in Trademark Cases in the United States*, in SURVEY EVIDENCE AND THE LAW WORLDWIDE (Ruth M. Corbin and J. Kelly Gill, eds., 2008).

---

### *Focusing Too Narrowly on One Party's Specific Products or Services*

Some courts (erroneously in this author's view) focus too narrowly on one party's *specific* products (as opposed to products of that general type), suggesting that only consumers in the market for that specific party's product—using that party's specific distribution channel—are in the relevant universe. A good example of this overly restrictive view is found in *University of Kansas v. Sinks*.[88] In that case, the defendants operated a retail store and website selling humorous T-shirts referencing the University of Kansas (KU). Defendants commissioned a survey attempting to focus on KU fans who might buy a KU shirt, limiting the universe to KU students or residents of the Lawrence, Kansas, area who had ever purchased a T-shirt or sweatshirt that bears the name of a university or professional sports team. Although that would seem to be a reasonably appropriate survey universe for this case, the court held that it was overinclusive. The court stated that the proper universe "is the potential purchasers of t-shirts from the [defendants'] retail store and website," and criticized the defendants' survey universe because it screened only for purchasers of sports team apparel in general, as opposed to likely future purchasers of defendants' T-shirts specifically. This author would venture to guess that in a city dominated by college sports like Lawrence, Kansas (similar to my own hometown of Austin, Texas), the vast majority of residents and college students who purchase apparel bearing a sports team name are at least *potential* purchasers or wearers of a T-shirt bearing the name of the local university. If they're not fans of the university themselves, they probably have friends who are (and thus may buy university apparel to give to their friends). At the very least, KU students and Lawrence residents no doubt frequently see others wearing KU apparel, and thus their views would likely be relevant to "post-sale" confusion (so long as they were potential purchasers of such products in the future). Thus, it seems highly doubtful that defendants' survey in this case included very many respondents whose opinions would be totally irrelevant to the legal issues at hand.

A similar situation arose in *Smith v. Wal-Mart Stores, Inc.*[89] In that case, the plaintiff sold T-shirts, mugs, bumper stickers, and other merchandise criticizing Walmart through CaféPress webstores (an online retailer). Walmart commissioned two surveys—one testing respondents' reactions to plaintiff's T-shirts, and the other testing respondents' reactions to simulations of plaintiff's CaféPress webpages. All respondents were at least 13 years old, and must have purchased within the past year or would consider purchasing in the next year bumper stickers, T-shirts, or coffee mugs displaying words, symbols, or designs. In addition, respondents in the survey testing plaintiff's webpages must have used the Internet in the past month to search for information on products or services, or must have purchased on the Internet within the past year or would consider purchasing on the Internet in the next year bumper stickers, T-shirts, or coffee mugs displaying words, symbols, or designs. Once again,

---

88. 2008 WL 755065 (D. Kan. 2008).
89. 537 F. Supp. 2d 1302 (N.D. Ga. 2008).

Case 1:14-cv-01611-LO-JFA Document 478-6 Filed 10/23/15 Page 18 of 19 PageID# 13628

although these would appear to be reasonable universe definitions for these types of products in general, the court found them "significantly overbroad" because they were not limited to consumers most likely to purchase the plaintiff's products in particular.[90] The court suggested that the universe should have been limited to CaféPress shoppers (not shoppers or Internet shoppers in general) interested in purchasing merchandise displaying messages about Walmart (not messages in general).[91]

### *Past Purchasers versus Prospective Purchasers*

Another common situation is where the survey universe is screened for *past* purchasers of the relevant products or services (instead of or in addition to individuals who indicate that they intend to purchase such products or services in the future). Some courts criticize such surveys on the ground that the universe should consist only of *prospective* purchasers, apparently assuming that past purchasers are unlikely to ever purchase the relevant products or services again. Although that might be a valid assumption in very rare circumstances (e.g., a purchaser of a tonsillectomy or appendix surgery would presumably have no need to purchase those services again), in the vast majority of situations past purchasing habits are probably a fairly reliable indicator of the types of products or services a consumer is likely to purchase in the future.[92]

