**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:14-cv-1611 (LOG/JFA) |
| v. | ) ) | |
| COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF WILLIAM ROSENBLATT IN SUPPORT OF**
**COX'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE**

I, William Rosenblatt, submit this declaration pursuant to 28 U.S.C. § 1746.

1.      I am president of GiantSteps Media Technology Strategies, a consultancy that I formed in June 2000.  I have previously submitted three expert reports in this matter, as well as a declaration in support of Cox's opposition to Plaintiffs' motion for partial summary judgment. *See* Dkt. 390.  I understand that Plaintiffs have filed a motion to strike my expert declaration, and I submit this declaration in opposition to that motion to strike.  I have personal knowledge of the facts in this declaration.

2.      In my earlier declaration, I described my qualifications for offering opinions on industry practices regarding allegations of copyright infringement, as well as on Cox's graduated response procedures for handling allegations of copyright infringement.  Dkt. 390 at ¶¶ 2-12.  I offer this declaration to provide greater detail about my relevant background, qualifications, and personal knowledge.

3.      Through my company GiantSteps, I consult on technology strategy related to digital content with particular emphasis on digital rights and digital access control technologies, digital content management, and the Internet.  Exhibit A to this declaration is a collection of pages from the GiantSteps website providing a list of representative clients and describing consulting work I have performed for both content providers and technology companies in the past.  Exhibit B is my current profile on LinkedIn, which includes testimonials from some of my previous clients.

4.      I understand that Plaintiffs claim in their motion to strike that my only experience with the Digital Millennium Copyright Act of 1998 ("DMCA") is as an expert witness in *Perfect 10, Inc. v. Giganews, Inc., et al.*, (C.D. Cal), No. CV 11-07098-AB SHX.  At my August 5, 2015 deposition, Plaintiffs' counsel questioned me about my previous engagement in the Giganews

matter.  While discussing the Giganews matter, Plaintiffs' counsel asked me: "Have you had any other consulting engagements that have involved Section 512 of the Copyright Act?"  At the time, I had misunderstood his question as referring to litigations only, and I answered: "Not that I can think of."  Exhibit C is the relevant excerpts of the transcript from my August 5 deposition. In my errata sheet for this deposition, I changed my answer to this question to "Yes, several," citing "Accuracy" as the reason for the correction.  Exhibit D is the signed errata sheet concerning my August 5 deposition.  In fact, I have had consulting engagements regarding DMCA issues for multiple matters that did not involve active litigation.  The details of these engagements are confidential and privileged, but speaking generally these matters have included:

a.      Work for a major music copyright owner concerning potential litigation against an online service provider on DMCA and other grounds.

b.      Work for an established Internet service provider (ISP) regarding a video service that it planned to launch; there, the ISP wanted to understand what features it could include that would not damage its relationships with copyright owners or jeopardize its DMCA safe harbor.

c.      Work for a digital video startup along similar lines; the startup inquired about what technology and features it could implement that would not require taking licenses to content from Hollywood studios and that would not run afoul of the DMCA.

5.      In connection with my work at GiantSteps, I have consulted to providers of content identification and copyright monitoring technologies, including companies like Attributor, Digimarc, GP International (Museek), iCopyright, Irdeto, and Zeitera.  These technologies are similar to those used in both Rightscorp's system for enforcing Plaintiffs'

2

copyrights and MarkMonitor's system used in the Copyright Alert System.  Dkt. 390 at ¶¶ 23-30.

In October 2013, I gave a talk on digital copyright at MarkMonitor's annual user conference.

6.      In October 2001, after the publication of my book *Digital Rights Management:*

*Business and Technology* [M&T Press 2001], I started an online newsletter called DRM Watch

(then hosted at the website drmwatch.com).  From 2001-2009, I wrote about legal and

technological developments in digital rights management (DRM) and other technologies used in

copyright monitoring and enforcement such as fingerprinting, watermarking, etc.  My duties

included writing an annual "Year in Review" feature.  Exhibit E is the three-part "Year in

Review" detailing the developments that occurred in 2008, the last year for which I wrote such a

review.

