# EXHIBIT G



# Copyright and Technology

News and analysis of rights technologies and copyright law.

home    about    whitepapers/presentations    nyc 2016 conference

search [          ] go!

# The Copyright Alert System: A Cautious Experiment   July 10, 2011

Posted by Bill Rosenblatt in Law, Services, United States. trackback

Last Thursday, a coalition of content owners and ISPs announced the creation of a Center for Copyright Information (CCI) and a framework for "Copyright Alerts." Briefly, the Copyright Alert system identifies a six-level system of interventions that ISPs should take with subscribers if they receive evidence of suspected copyright infringement.  They start with simple "educational" messages, move to messages that require user acknowledgement, and culminate in "Mitigation Measures" that could include bandwidth reduction (throttling) or account termination. The CCI analogizes the Copyright Alert system to credit card fraud alerts.  It positions the framework as a starting point towards a set of best practices for how ISPs should deal with online infringement.

Perhaps the most encouraging sign about this development is that several organizations representing indie content creators have either signed onto the initiative or issued statements endorsing it, including the Independent Film & Television Alliance, American Association of Independent Music, and Future of Music Coalition.  In other words, this is not just the MPAA and/or RIAA. Another good sign for the future is that the announcement has received relatively tepid reactions from entities that one would expect to sound alarms.  I can summarize the substantive concerns that have been raised by putting them in a few buckets:

1. This initiative may sound inoffensive, but it's really a foot in the door; future versions of the Copyright Alert system will become more draconian.
2. All the language on the Center for Copyright Information website that says "This is not 'Three Strikes'" is disingenuous: ISPs do have the option to terminate users' accounts if they are still accused of copyright infringement after a suitable number of warnings.
3. The system is based on accusations from copyright owners, not from any sort of objective source, thereby laying the system open to false positives and other abuses.
4. There is an issue with presumption of innocence: you can appeal your accusation of infringement to the CCI, but it could cost you $35 to do so; there does not seem to be any redress mechanism for entities that file egregious complaints.

Brought to you by:



GiantSteps
Media Technology Strategies

Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific  Book reviews  Business models  Conditional Access  Devices  DRM  Economics  Enterprise Rights Management  Europe  Events  Fingerprinting  Games  Images  Japan  Law  Libraries  Mobile  Music  New Zealand  Publishing  Rights Licensing  Services  Standards  Technologies  UK  Uncategorized  United States  Video  Watermarking  White Paper

Follow

As is often the case, I think Nate Anderson of Ars Technica got it right: the Copyright Alert system does seem sensible, though it would have been easier to swallow if it had been introduced several years ago, instead of after several years of more drastic actions such as lawsuits against individuals and attempts at blunt–instrument legislation (and blunter–instrument levy schemes).

Fear of worse things to come based on worse things that already came explains #1 and #2 above.  ISPs have always reserved the right to terminate a subscriber for breach of their Terms of Service anyway.

As for #3, what are the alternatives?  ISPs can't be relied on to self–police.  Copyright owners have to produce their own evidence of infringement.  The only other possibility would be the government, perhaps through the FBI or some newly created entity.

First of all, this is not supposed to be about law enforcement and criminal charges.  Secondly, a fundamental premise of this type of arrangement between industries is to avoid governmental intrusion — and it was most likely created in the first place because the White House and then–New York Attorney General (now Governor) Andrew Cuomo threatened government intervention if the two factions couldn't reach agreement by themselves.  Finally, involvement of some government entity would raise concerns about taxpayer funding, which would be tantamount to the deeply misguided antipiracy levy that was proposed in the UK in early 2009.

I have to admit some sympathy for #4, though, once again, this is not law enforcement.  The reason for charging the $35 fee is supposedly to discourage people from abusing the system (i.e. overworking the Copyright Information Center) by bombarding it with cycles of illegal upload, appeal, illegal upload, appeal, etc.  If the point is to prevent scalable abuse, then a Captcha system on the appeal form ought to suffice.  But if the real reason is to foist the cost of this mechanism onto consumers, then once again, that's wrong — and this is a particularly poor way to do it, given that at least some of the users who appeal will be innocent.

Yet otherwise, this ought to count as yet another of the many instances in modern life where you have to put up with inconvenience and cost to shake off a false accusation.  Anyone who has had a credit card charge refused because of the card company's hair–trigger fraud detection mechanism, was issued a bogus parking ticket, or found mysterious long–duration calls to Eritrea on their phone bill, will understand — not sympathize, perhaps, but understand.  (Yes, all of those things have happened to me.)

What the Copyright Alert system is *not* is an opportunity for providers of technology to detect infringement on networks, such as content identification (watermarking and fingerprinting) or traffic monitoring, to sell more of their services.  Content owners will most likely continue to use the infringement detection services that they currently use.  The

## Follow "Copyright and Technology"

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

**Sign me up**

Build a website with WordPress.com

Mos…

- Ye…
  H…
- Th…
- Wh…
- Th…
  Ex…
- Ni…
  N…
- Cr…
  th…
- Co…
- Ab…
- FreeAllMusic.com Offers MP3 Downloads for Watching Ads
- Copyright Technology, Gangnam Style

## Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New…

Christopher Levy on Forbes: Is Ad Blocking the New…

CCP Industry Updates… on ACTA Process to Go Public

Argument Essay | Con… on Yes, Piracy Does Cause Economi…

Bill Rosenblatt on Yes, Piracy Does Cause Economi…

### Bill's Music Blog
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early–mid 1970s –– music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

## Most Recent Tweets

- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago
- @billtrippe I want this book! 3 weeks ago

Copyright Alert system gives them a mechanism through ISPs to inform subscribers about allegedly infringing activities and potentially some actions to take against repeat offenders.

As to the question of whether five or six strikes can ever get you out — i.e., get your Internet access terminated — I suspect the answer is no for the foreseeable future. The Electronic Frontier Foundation has described what's likely to happen here. ISPs will naturally object to cutting customers off from the products they've paid for. The EFF suggests that content owners will believe that they have leverage against ISPs under the DMCA: they will argue that ISPs that refuse to cut off infringers should not enjoy the benefits of DMCA safe harbor (i.e. not being held secondarily liable for users' infringement). The issue may well end up in court.

In that case, there will be litigation over the meaning of the DMCA — not unlike the current long-running litigation between Viacom and YouTube — that would be destined for high level appeals courts. In other words, a definitive answer to the question of "can ISPs get away with not terminating repeat infringers' accounts?" will (barring any preliminary injunctions) be several years away, and until that day, the answer will be yes.

The Copyright Alert system is, at bottom, a cautious and reasonable experiment — one that, as many have argued, could have been launched ten years ago to better effect. Many details have yet to be determined, as does the system's effect on ISP subscribers and on copyright infringement. It's best thought of as a "watch this space" initiative, to put people on notice. Any conclusions drawn about it are premature, and that's how it should be.

---

## Share this:

 Reddit

☐ Like

Be the first to like this.

### Related

**Copyright Alert System Launches in U.S.**
In "Fingerprinting"

**Copyright Alert System Releases First Year Results**
In "Europe"

**UK ISPs to Implement "Educational" Graduated Response System**
In "Fingerprinting"

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
- MT @randomfoodtruck @CarpeDonutNYC @carlssteaks @souvlakitruck @gcnyc1 – @Chefsamirtruck there too
  3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month


Copyright and Technology is licensed under a Creative Commons Attribution-NonCommercial-NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS

## Comments»

### 1. Chris Brand – July 11, 2011

I think the real issue is the combination of 3 and 4 – there's (apparently) no cost to making an accusation (accurate or not), but there is a cost to appeal it. Without some sort of penalty for false accusations, there is no incentive not to accuse first and worry about whether the accusation has any merit later.

### 2. Steve – September 1, 2011

The lack of a penalty for falsely accusing innocent, 100% uninvolved bystanders is what aggravates me.

We're seeing DMCA notifications used against independent musicians, legitimate fair use cases, etc. because there is no really major risk in messing up an accusation.

You generally only have to deal with parking authorities if you park in an area they control. This system will encompass the entire internet! It provides license to target absolutely anyone.

## Leave a Reply

Enter your comment here...

The Regulus Theme. | Blog at WordPress.com. | Top |



home | about | whitepapers/presentations | nyc 2016 conference

News and analysis of rights technologies and copyright law.

# Copyright Alert System Launches in U.S.

### February 25, 2013

Posted by Bill Rosenblatt in Fingerprinting, Law, Music, Video. trackback

With today's launch of the Copyright Alert System (CAS) by the Center for Copyright Information, the United States joins the list of countries that have adopted a so-called graduated response system for educating Internet users about online copyright infringement and taking steps to punish repeat offenders.  The CAS is finally launching after a few months' delay, part of which was supposedly due to the effects of Sandy, the mega-storm that hit the northeast U.S. late last year.  Other graduated response countries include France, New Zealand, and South Korea; the United Kingdom is currently struggling with its own implementation.

