1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-------------------------------:
                               :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                        :
            Plaintiffs,        :
                               : Case No. 1:14-cv-1611
     vs.                       :
                               :
                               :
COX ENTERPRISES, INC., et al., :
            Defendants.        :
-------------------------------:
```

HEARING ON MOTIONS

October 30, 2015

Before:  Liam O'Grady, USDC Judge

APPEARANCES:

Jeffrey M. Theodore, William G. Pecau, Walter D. Kelley, Jr.,
John M. Caracappa, Michael J. Allan, Jeremy D. Engle, and
Stephanie L. Roberts, Counsel for the Plaintiffs

Andrew P. Bridges, Brian D. Buckley, Guinevere Jobson, and
Craig C. Reilly, Counsel for the Defendants

1              THE CLERK:  Civil action 1:14-cv-1611, BMG Rights

2  Management LLC, et al. versus Cox Communications, Incorporated,

3  et al.

4              If counsel would please identify themselves for the

5  record.

6              MR. KELLEY:  Walter Kelley on behalf of the

7  plaintiffs.  With me are Jeff Theodore, Will Pecau, Mike Allan,

8  John Caracappa, Stephanie Roberts, and Jeremy Engle.

9              Mr. Allan, Mr. Theodore, and Mr. Pecau are going to

10 split up the various arguments today.

11             THE COURT:  All right, thank you.

12             Good afternoon to each of you.

13             MR. THEODORE:  Good afternoon, Your Honor.

14             MR. REILLY:  Good afternoon, Your Honor.  Craig

15 Reilly here for the defendants, together with my co-counsel

16 Andrew Bridges, Guinevere Jobson, Brian Buckley.  And our

17 client representative, Marcus Delgado, from the legal

18 department at Cox.

19             THE COURT:  All right.

20             MR. REILLY:  Mr. Bridges will address the Court on

21 most of the summary judgment motion issues.  And Mr. Buckley

22 will address the Court if the Court is going to hear argument

23 on the motion to strike Mr. Rosenblatt's declaration.

24             THE COURT:  All right.  Thank you, Mr. Reilly.

25             Good afternoon to each of you.

1          Why don't we start with that.  I am not going to hear

2     argument on the Rosenblatt declaration.  I look at that as if

3     -- and I am going to deny the motion to strike because I

4     reviewed it.  It doesn't say anything other than I understand

5     from Cox that they do this and I think what they did was

6     reasonable.

7          And certainly it's almost like reading Nimmer or

8     Menell or Goldstein on copyright law, he is providing his ideas

9     on what he thinks is reasonable in the safe harbor area.  So

10    I've admitted it for that purpose.  It certainly wouldn't be

11    admissible testimony.  And I think that that probably was why

12    it was brought before me now versus the day before trial or

13    something.

14         There is nothing that Mr. Rosenblatt has said which

15    he has personal knowledge about.  We have got affidavits from

16    four different Cox employees who are either engineers or

17    supervisors in charge of their abuse program.  And those, of

18    course, would be the witnesses who would be relevant to the

19    safe harbor and termination decisions that were made by Cox.

20         Mr. Rosenblatt is not qualified to make judgments

21    about the law, and those are provided in jury instructions,

22    which I'm sure we'll have lots of conversations about.

23         But I equate Mr. Rosenblatt to a Commissioner of

24    Patents, Mr. Messingale -- is that right, am I pronouncing that

25    correctly -- who is going to come up and testify about how the

4

1    procedures of the Patent Office operate and how a patent

2    examiner goes about his business.  That is never admitted here

3    in this court.  I don't think it's of assistance.  And although

4    he may be qualified as an expert to talk about the Patent

5    Office procedures, when he gets into substance it's just his

6    view.

7           So in terms of whether you thought perhaps Mr.

8    Rosenblatt would be a witness at trial, he won't be.  But his

9    declaration is accepted for today.

10          As I said in my order earlier this week, I think one

11   of the summary judgment motions concerns the ownership issue,

12   and I asked for further briefing on Round Hill, that entity.

13   And that I will get next week, I hope, and I will further

14   consider that.

15          But I otherwise find that the plaintiff has

16   demonstrated ownership over the other works.  And I believe

17   that's an issue that the Court decides as a matter of law, and

18   I don't think there is any argument about that, but I find that

19   BMG is entitled to bring the action against Cox as to at least

20   the works that I haven't identified as requiring further

21   briefing.

22          There was minimal briefing on the damages issue or

23   the unclean hands.  I don't know whether you wanted to argue

24   that today.  I will hear briefly if you do.  But I really think

25   that we ought to talk today about the safe harbor provisions

1    and that statute and some of the things that it lacks.

2            And also whether the standard of infringement is

3    going to include "making available" as a means of proving

4    infringement.

5            I will give you an opportunity to convince me

6    otherwise, but I don't think that the Hotaling case out of the

7    Fourth Circuit is applicable in this electronic world.

8            I think that the judges in Massachusetts and Arizona,

9    I guess, in London-Sire and Atlantic Recording I think got it

10   right in that it should be limited to the library context, the

11   physical world that they were dealing with in that case.

12           And I think when we're dealing with file-to-file

13   sharing and the presence -- the possession of these copyrighted

14   works in the electronic area, I think that "making available"

15   is inconsistent with the language of the statute itself, which

16   requires distribution.  Not publication, but distribution.

17           I also will give you an opportunity to briefly

18   convince me why "material objects" does not include electronic

19   files because they're not tangible physical files, but I think

20   that the Act does include electronic files.

21           And then we'll talk about the safe harbor.

22           So who wants to argue the "making available" issue

23   for BMG, I'll hear from you first.

24           MR. PECAU:  I am, Your Honor.  It's Will Pecau for

25   BMG.

1          THE COURT:  All right.

2          MR. PECAU:  So, Your Honor, the "making available,"

3  just for a clarification purposes, Your Honor, the "making

4  available" provision isn't only what BMG is relying on.

5          And as the London-Sire case pointed out, Your Honor,

6  the fact that these electronic files are made available by the

7  various Cox subscribers for copying on BitTorrent can be seen

8  as -- can be determined by evidence by the jury that in fact

9  not only are the files made available, but because of the way

10  BitTorrent works, that there is copying and distribution as

11  well.

12          THE COURT:  And I acknowledge that, and I believe

13  that there is a circumstantial way of proving infringement.

14  And that was going to be the second prong of my questioning,

15  was how does BMG intend to prove circumstantially that there

16  has been distribution if merely the availability of the

17  copyrighted work is insufficient?

18          So if you want to address that now, that's fine.

19          MR. PECAU:  I would be happy to do that, Your Honor.

20  Well, there is lots of evidence to show that there actually has

21  been distribution.  Direct evidence of it is that Rightscorp

22  downloaded 100,000 full copies of musical compositions that the

23  plaintiffs claimed even before the case was brought.  So that's

24  a --

25          THE COURT:  Where did that come from?

1          MR. PECAU:  Where did that come from?

2          THE COURT:  That same from not Cox, but from

3    customers of Cox?

4          MR. PECAU:  Right.  Yeah, what it was, Your Honor, is

5    that one of the things that Rightscorp can do, they have these

6    bit torrent files --

7          THE COURT:  Right.

8          MR. PECAU:  And it can determine from those bit

9    torrent files whether Cox subscribers are seeding the various

10   songs.  Which means that they have the files, they have the

11   files in their computers, and they're letting the swarms come

12   in and take these files of the plaintiffs' musical works.

13         THE COURT:  That's making available?

14         MR. PECAU:  Right.

15         THE COURT:  All right.  So I understand that.  Where

16   is the evidence that goes beyond that?  And dig down for me so

17   I understand how a trial would go.

18         MR. PECAU:  All right.  So one of the things that

19   Rightscorp did to confirm that in fact full files were being

20   made available, full files of the plaintiffs' compositions, is

21   that it was able by means of tracking these bit torrent files

22   made available by Cox subscribers, that they could go onto that

23   pier, to the Cox subscribers' files and actually download the

24   entire song.  And they did that 100,000 times.

25         Obviously, they didn't do it for 1.8 million times

8

1    because just the amount of computer memory that it would take

2    would be too much.  But to confirm that their system actually

3    worked, that's what they did.  And our expert confirmed that

4    that's what they did and it was successful.

5          So that is direct evidence of actual distribution by

6    Cox subscribers.  That's one thing.

7          The other thing is that --

8          THE COURT:  Do you have evidence that third parties,

9    not investigators -- and I understand <u>Arista Records</u> and Judge

10   Woods' findings on that, but do you have evidence that third

11   parties went on and obtained those copyrighted works from the

12   subscribers' files?

13         MR. PECAU:  Well, Your Honor, I think that --

14         THE COURT:  I'm not saying it's necessary, but I am

15   kind of curious.

16         MR. PECAU:  Well, I don't think we have any evidence

17   that third -- we didn't get any evidence that third parties

18   actually downloaded the entire files, but we do have evidence

19   that looking at the hash values of the bit torrent files that

20   the Cox subscribers had -- and you know, Your Honor, from

21   reading all these papers that those things are like

22   fingerprints, that they show exactly whether the file was one

23   of the plaintiffs' musical compositions.

24         What our experts have determined from that, and I

25   think Mr. Boswell as well, who is a Rightscorp employee, what

1    they determined by looking at this was that actually some of

2    the hash values that Cox subscribers had were exactly the same.

3    Which meant that those Cox subscribers had gotten that material

4    and had shared that material through a bit torrent.  So that's

5    additional evidence that occurred.

6            Of course, Your Honor, I already referred to the

7    circumstantial evidence itself that just the nature of bit

8    torrent, the way it works, that once you start downloading

9    material as a leecher, you automatically become a seeder as

10   well.  So that the bit torrent files are going up and down at

11   the same time.

12           And that information alone, based on the fact that,

13   as the London-Sire court pointed out, the fact that this stuff

14   is made available, that these folks did everything up to -- I

15   mean, the evidence showed everything up to distributing it,

16   that direct evidence, the circumstantial evidence is more than

17   enough for a jury to conclude that there was actual

18   distribution and copying going on in a massive scale.

19           Now, moving to the question that you raised, Your

20   Honor, initially, and that is whether "making available" alone

21   would be sufficient for copyright infringement and would

22   violate the distribution rights in section 106(3).

23           As Your Honor knows, the Hotaling decision actually

24   has been followed by other courts in the digital context.

25           THE COURT:  Right, that's the Sony BMG case?

10

1          MR. PECAU:  Right.  And the rationale of Hotaling

2  certainly makes sense in the digital context as well.  I mean,

3  one of the reasons that the Court found that the copyright

4  owners' rights were infringed by this "making available" is

5  because the library didn't keep records of who actually saw it.

6          Well, we have the same problem here.  And you do have

7  the same problem in the digital context.  Is that, you know,

8  for example, Cox has actually destroyed the subscribers' names,

9  so that's not available.  And Cox is a gatekeeper of those

10  subscribers' names.  So it's not available.  So that's one

11  reason why it makes sense to have a broader view of this

12  distribution right.

13          Now, Your Honor knows, of course, that Congress has

14  thought that the distribution right included making available.

15  And that's why it didn't change the statute when the United

16  States became a signatory of the WIPO Copyright Treaty.  And

17  the Copyright Office had that same view.  And I think the most

18  persuasive thing is Professor Nimmer and Professor Menell who

19  actually went back into the history of the Copyright Act and

20  determined through exhaustive analysis that the whole point of

21  the use of the word "distribution" was to include publication,

22  which, of course, traditionally included "offers for sale" as

23  well.

24          THE COURT:  Yeah, but they make the argument for both

25  sides.

1            MR. PECAU:  Right.

2            THE COURT:  Especially Menell.  And he just goes

3    through, well, back in the '80s and '90s, the Court said this

4    and then in the 2000s the Court says that.  And what I think is

5    that, you know, distribution is the equivalent of publication

6    and, therefore, "making available" is sufficient.  But the

7    statute doesn't say that, of course, and that's my problem, is

8    in a literal reading without using those professors -- you

9    know, what am I looking at on a piece of paper?  That's the

10   problem.

11           MR. PECAU:  Well, the word "distribution" is

12   ambiguous.  And as Menell pointed out, that it could mean lent.

