# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

_____

BMG RIGHTS MANAGEMENT (US) LLC, AND    )

ROUND HILL MUSIC LP,                   )

                                       )

                     PLAINTIFFS, )CASE NO.

                                )1:14-CV-1611 (LOG/JFA)

          vs.                          )

                                       )

COX ENTERPRISES, INC., COX             )

COMMUNICATIONS, INC., AND COXCOM,      )

LLC,                                   )

                                       )

                     DEFENDANTS. )

_____)


    ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY***


    VIDEOTAPED DEPOSITION OF WILLIAM ROSENBLATT

         TAKEN WEDNESDAY, AUGUST 5, 2015

            SAN FRANCISCO, CALIFORNIA

    Reported by Audra E. Cramer, CSR No. 9901


-----------------------------------------------------

            DIGITAL EVIDENCE GROUP

         1726 M Street NW, Suite 1010

            Washington, DC  20036

                (202) 232-0646

Page 167

1    statement, they have increased over time as have things

2    in general like the number of Cox subscribers.

3    BY MR. ALLAN:

4         Q.   So the question is, with those two

5    understandings -- with that understanding in mind, when

6    you increase the number of steps in the graduated

7    response process, don't you also reduce the chances that

8    a particular subscriber will reach a particular level on

9    the graduated response process at any given time period?

10        MR. BRIDGES:  Objection.  Lacks foundation.

11   Calls for speculation.  Assumes many facts not in

12   evidence.  Calls for non-expert opinion.  Beyond the

13   scope of the opinion.

14        THE WITNESS:  I can think of cases where that

15   might not be true.  It's not a hard-and-fast rule the

16   way this data might behave.  You'd have to look at

17   actual data.

18   BY MR. ALLAN:

19        Q.   And you did not do that in this case; correct?

20        MR. BRIDGES:  All the same objections.

21        THE WITNESS:  I did not provide -- I did not

22   attempt an analysis of the -- of the -- I need to find a

Page 168

1  word -- of the phenomena that you just described with

2  regard to the likelihood that a given subscriber who is

3  alleged to be infringing reached a certain level in the

4  graduated response process.  I did not do that analysis.

5  BY MR. ALLAN:

6      Q.  Are you familiar with the term

7  "black-listing" --

8          MR. BRIDGES:  Objection.

9  BY MR. ALLAN:

10     Q.    -- as used in this case by Cox?

11         MR. BRIDGES:  Objection.  Lacks foundation.

12  Vague and ambiguous.  Can you show him an instance you

13  want him to refer to?

14         THE WITNESS:  Yes.  I've seen that term.

15  BY MR. ALLAN:

16     Q.  What's your understanding of what it means?

17         MR. BRIDGES:  All the same objections.

18         THE WITNESS:  Black-listing refers to making a

19  determination that a complainant's copyright complaints

20  are not compliant with Cox's standards and therefore not

21  burdening the system with processing the complaints from

22  that complainant.

Page 169

1    BY MR. ALLAN:

2        Q.    Is it your understanding that the plaintiff's

3    agent, in this case Rightscorp, has been black-listed by

4    Cox?

5            MR. BRIDGES:   Objection.   Vague and ambiguous.

6            THE WITNESS:   Yes.

7    BY MR. ALLAN:

8        Q.    And is it your understanding that the

9    decision -- well, strike that.

10           Are you -- strike that.

11           I don't see any opinion in your report in which

12   you offer an opinion on the reasonableness of the

13   decision to blacklist Rightscorp.   I just want to make

14   sure that I understand that correctly.

15           MR. BRIDGES:   Objection.   The reports and

16   opinions speak for themselves.   Lacks foundation.   Vague

17   and ambiguous.

18           THE WITNESS:   Well, let me think about that.

19   Did I offer an opinion on the reasonableness of the

20   decision to blacklist Rightscorp?   Is that what you're

21   asking?

22

Page 170

1   BY MR. ALLAN:

2       Q.   Yeah.   Is that in any of your written opinions?

3   And I don't think it is, and I'd like you to confirm

4   that that's the case, that you are not offering such an

5   opinion.

6           MR. BRIDGES:   And please review your opinions

7   in order to answer the question.

8   BY MR. ALLAN:

9       Q.   I can refer you specifically to your reply,

10  paragraph 28.

11          MR. BRIDGES:   If you're asking if it's anywhere

12  in his opinions, he has to read his opinions.

