**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, )<br>)<br>)<br>)<br>Defendants. )<br>) | Case No. 1:14-cv-1611 (LOG/JFA) |

**COX'S OPPOSITION TO PLAINTIFFS'
MOTION *IN LIMINE* NO. 7
(COX NOTICE AND WARNING STATISTICS)**

**INTRODUCTION**

Cox respectfully submits this opposition to Plaintiffs' Motion *In Limine* No. 7 To Preclude Cox and Its Experts From Using Deceptive Notice and Warning Statistics To Argue That Its "Graduated Response" Is Highly Effective At Curbing Infringement (Dkt. No. 563).

Plaintiffs argue that the data set forth in a graphic used by Cox's expert William Rosenblatt, as a partial basis upon which he draws the conclusion that Cox's graduated response procedures are effective at curbing allegedly infringing behavior, are misleading and do not support his conclusion. While Cox disagrees for the reasons set forth below, Plaintiffs' arguments with respect to this data are nothing more than a dry run of arguments that they are free to make upon cross examination of Mr. Rosenblatt at trial if and when he presents that data. They are not proper grounds for excluding Mr. Rosenblatt from presenting that data at all.

The Fourth Circuit has stated that "the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence," and that "exclusion is the least favored means of rendering questionable scientific evidence ineffective." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999); *Cavallo v. Star Enter.,* 100 F.3d 1150, 1158 (4th Cir. 1996). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

In any event, Plaintiffs do not mention or challenge other data produced by Cox that Mr. Rosenblatt analyzed and relied upon to form the same conclusions concerning the effectiveness of Cox's graduated response procedures. Excluding portions of the bases for Mr. Rosenblatt's opinion will do nothing to streamline the issues for trial. Plaintiffs' motion should therefore be denied.

## ARGUMENT

Plaintiffs begin their arguments with a misleading characterization of Cox's CATS system, which processes notices of alleged infringement, by claiming that Cox takes customer-facing actions on only ten percent of copyright notices sent by entities other than Rightscorp. Plaintiffs do not identify how that ten percent figure was derived but it was apparently calculated in a fashion similar to a five percent figure that Plaintiffs claimed in their summary judgment motion. *See* Dkt. No. 330 at 15-16 (¶¶ 63-65). Those calculations are misleading because they count in the universe of notices sent to Cox (the base upon which Plaintiffs calculate their

percentages) all notices from blacklisted senders, all first notices to a particular Cox account holder that CATS auto-closes as a "hold for more," and all notices that are subject to various "hard" and "soft" limits in the CATS system.

As multiple Cox witnesses will explain, Cox has good technical and business reasons for not processing notices from entities that refuse, after discussions with Cox, to send compliant notices. It is therefore misleading to count notices sent by such "blacklisted" entities when assessing whether Cox's process for handling complaints is reasonable and effective at curbing alleged infringements. Plaintiffs have no evidence to suggest that, if those entities had submitted compliant notices to Cox, Cox would not have processed and taken action on them, as it does for all other compliant notices. Moreover, in the case of first notices for which Cox does a "hold for more" (for efficiency reasons, because Cox has determined that in the vast majority of cases those account holders never receive a second notice), Cox still retains the notice in CATS. If Cox receives subsequent complaints regarding that account holder, the initial "hold for more" notice is counted in the process that could lead to suspensions and termination. *See* Dkt. No. 397 (Zabek Dec.), ¶ 9.

Finally, many of the notices are not processed immediately because various reasonable limits in the CATS system cause them to be processed in the next day or two; such limits are used to avoid having the system and its customer support organizations become overwhelmed with notices in a particular 24-hour period, causing them to be unable to respond. Dkt. No. 387 (Beck Dec.), ¶¶ 5, 9-12. With those facts in mind, apart from complaints from blacklisted entities, Cox takes some sort of action on <u>all</u> of the copyright complaints it receives into the CATS system. *Id*., ¶ 9. Plaintiffs' ten percent figure is therefore a red herring to distract from the actual object of their motion, which is a set of statistics relating to the number of warnings

Cox sent to its customers contained in a graphic cited by Mr. Rosenblatt in his Opening Expert Report. *See* Dkt. No. 452, Ex. 1, ¶ 107.

Plaintiffs assert that the data in the graphic show only that Cox has sent five or fewer notices to 96% of its customers, but "does not show that 96% of customers stop after five notices or, indeed, show anything about Cox subscriber behavior. Instead, the slide simply reflects the number of warnings that Cox sends to its customers." Dkt. No. 563 at 3. First, Plaintiffs mischaracterize the point Mr. Rosenblatt was making with that data. He did not cite the data to prove "that 96% of customers stop after five notices." Rather, he cited the data in order to make a comparison with the Copyright Alert System (CAS), to show that a higher percentage of account holders receiving a fifth warning in CAS go on to receive a sixth alert than do so in Cox's graduated response process. He opined that this suggests that Cox's scheme is more effective at curbing alleged repeat infringements *than CAS*. Dkt. No. 452, Ex. 1, ¶¶ 107-108. But more importantly, whether Mr. Rosenblatt's comparisons or inferences from the statistics are reasonable or correct can be adequately tested by Plaintiffs on cross examination, including on the grounds that Plaintiffs' argue in this motion.

Plaintiffs further object that Mr. Rosenblatt did not adequately identify the source of the data in the graphic or discuss its timescale, and that he merely took the data at face value from a PowerPoint presentation prepared by Cox's in-house legal department. But these objections merely go to the weight that should be given to the data. Plaintiffs can raise those bases, as well as any other grounds they deem relevant for questioning the weight of the data, at trial.

