UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP, <br><br> Plaintiff, <br><br> v. <br><br> COX ENTERPRISES, INC., COX COMMUNICATIONS, INC., and COXCOM, LLC, <br><br> Defendants. | Case No. 1:14-cv-1611 (LOG/JFA) |

**COX'S OPPOSITION TO PLAINTIFFS'
MOTION *IN LIMINE* NO. 3
(THE COPYRIGHT ALERT SYSTEM AND OTHER ISP PRACTICES)**

**INTRODUCTION**

Cox respectfully submits this opposition to Plaintiffs' Motion *In Limine* No. 3 To Prohibit Cox from Referencing the Copyright Alert System Or The DMCA Practices Of Other Internet Service Providers (Dkt. No. 551). Plaintiffs ask this Court to preclude Cox and its experts "from referring to the Copyright Alert System ('CAS') as well as the practices of other internet service providers ('ISPs') for responding to notices of copyright infringement." Dkt. No. 551 at 1. The Court should deny that request.

As the Court observed at the summary judgment hearing on October 30, 2015, the DMCA requirements for safe harbor provide little clear guidance: "And we get to the safe harbor provision, and it doesn't define any of the meaningful terms." Dkt. No. 510 (October

30, 2015 Hearing Transcript) at 35-36.  When he was informed of the applicable safe harbor provisions of the DMCA, Plaintiffs' putative industry expert, Dr. Terrence McGarty, admitted that he had no clue how to interpret those provisions.  *See* Dkt. No. 464-4 at 44:10-45:4 ("It leaves the person implementing it to the – to wander in the desert.  I have no idea what it means ….").  In light of that ambiguity, the Court correctly noted that the responsibility of applying the terms of the DMCA is best left to the jury:  "And whether there was appropriate circumstances, whether we have repeat offenders, whether their violations were repeated or flagrant, those are issues that I think a jury may have to decide."  Dkt. No. 510 (October 30, 2015 Hearing Transcript) at 35-36.

The Court should not leave the jury "to wander in the desert."  The jurors will require *some* context for determining what are "appropriate circumstances" and what is "reasonable implementation" of a policy for addressing "repeat infringers."  The CAS, and information about other ISPs' practices for addressing infringement allegations, both help provide that context and will almost certainly be useful for the jury.  And that is the test:  to be helpful for jurors, and therefore admissible, evidence must inform a factual question, not answer it.  *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985) ("[I]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue ….").

Plaintiffs seek to usurp the jury's role.  They impose their own incorrect interpretation of the CAS and summarily decide that it deserves no weight.  And by seeking to exclude entirely evidence of the practices of other ISPs, they similarly decide that it deserves no weight.  But the degree of weight to accord the CAS and the known practices of other ISPs is up to the jury.

**ARGUMENT**

"To be admissible, evidence must be relevant—a low barrier requiring only that evidence be worth consideration by the jury." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 349 (4th Cir. 2014) (internal quotations and citations omitted); *see also* FED. R. EVID. 401. Moreover, Rule 403 only permits the exclusion of evidence that creates a "danger of *unfair* prejudice." FED. R. EVID. 403 (emphasis added); *U.S. v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003) ("Rule 403 requires exclusion of evidence only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.") (internal quotation omitted).

"It is appropriate for experts to testify about the ordinary practices of a profession or trade to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1372 (S.D.N.Y. 1982) (internal quotations omitted); *see also Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 728 (E.D.N.C. 2007) ("[E]xpert testimony pertaining to industry standards and [a litigant's] compliance or non-compliance is undoubtedly helpful …."). In cases involving complex legal compliance schemes, it is often "difficult to imagine how" a litigant can present its case "without the assistance of expert testimony to explain the intricate regulatory landscape and how [p]ractitioners function within it." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (affirming admission of expert testimony in case involving complex issues of securities law).

