**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,  ) ) ) | |
| ) | Civil No. 1:14-cv-1611 |
| Plaintiffs,  ) ) | |
| ) | Hon. Liam O'Grady |
| v.  ) ) | |
| COX COMMUNICATIONS, INC., and COXCOM, LLC,  ) ) ) | |
| Defendants.  ) ) | |

**MEMORANDUM OPINION**

In this copyright action, the putative owners of more than 1,400 musical composition

copyrights seek to hold Cox Communications, Inc. and Cox Com, LLC (collectively, "Cox")

contributorily and vicariously liable for alleged copyright infringement taking place over its

high-speed internet service.  At the close of extensive discovery, the parties cross-moved for

summary judgment.  Following oral argument, the Court issued an Order (Dkt. No. 675) granting

in part and denying in part Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 310) and

denying Cox's Motion for Summary Judgment (Dkt. No. 305) for the reasons stated in this

memorandum opinion.

## I.  Background

Cox provides high-speed internet service to customers nationwide.  Plaintiffs BMG

Rights Management (US), LLC ("BMG") and Round Hill Music LP are the putative owners or

administrators of approximately 1,400 musical composition copyrights.  Plaintiffs allege users of

1

Cox internet service employ BitTorrent, a type of peer-to-peer ("P2P") file sharing, to illegally upload and download music files, thereby violating Plaintiffs' exclusive rights.

**A.      *BitTorrent***

The innovation of P2P file sharing is that it allows "user's computers [to] communicate directly with each other," rather than through a central server. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919 (2005). All P2P protocols have "one thing in common: a decentralized infrastructure whereby each participant in the network (typically called a 'peer,' but sometimes called a 'node') acts as both a supplier and consumer of information resources." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1024 (9th Cir. 2013). While P2P protocols have many benefits and non-infringing uses, *see Grokster*, 545 U.S. at 920 (noting that P2P networks are "employed to store and distribute files by universities, government agencies, corporations, and libraries, among others"), they have also been harnessed for less meritorious purposes by "those wanting access to pirated media, [such as] music, movies, and television shows." *Columbia Pictures Indus., Inc.*, 710 F.3d at 1025.

The BitTorrent protocol is unique in "how it facilitates file transfers." *Id.* at 1026. BitTorrent breaks files into pieces, which "permits users to download lots of different pieces at the same time from different peers." *Id.* It also allows users to begin sharing before the complete file has downloaded, meaning "at any given time, each user is both downloading and uploading several different pieces of a file from and to multiple other users." *Id.* at 1027.

**B.      *Rightscorp, Inc.***

Plaintiffs enlisted Rightscorp, Inc. ("Rightscorp") as their agent to identify infringing uses of their copyrighted works. Rightscorp's software searches websites that index torrent files and identifies files that appear to contain one or more of the Plaintiffs' copyrighted works.

Defs.' SUMF ¶ 19.  A torrent file does not actually contain any content.  *Id.* ¶ 18.  It contains metadata about the files available to be distributed and other information that allows Rightscorp to contact a tracker and find peers offering torrent payloads that contain the files.  *Id.*  If Rightscorp contacts a peer and determines that the peer has the torrent payload, Rightscorp will record the date, time, the peer's IP address, the port on the peer's computer through which the connection was made, the torrent file's unique hash value, and the name of the copyrighted work.  Pls.' SAMF ¶ 7.  Rightscorp then sends a notice of infringement to the internet service provider associated with the recorded IP address.  *Id.*  According to Plaintiffs, Rightscorp sent Cox 2.5 million notices corresponding to instances in which Cox internet users offered one of Plaintiffs' copyrighted works for download.[1]  *Id.*  ¶ 15.  Plaintiffs also contend that Rightscorp downloaded more than 100,000 full copies of music files that violated Plaintiffs' musical composition copyrights from peers through Cox's internet service.  *Id.* ¶ 10.

## C.    *Cox's Copyright Policy and Graduated Response Procedure*

Cox's Acceptable Use Policy ("AUP") provides that account holders may not use Cox's internet service "to post, copy, transmit, or disseminate any content that infringes the patents, copyrights, trade secrets, trademark, moral rights, or propriety rights of any party."  Theodore Decl. Ex. 10; Trickey Decl. ¶ 11.  The AUP further provides that "[v]iolation of any terms of this AUP may result in the immediate suspension or termination of either . . . access to the Service

---

[1]  This number is disputed.  Rightscorp asserts that during the time period relevant to this litigation, an infringement notice issued only when Rightscorp's software confirmed that a peer was offering 100% of its payload.  Rightscorp admits that beginning in December 2014, after the filing of this lawsuit, it began sending notices when a payload contained anywhere between 10% and 100%.  Because a torrent payload may contain hundreds of files, establishing that a peer is offering 10% of a payload is not a guarantee that the work identified in a notice was in fact in the payload.  Cox claims that over 500,000 of the 2.5 million notices were issued after the lawsuit was filed and therefore, for at least some of those notices, the peer did not actually have the allegedly infringing file.  Cox also argues that Rightscorp cannot establish that it was utilizing a 100% bitfield threshold during the time period relevant to the suit.

and/or [the] Cox account."  Theodore Decl. Ex. 10; Trickey Decl. ¶ 11.  Cox informs account

holders of the policy in subscriber agreements.  Trickey Decl. ¶ 12.  The terms on Cox's website

also incorporate the AUP's policy by reference.  *Id.* ¶ 13.

     Cox's abuse department handles misconduct on Cox's network.  Abuse ranges from

copyright infringement to hacking to excessive bandwidth usage.  Pls.' SUMF ¶ 17.  Cox offers

copyright owners an email address, abuse@cox.net, to which they can send notices of

infringement.  Beck Decl. ¶ 3.  Cox processes the notices it receives using a largely automated

system called CATS—Cox Abuse Tracking System.  Pls.' SUMF ¶ 19.  CATS scans the

messages in the inbox and culls certain information, such as the date of the alleged abuse, the IP

address, and so on.  Beck Decl. ¶ 7.  That information is then used to create a "ticket."  *Id.* ¶ 3.

     Three features of the CATS system are worth mentioning.  First, when Cox receives

multiple complaints in one day for a single account, the tickets are "rolled up," meaning Cox

counts only the first ticket.  *Id.* ¶ 8 & n.4; Zabek Decl. ¶ 9; Theodore Decl. Ex. 1 at 155–56.

Second, Cox imposes a "hard limit" on the number of complaints a complainant can submit that

will receive customer-facing action.  Beck Decl. ¶ 8.  If a complainant exceeds the hard limit,

CATS automatically sends an email informing the complainant that the daily limit has been

reached and the tickets created from those emails are automatically closed.  Theodore Decl. Ex.

42 at 7.  The default limit is 200 complaints per complainant per day, but Cox says it will work

with a complainant to set a reasonable number.  *Id.*; Zabeck Decl. ¶ 30.  Cox claims such limits

are necessary to keep the number of complaints at a manageable capacity for staff and to prevent

a single complainant from overwhelming the company.  Beck Decl. ¶ 10.  Third, Cox defines its

"abuse cycle" in 180-day periods.  Theodore Decl. Ex. 17 at 2.  While Cox maintains a record of

its customers' full ticket histories, if no complaints are received within six months from the last complaint, the cycle restarts.  *Id.*; Zabek Decl. ¶ 9.

Cox handles tickets generated by CATS according to its graduated response procedure. Beck Decl. ¶ 12; Theodore Decl. Ex. 39 at 10; *id.* Ex. 17.  This process, which Cox does not publicize to customers, progresses from warnings to suspensions and ultimately, the possibility of termination.  Theodore Decl. Ex. 17 at 11–12.  Cox takes no action on an account's first ticket because a "substantial percentage" of accounts never receive a second complaint within one abuse cycle.  Zabek Decl. ¶ 9; Theodore Decl. Ex. 17 at 11; *id.* Ex. 39 at 13.  When a second complaint arrives, CATS generates an email to the account holder that includes a letter from Cox explaining the alleged infringement as well as the complete text of the infringement notice Cox received from the copyright owner.[2]  Beck Decl. ¶ 12; Zabek Decl. ¶ 9.  When Cox has "rolled up" complaints over the course of a day, CATS will only send the first complaint received that day.  Beck Decl. ¶ 12 n.9.  This process of sending an email warning repeats on the third, fourth, fifth, sixth, and seventh complaints Cox receives for an account within a six-month period. Theodore Decl. Ex. 17 at 11.

When Cox receives an eighth notice, it suspends the account and places the account holder in what Cox calls a "soft-walled garden."  Beck Decl. ¶ 9.  That means the account holder's internet access is temporarily limited to a single webpage that displays a warning message.  *Id.*; Zabeck Decl. ¶ 9.  The account holder can exit the soft-walled garden and self-reactivate service by clicking a link on the webpage.  Beck Decl. Ex. 3 ("After deleting the files and disabling file sharing, you may click here to reactivate your service." (emphasis omitted));

---

[2]  If there is no email address on record for the customer, Cox skips the warning stage and moves directly to suspensions.  Theodore Decl. Ex. 17 at 12; Beck Decl. ¶ 9 n.10.

Theodore Decl. Ex. 17 at 11; *id.* Ex. 2 at 178–79.  On the ninth complaint, the account holder is again sent to the soft-walled garden.  Beck Decl. ¶ 9; Theodore Decl. Ex. 17 at 11.

The tenth complaint results in what Cox calls a "hard-walled garden."  Beck Decl. ¶ 9.  The account holder is now directed to a webpage with instructions to call Cox customer service.  Theodore Decl. Ex. 17 at 11.  When the account holder calls Cox, he or she can request reactivation.  *Id.*; *id.* Ex. 1 at 73.  The eleventh complaint is the same.  *Id.* Ex. 17 at 11.  The twelfth and thirteenth complaints also place account holders in the hard-walled garden, but now they must speak to higher-level Cox customer service representatives to request reactivation.  *Id.*; *id.* Ex. 1 at 79–80.  When Cox receives the fourteenth complaint in an abuse cycle, it will review the full account history and consider termination.  *Id.* Ex. 17 at 12.  Termination is never automatic, however, and is left to the discretion of Cox employees.  Beck Decl. ¶ 13.  In the "vast majority" of cases, Cox says it is able to address the behavior triggering the infringement notices during the preliminary steps and never has to reach the "drastic measure" of terminating service.  Zabek Decl. ¶¶ 9, 14.

### D.        Cox's Rejection of Rightscorp's Notices

Rightscorp includes within its standard infringement notice an offer of settlement.  Specifically, the notices say, "This notice is an offer of settlement.  If you click on the link below and login to the Rightscorp, Inc. automated settlement system, for $10.00 [or $20.00] per infringement, you will receive a legal release from the copyright owner."  Beck Decl. Ex. 6.  As a policy, Cox does not accept or process infringement notices that contain settlement offers.  Beck Decl. ¶ 17–18; Zabek Decl. ¶ 31.  Cox's in-house privacy counsel set the policy after concluding that such notices are improper and fall outside the "spirit" of the DMCA.  Theodore Decl. Ex. 5 at 77–78; Zabek Decl. ¶ 31.

When Cox receives a complaint with a settlement offer, it asks the complainant to conform the notice and explains that the notice will not be forwarded unless and until it is amended.  Beck Decl. ¶ 17; Zabeck Decl. ¶ 34.  Until a complainant complies, Cox "blacklists" all complaints received from that complainant by configuring CATS to auto-delete messages received from that complainant's email address.  Beck Decl. ¶ 17.

On March 9, 2011, Cox received its first notice of infringement from Rightscorp.  *Id.* ¶ 19.  Cox asked Rightscorp to remove its settlement offers, but Rightscorp declined to do so and continued to send Cox notices.  Zabek Decl. ¶¶ 32, 35; *id.* Ex. 13.  On March 14, Cox blacklisted Rightscorp, meaning from that point on, Cox auto-deleted Rightscorp's emails and never retrieved the information from the body of those notices.  Beck Decl. ¶ 20; Theodore Decl. Ex. 41 at 10, 12–13.  The following October, Cox claims Rightscorp "started inundating" its inbox, sending as many as 24,000 notices in one day.  Beck Decl. ¶ 21; Zabek Decl. ¶ 33.  In response, Cox blocked Rightscorp.  Blocking messages goes one step beyond blacklisting: now Rightscorp's notices never even entered Cox's inbox.  Theodore Decl. Ex. 2 at 339–40; *id.* Ex. 41 at 10, 13; Beck Decl. ¶ 21.  When a complainant is blacklisted, Cox still has a record of the emails received and deleted.  When a complainant is blocked at the server level, there is no record of any message received.  Theodore Decl. Ex. 41 at 10.

### E.    *Procedural Background*

In November 2014, Plaintiffs filed suit against Cox alleging contributory and vicarious copyright infringement for direct infringements occurring between February 2012 and November 2014.  As relief, Plaintiffs seek statutory damages, injunctive relief, fees, and costs.[3]  In its answer, Cox asserted a number of defenses, including, as is relevant here, eligibility for a

---

[3]  The First Amended Complaint elected both actual and statutory damages.  Plaintiffs made clear in subsequent motions that they only seek statutory damages.

liability-limiting safe harbor in the Digital Millennium Copyright Act ("DMCA").  After

extensive and contentious discovery, the parties cross-moved for summary judgment.  (Dkt. Nos.

305, 310).  On October 29, 2015, the Court ordered supplemental briefing on the limited issue of

Plaintiff Round Hill Music LP's standing.  (Dkt. No. 501).  The following day, the Court heard

oral argument.  The motions are now fully briefed and ripe for consideration.

## II.  Analysis

Plaintiffs seek to hold Cox liable for the direct infringing activities of individuals using

Cox's internet service.  "Although the Copyright Act does not expressly render anyone liable for

infringement committed by another, . . . doctrines of secondary liability emerged from common

law principles and are well established in the law."  *Grokster*, 545 U.S. at 930 (internal

quotations, alteration, and citations omitted).  Plaintiffs invoke two theories of secondary

liability: contributory and vicarious infringement.  "One infringes contributorily by inducing or

encouraging direct infringement, and infringes vicariously by profiting from direct infringement

while declining to exercise a right to stop or limit it."  *Id.* (citations omitted).

After setting out the applicable standard of review, the Court addresses each motion for

summary judgment separately, as it must.  *See Desmond v. PNGI Charles Town Gaming, L.L.C.*,

630 F.3d 351, 354 (4th Cir. 2011).

### A.      *Standard of Review*

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

genuine issue of material fact exists where, after reviewing the record as a whole, a court finds

that a reasonable jury could return a verdict for the nonmoving party."  *McAirlaids, Inc. v.

Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2010).  "It is an axiom that in ruling on a

motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (alteration omitted) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam)) (internal quotation marks omitted).  Although the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party, it is ultimately the nonmovant's burden to persuade [the Court] that there is indeed a dispute of material fact." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014).  That showing requires "more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *Id.*

**B.      *Plaintiffs' Motion for Partial Summary Judgment***

Plaintiffs move for partial summary judgment on two issues.  First, Plaintiffs seek a ruling that they own the copyrights at issue.  Second, Plaintiffs ask the Court to find as a matter of law that Cox is not entitled to protection under the DMCA's safe harbor provisions.  Cox opposes the motion and asks the Court to deny the motion or alternatively enter summary judgment in its favor on both issues.

**1.      Ownership**

To establish a claim of infringement, Plaintiffs must establish their ownership of the 1,421 musical composition copyrights allegedly infringed.[4]  *See Univ. Furniture Int'l, Inc. v. Collezione Europa USA*, 618 F.3d 417, 428 (4th Cir. 2010).  The copyrights at issue can be broken down into four groups: (1) copyrights with certificates of registration that list BMG as the claimant; (2) copyrights with certificates of registration that list a BMG predecessor as the claimant; (3) copyrights that BMG purchased or otherwise acquired from third parties; and

---

[4]  Plaintiffs' memorandum in support of their motion for summary judgment states there are 1,422 copyrights at issue, but Plaintiffs subsequently withdrew one copyright in their reply brief.  *See* Pls.' Reply at 5 n.3.

(4) copyrights with certificates of registration that list Round Hill Music, LLC as the claimant and copyrights that Round Hill Music, LLC purchased or otherwise acquired from third parties. Cox challenges Plaintiffs' ability to establish ownership as to each category and instead asks the Court to enter summary judgment on the element of ownership in its favor.  *See* Defs.' Opp'n at 24.

### a.   *Copyrights That List BMG as the Claimant on the Certificate of Registration*

For this first category of copyrights, Plaintiffs have produced certificates of registration that list BMG as the claimant.  *See* Briggs Decl. Apps. A1–A7, A13 (composition titles and copyright registration numbers); *id.* Exs. B1–B137, B391, B934 (certificates).  The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after the first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c). Included in the facts entitled to the presumption of validity is ownership.  *Univ. Furniture Int'l, Inc.*, 618 F.3d at 428.  Because Plaintiffs produced the certificates they have met their initial burden, and the burden shifts to Cox to "prove that the claimed copyrights are invalid."  *Id.* (citing *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986)).

Cox agrees that the copyright registrations create a rebuttable presumption of ownership, *see* Defs.' Opp'n at 25, but it contends that the evidence needed to rebut the presumption and shift the burden back to Plaintiffs to conclusively establish ownership is not heavy.  Indeed, the Fourth Circuit has cautioned that "the Copyright Office's practice of summarily issuing registrations . . . counsels against placing too much weight on registrations as proof of a valid copyright," and has instructed "reviewing court[s to] assess other relevant indicia of ownership, such as the parties' intent and the terms of transfer agreements and other documents establishing

a chain of title." *Univ. Furniture Int'l, Inc.*, 618 F.3d at 428; *see also* 3-12 Nimmer on Copyright § 12.11 ("[A]lthough certain *prima facie* presumptions are thereby created, the courts are free to examine the underlying facts and to rebut those presumptions, should the facts so warrant.").

The question, then, is whether Cox has come forward with sufficient evidence to rebut Plaintiffs' prima facie case of ownership or create a genuine issue of material fact as to ownership.  Cox argues that testimony by BMG's Vice President of Copyright Administration, Robert Briggs, about BMG's registration process undermines the presumption of validity. Specifically, Cox claims the testimony establishes that BMG does not check to see if it owns copyrights before it registers them.  In response, Plaintiffs argue that Cox greatly mischaracterizes Briggs's testimony and that the testimony is insufficient to rebut the presumption.

During his deposition, Briggs was asked whether and how BMG verifies its ownership of a copyright prior to filing a registration application.  When asked whether BMG checks to see if there is a valid assignment agreement before filing the registration, Briggs responded, "I can't say specifically," and "[g]enerally, this is speculation on my part but I think that they are not checking each song."  Bridges Decl. Ex. 19 at 23.  He also testified that he did not know whether BMG has or checks its files for complete documentation of ownership following registration. But Briggs also explained that when a "song is delivered to our department, it's delivered by departments who are working on an understanding that there is an active agreement with that writer or client." *Id.*  He also said that those active agreements are in place before the songs are delivered and before the applications are filed for registration.  And although he testified that it was his understanding that BMG has asked for a correction of a copyright ownership after

discovering errors with respect to copyright ownership, Briggs did not know of any specific examples of that happening.

When Briggs's testimony is read in full, it is not enough to cast doubt on BMG's ownership. Although "a defendant sued for infringement 'must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement,'" *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005) (quoting *Entm't Res. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997)), a finding that Briggs's testimony is sufficient would render the statutory presumption meaningless. "[M]ore than conjecture is required to rebut the presumption," 3-12 Nimmer on Copyright § 12.11 n.28.18, and conjecture is all that Cox offers from the testimony. Cox has presented no "specific evidence that rebuts the presumption of validity which attaches to a duly issue[d] registration." *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 979 F. Supp. 2d 456, 470 (S.D.N.Y. 2013). Because there is insufficient evidence in the record to rebut the presumption, the Court grants Plaintiffs' motion for partial summary judgment with respect to the copyrights that list BMG as the claimant on the certificate of registration.

### b.    *Copyrights That List a Predecessor of BMG as the Claimant on the Certificate of Registration*

The next group of copyrights lists a BMG predecessor entity as the claimant on the certificates of registration.  *See* Briggs Decl. Apps. A8–A12, A14–A19, A20–A33, A36 (composition titles and registration numbers); *id.* Exs. B138–B390, B392–B700, B704, B932–B933 (certificates).  Because BMG is not listed as the claimant, Plaintiffs must produce additional evidence of the chain of title from the claimant listed on the registration to BMG.

To meet their burden, Plaintiffs have produced both the certificates of registration and the merger and acquisition agreements between BMG and the entity (or a d/b/a of the entity) listed

as the claimant on the certificates.  *See* Briggs Decl. Exs. 1–12.  Cox makes two general

challenges to the chain of title evidence.  First, Cox contends that the Court should require the

chain of title to extend beyond the claimant listed on the certificate to the original author of the

work.  Second, Cox argues that the merger and acquisition agreements produced by Plaintiffs are

insufficient to establish chain of title because they do not specify the individual works acquired.

*See* Defs.' Opp'n at 28 ("Without conclusive evidence of which songs it acquired through

mergers, BMG cannot prove that it owns the . . . works.").  Neither argument is persuasive.

There is no basis for Cox's argument that the chain of title must relate back to the author

instead of the original claimant.  The weight of authority supports finding the latter sufficient.

*See* 4-13 Nimmer on Copyright § 13.01 ("The only evidence required of the plaintiff, in addition

to the registration certificate, is evidence of plaintiff's chain of title *from the original copyright*

*registrant*." (emphasis added)); *see also Montgomery Cty. Ass'n of Realtors, Inc. v. Realty Photo*

*Master Corp.*, 878 F. Supp. 804, 809–10 (D. Md. 1995) (quoting Nimmer for the proposition that

the evidence of chain of title is "from the original copyright registrant"), *aff'd*, 91 F.3d 132 (4th

Cir. 1996).  Moreover, the only case cited by Cox did not require the plaintiff to establish a chain

of title to the author.  Cox quotes language from *In re Napster, Inc. Copyright Litig.*, 191

F. Supp. 2d 1087, 1101 (N.D. Cal. 2002), that "plaintiffs need to produce chain of title from the

listed author to themselves."  But the court went on to find that the plaintiff's production of an

agreement between the copyright claimant and the plaintiff was sufficient to establish chain of

title.  *See id.*

Cox's second argument is that Plaintiffs cannot establish ownership because the merger

agreements do not list the specific copyrights acquired.  Cox cites no authority for the

proposition that the writing used to transfer copyrights must list the specific assets acquired.

Moreover, there is an exception to the Copyright Act's general requirement that the transfer of exclusive rights be made in writing where such a transfer occurs by "operation of law." 17 U.S.C. § 204(a).  In *Universal Furniture International, Inc. v. Collezione Europa USA*, the Fourth Circuit recognized that "although the Copyright Act generally requires a writing to transfer copyright ownership, it makes exceptions for transfers that occur by 'operation of law.'" 618 F.3d at 429 (quoting 17 U.S.C. § 204(a)).  The court went on to note that "certain of our sister circuits have ruled that mergers transfer copyrights 'by operation of law' and obviate the writing requirement."  *Id.* (citing *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 963 (8th Cir. 2005), and *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 721 (9th Cir. 1984)); *see also Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 41 (1st Cir. 2012).  If no writing is required to transfer copyright ownership in a merger, Cox cannot be correct that there must be a list of the specific copyrights acquired.  *See Design Basics, L.L.C. v. DeShano Cos., Inc.*, No. 10-14419, 2012 WL 4321313, at *4–5 (E.D. Mich. 2012) (finding plaintiff established ownership with certificate of registration and proof of merger).  The Court finds Plaintiffs have established ownership by the production of the certificates of registration and the relevant merger and acquisition agreements.

Finally, Cox disputes five individual copyrights in this category.  In response, Plaintiffs withdrew their claim of ownership as to one copyright, *see* Pls.' Reply at 5 n.3 (withdrawing Exhibit B403), but argue that the remaining challenges are baseless.  The Court agrees.  Cox first disputes the copyright for "Call of the Zombie," *see* Briggs Decl. Ex. B468, because "Bug Music" (a BMG predecessor) is handwritten under "claimant" on the certificate of registration. Plaintiffs respond that the handwritten name is immaterial.  Neither party cites any authority on this point.  The Court need not decide whether a handwritten notation would be sufficient to

14

undermine a claim of ownership because the unofficial copyright registration available on the public catalog, of which the Court may take judicial notice,[5] also lists Bug Music as the claimant.  *See* Roberts Decl. Ex. 3.  Cox next challenges the copyrights for "Hotel," *see* Briggs Decl. Ex. B568, "Clones," *see id.* Ex. B704, and "Cocaina," *see id.* Ex. B587, on the ground that a BMG predecessor is not listed as a claimant on the registrations.  The certificate for "Hotel" lists Hitco South as a claimant.  Hitco South is a d/b/a of BMG predecessor Hitco Music Publishing LLC.  *Id.* ¶ 37.  The certificate for "Clones" lists Trio Music Co Inc., which is a d/b/a of BMG predecessor, Bug Music, Inc.  *See id.* ¶ 36.  Plaintiffs concede that the exhibit with the registration for "Cocaina" is "inadvertently missing two pages," but they ask the Court to take judicial notice of the unofficial copyright registration.  Pls. Reply at 5 n.3.  The unofficial registration lists Music of Windswept, *see* Roberts Decl. Ex. 2, which is a d/b/a of BMG predecessor Windswept Holdings, LLC.  *See* Briggs Decl. ¶ 38.  The Court takes judicial notice of the public catalog entry.

There is no genuine issue of material fact as to the ownership of these copyrights. Accordingly, the Court grants Plaintiffs' motion with respect to this category of copyrights, with the exception of the withdrawn claim of ownership as to Exhibit B403.

---

[5] *See Island Software & Comp. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("The district court was entitled to take judicial notice of Microsoft's federal copyright registrations, as published in the Copyright Office's registry."); *White v. Alcon Film Fund, LLC*, 52 F. Supp. 3d 1308, 1316 n.9 (N.D. Ga. 2014) ("While a copy of the original registration would be preferable, courts have taken judicial notice of true and correct copies of the Copyright Office's online record of registration . . . ."); *Liberty Media Hldgs., LLC v. Tabora*, No. 12 Civ. 2234, 2012 WL 2711381, at *1 n.11 (S.D.N.Y. July 9, 2012) ("[T]he public catalog entry with respect to that certificate is a proper subject of judicial notice in the absence of any dispute or reason to dispute its accuracy.").

### c.      *Copyrights That BMG Purchased or Otherwise Acquired from Third Parties*

The third category consists of copyrights that BMG (or a BMG predecessor) purchased or otherwise acquired from third parties.  Plaintiffs have produced the certificates of registration for these works, *see* Briggs Decl. Apps. A35, A37–102; *id.* Exs. B702–B703, B705–B931, and the underlying purchase agreements, *see id.* Exs. 8–9, 13–105.[6]  Additionally, Robert Briggs testified to the acquisitions in his declaration.  *See* Briggs Decl. ¶¶ 41–125.  Cox challenges the chain of title with respect to the works listed in Appendices A37, A40, A42, A44–A46, A48–A52, A54, A57–A60, A62–A64, A66, A73, A74, A76, A77, A79, A83–A89, A91, A95–A98, and A100–102[7] to the Briggs declaration.  Defs.' Opp'n at 29–30.  Because Cox does not raise a challenge to those works in the appendices not listed, the Court grants summary judgment to Plaintiffs as to the ownership of those works.[8]

Cox first argues that "BMG relies on incomplete co-publication or administration agreements."  *Id.* at 29.  These agreements, Cox argues, "grant BMG various rights to songs in attachments that do not exist" and thus "do not establish chain of title because they do not identify the objects of a transfer."  *Id.*  As examples, Cox cites two agreements that assign exclusive rights to copyrights to be listed in an attachment but that fail to include the named attachment.  Relatedly, Cox argues that BMG "relies on vague agreements that also fail to

---

[6]  There are three types of agreements: (1) Asset Purchase Agreements (or Songwriter and/or Copyright Purchase Agreements), which transfer ownership; (2) Publishing and Co-Publishing Agreements, which convey some percentage of the copyright; and (3) Exclusive Administration Agreements.

[7]  Cox's brief challenges ownership of works listed in Appendix A103 and A104, but the Court's copy of the Briggs Declaration ends at Appendix A102.

[8]  Specifically, summary judgment is granted as to ownership of the works listed in A35, A38, A39, A41, A43, A47, A53, A55, A61, A65, A67–A72, A75, A78, A80–A82, A90, A92–A94, and A99.

identify the works." *Id.* As examples, Cox cites agreements that give BMG rights "to any and all compositions," to works acquired after the agreement, and to "all musical compositions, including but not limited to" works listed in a non-existent schedule. *Id.* These agreements, Cox contends, fail to establish a chain of title because they likewise do not identify which songs were transferred.

Plaintiffs respond that each agreement meets the Copyright Act's requirement that transfers of ownership by assignment or exclusive license be signed and in writing. *See* 17 U.S.C. § 204(a). There is no requirement, they argue, that each work be identified, and they note that Cox does not cite to a single case or other authority supporting such a proposition. Indeed, courts often say that "a qualifying writing under Section 204(a) need not contain an elaborate explanation nor any particular 'magic words,' but must simply show an agreement to transfer copyright." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (citations omitted) (internal quotation marks omitted); *see also Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("It doesn't have to be the Magna Charta; a one-line pro forma statement will do.").

