1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                         :
              Plaintiffs,       :
                                : Case No. 1:14-cv-1611
     vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,  :
              Defendants.        :
--------------------------------:
```


MOTIONS HEARING


December 1, 2015


Before:  Liam O'Grady, USDC Judge

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

APPEARANCES:


COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Margaret P. Kammerud
William G. Pecau
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006



COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

1        THE CLERK:  Civil action 1:14-cv-1611, BMG Rights

2   Management LLC, et al. versus Cox Communications, Incorporated,

3   et al.  If counsel would identify themselves for the record.

4        MR. KELLEY:  For the plaintiff, Walter Kelley, Mike

5   Allan, John Caracappa, Meg Kammerud, I got it right, Jeff

6   Theodore, and Will Pecau.

7        THE COURT:  All right, good afternoon.

8        MR. BRIDGES:  Good afternoon, Your Honor.  For the

9   defendant, Andrew Bridges.  And with me is Guinevere Jobson,

10  Brian Buckley, Craig Reilly, Jed Wakefield.  And for the

11  client, Marcus Delgado.

12       THE COURT:  All right, good afternoon to each of you.

13       We were contacted last night that maybe spending a

14  few minutes this afternoon would help clarify some issues so

15  that the trial would go more smoothly in front of the jury, and

16  I thought it was a real good suggestion.

17       I reviewed the e-mail requests.  And I don't know how

18  you want to proceed.  We also have a couple of pending motions.

19  One is to strike a subpoena that was issued.  And the other is

20  to strike a supplemental exhibit list.

21       I don't know, Mr. Kelley, Mr. Bridges, have you

22  gentlemen discussed how to proceed?

23       MR. BRIDGES:  We hadn't, Your Honor, but it seems to

24  me we should probably proceed on the motions first and then we

25  can address the other issues.

4

1          THE COURT:  That's fine.

2          MR. BRIDGES:  Mr. Buckley, is prepared to discuss our

3     motion to quash.  And Ms. Jobson will respond on the motion to

4     strike.

5          THE COURT:  All right, fine.

6          Mr. Buckley.

7          MR. BUCKLEY:  Thank you, Your Honor.  So I don't know

8     if you have had an opportunity to review the papers, but this

9     relates --

10          THE COURT:  I did, yeah.

11          MR. BUCKLEY:  -- to a trial subpoena that was served

12     on a lower to midlevel customer service representative in

13     Hampton Roads, Virginia.  There are a couple of technical

14     defects that we believe are fatal.  It was served late, and we

15     believe the deadline means what it says.

16          They did not tender the proper amount of compensation

17     for Mr. Vredenburg to travel 200 miles and stay in a hotel and

18     travel home.

19          Your Honor, I think in addition to that and probably

20     the larger issue is Mr. Vredenburg is a 66-year-old midlevel

21     employee at Cox.  He was already deposed for an entire day on

22     video.  They have designated huge swaths of his video to use in

23     their case in chief, which they are of course free to do.  In

24     fact, he was the second most designations of any of our

25     witnesses --

1          THE COURT:  Well, that's their choice though, right?

2          MR. BUCKLEY:  Certainly.

3          THE COURT:  I mean, he is within the subpoena power

4    of the Court.  So whether they want to call him live or by

5    deposition, that's a trial decision that they make, right?

6          MR. BUCKLEY:  And that's fair, Your Honor.  I think

7    that's relevant to weigh whether or not you ought to overlook

8    the technical defects and if he is critical in some way to

9    their case.  I don't believe he is because he has been deposed.

10   What he has to say is also cumulative of several other

11   witnesses.

12          And, Your Honor, mostly what Mr. Vredenburg talked

13   about in his deposition was the details of Cox's graduated

14   response process, and that's another issue that we want to

15   discuss, I think both sides want to discuss this afternoon.

16          We believe that the granular detail of that process

17   is no longer relevant in light of your rulings.  So I do think

18   there is an argument that Mr. Vredenburg is not relevant,

19   period.

20          THE COURT:  Well, okay.  I'll hear from --

21          MR. BUCKLEY:  Thank you, Your Honor.

22          THE COURT:  -- BMG on the technical issues.

23          MS. KAMMERUD:  Good afternoon, Your Honor.

24          THE COURT:  Good afternoon.

25          MS. KAMMERUD:  Meg Kammerud for the plaintiff.

1            As an initial matter, we don't believe that the

2    subpoena was served late.  Under the Local Rules, the language

3    does not call for the subpoena to be served 14 days before the

4    commencement of trial.  It says 14 days before trial.

5            And as set forth in our papers, we served that

6    subpoena 18 days before this witness has been asked to appear

7    for trial.  Asking him to appear on the first day of trial when

8    we knew we wouldn't call him until next week would be

9    unreasonable in light of the travel he has to handle on his way

10   here.

11           We also did provide him with witness fees.  To the

12   extent that they are inadequate to cover all of his expenses

13   while he's here, BMG will certainly cover those expenses.  And

14   as set forth in our papers, there is no case law supporting

15   Cox's position that the motion should be quashed because of an

16   incorrect payment of fees when fees were indeed paid.

17           THE COURT:  All right.

18           MS. KAMMERUD:  In terms of -- in terms of why this

19   particular witness is important, I think you acknowledged our

20   e-mail, which is this is a matter of trial strategy.  And there

21   is a great difference between presenting a witness through

22   video deposition testimony and presenting that witness live.

23           Mr. Vredenburg is one of four Cox employees who

24   handles abuse complaints that are at the highest grades within

25   their graduated response system.

1          So he is the person who is dealing directly with

2     levels 12 to 14 infringers.  So those are the serial infringers

3     who have been caught again and again and again.  And he is

4     directly involved in making decisions on whether to let those

5     infringers continue with their Cox service or whether their

6     service should be terminated.

7          And that goes to a number of issues in our case,

8     including willful -- Cox's willfulness and their knowledge of

9     the infringement going on in their network.  It goes well

10    beyond the DMCA limitations.  So we believe this is certainly

11    relevant to our case.

12         The final point I would like to make is that Cox -- I

13    think their reply is quite telling.  In their reply Cox

14    specifically states that Cox may call one or both of the

15    individuals in its case in chief, referring to Mr. Zabek and

16    Mr. Sikes, who are key witnesses as to its abuse system as to

17    the management level employees.

18         And during discussions of Cox's 30(b)(6) witnesses'

19    lack of knowledge as to certain aspects of the abuse system,

20    Cox's counsel represented to us that we would never see Mr.

21    Zabek again.  In their reply they say they may call him in

22    their case or they may not.  And the Court does not have

23    subpoena power over those two key witnesses.

24         So we're asking that someone who reports directly to

25    them and is responsible for implementation of their policies be

1    brought to trial.

2              THE COURT:  All right.  Thank you.

3              All right.  Well, I don't find that there is

4    technical violations for reasons that BMG and Ms. Kammerud have

5    just indicated.  The witness was subpoenaed for a day not at

6    the beginning of trial, I would assume for his own convenience,

7    and just for a target date when they believed they may need

8    him.

9              The larger issue that we should address now is how

10   this case is going to go in.  You know, I've made some rulings.

11   I have an opinion coming out this afternoon that fills in all

12   around the corner -- around the edges of my very brief ruling

13   on why I ruled the way I did for some of the summary judgment

14   issues and the contributory infringement.

15             So here is how -- and tell me where I'm wrong.  Round

16   Hill Music is out of the case, so they're just a dismissed

17   plaintiff in the action.  And in answer to a question from BMG,

18   I think that to the extent that there are exhibits, et cetera,

19   which come in from Round Hill Music, they're relevant if

20   they're relevant and admissible, they still come in.  But I

21   don't know enough about the evidence to know whether that in

22   fact is going to be an issue.

23             But BMG is going through Rightscorp's testimony to

24   prove the infringement.  I still have a question about the

25   notices, which we need to talk about.  And then it has

1    contributory and vicarious infringement issues.  And of course,

2    one of the contributory infringement issues I expect they are

3    going to raise is willful blindness.

4         The willful blindness prong is really going to get

5    into the middle of Cox's program when it received notices and

6    the remedial program it had in place where they refused to

7    submit those notices to their customers because of the

8    settlement offer.  And then were inundated with the notices, so

9    they blocked the notices entirely.

10        It seems to me the jury needs to know -- and I

11   excluded the testimony of Mr. Oman because having him get up

12   and opine on what he believed Congress did with the DMCA, and

13   why they put in different provisions, is not I don't think

14   helpful to the jury.  A tutorial on what his views are as to

15   why things were done is not relevant to this case.

16        The statutory construction of the Act itself is

17   relevant.  And I expect that the lawyers are going to put that

18   in.  If BMG wants to put in the framework of the statute itself

19   through Oman, we can talk about that, but that's all he's going

20   to testify about.  Unless he is called perhaps in rebuttal to

21   talk about whether there is anything in the statute concerning

22   a notice of settlement somehow making the notices noncompliant

23   with 512, I think.

24        And so, that's kind of the moving target that I'm

25   interested in your reaction to.

1          But with the willful blindness, the contributory

2   infringement, then Cox wants -- I think wants to put in

3   evidence that in fact they had a program in effect.  They can't

4   use it for safe harbor defense because I have ruled on that.

5   But can they use it to show that they were not willfully blind,

6   that they had the program, that they implemented the program

7   with other entities where they received notices and passed them

8   on to their customers?

9          As I understand it, there is what, 700,000 notices

10  that were passed on by Cox to different customers and different

11  plaintiffs, different copyrighted materials.  And I had some

