UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC, :
et al.,                         :
                Plaintiffs,     :
                                : Case No. 1:14-cv-1611
       vs.                      :
                                :
                                :
COX ENTERPRISES, INC., et al.,  :
                Defendants.     :
--------------------------------:
```

<u>VOLUME  2  (A.M. portion)</u>

TRIAL TRANSCRIPT

December 3, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

<u>APPEARANCES</u>:


COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA   98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

INDEX

WITNESS                              EXAMINATION        PAGE


    BARBARA A. FREDERIKSEN-CROSS
                                     DIRECT             263

```
 1            NOTE:  The December 3, 2015 portion of the case

 2    begins in the absence of the jury as follows:

 3    JURY OUT

 4            THE COURT:  All right.  Good morning.  I see everyone

 5    that's anyone is here, and we agreed to meet a little early.  I

 6    appreciate the supplemental briefing.  And it's Cox's

 7    objection.  Mr. Buckley, do you want to be heard, sir?

 8            MR. BUCKLEY:  Thank you, Your Honor.  Yes.  We

 9    submitted a brief last night.  I don't think that the issues

10    have changed dramatically, and I think I've been making the

11    same basic argument all along.  If there is evidence of

12    infringement, it's this data in this little part of the notice

13    right here.  The rest of this notice is statements by human

14    beings, and fairly aggressive statements by human beings

15    including under penalty of perjury, we own the copyrights,

16    you're violating the law.  Those are not the kinds of things

17    that computers send.

18            THE COURT:  Why is it different than the red light

19    case?

20            MR. BUCKLEY:  I'm glad they flagged it.  When you're

21    home and you get a letter from the police department that says,

22    we got you on camera blowing the red light, you need to come to

23    court.  That is not evidence that you blew the red light.

24            When you show up in court, they're going to use the

25    photo of you blowing the red light, and they're going to use
```

1    the notice as evidence of why you're in court.  They're not

2    going to say, here's the evidence that the judge blew the red

3    light.  They're going to show you -- they're going to show the

4    photo.

5              This is the letter from the Police Department, but

6    much worse because it's got all sorts of other stuff in it that

7    is not computer generated.  This is the reference to the

8    camera.

9              They can certainly come in and put on evidence that

10   their systems generate this kind of data and the data is

11   reliable and it sits in tables, and -- but this kind of

12   compilation of this evidence doesn't prove the data.  That's

13   what the hearsay rule says.

14             And that's exactly what 105 is supposed to deal with.

15   When you've got evidence that's admissible for one purpose --

16   and we've all agreed that the notices -- some portion of the

17   notices are going to come in, we're going to talk about what

18   they say.  All we want is for the jury to understand that

19   doesn't mean that this is proof -- this document is prove of

20   infringement.  And I don't think there's any dispute about that

21   either.  I don't think they're saying they're going to use it

22   for that purpose.

23             THE COURT:  No.

24             MR. BUCKLEY:  Thank you, Your Honor.

25             THE COURT:  All right.  Thank you, Mr. Buckley.

1          Do you want to respond?

2          MR. THEODORE:  I think the critical question here,

3    Your Honor, is of prejudice.  Is it prejudice to them and

4    prejudice to us?

5          So -- and I don't think there is prejudice to them.

6    There is going to be tremendous argument on this issue, what do

7    the notices mean, what's their significance, what do they

8    prove.  It's going to be a central issue in this case, and

9    they're going to have every opportunity to put in evidence on

10   it.

11         What they want I think here is for you, Your Honor,

12   essentially to put your finger on the scale.  The parties are

13   going to have a debate as to what the Rightscorp data means,

14   what the Rightscorp system means, what the Rightscorp data that

15   is incorporated into these notices mean.  And what they're

16   asking you to do is to put your finger on the scale and say to

17   the jury, essentially, the Rightscorp -- the Rightscorp data,

18   the Rightscorp system as a whole into which these -- which

19   these notices are a record, of which they're a part in effect

20   is insufficient to prove infringement.

21         But that's something that they can extremely

22   effectively argue to the jury.  And it's extraordinarily

23   prejudicial to us to have a jury instruction that essentially

24   says these notices, which are computer-generated records of our

25   system, of the system that is our essential proof in this case,

1   are unreliable.

2            And I think what's interesting on the prejudice point

3   is that if you look back to their original paper, their

4   original motion in limine, the prejudice that they identified

5   was the volume of notices.  It was stacking two million notices

6   in front of the jury.  But we're not proposing to do that.

7   We're just going to put in a summary exhibit and one notice per

8   work.

9            It's, in fact, they who are emphasizing the number of

10  notices in this case.  In their opening and in their cross of

11  Hubert they made a huge issue of the number of notices that

12  were sent.

13           So I think that it's a little bit unfair for them to

14  make a huge issue of the great volume of notices and then come

15  in and say that the volume of notices is so unfair that they're

16  entitled to a limiting instruction that essentially says to the

17  jury, here's how you should decide the case.

18           THE COURT:  Okay.  All right.  Thank you.

19           Well, I'm going to admit the notices without a

20  limiting instruction.  I think they are entirely

21  computer-generated notices.  You know, the -- if you drill down

22  the entire document, everything is generated by persons.  You

23  know, all the source code is generated by persons.

24           I think the law in the case, when you're looking at

25  hearsay takes that aside and says, listen, is this document

1    computer generated.  And regardless of whether a portion of it

2    is generated by the software system for purposes of identifying

3    infringement or for purposes of notifying the recipient that

4    they -- you know, they believe that infringement has occurred

5    and you can pay $20 and we'll give you a release.  It's --

6    there's a combination here of the author, but the notice itself

7    is computer generated and, therefore, not subject to the

8    hearsay exception.

9           I think the red light case is a -- I think, Mr.

10   Buckley, your argument is a little too narrow because in the

11   notice that the person gets at home, there is a combination of,

12   hey, show up in court if you want to contest this.  Otherwise,

13   pay $50, and it's not going to go -- you're not going to get

14   points on your record, but, you know, we're going to go after

15   you, and you either need to show up in court or pay it.  None

16   of that comes out of the computer system which takes the

17   photograph.

18          So it's a combination, again, of the notice, one,

19   generating the infringing act through its software system; and

20   the second is the additional information that is put into the

21   notice by a person, but ultimately all computer generated.

22          So your exception is noted.  I think the record is

23   pretty clear of Cox's position, but I'm not going to give a

24   limiting instruction.  I think the notices, as BMG has stated,

25   are part of the hearsay burden that they face that they are --

1  you know, ultimately, they are on their face reliable.

2  Whether, in fact, the jury finds that they are reliable and are

3  persuasive will depend on the testimony of Rightscorp.  So --

4           MR. BUCKLEY:  Thank you, Your Honor.  Can I ask for

5  one point of clarification?

6           THE COURT:  Yes, sir.

7           MR. BUCKLEY:  So the notices are e-mails.

8           THE COURT:  I'm sorry?

9           MR. BUCKLEY:  The notices are e-mails.

10          THE COURT:  Yes.

11          MR. BUCKLEY:  And all e-mails are computer generated.

12  So I'm wondering whether this is an issue that we're now going

13  to be dealing with with other documents in this case that are

14  no longer hearsay because they are generated by computers.  And

15  that's -- so I am assume you're going to say no, but I suspect

16  that this issue is going to come up again, so I'd like to note

17  it for the record.

18          THE COURT:  Yeah, there's a real distinction there --

19          MR. BUCKLEY:  Thank you, Your Honor.

20          THE COURT:  -- Mr. Buckley.  I think your -- your

21  partner has been -- well, all right.  Thank you.  We'll deal

22  with admissibility on a document-by-document basis.

23          I went through the deposition designations and

24  objections last night.  You know, I don't know how many judges

25  are spending their evenings doing that every night during

1   trial.  I kind of thought that when I left private practice,

2   that meant I actually wouldn't spend my evenings between the

3   courtroom days working.

4           And so I understand the -- what I call the machine

5   gun approach to objections during the depositions themselves.

6   I'm sure Mr. Bridges got out, you know, authentication,

7   speculation, relevance, ambiguous.  I'm sure that only took

8   about a second-and-a-half in between the question and the

9   answer each time, but that -- and I guess that's going to be

10  played on the videos, or is it out?  I mean, because I think

11  the jury is going to get pretty tired of that if they're

12  hearing it every time.

13          MR. BUCKLEY:  Your Honor, I think the assumption is

14  that objections -- for admissible questions, objections will be

15  edited out.

16          THE COURT:  Okay.  All right.  Good.  I don't -- so

17  I've made -- I don't know if you can understand it.  O is

18  overruled.  S is sustained.

19          I overruled the vast majority of the objections that

20  were made.  And do we just -- did we just erase everybody's

21  information on their computers?  I hope not.

22          But let's be a little more careful in making the

23  objections for purposes of the trial exhibits now.  I think

24  that they were over-objected to, and maybe using my example of

25  the rulings I made last night will help guide you in the

```
1    future.
2              All right.  Anything else before we get started?
3              MS. JOBSON:  Yes, Your Honor, I just wanted a point
4    of clarification.
5              THE COURT:  Yeah, I made some written comments on
6    there.
7              MS. JOBSON:  Yes.  I just want to make sure I
8    understand on this first page of the document we received, on
9    the second -- on the bottom half --
10             THE COURT:  "Witness doesn't know what soft
11   termination meant.  Was another witness put up to answer this."
12             It's a -- you know, it was a 30(b)(6) witness, so
13   that was part of my problem with the over-designation of
14   objections.  So was there another witness?  Because this
15   witness didn't answer any of the questions, just said, "I don't
16   know."  And I don't know what the relevance is for BMG's
17   purpose of putting -- of designating that testimony if the
18   witness said, "I don't know."
19             MS. JOBSON:  I agree, Your Honor.  I share the same
20   confusion.  I believe he doesn't know and, therefore, his
21   testimony on that point is not helpful.
22             THE COURT:  Was another witness put up?
23             MS. JOBSON:  We don't have another -- there's not
24   another 30(b)(6) witness that does know.  They did ask
25   questions of Mr. Sikes on that point.
```

1          THE COURT:  Okay.  As an individual?

2          MS. JOBSON:  As an individual, correct.

3          THE COURT:  All right.  Let's go ahead and strike

4    that from the --

5          MS. KAMMERUD:  Your Honor, if I might be heard on

6    that?

7          THE COURT:  Please.

8          MS. KAMMERUD:  Mr. Carothers was put up as Cox's

9    30(b)(6) witness on issues of their policies.  And he

10   throughout his deposition maintained that he did not know

11   anything about those policies.

12         Mr. Sikes and Mr. Zabek were -- also had testified --

13   they had previously testified, I believe, and did have quite a

14   bit of knowledge about those policies, and they were not

15   designated as 30(b)(6) witnesses or as corporate designees

16   either during -- before, during, or after their designations --

17   or their depositions.

18         THE COURT:  All right.  So my question is, why leave

19   this in?  Is there some -- is the failure to be able to answer

20   the question relevant to BMG, you believe?

21         MS. KAMMERUD:  Well, we have also designated

22   testimony from Mr. Sikes regarding this soft termination

23   policy.  And that testimony, Mr. Sikes initially denies

24   knowledge of it and then admits knowledge of this policy.  So

25   we believe --

```
1              THE COURT:  Okay.

2              MS. KAMMERUD:  -- that this sort of a pattern of

3   denial and allegedly not knowing about this policy speaks to

4   their willful blindness because based on Mr. Sikes' testimony,

5   they were aware of the soft termination policy.

6              THE COURT:  So you think Mr. Carothers was testifying

7   incorrectly and that he actually was aware of the soft

8   termination policy?

9              MS. KAMMERUD:  I can't speak to his knowledge.  I --

10  it's our position that Mr. Carothers was not prepared

11  appropriately for his deposition as the corporate designee.

12  And throughout that deposition maintained he didn't know about

13  a lot of their policies that are key aspects of this case.

14             THE COURT:  Well, the answer there is for BMG to say,

15  put another witness up who is prepared to testify about this

16  designated topic, right?

