UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                         :
              Plaintiffs,        :
                                : Case No. 1:14-cv-1611
      vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
              Defendants.        :
--------------------------------:
```

VOLUME  5  (P.M. portion)

TRIAL TRANSCRIPT

December 8, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

1   <u>APPEARANCES</u>:

2

    COUNSEL FOR THE PLAINTIFFS:
3
    Michael J. Allan
4   John M. Caracappa
    Jeremy D. Engle
5   Paul Gennari
    Margaret P. Kammerud
6   William G. Pecau
    Stephanie L. Roberts
7   Jeffrey M. Theodore
    Roger E. Warin
8   STEPTOE & JOHNSON LLP
    1330 Connecticut Avenue, N.W.
9   Washington, D.C.   20036

10
    Walter D. Kelley, Jr.,
11  HAUSFELD LLP
    Suite 650
12  1700 K Street N.W.
    Washington, D.C.   20006

13

14
    COUNSEL FOR THE DEFENDANTS:
15
    Andrew P. Bridges
16  Guinevere L. Jobson
    Jedediah Wakefield
17  FENWICK & WEST LLP
    555 California Street, 12th Floor
18  San Francisco, CA 94194

19  Brian D. Buckley
    FENWICK & WEST LLP
20  1191 2nd Avenue, 10th Floor
    Seattle, WA  98101

21
    Craig C. Reilly
22  CRAIG C. REILLY, ESQ.
    111 Oronoco Street
23  Alexandria, VA 22314

24

25

1050

1    I N D E X

2

3                                   DIRECT   CROSS   EXAMINATION

WITNESSES ON BEHALF OF
4    THE PLAINTIFF:

5    William Herndon Lehr              1052    1107

6    Jason Zabek                                         1130
       (by video deposition)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A F T E R N O O N   S E S S I O N

2                    (Jury out.)

3         THE COURT:  All right.  Any preliminary matters?

4         MR. WARIN:  Not that we're aware of, Your Honor.

5         THE COURT:  Okay.

6         MR. BUCKLEY:  We got the screens figured out.

7         THE COURT:  Great.  All right, Joe, let's get our

8    jury.

9         THE COURT SECURITY OFFICER:  Your Honor, we are one

10   missing, one juror missing.

11        THE COURT:  Okay.  My chair is really starting to

12   squeak rather loudly.  I'm sorry.

13        MR. BUCKLEY:  Is that yours?  I've been hearing that.

14        THE COURT:  Well, there's also some real strange,

15   high-pitched sound that we have not identified, but the

16   squeaking is my chair, and I'll get the WD-40 after you guys

17   are gone.

18                    (Jury present.)

19        THE COURT:  All right, please be seated.  I hope you

20   had a good lunch.

21        And, Mr. Warin, your next witness, sir.

22        MR. WARIN:  Your Honor, we'd like to call as our next

23   witness William Lehr.

24        THE COURT:  All right.  Mr. Lehr, come forward.

25        THE COURT SECURITY OFFICER:  Over here, sir.  Please

1    face the clerk.  Raise your right hand.  Left hand on the

2    Bible, please.

3            WILLIAM HERNDON LEHR, PLAINTIFF'S WITNESS, SWORN

4                         DIRECT EXAMINATION

5    BY MR. WARIN:

6    Q.   Good afternoon, sir.

7    A.   Good afternoon.

8    Q.   Would you state your full name.

9    A.   William Herndon Lehr.

10   Q.   What work do you do, Mr. Lehr?

11   A.   I'm an economist at the Massachusetts Institute of

12   Technology in their computer science and artificial

13   intelligence laboratory, where I participate in

14   multidisciplinary research on the Internet, telecommunications,

15   and digital media industries.

16   Q.   Is that Cambridge, Massachusetts?

17   A.   That's in Cambridge Massachusetts.

18   Q.   What is your education beyond high school?

19   A.   I have a Ph.D. in Economics from Stanford University.  I

20   have an MBA in Finance from the Wharton Business School.  I

21   have a graduate -- an undergraduate degree in engineering, and

22   also an undergraduate in history from the University of

23   Pennsylvania.

24   Q.   All right.  Dr. Lehr, I'd like you to take a look, if you

25   could, at a book in the binders that we're going to be passing

1    out.

2            Dr. Lehr, could you look at the second tab there,

3    which is labeled DTX 3415?

4    A.    Yes.

5    Q.    Do you recognize it?

6    A.    I do.

7    Q.    All right.  Would you tell us what it is?

8    A.    This is my curriculum vitae, or resume.

9    Q.    All right.  Does it summarize your educational and

10   employment history?

11   A.    Yes.

12           MR. WARIN:  All right.  Your Honor, I'd like to move

13   the admission of DTX 3415.

14           MR. BUCKLEY:  No objection.

15           THE COURT:  All right, it's received.

16   BY MR. WARIN:

17   Q.    You indicated that you worked at MIT.  Does your work

18   there have any particular focus or specialty?

19   A.    Yes.  I'm interested in the economic and regulatory

20   implications of changes in the technologies and markets for

21   Internet, telecommunications, and digital media.

22   Q.    Have you written or published any articles on those

23   topics?

24   A.    Yes.  I've published quite a number of them.

25   Q.    All right.  I'd like to refer you to your resume, which is

W. Lehr - Direct                                                1054

1   in front of us, and specifically page 3.  It list "Appendix A"

2   at the top.  Do you see that?

3   A.   Yes.

4   Q.   Could you tell us what's listed beginning under the

5   caption "Papers and Publications"?

6   A.   This is a list of the papers and publications that I've

7   authored or coauthored, and it goes on for a number of pages.

8   Q.   All right.  So this begins on page 3 and continues.  If we

9   could, Karl, go all the way to page 12.

10          All right.  So from page 3 to page 12, it lists all

11  the various publications and articles you've written?

12  A.   Yes.

13  Q.   And these would be generally on topics of economics and

14  media and communication?

15  A.   Yes, these are on the economic issues and things that my

16  research is on.

17  Q.   All right.  Have you taught any courses either at MIT or

18  elsewhere?

19  A.   Yes.  I've taught graduate courses at Massachusetts

20  Institute of Technology, MIT, also the Graduate School of

21  Business at Columbia University, Cambridge University in

22  England, and some other places, on such things as competitive

23  strategies and media industries, the economics of the Internet,

24  telecommunications, pricing, those sorts of things.

25  Q.   Are some of the courses you've taught also listed on your

W. Lehr - Direct                                                          1055

1    resume?

2    A.    Yes.

3    Q.    All right.  Karl, if I could draw your attention to the

4    bottom of page 2 there?

5          Are those some of the courses?

6    A.    Yes.

7    Q.    Do they continue over onto page 3?

8    A.    Yes.

9    Q.    Have you done any work in connection with this lawsuit?

10   A.    Yes.

11   Q.    All right.  What were you asked to do?

12   A.    I was asked to provide economic analysis of a number of

13   the issues of importance in this case, and more specifically, I

14   was asked to opine or analyze three issues:  first, to take a

15   look at what the economics says about whether or not copyright

16   holders suffer economic harm as a result of infringement; two,

17   to take a look at what might be the incentives and economic

18   impacts on Cox of tolerating infringement or acting so as to

19   deter infringement; and three, looking at actually, you know,

20   what the economic benefit -- to estimate the economic benefit

21   to Cox of retaining and having subscribers on its network.

22   Q.    All right.  Are you giving any legal opinions concerning

23   copyrights today or copyright infringement?

24   A.    No.

25   Q.    All right.  What documents did you review in order to form

W. Lehr - Direct                                                    1056

1   your opinions on those three issues you just listed?

2   A.   Well, in addition to the materials I consider in the

3   normal course of my research and work, I looked at a number of

4   documents that were specific to this matter.  Those included

5   financial documents relating to the costs and revenues

6   associated with different services that Cox offers, a number of

7   other documents describing how Cox thinks about some of those

8   services, a number of the depositions in this matter, and then

9   some other research that, you know, I discovered and found

10  useful in coming to the opinions I've come to.

11  Q.   Did you read any general articles on Internet economics

12  and the economics of copyright infringement on the Internet?

13  A.   Yes.  I mean, I read a lot of that kind of stuff in the

14  normal course of my business, but I examined the literature on

15  this topic quite extensively as part of the basis of

16  formulating my opinions today.

17  Q.   All right.  Are you charging for your work on this case?

18  A.   I am.  I bill hourly at the rate of $650 an hour.

19  Q.   And approximately how many hours have you spent so far in

20  getting -- preparing your report and getting ready for your

21  testimony today?

22  A.   Between 200 and 250 hours.

23  Q.   All right.  Is the payment of your fees in any way

24  contingent on the outcome of this case?

25  A.   No.  I bill on an hourly basis, and whatever happens is

W. Lehr - Direct                                                      1057

1   whatever happens.

2   Q.   Were you able to form any opinions on those topics you

3   were asked to research, namely, the economic impact that online

4   copyright infringement has on copyright holders, to determine

5   how much revenue and profit Cox makes from its residential

6   high-speed Internet services, Cox's economic incentives, etc.,

7   the ones you listed earlier?

8   A.   Yes, I was.

9         MR. WARIN:  All right.  Your Honor, I would offer

10  Dr. Lehr as an expert in the field of economics, Internet

11  telecommunications, and media industries.

12        THE COURT:  Any objection?

13        MR. BUCKLEY:  No objection, Your Honor.

14        THE COURT:  Proceed.

15  BY MR. WARIN:

16  Q.   All right.  Dr. Lehr, I'd like to walk you through a

17  summary of the opinions or conclusions that you've reached.

18  Have you prepared a slide that summarizes your opinions?

19  A.   I have.

20  Q.   All right.  Karl, could we have that displayed, please?

21        All right.  Is this the slide that you prepared that

22  summarizes the three principal conclusions you've reached?

23  A.   Yes, it is.

24  Q.   Why don't you walk through somewhat briefly each of those

25  and explain them to the jury, because we'll spend a little more

W. Lehr - Direct                                              1058

1   time going through each of these and ask you to explain the

2   underlying basis for your conclusions.  All right, let's start

3   with this overall slide.

4   A.    So, so the first opinion is that copyright infringement

5   causes significant economic harm to copyright holders, and

6   that's broadly supported by the economic literature, but

7   because the economic literature includes a diversity of data

8   sets and methods and all of that, it's not possible in the

9   context of the literature to accurately estimate or come up

10  with a single estimate of what that harm is for the industry,

11  and it's impossible in the context of an individual rights

12  holder.

13  Q.    All right, that's your first conclusion.  What's your

14  second conclusion or opinion?

15  A.    That subscribers to Cox are very valuable, and there's

16  evidence that indicates that a number of Cox subscribers are

17  infringing, and those subscribers are also very valuable, so

18  that Cox is deriving significant financial economic benefit

19  from having infringing subscribers on its network.

20  Q.    And your third conclusion?

21  A.    That in light of that second conclusion, if you look at

22  the economic incentives that Cox has to tolerate infringement,

23  they're substantial, and were it to take actions that would

24  deter the infringement, that would actually -- that would be

25  likely to disrupt their relationship with their subscribers,

W. Lehr - Direct                                                    1059

1   and so they have strong economic incentives not to do anything

2   like that.

3   Q.   I'd like to take you through each of your three opinions

4   one by one.  So let's start with the first one, that copyright

5   infringement causes significant harms to copyright holders that

6   are impossible to quantify accurately.

7          Have you prepared another slide that summarizes the

8   basis for your conclusion?

9   A.   Yes.  If we could go to the next slide?

10         What this slide summarizes is, first, if you think of

11  the economic theory of why one might expect there to be harm,

12  you can identify a number of ways that harm would arise, and

13  that's what I'll talk about on this slide, and -- but having

14  identified those, then you have to look at is there actual

15  evidence.  In other words, the theory says this is what would

16  happen, but what does the data say when you actually look at

17  the data?  And I'll do both of those.

18         So first, the most obvious thing is if you're trying

19  to sell copyright materials legally and you're competing

20  against free copies, that's going to harm your ability to sell

21  those free copies.

22  Q.   Free copies of the same material?

23  A.   Of the same material.

24         So when people are out there saying, gee, should I

25  buy, you know, the market, should I pay for and buy legal

W. Lehr - Direct                                                      1060

1   copies of the material, their willingness to do that, the

2   likelihood they'll do that is much less if there's illegal

3   copies out there.  So the illegal copies cannibalize the

4   revenues and the profits of legal sales, and that's the most

5   substantial and direct, and the focus in most of the empirical

6   estimates is how much are sales reduced because of the

7   prevalence of illegal copies in the marketplace.

8   Q.   The second point you've got there?

9   A.   Well, the second one about the infringing downloads and

10  uploads are displacing the legitimate sales, that's a

11  refinement really of the first point.

12          The, the third bullet points identifies the fact that

13  when there are illegal sales out there, it's not just that the

14  companies sell fewer units.  It's also their ability to price

15  the units they still manage to sell is adversely affected, and

16  that adversely impacts their business models.

17          So, for example, a copyright holder might not want to

18  or not be able to reduce very high-resolution versions of the

19  content, because if they release those very high-resolution

20  versions of the content, even if consumers might be willing to

21  pay more for those, that makes it even easier for other

22  pirates, that if they get a pirated copy of that, to abuse it,

23  and it distorts other aspects of their business model.

24          And then --

25  Q.   You use the word "piracy" here.  What do you mean by

1  piracy?

2  A.   Sorry.  What I mean by piracy is the infringing illegal --

3  taking use of copyright materials without the copy -- the

4  authorization of the copyright holders.

5  Q.   All right.  And your last bullet point?

6  A.   The last bullet point is that the rights holders have, you

7  know, expended quite a bit of money over the years attempting

8  to try and combat piracy in addressing this problem, because

9  it's a big, huge source of economic harm to them.

10  Q.   All right.  Now, in reaching these conclusions and your

11  overall conclusion that Internet piracy causes harms to holders

12  of copyrights, did you review any materials, literature,

13  documents, articles, summaries, things of that sort?

