UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                          :
              Plaintiffs,        :
                                : Case No. 1:14-cv-1611
     vs.                         :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
              Defendants.        :
--------------------------------:
```

VOLUME  6  (A.M. portion)

TRIAL TRANSCRIPT

December 9, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:


COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006



COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA   98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

<u>INDEX</u>

<u>WITNESS</u>                              <u>EXAMINATION</u>        <u>PAGE</u>

SIDD NEGRETTI

                                    DIRECT              1151
                                    CROSS               1205
                                    REDIRECT            1223

HAL PORET

                                    DIRECT              1233
                                    CROSS               1272
                                    REDIRECT            1280

1    NOTE:  The December 9, 2015 portion of the case

2  begins in the absence of the jury as follows:

3  JURY OUT

4    THE COURT:  All right.  Good morning to all counsel.

5  We had a preliminary matter.  Is that --

6    MR. PECAU:  Just one.

7    THE COURT:  Sure.

8    MR. THEODORE:  Yes, Your Honor.  So I think we have

9  an agreement on the -- on the rogs where we're going to move in

10  PX 1610, PX 1620, PX 1622, and PX 1614, which are versions of

11  the rogs that we have redacted the objections and we've

12  redacted a couple of different interrogatories that we both

13  agreed were not necessary under the circumstances.

14    THE COURT:  All right.  Is that right, Mr. Reilly?

15    MR. REILLY:  That's correct, Your Honor, and we

16  appreciate the plaintiff's cooperation with us on that.

17    THE COURT:  All right.

18    MR. REILLY:  Our only concern that remains is, again,

19  that these were answered at the time when the DMCA safe harbor

20  defense was still in the case, so there are a lot of references

21  to section 512 of the DMCA, and it may be appropriate for the

22  Court's consideration when giving some sort of instruction

23  about that issue.

24    THE COURT:  Versus redacting that portion out or --

25    MR. REILLY:  I think it would probably disrupt the

1148

1  sentences to the extent that it would make them less

2  intelligible.  I mean, I think that's -- in the same way it's

3  come out in the deposition testimony that's been read into the

4  record as well as the references to it that have been -- you

5  know, the incidental references to it that have come forth in

6  all the other testimony.

7      THE COURT:  Okay.  Well, I'll look at it and then we

8  can talk about at the end when we are looking at jury

9  instructions.

10      MR. REILLY:  Thank you, Your Honor.  Just one other

11  clarification in the record.  When we had turned in a disk of

12  the electronic spreadsheet during Dr. Nowlis' testimony --

13      MR. THEODORE:  That's correct.

14      MR. REILLY:  -- we have tendered to the Court a disk,

15  and I just wanted to confirm in the record its number.  And you

16  had ruled that it would be admitted.  I needed to connect the

17  dots of the number and the admission, and I think it's without

18  objection, and that number --

19      MR. PECAU:  There is no objection, Your Honor.

20      THE COURT:  Okay.

21      MR. REILLY:  Thank you.  That's DTX 0307, and that's

22  a compact disk containing a digital version of that

23  spreadsheet.

24      THE COURT:  All right.  Thank you.

25      MR. REILLY:  Thank you, Your Honor.

1149

1          MR. CARACAPPA:  Your Honor, one other issue.  We just

2   want to make sure that the Zabek video transcript has

3   officially been moved into evidence.  It was played yesterday.

4   We believe it was, but we just wanted to confirm that with the

5   Court.

6          THE COURT:  Yeah, there was no objection to that,

7   right?

8          MR. CARACAPPA:  No, Your Honor, there wasn't.

9          THE COURT:  No, it's in.

10         MR. CARACAPPA:  Okay.  Thank you, Your Honor.

11         MS. JOBSON:  Good morning, Your Honor.  One other --

12  excuse me.  One other note --

13         THE COURT:  Good morning, Ms. Jobson.

14         MS. JOBSON:  I believe we received your notes on the

15  video objections of Christopher Sabec, and there was one where

16  you had noted, I believe, that you'd like to hear from us.

17         THE COURT:  And I just didn't -- on 166 through 171,

18  I guess, without having the exhibits, I just wasn't sure what

19  was -- the purpose of putting those pages in.

20         MS. JOBSON:  This was for the purpose of showing --

21  it goes to the reliability of the software that generates the

22  notices in terms of sending notices to businesses, social

23  clubs, and that kind of thing.  And the document associated

24  with that testimony.  I have a copy here if you would like to

25  take a look.

1    THE COURT:  Say that one more time.  You have what?

2  It goes to the accuracy of the software system.

3    MS. JOBSON:  Yes, Your Honor.

4    THE COURT:  And then what?

5    MS. JOBSON:  And the nature of the IP addresses that

6  it sends the notices to.  It includes businesses, social clubs,

7  etc., as opposed to individual subscribers.

8    THE COURT:  Okay.  I will let it in then.

9    MS. JOBSON:  Thank you, Your Honor.

10    THE COURT:  All right.  Are we ready for our jury

11  then?

12    MR. WAKEFIELD:  I think so, Your Honor.

13    THE COURT:  All right, Joe.  Let's get our jury.

14    NOTE:  At this point the jury returns to the

15  courtroom; whereupon the case continues as follows:

16  JURY IN

17    NOTE:  At this point the jury returns to the

18  courtroom; whereupon the case continues as follows:

19  JURY IN

20    THE COURT:  All right.  Please be seated.

21    Good morning, ladies and gentlemen.  I hope you had a

22  good evening.  Can I have that same nod of heads that you

23  didn't do any investigation or research or discuss the case

24  with anyone?  All right.  Thank you very much.

25    All right, we will begin Cox's case.

1    Mr. Wakefield, first witness, sir.

2    MR. WAKEFIELD:  Cox calls Sidd Negretti.

3    NOTE:  The witness is sworn.

4    SIDD NEGRETTI, called by counsel for the defendant,

5    first being duly sworn, testifies and states:

6    DIRECT EXAMINATION

7    BY MR. WAKEFIELD:

8    Q.   Good morning, Mr. Negretti.

9    A.   Hi.

10   Q.   Could you state your full name for the record.

11   A.   Sidd Negretti.

12   Q.   And what is your position at Cox?

13   A.   I'm currently the executive director of product marketing

14   strategy.

15   Q.   And can you describe for the jury your educational

16   background.

17   A.   My educational background?

18   Q.   Yes.

19   A.   Yeah.  So I went to undergrad at Arizona State University,

20   and my undergrad degree was a Bachelor of Arts in broadcast

21   marketing.  And then I got my MBA in 2008 from Emory University

22   in Atlanta, Georgia, that has a concentration in finance and

23   marketing.

24   Q.   And I think you said executive director of product

25   marketing strategy; is that correct?

1  A.    Yes.

2  Q.    How long have you been with Cox?

3  A.    I have been with the company since January of 1999.

4  Q.    And was that direct out of college or --

5  A.    It was my second job out of college.

6  Q.    When you first joined the company, Cox, what were your job

7  responsibilities?

8  A.    Yeah, so I was a technical support representative for our

9  San Diego office, so I basically worked with other call center

10  reps to handle billing calls, tech support calls, and even

11  sales and upgrade calls for our telephone product.

12  Q.    Okay.  And over time did your responsibilities expand

13  beyond the telephone product?

14  A.    Yes, absolutely.

15  Q.    And today what are the products that you support?

16  A.    Yes.  So as the executive director of product marketing

17  strategy, I oversee our digital telephone product that I

18  mentioned before, as well as Cox high-speed Internet, which is

19  our Internet broadband product, and our digital cable or

20  advanced TV product.

21  Q.    Okay.  So digital cable, that's -- would that be cable TV?

22  A.    Yep, that's right.

23  Q.    In your work doing support, did you have opportunities to

24  go into customer homes?

25  A.    Absolutely, yes.

S. Negretti - Direct

1153

1 Q.    Have you ever had experience actually installing cable in

2 somebody's home?

3 A.    Yep, even very recently.

4 Q.    Okay.  Well, even recently as the --

5 A.    Yes.

6 Q.    -- as the executive director of product marketing?

7 A.    Yes, absolutely.

8 Q.    How is it that as the executive director of product

9 marketing you actually go into people's homes?

10 A.    Yeah, so something that I do personally and that I

11 encourage my team to do, and then what our company overall

12 wants us to do is make sure we stay in touch with the customer

13 as often and as conveniently as possible.

14         And so, I will make it a quarterly effort to go and

15 visit with our customers in our different markets and our

16 regions.  And when I'm in those regions -- in those homes, I

17 will certainly help out our technical installers by installing

18 the equipment, installing the boxes, explaining to the consumer

19 what it is that they're getting from us.

20 Q.    And do you go into homes only in the region around your

21 office?

22 A.    Oh, no, all across the country.  We have regions

23 everywhere from San Diego and Las Vegas on the West Coast, all

24 the way from here in Virginia to Rhode Island on the East

25 Coast, and we'll try to visit as many different regions as

S. Negretti - Direct

1154

1    possible.

2    Q.   Okay.  In going into people's homes and talking to them,

3    do you have information about how often you see WiFi set up

4    with people's Internet?

5    A.   Say that again.

6    Q.   How often do you encounter WiFi, wireless Internet set up

7    in people's homes?

8    A.   Well, at this point in time it's almost ubiquitous, right?

9    You see it all the time.  In fact, in 2014 we did a study on

10   the Internet product to try to understand a little bit more

11   about what people thought about Internet services.  And one of

12   the big things that came out of that study was that Internet is

13   WiFi and WiFi is Internet.

14            And so, when consumers start referring to their

15   Internet services in their homes, they say my WiFi is down, my

16   WiFi costs too much, my WiFi is this, as a reflection of what

17   they mean by the Internet services we are providing to them.

18   Q.   If you think back to the 2011 time frame, was WiFi

19   prevalent in your view in customers' homes?

20   A.   Yeah, very much so.

21   Q.   Let's go back through some of that job responsibility.

22   A.   Sure.

23   Q.   You were doing telephone product marketing, I believe, for

24   the San Diego market; is that right?

25   A.   That's right.

S. Negretti - Direct

1155

1   Q.   And then what was your next position at the company?

2   A.   Yeah, after that I became a training specialist for that

3   same San Diego market.  So all the folks that were on the

4   phones answering the calls from the customers, I became the

5   trainer to help understand and develop their skill sets.

6   Q.   All right.  And when did you move from supporting the

7   telephone service to cover Internet service as well?

8   A.   Yes.  So I owned the telephone product not only at a

9   regional level in San Diego, but then in Atlanta between 2005

10  and 2010 as their a product marketing manager for telephone.

11  At that point in time, I went to the Las Vegas market and was

12  the director of product marketing, and that included our

13  telephone product, our Internet product, and our video product.

14  Q.   Okay.

15  A.   And I've stayed at a level that has included all of our

16  residential products since that point forward.

17  Q.   And so all the residential products, you mentioned that's

18  TV, phone, and Internet?

19  A.   That's right, with the exception of home security.  Home

20  security is more nascent product that we are still developing.

21  So that is housed separately in a different part of our

22  company.

23  Q.   Okay.  And did your -- so it sounds like you have had

24  those three main products of the four since 2010.  Has the

25  geography that you have served expanded over time?

S. Negretti - Direct

1156

1    A.   Yeah, that's right.  So when I -- I mentioned that I went

2    out to Las Vegas in 2010.  In 2012 my responsibilities expanded

3    beyond Las Vegas to include Arizona as well, which is our

4    biggest market where we have our most customers.  So with the

5    southwest region from 2012 to 2014.

6    Q.   Okay.

7    A.   And then in 2014 I returned to our Atlanta office to

8    oversee this for the entire company.

9    Q.   So now how would you describe your job responsibilities

10   since 2014?

11   A.   Yeah.  So I think of my job responsibilities as three

12   different things really.  One is knowing and understanding

13   consumer insights.  So when we are talking earlier about being

14   in customers' homes, that's one way to continue to be close to

15   the consumer, to understand what it is that they want and need

16   out of a service provider such as ours.

17        Number two is to take those insights and distill them

18   into product development.  What products and services do we

19   need to want to develop so consumers can then purchase them

20   from us.

21        And number three is figuring out which market

22   segments are out there in the population that we can market

23   those products and services to.  Those are probably the three

24   key responsibilities of my job.

25   Q.   Thank you.  And are you aware of any awards that Cox has

S. Negretti - Direct

1157

1    received for its Internet service?

2    A.   Yeah.  So we've received numerous awards over the years

3    for our Internet service.  I can think of a couple off the top

4    of my head.  One of the ones that I am most proud of is the

5    J.D. Power Award for highest in customer satisfaction.  We

6    think that's an important award and we have won it several

7    different times, both the regional and national level.

8             Most recently, I think in 2012, we won it for the

9    Highest in Customer Satisfaction of our Internet service.  The

10   reason I think that is important is because satisfaction,

11   customer satisfaction doesn't mean just the price you charge

12   for the customer or the speed that you are delivering to the

13   customer.  It means an array of things in terms of how we

14   support the customer and how we do business with the customer,

15   and how satisfied they are as a result.

16   Q.   Okay.  You mentioned these three -- the three core

17   products that you have responsibility for.  To your knowledge,

18   does Cox supervise how people use the cable TV?

19   A.   I don't understand.

20             MR. PECAU:  Objection, Your Honor, it's leading.

21             THE COURT:  Let's lay a foundation for how he would

22   know that.

23   BY MR. WAKEFIELD: (Continuing)

24   Q.   Are you familiar with what abilities Cox either has or

25   does not have to determine how people use the services they

S. Negretti - Direct

1158

1   purchase from Cox?

2   A.   How they use it?  No, we don't -- I mean, we wouldn't

3   instruct them how to use it other than to share with them how

4   to get the best out of it.  For example, if there's TV shows

5   that they -- that we want them to know and be aware of, this is

6   how you find the TV shows.  Product education, things like

7   that.

8          But I don't know if that answered the question.

9   Q.   I think it does.

10          Well, I think that establishes a foundation for the

11   question I had asked earlier, Your Honor.

12          THE COURT:  I don't think it does.

13          MR. WAKEFIELD:  Okay.  I can move on.

14          THE COURT:  All right.

15   BY MR. WAKEFIELD: (Continuing)

16   Q.   Let's talk about the TV part of the business for a second.

17   A.   Sure.

18   Q.   What are the -- are you familiar with the main costs of

19   developing that product and providing it to people's homes?

20   A.   Yeah, absolutely.

21   Q.   And what are the main costs?

22   A.   Yeah.  So, well, the biggest cost is the direct cost that

23   we pay for programming.  So anything that we're going to put on

24   our airwave and share with our customers comes out of

25   programming costs because those programmers have to develop

S. Negretti - Direct

1159

1    that content and provide it to us.  So that's a very high

2    amount of the costs.

3           There are other costs as well in terms of the

4    hardware cost and the physical plant facility to deliver that

5    all the way to the consumer's home from what we call our head

6    end or the central station in which the signal starts and is

7    delivered.

8    Q.   So, for example, if a customer has TV, if a Cox customer

9    has TV service and they get HBO, is there any cost associated

10   with HBO content?

11   A.   Yeah, absolutely.  So we pay HBO for that content.  We pay

12   all of our content providers for the content.  And as I said

13   before, that's a high driver of the consumer costs,

14   unfortunately, and we have to pass that along to the consumer

15   in a way that is hurting both the consumer and us as a company

16   because it challenges us from the ability to deliver revenue

17   for our bottom line, but also keep the price low for the

18   consumer.

19   Q.   Over the time you've been in marketing, has the cost of

20   the content that Cox provides generally gone down or up or

21   stayed the same?

22   A.   Up, absolutely up.

23   Q.   Okay.  How would it affect Cox's financial interest if in

24   providing that sort of content that it pays for, the customers

25   could get the same content for free?

S. Negretti - Direct

1160

1   A.   Well, so that's a challenge for us, right?  So if you

2   think about that example that you're talking about with HBO, so

3   HBO charges us -- we can use some numbers here.  HBO might

4   charge us $10 per month to offer its product for the consumer.

5   We turn around and might sell that to the consumer for $15.  So

6   we make $5 worth of revenue off of each sale of HBO, for

7   example.

8          If for some reason the HBO content, maybe it is Game

9   of Thrones or whatever else that people like and consume, is

10  available somewhere else, that's an indication to us from a

11  cost perspective in two different ways.  Number one is we no

12  longer get that $5 in revenue.  So as a company trying to make

13  a profit, that is a challenge.

14         Number two, it is a constrain on our network, right,

15  because if they're using that content in other resources, in

16  other places, then we have to support that network in a way

17  that's much more costlier than before.

18  Q.   Okay.  So would that be bandwidth cost?

19  A.   Yes.

20  Q.   Okay.

21  A.   Bandwidth and an infrastructure cost.

22  Q.   In addition to the TV content, do cable subscribers from

23  Cox also receive music content?

24  A.   Sure, absolutely.  We're always looking at ways to drive

25  added value to our consumers, and whether it is through the

S. Negretti - Direct

1161

1   video service, through music and things like that, we are

2   looking at ways to try to deliver them new things that they

3   can't get either on their own or on their own at full price.

4           So, for example, we have got a current engagement

5   with Pandora.  Pandora is a music provider, streaming audio

6   provider that allows you to choose channels or moods or genres

7   of music to listen to on not only your -- things like your cell

8   phones and things like that, but also on your cable box through

9   Cox Communications.

10          So we enable that subscription to happen through our

11  cable box, and then they can play that music throughout their

12  house if they want.  It's just a more tightly integrated way of

13  offering them streaming services.

14  Q.   So let me make sure I understand how that would work.  So

15  if a customers pays for a subscription to Pandora, they can get

16  that -- can they get that on their computer?

17  A.   Yeah.  So I am not as clear as to whether Pandora has a

18  paid or free service.  Spotify would be an example where there

19  is a free and paid service.  But this consumer brings their own

20  authentication and log-in to the Pandora service to our video

21  set-top box.  They enable that -- we can enable that on the

22  video set-top box enabling the consumer to see all their

23  playlist and even go and pick new songs or playlists or

24  whatever they may feel are important to them, and then they can

25  hear that on their video set-top box and whatever that

1   video-set top box is hooked up.

2   Q.   Why does Cox include a music service like Pandora with its

3   TV service?

4   A.   Yeah, I think -- I mean, the key thing is consumers want

5   it, consumers ask for the ability to have more integration with

6   things that they feel are important to their lives, such as

7   streaming music service.

8   Q.   Are there other music services that work with the Cox

9   cable service?

10  A.   Sure.  Pandora is one example.  But there is a company

11  called Music Choice.  Music Choice works the same way.  We give

12  you the ability to actually tune directly to channels on our

13  cable box, and you can listen to different types of Music

14  Choice music.  Right now the holiday music is pretty popular.

15          You can also pull up Music Choice on demand and

16  listen to -- if you want to listen to specific artists, you can

17  pull up those songs on demand and listen to them through our

18  Music Choice app on our set-top box as well.

19  Q.   Is that included in the monthly subscription?

20  A.   Yes.  That's what we call an added value, really.  It is a

21  way of giving consumers more for the price that they are

22  paying.

23  Q.   And how would it affect Cox if a customer that has that

24  service through the cable could get those same songs through

25  unlicensed services for free?

S. Negretti - Direct

1163

1   A.   Yes.  So it's going to have a negative impact because --

2   for a couple reasons.  One is it drives down the engagement the

3   customers have with our products and services, right.  So we

4   want the customer to have high levels of engagement with our

5   products and services, use the product and services often, and

6   feel an allegiance to that product and services.

7        If they are not using the things that we are giving

8   them, then they are going to think specifically about one thing

9   or less things about the products that we offer, and they are

10  not going to have as much brand positivity when it comes to

11  that product.

12  Q.   Now, you mentioned earlier that part of your job

13  responsibility is gaining customer insights, I believe is the

14  term you used.

15  A.   Sure.

16  Q.   What do you mean by that?

17  A.   Say that again.

18  Q.   What do you mean by gaining customer insights?

19  A.   Gaining customer insights?  Okay.  Well, again, if I was

20  to categorize what our job is, the most important thing about

21  our job as a product marketer and as the strategic arm of

22  product marketing is to know and understand the consumers'

23  interests.  So we have to do as much as we can to really

24  understand the different types of consumers that are out there,

25  what motivates them, what needs they have, what it is they want

S. Negretti - Direct

1164

1    to see out of a provider such as ours so we can help deliver

2    those products into the marketplace, because that is what's

3    going to help drive value in our company.

4    Q.   Okay.  Now, I have heard the term "product marketing and

5    advertising."  Can you explain what the differences are between

6    those?

7    A.   Product marketing -- let me start.  Advertising is more of

8    an output, right.  Advertising is what the consumer sees in the

9    marketplace that tells them, this is what Cox is offering in

10   the marketplace, this is how much it costs, this is why you

11   should buy it, this is how you should feel about it.

12             Product marketing -- or the process of developing the

13   product and all the insights and all the germination to develop

14   that content that would go into the advertising.

15             So product marketing is the input and the driver, and

16   the output is advertising.

17   Q.   Okay.  And would you consider yourself in the advertising

18   side or the marketing side?

19   A.   I am definitely on the product marketing side.

20   Q.   Okay.  From your perspective, is there any statement or