One of the leading cases espousing this type of criticism was the Second Circuit's decision in *Universal City Studios, Inc. v. Nintendo Co.*[93] In that case, Universal (owner of trademark rights in the movie character King Kong) sued Nintendo, maker of the enormously popular video game Donkey Kong. Universal commissioned a likelihood of confusion survey among "arcade, bowling alley and pizza parlor owners and managers who had purchased or leased one or more Donkey Kong games."[94] The court criticized the survey on several grounds, including that it "utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease."[95] The court's criticism on this point seems questionable for several reasons. First, it would seem that many arcade, bowling alley, or pizza parlor owners or managers who have purchased a Donkey Kong game would be potential repeat purchasers, as they might install the game at additional locations or replace broken or outdated versions of the game. Second, even assuming some of the respondents might never purchase another Donkey Kong game, they might recommend the game to another purchaser. Finally, to the extent that this definition of the survey universe may have biased the results, it would seem to have lowered the confusion results to the detriment of Universal (the survey proponent), since any initial confusion on the

---

90. *Id.* at 1325.
91. *Id.* at 1325–26.
92. *See e.g.,* Nat'l Pork Board v. Supreme Lobster and Seafood Co., 96 U.S.P.Q. 2d 1479, 1491 (T.T.A.B. 2010) ("A past purchaser of 'seafood or fish' is a potential future consumer of 'salmon.'").
93. 746 F.2d 112 (2d Cir. 1984).
94. *Id.* at 118.
95. *Id.*

part of an arcade owner or manager would likely be dispelled after actually purchasing and becoming familiar with the Donkey Kong game.

The *Universal* court's criticism might arguably be justifiable if limited to cases involving expensive products likely to be purchased only one time by any particular consumer. In that narrow fact pattern, one could at least make a plausible argument that past purchasers are unlikely to be potential future purchasers. Unfortunately, however, some courts (primarily in the Southern District of New York) have applied this criticism more generally, even in cases involving ordinary consumer products where repeat purchases are the rule not the exception.

For example, in *Paco Sport, Ltd. v. Paco Rabanne Parfums*,[96] the court found that one party's survey "improperly excluded prospective purchasers" because the universe was defined as persons who had purchased the products (fragrances and jeans) in the preceding 12 months rather than those who intended to purchase the products in the future.[97] The court expressly rejected the survey expert's assertion that "past behavior is the best predictor of future behavior," stating that there was "no evidence . . . to show that this principle is applicable to the jeans or fragrance markets."[98] Apparently, the judge had never used up a bottle of fragrance or worn out a pair of jeans.[99]

## SAMPLING AND SCREENING THE UNIVERSE

Once the universe for the survey has been defined, potential respondents must be screened to ensure that they qualify as members of that universe, and a representative sample of the universe must be interviewed.

### Sampling

In an ideal world, contact information for all members of a defined universe would be available on a list, and the person conducting the survey could randomly select a desired number of people from the list to participate in the survey. This type of sampling (called "probability sampling") produces the most statistically reliable results, because the survey expert can calculate precise "confidence intervals" to predict the margin of error between the sample interviewed and the universe as a whole.[100]

---

96. 86 F. Supp. 2d 305 (S.D.N.Y. 2000).
97. *Id.* at 322.
98. *Id.* at 322 n.16.
99. Similar criticisms of survey universes that included "past" purchasers have been applied in cases involving handbags, Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007) ("It is well-established that only potential future purchasers, not past purchasers, are relevant to a confusion study"); prestige fragrances, Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999) (finding plaintiff's survey flawed for several reasons, including that "it included past purchasers who were not necessarily future potential purchasers"); and jeans, Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 518–19 (S.D.N.Y. 1993) (survey "does not constitute acceptable evidence of actual confusion" because universe was limited to participants who had purchased or worn jeans within the past six months and thus did "not necessarily include potential purchasers of jeans").
100. *See* Diamond, *supra* note 2, at 381.

Typically, however (particularly in surveys for Lanham Act cases), such ready access to all universe members is not available. Many surveys for Lanham Act cases require that respondents be shown the relevant products or advertisements,[101] which often makes probability sampling infeasible or prohibitively expensive. For these reasons, "[a] majority of the consumer surveys conducted for Lanham Act litigation present results from nonprobability convenience samples. They are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that 'results of these studies are used by major American companies in making decisions of considerable consequence.'"[102]

Even if a nonprobability sample is used, however, the sampling frame to select respondents should be designed to encompass a representative cross-section of the entire universe. If the sampling frame focuses on one segment of relevant respondents or excludes others, the survey is likely to be criticized as underinclusive.[103]