7.      In January 2009, I launched a new blog called Copyright and Technology, which

is available at copyrightandtechnology.com.  Exhibit F is my final article for DRM Watch, in

which I announce the launch of Copyright and Technology.  Given the rapid development of

copyright-related technologies, the digital copyright space had moved beyond the DRM context,

and I started Copyright and Technology to encompass discussion of a broader range of issues.

8.      I still maintain and regularly update Copyright and Technology.  In particular, I

have written on many occasions about graduated response regimes for handling notices of

alleged copyright infringement online, including the Copyright Alert System, and their use in

copyright monitoring.  Exhibit G is a collection of ten articles I wrote about graduated response

regimes for handling allegations of copyright infringement.  (I also regularly contribute articles

about digital copyright issues on the Forbes website, and I have contributed over fifteen such

articles since November 2014.)

9.      I have also chaired the Copyright and Technology conferences in New York City

and London each year from 2010 to the present.  (The next one will occur at New York

University on January 19, 2016, and is co-sponsored by the Copyright Society of the USA.)  My

duties as Program Chair include (1) creating conference agenda based on my understanding of

the "hot" topics in the field; (2) inviting speakers and moderators through my personal network

of people involved in key developments; and (3) ensuring balance and depth in the treatment of

topics.[1]  At each of these conference, I delivered opening remarks that served as introductions to

the field for attendees, and I frequently served as moderator of the panels.  (Exhibit H is the

agenda for the 2010 conference in New York; Exhibit I, 2011 New York conference; Exhibit J,

2012 New York conference; Exhibit K, 2012 London conference; Exhibit L, 2013 London

conference; and Exhibit M, 2014 London conference.)  The New York conferences have been

eligible for New York State CLE credit.  Past conferences have included multiple presentations

and panels regarding the DMCA and copyright enforcement regimes, including:

a.      "Progressive Response in the US? Likelihood and Ramifications" (2010

panel);[2]

b.      Keynote by Stanley Pierre-Louis, then Associate General Counsel for

Intellectual Property and Content Protection at Viacom (2010), which

discussed the copyright responsibilities of ISPs;

c.       "Policing Copyright: Whose Job Is It?" (2010 panel), which focused on

technologies such as fingerprinting and included panelists from the MPAA

and Comcast;

---

[1] For the conferences based in New York, I also consulted on the materials to be provided to
attendees earning CLE credit.

[2] "Progressive response" is an older alternative term to "graduated response."

4

d.      "After the Ordeal: Public Policy in the Post SOPA/PIPA World" (2012

panel), which featured panelists from NBCUniversal and the Copyright

Alliance;

e.      "The Yin and Yang of Piracy Data Collection" (2012 panels), which

featured executives from MarkMonitor[3] discussing issues regarding

collecting data as evidence for copyright enforcement;

f.      "The Data Driven Media Company" (2013 presentation), presented by the

general manager of MarkMonitor's copyright enforcement business on the

use of data collected in copyright monitoring;

g.      "Observation Protocol & Impact Analysis" (2013 presentation), on the

measured effectiveness of the HADOPI graduated response system in

France, given by Pauline Blassel, HADOPI Director of Research;

h.      "New Challenges and Responses to Online Piracy" (2014 panel), featuring

panelists from two copyright monitoring agencies, Irdeto (f/k/a BayTSP)

and Muso; and

i.      "Should Internet Service Providers Be Copyright Cops?" (2014 panel),

which included a discussion of graduated response.