The CAS is a partnership between music and video content owners on the one hand and major ISPs on the other.  The content owner representatives include not just the majors (RIAA and MPAA) but also the Independent Film and Television Alliance (IFTA) and American Association of Independent Music (A2IM).  On the ISP side, membership includes the five largest providers: AT&T, Verizon, Time Warner Cable, Comcast, and Cablevision.  Book and game publishers are not involved at this point.

The CAS is run by Jill Lesser, a tech policy veteran with deep experience on both the content and ISP sides.  It has an advisory board whose principal function seems to be to curb abuses: it includes advocates for looser copyright laws (Gigi Sohn of Public Knowledge) and user privacy (Jules Polonetsky of the Future of Privacy Forum).

The CAS works similarly to other graduated response regimes: copyright owners employ infringement monitoring services, which can identify copyrighted works as users send them around the Internet using fingerprinting and other content recognition technologies.  The monitoring services send notices to ISPs, which issue warning messages to users.  The warnings get stronger with repeat infringements.

ISPs can opt to punish repeat alleged offenders by such means as throttling bandwidth and making users watch videos about copyright.  (ISPs already have policies for terminating repeat infringers' accounts, which they must have in order to maintain their eligibility for the DMCA

search [        ] go!

Brought to you by:


GiantSteps
Media Technology Strategies

Subscribe

 Subscribe to Copyright and Technology in a reader or via email

### Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific Book reviews Business models Conditional Access Devices DRM Economics Enterprise Rights Management Europe Events Fingerprinting Games Images Japan Law Libraries Mobile Music New Zealand Publishing Rights Licensing Services Standards Technologies UK Uncategorized United States Video Watermarking White Paper

□ Follow

safe harbor.)

Where the CAS differs from other graduated response systems is that it is not tied to law enforcement. The arrangement between content owners and ISPs is voluntary. ISPs will not terminate or suspend users' Internet accounts, nor will they pass information about infringements on to copyright owners. Another difference is that the CAS is not being funded through taxes or levies on Internet service (although funding sources are confidential).

In other words, the CAS is a more purely educational approach than France's HADOPI or other systems. Analysis of the CAS's results will therefore be more useful in determining how successful education by itself can be in getting people to respect copyright. The hope is that education will do more than draconian statutory damages or blunt-instrument legislation.

Given how little effect those approaches have had, it may not be difficult to declare the Copyright Alert System a relative success in the years to come. As it is now, it seems like quite a reasonable system: it raises awareness about the importance of copyright by using advanced Internet technologies instead of relegating enforcement to outmoded nontechnical legal means; it is permeated with references to legal content sources; and it doesn't cost users a thing.

## Share this:

☐ Reddit

☐ Like

Be the first to like this.

Related

**UK ISPs to Implement "Educational" Graduated Response System**
In "Fingerprinting"

**Copyright Alert System Releases First Year Results**
In "Europe"

**The Copyright Alert System: A Cautious Experiment**
In "Law"

## Comments»

### 1. O.M. – February 26, 2013

1. Minor nitpick with your terminology: Is an ISP subscriber who is repeatedly accused of infringement necessarily a "repeat offender"? There may not have actually been infringement, or the subscriber

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

**Sign me up**

Build a website with WordPress.com

Mos...

- Ye... H...
- Th...
- Wh...
- Th... Ex...
- Ni... N...
- Co... U...
- Cr... th...
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

## Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New....

Christopher Levy on Forbes: Is Ad Blocking the New....

CCP Industry Updates... on ACTA Process to Go Public

Argument Essay | Con... on Yes, Piracy Does Cause Economi...

Bill Rosenblatt on Yes, Piracy Does Cause Economi...

### Bill's Music Blog
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

## Most Recent Tweets
- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

may not actually be the infringer.

2. You say "ISPs already have policies for terminating repeat infringers' accounts." But then you say "ISPs will not terminate or suspend users' Internet accounts." Time will tell, but the latter statement appears to be false.

Six Strikes does not preclude termination of accounts in accordance with the ISP's obligations under the DMCA or the ISP's own TOS; see pages 7 and 13 of the leaked agreement between the CCI and the ISPs. And the ISP has no obligation to require any more proof than the fact that a subscriber got any number of CAS strikes, or any other accusations of infringement.

3. You say ISPs won't "pass information about infringements on to copyright owners." Where did this info come from? It's rather misleading, because the copyright owners and their reps will *already* have everything they need, including IP addresses, as reported to them by MarkMonitor. That's how they get the ISPs to generate the strike notices to begin with. It's right there on page 6 of the leaked agreement.

## Bill Rosenblatt – February 26, 2013

Hi O.M.,

1. Fair enough, I added "alleged."

2. The point about ISPs not terminating subscribers' accounts *as part of the CAS process* is taken directly from the CCI's website. All ISPs already have policies for terminating accounts of users accused of repeat copyright infringement; they have to in order to maintain their safe harbor eligibility under DMCA 512, and thus it's something of a separate matter. I've added a clarification to this effect.

3. Once again, this info came from the CCI's website. Monitoring services like MarkMonitor (there are a few of them that the majors use) collect IP addresses, but in many cases not the names of alleged infringers, to include in their reports to content owners. Only the ISPs (again, in many cases) can supply the identities of the accused. Of course there is a difference between an IP address and a personal identity. Part of the whole point of the system is to get ISPs' cooperation in linking those IP addresses to personal identities, so that users are not accused of something based on IP addresses alone, a longtime concern over online copyright enforcement.

In general I would suspect that Gigi Sohn was responsible for insisting on #2 (as a matter of copyright enforcement) and Jules Polonetzky was responsible for insisting on #3 (as a matter of privacy). Personally I was happy to see Gigi participating in this,

■ @billtrippe I want this book!
  3 weeks ago
■ Roundtable Discussion October 14th:
  Algorithms and the DMCA Post-Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
■ MT @randomfoodtruck
  @CarpeDonutNYC @carlssteaks
  @souvlakitruck @gcnyc1 –
  @Chefsamirtruck there too
  3 weeks ago

## Blogroll

■ Andrew Orlowski
■ Ars Technica
■ Future of Copyright
■ PaidContent
■ Robert Levine
■ The Cynical Musican
■ The Illusion of More
■ The Trichordist

## Archives

Select Month



Copyright and Technology is licensed under a Creative Commons Attribution–NonCommercial– NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS

as opposed to, as she herself put it, "guessing and complaining from the outside."

## Leave a Reply

Enter your comment here...



home   about   whitepapers/presentations   nyc 2016 conference

News and analysis of rights technologies and copyright law.

# UK ISPs to Implement "Educational" Graduated Response System   May 14, 2014

Posted by Bill Rosenblatt in Fingerprinting, Law, UK, Uncategorized, United States.
trackback

The BBC has discovered documents that detail a so-called graduated response program for detecting illegal downloads done by customers of major UK ISPs and sending alert messages to them. The program is called the Voluntary Copyright Alert Programme (Vcap). It was negotiated between the UK's four major ISPs (BT, Sky, Virgin Media, and TalkTalk) and trade associations for the music and film industries, and it is expected to launch sometime next year.

Vcap is a much watered-down version of measures defined in the Digital Economy Act of 2012, in that it calls only for repeated "educational" messages to be sent to ISP subscribers and for no punitive measures such as suspension or termination of their accounts.

In general, graduated response programs work like this: copyright owners engage network monitoring firms to monitor ISPs' networks for infringing behavior. Monitoring firms use a range of technologies, including fingerprinting to automatically recognize content that users are downloading. If they find evidence of illegal behavior, they report it to a central authority, which passes the information to the relevant ISP, typically including the IP address of the user's device. The ISP determines the identity of the targeted subscriber and takes some action, which depends on the details of the program.

In some cases (as in France and South Korea), the central authority is empowered to force the ISP to take punitive action; in other cases (as in the United States' Copyright Alert System (CAS) as well as Vcap), ISPs take action voluntarily.

Assuming that Vcap launches on schedule, we could soon have data points about the effectiveness of various types of programs for monitoring ISP subscribers' illegal downloading behaviors. The most important question to answer is whether truly punitive measures really make a difference in deterring online copyright infringement, or whether purely "educational" measures are enough to do the job. Currently there are graduated response programs in South Korea, New Zealand, Taiwan, and France that have punitive components, as well as

search [        ] go!

Brought to you by:



## Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific  Book reviews  Business models  Conditional Access  Devices  DRM  Economics  Enterprise Rights Management  Europe  Events  Fingerprinting  Games  Images  Japan  Law  Libraries  Mobile  Music  New Zealand  Publishing  Rights Licensing  Services  Standards  Technologies  UK  Uncategorized  United States  Video  Watermarking  White Paper  □ Follow

one in Ireland (with Eircom, the country's largest ISP) that is considered non-punitive.