13   And lent could be, for example, you know, he lent his influence

14   to other people.

15           So, I mean, lending could have a broad meaning, and

16   distribution can have a broad meeting as well.  I mean, other

17   courts in very similar contexts, I think it was the Seventh

18   Circuit -- I think it was either the Seventh or the Eighth

19   Circuit was looking at the term "publication" in terms of the

20   criminal act, which virtually uses the same words.  And they

21   determined that publication -- I mean, that distribution

22   clearly included publication.

23           So even in that context, publication and distribution

24   were determined to be the same thing.  And I certainly think

25   that with the precedence in this court, in the Fourth Circuit,

1  combined with all this other authority, that Your Honor should

2  find that "making available" is a violation of a copyright

3  owner's rights under the Copyright Act.

4          THE COURT:  Okay.  Thank you.

5          MR. PECAU:  Thank you.

6          MR. BRIDGES:  Good afternoon.  Thank you, Your Honor.

7          THE COURT:  Certainly.

8          MR. BRIDGES:  I would like to start at first with

9  principles, very first principles of copyright law.  It is a

10  federal statutory tort, and Congress has defined the rights of

11  a copyright holder in section 106(3).  And Mr. Pecau said that

12  it's vague or ambiguous, I don't know if he suggested it's

13  unintelligible.  That is the prerequisite for looking at

14  legislative history the way Professor Menell did.

15          What is interesting is Professor Menell persuaded

16  David Nimmer to change Nimmer on Copyright.  David Nimmer is

17  the son of the father/son pair who are the author.  And I think

18  the father started out the other way, Goldstein is the other

19  way, Patry is the other way.  It could be an academic debate,

20  but I am not here, Your Honor, to engage in an academic debate.

21  I am here to construe the law and to try to explain the law.

22          I would like to put on the screen, if I may, the text

23  of the law.

24          THE COURT:  You go ahead and handle the case the way

25  you want to this afternoon.  I have obviously looked at the

1   statute, but go ahead.

2          MR. BRIDGES:  Right.  I would like to have it up

3   there because --

4          THE COURT:  Whatever you want to use is --

5          MR. BRIDGES:  I appreciate it.  If would we could to

6   the next -- section 106 has the three different -- I am sorry,

7   has six different right of the copyright owner.

8          I would like to go to the next slide, please, because

9   this actually has four elements.  The first element is the

10  action, it's "to distribute."  It is an act.  It is not an

11  offer to distribute.  It is not a state of readiness.  It is

12  the verb "to distribute."

13         Then there is an object of the act, "copies or

14  phonorecords."

15         Section 101 of the Copyright Act has all the

16  definitions, and it defines "copies" and "phonorecords" as

17  material objects.  And it does also refer to "fixation in a

18  tangible medium of expression."

19         And "to the public" is an element, but I won't

20  belabor that here.

21         And then there is the phrase that I haven't heard the

22  other side address ever, "by sale or other transfer of

23  ownership, or by rental, lease, or lending."

24         And that means that there are four elements here.

25  One is the act.  One is the recipient to the public.  One is

1    the object.  And one is the transactional requirement.

2            And actually, the transactional requirement here

3    reinforces the material object nature of copies and

4    phonorecords because this aims at material objects and their

5    movements in commerce.

6            And there have been several arguments as to why that

7    should not apply.  One is the WIPO copyright treaty.  And the

8    question is, does this language need to be interpreted

9    differently or expanded to meet international obligations.  The

10   argument is, should we not apply the statute as Congress wrote

11   it because we have some international obligations?

12           I would like to put up, if I may, the WIPO copyright

13   treaty because what's interesting is that in the WIPO copyright

14   treaty there is an article called the Right of Distribution, it

15   is Article 6.  And the Right of Distribution talks about the

16   making available of the originals and copies of their works --

17   it's right here on the screen now.  The making available to the

18   public of the original and -- I'm sorry, I touched the screen

19   and I have made marks on it, I didn't mean to -- of the

20   original and copes of their works through sale or other

21   transfer of ownership.

22           So the WIPO treaty, where it talks about distribution

23   is actually narrower than U.S. copyright law.  That's why we

24   don't need to change U.S. copyright law to meet this "making

25   available" that relates to distribution.

1          And if we can scroll down to the Agreed statement --

2     it's all the way at the end, I think.  The Agreed statement is

3     an explanation, it's a commentary on what these terms mean.

4     And the Agreed statement on Article 6 -- there we go.  Oops,

5     oops, up please.  Right there in the middle.  As used in these

6     articles, the expression "copies" and "original and copies"

7     being subject to the right of distribution and also the right

8     of rental refer exclusively to fixed copies that can be put

9     into circulation as tangible objects.

10          So the WIPO treaty in fact reinforces the material

11     object and the transactional requirement of section 106(3).

12          Now, there is a little sleight of hand that is going

13     on among those industries that really want to expand it.  And

14     the sleight of hand is that Article 8 of the WIPO copyright

15     treaty is the right of communication to the public.  But that

16     in fact corresponds to our right of public display and right of

17     public performance.  And the language there tracks the

18     language -- the definitions of "public performance" and "public

19     display" in section 1 of the Copyright Act.

20          So if one looks at the statutory language, there is a

21     material object requirement and a transaction requirement.  If

22     one looks at the WIPO treaty, there is a material object

23     requirement and a transaction requirement.  And then if one

24     looks at Nimmer father and Goldstein and Patry and Agee versus

25     Paramount and National Car Rental, there was long agreement

1    until recently fueled by Menell.

2            And if you look at Menell's article -- Peter and I

3    are friends, we've talked about this a fair amount.  The

4    motivation in Menell's article is, well, it's just so hard to

5    prove a violation.

6            I'm not here to argue that transmitting files over

7    the Internet is not a violation.  It's not a violation of the

8    right of distributing copies or phonorecords to the public by

9    sale or other transfer of ownership, or by rental, lease, or

10   lending.

11           It would be a violation, if at all, of the

12   reproduction right when somebody receives the file.  And

13   somebody who sends the file is the contributory infringer of

14   the reproduction right when the person who receives the file

15   stores it, because that's the reproduction.  So there is no

16   need to expand this to make -- to make sure that these things

17   are infringing.

18           What it does do is it imposes on plaintiffs an

19   obligation to prove their case.  And if they're going to allege

20   contributory infringement of the reproduction right, then they

21   need to prove a reproduction.  And then they need to prove

22   contribution to that reproduction.

23           And we're in an environment where people say, we

24   don't want to have to prove an actual reproduction.  We want to

25   show that somebody had it and that's good enough.

1          And then there was one last comment Mr. Pecau made.

2   I think he was referring to section 506 of the criminal statute

3   that refers to a particular criminal violation in terms of

4   distribution and reproduction of works prepared for

5   distribution.  And what is notable is that that section, it's

6   in section 506, I don't know that we have it -- by the way, in

7   our reply brief there is a statutory appendix at the back.  We

8   thought it useful to have a statutory appendix for the Court so

9   that we can all stay focussed on the statute.

10          Section 506(a)(1) talks about -- the violation that

11  they said shows that it's "making available" is 506(a)(1)(C).

12  It says, "distribution of a work being prepared."  It doesn't

13  say, "distribution of copies or phonorecords by sale or other

14  transfer of ownership, rental, lease, or lending."

15          Congress knows how to make these fine distinctions.

16  Congress has people crawling all over it to change copyright

17  law the way various interests want Congress to change copyright

18  law.

19          So my point here, Your Honor, is I think the statute

20  is absolutely clear.  I think that the WIPO treaty absolutely

21  reinforces the clarity of the statute.

22          And one other thing.  If one expands this concept,

23  then if really facilitating a reproduction is now a

24  distribution, it's actually going to upset commercial relations

25  because people get licenses to do certain things.  And they may

1   get licenses to make a reproduction or to authorize a

2   reproduction.  But if authorizing a reproduction or making a

3   reproduction is now also a distribution, then licenses that

4   cover one may not cover the other.

5          There is no need to create a redundant interpretation

6   of section 106(3).  So that's my point on that, Your Honor.

7          I will say, the Hotaling case, very interesting case,

8   and one understands the reasoning behind it, but it was a

9   material object, and it was a lending institution.  And

10  material object, it was a copy, the microfiche is a material

11  object in which the work is fixed.  And it dovetails with the

12  transactional requirement, a sale or other transfer of

13  ownership or by rental, lease, or lending.

14         And to me, the hard question there is, was use of a

15  form of lending?  And the Fourth Circuit seemed to think that

16  it was there.  It also did acknowledge that it's construction

17  of 106(3) was affected by the concern about prejudice in that

18  case.

19         I would like to say one thing because they said that

20  Cox destroyed records or whatever.  We have been through that

21  with Judge Anderson.  And Judge Anderson has addressed their

22  concerns.  They got from Cox a number of records about

23  subscribers.  They got I think 138 or 139 records of

24  subscribers.  And they had an opportunity to subpoena them, to

25  question them.  They got one declaration back that was

1    completely unhelpful for them.

2           And I don't know if they contacted 139 and got

3    nothing as well, but they had an opportunity.  And courts

4    regularly have opportunities to find out what customers know

5    about what's going on.  And maybe they -- I don't know what

6    they did.

7           One last point.  Your Honor, Mr. Pecau kept referring

8    to subscribers and actions of subscribers.  There is absolutely

9    no evidence in this case about what Cox subscribers did.

10           Their expert, Mr. Bardwell, defined a subscriber as

11   an Internet node.  And there are a number of cases, the 2015

12   Malibu Media case, the VPR case, other cases have made it clear

13   that actions or states attributed to IP addresses cannot

14   necessarily be attributed to subscribers.

15           And that's one of the problems here.  There are many

16   ways by which nonsubscribers -- it could be the babysitter who

17   comes every Friday, it could be open wireless, there are so

18   many ways --

19           THE COURT:  Well, when you have 100,000 of them, what

20   does that mean?

21           MR. BRIDGES:  Your Honor, it doesn't --

22           THE COURT:  Is that circumstantial evidence that a

23   jury can consider?  I mean, each of these computers has an

24   individual address, and Cox keeps the records by -- or

25   Rightscorp identifies the receiver by the address of the

1    computer.  Cox had but no longer has many of the subscriber

2    information which would identify the subscriber to the computer

3    that was identified by Rightscorp.

4         But I mean, what's the burden on plaintiff in a case

5    like this?  Do they have to do anything more than just identify

6    the massive amount of computers that are subscriber or

7    subscribers to Cox and that Rightscorp can identify downloaded

8    this material?  What's your position on their burden?

9         MR. BRIDGES:  Well, first I need to make one factual

10   clarification, and then I will come back to their burden.

11        THE COURT:  Okay.

12        MR. BRIDGES:  The factual clarification is that Cox

13   does not identify computers to subscribers.  Cox identifies

14   modems and access points to the Internet to subscribers.

15        THE COURT:  So is there a disconnect between what

16   Rightscorp did and how Cox identifies its subscribers?

17        MR. BRIDGES:  Well, Cox knows who is paying for

18   Internet access that is associated with a particular modem.  It

19   doesn't know who is using that modem.  It could be babysitters

20   coming on Fridays.  It could be neighbors next door.

21        I think we got -- I mean, when the personal

22   information -- when we release personal information and warned

23   people that we were divulging their names, we got a letter from

24   a 60-year-old retired school teacher who says, I don't know

25   anything about BitTorrent and I could care less about One

1   Direction.  And these --

2          THE COURT:  We're getting out of field.  You answer

3   my question and then we'll move on from there.  As you

4   understand it, how is BMG using Rightscorp's software going to

5   identify the computers who were found to possess copyrighted

6   work and can tie them to Cox as the ISP?

7          MR. BRIDGES:  It discerns an IP address, the access

8   point of whatever resources they were looking at.  It then

9   easily looks up and sees that that is an access point

10  associated with Cox.