13          THE WITNESS:   Well, the opinion that I did

14  express is that it would be an unreasonable burden to

15  have to process those complaints one at a time only to

16  have to individually -- only have to reject them one at

17  a time because they are judged -- they are determined to

18  be noncompliant.   That's the opinion I expressed.

19  BY MR. ALLAN:

20      Q.   That's a different opinion than opining on the

21  reasonableness of Cox's decision to blacklist Rightscorp

22  at the outset; correct?

Page 171

1          MR. BRIDGES:  Objection.  Misstates facts.

2     Misstates testimony.  Argumentative.  Lacks foundation.

3     Vague and ambiguous.

4          THE WITNESS:  I would agree I did not opine on

5     the reasonableness of that particular decision.

6     BY MR. ALLAN:

7        Q.    And you're not offering an opinion in this case

8     concerning the spirit of the DMCA; correct?

9          MR. BRIDGES:  Objection to the extent it calls

10    for a legal conclusion and lacks foundation.  Vague and

11    ambiguous.

12         THE WITNESS:  Correct.

13    BY MR. ALLAN:

14       Q.    In your review of the DMCA, did you see any

15    reference to its spirit?

16         MR. BRIDGES:  Objection.  Lacks foundation.

17    Vague and ambiguous.  May call for a legal conclusion.

18         THE WITNESS:  Well, I didn't see the word

19    "spirit" in the statute, and again I'm not offering

20    opinion about it.

21    BY MR. ALLAN:

22       Q.    Is your opinion with respect to the

Page 172

1  reasonableness of Cox's graduated response process

2  limited to how Cox handles infringement allegations that

3  have not been black listed?

4          MR. BRIDGES:  Objection.  Lacks foundation.

5  Assumes many facts not in evidence.  Argumentative.

6  Confusing.

7          THE WITNESS:  No.  My opinion is that the

8  entire process is reasonable.

9  BY MR. ALLAN:

10      Q.   Do you think it is reasonable for Cox not to

11  use notices from black listed complainants for purposes

12  of a graduated response?

13          MR. BRIDGES:  Objection.  Calls for matters

14  outside the scope.  Lacks foundation.  Vague and

15  ambiguous.  Assumes many facts not in evidence.

16          THE WITNESS:  I'm sorry.  Repeat the question.

17  Just read it back, please.

18          MR. ALLAN:  Could you just read it.

19              (Record read.)

20          THE WITNESS:  Again, my opinion is that the

21  entire process, including determinations made that may

22  result in blacklisting of complainants, is reasonable.

Page 173

1    BY MR. ALLAN:

2        Q.   Well, I'm a little confused now,

3    Mr. Rosenblatt.   I thought you testified earlier that

4    you're not offering an opinion as to the reasonableness

5    of Cox's decision to black list Rightscorp.   But then

6    you just testified your opinion is that the entire

7    process, including determinations made that may result

8    in blacklisting of companies, is reasonable.

9        A.   Well, so --

10            MR. BRIDGES:   What's the question?   Wait for

11   him to ask you a question.

12            MR. ALLAN:   They seem to be internally

13   inconsistent statements.

14            MR. BRIDGES:   Wait for a question.   I'm sorry.

15   What's the question?

16   BY MR. ALLAN:

17       Q.   Are they --

18            MR. BRIDGES:   Objection.   Vague and ambiguous.

19   Lacks foundation.

20   BY MR. ALLAN:

21       Q.   Are you testifying today as to the

22   reasonableness of Cox's determination to black list

Page 174

1    Rightscorp or any other complainant?

2            MR. BRIDGES:  Objection.  His opinions,

3    testimony and reports speak for themselves.

4    Argumentative.  Lacks foundation.

5            THE WITNESS:  I am not testifying -- I am not

6    offering opinion on the process by which a complainant

7    is determined to be issuing noncompliant complaints.

8    I'm not offering that opinion.  I'm taking that as, it

9    is what it is.

10   BY MR. ALLAN:

11       Q.   Are you assuming for purposes of your opinion

12   that Cox's decision to black list Rightscorp or any

13   other complainant for failing to comply with the spirit

14   of the DMCA is reasonable?

15           MR. BRIDGES:  Objection.  Argumentative.  Lacks

16   foundation.  Misstates evidence.  Compound and assumes

17   many facts not in evidence.