Finally, Plaintiffs assert that the data in the graphic is the "sole support" Mr. Rosenblatt offers for his opinion that Cox's graduated response process is effective at curbing allegedly infringing behavior. Dkt. No. 563 at 3. This is patently incorrect. In his Reply Expert Report

4

(Dkt. No. 452, Ex. 1), to gain insight into the effectiveness of Cox's graduated response process in curbing allegedly infringing behaviors over time, Mr. Rosenblatt analyzed empirical data from CATS, relating to suspensions and terminations, across a three-and-a-half year period from January 2010 to April 2013. (That data was generated from CATS and produced in response to Plaintiffs' Interrogatory Nos. 5-8.) Figure 1 of his Reply Expert Report shows the number of suspensions per month during that time period, expressed as a percentage of the total number of copyright complaints received in CATS and as a percentage of the total number of subscriber-facing actions (including warnings, suspensions, and terminations) taken in response to those complaints. Based on analysis of that data, Mr. Rosenblatt concluded that changes made by Cox to the graduated response steps during this time period made the process more, not less, effective in curbing allegedly infringing behaviors. *See* Rosenblatt Reply Expert Report (Dkt. No. 452, Ex. 3), ¶¶ 51-56.

Mr. Rosenblatt also featured this data and analysis in his recent declaration in support of Cox's opposition to Plaintiffs' motion for partial summary judgment. *See* Dkt. No. 390, ¶¶106-111. It is conspicuous and telling that Plaintiffs fail to challenge these additional sources that Mr. Rosenblatt relied on to support his opinions regarding the effectiveness of Cox's graduated response process. That additional data also belies Plaintiffs' claim that "Mr. Rosenblatt does not discuss the data set, timescale, or source of information" on which he bases his analysis and conclusions. Dkt. No. 563 at 5.

Plaintiffs apparently believe that examination of data relating to suspensions, rather than solely to terminations, is irrelevant and an improper basis for drawing any conclusions concerning whether Cox's graduated response procedures are effective at curbing allegedly infringing behavior. Dkt. No. 563 at 3-4. Mr. Rosenblatt, based on his expertise and knowledge

of many graduated response systems, disagrees. The point of terminating repeat infringers, as required by Section 512(i) of the DMCA, is to stop them from engaging in further infringement. And the final step of Cox's graduated procedures is indeed to terminate those account holders for whom the other steps have failed to curb the allegedly infringing behavior. But in Mr. Rosenblatt's view, a well-designed graduated response procedure will aim to stop allegedly infringing behavior, through escalating consequences, without relying solely on the drastic final step of termination. If a procedure is effective in that regard, a small number of terminations would not reflect that the process was ineffective; quite the opposite.

For these reasons, Mr. Rosenblatt has chosen to examine both suspensions (the final steps preceding a termination) and terminations — and the relationship between the two — to make an assessment of whether Cox's procedures were eliminating allegedly infringing behavior before reaching the termination step. Plaintiffs and their experts may disagree with Mr. Rosenblatt's methodology, the relevance or adequacy of the data he has chosen to support his analysis, and the conclusions he draws from the data. But the proper vehicle to test those challenges and disagreements is vigorous cross examination of his testimony, not exclusion of the data, or the type of data, on which he bases his analysis and conclusions.

## CONCLUSION

For all the reasons above, the Court should deny Plaintiffs' Motion *In Limine* No. 7 and permit Mr. Rosenblatt to testify as to the reasons and bases, including data regarding warnings and notices Cox sends to its subscribers such as those set forth in his expert reports, for his conclusions that Cox's graduated response process is effective at curbing allegedly infringing behavior over the Cox network.

| | |
|---|---|
| Dated: November 13, 2015 | Respectfully submitted, |
| | |
| | */s/ Craig C. Reilly* |
| | Craig C. Reilly VSB # 20942 |
| | 111 Oronoco Street |
| | Alexandria, Virginia 22314 |
| | T<small>EL</small>:    (703) 549-5354 |
| | F<small>AX</small>:    (703) 549-5355 |
| | E-<small>MAIL</small>: craig.reilly@ccreillylaw.com |
| | |
| | *Counsel for Defendants* |

*Of Counsel for Defendants*

Andrew P. Bridges (*pro hac vice*)
David L. Hayes (*pro hac vice*)
Jedediah Wakefield (*pro hac vice)*
Guinevere L. Jobson (*pro hac vice*)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2300
Fax: (415) 281-1350
Email:   abridges@fenwick.com
         gjobson@fenwick.com

Brian D. Buckley (*pro hac vice)*
Fenwick & West LLP
1191 2nd Avenue, 10th Floor
Seattle, WA 98101
Tel: (206) 389-4510
Fax: (206) 389-4511
Email:   bbuckley@fenwick.com

Armen N. Nercessian (*pro hac vice*)
Ronnie Solomon (*pro hac vice*)
Ciara Mittan (*pro hac vice*)
Nicholas A. Plassaras (*pro hac vice*)
Fenwick & West LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500
Fax: (650) 938-5200
Email:   anercessian@fenwick.com
         rsolomon@fenwick.com
         cmittan@fenwick.com
         nplassaras@fenwick.com

7

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2015, the foregoing document was filed and served electronically by the Court's CM/ECF system upon all registered users:

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-5355
craig.reilly@ccreillylaw.com

*Counsel for Defendants*