**I.   THE COPYRIGHT ALERT SYSTEM IS A RELEVANT INDUSTRY STANDARD.**

The CAS is a highly relevant industry standard.  It is the most publicized graduated response system for handling allegations of copyright infringement.  It is the best documented,

including an over-thirty-page Memorandum of Understanding. *See generally* Dkt. No. 574 (Roberts Declaration in support of Plaintiffs' motions *in limine*) ("Roberts Dec."), Ex. 6. It is further informed by data and information published by each of the participating ISPs. And it involves an agreement among major stakeholders in the copyright space, both rightsholders and service providers.[1] The CAS represents an agreed-upon set of best practices among major industry players for addressing notices of alleged infringement, and as such it is a relevant guidepost of industry practices for other entities that deal with infringement allegations.[2]

Importantly, Cox also participated in the cross-industry negotiations that led up to the emergence of the CAS. Cox's former in-house counsel, Randy Cadenhead, played an active role in those negotiations. He ultimately advised Cox not to join the CAS because he believed that Cox's graduated response procedures were better and more effective at reducing the behaviors that give rise to allegations of infringement. Mr. Cadenhead testified at length about the CAS in his deposition. In other words, Cox itself considered the CAS a relevant point of comparison in assessing Cox's systems and procedures for addressing allegations of copyright infringement.[3] And Mr. Cadenhead's direct knowledge of both the CAS and Cox's procedures allows him to offer useful testimony about the similarities and key differences between the two systems.

---

[1] Plaintiffs try to marginalize the CAS as "an agreement between a small group of ISPs and copyright holders." Dkt. No. 551 at 3. The members in that "small group" include half of the top ten largest ISPs in the U.S., all of the major recorded music companies, and all of the major movie studios. *See* Roberts Dec., Ex. 6 at 21-25, 36.

[2] In fact, some of Cox's peer ISPs do not act upon any allegations of copyright infringement *except* through the CAS. *See, e.g.*, Dkt. No. 311, ¶ 4(q), (u), Exs. 2, 9, 11.

[3] The CAS provides helpful data points for evaluating specific aspects of Cox's graduated response procedures. For instance, just as the Cox Abuse Tracking System (CATS) has limits on the number of notices it will act on from a given copyright complainant in a given day, the CAS too imposes similar limits. *See* Dkt. No. 452, Ex. 3 ¶ 91. Plaintiffs cannot genuinely argue that such data points will not at least be *helpful* to the jury.

The CAS therefore plainly has probative value that would help the jury assess the reasonableness of Cox's graduated response procedures. Plaintiffs entirely dismiss that value, and seek wholesale exclusion of information regarding the CAS, based on Plaintiffs' claim that the CAS "by its express terms is not intended to be a replacement for DMCA policy and procedures." Dkt. No. 551 at 3. But that is not what the CAS says; it actually states:

> Notwithstanding the foregoing, (1) this Agreement does not and is not intended to create any obligation on a Participating ISP to adopt, implement, enforce, or otherwise take any action in furtherance of a DMCA Termination Policy; (2) the adoption, implementation, enforcement, or other action in furtherance of a DMCA Termination Policy is not part of any step of the Copyright Alert program or enforceable under this Agreement; and (3) entering into this Agreement is not, by itself, intended to address whether a Participating ISP has adopted and reasonably implemented a DMCA Termination Policy. This Agreement does not and is not intended to establish any legal inference regarding any ISP that does not participate in the Copyright Alert program or to address whether or not any ISP has adopted and reasonably implemented a DMCA Termination Policy ….

Roberts Dec., Ex. 6 at 9 n.1. That footnote says, in three different ways, that the CAS participants take no position on how the CAS relates to the DMCA. They left open whether and to what extent the CAS might also satisfy the DMCA safe harbor requirements. The footnote therefore sets forth the neutral position that election not to participate in the CAS does not mean that an ISP has not satisfied the provisions of the DMCA with respect to a termination policy, nor does election to participate mean that it has. Thus, the footnote leaves the question of the extent to which the CAS has any bearing on the reasonableness of an ISP's implementation of its DMCA termination policy where it belongs: with the finder of fact.

Plaintiffs also insist that the jury should ignore the CAS because it does not provide for termination as one of its graduated steps. *See* Dkt. No. 551 at 3. That hardly renders the CAS *irrelevant* to the inquiry of whether Cox reasonably implemented it policy for termination of repeat infringers in appropriate circumstances. Some (perhaps most) other ISPs do not

terminate their subscribers at all. For instance, AT&T has on many occasions stated publicly that it will terminate account holders only based on "conclusive determinations of infringement by a court." *See* Dkt. No. 597-6. Tellingly, Plaintiffs' putative industry expert, Dr. McGarty, admitted that he did not know of any ISP that terminated its customers based on mere allegations of copyright infringement. Dkt. No. 464-4 at 165:1-21. The jury is entitled to know that Cox is one of the few ISPs, if not the only one, that actually has a policy that results in termination.