Even assuming that to satisfy the chain-of-title requirement Plaintiffs must submit evidence of the specific copyrights covered by each agreement, they have done so via declaration testimony. For instance, Cox cites Exhibit 29, a Music Publishing Administration Agreement between John Legend Music, Inc. and BMG, as an example of an incomplete agreement. The agreement gives BMG exclusive rights to administer the musical compositions listed in Annex 1, but Annex 1 is left blank. In his declaration, Briggs testified that the agreement relates to the twenty-five works listed in Appendix A25. *See* Briggs Decl. ¶¶ 60–61. There is similar testimony relating to each transaction. *Cf. Arista Records LLC v. Lime Grp. LLC*, No. 06 CV

5936, 2011 WL 1641978, at *4 (S.D.N.Y. Apr. 29, 2011) (finding declaration testimony

sufficient to supplement the chain of title).  Cox's mere denial of these facts is not sufficient to

rebut the presumption of ownership or to create a genuine issue of material fact.[9]  *See id.* ("A

non-movant 'may not rely simply on conclusory statements or on contentions that the affidavits

supporting the motion are not credible, or upon mere allegations or denials of the nonmoving

party's pleading." (quoting *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532–33 (2d Cir. 1993)).

 Finally, Cox argues that "BMG relies on a few agreements that allegedly transferred to

rights from others [sic] to BMG but those other parties appear nowhere in the agreements."

Defs.' Opp'n at 30 (citing Briggs Decl. Exs. A76, A77, A89, A95, A101).  It is not entirely clear

what Cox is arguing here, but Plaintiffs address each challenged agreement in their reply and

identify the parties to the transfers.  Pls.' Reply at 6–7.

Accordingly, the Court grants summary judgment to Plaintiffs on the ownership of the

copyrights in this category.

>**d.**      **Copyrights That List Round Hill Music, LLC as the Claimant and**
>**Copyrights That Round Hill Music, LLC Purchased or Otherwise**
>**Acquired from Third Parties**

The final category consists of (1) copyrights that list Round Hill Music, LLC as the

claimant on the copyright registrations and (2) copyrights that Round Hill Music, LLC purchased

or otherwise acquired from third parties.  Gillis Decl. Apps. A1–A5 (composition titles and

registration numbers); *id.* Exs. C1–C22 (certificates); *id.* Exs. RH4–RH7 (purchase agreements).

Cox argues that Plaintiff Round Hill Music LP (not to be confused with Round Hill Music, LLC)

---

[9]  Cox raises multiple evidentiary objections to Briggs's declaration.  *See* Defs.' Opp'n at
2–3.  The Court has reviewed the declaration and overrules these objections.  Briggs is a proper
representative to testify to corporate documents regarding the ownership issues raised and the
Court finds his declaration reliable.

is not the legal or beneficial owner of any exclusive right associated with these copyrights and thus has no standing to sue for infringement under the Copyright Act.[10]

Section 501(b) of the Copyright Act provides that only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b); *see also X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 602 (E.D. Va. 2001).  Section 106 lists the six exclusive rights available under a copyright.[11]  That list is exhaustive.  *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir.

---

[10]  Cox also disputes Plaintiffs' assertion that the certificates of registration as to the first sub-category of Round Hill copyrights list "Round Hill Music, LLC" as the claimant.  Because the Court agrees with Cox that Round Hill Music LP is without standing, there is no need to reach this argument.

[11]  Section 106 provides, in pertinent part:

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

2015).  Thus, a plaintiff with the right to take actions that are merely incidental to copyright ownership without any accompanying interest in one of § 106's rights does not have standing to bring an infringement claim.  *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005).  Although § 106 is exhaustive, each exclusive right is transferable.  Section 101 defines a "transfer of copyright ownership" as "an assignment, . . . exclusive license, or any other conveyance . . . of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101.  In other words, "either an *assignment* (which transfers legal title to the transferee) or an *exclusive license* (which transfers an exclusive permission to use to the transferee) qualifies as a 'transfer' of a right in a copyright for purposes of the Act." *Minden Pictures, Inc.*, 795 F.3d at 1003. Moreover, each exclusive right is further divisible and "any subdivision of any right specified by section 106, may be transferred . . . and owned separately."  17 U.S.C. § 201(d)(2).

Plaintiffs do not contend that Round Hill Music LP was assigned legal title to any of the copyrights at issue.  They claim Round Hill Music LP was given an exclusive license to use each of the copyrights at issue for any and all of the exclusive rights listed in § 106.  Thus, it must be the case that Round Hill Music LP not only "received one or more divisible rights," but also that its interest in those rights is exclusive—that is, Round Hill Music LP is "entitled to enforce them."[12] *HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 383 (7th Cir. 2011).  To make

---

[12]  After reviewing the parties' initial arguments on this issue, the Court determined that additional briefing was necessary on the limited issue of standing.  The Court issued an Order directing the parties to

> (1) address what, if any, exclusive right(s) Round Hill Music, LP holds with respect to the copyrights at issue and the nature of the transfer of those rights from Round Hill Music Royalty Fund, LP (*i.e.*, whether there was an assignment of title to an exclusive right(s) or an exclusive license granted); (2) identify the strongest case law in support of their respective readings of the rights, if any,

this determination, the Court looks to "the substance of what was given to the licensee and not the label that the parties put on the agreement." *Warner/Chappell Music, Inc. v. Blue Moon Ventures*, No. 3:10-1160, 2011 WL 662691, at *4 (M.D. Tenn. Feb. 14, 2011); *see also HyperQuest, Inc.*, 632 F.3d at 383.

Three agreements are relevant here.  The first is the Asset Purchase Agreement that assigned the copyrights from Round Hill Music, LLC, the entity listed on the copyright registrations, to Round Hill Music Royalty Fund LP (the "Fund").  *See* Gillis Decl. Ex. RH1.  It is undisputed that the Fund owns legal title to the copyrights.

The second is the Third Amended and Restated Agreement of Limited Partnership of Round Hill Music Royalty Fund LP (the "Fund Agreement").  *See id.* Ex. RH2.  The Fund Agreement created a limited partnership consisting of a general partner—Round Hill Music Royalty Fund GP LP (the "General Partner")—and a sole limited partner—Joshua Gruss.  The Fund Agreement states that "management of the Partnership shall be vested exclusively in the General Partner . . . and the General Partner shall have full control over the business, assets, conduct and affairs of the Partnership."  *Id.* at 32.  The agreement also contemplates the appointment of a Management Company "to manage the affairs of the Partnership," *id.* at 29, and a Copyright Administrator, defined as "any Person (including an Affiliate of the General Partner) employed or retained by the Partnership and at the Partnership's expense, to provide services in connection with the administration, preparation and processing or any similar service of any

---

conveyed by the agreements attached as Exhibits RH2 and RH3 to the Gillis Declaration; and (3) address the breadth of the principle barring challenges by alleged third-party infringers to transfers of exclusive rights (*i.e.*, the *Eden Toys* principle) and its application to Defendants' standing challenge in this case.

(Dkt. No. 501).

copyrights owned by, or assigned to, the Partnership." *Id.* at 6.  With respect to the role of

Copyright Administrator, the Fund Agreement also states:

> The Partnership will retain the Copyright Administrator, which may be an
> Affiliate of the General Partner, to provide the services of administrator of the
> copyrights owned by or assigned to the Partnership.  The Copyright Administrator
> will be responsible for day-to-day administrative services relating to the
> Partnership's portfolio and will be reimbursed for its services.

*Id.* at 31.

The third relevant agreement, executed the same day as the Fund Agreement, is the

Management Agreement.  *See* Gillis Decl. Ex. RH3.  The Management Agreement was entered

into by the Fund, the General Partner, and Plaintiff Round Hill Music LP.  *Id.* at 1.  It appointed

Round Hill Music LP as the Management Company, and within that role, the Copyright

Administrator.  *See id.* (appointing Round Hill Music LP to "provide management or other

services, including acting as a Copyright Administrator").  The agreement further states that "[i]n

performing the services pursuant to [the] Agreement, the Manager [Round Hill Music LP] . . .

shall have the same rights, duties and obligations, and shall observe the same standards of care,

as would be applicable to the General Partner if it (and not the Manager) were providing the

services performed by the Manager." *Id.*

Plaintiffs rely on the combined effect of the Fund Agreement's grant to the General

Partner of "full control over the . . . assets" and the Management Agreement's statement that

Round Hill Music LP "shall have the same rights, duties and obligations" as the General Partner.

Putting the two together, Plaintiffs claim the Fund gave Round Hill Music LP "the exclusive

ownership rights to administer and exploit the copyrights," Gruss Decl. ¶ 3, including "all of the

exclusive rights described in . . . § 106." Pls.' Supp. Memo. in Supp. at 4.

The Court disagrees.  The plain language of the agreements only gives Round Hill Music LP the "same rights" as the General Partner—including "full control over the . . . assets"—when it is "providing the services performed by the Manager."  Thus, the language begs the question of what "services" the Manager, and within that role, the Copyright Administrator, performs with respect to the copyrights.  There is little, if any, indication that these "services" performed contemplated the transfer any legally cognizable right in any of the copyrights, much less that such permission was exclusive.  The Fund Agreement explains the role of Copyright Administrator as "provid[ing] the services of administrator of copyrights."  Gillis Decl. Ex. RH2 at 31.  But the responsibilities listed are "day-to-day administrative services" for which the Copyright Administrator will be reimbursed.  *Id.*  Similarly, the agreement defines Copyright Administrator as an entity "provid[ing] services in connection with the administration, preparation and process or any similar service of any copyrights" owned by the Partnership.  *Id.* at 6.  While Plaintiffs are correct that administration agreements *can* transfer a sufficient ownership interest, there is no other indication aside from the word "administration" that suggests the agreement transferred any interest at all.  There is no reference, for example, to any of the actions contemplated by § 106—for example, the right to reproduce or distribute.  Instead, the word "administration" is surrounded by language that paints Round Hill Music LP's role as administrative and acting directly on behalf of the Partnership.

The language in the agreements aligns much more closely with Cox's contention that the Fund merely hired Round Hill Music LP "to provide services related to copyrights it did not own" and that "[t]his employment did not result in any assignment of rights to" Plaintiff.  Defs.' Opp'n at 25.  As the Southern District of New York recently noted, "Considering the preeminence of exclusive rights in copyright cases, it is axiomatic that if the . . . Agreement did

not specify that exclusive rights were being transferred, no such rights were in fact transferred." *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 278 (S.D.N.Y. 2014).

Even assuming that the agreements did convey a license to use the copyrights, there is no indication that the license was *exclusive*.  An exclusive license is transferred when an "individual or entity is given the right to use a copyright" and "the owner promises not to convey that right to anyone outside of those persons or entities who have an interest in the license." *Warner/Chappell Music, Inc.*, 2011 WL 662691, at *4 (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)).  In other words, there is no indication of a "*further* promise[] that the same permission will not be given to others."  *Minden Pictures, Inc.*, 795 F.3d at 1005 (quoting *I.A.E., Inc.*, 74 F.3d at 775) (emphasis added).

Plaintiffs also rely on the declaration of Joshua Gruss, the managing member of the Round Hill entities, in which he testified that "[s]ince the Management Agreement was executed, Round Hill LP has acted as the exclusive worldwide administrator of the copyrights and other properties owned by the Partnership.  No other individual or entity, including the Partnership, has acted or has the right to act as the administrator of its copyrights, including those at issue in this case."  Gruss Decl. ¶ 5.  As noted above, the Court looks to the substance of the agreements to determine whether standing exists and not the *post hoc* label placed on the agreements by Plaintiffs.  The plain language of the agreements does not support finding a transfer of any exclusive license.  Nor is Gruss's declaration particularly helpful, as it does not shed any light on what the role of "exclusive worldwide administrator" entails.

Rather than attempting to explain what language in the agreements conveyed an exclusive license, Plaintiffs devoted most of their initial briefing to challenging Cox's ability to make its standing challenge.  Plaintiffs cite a line of cases that say an alleged third-party

infringer cannot attempt to avoid liability by arguing that an underlying assignment of copyright failed to comply with the Copyright Act's writing requirement.  *See* 17 U.S.C. § 204(a) ("A transfer of copyright ownership . . . is not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed . . . .").  The principle arose out of cases where there had been an oral transfer of rights and the question was whether a later written memorialization of the transfer was sufficient to comply with the writing requirement.  Because the purpose § 204 is to resolve disputes between transferors and transferees, those courts concluded that "it would be anomalous to permit a third party infringer to invoke this [writing] provision against the licensee."  *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982); *see also X-It Prods.*, 155 F. Supp. 2d at 603–04 (citing *Eden Toys* and collecting cases that support the proposition that "an oral assignment of copyright rights is an effective assignment if the oral assignment is subsequently memorialized in a written document").

Plaintiffs ask the Court to apply this principle broadly and hold that Cox, as an alleged third-party infringer, cannot challenge the assignment between the Fund and Round Hill Music LP because there is no dispute between them regarding what was transferred.  The Court does not believe the principle extends as far as Plaintiffs urge.  Cox is not invoking § 204's writing requirement or relying on the informality of the transfer to avoid liability.  Rather, it is pointing to the language within the written agreements and asking if that language conveyed the type of right necessary to support standing to bring an infringement claim.  *See Marya v. Warner/Chappell Music, Inc.*, No. CV13-4460, 2015 WL 5568497, at *19 (C.D. Cal. Sept. 22, 2015) ("*Eden Toys* do[es] not stand for the proposition that so long as an alleged transferor and transferee say that a transfer occurred, a third-party has no choice but to take them at their word.

25

Rather, these cases stand for the proposition that, if there is evidence of a transfer, the informality with which the transfer was conducted does not prevent the transferee from asserting an interest in the copyright.").  Accordingly, Cox's challenge is permissible.

Because Round Hill Music LP does not co-own the copyrights or have an exclusive license for any use of the copyrights, it is without standing to bring this infringement action. Accordingly, the Court finds Round Hill Music LP cannot proceed in this action and its claims for infringement against Cox are dismissed.

### 2. DMCA Safe-Harbor Defense

BMG also moves for summary judgment on Cox's entitlement to its DMCA safe-harbor defense.[13]  Specifically, BMG contends Cox cannot meet the statute's threshold requirement that internet service providers ("ISPs") adopt and reasonably implement a repeat infringer policy. After providing an overview of the DMCA's safe harbor provisions, the Court turns to Cox's policies and practices.

### a. Statutory Framework

Title II of the DMCA, titled the Online Copyright Infringement Liability Limitation Act, was Congress's answer to the potentially enormous liability that ISPs faced for the materials being transmitted over their networks.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2013).  To that end, Congress created four safe harbors that protect ISPs from liability for copyright infringement when their involvement is limited to certain activities—transitory digital networking communications, system caching, information residing on systems or networks at the direction of users, and information location tools.  *See* 17 U.S.C. §§ 512(a)–(d). Cox invokes the first of these safe harbors, § 512(a), which "limits the liability of ISPs when

---

[13]  Because Round Hill Music LP is without standing, the remainder of this opinion refers to BMG as the sole plaintiff.

they do nothing more than transmit, route, or provide connections for copyrighted material—that is, when the ISP is a mere conduit for transmission." *In re Charter Commc'ns, Inc.*, 393 F.3d 771, 775 (8th Cir. 2005).