12  information about that, but not a lot.

13         And then, I don't believe that there was an opinion

14  of counsel, so I have struck that.  But I expect that Cox will

15  have a witness who will get up and say, I didn't forward these

16  notices because they had a settlement provision in it and I

17  thought that was unreasonable.  I notified BMG that it was

18  unreasonable and they said, you know, too bad, we're not

19  changing.

20         And that obviously begs the question, well, why did

21  you think that the settlement offer inclusion was unreasonable?

22  And you need to understand how far Cox would like to go in

23  response to that.

24         So I think the first question after that rambling

25  introduction is, would Cox like to put in the fact that it had

1    the program in place to terminate infringers even though there

2    is no safe harbor defense available to combat willful

3    infringement under the contributory infringement case?

4            Mr. Bridges.

5            MR. BRIDGES:  Your Honor, I believe I can address

6    that, and I believe I have an answer.  I would like to have

7    30 seconds with the client and my colleague just to make sure

8    that we are all in accord on the answer, if it's correct.

9            THE COURT:  Sure.

10           NOTE:  A discussion is had among counsel.

11           MR. BRIDGES:  Thank you, Your Honor.

12           THE COURT:  Yes, sir.

13           MR. BRIDGES:  What I thought was the answer is

14   correct.

15           Your Honor, Cox believes that on this point it wishes

16   to inform the jury that it does forward notices, but it does

17   not plan to rely -- under current thinking, as things evolve

18   today, we may need to revisit that, but it does not plan to

19   evoke its terminations or its graduated response process.

20           And it believes that in light of the Court's ruling

21   that Cox did not meet the standard of 512(a) of appropriate --

22   of reasonably implementing a policy of terminating subscribers

23   in appropriate circumstances, it doesn't believe that the DMCA

24   should be a subject of any testimony or evidence, Your Honor.

25           So the question will be, does Cox forward the notices

1    or not?

2          THE COURT:  And you would have a witness who would

3    say -- who would get up and perhaps the same witness say, we

4    did not forward these notices because they contained the

5    settlement offer, we thought that was outside of the DMCA --

6          MR. BRIDGES:  No, Your Honor.  We will not refer to

7    the DMCA.

8          THE COURT:  All right.

9          MR. BRIDGES:  Just say we did not -- there may be --

10   as we go along, we may have a question or two about some

11   documents where there is some reference to the DMCA because we

12   don't want at this point rely on the DMCA.  But my

13   understanding, Your Honor, is that the evidence will be Cox did

14   not forward these notices because Cox felt that these notices

15   were inappropriate, period.

16         THE COURT:  Okay.  All right.  That answers my

17   question.

18         MR. PECAU:  Your Honor --

19         THE COURT:  Mr. Engle, yes, sir.

20         MR. PECAU:  Yes, sir.  Well, there are two issues.

21   The first issue is on notice.  And we believe the law is pretty

22   clear that once Cox got the notices, that they had constructive

23   knowledge.

24         It does go to the issue of willful blindness.  And

25   let me just address --

1          THE COURT:  Well, are you going to put a willful

2   blindness case on?

3          MR. PECAU:  Yes, Your Honor.  The thing is that it's

4   impossible in this case to avoid the DMCA and the CATS program.

5   It is completely embedded in all the documents and all the

6   testimony.  In fact, if you look at the documents, Your Honor,

7   DMCA violations are equated to copyright infringement.

8          So as a practical matter, it's impossible --

9          THE COURT:  Well, the jury needs to know the

10   framework under which this dispute arose.  And the framework

11   was the DMCA builds in a safe harbor provision, requires

12   notices be forwarded, we forwarded them to Cox, Cox did not

13   forward them on to their customers.

14          MR. PECAU:  Right.

15          THE COURT:  So I don't think Mr. Bridges is saying

16   that the DMCA can't be -- well, they may prefer not to have it,

17   but it's your theory of infringement and contributory

18   infringement.  So that is going to come in.

19          MR. PECAU:  Right, Your Honor.  I mean, the bigger

20   issue, and you're asking what the theory of our case is --

21          THE COURT:  Yes.

22          MR. PECAU:  And we think that this is completely

23   important, in fact is central to the theory of our case.  The

24   theory of our case basically is that Cox concocted this entire

25   scheme.  And that the blocking, the blacklisting of all the

1  e-mails, the notices of infringement from our client was part

2  of a larger scheme in which they set up this whole thing where

3  they pretended as though they were acting as a responsible

4  citizen, as someone who would avoid contributory infringement

5  by acting upon these things.  And the fact is that it was a

6  scheme, basically to do nothing but to give the appearance.

7       And, Your Honor, we believe that if you think about

8  it, their scheme, the CATS program, and the DMCA goes to each

9  one of the elements that we have to prove in contributory

10  infringement.  We have to show knowledge.

11       And Your Honor referred to willful blindness.  Well,

12  it definitely shows willfulness.  If we can prove to the jury

13  that there was this scheme, that they put -- they concocted

14  this whole think so that they didn't have to act as a

15  responsible citizen and their responsibilities under secondary

16  liability theories.  So that's willfulness.

17       Certainly with respect to material contribution, what

18  they did -- for example, after they had -- after they had

19  terminated a repeat infringer twice, for example, they

20  reinstated him.  That shows a material contribution.  It is

21  actually something actual that the jury can see that they were

22  contributing to the infringement that they were aware of.

23       Now, with respect to vicarious liability, the first

24  thing that you have to show is that you had the right and

25  ability to control.  Well, certainly the AUP policy, which is

1   tied into the DMCA and their CATS program, showed they had the

2   right, they had the contractual right to do it.

3         But even more than that, with respect to the ability

4   to control, the CATS program showed that they had lots of

5   control and that they were exercising control.

6         So we think that it's completely relevant with

7   respect to that first element of it.

8         Then with respect to financial benefit.  As you know,

9   Your Honor, there are a couple of reasons why we think that

10  there is financial benefit.  One, of course, is what Dr. Nowlis

11  will show, it that it is an attraction to use Cox, it enhances

12  the value of Cox.

13        But an important element of it also, Your Honor, with

14  respect to the financial benefit, are all these e-mails in

15  which their employee said, well, we know these guys are

16  infringing like mad, but, you know, they pay us 400 bucks a

17  month, we have got to keep them.

18        Now, Your Honor, I think that is an admission of

19  their knowledge of financial benefit and is tied completely

20  into this overall scheme.

21        Now, Your Honor, I understand the concern about going

22  through the 13 or 14 steps of the graduated response program.

23  And it isn't our intention to go into that in huge detail, it

24  isn't as relevant anymore.  But on the type of level that we're

25  talking about and the specific testimony and the e-mails

1    concerning these various elements, Your Honor, we think that

2    it's absolutely necessary that we present this to the jury so

3    that they see the big picture.

4          You just can't see this thing as, oh, they're getting

5    some notices coming in that has this language in it and why Cox

6    did what they did, unless you saw what Cox was doing with

7    respect to everything.  Because this is only one element in an

8    entire scheme basically not to take any responsible action,

9    Your Honor.

10         THE COURT:  So you would want to put in evidence what

11   they did with spam and other stuff, that they followed a

12   different policy with regard to them versus DMCA notices?  Are

13   you going to anticipate going that far?

14         MR. PECAU:  Well, you know, Your Honor, I mean, if we

15   had something on a comparison between what they did with

16   respect to, you know, a broadband violation and compared that

17   to what they did with CATS -- I mean, the amount of testimony

18   that would be involved in that, based on what I have seen,

19   would be a matter of 20 minutes.  I mean, it's not a central

20   part of our case.

21         And we really don't want to go into that level

22   because we don't think it's that relevant anymore that the DMCA

23   defense is out.

24         What we're going to focus on really is the element of

25   knowledge.  Which we think is extraordinarily important in this

1    case for damages, for contributory infringement, and for

2    vicarious liability.

3           Thank you, Your Honor.

4           THE COURT:  Okay.  All right.  So that gives you a

5    little clearer picture of what BMG would like to present.

6           MR. BRIDGES:  Yes, Your Honor.  And it goes to -- he

7    has articulated something very close to what I thought their

8    theory of the case was all along.  And their theory of the case

9    was, if you don't have a DMCA safe harbor, you are liable.

10          There is an intervening step that they have missed.

11   Which is, they have to prove liability because section 512 is

12   simply a damages limitation if there is liability.  If there is

13   no liability, one doesn't reach the safe harbor to begin with

14   because it's just about remedies.

15          There are a couple of points that are very, very

16   important here, Your Honor.  I think the Court asked a question

17   as to whether -- and there may have been statements -- or the

18   Court may have asked Mr. Pecau, well, are you going to argue

19   that the DMCA requires notices to be forwarded?

20          The DMCA is nothing but a safe harbor.  It has no

21   substantive obligation for a defendant whatsoever.  There is no

22   affirmative obligation.  It is optional.

23          So, for example, if there is -- for people paying

24   quarterly estimated taxes, there is a safe harbor against

25   underpayment if you pay more than a certain amount of your

1  previous year's taxes.

2         Well, if you pay that amount, you've got your safe

3  harbor against penalties.  But if you don't owe that much tax,

4  you didn't have to opt for that safe harbor.

5         So the point is, the safe harbor is purely optional

6  and it is just not an affirmative obligation.

7         And the section 512, I'm sorry, I don't have the

8  statute with me, but there is a section, if the Court reads it,

9  it says there, it does not affect any of the substantive

10 standards of copyright law.  It doesn't change what

11 contributory and vicarious standards are.

12        And so -- but they've always wanted to blow up this