17             Mr. Caracappa.

18             MR. CARACAPPA:  Yeah, Your Honor, I apologize.  I'm

19  not sure of the exact circumstances surrounding that.  I don't

20  recall whether we asked for another 30(b)(6) witness or asked

21  for someone with knowledge on that topic.  But I know that

22  issue was discussed.  And we did want to speak to the people

23  who were consistently designated as being the most

24  knowledgeable on that topic, Mr. Sikes and Mr. Zabek.  And they

25  refused to designate that testimony as testimony that was Cox
```

1   testimony.

2          So we think that's the issue, that we think they're

3   going to have them come in now and change the Cox testimony.

4          THE COURT:  Well, if they do, you will be able to

5   explore that.  But let's take 124 through 128 out of the

6   designated testimony for now.  And that brings up an important

7   issue.  Which is, there has been an objection by Cox to using

8   these depositions at all because they are going to be live

9   witnesses on behalf of Cox.

10         And I believe that BMG has the right to put its case

11   on the way it wants to put its case on, and can put these in by

12   deposition.  However, you know, BMG has to make the decision

13   whether it's going to put them in by deposition or wait and put

14   it in through cross-examination.  But the jury is not going to

15   sit through a repeat of all of the questions asked in this

16   deposition.

17         You know, I am not precluding you from getting into

18   topics that may have been discussed, but we are not going to go

19   -- it's not going to be an opportunity for BMG to delve back

20   into every issue that was addressed in the deposition.  So if I

21   think you are doing that and the jury is hearing everything for

22   a second time, then we'll talk about that because that's -- I

23   am not going to permit that.  Okay?

24         MR. CARACAPPA:  Thank you, Your Honor.

25         THE COURT:  All right.  What else did I write that

1    you don't -- you must have clerked somewhere because you

2    understand -- or if you have got partners that are still

3    writing in handwriting, because you actually could decipher

4    my --

5            MS. JOBSON:  It's the latter, Your Honor.  I won't

6    name names.

7            THE COURT:  So go ahead.  You asked me a question.

8            MS. JOBSON:  Yes.  I have a couple of questions that

9    pertain to some of the documents that are referenced in the

10   testimony designated.

11           THE COURT:  Okay.

12           MS. JOBSON:  And in particular for a document they

13   present, PX 1505, that the witness, Mr. Carothers, does not

14   authenticate in his deposition.  I would just ask that it not

15   be authenticated at that time.

16           THE COURT:  Okay.

17           MS. JOBSON:  If they want to authenticate it in some

18   other way, we can see if they are able to do that.

19           THE COURT:  Okay.  And BMG's response?  I don't have

20   the document obviously and don't know the reference, but if

21   Mr. Carothers was shown a document and could not identify it or

22   authenticate it, I don't see how it comes in in the deposition.

23           MS. JOBSON:  I just wanted to clarify that point.

24           THE COURT:  Yes.

25           MS. JOBSON:  It is the Envisional -- Your Honor,

1    we're still working together to smooth out this process.  I am

2    confident we will be able to get this a little cleaner.

3         MS. KAMMERUD:  Your Honor, we will consider this and

4    get back with you if there is a continuing issue on the

5    exhibit.

6         THE COURT:  Okay.  That's fine.  Just obviously

7    before it is played.

8         MS. JOBSON:  And then one final point.  I just wanted

9    to echo Mr. Wakefield's comment yesterday regarding to the

10   extent that some of this deposition testimony that is being

11   offered as video goes to the DMCA question and the graduated

12   response.  We just ask that to the extent they play testimony

13   in support of their position, that we are able to also present

14   testimony in support of our position in rebutting their

15   position.

16        THE COURT:  In terms of how Cox treated other

17   copyright owners' notices, is that --

18        MS. JOBSON:  Yes, Your Honor, to the extent that that

19   testimony is covered to support their point.  We would like to

20   offer just the rebutting testimony.

21        THE COURT:  Yeah.  Well, we will talk about that when

22   it comes up.  But I know -- I realize that's a continuing

23   issue, and I still don't have my firm grasp on how I should

24   rule on it.  So we will continue to talk about it.

25        MS. JOBSON:  Understood.  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2          Joe, how is our jury?

3          THE BAILIFF:  We have one juror missing.

4          THE COURT:  Missing.  Okay.  Anything else?

5          MR. CARACAPPA:  Yes.  Yesterday --

6          THE COURT:  Yes.

7          MR. CARACAPPA:  It' John Caracappa, Your Honor.

8          THE COURT:  Yes.

9          MR. CARACAPPA:  Yesterday at sidebar we talked about

10   Ms. Frederiksen's PowerPoint presentation.  I think all those

11   issues have been resolved; is that right?

12          MR. BUCKLEY:  They have, Your Honor.

13          THE COURT:  Terrific.

14          MR. CARACAPPA:  Thank you.

15          THE COURT:  Thank you.  All right.  We will take a

16   brief recess and we'll come back when our jury is all here.

17          All right, we are in recess.

18          NOTE:  At this point a recess is taken; at the

19   conclusion of which the case continues in the absence of the

20   jury as follow:

21   JURY OUT

22          THE COURT:  All right.  Ready for our jury?

23          Joe, let's get our jury.

24          NOTE:  At this point the jury returns to the

25   courtroom; whereupon the case continues as follows:

1    JURY IN

2            THE COURT:  All right.  Please be seated.

3            Good morning, ladies and gentlemen.

4            THE JURY:  Good morning.

5            THE COURT:  Did you heed my advice not to do any

6    research or investigation or talk about the case?  Can I have a

7    nod of heads from everybody?  All right.  Thank you.  As I

8    said, it's vitally important.

9            All right.  Let's continue with the direct

10   examination of Ms. Frederiksen-Cross, please.

11           A JUROR:  If I could just get her to talk into the

12   microphone, it would be tremendous, I could hear it then.

13           THE COURT:  Okay.  You have a soft voice, so let's

14   try and get a little closer to the microphone to make sure that

15   everybody can hear you.  All right?

16           THE WITNESS:  Okay.

17           THE COURT:  Thank you.

18           MR. CARACAPPA:  Thank you, Your Honor.  I have the

19   witness binder here as well.

20           THE COURT:  Yes.

21

22

23

24

25

B.A. Frederiksen-Cross - Direct

263

1              BARBARA A. FREDERIKSEN-CROSS, a witness called by

2      counsel for the plaintiff, having been previously sworn,

3      continues to testify and state as follows:

4          DIRECT EXAMINATION

5      BY MR. CARACAPPA:

6      Q.   Ms. Frederiksen-Cross, good morning.

7      A.   Good morning.

8      Q.   I would like to continue with your direct examination if

9      that's okay.

10     A.   Certainly.

11     Q.   I would like to start from the very beginning.  I use the

12     Internet all the time and I'm not really sure how it works.

13              Can you explain that to the jury, please.

14     A.   Certainly.  And with the Court's permission, I have some

15     slides that I think will help me as I go along just to make

16     various points.

17              THE COURT:  Sure.  Go ahead.

18     Q.   If you can turn to PDX 1 in your binder.  And if you can

19     just look briefly at those slides.  And my question is going to

20     be, do those slides accurately reflect your opinions and did

21     you prepare them?

22     A.   Yes, I did.  I did the hand drawn drafts for these slides,

23     and then I was aided by the trial graphics folks to make them

24     pretty.

25     Q.   Okay.  Thank you.  Okay.  Could you please explain the

1   Internet to the jury, please.

2   A.   Certainly.  And I am just going to give you a high level

3   view here touching on the terminology that I am going to use so

4   that I can be sure we're all on the same page with that

5   terminology.

6        So to start out with, the Internet is a collection of

7   computers, a network of computers that are able to communicate

8   with each other because they all are using the same protocol or

9   an agreed-upon protocol for that communication.

10       And the way your home computer or any other device

11  you use connects to the Internet is normally going to be

12  through what is called an Internet service provider.  So that

13  might be somebody like Fios or your cable company or, in this

14  instance, Cox.

15       And the role of the Internet service provider is

16  really this pipe that you should be seeing on your slides

17  there.  That pipe serves as a conduit.  And it's not really a

18  physical pipe, but it's a metaphorical pipe in that that's the

19  passageway your communication gets from your computer to the

20  Internet.  And that connection, that conduit, is provided by

21  your Internet service provider.

22       So without such a conduit, with very few exceptions

23  like certain government agencies that serve as their own ISP or

24  ISPs themselves, you don't connect to the Internet without that

25  service provider.  They are the gateway you go through.

B.A. Frederiksen-Cross - Direct

265

1   Q.    And in this case, who is the Internet service provider?

2   A.    Cox in this matter.

3   Q.    And can you explain how Cox provides service to the

4   Internet for its users.

5   A.    Well, the -- one of the key services that is provided by

6   the Internet service provider is the ability to connect to the

7   Internet.  So typically that's done by hardware that is

8   installed at your home or business that allows your network or

9   your computer to talk to Cox.

10          And in order to be able to send messages on the

11  Internet -- just like you have to have an address to send a

12  letter from one side of the country to somebody else, you have

13  got to have your address and their address so communication can

14  go back and forth by mail -- on the Internet, the computers on

15  the Internet also have an address.

16          And that address, at least at the entry point to your

17  residence or your business, is administered by your Internet

18  service provider.  So when you become a subscriber, when you go

19  to get onto the Internet, they assign you an address.

20          Now, that address can change over time in most cases,

21  unless you are paying for a fixed address.  But they are the

22  one who provides that address, and that address is what lets

23  communication go back and forth between your computer and

24  another computer on the network, along with the physical

25  infrastructure and backbone that they provide, the wires and

266

1    routers and things.

2    Q.    And just to be clear, that is called an IP address?

3    A.    Yes.  IP stands for Internet protocol, but we are going to

4    call it IP just for short.

5    Q.    Okay.  So you talked to me earlier about how the Internet

6    address is a little bit like a postcard.  Could you explain

7    that to the jury.

8    A.    Well, it's like a postcard or a letter in that when you

9    send a letter, you use a protocol.  You may not think about it

10   in those terms, but when you address the letter, there is a

11   place on the envelope you put the sender's return address,

12   there is a place on the envelope you put the recipient's

13   address, there is a place on the envelope you put the postage,

14   and inside the envelope you put the message.  Or using the

15   analogy of a postcard, on the back you put the message, and on

16   the front you put that other data.

17          Well, communication on the Internet actually works a

18   lot like that.  There is -- if you look at the top box here in

19   the bottom, you see that there is a source address.  So in this

20   case I've used a Cox IP address as the source.  And you see in

21   the box below that there is a destination address.

22          Now, the port number that I show there -- port

23   numbers, some of them are assigned.  Like there is special port

24   numbers that say, this is an e-mail, or this is a request for a

25   file transfer, or this is a request for a Web page.  Other port

B.A. Frederiksen-Cross - Direct

267

1    numbers are assignable to specific programs for specific

2    purposes.  That is to say, a program can assign it just for the

3    purpose of a communication during a communication session.

4            So when used -- in this example we are going to send

5    a request for a Web page out to the Web server.  So the user's

6    message with that content, with the source, the destination,

7    and the identity of the Web page they are looking for, is going

8    to go out to that Web server.

9            Now, a program on that Web server is going to receive

10   that message -- or software on the Web server will receive it,

11   and it will know from that destination port 80 that, oh, this

12   is supposed to go to a Web server, this is a request for a Web

13   page not a request for an e-mail server, or something like

14   that.

15           And so, if you could click, we'll send that up to the

16   Web server here.  And in response, the computer that receives

17   that communication, just like you would if you got a letter

18   requesting a response, you take the sender's address, that

19   becomes the destination address of your message.  And you take

20   the recipient's address, your address, and that becomes the

21   sender's address.  And then you send back the response that is

22   requested.

23           Well, the same thing kind of happens with the Web

24   page.  It reverses those addresses so the sender becomes the

25   receiver, the receiver becomes the sender, and it sends the

B.A. Frederiksen-Cross - Direct

268

1   content that is requested back to your computer.

2          And on your computer software that sent that request

3   then can receive the request and display your Web page or do

4   whatever else was requested in the context of the particular

5   communication.

6   Q.   Thank you.  Now, this is just a random sample IP address

7   to use as an example.  But how would one know who owned that IP

8   address?

9   A.   Well, IP addresses are assigned in blocks of numbers.  You

10  know, an IP address is this number:  Number, number, dot,

11  number, number, number, dot, number, number, number, dot,

12  number, number, number.  So it's those four little octets

13  together.

14         There is an administration system within the Internet

15  that assigns blocks of addresses to ISPs or entities entitled

16  to distribute those addresses.  And by going out to their

17  look-up service -- like, for instance, I would use the American

18  Registry of Internet Numbers, or ARIN, as it's called, I could

19  go out and ask who is assigned to this block of addresses.  And

20  I would get back typically the ISP that is assigned.

21         So at that point I go, oh, okay, I know who that is.

22  I know who the ISP is at least.  I don't know who the person

23  is, but I know who I can go to to ask, can you identify who is

24  using this address at a particular date and time.

25  Q.   And is that information publicly available?

A.   The information to look up who an Internet address is
assigned to, that is to say who the administering agency for
that address is, is publicly available.  Who they have assigned
it to, no, or typically would not be.

Q.   Who would know who they have assigned it to?

A.   The administering --

MR. BUCKLEY:  Objection, speculation.

THE COURT:  Overruled.

A.   The administering authority.  So, for instance, if the
address was assigned to Cox, you would go to Cox to see what
subscriber was using that address at a particular date and
time.

BY MR. CARACAPPA: (Continuing)

Q.   And do those records linking the IP address to the
particular subscriber have a name?

A.   They are typically called DHCP leases.  And it is called a
lease because you're just using the IP address.  And companies
will typically have that information in a database.  And
because the addresses can move around amongst people, there is
also going to be associated with a start time for the lease.
And if the lease is subsequently removed, then often a
termination time as well.

So you know that it was good on February 1 from
8:00 a.m. until March 31 at 10:00 p.m., but then it was no
longer associated with that particular subscriber.  It either

1  went back into the pool or it may have gotten assigned to

2  somebody else, in which case you would look up the next record

3  to see who had it.

4  Q.   Ms. Frederiksen-Cross, on this page 3 that is on the

5  screen you talk about the IP address, but you also have

6  something called a port.  Can you explain what a port is.

7  A.   Yeah.  As I mentioned, the port -- the IP address is sort

8  of like the street address on an envelope.  The port is sort of

9  like the identity of the person you might send it to or, you

10  know, accounting department, attention:  accounting department,

11  or, attention:  vital records, or maybe just my name if you

12  want the letter to go to me and not somebody else in my family.

13          So the port is an indicator of on the receiving

14  computer who should receive and handle this communication.  Who

15  being a program there, like what program.  Is it going to be

16  handled by your Web browser or by your e-mail server.

17  Q.   I would like to talk about the Internet in the context of

18  downloading music.  Can you explain how one downloads music

19  over the Internet?

20  A.   Well, there is a variety of ways.  I mean, I'm guessing

21  that probably a lot of you have used iTunes or maybe gone out

22  to YouTube and viewed a video on the Internet that includes

23  music.

24          THE COURT:  Let's keep our voice up.  Move a little

25  closer.

1          THE WITNESS:  Okay.  Thank you.

2   BY MR. CARACAPPA: (Continuing)

3   Q.   Ms. Frederiksen-Cross, can you move the mike closer to

4   you?

5   A.   I will see if I could do that, yeah.  Okay.

6          So there are a number of ways.  One is to go out to a

7   server.  And I think we have a -- we could use this slide even

8   as an example of that.

9          Maybe I am sending a request to the iTunes server to

10  buy a piece of music.  So they get my credit card or they get

11  my PayPal account and they send me back the piece of music that

12  I have asked for.

13         Now, there are other ways as well, and some of them

14  involve going to what is called file sharing systems or

15  peer-to-peer networks.  And this case involves one of those

16  technologies.  It is a peer-to-peer network called BitTorrent.

17  Q.   And what is a peer-to-peer network?

18  A.   Can we go to the next slide here?

19         In the slide we just looked at before this you had a

20  computer, and it was talking to one computer to receive its

21  content, a server.  So my computer would talk to that server

22  and the content would come back to me.

23         In a peer-to-peer network, you have a whole bunch of

24  computers, and they can all be both requesters of information

25  and senders of information.  In that sense, they are peers.

B.A. Frederiksen-Cross - Direct

1    One is not the server and the client, but they are all just on

2    the same level in that they are sharing and requesting

3    information from each other.

4           And so in this diagram, all the ones that look like

5    laptops in the picture are peers.  And I have numbered them

6    Peer 1 through Peer 6.  And so these are the computers that

7    might be looking for content.  They might already have content

8    but still be looking for content.  So maybe they have got half

9    a song or half an album and they are collecting the other half

10   of it while they are sharing what they already have.

11          Or they might be what is called seeds, and that is a

12   computer that has all of the work, whether it is a single song

13   or a single album or a movie or a collection of albums.  And

14   they are saying, like, I have all of it and I can give you any

15   piece you want.

16   Q.   How, if at all, is BitTorrent and peer-to-peer related?

17   A.   Well, BitTorrent is an example of peer-to-peer.

18   Peer-to-peer is a term that is used in the industry to talk

19   about this concept of computers that are communicating with

20   each other essentially as peers.  So I might ask you for

21   something, you might ask me for something, we are exchanging

22   information.

23          Whereas -- and that's just a contrast to the other

24   model that is commonly called client server where one computer

25   is only asking and the other computer is only providing.

B.A. Frederiksen-Cross - Direct

273

1   Q.   I would like to ask you to explain BitTorrent to the jury.

2   But before I do, I think there are some terms that you would

3   like to discuss.

4   A.   Yeah.  I think it will be helpful to review some of the

5   terminology before I go into the in-depth explanation just so

6   it is familiar to you.  I will try to revisit it periodically

7   as we go along because there's a lot of jargon when you start

8   talking about the Internet.  So let me try to give you a

9   preview of that so that you will be familiar with these terms

10  and how I am using them today as we go along.

11  Q.   All right.  And let me start with the question, what is a

12  torrent?

13  A.   Well, a torrent -- and if you can pop it up so the jury

14  can read it as I am talking here.  A torrent is the concept of

15  the different pieces of files that are being shared by a

16  particular group of peers.  And so the payload of the torrent,

17  as it is called, makes up the content that those peers are

18  actually exchanging with each other.

19          And so, you could have a group of computers all

20  sharing files and maybe they are sharing files from one torrent

21  or maybe the same group of computers could even be sharing

22  multiple torrents that they all happen to have at the same

23  time.  But each torrent represents the communication with

24  respect to a specific payload and the specific computers that

25  are trading in that payload.

B.A. Frederiksen-Cross - Direct

274

1    Q.    Okay.  What is a .torrent file?

2    A.    Well, the way that you know or that the most common way

3    that you know in BitTorrent what a particular payload is is

4    because it's described in what is called a .torrent file.  And

5    I call it a .torrent file because it will be some name .torrent

6    at the end.  Just like a Microsoft Word document might be .doc

7    or .docx.  A torrent file used by bit file -- BitTorrent is

8    typically .torrent at the end.

9          And that file describes information about what the

10   payload for that particular torrent is.  And it also provides

11   information about how to contact what's called a tracker.  And

12   we'll get to tracker in just a sec here.

13   Q.    And what is a SHA-1 hash value?

14   A.    We usually pronounce that SHA-1.  And SHA-1 is a digital

15   fingerprint, that is to say it is a mathematically-derived

16   fingerprint for a file that's created using a mathematical

17   formula that was originally developed by the U.S. government

18   for the specific purpose of identifying content and being able

19   to authenticate content.  So because the algorithm runs against

20   the contents of a file and the output, the SHA-1 value is based

21   on those contents, if anything changes in the file, you will

22   get a different SHA-1.

23         And so it is really useful because you can use it

24   when you are comparing two things to see if this file is the

25   same as this file.  You can use it as kind of a unique

B.A. Frederiksen-Cross - Direct

275

1    reference to the contents of a file.  So if you ask for a file

2    using its SHA-1, you are asking for a very specific set of

3    contents.

4           And then when you get that content, if your program

5    runs the same algorithm and it is a standard algorithm, your

6    computer SHA-1, and by comparing the two you can see if there

7    were any changes, like an accidental error that happened during

8    transmission.  Maybe some bit of a file wasn't transmitted or

9    someone could have tampered with the file.  So they could say

10   they are sending you a particular file, but if you check at

11   SHA-1, you can go, that's not what I asked for.

12          So it's used in that sense for comparison and

13   authentication.

14   Q.   So if hypothetically I were to prepare a torrent payload

15   and Mr. Warin was to prepare a torrent payload, what are the

16   chances that the SHA-1 hash values of those two payloads would

17   be the same?

18   A.   Are you assuming that you have exactly the same content or

19   different content?

20   Q.   Could be the same.

21   A.   If you had exactly the same content, the SHA-1 value would

22   be the same.  If you had different content, even by as much as

23   a single character or a single note if we're talking about a

24   musical composition, then it's going to be different.

25   Q.   Can you describe for me what's at page 8, please.

B.A. Frederiksen-Cross - Direct

276

1   A.   Yes.  This is just an example that was taken from one of

2   Rightscorp's infringement reports.  And as you can see on the

3   first line, it says that this is going to show the title, the

4   file name, that timestamp and hash value.

5          And then followed by that you see the actual data.

6   The title was Young Girls.  The file name was copy of

7   01-01BrunoMars-younggirls.MP3.  The timestamp that this

8   particular record was collected was March 5, 2013, at 4:57:20.

9   And then the SHA-1 value that is highlighted at the bottom is

10  just an example of that actual SHA-1 value, what it looks like.

11         So it is just a series of numbers and letters that

12  get generated as a result of that mathematical algorithm.

13  Q.   Ms. Frederiksen-Cross, what's a torrent payload?

14  A.   I may have already mentioned this, but the torrent payload