14  A.   Yes, I did.  If you'd go to the next slide?

15  Q.   Next slide, please.

16  A.   This is a slide that shows a sample of the number of

17  papers, you know, that are well known in this literature,

18  there -- that this is not by any means the universe of these

19  papers.  There's a lot more of these kinds of papers.  But if

20  you just look at these papers and you sort of see these

21  percentages and you see the dollar amounts, the thing you'll

22  notice is these percentages refer to these various papers that

23  are estimating the reduction in sales as a consequence of the

24  piracy, using different sorts of data sets, using different

25  time periods and different methods.

W. Lehr - Direct                                                    1062

1           But in all cases, you're seeing large percentage

2   numbers, in many cases a double-digit percentage reduction in

3   sales.  That's a big number.  And when they mention things like

4   dollars, you know, they're talking often about on the industry

5   effects in the billions of dollars.

6   Q.   All right.  Are you familiar with any of these authors?

7   A.   Yes.  I know Joel Waldfogel and I know Jon Peha.

8   Q.   All right.  And are they recognized as proficient in these

9   areas?

10  A.   Yes.  I mean, they're both well-known academics.

11  Q.   Are there any one of these particular articles that you

12  focused on in terms of reaching your conclusions with respect

13  to the quantification or how substantial the impact is?

14  A.   Yes.  I mean, I can talk about -- these are actually

15  representative of what the sort of balance of literature says,

16  and if we go to, like, the next slide, I think, pulls up one of

17  the particular ones.  So this is the paper from Mateus and Peha

18  that was --

19  Q.   That was listed on the earlier page?

20  A.   That was listed on the earlier one.  And this is a 2011

21  paper, and one reason I'm highlighting this is they took --

22  they looked specifically at BitTorrent, and what they were

23  interested in trying to understand was for the consumers they

24  looked at who were engaged in illegal downloads, how many fewer

25  copies of legal content songs did they buy, and they concluded

W. Lehr - Direct                                                    1063

1   that, you know, the number of copies transferred is an order of

2   magnitude greater than the number sold through legal channels.

3        For example, we estimate that 10.7 songs were

4   transferred using BitTorrent for every song sold.  So that kind

5   of result is pretty typical in the findings that you see in

6   this literature.

7        You know, they also find that the vast majority of

8   music and video content transferred using BitTorrent is indeed

9   copyrighted, there's a bunch of other evidence that

10  demonstrates that, and that copyright holders fail to recognize

11  significant revenues as a result, which is sort of the direct,

12  obvious conclusion that falls from that.  And then further down

13  in that paper, they estimate that if you scale the effects to

14  the size of the industry, that would suggest a loss to the

15  industry of 7 to 13 billion dollars.

16  Q.   All right.  Are there any other articles that you relied

17  on or reviewed that talked about the content of copyrighting or

18  legal material, one or the other, on the Internet with respect

19  to BitTorrent?

20  A.   Well, there's one other thing -- I think it's -- you know,

21  we can highlight today, if you go to the next slide.

22        This is a paper by Danaher, Smith, and Telang.  And

23  it's interesting because it's a 2014 paper, and the purpose of

24  this paper was to provide a survey article.  So these are some

25  well-known economists doing a survey article basically saying

1    what does the economic literature on this question have to say.

2           And this was published in an NBER working paper

3    series.  The NBER is the National Bureau of Economic Research,

4    which is one of the premier empirical research groups that

5    draws up scholars from multiple universities.  So this is, you

6    know, one of the things that professional economists, academic

7    economists, they would look to these kind of papers.

8           And they conclude in looking at this, and they've got

9    a long bibliography in this paper.

10   Q.    Bibliography --

11   A.    Yeah, they go and --

12   Q.    Is this a list of the resources they reviewed?

13   A.    That's right.  So they cite the papers that I cited and a

14   bunch of other papers, and they have say, "While the academic

15   literature is not uniform in finding harm, taken as a whole, we

16   see a very consistent story across the academic literature.

17   The vast majority of papers which have been published in

18   peer-reviewed academic journals, papers spanning a variety of

19   methods, time periods, and contexts, find that piracy causes a

20   statistically significant decrease in sales."

21          So they've gone and they've looked at all the

22   research that was done, the results of which become these

23   papers they're referencing, and when you do economic research

24   and you do this kind of econometric research, often the problem

25   is you can't find an effect because there's just not enough

W. Lehr - Direct                                                    1065

1    evidence in the data.

2            They're saying consistently they're finding an effect

3    that's significant, and consistently that significant effect

4    they're finding is that there's economic harm.  So that's --

5    you know, this is very consistent with sort of the opinion I

6    came to looking at the same problem.

7    Q.   All right.  So the economic harm they're talking about

8    here is lost sales?

9    A.   It's -- well, they are -- different people measure it in

10   different ways.  Ultimately, it's the lost sales, and then do

11   they measure in the lost units or loss revenue or lost profits.

12   They do it a bunch of different ways across the literature, but

13   ultimately, it comes down to displaced sales.

14   Q.   Other than displaced or lost sales, do you have an opinion

15   as to whether or not there's any other harm to copyright

16   holders as a result of illegal infringement on the Internet?

17   A.   Well, I mentioned some of the other ones on the slide when

18   I was talking about the background, and it's harder to

19   estimate.  So, for example, the adverse price effect of having

20   pirated goods out there, the fact that that limits how you

21   might price your other goods, the ones that you are actually

22   able to sell.  That effect is hard to separate and take account

23   of.

24           It's also, again, the disruption it does to the

25   business models because it's hard to see what would have

1   happened, how much more content the copyright holders might

2   have been able to bring to market if they weren't trying to

3   fight pirates, and what quality that content would have been

4   and all of that.  So to estimate that is also difficult to do

5   reliably.

6   Q.   What's the economic result when legitimate music has to

7   compete with music illegally copied and given away for free?

8           MR. BUCKLEY:  Leading.

9           THE COURT:  Overruled.

10  BY MR. WARIN:

11  Q.   You can answer the question.

12  A.   Well, I mean, I think it's pretty obvious that if you're

13  trying to sell a legitimate copy, some of your consumers are

14  going to say it's better to have it for free, and that's going

15  to hurt the sales and your ability to sell the ones that -- you

16  know, and that's going to hurt your profit.  It's going to hurt

17  your whole business.

18  Q.   All right.  So you reached a conclusion, it's one of the

19  opinions you listed in the beginning, that illegal copying on

20  the Internet of copyrighted materials causes harm to copyright

21  holders.  Now, my question to you is, is it possible to put an

22  exact dollar valuation on the impact on BMG of file sharing or

23  the unauthorized copying of BMG songs by Cox subscribers?

24  A.   No, I don't believe it is.  As a general matter, as I've

25  explained, there are lots of different studies and methods that

W. Lehr - Direct                                                    1067

1    depend on the data and a bunch of methodological issues that

2    come up that would make it impossible to come up with a single

3    number if you had the data, but if you don't have --

4    Q.   I believe there may be a slide that you prepared in

5    connection with this.

6    A.   Yeah, there is.

7            But if you don't have the data, you can't do it, and

8    in this case, you fundamentally do not have the data.  This

9    slide highlights some of the data problems that make coming up

10   with an estimate of the harm suffered by BMG impossible in this

11   matter.

12           First, there's no data, good data with which to

13   quantify the number of actual illegal copies, infringing

14   uploads and downloads, that the consumers who would otherwise

15   buy legal copies, whether they're Cox subscribers or other

16   subscribers that got it from Cox subscribers, what they would

17   have bought.  So you don't know how many copies they got, were

18   out there that they were consuming.  What we have is data

19   that's potentially indicative of that, but you don't have a way

20   to actually estimate that.

21           Second, you don't have any data on the behavior of

22   those infringing Cox subscribers or the people they gave it to.

23   You don't know what they would have, what they would have

24   bought and what they would have been willing to pay for if they

25   hadn't been able to consume the illegal, illegal copies.  And

W. Lehr - Direct                                                 1068

1   in this case, there's just no data on that, and so the only way

2   you come up with that is by making some arbitrary and ad hoc

3   assumptions about consumer behavior to come up with an -- to

4   come up with an estimate that had a reasonable evidentiary

5   foundation that you could then support.

6   Q.   All right.

7   A.   And then finally, the other -- some of those other

8   effects, the effect on pricing, the business model, those, you

9   know, you just really can't do.  There's nothing in the case to

10  allow you really to do that, and so you know that if you left

11  that out, you'd be biasing down whatever, you know, sort of

12  fabricated estimate you could come up with, but, you know, the

13  fact that you don't have the basic data you need and you can't

14  get it in this case means you can't come up with an estimate.

15  Q.   All right, thank you.

16       I'd like to switch gears, if I could now.  I'd like

17  to talk about Cox, and you've reviewed in connection with

18  rendering your expert opinions here certain documents.  You've

19  already identified what they were, certain depositions, etc.

20  What is the business that Cox is in?

21  A.   Well, to set the analysis, you first have to have a

22  picture of that.  So basically, Cox is a cable television

23  company, and being a cable television company, what that means

24  is they have a cable television, telecommunications network

25  that they've built into the markets that they want to provide

1    service.

2           Having built that network into those markets where

3    they want to provide service, they then try and sell those

4    services to as many of the households in their serving areas

5    that they serve as possible, and the services they sell are

6    Internet; television, cable television; and telephone services.

7    Q.   All right.  Approximately how many subscribers does Cox

8    have?

9    A.   Cox has approximately 4.5 million subscribers.

10   Q.   And approximately how many homes are within the service

11   area of where Cox currently provides the service?

12   A.   Cox currently --

13          MR. BUCKLEY:  Your Honor, lack of foundation.

14          THE COURT:  Lay a foundation.

15   BY MR. WARIN:

16   Q.   Have you reviewed data with respect to the number of homes

17   that are in the service area that Cox provides service?

18   A.   Yes.  I'm sorry.  The documents I reviewed included a

19   bunch of stuff that describes how Cox operates and --

20   Q.   And --

21   A.   -- and the extent of their network and where they operate

22   and that sort of thing.

23   Q.   Based upon that, what's your understanding as to

24   approximately how many homes are in the neighborhoods that Cox

25   services?

W. Lehr - Direct                                                    1070

1   A.   They -- from -- they currently operate in portions of 18

2   different states.  So in 18 states, there are areas, serving

3   areas where they've decided to build out network.  If you look

4   at the footprint of all those networks and the number of

5   households that those networks cover and are able to serve,

6   that represents about 10 million households, or about 7 percent

7   of the households in the U.S., housing units in the U.S., and

8   that's about -- covering about 7 percent of the population,

9   which is something like 22 million of the U.S. population.

10  Q.   All right.  How do Cox subscribers pay for their Cox

11  service?

12  A.   Well, the subscribers have to live in one of the areas

13  that's served by Cox and within access of their network, and

14  then once they become subscribers of Cox and get hooked up to

15  the Cox network, then they can buy the service, and they buy

16  them on a subscription basis.  So depending on what services

17  they buy, and most of them buy several services, so they buy,

18  you know, a mix of the three services, they pay a monthly

19  subscription fee, and they pay that every month for as long as

20  they're a customer of Cox.

21  Q.   And I think you testified earlier that the three services

22  that you focused on are Internet, television, and phone; is

23  that right?

24  A.   Yes.

25  Q.   Are there any other terms that are used either in the Cox

1   documents or general industry for those three kinds of

2   services?

3   A.   Yes.  And there are -- the Internet service is sometimes

4   referred to as Internet access service.  In some of the

5   documents we'll look at, it's referred to as high-speed

6   Internet or it's abbreviated as HSI, the first three initials.

7   That's the, that's the Internet service.  It's also sometimes

8   referred to as broadband.

9          The cable television service is sometimes referred to

10  as the video service or video product, and the telephone

11  service is referred to as the voice product.

12  Q.   All right.  Dr. Lehr, how is Cox able to provide these

13  services?  What's the physical architecture that allows them to

14  do that?

15  A.   Well, there's -- the basic core element of this, there's a

16  bunch of electronic stuff, but they need to have wires that run

17  down the streets of -- and past the houses they want to provide

18  service to, and then, you know, so they essentially have to

19  build out a neighborhood and have this network in place, and,

20  of course, they also need to have a marketing establishment, a

21  headquarters, and all that stuff about sort of having the

22  business.

23          But they have these wires that go down all the

24  streets, and then they have to get as many households that are

25  in the serving area that they're serving to sign up for as many

W. Lehr - Direct                                                          1072

1    services as they possibly can get.

2    Q.    All right.  So just so I understand it, if a cable goes

3    down the middle of the street and there's 100 houses on each

4    side, not everybody is automatically signed up, correct?

5    A.    No.  Not everybody is automatically signed up to Cox,

6    because not everybody buys service, and not everybody who buys

7    service buys service from Cox, because there's other providers

8    in almost all these markets, as far as I know, all these

9    markets, that they could buy service from.

10   Q.    All right.  So is it -- does Cox face competition in each

11   of the markets they're providing services for?

12   A.    Yes.  In almost all markets, there's both a cable

13   television provider, which is Cox Communications, and then also

14   the descendant of the telephone company, and that's usually a

15   second market, and the vast majority of markets are covered by

16   at least two wired competitors offering what's called this

17   Triple Play --

18           THE COURT:  Lay a foundation for this as we go along,

19   please.

20           MR. WARIN:  Fine.  Thank you, Your Honor.

21   Q.    What economic impact does having more subscribers have on

22   Cox within the markets they serve?

23   A.    Well, when you actually look at the data, you'll see why

24   this is the case, but adding additional subscribers, unless, of

25   course, they're subscribers that don't pay, essentially these

1   are paying subscribers, but paying subscribers is very, very

2   profitable, and so adding each additional subscriber

3   contributes to your bottom line.

4           And so when you -- if you think sort of they first

5   build the network, if they have no subscribers, they have a lot

6   of costs, so they're not going to be profitable.  So you need a

7   bunch of subscribers, and then each additional subscriber they

8   get just makes them more profitable.

9   Q.   All right.  Would that be true in converse with respect to

10  losing customers?

11  A.   Yes, because the -- when you think about what happens when

12  you add a subscriber or lose a subscriber, when you add a

13  subscriber, you get the revenue, the subscription revenue from

14  that subscriber, and then you have some additional costs

15  associated with providing service to that subscriber, and the

16  difference between them is the incremental profit that you get

17  from providing service to that subscriber.