21   motto that affects your decisions as a product marketer for

22   Cox?

23   A.   Well, there are several.  I think the most important one

24   is our company promise, our company motto, and that is to be

25   the most -- The Trusted Provider of Entertainment Services and

S. Negretti - Direct

1165

1   Media Services in the United States.  I think that is the one

2   that we look to when we're trying to make all of our decisions

3   about what it is that the consumer wants and how we should be

4   bringing those products to market.

5   Q.   Okay.  And then in your job, in your role in marketing, do

6   you have input into what products to develop and how to

7   position them?

8   A.   Yep, very much so.

9   Q.   And how do you get information about what customers want

10  to go about making those decisions?

11  A.   Yep.  So, again, we talked about those consumer insights

12  before, and that's the key way.  You can get consumer insights

13  lots of different ways.  So you can ask customers through

14  polling, either online surveys, or telephone surveys, or

15  in-person surveys what they think about something.  You can

16  create that polling in lots of different ways.  They help drive

17  the decision that you are trying to make.

18          You can be structured in terms of focus groups.  You

19  can actually sit in a room with consumers, whether it is what

20  is called a blind test where they don't know who you are or

21  a -- you know, where they have full understanding of what you

22  are, that you are from Cox Communications, and you get feedback

23  from them.

24          I mentioned before going into consumers' houses,

25  spending time with our consumers, both over the phone, in

1   person, and when they come visit us, for example, in our retail

2   stores, and understanding from them what it is that they are

3   feeling motivated by and what their necessities are.

4   Q.   And in your role do you personally review research about

5   customers and what they want?

6   A.   Yeah.

7   Q.   Is there a group within Cox that is responsible for

8   conducting market research?

9   A.   Yeah.  So we work closely with the Cox consumers insights

10  group.  So as product marketers we will come to that group with

11  a set of questions or a set of decisions that we're trying to

12  make.  And we will try to understand from them what inputs they

13  need from us in order to be able to field these surveys, if

14  they will, or these polls.  And then they'll go and talk with

15  different research companies and with consumers and try to

16  understand what it is that the consumers are thinking about.

17  Q.   All right.  And how do you interact with the Consumer

18  Insights Group?

19  A.   Yeah.  So we work very close boundary partners with them.

20  So we will have lots of intake meetings and lots of output

21  meetings, right.  So we will talk to them about -- again, I

22  mentioned, what question do we want to know the answer to, what

23  decision are we trying to make if that answer is a positive or

24  a negative, and then sit down with them.  And we'll design

25  things like survey instruments and they will put their

S. Negretti - Direct

1167

1    expertise on it and how they are going to reach across either

2    to our consumers or our customers directly and, you know, what

3    that should look like.

4            At that point in time we will even be invited to go

5    along on some of those research studies and actually hear from

6    the customer what they are thinking and feeling and saying.

7    They will bring back to us outputs, whether that is

8    quantifiable output, qualifiable output, or combinations

9    thereof, things like video tapes and audio tapes, and just ways

10   that we can get context about what the consumer is hearing,

11   feeling, and saying.

12   Q.   So you mentioned qualifiable and quantifiable outputs.

13   Can you explain what the difference is.

14   A.   Yep.  Quantitative -- I am sorry, I meant quantitative and

15   qualitative.  And so quantitative is something that's a

16   specific data set, right?  Something that will tell you in

17   somewhat of a binary fashion or across the scale, yes, no,

18   worst, best, things like that.

19           Qualitative is a little bit more -- it is a little

20   bit more subjective and narrative.  It is the consumer

21   expressing words, phrases, sentences, and saying this is how I

22   see that or perceive that.

23   Q.   And do you consider both in making decisions in your role?

24   A.   Very important.  You have to do one with the other.

25   Q.   And what's your understanding of how the consumer research

S. Negretti - Direct

1168

1   group actually conducts surveys or polls?

2   A.   Can you explain that a little bit more?

3   Q.   Yes.  So if there is a poll conducting, what actual

4   happens, to your knowledge?

5   A.   Yeah.  Well, I don't have all the details because I am not

6   in the Consumer Insights Group, but they'll look at a

7   significant portion of their audience that they feel is

8   necessary to gain a sample size.  They will conduct a survey or

9   create a survey instrument that will be used to go out there

10  and ask a set of questions.

11          One of the key points, I think, that we always

12  struggle with as marketers and as researchers is how to pull

13  out bias, if you will.  It is very easy to inject bias in this

14  thing, because I may come with a certain set of questions or a

15  decision I want to make, and that might be -- that might

16  permeate through the study, right?  And it's almost saying,

17  would you like to do that, wouldn't you like to do that.  And

18  those can be dangerous ways to receive information, if you

19  will.

20          So we spend a lot of time thinking about how to drill

21  down and eliminate that bias so we can get as clean a read on

22  the consumer and what their true desires and insights are.

23  Q.   I would like to turn to some of the market research in

24  particular.  You should have a binder there with some tabs.

25  A.   I do.

S. Negretti - Direct

1169

1    Q.    And if you go to the one that says DTX 0284.

2    A.    O2 what?

3    Q.    0284.  It should be, I think, the third tab.

4    A.    Opportunities to Maximize Demand for Residential Internet

5    Service?

6    Q.    Right.

7    A.    Yes.

8    Q.    And do you recognize the document that has been identified

9    as DTX 0284?

10   A.    Yes.

11   Q.    And what is it?

12   A.    So this is an insight study that we did in the middle half

13   of last year to try to understand a little bit more about our

14   Internet services specifically in terms of how to generate more

15   demand for the Internet services and how to price and package

16   our Internet services more effectively for the consumer.

17   Q.    And is this among the types of research materials that you

18   consider in your role?

19   A.    Yeah, this is pretty typical.

20            MR. WAKEFIELD:  Cox offers DTX 0284 in evidence.

21            THE COURT:  Any objection?

22            MR. PECAU:  No objection, Your Honor.

23            THE COURT:  It is received.

24            MR. WAKEFIELD:  So if we could but up the first page

25   of DTX 0284.

S. Negretti - Direct

1170

1    BY MR. WAKEFIELD: (Continuing)

2    Q.   So how would you typically receive this sort of research

3    information?

4    A.   Yes.  You mean at the end when we have the outputs?

5    Q.   Right.

6    A.   So what the Consumer Insights Group will do is -- again,

7    we have a pretty consistent cadence with them where we will

8    literally sit down and hear the outputs.  We will hear them in

9    phases, right, because you will get the outputs in raw form and

10   then you'll get the outputs in refined form when they have, you

11   know, more explanation behind them.  Some of the outputs are,

12   you know, still being tested or still being evaluated.

13           And so, the point is that they'll sit down with us

14   periodically and go over, here is what we are seeing, here is

15   what we are learning.  At the end they will put together

16   something like this document that you have in front of you, and

17   it will give us a pretty exhaustive view of the set of

18   questions that we are trying to hear the answers to.

19   Q.   Okay.  Would this be presented to you in the form of like

20   a PowerPoint?

21   A.   Yeah, so this would be a PowerPoint presentation.  We will

22   also, if we needed, have access to the back-end data that

23   drives this, if it is meaningful, to help drive our decisions.

24   Q.   Okay.  Let's turn to the second page.  And there is a

25   statement of research objectives and also a business objective?

1   A.   Yep.

2   Q.   What's the difference between those?

3   A.   Yeah.  So when I was talking earlier about the question

4   we're trying to ask or the decision we're trying to make,

5   that's an example of the business objective.  That's really our

6   job as part of product marketing strategists, to come into the

7   room and bring that question with us.  And in this case it is

8   Cox would like to determine how to package and price its

9   Internet services in order to maximize demand.  So that's the

10  question that's on our mind.

11        As a result of that and as a discussion -- as a

12  result of the discussion with the Consumer Insights team, they

13  will come up with set of research objectives.  What do we want

14  to learn from this specific set of studies?  What are the

15  things we think are important?  Because you could ask a lot of

16  questions, you could ask a few questions, but how do we

17  understand based off of the business objective what it is that

18  you want as an output.

19        And so, these are the research objectives to get at

20  that.

21  Q.   I see.  And what's the date of the study?

22  A.   What's that?

23  Q.   The study is from August 2014; is that right?

24  A.   Yes.

25  Q.   And if you turn to the second page -- I'm sorry -- the

1   next page ending in 7225, there's a slide entitled,

2   Methodology.  Do you see that?

3   A.   Yes.

4   Q.   And so there's a statement that there is a total of 1,513

5   online surveys that were completed; is that right?

6   A.   Yep.

7   Q.   And there's a discussion of sample requirements?

8   A.   Yep.

9   Q.   Okay.  And why are sample requirements used in the

10  research that Cox does?

11  A.   Yeah.  And again, this is where the Consumer Insights

12  Group knows and understands this as at a lot deeper level than

13  I do, but it is important to know and understand who you are

14  going to poll, who you are going to get insights and research

15  from.

16       The point is that I -- again, as I talked about

17  biases, if you want to know something that might be prevalent

18  to a very specific segment of customers and you ask all

19  customers that information, you may not get the accurate

20  information.

21       And vice versa, if you want to -- you know, if you

22  are trying to understand how price might affect all of our

23  customers, but you only ask customers who are at a certain age

24  group where price is more important to them, then you're not

25  going to get a relative response as a result.

S. Negretti - Direct

1173

1      So it's important to have those sample requirements
2  laid out in terms of what ages, samples -- you know, are they
3  customers of ours or not?  Do they live in our footprint or
4  not?  Do they subscribe to our products?  Which ones do they
5  subscribe to?  And so forth.
6  Q.   I see.  So looking to the right, where it describes Sample
7  Structure, the people polled in this survey included Cox
8  customers; is that right?
9  A.   Yes.
10  Q.   Okay.  How many?
11  A.   Well, in this case it's 1,500.
12  Q.   Well, if you look next to Cox Customers and Cox Prospects,
13  there are different numbers.  Do you see those?
14  A.   Yep.  So --
15  Q.   And then below that there is also AT&T, Verizon, and
16  CenturyLink?
17  A.   That's right.
18  Q.   Okay.  So is it your understanding that the 1,513 included
19  a mix?
20  A.   Yes, and that's exactly right.  So that's that mix that I
21  was talking about in terms of, you know, we want to make sure
22  based on the question that we're answering and the decision
23  that we are making, that we have relative perspective.
24      And so this tells what that relative perspective will
25  look like.  We ask people who are customers of, we ask people

S. Negretti - Direct

1174

1    who do not have a relationship with us currently.

2            Of the people who do -- that are customers of ours

3    and who do not have a relationship with us, that's how it broke

4    down in terms of who they do business with today, which one of

5    the major competitors that we have in our marketplaces do they

6    do business with.

7    Q.   So in this case, it looks like more than half were Cox

8    customers?

9    A.   Yes.

10   Q.   Okay.

11   A.   And that's typical because we normally have more than half

12   of the marketplace in terms of our penetration.  So we want to

13   make sure that the sample size looks, in this case, like the

14   marketplace as a whole.

15   Q.   Right.  And that reference you mentioned earlier to the

16   Cox footprint?

17   A.   Yes.

18   Q.   What is that a reference to?

19   A.   So a footprint is where we offer cable service, where we a

20   offer ability for consumers to sign up for our Internet

21   service, our phone service, and our cable service.

22   Q.   And when you mentioned having more than half of the market

23   share, is that nationally or in particular footprints?

24   A.   That is both.  Well, so in most of our footprint, we are

25   the marketplace leader in -- with most of our products.  And

S. Negretti - Direct

1175

1    then nationally as well.

2    Q.   So is -- but are you saying that Cox is -- has more market

3    share or less market share than, say, Comcast?

4    A.   Well, so Comcast is not a direct competitor of ours, so we

5    don't have -- Comcast -- the Comcast territory is not an area

6    that we would consider part of our footprint.  We would use it

7    for research studies sometimes because we would want to

8    understand what a consumer in that area would be thinking, but

9    we don't compete with Comcast directly.

10   Q.   So nationally -- not only in your footprint, but just as

11   you nationally, do you have the majority of Internet service?

12   A.   Well, when we say nationally, we're talking about within

13   our footprint nationally.

14   Q.   Right.  So just so the record is clear, nationally

15   footprint and outside of your footprint, are you the top

16   Internet service provider?

17   A.   Well, we're pretty small in context of nationally, right?

18   We probably only have about 10 percent of the national

19   footprint, so we can only offer our services to about 10

20   percent of the people in the United States.

21   Q.   Okay.  I just wanted to clarify that point.

22            THE COURT:  Well, did you-all understand the last

23   statement that he made there about 10 percent of --

24            THE WITNESS:  Sorry about that.

25            THE COURT:  It was a little confusing, but I think

S. Negretti - Direct

1176

1    they have got it.

2              MR. WAKEFIELD:  Okay.  Thank you, Your Honor.

3    BY MR. WAKEFIELD: (Continuing)

4    Q.   If you could flip ahead, we are going to turn to the page

5    that ends in 7228 of this same exhibit.

6    A.   Okay.  Yes.

7    Q.   All right.  Let's blow that up for the jury to see.

8              And so does this reflect conclusions from the

9    research that was conducted?

10   A.   Yes.

11   Q.   And what were the conclusions?

12   A.   Well, so the question here was trying to understand

13   reasons for selecting a provider such as ours.  And what this

14   essentially says is that the top reasons for selecting a

15   provider such as ours -- the top two reasons would be price,

16   number 1, and then the download speeds the consumer could

17   receive from us, number 2.

18             Right behind that are other important reasons such as

19   upload speed, and then the presence of in home WiFi privacy,

20   and security protection.

21   Q.   Okay.  Among all the things that were listed as a result

22   of this research, does the ability to conduct searches on a

23   search engine appear?

24   A.   Say that again?

25   Q.   Among all these things that were listed as results, does

1   the ability to do searches on a search engine appear?

2   A.   No, it doesn't.  And I don't think it would so --

3   Q.   And why would you think that?

4   A.   Well, so -- okay, so what we are asking about is why

5   people choose a provider, right?  Distinguishing the

6   marketplace between having a choice between us and AT&T, for

7   example, us and Verizon.  And the ability to search the

8   Internet is somewhat of a ubiquitous exercise, right?  Even

9   though it may be a very popular exercise and may be a key

10  reason people use the Internet, choosing providers, it's

11  probably not going to rate very high at all in terms of

12  choosing providers.  We look for things that are you unique and

13  specific to our company as a result.

14  Q.   And in all of your experience and the research that you've

15  reviewed, have you ever heard that the ability to run a search

16  on the Internet is a reason for choosing an ISP like Cox?

17  A.   No.  I mean, it -- again, it's just not -- it's not

18  relevant, if you will, in terms -- if you can do that from all

19  different devices with all different providers, including

20  people who are offering wireless Internet services, such as

21  Verizon Wireless or AT&T, it's not, even though it's a very

22  important reason to use the Internet, it's not a reason you

23  would choose a provider, in my opinion.

24  Q.   Have you ever heard that the ability to download or upload

25  music using BitTorrent is a reason for choosing Cox or any

S. Negretti - Direct

1178

1   other ISP?

2   A.   No.

3           MR. PECAU:  Objection, Your Honor, it's a little bit

4   leading.

5           THE COURT:  It is leading, but I will allow the

6   question.  So answer the question if you can.

7           Did you hear the question after the objection?  You

8   can answer the question if you heard it.

9           THE WITNESS:  Yeah, I did, and the answer is no.

10          THE COURT:  Okay.

11  BY MR. WAKEFIELD: (Continuing)

12  Q.   If you could turn to the page ending in 7230.  And this is

13  the slide that begins, "In addition to basic Internet usage."

14  What information is this slide providing?

15  A.   Yeah.  So what this is talking about is, "in addition to

16  basic internet usage, subscribers are also using their Internet

17  services to connect away from home and stream audio and video.

18  One-quarter of subscribers use the Internet to game."

19          So this is talking why people are using the Internet.

20  Again, similar to the question -- a little different than the

21  question before.  The question before was talking about why

22  they choose a provider.  This is drilling down specifically on

23  why they use the Internet.

24  Q.   Okay.  And in the research you conduct, are those

25  considered different questions or the same question?

S. Negretti - Direct

1179

1    A.    They're different.  Again, why they would use the Internet

2    specifically and why they make a choice of a provider are very

3    different.  There's different attributes that would drive those

4    things.  For example, the price that you pay isn't a reason why

5    you would use the Internet.  It would be a reason why you would

6    select a provider.

7    Q.    Okay.  There's a reference to streaming audio.  What does

8    that -- we touched on that earlier, but --

9    A.    Yeah.

10   Q.    -- what trends are you seeing in your work with respect to

11   streaming audio?

12   A.    Well, the idea of streaming in general is becoming more

13   popular and prevalent, whether it is streaming audio or

14   streaming video.  It's just a more convenient way for the

15   consumer to get the content that they want to enjoy.  Things

16   like seeing their favorite TV shows or movies, and also hearing

17   their favorite songs or their favorite artists and so forth.

18         It's a little different than it used to be it, right?

19   Used to be a world where you literally had to go to iTunes and

20   you had to download that file.  If it was a song, it didn't

21   take too long, but if it was a movie, it took awhile, and that

22   was challenging.

23         Not only that, you then had that downloadable file on

24   your device and that took up hard drive space, which at some

25   point in time you ran out of capacity and you'd have to figure

1  out how to get a new device and figure out to get those files

2  on to that device.  That was also challenging for the consumer.

3          The idea of streaming makes it whole lot easier,

4  right?  So you then can take the audio list that you've set up,

5  your playlist, if you will, and you can see that or use that

6  from wherever you are, whether it's on a Cox set-top box in the

7  case of something like Pandora, or whether it's on your cell

8  phone when you're out and about, or whether it's on your

9  computer at work.

10 Q.   I'd like to switch gears a bit from the research you

11 review to how Cox takes that research and positions and

12 promotes itself.

13 A.   Sure.

14 Q.   So what are the key points that Cox makes when promoting

15 and positioning itself?

16 A.   Well, similar to the research that we saw here, price

17 drives the game.  That's why consumers choose providers, one

18 versus another.  And I think that's the case beyond just

19 Internet providers or cable companies, but when you're choosing

20 an airline or when you're choosing lots of different -- you

21 know, hotel room, for example.  Price drives why that decision

22 is made.  It is a big driver of why that is occurring.

23 Q.   All right.  As part of the things you consider in deciding

24 how to promote products, do you also look at public information

25 about any other ISPs?

S. Negretti - Direct

1181

1    A.    Sure, sure.

2    Q.    And in your experiences, what do other ISPs do with

3    respect to promoting on the point of price?

4            MR. PECAU:   Your Honor.

5    A.    Well, there's different things --

6            THE COURT:   Hold on.   There is an objection.   If you

7    hear an objection, please stop.

8            Yes, sir.

9            MR. PECAU:   Your Honor, I object for two reasons.

10   One is relevance of what other ISPs do.   And, two, it's

11   hearsay.

12           THE COURT:   Well, he's -- I think he's indicated that

13   he has done research on what other ISPs do, so I will overrule

14   the objection.   I'll allow you to answer the question.

15           Go ahead, sir.   You may answer.

16   A.    Can you restate the question if you don't mind?

17   BY MR. WAKEFIELD: (Continuing)

18   Q.    Yeah.   Sure.   So are you familiar with how other ISPs

19   promote their goods and services with respect to price?

20   A.    Yes.   So, I mean, they'll do things like discount their

21   price, they'll -- and we do the same thing.   They will offer

22   discounts for their price.   They will offer long-term offers

23   for their price and say, this will be your price for a long

24   period of time, we're going to look you into that price.   They

25   will give you upfront discounts, such as a gift card, right?

1182

1    So you will have the ability to get cash back if you sign up

2    for their service.  And the same thing with us.

3              So we're all competing essentially in the same game

4    driving to customer behavior based on those decisions.

5    Q.   Are you familiar with the expression "bundling"?

6    A.   Absolutely.

7    Q.   And is that something that Cox does?

8    A.   Yes.  So -- well, and you talk about bundling.  You can

9    call it bundling, you can call it Triple Play, you can call it

10   different things like that.  That's a different attribute,

11   right?  So price is one attribute, and frankly, that is one way

12   to drive business and is a key important factor for the

13   consumer.

14             But the other way to is drive added value, right?  So

15   added value is created by packaging services together.  So if

16   the consumer is subscribing to Internet service or cable

17   service, we would like them to subscribe to our other products

18   and services.

19             So by driving a bundle of services, we give them more

20   things that they would normally not get or not get at a higher

21   price.  So creating added value, entrenching reasons for

22   customers to do business with us and higher -- driving higher

23   levels of engagement from them.

24   Q.   And if you could turn in your binder to DTX 0289, 0289.

25   A.   Okay, yes.

S. Negretti - Direct

1183