### Screening

Each participant in a survey should first be questioned to ensure that he or she qualifies to be a member of the defined universe. This is typically done using a screening questionnaire (or screener). Questions used in a screener should be carefully crafted to: (a) define the relevant characteristics or criteria corresponding to the defined universe,[104] and (b) not bias or influence the participants' responses to the questions that follow in the main questionnaire. For example, the parties' names or marks typically should not be mentioned to respondents during the screener.[105]

---

101. These types of surveys typically consist of in-person interviews conducted in malls or shopping centers located in selected cities dispersed throughout the relevant party's trade area (called "mall intercept surveys"). Alternatively, Internet surveys are becoming increasingly popular for these purposes, where respondents log into a website from a computer and are shown the relevant products or advertisements on their computer screen.

102. Diamond, *supra* note 2, at 382 (*quoting* National Football League Properties, Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 515 (D.N.J. 1986)). *But see* American Home Products Corp. v. Barr Laboratories, Inc., 656 F. Supp. 1058, 1065, 1070 (D.N.J.) (although acknowledging that "[n]on-probability samples are commonly used in market research" and "may be admissible," the court concluded that "they are weak evidence of behavior patterns in the test universe"), *aff'd*, 834 F.2d 368 (3d Cir. 1987).

103. For example, in Shell Trademark Mgmt. v. Warren Unilube, Inc., No. 09-2851 (S.D. Tex. Jan. 10, 2011), plaintiff's survey interviewed diesel truck motor oil consumers at various truck stops across the United States. The court found this universe "somewhat underinclusive because it was targeted more at long-haul truck drivers [who frequent truck stops] than at other users of heavy-duty motor oil" (such as pick-up truck and commercial van drivers, and users of construction and agricultural equipment).

104. *See, e.g.*, Gross v. Bare Escentuals Beauty, Inc., 90 U.S.P.Q. 2d 1448, 1456 (S.D.N.Y. 2008) (universe of "prospective purchasers of premium skin care products" was properly captured by screening for respondents who spent more than $50 per month on cosmetic skin care products); *but see*, Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 630–31 (S.D.N.Y. 2007) (survey expert's "screening criteria did little to assure that he got the right consumers" for upscale handbags where many of the malls utilized were not "upscale" and respondents were required only to have been likely to purchase a handbag costing at least $100; "a $100 handbag is 'hardly an indicia of prestige'").

105. On occasion, the survey expert may need to use a post-interview screener when a qualifying question may signal information that is likely to bias responses and cannot be effectively disguised in the initial screener.

---

Screeners are also typically used to exclude respondents who might have specialized knowledge or experience, or suffer an impairment, that would make their responses atypical of ordinary consumers. For example, screeners in Lanham Act surveys frequently exclude individuals who: (a) are employed in the same industry as one of the parties or by a market research, advertising, or public relations firm; (b) have recently participated in a market research survey; or (c) normally wear eyeglasses or contacts when shopping but are not wearing them at the time of survey.[106]

Finally, the screening process can be used to implement any quotas that may be established by the survey expert. Particularly when nonprobability sampling is utilized, it may be desirable to set quotas (e.g., by gender, age, income, geography, etc.) so that the demographics of the sample surveyed corresponds to the relevant universe as a whole.[107] In such situations, the survey interviewers can be instructed to screen respondents so that each quota is satisfied.

## CONCLUSION

One of the very first—and most critical—steps in designing a survey for trademark litigation is selecting the proper universe. Any misstep at this early stage of the process can potentially render all future work on the survey meaningless, as courts frequently discount, disregard, or even exclude surveys using flawed universes. To select the proper universe, survey designers must have a thorough understanding of the legal issue or issues to be tested, and then carefully select the population of consumers whose mental impressions are relevant to that issue. Only then will the survey have a chance to have the desired impact in court.

---

106. *See, e.g.*, Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 2008 WL 4614660 (N.D. Cal. 2008); Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 779 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007); Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990).

107. *See, e.g.*, Pharmacia Corp. v. Alcon Laboratories, Inc., 201 F. Supp. 2d 335, 363 (D.N.J. 2002) (criticizing plaintiff's survey for "failing to take any steps to ensure that the sample drawn . . . was . . . representative of the marketplace of ophthalmologists," e.g., screening for respondents' years of experience or size of practice). *Cf.*, American Home Products, 656 F. Supp. at 1070 (skewed geographic distribution of respondents "underscore[d] the absence of probability sampling in the survey.").