10.     Exhibit N is the list of the publications that I submitted in connection with my

reply report in this matter.  In addition to the writings I disclosed in connection with my

submission of expert reports in this matter, I also co-authored the article "Peer-to-Peer

Networking and Digital Rights Management: How Market Tools Can Solve Copyright

---

[3] At the time these panels occurred, it was generally known that MarkMonitor would be the
copyright enforcement agent for the Copyright Alert System, and MarkMonitor's involvement in
the Copyright Alert System was discussed at the event.

Problems," published as Policy Analysis #534, The Cato Institute, February 17, 2005, and in

Journal of the Copyright Society of the USA, Vol. 52, No. 2, Winter 2005, pp. 239-271.  (I did

not include this article in the list I submitted in connection with this litigation because its original

publication date was prior to the 10-year timeframe that started in July 2005.)

      11.    My website, copyrightandtechnology.com, also includes multiple white papers,

presentations and other documents that are available upon request to Copyright and Technology

readers.  To request these documents, one must fill out a form and ask for them.  During the

course of this litigation, Plaintiffs' counsel requested and obtained the following two documents:

      a.    "Automating Notice and Takedown," a presentation I gave at a 2007

Progress and Freedom Foundation symposium in Washington called

"What Goes Up Must Come Down: Copyright and Process in the Age of

User-Posted Content."  Exhibit O is the slide deck for this presentation.

The audience for this presentation included media industry lobbyists and

congressional aides; panelists included Donald Verrilli, then lead counsel

for Viacom in its litigation against YouTube.  (I refer to this presentation

in my summary judgment declaration.  *See* Dkt. 390 at ¶ 7.)  In this

presentation, I described the potential for standard notice formats to

promote automation of the process of submission and handling of notices

of alleged copyright infringement, anticipating the Automated Copyright

Notice System (ACNS) format that appeared two years later and that has

been mentioned in this litigation.

      b.    "Content Identification Technologies: Business Benefits for Content

Owners," a 2008 whitepaper on technologies like fingerprinting and

watermarking that are used in (among other things) copyright enforcement

services.  Exhibit P is this 2008 whitepaper.

12.     I frequently speak on copyright issues, including guest lectures on digital

copyright issues at Rutgers Law School, the Franklin Pierce Law Center (University of New

Hampshire), and the University of Maryland.  These speaking engagements have often involved

discussion of the DMCA.  For example, in March 2005, I participated as a speaker at symposium

called "The Unintended Consequences of Legislating Technology: The Digital Millennium

Copyright Act," held at the New York University School of Law.  Another example is a panel

discussion in Washington, D.C., in October 2009 called "Using Tech to Safeguard Content and

IP," which discussed copyright monitoring and graduated response; panelists in addition to

myself included Prof. Peter Jaszi of American University Law School, a representative of the

Motion Picture Association of America, and former Copyright Office General Counsel Jon

Baumgarten.  These examples are in addition to the many talks I have given at conferences

around the world.  *See* Dkt. 390 at ¶ 7.

13.     My involvement with copyright-related technology goes back further than the

DMCA.  In the mid-1990s, while working in the publishing industry, I was one of the designers

of the Digital Object Identifier (DOI), a standard identifier for content.  The DOI was created,

under the auspices of the Association of American Publishers, to enable unambiguous

identification of copyrighted works online for purposes of copyright management and

enforcement.  It has become a widely-used global standard in scientific, scholarly, and other

segments of the publishing industry.  An article I wrote on the history and design of the DOI,

"The Digital Object Identifier: Solving the Dilemma of Copyright Protection Online," was

published in the Journal of Electronic Publishing in December 1997.  Exhibit Q is that 1997 article.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed October 27, 2015.

William Rosenblatt

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2015, the foregoing was filed and served electronically by the

Court's CM/ECF system upon all registered users.

*/s/ Craig C. Reilly*

Craig C. Reilly (VSB No. 20942)
111 Oronoco Street
Alexandria, VA  22314
Tel:  703-549-5354
Fax:  (703) 549-5355
Email:  craig.reilly.@ccreillylaw.com

*Counsel for Defendants*