Is America's CAS punitive or educational?  That's a good question.  CAS has been called a "six strikes" system (as opposed to other countries' "three strikes"), because it defines six levels of alerts that ISPs must generate, although ISPs are intended to take "mitigation measures" against their subscribers starting at the fifth "strike."  What are these mitigation measures?  It's largely unclear.  The CAS's rules are ambiguous and leave quite a bit of wiggle room for each participating ISP to define its own actions.

Instead, you have to look at the policies of each of the five ISPs to find details about any punitive measures they may take — information that is often ambiguous or nonexistent.  For example:

- AT&T: its online documentation contains no specifics at all about mitigation measures.
- Cablevision (Optimum Online): its policy is ambiguous, stating that it "may temporarily suspend your Internet access for a set period of time, or until you contact Optimum."  Other language in Cablevision's policy suggests that the temporary suspension period is 24 hours.
- Comcast (Xfinity): Comcast's written policy is also ambiguous, saying only that it will continue to post alert messages until the subscriber "resolve[s] the matter" and that it will never terminate an account.
- Time Warner Cable: also ambiguous but suggesting nothing on the order of suspension or termination, or bandwidth throttling.  It states that "The range of actions may include redirection to a landing page for a period or until you contact Time Warner Cable."
- Verizon: Verizon's policy is the only one with much specificity.  On the fifth alert, Verizon throttles the user's Internet speed to 256kbps — equivalent to a bottom-of-the-line residential DSL connection in the US — for a period of two days after a 14-day advance warning.  At the sixth alert, it throttles bandwidth for three days.

In other words, the so-called mitigation measures are not very punitive at all, not even at their worst — at least not compared to these penalties in other countries:

- France: up to ISP account suspension for up to one year and fines of up to €1500 (US $2000), although the fate of the HADOPI system in France is currently under legal review.
- New Zealand: account suspension of up to six months and fines of up to NZ $15,000 (US $13,000).
- South Korea: account suspension of up to six months.
- Taiwan: suspension or termination of accounts, although the fate of Taiwan's graduated response program is also in doubt.

[Major hat tip to Thomas Dillon's graduatedresponse.org blog for much of this information.]

In contrast, Vcap will be restricted to sending out four alerts that must be "educational" and "promot[e] an increase in awareness" of copyright issues.  Vcap is intended to run for three years, after which it will be re-

Mos

Follow "Copyright and Technology"

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

Sign me up

Build a website with WordPress.com

- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New…

Christopher Levy on Forbes: Is Ad Blocking the New…

CCP Industry Updates… on ACTA Process to Go Public

Argument Essay | Con… on Yes, Piracy Does Cause Economi…

Bill Rosenblatt on Yes, Piracy Does Cause Economi…

Bill's Music Blog
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

Most Recent Tweets

- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

evaluated — and if judged to be ineffective, possibly replaced with something that more closely resembles the original, stricter provisions in the Digital Economy Act. By 2018, the UK should also have plenty of data to draw on from other countries' graduated response regimes about any relationship between punitive measures and reduced infringements.

_____

## Share this:

 Reddit

 Like 

One blogger likes this.

Related

**Copyright Alert System Releases First Year Results**
In "Europe"

**Copyright Alert System Launches in U.S.**
In "Fingerprinting"

**UK Digital Economy Bill Survives Last Legal Challenge**
In "Fingerprinting"

## Comments»

1. AlanD – May 14, 2014

MUSIC SHARING
WE NEED A NEW BUSINESS MODEL FOR THE MUSIC INDUSTRY (Time To Decriminalize Music File Sharing)

As you know music fans visit web sites where they download folders filled with songs from albums in the MP3 format. Then, one at a time, they play the songs they downloaded in WinAmp or Real Player.

If the music fan likes a song, he adds the song to his iTunes Player. If the music fan dislikes the song he drops it into his recycle bin. Over time, the music fan will build some number of playlists in his iTunes and he will accumulate a substantial number of music files.

Here comes the hard part. Someone, a software engineer, has to write a software package purpose built for use by Apple and Amazon and all the on line music companies. When the music fan links up with the package on line. The software scans the meta data in all of his music files, his MP3's (could be FLAC files also).

First, the software package breaks the music fans music files into

- @billtrippe I want this book! 3 weeks ago
- Roundtable Discussion October 14th: Algorithms and the DMCA Post-Lenz copyrightandtechnology.com/2015/10. 3 weeks ago
- MT @randomfoodtruck @CarpeDonutNYC @carlssteaks @souvlakitruck @gcnyc1 – @Chefsamirtruck there too 3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month



Copyright and Technology is licensed under a Creative Commons Attribution-NonCommercial-NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS

two main categories:

1. MP3's showing a receipt for payment in the meta data.
2. MP3's not showing a receipt for payment in the meta data.

Next, the software package presents a bill at say 97 cents a song to the music fan. If the fan pays with a credit card, the software package adds a receipt to the meta data of all of the MP3's in question. In this way we can decriminalize music file sharing and, at the same time, restore the profit margins to the music industry.

(Feel free to run with this thread as if it were your own)

Have A Nice Day!

## Leave a Reply

Enter your comment here...



## Copyright and Technology

News and analysis of rights technologies and copyright law.

home    about    whitepapers/presentations    nyc 2016 conference

# Copyright Alert System Releases First Year Results   June 10, 2014

Posted by Bill Rosenblatt in Europe, Fingerprinting, Law, United States, Watermarking.
trackback

The Center for Copyright Information (CCI) released a report last month summarizing the first calendar year of activity of the Copyright Alert System (CAS), the United States' voluntary graduated response scheme for involving ISPs in flagging their subscribers' alleged copyright infringement. The report contains data from CAS activity as well as results of a study that CCI commissioned on consumer attitudes in the US towards copyright and file sharing.

The way CAS works, copyright owners monitor ISPs' networks for allegedly illegal file sharing, using MarkMonitor's piracy monitoring service.  MarkMonitor determines which ISP manages the user's IP address and sends a notice to that ISP.  The ISP then looks up the subscriber ID associated with that ISP address and sends a copyright alert.  The first two copyright alerts sent to a given user are purely educational, not requiring the user to take any action. Subsequent alerts proceed from "educational" to "acknowledgement" (requiring the user to acknowledge the alert in some way, similar to the way in which users agree to terms of use on websites) and then to "mitigation" (the ISP imposes some penalty, such as temporarily throttling the user's bandwidth).

There are two alerts at each level, for a total of six, but the three categories make it easier to compare the CAS with "three strikes" graduated response regimes in other countries.  As I discussed recently, the CAS's "mitigation" penalties are very minor compared to punitive measures in other systems such as those in France and South Korea.

The CCI's report indicates that during the first ten months of operation, it sent out 1.3 million alerts.  Of these, 72% were "educational," 20% were "acknowledgement," and 8% were "mitigation."  The CAS includes a process for users to submit mitigation alerts they receive to an independent review process.  Only 265 review requests were sent, and among these, 47 (18%) resulted in the alert being overturned.  Most of these 47 were overturned because the review process found that the user's account was used by someone else without the user's

search [                    ]
[go!]

Brought to you by:



GiantSteps
Media Technology Strategies

## Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific  Book reviews  Business models  Conditional Access  Devices  DRM  Economics  Enterprise Rights Management  Europe  Events  Fingerprinting  Games  Images  Japan  Law  Libraries  Mobile  Music  New Zealand  Publishing  Rights Licensing  Services  Standards  Technologies  UK  Uncategorized  United States  Video  Watermarking  White Paper

☐ Follow

authorization.  In no case did the review process turn up a false positive, i.e. a file that the user shared that was actually not unauthorized use of copyrighted material.

It's particularly instructive to compare these results to France's HADOPI system.  This is possible thanks to the detailed research reports that HADOPI routinely issues.  Two of these were presented at our Copyright and Technology London conferences and are available on SlideShare (2012 report here; 2013 report here).  Here is a comparison of the percent of alerts issued by each system at each of the three levels:

| Alert Level | HADOPI 2012 | HADOPI 2013 | CAS 2013 |
|---|---|---|---|
| 1st/Educational | 91.65% | 90.80% | 72.39% |
| 2nd/Acknowledgement | 8.32% | 9.17% | 20.05% |
| 3rd/Mitigation | 0.03% | 0.03% | 7.56% |

Of course these comparisons are not precise; but it is hard not to draw an inference from them that threats of harsher punitive measures succeed in deterring file-sharing.  In the French system — in which users can face fines of up to €1500 and one year suspensions of their Internet service — only 0.03% of those who received notices kept receiving them up to the third level, and only a tiny handful of users actually received penalties.  In the US system — where penalties are much lighter and not widely advertised — almost 8% of users who received alerts went all the way to the "mitigation" levels. (Of that 8%, 3% went to the sixth and final level.)