11         The way you then do it is if you think that person is

12  an infringer, as in Hard Drive Productions, you file a lawsuit

13  against the alleged infringer as a John Doe and you subpoena

14  the ISP for the information.  Then you find out who the

15  subscriber is.  And then you --

16         THE COURT:  That is Malibu Media, that's what they

17  did.  BMG did not do that here.  And what they did was to

18  identify these hundreds of thousands of IP addresses of

19  computers.  And you're using the word "modem" to define how Cox

20  identifies its subscribers versus the computer, and I'm

21  confused about that.

22         MR. BRIDGES:  Your Honor, getting all electronics

23  into this courthouse, but some courthouses have wireless

24  networks.  Those wireless networks converge on a modem.  And

25  Cox knows --

1          THE COURT:  Right.  We have one, we're just not

2     allowed to use it.  I understand what a modem is.

3          MR. BRIDGES:  Right.

4          THE COURT:  But Cox can identify a subscriber's

5     computer, can it not?

6          MR. BRIDGES:  No, Your Honor.  No, Your Honor, it

7     cannot.  That's the problem.  As a matter of fact, all it can

8     do is identify whose name and address are on the account that

9     corresponds to that modem's access to the Internet.  And then

10    who accesses that --

11         THE COURT:  You get a notice from somebody other than

12    Rightscorp which doesn't have a demand in it, and you send it

13    out to a customer.  How do you determine who the customer is?

14         MR. BRIDGES:  Because when they tell us what the IP

15    address is at a certain time, we can find out whose modem it

16    was.  And we send the notice to the person whose modem was

17    associated with that IP address.  And we have no clue --

18         THE COURT:  So it is not something you do until you

19    get a notice of infringement?

20         MR. BRIDGES:  That's right, Your Honor.  Well, we

21    know -- well, it has billing records in its account system.  It

22    says, this -- there are a couple of different things that come

23    together.

24         THE COURT:  In the commercial environment, there may

25    be lots of computers hooked up to one modem.  In a home, maybe

1    just one.

2           MR. BRIDGES:  Your Honor, in a home it may be eight

3    or ten.  It may be -- when I'm at home with my family, I would

4    say we probably have at least six or seven devices on the modem

5    at once, my wife, and myself, and two kids, and I actually put

6    my phone into the wireless network, and others do.  And then we

7    don't have a video cam at home, but that might go into the

8    modem.

9           And when I go home and I look up and connect to

10   wireless, I get an option of about four different wireless

11   networks.  Only one is mine.  There are others there.

12          THE COURT:  Right.

13          MR. BRIDGES:  And just to bring this point home.

14   Rightscorp early on in a different aspect of its argument -- or

15   the plaintiffs were arguing that Cox had knowledge of their

16   Dashboard because they had evidence of access to their

17   Dashboard.

18          THE COURT:  Dashboard, what's Dashboard?

19          MR. BRIDGES:  Sorry?

20          THE COURT:  Define Dashboard as you're using it.

21          MR. BRIDGES:  Their Dashboard was a Web site that

22   they said they created and offered to Cox so that Cox could

23   come and see all this information that they wanted Cox to read.

24   And they said that they believed that Cox accessed their

25   Dashboard because they tracked it to a Cox IP address.  And,

1    therefore, they really believed -- and they were sending

2    discovery and they thought it was coming from Cox.

3           And we asked them -- we in the statement of material

4    facts, I think it was the statement of material facts, or was

5    it and admission -- but anyway, they admitted at one point --

6    or they refused to admit that they had no evidence that Cox

7    accessed the Dashboard.  And they said the evidence was there

8    access from a Cox IP account.  That's their evidence for why

9    Cox accessed it.

10          But you know what it really was?  It was an IP

11   account associated with a Ritz Carlton Hotel in Laguna Niguel,

12   California on the very day that Rightscorp's principles were

13   making an investor presentation at that hotel.  So Rightscorp

14   is there accusing Cox of seeing its Dashboard from an IP

15   address that it appears that Rightscorp was using that day.

16   That's the key problem.

17          What is the proper way for a copyright holder to

18   proceed?  It's a standard procedure.  If you think there is an

19   infringer out there, a significant infringer, you file a John

20   Doe lawsuit and then you track it down properly.  And that has

21   not happened here.  And it is something that could be done.

22          And that's not to -- it's a different part of the

23   case, but Cox would be sending these notices on if the notices

24   were different.  Cost has not been trying to interfere with

25   this.  Cox is sending notices on for countless other copyright

1    holders.  So it is a self=created problem on Rightscorp's part.

2    There would be ways to accomplish this goal, but Rightscorp and

3    the plaintiffs have avoided every reasonable way of

4    accomplishing the goal.

5              THE COURT:  All right.  Thank you, sir.

6              MR. BRIDGES:  Thank you, Your Honor.

7              MR. PECAU:  Your Honor, may I --

8              THE COURT:  Yes, you may reply.

9              MR. PECAU:  We went pretty far afield.  Can I address

10   a number of these things?

11             THE COURT:  Address whatever you would like to.

12             MR. PECAU:  Thank you, Your Honor.  Well, first of

13   all --

14             THE COURT:  Well, within the infringement --

15             MR. PECAU:  Right, he went all over the place.  Well,

16   first of all, I would like to start with this idea of

17   distribution.  And the thing is, when you think about what

18   distribution is, distribution also includes -- and I think

19   Alexandria is like this, but I know Washington, D.C., and New

20   York is like this, you have free newspapers.  Right?  They

21   stick them in one of those bins, people walk by, they pick it

22   up.  But putting the papers in the bins for picking up, that's

23   distribution.

24             And also, we talked about lending.  I did mention

25   lending before, but I'll mention it again.  So what happens in

1    the digital world, what we have evidence of the Cox users

2    doing, in addition to all the other circumstantial evidence and

3    direct evidence that we have, we have evidence that just like

4    putting newspapers in a bin for outside, what they do here is

5    each of these Cox subscribers, they put the file -- plaintiffs'

6    works, into a bin, into a file, that's available for people to

7    walk by and pick it up, and that's lending.

8              And the thing is, Your Honor, you know, if you think

9    about a newspaper, that's pretty easy.  You know, you have like

10   a half a dozen newspapers, you put in a bin somebody, can pick

11   it up.

12             The real danger here, the real evil that is

13   occurring, the amount of massive theft that is going on is that

14   when one of Cox's subscribers puts it's in their file, in that

15   bin, everybody in the world can steal that music.  And that's

16   what's happening.  And that's why it's a distribution.  That's

17   why it's a lending.  And that's why it violates the copyright

18   law.

19             Now, Cox in their statement referred to WIPO.  And

20   they only refer to section 6, and then quoted section 6, but

21   they didn't show you, Your Honor, section 8.

22             Can we put up section 8 of the WIPO?  That's Article

23   6.  Now let's go to Article 8, please.  Well, that's great,

24   thank you.

25             Now, in the case Your Honor referred to before in

1    which the court went through the history, the significance of

2    WIPO, the court said, look, clearly in WIPO there is a making

3    available right.  And the making available right does appear in

4    two places.  One in Article 6, which Cox's attorney referred

5    to, and the other is in Article 8.

6         And Article 8, everybody knows what Article 8 means.

7    Article 8 means that authors of literary and artistic work

8    shall enjoy the exclusive right of authorizing any

9    communication to the public of their works by wire or wireless

10   means.  And that clearly includes digital availability.

11        Okay.  Then the other thing, and I think this is a

12   supremely important point here, is Cox's argument that the

13   distribution right and the reproduction right doesn't include

14   copying or distribution of digital works.  I mean, this is just

15   wishful thinking of a copyright infringer.

16        It is settled law that the distribution of digital

17   copies of copyrighted works is copyright infringement.  That's

18   Grokster, the Supreme Court, that's Napster, London-Sire, every

19   court who has ever considered this issue has determined that if

20   you are making available for distribution or if you're copying

21   digital works, you're infringing copyrights.

22        Now, the only way Cox can make its argument is by

23   truncated definitions.  So Cox refers to material objects.  And

24   can we go to the definition of "copies," please, in the

25   copyright law.  And this is in section 101.

1          THE COURT:  So we're out of WIPO now?  We're talking

2    about --

3          MR. PECAU:  We're out of WIPO.  We're back in the

4    United States, Your Honor.  Okay.

5          Copies are material objects, that's true.  But what

6    is a material object in copyright law?  It's anything from work

7    -- a work may be perceived, reproduced, or otherwise

8    communicated, either directly or with the aid of a machine or a

9    device.  And what that means, it includes copies that can be

10   made with computers.  All right.

11         Now, Cox's attorney also referred to tangible.  You

12   know, that things have to be fixed in a tangible medium.

13   That's true, but that's not the entire definition of "fixed."

14   Can we go to the definition of "fixed," please.

15         Okay.  A work is fixed in a tangible medium of

16   expression when its embodiment in a copy or phonorecord -- and

17   I will do some ellipses here -- permitted to be preserved,

18   reproduced, or otherwise communicated for a period of more than

19   other than a transitory duration.

20         So what happens when these Cox subscribers are

21   putting files on their computer, Your Honor?  They are allowing

22   these -- they are fixed at that point because they can be

23   copied.  And that's the whole point of this suit and bit

24   torrent, massive copying.

25         All right.  So the next thing that we had moved over

1   into was Cox's argument that because BMG and Round Hill --

2   because of the nature of technology, and because Cox is a

3   gatekeeper of the names, do not know the names of the

4   subscribers or the users who are using its system.  But the law

5   is absolutely clear that you don't have to identify the name of

6   each individual when you're dealing in secondary liability

7   cases.  That's the whole point of secondary liability cases.

8   All you have to show is that users of Cox's services are

9   infringing plaintiffs' copyrights.

10          You don't have to identify each of the users.  You

11  have to show that it's going on, and then you have to satisfy

12  the elements, obviously, of contributory infringement and/or

13  vicarious liability.

14          THE COURT:  So how are you going to show that these

15  are users?

16          MR. PECAU:  Well, Your Honor --

17          THE COURT:  You have got IP accounts.

18          MR. PECAU:  Right.

19          THE COURT:  And you don't have subscriber

20  information.  And you have got lots and lots of IP accounts.

21          MR. PECAU:  Right.

22          THE COURT:  Just by numbers circumstantially?

23          MR. PECAU:  No, no, no, Your Honor.  Let's talk a

24  little bit about what's going on and what Rightscorp can

25  identify with these bit torrent files.

1          THE COURT:  Please.

2          MR. PECAU:  So what it's identifying with the bit

3    torrent file is through what we had discussed before with the

4    .torrent files.  What Rightscorp can identify and what it

5    advises Cox is the IP address, the computer port, the name of

6    the musical composition, and the date and the time that it took

7    place.  Okay.

8          With the IP address and the port, Cox knows the

9    modem, they know the subscriber through which that

10   information -- which files they're making available.

11         Now, it doesn't really make any difference who the

12   user is.  It's the fact that it's the subscriber, and Cox has

13   control over that subscriber and the folks that use it.

14         And in fact, if you look at its acceptable use

15   policy, Cox itself says that as a subscriber you're responsible

16   for all the stuff that you're pushing through our service.  I

17   mean, that's what they require.

18         And the law itself doesn't distinguish between

19   subscribers and users.  It says that if your system is being

20   used to enable this kind of infringement, you have knowledge of

21   it and you have control over it, which they certainly do, you

22   have a responsibility to do something.

23         And Cox clearly knows the folks that are doing that.

24   Even in the few instances where it actually does something, you

25   will see lists of, under a particular subscriber, lists of all

1    the infringement over the years, the chronic copying, making

2    available that these folks are doing, and that they are never

3    terminated.

4            So Cox knows the subscribers, they know what's going

5    on, and this case is really about them choosing to do nothing.

6            So let's see what else.  I mean, there are so many

7    things that you guys covered.  Let's see.  So we covered

8    lending.  All right.

9            I think I covered all of the things -- oh, we talked

10   about the Dashboard, Your Honor asked about the Dashboard.

11   That's the last thing I'll discuss.

12           What the Dashboard is is that Cox makes -- I'm sorry.

13   Rightscorp makes available to the ISPs to whom it sends these

14   infringement notices a Dashboard, which actually you can search

15   and you can summarize and you can see for each one of those IP

16   addresses the amount of infringement that's going on, the song,

17   and all the rest of that stuff.  It's searchable and you can

18   look at it.