18           THE WITNESS:  I am assuming for purposes of my

19   opinion that Cox's decision to black list complainants

20   for failing to meet Cox's criteria for compliant

21   complaints is reasonable.

22

Page 175

1  BY MR. ALLAN:

2      Q.   If it's determined in this case that Cox's

3  decision to black list Rightscorp or any other

4  complainant is not reasonable, does that affect the

5  outcome of your opinion?

6          MR. BRIDGES:  Objection.  Hypothetical.

7  Assumes many facts not in evidence.  Lacks foundation.

8  Argumentative.

9          THE WITNESS:  I don't know how to answer that,

10  honestly.  I don't have an answer for that.

11  BY MR. ALLAN:

12      Q.   Why not?

13          MR. BRIDGES:  Objection.  Hypothetical.

14  Assumes many facts not in evidence.  Lacks foundation

15  and argumentative.

16          THE WITNESS:  Because it depends on in what way

17  the -- what are you calling that?  Reasonable...

18  BY MR. ALLAN:

19      Q.   Let me ask it a different way.  Okay?  I'm

20  trying to understand the scope of your opinion.

21      A.   Uh-huh.

22      Q.   You're not opining on the reasonableness of

Page 176

1   Cox's decision to black list Rightscorp.   You are

2   assuming that it's reasonable; correct?

3        A.    Yes.

4             MR. BRIDGES:   The opinions and reports speak

5   for themselves.

6   BY MR. ALLAN:

7        Q.    If that assumption is incorrect and it's found

8   in this case that Cox's decision to blacklist Rightscorp

9   was not reasonable, how, if at all, does that affect

10   your opinion that Cox's graduated response process

11   overall is reasonable?

12             MR. BRIDGES:   Objection.   Hypothetical.

13   Assumes many facts not in evidence.   Lacks foundation

14   and argumentative.

15             THE WITNESS:   I'd have to think about it.   I

16   can't give an opinion sitting here today.

17   BY MR. ALLAN:

18        Q.    Would the number of Rightscorp notices that are

19   sent to Cox have any impact on that calculation for you?

20             MR. BRIDGES:   Objection.   Hypothetical.

21   Assumes many facts not in evidence.   Lacks foundation.

22   Argumentative.

Page 177

1          THE WITNESS:  The number of notices that any

2    complainant sends is -- is independent of a

3    determination by Cox about the reasonableness -- or

4    sorry, the compliance of those complaints.  So the

5    answer is no, it would not change my opinion.  The

6    number of complaints would have nothing to do with that

7    opinion.

8    BY MR. ALLAN:

9        Q.   So it wouldn't -- so under my hypothetical, if

10   it's found that Cox's decision to blacklist Rightscorp

11   was not reasonable, it wouldn't matter to you whether

12   Rightscorp sent Cox 10 notices a month or 500,000

13   notices a month?

14          MR. BRIDGES:  Objection.  Hypothetical.

15   Assumes many facts not in evidence.  Lacks foundation.

16   Argumentative.

17          THE WITNESS:  Well, I'll tell you one way in

18   which it would matter, which is that Cox has a mechanism

19   for automating complaint processing if certain criteria

20   are met, one of which is that the volume of complaints

21   is sufficient to merit automation of those -- of the

22   processing of those complaints as a way of increasing

Page 178

1    the efficiency of processing those complaints.  So that

2    is one way in which my opinion might be affected by the

3    number of complaints that a given complainant sends to

4    Cox.

5    BY MR. ALLAN:                                let me put it

6        Q.   Are you aware of any facts other than the fact

7    that Rightscorp's infringement notices can contain a

8    settlement offer that would prevent Cox from automating

9    the collection and processing of Rightscorp's notices?

10        MR. BRIDGES:  Objection.  I think it's outside

11   the scope of his opinions.  It assumes many facts not in

12   evidence.  Lacks foundation.  Argumentative.

13        THE WITNESS:  Well, ~~let me it~~ this way.  I have

14   not seen or heard any evidence that there were any other

15   determining factors in making the determination that

16   Rightscorp's complaints were not compliant.  That's the

17   only factor that I've seen evidence about.

18        MR. BRIDGES:  It's almost 1:45, Mr. Allan, so

19   if you can...

20        MR. ALLAN:  One more question.

21        MR. BRIDGES:  All right.

22

Page 259

1  unsecured WiFi, such as bandwidth usage, open proxy.