**II.     COX'S WITNESSES HAVE A RELIABLE FOUNDATION FOR THEIR TESTIMONY ABOUT THE COPYRIGHT ALERT SYSTEM.**

Plaintiffs also assert that Cox's fact and expert witnesses do not have "independent knowledge" of the CAS and the DMCA-related policies of other ISPs. *See* Dkt. No. 551 at 3-4. That is false. As explained above, Mr. Cadenhead actively participated in the cross-industry discussions leading up to the advent of the CAS. Cox's expert, William Rosenblatt, has spent two decades consulting, writing, and lecturing in the digital rights space, often with respect to the CAS and other graduated response regimes. *See, e.g.*, Dkt. No. 500 ¶ 8, Ex. G (collecting ten articles that Mr. Rosenblatt has written reporting on graduated response regimes).

Moreover, as an expert, Mr. Rosenblatt can reasonably rely on publicly available information about the CAS, such as the Memorandum of Understanding, which provides significant detail about the CAS's graduated response procedures. *See* Roberts Dec., Ex. 6; *cf.* FED. R. EVID. 703. "[T]he cases uniformly recognize that trade and industry publications and compilations can be appropriate sources of facts and data upon which an expert can reasonably rely." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 656 (N.D. Ill. 2006) (collecting cases). Thus, "application of [Mr. Rosenblatt's] expertise to publicly available information does not

place the proposed testimony outside of [his] area of expertise." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 497 (S.D.N.Y. 2009).

If Plaintiffs truly believe that such publicly available materials, and Mr. Rosenblatt's long experience in the digital rights space, do not provide him a basis to "credibly opine on other ISPs' policies," the correct vehicle for challenging his opinions is cross-examination, not exclusion: "While [publicly available] data [may be] imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) (holding that district court did not abuse its discretion in admitting testimony from damages expert, where "the facts were drawn from internal [defendant's] documents, *publicly available information about other custom XML editing software*, and a survey designed to estimate the amount of infringing use") (emphasis added); *see also U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748, 764-65 (N.D. Ill. 2009) (admitting expert testimony on ultimate issue of whether certain information constituted a "trade secret," where the witness "adequately corroborated opinions based on his own substantial personal experience with frequent reference to publicly-available information").

Because both Mr. Cadenhead and Mr. Rosenblatt have an adequate foundation to offer testimony about the CAS, the Court should deny Plaintiffs' motion and admit evidence, testimony, and argument by Cox about the CAS and the known practices of other ISPs for responding to notices of alleged copyright infringement.

## CONCLUSION

For the reasons set forth above, Cox respectfully submits that Plaintiffs' motion *in limine* No. 3 must be denied.

Dated: November 13, 2015    Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
TEL:    (703) 549-5354
FAX:    (703) 549-5355
E-MAIL: craig.reilly@ccreillylaw.com

*Counsel for Defendants*

*Of Counsel for Defendants*

Andrew P. Bridges (*pro hac vice*)
David L. Hayes (*pro hac vice*)
Jedediah Wakefield (*pro hac vice)*
Guinevere L. Jobson (*pro hac vice*)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2300
Fax: (415) 281-1350
Email: abridges@fenwick.com
　　　　gjobson@fenwick.com

Brian D. Buckley (*pro hac vice)*
Fenwick & West LLP
1191 2nd Avenue, 10th Floor
Seattle, WA 98101
Tel: (206) 389-4510
Fax: (206) 389-4511
Email: bbuckley@fenwick.com

Armen N. Nercessian (*pro hac vice*)
Ronnie Solomon (*pro hac vice*)
Ciara Mittan (*pro hac vice*)
Nicholas A. Plassaras (*pro hac vice*)
Fenwick & West LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500
Fax: (650) 938-5200
Email: anercessian@fenwick.com
　　　　rsolomon@fenwick.com
　　　　cmittan@fenwick.com
　　　　nplassaras@fenwick.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 13, 2015, the foregoing document was filed and served electronically by the Court's CM/ECF system upon all registered users:

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-5355
craig.reilly@ccreillylaw.com

*Counsel for Defendants*