To benefit from any one of the safe harbors, Congress imposed certain threshold requirements on all ISPs. As is relevant here, a service provider must demonstrate that it has "adopted and reasonably implemented, and informed subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). The requirement that service providers implement a repeat-infringer policy is a "fundamental safeguard for copyright owners" and "essential to maintain[ing] the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011) (internal quotation marks omitted).

The dispute in this case centers on what it means for a service provider to "reasonably implement[]" its policy. The phrase is not defined in the statute. In deciphering its meaning, courts have split the phrase into two separate requirements: (1) whether a service provider *implemented* its policy; and (2) whether that implementation was *reasonable*. *See, e.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109–10 (9th Cir. 2010). Courts have identified several "threshold functions" that must be present in order for a service provider to implement any repeat-infringer policy. *Disney Enters., Inc. v. Hotfile Corp.*, No 11-20427, 2013 WL 6336286, at *21 (S.D. Fla. Sept. 20, 2013). For example, a service provider must have a "working notification system" and "a procedure for dealing with DMCA-compliant notifications," and the

provider must "not actively prevent copyright owners from collecting information needed to issue such notifications." *CCBill LLC*, 488 F.3d at 1109.  Additionally, the penalty imposed for repeat infringers (when appropriate circumstances exist) must be termination and not some lesser consequence.  *See Capital Records, LLC v. Escape Media Grp., Inc.*, No. 12-cv-6646, 2015 WL 1402049, at *9 (S.D.N.Y. March 25, 2015).

A service provider's implementation is reasonable if it terminates a repeat infringer's access in appropriate circumstances.  *See CCBill LLC*, 488 F.3d at 1111.  This raises the dual questions of when a service provider should consider a subscriber or account holder to be a repeat infringer and when circumstances become appropriate for termination.  As Professor Nimmer points out, "repeat infringer" could have a number of meanings.  On one end of the spectrum, an infringer could be "an adjudicated copyright infringer."  *See* 4-12B Nimmer on Copyright § 12B.10.  In the middle may be someone against whom an unadjudicated charge has been made, but the service provider has actual knowledge of, or is aware of facts and circumstances suggesting, infringement.  On the other end, an infringer could be someone against whom "an unadjudicated charge of infringement has been preferred."  *Id.*  Although Cox asks the Court to hold that one can be labeled an infringer only when adjudicated as such, the Court finds no support in caselaw for that interpretation.  Instead, courts have articulated a knowledge standard: "A policy is unreasonable . . . if the service provider failed to respond when it had *knowledge* of the infringement."  *CCBill LLC*, 488 F.3d at 1113 (emphasis added); *see also MP3Tunes, LLC*, 821 F. Supp. 2d at 638 ("While knowledge is not an element of copyright infringement, it is relevant to a service provider's decision whether appropriate circumstances exist to terminate a user's account.").

Even if a service provider has knowledge of infringement, however, the Act requires termination only in "appropriate circumstances."  The inclusion of this phrase implies that there are some circumstances under which termination of a repeat infringer may not be appropriate. For example, courts have noted that there are different degrees of online copyright infringement, from the inadvertent and noncommercial, to the willful and commercial.  *See* H.R. Rep. 105–551, pt. 2 at 61 (1998).  Another common benchmark, taken from the House and Senate Reports, is that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for intellectual property rights of others should know that there is a realistic threat of losing that access."  *Id.*  Thus, appropriate circumstances clearly cover account holders who repeatedly or flagrantly infringe copyright, particularly infringement of a willful and commercial nature.  *See Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 514 (S.D.N.Y. 2013).  Equally clear is that this standard cannot be applied in such a way as to impose an affirmative duty on service providers to monitor for infringement.  *See* 17 U.S.C. § 512(m)(1) ("Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity . . . ."); *CCBill LLC*, 488 F.3d at 1111 ("To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement.").

In sum, the Court finds § 512(i) covers, "at a minimum, instances where a service provider is given sufficient evidence to create actual knowledge of blatant, repeat infringement by particular users, particularly infringement of a willful and commercial nature." [14]  *Cybernet*

---

[14]  In *Perfect 10, Inc. v. CCBill LLC*, the Ninth Circuit imported the knowledge standard in § 512(c)'s safe harbor into its determination of whether the service provider was reasonably implementing its repeat infringer policy.  488 F.3d at 1113–14.  Section 512(c) contains both an actual knowledge and a red-flag knowledge standard.  At the summary judgment hearing, Cox argued that the knowledge standards contained in § 512(c) cannot be applied in this case because

*Ventures, Inc.*, 213 F. Supp. 2d at 1177; *Corbis Corp. v. Amazon.com*, 351 F. Supp. 2d 1090,

1104 (W.D. Wash. 2004) ("Because it does not have an affirmative duty to police its users,

failure to properly implement an infringement policy requires a showing of instances where a

service provider fails to terminate a user even though it has sufficient evidence to create actual

knowledge of that user's blatant, repeat infringement of a willful and commercial nature.").

### b.    Application

BMG identifies three reasons why Cox did not reasonably implement its repeat infringer

policy.  First, BMG says Cox cannot be said to be implementing its policy if it refuses to accept

Rightscorp's infringement notices merely because they contain settlement offers.  And even

beyond Cox's blanket refusal to forward those notices to its account holders, BMG argues it is

also unreasonable that Cox makes no effort to record the other information contained in the

notices, such as the date and time of the infringing activity and the account holder's IP address.

Second, BMG argues that with millions of subscribers, Cox's use of a "hard limit" on the

number of infringement notices it will receive in a twenty-four-hour period is additional

evidence of unreasonableness.  Third, BMG argues that Cox does not terminate access of repeat

infringers under appropriate circumstances.

The Court finds this last ground sufficient, standing alone, to bar Cox from invoking the

DMCA's protection.[15]   Accordingly, there is no need to decide whether Cox's refusal to receive

---

Cox is relying on § 512(a) not § 512(c).  There is no need to decide whether red-flag knowledge would be sufficient in this case because, as explained below, Cox had subjective knowledge of specific repeat infringements by its account holders.  That is enough under an actual knowledge standard.

[15]  Because Cox was not acting on or receiving Rightscorp's notices, the Court's analysis focuses on how Cox treated notices of infringement received from third-party copyright owners. As the Ninth Circuit has noted, "Section 512(i)(1)(A) requires an assessment of the service

notices with settlement agreements or its "hard limit" on the number of notices received might also render Cox ineligible for a safe harbor. In assessing Cox's termination of repeat infringers, the Court divides Cox's practices into two time periods: before the fall of 2012 and after.

### *i. Cox Did Not Implement a Repeat Infringer Policy Before Fall 2012*

The record conclusively establishes that before the fall of 2012 Cox did not implement its repeat infringer policy. Instead, Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA's requirements. Cox employees followed an unwritten policy put in place by senior members of Cox's abuse group by which accounts used to repeatedly infringe copyrights would be nominally terminated, only to be reactivated upon request. Once these accounts were reactivated, customers were given clean slates, meaning the next notice of infringement Cox received linked to those accounts would be considered the first in Cox's graduate response procedure.

Numerous emails in the record, portions of which are reproduced below, support these conclusions. Even viewed in the light most favorable to Cox, the Court finds the contents of the emails cannot be explained away. Cox's attempts to recast the emails are unavailing. Nor can they be pinned on low level employees whose views had no real significance. The name that appears again and again on these emails is Jason Zabek, Cox's Manager of Customer Abuse Operations.

In 2009, Zabek sent an email titled, "DMCA Terminations," to the abuse group that said:

> As we move forward in this challenging time we want to hold on to every subscriber we can. With this in mind if a customer is terminated for DMCA, you are able to reactivate them after you give them a stern warning about violating our AUP and the DMCA. We must still terminate in order for us to be in compliance

---

provider's 'policy,' not how the service provider treated a particular copyright holder." *CCBill LLC*, 488 F.3d at 1113.

> with safe harbor but once termination is complete, we have fulfilled our
> obligation.   After you reactivate them the DMCA 'counter' restarts; The
> procedure restarts with the sending of warning letters, just like a first offense.
> This is to be an unwritten semi-policy . . . We do not talk about it or give the
> subscriber any indication that reactivating them is normal.   Use your best
> judgment and remember to do what is right for our company and subscribers. . . .
> This only pertains to DMCA violations.  It does not pertain to spammers, hackers,
> etc.

Theodore Decl. Ex. 18.

In a January 2010 email exchange, Zabek was asked by an employee what to do in the

following scenario:

> Customer had several email warnings, followed by suspensions up to TOC
> [technical operations center] and was terminated December 8th.  Voicemail call
> back on January 7th shows I explained to the account holder [redacted] they could
> request review in 6 months for possible reactivation.   ICOMS notes shows
> [redacted] called about the bill January 11 and got reinstated.  We already have a
> DMCA complaint . . . .

*Id.* Ex. 19.  In other words, this customer had progressed through Cox's graduated response

procedure and Cox had ultimately determined appropriate circumstances existed to terminate this

customer for six months.  One month into the termination, the customer was reactivated and soon

thereafter, Cox received another notice of infringement tied to the account.

This was Zabek's response:

> This is fine.  If asked, I would have allowed them back on.  We have been turning
> customers back on who have been terminated for DMCA complaints.  As long as
> our process of warnings, suspen[sion], then termination is followed, we can turn
> the customer back on and start the DMCA count over.  During this time, as we try
> to keep customers and gain more RGU's [revenue generating units] it is important
> to try and balance the needs of the company with the protection of the network.
> DMCA does not hurt the network like DOS attack, spam or hacking.  It is not
> something we advertise however.

*Id.*

In a series of emails in June of that year, a customer service representative asked whether

she needed the abuse group's "okay" to reactivate an account after "a customer is terminated for

the first time." *Id.* Ex. 20.  Zabek responded: "If it is for DMCA you can go ahead and reactivate.  Any other issues (hacking, spam, etc.) give[] us a heads up and we can all look at it together." *Id.*  In the same chain, another Cox employee wrote: "[I]n 99% of the cases we are going to turn the customer back on. . . . [I]n that 1% of the cases, the customer will not reactivate at their own discretion." *Id.*

In August, a representative sent the abuse group an email to confirm that, after a customer is terminated and then reactivated, the next complaint Cox received "is to be treated as a brand new complaint" and the customer is to be "given a clean slate." *Id.* Ex. 21.  Zabek responded:

> Internal info only.  Do not forward.  After termination of DMCA, if you do suspend someone for another DMCA violation, you are not wrong.  However, if the customer has a cox.net email we would like to start the warning cycle over, hold for more, etc.  A clean slate if you will.  This way, we can collect a few extra weeks of payments for their account.  ;-)  Once the customer has been terminated for DMCA, we have fulfilled the obligation of the DMCA safe harbor and can start over. . . .  We have some leeway here.  But know that once a termination happens, we have fulfilled "safe harbor."  These are not in our procedures as we do not make this information publicly known.

*Id.*; *see also id.* Ex. 2 at 201, 222 (confirming that the process would begin anew following reactivation).

In March 2011, a customer service representative sent Zabek an email, saying: "Spoke to the customer this morning and he flat out is refusing to do anything on his side and insists nothing is coming from it despite multiple tickets. . . .  If possible, please give me some insight on where we should go from this point; ie suspension or something of the sort." *Id.* Ex. 24.  This was Zabek's instruction:

> You can of course suspend but I would suggest that you just forward any DMCA complaints to his email. . . . He just has to realize that we must send these to him. If a copyright holder dec[ides] to sue, then we want to make sure the customer knows why . . . . And it is the law.  Make sense?  I am not concerned about

DMCA and not ready to terminate a CB customer for it . . . yet.  It does not cause a big problem on the network.  Not like spam, Dos attacks, hacking, etc. do . . . *The customer is doing this on purpose*.  I just know it (I can feel it) and is not owned IMO.  *They just want to steal stuff* . . . .

*Id.* (emphasis added).

In another March email, a representative emailed Zabek: "Here is another example of a customer that I consider *a[] habitual abuser*.  In a year was terminated twice and turned back on.  I suspended him again since no e-mail address and according to procedure he start over [sic] in the process."  *Id.* Ex. 45 (emphasis added).  Zabek responded, "It is fine.  We need the customers."  *Id.*  In an April exchange, a customer service representative sent this inquiry: "This is the customers [sic] third termination.  He is waiting call [sic].  What do I tell him when I call him?"  *Id.* Ex. 22.  Zabek wrote, "DMCA = reactivate," and then by separate email, "You can make him wait a day or so if you want.  ;-)[.]"  *Id.*

In August, Brent Beck, a software engineer, wrote, "I understand that recently the termination procedure has been relaxed a bit, so as to involve suspending the customer's modem instead of removing the services (since most are reactivated, this was faster and easier)."  *Id.* Ex. 46.  In the same email chain, Zabek wrote, "Remember that we must terminate to receive protection under the save [sic] harbor amendment."  *Id.*  Joseph Sikes, Cox's Senior Lead Abuse Engineer, added, "Yep, right, we sure do.  But I don't believe the TOC is actually terminating the service, completely removing it in ICOMS.  They are just clicking Terminate and Update Ticket, which shows a Termination in the Customers Ticket History."  *Id.*

A January 2012 AOL instant messenger conversation between Sikes and Beck discussed the meaning of the term, "soft terminate."  *Id.* Ex. 13.  When asked what a "soft term" was, Sikes explained: "basically, a suspension that is called a termination with the likelihood of reactivation."  *Id.*  Then he said, "for DMCA – we don't want to loose [sic] the revenue."  *Id.*

And in response to further questions from Beck, Sikes said, "this is a relatively new process that we've been doing for the past year, again, to retain revenue." *Id.* Sikes warned Beck that the "Hard/Soft verbiage stays amongst us only. . . . It's kind of an 'under the table' procedure, again, to preserve revenues, when we were loosing [sic] Subscribers, but it only happens about once per month." *Id.* Finally, a February 2012 email from a Cox employee to the abuse group said, "I was chatting with Daryl and it seems no one has let them know in SAN that DMCA *Terms are not really Terminations any longer*." *Id.* Ex. 52 (emphasis added).