13 controversy about, well, you didn't handle the DMCA well, and

14 because of that, you must be liable.  But the statute, Your

15 Honor, section 512 precludes that type of argument.

16        THE COURT:  So if I understand your argument, you're

17 not arguing that BMG doesn't have the right to introduce actual

18 infringement testimony or evidence in Cox's files, whatever

19 they have done.  Your argument is that they don't have to

20 reference the DMCA to prove contributory infringement or the

21 actual knowledge necessary for infringement and then contrib?

22        MR. BRIDGES:  That's it, Your Honor.  And the context

23 here started out with Mr. Vredenburg.  And what I would like to

24 point out, the evidence that they want to make about what Cox

25 did, none of it, none of the graduated response process has

19

1   anything to do with any BMG or any Rightscorp notices at all

2   because Cox merely blocked them.  What Cox did in escalating

3   people up through its various steps, Cox did that only for the

4   notices that it got from Warner Music, from Sony, from HBO.

5   And so, these steps are completely irrelevant to this.

6         Whether Cox forwarded notices or not, we think that's

7   fair game.  If they want to say, did Cox terminate or not --

8   because I think they're arguing that the right and ability to

9   control -- sorry, it's not right and ability to control.  The

10  standard in the Fourth Circuit Court under Nelson-Salabes and

11  Humphreys is the right and ability to supervise infringing

12  conduct, coupled with an obvious and direct financial interest

13  in the infringing activity.

14        What the graduated response program is, they're

15  arguing you can terminate, and that's your supervision.  Well,

16  then they can argue termination, they can argue numbers of

17  terminations, but we don't have to go through any reference to

18  the DMCA, and we don't have to go through all these steps.

19        THE COURT:  Well, the problem in limiting it the way

20  you would prefer is that the jury is not going to understand

21  the context of the e-mails exchanged by Cox's employees.  And

22  they're the ones that talk about, this is our third warning.

23  This customer has been at level 14 or 12, 13, and 14, and now I

24  counseled him.  The response is, counsel him again instead of

25  terminating him.

1          The guy comes back and says, well, I counseled him

2   actually last week.  And so, I have done what you told me to

3   do.  Should I terminate him this time?  And the answer is, no,

4   give him another chance.

5          So the jury, in proving actual knowledge, the jury is

6   going to need some context as to what this all means.

7          MR. BRIDGES:  I understand that, Your Honor, but that

8   context has nothing to do with these notices.  It has nothing

9   to do with this plaintiff.  That context is entirely separate,

10  a completely separate question from the question that should be

11  here, is did Cox wrongly refuse to forward those notices?  And

12  should Cox be liable because it didn't terminate the people

13  whom the plaintiffs want -- whom these plaintiffs wanted to

14  terminate?

15         And why did Cox not terminate them?  Well, among

16  other reasons, it didn't even take the notices into the system.

17         What lower level Cox personnel in Hampton Roads were

18  doing about somebody who is accused of having infringed upon

19  Avatar five years ago in some of these e-mails and the like,

20  Your Honor, they are a long time ago, that's the wrong --

21  that's precisely the wrong context for the jury.

22         The context that is appropriate for this jury is what

23  did Cox do with these notices?  And why?  And what was the

24  consequence of Cox's failure to deal with these notices?

25  That's all this case is about.

1          And the Court said last time, this is a copyright

2     infringement case.  Absolutely.  And we can apply the standards

3     from the Supreme Court in Grokster, from the Fourth Circuit in

4     CoStar, from the Fourth Circuit in Nelson-Salabes, and address

5     all of these issues entirely in the context of what Cox did

6     with these notices.

7          And if they want to argue the failure to terminate

8     based on these notices -- because what they are arguing is that

9     they also sent Cox demands for termination and Cox didn't.  Cox

10     had no affirmative obligation to terminate anybody under the

11     DMCA because that's just a remedies limitation at its option.

12          If it had an obligation to terminate, the law of

13     contributory or vicarious liability would create that

14     obligation, not the DMCA.

15          So they can make a case of you didn't forward our

16     notices and you should have terminated 138,000 people, or

17     500,000 people, or 78,000 people, and that's what the jury

18     should be discussing, Your Honor.

19          Thank you.

20          MR. PECAU:  Your Honor, could I respond briefly?

21          THE COURT:  Yes, please, go ahead.

22          MR. PECAU:  Well, not surprisingly, the defendants

23     have described the case -- our plaintiffs' case the way the

24     defendants would like the case to be.  Well, that's fine.

25          But, Your Honor, really what this case is really

1     about is about Cox's behavior and its willfulness.  And the

2     only reason that we are looking at these issues is because it

3     reflects what Cox's behavior is and what its willfulness is.

4           Now, with respect to --

5           THE COURT:  Is it your position that the motive

6     behind refusing to send out these notices was, it didn't want

7     to lose customers so it wasn't even going to allow BMG's

8     copyright notices to get to the customers and precluded it?

9           Because Mr. Bridges' point is, none of this e-mail

10    traffic concerns Rightscorp's notices because none of them went

11    to their customers.

12          MR. PECAU:  Your Honor, I am glad you raised that

13    because the thing is -- we are continuing to look at this from

14    a DMCA perspective as a defense.  You know, this idea of having

15    to forward on notices and whether you're creating a safe

16    harbor.

17          The real -- what we should really be looking at, Your

18    Honor, is what do we have to show for contributory infringement

19    and vicarious liability.  Those two doctrines, they have been

20    around for a long time, what they do is define when a person is

21    liable for acts that are basically under its control.

22          THE COURT:  And the opinion that I apologize for not

23    getting you sooner, I say exactly that.  You have to prove

24    infringement.  I identify half a dozen of the e-mails that show

25    actual knowledge.  You know, I find that not only actual

1   knowledge, but constructive knowledge, or willful blindness can

2   be used to prove contributory infringement in the Fourth

3   Circuit.  And then you have the vicarious liability issue where

4   we'll talk in a minute about the financial incentives that I

5   may have misstated my limitation on Lehr's testimony as well

6   and said that he couldn't talk about economic incentives.  And

7   I want to revisit that.

8           So I agree with you completely.  How far do you need

9   to go?  And how are you going to use it?  Because it does go to

10  contributory infringement.

11          MR. PECAU:  Right.

12          THE COURT:  And you have to prove infringement.  And

13  we may have to fashion some kind of limiting instruction as to

14  what that actual knowledge goes to.

15          MR. PECAU:  Well, Your Honor, I think we have to look

16  at it in terms of -- you know, the elements in contributory

17  infringement and vicarious liability, we have to prove those

18  things to show that they're responsible.

19          And if you look at the cases, Your Honor, they're not

20  limited to the specific works at issue.  They're basically

21  looking -- they're looking at, well, for contributory

22  infringement, they've got to know what's going on.  And two,

23  they have to materially contribute.  I mean, that isn't

24  specific to the particular, the particular works at issue.

25          The same thing for vicarious liability.  Do you have

1    the right and ability to control, and are you getting a direct

2    financial benefit?  That's what all the cases are looking at.

3            So what we're arguing, Your Honor, and what our whole

4    focus on in our case is not on the DMCA anymore per se.  Our

5    focus is on, what was their behavior?  Right.  What were they

6    doing?  Were they violating the law of contributory

7    infringement and vicarious liability?  That's our entire focus.

8            THE COURT:  And they use the response to the

9    settlement offers as a reason not to follow through with their

10   customers, and they had an economic benefit as a result of not

11   terminating any customers, is that your argument?

12           MR. PECAU:  That's part of it, Your Honor.  You know,

13   as we've indicated -- we've indicated many times before, we

14   think it's part of a whole scheme to avoid their responsibility

15   under contributory infringement and vicarious liability

16   principles.  That's our whole thing.

17           Now, it isn't a matter of whether they forwarded it

18   on to something.  It's a matter of whether once they got

19   notice, did they do what was required under the law?

20           And our argument is, Your Honor, all of these e-mails

21   and all of these actions are directly on point.  That's

22   basically it.

23           THE COURT:  But they did follow through in sending

24   notices to some customers, right?  Where does that fit into

25   your theory?

1          MR. PECAU:  Well, Your Honor -- well, it doesn't fit

2   into our theory at all because we --

3          THE COURT:  Well, how do you deal with that?

4          MR. PECAU:  Are we going to deal with that?  Well,

5   Your Honor, the way we're going to deal with it is we're going

6   to say that under principles of vicarious infringement and

7   contributory infringement, is that when they got notices of

8   these things, they had to act upon it.  They had to act

9   responsibly.

10          And they had all kinds of choices.  They could have

11   sent out their own notice.  They could have ripped out whatever

12   they didn't like in our notice.  They could have forwarded our

13   own notices.  But they didn't choose any of the responsible

14   actions.  What they said is, our way or the highway.

15          And, Your Honor, we don't think that that's -- that

16   there is any basis that they can take that position.

17          Now, you know, they can argue willfulness, and we

18   don't know how they are going to argue --

19          THE COURT:  Mr. Bridges' statement is that the safe

20   harbor is just a damages issue.  They don't have to opt into

21   the safe harbor.  And they don't need to issue notices to

22   customers if they choose not to.

23          MR. PECAU:  I agree, Your Honor.

24          THE COURT:  And it's still your burden.

25          MR. PECAU:  I agree, Your Honor.  Safe harbor is a

1    defense that is out of the case.  But it is still part of the

2    case of whether they are contributorily infringing or they are

3    in vicarious liability.  And their behavior, their conduct and

4    their willfulness, is all part of the fabric of the case and it