15  is the song or collection of songs or collection of files that

16  make up the actual music or movie or whatever is being traded

17  on that particular torrent.  So that's what the user is really

18  after.  That's the payload that they are going for when they

19  want to get a copy of what that torrent is trading.

20  Q.   It's the stuff?

21  A.   It's the stuff.  It's the files, yeah.

22  Q.   And what's a peer?

23  A.   A peer, as I mentioned before, is any computer that is

24  involved in this sharing.  And for BitTorrent, that means that

25  those computers are running a piece of software called a

1    BitTorrent client.  I am just going to call it the BitTorrent

2    software as we talk here just for shorthand.

3            The BitTorrent software is something that a user

4    would download from the Internet and install on their computer

5    or maybe get a copy from a friend and install on their

6    computer.  But it is software that normally you have to get --

7    you have to take an active action to get and put on your

8    computer.

9            And then that software is used to facilitate

10   BitTorrent file sharing by -- or file copying -- obtaining the

11   copies of materials or sharing the copies you have with others,

12   because it helps you to locate -- using that torrent file, it

13   helps you to locate a system, the tracker, that can tell you

14   who is trading in that payload that you're interested in, and

15   then give you information you need, their addresses, so that

16   the software on your machine can start talking to the software

17   on their machine.

18   Q.   All right.  Just a couple more definitions I would like to

19   go over.  What is a downloader?

20   A.   A downloader is a term that is used for a peer that

21   doesn't have the entire payload yet.

22           So in my little diagram here, I show the torrent

23   payload, but I show it only half filled-in.  This guy has got

24   pieces 1 and 3, but not 2 and 4.

25           And so, as soon as you start acting on BitTorrent, as

B.A. Frederiksen-Cross - Direct

1   soon as you open a BitTorrent -- or a .torrent file and go out

2   to BitTorrent, your computer will begin downloading the pieces

3   of the torrent you have asked for.  But it doesn't get them all

4   in a single piece.  They come in in chunks.  And as long as you

5   have those chunks, you can be sharing any chunk you have got

6   with somebody else.  But if you don't have all of it, you are

7   still called the downloader.

8           And then that's to contrast to what is called a seed.

9   And a seed is just a downloader that has completed its

10  collection of all the pieces, so now it has all the pieces

11  available to anybody who asks as opposed to just some of the

12  pieces.

13  Q.   And a swarm?

14  A.   The swarm is that group of peers that is trading in a

15  particular payload.

16  Q.   All right.  One more definition, tracker.

17  A.   Okay.  Let's talk about the tracker for a second.  The

18  tracker is different than the server that we looked at in my

19  very first slides, the client server.  But in older BitTorrent

20  clients and even most clients as used today, the tracker plays

21  a key role because when you get a torrent file, one of the

22  things that is in the torrent file is the address of the

23  tracker for that torrent.  And before you can start trading

24  with peers, you have -- your software has to know their

25  address.

1        And so, the way you find out who is currently trading

2   in that payload for that torrent is your computer will go out

3   to the tracker and receive back a list of who is trading in

4   that payload.  And then your software can start sending

5   messages to those addresses in order to retrieve pieces of the

6   payload.  And the pieces all come in from different computers

7   at once, typically.  And the reason that BitTorrent is written

8   that way is because it makes more efficient use of bandwidth.

9        If I was just going to go to one computer and get a

10  big file, anybody else who wanted that file might have to wait

11  in line until my download was completed.  But if I am instead

12  getting -- if instead there are 100 pieces of that file and I

13  am getting them from 100 different computers, and you wanted to

14  get a piece of that, you wanted to get that same payload, you

15  could reach out to 100 different computers too.  So the

16  download goes much faster and it makes more level use of

17  network bandwidth.

18  Q.   Thank you, Ms. Frederiksen-Cross.  All right.  Now I would

19  like you to explain how BitTorrent works.

20  A.   Okay.  Let's kind of walk through a BitTorrent

21  interaction, if we could.  So you have got the Internet out

22  here and you have got your Internet service provider sitting

23  out there.  The peer who wishes to start trading or wishes to

24  get a copy of a payload -- let's say that he doesn't have

25  anything in the beginning but he wants to get something.  He's

B.A. Frederiksen-Cross - Direct

1    going to first go out to the Internet and find a torrent file

2    for the payload he wants.  And so he is going to send a request

3    out to the Internet.

4         And you can do this via Google, by hand.  You can go

5    to special sites that list indexes of torrent files so that you

6    can just click on them and download them.  There is a couple

7    different ways to search for that.  But basically you, the

8    user, are going to search for a torrent file and download it to

9    your computer, and then you are going to add it to your

10   BitTorrent session, essentially opening that torrent file in

11   your session.

12   Q.   And that's the .torrent file you talked about earlier?

13   A.   That's the .torrent file, yes.  So this is not the payload

14   yet, it's just that describing file that is going to describe

15   what the payload is.  And, of course, you have searched for it

16   by the song or movie or artist that you are interested in.

17   That's how would you find it in the first place.  And then

18   you'd download it to your computer.  You tell BitTorrent to use

19   it.

20        And then what happens is once you have taken the

21   action of basically telling BitTorrent, now I want to go get a

22   copy of this, then the BitTorrent software begins that process

23   necessary to collect the copy of the work.

24   Q.   And how does it begin that process?

25   A.   So the first thing that your BitTorrent software is going

B.A. Frederiksen-Cross - Direct

281

1    to do is it's going to go out to the tracker that's identified

2    in that .torrent file, just like I said, and it's going to find

3    out from the tracker information about other peers that have --

4    that are participating in sharing this particular file or set

5    of files.

6    Q.    What are some of the popular trackers?

7    A.    OpenBitTorrent, Public BitTorrent, I Stole It.  There's a

8    whole lot of them.  And they -- they change all the time.  I

9    mean, you can also have private trackers.  Like if I had

10   created a movie and I wanted to share it with somebody, but I

11   didn't want to share it with the world, I could either create a

12   private tracker, or more likely just go to a private tracker

13   that I subscribe to and post my torrent file there so that

14   others could see my work.

15         I would have to put -- make a torrent file for my

16   movie or my song or whatever I was publishing and then I would

17   have to put it out there.

18         And the difference between a private and a public

19   tracker is really just the private ones kind of require you to

20   sign in.  Some of them have a fee associated.  But they -- they

21   limit who can contact the tracker to authorized recipients.  So

22   the public ones are the ones that are most widely used for

23   music sharing.

24   Q.    Thank you.  What happens next?

25   A.    Well, the tracker sends back that information to the

1    requester.  That is to say that it sends back the list of what

2    peers are trading.  And that list has their IP addresses.

3           And so now the software on the requester's computer

4    on our Peer 1 up here can begin sending messages to those peers

5    requesting pieces of the payload that they're interested in.

6    Q.   So using the word I used before, the tracker tells me who

7    has the stuff that I want, right?

8    A.   Right, right.  And the beginning of that communication,

9    the first thing that happens when the requester's computer

10   reaches out to one of the other peers is it does what's called

11   a handshake.  It is basically the peer is reaching out to

12   another computer that's in that swarm and saying, gee, this is

13   the payload I'm looking for.

14          And the other computer can either accept that

15   handshake and basically say, yeah, okay, I got something you

16   want, or it can reject the handshake and just hang up.  And it

17   would do that maybe if it was too busy to trade right now, or

18   if it didn't have the requested payload, or if it had been

19   configured not to share.  You know, there's different reasons

20   it might not accept your handshake and go forward.

21          But the peer that receives that handshake can

22   respond.  But if it does respond, if it does shake hands and

23   say, okay, here's what we do, it passes back as a part of that

24   handshake what's called a bitfield, and you're going to hear a

25   lot about this bitfield.  What it is is it's a string of ones

1    and zeros or maybe all ones, and each -- if you broke the song

2    into 100 pieces, there would be 100 of these bits in the -- in

3    the list, and it would have a 1 for the pieces it says it has

4    and a 0 for the pieces that it doesn't have.

5            So if it had all the pieces, it would be all 1 -- or

6    all 1s, each one would be a 1.  If it had some part of that, it

7    could be -- some of them could be 0.

8            Now, under some circumstances, and we'll talk about

9    these later, that bitfield isn't always accurate.  Sometimes it

10   underreports what it has.  And it's easy to kind of see why

11   that could happen just in the course of BitTorrent working

12   because computers are constantly downloading pieces.  So it

13   might be still downloading a piece that it basically has, but

14   it hasn't verified yet, so it hasn't turned that bit on.

15           But also in order to evade interference with file

16   detecting, some BitTorrent clients will underreport what they

17   have.  And that's -- we'll talk about that more, it's called

18   lazy bitfield.

19   Q.   Let's talk about the handshake for a minute.  What type of

20   computers will not enter into the handshake with someone who is

21   trying to take my stuff?

22   A.   Well, if I were to ask your computer, for instance, for a

23   copy of a file, you might reject my handshake, my initiation of

24   that communication because you were busy sharing with somebody

25   else and the person who configured the software had said, don't

1    use over X percent of your capacity for BitTorrent traffic

2    because I'm going to be doing something else am and I am just

3    doing this in the background.  So you might be too busy and not

4    have the capacity to handle my request.

5            You might be configured not to share.  That's called

6    a leech.  It's a person who only downloads copies of stuff, but

7    they never share them.

8            And I guess I should mention here that BitTorrent is

9    designed to encourage file sharing.  And if you have files on

10   your computer that you're sharing with other users, BitTorrent

11   rewards you for that sharing by giving you incremental

12   increases in bandwidth, so your subsequent requests will go

13   faster if you share.

14           So if you don't share, you kind of are in the slow

15   boat when it comes to downloading stuff.  You can still

16   download stuff with most sites, but you won't get the speedy

17   download that a person who is sharing gets.

18   Q.   What if -- what if my computer was on this and I did not

19   have the BitTorrent software on my computer?  Would I enter

20   into a handshake with you?

21   A.   Oh, no.

22   Q.   Would you even ask me?

23   A.   No, because if you weren't participating in some file

24   sharing already, you would never be on that list the tracker

25   gave me.

B.A. Frederiksen-Cross - Direct

1          And the -- when new peers enter the swarm or as they

2    collect additional content, they are periodically touching

3    bases with the tracker to update their status.  So if you're

4    not there or your computer is off, you know, if your computer

5    was turned off, it's not going to answer the handshake even if

6    you had been sharing yesterday because obviously the computer

7    is off.

8    Q.   Okay.  Thank you.  All right.  What happens after the

9    handshake?

10   A.   Then what would happen in the course of normal BitTorrent

11   use is once the handshake is completed, there's a little

12   exchange of information that let's the two programs recognize

13   which specific protocol they're speaking.  And then they begin

14   to exchange files.

15          So in this instance, our Peer 1 requester is going to

16   start receiving pieces from those other computers that are in

17   the swarm, and as soon as it's verified each piece, it will

18   also begin sharing those pieces with other computers that might

19   be looking for it, other BitTorrent clients that might be

20   looking for it.

21          One it's assembled all of the pieces for a

22   particular -- or as it gets each piece, it verifies it using a

23   SHA-1 value that's associated with the piece just to make sure

24   the piece was transmitted properly, and then it puts it in its

25   appropriate slot, if you will.  So it's basically putting

1    Humpty Dumpty back together again as it collects the pieces.

2           Now, it doesn't have to have the whole work to start

3    sharing.  It can start sharing right away with the pieces it

4    has.  But once it has the entire work, then it can start

5    sharing all pieces with anyone who requests.

6    Q.   How does the peer verify and put the pieces in the proper

7    order?

8    A.   Well, there's an index or pointer associated with each

9    piece that identifies where it is in that order.  And that

10   information -- and the information about what the SHA value for

11   a particular piece at a particular location is is a part of the

12   information that is provided in the .torrent file.

13          So when the system is putting things back together,

14   it can verify them using the SHA-1 that was provided in the

15   torrent file and it can also reorder them using that piece

16   index that says this is Piece Number 4, Piece Number 3, Piece

17   Number 5, Piece Number 1, whatever, until it fills in the whole

18   work.  And that also helps it in being able to check that it's

19   complete with the work.

20   Q.   We talked --

21          MR. BUCKLEY:  Your Honor, I apologize.  May I have a

22   very brief sidebar.

23          THE COURT:  Yes, sir.

24          NOTE:  A side-bar discussion is had between the Court

25   and counsel out of the hearing of the jury as follows:

B.A. Frederiksen-Cross - Direct

287

1   AT SIDE BAR

2         MR. BUCKLEY:  Your Honor, the copy of the slides we

3   got or that I got didn't have all the animation in it.  I

4   understand that this background and it is fairly helpful, but

5   this is feeling a lot more like closing argument than it is

6   like testimony.

7         So it's fine for it to continue and I'm not

8   suggesting the slides ought to be stricken, but I would like to

9   suggest that as we go forward, if this is the sort of animation

10  the experts are going to be allowed to use, that that is a

11  two-way street.

12        MR. CARACAPPA:  Yeah, I thought -- can you

13  double-check to make sure that if you put it in animation it's

14  not there, because I think we sent it over.

15        MR. BUCKLEY:  It's possible.  And, John, the one I

16  had was a PDF, which that doesn't suggest that you didn't send

17  this, I'm just saying I haven't seen the animation before

18  today, and that might be my fault.

19        So again, this is actually really useful, and I don't

20  want to cut it off, I just want to make sure that the leeway is

21  going to be all-encompassing.

22        MR. CARACAPPA:  We don't have any animation that fly

23  the words "Cox" in and stamp it as infringer.

24        MR. BUCKLEY:  I assume he took those all out.

25        MR. BRIDGES:  He already took those out last night.

B.A. Frederiksen-Cross - Direct

288

1          MR. CARACAPPA:  Yeah.  So what we have been doing --

2          THE COURT:  They took them all out.

3          MR. CARACAPPA:  I will make sure that the next time

4    you get a document like this, you can play the animation.  I

5    think he did.  But in the future, I will make sure.

6          THE COURT:  And do you have some that are going to be

7    animated with moving parts as well?

8          MR. BUCKLEY:  We may now.  And I don't mean to be

9    glib about it.  Yeah, it's possible there may be some.  That's

10   fine.  I think it is helpful for these folks.  I just want to

11   make sure that I'm not going to later be part of an objection

12   that no animation is appropriate.

13         THE COURT:  Okay, duly noted.

14         MR. CARACAPPA:  Okay.  Thank you.

15         MR. BUCKLEY:  I'm sorry to interrupt.  Thank you.

16         NOTE:  The side-bar discussion is concluded;

17   whereupon the case continues before the jury as follows:

18   BEFORE THE JURY

19         THE COURT:  All right.  Let's keep that voice up now

20   and get close to the microphone.

21         THE WITNESS:  Okay.  Get close to the microphone.

22   BY MR. CARACAPPA: (Continuing)

23   Q.   Thank you, Ms. Frederiksen-Cross.  We talked about how if

24   I don't have the BitTorrent software, you won't even ask me to

25   shake hands, right?

B.A. Frederiksen-Cross - Direct

289

1   A.   That's right.

2   Q.   How does the tracker know who has and is willing to share

3   the particular stuff or the torrent payload that I need?

4   A.   Well, the role of the tracker is to keep track of who is

5   participating in a particular torrent.  So when you open a

6   torrent file in your BitTorrent client, part of that first

7   communication when you go out to the tracker using the URL

8   that's in the torrent file -- or when your software does --

9   this happens just by running the software.  When your software

10  goes out to the tracker, the tracker also makes a note that

11  you're now participating in that sharing.

12          And so, at that point in time the tracker adds you to

13  the list of peers for that particular swarm.  And so that's how

14  the tracker knows who is in the swarm.

15  Q.   Once I've downloaded that torrent payload and my computer

16  is on, tell me the effect that has, if any, on who can take

17  this particular stuff from me.

18  A.   If you could advance, I think a got a little ahead of

19  myself here, my next slide shows the communication between the

20  tracker -- and we've already talked about that, so you could

21  skip over that if you want.

22          But what happens then, once a particular payload is

23  being traded on the BitTorrent, initially there may only be,

24  you know, one file -- one computer offering it and then others

25  begin to look for it because they see that torrent file when

1    they search for their -- .torrent file when they search for

2    their -- the work that they're interested in.

3            And so, now the computer that had it begins to share

4    it with others, and those computers begin to share it with

5    others.  And if it's a popular song, as more and more people

6    search for it, more and more people will join that swarm

7    trading it and more and more copies will be exchanged.  So

8    pretty soon that song is spread all over thousands of machines,

9    hundreds of thousands even conceivably.

10           If it's really popular song, it's going to spread

11   like wild fire because people hear it on the radio and they

12   want it and they go out there and search for it.  And so more

13   and more peers are joining the swarm, more and more peers are

14   sharing, and it just spreads.

15           And what that means is that now copies of this file

16   are all over the Internet and they're being traded by anybody

17   who has got the BitTorrent software, and it's really like no

18   longer in the control of, say, the person who had the

19   copyrights to say, I authorize this copying or I don't

20   authorize this copying.

21           And it's also very, very difficult to stop because

22   now there's a whole bunch of computers trading this file.

23   Q.   So once you have it, you can share it with anyone?

24   A.   Yeah.  Well, anyone who is using BitTorrent if I have it

25   in a torrent format.

1           Now, I want to be really clear here because I get

2    asked this question a lot when I'm -- especially if I'm

3    speaking to, like, high school or college age kids, having

4    BitTorrent on your machine doesn't trade other songs that you

5    might have on your machine, like it doesn't go out and raid

6    your iTunes library and just start sending your iTunes stuff

7    out of to the network.

8           Every file that's traded with BitTorrent has to have

9    a corresponding .torrent file or every collection of files.  It

10   could be a whole album or even a collection of albums, but any

11   payload has to have a .torrent file.  And the way that it's

12   trade is through that .torrent file.

13   Q.   Thank you, Ms. Frederiksen-Cross.  Now that we've talked

14   about --

15   A.   Actually, can I just clarify something I just said because

16   I want to be absolutely accurate about this.  There are some

17   changes happening in BitTorrent and in file sharing that are

18   redirecting that a little bit because it's recognized in the

19   file sharing community that the torrent is like -- the torrent

20   file is a vulnerability that could be used to interfere with

21   trading.  So there are versions of the BitTorrent clients that

22   are being developed that don't need that.  But most of them

23   currently in use still support that torrent file and many of

24   them rely on it entirely.

25   Q.   How often do changes occur in the BitTorrent community?

1          MR. BUCKLEY:  Objection, that requires speculation.

2          MR. CARACAPPA:  I'll withdraw the question.

3          THE COURT:  Yes.

BY MR. CARACAPPA: (Continuing)

4

5     Q.   Now that we've gone over generally BitTorrent, I would

6     like you to step through a practical example.

7     A.   Okay.  Let's pretend we're going to look for a song on the

8     Internet and find its torrent and download it using the

9     BitTorrent client.  I'm going to actually show you some of the

10    screens you might go through in that process.

11         So, first of all -- and if you could -- can you blow

12    this up a little bit just to show the Google search?  In this

13    particular case, I'm searching for a song called American Honey

14    by an artist called Lady Antebellum, and I put the word

15    BitTorrent in there or I might put the word torrent to make

16    sure that some of the first hits I get are going to be for

17    torrent files.

18         And so if we can go to the next slide.  When I get

19    back -- my search results seemed to have disappeared somewhat.

20    When I get back, here I would go to a site then and see a list.

21    In this case I've gone out to a site that actually lists

22    torrent files that are available for download.  So I might have

23    got there through my search or I may have -- I may have just

24    known about this site and gone to it.

25         But here you see that that particular work -- if you

1    could scroll down just a tiny bit -- that Lady Antebellum's

2    America Honey is actually available in a few different torrents

3    because there's no rule that one work can only be traded by one

4    torrent.  You could have many torrents with the same work.  So

5    we're going to just pick one of these.  And I think we'll go to

6    that -- the torrent on the top named Lady Antebellum American

7    Honey.

8    Q.   So just to be clear, so at this stage you're trying to

9    find who has that stuff?

10   A.   Right.  At this stage I'm just checking out what torrents

11   are out.  And this is an older song, so, you know, there may

12   not be a lot of activity on it.  But I still get several

13   torrents when I run for a song.  If it was a wildly popular new

14   song, you know, that's only been out a week, there would

15   probably be many more torrents that this little short list.

16   Q.   After you find who has the stuff that you want, what

17   happens next?

18   A.   Well, then I want to go actually get the torrent file,

19   because right now I know about the torrent file, but I don't

20   have it on my computer yet.  So I'm going to go to one of these

21   sites and I'm going to download the torrent file.

22           And so, if we could go on then, I download that

23   torrent file and it comes back to my machine.  So now it's in

24   my downloads folder on my machine.

25           Now, when I set up my BitTorrent client, I could have

B.A. Frederiksen-Cross - Direct

294

1   put it somewhere else, like I could have created a folder

2   called Torrents and put it there.  But whatever my BitTorrent

3   client is configured to show torrent files -- or, I'm sorry,

4   wherever my computer is configured to store my downloads,

5   that's where that download is going to be.  And so I go out

6   there now and what I want to do is I want to open that torrent

7   file with my BitTorrent software.

8          So in the particular BitTorrent client I'm using

9   here, which is -- it's called uTorrent or µTorrent.  Actually

10  the first character is the Greek character µ, but it's

11  sometimes called uTorrent or µTorrent or even mytorrent

12  depending who you're talking to, but that's the client I was

13  running on this computer.

14         So when I go out, I see that Lady Antebellum torrent,

15  I want to add that in my BitTorrent client.  So over on the

16  right-hand side here, you know, it's giving me a list of what