18          If you lose that subscriber, you lose that amount,

19  and since that amount is positive, that's like losing

20  something -- you know, you're losing money.

21  Q.   You just used the term I want you to define, which is

22  incremental profit.  Can you describe or define that for the

23  ladies and gentlemen of the jury?

24  A.   So what's of interest in terms of trying to understand the

25  economic incentives of Cox and the benefit Cox gets from the

1  infringement is to understand how valuable having subscribers

2  is to Cox and adding or losing a few subscribers, what that

3  effect is, and so you want to understand what are the revenues

4  and costs of adding a subscriber because that then gives you an

5  idea of what this effect is.

6         So you're looking for the incremental profit, the

7  increment, increase in profit that's associated with adding a

8  subscriber.  So you say, how much revenue do I get on average

9  when I add a subscriber?  That's the incremental revenue.  And

10 I say, how much cost do I get because I've added that

11 subscriber?  That's the incremental cost.

12        And the difference between those two, incremental

13 revenue minus incremental cost, is the incremental profit, and

14 that's one of the key numbers on a per service basis that I'm

15 going to need to calculate.

16 Q.   From your point of view, does Cox's incremental profit

17 have any significance to the opinions you're rendering?

18 A.   Yes.  It's fundamental to establishing the magnitude of

19 the economic incentive they have to tolerate infringing

20 customers on its network and the financial benefit they realize

21 from those subscribers and to establishing the basis for the

22 economic incentives that they have to avoid doing anything that

23 would disrupt their relationship with those subscribers.

24 Q.   Have you been able to calculate Cox's incremental profit

25 margin, as you've described it?

1    A.    Yes.

2    Q.    All right.  Could you tell us how you did that, how you

3    performed this analysis or were able to determine that?

4    A.    Well, what I discussed so far about their basic business

5    and this notion of how -- what actually an incremental profit

6    margin is, the key thing is the data.  So you need data on the

7    revenues and costs of Cox's services.  Now, Cox is a privately

8    held company, so that data is not available in the public

9    domain, but that data was provided for the residential services

10   by Cox.

11   Q.    All right.  I'd like to have you, if you could, look at

12   the notebook in front of you, Dr. Lehr, and look at PX 1514,

13   which I, believe Your, Honor has already been introduced in

14   evidence.

15         And to remind the Court, this is the one where this

16   document will not be shown on the big screens but will be shown

17   on every individual monitor.  They'll be shown down here in

18   front of the jury and on the monitors at counsel table and the

19   Court's table.

20         THE COURT:  Okay.

21         MR. WARIN:  And yours as well.

22         THE WITNESS:  Good.  Because I don't have my glasses.

23         THE COURT:  If it doesn't show up on your screen,

24   please let me know.

25         THE WITNESS:  All right.

1   BY MR. WARIN:

2   Q.   All right.  Dr. Lehr, could you tell us what this is?

3   A.   Well, this is -- we'll look at the first one, we'll look

4   at the page that refers to the Internet revenues, but I'm going

5   to need to look at both the Internet, the video or television,

6   and the telephone product, and I'll go through the data one in

7   detail, but it's worth looking at the numbers for the others,

8   too.

9           So the first one we're looking at here is this sheet

10  that at the top says "Res Data Product P&L."  That's for

11  residential data or Internet service, and this is their product

12  profit and loss statement.  So this is a statement that the

13  management uses to understand what the cost and revenue effects

14  are of operating their business, and some of these --

15  Q.   You said earlier data was one of the terms that was used

16  for Internet?

17  A.   Yes.

18  Q.   All right.

19  A.   This is the Internet service, and this is prepared by Cox.

20  This is their data.  And you'll see that a number of the

21  numbers here are in thousands of dollars, and I'll point that

22  out.

23          What you got, what you have here is you have a series

24  of columns from 2011 to 2014, and that's showing you the

25  historical performance of the data, and then in the most

1   leftward number column is the 2015 forecast.  I'm going to be

2   focusing on the 2014 actuals because those are the most recent

3   year for which we have a full year of actual data, and I don't

4   have to rely on forecasted data, and then on the --

5   Q.   So did you rely on 2015 at all?

6   A.   No.  I mean, I looked at -- I look at everything here to

7   see does this make sense.  The format layout of this, this is a

8   very standard kind of presentation of this kind of information,

9   and anybody that looks at these sort of statements would easily

10  understand what this is about.

11         And the different rows are -- at the top are the

12  revenues, and then they break out the costs, and then they show

13  you what -- you know, after they account for different

14  categories of costs, what the final, you know, sort of cash

15  contribution of this business is.

16  Q.   You mentioned revenue.

17  A.   Yes.

18  Q.   So let's have you walk us through the revenue that Cox

19  received in 2014 from its residential Internet service.

20  A.   Right.  So the first number of interest here is if you

21  look at the total product revenue, where it says 2,838,330,

22  that's $2.8 billion.  So their data service, their Internet

23  service in 2014 produced for them $2.8 billion in revenues.

24  And when they take that and they divide it by their 4.5 million

25  subscribers, that translates into per revenue per sub, or

W. Lehr - Direct                                                      1078

1   subscriber, of $623.22.

2           So the contribution they're getting from all their --

3   each of their customers that purchases their broadband Internet

4   data service, all the same thing, is $623.22.  That's just for

5   the data service.

6   Q.   All right.

7   A.   Okay?  Now, that's the revenue.

8   Q.   That's in the year 2014?

9   A.   That's in 2014.

10  Q.   All right.

11  A.   That's just the revenue, okay?  When they deliver that

12  service, they also incur some costs, and those costs for this

13  to make sense for them to add customers, that cost has to be

14  lower.  It is lower.  It's substantially lower.

15          If you go down where it says "Total Product Direct

16  Costs," when they add up the costs that are directly

17  attributable to subscribers, so they're like the costs, I add a

18  subscriber, I get this cost, don't add that subscriber, I don't

19  get that cost, those numbers, that's $97 million.

20          So you take 2.8 billion and you subtract 97 million,

21  you end up with product contribution margin which is $2.7

22  billion.  That's the incremental profit contribution.

23          So you divide that by the number of subscribers, you

24  come up with $601.77.  They show us that number here, and that

25  number --

1  Q.   Could you highlight that, please, Karl?

2  A.   601.77, that's the incremental profit contribution per

3  year per subscriber.  And if you look at that and you compare

4  the 601.77 and divide it by the 623.22, that gives you a profit

5  margin, incremental profit margin, and that incremental profit

6  margin on their Internet service is 96.6 percent, okay?

7           That is very high, if people have ever looked at

8  these kinds of things, but that's because of the nature of this

9  business.  Adding and keeping subscribers is very valuable to

10 these companies and for this Internet.

11 Q.   All right.  So you've listed what you've called the

12 product direct costs.

13 A.   That's right.

14 Q.   All right.  Does Cox have any other costs other than the

15 costs that are directly associated with adding or losing a

16 subscriber, an individual subscriber?

17 A.   Yes.  Being in this business is also very expensive.

18 There's a lot of costs associated with keeping a network, you

19 know, the headquarters, maintaining a customer service

20 operation, having marketing, doing national advertising, all

21 that.  Those costs, though, are fixed and don't vary with the

22 number of subscribers.

23           You hope when you incur these costs or commit to

24 these costs that you will have a lot of subscribers

25 contributing you a lot of profit.  This tells you what actually

W. Lehr - Direct                                                    1080

1   happens to them, and if you go down and look at the second

2   column and you go back to the -- where it says "Total Opex,"

3   that's what those costs are, total operating expenses.  Those

4   are those other costs, I think that's adding them all up.

5          But when they take off all of their costs, they're

6   saying that they're still getting $1.7 billion from their data

7   product.  They're earning a margin on that product of 59.8

8   percent after taking account of all their costs, okay?  And

9   that means they're getting a contribution of $372.72 per year

10  for these -- taking account of all their costs.

11         This is not -- I'm interested in the incremental

12  profit because I'll be interested in that question about adding

13  and dropping customers, but it's interesting to understand this

14  to understand sort of, you know, the whole business.

15  Q.   All right.  Now, looking at the second category of costs,

16  it's called operational expenses, do those vary in any material

17  way when a customer is added or a customer is lost?

18  A.   No.

19  Q.   All right.  Do the incremental costs, which were the ones

20  you looked at above, vary when a customer is added or a

21  customer is lost?

22  A.   Yes.  And that's why Cox has broken them out specifically,

23  because if you're going to analyze this and try and use this

24  information, you want to understand which costs are directly

25  attributable to the product, and so, you know, you almost look

1   at that revenue number and go, oh, I get that for free.  No, it

2   costs you to generate those subscriber revenues, and then that

3   net effect you get helps you pay for all those other costs, but

4   if you don't get those subscribers, you still have all those

5   costs.

6   Q.   All right.  You just walked us through this fairly

7   detailed sheet with respect to the high-speed Internet service.

8   Have you looked at any other data provided by Cox in terms of

9   rendering your opinions in this case?

10  A.   Well, as I explained, because I'm interested in what the

11  value of a subscriber is to Cox, I need to look at the other

12  services also that such a subscriber would purchase, and so I

13  also want to look at the data on the residential cable

14  television service.

15  Q.   All right.  Have you done that?

16  A.   I have.

17  Q.   All right.  And we've now got on the sheet another page

18  from the materials provided by Cox.  Could you tell us what

19  this is?

20  A.   This is similar to the page that we talked about for the

21  Internet, but this refers to the video, and so we can go

22  through this faster.  The total --

23  Q.   Not too fast, Dr. Lehr.

24  A.   Okay.

25  Q.   Please, walk us through.

1   A.   All right.  So if we look at 2014 actuals and you say,

2   well, how much revenue did Cox earn selling video services to

3   its residential consumers?  And their billings for that were

4   $4.2 billion.  So higher billings than for the Internet

5   service.

6           And when they divide that by the number of

7   subscribers, every subscriber that's buying the television

8   service is paying on average $1,034.30 per year, and so

9   Internet service by Internet and this, you're paying for both,

10  but then when you go down and you look and you say, well, what

11  are the costs, the direct product costs that are associated

12  with the video service are also actually quite high.  So

13  they're $2.2 billion.

14          So when you take those off the revenues to get the

15  incremental profit, you get an incremental profit of

16  $2 billion, which implies a contribution margin of 47.9, which

17  is substantially lower than the 96-point-something percent we

18  saw for the Internet product, but you're still getting an

19  incremental profit contribution of $495.50, which is a nice

20  amount of money.

21  Q.   From your review of the data, why is the incremental

22  profit margin so much higher for the high-speed Internet versus

23  the video or the television?

24  A.   Well, with video, in contrast to the Internet service and

25  the telephone service, which is much more like the Internet

W. Lehr - Direct                                                    1083

1    service, when you sell video television service, you have to

2    sell the programming, too.  Cox incurs substantial programming

3    costs that vary with the number of subscribers.  So when Cox

4    sells you, you know, HBO, ESPN, and this sort of thing, they

5    pay ESPN, HBO, because you're a subscriber, and so their

6    programming costs that are attributable to the video service on

7    a per subscriber basis are substantial, and that means they get

8    a lower margin on the video.

9           It's not that it's a bad business.  It just means

10   that you add a video subscriber, you add a bunch of revenue,

11   but you also add a bunch of costs.  You still make money.  You

12   just don't make as much money.

13   Q.   All right.  Let's just go down just so we're consistent to

14   the bottom, when they -- all the costs are added in.  What are

15   the numbers there?

16   A.   So if you go to the bottom and they take out all the

17   costs, they're still making $912 million on their video

18   service, and that means every one of those subscribers is

19   contributing to them per year $222.79 after they've taken

20   account of all those costs.

21   Q.   That's profit?

22   A.   That's profit, yes.

23   Q.   Let's now go to the phone service.

24   A.   Yes.

25   Q.   Is there a sheet on the screen in front of you that

W. Lehr - Direct                                                    1084

1   displays the phone service data?

2   A.   Yes.

3   Q.   All right.  Could you walk us through that, please?

4   A.   So here, if we look at the total revenue, we see for 2014,

5   they call this the telephony product, also sometimes it's

6   called the voice product, we see revenues attributable to this

7   service are $1 billion, or on an annualized per subscriber

8   basis, $442.94, and then when they account for the incremental

9   costs that are directly attributable to providing the telephone

10  service to those subscribers, they still end up with an

11  incremental profit margin of $1 billion, and that margin is

12  97.3 percent, so slightly higher than what they realize even on

13  the Internet service, and they're getting a contribution per

14  subscriber of $431.06.

15  Q.   Okay.  So in the profit, as I understand it, per

16  subscriber on the phone service per year is $431.06 before

17  you've taken into account the fixed cost; is that right?

18  A.   Yes.

19  Q.   Let's go to the bottom and take into account the fixed

20  cost.

21  A.   So when you get to the bottom here, what they're making is

22  $570 million from their telephone service, and that means each

23  of those telephone subscribers is contributing profits of

24  $232.67 after taking into account all the costs.

25  Q.   All right.  Now, have you prepared a slide, because we've

W. Lehr - Direct                                                      1085

1   got a lot of data on this page, and have you prepared a slide

2   that summarizes some of the key points that you've gone through

3   now on this?

4   A.   Yeah.  First, I just want to just look at like -- sort of

5   put these three sheets together, just talk about the top line

6   numbers, and then we can go to, you know, what it takes to

7   actually come up with the value of an individual subscriber.

8   Q.   All right.  And before we do that, could you tell me why

9   you bothered to look at television and phone as opposed to just

10  high-speed Internet?

11  A.   Because what I'm -- the value of having infringing

12  subscribers on the network is the value of having the

13  subscriber, and when you have a subscriber, they typically

14  purchase multiple services from you.  So when you attract a

15  subscriber, you'll get multiple services, and if you lose a

16  subscriber, he's likely to leave and take his multiple services

17  to another provider.

18         So you want to -- you need to take account of what

19  the customer -- the average customer actually buys, as opposed

20  to just sort of looking at what would happen if you just looked

21  at the data-related revenue.