```
1   Q.    And do you recognize this document?

2   A.    So this is a --

3   Q.    I'm sorry.  I'm just asking if you recognize it.

4   A.    Yes.

5   Q.    And then what is it?

6   A.    What is it?  Yeah, so this is an example of how we'll sell

7   our services on our Cox.com Web page, offer our services to

8   consumers.

9           MR. WAKEFIELD:  Your Honor, we offer DTX 0289.

10          THE COURT:  Any objection?

11          MR. PECAU:  No objection, Your Honor.

12          THE COURT:  It is received.

13  BY MR. WAKEFIELD: (Continuing)

14  Q.    And if you can turn to the third page, Maximize Your

15  Entertainment.

16  A.    Yes.

17  Q.    And it refers to "bundling high-speed Internet with TV,"

18  do you see that?

19  A.    Yes.

20  Q.    Is that an example of the bundling you were just

21  describing?

22  A.    That is exactly right.

23  Q.    And how would that work in this particular example for a

24  consumer?

25  A.    Yeah, so in this case here, we are offering a consumer a
```

S. Negretti - Direct

1184

1    discount for taking all of our products or all three of our

2    products or two of our products bundled into one package as

3    opposed to buying just one product.

4    Q.    And why is that attractive to customers?

5    A.    For a customer?

6    Q.    Yes.

7    A.    Lower prices, higher added value, things that they get as

8    a result.

9    Q.    Are you aware of other ISPs bundling as well?

10   A.    Sure, absolutely.

11   Q.    Does Cox do any promotion with respect to customer

12   service?

13   A.    With respect to our customer service?

14   Q.    Yes.

15   A.    Absolutely.  So as we are talking about all of this in

16   terms of driving potential sales through price, it's not a big

17   differentiator to the point you mentioned earlier.  We are all

18   competing on price, and so the differentiators that we try to

19   bring that are unique to us -- when I talked earlier about our

20   company promise being The Most Trusted Provider in America, we

21   try to emulate that in the way that we do business with

22   consumers and then point that out differentiator.  Because if

23   you have a choice between two things that are equivocally

24   priced or even something that may be slightly cheaper, the

25   reason you want to do business with Cox is because we are going

S. Negretti - Direct

1185

1   to provide you with that great customer service.

2   Q.   And do other ISPs that you are familiar with promote their

3   customer service?

4   A.   I think they do.  I'd like to think that we do it better

5   and the best.

6   Q.   Let's go to another exhibit, DTX 0290.

7            Are you there in your binder?

8   A.   Yes.

9   Q.   Okay.  And do you recognize this document?

10  A.   Yes.

11  Q.   What is it?

12  A.   Similar to what we looked at before, it's a promotional

13  offering through our online channel, through our Web site

14  explaining to the consumer they can purchase different levels

15  of bundled service from us.

16           MR. WAKEFIELD:  Okay.  Cox offers DTX 0290 in

17  evidence.

18           MR. PECAU:  No objection, Your Honor.

19           THE COURT:  Received.

20  BY MR. WAKEFIELD: (Continuing)

21  Q.   And if you look to the first page there, you see examples.

22  Are those examples of bundles across the top?

23  A.   Yes.

24  Q.   And there's also an offer down below that includes HBO and

25  a DVR; is that right?

S. Negretti - Direct

1186

1    A.    A Record-6 DVR, yes.

2    Q.    Okay.  And if you go to the second page in the bottom

3    left, there is something called Contour from Cox?

4    A.    That's right.

5    Q.    What is that?

6    A.    So Contour is our advanced television product.  It's a new

7    on-screen guide that we began offering customers about two

8    years ago.  It comes with a larger drive, there is that

9    Record-6 hard drive that we're talking about.  What we mean by

10   that is you can record six shows at the same time, as well as

11   you have the ability to download a portable app to your cell

12   phone and tablet and then see different content inside or

13   outside of your home that you are subscribing to.

14   Q.    Okay.  So if someone had a favorite show watching at home

15   and had to take a trip, could they see it on the Contour?

16   A.    If it's available, right.  So not all rights are available

17   to us.  So we only obviously give customers the rights that

18   they have.

19          An example of that it would be watching ESPN.  So,

20   for example, if at the consumer wanted to see a game whether

21   it's their favorite team or not and they want to see it in

22   places that are other than their set-top television in the

23   living room, then they could download it onto a tablet and

24   watch that game at their location of choice.

25   Q.    Now, some of the promotions we have seen have also

S. Negretti - Direct

1187

1    referred to speed?

2    A.    Sure.

3    Q.    Does Cox promote itself regarding speed?

4    A.    Sure, absolutely.

5    Q.    And in your experience, do other Internet service

6    companies do the same?

7    A.    Yes.

8    Q.    Why does Cox promote itself on the basis of speed?

9    A.    Well, there's a couple reasons.  One is it's, again, when

10   we talk about the consumer, consumers wants that understanding,

11   they want to know is this the fastest Internet that I can get.

12           Number two, is we have invested in our technology

13   over the years to make sure that it meets those needs.  So the

14   consumer is asking us for that, and so we want to make sure

15   that we tout the value of that product for the consumer.

16   Q.    Are their certain markets where Cox is faster than its

17   competitors?

18   A.    Yes.

19   Q.    Are there certain markets where the competitors are faster

20   than Cox?

21   A.    Unfortunately, yes.

22   Q.    And we've seen a lot of the use of the term "high-speed

23   Internet" in this case.  Do other -- I'm sorry.

24           Have you encountered other service providers using

25   the term "high-speed Internet" to refer to their service?

S. Negretti - Direct

1188

1    A.   Yeah, absolutely.

2    Q.   In your experience, what are some of the speed or

3    bandwidth-intensive applications that are popular?

4    A.   Well, I think the big one is streaming video that we were

5    talking about earlier, right?  But it is not limited to that.

6    More people are using streaming video, but more people are

7    using the Internet overall and they are using it for more

8    things.  So speed is a multifunction capability, right?

9         If you think about it as lanes on a freeway, if you

10   will, the faster that you can go, the less you sit in rush-hour

11   traffic.  And so everybody wants that speed whether they are

12   using it for things such as downloading an e-mail, posting a

13   YouTube video, or watching streaming video.

14   Q.   In your experience working with customers, does speed

15   matter for something as simple as sending an e-mail?

16   A.   Yeah, absolutely.  I mean, first of all, we saw it in the

17   insight that we reviewed earlier.  If you think about

18   personally, every time that you go to send an e-mail and it's

19   not sending instantaneously or your e-mail that you are trying

20   to get is not downloading instantaneously, we've become

21   accustomed to saying, "that's a problem."  And we get a lot of

22   phone calls when that happens.

23        So people want speed, people want speed inside their

24   home, all the way throughout their home, whatever they are

25   using the Internet for.

S. Negretti - Direct

1189

1   Q.   Are there -- let me ask a different question.

2          Are you familiar with any trends with respect to

3   increase use of home video, such as videos shot with smart

4   phones or --

5   A.   Yeah.  Again, as I talked about earlier, people are using

6   the Internet for more and more things, right?  So you are

7   seeing more and more dynamic uses.  I talked about streaming

8   video.  But you're also seeing people creating their own

9   content, right?

10         So GoPro is a company that has become relatively

11  popular in the last couple years, and they sell a device that

12  allows you -- and a very small device that allows you to shoot

13  some high definition video.  And it is really extreme --

14  associated with extreme events.  So people will go skiing or

15  mountain biking, and then they will come home with that footage

16  and they'll edit it and they'll post it for their friends, and

17  their friends will download it or view or things like that.

18         So it has become a really unique and cool reason to

19  use the Internet.

20  Q.   Is speed important for that kind of use as well?

21  A.   Yeah, absolutely.  So, again, because you are dealing with

22  large files, you want to make sure that the speed is available

23  to do that for you.

24  Q.   In any of the research that you have seen, have you come

25  across reference to supporting unauthorized access to content

S. Negretti - Direct

1   as a positioning point for your products?

2   A.   We have seen it in the research, but not as a positioning

3   point.  That wouldn't make sense.

4   Q.   Right.  So -- and I think there were some examples in the

5   deposition that was read in in which someone else, I believe,

6   played your role.  But --

7   A.   Hopefully they did as well as I could.

8   Q.   But in terms of how you position the product, how you

9   market and promote, what, if any, reference do you make to

10  accessing unauthorized content?

11  A.   We don't.

12  Q.   To your knowledge, is that something that Cox has ever

13  promoted or encouraged?

14  A.   No.

15  Q.   I would like to talk about a few more research items.  If

16  we can go to PX 1404.  This is a document that I think I will

17  have to hand you.  It was in --

18  A.   Thank you.

19  Q.   Is there writing on the cover of that one?  No?  Okay.

20  Good.

21          So I believe PX 1404 is already in evidence.  Is this

22  a document you are familiar with?

23  A.   Yes.

24  Q.   All right.  And if you would turn to the -- well, first of

25  all, what's the title of the document?

S. Negretti - Direct

1191

1    A.    Music Listening Habits For Current HIS Customers.

2    Q.    Okay.  And on the second page there is a reference to a

3    partnership with Rhapsody.  I believe earlier you mentioned

4    working with Pandora.

5           What is Rhapsody?

6    A.    So Rhapsody is a similar company.  This is a similar

7    venture that we explored.  Little different in the sense that

8    we were offering a paid model as well for the consumer to

9    subscribe to that we explored and ways to enhance value for

10   consumers wanting to listen to music over the Internet.

11   Q.    And I believe you might have been asked about this in your

12   deposition, but if we turn to the page ending in 9582.

13   A.    Titled Music Sources.

14   Q.    Okay.  Right.  So Music Sources.  And there are several

15   sources listed.  "CDs," do you see that?

16   A.    That's right.

17   Q.    Okay.  "Online music services"?

18   A.    That's right.

19   Q.    And then there is a reference to "digital music obtained

20   from friends or peer-to-peer Web sites."

21   A.    That's right.

22   Q.    All right.  Is it your understanding that that is a

23   reference to BitTorrent in particular?

24   A.    It is not a reference to BitTorrent in specific, no.

25   Q.    Okay.  And are you familiar with any Web sites where

S. Negretti - Direct

1192

1    artists can choose to share music through peer-to-peer

2    networks?

3    A.    Sure, absolutely.

4    Q.    If you could go to the page in the same document 219584.

5    A.    Yes.

6    Q.    There is a reference to "download individual songs free of

7    charge."

8    A.    That's right.

9    Q.    And is that something that you would associate with

10   BitTorrent in particular?

11   A.    I don't know that I would associate it with BitTorrent in

12   specific because there are clearly many ways that consumers can

13   download music for free using many different things.

14   Q.    Okay.  Are you aware of any services where consumers can

15   download individual songs free of charge legally?

16   A.    Yeah, absolutely.  Even iTunes, for example.

17   Q.    Have you experienced that with iTunes?

18   A.    Sure, absolutely.

19   Q.    How was that -- I am aware of $0.99 songs on iTunes.

20   A.    Right.  I mean, so, for example, artists will promote

21   their music through iTunes.  You could even -- they will

22   cross-promote their music through Starbucks, for example, and

23   you can go into Starbucks and you will get a coupon or you will

24   get it on your phone and you can go download the music for free

25   from iTunes.

S. Negretti - Direct

1193

1   Q.   Do you have any understanding what the date of this

2   document is?

3   A.   So I don't know the date specific, but it is an

4   interesting study because it is a little older than the things

5   that we currently look at.

6   Q.   Based on the information, are you able to estimate the

7   date of this document?

8   A.   Yeah, I would estimate sometime between the 2005-2010 time

9   frame, would be my best guess.

10  Q.   If we could go to the page ending in 9624 of this same

11  exhibit.  And this was Sources For Acquiring Music.  Do you see

12  that?

13       Yeah.  And if you could say an audible yes or no for

14  the record.

15  A.   Yes.

16  Q.   It is hard to remember, I know, but -- so at the top it

17  says, "two-thirds of these Echo Boomers still purchase CDs, and

18  40 percent buy single songs online."

19       Do you see that?

20  A.   Yep.

21  Q.   Is Echo Boomers a term you are familiar with?

22  A.   Well, it's a legacy term.  It's a legacy term used to

23  describe what has now become the millennial generation,

24  consumers who are 19 to 36 years old.  This is probably

25  referring to the older part of the millennial generation.  It

S. Negretti - Direct

1194

1   is no longer a term that is widely used because we now call

2   them millennials.

3   Q.   Okay.  And there is a reference in the bottom of that

4   first paragraph to people getting music for free, "such as

5   downloading for free, burning songs from friends' CDs, and

6   stealing songs online."

7   A.   That's right, yes.

8   Q.   Okay.  And why, in your research, is there a distinction

9   between downloading for free and stealing songs online?

10  A.   Well, I think because they are different, right?  The idea

11  of -- well, all three of these things, for example.

12  Downloading music for free, burning songs from a CD, and

13  stealing songs, those are three different types of activities

14  uniquely different to each other.

15  Q.   And this piece of the research was about Echo Boomers?

16  A.   That's right.

17  Q.   Is that a particular subset of the market you would

18  research?

19  A.   That's right.

20  Q.   Okay.  What are some of the other market segments you

21  would look at?

22  A.   We look at things in lots of different market segments.

23  So when I talked about millennials, we even look at a

24  millennial specifically and say, what type of millennial are

25  you.  You could be, for example, a young start-out, which is

S. Negretti - Direct

1195

1    somebody who is probably just coming out of college, just

2    starting their professional career.  They may not have a lot of

3    disposable income today, but they will ramp up to having a

4    significant amount of disposable income in the future.

5            Additionally, we have things that are called -- a

6    group that are called trendy techies.  Trendy techies are

7    consumers that are very much into technology and they very much

8    want to understand what it is that technology can do for them

9    and leverage it to its fullest.

10           We have consumer groups called budget families.

11   These are groups of consumers that are married usually and they

12   have dependencies in the household, such as children.  These

13   families are on a budget, though.  They are constrained by the

14   decisions they make.  Their discretionary income isn't high,

15   and they have to make rational choices and trade-offs about

16   what they spend their money on.

17           iFamilies, this is what a trendy techie will become

18   over time.  They'll become an iFamily when they get married and

19   they start to have kids and they introduce and use and leverage

20   technology in their home.

21           We also have things like modern matures and

22   traditionalists.  Modern matures are consumers that are elder,

23   but they are very much aware and use technology.  You'll see

24   this all the time with people using smart phones.

25           And then traditionalists, they are the people who --

1   they think the '50s were the greatest era, right?  They were

2   the people who remember back in my day.  But their needs and

3   desires are very specific, and we need to cater and figure out

4   ways to deliver them products and services.

5   Q.   In this study there was a reference -- there was a

6   statistic that was quoted and came out in your deposition

7   testimony that I believe was played yesterday about 78 percent

8   of respondents indicating that unlimited access to millions of

9   songs was an important factor in selecting their online music

10  source.

11           That's a yes?

12  A.   Yes.  I'll get it, I promise.

13  Q.   What sources are you aware of where there are -- where

14  there is unlimited access to millions of songs?

15  A.   Yeah.  So, well, we talked about Pandora.  So Pandora is

16  an example of that.  You can have a free service access to

17  Pandora.

18           Spotify is another example I cited earlier.  So you

19  can get lots of songs from Spotify.

20           There is a lot of different music providers out there

21  providing this access to consumers.  They either will have

22  revenue-based models where they make consumers listen to

23  commercials, advertisements, or the consumer will pay a premium

24  to them and they won't have to listen to the commercials and

25  they can maybe their tailor or curate their playlist as a

S. Negretti - Direct

1197

1   result of that.

2           So there's lots of different versions of that.  It is

3   actually quite popular.

4   Q.   Thank you.  I would like to turn to another study, DTX

5   0282.

6           THE COURT:  Mr. Negretti, did you say 2009, 2010 for

7   when you believe that study -- the last study was done, or

8   2005 -- between 2005 and 2010?  You weren't sure of the date of

9   that exhibit -- when that study was done, right?

10          THE WITNESS:  Yeah.

11          THE COURT:  And what was your answer?  I wasn't sure.

12          THE WITNESS:  Yeah, I don't have the information as

13  to when the study was done.  I can infer based off of the

14  terminology used in the study.  That's about the best guess I

15  can put.

16          THE COURT:  And what dates did you give?

17          THE WITNESS:  2005 to 2010.

18          THE COURT:  2005, 2010.

19          THE WITNESS:  Yeah.

20          THE COURT:  Okay.  Thank you.  I wasn't sure I heard

21  it right.  All right.  Thank you.

22          MR. WAKEFIELD:  Thank you, Your Honor.

23          THE WITNESS:  What was your latest question?

24  BY MR. WAKEFIELD:

25  Q.   Oh, we are going to look at 0282, DTX 0282.  And it's

S. Negretti - Direct

1198

1    toward the front of the binder there.

2            And do you recognize this as another piece of market

3    research that Cox had conducted?

4    A.   Yes.  2012 Cox High-Speed Internet Service Residential

5    Subscriber Tracking Survey.

6    Q.   And is this the type of research, again, that you would

7    consider in your role?

8    A.   Yes, absolutely.

9            MR. WAKEFIELD:  We offer DTX 0282 into evidence.

10           MR. PECAU:  No objection.

11           THE COURT:  It is received.

12   BY MR. WAKEFIELD: (Continuing)

13   Q.   And how would you use a piece of research like this in

14   your daily job?

15   A.   Yeah.  So this is a pretty exhaustive piece of research.

16   So we could use it for a lot of different reasons.

17           The fact that it is called a Tracking Study is very

18   important.  That's what we most likely would use it for, is to

19   see changing trends over time.  How consumers feel about

20   certain things, not only specific to the product, but the

21   company, and how we do business with the consumer over time.

22   How is that shifting and changing.

23   Q.   Okay.  And I am sorry if I missed it, is this something

24   that gets updated periodically?

25   A.   This is no longer an active study, but it would be

S. Negretti - Direct

1199

1    something that is updated periodically.

2    Q.   Okay.  And just for the record, about how many pages is