Furthermore, while the HADOPI results are consistent from 2012 to 2013, they reflect a slight upward shift in the number of users who receive second-level notices, while the percent of third-level notices — those that could involve fines or suspensions — remained constant.  This reinforces the conclusion that actual punitive measures serve as deterrents.  At the same time, the 2013 results also showed that while the HADOPI system did reduce P2P file sharing by about one-third during roughly the second year of the system's operation, P2P usage stabilized and even rose slightly in the two years after that.  This suggests that HADOPI has succeeded in deterring certain types of P2P file-sharers but that hardcore pirates remain undeterred — a reasonable conclusion.

It will be interesting to see if the CCI takes this type of data from other graduated response systems worldwide — including those with no punitive measures at all, such as the UK's planned Vcap system — into account and uses it to adjust its level of punitive responses in the Copyright Alert System.



Mos...

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

**Sign me up**

Build a website with WordPress.com

■ Ye...
   H...

■ Th...

■ W...

■ Th...
   Ex...

■ Ni...
   N...

■ Co...
   U...

■ Cr...
   th...

■ UK ISPs to Implement "Educational" Graduated Response System

■ Copyright Technology, Gangnam Style

■ About

## Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New...

Christopher Levy on Forbes: Is Ad Blocking the New...

CCP Industry Updates... on ACTA Process to Go Public

Argument Essay | Con... on Yes, Piracy Does Cause Economi...

Bill Rosenblatt on Yes, Piracy Does Cause Economi...

### Bill's Music Blog
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

## Most Recent Tweets
■ @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
■ @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

@billtrippe I want this book!
3 weeks ago
- Roundtable Discussion October 14th:
  Algorithms and the DMCA Post-Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
- MT @randomfoodtruck
  @CarpeDonutNYC @carlssteaks
  @souvlakitruck @gcnyc1 –
  @Chefsamirtruck there too
  3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month

Copyright and Technology is
licensed under a  Creative Commons
Attribution–NonCommercial–
NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS 

---

## Share this:

☐ Reddit

☐ Like

Be the first to like this.

### Related

**UK ISPs to Implement "Educational" Graduated Response System**
In "Fingerprinting"

**The Copyright Alert System: A Cautious Experiment**
In "Law"

**Copyright Alert System Launches in U.S.**
In "Fingerprinting"

## Comments»

1. AlanD – June 10, 2014

WE NEED A NEW BUSINESS MODEL FOR THE MUSIC INDUSTRY (Time To Decriminalize Music File Sharing)

As you know music fans visit web sites where they download folders filled with songs from albums in the MP3 format. Then, one at a time, they play the songs they downloaded in WinAmp or Real Player.

If the music fan likes a song, he adds the song to his iTunes Player. If the music fan dislikes the song he drops it into his recycle bin. Over time, the music fan will build some number of playlists in his iTunes and he will accumulate a substantial number of music files.

Here comes the hard part. Someone, a software engineer, has to write a software package purpose built for use by Apple and Amazon and all the on line music companies. When the music fan links up with the package on line. The software scans the meta data in all of his music files, his MP3's (could be FLAC files also).

First, the software package breaks the music fans music files into two main categories:

1. MP3's showing a receipt for payment in the meta data.
2. MP3's not showing a receipt for payment in the meta data.

Next, the software package presents a bill at say 97 cents a song to the music fan. If the fan pays with a credit card, the software package adds a receipt to the meta data of all of the MP3's in question. In this way we can decriminalize music file sharing and, at the same time, restore the profit margins to the music industry.

(Feel free to run with this thread as if it were your own)

Have A Nice Day!

------------------------------------------------------------

2. Intermediate results | Get Free Info – July 22, 2014

[…] Copyright Alert System Releases First Year Results … http://copyrightandtechnology.com/Of course these comparisons are not precise; but it is hard not to draw an inference from them that threats of harsher punitive measures succeed in deterring file-sharing. In the French system — in which users can face fines of … […]

## Leave a Reply

Enter your comment here...

The Regulus Theme.  |  Blog at WordPress.com.  |  Top

# Copyright and Technology

home    about    whitepapers/presentations    nyc 2016 conference

News and analysis of rights technologies and copyright law.

## The Future of HADOPI   October 26, 2012

Posted by Bill Rosenblatt in Economics, Europe, Law.
trackback

A recently-released report from the French government, Rapport sur les autorités publiques indépendantes (Report on the Independent Public Authorities), includes a section on HADOPI (Haute Autorité pour la diffusion des oeuvres et la protection des droits sur internet), the regulatory body set up to oversee France's "graduated response" law for issuing warnings and potentially punishments to online copyright infringers.

The headline that most Anglophone writers took away from the 24 pages in this report that were devoted to HADOPI was "HADOPI's budget to be cut by 23%." These writers took their cues from anti-HADOPI statements by various French politicians — including new French President Francois Hollande — and mischaracterized a statement about HADOPI by the French culture minister, Aurélie Filippetti.

Unfortunately, none of these people appear to have actually read the government report. (Yes, it's in French, but there is Google Translate. I used it.) HADOPI is not on the way out; not even close.

Let's get the most obvious facts out of the way first. Yes, HADOPI's operating budget is being cut from €10.3 Million to €8 Million, but its headcount is being increased (from 56.2 to 65.2 FTE). Apparently the budget cut reflects the fact that HADOPI's ramp-up period is coming to an end in 2012, and the focus is being shifted to increasing operational efficiencies and cutting overhead. Moreover, HADOPI's purview is being expanded to include video games as well as music and video content.

Another bit of factual cherry-picking in the Anglophone press: HADOPI has merely sent out more than a million emails but only prosecuted 14 people and only fined one (less than €200), so therefore it must be a big waste of money.

On the contrary: all of the data in the report, as well as the conclusions it draws, point to an agency whose successes are outnumbering its failures and whose mission is quite properly being optimized.

As it turns out, HADOPI has several objectives, not just issuing warning notices to illegal downloaders. Those other functions are where

search [          ]
[go!]

Brought to you by:



### Subscribe

 Subscribe to Copyright and Technology in a reader or via email

### Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific Book reviews
Business models Conditional
Access Devices DRM
Economics Enterprise Rights
Management Europe Events
Fingerprinting Games Images
Japan Law Libraries Mobile
Music New Zealand
Publishing Rights
Licensing Services
Standards Technologies
UK Uncategorized
United States Video
Watermarking White Paper

□ Follow

HADOPI does not look as successful as hoped.  One objective is to increase the number of legal content offerings in France.  To do this, it has put a labeling system into place, along with a website called PUR (Promotions des Usages Responsables, also an acronym for the French word for "pure") that lists all of the labeled services.  Although the report cites a sharp increase in the number of such services in France over the past year, that increase is surely attributable to market forces and is no different from similar increases in other countries.

Another of HADOPI's objectives is to regulate the use of DRM technology according to rules derived from the European Union Copyright Directive of 2001.  This means both ensuring that DRM systems don't unduly restrict users' rights to content and that DRM circumvention schemes (hacks) are prosecuted under the law.  So far, HADOPI has only been asked to intervene in two DRM disputes concerning users' rights, and both reviews are ongoing.  This can't be counted as a great success either.

Yet regarding HADOPI's core "graduated response" function, the data in the report shows nothing but success so far.  Fining people (a maximum of €1500) and suspending their Internet access (up to one month) is not the objective; reducing copyright infringement is.  The number of people who have been fined or had their Internet access suspended is simply the wrong metric.

The good news is that HADOPI appears to be succeeding as an education program rather than as a punitive one.  In 2011, HADOPI reports that fully 96% of people who received a first warning message did not receive a second one; this number stayed about the same in 2012.  In addition, the percentage of people who received second notices but not third ones rose from 90% to 98% from 2011 to 2012.  (The legal steps that could lead to fines or suspensions begin after the third notice.)  To buttress this data, HADOPI has published results from four independent research reports that note significant decreases in illegal downloading in 2011.  No one has substantively debunked any of these findings.

Furthermore, HADOPI does not simply take complaints from copyright owners — which monitor the Internet and submit complaints to HADOPI — at face value.  For more than half of the users who received three warnings, HADOPI chose not to send the cases to French authorities for prosecution.

It is also interesting to note that the educational aspect of HADOPI appears to be succeeding despite the fact that it treats violations as misdemeanors, with small punishments, in contrast to the enormous criminal penalties associated with copyright infringement in France (as they are in the U.S.).  This points to the conclusion that online education is more effective than large statutory damages in curbing infringement.

Now let's talk about the economics.  Ideally, this type of program would be funded by copyright holders — the ones with rights that they want

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

Sign me up

Build a website with WordPress.com

Mos

- Ye
  H
- Th
- Wh
- Th
  Ex
- Ni
  N
- Co
  U
- Cr
  th
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

**Recent Comments**

Bill Rosenblatt on Forbes: Is Ad Blocking the New...