19           And in every single one of the notices of

20   infringement that Rightscorp sent to Cox, in that it said,

21   well, here is a notice, this is what this person is doing or

22   this subscriber, and you can go back and look at our Dashboard

23   and you can see all the times that they're doing this.  All

24   right.

25           Now, Cox says that they didn't look at it.  And, you

1    know, they probably didn't look at it, and that is part of

2    their knowledge here.  It's the willful blindness that fits

3    with their refusal to accept any of these notices.  That they

4    had this available take a look at to see if, oh, are these

5    folks really repeat infringers?  How long have they been doing

6    it?  It's right there.

7              And what they did is that they chose not to look at

8    it.  That is exactly what we're saying, they didn't look at it.

9    You know, whether they looked at it once or they didn't look at

10   it at all, it's all the same thing, it's part of their willful

11   blindness.

12             Thank you, Your Honor.

13             THE COURT:  All right, thank you.

14             MR. BRIDGES:  Your Honor --

15             THE COURT:  Very briefly.

16             MR. BRIDGES:  I think it would be very useful if we

17   could bring up one of the notices.  We can see what the

18   plaintiffs were referring to.

19             And this is the first form of notice, a form of

20   notice from BMG.  This actually was not even directed at Cox

21   particularly.  Later they changed their form to try to make it

22   look obviously to Cox, but they wanted Cox to send these on.

23   And it says:  Your ISP has forwarded you this notice.  And then

24   it goes on to say:  Your ISP account.  Your account.

25             Now, what did they accuse the account of doing?

1   Well, they didn't really say.  They said it's been used to

2   download, upload, or offer for upload.

3           THE COURT:  Well, then it specifically goes to, you

4   know, this is Bruno Mars' song, it has been infringed by a

5   computer at an IP address.

6           So I have seen these, I have seen lots of them.

7   What's your point?

8           MR. BRIDGES:  My point is, an offer for upload, Your

9   Honor, is not a violation of copyright law.

10          So to begin with, when Cox got these, among other

11  things --

12          THE COURT:  Well, it says, you've infringed.  It's

13  not a legal document.  It's a notice that they believe that the

14  customer of the ISP has infringed their copyrighted work.

15          MR. BRIDGES:  That's correct, Your Honor, but in

16  coming back to what is the underlying infringement, because

17  that's where we started out, whether it's making available or

18  whatever --

19          THE COURT:  You know, this is not the document to use

20  for that.

21          MR. BRIDGES:  I understand that, Your Honor.

22          THE COURT:  All right.  So again --

23          MR. BRIDGES:  When we get to knowledge, virtually all

24  cases require actual, specific knowledge of specific

25  infringements, and that doesn't meet it.

1          And then when he talks about willful blindness --

2          THE COURT:  Well, we're going to talk about that in

3     the safe harbor arguments.

4          MR. BRIDGES:  I will sit down for now.

5          THE COURT:  Okay.  Thank you.  Go ahead.

6          MR. PECAU:  Your Honor, I'm sorry, this is very

7     quick.

8          THE COURT:  Yes.  You need to come to the podium

9     though so we make sure we get this down on the record.

10         MR. PECAU:  I apologize, Your Honor.

11         Your Honor, I just want to point out that at one

12    point when the parties were discussing this, back in I think

13    2011, Cox sends to Rightscorp what they would like as a sample

14    notification.  And it's interesting because it's almost exactly

15    what Rightscorp says.  It says -- this is what they suggested

16    that Rightscorp have in its notification:  It has come to our

17    attention that Cox Communications is the service provider for

18    the IP address listed below from which unauthorized copy and

19    distribution (downloading, uploading, file serving, file

20    swapping, or other similar activities.)

21         And that's pretty much what we have in ours.

22         THE COURT:  Okay.  Again, this doesn't go to any

23    legal issues that we're addressing today.

24         MR. PECAU:  Okay.

25         THE COURT:  It's just background on how long you've

1   been fighting and disagreeing.

2          MR. PECAU:  Thank you, Your Honor.

3          THE COURT:  All right.  So let's talk about safe

4   harbor.  We have had conversation about how specific the Act

5   is.  What a wonderful Act.  And we get to the safe harbor

6   provision, and it doesn't define any of the meaningful terms.

7   And so, I think it's a little less laudable than you all think.

8          So we have the safe harbor provision.  We have on the

9   one hand Cox getting the notices and saying, we're not going to

10  send them.  They obviously have a policy.  They have

11  implemented the policy.  I have got four different affidavits

12  from everybody who is, one, in charge of the program, down to

13  Mr. Beck who had a fun time trashing the Digital Act and

14  professing that they weren't going to adhere to it and they

15  weren't going to terminate anybody because they need the

16  subscribers.

17         So it seems to me that these are issues of fact which

18  have got to go to a jury.  And whether there was appropriate

19  circumstances, whether we have repeat offenders, whether their

20  violations were repeated or flagrant, those are issues that I

21  think a jury may have to decide.

22         And then we go to what did Cox do in terminating.

23  And then all of a sudden, what's reasonable in the termination.

24  And we then cross over to issues such as, you know, are

25  accusations sufficient, or do they have to be adjudicated

1    infringers, and that may be relevant.

2         So I see an awful lot of room here for factual

3    decisions that a jury needs to make.  So those are some of my

4    thoughts on it.

5         It's BMG's motion.  Do you want to go first?  Go

6    ahead.  And I'm sorry, your name again?

7         MR. THEODORE:  I am Jeff Theodore, Your Honor, on

8    behalf of the plaintiffs.

9         THE COURT:  All right.

10        MR. THEODORE:  And I understand where you're coming

11   from, Your Honor, but let me try to persuade you otherwise.

12        THE COURT:  Okay.

13        MR. THEODORE:  I think that the critical point in

14   this case is that the essential facts, the facts -- when you

15   boil it down to whether or not Cox terminates known repeat

16   infringers, I think it's actually undisputed that they don't.

17        And there are two time periods to divide this into.

18   So they really sort of switched their policy in the fall of

19   2012.  So let me talk about up until the fall of 2012, and then

20   from the fall of 2012 to present.

21        THE COURT:  Whether perhaps they should be precluded

22   from using the safe harbor affirmative defense until 2012?

23        MR. THEODORE:  That's right.  I mean, you certainly

24   could-- we think that they should be precluded in both cases,

25   but we think at a minimum you could do one or the other.

1           So up through 2012, I really don't think that there

2    is any genuine dispute that they were not terminating.  And

3    that's the period where they were as a matter of policy

4    reactivating allegedly terminated subscribers in order to claim

5    terminations for purposes of the DMCA.

6           So let's take a look at Exhibit 20 to the Theodore

7    declaration.

8           THE COURT:  Whose declaration?

9           MR. THEODORE:  The Theodore declaration, Your Honor.

10          So let's go to -- so if we go down to the first

11   e-mail in the chain, all the way down to the bottom.  So this

12   is an e-mail from one of Cox's customer service

13   representatives.  And she sends it to the Corporate Abuse

14   group.  And what she says is:  When a customer is terminated

15   for the first time, do we need your okay to turn them back on,

16   or do we make the call?

17          So let's go up to the next e-mail.  And the next

18   e-mail is the response from Jason Zabek, who is their manager

19   of Abuse Operations.  He is the guy in charge of this.  And

20   here is what it says:  If it is for DMCA, you can go ahead and

21   reactivate.  Any other issues, we can all look at it together.

22          And then let's go up to the top e-mail in this chain.

23   Let me read it to you, Your Honor.  What it says is in 99 --

24   oh, here we go.  So if we blow up the top e-mail in this chain,

25   this is another e-mail from a customer service representative.

1    So these are the people who are actually dealing with the

2    subscribers.  They're actually implementing the policy.

3              And what she says:  In 99 percent of the cases, we

4    are going to turn the customer back on.

5              And then she says:  In 1 percent of the cases the

6    customer will not reactivate at their own discretion.

7              So as a matter of policy, it is Cox's policy to turn

8    these people back on when they want to be turned back on.  The

9    1 percent who don't get turned back on, it's because they don't

10   ask.  It's because they don't ask.

11             Let's look at Exhibit 22.  Let's go again down to the

12   bottom, to the first e-mail.  So this is an e-mail from Roger

13   Vredenburg, another customer service representative:  Third

14   termination, what should we do?

15             So Joseph Sikes, who is the senior lead abuse

16   engineer, Zabek's deputy, if we go up to the next e-mail, he is

17   going to respond.  And he says -- if we go up one e-mail:  What

18   would Jason Zabek do?  I'm sure Jason would say reactivate.

19             And the next e-mail Jason Zabek actually speaks.  And

20   what does he say?  DMCA equals reactivate.

21             That's their policy for this period, DMCA equals

22   reactivate.

23             Then at the top he says:  You can make them wait a

24   day or so if you want, with a little wink.

25             That's their policy, Your Honor.  And here we're

1    talking about customers who Cox itself, Cox itself deemed them

2    appropriate to terminate.  Cox decided, these are the ones we

3    should terminate, and then it turned them back on promptly

4    because it wanted to keep them as subscribers.

5            Now, that's not termination for purposes of the DMCA.

6    That's not a real termination.  That just doesn't -- they don't

7    cite a single case -- in fact, they don't really even argue in

8    their brief that turning customers off for a day and turning

9    them back on constitutes terminations.  That is not a

10   termination policy.

11           So why did they do this?  Let's look at exhibit --

12   let's look at Exhibit 46.

13           THE COURT:  The same declaration?

14           MR. THEODORE:  Yes, this is all to the Theodore

15   declaration, Your Honor.  Let's look at the second e-mail from

16   the top.  This is an e-mail from Jason Zabek.  Why do they

17   perform this charade?  They say:  Remember that we must

18   terminate to receive protection under the safe harbor

19   amendment.

20           So what they're trying to do here is to mark people

21   down as terminated, go into court and claim, represent that

22   they've terminated them so that they can claim a DMCA defense,

23   but actually turn them right back on to retain the revenue.

24           So let's see what Joseph Sikes says in response.  So

25   after Mr. Zabek has said, we need to terminate to receive

1    protection under the safe harbor, yep, right, sure, we do, but

2    I don't believe TOC is actually terminating the service.  They

3    are just clicking "terminate" and "update ticket," which shows

4    a termination in the customer's ticket history.

5            Just updating the ticket, not actually terminating.

6    That's not a termination policy.

7            And Cox doesn't really dispute this.  So Cox doesn't

8    point to any subscribers during the time period from when

9    Rightscorp started sending notices on behalf of the plaintiffs

10   to December 2012 where they actually terminated someone and

11   didn't reactivate.  It's Cox's burden, it's Cox's burden to

12   show the safe harbor here, Your Honor.

13           They don't come forward with a single subscriber in

14   the first three quarters of 2012 who they terminated without

15   reactivating.  That is just not a termination policy during

16   this period.

17           Moreover, they don't even really deny it.  If you

18   look at their declarations closely, what you will see is a

19   discussion of this in the present tense.  All of their -- all

20   of the language in their declarations, terminations is

21   terminations, present tense.

22           But let's look at what their employees actually said

23   about this at the time.  Let's look at Theodore Exhibit 52.

24           Let's go -- I think this is just one e-mail:  DMCA

25   terms are not really terminations.  They acknowledge this

1    internally.   DMCA terms are not really terminations.

2         So they marked them down as terminations so they

3    could represent in court that they were terminations, but even

4    they acknowledge themselves they are not really terminations.

5         So I'll let Mr. Bridges put forward the evidence he

6    wants to, but I think the undisputed evidence here, that there

7    is no genuine dispute of material fact as to the critical -- a

8    critical point.  They did not terminate during this period.

9    And without terminations, with a policy of not to terminate, at

10   least during that period, they cannot satisfy the DMCA safe

11   harbor.

12        So let's talk about the period after the Fall of

13   2012, from the Fall of 2012 to present.  So Cox didn't

14   terminate in that period either.  Let's look at slide 1.

15        So what this shows, Your Honor, this shows by month

16   the number of terminations that Cox performed or claimed to

17   perform from 2012 through the last month for which they gave us

18   data.  And these numbers are straight from their interrogatory

19   responses.  And the numbers on the left are individual numbers

20   of terminations.  These are individual subscribers, 1, 2, 3, 4.