2  There are a number of abuses that could be the result of

3  unsecured WiFi activity unbeknownst to the account

4  holder.

5  BY MR. ALLAN:

6     Q.   Do you know whether when Cox installs high

7  speed Internet at a new subscriber's house they -- their

8  default procedure is to secure the wireless connection?

9        MR. BRIDGES:  Objection.  Lacks foundation.

10  Assumes many facts not in evidence.  Competence.  May

11  call for speculation.

12        THE WITNESS:  Okay.  So you asked me if -- let

13  me just review the question on the real-time.

14        Their default procedure is to secure the

15  wireless connection.  So that would be an installer

16  working with individual account holders in onboarding

17  their accounts, and I have no knowledge of what takes

18  place among individual installers and account holders.

19  I do understand that account holders are given a welcome

20  package which includes policies and technical

21  information.

22

Page  260

BY MR. ALLAN:

Q.   In your report, Mr. Rosenblatt, you compare

Cox's graduated response process to that of the

Copyright Alert System; is that right?

A.   Yes.

Q.   And do you know whether -- strike that.

Why do you believe that a comparison between

Cox's graduated response process and the Copyright Alert

System is an appropriate comparison for purposes of

rendering your opinion in this case?

A.   Two reasons.  Two primary reasons.  The first

reason is -- and let me make sure I state it correctly.

Well, okay.  Three reasons.  One reason is that this --

the Copyright Alert System represents an agreed-upon set

of best practices for addressing allegations of

copyright infringement on ISPs that was agreed upon --

that was agreed to by several of the major US ISPs,

which are as we discussed this morning in what I

consider to be a Cox peer group, Cox's peer group as an

ISP and major as well independent holders of copyright

rights, and so therefore it represents a set of best

practices that the major stakeholders regarding online

Page  261

1    copyright infringement allegations have agreed.  So

2    that's reason No. 1.

3              Reason No. 2 is, the level of detail that the

4    Copyright Alert System Memo of Understanding goes into,

5    plus that of the information that each of the

6    participating ISPs has published about it, enables us to

7    gain enough detail about how the process works to be

8    able to legitimately compare it to Cox's graduated

9    response process.

10             And No. 3 is -- well, okay.  I already pretty

11   much said No. 3.  No. 3 is that the ISPs involved are

12   peers of Cox in terms of being major ISPs in the

13   United States.

14             That's the -- those are the reasons why I chose

15   to compare Cox's graduated response process with that of

16   the Copyright Alert System.

17        Q.   So in terms of reason No. 2, I just want to

18   make sure I understand this.  Your opinion is that as

19   between the MOU and the various published policies of

20   the various participating ISPs, there's enough detail in

21   that process to be able to legitimately compare to Cox's

22   graduated response process?

Page 262

1        MR. BRIDGES:  Objection.  His testimony speaks

2   for itself, and his opinion and reports -- his opinions

3   and reports speak for themselves.

4        THE WITNESS:  Let me add to that answer,

5   actually.  Let me amend that No. 2.  The additional

6   source of information that enables me to be confident in

7   the level of detail required to be able to make a

8   legitimate comparison is the independent analysis of the

9   Copyright Alert System that was done by Stroz Friedberg

10  sometime in -- I forget exactly when.  I could find it

11  in my report.  But there was an independent analysis

12  done, which to someone such as myself who is familiar

13  with alleged infringement-monitoring techniques, the

14  level of detail is such that I could make use of that

15  report and compare it to what Cox does.

16  BY MR. ALLAN:

17      Q.   What is your experience with alleged

18  infringement-monitoring techniques?

19      A.   I have worked with various companies that

20  produce technology that's relevant in that arena.

21      Q.   Which companies?

22      A.   Okay.  So Zeitera is one.  It's a

8/5/2015          BMG Rights Management, et al. v. Cox Enterprises, Inc., et al.     William Rosenblatt
                           Highly Confidential - Attorneys' Eyes Only

Page 263

1  fingerprinting company that's spelled Z-e-i-t-e-r-a.

2  Attributor is another company in that space.  There's

3  one more.  Digimarc, Irdeto, NDS, now known as Cisco

4  since Cisco acquired them.

5      Q.  What specifically have you done with respect to

6  each of these companies as concerns

7  infringement-monitoring techniques?