To implement the repeat infringer policy contemplated by § 512(i), the penalty imposed by service providers must be termination. Terminate means "[t]o put an end to; to bring to an end." Black's Law Dictionary (10th ed. 2014). Service providers cannot skirt the termination requirement by imposing something short of complete termination of a subscriber or account holder. The District Court for the Southern District of New York recently examined the DMCA's termination requirement and reasoned that the "definition suggests that Congress intended service providers to have a policy in place that would end or discontinue the accounts of repeat infringers, *not something short of that* such as limiting repeat infringers' user privileges." *Capital Records, LLC*, 2015 WL 1402049, at *10 (emphasis added). That is exactly what Cox did. In Zabek's words, "DMCA = reactivate." Theodore Decl. Ex. 22. Although Cox asserts that "its policy has always been to terminate account holders in appropriate circumstances," Defs.' Opp'n at 22, that bare assertion is not enough to defeat summary judgment.

The Fourth Circuit has said that the immunity granted by Congress to service providers "is not presumptive" and is to be "granted only to innocent service providers." *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (internal quotation marks omitted). The emails in the record strip Cox of any innocence. They make clear that it was Cox's policy to

intentionally circumvent the DMCA.  Despite having a repeat-infringer policy on the books, Cox's implementation rendered the policy an "absolute mirage."  *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 n.18 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003); *see also MP3Tunes, LLC*, 821 F. Supp. 2d at 637 ("Thus, service providers that purposefully . . . fail to terminate users despite their persistent and flagrant infringement are not eligible for protection under the safe harbor.").  In sum, no reasonable juror could find that Cox implemented a repeat-infringer policy before the fall of 2012.

### ii.  *Cox Did Not Reasonably Implement Its Repeat Infringer Policy After the Fall of 2012*

In October 2012, Cox added two additional suspension steps to its graduated response procedure.  *See* Theodore Decl. Ex. 39 at 10–13.  BMG concedes that around the same time that Cox adopted these new procedures, Cox abandoned its tacit "DMCA = reactivate" policy.  Now when Cox terminated a customer, it meant complete termination of access for six months.[16]  The problem, BMG contends, is that in place of the fake terminations, Cox stopped terminating customers altogether.  In other words, now that termination would mean losing a customer, BMG alleges Cox would not terminate even when Cox knew that a customer was repeatedly and blatantly violating copyrights.  As evidence, BMG points to (1) the drop-off in the number of terminations following the policy shift; and (2) emails documenting specific instances in which Cox personnel did not terminate account holders despite having knowledge that the account holder was repeatedly infringing.

---

[16]  The emails from this period evidence a shift to real terminations.  In a 2012 email, Sikes wrote, "Now, when we terminate Customers, we REALLY terminate the Customer (for 6 months)."  Theodore Decl. Ex. 23.  And in the same email chain, he wrote, "[Employee] may not have been aware that we now terminate, for real.  He's been out of the loop, for a while.  We'll get him on the same page."  *Id.*

The numbers bear out BMG's first argument.  From January 2010 until August 2012, Cox terminated an average of 15.5 account holders a month.  Theodore Decl. Ex. 39 at 25–27. Between September 2012 and November 2014 when this suit was filed, Cox terminated an average of 0.8 accounts per month, with a total of 22 terminations.[17]  *Id.*  In that same period, Cox took approximately 711,000 customer-facing actions—meaning Cox issued 711,000 email warnings and suspensions—in response to alleged infringements.  *Id.*  That number does not include the number of first complaints Cox received for each account because Cox takes no action on those.  Cox also admits that of the 22 terminated accounts, 17 of those had also either failed to pay their bills on time or were excessive bandwidth users.  Pls.' SUMF 66, 68.  Were these numbers all BMG had, the Court could not grant summary judgment.  An inference that Cox was not reasonably implementing its policy may be drawn from the numbers.  But "that conclusion is *not compelled* by the evidence."  *Perfect 10, Inc. v. Giganews, Inc.*, 993 F. Supp. 2d 1192, 1197 (C.D. Cal. 2014).

BMG has also presented evidence of specific instances in which Cox did not terminate account holders despite knowing that they were using Cox's service to repeatedly infringe.  For instance, in a March 2014 exchange, a customer service representative wrote, "Customer has been told multiple times that he needs to secure his open wireless router.  He has also been warned that the next complaint can result in termination of service."  Roberts Decl. Ex. 6.  Sikes responded, "Yep, this is their absolute last chance to either secure their wireless router and/or remove ALL P2P clients from their systems.  Next complaint = 6 month termination."  *Id.*  A few weeks later, the same service representative emailed to say, "Last ticket . . . customer was

---

[17]   In the three months after the suit was filed, Cox terminated an average of 11.6 customers per month.  Theodore Decl. Ex. 39 at 27.

warned that further complaints would result in termination. We have received an additional

complaint." *Id.* Ex. 5.

> Sikes responded:
>
> [I]t looks like the Customer suspected that their wireless network was the culprit. I assume you also covered the likely possibility that it could also be a BitTorrent client running on one of their computers? If this was not covered thoroughly in the last call with them, please advise them that securing their wireless network obviously did not work. So, the BitTorrent client is running on one of their computers (their child's, etc.) and they need to uninstall it. This customer pays us over $400/month and if we terminate their service, they will likely cancel the rest of their services. Every terminated Customer becomes lost revenue and a potential Detractor to our Net Promoter Score. We should make absolutely certain that we have covered each and every possibility with them ("to the bitter end") before we terminate them. If all of this has been covered in detail, then please go ahead and terminate their internet service for this complaint.

*Id.* The rep responded, "Looks like PTP programs were discussed back on ticket 15711339

(Which was also a final suspension as well)." *Id.* Sikes responded,

> That was back in October 2013 [approximately five months earlier]. We can't expect our Customers to know and remember as much as we do about this stuff, especially if the account holder is not the one using BitTorrent. . . . On this Customer's last suspension . . ., at the beginning of this month (March 5th), did you also explain that they should still check all of the computers in their household for BitTorrent clients and to speak with other members of their household . . . about running/installing BitTorrent and downloading/sharing files? You only mentioned their wireless network in your work log notes. On final suspensions, we need to be as detailed as possible on the work log notes, show that we have covered EVERYTHING with the Customer. On 404 suspensions for DMCA, this is our last ditch effort to save the Customer. Obviously, if they don't care and don't want to help us help them, there's not much more we can do, but this should also be noted in the work log notes.

*Id.*[18] After a service representative responded that the customer had been told about file sharing

and torrents, Sikes decided, "Please suspend this Customer, one LAST time." *Id.*

---

[18] "404" refers to the area code in Atlanta, Georgia. This means the customer had been through the final suspension steps where he or she was required to speak with Cox's high-level customer service representatives. Theodore Decl. Ex. 1 at 79–80.

In May, a representative sent an email to the abuse group that said, "Request for termination review—Cats Ticket 19991279. This is the 3rd time to the 404 number. Was warned on last call that next offense would result in termination review. Notes indicate that customer was advised to remove file sharing program on last call." Theodore Decl. Ex. 49. Sikes responded, "Since this Customer knows 'it's his fault', [sic] please ask this Customer what he will do to prevent this from happening again and note it in the ticket work log. Then let him know that one more complaint will result in a 6 month Termination." *Id.*

In June, a senior engineer in the abuse group said this about a customer who had been given a final suspension and advised to remove all P2P file-sharing programs: "This customer will likely fail again, but let's give him one more change [sic]. [H]e pays 317.63 a month." *Id.* Ex. 34. Also in June, a customer service representative emailed the abuse group about a different customer, saying, "This customer is well aware of his actions and is upset that 'after years of doing this' he is now getting caught. Customer was advised to shop sharing, check his wireless and remove his PTP programs." *Id.* Ex. 47. Sikes responded, "Please advise this Customer that this is their final termination & reactivation. If we receive one more complaint, we will, regretfully, not be able to provide them with data service for 6 months." *Id.*

Thus, BMG has identified specific instances in which Cox knew accounts were being used repeatedly for infringing activity yet failed to terminate. Cox does not seriously challenge these examples. Labeling them as "nothing more than conjecture and hyperbole," Cox argues that these "snippets of conversations do not show what actions call centers actually took against accounts." Defs.' Opp'n at 22. Cox, of course, is careful never to assert that these customers were in fact terminated. As BMG notes in its reply, "no conjecture is required—not one of these

subscribers or their abuse ticket numbers can be found on the list of terminated subscribers Cox did produce." Pls.' Reply at 11. n.7.

Instead, Cox hangs its hat on the notion that an "infringer" is someone who has been adjudicated an infringer in court. Working from that baseline, Cox argues that "as a matter of choice and not obligation, Cox applies its process to mere *accusations* involving its accounts." Defs.' Opp'n at 15–16. In other words, Cox's policy goes above and beyond what the DMCA requires, so its failure to act based on notices of infringement cannot render Cox ineligible for the safe harbor's protection. Cox also argues that by not defining "appropriate circumstances" Congress left it to the service provider to make its own determination of when such circumstances exist.

Although Cox was under no duty to monitor for infringement, Cox did not have leeway to wait until an account holder was adjudicated as an infringer to find that circumstances were appropriate for termination. As explained above, the Court disagrees that a repeat infringer policy applies only to those who have been held liable in a copyright suit. Rather, an account holder must be considered an infringer, at minimum, when the service provider has actual knowledge that the account holder is using its services for infringing purposes. Nor do service providers have complete discretion to define "appropriate circumstances." Appropriate circumstances arise when an account holder is repeatedly or flagrantly infringing copyrights. Thus, when Cox had actual knowledge of particular account holders who blatantly or repeatedly infringed, the responsibility shifted to Cox to terminate their accounts.

Cox makes the additional argument that knowledge of infringement cannot be established by notices submitted by copyright holders.[19]  Cox claims such notices are unreliable for a variety of reasons.  There is conflicting authority as to whether notices of infringement should be considered evidence sufficient to give an ISP knowledge of a user's infringement.  *See Disney Enters., Inc.*, 2013 WL 6336286, at *22 (collecting cases and noting that "there is some disagreement as to whether such notices equate to knowledge of a user's actual infringement").  Whether or not DMCA-compliant notices are sufficient, standing alone, to establish a service provider's knowledge for purposes of the statutory safe harbor, they are "powerful evidence of a service provider's knowledge."  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013).

Moreover, the account holders referenced in the emails above had already been through Cox's entire graduated response procedure.  That means Cox had received, not one or two, but at least *fourteen* infringement notices tied to their accounts in a six-month period.  And Cox customer service representatives worked with the customers on each of their four "hard-walled garden" suspensions to identify the cause of the infringement notices—including the possibilities of malware, an unsecured wireless network, or a file-sharing program on another computer in the

---

[19]  Section § 512(c)(3)(A) lists the elements that copyright owners must include in a notification of claimed infringement.  Section 512(a), the safe harbor on which Cox relies, is the only safe harbor that does not reference the notification provision in § 512(c).  The absence of the notification provision "make senses where an ISP merely acts as a conduit for infringing material—rather than directly storing, caching, or linking to infringing material—because the ISP has no ability to remove the infringing material from its system or disable access to the infringing material."  *In re Charter Commc'ns*, 393 F.3d at 776; *see also Recording Indus. Assoc. of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1234–37 (D.C. Cir. 2003).  Despite this, Cox concedes that it still requests the information specified in § 512(c)(3)(A) from copyright owners.  Defs.' Opp'n at 18 ("While Section 512(a) does not call for notifications by complainants or their processing by ISPs, Cox asks for information that a different provision, Section 512(c)(3), specifies, because that is widely familiar.").  It should also be noted that the tickets in the emails discussed above were a result of notices that Cox deemed DMCA-compliant and had forwarded on to its account holders.

household.  By the time an account holder reaches the end of Cox's graduated response procedure, the chance that the account holder is not a willful infringer has substantially lessened.

Finally, and critically, the emails in the record reveal that Cox had knowledge that at least some of its account holders were intentionally and repeatedly infringing.  *See, e.g.*, Theodore Decl. Ex. 47 ("This customer is well aware of his actions and is upset that '*after years of doing this*' he is now getting caught.  Customer was advised to shop sharing, check his wireless and remove *his* PTP programs." (emphases added)); *id.* Ex. 49 ("This Customer knows 'it's *his fault*' . . . ." (emphasis added)).  As one court explained, "[a]lthough efforts to pin down exactly what amounts to knowledge of blatant copyright infringement may be difficult, it requires, at a minimum, that a service provider who receives a notice of a copyright violation be able to tell merely from looking at the user's activities, statements, or conduct that copyright infringement is occurring."  *Corbis Corp.*, 351 F. Supp. 2d at 1104–05.  It is clear that Cox was able to tell from these account holders' statements and conduct that infringement was occurring.  Yet, Cox continued to provide service.

Implementation of a repeat-infringer policy is "unreasonable when service providers fail[] to terminate users who 'repeatedly or blatantly infringe copyright.'"  *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 514 (S.D.N.Y. 2013) (quoting *CCBill*, 488 F.3d at 1109).  Cox has not come forward with any evidence that would raise a genuine issue of material fact as to whether it has done so.  Accordingly, BMG is entitled to summary judgment on Cox's safe-harbor defense.  If Cox is determined to be liable for contributory or vicarious copyright infringement, BMG will not be limited in the remedies it seeks.

C.      *Defendants' Motion for Summary Judgment*

Cox moves for summary judgment on five grounds: (1) whether there is evidence of direct infringement by third parties; (2) whether there is evidence of Cox's contributory infringement; (3) whether there is evidence of Cox's vicarious liability; (4) whether BMG failed to mitigate its damages; and (5) whether BMG's unclean hands bar its claims.  After a careful review of the record in the light most favorable to BMG, the Court finds summary judgment on any of the first four grounds is inappropriate.  Issues of material fact remain for the jury to decide at trial.  The Court finds Cox's unclean hands defense fails as a matter of law.

### 1.      Direct Copyright Infringement by Third Parties

BMG cannot hold Cox liable for contributory or vicarious infringement absent evidence of underlying direct infringement.  *See Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 375 (E.D. Va. 2011); *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 731 (E.D. Va. 2003).  Direct infringement requires proof of (1) ownership of a valid copyright and (2) copying.  Copying is established when any of the exclusive rights listed in § 106 are violated.  *See* 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright . . . .").  In the complaint, BMG alleged that its exclusive rights of reproduction and distribution, *see* §§ 106(1), (3), "are directly infringed each time a Cox subscriber without authorization uploads or downloads through the Cox system a recording that embodies a composition."  Am. Compl. at 12.  Cox claims there is no evidence in the record to support that allegation.

### a.      *Level of Specificity Required*

It is undisputed that BMG has not identified a specific individual Cox account holder who utilized a BitTorrent protocol on Cox's internet service to upload or download music files

that infringed BMG's copyrights.  Cox believes this is a critical deficiency in BMG's evidence. In Cox's view, BMG should have brought John Doe lawsuits and used subpoenas to establish at least one account holder as a direct infringer.  Cox argues Rightscorp's identifications of IP addresses associated with Cox accounts is insufficient to establish that any infringing act was committed by a Cox *account holder* rather than some third party who tapped into the account holder's network—for example, a neighbor accessing an unsecured wireless network or a babysitter on a Friday night.