5    all fits together.  You just can't -- you can't take reality

6    out of this case and then try to put something to the jury.

7    They will have no clue as to what's going on.  And it doesn't

8    really reflect the reality of what has happened or why we

9    believe that they are liable.

10          THE COURT:  Okay.

11          MR. BRIDGES:  Your Honor, the irony is not lost on me

12   that they asked for the DMCA to be out of this case.  And they

13   got what they asked for.  And now they're saying, oh, but we

14   want it to be out of the case for any purpose that benefits

15   them, but we still want to use it as a sword, and they don't

16   get a shield.

17          Your Honor, that makes no sense as an approach.  It's

18   not an intellectually honest approach.  If they wanted it in,

19   it should have been in.  And if they wanted it out, it should

20   be out.  And we believe Your Honor's ruling is that it is out.

21          They are trying to say, essentially, they did us

22   wrong, they did us wrong, because they did other copyright

23   holders wrong.  And they did us wrong in a different way

24   because they wouldn't even accept our notices.  And so, we want

25   to show how they did every other copyright holder wrong by not

1    implementing their graduated process correctly.

2            And, Your Honor, that's evidence of unrelated conduct

3    that is irrelevant to this.  The question is, were they harmed

4    by this failure?

5            I need to say one thing, Your Honor.  I'm sure that

6    the water may be under the bridge on this, but I have been

7    talking about knowledge a little bit, and I have talked about

8    it in the past.  When time comes to discuss the jury

9    instructions, we believe that there is a sharp divide here in

10   terms of what the appropriate standard is for contributory

11   infringement.

12           And I will just zoom back for a bit.  Vicarious

13   liability is about a particular relationship.  Contributory

14   infringement is about culpable behavior.  And I don't believe

15   they mentioned in their jury instructions, they may have, but I

16   don't think so, the Grokster decision is the latest decision on

17   contributory.  And it distinguished the Sony decision of the

18   Supreme Court.  Those are the two landmarks of contributory

19   which establish the two essential branches of contributory.

20           And the Sony case, as Justice Ginsberg explained in

21   the Grokster concurrence where she sort of set out the whole

22   framework, she said, you're liable because you're providing a

23   product that is devoted to infringement.  That's one path.  The

24   other path is, you're liable for intentionally -- for

25   intentionally inducing infringement.

1          And in the majority opinion, I think it was unanimous

2    on this part in Grokster, the Court said, mere knowledge of

3    actual infringing uses is not enough.  Mere knowledge of actual

4    infringing uses is not enough.  Those words are in the statute.

5          So this is a little bit of a detour.  We knew that

6    they were going to avoid Grokster on the summary judgment

7    motion.  We knew they were going to avoid it.  So we did some

8    argument about the argument we thought that they were going to

9    resort to.  But I just want to emphasize to the Court that the

10   correct standard is the Supreme Court standard.

11         And you will discover in their jury instructions that

12   they tend to resort to Ninth Circuit law a lot.  Now, we're

13   from California, we would have been happy to have tried this

14   case in California, Your Honor, under the Ninth Circuit, but

15   this case got filed here.  And we think the Supreme Court and

16   the Fourth Circuit in CoStar and Nelson-Salabes should apply.

17         So I just want to make those cases.

18         One thing I noticed, the Court seems to be revisiting

19   a couple of the decisions on this.  We think the DMCA should be

20   out.  But if the DMCA in any respect comes in, then I think we

21   absolutely need to show that Cox's response to Rightscorp was

22   echoed by Charter, by Suddenlink, by Clearwire, by AT&T, by

23   Verizon.

24         The Court had a question at one of the earlier

25   hearings, what do other ISPs do?  So to me, Your Honor, if they

1   want to use DMCA processes for other copyright complainants,

2   then it would be equally fair game to bring in other ISP

3   responses to these notices.

4           So there just needs to be a basic balance here.  And

5   what they're asking for is a completely imbalanced outcome,

6   Your Honor.

7           Thank you.

8           THE COURT:  Well --

9           MR. PECAU:  Your Honor, I don't want to reargue the

10  motion for summary judgment.  I just want to make a point on

11  what I think we're talking about.

12          THE COURT:  Go ahead, one point.

13          MR. PECAU:  And it's going to be very quick.

14          Your Honor, what they're trying to do is use this

15  whole thing, the DMCA, as a sword and a shield.  So basically

16  what they want to do is --

17          THE COURT:  You're in agreement then.

18          MR. PECAU:  I am in agreement with that, Your Honor.

19  Basically what they want to do is to be able to say that, you

20  know, we acted responsibly.  But the fact is that we should be

21  able to show that they irresponsibly.

22          And the thing is that then they say, well, you know,

23  we want to show that they were treated like everyone else.  If

24  they want to show that they were treated -- that we would be

25  treated like everyone else if we went into their program, well,

1    the result of going into their program is that you're not being

2    treated responsibly, Your Honor.

3           It all goes to this entire scheme that they've put

4    together and to their willfulness.

5           THE COURT:  Okay.  All right.  Well, I'm going to

6    allow BMG to put on its theory of the case.  And as promised,

7    we're not going to harp on the 14 steps to termination.  But I

8    think that for purposes of contributory infringement, actual

9    knowledge is BMG's burden.  All of the e-mails, even though

10   they are not of BMG clients, go to the actual knowledge of the

11   program and the fact that Cox was not going to follow it.  And

12   they weren't going to follow it because they didn't want to

13   lose customers.  And it also clearly goes to the financial

14   incentive to keep the customers and, therefore, is highly

15   relevant to vicarious liability.

16          Whether the safe harbor defense exists or doesn't

17   exist doesn't change plaintiffs' burden to prove direct

18   infringement and then contributory or vicarious liability or

19   both.  And that's why there is 40 cases to read on every one of

20   these issues.  It's because the courts have allowed plaintiffs

21   to put in the evidence of what the defendant did with regard to

22   the DMCA and its obligation under the DMCA to or not to avoid

23   the liability issue.  And so, I think it is relevant.

24          As to what other ISPs did, I will continue to think

25   about that now that you've brought it up and we've talked here

1    this afternoon about the parameters of the case.

2            So that gets us back to whether the testimony of Mr.

3    Vredenburg is relevant.  And I don't know the answer to that.

4    I don't think there is a technical violation.  I don't know

5    whether ultimately BMG wants to call him.  And if so, whether

6    it's in rebuttal.  But we will need a proffer on why his

7    testimony is relevant after we get going.

8            But Cox should put him on notice that the subpoena

9    has been issued, it is valid, it is a court order to appear

10   when he is directed to during the course of the trial.

11           And before you intend to call him, the night before

12   we should -- or a day before, whatever, we should give him --

13   decide whether he is going to be called and give him sufficient

14   time to get up here from Virginia Beach.

15           All right.  The other issue is the exclusion of the

16   supplemental exhibit list.  The arguments are pretty clear.

17   One, there was no motion filed to be permitted to supplement,

18   which is I think a violation of the scheduling order which

19   clearly required the parties to file those exhibits back in

20   September.

21           And whether or not there is prejudice as a result

22   given the fact that most of the additional exhibits, according

23   to Cox, are well known, used in depositions, and are not

24   prejudicial.

25           So clearly the failure to file a notice to be allowed

1   to amend is a violation.  The fact that it came in so late,

2   just several days ago, creates an appearance certainly of

3   prejudice to BMG.  But let me hear from BMG.

4            What's the prejudice?  And what's the -- what's your

5   position on whether these exhibits have been used and shouldn't

6   ruffle BMG's feathers.

7            MR. THEODORE:  I think the prejudice, Your Honor, is

8   that we didn't -- you know, they served these I think the

9   evening before Thanksgiving, three business days before trial.

10  They had already served an exhibit list of four thousand

11  exhibits.  There have been probably hundreds of thousands or

12  millions of documents produced in this case.

13           The vast majority of these were not used at

14  deposition, so we had no idea that these were going to be used.

15  In fact, some of them had not even appeared in this case.

16           So, for example, I think defendant's new Exhibit 3591

17  is an FCC order from 2008 that had never -- have never been

18  mentioned in this case.  It's just stuff that we had no

19  opportunity to prepare for.  No opportunity to respond to.

20           And I think the notable thing about their reply brief

21  is that it doesn't give any explanation whatsoever as to why

22  they didn't provide this material earlier.  They haven't given

23  any reason why they had to wait until November.  I mean, it

24  wasn't that it was necessarily discovered late or anything like

25  that.  There is no reason they couldn't have provided this

1    stuff to us in September.

2            THE COURT:  Thank you.  All right.

3            MS. JOBSON:  As Your Honor I think aptly pointed out,

4    we did provide these documents, there were 59 of them in the

5    supplement list, they were all either disclosed in discovery,

6    on BMG's own exhibit list, appended to do an expert report, in

7    the public record, or part of the summary judgment record.

8            And many of these documents were simply inadvertently

9    missed in our first time around, and we were able to supplement

10   them as soon as practicable.  I don't believe that any of these

11   actually are prejudicial given that they are all already part

12   of the record.

13           THE COURT:  All right.  Thank you.

14           I am going to grant the motion.  You can't -- you

15   know, a motion to supplement filed in October or the first part

16   of November even might have been considered, but to file as

17   late as you did after exhibits have been produced, after the

18   parties have had an opportunity to review the exhibits, plan

19   accordingly to have these filed this late without even a motion

20   to supplement, is totally improper and prejudicial.

21           MS. JOBSON:  Your Honor, may I ask for one point of