17  torrents I have out there and I'm clicking one and saying this

18  is the one I want.  And then I open it.

19         So as soon as I do that, or as soon as I add it,

20  which is effectively opening it, it starts coming down to my

21  machine.  So on this first screen you can see that it -- it's

22  out there -- and if you can go onto the screen, we'll show you

23  like the process, what I would see as I download that song.

24         So initially, if you could go to the --

25  Q.   Next line?

B.A. Frederiksen-Cross - Direct

1   A.   Next one, yeah.  So here, for instance -- can you zoom in

2   again -- you see the name of that torrent is the one that I

3   selected.  And the status -- if you go over to where the blue

4   bar is on that top line -- the status says it is downloading

5   and it's about 20 percent complete.

6            And so, if you want to advance here then -- if you

7   can go to the next slide.  So now on this next slide, I think

8   we have gone up to maybe 32 percent complete, and it's starting

9   to give me some status about what I've got downloaded and what

10  I've got available.

11           So if we continue on, then that status bar is just

12  going to run across and pretty soon it's going to pop up.  And

13  if you can blow this one up, you'll see that now my status has

14  changed to seeding because now I have all the parts and I am

15  making all of those parts available to whoever else is looking

16  for this song.  And it shows that I have 100 percent of the

17  pieces down below where it's showing that torrent.

18           So there you see that we've got the entire song

19  collected now and we're sharing the entire song with anybody

20  else who's using BitTorrent looking for that particular torrent

21  payload.

22           Now, back when I had just pieces of it, I was sharing

23  those pieces, but I wasn't a seeder yet because I didn't have

24  all the pieces.

25  Q.   So you used the word "download."  What is a download and

B.A. Frederiksen-Cross - Direct

296

1   how is it different, if at all, from an upload?

2   A.   Well, of course, each one of those terms depends upon your

3   point of view.  If I am -- the way I use the term, if I am

4   receiving the piece, I am downloading the piece.  But if I were

5   sending the piece, I would use the term "uploading."  I am

6   uploading it to you.

7          Now, obviously from your standpoint, that would be

8   downloading it to you, because I'm uploading it, but you're

9   downloading it.  But they just mean which way the piece is

10  going.

11  Q.   Okay.  So what happens next after you become a seeder?

12  A.   Well, it's not so much after I became a seeder, but after

13  I collect all the pieces, I put Humpty Dumpty back together

14  again.  I now have this MP3 file and I can click on it and run

15  it if I want to listen to the music, or I could copy it to my

16  phone to listen to on my phone or my iPad or whatever, because

17  once it's complete, once the whole file is there, I can move it

18  around and listen to it with whatever music software I want to

19  use to listen to it.

20  Q.   Thank you, Ms. Frederiksen-Cross.  I'd like to talk now

21  about the Rightscorp system.

22          Do you have an understanding as to how the Rightscorp

23  system works?

24  A.   Yes, I do.

25  Q.   And how did you come to that understanding?

B.A. Frederiksen-Cross - Direct

1   A.    A combination of techniques.  I reviewed the source code

2   for the Rightscorp system.

3           I have also had the opportunity to interview

4   Rightscorp technical personnel who were involved in the

5   creation and day-to-day maintenance of that system.  I have had

6   the opportunity to examine data from that system and also data

7   from some of the notices it generates.  And then I have run

8   some of my own tests by using BitTorrent on a computer that I

9   had put some special software on that let me look at network

10  traffic so I could see what my BitTorrent test was doing and

11  then getting the corresponding data from Rightscorp to see what

12  Rightscorp had captured about my activity.

13          So, I mean, I used all of those techniques to help me

14  better understand the code and what it captured and what it

15  provided.  So the code itself, the data, the information

16  provided by technicians and my own testing.

17  Q.    Could you please describe for the jury your review of the

18  source code.

19  A.    Yes.  Initially, I first received source code relating to

20  the Rightscorp system in 2013.  And at that point in time, I

21  had been asked by the attorneys who were working with

22  Rightscorp to help them understand how this code worked and to

23  look at particularly the portions of the code that are aimed at

24  detecting file sharing and collecting samples of shared works

25  to vet the accuracy of the code and the soundness of the

B.A. Frederiksen-Cross - Direct

298

1    approach being used, and then to explain the technology once I

2    understood it to the lawyers who would be working with

3    Rightscorp so that they could have that technical

4    understanding.

5    Q.   And then what happened?

6    A.   During the course of 2013 I got several code drops to look

7    at.  The earliest, I think, was in the spring of 2013, April or

8    May.  Oh, no, I'm sorry.  March or April, end of March or early

9    April.  And then the last one I got in 2013 was in, I believe,

10   November of 2013.

11          Then some time went by, the case was dormant, you

12   know, I had provided my explanation to counsel, had given them

13   a little overview of how the code worked.

14          In 2015 then I was contacted, again by counsel for

15   Rightscorp to say that they wanted me to take another look at

16   the code.  And at that point in time, I -- you know, I talked

17   to the engineers again to kind of say, what's changed in the

18   code and can you send me the code.

19          So over the course of early 2017, they began sending

20   me the code.

21   Q.   I'm sorry, did you say 2017?

22   A.   I'm sorry.  2015.  They began sending me the code, and I

23   received the code in a couple of chunks at the beginning of

24   2015 up until about July of 2015.  So it spanned a couple

25   months as different parts of the system were made available for

1    my review.

2            During that same time, I also received some of the

3    data samples from them again.  I had received some early on

4    just looking at them online, and now I was actually given

5    copies on disk to look at.

6    Q.   Do you recall the names of some of the files of the code

7    that you looked at?

8    A.   Well, the key components from the standpoint of looking

9    back even to 2013, my original review, there was a component

10   that the Rightscorp personnel referred to as Infringement

11   Finder.  And the code associated with that, the main program

12   was a program called Test5.java, and then it used several other

13   programs that it interacted with.

14           And it also used the BitTorrent API, that's the

15   application programming interface to BitTorrent, and that's

16   actually provided, you can you download it from SourceForge or

17   BitTorrent.org, but it is freely available code for anyone who

18   wants to write a BitTorrent client of their own or to study how

19   it works.  You can get the code for the BitTorrent client.  So

20   they also used that, and that was produced to me as well.

21   Q.   Do you have an opinion regarding the accuracy of the

22   Rightscorp system?

23   A.   Yeah.  There was -- do you want me to continue with some

24   of the other components, or do you kind of want to go component

25   by component?

1   Q.   Let's continue with some of the other and then we go by

2   component by component.

3   A.   Okay.  Because I hadn't quite finished that whole --

4   Q.   That's fine.

5   A.   Another really important component at the time of the

6   system was a part that actually goes out and collects samples

7   of -- collects copies of work from peers in the BitTorrent

8   swarm.  So you could direct the code via an entry in a table to

9   go out and do some sampling for somebody that you thought might

10  be copying or trading in a copied work.  And that program was

11  called SampleIt2.java.  And, of course, it had some other

12  pieces that it interacted with, but throughout our discussion,

13  I'll probably refer to those as Test5.java and SampleIt2, if we

14  can just use that terminology.

15          THE COURT:  Let's listen to the question and answer

16  the questions that you're asked instead of going off on your

17  own.  Okay?

18          THE WITNESS:  Okay.

19          THE COURT:  Thank you.

20  BY MR. CARACAPPA: (Continuing)

21  Q.   Ms. Frederiksen-Cross, can you pull microphone a little

22  closer?  Is that even -- is that possible?

23  A.   I think I can, yeah.

24  Q.   Okay.  Great.  Thank you.  My question is, do you have an

25  opinion regarding the accuracy of the Rightscorp system?

1   A.   Yes.

2   Q.   What is that opinion?

3   A.   With respect to the code that I reviewed and the data that

4   I reviewed, it's my opinion that the system is by and large

5   very accurate.  And that it's effective with respect to the

6   types of sampling that it does.

7   Q.   Let's talk about the Rightscorp code or the system

8   functionality.  What's the first thing Rightscorp does when

9   attempting to identify infringement?

10  A.   Well, the very first thing is it starts with a list of the

11  works that it's supposed to look for.  So it doesn't look for

12  every song ever known to man.  Rightscorp gets a specific list

13  of works from its clients that they want Rightscorp to look

14  for.

15       And so, Rightscorp takes that list and it puts them

16  in their database so that it can use that when it's searching

17  for things or when it's matching things.

18  Q.   What happens next?

19  A.   The next thing then -- and we have some slides for this,

20  if you want to advance to them and we can kind of have them

21  visually as we go along.  The next thing it does is it actually

22  goes out to the Internet and it finds those torrent files that

23  represent payloads that have the work that is a protected work

24  for one of its clients.

25       And it downloads those torrent files back to the

B.A. Frederiksen-Cross - Direct

302

1  Rightscorp system.  So now Rightscorp has those torrent files

2  in its possession and can use them to facilitate doing

3  sampling.

4  Q.   After it ingests and verifies the .torrent files, what

5  happens next?

6  A.   Well, we didn't really talk about the verification step

7  yet so let me just touch on that before I answer that question.

8  Q.   I apologize, yes.

9  A.   With respect to the verification once it has the torrent

10  files, there's always the possibility that some malicious

11  person has created a torrent file with a name of a popular song

12  or a work and put a virus in it or some other malicious code or

13  that it's just got garbage in it even.

14       And so the next step once those torrent files are

15  collected is Rightscorp uses technology to verify that the

16  contents of that payload are the expected contents of the

17  payload.  So if it says it's a Lady Antebellum song, it

18  actually -- Rightscorp actually verifies that it's a Lady

19  Antebellum song.  Or if it says it's a particular album, it

20  verifies what songs are in that payload so it can identify them

21  and know that they're not something bogus.

22  Q.   After --

23       MR. BUCKLEY:  I apologize, Your Honor.  The testimony

24  as to what Rightscorp does -- the testimony as to what

25  Rightscorp does as opposed to the code, lack of foundation and

B.A. Frederiksen-Cross - Direct

303

1   speculation.

2           THE COURT:  All right.  Sustained.  Let's -- you

3   know, she's testified that she got -- she talked to the

4   technicians versus -- and also went through all the code and so

5   differentiate where she's getting that information, if you

6   would.

7           MR. CARACAPPA:  I understand.  Thank you, Your Honor.

8   BY MR. CARACAPPA: (Continuing)

9   Q.   With respect to the ingestion and verification of the

10  .torrent files, is your understanding of those files based on

11  your review of the code or conversations with Rightscorp or

12  both?

13  A.   It's both.  In the 2013 time frame, it was based -- the

14  ingestion of torrents -- my understanding of that was based

15  primarily on understanding with Rightscorp -- of discussions

16  with Rightscorp personnel.

17          In 2015 I actually reviewed the code related to

18  torrent ingestion and verification.

19  Q.   After the torrents are ingested and verified, what does

20  the Rightscorp system do next?

21  A.   Once it has verified the torrents, if we can go on to the

22  next visual I have after this one, go to the next slide if you

23  would, please, the next step in the process is to take the

24  verified torrents and to determine which of those -- which of

25  the torrents that it's pulled in are -- contain Rightscorp

1    or -- works that Rightscorp has been protected to hire -- hired

2    to protect.  I'm sorry.

3            And so there's a process that goes through and checks

4    against that list of protected works to create a list of the

5    torrents that it's pulled in that actually have protected works

6    in them, because they pull in more than they actually -- you

7    know, they pull in some that don't have protected works so they

8    want to make sure that they have that.

9    Q.   And what is that understanding based on?

10   A.   The code -- looking at the code -- for the current version

11   of the code.

12           So what happens after that then is a process that

13   goes out and uses that torrent information that's been ingested

14   to actually reach out and do that handshake we talked about

15   with peers who are offering to share these works.  And I think

16   I have a diagram of that on the next slide if you --

17   Q.   Well, I think what I'd like to do is just list the steps

18   first and then we can go into more detail about how the steps

19   actually work.

20   A.   Sure.  So the step that is involved in looking for peers

21   who are sharing the particular file is a program -- that's that

22   Test5.java program I mentioned -- that goes out to those peers

23   and -- or it goes out to the tracker for the torrent file that

24   it's got.  It gets the current list of peers trading in the

25   particular payload, and so that payload could be a whole

B.A. Frederiksen-Cross - Direct

305

1    collection of songs, some of which are protected works.  So it

2    goes out and it gets that payload.

3         And it reaches out to shake hands with each of those

4    peers that's offering to share copies of that payload.  And it

5    gets back during that handshake the bitfield.

6         So if they answer the handshake -- if a peer that it

7    tries to reach out to answers the handshake, a record ends up

8    getting created that that peer says that it's going to share

9    copies of a portion or all of that payload.

10        And up until -- I won't get ahead of myself here.

11   The record is made that that peer is offering to share part of

12   the payload.  And so, that record records the date and time and

13   the IP address and the port and the particular work, you know,

14   the information that just records that incident.  It also

15   records that bitfield.

16        And at the time the record is created, a check is

17   made to see if the bitfield shows that that peer is offering

18   all of the pieces.  And if it is, that little flag is set to a

19   1.  And if there are some pieces missing, the flag is set to a

20   0.

21        So this just represents the results of that handshake

22   with the peer to see if the peer is offering to share the file.

23   Q.   And what is this understanding based on?

24   A.   Looking at the code.

25   Q.   And which portions of the code?  Do you recall?

1  A.   Well, the primary portion is Test5.java.  At the beginning

2  of the program, it uses another program just to pull the file

3  out of the database, and it uses the BitTorrent API to actually

4  interact with the tracker and get the torrent file and to parse

5  that torrent file.  And then it uses another program that it

6  just calls with the record it's ready to save to stick it in a

7  database.

8  Q.   After Test5.java goes out and sees who is willing to share

9  a certain work, what happens next?

10  A.   Do you want the current processing?

11  Q.   You could just --

12  A.   Like where we are right now in 2015?

13  Q.   If you could, just very high level and then we'll go into

14  detail about what was done when.

15  A.   Okay.  That Test5.jave has created essentially one work

16  that represents this is a payload.  So the next thing that

17  happens is a process is run to split that payload to reflect

18  each individual protected work in the payload.

19       So the data record that said, I found someone trading

20  this payload, is now expanded by a program called

21  ExpanderToInfractions.  And that program creates a record for

22  each protected work that was in that payload.  So we found one

23  payload being traded, now we have a list of the works that were

24  in that payload that we care about.

25       And then subsequent to that, that list can be used to

1   drive a couple different processes.  One of them is that the

2   list of works that were in the payload can be used to drive a

3   process that creates notices e-mailed to Cox saying, you know,

4   we have detected -- or that we'll show you the notice and the

5   exact wording, but basically the notice says, we have detected

6   this file sharing and we'd like you to pass this notice on to

7   your clients.  Or the expectation is that they will pass it on

8   to their customers to alert them that the file sharing has been

9   detected and that there is a copyright for that work.  And it

10  contains an offer to settle up for the copyright or to settle

11  up for the copying of the song.

12  Q.   And your understanding regarding the generation of the

13  notices, what's that based upon?

14  A.   Reviewing the code.

15  Q.   After the notices are generated, what then does Rightscorp

16  do?

17  A.   Just to be clear, I've also spoken to the --

18          MR. BUCKLEY:  Objection, foundation.

19          THE COURT:  All right.  Lay a foundation.

20  BY MR. CARACAPPA: (Continuing)

21  Q.   Did you speak to anyone or did you review any documents

22  that tell you what Rightscorp or Rightscorp's systems do after

23  generating the notice?

24  A.   Yes.  I both looked at some of the code and I've also had

25  conversations with the technicians at Rightscorp.  And just to

1    be clear, I have also had conversations with the Rightscorp

2    technicians about these various components that we've already

3    spoken of as well.

4    Q.   And based on that understanding, what does Rightscorp do

5    after generating infringement notices?

6    A.   After the notices are generated and mailed to Cox, a

7    record is made that a particular notice was mailed on a

8    particular day and a copy of that notice is stored in the

9    databases.

10   Q.   Okay.

11   A.   Now, there's some other processing that can also take

12   place --

13           THE COURT:  Wait for the next question, please.

14   Q.   Okay.  Ms. Frederiksen-Cross, I'd like to focus on a

15   particular period of Rightscorp.  And I'd like to focus on from

16   February 2, 2012, until November 26, 2014.

17   A.   Okay.

18   Q.   And I'd like to first talk about the ingestion of the

19   protected works.  And can you tell me how that worked during

20   that time period?  And I'm going to refer to that as the

21   relevant time period from this point forward.  Okay?

22   A.   Okay.  So from February 2 of 2012 to November 26 of 2014?

23   Q.   Yes.

24   A.   Okay.  The ingestion happened originally manually.  That

25   is to say, Rightscorp's personnel have informed me that during

B.A. Frederiksen-Cross - Direct

309

1   the early phases of the code they went out and did manual

2   searches, like I showed you on the Internet, and pulled in the

3   torrent files.

4   Q.   I just want to take a step back.  I want to start from a

5   step before that.  And I first want to talk about the ingestion

6   of the protected works.  So, for example --

7   A.   Oh, I'm sorry.

8   Q.   -- if BMG wants to use Rightscorp to protect its

9   copyrights, what happens?

10  A.   Initially -- again, in the early days the process was

11  manual.  And Rightscorp would receive a list of protected works

12  and they would type or copy that into their database.  At later

13  points in time they would receive it in the form of a

14  spreadsheet that they could either copy and paste or eventually

15  just import directly into the database.

16  Q.   And what happens after the work is ingested?

17           MR. BUCKLEY:  Your Honor, foundation.

18           THE COURT:  Well, he has laid the foundation for this

19  part of the testimony.

20           MR. CARACAPPA:  Thank you, Your Honor.

21           THE COURT:  It's a combination of interviews and code

22  and discussing it with technicians.  If that's not the case,

23  then you tell us.  If you get it from other than what you have

24  just testified to, then tell us where that source came from.

25  All right.

B.A. Frederiksen-Cross - Direct

310

1          THE WITNESS:  Okay.  And I will try to be clear with

2    respect to different points in time when things were different.

3          THE COURT:  All right.

4          THE WITNESS:  You just asked when the work was

5    ingested.  Are you -- did you mean the work or did you mean the

6    list of protected works, just to clarify?

7    BY MR. CARACAPPA: (Continuing)

8    Q.    First we get the list of protected works from BMG, right?

9    A.    Correct.

10   Q.    We meaning Rightscorp, right?

11   A.    Correct.

12   Q.    And what happens next?

13   A.    Okay.  The next step in the process is that process that I

14   talked about of going out and finding torrents that correspond

15   to that list of protected works.

16   Q.    Is that called the ingestion process?

17   A.    Ingestion of torrents specifically, yeah.

18   Q.    And can you explain that process with reference to the

19   demonstrative, please.

20   A.    Or ingestion of torrent files.  Yeah, what happens here is

21   once the list of torrent files is obtained, and that's in the

22   old days searching for torrents that had the works, and in the

23   new days currently they go out to a site called KickassTorrents

24   and they download what's called a digest or a huge list of

25   torrents that this particular indexing site knows about.  But

1    they bring that list of torrents into their system as well, and

2    then they retrieve the torrents.  In the old days that was done

3    manually.  They actually go out and manually downloaded them.

4           In current processing, they use a program that goes

5    out to the Web and -- based on the torrent name and the

6    information that they have in the digest, and just downloads

7    those torrents from the location that they are stored on the

8    Web.

9           And once they are downloaded, they are put in a

10   Rightscorp database.  And that was true both in the old days

11   and currently.  Once the torrents were downloaded, they are put

12   in a database.  They are actually put in two databases.  One of

13   them has the copy of the torrent, the *.torrent file.  The

14   other has some of the directory of the contents of the

15   *.torrent file broken out as separate records because now they

16   can do copyright checking against those records and stuff.  So

17   the same content, but in two places.

18   Q.   And what happens after the .torrent files are put in the

19   Rightscorp database?

20   A.   Well, in the old process where it was manually done they

21   had already verified that those torrents had their payload.  In

22   the new process where they are downloading lots of them, there

23   is an extra step that goes out and picks which torrents have

24   protected payloads.  So there is one extra step that is

25   inserted in there to accommodate the automation.

1           And that information then is stored in another copy

2    of the table so that they now have what is their working table

3    for these torrents that they are going to be working with.

4    Q.   Does Rightscorp ever compare the list of protected works

5    to the ingested .torrent files?

6    A.   Once -- to the ingested torrent file?  Yes.  That's --

7    well, they compare it -- not to the torrent file as a whole,

8    but, as I said, when they bring that torrent file in, they also

9    take the directory part of it that represents the different

10   files that are in the torrent and they store that in a database

11   where there is one record per payload content, if you will, one

12   record per file in the payload.  And so, they compare the

13   copyright to that list.

14   Q.   Is that what's shown here in demonstrative slide 45?

15   A.   Yes.

16   Q.   Okay.  Thank you.

17           Okay.  What happens next, Ms. Frederiksen-Cross?

18   A.   Okay.  The next thing, then, after the torrents have been

19   ingested and the *.torrent files have been ingested and sorted

20   out, the system actually goes out and collects a copy of the

21   payload for those torrents so that it can check that payload

22   and see if it's really what it is supposed to be.  And we call

23   that ingesting the torrent payload as opposed to ingesting the

24   torrent file.

25           So the ingestion of the torrent payload is done

1    currently by a program called SampleIt3.  Prior to that it was

2    done manually.  Again, they would go down -- in the early days,

3    they would go out and just actually download the payload

4    themselves using BitTorrent.

5    Q.   So Rightscorp goes out to find out where the stuff is and

6    gets the stuff, right?

7    A.   Right.  They get it and they save it in a database that

8    represents the torrent payloads for the various torrents that

9    they process.

10   Q.   Can you describe the process of what happens after the

11   torrent payload is ingested?

12   A.   Well, the next step after the payload is ingested is, as I