22  Q.   High-speed Internet?

23  A.   High-speed Internet, yeah.

24  Q.   So you said -- I interrupted you, and you were about to

25  move on to a slide that summarizes the data from those three

W. Lehr - Direct                                                  1086

1  sheets we just looked at.

2  A.   Yes.  If we could just bring up the next slide?

3         So these are data just presented on one slide that we

4  basically just pulled off those sheets, the bottom line

5  numbers.  So remember, I walked us through on the leftmost

6  column the top line revenue numbers.  So the Internet was, you

7  know, generating revenue of 2.8 billion, the video 4.2 billion,

8  and the voice 1 billion.  So they're capturing -- in their 18

9  states where they have markets, they're capturing revenues of

10 $8.2 billion.

11 Q.   Let me interrupt you a second.  And that's for residential

12 customers only, as I understand you?

13 A.   Yeah.  This is just for residential customers.  If -- you

14 know, to the extent they have wholesale business and I know

15 they have some alarm services and they've got some other

16 things, you know, that they -- probably business accounts, that

17 wouldn't be in this data.  That would be different.

18 Q.   I didn't mean to interrupt.  Please continue.

19 A.   Sorry.  Yeah, I was -- the only data Cox provided would

20 relate to the residential service, so that's all I was able to

21 estimate.

22        The incremental profit that this $8 billion in

23 revenue produces is $5.6 billion, and the net profit after

24 taking account of all of their expenses is $3.2 billion.  So

25 these numbers are interesting because it shows sort of the

W. Lehr - Direct                                                      1087

1   scale of the operation, and it may -- you know, understanding

2   how this business works.  This is a very profitable business.

3   Q.   All right.  Could we go on now to the value to Cox of an

4   individual subscriber?  Have you made some calculations that

5   demonstrate that?

6   A.   Yes, I have.

7   Q.   All right.  Could we move to the next slide?

8   A.   So what this slide is showing is the data at the top, this

9   is the data that was actually on those sheets pulled out on a

10  per subscriber basis.  So you see, for example, the per

11  subscriber revenue for Internet, $623.22; for television,

12  $1,034.30; and then the incremental profits of $601.77 and so

13  on.

14        Down below, what I've done is I've taken those

15  numbers and divided them by 12 just to put them on a monthly

16  basis because that makes them closer to the kinds of things we

17  actually think about, if you think about what a typical bill

18  looks like.  So $623.22 divided by 12 is $51.94.

19        So what the lower part is saying is for each monthly

20  subscriber buying the broadband service, that customer is

21  paying in their bill $52 to pay for the Internet service that

22  Cox is giving them, and that's only costing Cox about $2 to

23  give them that service additional -- you know, additional

24  beyond the costs they're already incurring, and so they're

25  getting the contribution from having that customer of $50

W. Lehr - Direct                                                  1088

1   per --

2   Q.   That's the bottom line in the first column?

3   A.   That's right.  And you need to calculate that for each of

4   the services, and so these datum are the elements of

5   calculating what the per service contribution margins are.

6   Q.   Okay.  So you've now gotten the incremental profits per

7   subscriber by each of these lines of business.  What did you do

8   with the data after that?

9   A.   Well, what I'm interested in is trying to figure out what

10  the value is of the average subscriber.  So if you go to the

11  next slide, this is looking at the monthly revenue of a --

12  coming to the monthly revenue of an average subscriber, and the

13  number I'm interested in is the 133.40 down here in this lower

14  right-hand corner.

15          What I'm doing is I'm saying that if you have a

16  broadband Internet subscriber, some of them just buy broadband

17  Internet, and the data indicates that that's like 21 percent or

18  the data I have -- the data we -- 26.6 percent, and the revenue

19  for that subscriber is the $52 that they get because they're

20  just an Internet subscriber.

21  Q.   And on this slide, we're just talking revenue at this

22  point?

23  A.   We're just talking revenue, yes.

24          The -- some of those Internet subscribers, 29.8

25  percent of those Internet subscribers also buy a second

W. Lehr - Direct                                                1089

1    service, and they buy cable television, and for those

2    subscribers, the average bill is $138.13.

3         6.1 percent of the subscribers purchase a second

4    service, and the second service is the telephone or voice

5    service, and they're paying $88.85, and then 43.5 percent of

6    the subscribers actually purchase all three of the services

7    from Cox, and they're paying $175.04.

8    Q.  All right.  So would that be, if I'm a Cox subscriber, I

9    got to get all three, high-speed Internet, video, and voice,

10   would that be a typical or average monthly bill that I'd get

11   for those services?

12   A.  That would be a typical average bill.  And what's, you

13   know, when you buy these services -- buy more than one service,

14   there are benefits to both Cox and the subscriber.  For Cox,

15   it's less costly for them to sell you an additional service

16   because they've already got a billing relationship with you,

17   etc.  So the more service they can sell you, it's good business

18   for them.  Also, you know, you're less likely to churn.  It's

19   easier to hold onto customers that buy multiple services by

20   you.

21   Q.  I don't know what you mean by "churn."  Tell me what you

22   mean.

23   A.  Sorry.  Churn is the rate at which customers leave you.

24   So, you know, when you're trying to hold onto customers and

25   keep them from going to a competitor, you want to reduce churn,

W. Lehr - Direct                                                      1090

1   and so customers that you're able to sell three services to

2   are, you know, harder for a competitor to steal away.  They're

3   harder for you to get, too, but they're more valuable.

4   Q.   Now, it mentions bundle distribution.  What's that mean?

5   A.   Well, what I mean is that they -- this is the different --

6   the share of customers that just purchased one service or two

7   services or three services.  The advantage -- the other thing

8   is the advantage to the consumer is that when you buy services

9   bundled, you pay less.

10        The revenues we've looked at reflect those bundle

11  discounts.  So if you were to go and, say, buy a la carte each

12  individual thing, you'd pay more.  Like in a restaurant, if

13  you, you know, get the three courses as opposed to individual

14  courses, it's that same kind of deal.  And then, of course,

15  you're only dealing with a single customer relationship.  So if

16  you have a problem, you call one number and hopefully they can

17  sort it out instead of having to call three different

18  providers.

19        But when you weight average, those numbers on the far

20  right, which are the price that a typical person in each of

21  those bundles would pay on average, you come up with what the

22  average customer pays, so the average customer is contributing

23  to Cox $133.40.  That's what the data says is your average

24  bill.

25  Q.   All right.  Just so I understand it, though, at this

W. Lehr - Direct                                                    1091

1   point, you've only talked about revenue.  Do you have a slide

2   that takes into account --

3   A.   Yes.

4   Q.   -- incremental cost of those services?

5   A.   Well, it reflects it.  If we go to the next slide, the

6   next slide looks at the incremental profit.  So remember on

7   that slide where I showed you here are those core numbers and I

8   said there was $52 for the Internet, but then $50 was the

9   incremental profit because it has a 96 -- 97 percent margin?

10  Well, these numbers over here are reflecting -- these are the

11  contribution margins.

12          So when you weight them using the same weights for

13  the bundles, you come up with the blended average incremental

14  profit for the average subscriber, and the -- so that's -- so

15  what this is saying -- what these two slides are saying is the

16  average customer has a bill of $133 per month, and the

17  incremental profit that flows to Cox's bottom line by having

18  those subscribers is $98.23, or almost $100.  So if they get

19  another subscriber, that's worth to their bottom line an

20  additional $100, and if they lose that subscriber --

21  Q.   Per month.

22  A.   Per month, per month.

23  Q.   All right.  Now, the bottom line, though, says Average

24  Profit Per HSI Subscriber.  And you said that was high-speed

25  Internet, but this seems to include more than just high-speed

W. Lehr - Direct                                                    1092

1   Internet.  Can you explain?

2   A.   Because the average Internet -- the average subscriber to

3   the high-speed Internet service buys more than one service, so

4   the bills -- they also pay -- there's also different tiers of

5   service.  So, you know, there are some consumers -- there are

6   some number of Cox subscribers that buy the lowest tier

7   service, some that buy more expensive, and some that buy the

8   most expensive one.

9              Cox did not provide data on the breakout of their

10  subscribers by billing tier or by usage.

11  Q.   All right.  Now, this is all, and it says it at the top of

12  your slide, 2014 monthly incremental profit.

13  A.   Yes.

14  Q.   Did you do anything with this number to determine the

15  longer-term value of a Cox customer based upon 2014 data?

16  A.   I assume that this was a reasonable forecast of the future

17  because I didn't have additional data to make adjustments.

18  Q.   All right.  Did you make a slide on that?

19  A.   I didn't make a slide on that, but what I did do is this

20  is only the value.  What this slide is is what's the value of a

21  subscriber to Cox, because what I talked about there was an

22  individual subscriber is a subscriber of Cox for multiple

23  months.  So it's not like they get a subscriber, they get one

24  month's bill and that's it.  No, they get a hundred bucks a

25  month for the average subscriber, and that goes on for as long

W. Lehr - Direct                                                      1093

1    as the subscriber is a Cox customer.

2              And the data shows that the typical customer stays

3    with Cox for 67 months, or 5.6 years.  So if you think about

4    100 bucks a month per subscriber over 12 months, that's $1,200

5    contribution to their bottom line in the first year.  Second

6    year it's another 1,200 bucks, third year it's another 1,200

7    bucks.  If we did that over six years, that 7,400 bucks in

8    aggregate.

9              But if you say what would I pay today, what's the

10   value today of a stream of revenues that takes place over time,

11   those revenues that happen in later years are less valuable, so

12   I discount those back.  This is a standard calculation when you

13   try to evaluate money flows that take place over time.  It's

14   calculating the present value of the stream, monthly stream of

15   payments.

16             If you discount that stream of monthly payments at a

17   discount rate of 8 percent over the life of the typical

18   customer, you come up with the customer's value, the lifetime

19   value, what -- what's going to be contributed to the value, and

20   that estimate is $5,294.

21   Q.   All right.  Is a calculation like this used at all in

22   business transactions or economics?

23   A.   Yeah.  This is very standard because you're trying -- you

24   know, again, if someone said compare, compare the hundred

25   dollars a month to what a subscriber is worth, you'd say, no,

W. Lehr - Direct                                              1094

1    because I'm going to get a hundred bucks the next month, the

2    next month, the next month, and the next month for 67 months.

3    The value of that is $5,294, and that's the value of a

4    subscriber to Cox.

5            So when they say, I'm going to go -- you know, what

6    is it worth if we can keep a subscriber or attract a subscriber

7    to our network, it's $5,294.

8    Q.   All right.  How do BitTorrent users compare to the average

9    subscribers in terms of profitable?

10   A.   Well, the evidence suggests that BitTorrent users are

11   likely to be more profitable because the BitTorrent users are

12   more likely to be, for example, purchasing the higher-tier

13   broadband services.  I was here earlier today and we saw some

14   data from, I guess it was Mr. Negretti.  Some of that data I'd

15   seen also, but basically what that talked about was the data

16   utilization of file sharing, and customers that are engaging in

17   infringing, they're doing those services, and they need more

18   data.  They need higher data caps.

19           With the lowest data cap, you can't do what they're

20   saying a lot of their customers were doing.  If you're a heavy

21   downloader, you would need to buy a higher, more profitable for

22   Cox, higher-tier service.  So it's likely that the average data

23   that I'm working with is a lower bound on the value of a

24   subscriber who's infringing.

25   Q.   All right.  You mentioned some data you saw today earlier

1    when Mr. Negretti's testimony was read.  Could I refer you to

2    PX 1412?

3            Which I believe is already in evidence, Your Honor.

4    A.   Yes, this is one of the things that I had looked at

5    before.

6    Q.   Was that something you referred to just now in your

7    testimony?

8    A.   Yes.

9    Q.   I'd like to direct you to page 5 on that.  And this

10   particular page is captioned "Online Activity Summary"?

11   A.   Yes.

12   Q.   Do you see that at the top?  All right.

13           And I'd like to ask you if there's any particular

14   line in here that was relevant with respect to any of the

15   opinions you're rendering here today?

16   A.   Well, all of this is interesting because it shows that,

17   you know, Cox is paying attention, which is hardly surprising,

18   to what their customers want today and are doing, because it's

19   in the business of keeping its customers happy so they can keep

20   them and continue to make money on them.

21           But the most interesting line on this is the fourth

22   line from the bottom, where it says "P2P BitTorrent," and this

23   is saying that the customers -- that this survey that was done

24   for Cox looking at the behavior of their customers, that their

25   typical customer was spending 21 hours per month on BitTorrent

W. Lehr - Direct                                              1096

1   and using, like, 1.44 gigabits per hour.  If you take 1.44 and

2   multiply it by 21, you get, you know, enough so that you can't

3   buy, like, the lowest tier.  And this is, again, just an

4   average.

5           And we know from other evidence that when it says

6   BitTorrent, you can effectively say BitTorrent equals

7   infringing traffic.

8   Q.   All right.  Well, you mentioned you know from other

9   evidence that BitTorrent equals infringing traffic.  What are

10  you referring to?

11  A.   Well, for example, there's a number of studies.  There

12  were two, two studies in particular that, that were widely

13  cited in the industry and used by a lot of folks.  There was a

14  study in 2011 by Envisional and a study in 2013 referred to as

15  the NetNames study, and that was essentially a repeat of the

16  2011 study, and of those two studies, you looked at -- you

17  know, they were sort of the most substantial published publicly

18  available studies analyzing what's actually in BitTorrent

19  traffic, and so what they looked at was they -- the 2011 study

20  looked at something like almost 3 million torrents on the

21  largest public site that shows you what, you know, what's in

22  these files and then analyzed those, analyzed the top 10,000

23  files in those, and, you know, it found that, like -- something

24  like 99.9 percent of the content, the media content in those

25  files and in those torrents was infringing content.

1           And what was surprising in the 2011 study was of the

2    music files that they identified in the content, 100 percent,

3    all of them were infringing, and when they did the study in

4    2013, they found that, I think, the total composition of

5    infringing content was like 99-point-something.