3    this study?  If you could turn to the last page?

4    A.   I have 170 pages.

5    Q.   I made a terrible mistake by taking it out of my binder.

6    If you look to the page -- page 14 in the internal document,

7    and that's Bates number ending 180.

8    A.   Yes.

9    Q.   Okay.  And so there are categories listed at the top under

10   a heading Reasons Likely to Cancel Cox High-Speed Internet

11   Service.

12   A.   Yes.

13   Q.   And why does Cox research that?

14   A.   Well, we want to know why customers would leave us.  We

15   want to use that information to make some decisions in terms of

16   how do we prevent them from leaving us to begin with.  And if

17   they have left us, how do we attempt to win them back by fixing

18   why it is that they have left us.

19   Q.   And the topics listed, are they organized in any

20   particular way, from left to right?  It is foundational.  It

21   looks like they are highest and then decreasing as they go.

22   A.   These are listed by the Total Company responses along the

23   top.

24   Q.   Okay.

25   A.   The percentages that they'll apply to each attribute stack

S. Negretti - Direct

1200

1    ranked.

2    Q.   So what was the highest reason that someone might --

3    A.   Cost, Monthly Cost Too Expensive.

4    Q.   Okay.  And the second highest category, what is that?

5    A.   That is a derivative cost, Lower Rates From Other

6    Providers.

7    Q.   So, again, is that related to price?

8    A.   Yep.

9    Q.   The third is Service.

10   A.   Service is Unreliable, yes.

11   Q.   And the next is Slow or Inadequate Speeds.

12   A.   Yes.

13   Q.   And the next is Need to Save Money.

14   A.   Yes, which is also derivative of cost and price.

15   Q.   Okay.  And then does this continue on to the next page,

16   this ranking of reasons people were likely to cancel their Cox

17   high-speed Internet service?

18   A.   Yes.

19   Q.   All right.  And was access to BitTorrent sites listed

20   among any of those categories?

21   A.   No.

22   Q.   If you go to page 19, it is Bates -- ending in Bates

23   number 9185.

24   A.   Reasons For Choosing Cox Over Other High-Speed Internet

25   Services.

S. Negretti - Direct

1201

1    Q.    Okay.  We can blow up the top --

2    A.    Yes.

3    Q.    -- list of choices there for everyone to see.

4          And there are other categories, again, ranked in

5    response rate highest to lowest.

6    A.    That's correct.

7    Q.    All right.  And what is the top reason for choosing Cox?

8    A.    According to this study, it would be No Contract or

9    Commitment.

10   Q.    Okay.  And that also then continues for a few pages.  In

11   any of those choices, do you see anything about BitTorrent?

12   A.    No.

13   Q.    Do you see anything about free movies or free music

14   generally?

15   A.    No.

16   Q.    If we could go to page 112 of this study ending in Bates

17   number 9278.

18   A.    Yes, Online Activities.

19   Q.    Okay.  Now, this a different part of the report and what

20   is this recording?

21   A.    This question is asking, "how often do you or other

22   members of your household engage in the following online

23   activities?"

24   Q.    And is that considered part of the same question as why do

25   you choose Cox or why might you stop using Cox?

S. Negretti - Direct

1202

1    A.   It's a little different.  It's more of an engagement

2    question, what do you engage with when you're on the Internet.

3    It's less of a purchase-intent question or a reason to leave or

4    reason to abandon the service.

5    Q.   So in your experience, are those different questions?

6    A.   Yes.

7    Q.   Your Honor, I'm just catching up and crossing things off

8    the list.

9         We talked earlier about people gaining access to

10   licensed music through the Cox cable service.  How is Cox

11   affected if those customers are able to get that same music

12   from an unlicensed source for free?

13   A.   Say that again.

14   Q.   We talked about the music services that Cox offers --

15   A.   Yep.

16   Q.   -- that it pays for --

17   A.   Yes.

18   Q.   -- and has licenses for.  How is Cox affected if people

19   have access to that same -- let me ask a different question.

20        In your experience, do you consider it to be in Cox's

21   interest for customers to have access to that same music for

22   free --

23   A.   No.

24   Q.   -- from an unlicensed source?

25   A.   No, not from an unlicensed.

1   MR. PECAU:  Objection, Your Honor.  It is leading,

2   and it's asked and answered already.

3   THE COURT:  All right.  I'll allow it.

4   MR. WAKEFIELD:  And I think he answered.  And the

5   earlier question was about video.  This is about music.

6   THE COURT:  Okay.

7   BY MR. WAKEFIELD:  (Continuing)

8   Q.   You talked about streaming becoming quite a phenomenon.

9   How in your view or how in your experience and understanding

10  from research is that affecting the extent to which people are

11  downloading and storing music locally?

12  A.   Yes.  So it's replacing at a higher rate.  Not only is it

13  replacing, but it's introducing more people to the opportunity,

14  right?

15  So, again, I talked earlier about how downloading was

16  a viable way to receive content at one point in time, but it

17  took awhile.  But I'd rather still download it than go to the

18  store, for example.

19  Now, you no longer have to download content.  You can

20  simply instantaneously select your title, whether it is a music

21  title or a video title, whatever it might be, TV show, and

22  start watching it, stop watching, take it with you.  You can

23  have access to it wherever you are.

24  So it's replacing the need to download it and it's

25  also introducing more people to the idea that I can do this,

S. Negretti - Direct

1204

1    it's pretty easy to do.

2    Q.    And is that streaming that you're talking about done

3    without permission from the rights owners or is it licensed?

4    A.    No.  So -- I mean, we pay for all the content that we

5    offer our consumers.  Either we pay as part of an overall

6    contract or specifically for the content that the consumer is

7    downloading or streaming.

8              So, for example, movies.  If they are watching a

9    movie from us, they're going to pay for that title to us.  And

10   we are going to, in turn, provide the movie studio with the

11   money for that title.

12   Q.    Okay.  In your experience in thinking about how to promote

13   the products and how to position the products, have you ever

14   come across a time where Cox promoted the consumption of

15   unauthorized contract from ThePirateBay?

16   A.    No.

17   Q.    Before this case -- involvement in this case, had you

18   heard of ThePirateBay?

19   A.    No.

20   Q.    Had you heard of a Web site called KickassTorrents?

21   A.    No.

22   Q.    Had you heard of a Web site called Torrentz with a Z?

23   A.    No.

24   Q.    In your experience, have you ever encountered anything Cox

25   has done to promote the consumption of unauthorized content

1   from any service or Web site?

2   A.   No.  Well, when we talked earlier about my job as a

3   product marketer, to understand and hear what consumer insights

4   are and develop products and services for the consumer and

5   figure out market segments where that products and service

6   could be marketed, and you think about our Trusted Provider

7   claim, that's just not part of our business model.  That's not

8   the way we do business with our consumers.

9   Q.   And in your experience, has Cox ever done anything to

10  position itself to be more appealing to copyright infringers?

11  A.   No.

12        MR. WAKEFIELD:  Pass the witness, Your Honor.

13        THE COURT:  All right.  Thank you.

14        Cross-examination, Mr. Pecau.

15        MR. PECAU:  Thank you, Your Honor.

16     CROSS-EXAMINATION

17  BY MR. PECAU:

18  Q.   Hi, Mr. Negretti.  My name is Will Pecau.  I represent BMG

19  in this case.

20        You said you're the executive director of product

21  marketing strategy; is that correct.

22  A.   That is correct.

23  Q.   And you oversee the marketing of Cox's video, voice, and

24  data products, is that right?

25  A.   That's correct.

S. Negretti - Cross

1206

1    Q.   And part of your job is to get new subscribers and to get

2    existing subscribers to buy faster service and bundles, isn't

3    that what you testified to?

4    A.   Well, that's part of the job certainly is to give

5    consumers reasons to purchase our Internet service and to

6    bundle them up, give them reasons to purchase our bundle.

7    Q.   All right.  And an example of a product that you are

8    marketing now for your Cox's high-speed Internet is your

9    Gigablast service; is that correct?

10   A.   That's right.

11   Q.   And your job as a marketing person is to convince

12   subscribers, as you said, to give a reason to pay more, so

13   let's say to pay for a higher speed service; is that correct?

14   A.   That's correct.

15   Q.   And to do that, you present things that a person would

16   highly value, that they would do with the increased speed of

17   their new service; isn't that correct?

18   A.   To the best of our ability, yes.

19   Q.   And this is the reason they would pay a higher-premium

20   service, because they're not buying speed, they're buying the

21   activity they can do with it; is that correct?

22   A.   That's correct, yes.

23   Q.   And that's what I think you marketers called a message

24   function of marketing; is that correct?

25   A.   Absolutely, sure.

S. Negretti - Cross

1207

1   Q.   Okay.  And these messages of highly-valued benefits are

2   found in a company's advertising and promotional materials;

3   isn't that correct?

4   A.   Yes.

5   Q.   Okay.  Oh, by the way, I mentioned Cox's Gigablast

6   service.  Could you describe that for the Court, please.

7   A.   Absolutely.  So Gigablast service is a brand name used to

8   describe our one-gigabit Internet service that we are starting

9   to offer in many of our markets across the country.  So it's

10  the highest speed of Internet service that we offer as a

11  company and among the higher speeds of Internet services that

12  are being offered in the marketplace today.

13  Q.   All right.  And that's the amount of information, it's a

14  full gigabyte that a person may download in a second using your

15  service?

16  A.   That's correct.

17  Q.   Okay.  Okay.  And the way you determine these

18  highly-valued benefits in the messaging of Cox's services, I

19  think you said was determined by the consumer research that you

20  do?

21  A.   That's one of the key drivers, yes.

22  Q.   Right.  And the research I think that you referred to, you

23  do focus groups, you do tracking studies, you do qual -- other

24  qualitative and quantitative studies; is that correct?

25  A.   That's correct.

1  Q.   And you also get it from talking to consumers, you said

2  going to their homes and at retail stores; is that correct?

3  A.   That's correct.

4  Q.   And with it you create your messages that you want to have

5  in your advertising and promotion to get people to buy these

6  bundles and faster service, right?

7  A.   That's right.

8  Q.   To give them highly-valued benefits they would get from

9  it; is that correct?

10  A.   Correct.

11  Q.   Let's see.  So let me show you some screen shots of pages.

12          So, Mr. Negretti, I'm showing you what has been

13  marked as PX 5001.  And do you recognize these Web pages from

14  Cox's Web site advertising Gigablast.

15  A.   I do, yes.

16          MR. PECAU:  Your Honor, I'd like to offer PX 5001

17  into evidence, please.

18          THE COURT:  Any objection?

19          MR. WAKEFIELD:  No objection, Your Honor.

20          THE COURT:  Received.

21  BY MR. PECAU: (Continuing)

22  Q.   All right.  So you recognize them as promoting Cox's

23  Gigablast high-speed Internet service, right?

24  A.   That's correct.

25  Q.   Okay.  Let's go to page 5 of PX 5001.  Are you with me,

S. Negretti - Cross

1209

1   Mr. Negretti?

2   A.   Yes.

3   Q.   Okay.  Great.  And at the top it says Find Out Why COX

4   Takes The Lead In Speed.

5            Do you see that?

6   A.   Yes.

7   Q.   Okay.  And then underneath -- and that -- and the purpose

8   of that is to give reason to the customer to go to the higher

9   speed; is that correct?

10  A.   That's correct, yes.

11  Q.   All right.  And you have there, How Will You Live The Gig

12  Life; is that correct?

13  A.   That's correct.

14  Q.   All right.  And then after the first paragraph, you have

15  two bullet points, right?  And the first bullet point is, "run

16  all your devices at the same time."

17           Do you see that?

18  A.   Yes.

19  Q.   But the second one says -- it identifies activities,

20  right?  And the activities that it identifies, the first one

21  is, "download 100 Tunes in three seconds."

22           Do you see that?

23  A.   Yes.

24  Q.   All right.  So that means using your Gigablast download,

25  you can -- in 30 seconds you could download a thousand songs;

S. Negretti - Cross

1210

1   is that right?

2   A.   If the math proves correct, that's correct.

3   Q.   Well, ten times -- so this would mean that a Cox

4   subscriber could download the entire discography of Michael

5   Jackson in just a few seconds; is that correct?

6   A.   Well -- yes.

7   Q.   Okay.  And a place that you can download 100 songs in

8   three seconds is through peer-to-peer sites like BitTorrent

9   sites, right?

10  A.   I don't understand that connection.

11  Q.   Well, BitTorrent sites offer music, don't they?

12  A.   I don't -- to be honest, I don't have enough familiarity

13  with BitTorrent and the services that they offer and the

14  technology that's used, so I can't comment on that.

15  Q.   Have you ever been to a BitTorrent site?

16  A.   I don't think I have.

17  Q.   Well, let's got to BitTorrent's site.  Let me show it to

18  you.  And let's put in a demonstrative.  It is PDX 002, and

19  this was entered -- this was shown in Mr. Steele's testimony.

20  And let's go to page 4, I think.

21       All right.  And this is KickassTorrents, Michael

22  Jackson.  I'll just ask you a couple questions about this.

23  Let's go to line 7.

24       MR. WAKEFIELD:  Your Honor, I'm just anticipating any

25  questions on this lack of foundation.

S. Negretti - Cross

1211

1    THE COURT:  Okay.  Let's -- yeah, let's let him ask

2  the question then we'll go -- he says he's unfamiliar with

3  BitTorrent or the site, but ask your question and we'll go --

4  we'll see where we're going.

5    MR. PECAU:  Okay.

6  BY MR. PECAU: (Continuing)

7  Q.   So according to this it says, "Michael Jackson, Studio

8  Discography, 1972 to 2010."

9    And on the column that indicates how much stuff is

10  there, it says 5.02 gigabytes; is that correct.

11  A.   It's a little blurry, but I think that's what it says.  I

12  can trust you on that.

13  Q.   So with your service, you could download 5.2 gigabytes in

14  less than six seconds, is that correct?

15  A.   If that's how the math works out, yes.

16  Q.   And it also refers to 352 files, right?

17  A.   It refers to the number 352.  I am not sure what the

18  header is.

19  Q.   Okay.  Can we go to the header, please.  Do you see it's

20  under Files?

21  A.   Yes, if those headers are lined up correctly, then the

22  exhibit shows that you could download 352 files with this -- I

23  guess with this title.

24  Q.   Okay.  Mr. Negretti, do you know if you can download the

25  entire discography of Michael Jackson with one click on iTunes,

1   or do you have to pay for it one album at a time?

2   A.   It depends on how iTunes is structuring their collection

3   of music.  You -- you have --

4   Q.   Well, do you know?

5   A.   Well, it depends upon on how -- they do it in multiple

6   different ways.  They do it per songs, per albums, and per

7   catalog, and per collection titles all the time.

8   Q.   So you could download the entire discography of Michael

9   Jackson --

10  A.   If you could or not is up to Apple.  If it's available,

11  you certainly could.

12  Q.   Right, but I'm asking for your knowledge.  Do you know if

13  Apple provides the entire discography of Michael Jackson that

14  you could click down --

15  A.   I don't know for sure whether they are offering that.

16  Q.   Okay.  And so, if you have 512 files, 512 songs, for

17  example, or 352 songs -- so I think you said that an iTunes

18  song awhile ago was about $0.99 a song; is that correct?

19  A.   Between $0.99 and a $1.40, depending upon the title and

20  the artist.

21  Q.   Right so 512 songs or 352 songs would be a few hundred

22  dollars; is that correct?

23  A.   Yep, my best estimate of math, yes.

24  Q.   And here with BitTorrent using Cox's Gigablast service,

25  you could get for free an entire artist's life work in six

1    seconds; is that right?

2            MR. WAKEFIELD:  Objection, lacks foundation.

3            THE COURT:  Overruled.  If you can answer the

4    question, answer the question.  Did you understand the

5    question?

6            Ask the question again, please, Mr. Pecau.

7            MR. PECAU:  Yes, Your Honor.

8    BY MR. PECAU: (Continuing)

9    Q.   So here with BitTorrent using Cox's Gigablast service, you

10   can get for free an artist's entire life work in six seconds;

11   is that correct?

12   A.   Well, so technically, I guess you probably could.  Whether

13   you're legally allowed to, I don't know the legality behind

14   that.

15   Q.   Okay.  So let's go back to page 5 in PX 5001.

16           Okay.  And on, how You Will Live The Gig Life and

17   Find Out Why COX Takes The Lead In Speed, on this page when

18   you're giving your highly valid benefits, you're not promoting

19   music streaming on the Internet, are you?

20   A.   Yeah, no, that's not in here.

21   Q.   Right.  And you're not promoting Internet music radio

22   here, are you?

23   A.   That's correct.

24   Q.   And the Web page does not refer to work activities,

25   keeping in touch, paying bills, searching for a job, or

1   health-related activities, does it?

2   A.   Not, not for this message in specific, no.

3   Q.   The only highly-valued activities here for why Cox takes

4   the lead in speed are downloading music and movies; isn't that

5   correct?

6   A.   The two that we have chosen to place in this advertisement

7   are that, correct.

8   Q.   Okay.  Now, let's go to the page before, please.  Okay.

9   And this is the What is Gigablast page.  Do you see that?

10  A.   Yes.

11  Q.   Okay.  And Speed 101, that's a button that gets you to

12  additional Cox pages; is that correct?

13  A.   Yes.

14  Q.   All right.

15          MR. PECAU:  Let's mark this as Exhibit PX 5002.

16          MR. WAKEFIELD:  Your Honor, I don't believe this

17  document was produced in discovery.

18          MR. PECAU:  Your Honor, this is cross-examination.

19  I'm asking him about Cox's services.

20          THE COURT:  I'll allow it.

21          MR. PECAU:  Thank you, Your Honor.

22  BY MR. PECAU: (Continuing)

23  Q.   Let me show you what has been marked as PX 5002.

24  A.   Yes.

25  Q.   And you recognize these also as Web pages from Cox's Web

S. Negretti - Cross

1   site?

2   A.   That's correct, yes.

3          MR. PECAU:  Your Honor, I move to introduce PX 5002.

4          THE COURT:  Your exception is noted.  It's received.

5   BY MR. PECAU: (Continuing)

6   Q.   Okay.  And this is a current page; isn't that correct?

7   A.   I will trust you on that.

8   Q.   Well, it has a date 12/7/2015?

9   A.   Then yes.

10  Q.   Okay.  And let's look at -- let's see.  It says on this

11  first page here, "prepare for faster speeds, we'll show you

12  how."

13         Do you see that?

14  A.   Yes.

15  Q.   Now, let's go to page 3 of this document.

16  A.   Yes.

17  Q.   Okay.  And I'm looking in particular on point 4, do you

18  see that?

19  A.   Yes.

20  Q.   Okay.  And that is Sharing, right?

21         It says "sharing"?

22  A.   Yes.

23  Q.   Okay.  And next to Sharing it has a file, and those are

24  music symbols, aren't they?

25  A.   That's correct.

1  Q.    Okay.  And it says, "Someone in your house may be sharing

2  music or files, which can drastically reduce your results.

3  Increase your speed package to share files without sacrificing

4  your speed experience."

5        Is that correct?

6  A.    That's correct.

7  Q.    All right.  And this is another reason why people should

8  spend more and buy these higher speed services; is that

9  correct?

10 A.    Yes.

11 Q.    Okay.  So let's go to page 2.  All right.  And at the top

12 there this is Speed Against Speed, right?  And at the top it

13 says -- you have the measure of time to download one song; is

14 that correct?