Christopher Levy on Forbes: Is Ad Blocking the New...

CCP Industry Updates... on ACTA Process to Go Public

Argument Essay | Con... on Yes, Piracy Does Cause Economi...

Bill Rosenblatt on Yes, Piracy Does Cause Economi...

**Bill's Music Blog**
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

**Most Recent Tweets**

- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

protected.  France is funding HADOPI with taxpayers' money, although copyright owners do pay for the monitoring services that detect allegedly illegal downloads and report them to HADOPI.

At the same time, €8 Million isn't a bad deal.  France currently has about 50 million overall Internet users and about 25 million fixed broadband subscribers.  Let's assume that the total number of French people who pay for Internet subscriptions is about 30 million.  In that case, HADOPI's annual budget could be apportioned as a levy on Internet subscribers of about €0.27 (US $0.35).  This is two orders of magnitude smaller than the £20 (US $32) annual antipiracy levy on ISP subscribers that the Digital Britain Report proposed for the UK in 2009.

Furthermore, HADOPI measured the market impact of unauthorized downloading (not counting P2P) as €51 to 72.5 Million annually.  Although this figure can't be taken as a magnitude of lost sales, the worst case break-even point for HADOPI's cost-effectiveness would be that 16% of illegal downloads displace sales (one study attempted to measure promotional effects vs. sales displacement and suggested that about two-thirds of illegal downloads displace sales).

It's still too early to proclaim HADOPI's success or failure.  For example, the more determined infringers could move to ways of obtaining content that evade detection (e.g. HADOPI only deals with downloads and not streaming).  But the signs are encouraging enough that the French government has decided to keep the experiment going.

(By the way, if you would like to argue with me about this, I will be in Paris from November 7 through 11, speaking at the SNE conference "Les assizes du livre numeriques" on Thursday November 8.)

---

## Share this:

 Reddit

 Like

One blogger likes this.

Related

**IFPI Claims Success of Progressive Reponse in Curbing Infringement**
In "Europe"

**Copyright and Technology London 2012 and Hadopi**
In "Europe"

**Hadopi Becomes un Ballon de Football Politique**
In "Europe"

- @billtrippe I want this book!
  3 weeks ago
- Roundtable Discussion October 14th: Algorithms and the DMCA Post-Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
- MT @randomfoodtruck @CarpeDonutNYC @carlssteaks @souvlakitruck @gcnyc1 – @Chefsamirtruck there too
  3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month



Copyright and Technology is licensed under a Creative Commons Attribution–NonCommercial–NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS

## Comments»

No comments yet — be the first.

Leave a Reply

Enter your comment here...

The Regulus Theme.  | Blog at WordPress.com.  | Top  |

# Copyright and Technology

**News and analysis of rights technologies and copyright law.**

home | about | whitepapers/presentations | nyc 2016 conference

## Hadopi Becomes un Ballon de Football Politique   February 21, 2012

Posted by Bill Rosenblatt in Europe, Law, Uncategorized.
trackback

Those of us who deal with the so-called copyright wars here in the United States can take comfort in one thing: the battles between Big Media and Big Tech have mostly avoided getting sucked into this country's corrosive, debilitating party politics.

The "balanced copyright" movement has some alignment with leftist politics — not for nothing do many call it "copyleft" — but that's mostly confined to academics and a handful of not-very-industry–aligned advocacy groups.  Now that SOPA and PIPA are dead, the Republicans who run Congress can't decide whether to continue to align themselves with the politically entrenched media industry and promote further legislation, or to tout individual liberties (and appease the burgeoning Big Tech lobby) and repudiate such legislation.  Nobody involved in this year's presidential election has touched the online copyright issue.

France, however, shows a completely different picture.  As a recent New York Times article describes it, the Hadopi progressive response legislation has been in place for two years, warnings have been issued to consumers caught downloading illegally, and the first group of repeat offenders — 165 of them — have been handed over to the justice system for potential fines and suspension of their Internet accounts.  The first warnings were sent out in October 2010, about 1–1/3 years ago.

First of all, let's compare this with the RIAA's campaign of individual lawsuits in the US: the RIAA appears to have gone after between 18,000 and 35,000 people over a period of five years, or 3600–7000 per year on average.  Even if one allows for the fact that France has 19% of the Internet-using population of the US, the number of French Internet users thus affected by Hadopi is only 18–35% of the proportionate number of US Internet users sent nastygrams by the RIAA.

Every study of the Hadopi system that has been done so far has shown the system to be successfully reducing illegal downloading and increasing legitimate consumption of content, particularly music sales on iTunes.  (The effect of the law on subscription streaming services like Deezer and Spotify hasn't been measured.)  One would expect the

search [_____] go!

Brought to you by:


GiantSteps
Media Technology Strategies

## Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM–Free Music
- European Commission Issues Communication on Digital Single Market

Asia–Pacific  Book reviews
Business models Conditional
Access  Devices  DRM
Economics Enterprise Rights
Management  Europe Events
Fingerprinting Games Images
Japan Law Libraries Mobile
Music New Zealand
Publishing Rights
Licensing Services
Standards Technologies
UK Uncategorized
United States Video
Watermarking  White Paper    ☐ Follow

"usual suspects" to debunk the studies, but they haven't. Instead, there have been statements such as "the effects are undeniable but hard to quantify" (the liberal newspaper Le Monde) and "Apparently some of its intimidation is having a psychological effect" (La Quadrature du Net, a French advocacy group which otherwise argues that Hadopi is a waste of taxpayers' money to solve a nonexistent problem).

In other words, like it or not, the Hadopi system seems to be working so far.

French President Nicolas Sarkozy, who actively supported the Hadopi law, is up for re-election himself. As a result, online copyright has become in France what we in America call a political football. Socialists have been the most vocal enemies of the Hadopi law in France and have been calling for flat-tax statutory licenses, following the ideas of the Electronic Frontier Foundation, Terry Fisher of Harvard Law School, and other copyleft figures. Yet now that the right-wing candidate Marine Le Pen is now stealing the socialists' thunder by calling for a statutory license herself, the socialists are backing away from the idea, calling instead for some hazy combination of taxes and crackdowns on sites that enable illegal copying. Nevertheless, both anti-Sarkozy parties have professed Hadopi hatred, as both a populist gesture and a Sarkozy differentiator.

This is just a little bit crazy. Conservatives are supposed to be for individual liberties, low taxes, and small government. So what is a hard-right politician doing embracing a system that amounts to a tax on content, no matter how much each consumer uses, and that distributes money to content creators through opaque, government-entrenched entities like the collecting society SACEM? And what are the socialists, who are supposed to be for big government and equitable distribution of resources, doing opposing it? I'm sure that I, as an American, do not have a proper understanding of French politics. But to me, this smacks of political opportunism and demagoguery of the type that we are deluged with in this US election year on issues such as healthcare, taxes, gay marriage, etc., etc. It's sad.

I think five years is a reasonable timeframe in which to judge the success of Hadopi, so it's premature so far. Die-hard infringers will find ways around the system, such as through anonymizers, virtual private networks, and file encryption; we have yet to see how popular such methods become. The fairness and effectiveness of the enforcement and appeal mechanisms have yet to be established. But one hopes that Hadopi's educational effect coupled with the fear of getting caught will reduce infringement enough to make it worthwhile; in that case, other countries should adopt progressive response with a strong educational component too.

Let Hadopi-haters do their own serious quantitative studies, and let's compare the results. Let's make the judgments on facts, and for God's sake let's not let political posturing pollute the atmosphere. Then let's see the Copyright Alert System assess what's working in Hadopi and adopt it here in the United States, where — at least for the moment —

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

**Sign me up**

Build a website with WordPress.com

Mos

- Ye
  H
- Th
- Wh
- Th
  Ex
- Ni
  N
- Co
  U
- Cr
  th
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

## Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New…

Christopher Levy on Forbes: Is Ad Blocking the New…

CCP Industry Updates… on ACTA Process to Go Public

Argument Essay | Con… on Yes, Piracy Does Cause Economi…

Bill Rosenblatt on Yes, Piracy Does Cause Economi…

## Bill's Music Blog

Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

## Most Recent Tweets

- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

no one need worry about the issue being demagogued to death in election years.

_____

## Share this:

☐ Reddit

☐ Like

Be the first to like this.

Related

**Copyright and Technology London 2012 and Hadopi**
In "Europe"

**HADOPI Bill Fails in French Parliament**
In "Europe"

**The Future of HADOPI**
In "Economics"

## Comments»

1. **M** – March 2, 2012

I don't believe copyleft is about right or left in a political sense. Rather it's idea of using copyright itself to subvert it's intended purpose.