21        So from January through August 2012 -- or these are

22   all fakes terminations.  But they are claiming to terminate

23   six, seven, eight, once as high as 12 subscribers a month.

24        Then suddenly when they changed their policy, when

25   they stopped this fake termination business, look what happens.

1    Suddenly zero, one, one, zero, zero, zero.  I mean, the

2    terminations essentially disappear.

3            And we'll talk in a second about what these 22

4    alleged terminations actually mean, but here is how they

5    accomplish this.  First, they decided that they weren't going

6    to even consider a subscriber, not even consider a subscriber

7    for termination until they were the subject of 14 infringement

8    notices within a six-month period.  14 notices within a

9    six-month period is Cox's minimum for a repeat infringer.

10           Now, I think we can have a debate about two, three,

11   four, but there is no authority whatsoever to suggest that 14

12   is a reasonable baseline.

13           THE COURT:  There is no definition of what is

14   reasonable and what is unreasonable, right?

15           MR. THEODORE:  That's true, but if you look at the

16   legislative history, Your Honor, the legislative history, the

17   Conference Report suggests, I think this is page 75 of the

18   Conference Report, that more than two infringements within a

19   three-year period is a pattern of infringement.

20           THE COURT:  I am not going to look at that stuff.

21   There is 18 different people who said 18 different things about

22   it, and that's why legislative history is so unhelpful, it's

23   because people talk about lots of things.

24           What are the words of the statute?  And the lack of

25   definition here is troubling because it allows interpretation

1   by the company as long as they have a policy and they implement

2   the policy, then I think it's a jury question as to whether

3   it's a reasonable policy.  Whether 200 soft hits or 500 hard

4   hits are sufficient.  I think that because of that lack of

5   precision, you get into issues where a jury is necessary.

6           So let's not look at that legislative report.

7           MR. THEODORE:  Fair enough, Your Honor.

8           THE COURT:  So here we have very few terminations.

9           MR. THEODORE:  We have very few terminations.  And

10  what we have are many, many, many instances where Cox knows,

11  knows, knows and acknowledges, and even has its subscribers

12  acknowledge to Cox that they are repeat infringers, and Cox

13  still doesn't terminate.

14          THE COURT:  Does BMG have evidence of other ISPs and

15  their policies that on termination of those -- like Verizon?  I

16  mean, I'm just curious, I don't know what your evidence is

17  going to be down the road, but is there evidence of what other

18  ISPs -- how they have defined the number of violations

19  sufficient to cause termination?

20          MR. THEODORE:  I don't think that we are relying on

21  evidence of other ISPs.  I mean, I don't want to prejudice us

22  for trial, but let me say for purposes this motion --

23          THE COURT:  Right.  The evidence is closed, so I know

24  you may or may not use it, I'm just curious as to --

25          MR. THEODORE:  For purposes of this motion, we are

1   not relying on comparisons to other ISPs.

2          THE COURT:  I understood that.  It was a question

3   outside of what I have read getting ready for -- as I said, I

4   was just curious about it.  So ahead, I'm sorry.

5          MR. THEODORE:  No, I understand, Your Honor.  But

6   cases -- courts who have dealt with this have held that

7   whatever -- 512(i), as you say, Your Honor, it's not the

8   clearest statute.  But the Cybernet Ventures case, the Hot File

9   case, the Escape Media case, the common thread of every single

10  one of those cases is that when you know of a repeat infringer

11  and you do nothing, when you fail to terminate known and

12  acknowledged repeat infringers, that puts you outside the safe

13  harbor.

14         And here there is no genuine dispute of fact that Cox

15  knew that some of its subscribers were infringing and failed to

16  terminate them.  So let's look at the e-mails that show this.

17         Let's look at Theodore Exhibit 47.  And let's go down

18  to the first e-mail.  So this is termination review, Your

19  Honor.  So we talked about the 14 steps.  After 14 steps,

20  everyone is considered for termination.

21         So here this subscriber is being considered for

22  termination.  And the subscriber is well aware of his actions.

23  He is upset that, quote -- this is a Cox customer service

24  representative quoting the subscriber:  Upset that after years

25  of doing this, he is now getting caught.  After years of doing

1  this.

2      What does Cox do?  Let's go up to the top e-mail on

3  this chain:  Please advise this customer that this is their

4  final suspension and reactivation.

5      So Cox doesn't terminate him.  And the evidence shows

6  that this, we'll terminate them next time, this is their last

7  chance, that's a sham.

8      Let's look at Exhibit 6 to the Roberts declaration,

9  that is docket 346.  I'm sorry, 436.  That is docket 436.

10     So here we have a subscriber who has been told

11  multiple times to secure his open wireless router.  By the way,

12  this is a good point about the wireless.  By the time people

13  are getting to the termination stage here, they have had six

14  conversations with Cox abuse personnel who have told them to

15  put a password on their WiFi router.  We're not talking about

16  people sharing or WiFi poaching here, Your Honor.  They have

17  been told to secure their WiFi over and over.  He also been

18  warned that the next complaint can result in termination of

19  service.

20     All right.  So what does Joseph Sikes say, the senior

21  lead abuse engineer?  Yep, this is their absolute last chance.

22  Next complaint equals six months termination.

23     So this is March 4.  Note, March 4.  And I want you

24  to note the CATS ticket ID number, 18198022.

25     Let's go to Exhibit 5 to docket 436, this is to the

1    Roberts declaration.  Let's go to the bottom e-mail, all the

2    way down.  All the way to the bottom of this.  Couple pages

3    more.  Let's keep going.  Here we go.  So let's highlight this

4    bottom e-mail.

5            So first of all, last ticket, 18198022, talking about

6    the same customer.  Now they're on the next ticket, it's three

7    weeks later:  Customer was warned that further complaints would

8    result in termination.  We have received an additional

9    complaint.

10           So what happens?  Let's go up to the next e-mail.

11   All right.  So this is an e-mail from Joseph Sikes.  And he

12   says:  This customer pays us over 400 a month.  And if we

13   terminate their Internet service, they will likely cancel the

14   rest of their services.

15           Now, Cox accuses us of failing to quote the last line

16   of this e-mail:  If all of this has been covered in detail,

17   then please go ahead and terminate their Internet service for

18   this complaint.

19           Cox complains we don't quote that last line.  But

20   let's go to the top of this chain.  Let's blow up that top

21   e-mail.  What happens?  Please suspend this customer one last

22   time.

23           So, I mean, this is now the third time that Cox has

24   said, we're going to suspend this customer one last time.  And

25   in fact, according to the records that Cox has provided to us,

1     this customer was never terminated, never terminated.

2              Let's look at another e-mail.  Theodore Exhibit 49.

3     If we go to the bottom e-mail on this chain.  Third time to the

4     404 number.  The 404 number is the number for their technical

5     operations center in Atlanta.  That means they've talked to the

6     top tier customer services reps about this now three times:  He

7     was warned on the last call that the next offense would result

8     in termination review.

9              Let's go up to the top e-mail.  The customer knows

10    it's his fault.  There is no question here, Your Honor, that

11    this customer is the one infringing, repeatedly infringing.

12    What do they do?  They don't terminate him.  And according to

13    their records, he was never terminated.

14             We can keep going with these e-mails, Your Honor, but

15    we have limited time, so I won't bore you.  But the bottom line

16    is that over and over and over Cox received notice of repeat

17    infringement by its subscribers.  Their subscribers

18    acknowledged that they were repeat infringers, and Cox didn't

19    terminate them.

20             Let's put up slide 2.  Let's just put up all three

21    bars.  So 6.5 million, that's the number of notices that Cox

22    received, excluding every single Rightscorp notice.  We're

23    going to put aside all the Rightscorp notices that they don't

24    like because they have settlement offers.  Excluding every

25    single one of these, Cox got 6.5 million notices of

1    infringement.  It issued 711,000 warnings and suspensions.

2          Now, because Cox holds the first complaint for more,

3    that means every single one of those warnings and suspensions

4    was a notice of infringement that Cox deemed acceptable and

5    that was the second or greater notice of infringement within

6    six months.

7          How many people does Cox claim to have terminated?

8    22.  Cox claims to have terminated 22 of these repeat

9    infringers.  And in fact, Cox admits that of those 22 -- and it

10   is actually 21, they miscounted them, but we will use 22 that

11   was in their rog response, we will use it.  But if you look at

12   their actual evidence, which is Exhibit 55 to the Theodore

13   declaration, it's 21.  Of those 21 or 22, Cox admits that at

14   least, this is their response to SUMF 68, Cox admits that at

15   least 17 of those either had failed to pay their bills on time

16   or were excessive band width users.

17         So really what's happening here is that Cox knows of

18   repeat infringers, but it's not terminating repeat infringers

19   for repeat infringement.  It's terminating them when it's

20   convenient to Cox.

21         And whatever the intent of the statute, it's not

22   that.  The statute is not designed to allow Cox to terminate

23   repeat infringers when they're a financial burden on Cox.  Cox

24   needs to terminate repeat infringers when they repeat infringe

25   copyright.  And Cox just is not doing that.

1            And there are multiple cases, Your Honor, holding

2      that a repeat infringement policy is not adequate as a matter

3      of law where it is undisputed that, as it realistically is

4      here, there is not a genuine dispute that Cox has failed to

5      terminate known repeat infringers.  And when it fails to do

6      that, it takes itself out of the safe harbor.

7            As the ALS Scan case out of the Fourth Circuit said,

8      the safe harbor is for innocent, innocent service providers.

9      And that innocence disappears when you learn of infringement

10     and you do nothing.

11            That's what we have here.  Cox knew of infringement.

12     It did nothing.  That as a matter of law takes it outside of

13     the DMCA safe harbor.

14            THE COURT:  Okay.  Thank you.

15            Mr. Bridges.

16            MR. BRIDGES:  Thank you, Your Honor.  Evidence of

17     actual terminations, I would point the Court to Linda Trickey's

18     declaration on the summary judgment motion, paragraph 17.  The

19     Beck declaration opposing the plaintiffs' motion, Exhibit A.

20     Even Exhibit 55 of Mr. Theodore's declaration.

21            I actually commend to the Court, and they have picked

22     what they have found to be -- they think to be the most

23     inflammatory e-mails, it's actually worthwhile reading the full

24     e-mails and seeing the discussions that are going on.

25            There is a reluctance to terminate.  There is an

1    effort to work with people.  It's, let's try to get them to

2    shape up.  And there is an effort.  And there is evidence that

3    people do shape up.  And that is why Cox works so hard with

4    them.

5         Your Honor asked about other ISPs.  And actually

6    that's one of the things we use the Rosenblatt declaration

7    about.

8         THE COURT:  Yeah, but he doesn't know.  He's familiar

9    with the policies, and he thinks this and he thinks that, but

10   you need third-party people who are working at those entities

11   to have personal information.  And he doesn't have the personal

12   information.

13        MR. BRIDGES:  But he did draw upon the published

14   statements --

15        THE COURT:  Yeah.

16        MR. BRIDGES:  AT&T, Your Honor --

17        THE COURT:  Well, if you drew upon the public

18   statements that Cox made, you would think that they had a

19   wonderful policy and that they had a very structured review of

20   when terminations would occur.  And the numbers belie that.  So

21   that's why it's of marginal use.

22        MR. BRIDGES:  So there is I think some other

23   information.  We do know that AT&T -- I am pretty sure, AT&T

24   actually requires an adjudication.

25        Verizon didn't terminate anybody, I believe, until

1   2012.  One of their e-mails that they tried to use against Cox

2   because it has a chimp on it, chimp number 6, it's discussing a

3   news article that says that Verizon has started terminating

4   people.  And the evidence is that Cox has been terminating

5   people I think since at least 2004, if not earlier.  There was

6   a tip in the numbers, but there are real terminations.

7           THE COURT:  So that would be evidence if it's in the

8   record that you could present to a jury as to whether your

9   program was reasonable.

10          MR. BRIDGES:  That's correct, Your Honor.  One thing

11  though that I think is useful in looking at Rightscorp's

12  arguments here and its notices -- it's not an obligation.  It

13  is a condition of the safe harbor, is to adopt, notify users

14  of, and reasonably implement a policy for the termination of

15  account holders and subscribers who are repeat infringers.