8          MR. BRIDGES:  Objection.  Compound.

9          THE WITNESS:  Well, first of all, I should

10  caveat this whole discussion by saying that that

11  knowledge was more informing of my analysis of

12  Rightscorp's system than of the comparison of the

13  Copyright Alert System to Cox's graduated response

14  process, but I will answer your question.  So let's take

15  it one by one.

16          I mentioned Zeitera.  Zeitera was a video

17  fingerprinting technology company that was trying to

18  build basically a hardware device that would do video

19  fingerprinting as part of deep packet inspection that a

20  service provider might use.  And my work with them was

21  basically market strategy.

22          Who else did I mention?

Page 264

1          Q.    Attributor.

2          A.    Okay.   Attributor is now part of Digimarc, and

3     they have a system for crawling the Internet and looking

4     for instances of alleged infringement based on

5     fingerprinting.   And once again my role with respect to

6     that company was -- well, market strategy and also

7     advising them on new product development.   Digimarc, who

8     I consulted to separately from their acquisition and

9     previous to their acquisition of Attributor, that was

10    slightly different in the sense that Digimarc was at the

11    time a watermarking company as opposed to

12    fingerprinting.   It's a different set of techniques, and

13    I worked with them on a project having to do with the

14    use of standard identifiers for music content for

15    copyright management purposes.

16              Do you want me to go on?

17          Q.    Please.

18          A.    Digimarc has a "c" on the end, but we can fix

19    that later.   "Attributor," but we can fix that later.

20    Irdeto is a company that does content protection,

21    copyright monitoring and enforcement.   They do a bunch

22    of things in that space.   I've done a number of things

Page 265

1   with Irdeto.  I wrote a couple white papers for them.

2   Also they acquired a company called Bay TSP, B-a-y,

3   T-S-P, which you could say has a similar model to that

4   of Rightscorp.  And I was involved in -- they were

5   looking to find a buyer, and I was involved in trying to

6   help them find a buyer.  Irdeto eventually bought them.

7   I'm trying to remember which other companies I

8   mentioned.

9          Cisco NDS.  So NDS was originally a division of

10  News Corp., which had pay television content protection

11  technology as well as techniques for monitoring

12  copyright infringement online, and ~~did I~~ I did market strategy

13  work for them as well before they were acquired by

14  Cisco.

15          MR. ALLAN:  Okay.  Thank you.  I'm going to go

16  back to the Copyright Alert System.  Okay?

17          THE WITNESS:  Okay.

18          MR. ALLAN:  I'm going to hand you what I

19  believe is the MOU and ask you to confirm that for me.

20          MR. BRIDGES:  I'm sorry.  Are we marking this

21  as an exhibit?

22          MR. ALLAN:  It is.

Page 266

1          MR. BRIDGES:  This is Exhibit 13?

2          MR. ALLAN:  Yes.

3          MR. BRIDGES:  WR 13.

4                    (Whereupon, WR 13 was marked for

5               identification.)

6          THE WITNESS:  Yes, I confirm that that's the

7     CAS MOU.

8     BY MR. ALLAN:

9        Q.   And you are familiar with this document, are

10    you not, Mr. Rosenblatt?

11       A.   Yes, with particular familiarity to certain

12    parts of it.

13       Q.   I think you testified earlier that your

14    understanding is that this is an agreed-upon set of best

15    practices for addressing allegations of copyright

16    infringement; is that right?

17          MR. BRIDGES:  Are you asking if those are the

18    words he used?

19          THE WITNESS:  I don't remember if those are my

20    exact words, but I'll agree that that was the substance

21    of my testimony.

22

Page 346

1    STATE OF CALIFORNIA        )

2    COUNTY OF LOS ANGELES      )   SS.

3

4        I, AUDRA E. CRAMER, C.S.R. No. 9901, in and for
     the State of California, do hereby certify:

5        That, prior to being examined, the witness named
     in the foregoing deposition was by me duly sworn to

6    testify the truth, the whole truth and nothing but the

7    truth;

         That said deposition was taken down by me in

8    shorthand at the time and place therein named, and

9    thereafter reduced to typewriting under my direction,
     and the same is a true, correct and complete transcript

10   of said proceedings;

11       I further certify that I am not interested in the

12   event of the action.

13       Witness my hand this 8th day of August 2015.

14

15

16

17

18    _____

19    Certified Shorthand

20    Reporter for the

21    State of California

22