The Court disagrees with Cox's articulation of what is required of a copyright owner in a secondary liability suit.  First, imposing a rule that would require copyright owners to litigate John Doe lawsuits before bringing claims of secondary liability would undermine a key purpose of secondary liability claims.  As the Supreme Court explained, "When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious liability."  *Grokster*, 545 U.S. at 929–30; *see also Aimster*, 334 F.3d at 645.

Second, Cox's argument ignores the fact that BMG may establish direct infringement using circumstantial evidence that gives rise to an inference that Cox account holders or other authorized users accessed its service to directly infringe.  *See Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("[*D*]*irect* proof of actual dissemination is not required by the Copyright Act.  Plaintiffs are free to employ circumstantial evidence to attempt to prove [a violation].").  As explained more fully below, Rightscorp claims to have identified 2.5 million instances of Cox users making BMG's copyrighted works available for download, and Rightscorp itself downloaded approximately 100,000 full copies of BMG's works using

Cox's service.  BMG has presented more than enough evidence to raise a genuine issue of material fact as to whether Cox account holders directly infringed its exclusive rights.

Cox tries to counter this by arguing that BMG cannot rely solely on evidence compiled by Rightscorp because direct infringement requires a showing of volitional conduct by a third party.  *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) ("[W]e conclude that *Netcom* made a particularly rational interpretation of § 106 when it concluded that a person had to engage in volitional conduct—specifically, the act of constituting infringement— to become a direct infringer."); *see also Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).  Cox claims a plaintiff cannot rely on evidence of its own agent's volition.  Courts have routinely rejected the argument that evidence of infringement gathered by a copyright owner's investigative agent cannot be used to establish infringement.  *See, e.g.*, *Warner Bros. Records, Inc. v. Walker*, 704 F. Supp. 2d 460, 467 (W.D. Penn. 2010) ("It is undisputed that MediaSentry [the copyright holder's investigator] downloaded actual copies of nine of the Copyrighted Recordings from Defendant's computer, establishing unauthorized distribution as to those nine recordings."); *Thomas*, 579 F. Supp. 2d at 1216 ("The Court holds that distribution to MediaSentry can form the basis of an infringement claim."); *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008) (accepting that plaintiffs had proved actual distribution of the copyrighted sound recordings that plaintiffs' agent had downloaded); *Interscope Records v. Leadbetter*, No. C05-1149, 2007 WL 1217705, at *4 (W.D. Wash. Apr. 23, 2007) (finding proof that MediaSentry downloaded copyrighted works was evidence of direct infringement).  Where a copyright owner has not licensed its agent to authorize distribution or reproduction, the agent's downloading of the works is not authorized and thus does not run afoul of the general proposition that a copyright owner cannot infringe his own copyright.  *See*

*Thomas*, 579 F. Supp. 2d at 1215 ("[A] copyright owner's authorization of an investigator to pursue infringement does not authorize the investigator to validate the third party's unlawful conduct." (internal quotations and alteration omitted)); *Howell*, 554 F. Supp. 2d at 985. Thus, the fact that Rightscorp caused over 100,000 downloads of the copyrighted works is sufficient to meet the volition requirement.

Finally, Cox makes much of the distinction between infringement by the individual named on the account and infringement by other users with access to Cox service. Cox overstates the import of the distinction. Taking a scenario posed by Cox at oral argument, it is typical for each member of a multimember household to access the internet via an agreement between Cox and one individual in the household. Certainly, evidence that any one of those users infringed would be sufficient, notwithstanding the fact that the individual's name does not appear on the bill. While identity is a key issue in many individual infringement suits, it has little relevance in a large-scale secondary liability suit. On the other hand, Cox's liability for infringement over its network is not boundless. Cox is free to present evidence at trial that might weaken any inference raised by BMG's evidence of infringement. For instance, Cox can present evidence of the prevalence of stolen access to wireless networks or what it believes to be Rightscorp's imprecise methods of identifying IP addresses.

### b.   The Distribution Right

Cox devotes most of its argument to the scope of § 106(3)'s distribution right, arguing that BMG's evidence of Cox account holders making copyrighted works available for download is insufficient to show distribution. Cox asserts that BMG must show actual dissemination of the copyrighted works and that BMG has failed to do so. BMG responds that a "making available" definition of distribution is the law in the Fourth Circuit, but that even under an "actual

distribution" standard, there is sufficient evidence to establish infringement of its distribution right.

Section 106(3) grants "the owner of copyright . . . the exclusive rights to . . . distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). The right was "largely dormant" before the emergence of file-sharing technology. Peter S. Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute in the Internet Age*, 59 J. Copyright Soc'y 1, 6 (2011). As copyright owners have increasingly relied on the distribution right in the digital age, district courts and academia alike have split on how to define distribution.

One source of disagreement among courts is the question of how to understand early cases that discussed the distribution right in contexts far afield from online file sharing. The most commonly cited case in this debate comes from the Fourth Circuit. In *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997), the church obtained an authorized copy of the plaintiffs' copyrighted research materials for its main library's collection. The church then made unauthorized microfiche copies of the research and sent the copies to its branch libraries. Upon discovering a copy at one of the branches, the copyright owners sued, alleging a violation of his distribution right. Because the library did not keep records of who used the microfiche, the church argued that the plaintiffs could not establish distribution because there was no evidence that a member of the public had ever used it. The Fourth Circuit disagreed.

After stating the general principle that "[i]n order to establish 'distribution' of a copyrighted work, a party must show that an unlawful copy was disseminated 'to the public,'" *id.*

at 203 (citing *Nat'l Car Rental v. Computer Assocs.*, 991 F.2d 426, 434 (8th Cir. 1993)), the

court held:

> When a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public. At that point, members of the public can visit the library and use the work. Were this not to be considered distribution within the meaning of § 106(3), a copyright holder would be prejudiced by a library that does not keep records of public use, and the library would unjustly profit by its own omission.

*Id.*

The Fourth Circuit has never returned to its holding in *Hotaling* and thus has not had the

opportunity to consider whether evidence that sound recordings were made available for

download without authorization via BitTorrent would be enough to show distribution. *Cf.*

Menell, *supra*, at 8 (noting that *Hotaling* "arose in arcane circumstances far removed from the

file-sharing context"). BMG contends that *Hotaling* announced a broadly applicable "making

available" definition of distribution that applies equally to file-sharing and that the Court is

bound by that definition. While the Court is bound by Fourth Circuit precedent, the Court does

not read *Hotaling* as broadly as BMG urges.

The *Hotaling* court announced the definition of distribution when it said, "In order to

establish 'distribution' of a copyrighted work, a party must show that an unlawful copy was

*disseminated* 'to the public.'" 118 F.3d at 203 (emphasis added). The court's specific holding

that the plaintiffs established a distribution from the library was driven by equitable concerns

rather than an analysis of the statute. *See Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d

234, 243 (S.D.N.Y. 2008) (characterizing *Hotaling* as "apparently motivated by equitable

principles" and grounded in "public policy"); *Thomas*, 579 F. Supp. 2d at 1224 (noting that the

court "did not analyze any case law to support its conclusion" or "conduct any analysis of

§ 106(3)" but was instead "guided by equitable concerns").  As Goldstein explains:

> *Hotaling* can also be understood as only a more limited decision on what is
> required to prove distribution.  Although the record on the summary judgment
> appeal revealed no instances in which the library in fact loaned the infringing
> copy to the public, the court observed that "members of the public can visit the
> library and use the work," and further that "[i]f, as the [defendant] Church says,
> actual use by the public must be shown to establish distribution, no one can
> expect a copyright holder to prove particular instances of use by the public when
> the proof is impossible to produce because the infringing library has not kept
> records of public use.

Goldstein on Copyright § 7.5.1 (3d ed. 2012 Supp.) (footnotes omitted); *see also* Patry on

Copyright § 13:9 ("[T]he majority's decision can be saved only if it is read to rest on an

evidentiary probability that there had been an actual loan of the copy.").

To be sure, some courts have construed the holding in *Hotaling* broadly and held that

making works available on file-sharing programs is distribution.[20]  *See, e.g.*, *Universal Studios*

*Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190 (D. Me. 2006); *Arista Records LLC v.*

*Greubel*, 453 F. Supp. 2d 961, 970–71 (N.D. Tex. 2006).  But "[t]he general rule, supported by

the great weight of authority, is that infringement of the distribution right requires an actual

dissemination of either copies or phonorecords."  *Howell*, 554 F. Supp. 2d at 981 (internal

quotations and alteration omitted); *see also Thomas*, 579 F. Supp. 2d at 1225;  *London-Sire*

*Records, Inc. v. Doe*, 542 F. Supp. 2d 153, 166–67 (D. Mass. 2008); *In re Napster, Inc.*

*Copyright Litig.*, 377 F. Supp. 2d 796, 805 (N.D. Cal. 2005); *Musical Prods., Inc. v. Roma's*

*Record Corp.*, No. 05-cv-5903, 2007 WL 750319, at *1 (E.D.N.Y. Mar. 7, 2007).  The Court

---

[20]  The Tenth Circuit recently relied on *Hotaling* in a case involving a library's
distribution of a copyrighted work.  *See Diversey v. Schmidly*, 738 F.3d 1196, 1202 n.7 (10th Cir.
2013).  In a footnote, however, the court acknowledged that there has been "dissensus,
particularly among district courts, about the applicability of *Hotaling*'s holding to cases of
Internet file-sharing."  *Id.* The court found it unnecessary to "delve into the file-sharing issue"
because the case was factually on all fours with *Hotaling*.  *Id.*

joins those courts and holds that *Hotaling* did not announce a rule of general applicability, but instead articulated a principle that applies only in cases where it is impossible for a copyright owner to produce proof of actual distribution.  *See Howell*, 554 F. Supp. 2d at 982 (explaining *Hotaling* as reaching instances where proof of use by the public was impossible to produce); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) ("While a copyright holder may not be required to prove particular instances of use by the public when the proof is impossible to produce because the infringer has not kept records of public use, *see Hotaling*, 188 F.3d at 204, in the present case there has been no showing that the record companies did not have access to such data.").

This reading of *Hotaling* is also consistent with the plain meaning of the statute. Section 101 does not contain a further definition of distribution.  Section 106(3) provides the only relevant definition.  A distribution occurs when a work is transferred to the public "by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106(3).  Thus, Congress provided the list of specific transactions that will consummate a distribution.  As Cox notes, clearly missing from the list is an offer to sell, transfer, rent, lease, or lend a work.  *See Howell*, 554 F. Supp. 2d at 985 ("The scope of the term distribution is only defined within § 106(3) itself . . . ."); *Thomas*, 579 F. Supp. 2d at 1217 ("Congress explains the manners in which distribution can be effected: sale, transfer of ownership, rental, lease, or lending.  The provision does not state that an offer to do any of these acts constitutes distribution.  Nor does § 106(3) provide that making a work available for any of these activities constitutes distribution."); Patry on Copyright § 13:9 ("Perhaps because the statute lists the types of distribution covered, there is no definition of 'distribution.'").

50

BMG argues in response that reading distribution to include a "making available" right is consistent with other provisions in the Copyright Act.  As examples, BMG cites the definition of "publication" in § 101, which includes "offering to distribute copies," and § 506(a)(1)(C), a criminal provision that provides that "the distribution of a work" may be accomplished by "making it available on a computer network accessible to members of the public."  Courts have debated whether the definition of "publication" in § 101 supports a broader reading of the distribution right.  Some courts have concluded that "distribution" and "publication" are synonymous terms under the Copyright Act and, working from that baseline, use the definition of "publication" to define "distribution."  This logic is flawed for several reasons.

At the threshold, the Court questions the evidence relied on by those courts that purportedly establishes that distribution is interchangeable with publication.  Those courts build upon comments in legislative history as well as an excerpt from the Supreme Court's decision in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985).  Legislative history cannot override the plain meaning of "distribution" under § 106(3), however, and *Harper & Row* involved a narrow discussion of first publication and not the meaning of distribution and publication generally.  *Cf. Thomas*, 579 F. Supp. 2d at 1219–20.

Nor does the definition of "publication" support a broader reading of the distribution right.  The Act defines "publication" as

> the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.

17 U.S.C. § 101.  The first sentence of the definition tracks the language in § 106(3), making it clear that all distributions are publications.  It does not follow from that proposition that the inverse—all publications are distributions—is also true.  *See* Patry on Copyright § 13:11.50

51

(noting that courts that assume the inverse is true fall within "the logical fallacy of affirming the consequent" (internal quotation marks omitted)).  The "offering to distribute" language forms an additional category of publications that are *not* distributions.  *See London-Sire*, 542 F. Supp. 2d at 169; *see also Howell*, 554 F. Supp. 2d at 985 ("A plain reading of the statute indicates that a publication can be either a distribution or an offer to distribute for the purposes of further distribution, but that a distribution must involve a 'sale or other transfer of ownership,' or a 'rental, lease, or lending' of a copy of the work.").  In short, § 101 provides no support for BMG's "making available" theory.

Section 506(a)(1)(C), a criminal provision that imposes penalties for "the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public," likewise convinces the Court that its reading of § 106(3) is correct.  This provision and § 101 establish that "when Congress intends distribution to encompass making available or offering to transfer, it has demonstrated that it is quite capable of explicitly providing that in the statute."  *Thomas*, 579 F. Supp. 2d at 1218.

BMG makes three additional arguments for a "making available" interpretation that the court finds equally unpersuasive.  First, BMG says that "making available" is "the view of definitive treatises."  Pls.' Opp'n at 12.  That is not correct.  There is a split in the academic debate, with Menell and Nimmer advocating for a "making available" right and Patry and Goldstein advocating for actual distribution.[21]  Menell and Nimmer rely heavily on legislative

---

[21]   *Compare* Menell, *supra*, at 67 ("[T]o prove a violation of copyright's distribution right, a copyright owner need merely show that a copyrighted work has been placed in a share folder that is accessible to the public."), *and* Nimmer on Copyright § 8.11[B], *with* Paul Goldstein, Goldstein on Copyright § 7.5.1 (3d ed. 2005) ("[A]n actual transfer must take place; a mere offer for sale will not infringe the right."), *and* William F. Patry, *Patry on Copyright* § 13:11.50 (2015) ("[T]he mere offering to distribute a copy work does not violate section 106(3).").  Earlier versions of Nimmer on Copyright endorsed an actual dissemination reading of

history for their expansive reading of the distribution right.  The Court has already reviewed the statutory language and found it plain and unambiguous.  Legislative history may not be used "to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1482 (4th Cir. 1996) ("If the language is plain and unambiguous, we look no further.").  The Court leaves any further debate to academia.