22   clarification?

23           THE COURT:  Yes.

24           MS. JOBSON:  For those documents that were disclosed

25   either on plaintiffs' or defendants' initial trial exhibit

1    list, but that constitute sort of a summary of documents that

2    were already on one of the parties' lists, we would like to be

3    able to include those.

4              THE COURT:  Say that again.  You have a summary

5    document that you want to use?  I mean, I thought we're talking

6    about exhibits which are not on anybody's exhibit list.

7              MS. JOBSON:  I will try and explain it.  It is a

8    little bit complicated.

9              There are certain exhibits that were designated on

10   one or both of the initial trial exhibit lists that were filed

11   on time, including a hard drive that constitutes a large amount

12   of information contained in a hard drive.

13             And to the extent that some of the exhibits are

14   specifically called out in the supplemental exhibit list, some

15   of those were contained within those hard drives.  And we would

16   like to be able to continue to rely on those because they were

17   provided as part --

18             THE COURT:  Did the hard drive identify the exhibits?

19   I mean, is there an index for the hard drive that says, these

20   are exhibits which we intend to use and they are contained in

21   this hard drive?

22             MS. JOBSON:  The hard drive itself is noted as a

23   unitary exhibit, although it contains multiple files within it.

24             THE COURT:  Okay.  And did BMG object to the form of

25   the filing of that exhibit?

1          MS. JOBSON:  No, Your Honor.  My understanding is

2    that it was -- the hard drive is also on plaintiffs' exhibit

3    list.  And it's the plaintiffs' hard drive that they had

4    provided in discovery.

5          THE COURT:  All right.  Now I am totally confused.

6    Let me hear from BMG.

7          Thank you.

8          MR. THEODORE:  Your Honor, if there is some subset --

9    sorry, let me reach the podium.

10          If there is some subset of these that are legitimate

11    summaries, I think that is probably something we can talk to

12    them about and maybe work out an agreement on.  I mean, those

13    frankly might be more demonstratives even than exhibits.  So I

14    think summaries are something we can work out.

15          But in terms of, you know, new exhibits --

16          THE COURT:  Whatever is in the hard drive, you're

17    willing to agree is an exhibit -- whatever exhibits are

18    contained within the hard drive that evidently you produced at

19    some stage, you would agree are properly filed in the original

20    exhibit list?

21          MR. THEODORE:  I am not quite sure exactly what hard

22    drive she is referring to.  So I guess there are a couple of

23    possibilities of what she might be -- of what Ms. Jobson might

24    be referring to.  If it is in our hard drive or their hard

25    drive, or it's on our list or their list --

1          MS. JOBSON:  I can clarify, if that's helpful.

2          THE COURT:  Both of you stay right there.

3          MS. JOBSON:  I think there is room for both of us.

4          So the hard drive, which was produced by plaintiffs,

5   we are looking at DTX 3554 to 56 -- the hard drive which was

6   produced by plaintiffs, it's the downloads of what Rightscorp

7   had downloaded, and the infractions table --

8          MR. THEODORE:  Wait, I have those as discovery -- I

9   have those as discovery responses.

10          MS. JOBSON:  Sorry, 3559, my apologies.  And so, to

11   the extent anything that was on the hard drive that were

12   produced by plaintiffs, that were on plaintiffs' exhibit list,

13   and that was on defendants' original exhibit list, the hard

14   drive in its whole was disclosed.

15          And what was more specifically culled out in the

16   supplemental are items that were contained within the hard

17   drive.

18          MR. THEODORE:  So I think that's the sort of thing

19   that I think we can work out.  I mean, I think that those --

20          THE COURT:  That sounds like that is proper notice to

21   me and that this is not a surprise.

22          MR. THEODORE:  Yeah, I mean --

23          THE COURT:  If you look at what is in the hard drive

24   and you see the individual exhibits which are now on the

25   supplemental list, I think that is just Cox giving fair notice

1   that these are more particularly going to be used.

2          MR. THEODORE:  I think the way I would put it for

3   that is they don't -- if that is something that was originally

4   on the exhibit list, that is not even something that they need

5   a supplemental list for if it was fairly disclosed on the

6   original list.

7          So if something was fairly disclosed, we have no

8   objection to it.  And I think we can also negotiate summaries.

9          What we object to is a new list that puts new stuff

10  in.  And probably this list is a mixture of new stuff and maybe

11  some of it was on the hard drives.

12         So I guess our view is that the list should be

13  struck.  And if it was fairly disclosed on the original list,

14  then they're fine whether or not they have the new list.

15         THE COURT:  Okay.  How about that?

16         MS. JOBSON:  I understand, Your Honor.  I would

17  continue to object that they are not prejudiced by the

18  supplemental list.  But to the extent --

19         THE COURT:  They have got witnesses who they have got

20  exhibit numbers, Q and A that they've prepared which exhibits

21  they want to use and now the numbers are jumbled.  So I think

22  that is a fair item to protest.

23         So to the extent the supplemental exhibits are

24  identified in the hard drive, they will be admitted as under

25  the original exhibit list.

1          To the extent that there are additional exhibits

2   which were not identified on the September 16 exhibit list,

3   then the filing of them the other day is too late and there is

4   clear prejudice.

5          So hopefully you can work it out within the

6   parameters of that.

7          MR. THEODORE:  Thank you, Your Honor.

8          MS. JOBSON:  I think we can.  Thank you.

9          MR. BRIDGES:  Your Honor --

10          THE COURT:  Yes, sir.

11          MR. BRIDGES:  Just going back, if I may briefly, just

12   one point of clarification.

13          If the Court does -- whatever the Court decides on

14   the DMCA issue, we would like clarity.  If they are going to

15   get at anything regarding graduated response, then I would

16   trust that Cox would at least be able to discuss the

17   terminations it did do.

18          THE COURT:  Terminations --

19          MR. BRIDGES:  It did terminate -- it did warn.  It

20   suspended many people.  And it terminated probably a total of

21   600 people over the years, or 500, thereabouts.

22          THE COURT:  Those are the numbers I remember.  But if

23   you break them down monthly, they are pretty marginable

24   numbers.

25          MR. BRIDGES:  And I understand that.  But what we

1    don't want is a situation where they talk about Cox practices

2    without Cox being able to defend its practices.

3           THE COURT:  And I agree with you, and that's why I

4    started out the way I did this afternoon.

5           MR. BRIDGES:  Thank you.

6           THE COURT:  Let's see what happens on direct with

7    their case in chief and see where we go with that.

8           MR. BRIDGES:  Thank you, Your Honor.

9           THE COURT:  I will give preliminary instructions.

10   Final jury instructions, you've submitted them.  You're going

11   to meet and confer after the case is closer to final argument,

12   and we'll have a jury instruction conference.  And I will give

13   everybody the opportunity to object to whatever instructions

14   they don't like.

15          But the first thing is as we get closer to the end of

16   the case, you two parties are responsible for getting together,

17   designating somebody, going over the instructions, saying,

18   okay, there is no argument with the general instructions on --

19   we should make up 45 out of the 50 something or whatever, and

20   then we fight about the ones that we can't agree on.  And we

21   will have time to do that either in an evening or early in a

22   morning.

23          And I will give -- I am just going to give standard

24   preliminary instructions that I give in any civil case.  I will

25   explain briefly the nature of this case, but I am not going to

1    go into an elongated discussion of how plaintiff is going to be

2    to prove its case or how defendant intends to defend itself.

3    That is your duty on opening statements.

4            If people want to use demonstratives in opening

5    statements, like the statute or things that are

6    noncontroversial, that's fine, however you want to do that.

7            The old adage in this court is that there is a reason

8    why TV shows only last a half an hour, and that's because

9    that's as long as people can pay attention anymore, they have

10   been trained.  If you look at my children, that's reduced down

11   to about two-and-a-half minutes I think because of their cell

12   phones and iPads.

13           But how long do you want in opening statements?

14           MR. PECAU:  Your Honor, we would like an hour.

15           THE COURT:  All right.  I figured an hour was going

16   to be it.

17           Mr. Bridges.

18           MR. BRIDGES:  Your Honor, we will try to come in at

19   just under an hour.

20           THE COURT:  All right.  In a case like this, I think

21   it's important to give the jury more information than less.

22           So you will each have an hour for opening statements.

23           And confidential business information, you know, if

24   you want to use something in the public -- I'm not closing the

25   courtroom in a case like this.  If you use an exhibit that you

1    think contains confidential information, to the extent you use

2    pages 2, 3, and 4, those are going into evidence.  If you want

3    to redact certain information after it has been disclosed to

4    the jury, then I will consider that.

5             But, you know, what you do in getting ready for trial

6    and identifying confidential information is one thing.  What

7    happens once we get into the courtroom is entirely different.

8             So count on virtually nothing being kept

9    confidential.  If you use a document and then want to seal it

10   for a period of time, or have it redacted before it's put in

11   the public domain, then we can talk about that.

12            Mr. Buckley.

13            MR. BUCKLEY:  Your Honor, just one specific issue on

14   that.  I believe the plaintiffs intend to use some of Cox's

15   confidential financial information in their opening statement,

16   and we're not sure exactly what they intend to use.  It is

17   probably not necessary to get that granular in an opening.

18            But we may, we may have an issue to deal with that

19   tomorrow.

20            THE COURT:  Okay.  Is that correct?  And if so, let's

21   get this out on the --

22            MR. ALLAN:  Your Honor, Michael Allan of Steptoe.

23            I believe the opening just mentions their annual

24   profit numbers.  I think it is one line on a slide.

25            THE COURT:  And that's all subject to an SEC filing