13   said, to verify that its contents are what you expect the

14   contents to be.  And in the old days that was done by a human

15   listening to the songs in the payload or the ones that were

16   relevant to the protected works and verifying that they were

17   the songs that they were supposed to be.

18          Now they can use some automation for that, at least

19   to make -- to process all of the records.  That automation

20   takes a form of two different programs.  First they use a

21   program called AcoustID, and that program works by creating a

22   digital fingerprint.  The exact method is proprietary.  It uses

23   a program that is provided by the AcoustID vendors.

24          They run a song through that program and it generates

25   a fingerprint.  And we don't really know if it is a SHA-1 or

B.A. Frederiksen-Cross - Direct

314

1    exactly what kind of fingerprint that is because that's

2    proprietary to that third party.  But then that fingerprint is

3    sent to the third-party's Web site and they look it up in a

4    database and they come back -- they return information back

5    about the song and artist that that particular -- that match

6    that particular work.  And it can be a list because, of course,

7    the same song could be, for instance, on multiple albums.  So

8    they come back with a list of title and artist related to who

9    that work could be.

10          Now, if that process doesn't for some reason return a

11   result, like it comes back and it's still unknown, then they

12   use Audible Magic.  And Audible Magic is another kind of

13   third-party software that is used in the industry -- in the

14   music recording industry to identify musical works.  And it is

15   based on creating a fingerprint that uses as its source

16   acoustical characteristics of the recording.

17          And again, it is kind of a proprietary thing.  They

18   don't really publish what acoustic characteristics they look

19   at, but that fingerprint for Audible Magic is then generated

20   and passed through the Audible Magic website where it's matched

21   by Audible Magic against their website -- or against their

22   databases, and then they pass back a similar list of what the

23   song could be.

24   Q.   After Rightscorp has verified the contents of the torrent

25   payload, what does it do next?

1    A.    Well, when it has got the identification back from either

2    of those fingerprints, it updates the information in the

3    database to reflect that it has been verified, that the song

4    and title name are as provided by the third party.  And it also

5    sets a flag that indicates -- and a record in a database called

6    torrent copyrights, I believe it is, that is used subsequently

7    in processing to make sure that the songs that are verified are

8    the songs that have been verified through one of these

9    processes.  Or in rare instances they may even today still use

10   manual listening if it falls through the first two processes,

11   and then a human would type in the title.

12   Q.    What does Infringement Finder do?

13   A.    The Infringement Finder or Test5.java program that I

14   described earlier process verified songs.  That is to say,

15   songs that are in that torrent copyright database and also in

16   the -- it pulls them out of -- it uses that torrent copyright

17   to pull them out of the individual payloads, and goes out and

18   contacts the tracker for that torrent payload.  And then based

19   on the information passed back from the tracker, goes to the

20   individual peers and initiates that handshake we talked about.

21          And as a result of that handshake, it identifies

22   peers that are offering to share copies of the file, and it

23   makes a record of that offer to make the file available in its

24   databases.

25   Q.    Have you prepared a demonstrative to help further explain

B.A. Frederiksen-Cross - Direct

316

1   how Infringement Finder works?

2   A.   Yes.

3   Q.   Can you explain it with respect to that demonstrative,

4   please.

5   A.   Yes.  If you can pull up the next slide here.

6           So essentially the Rightscorp system first takes --

7   actually, there should be a first step here that somehow got

8   omitted from the slide.  The first thing it does is it goes out

9   and gets that tracker information for the torrent that it has

10  in its database that it knows has a protected payload in it or

11  has a protected work in it as part of the payload.  Then --

12  Q.   We talked about that earlier.  The tracker has to tell

13  Rightscorp who has the stuff?

14  A.   Right, has to give it the IP addresses.

15  Q.   And once Rightscorp's system figures out who has the

16  stuff, what happens next?

17  A.   It starts looping through that list of IP addresses.  And

18  for each IP address, it goes out and does a handshake with that

19  peer.

20  Q.   So in this example, how many peers did the tracker

21  identify as having the torrent payload or the stuff?

22  A.   Well, five in addition -- I mean, there is our system

23  that's reaching out there and then we have Peer 2, 3, 4, 5, and

24  6 in this example.

25  Q.   Sorry.  Continue.  What happens next?

317

1  A.   Okay.  So once the handshake is made, you will see I have

2  kind of popped up a little blank document here.  That's my --

3  the best we could do to say it puts a record in the database to

4  record that handshake.

5       Then it goes out to next peer in the list and

6  attempts the handshake.  And if the handshake is successful, it

7  puts another record in the database to reflect that handshake.

8       If you can give me one more click.

9       And then it goes out to the next peer, does a

10  handshake.  And if the handshake is successful, it again

11  creates that record with the bitfield and the full file flag,

12  et cetera, and so on as it works its way through the list.

13  Now --

14  Q.   Okay.  What happened to Peer 6?

15  A.   Now, Peer 6 didn't answer the handshake.  So no record was

16  created for Peer 6.

17  Q.   And what are some of the reasons why Peer 6 would not want

18  to answer the shake?

19  A.   Well again, Peer 6 may not have had the content.  Peer 6

20  may have been busy.  Peer 6 may have been configured not to

21  share.  Any one of a number of reasons.

22  Q.   What happens after the Rightscorp system generates these

23  records?

24  A.   Once the initial records are generated, the record created

25  by Test5.java is -- really represents the offer to share a

B.A. Frederiksen-Cross - Direct

318

1   payload.  So the next process really is to take that

2   payload-related record and split it into a database that has a

3   record for each protected song in that payload.

4   Q.   Just to be clear, we talked earlier about notices.  How,

5   if at all, do records relate to notices during the relevant

6   time period?

7   A.   During the relevant time period from February to

8   November 26 of 2014, the notices would be sent one per

9   protected work out of that payload.  And they would only be

10  sent for payloads that had responded with the bitfield saying

11  that that particular client had the entire payload available to

12  share.

13  Q.   Okay.  So let's take a look at this animation that you

14  have prepared.

15  A.   Okay.

16  Q.   Relating back to the earlier animation, there were four

17  records generated; is that right?

18  A.   That's correct.

19  Q.   Because there were four handshakes?

20  A.   Correct.

21  Q.   And of the records generated during the relevant time

22  period, how many notices were sent to Cox?

23  A.   Well, there would have been a notice for each of the peers

24  that responded -- there would have been at least one notice for

25  each of the peers that responded with a full handshake.

1              Now, if that peer's payload had five songs, they

2    might have received five notices on the -- for the particular

3    day the handshake was made.  And then, of course, during that

4    time period the system might come back to them again.  And if

5    it came back on a different day and there were still five songs

6    in the payload, it would generate another five notices, one

7    for -- one notice per song per day per peer visited.

8    Q.    In this example, how many notices were sent?

9    A.    Well, in this example, which is just one specific run, it

10   would send two notices.  One for Peer Number 3 who responded

11   that they had the whole payload, and one for Peer Number 5 who

12   responded that they had the whole payload.

13   Q.    And just so the jury understands, the whole payload or all

14   the stuff is generated by the full green note; is that right?

15   A.    Right.  Right.

16   Q.    And Peer 2 does not have all the payload, so it is half of

17   a green note in this example, the same thing Peer 4; is that

18   right?

19   A.    Right.  Now, in this example I want to point out that

20   we're assuming the payload was a single song.  So there would

21   be one notice per song for each of these peers.  If their

22   payload happened to have five songs, there would be one notice

23   per each of those songs because each one is a separate

24   protected work on the list that was provided to Rightscorp.

25   Q.    Why doesn't Rightscorp send the notice to the Cox

B.A. Frederiksen-Cross - Direct

320

1    subscriber?

2    A.   Well, Rightscorp can't because Rightscorp's sampling knows

3    what the IP was.  And the process that we're talking about that

4    generates the sampling records, you know, the records that

5    reflect an offer to make a work available, also goes out to a

6    publicly available source and looks up who the ISP is.  So they

7    can get that far, but Rightscorp themselves has no way of

8    telling who Cox's customers are.

9         So all they can tell is that the Internet service

10   provider is Cox or Fios or, you know, whoever the provider is,

11   and they can send the notices to that provider.  But then the

12   provider has to determine who the ultimate subscriber was who

13   was using that address on that day and time.

14   Q.   During the relevant time period, did Rightscorp send more

15   than one notice per day?

16   A.   It certainly -- I want to make sure I am answering your

17   question the way you intended.  Do you mean per song, or per

18   client, or for everything in the whole world?

19   Q.   That's a good question, and I will clarify.  Did

20   Rightscorp send more than one notice per day per copyrighted

21   work per Cox subscriber?

22   A.   I am aware of at least one occasion where there was a

23   hiccup and it sent multiple notices on the same day.  But

24   generally speaking, both the code I have reviewed and the data

25   I have reviewed say that the system worked as designed and sent

1  one notice per day per IP per song that it detected that was a

2  protected song.

3  Q.   Thank you, Ms. Frederiksen-Cross.  I would like to talk

4  for a minute about the Rightscorp notice.

5        Have you seen the Rightscorp notices?

6  A.   I have seen them, yes.

7  Q.   Are you familiar with the software that generates these

8  notices?

9  A.   Yes, I am.

10 Q.   Have you spoken to Rightscorp employees about these

11 notices?

12 A.   Yes, I have.

13 Q.   Okay.  Up on the screen is PX 2839, which is Rightscorp

14 15015599-60.

15        Do you see that?

16 A.   I do.

17 Q.   And can you explain to the jury a little bit about the

18 information contained in this notice.

19        MR. BUCKLEY:  Your Honor, can I just preserve our

20 prior objection?

21        THE COURT:  Yes, sir.

22        THE WITNESS:  Yeah, if we can blow up a couple parts

23 of this, it will be a little easier to see.

24        THE COURT:  How are you all doing?  You ready for a

25 break?

B.A. Frederiksen-Cross - Direct

322

1          Mr. Caracappa, you're kind of moving into a new area,

2     so I think maybe this is a good time to take a break.

3          Let's take our mid-morning break.  We'll come back in

4     15 or 20 minutes.

5          All right, thank you.  You're excused.

6          NOTE:  At this point the jury leaves the courtroom;

7     whereupon the case continues as follows:

8     JURY OUT

9          THE COURT:  Okay.  I think I responded, your

10    objections are preserved.

11         MR. BUCKLEY:  Yes.

12         THE COURT:  Okay.  All right.  And let's take --

13    let's come back at five minutes after 11.  All right?

14         MR. CARACAPPA:  Thank you, Your Honor.

15         MR. BUCKLEY:  Thank you, Your Honor.

16         THE COURT:  Thank you.  We're in recess.

17         NOTE:  At this point a recess is taken; at the

18    conclusion of which the case continues in the absence of the

19    jury as follows:

20    JURY OUT

21         THE COURT:  All right.  Ready for our jury?

22         Joe, let's get our jury.

23         NOTE:  At this point the jury returns to the

24    courtroom; whereupon the case continues as follows:

25    JURY IN

B.A. Frederiksen-Cross - Direct

323

1      THE COURT:  All right.  Please be seated.  Let's

2   continue, Mr. Caracappa.

3      MR. CARACAPPA:  Thank you, Your Honor.

4      THE COURT:  Let's keep our voice up and our -- and be

5   close to that microphone.

6      MR. CARACAPPA:  Thank you.

7   BY MR. CARACAPPA:

8   Q.   Ms. Frederiksen-Cross, I just want to come go back and

9   talk for two minutes about where we discussed the notices.

10  Okay?

11  A.   Yes.

12  Q.   If I can have you look at the demonstrative you prepared,

13  Number 53.  During the relevant time period, would Rightscorp

14  send a notice to Cox based on the record generated from Peer 2?

15  A.   During the time period from February 2 to November 26,

16  2014, no.

17  Q.   Why not?

18  A.   Because during that time period the notice would only be

19  sent if Cox's handshake had received a bit field that indicated

20  that the particular peer was offering to trade all pieces of

21  the payload.  And since it had all pieces of the payload,

22  obviously it would have all pieces of any particular song in

23  that payload.  So during that time frame the trading was

24  focused on only peers, or the notices were focused only on

25  those peers who had the entire payload.

B.A. Frederiksen-Cross - Direct

324

1    Q.   And in your example, which peers would that be?

2    A.   In this example, that would be Peer Number 3, which

3    has the entire payload, and Peer Number 5, which has the entire

4    payload.  The others only had part, so they would be left out.

5    Q.   And that's because we see the entire note in green.  Is

6    that right?

7    A.   Well, in my -- in my picture that's how I depicted it,

8    yeah, the entire notice in green.

9    Q.   Okay.  Thank you.

10   A.   Counsel, could I correct something I misstated in my

11   earlier testimony?

12   Q.   Yes, please.

13   A.   I realized on the break that when I had named a particular

14   program, I had given you the program with a similar name but

15   the wrong name.  I had said that the program that splits the

16   record for the torrent into the individual files was expander

17   to infractions, and the actual name of that program is torrent

18   infractions expander.  So I misspoke when I named it, but I

19   would like to leave the record clear because we've got enough

20   jargon here.  No need to mess it up.

21   Q.   Thank you, Ms. Frederiksen-Cross.

22   A.   Thank you.

23   Q.   I would like to pull up a right Rightscorp notice.  Have

24   you seen these notices before?

25   A.   Yes, I have, sir.

1   Q.   And have you reviewed the Rightscorp source code that

2   generates these notices?

3   A.   I have, yes.

4   Q.   And do you recall the names of those files?

5   A.   CEmail.java is the primary program -- that's a capital C

6   and a capital E -- is the primary program that generates the

7   notices.  And then I think I mentioned this before, but just

8   for the general format of the notice, there's a template and

9   the template for Cox e-mails is called Cox.txt.  So the data is

10  merged into that template to create this file.

11  Q.   Okay.  Thank you.

12          Can you over, please, for the jury the type of

13  information that's included in the notice?

14  A.   Yeah.  If we could, again, pop up some sections to make it

15  easier to read.  And as we go along, if you don't mind clicking

16  on these.

17          It shows -- the notice says who the copyright owner

18  is, who's sending this -- or on behalf of whom this complaint

19  is being sent.  It names the ISP to whom the notice is being

20  sent.  It names the work -- sorry -- date and timestamp that

21  the notice -- or that the observation was made to which this

22  notice relates.

23  Q.   Can you explain the date and timestamp a bit?

24  A.   Sure.  Computers have an internal clock, and that clock

25  keeps track of what day and time it is.  This note happens to

1    be Greenwich Mean Time.  That's what the GMT means on the end

2    there.  And the reason the notice contains the date and

3    timestamp is partly to allow Cox or the ultimate recipient to

4    know when this record was -- or when this event -- this

5    observation was taken.  But it's also important because if Cox

6    wants to look up which subscriber was using a particular IP

7    address, they generally will need the date and time to know who

8    they had assigned it to, because then they can look in their

9    DHCP database and see who was using that particular address on

10   that date and time.

11   Q.   Thank you.

12        And what other information does the notice contain?

13   A.   It indicates the port.  It identifies the specific work

14   that was identified.  So in this case, I think I've got it

15   highlighted here, American Honey of the Lady Antebellum album.

16   So it identifies what was being traded, who was trading it as

17   far as Rightscorp can establish -- that's the IP address -- and

18   the port number that it was being traded from.  The date and

19   time; who owns the rights; who the e-mail is being directed to,

20   of course; and, you know, the basic information that's required

21   for a notice, a DMCA-style notice.

22        MR. BUCKLEY:  Objection, Your Honor.  Legal

23   conclusion.

24        THE COURT:  Overruled.

25   BY MR. CARACAPPA:

B.A. Frederiksen-Cross - Direct

1    Q.   I'd like to just go over one other notice, and this is a

2    notice that was generated on July 7, 2014.  Does it contain

3    generally the same information?

4    A.   Yes, it's slightly reformatted, but it has generally the

5    same information.

6    Q.   And what information is that?

7    A.   Again, we have, you know, who the ISP is, who the rights

8    holder is.  You see BMG Management.  Yeah, thank you.

9         What the name of the file that was downloaded was,

10   the IP address of the computer that downloaded it on a

11   particular date and time.  And then the port that was used with

12   respect to that download.

13   Q.   We talked a little bit about this yesterday.

14        Do you recall the number of notices that Rightscorp

15   sent to Cox during the relevant time period for the asserted

16   works?

17   A.   About 1.8 million.

18   Q.   Would Cox have had to have manually gone through all of

19   those notices?

20        MR. BUCKLEY:  Foundation.

21        THE COURT:  Sustained.

22        MR. CARACAPPA:  What was the objection?  I'm sorry.

23        THE COURT:  Foundation.

24        MR. CARACAPPA:  I'll come back to this.

25        THE COURT:  Okay.

328

BY MR. CARACAPPA:

Q.   Was there any other information contained in the notice?

A.   Well, I think it's important to note -- and I think we have a slide for this.  Yeah.

At the bottom of the notice, at the end of the e-mail, there's some stuff that if you -- oh, I'm sorry.  I've gotten ahead of myself again.

This particular slide shows the Dashboard link.  And what the Dashboard is is a website that Rightscorp provides for ISPs, and each ISP is limited only to being able to view its own customers.  But Rightscorp provides the ability for an ISP to go out and see some quantitative numbers, some summary numbers about how many notices were sent on what day and then they can click on that on a particular dates number and pull up a list of those notices.  And then if they want to recall a copy of the e-mail, they can select a specific e-mail and pull that up for subsequent review.

So, for instance, if they had a customer on the phone, they could go find that complaint number in the system.  And it also lets them just pull up a specific e-mail or to pull up other status information about, for instance, people that have been sent multiple notices.

Q.   Would it be fair to say that this is a summary, this Dashboard that you're discussing?

A.   Well, it's both summary and detail because it goes right

1    down to the individual notice level.  You can pull up the

2    actual e-mail that was sent to a -- or Cox can pull up a Cox

3    customer, for instance, e-mail that they received.  But it also

4    has summary data, so it's both summary and detail.

5    Q.   Does Rightscorp keep any records of the notices that it

6    sends?

7    A.   Yes, it makes an entry in its database.  Every time it

8    sends a notice it basically logs that it sent that notice.

9         And so what we have on the screen or what we just

10   flew by was a sample of what that data looks like.  It shows

11   the date and the time and the work and the e-mail.

12   Q.   Sorry.  I used my clicker prematurely.  Can you please

13   describe the Rightscorp record?

14   A.   Sure.  The Rightscorp record includes basically the

15   information that's in the notice.  So it has the IP number and

16   the song title and the artist and the song owner, you know, on

17   whose behalf Rightscorp was sending the e-mail.  It's got to

18   the date, the port, the file name, the date that the notice was

19   actually e-mailed.  So the first date is the date that the

20   observation occurred, and the second is the date that the --

21   that the e-mail notice was sent.

22        And then it's got the hash value, and it basically

23   just preserves a record for every single e-mail that's sent so

24   that Rightscorp can know what e-mails it sent and to whom and

25   at what time.

B.A. Frederiksen-Cross - Direct

330

1  Q.   So we talked about the Rightscorp system and how it

2  ingests the works from BMG, and that it ingests and verifies

3  the torrents, and we talked about Infringement Finder and the

4  notices.

5       What happens next?

6  A.   Well, there's several other things that happen in the

7  system.  I mean, next is kind of on your point of view.  But,

8  for instance, one of the other things that happens is that

9  periodically Rightscorp will use the -- these records that --

10  or the records that it created that a particular peer was

11  offering a particular protected work, and it will randomly go

12  out to that database and sample from some of those peers.it

13  will go back to that peer and actually download the entire work

14  this time.

15       So it's going out.  It will select the record out of

16  that collection of records for the peers its identified, and it

17  will go out and it will do the handshake with the peer.  But

18  instead of stopping at the handshake, it will then go ahead and

19  collect all the pieces.

20       And it collects them from a single peer, and I think

21  that's an important distinction to make over the sampling we

22  talked about earlier that was to download payload.  This

23  sampling is -- they use -- they've made a slight override to

24  the normal BitTorrent API.  So they're still using the

25  BitTorrent code to go out to this peer, but now instead of

1   sampling from the swarm as a whole, it goes after that song

2   from a specific peer and downloads that song and then it

3   creates a record about -- again, about this download.  And it

4   saves the sample that it downloaded, the song itself, and it

5   also saves information about that download activity.

6   Q.   You talked earlier about how it downloads the file.  Do

7   you remember the name of the source code that performs that

8   function?

9   A.   The primary program is called SampleIt2, and that's with a

10  capital S, a capital I, and the numeric 2.java.

11  Q.   And do you recall the name of the code that downloads the

12  sample of the work from the BitTorrent user?

13  A.   I'm sorry.  Maybe I -- can you ask that last question

14  again?  Maybe I misunderstood what you were asking.

15  Q.   We talked about how early in the process Rightscorp goes

16  out and gets the torrent.

17  A.   Okay.  I'm sorry.  The program that downloads the torrent

18  payload is SampleIt3.java.  The program that goes to a specific

19  peer and downloads a specific work is SampleIt2.java.

20  Q.   And have you prepared a demonstrative to show the jury how

21  SampleIt2 works?

22  A.   Yes, I have.

23  Q.   Okay.

24          THE COURT:  Is this in existence of the relevant

25  period?  Is that correct?

1           MR. CARACAPPA:  Ms. Frederiksen-Cross -- you can ask

2      the witness or I can ask it.

3           THE COURT:  Yeah, go ahead.  You ask her.

4           MR. CARACAPPA:  Okay.

5      BY MR. CARACAPPA:

6      Q.   Ms. Frederiksen-Cross, when did Rightscorp use SampleIt2?

7      A.   The first version of the program I received was in early

8      2013 -- or 20 -- yeah, 2013.  It's my understanding that they

9      actually used SampleIt2 from the beginning of their sampling

10     for the entire relevant time period.

11     Q.   I'm sorry.  We're in SampleIt2 now.  Right?

12     A.   Yes.

13     Q.   SampleIt2 is what downloads the sample works?

14     A.   Oh, I'm sorry.  SampleIt2 was started in -- I want to say

15     about February of 2014, I believe, through the November time

16     frame that's at issue here.  I mean -- or actually through I

17     think August, end of August of the time frame that's at issue

18     here.  So it's a subset of the total time period we've been

19     talking about.

20     Q.   And this just summarizes what we discussed, that SampleIt2

21     was used from February 1 -- February 1, 2014, to August 28,

22     2014?

23     A.   Correct.

24     Q.   All right.  Can you step through this demonstrative to

25     explain to the jury how SampleIt2 worked during that time

1   period?

2   A.   Yeah.  What the software does is it -- as I mentioned, it