6           So -- and -- so, A, they did the test two different

7    times, you know, with two years and lots of people able to

8    weigh in and sort of say, you know, does this make sense, and

9    they came up with essentially, you know, that traffic is almost

10   all infringing, and they also found that the traffic had

11   increased, that the number of peers that were involved had

12   grown and that the number of infringing matter and infringing

13   content had grown and, you know, that's -- that might -- I

14   mean, you know, that's not surprising when you understand that

15   the -- a number of broadband subscribers worldwide and their

16   ability to access high speed and having the devices and take

17   advantage of the Internet has also grown.

18          So the fact that it's grown, you know, makes sense,

19   but that's what those studies show.

20   Q.   All right.  Are these studies that you were familiar with

21   before you began your work on this case?

22   A.   You know, I was -- yes.  I was generally familiar with

23   them, yes.

24   Q.   Are these studies that are generally relied upon by

25   economists like yourself doing these kinds of things?

W. Lehr - Direct                                                  1098

1    A.    Yes.   I mean, this kind of work, you know, you'd be

2    interested in this sort of data, and then there are other

3    studies like this that have similar results.   It was pretty

4    much common knowledge amongst folks that, you know, most of the

5    BitTorrent traffic was likely to be infringing, but until

6    someone goes out and actually measures it and does it in a way

7    that people can say okay, yep, they did it that way, all right,

8    yep, I believe those results, you're not necessarily going to

9    feel confident.   That's just saying it's most of it.   You know,

10   you want to know what the numbers are.   Seeing the numbers as

11   high as they are, that was potentially surprising.

12            MR. WARIN:   Your Honor, may we approach for a moment?

13            THE COURT:   Yes, sir.

14            (Sidebar on the record.)

15            THE COURT:   Yes.

16            MR. WARIN:   Your Honor, these are the much talked

17   about Envisional studies.

18            THE COURT:   Right.

19            MR. WARIN:   He's testified to his use of them and the

20   fact that they are widely respected and used.   We think this

21   falls within the compilation description.

22            THE COURT:   Certainly 703.   Do you want, actually

23   want them admitted under 803(17)?   Do you believe they're --

24            MR. WARIN:   Yes, I do.

25            THE COURT:   Where do they fit in in (17)?   Just

W. Lehr - Direct                                                    1099

1  market studies?

2           MR. WARIN:  Yeah, market studies.  And that's what we

3  hang our hook on, (17).

4           THE COURT:  Okay.

5           MR. BUCKLEY:  Your Honor, it's the same objection as

6  we've had.  He's talked about them to the extent he relied on

7  them.  We've now had an expert saying BitTorrent equals

8  infringement, but I don't know that that particular conclusion

9  really relates to his opinion, which is that subscribers are

10 valuable, and so I don't know that the reports need to come in,

11 and they have all of the same reliability, and, you know,

12 they're embedded expert opinions that haven't been verified.

13          THE COURT:  This is right in Dr. Lehr's wheelhouse.

14 This is what he does on a regular basis as a professor and

15 studying economic effects of influences on the Internet, and he

16 deals in the economic world, so he's the first one that I

17 thought had a right to come in and say yes, this is used in the

18 industry, I'm familiar with it, and the rest of his testimony

19 talked about the reliability.  So your exception is noted, but

20 I'm going to admit the documents.

21          MR. WARIN:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. BUCKLEY:  Thank you.

24          (End of sidebar.)

25 BY MR. WARIN:

1   Q.   Dr. Lehr, in the notebook in front of you, you have an

2   exhibit that's been marked PX 2429.  Can you take a look at it?

3   A.   Yes.

4   Q.   Tell us what it is.

5   A.   This is the Envisional 2011 report I was describing in my

6   testimony.

7            MR. WARIN:  All right.  Your Honor, I'd like to move

8   admission of this it document.

9            THE COURT:  It's received, and your exception is

10  noted.

11           MR. BUCKLEY:  Thank you.

12           MR. WARIN:  Thank you, Your Honor.

13  BY MR. WARIN:

14  Q.   I'd like to refer you, if I could, Dr. Lehr, to page 5 of

15  that, and I'd like you to look down at the third bullet on the

16  right-hand side.  Could you read into the record that statement

17  that begins with 2.9 percent?

18  A.   Yes.  It says, "2.9 percent was music content -- all of

19  which was copyrighted and shared illegitimately."

20  Q.   That was talk about BitTorrent traffic; is that right?

21  A.   This is -- yes, this is the share of the BitTorrent

22  traffic.

23  Q.   All right.  I'd like to have you, if you could, look at

24  the DTX 0308, could you tell us what this is?

25  A.   This is the 2013 study that I was referring to.

1   Q.   And were these studies prepared by the same people

2   generally?

3   A.   Yeah.  I don't know exactly -- there was a relationship

4   between them, and they were sort of a repeat.  I don't know if

5   all the individuals were the same.

6            MR. WARIN:  All right.  Your Honor, I'd like to move

7   the admission of DTX 0308.

8            MR. BUCKLEY:  Same objection.

9            THE COURT:  All right, it's received.  Your exception

10  is noted.

11  BY MR. WARIN:

12  Q.   All right.  Turning back to Cox for a moment, if you

13  could, and I'd like you to focus on Cox incremental profits

14  from repeat infringers.  How do those relate to Cox's economic

15  incentives with respect to subscribers' infringement of BMG

16  works at issue in this litigation?

17  A.   Well, to -- you know, it's central to estimating and

18  understanding the -- and quantifying the value to Cox of having

19  infringers on its network.  So the value of having a

20  subscriber -- the average value of having a subscriber to Cox

21  is $5,284 -- roughly $5,000, over $5,000, and, you know, if

22  they have a subscriber and they lose that subscriber, that's

23  worth $5,000 to them, and the evidence that I've seen shows

24  that they have indeed infringing subscribers on their network,

25  and so they're benefiting from those infringing subscribers to

W. Lehr - Direct                                                    1102

1   the tune of $5,000 per infringing subscriber.

2   Q.    What would happen with respect to loss of those?

3   A.    They would lose $5,000 if they were to lose those

4   subscribers, and so those numbers speak directly to their

5   incentives to tolerate infringement on their network or to

6   avoid taking actions that would significantly disrupt their

7   relationship with those subscribers, and, you know, from Cox's

8   perspective, the worst case would be if they lost those

9   subscribers.

10  Q.    All right.  What are the implications of Cox's economic

11  incentive for BMG's ability to address infringement of its

12  works by Cox subscribers?

13  A.    Well, if Cox doesn't participate in trying to deter the

14  infringers, there are other things that a BMG or copyright

15  holders can do, but they're all very expensive and they don't

16  work very well.  So, for example, they've tried -- the industry

17  copyright holders have tried doing things like digital rights

18  management, implementing, you know, complicated encryption

19  strategies, and those haven't worked very well and have been

20  very expensive and been largely perceived to be a failure in

21  the marketplace.

22        They can also try and sue individual subscribers.  Of

23  course, they have to figure out who are the actual individuals

24  that are infringing, and Cox's help in that is critical.

25  Q.    And why is that?

W. Lehr - Direct                                                    1103

1    A.    Because the --

2              MR. BUCKLEY:  Your Honor, scope and foundation.

3              THE COURT:  Yeah, lay a foundation as to how he knows

4    what information -- the standard questions about how you get to

5    the actual name of the subscriber.

6              MR. WARIN:  The subscriber.

7    Q.    Who knows the identity of the individual subscriber?

8    A.    Cox knows the identity of the individual subscriber

9    because what's, what's observable in, for example, the

10   BitTorrent data or the illegal file uploading activity is the

11   files that are getting moved and the IP addresses from whence

12   they're coming and to whence they're going, but the mapping of

13   those IP addresses to individual subscriber addresses, that's,

14   that's what Cox knows because Cox assigns those addresses, and

15   it's the one that maintains a relationship with those

16   subscribers.

17             Now, there potentially are other ways that BMG might

18   be able to identify some subset of illegal subscribers and then

19   go and sue them directly, but in going to sue them directly,

20   that -- versions of that have been tried by folks, and it's

21   just economically not viable.  You know, that's thousands of

22   infringers and thousands of cases.  It's just too expensive.

23   Q.    How about suing BitTorrent?

24   A.    Well, you can't sue BitTorrent because it's a protocol.

25             MR. BUCKLEY:  Your Honor, could we have a sidebar,

1   please?

2           THE COURT:  Yes, sir.

3           (Sidebar on the record.)

4           MR. BUCKLEY:  Not a word of this about John Doe

5   lawsuits and suing BitTorrent and all that was in his report.

6   He never opined about any of this.  So the economic incentive

7   arguments were they're valuable, they pay more for high-speed

8   Internet, not that it's going to cost them more to go out and

9   do it another way.  That's the first time he's opined of that.

10          THE COURT:  Well, go ahead, Mr. Warin.  Well, I think

11  Mr. Theodore has been kind enough to hand me -- paragraph 45.

12          MR. WARIN:  45.

13          MR. BUCKLEY:  Is this the opening report?

14          MR. THEODORE:  Yes.

15          MR. BUCKLEY:  This is the public policy stuff you

16  struck.

17          THE COURT:  Well, you're trying to identify how the

18  impact of the market and what infringement does to copyright

19  holders, and when you're looking for relief, which I think that

20  he's certainly qualified to talk about, you know, you have

21  asked questions about, you know, couldn't you sue the

22  subscriber and John Doe lawsuits and -- so I think it's fair

23  game for him to be able to say you can't sue BitTorrent.  I

24  know there was some testimony about it earlier, and I can't

25  remember what that testimony was about BitTorrent.  Do you

1    remember when it came up earlier?

2              MR. WARIN:  I think that Ms. Frederiksen-Cross

3    described that BitTorrent was a protocol.

4              MR. BUCKLEY:  Yeah.

5              THE COURT:  I'm going to allow it.  Your exception is

6    noted.

7              MR. BUCKLEY:  Thank you, Your Honor.

8              (End of sidebar.)

9    BY MR. WARIN:

10   Q.   Dr. Lehr, I'll repeat the question I asked just before we

11   took a break.  What about suing BitTorrent?

12   A.   BitTorrent is a protocol, so you can't sue that.  You

13   might be able to sue companies that write the programs that

14   users get to actually implement the protocol, but there's lots

15   of those, and they're relatively easy to write.  So there would

16   be, like, a Whac-A-Mole problem.

17             You could also possibly consider suing things like

18   PirateBay or the sites that host these torrents, but again,

19   that's the Whac-A-Mole problem because they're easy to

20   replicate and, you know, someone offshore or wherever could

21   host them.  So it's just impractical.  It's economically

22   impractical.

23   Q.   How do these other alternatives that you've just described

24   relate to Cox's economic incentives to combat privacy?

25   A.   Well, Cox is benefiting from the piracy, and the fact that

1   there's no practical way to deter it just means that, you know,

2   more of this activity goes on, more subscribers who want to do

3   this can become Cox subscribers and do this, in addition to the

4   other things they may want to do on the Cox network, but it

5   helps them, you know, they're making profits, keeping their

6   customers happy, and clearly doing this file downloading is

7   something their customers are regularly doing and wanting to

8   do.

9   Q.   All right.  I think you testified a moment ago that the

10  average value of a Cox subscriber was approximately $5,000?

11  A.   Yes.

12  Q.   If there were evidence in this case that indicated there

13  were approximately 60,000 Cox subscribers who were repeat

14  infringers of BMG works, how would that affect Cox's direct

15  economic benefit in keeping those subscribers?

16  A.   Well, as I explained, the 5,294 estimate is a value of a

17  subscriber, and so if you said, well, that's roughly $5,000

18  that they're getting for each of the -- that that's the value

19  of each of those subscribers, so having 60,000 subscribers

20  times 5,000, that's $300 million.  So that's -- you could say

21  that's the financial benefit that Cox is realizing because it

22  has those infringing subscribers on its network.

23  Q.   Do you have an opinion as to whether Cox has a substantial

24  incentive, economic incentive to tolerate infringement?

25  A.   Yes.  I think the evidence amply supports that.

 1          MR. WARIN:  No further questions, Your Honor.

 2          THE COURT:  All right.  Mr. Buckley?

 3          MR. BUCKLEY:  Yes.  Thank you, Your Honor.

 4                        CROSS-EXAMINATION

 5   BY MR. BUCKLEY:

 6   Q.   Good afternoon, Dr. Lehr.

 7   A.   Good afternoon.

 8   Q.   We haven't met.  My name is Brian Buckley.  I'm one of

 9   Cox's attorneys.

10          You testified on direct, Dr. Lehr, about your

11   credentials and other cases that you've been involved in, your

12   expertise; is that right?

13   A.   Yes.

14   Q.   This is the first copyright case you've consulted in,

15   right?

16   A.   It's certainly the first case that specifically -- well,

17   no, it's certainly the first case where the focus is on

18   copyrights.  Whether or not copyrights were involved in other

19   matters I've been involved in, they probably were.  I've

20   certainly been involved in other intellectual property matters.

21   Q.   Is this the first copyright case you've testified in?

22   A.   Yes.  I think that's right, yes.

23   Q.   Do you consider yourself to have any specific expertise in

24   copyright issues?

25   A.   Yes.

1   Q.   Can you describe what that is?

2   A.   Well, I think understanding the economics of the industry,

3   the digital media industries and the infrastructures by which

4   they provide those services, all of that is of relevance.

5   Q.   But you don't have any expertise specifically with the

6   Copyright Act, correct?

7   A.   Sorry, the Copyright Act?

8   Q.   Yeah.

9   A.   Specific?  I'm generally familiar with it, and, and -- but

10  I'm not here offering any legal opinions about it.

11  Q.   How about the Digital Millennium Copyright Act?

12  A.   No, I'm not offering any legal opinions about any of that.

13  Q.   Are you an expert on BitTorrent?

14  A.   I'm -- as an economist, I think I know quite a bit about

15  the economic implications of it, but I'm not here testifying as

16  a technical expert on BitTorrent, but I generally understand

17  how it works and that sort of thing.

18  Q.   But you're not offering expert opinions about the

19  operation of BitTorrent?

20  A.   No.

21  Q.   And I believe that you said on direct that BitTorrent

22  equals infringement.  Do you remember saying that?