15 A.    That is correct.

16 Q.    All right.  And let's go to page 1, please.  And look at

17 the left-hand side on why the speed matters.  Can you blow that

18 up, please.

19        All right.  And the first thing that you say under

20 Why Speed Matters, "do you like to download music," isn't that

21 true?

22 A.    That's correct.

23 Q.    That's the first thing you put.  All right.  Let's go --

24 and Cox's other ads promote music downloads, don't they?

25 A.    I don't know what you are referring to.

1   Q.   Well, isn't this promoting downloading music?

2   A.   On this, yes.

3   Q.   Okay.  And you have other ads that promote downloading

4   music through the Cox Internet service?

5   A.   Again, I don't have those in front of me, I am sorry.  I

6   have this, so I know that it is correct on that.

7   Q.   Right.  But are you aware of any other Cox ads that

8   promote the downloading of music through its high-speed

9   Internet service?

10  A.   Without seeing them, I wouldn't be able to comment on

11  that, I am sorry.

12  Q.   Okay.  Well, I will help you out there.  All right.  Let's

13  go to -- actually, you looked at it this morning, I think it's

14  DTX 0289.

15          It is also -- it's already in, also, Your Honor, as

16  Plaintiffs Exhibit 1407.

17  A.   DTX, what was the last for?

18  Q.   It is DTX 0289.

19  A.   Okay.

20  Q.   And I believe this is one of the exhibits you identified

21  today; is that correct?

22  A.   That is correct.

23  Q.   All right.  And let's go to page 4.

24  A.   Okay.

25  Q.   Okay.  And under Speed Matters.  All right.  And it says,

1   the first thing you talk about, "whether you like to download

2   music, stream movies, or engage in online gaming warfare with

3   your friends, your Internet speed is important;" is that right?

4   A.   That is correct.

5   Q.   And the first thing that you refer to here also is

6   downloading music; is that correct?

7   A.   True.

8   Q.   Okay.  Let's go to DTX -- I can't read this.  Let's go to

9   PX 1409, please.  All right.  I think it's in your folder as

10  DTX 0291.

11  A.   I don't see it, but I see it here.

12  Q.   You don't see it?

13  A.   I don't see it here, but I see it here.

14  Q.   Okay.  Well, we can look at this one.  And let's go to

15  page 2.

16  A.   Oh, I am sorry, it was at the top.  Okay.

17  Q.   All right.  And page 2 in the one that you are looking at.

18  A.   Yep.

19  Q.   And let's look again at Speed Matters.  And this says the

20  same thing, the first thing you refer to is the download music;

21  is that correct?

22  A.   That's correct.

23  Q.   All right.  Now, are you aware of any ads in addition to

24  the first one that we saw that promotes music sharing?

25  A.   Music sharing?

S. Negretti - Cross

1219

1   Q.   Yes.

2   A.   I don't know what you are referring to, but I am not aware

3   of that.

4            MR. WAKEFIELD:   And I will object as

5   mischaracterizing the evidence.

6   BY MR. PECAU:  (Continuing)

7   Q.   All right.  Let's go to PX 1407, which I also think is DTX

8   0289, page 1.

9            Okay.  And where it talks about "Cox has doubled

10  Internet speeds," do you see that on the right-hand side there?

11  A.   Yes.

12  Q.   Okay.  So the three things that they refer to, the three

13  activities are "surf, stream, and share on the fastest in-home

14  WiFi."  Do you see that?

15  A.   Right.

16  Q.   Do you see that?

17  A.   Yes.

18  Q.   Okay.  And that's, again, a highly-valued attribute that

19  Cox is trying to sell to people to get them to increase the

20  speed of the product that they are selling; is that correct?

21  A.   This is an attribute that we have selected for this

22  advertisement, yes.

23  Q.   Right.  Okay.  Now, let's -- so fast sharing is a benefit

24  of Cox high-speed Internet; isn't that correct?

25  A.   It will explain to the consumer why they should choose

S. Negretti - Cross

1220

1   Cox, yes.

2   Q.   Okay.  Now, let's look at Plaintiffs Exhibit 5001 on the

3   first page.  Can we do that, please.

4          And you see under there that Gigablast Internet is

5   $99.99 a month.  Did I say that right?  99.99 a month; is that

6   correct?

7   A.   That's correct.

8   Q.   And let's go to PX 1407, page 2.  And I think it might be

9   on -- if you want to look at your binder, it is probably DTX

10  0289, the same page.

11  A.   Okay.

12  Q.   Okay.  And looking under Time to Download One Song, it has

13  a series of different things that they charge -- well, amounts

14  that they charge subscribers; is that correct?

15  A.   For the different packages of Internet based on the speed

16  of those Internet packages, yes.

17  Q.   Okay.  And then you start at 39.99, and then you go to

18  54.99, 64.99, and 79.99, is that correct?

19  A.   That's correct.

20  Q.   And the Gigablast for $99 is significantly more than the

21  39.99; isn't that correct?

22  A.   That's correct.

23  Q.   So Cox gets a direct financial benefit from getting people

24  to subscribe to its Gigablast services; isn't that correct?

25  A.   We derive revenue from it.  Whether there is financial

1   benefit from it or not is yet to be proven out.

2   Q.   All right.

3   A.   It is a very nascent service.

4   Q.   All right.  Mr. Negretti, you talked about a number of

5   surveys that you have seen.  Have you seen any surveys

6   regarding the size of the piracy universe or the amount of

7   illegal downloading that is on the bit net -- using BitTorrent?

8   A.   I may have been exposed to some of those.  I don't have

9   those facts and figures memorized by any means.

10  Q.   Well, I mean, the ones that you have seen, they have

11  indicated that significantly more than 95 percent of the

12  content was infringing; is that true?

13           MR. WAKEFIELD:  Objection, lacks foundation.

14           THE COURT:  Well, he just said he had some

15  familiarity.  So I am going to permit the question.  I'm not

16  sure whether it is inconsistent with earlier statements he

17  made.

18           But answer the question if you can, sir.

19           THE WITNESS:  Yeah.  I would have to see the survey

20  you are referring to be able to understand that claim.

21  BY MR. PECAU: (Continuing)

22  Q.   Well, you said you have some memory of surveys.

23  A.   That's correct.

24  Q.   Any -- and is it inconsistent with your memory of surveys

25  that over 95 percent of the music traffic and the other

1    copyrighted works being shared on BitTorrent are infringing?

2    A.   Yeah.  I don't have that kind of information without

3    reviewing the material.  The reason why is because --

4            THE COURT:  I am sorry.  The question was, could you

5    -- did you have that understanding based on what you had read

6    in the past?  Is your answer no?

7            THE WITNESS:  The answer is no.

8            THE COURT:  Okay.  Next question.

9            MR. PECAU:  Last question, Your Honor.

10   BY MR. PECAU: (Continuing)

11   Q.   Do you consider downloading copyrighted music without

12   authorization to be theft?

13   A.   I am sorry.  Repeat that question.

14   Q.   Sure.  Do you consider downloading copyrighted music

15   without authorization to be theft?

16   A.   That's correct.

17           MR. WAKEFIELD:  Argumentative, Your Honor.

18           THE WITNESS:  Could you restate the question?

19   BY MR. PECAU: (Continuing)

20   Q.   Sure.  Do you consider downloading copyrighted music

21   without authorization to be theft?

22   A.   That's correct, yes.

23           MR. PECAU:  Thank you, Your Honor.

24           THE COURT:  All right.  Any redirect?

25           MR. WAKEFIELD:  Redirect, Your Honor, yes.  I don't

S. Negretti - Redirect

1223

1   have, because I don't believe this document was ever produced

2   to us, PX 5002.

3            MR. PECAU:  We will be happy to pull it up for you.

4            MR. WAKEFIELD:  If I can have that pulled up.

5       REDIRECT EXAMINATION

6   BY MR. WAKEFIELD:

7   Q.   If we could go to the page that Mr. Pecau asked you about

8   that had the word "sharing" on it, the third page of the

9   document.

10           From your understanding of how people have WiFi set

11  up in their homes and how they access high-speed Internet

12  through Cox, is there an impact if many people within a home

13  are distributing materials within the family or within the

14  household using their WiFi?

15           MR. PECAU:  Your Honor, I object.  That is leading.

16           THE COURT:  It is leading.

17           MR. WAKEFIELD:  Okay.  Let me ask it differently.

18  BY MR. WAKEFIELD: (Continuing)

19  Q.   Is there any -- what, if any, impact is there on the

20  performance of a network in a home if you have multiple people

21  accessing a wireless router in that home at the same time?

22  A.   Yeah, that's a high impact.  In fact, that is one of the

23  biggest complaints our consumers have today with the Internet

24  service, is the WiFi service in their home causes congestion

25  when multiple people are on the Internet.

S. Negretti - Redirect

1224

1   Q.   So in your experience, when people call in for support, do

2   you offer any guidance or recommendations concerning content

3   moving not over the Cox network but within the home?

4   A.   Sure, absolutely, to the best of our ability without

5   physically understanding the problem in person.

6   Q.   Okay.  Are you aware of any legal and licensed music

7   services that allow a sharing of files within a home network?

8   A.   Yeah, absolutely.

9            MR. PECAU:  Your Honor, I object.  It is asking for

10  opinion.  There is no foundation and it's leading.

11           THE COURT:  Well, lay a foundation, if you would.

12           MR. WAKEFIELD:  Okay.

13  BY MR. WAKEFIELD: (Continuing)

14  Q.   Are you -- do you have familiarity with some of the

15  content services that your customers use?

16  A.   Yes.  So specific to what we're talking about here on this

17  page where it says, "number 4, sharing."

18  Q.   Yeah.

19  A.   Our intent and our belief structure is iTunes is a big

20  reason why consumers share music inside the home, right?  So

21  you have your iTunes library in a central location, and then

22  you can then receive your iTunes music library from other

23  locations based on speaker setups or PC setups at another

24  location to create somewhat of a quasi stereo system in the

25  home.  It causes a lot of congestion, and that congestion

1    sometimes reflects back to the consumer in terms of dropped

2    signal where they missed parts of their music and so forth, as

3    well as not being able to use the Internet for other things,

4    because of the speed of that, the capacity of that localized

5    device, that router that is inside the customer's home.

6    Q.    Okay.  And when files are moving from one part of the home

7    to another, what is that referred to as?

8    A.    Sharing, file sharing.

9    Q.    Okay.  When you're talking about sharing in this document

10   that we got this morning, are you referring to peer-to-peer

11   file sharing or BitTorrent file sharing?

12            MR. PECAU:  Objection, Your Honor.  It's leading.

13            THE COURT:  It is leading.  Just ask what are you

14   referring to, if he knows.

15            MR. WAKEFIELD:  Yeah.

16   BY MR. WAKEFIELD: (Continuing)

17   Q.    What are you referring to in this document?

18   A.    Yeah.  It is the sharing -- the base case -- the use case

19   that we use in the scenario is the ability to share music from

20   an iTunes central music server, such as a PC, within the rest

21   of the home.

22   Q.    Okay.

23   A.    That's the use case for that language.

24   Q.    Are you familiar with a product called the Apple TV?

25   A.    Absolutely.

S. Negretti - Redirect

1226

1    Q.    Are you familiar with a product call the Amazon Fire?

2    A.    Yes.

3    Q.    And what are those devices?

4    A.    Those are ancillary devices that customers can purchase

5    that can use our Internet service or any competitive Internet

6    service to enable them to watch things like video and music.

7    And even with the case of Apple TV, it allows you to see

8    photographs that you have, to the point about being able to

9    share music files, you can then do that more effectively with

10   the Apple TV in your home.

11   Q.    Okay.  And if a user has, let's say, an iPad tablet and

12   has downloaded a licensed movie from iTunes, is there any way

13   that they can use the Apple TV to watch that same movie or TV

14   show on the TV screen?

15   A.    Yes.

16   Q.    And what would you refer to that as within the home?

17   A.    Movie sharing, file sharing, TV sharing, something like

18   that.  Depends on the title.

19   Q.    Okay.  To your knowledge, does that have anything to do

20   with BitTorrent?

21   A.    I don't think it does, no.  I hope it does not.

22   Q.    Okay.  Mr. Pecau showed you some other documents regarding

23   using movies or music files as sort of a metric for speed.  Do

24   you recall that?

25   A.    Yes.

1   Q.   Why does Cox use a tune or a song as a measurement of

2   speed?

3   A.   Yeah.  So that's a good question.  So if you look at that

4   document, you will see there are several different things that

5   are being measured there.  And the point is that we are trying

6   to give an articulate picture to the consumer as to how fast

7   gigabit speeds are.  This is new in nascent space, as I said

8   earlier.  We are all trying to learn about why this is of value

9   to the consumer.

10          At the present time we know and understand gigabit

11  services to be far more than what most consumers need or will

12  ever need to consume in their normal household daily usage, but

13  we need to articulate to them in a memorable way, in a very

14  simple memorable way as to what they can use gigabit services

15  for, how it makes their lives easier and simpler.

16          And so, using things like how fast you can download a

17  song, a file, a video, and things like that leave a clear

18  picture in their mind, this is how much times faster it is than

19  my normal Internet.

20  Q.   Okay.  In your experience, have you come to understand

21  that there is a sort of typical range of file sizes for songs

22  from a service such as iTunes?

23  A.   Yes.

24  Q.   Off the top your head, do you happen to know about what

25  that is?

A.   Anywhere between 2 and 10 meg is typically what a song

size is.

Q.   Okay.  Why doesn't Cox promote the ability to download a

PowerPoint document from work?

A.   Well, it's less memorable, frankly.  Even though that's a

clear reason why people use Internet speeds, is to be able to

not only download, but upload them as well.

          Secondarily, we would probably have to work with a

company, like Microsoft, to obtain licensing and so forth.  And

we felt it was easier to be a little bit more ambiguous and

talk about something that means a little bit more to most

consumers.

Q.   Okay.  Well, what about -- why not mention a -- the

ability to download a spreadsheet in a particular amount of

time?  Why don't you do that?

A.   We certainly would do things like that if the right target

audience was who we are going after and we could specifically

know that that target audience is motivated by an attribute

such as that.

          Most consumers probably don't use spreadsheets every

day.  They use them at work potentially, but what they do do

most of the time is things like consuming entertainment,

whether it's video entertainment, music entertainment, or any

other form of entertainment.  And so that seems to be more

relative to the general mass than a Web page advertisement

1  would speak to.

2  Q.   Is the range of size between, you know, a small

3  spreadsheet and a large spreadsheet --

4  A.   Absolutely.

5  Q.   How does that compare to the range of size for a song?

6  A.   Yeah.  So, I mean, spreadsheet files, just like PowerPoint

7  files and even Word files to a degree, typically are about that

8  same size these days, between 2 and 10 megabits, believe it or

9  not, when you insert things like pictures and graphics and

10  other files into the spreadsheets and into the PowerPoints.

11       So it's not unlike that type of size.  You could have

12  a range a lot bigger than that.  In fact, some spreadsheets and

13  PowerPoints are two to three times that size.

14  Q.   Okay.  There was some questioning from Mr. Pecau about the

15  Gigablast service.  Was that available in 2011?

16  A.   No.

17  Q.   All right.  Is it something -- or what is the timing of

18  it?  I believe you said it is nascent.  What did you mean by

19  that?

20  A.   Yeah.  So "nascent" means very new.  It is something that

21  had just started out.  In fact, we just installed our first

22  gigabit customer on October 31 of 2014 in Phoenix, Arizona.

23  Q.   And is there any sort of competent threat out there that

24  this is in response to?

25  A.   Very much so.  There is a company, Google, most people

S. Negretti - Redirect

1230

1  probably know about, and Google has decided to enter the

2  telecom space by offering high-speed Internet and video

3  services to residential consumers.  They've started offering

4  the service in Kansas City, and several other sites, including

5  Provo, Utah, and they've started to offer and consider more and

6  more sites across the country.

7            In the early lifts they've identified sites that they

8  were considering.  Phoenix, Tempe, and Scottsdale, which all

9  fall into our footprint, if you will, were considered as three

10 potential places where they would launch the service.

11           And so, this was actually a response to try to keep

12 consumers from selecting or considering Google as a provider

13 for those Internet services.

14           MR. WAKEFIELD:  Thank you very much, Mr. Negretti.

15           THE COURT:  All right.  May Mr. Negretti be excused?

16           MR. PECAU:  Your Honor, can I ask a couple questions?

17           THE COURT:  No.  We're done.

18           MR. PECAU:  Okay.

19           THE COURT:  Thank you, Mr. Negretti -- I am sorry,

20 what was the answer?  May he be excused?

21           MR. WAKEFIELD:  Yes, he may.  Thank you, Your Honor.

22           THE COURT:  All right.  Any reason for recall of

23 Mr. Negretti?

24           MR. PECAU:  No, Your Honor.

25           THE COURT:  All right.  Mr. Negretti, you are

1   excused, sir, at this time with our thanks.  Please don't

2   discuss the testimony you have given with anyone, any other

3   fact witness until our trial is over.  All right.

4              THE WITNESS:  Okay.

5              THE COURT:  All right.  Have a good day.

6              THE WITNESS:  Thank you.

7              NOTE:  The witness stood down.

8              THE COURT:  All right.  Let's take our mid-morning

9   break, and we'll come back at about 10 minutes after 11:00.

10             All right.  Thank you.  You are excused.

11             NOTE:  At this point the jury leaves the courtroom;

12  whereupon the case continues as follows:

13  JURY OUT

14             THE COURT:  All right.  Let's take 15 minutes.  We

15  are in recess.

16             NOTE:  At this point a recess is taken; at the

17  conclusion of which the case continues in the absence of the

18  jury as follows:

19  JURY OUT

20             THE COURT:  All right, Joe, let's get our jury.

21             MR. THEODORE:  Your Honor?

22             THE COURT:  I'm sorry.  Hold on, Joe.

23             MR. THEODORE:  Very briefly.  I have copies of the

24  Zabek video testimony from yesterday we'd like to put in, and I

25  believe I have copies of certain documents from the Jason Zabek

1232

1   testimony.  I think they are already in, but I have copies for

2   Your Honor.

3           THE COURT:  Okay.  Hand them to Joe, please.

4           MR. THEODORE:  Thank you, Your Honor.

5           THE COURT:  Yes, sir.

6           THE COURT SECURITY OFFICER:  Ready, sir, for the

7   jury?

8           THE COURT:  Yes.  Thank you.

9           Sorry.  You'll get my attention faster between the

10  breaks if you actually come to the podium.  If somebody doesn't

11  move quickly, I've stopped asking just because nobody's had

12  much going on, but come to the -- you know, let me see you at

13  the podium.  That will help me recognize that we have something

14  to talk about.

15          MR. THEODORE:  I will.  I will, Your Honor.  Thank

16  you.

17  JURY IN

18          THE COURT:  All right, please have a seat.  I'm sorry

19  for the delay.  We had technical difficulties with some of our

20  electronics in here for the second time today.  Hopefully,

21  we've got it all ironed out now.

22          All right.  Mr. Wakefield, your next witness?

23          MR. WAKEFIELD:  Thank you, Your Honor.  Cox calls Hal

24  Poret.

25              HAL PORET, DEFENDANTS' WITNESS, SWORN

H. Poret - Direct

1233