Instead of saying "you can not share this" (as is typical in copyright), if you want to a license for this, "you MUST share this".

Copyleft puts copyright on it's head. Quite a clever idea. The General Public License (what your blog, WordPress is licensed under) is good example of a copyleft license.

**Bill Rosenblatt** – March 2, 2012

Thanks for the comment. I think it's more accurate to say that copyleft is about using *licenses* to "subvert [copyright]'s intended purpose." This led me to be curious about the origin of the term copyleft. According to Wikipedia, it originated back in 1976. I had thought it originated with Richard Stallman in the 1980s but it turns out to have predated him by several years.

Leave a Reply

---

■ @billtrippe I want this book!
3 weeks ago
■ Roundtable Discussion October 14th: Algorithms and the DMCA Post-Lenz copyrightandtechnology.com/2015/10,
3 weeks ago
■ MT @randomfoodtruck @CarpeDonutNYC @carlssteaks @souvlakitruck @gcnyc1 – @Chefsamirtruck there too
3 weeks ago

## Blogroll

■ Andrew Orlowski
■ Ars Technica
■ Future of Copyright
■ PaidContent
■ Robert Levine
■ The Cynical Musican
■ The Illusion of More
■ The Trichordist

## Archives

Select Month



Copyright and Technology is licensed under a  Creative Commons Attribution–NonCommercial– NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS

Enter your comment here...

The Regulus Theme.   |   Blog at WordPress.com.   |   Top   |



home | about | whitepapers/presentations | nyc 2016 conference

News and analysis of rights technologies and copyright law.

# HADOPI Bill Fails in French Parliament   April 13, 2009

Posted by Bill Rosenblatt in Europe, Fingerprinting, Law, Watermarking. trackback

Last week the French legislation known as la Loi HADOPI (Haute Autorité pour la Diffusion des Oeuvres et la Protection des droits sur l'Internet) failed to muster enough votes from the ruling UMP party in French parliament and failed passage.  The bill may be re-introduced later this year.

HADOPI was the leading example of so-called graduated response legislation, whereby a user who uploads copyrighted content without authorization is detected and gets a series of warnings, culminating in suspension or termination of her Internet account.

The French legislation was crafted last year following an agreement in late 2007 between the media industry and ISPs brokered by Denis Olivennes, CEO of the media product retailer FNAC.  Its failure to pass in the Assemblee Nationale was a defeat for French president Nicolas Sarkozy and his party, and a victory for left-wing opposition and consumer groups.

The bill's failure is also a setback for vendors of technology that could be used to monitor ISP traffic and detect unauthorized downloads, such as fingerprinting and watermarking.  A Belgian court had already identified acoustic fingerprinting as a technology that ISPs should adopt in order to block unauthorized uploads.  Similar processes are going on elsewhere now, such as in the US, in the *Streamcast* ligitation that was remanded to the 9th circuit appeals court by the Supreme Court after its 2005 opinion in *MGM v. Grokster*.

As today's *New York Times* points out, legislators in various countries are finding that legislation obligating ISPs to monitor users' traffic for illegal uploads is politically unpopular.  And legislative bodies nowadays are having their attentions taken up by the economic crisis, wars, and other pressiing issues.  As a result, courts will probably be the primary venues for legal decisions regarding digital copyright in the foreseeable future.

search [          ] go!

Brought to you by:



GiantSteps
Media Technology Strategies

## Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific Book reviews Business models Conditional Access Devices DRM Economics Enterprise Rights Management Europe Events Fingerprinting Games Images Japan Law Libraries Mobile Music New Zealand Publishing Rights Licensing Services Standards Technologies UK Uncategorized United States Video Watermarking White Paper

□ Follow

Share this:

☐ Reddit

☐ Like

Be the first to like this.

Related

**France Weakens Progressive Response Anti-Piracy Law**
In "Europe"

**Hadopi Becomes un Ballon de Football Politique**
In "Europe"

**The Future of HADOPI**
In "Economics"

## Comments»

No comments yet — be the first.

## Leave a Reply

Enter your comment here...

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

**Sign me up**

Build a website with WordPress.com

Mos...
- Ye...
  H
- Th
- Wh
- Th
  Ex
- Ni
  N
- Co
  U
- Cr
  th
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

## Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New....

Christopher Levy on Forbes: Is Ad Blocking the New...

CCP Industry Updates... on ACTA Process to Go Public

Argument Essay | Con... on Yes, Piracy Does Cause Economi...

Bill Rosenblatt on Yes, Piracy Does Cause Economi...

### Bill's Music Blog
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

## Most Recent Tweets
- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

■ @billtrippe I want this book!
  3 weeks ago
■ Roundtable Discussion October 14th:
  Algorithms and the DMCA Post–Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
■ MT @randomfoodtruck
  @CarpeDonutNYC @carlssteaks
  @souvlakitruck @gcnyc1 –
  @Chefsamirtruck there too
  3 weeks ago

## Blogroll

■ Andrew Orlowski

■ Ars Technica

■ Future of Copyright

■ PaidContent

■ Robert Levine

■ The Cynical Musican

■ The Illusion of More

■ The Trichordist

## Archives

Select Month

Copyright and Technology is
licensed under a  Creative Commons
Attribution–NonCommercial–
NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam
blocked by Akismet

FEEDS    FULL    COMMENTS

ʊ



home · about · whitepapers/presentations · nyc 2016 conference

News and analysis of rights technologies and copyright law.

# Copyright Technology, Gangnam Style

### November 7, 2013

Posted by Bill Rosenblatt in Asia-Pacific, Events. trackback

The Samsung TV monitor wasn't particularly large. But the picture was so sharp that, even from several meters away, you could make out each hair of the perfectly sculpted eyebrows on the perfectly groomed K-Pop starlets performing on the MTV Korea broadcast. The scene was a casual neighborhood restaurant in Gangnam, the upscale district of Seoul that PSY made world-famous. The makgeolli (Korean rice wine) flowed freely, if more freely to the locals than to those of us who had flown across many timezones to get there. We were all celebrating the successful end of ICOTEC, the International Copyright Technology Conference, which attracted 600 attendees earlier this week.

This is what happens when a government not only pays lip service to copyright but also puts its money where its mouth is. South Korea is in the midst of a perfect storm of growth in digital media: Samsung Galaxy mobile devices everywhere; broadband Internet at speeds several times those available in the west; K-Pop idol factories churning out one international sensation after another. The media, telecoms, and consumer electronics industries don't agree on everything (e.g., consumer electronics companies refuse to pay copyright levies on their devices), but they largely cooperate – as their offices sit near one another in Digital Media City, a special district across town from Gangnam that emerged from a landfill site just over a decade ago. Much of that cooperation is fostered by the government, and it has resulted in a global digital media juggernaut.

The Ministry of Culture, Sports and Tourism (MCST) sponsored ICOTEC, now in its third year. It was as well organized as any private-sector conference I've seen, and admission was free. The conference program had more emphasis on technology than on law compared to my own Copyright and Technology conferences in New York and London. That's fitting because, as I have mentioned, Korea and its Asia-Pacific neighbors produce more innovation in rights technologies (relative to their GDPs) than the traditional content-producing regions of the United States and Europe. But now Korea is producing technological innovations not just to satisfy the distant demands of western media companies; it's launching innovative content models and technologies

search [_____] go!

## Brought to you by:



GiantSteps
Media Technology Strategies

### Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues Communication on Digital Single Market

Asia-Pacific  Book reviews  Business models  Conditional Access  Devices  DRM  Economics  Enterprise Rights Management  Europe  Events  Fingerprinting  Games  Images  Japan  Law  Libraries  Mobile  Music  New Zealand  Publishing  Rights Licensing  Services  Standards  Technologies  UK  Uncategorized  United States  Video  Watermarking  White Paper

☐ Follow

to protect copyright for the benefit of its own multi-billion-dollar content. As ICOTEC attendees could see, Korea has perhaps the most vibrant rights technologies industry of any single country in the world today.

The Korean government's own foray into rights technology is particularly interesting: it operates the Copyright Protection Center (CPC), part of the Korean Federation of Copyright Organizations (known as KOFOCO). The CPC runs a piracy monitoring system called ICOP — a reverse-engineered acronym for Illegal Copyright Obstruction Program.

ICOP is analogous to private-sector piracy monitoring services such as MarkMonitor, Irdeto/BayTSP, Muso, Ayatii, and various others. It monitors various types of online services, including P2P file-sharing sites, web portals, "web-hard" (Korea's equivalent to "cloud storage") services, torrent sites, and so on. Like those piracy monitoring services, ICOP uses a combination of techniques including fingerprinting technology and analysis of metadata and information surrounding potentially infringing content on the monitored sites.