16          Now, I can't remember if it was Mr. Pecau or somebody

17  on the other side earlier said the law makes no difference

18  between subscribers and users.  It absolutely does make a

19  difference in the text of section 512(i).  It doesn't say:

20  Terminate subscribers where their accounts have been misused.

21  It said:  Terminate subscribers or account holders who are

22  repeat infringers.

23          Now, the big question, and this is part of the

24  uncertainty that the Court has pointed to in the law, elsewhere

25  in section 512 there are references to claims of infringement.

1   Section 512(c), which is about a different type of safe harbor,

2   talks about notifications of claimed infringement.  Other

3   places it talks about claims of infringement or allegations of

4   infringement.

5        Here it's not a policy to terminate persons alleged

6   to be infringers.  And that's why David Nimmer in his early

7   article, which I guess AT&T is following, said it should be

8   adjudications.

9        THE COURT:  But Cox read the statute and they

10  constructed their policy, and their policy dealt with accused

11  infringers.

12       MR. BRIDGES:  Absolutely, Your Honor.

13       THE COURT:  So it didn't require adjudication.  And

14  it followed up by saying, we're going to do the following.

15  When we get the second notice, we'll do this.  When we get the

16  eighth notice, we'll do this.  When we get the 14th notice,

17  we'll do this.

18       So Cox has looked at the statutory requirements for

19  safe harbor and decided, this is what we are going to do.

20       MR. BRIDGES:  Exactly, Your Honor, because Cox said,

21  we're going to do more than we think that the statute requires.

22  But they don't lose the safe harbor for failing to do as much

23  more than the safe harbor requires as they could.

24       THE COURT:  The issue is, did they do what they said

25  they were going to do.  Isn't that what BMG's proof is?  You

1    didn't do what you said you were going to do.

2           MR. BRIDGES:  Your Honor, I'm not sure that that's

3    the standard in section 512(i).  The standard is to adopt a

4    policy.  And the policy is to terminate people who violate the

5    acceptable use policy.

6           But I want to point out also, there is in the record,

7    and I think this is important, there are several letters from

8    other ISPs to the plaintiffs.  And what's interesting is the

9    plaintiffs didn't care about these letters.  The plaintiffs

10   just shot them right over to Rightscorp.  The plaintiffs, BMG

11   and Round Hill, they weren't going to read these letters.  And

12   these are letters from other ISPs explaining why Rightscorp's

13   notices are invalid.

14          Now, the point is, one of the problems that Cox faces

15   is it's not well-positioned to do adjudications of

16   infringement.  So it has done its best.  And I am confident,

17   Your Honor, that a jury will be able to look at these and make

18   its decision according to what it thinks the standard is under

19   the law.

20          And I think that the context and the explanations --

21   the interesting thing is that most inflammatory statement I

22   think Your Honor alluded to earlier, there is a famous F, there

23   is a famous F --

24          THE COURT:  He's an engineer.  You have got people on

25   top of him who are talking about the policy.

1          MR. BRIDGES:  That's right.

2          THE COURT:  But all of these e-mails that Theodore

3    references are damning.  You know, I think you're going to get

4    crushed, frankly, in front of a jury.  I mean, we've got smart

5    juries in this town, and they are going to look at this, and

6    you put your best foot forward, but I am not sure you are going

7    to have much success.  But that's something that we'll deal

8    with down the road.  But that's my personal assessment.

9          Let me ask you this.  Cox gets the notices.  They

10   include a demand for $10 or $20, and I'm not sure why the

11   difference.  But they say, you know, we can resolve this, give

12   us 10 bucks.  Cox says, we're not forwarding that kind of

13   information on, that's extortion.  There has been no

14   adjudication, or for whatever reason we're not going to get in

15   bed with you, we don't think this is appropriate.  No, we're

16   not willing to share the $10 with you.  Rightscorp, clean up

17   your act.

18         Why didn't Cox send the notices on anyway without the

19   letter?

20         MR. BRIDGES:  Well, I think it would have to rewrite

21   the plaintiffs' notices, and I don't think that's a very good

22   practice for an ISP to do.

23         THE COURT:  I mean, you're collecting information

24   from the letter so that you can identify the information in the

25   ticket, right?

55

1           MR. BRIDGES:  That's right.  But, Your Honor, this

2   process, which is called a graduated response process --

3   actually, I want to come back to this.  I forgot part of my

4   answer earlier.  If I can answer something earlier and then

5   come back.

6           The copyright alert system, which most of the major

7   ISPs use, it doesn't particularly fulfill this DMCA

8   requirement, but it's as a practical matter what most of them

9   use.  It does not have any termination provision at all.

10          THE COURT:  Yeah, but that's not binding on -- that's

11  a tool that is being used in the industry that is outside of

12  the requirements of the Act.

13          MR. BRIDGES:  That's correct, Your Honor.  You did

14  ask what other ISPs had done, and I wanted to mention that.

15          And then also, it may inform what in a broader scheme

16  is a reasonable implementation of a policy even if there is

17  something analogous that is not directly equal.

18          But to come back to this question, Your Honor.  Part

19  of the difficulty was this was a business model by Rightscorp

20  to monetize the threat of loss of Internet service.  And it

21  starts out by saying:  Your ISP has forwarded you this notice.

22  You may lose your Internet service.

23          Cox felt that it was being drawn into an extortion

24  scheme that it did not want to be a part of.

25          THE COURT:  I understand that.  I think I just said

1    that.  And that's a decision they made.

2           My question was, why didn't they modify it and at

3    least send the notice on so that, one, you're covered by the

4    safe harbor provision, which requires you to forward this

5    information on; and two, so that the subscriber understands

6    that he is at risk for losing his ISP?

7           MR. BRIDGES:  Well, Your Honor, the question is

8    interesting because Cox was asking Rightscorp to change the

9    notices.  In testimony -- I took the depositions of the

10   plaintiffs, and they said they wouldn't want the changes.

11          THE COURT:  And I understand.  And that's on them.

12          MR. BRIDGES:  Right.

13          THE COURT:  I mean, Rightscorp refusing to change the

14   provision, that's an affirmative decision they made that I

15   don't think a jury is going to like.  And it may turn out to be

16   a very reasonable reaction by Cox to this demand.  And they may

17   just -- they may think that, well, I would have done the same

18   thing.

19          My question was, why didn't Cox at least send the

20   notification on?

21          MR. BRIDGES:  Well, if it were to -- you mean

22   changing it or not changing it?

23          THE COURT:  Changed.

24          MR. BRIDGES:  Changing.  One it changes --

25          THE COURT:  Eliminate the whole request for money.

1          MR. BRIDGES:  So if there is illegal conduct or if

2    there is skulduggery here or a risk of it, if Cox materially

3    changes the notice, it loses the protection under section

4    230(d) of the Communications Decency Act and makes Cox the

5    author of that notice now instead of Rightscorp.

6          Rightscorp is the author of that notice, and Cox

7    should not be getting in and messing with it.  The easy answer,

8    Your Honor, is that Rightscorp could fix it.  And they kept

9    asking.  And plaintiffs knew about this.  Rightscorp was all

10   over this.  This was the business model.

11         And the other thing is, these were demands being made

12   of account holders regardless of responsibility.  And there is

13   an established path in the law.  And the established path in

14   the law, as we see in Hard Drive Productions here in Virginia,

15   is if you want to go after somebody, you bring the John Doe

16   lawsuit and you actually find the perpetrator.

17         I will sit down now, Your Honor, except there is one

18   point I would like to make.  The Court addressed the direct

19   infringement underlying prerequisite for secondary liability,

20   and then we've been addressing the DMCA.  What we have not yet

21   addressed are the substantive standards for contributory

22   infringement and vicarious liability, and I do hope to have the

23   opportunity to do that, Your Honor.

24         THE COURT:  And I will give you that in a minute.

25   Thank you, Mr. Bridges.

1                MR. BRIDGES:  Thank you.

2                MR. THEODORE:  Very brief response, Your Honor.

3                THE COURT:  Yes, sir.

4                MR. THEODORE:  What you didn't hear from Mr. Bridges

5     was anything about 2012, nothing about their reactivations.

6                Now, what you did hear from him, when you asked him,

7     what is your evidence of terminations, he pointed to the

8     Trickey declaration and the Beck declaration.  That's just a

9     list of claimed terminations.  Many of which were reactivated

10    and many of which may have been terminated for other reasons.

11    It is their burden to show their affirmative defense by coming

12    forward with evidence that they terminated in appropriate

13    circumstances.

14               They have given a list of numbers.  That is what is

15    in the Trickey declaration and the Beck declaration, one, two,

16    three terminations a month.  They haven't come forward with any

17    evidence to meet their burden to show that they terminated for

18    copyright infringement in appropriate circumstances.

19               And they admit that in 17 of those 21 or 22 instances

20    there were other non-copyright reasons.  They have not met

21    their burden.  They have not come forward with evidence to

22    create a genuine issue of material fact on the question of

23    their having a policy to terminate repeat infringers in

24    appropriate circumstances and to reasonably implement.

25               Now, one other point, Your Honor.  Mr. Bridges talked

1  a lot about adjudications.  That is simply not the law.  There

2  is not a single case that has required adjudications in order

3  to overcome the DMCA safe harbor.

4       We cite a lot of cases that establish that red flag

5  knowledge and actual knowledge require an ISP to terminate in

6  order to preserve the safe harbor.  And the reason for that,

7  Your Honor, is the reason for secondary liability.  As Grokster

8  said, as Aimster said, as Judge Posner said in the Aimster case

9  out of the Seventh Circuit, the entire point of secondary

10  liability is so that you don't have to proceed against a

11  thousand or 100,000 or a million individual subscribers.

12       If they were entitled to a DMCA safe harbor unless we

13  got adjudications of infringement against every direct

14  infringer, there would be no point to secondary liability.

15       As the Fourth Circuit has said, an ISP loses its safe

16  harbor when it loses its innocence.  Cox is not innocent.

17  Their e-mails make that abundantly clear.  And you didn't hear

18  anything from Mr. Bridges to create a genuine dispute of

19  material fact on that point.

20            THE COURT:  All right.  Thank you.

21            MR. BRIDGES:  I do need to respond briefly, Your

22  Honor.

23            THE COURT:  Very briefly.

24            MR. BRIDGES:  Because he invoked references to red

25  flags and knowledge.

1          THE COURT:  Yes.

2          MR. BRIDGES:  I think Mr. Theodore has badly confused

3   two very different safe harbors.  There are four safe harbors.

4   And 512(a), which applies to conduit services like Cox, is

5   unique.  It has only two conditions.

6          The other safe harbors have many more conditions that

7   a service provider must meet.  The red flag and knowledge

8   criteria he just referred to are in 512(c), and they may be

9   in -- they are also in (d).  I can't remember if it's in (b).

10          But I just want to say, we're not here talking about

11   512(c), and many of these cases are about 512(c).

12          So I just wanted to --

13          THE COURT:  All right.  Stay up.

14          MR. THEODORE:  I'm sorry.

15          THE COURT:  Stay up there.  Talk about contributory

16   infringement.

17          MR. BRIDGES:  Thank you.  So, Your Honor,

18   contributory -- let me back up a bit and talk about both

19   contributory and vicarious because I think a lot of courts and

20   lawyers get confused about how they differ.  And contributory

21   is about wrongful conduct, it's like aiding and abetting.  And

22   vicarious doesn't have to be wrongful at all, it's just about a

23   special relationship.

24          So one is conduct based and culpability based, and

25   the other is special relationship based.  And they have

1    different approaches and different ways of thinking about them.

2         Some cases -- frankly, I think the Fonovisa case in

3    the Ninth Circuit, they jumbled all the facts together so

4    people have confused sometimes contributory with vicarious, but

5    I think it is important to keep them separate.

6         The Supreme Court -- as you know, there is no statute

7    for either contributory or vicarious.  So unlike the underlying

8    direct infringement which must be grounded in the statute, this

9    is all judge made.

10        And on contributory, the Supreme Court has spoken in

11   the Grokster case.  And do we have the language in Grokster?