BMG also argues that interpreting the right broadly is essential to comport with the United States's obligations under the World Intellectual Property Organization ("WIPO") Copyright Treaty.  While the WIPO Treaty does recognize a "making available" right, the treaty is "not self-executing and [it] lack[s] any binding legal authority separate from [its] implementation through the Copyright Act." *Thomas*, 579 F. Supp. 2d at 1226; *see also Medellin v. Texas*, 552 U.S. 491, 505 (2008) (stating that treaties "are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on those terms").  Moreover, courts employ the so-called *Charming Betsy* canon of statutory interpretation only when "constru[ing] *ambiguous* statutes to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (emphasis added); *see also Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).  As already explained, the statute is unambiguous.  "[I]f a statute makes plain Congress's intent, a court must enforce the intent of Congress irrespective of whether the statute conforms to customary international law." *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2005) (internal quotation marks omitted); *see*

---

the statute. *See* 2 David Nimmer  & Melville B. Nimmer, Nimmer on Copyright § 8.11[A] (2007) ("Infringement . . . requires an actual dissemination of either copies or phonorecords."); *see also* Rick Sanders, *Will Professor Nimmer's Change of Heart on File Sharing Matter?*, 15 Vanderbilt J. Ent. & L. 857, 865 (2013) (noting that the "copyright treatises *were* unanimous until recently").

*also Thomas*, 579 F. Supp. 2d at 1226 (concluding that "concern for U.S. compliance with the WIPO treat[y] . . . cannot override the clear congressional intent in § 106(3)").

Finally, BMG points to a letter written by Marybeth Peters, the former Register of Copyrights, that embraces a "making available" reading of the statute. *See* Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard L. Berman (Sept. 25, 2002). The opinions expressed in the letter have no controlling weight and the Court does not consider them. *See Elektra Entm't Grp., Inc.*, 551 F. Supp. 2d at 242–43 n.7 (declining to rely on the Peters letter); *Thomas*, 579 F. Supp. 2d at 1217 ("[O]pinion letters from the Copyright Office to Congress on matters of statutory interpretation are not binding and are 'entitled to respect insofar as they are persuasive.'" (quoting *Broad. Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 778 (6th Cir. 2005))).

Although the Court agrees with Cox up to this point, Cox makes two additional arguments regarding the contours of the distribution right that the Court does not accept. First, Cox contends "copies or phonorecords" cover only tangible, material objects and the distribution right is not infringed by electronic, rather than physical, transfers. Second, Cox argues that the transactional language in the statute—"by sale or other transfer of ownership, or by rental, lease, or lending"—requires that there be a consummated "transfer" of copy or phonorecord and that there is no evidence of such a transfer in this case. The Court believes Cox is mistaken on both counts.

The distribution right extends only to "copies" and "phonorecords." 17 U.S.C. § 106(3). Phonorecords are "material objects in which sounds . . . are . . . fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise

communicated, either directly or with the aid of a machine or device."[22]  *Id.* § 101.  A work is

"fixed" if it is "in a tangible medium of expression when its embodiment in a copy or

phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit

it to be perceived, reproduced, or otherwise communicated for a period of more than transitory

duration."  *Id.*  Although Cox equates the phrase "material object" with a physical object, in fact

"any object in which a sound recording can be fixed is a 'material object.'"  *London-Sire*, 542 F.

Supp. 2d at 171.  And that includes electronic files.  *Id.* at 170 ("It makes no difference that the

distribution occurs electronically, or that the items are electronic sequences of data rather than

physical objects."); *id.* at 173 (restating that "'material objects' should not be understood as

separating tangible copies from non-tangible copies"); *see also Fox Broad. Co. Inc. v. Dish

Network, L.C.C.*, 905 F. Supp. 2d 1088, 1106 (C.D. Cal. 2012), *aff'd* 723 F.3d 1067 (9th Cir.

2013) ("In the electronic context, copies may be distributed electronically."); *Greubel*, 453

F. Supp. 2d at 968 (noting that "courts have not hesitated to find copyright infringement by

distribution in cases of file-sharing or electronic transmission of copyrighted works").

     Not only can electronic files be "material objects," but transferring files using a

BitTorrent protocol satisfies the transactional element of distribution.  Section 106(3) requires a

distribution "by sale or other transfer of ownership, or by rental, lease, or lending."  While

BitTorrent transfers do not fit within our ordinary conception of a "transfer of ownership"

because the transferor retains his or her own copy of the file, the Court finds the *London-Sire*

court's reasoning on this issue persuasive.  "[I]t is the newly minted ownership rights held by the

transferee that concern it, not whether the transferor gives up his own."  542 F. Supp. 2d at 173.

---

[22]   The definition of "copies" is the same except that they are "material objects, *other than phonorecords*, in which a work is fixed."  § 101 (emphasis added); *see also London-Sire*, 542 F. Supp. 2d at 165 n.14 ("The two terms appear to be functionally interchangeable . . ., differing only in the nature of the copyrighted work.").

In other words, what matters is that "when the transaction is completed, the distributee has a material object." *Id.* at 174.

In sum, to establish a direct infringement of its distribution right, BMG must show an actual dissemination of a copyrighted work.  BMG contends that even under this standard, it has produced more than enough evidence to show actual dissemination.  First, Rightscorp identified Cox subscribers sharing torrents that Rightscorp had also found on torrent indexing websites. Because each torrent contains a unique "hash," an identifying code that is only created once, BMG argues these Cox users must have downloaded the torrents at some point.  Second, Rightscorp downloaded over 700,000 copies of copyrighted works from Cox subscribers using Cox's internet service and 100,000 of those copies were of the works at issue in this case.[23] Third, Rightscorp says it identified 2.5 million instances in which Cox users made available the copyrighted works for downloading.  BMG argues that even if this "making available" evidence is not direct evidence of distribution, it is circumstantial evidence that the works were in fact downloaded given the way a BitTorrent protocol operates.  *See London-Sire*, 542 F. Supp. 2d at 169 (finding it is reasonable to infer that distribution actually took place "where the defendant has completed all the necessary steps for public distribution"); *see also Howell*, 554 F. Supp. 2d at 983.

The Court finds BMG has demonstrated that there is a genuine issue of material fact as to whether its distribution right was directly infringed.

---

[23] Cox's expert concluded that "the samples that Rightscorp collected revealed multiple errors in its software's detection process."  Reply at 10 n.3.  The reliability of the samples will be a factual issue for the jury to weigh.

### 2.      Contributory Infringement

A contributory infringer is one who, (1) "with knowledge of the infringing activity,"

(2) "induces, causes or materially contributes to the infringing conduct of another."  *CoStar Grp.,*

*Inc.*, 373 F.3d at 550 (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d

1159, 1162 (2d Cir. 1971)).  BMG's claim is that Cox knew, had reason to know, or was

willfully blind to its users' infringement and materially contributed to that infringement.  Cox

raises two general challenges to BMG's claim.  First, Cox contends that only an inducement

theory of contributory infringement survived the Supreme Court's decision in *Metro–Goldwin–*

*Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).  Because BMG concedes for

purposes of summary judgment that there is no evidence that Cox induced infringement, *see*

Defs.' SUMF 8, Cox asks for summary judgment.  Second, even if the Court finds a "material

contribution" theory is still viable, Cox argues that BMG has no evidence that Cox knew of the

specific infringing activity at issue in this case.

### a.      *Effect of* Grokster

The Court finds no support for Cox's reading of *Grokster*.  *Grokster* clarified the scope of

inducement; it did not explicitly or implicitly reject a material contribution theory of liability.[24]

*See Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098, 2014 WL 8628031, at *6 (C.D. Cal.

Nov. 14, 2014) (rejecting the same argument); *see also* Goldstein on Copyright § 8.0 (3d ed.

---

[24]  The *Grokster* Court said that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement."  545 U.S. at 930 (citing *Gershwin*, 443 F.3d at 1162).  Cox contends this language displaced the "older formulation" of contributory infringement articulated by the Second Circuit in *Gershwin Publishing Corporation* (and quoted above) that a contributory infringer is one who "with knowledge of the infringing activity induces, causes or materially contributes to the infringing conduct of another."  443 F.2d at 1162.  Far from implying any disapproval of *Gershwin*, however, the Supreme Court cited favorably to *Gershwin* in support of its assertion.

2011 Supp.) (noting that *Grokster* "gave prominence to the inducement *branch* of contributory liability" (emphasis added)).  The Court also finds it persuasive that in the wake of *Grokster* courts have continued to articulate both inducement and material contribution theories of contributory infringement.  *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 n.11 (9th Cir. 2007) ("[T]he Supreme Court in *Grokster* did not suggest that a court must find inducement in order to impose contributory liability under common law principles.").

### b.    Knowledge

Cox argues that even if a "material contribution" theory survived *Grokster*, BMG cannot succeed because there is no evidence that Cox had knowledge of infringing activity.[25]   The knowledge requirement is met by a showing of actual or constructive knowledge or by evidence that a defendant took deliberate actions to willfully blind itself to specific infringing activity.[26]  *See Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, No. 1:10cv651, 2010 WL 4645791, at *3 (E.D. Va. Nov. 8, 2010); *Seoul Broad. Sys. Int'l, Inc. v. Young Min Ro*, No. 1:09cv433, 2011 WL 3207024, at *9 (E.D. Va. July 27, 2011) (stating that plaintiffs were "at the very least . . . willfully blind to the possibility" of infringement and thus were liable for contributory infringement).

---

[25]  Cox did not raise BMG's ability to establish the second "material contribution" element until its reply brief.  Accordingly, the Court declines to reach the issue of whether there is sufficient evidence of Cox's contribution to the alleged infringement.

[26]  Some courts have abandoned constructive knowledge in the online context and instead required plaintiffs to establish "actual knowledge of specific acts of infringement."  *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001)).  Absent any indication from the Fourth Circuit to the contrary, the Court declines to alter the contributory infringement standard.  Cox will be liable if it knew or *had reason to know* of direct infringement.  The Court may permit the jury to be asked whether Cox had actual or constructive knowledge of, or was willfully blind to, specific acts of infringement by interrogatory.

BMG asserts that Cox had knowledge of its users' infringing activity because Rightscorp sent Cox more than two million infringement notices pertaining to its copyrighted works. Despite Cox's arguments to the contrary, DMCA-compliant notices are evidence of knowledge. *See Capitol Records, LLC*, 2015 WL 1402049, at *43; *Giganews, Inc.*, 2014 WL 8628031, at *7; *see also Corbis Corp.*, 351 F. Supp. 2d at 1107 (stating in another context that notices are "the most powerful evidence of a service provider's knowledge"). This case presents an unusual fact pattern, however, because it is undisputed that Cox never received Rightscorp's notices related to BMG's copyrights during the period covered by the Complaint. Cox began blocking Rightscorp's notices at the server level in 2011, meaning not only did Cox not receive the notices, it also has no record of receiving them.[27] The notices relevant to this litigation were not sent until 2012.

BMG argues that Cox's unreasonable decision not to receive Rightscorp's notices gave Cox reason to know of the infringing activity. In support, BMG draws a comparison to *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004). In that case, AOL changed the email address it used to accept infringement notices but did not immediately register the change with the U.S. Copyright Office or put a mechanism in place to forward or return messages received at its old address. The Ninth Circuit concluded that "[b]ecause there [was] evidence indicating that AOL changed its e-mail address in an unreasonable manner and that AOL should have been on notice of infringing activity," a trier of fact could find AOL had reason to know of the infringing

---

[27] Cox contends the notices are not evidence of knowledge because even *had* Cox received them, the notices were deficient. But Cox's in-house counsel, who set Cox's policy not to accept Rightscorp's notices, testified that the notices were "generally consistent" with the DMCA in all other respects, *see* Allan Decl. Ex. 2, and Cox has repeatedly asserted in this litigation that if Rightscorp had only agreed to delete the settlement language from the notices, they would have been forwarded to Cox account holders. At this stage of the litigation, viewing the evidence in the light most favorable to BMG, the Court finds a reasonable trier of fact could conclude that had Cox received the notices, they would be evidence of infringing activity.

activity occurring.  *Id.* at 1077.  BMG says Cox's blacklisting of its notices was similarly unreasonable and that, as in *Ellison*, there is other evidence in the record that put Cox on notice of specific infringing activity.

First, BMG claims that when Cox refused to forward its notices, it gave Cox access to a searchable and sortable "dashboard" that contained all of the information pertaining to the alleged infringements occurring at each IP address.  Although Cox received an email from Rightscorp with instructions on how to access the dashboard, Cox maintains that it never in fact accessed the dashboard and thus it could not have been a source of knowledge.  Second, BMG says after Cox blocked Rightscorp's notices, Rightscorp sent emails to Zabek, the abuse group, and Cox's in-house privacy counsel identifying IP addresses with a significant amount of infringing activity.  *See* Allan Decl. Exs. 14, 61.  Finally, BMG reprises the statements by members of Cox's abuse group discussed above that describe specific customers with phrases like "habitual abuser" or "well aware of his actions."[28]  *Id.* Exs. 28, 40.

Considering all of this together, the Court finds a reasonable jury could conclude that Cox's refusal to accept Rightscorp's notices was unreasonable and that additional notice provided to Cox gave it reason to know of the allegedly infringing activity on its network.

### c.    *Willful Blindness*

BMG also argues that the record establishes Cox's willful blindness to the direct infringement.  As noted above, willful blindness is the equivalent of knowledge in copyright law.

---

[28]  Cox attempts to characterize these emails as merely acknowledging the presence of widespread infringement on the internet.  The Court disagrees.  These emails show Cox employees discussing specific interactions with individual Cox account holders regarding what Cox employees believed was specific infringing activity.  Even if these emails would not be sufficient standing alone to establish knowledge, they strengthen the inference that Cox's knowledge of infringement went beyond the mere possibility that its service was being used for infringement.

*See Aimster*, 334 F.3d at 650.  "A person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  *Viacom Int'l, Inc.*, 676 F.3d at 35 (internal quotation marks omitted).  Willful blindness requires more than negligence or recklessness.  *See Luvdarts, LLC*, 710 F.3d at 1073.  There must be evidence that the defendant took "deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Global-Tech Appliances, Inc. v. S.B.A.*, 131 S. Ct. 2060, 2070 (2011) (addressing willful blindness in the context of patent infringement).

BMG argues that Cox's failure to terminate repeat infringers from its service and its deliberate avoidance of Rightscorp's notices establishes its willful blindness.  In response, Cox points to the actions it *does* take when it receives what it considers proper infringement notices.  Cox says that it forwards hundreds of thousands of infringement notices annually, that it works with account holders to identify and stop the activities causing the notices, and that it suspends and when necessary terminates account holders.  But this generalized evidence that Cox does not always turn a blind eye to infringement, does not mean that it has never done so.  *Cf. MP3tunes, LLC*, 2013 WL 1987225, at *3 ("[Defendant's] ability to identify repeat infringers does not mean that it never looked the other way when confronted by a high probability that certain conduct was infringing.").  Cox also argues that BMG cannot show that its decision to block Rightscorp notices was made with the intent to avoid knowledge of infringement because Cox works with complainants to remove "improper language" from notices.  Because Cox offered to do the same with Rightscorp's notices, Cox argues there is no evidence that it was deliberately avoiding knowledge of illegal activity.  While this would certainly be a reasonable inference for a jury to draw, it is not the only inference available.