```
 1    and is public information, right?  It is not -- Cox is a

 2    private --

 3             MR. BRIDGES:  Cox is a private organization.  But the

 4    specific thing that they referred to that Cox would be very

 5    sensitive about is something called the contribution margin.

 6    So it's revenues and contribution margin.

 7             THE COURT:  Dr. Lehr's testimony gets into that?

 8             MR. BRIDGES:  That's right.  But that's a point of

 9    specific concern.

10             THE COURT:  Okay.

11             MR. BRIDGES:  And whether an opening statement needs

12    to be that granular is another question, but that's sort of up

13    to them, but we wanted to make the Court aware that this is a

14    concern for Cox.

15             THE COURT:  Okay.

16             MR. ALLAN:  Well, Your Honor, I think we are planning

17    to mention that in our opening statement.  It is incredibly

18    important to our case, and the financial benefit, and the fact

19    that they make an incredible amount of money off their services

20    here.

21             And it's central to Dr. Lehr's testimony.  I believe

22    Dr. Sullivan discusses it.  It's absolutely going to come out

23    in open court.  And we see no reason why we should be hindered

24    by -- to deal with it in opening statement.

25             THE COURT:  It seems to me that that is central to
```

1    the vicarious liability.  So it may be used in opening

2    statement.

3         MR. ALLAN:  Thank you, Your Honor.

4         THE COURT:  As I talked a little bit last week, the

5    timing concerning argument about exhibits and et cetera -- if

6    we have -- if I have got an advance warning, I come out before

7    we bring the jury in and we talk about what's going on with

8    this next witness and what exhibits we object to and if it's

9    beyond the pedestrian relevance or hearsay.  But if there is a

10   particular issue, then certainly I want to hear it outside of

11   the presence of the jury versus at sidebar.

12        The deposition designations.  I got Mr. Reilly's

13   e-mail last night talking about how the parties are going to

14   continue to work to try to narrow areas of disagreement and

15   narrow the amount of information, the amount of testimony

16   sought through the deposition designations, and that they are

17   going to arrive at a final decision, get as far as they can get

18   by the evening before the deposition is going to be introduced.

19        From my standpoint, I'm wondering when did you want

20   me to look at it?  And do you expect me to be objecting --

21   ruling on objections that are in the deposition by video as

22   it's going in?

23        I mean, when were you going to give me a chance to

24   make a decision on whether it was an appropriate objection or

25   whether it should be overruled?  And if it's between 10 p.m.

1   and 1 a.m. the day before the next trial day, you all are going

2   to get a grumpy judge.

3            So I don't see how that gives me time to reflect on

4   the objections that you've made.

5            MR. ALLAN:  Your Honor, I think we've agreed to some

6   pretrial logistics, and I just want to make sure I understand.

7            On the deposition designations, we have agreed to

8   provide designations the morning two days before the tape would

9   be played.

10           MR. BUCKLEY:  Right.

11           MR. ALLAN:  So then we could confer that evening, I

12  think is the understanding --

13           THE COURT:  I got the details.  You are going to

14  continue to confer.  There is cross-designations, and then

15  there is objections by both sides, and then you are going to

16  meet and confer the evening before the deposition is going to

17  be offered on the next trial date and get as close as you can

18  to resolution.  Somebody is going to package it up, you're

19  going to have it ready to present to the jury the following

20  morning.  And the judge will not have looked at it.  That's

21  what I see is the problem.

22           MR. ALLAN:  Well, I think what I'm suggesting is we

23  might be able to get it in front of you a day before it

24  actually gets played, unless I'm missing a day here somewhere

25  in my calculation.

1          MR. BUCKLEY:  We could do it that way.  Or we could

2  come in in the morning, you could ruling that morning, and at

3  least on our side if we had about ten minutes, our video guy

4  can pull out the objections based on what you rule, fix the

5  clip with 10 or 15 minutes advance notice.

6          THE COURT:  Well, if you give it to me the night

7  before and then we can have ten minutes of argument before the

8  deposition is offered that day, that's fine.

9          MR. BUCKLEY:  So, Your Honor, if you're okay with

10  that approach, why don't we talk.  And are you okay with either

11  approach?  If we decide we would rather bump it up a day --

12          THE COURT:  No, I want to sit and -- I want to read

13  the deposition -- you know, responding without having

14  substantive knowledge about why the witness is testifying, and

15  what his testimony is, and what's relevant about it -- you

16  know, it ain't going to be obvious to me unless I have time to

17  just sit and mull it over a little bit.

18          MR. BUCKLEY:  Okay.

19          THE COURT:  So I would rather have more time than

20  less.  The rate of error is hopefully a little less if I have a

21  little more time.  So get me something the night before.

22          MR. BUCKLEY:  Okay.

23          THE COURT:  That we then can talk about the following

24  morning.

25          MR. ALLAN:  Thank you, Your Honor.

1          MR. BUCKLEY:  Thank you, Your Honor.

2          THE COURT:  Okay.  Good.  Thank you.

3          MR. BRIDGES:  If I could --

4          THE COURT:  Yes, sir, Mr. Bridges.

5          MR. BRIDGES:  If I can raise a couple of other

6    points.

7          Number one, we had a question about one aspect of the

8    Court's ruling on BMG's first motion in limine.  We get

9    entirely the avoidance of derogatory terms like "troll," and we

10   get the issue about finances or allegations that Rightscorp

11   violated debt collection laws, things like that.

12         There is one category that gives some examples, and

13   we're comfortable with the examples, but we're concerned about

14   what might be the boundary beyond that.  And it's the category

15   of evidence concerning Rightscorp's business practices after

16   2011, including evidence concerning telephone agents, phone

17   script, or call recordings.  We understand those items,

18   telephone scripts --

19         THE COURT:  It's not relevant.

20         MR. BRIDGES:  We understand the Court's ruling on

21   that.  We want to make sure, however, that it does not

22   encompass all of Rightscorp's business practices, specifically

23   Rightscorp's interactions with Cox after 2011.  Namely, all the

24   notices.  And Rightscorp's communications to and from Cox.

25   Rightscorp's communications to and from BMG about BMG's

47

 1  copyrights and enforcement of BMG's copyrights.  We think those

 2  are fair, those are at the core of the case.

 3          THE COURT:  Well, I think that they have -- in part

 4  they were going to be used by BMG to show notice.  But what

 5  else do they talk about?  Unless I --

 6          MR. BRIDGES:  There are discussions between

 7  Rightscorp and -- between BMG and Rightscorp where BMG is

 8  instructing Rightscorp in certain ways.  Or Rightscorp is

 9  making a proposal to BMG on how to handle certain things.  It's

10  about the BMG/Rightscorp relationship.  It's not about what

11  Rightscorp is off doing in general.

12          So we think things that are tethered -- that

13  Rightscorp's interactions with either Cox or BMG, not the world

14  at large, should be fair game.

15          THE COURT:  Well, it just depends whether it's

16  relevant.  I mean, if they're talking about, you know, how the

17  music industry is going to be handled this way and how the

18  motion picture industry is going to be handled that way --

19          MR. BRIDGES:  No, Your Honor.  It's about, it's about

20  enforcement of BMG copyrights.

21          THE COURT:  And how the notices are going to be

22  fashioned?

23          MR. BRIDGES:  Or what cases to settle or not to

24  settle and things like that.  And what is or is not authorized

25  to be within the notices.  And things like that.