3   starts by going out to the record of -- that it's already

4   identified with respect to who is sharing a particular payload.

5   So it starts with, I've already identified this person via the

6   handshake process we talked about earlier.  So now it randomly

7   samples from that database of recorded handshakes to go out to

8   the specific peer -- it goes back to the same one, to collect

9   specifically the protected work that was --

10  Q.   The entire payload from a single peer.  Is that right?

11  A.   The -- the payload that's related to the protected works

12  from the single peer is what it's focused on because it only

13  stores those payload samples that are -- correspond to

14  protected works.

15  Q.   So in this example, Rightscorp's going to a Cox subscriber

16  and getting the entire payload from a single subscriber.  Is

17  that right?

18          MR. BUCKLEY:  Leading.

19          THE COURT:  Overruled because she's already testified

20  to it a few moments ago, but let's try not to lead.

21          MR. CARACAPPA:  I understand, Your Honor.  Thank you.

22          THE WITNESS:  Just to be clear, the purpose of

23  SampleIt2 is to sample for protected works, so when it goes to

24  that subscriber the only record that it's making at this point

25  is with respect to the protected works that it copies back.  It

B.A. Frederiksen-Cross - Direct

334

1    doesn't -- it doesn't make a record for the payload as a whole,

2    but just for the protected works that it obtains from that

3    peer.

4    BY MR. CARACAPPA:

5    Q.   Compare for me how SampleIt2 works, how BitTorrent works

6    generally.  What is the differences?

7    A.   Well, the primary difference is that if you're just a

8    BitTorrent user, you're going to be going out to the swarm and

9    you're going to get pieces from all over the swarm as you

10   collect that payload.  And in contrast, SampleIt2 has been

11   directed to get its entire copy of a song from a single peer.

12          So instead of collecting it from the swarm generally,

13   it goes to a peer and it says, give me this piece, this piece,

14   this piece, this piece, this piece until it's reconstructed the

15   song, and then it saves that song in a sample database and it

16   saves a record of when it went to that peer and got that

17   sample.  And then it goes on to the next peer in its list, you

18   know, that has a protected work or protected works -- it could

19   be more than one -- and it goes out to that peer and gets its

20   samples.

21   Q.   And one of the songs that was made available for upload

22   and that Rightscorp obtained from a Cox subscriber is Lady

23   Antebellum.  Correct?

24   A.   Yeah, the one we've been using in our examples here

25   specifically.

1          MR. CARACAPPA:  Your Honor, can we play this song for

2     five seconds just to show the jury the audio?

3          THE COURT:  Yes.

4     (PLAYING AUDIO.)

5          MR. CARACAPPA:  BitTorrent, and she said yes.

6          THE WITNESS:  And I said yes.

7          MR. BUCKLEY:  Foundation.

8          THE COURT:  Overruled.

9          Go ahead.

10    BY MR. CARACAPPA:

11    Q.   Talked about the notices that Rightscorp sends to Cox.

12         Are there additional ways that Rightscorp notifies

13    Cox of the infringement on its network?

14    A.   Yes.  When the Rightscorp system detects that someone is

15    sharing a copy of a file that Rightscorp has been hired to

16    monitor, they send these notices out that we've already

17    discussed.  But also on an approximately weekly basis they send

18    another e-mail to the ISPs, in this case Cox, that says that

19    they have observed that there are repeat infringers.  That is

20    to say they look at the folks for whom they have collected

21    multiple of these handshakes over a period of time and they

22    identify for Cox or for the ISP that receives this e-mail how

23    many such infringers there were in a particular time frame.

24    And these are just the repeat infringers where repeat infringer

25    is defined as someone who has received multiple notices during

1    that time frame for multiple works.

2              And they also -- in addition to just sending an

3    e-mail with the summary counts, they attach then a file to that

4    e-mail, a computer-readable file like an Excel spreadsheet,

5    that just had -- or it's readable with Excel -- that just has

6    the detail for each of these infringers.  So it would have --

7    if this -- in this particular one it says, you know, there were

8    13,145 repeat infringers during this period of time, then the

9    attached file would have the details corresponding to those

10   infringers.

11             MR. CARACAPPA:  Your Honor, one housekeeping matter.

12   I would like to move in PX 2839, which contains the two notices

13   that Ms. Frederiksen-Cross discussed.

14             THE COURT:  You want to move them into evidence now?

15             MR. CARACAPPA:  Yes, please.

16             THE COURT:  Any objection?

17             MR. BUCKLEY:  Same objections as before, Your Honor.

18             THE COURT:  All right.  They'll be received.  Your

19   exception is noted.

20             MR. CARACAPPA:  Thank you, Your Honor.

21   BY MR. CARACAPPA:

22   Q.   I also forgot to ask you a question, Ms.

23   Frederiksen-Cross.  The full file downloads, do you know

24   approximately how many full file downloads Rightscorp has?

25   A.   By full file download, you mean that -- those downloaded

1   samples we were talking about that are collected by SampleIt2?

2   Q.   Yes.

3   A.   And are you talking about just how many they have for BMG

4   or how many they have for everything?

5   Q.   Two questions.

6           How many do they have generally?

7   A.   The -- the sample that I have seen had about 700,000 files

8   generally.

9   Q.   And how many have they downloaded from the Cox network

10  that relate to the works at issue?

11  A.   For the time period that we're talking about here at issue

12  and for the works that are currently at issue, about 700,000

13  approximately.

14  Q.   So I think that that's --

15  A.   Oh, I'm sorry.  That's the total group.

16          For just BMG it would be about 150,000.

17  Q.   Thank you.

18          We talked about the termination request.  Let's talk

19  about the repeat infringement records that Rightscorp keeps.

20  What are repeat infringement records?

21          MR. BUCKLEY:  Objection.  Calls for legal opinion.

22          THE COURT:  I'm sorry?

23          MR. BUCKLEY:  Calls for a legal opinion.

24          THE COURT:  Rephrase the question.  And, you know,

25  let's be careful about how you ask the questions.

1          Infringement is one of the issues that you'll resolve

2     on the basis of the testimony and the facts in the law that I

3     give you, so, you know using the term infringement here is in

4     reference to the notices and the works that we're -- you know,

5     all of us keep in mind that we're not going to -- you'll be

6     making the ultimate decision.  So when we're using the word

7     infringement now, it's based on the notices and the contents in

8     the notices.

9          All right.  Go ahead.

10          MR. CARACAPPA:  Thank you, Your Honor.

11     BY MR. CARACAPPA:

12     Q.   Let's look at an example of a Rightscorp record.  Okay?

13     A.   Okay.

14     Q.   And we have one up on the screen at Exhibit PX 1, page 69.

15     Could you please explain this exhibit to the jury?

16     A.   Sure.  This is one of those records that might be

17     associated, for instance, with the termination request or the

18     termination notice, the second kind of notice that gets

19     e-mailed to Cox.  And what this shows is some summary data

20     related to particular infringers who during that handshake --

21     or I'm sorry -- particular folks sharing the file copies who

22     during that handshake process were identified to have -- over a

23     period of time, you know, when the system went back to them on

24     the next day and did the handshake, they still had the same

25     content, so they still had the same payload and the same

1    protected works were being offered for sharing.

2           And so this report summarizes in the first column how

3    many times a particular IP address and port was observed to

4    have a copy of that work available.  And then it shows the IP

5    address in the port, the date that it was first detected to

6    have that content, and the most recent date that it was

7    detected to have that content, the number of days that was in

8    that span that the particular IP address import were sampled

9    and then the -- whether or not Rightscorp had received any

10   response related to the e-mails it had sent to Cox, and then

11   the torrent name and a sample file name from that torrent name.

12   Q.   The column on the left you said "available," and I just

13   want to make sure we're clear.  When you used the word

14   available, that means made available for upload or download.

15   Is that right?

16   A.   Right.  It means that when the Rightscorp system went out

17   and did a handshake with that peer, that peer answered the

18   handshake and provided a bit field that identified that the

19   work -- that the payload in its entirety was available.

20   Q.   Under torrent name, the first torrent name is Otis Redding

21   Discography.  I think that may be spelled wrong.  Right?  But

22   what is a discography?

23   A.   A discography is essentially a collection of the lifeworks

24   of a particular performer, so it would be all of the songs they

25   had recorded or all of the albums they had produced.  Or if

1    they had albums and singles, it would be all the albums and all

2    the singles.

3    Q.   So here, this Cox subscriber is making available the

4    entire Otis Redding discography.  Correct?

5    A.   That is correct based on the name shown here, yes.  And

6    normally those are not -- I mean, the BitTorrent people who put

7    stuff up tend to label things so that others can find what

8    they're looking for, so.

9    Q.   I'd like to talk a little bit about the Dashboard.  I'd

10   like to talk for a minute about the Dashboard.

11          Did you review the code surrounding the generation of

12   the Dashboard?

13   A.   The code used to actually select the data and to present

14   the screens to users, yes.

15   Q.   Okay.  And can you step through the Dashboard, please, for

16   the jury?

17   A.   Yeah, what -- oh.

18          MR. BUCKLEY:  Relevance.

19          THE COURT:  Overruled.

20          THE WITNESS:  And just as a reminder, the Dashboard

21   is an online site that Rightscorp makes available to ISPs so

22   that ISPs can go out and look at information about their own

23   subscribers but not somebody else's subscribers.

24          And so the main menu for the Dashboard has the four

25   items that we see here.  I've highlighted the first one.

341

1           There's a count of e-mailed notices.  There's a list

2    of those folks who would have fallen onto a termination list or

3    termination request, the ones who had multiple observations.

4           So if we look at that -- the first option, for

5    instance, you would see here -- and this is arranged according

6    to each day of the month.  So it's going to show the total

7    number of notices that were sent on a particular date.  In this

8    case, I've highlighted the one for -- I think it's 2014/9/09,

9    or I'm sorry.  2014/9/11 was the date.

10          And so when you click on that link, the -- in blue

11   there on the number, then it pulls up the underlying detail.

12   So this is -- and it pulls them up a hundred at a time so you

13   can scroll through them so you can see a little bit more detail

14   about, you know, what the case number was, what the track name,

15   what the payload name was, the date, the IP, the port,

16   et cetera.  And there's a little box you'll notice at the front

17   of these that if you click that, then you can actually pull up

18   the notice that was sent in association with this observation.

19   BY MR. CARACAPPA:

20   Q.   Okay.  And just so that I am clear, we're stepping through

21   the four bullet points on the Dashboard.  Right?

22   A.   Yeah, we're going to walk through what those represent.

23   Q.   And we just did the first bullet point, and now we're on

24   the second bullet point.  Right?

25   A.   Right.  Right.

B.A. Frederiksen-Cross - Direct

342

1   Q.   And what happens when one clicks on the list of e-mails,

2   multiple infringers for your ISP?

3   A.   Well, again, it first provides a screen with some summary

4   data.  In this case, a particular IP address in port and then

5   the date of the first observation, the date of the most recent

6   observation, the number of days between the count of notices

7   that were -- or the count of handshakes -- of notices

8   actually -- that were sent during that time frame.  So these

9   are just the ones that notices were sent for.

10           And, again, the number of days that was in that time

11   frame, so you don't have to do the math.  And then again,

12   there's a link that you could go to to pull up more detail

13   about that particular IP address and ports so you could then

14   see the underlying detail behind those summary numbers.

15   Q.   And then bullet point 3 says, "Infringers for your ISP

16   that have paid their bill."  Do you see that?

17   A.   I do.

18   Q.   And what is that?

19   A.   If you pull up that screen, it would show you whether any

20   of the individuals on the first or second screens had actually

21   contacted Rightscorp in response the settlement offer and paid

22   that settlement offer to conclude, you know, the -- or to -- I

23   guess to respond to the settlement offer by paying the $10 or

24   20 or whatever it was at that particular point in time.

25   Q.   And the last bullet point says, "Retrieve e-mails sent to

B.A. Frederiksen-Cross - Direct

1    you from our database."  What's that entry?

2    A.   And that one just let's the Cox or another ISP -- each

3    e-mail has a case number on it.  And if they were to type that

4    case number into the screen that pops up, they can pull up a

5    copy of the e-mail.

6              So, for instance, if a customer said, hey, I got this

7    e-mail and it's number blah, blah, blah, they could type that

8    number in and actually be looking at the e-mail at the same

9    time when they're talking to the subscriber.

10   Q.   Ms. Frederickson-Cross, who is Mr. Rucinski?

11   A.   Mr. Rucinski is an expert like myself who was hired by Cox

12   to perform analysis and provide his opinions in this case.

13   Q.   And Mr. Rucinski presented a report in this case.  Is that

14   right?

15   A.   That is correct, yes.

16   Q.   And in that report, he had some comments to some of the

17   statements you made and the observations reflected in your

18   report.  Is that right?

19   A.   That is correct.

20   Q.   First one I'd like to talk about is the SampeIt2 versus

21   SampleIt3.  And we talked a little bit about this earlier, but

22   Mr. Rucinski criticized your use of those terms.  Is that

23   right?

24   A.   He did in a couple of places in his report, yes.

25   Q.   Okay.  Could you explain that criticism?

B.A. Frederiksen-Cross - Direct

344

1  A.   Actually, the -- his first criticism was that there was a

2  paragraph where I had omitted the number on the end and just

3  referred to it generally as the SampleIt process, which is what

4  Rightscorp typically refers to both of their sampling processes

5  as unless they need to be talking about specifically the

6  download of torrent payload or the download of a particular

7  song.

8           And, you know, he's right.  I had a place in my

9  report where I was unclear which process I was talking about,

10  and he called me out on that.  And I agree.  You know, I should

11  have been more clear on that paragraph.

12          MR. BUCKLEY:  Your Honor, this whole line assumes

13  facts and testimony that's not in evidence.

14          THE COURT:  Well, approach the bench.  Sidebar,

15  please.  All right.  Excuse us.

16  (ON-THE-RECORD BENCH CONFERENCE, TO WIT:

17          THE COURT:  Well, it's not in evidence.  And the

18  issue is, do we want to deal with it now versus coming back on

19  rebuttal testimony?  I mean, you've got to make a choice.  You

20  can do it either way, but, you know, the goose and the gander.

21  And, you know, if she testifies about this now, then I don't

22  expect you to call her for rebuttal when he criticizes the

23  testimony she's given.  So you can have it one way or the

24  other, but you're not going to repeat it in a rebuttal

25  testimony and what she's about to testify now.

B.A. Frederiksen-Cross - Direct

345

1          MR. CARACAPPA:  I -- if -- that's okay as long as --

2     if Mr. Rucinski criticizes her for other reasons, she can be

3     brought in rebuttal to address those other reasons.  And part

4     of the reason we're doing this now is because we'd expect Cox

5     is going to bring it out on cross.  We went over this with

6     Frederiksen.  She's identified some errors, and we would like

7     to explain that.

8          THE COURT:  Okay.  And I think that's permissible

9     versus doing it on redirect.  If you expect that you want to

10    get it out, then you have a right to get it out.

11         So where are we?

12         MR. BUCKLEY:  Your Honor, you granted the relief I

13    was going to request.  As long as they're also not going to

14    bring it back on rebuttal to testify to the --

15         THE COURT:  Same case.  Okay.

16         All right.  That will be the rule of the case.

17         MR. CARACAPPA:  Thank you, Your Honor.

18         MR. BUCKLEY:  Thank you, Your Honor.

19         THE COURT:  All right.  Thank you-all.

20    (END OF BENCH CONFERENCE.)

21         THE COURT:  All right.  Let's continue, please.

22    BY MR. CARACAPPA:

23    Q.   So we were talking about some of Mr. Rucinski or Cox's

24    witness or expert who had some comments to your report.  Right?

25    We talked about SampleIt2 versus SampleIt3.

B.A. Frederiksen-Cross - Direct

346

1    A.   Yeah, I don't think we quite finished that discussion,

2    but --

3    Q.   Okay.

4              MR. CARACAPPA:  Is it possible --

5              THE COURT:  Well, what -- go ahead.  Ask your next

6    question.

7              MR. CARACAPPA:  Is it possible for me to have the

8    original question read back before the objection?

9              THE REPORTER:  I will try.

10             MR. CARACAPPA:  Okay.

11             And you know what, I don't think I need it if I --

12   could I just --

13             THE COURT:  Yeah, re-ask it -- re-ask your question.

14             MR. CARACAPPA:  Thank you, Your Honor.

15   BY MR. CARACAPPA:

16   Q.   One of the criticisms Mr. Rucinski had was your use of the

17   term SampleIt2 versus SampleIt3.  Is that right?

18   A.   Right.  There was a paragraph where I had inadvertently

19   switched the 2 and the 3.  And again, he quite rightly took me

20   to task for that, and I think I clarified that in a subsequent

21   declaration.  But just to be clear, the --

22   Q.   Speak up and into the mike.

23   A.   Yeah.  Just to be clear, the SampleIt3 is the program that

24   downloads the entire payload in order to use for verification,

25   while the SampleIt2 downloads specific samples from a peer

1   that's already identified as a sharer of the file and preserves

2   a record of that sharing by downloading the file.

3   Q.    And this is a little counterintuitive, but SampleIt3

4   actually occurs before SampleIt2.  Right?

5   A.    In the process that its run, yes.

6   Q.    Mr. Rucinski also talks about the ratio for SampleIt2 that

7   you discussed in your report.  Do you recall that criticism?

8   A.    I do, yes.

9   Q.    And what was that criticism?

10  A.    In my report, I had noted that the ratio of the sampling

11  of songs from identified sharers was -- or had said that there

12  was a ratio because they didn't sample every song, but

13  rather -- or every identified offer to make available, but they

14  only just do random sampling for performance reasons.  And I

15  had referred to that as a ratio that's controlled by how

16  frequently the sampling program runs and what it's directed to

17  sample.

18          And one of Rightscorp's witnesses when asked about

19  the sampling ratio said he didn't understand what that was

20  about.  But I had originally discussed this with the witness

21  and, you know, went back to my notes and said, yeah, there's a

22  sampling ratio.

23          Well, subsequent to that, you know, I've talked to

24  the witness again and he has said to me, oh, I see what you

25  were saying now because, yeah, we're not sampling every one, so

B.A. Frederiksen-Cross - Direct

348

1    there's going to be some ratio, if you will, some relationship

2    or ration between the total number that we sample for the

3    handshake and the total number we download.

4          So my understanding is that that was an issue that

5    was cleared up subsequently, and that really it was a

6    misunderstanding of terminology as opposed to any clear

7    distinction in the operation of the code.

8          MR. CARACAPPA:  Paul, can you pull up the opening

9    slide, number 44, that was used in Cox's opening statement.

10   BY MR. CARACAPPA:

11   Q.   The heading says, "Rightscorp sends notices after

12   detecting only 10 percent of a torrent."  Do you see that?

13   A.   I see that.

14   Q.   For the relevant time period, is that slide true?

15   A.   No, it is not.

16   Q.   How do you know?

17   A.   Can I explain what the 10 percent issue is about to the

18   jury just so they --

19         THE COURT:  Well, you listen to the questions and

20   answer the questions --

21         THE WITNESS:  Okay.

22         THE COURT:  -- and then he -- Mr. Caracappa will

23   follow up if he believes it's appropriate.

24         THE WITNESS:  Okay.

25         I know that based on my examination of the code and

1   my discussion with Rightscorp's personnel about when certain

2   changes were made to the code.

3   BY MR. CARACAPPA:

4   Q.    Thank you.

5         And what does this mean, 10 percent of a torrent?

6   A.    I believe that they're referring here to the fact that at

7   one point in time in December of 2014, after the time period at

8   interest here, Rightscorp had, in response to some changes that

9   were going on in the file sharing world, made a change to its

10  software to make it more sensitive to detecting sharing.

11  Because at that point in time the handshake, some clients were

12  underreporting the number of pieces they had in the handshake

13  so that bit field would show less than the totality even when

14  they had the totality.

15        And so in order to record notices or to create

16  notices for potential under-reporters, if you will, Rightscorp

17  changed the sensitivity by writing a little program that went

18  through and looked at that bit field, that I mentioned was

19  saved as a part of the record.  And they said, if there were

20  more than 30 parts and the peer was offering more than

21  10 percent of those parts, then change that flag that controls

22  whether or not that peer is eligible for a notice, to reflect

23  that they are eligible.

24        So before that change, they were only eligible if

25  they said they had the entire payload.  After that change, if

1    they said they had at least 10 percent of the payload, it was

2    switched to eligible.

3    Q.   And do you know approximately when that change was made?

4    A.   The first week of December in 2014.  December 2nd is the

5    date that sticks in mind.

6    Q.   And what's that based on?

7    A.   It's based on a couple of things.  There's a piece of code

8    that starts that process, the guy who goes through and looks to

9    flip that flag, if you will.  And the -- that piece of code

10   actually contains embedded within it information about when

11   that change was instigated, you know, the date that it was

12   running -- that it began running that, because it runs like

13   a -- it runs for 100,000 records at a time.  So this little

14   control file says how often it runs and when it started running

15   and how many records it processes on a whack, basically.

16   Q.   And what else?

17   A.   Well, I also talked to the developer, Mr. Boswell, who

18   wrote that code and to Mr. Steele as well at Rightscorp to

19   understand whether that date -- that information that was in

20   the scheduling file reflected the point in time when Rightscorp

21   began to -- to run this code for the first time.  And he

22   explained to me that it did.  And I -- you know, I asked, are

23   you sure, and, again, he explained to me that he was confident

24   of that date.

25            MR. BUCKLEY:  Your Honor, that's all hearsay.

B.A. Frederiksen-Cross - Direct

351

1           THE COURT:  Yeah, sustained.

2    BY MR. CARACAPPA:

3    Q.    Okay.  We talked about the 10 percent.  Have you prepared

4    a demonstrative to reflect how that actually works?

5    A.    Yes, I did.

6    Q.    Okay.  Can you step the jury through that demonstrative,

7    please?

8    A.    Sure.  So in this instance, which is similar to the one I

9    showed you for the individual -- for the sampling that was

10   taking place during the relevant time period, what you see is

11   that every time the Rightscorp system goes out to a peer and

12   gets that handshake, as long as the peer has at least 10

13   percent of the payload that's requested, it creates that

14   record.  And so in this case on this example it would have

15   created five records.  One for peer 2, 3, 4, 5, and 6.

16   Q.    So after the relevant time period, Rightscorp would send

17   notices if the Cox subscriber was making available less than a

18   hundred percent of the entire torrent payload.  Right?

19   A.    Right.  Because what happens is when that record is

20   written to the database, the flag is set as it always was for a

21   hundred percent.  But then this little program comes through

22   and switches the flag, so now all of those records would get

23   notices.

24   Q.    Are any of these notices considered in the 1.8 million

25   notices that were sent to Cox during the relevant time period?