23  A.   Yeah.  That was, that was perhaps sloppy shorthand.  What

24  I was saying was that when you see a bunch of traffic that is

25  BitTorrent traffic, the evidence suggests that it's a

W. Lehr - Cross                                                      1109

1    reasonable inference that most of the traffic you're seeing

2    there is, in fact, infringing traffic, and the reason that's a

3    reasonable inference is because there have been a number of

4    studies that show that that indeed is the case, and to my

5    knowledge, there's never been a single study that makes the

6    counterargument, in other words, that most of the traffic is

7    not infringing.  I've never heard anything like that from

8    anybody.

9    Q.   Okay.  But you didn't mean that statement literally.  You

10   didn't mean all BitTorrent traffic is infringing, right?

11   A.   No, I did not mean that literally.  That's why I tried to

12   clarify it right now.

13   Q.   That's why you described it as sloppy.

14   A.   Yes.  I'd say like 90 --

15   Q.   Just answer my question, please.

16   A.   Sorry.

17   Q.   I mean, that -- implicit in that is there are certain ways

18   to use BitTorrent that aren't infringing, right?

19   A.   Oh, yes.  It's a peer-to-peer sharing program, and it

20   would be possible to use it in ways that are non-infringing.

21   It's just that the evidence of residential subscribers is that

22   that's not what they're using it for.

23           MR. BUCKLEY:   Okay.  Move to strike.

24   Q.   My question was are there ways to use BitTorrent that are

25   non-infringing?

1   A.    Yes.

2   Q.    So one of the calculations that you went over at some

3   length with Mr. Warin was the profit margin; is that right?

4   A.    Yes.

5   Q.    Profit margin?

6   A.    Yes.

7   Q.    And you've referred to that sometimes as contribution

8   margin?

9   A.    Yes.

10  Q.    For the purposes of your opinion, are contribution margin

11  and profit margin the same thing?

12  A.    Well, I talked about several different things.  I was

13  talking about incremental contribution margin, incremental

14  profit margin, and in the purpose of my testimony, those two

15  things are the same.

16  Q.    Okay.  And I believe -- and correct me if I'm wrong, but I

17  believe you said contribution margin is equal to revenues less

18  variable costs; is that right?

19  A.    Yes.

20  Q.    And you've calculated Cox's contribution margin for

21  high-speed Internet to be almost 97 percent?

22  A.    Yes.  That's consistent with data I've seen estimated for

23  other providers for which there is publicly available data, you

24  know, by folks on Wall Street, that kind of thing.

25  Q.    Would you agree, Dr. Lehr, that that does not include all

1  of Cox's incremental costs?

2  A.   I'm not in a position to question -- I wouldn't agree with

3  that because the data that Cox provided identified the

4  incremental costs, and that gave me that margin.  And it's

5  plausible to me that, indeed, those margins are that high and

6  that it could include all -- indeed, include all the

7  incremental costs, but I wouldn't try and second-guess Cox's

8  own data on that.

9  Q.   And you're aware that Cox's economic expert, Dr. Sullivan,

10  included a number of costs in his profit calculation that you

11  didn't include; is that right?

12  A.   Dr. Sullivan included a lot of not -- costs that were not

13  incremental to adding subscribers in his analysis, and, you

14  know, I, I took exception with that when I reviewed his

15  analysis and, you know, prepared the reply comments.

16  Q.   Okay.  So he included costs associated with service

17  technicians to install customer modems, for example.  Did you

18  include those?

19  A.   Well, as incremental costs, yes, because if you look

20  actually on that sheet, what you see is you see certain line

21  items that are network costs.  So, for example, you need to

22  have a certain number of technicians to operate a network, and

23  you need to have a certain amount of outside plant staff that

24  doesn't vary directly with the number of subscribers you have,

25  and so there's some variation potentially in what you need to

W. Lehr - Cross                                                      1112

1  do in terms of staffing of your outside plant management that

2  varies with the number of subscribers, and presumably to the

3  extent that there is such a cost, it's in those direct costs,

4  and when you amortize those kind of costs over the portion

5  that's -- which would be small, but you amortize it over the

6  lifetime of a customer and account for it the way it is, it

7  would be in the direct costs.

8        I assume that's what Cox did because that's what you

9  do when you do a profit and loss statement like that.

10 Q.   Okay.  But that's a different way of saying you assumed

11 that was in the number from Cox that you relied on?

12 A.   No.  I read Cox's own statement where it says their

13 product direct costs, and I counted their product direct costs.

14 I did not try and second-guess and say if Cox had accounted for

15 their data differently, the costs would have been different.

16 If they had meant that and given me the information or said

17 that, I'd have considered that.

18       But to look, for example, at the numbers that

19 Dr. Sullivan uses and says those are incremental costs, that

20 would just be dead wrong.  That would be a gross overestimate

21 of the incremental costs that are associated with the service,

22 and I would think that would be improper analysis of the data.

23 Q.   Okay.  So it's possible that I misunderstood your

24 calculations.  So your calculations and your incremental cost

25 calculations do include operational costs like service

W. Lehr - Cross                                                      1113

1   technicians, customer service representatives?

2   A.   To the extent those vary with -- when I add an additional

3   subscriber to the margin, like I -- you know, they would be in

4   there presumably, and if they're not, it's because Cox doesn't

5   think they're variable, and so I wouldn't have included them

6   appropriately.  I was using the data Cox gave me.

7   Q.   Okay.  But you are aware that Dr. Sullivan came up with a

8   significantly lower profit margin, right?

9   A.   I'm well aware of that.  The problem with him is basically

10  he will seem to be throwing everything into the kitchen sink

11  that he could to say these are costs that relate to a

12  subscriber, and, you know, I don't think that's appropriate,

13  but even if -- if you look at it, it's still, they are still

14  immensely profitable subscribers, but I don't think that's

15  appropriate.  Those are not the incremental costs.

16          What he throws in are not costs that would vary.

17  They are costs Cox would still have whether it had those

18  subscribers or not.

19  Q.   You used the -- your calculation of profit margin to come

20  up with your lifetime subscriber value, right?

21  A.   Of course, yes.  I used what I believed to be the correct

22  estimate, yes.

23  Q.   And your lifetime subscriber value, you testified a bit

24  about it, is based not just on Internet revenue, right?

25  A.   It's a value of the subscriber, and the value of the

W. Lehr - Cross                                              1114

1   subscriber is not just the Internet revenue you get from that

2   subscriber; that's true.

3   Q.   All right.  So it includes the revenue that Cox gets for

4   telephone services, right?

5   A.   From the subscriber who was an Internet subscriber, yes.

6   It doesn't include the revenue that Cox gets from telephone

7   subscribers that aren't Internet subscribers.

8   Q.   Okay.  And the same thing for subscribers who have cable

9   service?

10  A.   Again, it's an Internet subscriber.  If they also purchase

11  video services, then those revenues would be appropriately

12  attributed to the value of that subscriber.

13  Q.   Did you do a lifetime subscriber value calculation that

14  was just isolated to Internet services?

15  A.   I think that table -- in my report, I did calculate that

16  number just to sort of see what it was, but I don't think it's

17  the relevant number.  You could do that.  You could sit there

18  and say -- essentially, you're asking the thought experiment,

19  so it's a hypothetical.  You say supposing all of Cox's service

20  customers, all they bought was Internet and they were happy,

21  that was just Internet, so all they were paying was 52 bucks a

22  month.  So those subscribers were not getting any TV or

23  telephone.  That's a strange hypothetical.  But were you to

24  look at that number and run it out, you'd come up with a number

25  that was several thousand dollars but less than $5,000.

W. Lehr - Cross                                                          1115

1   Q.   And you believe that calculation is in your tables

2   somewhere?

3   A.   It was in my original report.

4   Q.   Dr. Lehr, is the -- part of the point of your lifetime

5   value subscriber calculation is that subscribers are profitable

6   for Cox, right?

7   A.   Well, I think that's kind of self-evident because they

8   wouldn't add subscribers if they didn't think they were

9   profitable.  It's a question of how profitable.  You have to

10  understand how valuable they are, and it's an effort to

11  quantify them, and to quantify them, you need to do what I did.

12  Q.   Right.  So you're not here as an expert just to tell the

13  jury that profit is good?

14  A.   No.

15  Q.   And that profitable customers are good?

16  A.   No.  I mean, I think I'm trying to explain the context

17  within the context of a cable provider like Cox operating and

18  what's the value they derive in this business and how it

19  relates to the other facts in this case.  I think there's a lot

20  of, you know, other issues that come on.  So no, it's not just

21  that customers are profitable.

22  Q.   And it's your opinion that because the value for a single

23  subscriber is $5,000 or I think you said $600 per year is one

24  of the figures you used, that because a subscriber is

25  profitable at that level, then Cox has an incentive to retain

1   that subscriber?

2   A.   Yes.  That's part of what I was saying, yes.  And again,

3   you know, it relates to what is the, you know, the level of --

4   what's the financial benefit they're getting from

5   participating -- you know, tolerating infringement on their

6   network.

7   Q.   Right.  But you didn't do any calculation that took into

8   account the number of infringers on Cox's network, right?

9   A.   No.  I'm not -- I didn't -- I just provided some

10  illustrative numbers of how these numbers would be used in my

11  original report, and at the end of my testimony, I provided an

12  illustration of how you might use those numbers and what you

13  might reasonably infer from them.

14  Q.   Right.  Because you don't have any -- you're not aware of

15  any evidence of actual infringement by any Cox subscriber,

16  right?

17  A.   Well, I'm not -- I think there's been substantial evidence

18  and some of the testimony I've heard suggests that Cox

19  subscribers are using BitTorrent substantially and that

20  BitTorrent traffic is substantially -- contains infringing

21  traffic, but what specifically constitutes an infringement, I'm

22  not offering a legal opinion about that, but that that --

23  there's a lot of activity going on by Cox subscribers,

24  uploading, downloading illegal content.  I think there's lots

25  of evidence in this case that I've heard and considered.

1   Q.    Okay.  But my question was are you aware of any evidence

2   of any infringing activity by a particular Cox subscriber?

3   A.    Oh, you mean do I know an individual Cox, like a person,

4   like Joe?  No.

5   Q.    Do you know how many alleged infringements are at issue in

6   the case?

7   A.    As I sit here right now, I don't remember.  I think I was

8   in the room the other day and there was some discussion of

9   this.  I know there was some discussion of the number of

10  notices, for example, that some subscribers had, and I think,

11  like, there was one for two years the guy had gotten 28 notices

12  and stuff like that, you know, and was, you know, presumably

13  running BitTorrent over a lot of that time.  So that would be a

14  lot.

15  Q.    Do you know how many infringements are at issue?

16  A.    As I sit here right now, I don't.

17  Q.    And you don't have any -- you're not offering any opinions

18  about the Rightscorp system or the Rightscorp data, right?

19  A.    No.

20  Q.    Do you know what BMG's copyrights that they're asserting

21  in this case are worth?

22  A.    No, I'm not -- I didn't value their copyrights.

23  Q.    Do you have any information about the revenue that the

24  plaintiffs receive from their copyrighted works?

25  A.    No.  I mean, I -- you know, no, I don't.

1   Q.   Did you ask for any of that information?

2   A.   No, because I don't think if I had had that, it would have

3   factored into my analysis.  It wasn't something I needed for my

4   analysis.

5   Q.   But you didn't ask to see any revenue data?

6   A.   I did not.

7   Q.   For BMG?

8   A.   For BMG, no.

9   Q.   Is there anything that you asked for from BMG, any data

10  that you asked for as part of your work that you didn't get?

11  A.   No, I don't believe so.

12  Q.   In your reply report, Dr. Lehr, you stated, do you

13  remember, "My analysis does not hinge on the specific works

14  infringed or the specific copyright holders harmed"?  Do you

15  remember saying that?

16  A.   That's right.

17  Q.   Is that still true?

18  A.   Yes, because I don't believe you can estimate, as I

19  explained, what the harm is actually to the individual right

20  holders of BMG.  So even if I had had the information, for

21  example, about BMG's revenues, I still wouldn't have had the

22  data about the actual number of files uploaded and downloaded,

23  so I wouldn't have been able to calculate -- that would have

24  been one of the reasons why, there were other reasons, I

25  wouldn't have been able to calculate what the effect was on

1   BMG, and so since I couldn't calculate what the effect was on

2   BMG, I didn't -- you know, it didn't matter for what I was

3   opining about of what the specific rights were that BMG had

4   that were alleged to be infringed.

5   Q.   Okay.  So you didn't calculate any actual damage to BMG?

6   A.   No.

7   Q.   You didn't calculate any actual harm of any kind to BMG,

8   did you?  Calculate, calculate.

9   A.   Sorry.  No, I didn't try to calculate.  As I explained, I

10  don't think that's possible.  Dr. Sullivan in his testimony

11  does, and in my reply testimony, I explained why I thought his

12  analysis, you know, was implausible, and, you know, it was

13  based on assumptions that are insupportable by the data that

14  was available to him or to anybody in this case.

15  Q.   Okay.  And in your reply, you stated, "I was not asked,

16  nor am I offering an opinion that seeks to quantify damages in

17  this matter."  And that's still true, right?

18  A.   Yes.

19  Q.   Dr. Lehr, part of your opinion about Cox's economic

20  incentives relates to the notion that infringers pay for higher

21  service tiers, right?

22  A.   Well, that's -- I mean, in my actual estimate, I can't

23  actually -- I don't have data that would actually allow me to

24  estimate that, but the fact that it leads me to believe that

25  the estimates I've given are a lower bound to the value of

1   infringing subscribers because it's more likely that infringing

2   subscribers are more valuable.

3   Q.   Right.  So I may have misunderstood that.  You're saying

4   it's not part of the actual calculations you did, but it is

5   part of your opinion about Cox's economic incentive, right?

6   A.   Yes.

7   Q.   The notion that folks who are engaged in infringement are

8   going to pay for higher service tiers?