```
1                          DIRECT EXAMINATION

2    BY MR. WAKEFIELD:

3    Q.   Good morning, Mr. Poret.

4    A.   Good morning.

5    Q.   Please state your full name for the record.

6    A.   Hal Poret.

7    Q.   And what were you retained to do in this case?

8    A.   I was asked to review and analyze a survey that was

9    conducted for the plaintiffs by Dr. Nowlis.

10   Q.   Can you describe for the jury your educational background?

11   A.   Yes.  I have a Bachelor's in Math and a Master's Degree in

12   Math, and I have a J.D. from Harvard Law School.

13   Q.   And where did you obtain your Bachelor's in Math?

14   A.   That was at Union College in New York State.

15   Q.   And what about the master's degree?

16   A.   State University of New York in Albany.

17   Q.   Okay.  You said you have a J.D. that's a law degree?

18   A.   Yes.

19   Q.   Are you currently a practicing attorney?

20   A.   No.

21   Q.   Okay.  What do you do now?

22   A.   I practice survey research full time.

23   Q.   Okay.  And where are you employed?

24   A.   ORC International, which is a market research and business

25   research firm.
```

H. Poret - Direct

1234

1  Q.   All right.  And what do you do at ORC?

2  A.   I design and implement and analyze consumer surveys.

3  Q.   Okay.  Approximately how many consumer surveys have you

4  personally designed and implemented?

5  A.   Over 800.

6  Q.   How did you get started in the field of consumer surveys?

7  A.   I was practicing as an attorney after law school, and I

8  decided that I did not like being an attorney, and my original

9  background was in math and research, and I decided that doing

10 survey research was the best combination of my interest and

11 training in math and psychology and also in law in terms of the

12 instances where survey research is used for legal reasons.

13 Q.   Okay.  What other experience do you have in the field of

14 consumer surveys?

15 A.   Well, I also have been a speaker at a lot of conferences

16 on the topic of how to design and conduct reliable surveys such

17 as the American Intellectual Property Law Association and the

18 Association of National Advertisers and a lot of other

19 conferences, and I've also published two papers on survey

20 research as well as a lot of papers in connection with those

21 conferences.

22 Q.   What kinds of businesses retain you to do consumer

23 surveys?

24 A.   All kinds of small, medium, and large companies, as well

25 as law firms or other organizations.

H. Poret - Direct

1235

1    Q.    You mentioned law firms.  Are the surveys you do mostly

2    for litigation issues?

3    A.    No, no.  Less than half of what I do.  Less than half of

4    the surveys are for litigation.

5    Q.    Okay.  Let's talk about the surveys you do that are not

6    litigation related.  What -- what kinds of surveys are those?

7    A.    A lot of them are just typical corporate market research

8    surveys, such as the ones that the first witness talked about

9    where a company just needs to hire somebody to do a survey to

10   help them make decisions about their products or services or

11   find out what their customers think and want, essentially

12   services -- surveys to help companies make decisions about how

13   to design and market their product and services or their Web

14   sites or their advertising.

15        And another type that is not in litigation but is

16   legal related, I do tests to see whether there is

17   substantiation for advertising claims that companies want to

18   make.  For instance, if you wanted to advertise that our

19   customers prefer us to other Internet service providers, you

20   would have to prove that that's true with some evidence, so

21   sometimes I do surveys to test where there's support for claims

22   like that.  So those are some of the main examples.

23   Q.    Okay.  You mentioned testing relating to advertising for

24   Internet service.  Have you worked with Internet service

25   companies in doing survey research, other market research?

H. Poret - Direct

1236

1    A.   Yes.  I've done, I've done market research for Verizon and

2    AT&T and Cablevision, which has the optimum online Internet

3    service, and for Comcast.

4    Q.   And what kinds of materials -- I don't want to discuss the

5    specifics of things you read about those companies, but what

6    kinds of materials did you review regarding other Internet

7    companies in doing research for them?

8    A.   In the course of doing research for them, I've seen a

9    bunch of internal market research from all of these companies

10   as well as their -- some -- a lot of their advertising and a

11   lot of their materials about their advertising and marketing

12   plans, so I have had a lot of opportunity to see their own

13   research on what makes customers select them as an Internet

14   service provider or how they're trying to advertise themselves

15   to get people to select them.

16   Q.   Would you consider yourself to be a professional expert

17   witness?

18   A.   No.  That's -- it's only a small percentage of my time

19   that is actually involved in being a witness.

20   Q.   Okay.  Have your opinions been -- or let me ask that

21   differently.  Have you been accepted as an expert to testify

22   about consumer surveys by courts?

23   A.   Yes, I have.

24   Q.   Have any courts rejected your surveys and not permitted

25   them to be presented in your career?

H. Poret - Direct

1237

1  A.   No.

2  Q.   And why don't we go to -- in your binder DTX 3462.

3  A.   Okay.

4  Q.   Do you recognize that as a copy of your curriculum vitae,

5  or CV?

6  A.   Yes.

7  Q.   All right.  And is it accurate as of the date it was

8  prepared?

9  A.   It is as of the date.  It's just a little out of date

10  about a few things that could be added to it, but it's accurate

11  as of fairly recently.

12          MR. WAKEFIELD:  Okay.  We would offer Exhibit 3462 in

13  evidence.

14          THE COURT:  Any objection?

15          MR. PECAU:  No objection.

16          THE COURT:  It's received.

17          MR. WAKEFIELD:  And Cox offers Mr. Poret as an expert

18  on surveys regarding the perceptions, opinions, and behaviors

19  of consumers.

20          THE COURT:  Any objection?

21          MR. PECAU:  No, Your Honor.

22          THE COURT:  All right.  He will be received for that

23  purpose.

24          MR. WAKEFIELD:  Thank you, Your Honor.

25  Q.   Now, you said earlier you were retained to analyze the

H. Poret - Direct

1238

1    survey conducted by Dr. Nowlis, correct?

2    A.   Yes.

3    Q.   And can you -- well, why don't we go ahead and put up a

4    demonstrative slide that was put up during Dr. Nowlis's

5    testimony.  It's PDX 0003.  Okay.

6              Oh, and have you also had a chance to review the

7    transcript from Dr. Nowlis's trial testimony in this case?

8    A.   Yes, I have.

9    Q.   Okay.  So you heard him testify about this slide?

10   A.   Yes.

11   Q.   So briefly, can you summarize for the jury what

12   Dr. Nowlis's conclusions were?

13   A.   Well, he's saying that his survey measured the reasons

14   that consumers are drawn to select Cox as their Internet

15   service provider, and he claims that the survey shows that a

16   significant percentage of consumers are drawn to choose Cox

17   because of the ability to download or upload free music through

18   BitTorrent sites, such as ThePirateBay.

19   Q.   Okay.  And having reviewed his survey, did he ever ask

20   consumers if they used BitTorrent?

21   A.   No.

22   Q.   And we're going to walk through these in more detail, but

23   very briefly, what is your conclusion about the Nowlis survey?

24   A.   That it did not measure anything about why consumers

25   specifically select Cox as an Internet service provider.  At

H. Poret - Direct

1239

1   most, it got at what people do on the Internet generally and

2   maybe why they want the Internet service generally, but nothing

3   to do with why they would select Cox specifically.

4   Q.   And what are the main reasons, and we'll go into these

5   specifically, but what are the main reasons you reached that

6   opinion concerning the Nowlis survey?

7   A.   The first reason is that the questions didn't actually

8   offer people choices that reflect why people select Internet

9   service providers, so the answers people gave can't reflect why

10  they would choose a specific Internet provider like Cox.  They

11  could only reflect why people want the Internet generally.

12          The second reason is that there weren't proper

13  controls, or at least the ones that Dr. Nowlis had weren't used

14  properly, and the other reason is that with respect to the

15  question asking people about whether they download free music.

16  Because of serious problems with the wording of the questions

17  and the choices, it's not appropriate to conclude from people

18  selecting that choice that they actually use sites like

19  ThePirateBay or any BitTorrent sites to download illegal music.

20  They easily could have just been saying yes, I download music

21  on the Internet.

22  Q.   Okay.  And could that include legal sites?

23  A.   Yes.

24  Q.   Let's talk about the results themselves before digging

25  into the questions.  Is there anything about the results

H. Poret - Direct

1240

1  themselves that you saw that cause you to take -- to have

2  your -- inform your opinion about the Nowlis survey?

3  A.   Yes.

4  Q.   Why don't we go ahead and put up a screen that Dr. Nowlis

5  put up.  It's DTX -- it's an exhibit, DTX 3446.0001.  I believe

6  it's Table 1.

7  A.   Okay.

8  Q.   And are you familiar with this document?

9  A.   Yes.

10 Q.   And what is it?

11 A.   This is a table of the results of the key question from

12 Dr. Nowlis's survey, which shows the percentage of respondents

13 that answered that each of varies things were reasons for

14 subscribing to Cox.

15 Q.   Okay.  So let's look at the answer about using Google or

16 Yahoo.  I believe it's the bottom of that first page, "Use a

17 search engine to find information."

18        Do you see that?

19 A.   Yes.

20 Q.   And what percentage of respondents said that's a reason

21 they subscribe to Cox in particular?

22 A.   90.8 percent.

23 Q.   Okay.  And another question is about e-mail.  It's sort of

24 middle of the page, where it says, "Send/read e-mail."  That's

25 the answer choice.

H. Poret - Direct

1241

1    Do you see that?

2    A.   Yes.

3    Q.   And what was the percentage of people who said that

4    sending and reading e-mail is a reason they subscribe to Cox?

5    A.   90.1.

6    Q.   All right.  And for "Shop online," right below that, was

7    the percentage of people about the same?

8    A.   Yeah.  It was 86.9 percent.

9    Q.   Okay.  So that would indicate 86.9 percent of people

10   subscribe to Cox because of shopping online?

11   A.   That's what the figure is from the survey.

12   Q.   That's what that purports to show.

13        And another one about Facebook -- sorry -- it's about

14   social networking.  What was the result for that of people who

15   answered that they do social networking to -- as a reason they

16   subscribe to Cox?

17        MR. PECAU:  Your Honor, I'm going to object to the

18   question.  He's only reading part of the question.  He's done

19   it in each one of these things.  I think it's misleading.

20        THE COURT:  All right.  Let's read the -- if you want

21   him to testify about his opinion about work that Dr. Nowlis

22   worked on, then you have to give him the proper question,

23   please.

24   BY MR. WAKEFIELD:

25   Q.   Sure.  So I believe I had, but I can rephrase that one.

H. Poret - Direct

1242

1    The -- and we'll get into the structure and format of the

2    questions in particular, but the one that says "Social

3    networking" in bold type, do you see that?  Then it has a

4    space, then a hyphen, then a space, followed by the words,

5    "Such as Facebook, Twitter, LinkedIn, etc."

6            Do you see that?

7    A.   Yes.

8    Q.   That was the question I was asking about when I referred

9    to social networking, but I just read the full text.

10           What was the percentage of people, who in response to

11   that said that is a reason they subscribe to Cox?

12   A.   77.7 percent.

13   Q.   All right.  What conclusions do you draw from those

14   response rates of people who said that those identified

15   activities were a reason they subscribed to Cox?

16   A.   It's very clear that people are not identifying things

17   that are reasons that they would specifically select Cox.

18   They're just identifying things that are reasons they want the

19   Internet in general, because you can do all of these things on

20   any Internet service just as easily, and I know from my

21   experience, having done research with other Internet service

22   providers and seeing their own research and even beyond that, I

23   don't think you need to be -- you don't need to be a survey

24   expert.

25           Any of us who have looked into signing up for an

1243

1    Internet service provider can see that the ability to read

2    e-mail or shop online or use search engines is not a reason

3    that anybody picks an Internet service provider.  They're just

4    reasons that people want to use the Internet generally.

5            So what these numbers make clear is the fact that the

6    large majority of people are saying, yes, I use Google; yes, I

7    send/read e-mail; yes, I shop online; yes, I do social

8    networking, that can't possibly be saying those are the reasons

9    that I would select Cox specifically over other Internet

10   service providers.  It's just showing what percentage of people

11   feel that those are things that are important to why they want

12   the Internet in general.

13           And so the same thing is true of the downloading free

14   music choice.

15   Q.   But, Mr. Poret, the survey question did ask why people

16   subscribed to Cox.  Wouldn't the answers, wouldn't the answers

17   tell us the reasons to that question?

18   A.   Well, you can only understand a question in reference to

19   the answer choices.  So if you're asked a question about your

20   reasons for subscribing to Cox Internet service but none of

21   choices that you're given are the actual reasons that anybody

22   would pick a specific Internet service provider and all of the

23   choices that are given or virtually all of them are just common

24   Internet activities that people might want the Internet in

25   general for, then the only way to interpret the question is

H. Poret - Direct

1244

1    that it's asking you which of these things are important to you

2    in using the Internet.  It can't be interpreted as really

3    asking why did you specifically choose Cox, when none of these

4    answers are legitimate reasons.

5    Q.   If you were to go about coming up with a question to ask

6    people why they subscribed to Cox or why they continue to

7    subscribe or not switch from Cox, how would you ask that?

8    A.   What I would first do and what's very standard in surveys

9    is to ask people a question where they can answer in their own

10   words.  So I would ask them, please tell us as specifically as

11   possible what were the reasons that you selected Cox as your

12   Internet service provider, and then they would have a bunch of

13   boxes and they could type in whatever answer.

14           So they could type in price, they could type it in as

15   high speeds, they could type in, I got a good deal on a bundle,

16   or they could type in whatever, and that way, you would see

17   what people say in their own words, and you would see does

18   anybody mention anything about downloading music through

19   BitTorrent sites as a reason.

20           So I would certainly start off that way, and then I

21   would, I'm sure, follow up with a question like Dr. Nowlis had

22   that had a list of choices to pin that down, but I would

23   certainly have the choices that reflect realistic reasons for

24   selecting an Internet service, such as the price, such as

25   whatever the contract terms were, or the company's reputation,

H. Foret - Direct

1245

1  or the Internet speeds, download and upload speeds.  So it

2  would be an appropriate balance list of choices.

3  Q.   What's your basis for your opinion that you would list

4  things like price and service and speed and availability in the

5  answer choices for why someone subscribes to an ISP?

6  A.   Because as a consumer myself and as somebody who has

7  studied this area a lot as a market research consultant, having

8  done a lot of surveys for, like I named before, Comcast and

9  Verizon and AT&T and Cablevision, and having seen their own

10  research, it's very clear that the things that cause people to

11  pick one Internet service provider over another are not things

12  like the ability to shop online or do a Google search.  They're

13  what is the price of the service or what kind of bundle deal

14  can I get or how high are their speeds.

15       So those are, those are the things that make me think

16  that, as well as that I've been involved in a number of other

17  legal cases that have been between the Internet service

18  providers.  For instance, I was just involved in a case that

19  involves Comcast and Verizon basically fighting over each

20  other's claims that they have faster Internet speeds, and all

21  of that involved studying of all the various advertisements and

22  the support that each company has for their claims and their

23  own research, and it's obviously full of research about, you

24  know, who has faster Internet speeds and what are the prices

25  and what are the terms and why consumers would pick one over

H. Foret - Direct

1246

1    the other, and all of the advertising of these companies

2    focuses on these things.

3            You never see a Verizon ad that says, you know, you

4    can shop online great with us or you can do e-mail with us.

5    They highlight the things that would make somebody pick them,

6    such as we have really fast speeds or we have a better router

7    or your WiFi is going to work better or the price or bundles.

8    Q.   I'd like to show you DTX 2364.  It's in your binder.

9    A.   Okay.

10   Q.   Do you recognize DTX 2364?

11   A.   Yes.  This is an FCC study that I had also taken a look

12   at.

13   Q.   All right.  And that's something you had taken a look at

14   in connection with your work in this matter?

15   A.   Yes.

16           MR. WAKEFIELD:  Okay.  We would offer DTX 2364 in

17   evidence?

18           THE COURT:  Any objection?

19           MR. PECAU:  No objection, Your Honor.

20           THE COURT:  All right, it's received.

21   BY MR. WAKEFIELD:

22   Q.   The study was entitled "Broadband Decisions:  What Drives

23   Consumers to Switch or Stick with Their Broadband Internet

24   Provider."

25           Did I read that right?

H. Foret - Direct

1247

1    A.    Yes.

2    Q.    Okay.  And what's the date of this study?

3    A.    December 2010.

4    Q.    Okay.  And if you look to page 3, there's a list of

5    factors that can inhibit consumers from changing a service.

6    A.    Yes.

7    Q.    Do you see that?

8    A.    Yes.

9    Q.    And what were those?

10   A.    Those factors are having to pay for the setup or

11   installation fees; dealing with the hassle of getting new

12   service installed; having to put down a deposit; having to

13   change their bundle of Internet, TV, and phone service; having

14   to give up their current e-mail address; and having to pay

15   termination fees.

16   Q.    So were any of those answers about why people stick with

17   their ISP and don't switch related to a specific activity

18   around downloading music?

19   A.    No.

20   Q.    And if you look to the bottom half of the same page,

21   this -- what did this part of the study look at?

22   A.    This looked at what people said were reasons for changing

23   Internet services, and the major reasons were to get a higher

24   performance Internet connection; a better price on the service;

25   getting a bundle of Internet, TV, and phone; or because they

H. Foret - Direct

1248

1    had bad customer service from their old ISP; or getting more

2    features with the new service.

3    Q.   Okay.  Let's go to -- well, let me ask a different

4    question.  We're done with this document.

5            Was the FCC research inconsistent or consistent with

6    the kinds of research you had seen about, well, what matters to

7    Internet consumers?

8    A.   It's consistent.

9    Q.   Did you form any opinion about whether the Nowlis survey

10   did anything to control for this problem you've identified?

11   A.   No, it did not.

12   Q.   Okay.  And generally, can you describe the concept of a

13   control in a survey?

14   A.   Yes.  It's similar to the idea of a placebo in a

15   scientific experiment.  You would think of having a group that,

16   for example, tries a medication, and then you would have a

17   group that tries placebo or a sugar pill, which lacks the

18   active ingredient, and you would compare the results to

19   determine whether the medication actually works.

20           So, for instance, if 30 percent of the people said

21   the medication made my headache go away but also 30 percent

22   said that about a sugar pill, you would know you've just

23   measured a placebo effect and not something real.  But if

24   30 percent said that the medication helped their headache and

25   only 10 percent said the placebo did, then that difference

H. Poret - Direct

1    would have proven an effectiveness of the medication.

2           And you have the same thing in surveys when you ask

3    people questions and you're going to get a percentage who gave

4    certain answers.  It's very helpful to have a control to

5    measure what percentage of people would give those same

6    answers, even if what you have hypothesized isn't really true.

7    Q.   Did Dr. -- let me ask a different question.

8           Dr. Nowlis testified that he used control questions.

9    Do you recall that?

10   A.   Yes.

11   Q.   And what is your opinion about his use of control

12   questions?

13   A.   Well, I have two thoughts on that.  One is that it would

14   have been better to have a separate control group, and second,

15   that's fine that he used control questions, but he didn't

16   analyze them in the right way, and had he done that, you would

17   have seen a very different result.

18   Q.   Let's start with that second point you made about

19   analyzing the control questions the wrong way.  First, in

20   picking a question as a control, is there an assumption that a

21   survey designer is making about whether that control question

22   is actually measuring something or not?

23   A.   Yes.  What you're assuming with a control is that the

24   control lacks whatever you think is true about what you're

25   testing.  So in this case, if you're trying to test is

H. Poret - Direct

1250

1    downloading free music something that is drawing people to Cox,

2    and that's what you're testing, then your control choices would

3    naturally be things that you agree clearly do not draw people

4    to Cox.  So that's what the controls are.

5    Q.    Is that what Dr. Nowlis did?

6    A.    Yes.  The controls he selected were the idea that somebody

7    uses the Internet to create an avatar or representation of

8    themselves or that they use the Internet to calculate

9    radioactive decay rates, and he picked those two things because

10   he agreed those would not be things that anybody actually

11   selects Cox as an Internet provider for.

12   Q.    And on that issue, do you agree with Dr. Nowlis that those

13   would not be reasons someone would choose Cox as their Internet

14   provider?

15   A.    Yes, I do.

16   Q.    So why do you take issue with how he used those control

17   questions?

18   A.    Because when you are comparing a test result to a control

19   result, you have to compare apples to apples.  You have to do

20   the same computation for the test question as for the control

21   question, and he actually didn't in this case, and if you look

22   at the numbers that are in those charts, he did a different

23   calculation for the two control choices that results in those

24   appearing to be very small numbers, when if you did those

25   calculations the same way that he did for the choice of

H. Foret - Direct

1251

1    downloading free music, you would find that there was actually

2    the same rate of people saying that creating an avatar or

3    calculating decay rates is a reason they subscribe to Cox, as

4    with downloading free music.

5            And what that shows is that that question just leads

6    people to say that whatever they do on the Internet is most of

7    the time a reason that they want the Internet.

8    Q.   Let's actually go back to DTX 3446.0001, that table, and

9    we had already talked about the first page, where it was all

10   between -- except for one instance, they were in the high, in

11   the 70s up to the low 90s.  Dr. Nowlis says on the first column

12   next to his control questions, "Create an avatar or online

13   representation," that one, or the radioactive decay one you

14   mentioned.

15           What does he calculate there?

16   A.   Well, what he's showing is the number of people who said,

17   yes, creating an avatar or online representation of yourself

18   and calculating radioactive decay rates is a reason for

19   subscribing to Cox, but this 10.8 percent number and this

20   3.2 percent number are not based on the same method of

21   calculation that all those higher numbers are on the other side

22   of the table.

23   Q.   So what result do you get for the creating an avatar and

24   the calculate radioactive decay rates if you apply the same

25   methodology that Dr. Nowlis used for all the others that were

H. Foret - Direct

1252

1    70 and 80 and 90 percent?

2    A.    So for all of those others that have the high results,

3    what he's done is he's said, I'm taking all the people who said

4    I do that activity, and I'm telling you the percentage of those

5    people who do the activity who said that's a reason I subscribe

6    to Cox.

7              But for the avatar and the radioactive decay rates,

8    that's not what he did.  If you do that for those, if you say,

9    I'm going to take the people who said I do create an avatar,

10   and look at what percentage of those said, that's a reason I

11   subscribe to Cox, you get 68 percent, and if you take all the

12   people who said, yes, I do calculate radioactive decay rates,

13   and see of those how many, what percentage said, that's a

14   reason I subscribe to Cox, you get 80 percent.  So it's

15   effectively the same results that you get for the download

16   music choice and most of the others.

17   Q.    So that -- so in the example you gave of the medical test

18   with the placebo, if you have people getting a headache --

19   people with headaches and they take the medicine and 30 percent