ICOP gathers data in real time and sends takedown notices to the sites, which remove the content to avoid action from Korean law enforcement. CPC claims that nearly all of the monitored sites take down the accused content when requested. The effort also includes crackdowns on physical piracy: CPC employees armed with smartphones use specially-designed apps to photograph sellers of pirated DVDs and CDs on streets, in subway stations, etc. The apps geo-tag the photos and send them to the CPC in real time, where the data is displayed on maps, analyzed, and passed on to law enforcement for further action.

ICOP is arguably more effective than monitoring efforts elsewhere because it's better integrated with law enforcement. Media companies in the west use private-sector piracy monitoring services, which provide data that copyright owners must use to generate takedown notices and initiate litigation and law enforcement actions. The hands-off approach of western governments fosters competition among piracy monitoring services, which should theoretically lead to more effective technologies. But the reality has been a limit on revenue opportunities that has led to market consolidation, as many piracy monitoring services have merged, been acquired by larger companies for synergies with other businesses, or just ceased operations.

In contrast, CPC gets 90% of its funding from the Korean government. It operates on an annual budget of about US $5 Million, which works out to just 9 cents per Korean citizen; the other 10% comes from content industry trade associations. (By comparison, HADOPI costs the French about 15 cents per citizen per year.)

ICOP's fingerprinting technology comes from the Electronics Telecommunications Research Institute (ETRI), a government-funded research lab. Although much of the system is automated, the CPC employs 110 people to monitor and report on illegal content on

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

Sign me up

Build a website with WordPress.com

Mos

- Ye
  H
- Th
- Wh
- Th
  Ex
- Ni
  N
- Co
  U
- Cr
  th
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New…

Christopher Levy on Forbes: Is Ad Blocking the New…

CCP Industry Updates… on ACTA Process to Go Public

Argument Essay | Con… on Yes, Piracy Does Cause Economi…

Bill Rosenblatt on Yes, Piracy Does Cause Economi…

**Bill's Music Blog**
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

Most Recent Tweets

- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

targeted online services. The employees are disabled citizens who work from their homes.

(The CPC operates completely separately from Korea's "three strikes" graduated response regime, which, like HADOPI, targets individual downloaders instead of online service operators. Korea was actually the first country to implement graduated response.)

KOFOCO started ICOP in 2008 in response to the rapidly growing rate of piracy amid an equally rapidly growing content industry in Korea. CPC estimates that the size of the illegal content market shrank 27.6% between 2011 and 2012 alone, and that the infringement rate dropped 14% in the same time period.

Yet the Korean government doesn't just focus on copyright enforcement. MCST supports what is perhaps the world's leading effort to educate the public about copyright. It has also expanded the scope of fair use under Korean copyright law, increased access to public-sector content, introduced more cost-efficient legal processes for small infringement claims (for settlements below roughly US $10,000), and dramatically increased the efficiency of music rights licensing.

The ICOTEC conference put all this activity on proud display for attendees and speakers from around the world. It was a ton of very interesting information. The K-Pop CD sampler I bought at the airport on my way back should help — as the makgeolli did — to further my understanding of a country whose impact on the global digital media scene will only get bigger and bigger.

My keynote presentation at ICOTEC 2013 is available on SlideShare. Watch this space for links to other presentations from the conference.

---

## Share this:

 Reddit

 Like 

One blogger likes this.

Related

**Announcing Copyright and Technology New York 2012**
In "Events"

**C&T 2010: New Speakers for Legal Panel**
In "Events"

**MEGA CEO to speak at Copyright and Technology London 2013**
In "Asia-Pacific"

---

- @billtrippe I want this book! 3 weeks ago
- Roundtable Discussion October 14th: Algorithms and the DMCA Post-Lenz copyrightandtechnology.com/2015/10. 3 weeks ago
- MT @randomfoodtruck @CarpeDonutNYC @carlssteaks @souvlakitruck @gcnyc1 – @Chefsamirtruck there too 3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month



Copyright and Technology is licensed under a Creative Commons Attribution-NonCommercial-NoDerivs 3.0 Unported License .

## Spam Blocked

**896,604 spam**

FEEDS  FULL  COMMENTS

## Comments»

1. Jhonny P – <u>November 16, 2013</u>

Great review, thousand thanks. I think Singapore is the next country to move in this direction, IPOS and MDA are becoming very active about it, the difference is that they don't have (k-pop) or a strong content industry. This document shows that perspective:

http://www.ipos.gov.sg/Portals/0/Press%20Release/IP%20HUB%20MAS

## Leave a Reply

Enter your comment here...



home | about | whitepapers/presentations | nyc 2016 conference

News and analysis of rights technologies and copyright law.

# CISAC World Creators Summit 2013   June 6, 2013

Posted by Bill Rosenblatt in Events.
trackback

The World Creators Summit (formerly World Copyright Summit but still WCS) took place this week in Washington, DC.  The event is run by CISAC, the international umbrella organization of collecting societies that mainly serve songwriters, composers, screenwriters, and visual artists.  Its decision to change the name reflects the fact that copyright is not only no longer an insider's domain but also carries negative connotations in some circles.

The CISAC event takes place every two years, alternating between Brussels and Washington.  This year's conference was an improvement on the last Washington event in 2009 in that it felt more broad in its focus and less concerned with the "inside baseball" of collecting societies.  In fact, a consistent refrain throughout the event was the need for collecting societies to make it much easier for digital service providers to get licenses to content.

A few sessions at WCS particularly stood out.  One was on antipiracy initiatives, such as the graduated response systems in France (Hadopi) and the US (Copyright Alert System).  The most interesting thing we learned there was that, to paraphrase Mark Twain, recent rumors of Hadopi's death (such as this one and this one) have been greatly exaggerated.  (As is often the case, Ars Technica got it the most right.)  The reality is that Hadopi's core "three strikes" system will remain intact, but without the threat of suspending users' Internet access and with maximum fines lowered from €1500 to €60.  The Hadopi agency itself is to be disbanded, but the functions will simply move to another existing French agency, a process that has already started with the transfer of some personnel.

In other words, Hadopi is being repositioned as more of a copyright education campaign — closer to the Copyright Alert System being administered by the Center for Copyright Information, whose CEO, Jill Lesser, was also on the panel.

Although the Copyright Alert System is too new to report results, Hadopi has had time to acquire and analyze a significant amount of data.  Hadopi's director of legal affairs, Sarah Jacquier, acknowledged that

search [    ]  go!

Brought to you by:


GiantSteps
Media Technology Strategies

Subscribe

Subscribe to Copyright and Technology in a reader or via email

## Recent Posts

- Roundtable Discussion October 14th: Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown Notices to Address Fair Use
- The Myth of DRM–Free Music
- European Commission Issues Communication on Digital Single Market

Asia–Pacific  Book reviews  Business models  Conditional Access  Devices  DRM  Economics  Enterprise Rights Management  Europe  Events  Fingerprinting  Games  Images  Japan  Law  Libraries  Mobile  Music  New Zealand  Publishing  Rights Licensing  Services  Standards  Technologies  UK  Uncategorized  United States  Video  Watermarking  White Paper   □ Follow

Hadopi only addresses P2P file sharing and does not address direct downloads or illegal streaming. She noted that while both legal and illegal streaming have increased since Hadopi started in 2009, that same period saw drops in measured P2P usage, increases in usage of legal services, and an increase from 71% to 78% in the number of users who use legal content services only.

Another interesting panel was "Re-connnecting with the Digital Narrative"; it dealt with the need to re-establish the importance of copyright in the public dialog after the defeat of SOPA and similar legislation last year. Catharine Saxberg of the Canadian Music Publishers Association stressed the need for a simple, unified narrative to match the "freedom" and "censorship" rhetoric used in the SOPA/PIPA defeat, while her compatriot Eddie Schwartz of the Songwriters Association of Canada told of his organization's "Fair Trade Music" campaign. I found this panel's relatively low attendance disappointing, given the topic's crucial importance.

One of the penultimate sessions was a debate between David Israelite of the National Music Publishers Association and Zahava Levine of Google. Many of us were anticipating a contentious prizefight along the lines of Levine's debate with several collecting society and media trade association representatives at the 2009 event. In that respect, we were disappointed: the conversation was more of a love duet. Israelite praised the increasing importance of YouTube as a licensed music channel and source of ad revenue (which is admittedly more a promise for the future than current reality), and noted that agreements with YouTube were worked out within current copyright law and without recourse to blanket or statutory licenses. (Levine is actually no longer chief counsel for YouTube; she now runs content partnerships for the Android platform, including Google Play.)

The tone among collecting society representatives at WCS has also shifted over the past four years, from inward-looking self-congratulation and turf protection to a sense of urgency that collecting societies have to work together, erase both functional and national boundaries, and generally make it much easier to license content in the digital age.