12   The bottom quote here is the summary:  One infringes

13   contributorily by intentionally inducing or encouraging direct

14   infringement.  That's the summary.

15        But the holding is:  One who distributes a device, or

16   in this case provides a service, with the object of promoting

17   its use to infringe copyright, as shown by clear expression or

18   other affirmative steps taken to foster infringement, is liable

19   for the resulting acts of infringement by third parties.

20        Now, in fact this is the law of the land.  And this

21   is a statement of contributory infringement liability, the

22   first and only clear statement by the Supreme Court.  In the

23   Sony case back in 1984, the Supreme Court cited to Gershwin,

24   but it didn't rule on what the standard was the way Grokster

25   did.

1          And the plaintiffs have tried to say that courts have

2    not interpreted Grokster the way we have.  And I think in fact

3    courts have.  If you look at Perfect 10 versus Amazon.com in

4    the Ninth Circuit and Judge Posner's decision in Flava Works in

5    the Seventh Circuit, the courts are following this.

6          Judge Posner in Flava Works said that knowledge is

7    not enough.  There must be encouragement.  And Perfect 10

8    versus Amazon.com talked about when intent may be inferred.

9    And it said it can be inferred there from knowledge of actual

10   specific infringement coupled with a failure to take simple

11   measures.

12         And the fact is, in operating a general purpose

13   service like this, there are no simple measures.  They can't do

14   deep packet inspection.  They can't get in and alter the

15   service in a way that would help -- that would help avoid

16   infringement.

17         One important issue here is that there are two

18   different types of defendants and services at issue in the

19   various contributory cases.  And the ones that have -- where

20   courts have ruled against the defendants are generally in what

21   I would call closed systems where the defendants are providing

22   the site and facilities intentionally for infringement.  And

23   that would include Fonovisa where it was a flea market with

24   massive infringements and the sheriff always coming by and

25   people building an infringing site.

1          Napster speaks for itself.  Aimster.  These were

2   sites and operations that were really focused on infringement.

3          Cases that go the other way are more open systems.

4   Perfect 10 versus Amazon.com left it open that there could be

5   liability, but we're still dealing with a different thing.

6          So Cox isn't providing some service that is adapted

7   to infringement.  It provides normal Internet service.  There

8   is nothing different about what Cox provides the public from

9   what other ISPs provide the public.

10          THE COURT:  What's your understanding of how BMG is

11   going to prove contributory infringement?  Notice, right?

12   Notice that your systems were being used to contribute to

13   infringement.

14          MR. BRIDGES:  Actually, Your Honor --

15          THE COURT:  You knowingly allowed that to occur.  I

16   mean, I think that's --

17          MR. BRIDGES:  That's a legal argument, Your Honor.

18   But when we took the Grokster standard and put it in the

19   material facts in our brief, they admitted that they have no

20   evidence of an intent to induce or encourage infringement

21   through clear expression or other affirmative act.

22          They have admitted in their opposition that they

23   don't have facts that line up with the Grokster standard.  And

24   that's the standard.

25          Now, they go back to earlier pre-Grokster cases and

1    try to argue knowledge, but they can't actually show actual

2    specific knowledge because of all the problems with notices and

3    things like that.  And so, they invoke as their end run around

4    knowledge a concept of willful blindness.  That's their

5    argument.

6          Now, willful blindness is a controversial topic, but

7    I want to go to the Supreme Court in its recent willful

8    blindness case involving patent inducement.  And what was clear

9    from the Supreme Court there -- and I do think there are

10   differences between patent and copyright here even though the

11   Supreme Court keeps borrowing from patent for copyright.

12         In the Global Tech case, Your Honor, willful

13   blindness required active steps not to know and a deliberate

14   effort to shield one's self.  It's not recklessness.  It's not

15   negligence.  It's not mere knowledge.  And they don't have

16   enough to make the standard of willful blindness here.

17         Let me go through a number of points.  Number one,

18   these notices were not notices of actual specific infringement.

19   These were notices of, well, something bad is happening there.

20   That is not good enough.

21         And they weren't notices that particularly identified

22   the --

23         THE COURT:  So they said, IP account Joe Blow, you're

24   using this music and it's copyrighted and you haven't paid for

25   it.  What more do they have to do?

1          MR. BRIDGES:  They need to say -- well, using music,

2     Your Honor, I don't know what violates.

3          THE COURT:  Well, they accused them of infringing the

4     copyrighted work.

5          MR. BRIDGES:  Right.  And they said that it was by

6     download, upload, or offer to upload.  Which goes right back to

7     what is an offer to upload.  Because that could be like a

8     landlord saying to somebody, I am terminating your lease

9     because you have violated the lease because you have not paid

10    rent, or you have damaged the property, or you cooked spaghetti

11    on Sunday.

12         Well, that last bit isn't a violation of the lease.

13    And that might be a termination notice with two valid reasons,

14    but it's vague as to what the actual act was because copyright

15    infringement is not a state of mind, it requires an action, and

16    they didn't identify action.

17         THE COURT:  But it's notice, right?

18         MR. BRIDGES:  No, Your Honor, it's knowledge.  Notice

19    is a concept under the safe harbor under section 512(a).  And

20    there are a number of cases that say that notices do not

21    necessarily equal knowledge.  Knowledge is very different.

22         That's why in 512(c) there is an obligation to act on

23    notices.  And if you act on notices, then you have met one of

24    your many conditions.  But the knowledge issue is a separate

25    issue.

1          THE COURT:  Well, then we go back to the 512(a) and

2     the fact that Cox chose to go forward with the 512(i)

3     identification and implement its policy.  And maybe I've got

4     the subsection wrong.  But let's finish up your argument.

5          MR. BRIDGES:  The other thing is -- and we need to --

6     we may need to go to Judge Anderson's order.  Actually, before

7     I get there, the question is what could Cox do about anything?

8     It could do things only with respect to its account holders.

9     And it never got knowledge that its account holders were the

10    people violating copyright law.

11         And they had opportunity, they could use the existing

12    channels.  So they didn't learn anything about copyright, about

13    account holders.

14         Now, there is another problem here.  And this goes to

15    some spoliation issues here.  At some point -- well, it's how

16    Rightscorp itself defined an infringement.  It defined an

17    infringement as an observation of a report from a bit torrent

18    client software, software client about how much of a bit

19    torrent payload, sort of contents, it possessed.  And it didn't

20    actually, before it sent a notice, it didn't actually download

21    anything.  It never did.  It would just look to see what the

22    bit field said.

23         And at some point Rightscorp went from looking at the

24    whole bit field to see what the whole torrent package was to

25    looking for only 10 percent.  Which meant it couldn't verify

1    whether the person they accused of even possessing this music

2    had the music because 10 percent makes it impossible.

3          And they changed that software and destroyed the old

4    software.  And Judge Anderson found this to be an intentional

5    destruction and it was not lost through inadvertence or

6    mistake.  And he explained that the accuracy of Rightscorp's

7    system is essential to the proof here, and it's gone.  And he

8    said that the deposition testimony can't make up for it.

9          And so, we have a situation where these notices were

10   generated by a system that nobody can truly examine.  And these

11   notices didn't ever result from a download.  They resulted from

12   an observation.

13         And then let me say one other thing about these

14   notices.  For a while they were going and hitting somebody out

15   there on the Cox network multiple times per day.  And if they

16   saw part of a payload, if they knew or if they thought that a

17   payload was there and that payload might have 50 songs, then

18   they chalked that down as 50 infringements and sent 50 notices.

19         If they went back later that day and saw the same 50

20   songs there, it was another 50 notices.

21         And early on they were pounding the same Internet

22   piers many times a day.  Later they claimed to have trimmed it

23   down to one time a day.

24         Well, Your Honor, A, there is no competent evidence

25   as to what was in that payload at the time of the observation

1    because of the spoliation of the software.  So we don't know.

2    They don't know what was there.

3          Now, if they don't know what was there, how is Cox

4    chargeable with knowledge that these are actual infringements?

5          THE COURT:  When did the last -- I mean, they kept

6    writing over the software, I understand that.  When was the

7    last time that they wrote over the software -- asked

8    inartfully.

9          When did records begin to be kept as to the rewriting

10   of the software that Rightscorp was using that Judge Anderson

11   heard all the evidence about?  Sometime in 2012?

12         MR. BRIDGES:  No, I think it's 2015.  I think that's

13   what we've got, Your Honor, July 2015.  Am I correct there?

14         Right.  We know how the Rightscorp system operated as

15   of July 15, 2015.  Seven, eight, nine months into this lawsuit.

16   And we don't know beforehand.

17         And they want to say, oh, trust us, it worked the

18   way -- you know, their position, their benefit.  So we don't

19   know that at all.

20         And the other thing is, it goes back, their whole

21   premise of sending notices rests upon their undefined "making

22   available" theory.  Because they weren't actually testing

23   whether somebody was sending something to them.  They were

24   merely testing whether it was available.

25         THE COURT:  We're spilling over into other arguments.

1   We started out with the contributory/vicarious liability

2   argument, and I think --

3           MR. BRIDGES:  And I mention that because of

4   knowledge.

5           THE COURT:  And I think that --

6           MR. BRIDGES:  Okay.  So let me go to vicarious then.

7           THE COURT:  Let's finish up.  I'm sitting here with a

8   fever and --

9           MR. BRIDGES:  Oh, I'm sorry, Your Honor.  Okay, I

10  will go quickly.

11          THE COURT:  I feel terrible.

12          MR. BRIDGES:  I will go quickly.  Vicarious, it's

13  when an obvious and direct financial interest in --

14          THE COURT:  I understand the definition.  My

15  goodness, Mr. Bridges, let's not go back -- this is not a law

16  school class.

17          MR. BRIDGES:  Your Honor, that's fine.  I will say, I

18  think that the Nelson-Salabes case and the Humphreys case in

19  the Fourth Circuit provide very good guidance here.  It's a

20  relationship-based liability.

21          And Cox's relationship with its customers is not a

22  relationship that deserves vicarious liability.  If they want

23  to argue that Cox's bad behavior justifies it under

24  contributory, that's a separate argument.

25          And with that, I will sit down, Your Honor.

1          THE COURT:  Thank you, sir.

2          MR. BRIDGES:  Thank you.

3          THE COURT:  All right.

4          MR. PECAU:  Your Honor, I'll be as quick as I

5    possibly can be.

6          THE COURT:  Say what you have to say, until I stop

7    you.

8          MR. PECAU:  All right.  First of all, Your Honor, Cox

9    just gets Grokster wrong.  I mean, that isn't what Grokster

10   held.  It didn't change the common law definition and test for

11   contributory negligence.  All Grokster decided was that if you

12   have a case like Sony, and even without having direct knowledge

13   of infringement, if you can show that there was inducement, you

14   don't have to show direct knowledge, you have a claim.  That's

15   all Grokster said.

16         But what Grokster did say, it actually reaffirmed the

17   traditional principles of secondary liability and that they

18   continue to apply.  And they cited Gershwin, and they cited

19   Shapiro versus Green.  And they said, you know, that's the law

20   of the land and that's what we have to follow.

21         So what is that?  So contributory infringement, two

22   things.  One, you have to show knowledge.  And two, that the

23   person actively induces, causes, or materially contributes to

24   the infringing conduct of another, is also liable for

25   infringement.

1          We have plenty of Fourth Circuit cases in this

2    district saying that's the law.  Okay.

3          So what does Cox do?  It claims that it doesn't have

4    knowledge of the infringement by its subscribers of plaintiffs'

5    works.  But 1.8 million notices of infringement of specific

6    works by specific Cox subscribers identified by their IP

7    address and port number is evidence that Cox knew or had reason

8    to know of those infringements.

9          And there are cases, like the Ellison case, that say

10   the notices themselves establish, or at the very least are

11   actual notice -- or at the very least give actual notice or

12   reason to know or constructive knowledge.  That's something for

13   a jury to find.  And that's what the Ellison case said.

14         Further, you know, Cox says that it refused to accept

15   these notices -- I mean, Cox's refusal to accept these notices

16   is classic willful blindness.