BMG paints a very different picture of a company unhappy with the burdens of complying with the DMCA and using the settlement offers in Rightscorp's notices as a red herring to distract from its goal of reducing the number of infringement notices Cox receives. Given the evidence, this is also a justifiable inference.  It will be the jury's task, not the Court's, to weigh the evidence and choose among the competing inferences.  *See Columbia Union Coll. v. Clarke*, 159 F.3d 151, 164 (4th Cir. 1998) ("Where the party challenging the grant of summary judgment can show that the inferences they suggest are reasonable in light of the competing inferences, summary judgment must be denied." (internal quotation marks omitted)).

### 3.      Vicarious Infringement

BMG also alleges that Cox is liable for vicarious infringement.  A variant on *respondeat superior*, vicarious liability holds a defendant accountable for third-party infringement if he "(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials."  *Nelson–Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002).  Unlike contributory infringement, vicarious liability is not based on the knowledge or intent of the defendant.  It is entirely dependent on the existence of a financial benefit and the defendant's relationship to the infringement.  *See Arista Records, LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009); *see also EMI Apr. Music, Inc. v. White*, 618 F. Supp. 2d 497, 507 (E.D. Va. 2009) (noting that a lack of knowledge of direct infringement "is not a defense where both elements are satisfied").

### a.      *Right and Ability to Supervise*

The first element requires that the defendant "declin[ed] a right to stop or limit" the direct infringement.  *Grokster*, 545 U.S. at 930.  Cox expressly retains the right in its AUP to suspend

or terminate its account holders' access to internet service.  *See Viacom Int'l, Inc.*, 676 F.3d at 37 ("Under the common law vicarious liability standard, the ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." (internal quotation marks and alterations omitted)).  Thus, Cox has the contractual right to condition the availability of its internet access to users who do not use that service to violate copyrights.  If users listen when Cox exercises that power, infringement stops.  If users do not and Cox terminates them, that also stops or at least limits infringement.

In addition to its legal control, Cox also has the practical ability to stop or limit infringement.  There cannot be any serious dispute that internet service is an essential component of the infringing activity alleged by BMG.  File-sharing programs are completely dependent on the internet to facilitate the download and upload of files.  It is therefore a reasonable inference that the result of an internet service provider exercising its ability to suspend or terminate account holders stops or limits infringement.

Cox maintains that despite a legal right to stop or limit infringing activity by terminating accounts, there must also be evidence in the record that Cox's current architecture would allow it to exercise physical control over the infringing activity.  Cox reasons that the provision of general internet service is much different than the swap market in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996), where the defendant not only had the right to terminate vendors, but also "controlled the access of customers to the swap meet area."  It is also distinguishable, Cox contends, from defendants like Napster, which had "the ability to locate infringing material listed on its search indices."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024 (9th Cir. 2001).

In support, Cox relies on two more recent cases from the Ninth Circuit, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), and *Perfect 10, Inc. v. Visa International Service Association*, 494 F.3d 788 (9th Cir. 2007).   This Court is of course not bound by either decision, nor does the Court find the reasoning in those decisions warrants summary judgment here.   In *Amazon*, the owner of copyrighted images sued Google unsuccessfully on two theories of vicarious liability.   The first was that Google was vicariously liable for linking search results to third-party websites that contained the infringing images.   The Ninth Circuit found the "control" element was missing because the plaintiff "ha[d] not shown that Google has contracts with third-party websites that empower Google to stop or limit them from reproducing, displaying, and distributing infringing copies" of the infringing images.   508 F.3d at 1173.   The second theory was that Google had control via contracts underlying its AdSense program, through which owners of websites register to have Google place relevant advertising on their sites.   The contracts permitted Google to terminate partnerships for copyright violations.   Despite the right to terminate, the court found it did not in practice give Google "the right to stop direct infringement by third-party websites."   *Id.* at 1173–74.

By contrast, here Cox has the contractual right to control, which allows it to stop or limit individuals from infringing BMG's copyrights.   Moreover, unlike the scenario in which Google terminated a contract with an AdSense partner, when Cox terminates or suspends the relationship with an account holder, it takes away an essential component of direct infringement.   When an AdSense partner was terminated, the only result was that the ads were no longer sourced by Google.   It would have no effect on how the website worked.   Without the internet, individuals cannot upload or download illegal content.

In *Visa*, the Ninth Circuit held that Visa could not be vicariously liable for processing credit card payments on websites hosting infringing conduct. The court's holding was grounded in a concern that vicarious liability may be extended to entities whose ability to take steps against infringement would have only an "indirect effect of reducing infringing activity on the Internet at large." 494 F.3d at 803. The court believed that were Visa to exercise its contractual right to terminate relationships, it would exert at most "indirect economic pressure." *Id.* at 805. Here, the connection cannot be described as indirect. When Cox exercises its contractual right, Cox blocks a direct infringer's access to the internet. That individual is thereafter precluded from participation in the infringing activity. The *Visa* court even reasoned that Visa could only "block access to their payment system, but they cannot themselves *block access to the Internet*, to any particular websites, or to search engines enabling the location of such websites." *Id.* (emphasis added).

Nor does the Court agree with the *Visa* court's attempt to distinguish cases like *Fonovisa* and *Napster* where the defendant has physical control over the infringing activity. As Judge Kozinski explained in his dissent, "[p]hysical control over the infringing activity is one way to stop infringers, but it's certainly not the only way. Withdrawing crucial services, such as financial support, can be just as effective, and sometimes more effective, than technical measures that can often be circumvented." *Id.* at 821 (Kozinzki, J., dissenting).

In sum, Cox has a contractual relationship with its users and that relationship gives Cox the legal right to withhold service in the face of infringing conduct. Cox also provides a crucial service to the infringements alleged in this case, which gives Cox the practical ability to stop or limit infringement. That is enough to raise a genuine issue of material fact as to whether BMG can establish the first element of its vicarious liability claim.

### b.      Direct Financial Interest

The second element requires a "causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison*, 357 F.3d at 1079 (emphasis omitted). Financial benefit can be shown by evidence that "users are attracted to a defendant's product because it enables infringement, and that use of the product for infringement financially benefits the defendant." *Arista Records, LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011). To show users' attraction, a plaintiff must only establish that "the availability of infringing material acts as a 'draw' for customers." *A&M Records, Inc.*, 239 F.3d at 1023 (internal quotation marks omitted). "[T]he law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw—rather, it only need be 'a' draw." *Usenet.com, Inc.*, 633 F. Supp. 2d at 157. While the draw need not be significant, the requisite causal connection must be between "the infringing activities *at issue in th[e] case* and a direct financial benefit" to the defendant. *Giganews, Inc.*, 2014 WL 8628031, at *4.

Cox provides a content-neutral commercial service that makes a wide selection of services and activities available to its subscribers, including email, social networking, web surfing, gaming, P2P file sharing, and more. *See* Allan Decl. Ex. 37. Cox charges the same flat monthly fees to its users whether they use Cox's service for infringing or non-infringing purposes. Those "flat periodic payments for service . . . ordinarily would not constitute receiving a financial benefit directly attributable to the infringing activity," unless "the value of the service lies in providing access to infringing material." *Ellison*, 357 F.3d at 1079 (alteration omitted) (quoting S. Rep. 105–90, at 44). Thus, the relevant inquiry "where a service provider obtains revenue from 'subscribers,'" as here, is "whether the infringing activity constitutes a draw for

subscribers, not just an added benefit." *Fung*, 710 F.3d at 1044 (quoting *Ellison*, 357 F.3d at

1079) (internal quotation marks omitted).  In other words, Cox's receipt of monthly fees is only

evidence of direct financial benefit if some portion of those fees is generated from subscribers

that are drawn to Cox's service at least in part *because* of the infringing activity alleged in this

case.  Without that evidence, the requisite causal connection between the benefit and the

infringing activity is not established.

BMG offers evidence of the "draw" of infringing activity in the form of a survey

conducted by its expert, Stephen Nowlis.  The study of Cox internet subscribers concluded that

16% of subscribers "download or upload free digital music through sites such as ThePirateBay,

KickAssTorrents, and Torrentz," and of that 16%, 70% characterized the ability to do so as a

reason they subscribe to Cox.[29]  Pls.' Opp'n at 25 (citing Nowlis Decl. Ex. 2 at 4 n.2).  While

this evidence is hardly overwhelming,[30] it is also not clearly insufficient to satisfy the legal

standard.  At this stage, viewing the evidence in the light most favorable to BMG, the Court finds

a close question remains and reasonable minds could differ.  Accordingly, summary judgment is

inappropriate.  *See Walker v. Mod U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014).  A

reasonable trier of fact could conclude that some percentage of Cox customers were drawn to

Cox's internet service at least in part to download music, including BMG's copyrighted works,

using BitTorrent.

---

[29] Cox raised multiple challenges to Nowlis's survey in a *Daubert* motion.  (Dkt. No. 477).  The Court denied the motion on the ground that any deficiencies identified go to the weight of the survey and not its admissibility.  (Dkt. No. 691).

[30] BMG's only other evidence that subscribers chose Cox or retained their subscriptions to Cox because of the availability of infringing material is in the form of screenshots of message boards on the website Reddit.  BMG presents no explanation as to how these hearsay statements would be admissible or authenticated, and the Court does not consider them.

### 4.      Mitigation of Damages

Cox also raises BMG's alleged failure to mitigate its damages as a ground for summary judgment.  Specifically, Cox argues BMG failed to mitigate by declining to modify Rightscorp's infringement notices and by failing to pursue other sources of infringement.  BMG has elected to only pursue statutory damages.  *See* 17 U.S.C. § 504(c) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages . . . .").  District courts are divided on the question of whether a plaintiff's election of statutory damages invalidates a failure-to-mitigate defense.  The Court agrees with those courts to hold that it does not.  A plaintiff's actual damages are a relevant consideration in determining statutory damages under the Copyright Act.[31]  *See Malibu Media, LLC v. Guastaferro*, *Julien*, No. 1:14-cv-1544, 2015 WL 4603065, at *5 (E.D. Va. July 28, 2015).  Because actual damages are relevant, so too are the actions a plaintiff took to mitigate those damages.

To the extent failure to mitigate damages is applicable to the award of statutory damages, a genuine issue of material fact remains as to whether BMG in fact failed to mitigate its damages.

### 5.      Unclean Hands

Finally, Cox contends that BMG's unclean hands bar its claims.  Courts, including the Fourth Circuit, have "on occasion invoke[d] the equitable doctrine of unclean hands as a defense

---

[31]  When statutory damages are penal in nature, the focus is "necessarily on the [defendant's] actions and not the [plaintiff's]."  *Moothart v. Bell*, 21 F.3d 1499, 1507 (10th Cir. 2004) (finding mitigation inapplicable to statutory damages under ERISA because they are penal).  Statutory damages under the Copyright Act are not penal.  Instead, they are aimed at compensating copyright owners and deterring future infringing conduct.

in a copyright infringement action."[32]  4-13 Nimmer on Copyright § 13.09[B]; *see also Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507–08 (4th Cir. 1969).  "A court can deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief."  *In re Uwimana*, 274 F.3d 806, 810 (4th Cir. 2001) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)), *abrogated on other grounds by Bullock v. Bankchampaign, N.A.*, 135 S. Ct. 1753 (2013).  Moreover, an unclean hands defense "requires the defendant to show that he himself has been injured by the plaintiff's conduct."  *Lawler v. Gilliam*, 569 F.2d 1283, 1294 (4th Cir. 1978).  Evidence that the wrong was done to some third party is insufficient.  *See id.* at 1294 n.7 (citing J. Pomeroy, A Treaty on Equity Jurisprudence § 399).  Given these limitations, the defense has been "recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action."  *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 990–91 (9th Cir. 2009) (quoting 4-13 Nimmer on Copyright § 13.09[B]).

Cox argues BMG has unclean hands for two reasons.  Cox first claims BMG "failed to supervise [its agent] Rightscorp and cast a blind eye towards its extortionate scheme to profit from threats to cut off Internet service."  Defs.' Memo. in Supp. at 27.  The only conduct by Rightscorp with a direct nexus to this litigation is the inclusion of settlement offers in the notices sent to Cox.  The Court finds the notices are not evidence of "misconduct rising to the level of fraud, deceit, unconscionability or bad faith."  *ABC, Inc. v. PrimeTime 24, Joint Venture*, 17

---

[32]  Although it is an equitable defense, courts have applied the doctrine to preclude both equitable relief and damages at law.  *See Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 n.8 (4th Cir. 1969); *see also* 4-13 Nimmer on Copyright § 13.09[B] ("This equitable defense has been held available in a copyright infringement action regardless of whether the action is one at law or in equity.").

F. Supp. 2d 478, 484 (M.D.N.C. 1998), *aff'd in part, vacated in part*, 184 F.3d 348 (4th Cir. 1999). Cox's remaining allegations, which amount to general attacks on Rightscorp's business model, are all directed towards Rightscorp's treatment of third parties. None of these alleged practices resulted in any injury to Cox or any Cox customer and thus cannot form the basis of an unclean hands defense. *Cf. Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 379 (5th Cir. 2004) ("The unclean hands doctrine is used to defeat an undeserving plaintiff's claim for equitable relief against a defendant *that he has injured*." (emphasis added)); *Lawler*, 569 F.3d at 1294 ("The only wrong [plaintiff] committed was against third parties."); *see also In re Uwimana*, 274 F.3d at 810–11 ("We are not open to arguments about a party's general moral fitness . . . .").

Cox next submits that BMG is not entitled to relief because Rightscorp downloaded thousands of sound recordings and there is no evidence that Rightscorp had authorization to do so from the owners of the sound recording copyrights (as opposed to authorization from BMG, which owns the musical composition copyrights). However, "use of . . . undercover investigators and the like to ferret out infringement is routine, and provides no defense." 4-13 Nimmer on Copyright § 13.09[B] (citing *Sega Enters. v. MAPHIA*, 948 F. Supp. 923, 930 (N.D. Cal. 1996)). Moreover, the downloading did not personally injure Cox. Thus, this conduct cannot be used as the basis of an unclean hands defense. *Cf. Positive Black Talk Inc.*, 394 F.3d at 379. Accordingly, the Court finds Cox's unclean hands defense fails as a matter of law.

## III. CONCLUSION

For the reasons stated above, the Court **DENIES** Cox's Motion for Summary Judgment.

(Dkt. No. 305). The Court **GRANTS** in part and **DENIES** in part Plaintiffs' Motion for Partial

Summary Judgment. (Dkt. No. 310).

December 1, 2015
Alexandria, Virginia

Liam O'G
United Sta...