```
 1              THE COURT:  Okay.  Well, those are things I need to
 2    look at more closely.  I mean, whether BMG tells Rightscorp to
 3    settle this case or settle that case is totally irrelevant, as
 4    far as I can tell.  And these are settlement discussions of
 5    third parties.
 6              MR. BRIDGES:  Your Honor --
 7              THE COURT:  So there are lots of reasons -- am I
 8    going to allow BMG to have a witness come in and testify about
 9    why he allowed Rightscorp to settle certain cases because of
10    certain facts?  I mean, that doesn't --
11              MR. BRIDGES:  Well, it actually goes to the accuracy
12    of Rightscorp's notices to Cox during this time on behalf of
13    Rightscorp.
14              THE COURT:  So you're cross-examining a Rightscorp
15    witness and you're saying, isn't it true that BMG had to tell
16    you to modify the software to do this or to do that to capture
17    more accurate nodes?
18              MR. BRIDGES:  Or that we're not going to be -- we're
19    not supposed to be enforcing these.
20              THE COURT:  Because of the unreliability factor?
21              MR. BRIDGES:  Because there wasn't authority to
22    enforce them.
23              THE COURT:  Authority to enforce them.  You mean they
24    didn't own the rights to the copyrights?
25              MR. BRIDGES:  In some cases it was -- well, a good
```

1    example is a BMG artist put his own music out on BitTorrent.

2    And so, they're discussing -- Rightscorp says, well, since the

3    artist has put this out, we're going to stop -- now we're going

4    to stop sending notices on this.  Because it turns out that the

5    artist putting the music on BitTorrent would have been a

6    complete explanation for noninfringing use of that music on

7    BitTorrent.

8             And it goes to a broader question --

9             THE COURT:  So it goes to your argument that

10   BitTorrent had lots of music that was permissible and

11   noninfringing to upload or download?

12            MR. BRIDGES:  We don't need to make that argument,

13   Your Honor.  It goes to the question as to whether this notice

14   about this music that the artist put out is --

15            THE COURT:  But you don't have any evidence that any

16   of those artists who BMG is suing on behalf of had voluntarily

17   put their music in BitTorrent or any other cloud, right?

18            MR. BRIDGES:  Well, Your Honor, I'm not sure that

19   this case is only about the songs at issue in this case.  They

20   have tried to make a practice out of -- and they have tried to

21   make a case out of Cox's response to Rightscorp in general.

22            And one of the reasons why Cox was not going to be a

23   party of an effort to get money from Cox's subscribers was that

24   Cox isn't in the adjudication business, it's not going to be in

25   the we're helping you collect money business.  They can say,

1   get a court decision and we'll do it.

2          But Cox is being put in a squeeze here as to whether

3   it's going to pass on these sorts of allegations.  And whether

4   it's charged with knowledge that if it gets a notice from BMG,

5   it should know that that's an infringement.  This goes to

6   contributory.  It goes to a lot of things.

7          THE COURT:  All right.  I need to see those before

8   you use them in cross.

9          MR. BRIDGES:  That's fine, Your Honor.  We want to be

10  careful about the motion in limine, that's why I wanted to

11  bring it up.  And it is appropriate to look at it on a

12  case-by-case basis.

13         THE COURT:  I appreciate it, and I agree with you.

14         MR. BRIDGES:  Then one other thing is -- I think,

15  Brian, you were going to cover that.

16         MR. BUCKLEY:  Your Honor, just the last substantive

17  issue is the extent to which the parties are going to be

18  permitted to talk about your prior rulings, the summary

19  judgment and the motions in limine.

20         THE COURT:  What use do you want to make, or what use

21  do you not want made of any of my prior rulings?

22         MR. BUCKLEY:  No use, Your Honor.  You've said as a

23  matter of law those issues are irrelevant.  And I don't think

24  either side ought to be telling the jury what you ruled in

25  advance.  You said those are not issues in the case.

1          THE COURT:  All right.  BMG, do you agree with that?

2          MR. PECAU:  No, Your Honor.

3          THE COURT:  Come to the podium, please.

4          MR. PECAU:  So, Your Honor, there are basically two

5    issues that I think that your orders are relevant.  And one has

6    to do with the advice of counsel.

7          The thing is that a lot of the -- as you noted, a lot

8    of these documents may refer to advice of counsel.  So we think

9    that there should be a simple ruling.  We should be able to

10   point out to the jury that there is no opinion that they can

11   reasonably rely upon.

12         THE COURT:  What documents are going to say "advice

13   of counsel"?

14         MR. PECAU:  Well, there are quite a few documents I

15   think in e-mail traffic where they are -- you know, as Cox

16   indicated, that they wanted to put in some evidence of e-mail

17   traffic and correspondence between Rightscorp --

18         THE COURT:  Distinguish between advice of counsel --

19   an opinion of counsel versus Mr. Whoever from Cox who says,

20   we're not accepting -- we're not forwarding any notices because

21   they contain this settlement offer.

22         MR. PECAU:  Right.  That's fine.

23         THE COURT:  Okay.

24         MR. PECAU:  Most of these e-mails go a little bit

25   further than that, and they said, because our attorney told us

1    so.

2           So we think that because there are a number of

3    e-mails like this, that there is going to have to be an

4    instruction regarding advice of counsel.  And we will have to

5    be able to refer that there can't be any implication that they

6    have a defense based on advice of counsel.

7           THE COURT:  All right.  I don't think my -- so the

8    issue is do I permit you to reference the fact that there was

9    an advice of counsel defense sought and I denied it because

10   there was no formal opinion of counsel?  I don't think that's

11   necessary.

12          MR. PECAU:  Well, Your Honor, we want it to be very

13   vanilla, honestly.  And if you look at the proposed jury

14   instruction that we proposed on this, we basically copied the

15   four or five words that you had in it, just so that there

16   wouldn't be that implication.

17          We don't intend to be arguing unless we're responding

18   to some argument that they're making, but we think that because

19   it's in, these various documents, it's in a lot of testimony in

20   this case, that there has to be some at least equitable, some

21   way to explain to the jury that it is not a defense here.

22          Okay.  And then the other one --

23          MR. BUCKLEY:  Could I be heard on that?

24          THE COURT:  Well, let him finish, and then you can be

25   heard on both.

1          MR. PECAU:  The other one, of course, Your Honor, is

2     the DMCA, and that they don't have a defense.  Again, we

3     suggested an order -- I mean, an instruction, Your Honor, that

4     addresses that.  We tried to make it as even as possible.  And

5     Your Honor may want to change that.  But I think that the

6     jury -- it has to be made clear that there is no implication

7     that they do have a DMCA defense because it's in, as we've

8     said, a lot of different things.

9          So to that small extent, I think that your orders

10    have to be raised.

11         And also, Your Honor, you know, this is the law of

12    the case at this point.  And the jury should be told that they

13    had this defense, they raised it, and that there is not that

14    defense anymore, that they didn't act reasonably.  It's part of

15    the case now, Your Honor.

16         THE COURT:  Well, I mean -- all right.  Let me hear

17    from Mr. Buckley.

18         MR. BUCKLEY:  Your Honor, on the advice of counsel,

19    we never asserted an advice of counsel defense.

20         What we've said all along is that we're going to tell

21    the story.  And one of the people who tells the story is a

22    lawyer, Randy Cadenhead.  There is no instruction that says,

23    Cox has an advice of counsel defense.  So you don't need a

24    contrary instruction saying, we don't have an advice of counsel

25    defense.  And that's what their instruction says.

1          It's really just a way to tell the jury that they

2   brought a motion that you granted and they won.  So any

3   prejudice outweighs the probative value.

4          On the DMCA, Your Honor, the instruction that they

5   have proposed is not a balanced instruction, and it's focused

6   on the fact that you ruled.  We have proposed an instruction

7   that relates to the DMCA that says simply, there is a statute,

8   it provides a safe harbor, it's optional, it's not relevant in

9   this case, period.

10         It doesn't have to go to what you ruled or didn't

11  rule and open up the issue of, okay, the trial is starting, who

12  has already won.  And we are afraid that that's really what

13  they're trying to do here.

14         THE COURT:  Okay.  All right.  Well, the burden is

15  still on BMG to prove its case by a preponderance.  And as I

16  have said earlier today, that being allowed to identify the

17  construction of the DMCA, including the fact that it has a safe

18  harbor provision, and that's why they sent out notices, and

19  those notices were not forwarded by Cox because they included

20  settlement offers, and whether that was reasonable or not

21  reasonable, that's all I think necessary for a jury to

22  understand what this case is about.  So certainly that will be

23  permitted.

24         I think that BMG at that stage has the right to say

25  that there is no safe harbor defense in this case.  It doesn't

1  have to say that and shouldn't say that it's because the judge

2  ruled against Cox.  It should just say that's not a defense in

3  this case.  Just as copyright ownership is not a defense in

4  this case.  Those are matters that were decided as a matter of

5  law by the Court.  They are the rulings.  And they are just

6  uncontroverted, established principles under which we're going

7  to operate.

8          The opinion of counsel, the existence of the

9  references to I did this on counsel's advice, is going to

10  require some sort of an instruction.  But as long as there is

11  no substantive conversation about I relied on what Joe Blow

12  told me he had researched the issue definitively and gave me

13  this advice based on his own research, then I am less troubled

14  by the evidence of there having been a counsel involved in it.

15          And I think we can fashion an instruction at the

16  close of the case which focuses the jury on what import there

17  is to that, and what it is or what it is not.  And we will work

18  on that during the course of the trial.

19          All right.  Mr. Bridges.

20          MR. BUCKLEY:  So to be clear, there should not be

21  references to your summary judgment or MIL rulings, motion in

22  limine rulings in the opening statements?

23          THE COURT:  No.  This is just the way the case is

24  going to go in, this is -- you know, the fact that I have

25  weighed in to construct the case is not relevant to the jury.

1          There is jury instructions which both counsel have

2    asked for which say, nothing the Court says or did is intended

3    in any way to reflect what the Court's opinion is on who should

4    win the case.  Who wins the case is a decision that the jury

5    decides after receiving all the facts and the law.

6          All I have done is narrowed the parameters of what

7    evidence is going to be presented.  So I think it is

8    prejudicial to identify on either side that I have limited the

9    testimony or struck certain defenses.  They just exist, that's

10   the four corners of the case.  Okay.

11         MR. BRIDGES:  Your Honor, in light of the discussion

12   of the possible evidence on the DMCA and the discussion of the

13   framework, Cox would ask for leave for me to file one

14   supplemental jury instruction about that part of the DMCA

15   statute that says it does not affect the substantive law.

16         THE COURT:  Sure.  Absolutely.

17         MR. BRIDGES:  Thank you, Your Honor.

18         MR. ALLAN:  Your Honor, if I may, just a couple of

19   quick housekeeping matters.

20         THE COURT:  Yes.  I'm looking to see what I have

21   missed here.  Go ahead.

22         MR. ALLAN:  I think you spoke earlier about dealing

23   with exhibits in the morning.  There are a lot of e-mails in

24   this case and a lot of documents, I think on both sides of the

25   aisle.  The exhibit lists are pretty voluminous and everyone

1    has objected to a lot of different things.

2          We think that there could be a lot of

3    self-authenticating -- several self-authenticating e-mails, for

4    example.  And we might be able to streamline the process and

5    deal with a lot of admissions of exhibits outside the earshot

6    of the jury.  And we are certainly happy to work with counsel

7    to deal with that.

8          But we would suggest that maybe we could set up a

9    plan in the morning to deal with a number of exhibits that

10   might be used that day, for example.

11         THE COURT:  I heartily encourage that.

12         MR. ALLAN:  Very good.  One other --

13         THE COURT:  So BMG's case in chief, you're going to

14   sponsor Exhibits 1 through 14.  You've told Cox the night

15   before that these are the witnesses we expect to call tomorrow,

16   these are the exhibits we expect to use tomorrow with that

17   witness.  Is that what you have already talked about doing?

18         MR. ALLAN:  We do have that plan in place, Your

19   Honor.  There may just be other exhibits that we're going to

20   use, and we will certainly give them advance notice along this

21   criteria, but it might be just easier to just get a bunch of

22   self-authenticating documents out of the way all at once.

23         THE COURT:  Oh, oh, in the beginning -- before the

24   evidence starts, go through a list of what you believe are

25   self-authenticating documents?

1          MR. ALLAN:  We could do that or we could do --

2          THE COURT:  Whether they are going to be introduced

3    on Tuesday, Wednesday, Thursday, Friday, whatever.

4          MR. ALLAN:  Correct.  Then they know they're in

5    evidence and we don't have to go through that rigmarole.

6          THE COURT:  That's fine if you want to do that.

7    That's great.

8          Mr. Buckley.

9          MR. BUCKLEY:  The plan is, if we talk in the evening,

10   anything we agreed on, we would come in in the morning and say,

11   Exhibits 1 through 10 are agreed and preadmitted, is that what

12   you are proposing?

13         THE COURT:  No, his is a little broader --

14         MR. ALLAN:  Mine is a little bit broader.  Certainly

15   we have that proposal.  But what I was thinking is, you know,

16   there is a bunch of e-mails, for example, that we think are

17   self-authenticating.  They are Cox e-mails, they are from Cox

18   witnesses.  We can go through them one-by-one, and we would

19   give you a chunk of e-mails, for example, that we might use on

20   several of our witnesses, and just move them all for admission

21   into evidence.

22         We would obviously give you advance warning and have

23   them be in the witness binders.  But just so we -- you know, we

24   think there is a whole grouping that we can just deal with in

25   one fell swoop.

1          MR. BUCKLEY:  There might be some middle ground on

2     that.

3          THE COURT:  Yeah, let's look at that and see if we

4     can't move the ball there.

5          MR. ALLAN:  Very good.  One other housekeeping

6     matter, Your Honor.  I think we're done with everything else

7     substantively.

8          But this week is a little bit of an odd week, right,

9     because we're starting on Wednesday.  I just want to confirm,

10    we're just going Wednesday and Thursday of this week?

11         THE COURT:  We're going to go Friday too.  We may

12    start a little late, but we're going Friday too.

13         MR. ALLAN:  Okay.

14         THE COURT:  I told you before I wasn't sure, it would

15    depend on what kind of docket I had and what I could rearrange.

16    But we will probably start an hour late because of the criminal

17    docket.  But my civil docket, I am able to move around.

18         And I don't want to -- I want to get as far as we can

19    this week.  So we will go Friday as well.

20         MR. ALLAN:  So, Your Honor, we have -- basically all

21    of our witnesses are outside of the area.  We'll sort of --

22    obviously, when we get out of here and get to our phones, we

23    will make some calls.

24         Can we let you know whether we think we're going to

25    have issues with calling enough witnesses on Friday given the

1    timing?  That just may be a very realistic possibility.  I just

2    don't know.

3            THE COURT:  Well, I mean, your response from me is

4    going to be, call somebody else even if it's out of the order

5    you would like to call them --

6            MR. ALLAN:  Right.

7            THE COURT:  -- and fit them in.  Because the jury,

8    its Christmas holiday season, I don't want the jury to be here

9    any longer than they need to be here.

10           So the first thing you should do after you hear, I

11   can't do Friday, is find somebody else that can do Friday.  And

12   if you tell me that you have no witnesses that are going to

13   fill up Friday, then I'm not sure how to deal with that.  That

14   has never happened to me because, you know, the rule around

15   here is that you run out of witnesses, your case is over.

16           MR. ALLAN:  Right.  We are well aware of that rule,

17   Your Honor.

18           THE COURT:  Okay.

19           MR. ALLAN:  But you anticipate a full, maybe starting

20   an hour late, but still five or six hours of testimony after

21   that?

22           THE COURT:  Yes.  All right.  Let me ask this.

23           Mr. Kelley, you and I talked briefly about the

24   notices, whether they contained hearsay and went beyond the

25   notice because, one, they include issues of notice of a