```
 1   A.   No.

 2   Q.   Do you think it's fair that Rightscorp would send notices

 3   to Cox if only 10 percent of the payload was available?

 4              MR. BUCKLEY:  Leading, argumentative.

 5              THE COURT:  Yeah, I'm going to sustain the objection.

 6   I also don't understand the relevance unless you want to tell

 7   me why it's relevant.  It's outside the period that we're

 8   talking about, and also it's her opinion.  I don't know whether

 9   it's been the subject of her expert report or -- you want to

10   rephrase it and try again?  I'll -- I'll -- or you can -- I'll

11   listen to that.

12              Next question.

13   BY MR. CARACAPPA:

14   Q.   You alluded to this earlier and I just want to clarify it.

15   You said that Rightscorp changed this code in response to

16   something that was going on in the BitTorrent community.  Do

17   you recall that?

18   A.   Yes, I do.

19   Q.   And what was it responding to?

20              MR. BUCKLEY:  Foundation, speculation.

21              THE COURT:  Yeah, I think you did lay the foundation,

22   but just repeat it one more time.  I mean, she was allowed to

23   testify about all this ten minutes ago.  So I think that there

24   was foundation, but if you could ask a foundation question,

25   that would help.
```

1   BY MR. CARACAPPA:

2   Q.   Ms. Frederiksen-Cross, you're familiar with BitTorrent?

3   A.   I am, yes.

4   Q.   And you're familiar with how it works?

5   A.   I am, yes.

6          THE COURT:  We don't need to go back that far.

7   (LAUGHTER.)

8   BY MR. CARACAPPA:

9   Q.   And you're familiar with the Rightscorp code?

10  A.   Yes.

11  Q.   All right.

12         You testified earlier that in response to changes

13  that occurred in the BitTorrent community there was a change

14  that Rightscorp made.  Is that right?

15         MR. BUCKLEY:  Same objection.

16         THE WITNESS:  That's correct.

17         THE COURT:  Overruled.

18         Go ahead.

19  BY MR. CARACAPPA:

20  Q.   Why was that change made?

21  A.   Within the BitTorrent file sharing community, there's

22  always been a concern that ISPs or other entities, government

23  entities, whoever, would try to interfere with the sharing of

24  files.  And so from time to time there have been changes in

25  that community with respect to the software, the BitTorrent

B.A. Frederiksen-Cross - Direct

354

1    client software that a user uses or with respect to how the

2    trackers work or even some changes in the protocol.  It's

3    evolved over time.  There's public specs for that that you can

4    go and look at, you know, later, after this case, if you're

5    interested.

6            The -- one of the changes that happened was that

7    there was a perception that some ISPs were detecting BitTorrent

8    traffic using the handshake that's exchanged, because that's

9    recognizable when you look at the traffic between two

10   computers, and were cutting back on the bandwidth that they

11   allocated seeders to prevent their network from becoming

12   overused by people who were file sharing.  And so in order to

13   defeat that kind of detection and throttling, it's called,

14   where the bandwidth gets cut back, the BitTorrent community

15   responded by creating some clients that were able to do what's

16   called lazy bit field.

17           And lazy bit field just means that I'm not going to

18   report to you everything that I have on my handshake.  You

19   know, I may have 100 percent or 90 percent or 80 percent, but

20   maybe I'm only going to report 10 percent or 15 percent, enough

21   to initiate the conversation.  But then the -- when the client

22   send requests for specific pieces back and forth, they can

23   still respond and deliver everything it has, but it's harder to

24   detect that a particular computer has got the whole work and is

25   sharing the whole work.

355

1            And so in response to that, Rightscorp made some

2     changes.  The -- this little program that changed the flag

3     whether or not something would receive a notice to lower the

4     threshold from you have to have 100 percent of payload to you

5     have to have 10 percent of payload, in order to try to continue

6     to detect and report on file sharing activity that might have

7     otherwise been obscured by this change in the BitTorrent

8     client.

9     Q.    Thank you, Ms. Frederiksen-Cross.

10            Mr. Rucinski also talked about some of the samples on

11     the hard drive.  Do you recall that?

12     A.    I do, yes.

13     Q.    Okay.  And what is your recollection of that testimony or

14     as it's set forth in Mr. Rucinski's expert report?

15     A.    He basically identified when he went out and looked at the

16     sample files of music that had been downloaded from specific

17     peers.  And he was provided, as I was, a hard disk that had

18     quite a large number of these sample files on them.

19            And he went out and looked at it and he said, there's

20     a problem with some of these.  Some of these files are

21     misnamed.  The sample that was downloaded or the sample that

22     was present on that disk might have the name of a song, but it

23     actually wasn't the song.  It might be something like an

24     article -- I think you were shown one of those during opening

25     arguments, that had been named as a song, but it was about the

B.A. Frederiksen-Cross - Direct

356

1   contents or about the performer, or some of them might be

2   something like the album cover picture.  And so he identified

3   roughly about 800 such instances after he reviewed that file of

4   downloads.

5   Q.    Does it surprise you that the Rightscorp system is not

6   accurate 100 percent of the time?

7   A.    It does not.

8   Q.    Why not?

9   A.    In part because the system is dependent on data that might

10  be entered.  In this case that particular error was traced to

11  some data that was entered manually.  That is to say, during

12  the early phases when individuals who were verifying music and

13  entering the title of the music, they might not enter the

14  entire title just exactly as it appeared in the torrent

15  descriptor file.  So when the system went out and tried to

16  sample or went back to try to sample for that file, because it

17  wasn't using the exact file name, it might pick up or it would

18  default to the first file that was in the payload rather than

19  the proper file because it couldn't match the names.

20          And the reason that I feel that it's not a huge issue

21  with respect to accuracy is that when I look at the total

22  number of samples that are relevant in our time period of

23  interest and I look at the percentages of those samples that

24  have any problem, the accuracy rate is still well over 99

25  percent.  And so the system may not be perfect, but that's a

B.A. Frederiksen-Cross - Direct

357

1  really a very reasonable accuracy rate in my opinion.  And so I

2  find the data overall to be accurate.

3  Q.   Do you have an understanding as to whether the Rightscorp

4  code has changed at all during the relevant time period?

5  A.   There have been some changes, yes.

6  Q.   Can you explain those changes, please?

7  A.   Certainly.  Let's kind of start at the beginning of the

8  process.

9       Some of the things that used to be done manually,

10 like typing in titles, are now done in a more automated

11 fashion.  You know, copying them from one file into the

12 database, for instance.  Some of the processes, like

13 downloading torrents, torrent files, and downloading the

14 associated payload for those torrents used to be done manually

15 and now it's done using automation.

16      Some of the steps, like verifying that a particular

17 torrent has the material you think it has, used to be done by

18 listening to the songs in the torrent, and now they use the

19 technology of products like Audible Magic and AcoustID to

20 verify the contents as what the expected content is.  And so

21 there have been changes to improve or to replace manual

22 processes, particularly with respect to this ingestion and

23 verification of the torrent and the torrent payload.

24      The essential portions of the sampling logic, the

25 part that goes out and does the handshake with the peer to see

B.A. Frederiksen-Cross - Direct

358

1   if it's offering the work or the part that downloads a

2   particular file from the peer has not changed very much at all.

3   Those have essentially been the same throughout.

4          The -- well, actually, let me clarify that.  The

5   process to download samples from a peer didn't exist in the

6   very, very early days.  But since it's been implemented, it

7   appears not to have changed at all, or with very minor changes.

8   Just changes related to the names of some databases and some of

9   the -- when -- back up.

10          When they automated the ingestion of torrents and

11  torrent payload, they had to add an extra set of databases

12  because now they had a bunch of torrents and they really were

13  only interested in the ones that had payload.  So now it looks

14  at the later database instead of the former one.

15          MR. BUCKLEY:  Is there a question pending?

16          THE COURT:  Yeah, ask your next question.

17          And listen to the question and just respond to the

18  question, please.

19  BY MR. CARACAPPA:

20  Q.   Ms. Frederiksen-Cross, let's talk for a minute about

21  revision control.  Do you understand that term?

22  A.   Yes, I do.

23  Q.   And what is revision control?

24  A.   Revision control is software that's used to keep track of

25  changes to a document or a program.  So just like you might use

1    track changes in a Word document for a single document, a

2    revision control system keeps track of changes but across

3    multiple documents or multiple programs.

4    Q.   And does Rightscorp use revision control?

5    A.   To the best of my knowledge, they do not, unless they've

6    implemented it very recently.

7    Q.   Did Rightscorp use revision control during the relevant

8    time period?

9    A.   No.

10   Q.   Why not?

11   A.   Oh.

12            MR. BUCKLEY:  Calls for speculation, foundation.

13            THE COURT:  Yeah, lay a foundation.

14   BY MR. CARACAPPA:

15   Q.   Do you have an understanding from Rightscorp as to why

16   they didn't use revision control during the relevant time

17   period?

18            MR. BUCKLEY:  Hearsay.

19            THE COURT:  Overruled.

20            THE WITNESS:  My understanding based on --

21            THE COURT:  Hold on one second.

22            So she can testify that she talked to different

23   people, and based on that her opinion is X, Y, or Z.  If she's

24   going to actually say what someone else told her, then that's

25   subject to our ruling this morning about whether there's going

1    to be a witness who actually testifies to that later on in the

2    case.

3              MR. CARACAPPA:  There will be a Rightscorp witness

4    later in the case to testify on exactly this issue.

5              THE COURT:  Okay.  All right.  Then it's -- we'll

6    permit it based on our earlier conversations this morning.

7              Thank you.  Go ahead.

8              MR. CARACAPPA:  Thank you, Your Honor.

9    BY MR. CARACAPPA:

10   Q.   So just to be clear, you had conversations with Rightscorp

11   about why they didn't use revision control.  Correct?

12   A.   That's true, yes.

13   Q.   And based on those conversations, why didn't Rightscorp

14   use revision control?

15   A.   It's my understanding that they felt it wasn't necessary

16   in their environment in part due to the complexity of the

17   environment and the overhead that it would require to maintain

18   their code in that way.  And that they -- because it's a very

19   small environment, they're really one primary programmer.  And

20   only two people involved with the development of the code, they

21   felt that their communication was sufficiently close that they

22   wouldn't need it to keep each other informed of their changes.

23             MR. CARACAPPA:  I'm not sure if this is a question

24   you said I couldn't ask, so --

25             THE COURT:  Yeah.  Ask the question, but don't answer

B.A. Frederiksen-Cross - Direct

361

1    it until we get a response.

2              MR. CARACAPPA:  Thank you, Your Honor.

3              THE COURT:  Yes, sir.

4    BY MR. CARACAPPA:

5    Q.   Do you have an opinion regarding whether that decision was

6    reasonable?

7    A.   I do.

8    Q.   And what is that opinion?

9              THE COURT:  You may answer.  Thank you.

10             THE WITNESS:  Well, my opinion is that their decision

11   was made on their own business needs and on its face

12   reasonable, given that the use or not use of revision control

13   is not something required for developing software.  Your

14   decision of whether or not to use it is based on whether or not

15   you feel you need it.

16   BY MR. CARACAPPA:

17   Q.   If Rightscorp had asked you whether they should use

18   revision control, what would you tell them?

19   A.   I believe it's a helpful tool for development.  And had I

20   been asked, I would have suggested that they use revision

21   control or alternatively, depending on the factors of their

22   environment, some similar process to keep track of changes.

23   Q.   Have you been involved in cases over your career where

24   companies that you've worked with don't use revision control?

25   A.   I have been involved in many such cases, yes.

B.A. Frederiksen-Cross - Direct

362

1  Q.   All right.  Thank you.

2         We talked about the Rightscorp system.  And you

3  testified earlier that one of the things you did was you

4  actually tested the Rightscorp system.  Is that right?

5  A.   That is correct, yes.

6  Q.   And have you prepared some demonstratives to help explain

7  that test?

8  A.   I have, yes.

9  Q.   Would you mind stepping the jury through those

10 demonstratives, please, and explaining the testing that you

11 did?

12 A.   Certainly, if we could pull the first one up.

13        What I did in my testing -- just to give you sort of

14 the overview of the testing --

15 Q.   I'm sorry, Ms. Frederiksen-Cross.  Can you speak a little

16 bit louder and into the mike?

17 A.   What I did in my testing to provide an overview of that

18 testing -- just before I describe the details -- and I set up a

19 computer that had the BitTorrent client on it and I downloaded

20 some torrent files that were torrent files that indicated that

21 they had some of the protected works that Rightscorp was hired

22 to protect.  And I ran that -- I loaded those torrent files

23 then into my BitTorrent client, and I ran BitTorrent so that I

24 could collect copies of those works.  And, you know, I left it

25 open so that I could share copies of those works.  This was

363

1   with BMG's permission, of course.

2          And in addition to the normal BitTorrent, I just

3   download -- or just had on the computer one that was available

4   on the Internet.  In addition to that software, I put some

5   special software on that computer that would let me actually

6   capture at a very detailed level the traffic that went on

7   between my computer and other computers on the Internet.  It's

8   a product called Packet Sniffer.  I used a product called

9   WireShark.

10         And all it does is it just records every

11  communication going in and out of the computer, and then it

12  gives me a nice little interface that I can use to filter and

13  search for things so I can look for handshakes or I can look

14  for requests for pieces or exchanges of pieces.  It just lets

15  me burrow down into that data and find out what's really going

16  on under the covers.

17  Q.   All right.  Can you please describe what's on the screen

18  now at page 82 of PDX 1?

19  A.   This is the list of the songs taken from the copyright

20  list that I was provided of the works at issue in this case

21  that I just randomly selected to use in my testing.

22  Q.   And here we have the PA number.  What's that, do you know?

23  A.   My understanding is that that's a copyright filing number

24  related to a particular song or work.

25  Q.   Okay.  And we have the title, which would be the title of

1    the work?

2    A.    Correct.

3    Q.    The song code.  What's the song code?

4    A.    That's a code that I understand Rightscorp and their

5    clients use internally in some cases to make sure they're

6    talking about the same song.

7    Q.    And the artist, that's who performs the work?

8    A.    That's correct.

9    Q.    And what about the file name of the infringement notice?

10   What's that?

11   A.    That was something that was added here to make sure that

12   the songs I was selecting were related to some, you know, past

13   infringement notice.

14   Q.    Okay.  Slide 83 is a screen shot.  Is that right?

15   A.    It is.  The lower half is the screen shot and the upper

16   half is a separate screen shot.

17   Q.    Okay.  Can you please describe what's depicted at slide

18   83?

19   A.    Yes.  The upper half shows a particular IP address range

20   and information about who that IP range had been assigned to,

21   along with the -- the registration date and when the record for

22   that particular registration was last updated.  So this shows

23   that a range of 70.170.0.0 through 70.170.127.255 was assigned

24   to Cox Communications.

25   Q.    So anyone who has an IP address in that range and is

```
 1    making available a work for upload or download would be a Cox

 2    customer.  Right?