9   A.   It's more likely.  I think that's right, yes.

10  Q.   And that's because they use more data?

11  A.   Generally, yes.

12  Q.   And need higher bandwidth speeds?

13  A.   Yeah.  Well, and if you have -- if you're using more data,

14  you benefit from having a higher cap, and if you have higher

15  bandwidth speeds, you're going to get better BitTorrent

16  performance and you're going to have a more pleasurable

17  experience when you're uploading and downloading files, and

18  that also means probably that there are going to be more people

19  pulling files from you because they're also going to get a

20  better experience if they pull the files from you, so more

21  infringing copies are likely going into the network from a

22  higher-speed subscriber.

23           MR. BUCKLEY:  Michael, can we pull up DTX 480, which

24  is already in evidence?

25  Q.   So, Dr. Lehr, this is a presentation that Rightscorp made

W. Lehr - Cross                                                          1121

1   to Cox in March of 2011.  Have you ever seen this before?

2   A.   Yes.

3   Q.   You have seen this before?

4   A.   I have seen this.

5   Q.   Can you see, we've got a blow-up at the bottom there, and

6   it says -- this is from somebody at Rightscorp to somebody at

7   Cox.  "We have a new patent-pending solution to media piracy

8   that could safe Cox tens of millions of dollars in decreased

9   operating expenses."

10          Do you see that?

11  A.   Yes.

12          MR. BUCKLEY:  Michael, can we go to the next page?

13  It's the one that ends in 821.

14  Q.   And so this was from part of Rightscorp's presentation,

15  and that bullet that we've expanded there, "You will reduce

16  average cost per subscriber by reducing network traffic," do

17  you see that?

18  A.   Yes.

19  Q.   So Rightscorp's pitch was your costs are actually going to

20  go down if you terminate these folks who are allegedly

21  infringing because they're a drain on the network, which seems

22  to me to be the opposite of the point you're making; is that

23  right?

24  A.   No.  I don't, I don't think that's the point I'm making,

25  nor is it potentially inconsistent.  When I look at this, first

W. Lehr - Cross                                                    1122

1   off, this is talking about something different than what I was

2   talking about.  This is talking about cost, but you have to ask

3   yourself, assuming this number were right, in other words,

4   would I reduce -- this is average cost, not the incremental

5   cost, so it's potentially the total cost of the capacity cost

6   maybe, but what's the revenue effect of that?  That's not

7   talking about that.

8           And then as you said, this is a pitch, so it's a

9   marketing hype potentially.  They're claiming you're going to

10  save this amount of money, but, you know, maybe they will,

11  maybe they won't.  Maybe those fixed costs might go down if

12  they had a better managed network or if they could shift their

13  BitTorrent traffic off-peak.

14          So it doesn't cost them anything basically if people

15  are downloading a bunch of stuff when the network is not

16  congested, and so if the guys are doing it in the middle of the

17  night, it's not an issue.  It is an issue for the customers,

18  though, because the customers are facing the data cap.  So they

19  pay more to Comcast even though it doesn't cost Comcast more if

20  they download more data in the right way.

21  Q.   Dr. Lehr, you understand that what Rightscorp was saying

22  to Cox here is sign up for our program and terminate more

23  infringers because it will save you money in the long run, and

24  your opinion is hold onto as many infringers as you can because

25  you'll make more money in the long run?

1    MR. WARIN:  Your Honor, mischaracterizing earlier

2  testimony about what the Rightscorp people were saying.  There

3  was testimony about this brochure from them.  You know, he

4  didn't author it.

5    THE COURT:  If he can answer the question, I'll

6  permit it.  So --

7    THE WITNESS:  I don't see this is -- I mean,

8  basically if what they're saying is lose the traffic, you'll

9  reduce your costs by 25 or 40 percent and that's what you're

10  going to do, you'll lose the traffic, you'll lose the costs.

11  If you believe this estimate, you'll also lose the revenue.

12    As I explained to you, the revenue you lose is much,

13  much more than the cost.  So that loss of revenue, you're

14  losing a hundred bucks per subscriber, that's a bad business

15  decision.

16    Now, I understand why Rightscorp wasn't telling them

17  how to get more subscribers and make more business.  It was --

18  the product it was selling them was telling them how to manage

19  their network better, and they were making a pitch to Cox about

20  that.  That's -- you know, that's what this is.  I don't think

21  there's any inconsistency between this and my analysis.

22  BY MR. BUCKLEY:

23  Q.  Dr. Lehr, in your deposition, in the discussion about

24  terminating subscribers, you indicated that you didn't have an

25  opinion about how many more subscribers Cox should have

W. Lehr - Cross                                                      1124

1    terminated than it, in fact, did based on infringement

2    allegations, right?

3    A.    Yes.  I was not offering any opinion of what Cox's legal

4    obligation was or what their business practices ought to have

5    been with respect to terminating customers or not.

6    Q.    And you also didn't try to quantify how many more

7    customers Cox should have terminated than it did?

8    A.    That's right, yes.

9    Q.    Do you know how many subscribers Cox has terminated for

10   infringement allegations in the last five years?

11   A.    I don't know right now.

12   Q.    Have you seen any data as part of your work of the number

13   of terminations Cox has performed?

14   A.    I might have, but I don't recall what it was because I,

15   you know, I knew I wouldn't be trying to offer an opinion about

16   what specifically they should have done, because I was trying

17   to discuss the economics of this rather than, you know, sort of

18   what the business practices or the legal obligations of Cox was

19   in this situation.

20   Q.    Do you remember acknowledging at your deposition that it's

21   possible that some appropriate response to infringement might

22   involve terminating some amount of subscribers?  Would you

23   still agree with that?

24   A.    Yeah.  As a hypothetical, certainly it seems very

25   reasonable to me.

1   Q.   Yeah.  And you also said it's not inconsistent that they

2   would need to terminate some subscribers to maximize their

3   subscriber base or retain, you know, a profitable number of

4   subscribers?  Do you remember saying that?

5            MR. WARIN:  Your Honor, beyond the scope and beyond

6   his expert testimony.

7            THE COURT:  Well, I think what I'm hearing is it was

8   discussed in his deposition, but you're saying it wasn't part

9   of his expert report or his --

10           MR. WARIN:  And I didn't ask him questions about it.

11           THE COURT:  Well, I agree.

12           MR. BUCKLEY:  Your Honor, I'll end it after this.

13  This goes to the number of people they should or should not be

14  terminating, and that is -- it's embedded in his entire

15  analysis.

16           THE COURT:  He just said that he didn't -- wasn't

17  asked to and didn't calculate that and it wasn't part of his

18  opinion.

19           MR. BUCKLEY:  Yes.

20           THE COURT:  Okay.  Then that ends that.  Objection

21  sustained.

22  BY MR. BUCKLEY:

23  Q.   Okay.  Dr. Lehr, just a final question to make sure that I

24  understood you correctly.  You were not asked to and you are

25  not quantifying damages in this case; isn't that right?

1    A.   I'm not trying to come up with the -- I'm certainly not

2    trying to quantify the damages to BMG because I don't have

3    those, but I think the estimates that I've provided in this

4    case might be relevant for any such calculation to be done, but

5    I'm not offering an estimate of the damages.

6    Q.   And you didn't do those calculations?

7    A.   And I did not do those calculations.

8             MR. BUCKLEY:  Thank you.  Nothing further, Your

9    Honor.

10            THE COURT:  All right, thank you.

11            Any redirect?

12            MR. WARIN:  No redirect, Your Honor.

13            THE COURT:  All right.  May Dr. Lehr be excused?

14            MR. WARIN:  Subject to recall after Dr. Sullivan.

15            THE COURT:  All right.  Then you're excused at this

16   time, Dr. Lehr.  Please don't discuss the testimony you've

17   given with any of the fact witnesses involved in the case, all

18   right?

19            THE WITNESS:  Yes.

20            THE COURT:  All right.  Thank you, sir.  Have a good

21   afternoon.

22            THE WITNESS:  You, too.

23                      (Witness excused.)

24            THE COURT:  Why don't we do this:  Let's take our

25   afternoon break for 15 minutes, and then we'll come back and I

1   think I'll tell you where we are.

2           We have some deposition testimony left?

3           MR. WARIN:  We have the videotape of Jason Zabek.

4           THE COURT:  Okay.

5           MR. WARIN:  And I think that's the last witness

6   either by deposition or live witness we will have, and then

7   there are some interrogatory answers from Cox that we intend to

8   move, and we've identified those for Mr. Buckley already.

9           MR. BRIDGES:  We will need to discuss that last

10  issue.

11          THE COURT:  Okay.  Then we'll take our -- we'll come

12  back at, you know, 10 minutes of four, and we'll have a video

13  deposition testimony, and then we'll go from there, all right?

14  All right, you're excused.  Thank you.

15                  (Jury out.)

16          THE COURT:  Have you talked about the interrogatory

17  issue and what's objectionable and what isn't and gone as far

18  as you can get without my assistance?

19          MR. BUCKLEY:  No, Your Honor.  So we were just given

20  the list of documents right before we got started this

21  afternoon, so I actually haven't even had a chance to look at

22  them.  I don't know what they are.

23          THE COURT:  Okay.  Do you have copies of them?  Did

24  you give copies of them or --

25          MR. THEODORE:  They have copies; we have copies.

1    THE COURT:  All right.

2    MR. BUCKLEY:  We've got copies of them now.

3    THE COURT:  You have copies, all right.  Well, have

4  you had a chance to look at them yet?

5    MR. BRIDGES:  I've looked at them just a little bit.

6    THE COURT:  Okay.  Why don't you work on that a

7  little bit and get as far as we can.  Then we'll take, take

8  that up when we get back, all right?

9    MR. BUCKLEY:  Thank you, Your Honor.

10    MR. WARIN:  Thank you, Your Honor.

11    THE COURT:  All right, how about 5 minutes to four?

12  You may need a little extra time.

13    All right, thank you.  We're in recess.

14    NOTE:  At this point a recess is taken; whereupon at

15  the conclusion of which the case continues in the absence of

16  the jury as follows:

17  JURY OUT

18    THE COURT:  Okay.  Joe, let's get our jury.  Well,

19  hold on, Joe.

20    Did we resolve the interrogatory answers, or is that

21  going to take some time?

22    MR. THEODORE:  We think that these are admissions,

23  Your Honor.  We'd like to move them in.  They've asked that the

24  objections come out, at least, and we're happy to pull out the

25  objections and prepare revised versions.  But we think these

1    are party admissions and they come in.

2         MR. BUCKLEY:  Your Honor, the issues are broader than

3    that.  Part of the problem is that I was just asked this right

4    before we got started with Dr. Lehr.

5         THE COURT:  Yeah.

6         MR. BUCKLEY:  So just the first set, the very first

7    one, interrogatory number 21, relates to reliance of opinion of

8    counsel or legal opinion as a defense, which you struck.

9         So I really think we need to have a true meet and

10   confer rather than doing it on the fly at a break.

11        THE COURT:  All right.  Well, you've moved them in.

12   I will table that until I have given an opportunity to

13   Mr. Buckley or other members of the team to look at them and

14   rule on their admissibility at that time.  And it may be that

15   it's tomorrow.  Even if so, I won't -- you've formally moved

16   them in there, they're part of your case in chief to the extent

17   they're not objected to and precluded.  Okay.  Does that work?

18        MR. THEODORE:  Thank you, Your Honor.

19        THE COURT:  All right, Joe, let's get our jury.

20        So this is more homework for you, Mr. Buckley.  Give

21   Reilly something to do, will you?

22        MR. BUCKLEY:  I think I know what he would say.

23        NOTE:  At this point the jury returns to the

24   courtroom; whereupon the case continues as follows:

25   JURY IN

1130

1    THE COURT:  All right, please be seated.

2    Who has got the --

3    MR. WARIN:  Your Honor, we call as our next witness

4    by videotape, Jason Zabek.

5    THE COURT:  All right.  Thank you, sir.  And this

6    will include the designations and the counter-designations by

7    Cox, is that correct, sir?

8    MR. WARIN:  That's correct.  And I think we have no

9    disagreement at this point with respect to any of that.

10   THE COURT:  All right.  Good, then let's hit the

11   dial.

12   NOTE:  Portions of the JASON ZABEK videotape

13   testimony are played; at the conclusion of which the case

14   continues as follows:

15   MR. WARIN:  Your Honor, I believe that there are four

16   exhibits that were identified in the deposition that were not

17   previously admitted.  And I believe those are PX 1371, PX 1387,

18   PX 1393, and PX 1394.  I believe by agreement with Mr. Buckley,

19   and consistent with earlier rulings of the Court, those should

20   be admitted now.

21   THE COURT:  All right.  Mr. Buckley.

22   MR. BUCKLEY:  No objection, Your Honor.

23   THE COURT:  All right.  They are all received.

24   MR. WARIN:  Thank you.

25   THE COURT:  Mr. Warin, that's the end of -- with the

1    exception of some admission matters, that's BMG's case in

2    chief; is that correct, sir?

3              MR. WARIN:  Yes, it is, Your Honor.  Thank you.

4              THE COURT:  All right.  Well, we are getting towards

5    the end of the evening.  We have some matters to discuss, and

6    so I am going to let you go now to return at 9:00 o'clock

7    tomorrow morning.

8              And again, you know, go home, enjoy the evening and

9    don't -- please don't discuss the testimony you have heard here

10   with anyone, and don't do any research or investigation.

11             All right.  Thank you all.  We will see you tomorrow.

12             NOTE:  At this point the jury leaves the courtroom;

13   whereupon the case continues as follows:

14   JURY OUT

15             THE COURT:  All right.  I will give you time tonight

16   to look at the interrogatory answers.  Are there any motions at

17   this time?  Mr. Wakefield.

18             MR. WAKEFIELD:  Thank you, Your Honor.

19             We do have JMOLs for the record.  And to start with

20   direct infringement.  Cox submits there has been a failure of

21   proof on direct infringement under 106(3), distribution.  There

22   has been no evidence of a transmission from a Cox account to

23   any person other than Rightscorp and possibly Barbara

24   Frederiksen-Cross, who was plaintiff's agent.

25             So two of plaintiff's agents obtained some torrents,

1    but there is no evidence of a distribution to anyone else, and

2    certainly no evidence of a distribution to the public as 106(3)

3    requires.