20   of them feel better in five hours and then other people take

21   the placebo, which has no medicine, and 30 percent of them feel

22   better in five hours, too, what do you do with those two 30

23   percents?

24   A.    You compare them, and if you see that they're effectively

25   the same, then what that shows you is what you're testing is

H. Foret - Direct

1    not supported.  So here what this shows you is that this

2    question here, which he claims is measuring reasons for people

3    to subscribe to Cox, is not really doing that because all it's

4    doing is it's causing people to say that anything that they do

5    on the Internet is something that's somehow important to them

6    in having Internet service.

7    Q.   Let's go back to Dr. Nowlis's demonstrative slide,

8    PDX 0003.

9            So he refers to a percentage of subscribers who use

10   BitTorrent for free music say it is a reason they subscribe to

11   Cox, and he said 70.4 percent, right?

12   A.   Yes.

13   Q.   And then he does something called a net, right?

14   A.   Yes.

15   Q.   And what's he doing to get from the 70.4 to the 59.6?

16   A.   He's taken the 10.8 percent number that we saw from his

17   previous table about creating an avatar, and he subtracted it

18   from the 70.4, saying that that's weeding out the noise, but

19   like I said, that's not an apples-to-apples comparison of the

20   70 percent for downloading music to the 10 percent for the

21   avatar choice.

22           If you actually calculated those two things using the

23   same methodology, you'd get 70.4 and 68.3, and so if you did

24   that subtraction, rather than that taking you down to 59, it

25   would take you down to 2 percent basically.

H. Poret - Direct

1254

1   Q.   Okay.  Well, in fact, I believe you said for the

2   radioactive decay rate, it was about 80 percent?

3   A.   Yes.  So whichever one you subtracted would take you down

4   to the equivalent of zero.

5   Q.   Okay.  Would you -- in your opinion, would you consider

6   that net result -- if you did the control subtraction

7   correctly, would you consider that to be significant,

8   statistically significant or statistically insignificant?

9   A.   It's insignificant.  It's showing that that question

10  produces the same effect even when asked about something like

11  creating an avatar, which even he's conceding could not

12  possibly be a reason people select Cox.

13  Q.   You also mentioned the absence of a control group as

14  another problem with controls in this study.  What do you mean

15  by -- well, I think we covered it with the placebo question,

16  but what would a control group have been in this kind of survey

17  about why people choose Cox?

18  A.   If you really wanted to test why -- whether downloading

19  free music is actually something that specifically causes

20  people to choose Cox, the obvious thing you would do is you'd

21  run this survey with Cox subscribers, and then you'd run the

22  same survey but with a group of people who subscribed to other

23  Internet providers like Verizon or Comcast or any others, and

24  you'd ask both groups the same questions, and if you saw that

25  the people who subscribe to Verizon or Comcast or anybody else

H. Foret - Direct

1255

1  gives the same answers about downloading free music, then that

2  would be clear that it has nothing to do with Cox; it's just

3  that any Internet service provider that you ask the subscribers

4  will give these same answers, whereas if you actually got a

5  result where 70 percent of Cox subscribers said something but

6  for Verizon, that was only 30 percent, then you'd have proven

7  that there really is something specific about Cox that draws

8  people to them.  But without that control group, these numbers

9  don't really, can't stand on their own.

10 Q.   And did not Dr. Nowlis use any sort of control group?

11 A.   No, he didn't.

12 Q.   Were there -- other than the -- the sort of results

13 themselves and the control issues, were there other flaws that

14 you identified in the Nowlis survey?

15 A.   Yes.  There's also a serious problem with the way he asked

16 about the download free music choice, the way that that's

17 worded and the way he's interpreting those results.

18 Q.   All right.  Why don't we walk through the actual questions

19 from screen shots as they appeared so you can explain that for

20 the jury.

21         If we can put up PX 1685?  And -- okay.  So there's a

22 question 1 at page C-15, and why don't we blow up the response

23 choices there.

24         So the question is -- this is the actual question

25 about the -- that is supposed to measure why people choose Cox,

1  and what is it about these questions that you take issue with?

2  A.   Well, with the -- what's happening is that he's taking

3  people who select the choice download or upload free digital

4  music, and he's saying those people have just admitted to using

5  these BitTorrent sites for downloading illegal music, and his

6  basis for that is that he added these words on at the end that

7  says through sites such as ThePirateBay, KickassTorrents, and

8  Torrentz, but that is not even remotely a reliable basis for

9  concluding that the people who picked that choice actually were

10 intending to be confessing to downloading illegal music.

11         It very well could be that those people simply saw

12 the words "download or upload free digital music" and selected

13 that without even reading the remaining words, or it could also

14 be that people saw that choice and never even heard of those

15 Web sites but figured, well, I do download some free music

16 possibly legally from iTunes, from anything, and figured, well,

17 that's the right answer.

18 Q.   Before this case, had you heard of ThePirateBay,

19 KickassTorrents, or Torrentz?

20 A.   No.

21 Q.   And did you review Dr. Nowlis's testimony that he had not

22 heard of them, either?

23 A.   Yes, that's what he said.

24 Q.   But were you aware before this case of the ability to

25 download or upload free digital music?

H. Poret - Direct

1257

1    A.    Yes.

2    Q.    And were you aware of any way to do that that used

3    something other than BitTorrent?

4    A.    Yes.

5    Q.    Have you ever personally uploaded music to anything on the

6    Internet?

7    A.    I've uploaded music on YouTube and what I would call web

8    storage services like Google Drive, things like that, where --

9    I play music, and my kids play in a band, so we have lots of

10   recordings and videos that are shared amongst friends and other

11   people in the community, so I've done a lot of thing.

12   Q.    All right.  If you had been asked -- there's an earlier

13   question as opposed to the why you subscribe, but based on that

14   experience, if you had been asked these questions about are

15   these things you do, how would you have answered in response to

16   that question about download or upload?

17   A.    I would probably have just at this point seen "download or

18   upload free digital music" and just clicked yes for that, but,

19   I think, you know, you need to look at all of this, this whole

20   survey as a whole to really understand the psychology and the

21   process of why that would happen, because what's really going

22   on if you look at all these other choices is that for almost

23   every other choice there, the explanation after the bolded

24   phrase is completely unnecessary.

25         For instance, to say, "I send and read e-mail," and

1    then giving examples of Gmail or Hotmail or Yahoo, that's an

2    unnecessary explanation.  I'm not saying there's anything wrong

3    with giving that explanation.  I'm just saying it's

4    unnecessary.  People know what sending and reading e-mail

5    means.

6              And saying, "I use a search engine," and then giving

7    Google or Bing or Yahoo as examples, those are unnecessary, and

8    the same thing with social networking, Facebook, Twitter,

9    LinkedIn.  People know what social networking is.  And the same

10   thing with shopping online.  People know what that is.  They

11   don't need to see Walmart.com and Target.com as examples.

12             So the cumulative effect of all of this is as you're

13   taking the survey and you go down the list of these choices,

14   you see a bolded term, and then you see some examples which are

15   completely unnecessary, and so you'd quickly start to tune out

16   these examples since you're not spending a ton of time

17   scrutinizing every word of this.  You're just going through the

18   list, social networking, yes, send/read e-mail, yes, use a

19   search engine, yes.

20             And so, you know, you could get to the download or

21   upload free digital music choice and just click yes because

22   that's what the choice is and not really worry about what the

23   specific examples are.

24   Q.   Is there any significance to the fact that Dr. Nowlis

25   chose to put parts of these responses in bold with respect to

H. Poret - Direct

1259

1   that opinion?

2   A.   Yes.  He's indicating that that's the main choice and that

3   what's not involved is just -- are examples to inform

4   somebody's understanding of the choice.

5   Q.   What about the use of the words "such as" and "et cetera"

6   in these examples?  Is there any significance to your opinion

7   in the choice of those words?

8   A.   Well, "such as" is obviously indicating that these are

9   just examples, and the term "et cetera" indicates these are not

10  comprehensive lists.  They're just -- they're just examples.

11  Q.   And I believe in Dr. Nowlis's testimony, he indicated it

12  would be an appropriate answer if you were asked the shop

13  online question, that if you bought things through Diapers.com,

14  it would be okay to say yes.  Do you remember that?

15  A.   Sure, yeah.  And that's right because these are just

16  examples, and maybe you don't shop at Walmart.com, but maybe

17  you shop at Sears.com or something else like that, and, of

18  course, you would still say, yes, I shop online, even if you

19  don't shop at the specific ones that are listed here as

20  examples.

21  Q.   But aren't Walmart and Target and Amazon much broader in

22  what they offer people than Diapers.com?

23  A.   Yes.

24  Q.   Would you expect as a consumer going through these to do

25  an analysis of the specific choices and think about -- of the

H. Poret - Direct

1260

1   specific examples as you've described them and think about how

2   they relate before answering that question?

3   A.   No.  People are -- people who are taking the surveys are

4   not interested in spending a ton of time scrutinizing every

5   word and analyzing those things.  They're going through them

6   relatively quickly, and they're, you know, most likely just

7   going to see the main part of it and answer.

8   Q.   And in his testimony, do you remember what Dr. Nowlis said

9   about the time it would take someone to do this survey?

10  A.   Well, I think he said it's possible to do it in as little

11  as 30 seconds, and I think he observed that plenty of people

12  did it in around a minute.

13  Q.   Around one minute?

14  A.   Yeah.

15  Q.   Let's go back earlier in the question, you mentioned

16  something about the structure of the questions generally, so

17  before we get to this one, there were a series of screening

18  questions that people went through in this survey; is that

19  right?

20  A.   Yes, or introductory parts.

21  Q.   And having looked at all of the questions in the screener

22  and the main question, did you form any opinion about whether

23  there was a pattern to these questions?

24  A.   Yes.  There is a pattern, which is you see a number of

25  times in which their answer choices, where there is a main

H. Poret - Direct

1    choice and then there's something in parentheses or something

2    that follows that are giving examples of what that choice

3    means.

4    Q.   Let's go to question A-2 as an example.

5         While we're waiting for it to come up, do you

6    remember that one of the screening questions was about what

7    kind of device you're taking the survey on?

8    A.   Yes.  There was a question about that that listed some

9    choices, and it said things like a tablet, such as an iPad or

10   a -- I don't remember what the other choices were, and a

11   Smartphone, such as an iPhone or an Android phone.  So that's

12   one of the first examples of where the respondents start to see

13   that there are choices that then have these examples, which are

14   really unnecessary because they already know what a Smartphone

15   is and what a tablet is.

16        I'm not saying there's anything wrong with giving

17   those examples; that's fine.  It's just people fall into the

18   pattern of saying to themselves, I know what this means.  I

19   don't need to read examples of what a Smartphone is or a tablet

20   is to understand what this choice means.

21   Q.   Okay.  So if the choice is, you know, which type of

22   electronic device are you using to complete this survey and

23   you're told tablet computer, and then it gives examples Apple

24   iPad, Kindle Fire, Samsung Galaxy Tab, would you expect a

25   consumer using a Microsoft tablet computer to need to read

H. Poret - Direct

1262

1    those examples to answer that part of the screening question?

2    A.   No.  They'd know that they have a tablet, and they would

3    answer that it's a tablet.

4    Q.   And if there was another screening question about

5    smartphones and it gives example of iPhone, Blackberry,

6    Android, would someone in your experience with a smartphone

7    need to read those examples to know if they were using a

8    smartphone?

9    A.   No, they wouldn't, but I think more to the point, if they

10   did read those examples, they would quickly realize that these

11   examples are unnecessary to them, and they would start to tune

12   them out as they see that they're unnecessary.

13   Q.   Let's go to another one of the screening questions that

14   people got to before taking the main survey question, and this

15   is question S-5.

16            I'm sorry.  One moment while I confer on the

17   technical difficulties.

18            Yeah, it's this document.  This doesn't have all the

19   screen shots.

20            Well, I'll just discuss with you what the exhibit

21   showed, I believe, that's in evidence.  The question asks, if

22   you recall this from your review of the survey, which, if any,

23   of the following services do you receive at your current

24   residence.

25   A.   Yes.

H. Poret - Direct

1263

1    Q.    Do you remember that one?

2    A.    Yes, I do.

3    Q.    And one of the choices was television service, and another

4    was home telephone, another was magazine subscription.

5    A.    Yes.

6    Q.    Another was Internet.

7    A.    Yes.

8    Q.    And I can actually improvise and show you a copy.  Oh, we

9    might have Dr. Nowlis's binder here, too.

10            Sorry for the technical delays.

11   A.    Thank you.

12   Q.    And what I'm looking for is the screen shots from the

13   actual survey as they appear to the consumers.  We showed one

14   page from that earlier.

15   A.    I have it here.

16   Q.    Okay.  And if you can get to question S-5?

17   A.    Yeah.  So what it says is it's asking which of the

18   following services do you have at your current residence, and

19   the way it works is it -- in bold says, "Television service,"

20   and then it says, "such as cable, satellite, or from a

21   telephone company," and then it has bolded, "home telephone

22   service, such as landline from a cable company or telephone

23   company," and then it says bolded, "magazine subscription

24   service, such as subscription to magazines on fashion, news,

25   interior decoration, or health delivered to your home on a

H. Poret - Direct

1264

1    regular basis."

2          So the point is, people in the survey are very used

3    to at this point seeing a bolded term, which they understand

4    what it means and they can answer that, and they don't need

5    these explanations of these examples, and if they do those

6    things, they're going to say yes even if it's not the exact

7    example.

8          So maybe the person has a subscription to *Golf*

9    *Magazine* and *Sports Illustrated*, not a fashion or news

10   magazine, but they're clearly going to pick, yes, I have a

11   magazine subscription service at home, even though that's not

12   specifically what these examples are.

13   Q.    Thank you.

14         So back to the main question about why people

15   subscribe and back to the question about music.  Why do you not

16   conclude that when people say download free music is a reason,

17   why don't you conclude that they're talking about illegal file

18   sharing?

19   A.    Well, there's two reasons.  One is as somebody's going

20   through this survey and time and time again they're seeing

21   bolded choices about whether it's television service or it's, I

22   send e-mail, or it's shopping online, I think people largely

23   are going to be tuning out these examples when it says through

24   something such as, because in the vast majority of cases, those

25   things are totally unnecessary, and even in the event that

H. Poret - Direct

1265

1   somebody reads those things, I don't think somebody would say,

2   no, I don't download free music, if they do that, but just not

3   from those types of sites.

4           And I'll give you an example which I think is a nice

5   way to think about it, and, you know, the nice thing about

6   something like this is, you know, everybody, including the

7   members of the jury, you could be people who are taking

8   surveys, and all you need to do is think of what you would do

9   if you were asked questions like this, and I would think

10  about -- imagine if you were being asked which of the following

11  types of restaurants do you like to eat out at?  And you see

12  the first choice is fast-food burger restaurants, such as

13  McDonalds and Wendy's, and you answer that question, and then

14  you see Mexican restaurants, such as Taco Bell and Chipotle,

15  and you answer that question, and then you see seafood

16  restaurants, such as Red Lobster, and you answer that question,

17  and now you see pizza restaurants, such as Pie Nation, Luigi's,

18  and Joe's.

19          Well, you've never heard of those, let's say, but you

20  do eat out at pizza restaurants, and you've gone through these

21  choices:  fast-food burger restaurants, Mexican restaurants,

22  seafood restaurants, pizza restaurants.  You're probably going

23  to answer, yes, I like to eat out at pizza restaurants, even if

24  you don't recognize the names that I just listed after that,

25  and that's the same thing that's going on here, is you're

1266

1    getting these choices and -- that don't really define what

2    people specifically are saying.

3           So I could then turn around to you and say, well,

4    those three pizza restaurants I listed, they're actually

5    specifically Chicago deep-dish-style pizza restaurants, and

6    since you picked yes to that, now I know that you specifically

7    like Chicago-style deep-dish pizza, and that wouldn't be a

8    valid conclusion.  What would really happen is I just got you

9    to pick the pizza choice because you eat at pizza restaurants.

10          So for the same reason, you can't look at people who

11   pick yes to download or upload free digital music and conclude

12   that that means that they use the specific sites that were

13   listed there.  They may have completely tuned those out, or

14   they may have never heard of those at all and just ignored

15   them.

16   Q.   What if you pretend that those examples are gone and it

17   didn't say PirateBay or anything else, just download or upload

18   free digital music?  Would you consider that question by itself

19   to have been asking about illegal free music?

20   A.   No.  It would just be asking about free music, without

21   specifying that, and there would be no reason for people to

22   understand that to be asking them if they're doing something

23   illegal.

24   Q.   And earlier in your testimony, you mentioned some ways to

25   upload or download free music.  Do you recall you also included

1    some examples of that in your report?

2    A.    Yes.

3    Q.    And if you could refer to DTX 3464?

4    A.    Okay.

5    Q.    All right.  Do you recognize DTX 3464 as an appendix of

6    materials you considered in forming your opinions concerning

7    other sources of free digital music?

8    A.    Yes.

9              MR. WAKEFIELD:  All right.  Your Honor, we would

10   offer DTX 3464 in evidence.

11             THE COURT:  Any objection?

12             MR. PECAU:  No, Your Honor.

13             THE COURT:  All right, it's received.

14             MR. WAKEFIELD:  Thank you.

15   Q.    So after the title page, what did you assemble together

16   into this short appendix to your report?

17   A.    This shows examples of music that's available to be

18   downloaded for free on Amazon and free music that's available

19   on iTunes, and this also has some articles about how major

20   bands, like U2, were giving away music for free and Radiohead

21   was giving away music for free.  Those are just some examples

22   even outside of major sites where artists have just chosen on

23   their own to make their music available for free for download.

24   Q.    And how does that relate to your opinion concerning the

25   assumption in Dr. Nowlis's survey that people answering this

H. Poret - Direct

1268

1   question engage in illegal file sharing?

2   A.   It's just indicating that there are plenty of ways to

3   download or upload music for free on the Internet and that

4   people in the survey who said, I download or upload music for

5   free, might have been referring to normal, legal methods and

6   not intending to convey that they are doing something illegal.

7   Q.   If you can go to DTX 2361?

8   A.   Thank you.  Okay.

9   Q.   All right.  And do you recognize DTX 2361?

10  A.   Yes.

11  Q.   And is this other material that you considered in your

12  research for this product -- for this project concerning the

13  availability of licensed free digital music?

14  A.   Yes.  This is an article about ten sites that are for free

15  legal music downloads.

16          MR. WAKEFIELD:  We would offer DTX 2361 in evidence.

17          THE COURT:  Any objection?

18          MR. PECAU:  No objection, Your Honor.

19          THE COURT:  All right.  It's received.

20  BY MR. WAKEFIELD:

21  Q.   So why don't we put that on the screen, DTX 2361.

22          Looks like we have duplicate numbers, so we'll have

23  to solve that problem.

24          In your binder, is there a Digital Trends article?

25  A.   That is what I was looking at as 2361 in my binder.

H. Poret - Direct

1269

1   MR. WAKEFIELD:  So we won't put that up on the

2   screen, and if we have a -- in fact, perhaps we ought to give

3   this a .A or something to avoid a problem with the record.

4   THE COURT:  That's fine.  2361?

5   MR. WAKEFIELD:  It was -- my copy and the witness's

6   copy say -- okay.  So I hope we don't have two DTX 2361s, but

7   maybe we don't, so --

8   THE COURT:  All right.

9   MR. WAKEFIELD:  -- we can sort that out later and

10  figure it out.

11  Q.   Okay.  So is this the article that you referred to and

12  that you relied on in -- or considered in your research?

13  A.   Yes.

14  Q.   All right.  And generally, what does it discuss?

15  A.   It discusses varies sites where you can go to download

16  free music legally if you don't want to break the law.

17  Q.   And what's the title?  Well, the title is right there.

18  The title is, "Breaking the Law Not Your Thing?  Here are Ten

19  Sites for Free, Legal Music Downloads," correct?

20  A.   Yes.

21  Q.   All right.  And what are some of the sites that this

22  article discusses?

23  A.   It discusses Amazon, MP3.com, something called Jamendo,

24  and there's a few others, The Free Music Archive and Noise

25  Trade.

H. Poret - Direct

1270

1   Q.   Okay.  Speaking of legal versus illegal music, do you

2   recall Dr. Nowlis's testimony that he thought people would not

3   want to answer about something that they did that was illegal?

4   A.   Yes.

5   Q.   How does that impact your analysis of his survey?

6   A.   I think he's right, that people -- if you ask people a

7   question that sounds like you're asking them whether they do

8   something illegal, there's a strong tendency to say no because

9   people don't want to admit to doing something illegal, and that

10  is consistent with my position that people who said yes, that

11  they download free music, were not intending to answer that

12  they are using illegal sites or that they're doing something

13  illegal, for the same reasons Dr. Nowlis said, that people are

14  not likely to admit to something like that in a survey.

15  Q.   So would there be some way to craft a different kind of

16  question to get at the question of BitTorrent usage in

17  particular?

18  A.   Yes, I'm sure there would have been.  I mean, at a

19  minimum, you could ask people whether they've even heard of

20  BitTorrent and, if so, whether they've used BitTorrent sites

21  and if they know any specific BitTorrent sites.

22  Q.   But did Dr. Nowlis do that?

23  A.   No.

24  Q.   Finally, Mr. Poret, what was the sample size in this

25  survey?

H. Poret - Direct

1   A.   314.

2   Q.   Okay.  One of the criticisms I've heard from -- or

3   responses from Dr. Nowlis about your criticism is that Cox

4   didn't do its own -- well, didn't have you do your own survey.

5   What's your response to that?

6   A.   Well, for one, as we just heard before, Cox already has

7   its own internal market research that indicates why people are

8   interested or choose Cox.  It also includes why people leave

9   Cox, why people choose Cox.  So they already have their own

10  research on that topic.

11       And also, it wasn't necessary for me to do a survey

12  to do what I was asked to do, which is comment on whether

13  Dr. Nowlis's survey proves what he says it proves.

14  Q.   All right.  And ultimately, what is your opinion about

15  whether his survey proves what he says it proves?

16  A.   It clearly doesn't.  It's clearly just getting people to

17  say what activities they do on the Internet and what they are

18  interested in on the Internet generally.  None of those choices

19  have anything to do with why people select an Internet service

20  provider specifically over any other Internet service provider.

21       MR. WAKEFIELD:  Thank you, Mr. Poret.

22       Pass the witness.

23       THE COURT:  Thank you.  Cross-examination?

24       MR. PECAU:  Yes, Your Honor.  I was wondering if we

25  could have a break for lunch?  It's 20 of one.

H. Poret - Cross

1272

```
1              THE COURT:  Well --

2              MR. PECAU:  But if you want, Your Honor --

3              THE COURT:  Do you want to break now for lunch?  Do

4    you want to wait until 1:00?  Does it not -- I'm sorry.