Axel Dauchez, CEO of streaming music service Deezer, called rights fragmentation "the cancer of the digital world," and noted music analyst Mark Mulligan said that "rights fragmentation steals the oxygen away from early stage startups" looking to license content. His remarks preceded those of electronic music pioneer and incoming CISAC president Jean-Michel Jarre (did he echo the title of Jarre's biggest hit album intentionally?), who also stressed the need to automate and simplify licensing. Jarre also stated, regarding the tension between the creative and tech sectors, "I think the worst is behind us." Although I found some people skeptical about that, the tone of this year's edition of WCS did augur more hope for the future than previously.

Finally, I couldn't help but notice a remark made by Matt Mason of BitTorrent. Apparently BitTorrent is working with the media industry on

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

Sign me up

Build a website with WordPress.com

Most ___
- Ye___ H___
- Th___
- Wh___
- Th___ Ex___
- Ni___ N___
- Co___ U___
- Cr___ th___
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

**Recent Comments**

Bill Rosenblatt on Forbes: Is Ad Blocking the New…

Christopher Levy on Forbes: Is Ad Blocking the New…

CCP Industry Updates… on ACTA Process to Go Public

Argument Essay | Con… on Yes, Piracy Does Cause Economi…

Bill Rosenblatt on Yes, Piracy Does Cause Economi…

**Bill's Music Blog**
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

**Most Recent Tweets**
- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

a legitimate content distribution model based on a new type of torrent-able file that contains e-commerce functionality, "bring[ing] the store to the user." We don't have any details on this yet but… sounds to me like DRM?

Update: The functionality that BitTorrent is introducing (in beta at this writing) is called BitTorrent Bundles. It is not DRM. It's more like paywall functionality bundled with the torrent file delivery mechanism, so that the publisher of a file distributed through the BitTorrent protocol can force users to take an action before being able to view or listen to some of the content. This action could be an e-commerce transaction, but it could also be something non-monetary such as supplying an email address, liking the artist on Facebook, etc.

## Share this:

☐ Reddit

☐ Like

Be the first to like this.

Related

**The Future of Music: From Blanket Licensing to Registries**
In "Law"

**Gridlock at the World Copyright Summit**
In "Fingerprinting"

**Copyright Summit Coming to Washington**
In "Events"

## Comments»

No comments yet — be the first.

## Leave a Reply

Enter your comment here...

- @billtrippe I want this book!
  3 weeks ago
- Roundtable Discussion October 14th: Algorithms and the DMCA Post-Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
- MT @randomfoodtruck
  @CarpeDonutNYC @carlssteaks
  @souvlakitruck @gcnyc1 –
  @Chefsamirtruck there too
  3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month



Copyright and Technology is licensed under a Creative Commons Attribution-NonCommercial-NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS



# Copyright and Technology

News and analysis of rights technologies and copyright law.

home     about     whitepapers/presentations     nyc 2016 conference

## Digimarc Acquires Attributor   December 4, 2012

Posted by Bill Rosenblatt in Fingerprinting, Images, Publishing,
Watermarking.
trackback

Digimarc announced yesterday that it has acquired Attributor Corp.
Attributor, based in Silicon Valley, is one of a handful of companies
that crawls the Internet looking for instances of copyrighted material
that may be infringing, using a pattern-recognition technology akin to
fingerprinting. Digimarc is a leader in digital watermarking technology,
with a large and significant portfolio of IP in the space. The acquisition
price was a total of US $7.5 Million in cash, stock, and contingent
compensation.

This is a synergistic and strategically significant move for Digimarc. A
few years ago, Digimarc had pruned its efforts to create products and
services for digital media markets outside of still images. It had
decided, in effect, to leave products and services to its IP licensees,
companies such as Civolution of the Netherlands and MarkAny of South
Korea. Attributor's primary market is book publishing, with customers
including four out of the "Big Six" trade book publishers as well as
several leading educational and STM (scientific, technical, medical)
publishers.

Digimarc intends to leverage Attributor's relationships with book
publishers to help it expand its watermarking technology into that
market and to move into other markets such as magazine and financial
publishing. The company cited the explosive growth in e-books as a
reason for the acquisition.

Beyond that, Digimarc's acquisition is another sign of the increasing
importance of infringement monitoring services; the previous such sign
came over the summer, when Thomson Reuters acquired MarkMonitor.

There are two reasons for this increase in importance. First is the rise of
so-called progressive response legal regimes: copyright owners can
monitor the Internet and submit data on alleged infringements to a
legal authority, which sends users increasingly strong warning
messages and, if they keep on infringing, potentially suspends their ISP
accounts. The most advanced progressive response regime is HADOPI
in France, early results from which are encouraging. The Copyright
Alert System is supposedly gearing up for launch in the United States.

search _____
go!

### Brought to you by:



GiantSteps
Media Technology Strategies

### Subscribe

Subscribe to Copyright
and Technology in a reader or
via email

### Recent Posts

- Roundtable Discussion October 14th:
  Algorithms and the DMCA Post-*Lenz*
- Forbes: Is Ad Blocking the New Piracy?
- Ninth Circuit Calls for Takedown
  Notices to Address Fair Use
- The Myth of DRM-Free Music
- European Commission Issues
  Communication on Digital
  Single Market

Asia-Pacific  Book reviews
Business models  Conditional
Access  Devices  DRM
Economics  Enterprise Rights
Management  Europe  Events
Fingerprinting  Games  Images
Japan  Law  Libraries  Mobile
Music  New Zealand
Publishing  Rights
Licensing  Services
Standards  Technologies
UK  Uncategorized
United States  Video
Watermarking  White Paper   □ Follow

A handful of other countries have progressive response in place or in process as well.

The second reason for the increasing importance of so-called piracy monitoring is that copyright owners are starting to realize the value of the data they generate, beyond catching infringers. Piracy is evidence of popularity of content — of demand for it. The data that these services generate can be valuable for analytics purposes, to see who is interested in the content and in what ways. Big Champagne, for example, has been supplying this type of data to the music industry for may years. Attributor has been working on a new service that integrates piracy data with social media analytics; Digimarc intends to integrate this into its own data offerings for the image market.

In fact, we'll have a discussion on the value of piracy data tomorrow at Copyright and Technology NYC 2012. Leading the discussion will be Thomas Sehested of MarkMonitor. There's little doubt he will be called upon to talk about his new competition.

---

Share this:

☐ Reddit

☐ Like

Be the first to like this.

Related

**Digimarc Launches Social DRM for E-books**
In "Fingerprinting"

**2009 Year in Review, Part 3**

**HP Snapfish Goes into Stock Image Business**
In "Images"

## Comments»

1. Digimarc Acquires Attributor | Stan Stewart's Blog – December 6, 2012

[...] See on copyrightandtechnology.com [...]

## Leave a Reply

Enter your comment here...

**Follow "Copyright and Technology"**

Get every new post delivered to your Inbox.

Join 687 other followers

Enter your email address

**Sign me up**

Build a website with WordPress.com

Mos...

- Ye... H...
- Th...
- W...
- Th... Ex...
- Ni... N...
- Co... U...
- Cr... th...
- UK ISPs to Implement "Educational" Graduated Response System
- Copyright Technology, Gangnam Style
- About

Recent Comments

Bill Rosenblatt on Forbes: Is Ad Blocking the New...

Christopher Levy on Forbes: Is Ad Blocking the New...

CCP Industry Updates... on ACTA Process to Go Public

Argument Essay | Con... on Yes, Piracy Does Cause Economi...

Bill Rosenblatt on Yes, Piracy Does Cause Economi...

**Bill's Music Blog**
Bill's Musical Box :
Musings on music, including rediscoveries of rock music from the early-mid 1970s -- music I knew back then but didn't really grow up with. Everyone has to have a music blog, right?

Most Recent Tweets

- @BrettDanaher love to. Dm me and we can discuss if you like. 1 week ago
- @joshbrody surprised you RTed that quote from my article. BTW it has gotten most tweets & LinkedIn shares ever of all my Forbes pieces. 3 weeks ago

- @billtrippe I want this book!
  3 weeks ago
- Roundtable Discussion October 14th:
  Algorithms and the DMCA Post–Lenz
  copyrightandtechnology.com/2015/10,
  3 weeks ago
- MT @randomfoodtruck
  @CarpeDonutNYC @carlssteaks
  @souvlakitruck @gcnyc1 –
  @Chefsamirtruck there too
  3 weeks ago

## Blogroll

- Andrew Orlowski
- Ars Technica
- Future of Copyright
- PaidContent
- Robert Levine
- The Cynical Musican
- The Illusion of More
- The Trichordist

## Archives

Select Month

Copyright and Technology is
licensed under a  Creative Commons
Attribution–NonCommercial–
NoDerivs 3.0 Unported License .

## Spam Blocked

896,604 spam

FEEDS  FULL  COMMENTS

The Regulus Theme. | Blog at WordPress.com. | Top