17         Now, Cox comes up with an excuse, well, we didn't

18   know, you know, whether it's uploading, downloading, or making

19   available.  So how could we possibly know?

20         Well, first of all, they're sophisticated.  They know

21   if you're engaging in bit torrent, you're uploading, you're

22   downloading, and you're making available.  You're doing all

23   three things.  I mean, they knew that.

24         The fact is, this is traditional, classical willful

25   blindness.  And if they have excuses, you know, well, we

1   weren't really willfully blind, we had a reason not to accept

2   these things, as Your Honor pointed out, that's for a jury to

3   decide.  It's not a matter for summary judgment.

4          The second thing is that Cox materially contributed

5   to the infringement, providing the site and facilities by which

6   the subscribers accessed and shared infringing content.  In the

7   Fonovisa case, the Napster case, the Capital Records case all

8   say that.

9          Now, Cox tries to distinguish these things by saying,

10  well, you know, it isn't like the Amazon case.  Right?  I mean,

11  the Amazon case -- you know, the reason that they didn't find

12  that there was a contributory infringement, because there they

13  weren't providing access.  I mean, all it was was a search

14  engine.

15         And also in the Visa case, they weren't providing

16  access.  All they were doing is allowing them to pay for the

17  bills.  That isn't the same thing.  Completely distinguishable.

18         The other thing is that the material contribution

19  that a jury would certainly be interested in is the fact, as

20  Mr. Theodore pointed out, certainly up through 2012, is that

21  Cox knew about infringers, and they pretended to terminate

22  them.  And they actually reinstituted the next day or two what

23  they knew were known infringers.

24         If that isn't enabling infringement, I don't know

25  what is.

73

1          Okay.  So let's just quickly go to Cox's vicarious

2     liability.  Again, Cox is trying to make new law, but actually

3     it's trying to make law that is over 50 years old.  I mean, the

4     fact is that Gershwin and Shapiro, Bernstein, and even the

5     Court in Grokster said that, you know, vicarious liability

6     doesn't anymore depend on respondeat superior.

7          What you have to do is you have to prove two things

8     if you're a plaintiff.  You have to prove that a person, the

9     defendant has a right and ability to supervise the infringing

10    activity and has a direct financial interest in such

11    activities.

12         In other words, as the Court in Grokster stated, one

13    infringes vicariously by profiting from direct infringement

14    while declining to exercise a right to limit it.

15         Now, there is no doubt in this case that Cox had the

16    right to control this behavior under its acceptable use policy,

17    and it had the ability to control this behavior.  The fact is

18    that it had the right and the ability and didn't do it, and

19    that's why we're here, Your Honor.

20         Now, the parties appear to agree that if the ability

21    to conduct the direct infringing activities enhances the

22    attractiveness of the site, or acts as some sort of draw to the

23    service provider, then the direct financial benefit is

24    satisfied.

25         And, you know, the plaintiffs argue that the jury

1    could find that the access to free illegal music acts is a draw

2    to Cox's service.  And there is a lot of evidence that will

3    show this, Your Honor.  Fully 16 percent of the Cox users admit

4    to downloading or uploading music through sites such as Pirate

5    Bay, Kickass Torrents, and Torrents.

6              The evidence also -- the evidence also shows that

7    when these persons were asked, you know, the people that were

8    uploading and downloading this stuff --

9              THE COURT:  Was that a survey?  How did that

10   16 percent -- who did that?

11             MR. PECAU:  Okay.  Right.  That was Dr. Nowlis, who

12   is a well-respected professor who does these survey things.

13   And what he did is he went out to Cox subscribers and he asked

14   them a series of questions.  And one of them --

15             THE COURT:  Yeah, I remember now.

16             MR. PECAU:  So what are you doing?  So are you

17   uploading and downloading?  Yeah, 16 percent said that.

18             So then he asked that 16 percent, you know, trying to

19   find out whether it's a draw, he asked them, you know -- and he

20   had a list of things that he was moving around.  But one of the

21   things he asked them, he asked them, he said, you know -- he

22   asked them, is it -- you know, tell us the reasons that you

23   subscribe to Cox.

24             And one of the reasons is the ability to download or

25   upload free music through sites such as Pirate Bay, Kickass

1    Torrents, and Torrents.  All right.

2             And 70 percent of the respondents, and that is

3    70 percent of 16 percent, said, yeah, that's why we do it.  And

4    that is fully 10 percent of all Cox subscribers saying that a

5    reason that they subscribe to Cox is because they could get

6    this free music.

7             Your Honor, this makes a lot of sense when you think

8    about it.  I mean, the Cox subscribers really aren't getting

9    free music because they have to pay Cox a lot of money to get

10   free music, supposedly free music, just the same way you pay

11   large money for this --

12            THE COURT:  Does BMG have to show that Cox knew that

13   its subscribers getting this 16 percent, or that 70 percent of

14   that 16 percent were downloading free music and that's why they

15   subscribed?

16            MR. PECAU:  Well, Your Honor, first of all, we could

17   show that because, as Mr. Theodore pointed out, that even when

18   they were looking at, you know, whether they should terminate

19   somebody, they said, you know, this guy is paying us a lot of

20   money, we don't want to terminate him.

21            So they realized that they were getting a lot of

22   money from them.  In fact, the incremental profit from these

23   people is 97 percent.

24            But, Your Honor, I just want to make the point when

25   you think about it, what Cox provides.  If you think of their

1    cable service, what do they provide?  They provide things like

2    ESPN, but they pay a lot of money for ESPN.  Right?

3              But here, this is a great thing for them because what

4    peer-to-peer -- what this BitTorrent does is that they get a

5    large number of people coming to their service who can get

6    music, quote free music.  And that's a complete bonus to Cox.

7    They continue have to pay for that content.

8              So they are definitely getting a direct financial

9    benefit from it.  And, you know, this is something that, you

10   know, a jury is going to figure out.  It's perfectly what a

11   jury decides, is whether they are getting a direct financial

12   benefit.

13             We think that the evidence is absolutely clear, but

14   it's something that ultimately should be decided by a jury.

15             Thank you, Your Honor.

16             THE COURT:  All right, thank you.

17             All right.  Mr. Bridges, I will give you the last

18   word.

19             MR. BRIDGES:  I will go very briefly, Your Honor,

20   because I am conscious of the Court's condition.

21             A couple of things.  If one looks at -- I am not

22   trying to make new law.  I'm trying to keep the law on the

23   tracks, Your Honor.  And I'm trying to explicate it and why

24   vicarious is different from contributory in a way to assist the

25   Court.  And there are two different strands.

1          The cases that -- if you go through the major cases,

2     what types of relationships were there?  Shapiro, Bernstein, it

3     was a department store with an outsourced department that was

4     selling bootleg records.

5          In the Fourth Circuit, the Nelson-Salabes case and

6     the Humphreys cases, these were owners of entities or owners of

7     projects where there were infringing architectural projects

8     being built.  Financial interest and heavy involvement.

9          The Gershwin case is the paradigmatic with Shapiro,

10    Bernstein, the paradigmatic case.  What happened in Gershwin?

11    The defendant, who is an empresario company, it was Colombia

12    Artists Management, it managed artists, it directed them, it

13    created the audiences where the infringements would occur.

14    They were not employees.  It doesn't have to be respondeat

15    superior, but it has to be some kind of relationship-based

16    liability.

17         And the Second Circuit in Gershwin said, if you're

18    creating the audience, if you are directing what's going on,

19    you're going to be vicariously liable.  All this stands to

20    reason.

21         The Ellison case is an important case.  AOL in that

22    case lost the safe harbor because of an e-mail mix-up --

23         THE COURT:  Do you agree that this is something a

24    jury is going to decide after we properly instruct them?

25         MR. BRIDGES:  No.

1          THE COURT:  And that the fight here is over what the

2   proper instruction is?

3          MR. BRIDGES:  No, Your Honor, because this is a legal

4   concept of whether this relationship qualifies for vicarious

5   liability.  That's a pure legal question.

6          And, no, it's not just respondeat superior.  You

7   know, a partner can be responsible for another partner.

8   Alterego is responsible.  Parent/child.  Employer/employee.

9   There are lots of different ways.

10         What happened in Shapiro, Bernstein, which courts

11  have respected, is they said, what are the hallmarks of a

12  relationship that qualifies for vicarious liability?  And they

13  identified the hallmarks as an obvious and direct financial

14  interest in the infringement, coupled with a right and ability

15  to supervise.  Because that is sort of how employer/employee

16  is, but it's not limited to that.  But we have to look at that

17  as a way of saying -- how do we separate this type of

18  relationship that should be liable from, for example, a

19  landlord/tenant that shouldn't be liable.

20         And the Fonovisa case was an interesting case because

21  it was not really landlord/tenant even though it was flea

22  market and vendor because there was much more interaction

23  between them where the defendant was sort of creating that

24  market.

25         So that's what's involved here.  And the Ellison case

1    is great on the direct financial benefit.

2           The Wolk case is an excellent one, that's a District

3    Court though.  I have been trying to give you as many circuit

4    courts as possible.  But Wolk said that there has to be direct

5    financial benefit from infringement, not a direct financial

6    benefit just from offering the service.

7           Now, Ellison introduced the concept of what acts as a

8    draw.  But Ellison couched it in terms of a causal relationship

9    between infringement and the financial benefit.  And it

10   specifically said that ordinary fees, flat fees and the like,

11   don't qualify.  And they have shown no special financial

12   benefit here from infringement.

13          Now, I want to address their Nowlis survey because

14   that's what they claim does it.  I listened to Mr. Pecau

15   carefully, and I credit him because I think he was careful, he

16   was careful.  Mr. Nowlis didn't ask any questions about

17   infringement, didn't ask a one.  He said, do you upload or

18   download free music?  In bold.  I ask the Court to look at the

19   survey instrument, that's in bold letters.  And then in light

20   letters, through sites such as, several sites.

21          Now, I don't know about you, Your Honor, but I'd

22   never heard of any of those sites before this case.  But if I

23   had been asked, do I download or upload free music through

24   sites such as gobbledygook, I would say yes.  I got the card at

25   Starbucks and got my free download from Apple iTunes because of

1   my free card at Starbucks.

2           So the question didn't actually address infringement.

3           THE COURT:  I will look at it.

4           MR. BRIDGES:  And we have also got a <u>Daubert</u> motion

5   on file for Mr. Nowlis.  There are more reasons to reject that

6   as incompetent evidence, but I will sit down, Your Honor,

7   unless you have any questions.

8           THE COURT:  No, I don't.  I have run out myself.

9   We're a little over two hours, and I think we should end for

10  today unless somebody has something urgent they need to talk

11  about.

12          Not having seen any hands in the quarter second I

13  gave you, we will end for today.

14          We'll keep looking at the issues.  I appreciate the

15  briefing which was extensive and commensurate with the

16  professionalism of the parties here and obviously their

17  counsel.  And the argument today has been very helpful, and I

18  appreciate you coming in.  I know some of you have come a long

19  way.  And you bring a lot of institutional knowledge that I

20  don't have.  And I am trying to catch up and will continue to

21  try and catch up.

22          And we will get you out a decision on the issues that

23  are pending before us as soon as we can, but in a reasonable

24  period of time so that you can continue either to prepare for

25  trial or figure out how to resolve the situation.

1          I guess many of these cases didn't go to trial,

2    especially on some of the issues that we have discussed today

3    after these -- I think the Massachusetts and the Arizona cases

4    as far as we can tell never went to trial.  So maybe that will

5    be moving farther along than they did.

6          But the point is, I will get you out a decision on

7    the pending issues as soon as we can and relatively soon.

8          When are the Daubert motions set?  Are those next

9    week or two weeks?

10          MR. KELLEY:  November 20.

11          THE COURT:  November 20.  Okay.  So we have got some

12    time.  All right, good.

13          All right.  Well, I hope you all have a good weekend.

14    And we are in recess.

15    -------------------------------------------------
                      HEARING CONCLUDED

16

17

18

19

20          I certify that the foregoing is a true and

21      accurate transcription of my stenographic notes.

22

23
             /s/ Norman B. Linnell
24          Norman B. Linnell, RPR, CM, VCE, FCRR

25