```
 1   settlement offers, and who to contact, and the issues that if
 2   you don't respond, then you're subject to being sued, blah,
 3   blah, blah.  And you said they're not hearsay, they have been
 4   admitted regularly in courts across America.  And we never
 5   really finished our conversation.
 6           MR. KELLEY:  And I'm really not prepared to finish it
 7   now.
 8           THE COURT:  Okay.
 9           MR. KELLEY:  And I have been sick for the last five
10   days with food poisoning.
11           THE COURT:  Oh, I am sorry to hear that.
12           MR. KELLEY:  I am just happy to be here because
13   yesterday I was flat on my back.  I would be delighted to pick
14   it up whenever, tomorrow, I get a chance to get back up to
15   speed.
16           THE COURT:  Okay, let's do it tomorrow then after we
17   -- I mean, you're not going to need to use them in opening
18   statements, I would assume, or at least nobody is going to
19   focus on the contents of the notices.  But let's, obviously,
20   before you try to admit -- and as I've said, you can use
21   examples of the notice, but we're not admitting thousands of
22   notices.  We can talk about that further.
23           MR. KELLEY:  Okay.  Thank you, Your Honor.
24           THE COURT:  Mr. Buckley.
25           MR. BUCKLEY:  Just so there is no surprise, we are
```

1    going to talk about the contents of the notices tomorrow at

2    some length.

3              THE COURT:  Okay.

4              MR. BUCKLEY:  The issue is if two-and-a-half million

5    notices come in with boxes stacked to the ceiling --

6              THE COURT:  Come to the podium.  Tell me a little --

7    you're going to talk about the fact that the settlement offer

8    in the notices is why you didn't forward them on.

9              So it's important for you to be able to use that

10   evidence, which is what I said in my brief ruling.  Which is it

11   appears -- they appear to be relevant to both parties and may

12   be admissible for many different reasons.

13             MR. BUCKLEY:  So the form of the notices themselves

14   is of course relevant.  Our objection is that the notices are

15   not evidence of infringement, which is how they're trying to

16   use it.  For that purpose, it's clearly hearsay.  If you're

17   saying, what we told you in this notice is true, then of course

18   it's hearsay.

19             And that's why you don't need 2 million of them.

20   Maybe you need ten, or maybe there are a couple that are

21   particularly relevant.

22             So we're not saying that there isn't some relevance

23   for the notices.  We just don't think that the boxes stacked to

24   the ceiling makes any sense.

25             THE COURT:  They've already said we're not using them

1    as proof of infringement.  It's notice of our belief that you

2    are infringing.  Okay.

3              So the notices are going to come in as they are.  We

4    don't need to reflect on that.

5              I precluded Dr. Lehr from testifying about anything

6    but the profits.  He did reference the survey and the number of

7    infringing customers that Cox had from Nowlis' survey.  And I

8    said he couldn't talk about the economics.  And what I meant by

9    that was that I didn't want him opining about how copyright

10   laws are good or they are bad or, you know, they're the way

11   that the music industry survives or not.

12             But I think if his testimony is going to be offered

13   for the financial incentive on vicarious liability, then I did

14   not intend to exclude that testimony.  And I think that

15   Sullivan is prepared to testify about all of that in Cox's

16   case, and you can argue about whether it is or is not

17   profitable to -- well, profitability generally or file shares

18   use more bandwidth or costs of enforcing the notice

19   requirements.  I think that is fair game for Lehr's testimony.

20             So that's all I had.  And anybody else got anything?

21   So you understand the jury selection process?

22             Mr. Buckley.

23             MR. BUCKLEY:  Sorry, one point on Dr. Lehr.

24   Depending upon how far that economic incentive argument is

25   allowed to go --

1          THE COURT:  Yes.

2          MR. BUCKLEY:  -- our witness, Dr. Karaganis, rebutted

3   some of the points that Dr. Lehr had to make.  So could we at

4   least reserve the right to bring back up with you, depending on

5   what Dr. Lehr testifies about, whether we still need Dr.

6   Karaganis?

7          THE COURT:  Yes, absolutely.

8          MR. BUCKLEY:  Just reserve --

9          THE COURT:  Is the answer.  Karaganis is a

10  sociologist, et cetera, that's exactly what I don't want Lehr

11  to get into, is why people do what they do or don't do.  And

12  that's not I think proper for the jury.  Okay.

13         MR. BUCKLEY:  Thank you, Your Honor.

14         THE COURT:  All right.  All right.  Well, thank you

15  for suggesting that we get together today, I think this was

16  very helpful.  And we will see you all tomorrow at 10 o'clock.

17         Yes, sir.

18         MR. BUCKLEY:  I'm really sorry.  Can the jurors take

19  notes?

20         THE COURT:  Yes, they will be permitted.  And they

21  leave them in there at night when they go home.  They are for

22  their own personal use.  You know the drill about the use of

23  them.  And I will advise them of that in preliminary

24  instructions in the morning.

25         MR. BUCKLEY:  Thank you, Your Honor.

1          MR. BRIDGES:  Thank you, Your Honor.

2          MR. KELLEY:  Thank you, Your Honor.

3          THE COURT:  All right.  Thank you.  We are in recess.

4    ------------------------------------------------
                     HEARING CONCLUDED
5

6

7

8

9

10

11

12

13

14

15

16          I certify that the foregoing is a true and

17    accurate transcription of my stenographic notes.

18

19

20          /s/ Norman B. Linnell
21    Norman B. Linnell, RPR, CM, VCE, FCRR

22

23

24

25