 3              MR. BUCKLEY:  Objection.  Leading, foundation,

 4    argumentative.

 5              THE COURT:  It is leading.  And lay the foundation.

 6    And I know she's testified previously that a range of IP

 7    addresses are dedicated to each ISP, but make that clear first,

 8    please.

 9              MR. CARACAPPA:  I will, Your Honor.  Thank you.

10    BY MR. CARACAPPA:

11    Q.   You talked earlier about ARIN, or A-R-I-N.  Is that right?

12    A.   That's correct, the American Registry of Internet Numbers.

13    Q.   And what is that?

14    A.   That's an administrative group that can provide you the

15    ability to look up who any particular range of IP addresses

16    assigned to a U.S. provider has been assigned to.  And the

17    range information here with respect to registration relates to

18    the ARIN assignment of that block of numbers to Cox

19    Communications.

20              Now, Cox can have more than one block.  Let me just

21    be really clear.  It's not necessary that a subscriber only

22    have one block.  But this particular block, as shown here, was

23    assigned to Cox.

24    Q.   So if I had an IP address and I wanted to know what ISP

25    was assigned that IP address, where would I go?
```

B.A. Frederiksen-Cross - Direct

366

1   A.   You could go to ARIN or who is or one of the other public

2   facilities and look up the IP address, and what gets returned

3   to you is information about who's registered to administer that

4   IP.

5   Q.   So in this case, if I go to ARIN and type in IP address

6   70.170.0.0, who would it say is assigned that IP address?

7   A.   It would come back and say that Cox Communications was

8   assigned that IP address.

9   Q.   Thank you.

10         Could you continue with your description of this.

11   A.   Sure.  And the reason that I'm showing this registration

12   at the top is if we can scroll to the bottom half of my screen

13   now.

14         What I have captured here is the back and forth

15   communication between a computer I was using and a computer

16   that had an IP address that indicates it was being used by --

17   or that was assigned to a Cox subscriber account.  And I

18   filtered this mass of communication down by just selecting a

19   particular exchange between my computer and one other computer.

20         So my computer, the one that I'm using from a JLI

21   address is the one that in the very first row is indicated with

22   the source of 192.168.1.101.  That's a JLI address.

23         The destination computer that I'm talking to in this

24   particular conversation is 70.170.185.59, which is in that

25   range we just saw as belonging to or administered by Cox.

B.A. Frederiksen-Cross - Direct

367

1          And what this particular piece of exchange shows is

2     my computer.  And, again, this was not something I set out to

3     find a Cox person or anything.  I was just running my test.

4     But in that test data I captured, my computer reached out to a

5     peer that happened to be assigned to a Cox address and it

6     offered a handshake.  And then in the second line you can see

7     that now the source is that Cox administered IP responding to

8     my handshake with its own handshake, so we're completing that

9     handshake that I talked about.

10          And then the next couple of lines are some exchange

11     that we have between my computer and that Cox computer that are

12     just kind of setting up the protocol that were going to be used

13     for communication.

14          Below that, then, if you go down, for instance, to

15     the line that starts with line number 10, you see that

16     there's -- over on the right-hand side under info you see that

17     there's a request for a piece.  And what -- and that is my

18     computer requesting that piece from the Cox subscriber's

19     computer.  And then below that you see the response to that

20     piece where that Cox subscriber is passing information, the

21     piece of that payload back to me.

22          And so this is a portion of a conversation that I had

23     with that Cox subscriber during the time that I was running

24     BitTorrent testing where that Cox subscriber is responding to

25     my request for content that is part of a payload that has

B.A. Frederiksen-Cross - Direct

368

 1   protected works in it, and they're sending me pieces of that

 2   payload.

 3   Q.   Ms. Frederiksen-Cross, you used an interesting word.  You

 4   said "conversation".  You really didn't actually talk to the

 5   subscriber.  Right?

 6   A.   Well, that's the technical term used when two computers

 7   talk to each other.  I didn't talk to the subscriber.  My

 8   computer talked to their computer and their computer talked to

 9   my computer.

10   Q.   So this is a record of the digital conversation that your

11   computer had with the Cox subscriber?

12   A.   Yes.  Thank you for that clarification.

13   Q.   Okay.  Thank you.

14        Ms. Frederiksen-Cross, in conducting this test, what

15   ISP did you use?

16   A.   This particular test was conducted from JLI's primary ISP,

17   who is Comcast.

18   Q.   And why didn't you use Cox?

19   A.   Cox doesn't serve the Oregon area where our offices are,

20   and so I used the ISP that we had.  Because, again, this

21   testing was primarily focused on looking at the exchange of

22   information that happens with BitTorrent.  And then

23   subsequently I requested data about this exchange from

24   Rightscorp to see what they had captured reflecting this

25   exchange.

B.A. Frederiksen-Cross - Direct

369

1   Q.   And just to be clear, this Cox subscriber, then, is not

2   just making this work available to other people on the Cox

3   network, but it's anyone on the Internet.  Right?

4   A.   Yeah, that's the way BitTorrent works.  It's not limited

5   to a particular ISP or even a particular country.

6   Q.   Ms. Frederiksen-Cross, did -- strike that.

7            Was Rightscorp able to accurately detect your use of

8   BitTorrent?

9   A.   They were, yes.

10  Q.   Okay.  Could you please explain?

11  A.   Well, after I ran these tests for a few days using a

12  couple different IP addresses, I contacted Rightscorp and I

13  said, would you give me the data you collected for the

14  following IP addresses in these time frames.  And so Rightscorp

15  provided me back a file that was taken from their databases of

16  data they had captured during that time period specifically

17  related to the IP addresses I asked for, and sure enough I saw

18  my communications in there.

19           And I also asked them then if they had created any

20  infringement notices that might have been sent to Comcast,

21  could they, you know -- or any notices of my activity that had

22  been sent to Comcast.  And they said, yes, they had generated

23  some notices about my activity that were sent to Comcast.

24           So I asked them to send me a copy of those notices,

25  so they sent me a copy of the notices.  And I looked at things

B.A. Frederiksen-Cross - Direct

1    like that the titles -- you know, the song titles and works

2    that were identified and the torrent payloads that were

3    identified in those notices to make sure that they matched up

4    with what I had been doing and confirmed that they did.

5    Q.   Okay.   Thank you.

6         Ms. Frederiksen-Cross, what is depicted at Slide 84?

7    A.   This is a very similar exchange again between my computer,

8    192.168.1.90 in this case, and --

9    Q.   I'm sorry to keep interrupting you and asking this, but

10   can you just please make sure you speak into the microphone?

11   A.   Yeah.   Let me turn it around a little so I can use it

12   while I see here.

13        Okay.   So this is a communication again between my

14   computer and a computer whose IP address is in one of the

15   ranges that Cox administers.   And so on the left-hand side here

16   we have, again, the record showing that that IP address is

17   assigned to Cox to administer.

18        And what's different about this communication from

19   the previous one is in this one the Cox IP address is

20   initiating the handshake with me.   In other words, the Cox IP

21   address is asking my computer now to share files.   In the

22   previous one I was reaching out to somebody else to share.   Now

23   they're reaching out to me to share.

24        And so this captures a correspondence between my

25   computer and that computer, a conversation where they asked are

B.A. Frederiksen-Cross - Direct

371

1   you -- have you got this payload for BitTorrent.  I respond,

2   yes.  And then they begin to ask me -- after the little

3   plumbing bit at the beginning, they begin to ask me for pieces

4   and I respond by sending pieces.

5          And again, I did not start out this test focused on

6   only Cox IP addresses.  This is just content that I captured in

7   my testing of BitTorrent.

8   Q.   Okay.

9          MR. CARACAPPA:  Your Honor, I probably have about 15

10  to 20 minutes left.  What time do we normally break for --

11         THE COURT:  About 15, 20 minutes, so between quarter

12  to 1:00 and 1:00.

13         MR. CARACAPPA:  Okay.

14         THE COURT:  So let's go -- let's finish the questions

15  you know you have, and I'll let you review your notes and ask a

16  couple of additional questions if necessary after our lunch

17  break.

18         MR. CARACAPPA:  That's great.  Thank you, Your Honor.

19         THE COURT:  All right.

20  BY MR. CARACAPPA:

21  Q.   Okay.  We talked about BitTorrent, we talked about the

22  Rightscorp system, we talked about the test that you performed.

23  I would like to talk for a little bit about Cox.  Okay?

24  A.   Okay.

25  Q.   Cox has a system that it calls CATS.  Is that right?

B.A. Frederiksen-Cross - Direct

1    A.    That's correct.

2    Q.    Okay.  Do you have an understanding as to how CATS works?

3    A.    Based on review of the source code, yes.

4    Q.    Okay.  Can you describe for the jury what you did in

5    reviewing the CATS source code?

6    A.    I started by reviewing CATS' policies just to understand

7    generally the shape of what the code I was looking at would be

8    doing.  And then I reviewed -- actually Cox policies, just to

9    be clear, for automated handling.  And then I reviewed the code

10   called the CATS system that does that automated handling of

11   e-mailed complaints.

12   Q.    Do you know approximately how many lines of CATS source

13   code there were that you reviewed?

14   A.    I do not recall off the top of my head.  It was a fairly

15   large number of files.  I don't recall the number of lines.

16   Q.    We talked a little bit about the term "blacklist".  Is

17   that right?

18           MR. BUCKLEY:  Objection.  Foundation.

19           THE COURT:  I don't recall that testimony, so ask the

20   foundational questions, please.

21           MR. CARACAPPA:  Yes, sir.

22   BY MR. CARACAPPA:

23   Q.    Do you have an understanding as to the term "blacklist"?

24   A.    As it applies here, yes.

25   Q.    And what is that understanding based upon?

B.A. Frederiksen-Cross - Direct

373

1    A.   It's based upon reviewing Cox policies and also the Cox

2    source code.

3    Q.   Okay.  What does that term mean, as Cox uses that term?

4    A.   As used in this context --

5            MR. BUCKLEY:  Objection.  Requires speculation.

6            THE COURT:  Overruled.

7            THE WITNESS:  As used in this context, the term

8    blacklist is used for a data structure that contains e-mail

9    addresses from whom Cox will not accept e-mail.  So if you're

10   on the blacklist, they're not going to process your e-mails,

11   your complaint e-mails.

12   BY MR. CARACAPPA:

13   Q.   Is Rightscorp on that blacklist?

14   A.   Yes, it is.

15   Q.   And what does the CATS system do to notices received from

16   companies that are blacklisted?

17   A.   When the Cox automated system goes out to the e-mail

18   server and pulls in an e-mail, it checks to see if that e-mail

19   is blacklisted based on the sender ID.  And if it is, Cox

20   deletes the e-mail and doesn't process further in their

21   automated system.

22   Q.   So does Cox receive that e-mail?

23   A.   It comes into their server, yes, and then the system reads

24   it off the server and decides that it's blacklisted and

25   disposes of it.

1    Q.    How does CATS work for notices received from companies

2    that are not blacklisted?

3    A.    Well, the notices are then processed by pulling in the

4    body of the letter.  And once the CATS system has both the

5    header, you know, the to/from information and the body of the

6    letter, it creates a -- a complaint record that reflects that

7    particular e-mail.  It's associated just with that e-mail.

8          What happens next then is some evalu -- actually, let

9    me back up a little bit.  It complete -- it creates the record

10   related to that e-mail, but it also does some other testing to

11   determine whether or not that e-mail will be processed further.

12   Q.    And can you describe that testing, please?

13   A.    Yeah.  It checks things, for instance, like whether the

14   complainant, the person sending the e-mail, has exceeded a

15   threshold, an allocation.  The default is 200, but some

16   complainants have a higher limits that they're allowed.

17   Q.    Okay.  I'm going to stop you right there.

18         What does that mean that there's a threshold of 200?

19         MR. BUCKLEY:  Relevance.

20         THE COURT:  Overruled.

21         THE WITNESS:  That means that for Joe Q complainer,

22   had their e-mail been processed, it will process the first 200

23   that occur in a 24-hour period.  It's just a rolling 24-hour

24   window.  And once it hits 200 within a 24-hour period, it sets

25   a flag in that e-mail that prevents it from being processed

1    further.  So this actually happens before the complaint record

2    is -- is created.

3            So it's just saying, you know, you've hit your cap.

4    I'm not going to process the rest of these today.  Now, it

5    doesn't delete it at that point, but it can't be -- the flag

6    causes the e-mail not to be processed again for at least 24

7    hours.

8    BY MR. CARACAPPA:

9    Q.   Are there any other flags that place limits on the notices

10   that Cox is willing to process?

11   A.   Well, there are other checks, not so much flags as checks.

12   Q.   And what other checks are there?

13   A.   Well, for instance, the Cox system generally will allow

14   only one complaint per subscriber ID per complainant per day.

15   So if they had received five complaints about a particular

16   subscriber from a particular complainant on a particular day,

17   they would pass the first one through their filter, but the

18   other four would not be processed.

19   Q.   What if that subscriber was making available an entire

20   discography from The Rolling Stones?  How many notices would it

21   get?

22            MR. BUCKLEY:  Objection.  Leading, calls for

23   speculation.

24            THE COURT:  Overruled.

25            THE WITNESS:  Based on what I have seen in the code,

B.A. Frederiksen-Cross - Direct

376

1  they would still from that single complainant receive only one

2  notice for that -- that day.

3  BY MR. CARACAPPA:

4  Q.   Do you have any idea how many songs there are in The

5  Rolling Stones discography?

6  A.   I have not attempted to count that.

7  Q.   Probably more than one?

8  A.   Oh, yeah.

9          THE COURT:  She answered the question.

10         Go ahead.

11         MR. CARACAPPA:  Thank you, Your Honor.

12  BY MR. CARACAPPA:

13  Q.   We talked earlier about the number of notices that

14  Rightscorp sends to Cox.  Right?

15  A.   Yes, we've spoken on that.

16  Q.   And we talked a little bit about this, and I said I would

17  come back to it.

18         Does the CATS system allow for the automated

19  processing of notices?

20  A.   A substantial portion of them, yes.  Some are kicked out

21  for manual processing.  For instance, if the notice is

22  malformed in some way, it might be referred to a human rather

23  than being processed automatically.

24  Q.   And does the Rightscorp notice contain information that

25  allows the CATS system to automatically process the notice?

B.A. Frederiksen-Cross - Direct

377

1    A.    Yes, it does.

2    Q.    Okay.  If you can please look at Slide 89.  The Rightscorp

3    notice contains a heading.  It says, ACNS Header.  Is that

4    right?

5    A.    That's correct.  The ACNS data occurs at the end of the

6    e-mail notice.

7    Q.    And what is that?

8    A.    ACNS is an industry agreed-upon standard for the exchange

9    of information relating to automated notices that can be

10   e-mailed for copyright complaints.  And the -- the format looks

11   a little odd to us, but if you look at it, you'll see that

12   after each sharp bracket there's something that looks like a

13   title, like this is a phone or an e-mail ID or an IP address.

14           And then following that is data that represents the

15   data for that value.  It's called a key value pair in

16   programmer lingo.  But it just basically means here's something

17   you can look for, for instance, IP address, and then

18   immediately following that in a formatted fashion is the value

19   that is associated with IP address.  So it's a very

20   computer-friendly type of encoding that makes it very, very

21   easy to parse this kind of information out of an e-mail, or to

22   write a program to parse this information.

23   Q.    Do you know why Rightscorp was blacklisted?

24           MR. BUCKLEY:  Objection.  Speculation, foundation.

25           THE COURT:  Sustained.

B.A. Frederiksen-Cross - Direct

1   BY MR. CARACAPPA:

2   Q.   Can the CATS system process the Rightscorp notice without

3   forwarding the notice to its subscribers?

4   A.   I'm sorry.  Can you ask that again?

5   Q.   Can the CATS system, the Cox system, process the

6   Rightscorp notice without forwarding it to the Cox subscribers?

7   A.   Well, the only processing it does is to delete it.  So

8   depending what you're asking with processing, it deletes it.

9   Q.   Okay.  That's a fair point.

10          If Rightscorp were not blacklisted, could the Cox

11  CATS system process the notice without forwarding the notice to

12  its subscribers?

13  A.   The system as it now stands -- if they wanted to suppress

14  forwarding the notice, there's a flag they would have to turn

15  on in the processing.  So they would have to add, like, if

16  sender is Rightscorp, don't forward the body of the notice.

17  Q.   A flag that they'd have to turn on?

18  A.   Yeah, they would have to add basically a couple of

19  statements to their software.

20  Q.   And in your experience, how much work would it take to

21  turn that flag on?

22  A.   It's a trivial amount of work.  The software is already

23  designed to say whether or not -- there's a logic value of flag

24  that says whether or not to forward the body of a notice.  And

25  so what they would have to do to use that in the case of the

1    Rightscorp system is they would have to add something to turn

2    that flag, set it to the appropriate value if it was a

3    Rightscorp notice being processed.

4    Q.    Thank you.

5              MR. CARACAPPA:  If now is a good time for lunch, I

6    may have a couple of minutes of follow up after lunch after

7    reviewing my notes and can move in some exhibits.

8              THE COURT:  Okay.

9              We're going to break for lunch now and continue our

10   testimony when you-all return.  Let's come back at 20 minutes

11   to 2:00 and we'll -- actually, I've got people coming in to

12   sign some orders at 1:40, so let's make it 1:45.  We'll come

13   back and we'll resume the testimony.  All right?

14             Enjoy your lunch.  You're excused.  Thank you.

15             NOTE:  At this point the jury leaves the courtroom;

16   whereupon the case continues as follows:

17   JURY OUT

18             THE COURT:  All right.  Anything we need to talk

19   about now?

20             MR. CARACAPPA:  I don't think so.  I'm going to just

21   go over my list.  There may be some exhibits that we can move

22   in later, but --

23             THE COURT:  Okay.  All right.  Then we'll see you at

24   1:45.  We're in recess.

25             Ms. Frederiksen-Cross, of course, you're in the

B.A. Frederiksen-Cross - Direct

380

1   middle of your testimony, so don't discuss the testimony you've

2   given so far.  All right.

3           THE WITNESS:  Yes.

4           THE COURT:  Thank you.

5       ------------------------------------------------

6

7

8

9

10

11

12

13

14

15

16

17           We certify that the foregoing is a true and

18      accurate transcription of our stenographic notes.

19

20

                /s/  Norman B. Linnell
21          Norman B. Linnell, RPR, CM, VCE, FCRR

22

                /s/  Julie A. Goodwin
23          Julie A Goodwin, CSR, RPR

24

25