4           Rightscorp, not other users, initiated each

5    transaction.  BMG authorized Rightscorp as its agent to

6    initiate these transactions.  So there is no evidence of any

7    unauthorized distribution, even assuming that a digital

8    transmission constitutes a distribution.  Obviously we

9    disagree, but understood the Court's view of that in the

10   summary judgment ruling.

11          Under 106(1), reproduction, there is no evidence that

12   any Cox user downloaded BMG's songs over the Cox network.  In

13   other words, there is no evidence that they made a copy on

14   their computer while using the Cox network.  They possessed

15   files according to the Rightscorp data, but they might have

16   gotten those files at college, while describing to another ISP,

17   or sitting in a Starbucks.

18          Which takes me to the issue of speculation versus

19   circumstantial evidence.  BMG got subscriber information for at

20   least 122 holders of Cox accounts whom BMG accused of

21   infringement in this case.  It failed to provide evidence of

22   any actual activities by any single individual.  They brought

23   in one unreliable declaration which wasn't going to prove

24   anything and was excluded properly.

25          The likely response is, well, it's too hard to prove

1    because this is a mass -- an allegation of mass infringement,

2    but mass infringement still requires proof of infringement.

3    There shouldn't be gimmes for a case where a party is seeking

4    $150,000 per work.

5         Many copyright holders want to sue intermediaries

6    rather than individuals because proof that an individual

7    actually infringed is inconvenient, but we didn't make the law,

8    and that's the proof that the Copyright Act requires.  And we

9    don't think there should be a lower burden on direct

10   infringement than there would be for individuals.

11        Moving to contributory.  We argued in summary

12   judgment that Grokster really changed the playing field.  But

13   let's go pre-Grokster with Sony, the Supreme Court standard,

14   the Betamax case.  The Court considered there the traditional

15   contributory test, knowledge and material contribution, and it

16   ruled that a defendant could not be liable under that test for

17   providing a technology that is capable of significant

18   non-infringing uses.

19        Sony in that case knew that there was infringement

20   occurring with the Betamax.  And the allegation here is Cox

21   knows that there is this stuff going out there.  It might not

22   that a specific person did it, but there is a widespread

23   problem, everyone knows about it.

24        Well, everyone knew Betamax VCRs were used for

25   unauthorized copying.  In fact, that's what that machine did.

1    That machine did nothing but copy video, which was ever since

2    1976 protected the moment it was fixed in the tangible media.

3    This was a copy machine.

4            We don't make copy machines.  We provide a pipe.

5    Barbara Frederiksen-Cross put it out, it is a pipe to the

6    Internet.

7            Anything can happen on the Internet and we don't

8    control it, and we are not contributing to the particular

9    choices that people make merely by providing them a pipe.  The

10   Internet is capable of substantial non-infringing use.  I had

11   to use it to file things with this Court.  So there is no

12   question of that, and I think the law should be clear.

13           Their theory converts contributory infringement into

14   a whole new thing, into some sort of species of negligence law

15   where if you ought to know something, you ought to have a duty,

16   you ought to do something about it.  And that's really a

17   dramatic liberalization and expansion of contributory

18   infringement law beyond where it has been.

19           Finally, vicarious.  As I know my colleague,

20   Mr. Bridges, argued in the summary judgment motion, it's about

21   a relationship.  Vicarious liability turns on a special

22   relationship between a wrongdoer and a defendant.  Typically,

23   employer/employee, principle agent, partners in a partnership.

24   Cox has a contractual relationship with customers like every

25   business that provides a service does.  If that's enough, then

1   virtually any business that's capable of shutting anyone off

2   becomes liable for vicarious liability because it has the

3   alleged right and ability to supervise.

4           But think about the language in the Fourth Circuit

5   standard, right and ability to supervise.  That is different

6   than the ability to turn off a service.

7           Cox -- there is no evidence that Cox supervises the

8   particular decisions that individuals, millions of individuals

9   make.

10          And direct financial interest, what has been shown

11  here with evidence is that Cox does not want to lose customers,

12  true of every business.  But it is not like the Napsters of the

13  world who were running infringement businesses.  Cox provides a

14  pipe to the Internet.

15          And as for draw, I know Your Honor let that survey

16  in, but there is no evidence of any unique draw from that

17  survey to Cox.  Cox customers are like other ISP customers.

18  There is no evidence to show that they are not.

19          So there is no evidence of direct financial interest

20  and certainly no right and ability to supervise.

21          THE COURT:  Thank you, Mr. Wakefield.

22          MR. WAKEFIELD:  Thank you, Your Honor.

23          THE COURT:  Mr. Pecau.

24          MR. PECAU:  Your Honor, this is -- the argument that

25  the defendant is making is really just a rehash of the summary

 1    judgment arguments.  It doesn't really address the evidence

 2    that was introduced.  And, Your Honor, we believe that the

 3    evidence, consistent with your prior opinion, the plaintiffs

 4    have overwhelmingly made their case.

 5            In terms of the issue of direct infringement, Your

 6    Honor, there is plenty of evidence that there was direct

 7    infringement by Cox customers.  This evidence is shown in a

 8    variety of formats.

 9            It certainly was shown by the fact that Rightscorp

10    received the hash values, which are fingerprints of the actual

11    infringements that were occurring by Cox subscribers.  In

12    addition to that, they had actual downloads.

13            And as Your Honor mentioned in your motion for -- in

14    our motion for summary judgment and your order, that it is long

15    been the history of all courts that evidence that is gathered

16    by private investigators in copyright cases and in other cases

17    is evidence of infringement.  And that's what we have here.

18            In addition to that, Your Honor, as our experts have

19    shown, is that the nature of the -- of BitTorrent is the fact

20    that these files go up and down.  And, you know, when somebody

21    is receiving -- when somebody is uploading something, that they

22    are already downloading or have downloaded.  And there is

23    plenty of circumstantial evidence that this jury could find

24    that there was not only infringement by Cox subscribers, but

25    there was massive infringement by Cox subscribers.

1    Now, with respect -- now, with respect to the two

2    secondary liability issues, Your Honor, I will be very quick

3    about that.  The first one is contributory infringement has two

4    requirements, as Your Honor knows.  The first thing is that you

5    have to have knowledge of the infringement.

6    And, Your Honor, I think the evidence clearly shows

7    that there was constructive knowledge by the fact that all of

8    these notices were given to Cox and the nature of those

9    notices.  With all the information that they contain and the

10   fact that they were under penalty of perjury, gave Cox

11   constructive knowledge.

12   In addition, Your Honor, I think that we have made a

13   very strong case for willful blindness that the jury can find,

14   and obviously I think that issue is up to the jury.

15   But, Your Honor, I think the evidence is overwhelming

16   that this isn't just a matter of one isolated incident where

17   Cox decided that, you know, because of the nature of these

18   notices, we're just going to blacklist them because they are

19   seeking settlement.

20   As we have argued from the beginning, this is a

21   holistic thing.  This entire thing is a sham that was set up

22   not only to block people on blacklisting, to give artificial

23   hard limits, as Your Honor can see, that it is virtually

24   impossible.  In fact, it almost beggars the imagination that

25   anybody could get up to a level 13.  We saw the one ticket of

1    how those hard limits allowed somebody to continue to infringe

2    for 28 times over a two-and-a-half year period, and the Cox

3    witness said that's not a habitual user.

4         What they consider to be habitual users are people

5    that manage to go through this whole system three times, and

6    even then they're thinking, well, maybe, maybe we should

7    terminate them, and ultimately decide not to because DMCA

8    equals non-terminate, re-activate.

9         So, Your Honor, I think there is plenty of evidence

10   in terms of constructive knowledge.

11        And then in terms of material contribution.  Your

12   Honor, obviously Cox controls the access to the Internet.  And

13   you can see that with their CATS system, that they have a lot

14   of control over it.  And they are completely cognizant of that

15   control.  They have the AUP, which is completely dependent on

16   the fact that they know that they have the control over this

17   thing.

18        And you can see that even Mr. Vredenburg, sitting at

19   his desk, he can look at a ticket history and he can decide

20   whether to give them access or not.  That is control, Your

21   Honor.

22        And in terms of vicarious liability, the law is no

23   longer that you have to have a parent/child relationship or an

24   employer /employee relationship.  That changed with Gershwin in

25   1973 and has not been the law anywhere since then.

1    What you have to do for vicarious liability is you
2  have to have the right to control and the ability to control.
3  And, Your Honor, I don't think that there is any question in
4  anyone's mind that under the AUP they had the right to control.
5  And certainly Mr. Vredenburg's testimony and Barbara
6  Frederiksen-Cross' testimony, and virtually every witness who
7  knows anything about this system knows that they have the
8  ability to control and to supervise the particular activities
9  that go on.  I mean, that ticket showed plenty of ability to
10 supervise exactly what was going on.

11    And then in terms of the financial benefit.  We have
12 e-mail after e-mail in which Cox realized that they were
13 getting a financial benefit from continuing this infringement.
14 There is no doubt that they were getting a financial benefit.
15 And what was that benefit?  They clearly saw that their
16 customers were getting a value to be able to infringe.  And for
17 example, we just heard Mr. Zabek said, you know, when they're
18 looking at somebody who has been one of these multiple
19 infringers and whether they're going to cut them off or not, he
20 was thinking what the financial benefit was.  And he decided
21 that he would do what is right for Cox and for the infringer.

22    It wasn't in his idea that he was going to do the
23 right thing, which he knew that what these folks were engaging
24 in, using his own words, that they were engaged in theft.  And
25 what did Cox do?  It aided and abetted that theft.

1   And then finally we have the draw, Your Honor.   And

2   the draw is -- as Dr. Nowlis said, the issue was he asked Cox

3   subscribers two things.   First he asked them, are you using

4   sites such as ThePirateBay, Kickass Torrents, and Torrentz to

5   upload or download free digital music.   And 16 percent, one out

6   of six, Cox subscribers said that.

7   Then he asked them, is this -- basically, is this a

8   reason that you subscribe to Cox?   And 70 percent of those

9   people, which you do the math, it comes out to about 10 percent

10  of the people said it is a reason that I subscribe to Cox, so

11  that I can download and upload free digital music through sites

12  such as ThePirateBay, Kickass Torrents, and Torrentz.

13  And the evidence is clear that if you -- that if you

14  are downloading and uploading free music through sites such as

15  ThePirateBay, Kickass Torrents, and Torrentz, you are illegally

16  downloading, whether you know it or not, but that's what you're

17  doing.   There is no doubt about that.

18  So these folks clearly see the value of Cox to them.

19  Cox sees the value of infringing to them.   And this gives you

20  plenty to find -- the jury to find that there was vicarious

21  liability.

22  Thank you, Your Honor.

23  THE COURT:   All right, thank you.   Well, as you

24  know -- and we spent a lot of time looking at this before we,

25  you know, handed down our summary judgment decision in -- the

1    substance of it shortly before the trial started.  And whether

2    I'm right or wrong, somebody else is going to decide.  But, you

3    know, I considered the arguments of both parties pretty

4    carefully and came down with my decision.

5          So the issue before me now is did the evidence

6    conform to the decisions that I made.  And I believe that the

7    evidence did conform to it, and that the jury will receive

8    evidence that they may consider which -- in which they could

9    find that BMG has met its burden in each of the instances that

10   we've discussed this evening.

11         So I'm going to deny the judgment as a matter of law.

12   Your exception, of course, is noted.

13         How long do you think is it going to take to put

14   Cox's case in?

15             MR. BUCKLEY:  Probably four to five days, Your Honor.

16             THE COURT:  Really?

17             MR. BUCKLEY:  Yeah.

18             THE COURT:  God.  You're now my most unpopular person

19   in the room.

20             MR. BUCKLEY:  See how they both looked at me to stand

21   up.

22             THE COURT:  The deliveryman.  Go back to doing your

23   community service projects in Portland.

24             MR. BUCKLEY:  I would like to.

25             THE COURT:  Really?  Come on, you're kidding me.  No,

1  how many witnesses do you have?  I mean, you've got Sullivan.

2  How many experts?

3          MR. BUCKLEY:  We've got two experts, Your Honor,

4  Dr. Sullivan and Mr. Rucinski, who is going to talk -- and

5  Mr. Poret, our survey expert.

6          THE COURT:  Okay.  And then how many other witnesses?

7          MR. BUCKLEY:  Four or five.

8          THE COURT:  Okay.  So we'll go through the end of the

9  week in any event.  All right.  I'll explain that to the jury.

10          As I said, I've got this argument in Richmond on

11  Monday, so we won't sit on Monday.  We'll just come back

12  Tuesday.

13          And then you've got decisions on the rebuttal

14  evidence.  And, you know, let's target what you think is

15  important rather than trying to put your case in a second time

16  because -- well, you've already put it in twice, but now don't

17  try it a third time.  So -- okay.

18          So, Mr. Buckley, you're going to look at the

19  interrogatory answers tonight and see if you can't work that

20  out.  And you'll have your witnesses ready to start tomorrow

21  morning?

22          MR. BUCKLEY:  Absolutely.

23          THE COURT:  Okay.

24          MR. BUCKLEY:  Your Honor, we also have designations

25  and cross-designations for one of the videos that we may show,

1   Chris Sabec, the Rightscorp CEO, we may play portions of his

2   video.

3            THE COURT:  Okay.  Yeah.  Joe?  So I'll get that to

4   you in the morning?  Mr. Buckley, I'll get this back to you in

5   the morning?

6            MR. BUCKLEY:  That would be great.  Thank you, Your

7   Honor.  And if you would like to hear -- if you have questions

8   about it and want to hear a little argument on it in the

9   morning, we can do that too.

10           THE COURT:  Okay.  All right, good.  All right,

11   anything else tonight?

12           MR. PECAU:  I don't think so, Your Honor.

13           THE COURT:  All right.  Thank you.

14           We're in recess.

15           NOTE:  The December 8, 2015 portion of the case is

16   concluded.

17      --------------------------------------------------

18

19           We certify that the foregoing is a true and
         accurate transcription of our stenographic notes.

20

21           /s/  Norman B. Linnell
         Norman B. Linnell, RPR, CM, VCE, FCRR

22

23           /s/  Anneliese J. Thomson
         Anneliese J. Thomson, RDR, CRR

24

25