5              A JUROR:  1:00.

6              THE COURT:  1:00.  All right.  Let's get started

7    then, please.

8              MR. PECAU:  Sure, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. PECAU:

11   Q.   Mr. Poret, my name is Will Pecau, and good afternoon.

12        You said you didn't do a survey in this case, right?

13   A.   Right.

14   Q.   And you do about a hundred surveys a year; isn't that

15   correct?

16   A.   Yes.

17   Q.   And about 35 of them are for litigation, right?

18   A.   That seems to make sense to me.

19   Q.   Right.  And the excuse you gave for not doing a survey was

20   that you said that Cox had done some of its own surveys, right?

21   A.   I'm not saying that that's my only reason.

22   Q.   But that was the reason you gave, isn't it?

23   A.   No, I said -- I also said that it wasn't necessary to do

24   what I was asked to do, which was to comment on Dr. Nowlis's

25   survey.
```

H. Poret - Cross

1273

1    Q.   Sir, I asked you, that was a reason that you gave, was

2    because you said that Cox had done its own surveys.  Isn't that

3    the question?

4    A.   No.  The question was what is my response to Dr. Nowlis's

5    comments on not needing the survey, and I said one response to

6    that is that Cox does have their own market research.

7    Q.   So that was one of the reasons that you gave that you felt

8    as though you didn't have to do additional survey; isn't that

9    correct?

10   A.   No, I'm not saying that was one of my reasons at the time.

11   I'm just saying right now being asked to respond to

12   Dr. Nowlis's comment, that's one of my comments, but I didn't

13   say that's one of my reasons why I didn't do it originally.

14   Q.   And you know none of the Cox surveys that were certainly

15   identified by Cox referred to any of the BitTorrent sites that

16   Dr. Nowlis's study refers to; isn't that correct?

17   A.   Yes.

18   Q.   Okay.  And when you -- when you were first approached by

19   Cox, you said that you only vaguely knew about BitTorrent;

20   isn't that correct?

21   A.   Yes.

22   Q.   All right.  And all you knew about it was that you just

23   had a sense that it was some system that allowed people to

24   upload and download things; isn't that correct?

25   A.   It's a little hard to say at this point now that I've

H. Poret - Cross

1274

1    heard so much about it over such a long period of time, but

2    that sounds roughly right, that I just had a vague sense of it

3    but no particular knowledge of it.

4    Q.    And you weren't aware of ThePirateBay site, were you?

5    A.    No.

6    Q.    And you weren't aware of the KickassTorrents site, were

7    you?

8    A.    No, I wasn't.

9    Q.    And you weren't aware of the Torrentz site, were you?

10   A.    No, I wasn't.

11   Q.    Okay.  And actually, when you filed your report

12   criticizing Dr. Nowlis's survey, you still hadn't visited

13   ThePirateBay site; isn't that correct?

14   A.    I believe that's correct.

15   Q.    Right.  Or any of those other sites, right?

16   A.    Yes, I believe that's right.

17   Q.    In fact, you hadn't visited any sites that you knew to be

18   a BitTorrent site, isn't that correct, at the time that you

19   filed your report in this case?

20   A.    I believe that's right.

21   Q.    All right.  And, in fact, you didn't conduct any research

22   regarding BitTorrent Web sites prior to filing your report

23   criticizing Dr. Nowlis's survey; isn't that true?

24   A.    Yes.

25   Q.    Okay.  And prior to filing your report criticizing

H. Poret - Cross

1275

1  Dr. Nowlis's survey, you had no reason to have an opinion

2  whether the estimate by NetNames at 99.7 percent of

3  non-pornographic films distributed by BitTorrent's systems

4  infringed copyrights was correct, right?

5  A.   If the question was I had no reason to have an opinion on

6  that, yes, that's correct.

7  Q.   Okay.  You don't have any formal marketing education;

8  isn't it true?

9  A.   Right, if you mean degrees.

10 Q.   Right, I meant degrees.

11 A.   Yes.

12 Q.   You have none.

13        And you're not a professor at any college or

14 university in marketing or survey designs; isn't that correct?

15 A.   Yes.

16 Q.   All right.  And, in fact, in a very large percentage of

17 the cases in which you've presented surveys, the other side has

18 hired a survey expert to criticize your survey; isn't that

19 correct?

20 A.   I would say that's correct.

21 Q.   Right.

22 A.   People usually hire an expert to --

23 Q.   And, in fact, you've written words to the effect that it's

24 widely accepted that all surveys can be subject to varying

25 forms of criticism; isn't that correct?

H. Poret - Cross

1276

1   A.   Yes.

2   Q.   All right.  Now, in your report in which you're supposed

3   to have all of your criticisms of Dr. Nowlis, you never said

4   that Dr. Nowlis miscalculated his control number; isn't that

5   correct?

6   A.   I don't know if I said it in those words, but I talked

7   about the problem of his not having a control rate.

8   Q.   Right.  But you -- in your report, you never said that

9   Dr. Nowlis miscalculated his control number; isn't that

10  correct?

11  A.   That might be correct that that's, that I didn't put it in

12  those words, but I --

13  Q.   In fact, the number 68 percent never appeared in your

14  report, did it?

15  A.   I don't think so.

16  Q.   Okay.  You now know that ThePirateBay, KickassTorrents,

17  and Torrentz are BitTorrent sites?  You know that now, right?

18  A.   I understand that from this case.

19  Q.   Right.  And you don't have any survey evidence who said

20  that, yes, that the use site such as ThePirateBay,

21  KickassTorrents, or Torrentz did not know what those sites were

22  for?

23  A.   I'm not sure I understood that question.

24  Q.   Okay.  You haven't done a survey in this case, right?

25  A.   Yes.

H. Poret - Cross

1277

1  Q.   Right.  You haven't seen any survey that shows whether or

2  not most people who download -- illegally download free music

3  know about ThePirateBay, KickassTorrents, or Torrentz; isn't

4  that correct?

5  A.   Yes, that is correct.

6  Q.   Okay.  And the respondents who answered yes to the option

7  that they use sites such as KickassTorrents or Torrentz to

8  upload or download free digital music, they had the choice in

9  Dr. Nowlis's survey to select no or don't know or unsure,

10  right?

11  A.   Yes.

12  Q.   Okay.  And the respondents who answered yes to the option

13  that they chose Cox Internet service for the ability to

14  download or upload free digital music through sites such as

15  ThePirateBay, KickassTorrents, or Torrentz, etc., had the

16  choice also to select no or don't know or unsure, right?

17  A.   I thought that's the question you just asked me before.

18  Q.   Well, there were two main questions in the survey, right?

19  A.   Oh, yes, sorry.

20  Q.   And in both of them, they had the choice to say they could

21  say yes, right?  They could say no, or they could say don't

22  know/unsure, right?

23  A.   Yes.

24  Q.   Okay.  And Dr. Nowlis's survey right at the beginning, and

25  I think you might have read this, told respondents not to

1   guess; isn't that true?

2   A.   Yes.

3   Q.   Right.  And he also indicated that the response don't

4   know/unsure is perfectly fine; isn't that correct?

5   A.   Yes.

6   Q.   All right.  And he repeated that instruction before the

7   second major question he had; isn't that correct?

8   A.   I don't have it in front of me, but I'm sure it is if you

9   say it is.

10  Q.   Okay.  And Dr. Nowlis also in his study twice told

11  respondents that they shouldn't guess; isn't that correct?

12  A.   Again, I don't have it in front of me, but I don't have

13  any reason to doubt that.

14  Q.   All right.  The survey altogether only had eight

15  questions; isn't that right?

16  A.   Again, I'm going to take your word for it.  That seems

17  right.

18  Q.   All right.  And the 16.1 percent of respondents who said

19  that they downloaded or uploaded free digital music through

20  sites such as ThePirateBay, KickassTorrents, etc., they were

21  all Cox subscribers; isn't that true?

22  A.   Yes.

23  Q.   All right.  And the main question -- main survey question

24  didn't ask about use; isn't that correct?

25  A.   No.

H. Poret - Cross

1279

1   Q.   All right.  Instead, it asked the respondents which, if

2   any, of following are reasons why you subscribe to Cox Internet

3   service?  Isn't that what the question was?

4   A.   Yes.

5   Q.   All right.  And one of the options was to download or

6   upload free digital music through sites such as ThePirateBay,

7   KickassTorrents, or Torrentz; isn't that correct?

8   A.   Yes.

9   Q.   Okay.  And your counsel said in asking you questions about

10  this, he said, pretend that people don't read the entire

11  option, that they just read download or upload free digital

12  music.  Do you remember that?

13  A.   I don't know that he said "pretend."  I think he asked me

14  a hypothetical of what would I say about the question if it

15  didn't include that part.

16  Q.   Well, he actually used the word "pretend," and he wanted

17  you to imagine a world in which the full question wasn't asked;

18  isn't that correct?

19  A.   I do think he asked a hypothetical question, yes.

20  Q.   All right.  Now, do you -- is it your experience that

21  people when they're answering questions in surveys pretend

22  they're not reading the entire questions?

23  A.   I don't think it's a matter of pretending, but I think in

24  plenty of instances, people don't read everything.

25  Q.   So in your surveys, you assume that people aren't going to

1  read everything that you write?  Is that what you're saying?

2  A.   No, that's not what I'm saying.

3  Q.   Okay.  Now, you sat through Mr. Negretti's testimony this

4  morning; isn't that correct?

5  A.   Yes.

6  Q.   All right.  And you heard from Mr. Negretti that Cox used

7  downloading music as a highly valued benefit to buy Cox's

8  Gigablast service.  Do you remember hearing that?

9  A.   I remember hearing the testimony in that topic.  I don't

10  recall if that's exactly the way it was put, but I know what

11  you're referring to.

12          MR. PECAU:  All right.  No further questions, Your

13  Honor.

14          THE COURT:  All right.  Any redirect?

15          MR. WAKEFIELD:  Brief redirect, Your Honor.

16          THE COURT:  Yes.

17                    REDIRECT EXAMINATION

18  BY MR. WAKEFIELD:

19  Q.   Mr. Pecau asked you some questions about the instruction

20  at the beginning telling people not to guess.  Do you remember

21  that?

22  A.   Yes.

23  Q.   In your experience, would a consumer need to guess about

24  what the examples are to know how to answer the question about

25  uploading or downloading free digital music?

H. Poret - Redirect

1281

1   A.   No.  The problem isn't that they're guessing.  The problem

2   is that they're just seeing the choice, download free digital

3   music, and they're answering it without regard to what the

4   examples are.

5   Q.   Okay.  And I asked you at one point that even if the

6   example weren't there, how would your -- what would your

7   opinion be for just the bold option without the examples.  Do

8   you recall that?

9   A.   Yes.

10  Q.   I also asked you about the whole question as written.  Do

11  you remember that?

12  A.   Yes.

13  Q.   And your opinion is the same either way?

14  A.   Yes.

15          MR. WAKEFIELD:  All right.  Nothing further, Your

16  Honor.

17          THE COURT:  All right.  May Mr. Poret be excused?

18          MR. WAKEFIELD:  Yes, Your Honor.

19          THE COURT:  All right.  Do you want him subject to

20  recall or --

21          MR. WAKEFIELD:  Well, actually subject to recall for

22  their rebuttal case.  I mean, if they -- if they're pulling

23  back Dr. Nowlis, I'd want the option to -- if he's bringing in

24  somebody --

25          THE COURT:  Well, it's called rebuttal because they

1282

1    go first.

2              MR. WAKEFIELD:  Okay.  Got it.  Then no.

3              THE COURT:  All right.  You're excused with our

4    thanks, sir, and please don't discuss the testimony you've

5    given with any fact witness in the case until our trial is

6    over.  All right?

7              THE WITNESS:  Okay.  I understand.  Thank you, Your

8    Honor.

9              THE COURT:  Have a good day.

10             THE WITNESS:  Thank you.

11                          (Witness excused.)

12             THE COURT:  All right.  Well, let's break now a

13   little early, and we'll come back in an hour, and we'll

14   continue to hear testimony at that time.  Thank you, you're

15   excused.

16                          (Jury out.)

17             THE COURT:  All right.  Anything we need to talk

18   about right at this moment?

19             MR. PECAU:  Yes, Your Honor.  Your Honor,

20   Dr. Nowlis's testimony was complete sandbagging on this issue

21   of the proper control.  That stuff was not --

22             THE COURT:  Poret?

23             MR. PECAU:  Poret.  That stuff wasn't in his report

24   at all, and, in fact, they never raised it even in their motion

25   to disqualify Dr. Nowlis.  I mean, it was a complete sandbag,

1    Your Honor, and what we would like is an instruction to the

2    jury that any testimony that Dr. Poret made concerning,

3    concerning the percentage of control should be discarded --

4    disregarded because it wasn't in his report.  It's outrageous,

5    Your Honor.

6           THE COURT:  All right.  Mr. Wakefield?

7           MR. WAKEFIELD:  Yeah.  Your Honor, I obviously

8    disagree with the characterization of sandbagging.

9           THE COURT:  Well --

10          MR. WAKEFIELD:  He was directly critical in his

11   report, and they had an opportunity to depose him about the

12   controls.  He didn't do the specific calculation, but all that

13   is is division of two things that are in a very small set of

14   data that Dr. Nowlis provided.

15          Dr. Nowlis created a new demonstrative with a new

16   summary of what his opinion showed and put it on and showed the

17   math, the way the control is subtracted.  It became very

18   evident what they were trying to do with that, and this was an

19   appropriate response.

20          If they want to bring back Dr. Nowlis in rebuttal and

21   have him explain why he did the math that he did the way he did

22   it, they're free to do that, but an instruction here is

23   completely inappropriate.

24          MR. PECAU:  Your Honor, can I --

25          THE COURT:  Let me ask a question:  What was in his

1284

1   report about the control?  Because what he did was the last two

2   questions, he flipped the math, and he said that they actually

3   were 80 percent and 78 percent if you -- if Dr. Nowlis had

4   followed the same procedures that he followed in the earlier

5   questions where everything was 70 to 80 percent, and so

6   that's -- I think that's what Mr. Pecau is getting at.

7           MR. WAKEFIELD:  Yeah.  I -- I don't think his report

8   specifically talked about the calculation for each one.  It

9   specifically pointed out that the other answers throughout had

10  these high percentages which should be subtracted because each

11  of them isn't some -- isn't a reason why, and then when

12  Dr. Nowlis says, well, you subtract out these with a new slide

13  and new math, he just took the numbers and --

14          THE COURT:  Is there nothing in his report about the

15  control questions, the last two having been improperly

16  calculated?

17          MR. WAKEFIELD:  Not, specifically about the way --

18  about the numerator and the denominator.

19          THE COURT:  That was pretty powerful testimony.

20          MR. PECAU:  Your Honor, here's --

21          THE COURT:  All right.  Mr. Pecau?

22          MR. PECAU:  I'm sorry.  I apologize.

23          THE COURT:  Now, you can -- go ahead.  Go ahead.

24          MR. PECAU:  Your Honor, his entire conclusion about

25  this is in one paragraph on page 6.  There's nothing about

1   that, and I'd be happy to --

2           THE COURT:  All right, let's pass it up.  I'll look

3   at it during the lunch break.

4           MR. PECAU:  Thank you.

5           THE COURT:  That was significant testimony, so let me

6   look at it, and we'll discuss it a little further after I've

7   had a chance to look at it.

8           All right, anything else?

9           MR. WARIN:  Just a heads up.  Mr. Cadenhead is next.

10  We have some substantial objections to exhibits and scopes of

11  testimony, so I don't know whether you want to come back a

12  little early.

13          THE COURT:  Who's --

14          MR. WARIN:  He's the in-house lawyer that was the

15  subject of the advice of counsel motion in limine.

16          THE COURT:  What is he going to testify about?

17          MR. WAKEFIELD:  He's going to testify about the

18  history of interactions between Rightscorp and Cox, all those

19  communications about back and forth with him.  He's going to

20  talk about the setup of the graduated response system that I

21  believe that they've now walked through with all these people.

22          He's not going to be, you know, giving legal advice.

23  He's going to be talking about what happened.

24          MR. WARIN:  The e-mails have the legal advice in them

25  and -- which was cited in their interrogatory answer as the

1286

```
 1    advice of counsel, so --

 2            THE COURT:  Well, to the extent it just says, we

 3    don't accept notices that have settlement offers in it, that's,

 4    you know, that's --

 5            MR. WARIN:  Yeah, but it goes beyond that to talk

 6    about his opinion of what the DMCA does and doesn't do in that

 7    circumstance.

 8            THE COURT:  Okay.  Well, give me copies of that.

 9            MR. WARIN:  Okay.  We can give it to you --

10            THE COURT:  We'll come back at -- we'll take an hour,

11    but try and get me those copies ten minutes before we come back

12    so I can look at them beforehand, the ones you objected.

13            All right, we're in recess.

14            NOTE:  The morning portion of the proceedings on

15    December 9, 2015, is concluded.

16        ------------------------------------------------

17

18

19            We certify that the foregoing is a true and

20        accurate transcription of our stenographic notes.

21

22

                  /s/  Norman B. Linnell
23                Norman B. Linnell, RPR, CM, VCE, FCRR

24
                  /s/  Anneliese J. Thomson
25                Anneliese J. Thomson, RDR, CRR
```