UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                         :
              Plaintiffs,        :
                                : Case No. 1:14-cv-1611
     vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
              Defendants.        :
--------------------------------:
```


VOLUME  6  (P.M. portion)



TRIAL TRANSCRIPT

December 9, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

<u>APPEARANCES</u>:

COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.  20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

1289

## INDEX

| WITNESS | EXAMINATION | PAGE |
|---------|-------------|------|
| CHRISTOPHER SABEC by videotape | | 1311 |
| RANDALL J. CADENHEAD | DIRECT | 1328 |

1    NOTE:  The afternoon portion of the proceedings on

2  December 9, 2015, begins in the absence of the jury as follows:

3  JURY OUT

4    THE COURT:  Okay.  Let's first discuss the report of

5  Dr. Poret.  And I have looked in the report.  There is nothing

6  in here about the math of the control questions.

7    So, Mr. Wakefield, how is that permissible?

8    MR. WAKEFIELD:  Your Honor, we -- it was not

9  disclosed in his report, that calculation.  That specific just

10  bit of division of one column had not been done at that time.

11  And, in fact, it hadn't been done at the time because we

12  understood when Dr. Nowlis described his methodology, that he

13  had done what he had said he had done.  And it wasn't until

14  preparing -- I didn't understand this until last night in

15  preparing this direct examination what had happened.

16    And specifically, in paragraph 32 of his report, what

17  Dr. Nowlis said is that -- when describing his subtraction to

18  reach a net result, is that "the statistic of interest is that

19  the proportion of Cox Internet subscribers who download or

20  upload free digital music through sites such as ThePirateBay

21  for whom the ability to do so -- for whom the ability to do

22  this is a reason for subscribing to Cox Internet service."

23    So that's the relevant starting point, is the people

24  not just who say they do it, but for whom it's a reason.

25    Then he goes on to say, "to control for possible

1  survey noise, I included the two control questions.  By

2  subtracting the higher control value from the statistic of

3  interest, I obtain a net result of the proportion of Cox

4  Internet subscribers who download or upload free digital music

5  through sites such as ThePirateBay for whom the ability to do

6  this is a reason for subscribing to Cox Internet service."

7       That's a little complicated, but what I understood

8  that to mean and what I think he was saying to the jury is I've

9  compared apples to apples.  And it wasn't until just looking at

10  a spreadsheet that I saw and that Mr. Poret explained to me --

11       THE COURT:  But you had his survey and deposed him on

12  the survey.

13       MR. WAKEFIELD:  Right.

14       THE COURT:  And you had opportunities to study it

15  then and ask him questions about it.  Poret puts in his

16  response and he identifies his areas.  And, of course, the most

17  important one was the fact that he didn't think you could reach

18  the conclusions that Nowlis reached, but he also had the survey

19  and he had critiqued the survey, but he hadn't discussed the

20  numbers in the control questions that he came out with on the

21  stand.

22       So that's how I frame the question, and why should I

23  let it in as a result.

24       MR. WAKEFIELD:  So there was deposition questioning

25  about the numbers in the different groups, but not about the

1292

1    division, not about reaching the percentage.

2              THE COURT:  Because he never identified it as such.

3              MR. WAKEFIELD:  Right.  He indicated he had

4    criticisms of those controls and specifically about the fact

5    that you had different presentations of the numbers for the

6    control than the others, but not the numerator and denominator

7    piece.

8              THE COURT:  Okay.

9              MR. WAKEFIELD:  And it's my understanding that we

10   didn't know that at the time.  It became clear after hearing

11   that testimony and then going back and looking.

12             THE COURT:  Well, did you tell counsel you were going

13   to get into it this morning before court so that they could be

14   prepared to object if -- instead of in the middle of his

15   testimony and we could talk about it beforehand?

16             MR. WAKEFIELD:  I didn't, Your Honor.  Honestly, I

17   did think it fell within the scope of his general criticism of

18   the use of the controls and how they were applied to arrive at

19   this net, particularly when showing that everything else which

20   acts as a similar control subtracts out to reach a zero net

21   number.  That was my assessment.

22             THE COURT:  That was, you know -- that was -- as I

23   said before, that was significant testimony.  And the fact that

24   he reversed the math that Nowlis had used, and how he explained

25   that it should actually be 80 percent versus 10 percent, that

1   was significant, I think, to the jury's consideration of what

2   weight to give the survey.  And it hadn't been disclosed.

3           So, Mr. Pecau, you indicated you wanted a limiting

4   instruction.  It is beyond the scope of the Rule 26 report.  I

5   can strike it now.  I can advise the jury that the answers

6   about those two control questions should not be considered.

7           The issue then becomes what are you going to ask

8   Nowlis, and are you going to get right back in the middle of

9   exactly this?  So I am not sure how you massage that.

10          MR. PECAU:  Well, you know, Your Honor, I mean, the

11  sharp dealing here is pretty astonishing --

12          THE COURT:  Just answer my question.

13          MR. PECAU:  Okay.  Your Honor, I think what we would

14  like is a very strongly proposed -- strong instruction right

15  now to the jury saying that they should completely disregard

16  Mr. Poret's testimony regarding the control questions in

17  Dr. Nowlis' survey, and the jury should be instructed that

18  Dr. Poret's opinions were improper and were not disclosed by

19  Mr. Poret or Cox in violation of the Federal Rules of Civil

20  Procedure.

21          MR. WAKEFIELD:  If I can respond on that, Your Honor.

22          MR. WARIN:  Your Honor, Mr. Pecau has a copy.

23          MR. WAKEFIELD:  May I take a look?

24          THE COURT:  What were the two -- the subject matter

25  was the -- hold on, before I forget my question.  The two

1    control questions that he flipped the math were what?  Because

2    I think they --

3              MR. WAKEFIELD:  They were the questions about

4    radioactive decay and choosing an avatar.

5              THE COURT:  Right.

6              MR. WAKEFIELD:  And this is -- this proposed

7    instruction is a bit of a grab bag that far exceeds that.

8    There were definitely criticisms about the controls and absence

9    of controls in the report.  So I think if -- a limiting

10   instruction that says to disregard the testimony regarding the

11   calculations of the response rates for the two control -- the

12   numeric values to calculate the -- those questions, but

13   obviously he had a lot of other opinions about controls that

14   were disclosed.

15             And then the rest is getting into rulings that would

16   suggest somebody -- you know, it's essentially quite a sanction

17   to say his opinions were improper under the Federal Rules of

18   Civil Procedure -- seems completely unnecessary to the jury's

19   task.

20             MR. PECAU:  Well, Your Honor, I think that in this

21   case it is necessary.  The thing is that Dr. Nowlis' report was

22   on June 16.  And the fact is that he was deposed and he didn't

23   reveal this.  He -- they had a Daubert motion.  They didn't

24   reveal this.  And even more than that, Your Honor, is just the

25   sharp way that this thing was put in.  And how was it put in?

1  In every other expert we have had, we have had demonstratives.

2  Particularly when you have very complicated numbers like this.

3  I still don't know how they figured this out.  But there is no

4  demonstrative which would have given us some warning.  We

5  certainly didn't get any warning this morning.

6       And the way that this knife was slipped into us, he

7  asked a broad question, and he got a huge narrative answer.

8  This thing was a complete set up, Your Honor, and we think that

9  the instruction should reflect what actually happened here.

10      THE COURT:  Okay.  All right.  Well, I am going to

11 tell the jury that it was because it was a lack of disclosure

12 beforehand, and that it can't be considered for that purpose.

13 I am not sure whether that doesn't even soften the instruction

14 because they are going, well, it's probably true, but it wasn't

15 legit under the Federal Rules, so we are supposed to disregard

16 it now?

17      MR. PECAU:  Your Honor, that's the whole thing.

18 That's why it was a slipped in here.  I mean, it was a no-lose

19 proposition for them.  They didn't disclose it in any way.  And

20 they wanted to get it in front of the jury to create confusion,

21 to cast doubt.

22      And, Your Honor, we realize that the cat can't get

23 out of the bag, and that's why we think that it is appropriate

24 to have a very strong, very broad instruction.

25      THE COURT:  Okay.  I am going to give an instruction

1296

1    that will tell them not to consider it.  Tell them that as to

2    the calculations made in the -- on the control questions in

3    particular, the radioactive decay and choosing an avatar, that

4    it was not information which had been supported in an expert

5    report as is required.  So that it may not be considered under

6    any circumstances.

7          All right.  Let's go to the advice of counsel.  I

8    have looked at the e-mails.  I struck advice of counsel because

9    it wasn't timely.  And now I have got a bunch of e-mails where

10   you want to put in the fact that Cadenhead gave advice of

11   counsel and he is identified as the legal counsel.  And how is

12   that permissible in light of the way you responded to the

13   discovery requests?

14         Mr. Bridges.

15         MR. BRIDGES:  Your Honor, we never interposed an

16   advice of counsel defense.  We did not.

17         THE COURT:  This is advice of counsel, right?  These

18   are -- this is Cadenhead saying, we are not going to send these

19   notices to our customers because it is extortionate demands.

20         MR. BRIDGES:  Your Honor, the issue here is that

21   Mr. Cadenhead was acting as a principal.  He was making

22   decisions for Cox.

23         THE COURT:  He is the attorney making business

24   decisions for Cox?  He is giving advice as counsel, right?

25         MR. BRIDGES:  No, Your Honor.  He was not writing

1  memos.  The Court --

2          THE COURT:  Well, who does Cox believe made the

3  decision not to accept these notices?  What is your evidence

4  going to be on that?

5          MR. BRIDGES:  His testimony will be, I made the

6  decision.

7          THE COURT:  All right.  He is the counsel.

8          MR. BRIDGES:  Your Honor, many in-house counsel have

9  business functions and have business responsibilities.  He

10  was --

11          THE COURT:  What disclosure did you make about the

12  nature of his testimony in response to any interrogatory?  I

13  mean, and did you identify him as a fact witness?

14          MR. BRIDGES:  I am sorry, I don't recall what was in

15  interrogatory responses.  But we consciously, and during the

16  discovery period when this issue came up, when they were trying

17  to say that we were doing an advice of counsel defense, we said

18  we don't want to have this fight, we will waive privilege so

19  that everybody can see what it was.

20          But if the Court would actually see some of these

21  documents, documents that they have included themselves, there

22  was a process, a negotiation going on between Rightscorp and

23  Cox.  They called it a sales process, but their sales process,

24  Your Honor, was full of legal arguments.  Okay.  Full of legal

25  arguments.

1     And you heard Mr. Steele talk about all the law.  And

2  Mr. Sabec, the CEO of Rightscorp, who was interacting

3  personally with Mr. Cadenhead, Mr. Steele is arguing the law.

4  And Mr. Cadenhead is responding saying, we don't see your world

5  the same way.  But more importantly, Mr. Cadenhead is the

6  negotiator.  He is the person directing the customer safety

7  team.  And he says, block.  And he is the order giver.

8     Now, Mr. Hauprich testified earlier he is a counsel

9  and vice-president of content or whatever.  Many in-house

10  counsel have factual roles, not just mere advisory roles.  If

11  Mr. Hauprich were to talk about signing an artist, signing

12  Taylor Swift or not, that's a fact issue.

13     So Mr. Cadenhead's role is like that.

14     THE COURT:  Okay.  So the difference is that he gave

15  -- you want to allow him to give a legal opinion that Cox was

16  not required to send these notices on because of the settlement

17  demand within the notice.  That's an opinion of counsel.

18  There's no basis for it that has been identified.  And that's

19  why, I presume, BMG sought to determine whether anybody had

20  done research or made any attempt to determine the

21  reasonableness of the position that Cox has taken.  That's

22  what's missing here, right?

23     MR. BRIDGES:  Your Honor, we don't need to couch

24  it -- Mr. Cadenhead -- these documents are not being offered as

25  legal argument at all.  These are facts.  These documents are

1   events that happened.

2           THE COURT:  They include the opinion of counsel.

3   They include his opinion and his decision not to allow it.  And

4   that's out there.

5           I mean, I don't know what Cox is going to make out of

6   that.  You know, I sit here, and the way the case has come in,

7   the jury is really looking at it, is it reasonable for them not

8   to have sent the notices?  Was there some excuse?  They don't

9   understand where this is in the law.  They don't understand

10  whether the settlement demand takes them -- takes Cox out of

11  the responsibility to send them or not.

12          And the way to answer that question is to have an

13  attorney say, I made the decision not to forward the notices

14  because the settlement demand, and BMG sought that information,

15  and you didn't give it to them.

16          MR. BRIDGES:  Your Honor, we gave on a timely basis

17  information about the decisions that were made.  And the fact

18  is, this was not legal advice on the side that was laundered

19  through a business person.  He was -- he had the front line

20  responsibility of overseeing the actions of this team, and he

21  directed them.  He wasn't advising them for them to consider

22  something or not.  He directed them.

23          And, Your Honor, we have gotten so much law in this

24  case from Rightscorp.  We have gotten wheelbarrows full of law

25  from testimony, extensive testimony by Mr. Steele.  Their

1    documents.

2           They put in a document, Your Honor, I believe it's

3    Plaintiffs 2452, which is part of a long series of e-mails

4    between the sides, between Mr. Sabec and Mr. Cadenhead.  And to

5    say that Mr. Cadenhead isn't allowed to explain why Cox

6    responded to Rightscorp on these issues, is to leave Cox with

7    no explanation, Your Honor.  And in a case of this sort, merely

8    because the point person was a lawyer, and to say, you're not

9    allowed to explain yourself, would be having Cox with both arms

10   tied behind his back.

11          THE COURT:  Well, what is his answer going to be to

12   why didn't you forward the notices on?  Because you've

13   indicated it's by the settlement language.  And why is that a

14   good cause?

15          MR. BRIDGES:  He is going to explain, Your Honor,

16   that Cox had a policy, a policy of not forwarding settlements

17   like that because there had been two previous companies that

18   Cox had refused to forward those types of notices from.

19          So this was not some advice about, oh, Rightscorp,

20   this is something new.  There had been decisions and practices

21   earlier, established practices at Cox that these notices fell

22   within.

23          THE COURT:  And when he is asked what basis did Cox

24   have for those earlier decisions, what's his response going to

25   be?

1301

1       MR. BRIDGES:  There are several responses.  First of

2   all, he felt it was inappropriate for Cox to forward notices

3   like those to customers.

4       In Rightscorp's case, Your Honor --

5       THE COURT:  Answer my question.  So the reasons he is

6   going to give are he thought it was inappropriate in those

7   other cases and what else?

8       MR. BRIDGES:  And because these had -- these were

9   taking people to other Web sites with links, with passwords.

10  And Cox is very protective of its customer identities, and this

11  is sending Cox customers offsite to somebody else's Web site,

12  which is not a sound practice from any policy standpoint, Your

13  Honor.  This wasn't --

14      THE COURT:  Isn't that the customer's decision if

15  they get the notice?

16      MR. BRIDGES:  And it's the ISP's decision not to make

17  the customers vulnerable in that fashion.  And Your Honor, the

18  testimony -- I think these things will become clear as the

19  testimony unfolds.

20      The redirect option that Rightscorp suggested to Cox

21  was untenable for several reasons.  And one of them is, we

22  don't redirect our customers to somebody else's Web site.

23      In the world of web linking and the like, when you

24  think you're on a site and you get sent to another person's

25  site without opting to do so, that is a serious significant

1    issue.

2              THE COURT:  That's not what the DMCA requires, and

3    that's not what was being demanded here of Cox.  So that's

4    totally irrelevant to our discussion.  It may be a reason as a

5    policy never to allow your customers' information to come out.

6    And if the risk of some customers' information safety is so

7    paramount that that's Cox's policy on everything that they do,

8    then that -- you know, that doesn't -- even that doesn't, you

9    know, get you a denial of -- because it's the customer's

10   decision, and they are the ones that have to voluntarily

11   communicate with Rightscorp, right?

12             MR. BRIDGES:  Not necessarily with a redirect page,

13   Your Honor.  That would not be voluntary.

14             And, Your Honor, I understand these sound like

15   points, but these are points I think for the jury to hear.  And

16   if Cox says, we don't forward them because of some reason, and

17   we understand -- the DMCA is out of this case.

18             THE COURT:  Right.

19             MR. BRIDGES:  Okay.  The DMCA is out of this case.

20   There was a reason that Cox wasn't forwarding these settlement

21   demands, because they were improper.

22             Now, yes, he may have said outside the spirit of the

23   DMCA, but with the DMCA out, they are still improper.  They are

24   still improper.

25             And, Your Honor, I cannot stress enough, Cox needs to

1    be able to explain its actions.  And the person who engaged in

2    the actions is the person to explain them.

3            THE COURT:  Well, as you've stated, that is out there

4    already, that he told them not to do that.  The issue that is

5    before me is should he be allowed to explain as counsel why he

6    made that decision.  So -- all right.  You and I have talked

7    enough.

8            Does BMG want to respond?

9            MR. KELLEY:  Just briefly.  I think we've gotten

10   pretty far afield from the issue that we spotted.

11           The particular documents that we gave to you were

12   internal Cox documents, they weren't the back and forth with

13   Rightscorp.  We haven't objected to that.  That's going to be

14   discussed.  And what they are is Mr. Cadenhead opining about

15   what the DMCA does or doesn't do.  And so, those are the ones

16   that we think should not be introduced.

17           If they want to redact them, if they -- I don't know

18   how you do it, maybe you could, but that's what we have a

19   problem with.  And it's just that simple and just that narrow.

20           THE COURT:  What's your -- you've listened to

21   Mr. Bridges and I talk about his testimony, what he's going to

22   say about the reasonableness of his decision not to forward the

23   notices.

24           What's your position on the explanation that he is

25   likely to give?

```
 1            MR. KELLEY:  Well, I don't know exactly what he is

 2    going to say because everything up to now has been the DMCA

 3    doesn't allow it, they are against the law, blah, blah, blah.

 4    If he comes up with some new reasons that he doesn't like them,

 5    then I guess I've got to deal with the new reasons.

 6            THE COURT:  You think that's permissible testimony?

 7            MR. KELLEY:  Well, it's all wrapped in together, is

 8    the trouble.  It's a riddle inside of an enigma, whatever the

 9    Winston Churchill thing is.  So I have a hard time seeing how

10    exactly you fairly cross him on it.

11            THE COURT:  Okay.

12            MR. KELLEY:  And the other document is just this

13    Copyright Alert System thing that I thought we had already

14    dealt with.

15            THE COURT:  Yeah.  All right.

16            MR. BRIDGES:  Your Honor, if I may, just a couple

17    things.  As the Court said, this has been out in the air with

18    the jury.  And so, to me that's also an argument that on -- I

19    mean, we've heard DMCA and seen documents on DMCA many times so

20    far I think in this case.  And so, there's a serious open door

21    issue.

22            But I think that the critical thing here is that he

23    is the percipient witness who participated in internal

24    communications and external communications.

25            THE COURT:  Was he deposed?
```

1    MR. BRIDGES:  Oh, absolutely, Your Honor, absolutely.

2    And the other last point I'll make is let's take at

3  face value a concern about his statement that something was

4  outside the DMCA.  Okay.  Then let's put all the DMCA over to

5  one side, as the Court has done.

6    Then there's a question, I've got something

7  regardless of the DMCA, what do we do?  And when he says, it's

8  outside the spirit of the DMCA, he's making a decision about

9  what to do outside the DMCA.  And that's an authoritative

10  decision he could make in his role overseeing the customer

11  safety team, Your Honor, because it was about customer safety.

12    THE COURT:  Okay.  All right, Mr. Caracappa.

13    MR. CARACAPPA:  Your Honor, do you mind if I address

14  the issue about his deposition, because I took the deposition?

15    THE COURT:  Yes.

16    MR. CARACAPPA:  And throughout this entire case they

17  have said they are rejecting Rightscorp's notices for one

18  reason, and it's because it's outside the scope of the DMCA --

19  the spirit of the DMCA.  That is it.  And now what they're

20  saying, well, now we're going to have him come up with some

21  other reasons.

22    And his depo testimony and all the fact discovery is

23  very clear, it was one reason.  They're outside the spirit of

24  the DMCA, and that's it.  And now they're trying to change the

25  record and the testimony, and that's what they're going to try

1    and do through Mr. Cadenhead.

2            MR. BRIDGES:  Your Honor, he seized on one phrase,

3    and he now says that's the only phrase that was ever used.

4            THE COURT:  Well, what does his deposition say?  Do

5    you have that?

6            MR. BRIDGES:  I can get that.  Settlement amounts

7    have a lot to do with it.

8            THE COURT:  Settlement amounts, $10 and $20?

9            MR. BRIDGES:  Settlement amounts and --

10           THE COURT:  The fact that they hadn't identified that

11   there had been an actual infringement versus an allegation of

12   infringement?

13           MR. BRIDGES:  I'd love -- actually, if we could one

14   thing, Your Honor, if you don't mind.  I'd like to -- I want to

15   give the Court a good answer on this.  I think it may be useful

16   if we could proceed because we don't want to hold the jury up,

17   if we could proceed with the Sabec video testimony and come

18   back to Mr. Cadenhead later, and I'll be able to explain to you

19   exactly what he said in the deposition.

20           THE COURT:  All right.  That's a great idea.  Thank

21   you.

22           MR. BRIDGES:  Thank you.

23           MR. ALLAN:  Your Honor, I have one related point.  If

24   it pleases the Court, I can discuss it now or we can discuss it

25   after the deposition.

1    THE COURT:  Related to?

2    MR. ALLAN:  Well, it's actually related to both

3 issues we've talked about this afternoon, with respect to

4 Mr. Cadenhead and with respect to Mr. Poret.

5    The next two witnesses -- well, a couple of the next

6 two witnesses are Mr. Matt Carothers and Jason Zabek.  Matt

7 Carothers was the 30(b)(6) designee for the company on a number

8 of these topics, including Cox's policies and procedures for

9 notifying Cox's customers of infringement, actions that Cox has

10 taken or considered taking against its customers who have been

11 the subject of infringement notices.  There's a litany of them.

12    I have a six-page, single-spaced list of transcript

13 sites where Mr. Carothers doesn't know the answer to a

14 countless number of questions about their policies and why they

15 do certain things.  He was wholly unprepared for his

16 deposition.  He didn't know, he didn't speak to Mr. Zabek --

17    THE COURT:  Did you notify the Court and did Judge

18 Anderson rule on the fact that he -- did you bring a motion to

19 compel further testimony based on his inability to answer these

20 questions?

21    MR. ALLAN:  We did not file a motion to compel, Your

22 Honor.  We asked counsel if they would present Mr. Zabek, who

23 is clearly the most knowledgeable person about all these

24 policies, and they outright refused to do that.  So --

25    THE COURT:  So where are you going with the objection

1   now?

2          MR. ALLAN:  Well, I think the issue --

3          THE COURT:  What relief do you want?

4          MR. ALLAN:  Well, I don't think Mr. Carothers or

5   Mr. Cadenhead or Mr. Zabek should be able to change the

6   testimony that Matt Carothers had produced or provided in this

7   case with respect to the various policies.  I mean, it --

8          THE COURT:  Well, is that going to occur in this

9   video deposition unless we rule on that?

10         MR. ALLAN:  It won't occur in the Mr. Christopher

11  Sabec deposition, but it does implicate frankly every other Cox

12  witness they intend to call.

13         And we have a -- we put together a quick memo on

14  this, Your Honor.  We were thinking this might come up.  I'm

15  happy to hand it to you with a copy of the transcripts and

16  obviously counsel as well.

17         THE COURT:  All right.  That would -- yes, Mr. Warin.

18         MR. WARIN:  Your Honor, I have a question about the

19  Christopher Zabek deposition.  We had asked both during

20  discovery and during the course of this trial whether or not

21  Mr. Zabek would be available at trial.  We were told no --

22         MR. CARACAPPA:  Mr. Sabec --

23         MR. WARIN:  Oh, Sabec?  Oh, I'm sorry.  My mistake, I

24  made the Z an S thing.  Sorry, Your Honor.

25         THE COURT:  Okay.  All right.  Then I'll -- you have

1  got a copy for Mr. Bridges?

2          MR. ALLAN:  Yes, of course.  Yes, yes, Your Honor, I

3  do.

4          THE COURT:  All right.  I'll look at that.  I'd be

5  happy to look at it.

6          All right.  Ready for our jury?

7          All right.  Joe, let's get our jury.

8          NOTE:  At this point the jury returns to the

9  courtroom; whereupon the case continues as follows:

10  JURY IN

11          THE COURT:  All right.  Please be seated.

12          I apologize for the delay.  We've been working out

13  here and I think I said I'd try to limit these to when you're

14  not sitting in the back room so that we don't delay it, and

15  sometimes it works and sometimes it doesn't.

16          But, you know, in any trial unexpected events occur

17  that require some time before you're allowed to return.  So I

18  apologize.  We'll keep it to a minimum.  You know, we start

19  early before you get in often, and we stay late after you have

20  left for the evening to try and prevent delays in the testimony

21  during the day, but it's -- you know, issues come up.

22          Let me address Mr. Poret's testimony that you just

23  heard before lunch break.  He was giving testimony regarding

24  Mr. Nowlis' -- I guess they are both doctors -- Nowlis' survey

25  and had certain criticisms of it.  And one of the areas that he

1   discussed were the control questions, and in particular, the

2   radioactive decay control question, and also the choosing the

3   avatar question, and he criticized the use of those controls.

4   And he also gave you some numerical values which were at odds

5   with the numerical values that Dr. Nowlis had in his report on

6   those control questions.

7           You are to disregard that testimony.  That testimony

8   that he gave had not been disclosed prior to the testimony he

9   gave today.  And it doesn't matter why, it just wasn't

10  disclosed.  Therefore, under the Federal Rules, it can't be

11  admitted into evidence.

12          So I realize that doesn't answer any -- or some of

13  the questions you may have about the reasons why, but the why

14  is not important for you really to -- I don't want you to

15  speculate on the why.  I want you to disregard that testimony.

16          I mean, he had some other testimony about control

17  questions which didn't involve the mathematical calculations.

18  You may consider that, but you're just not to consider the math

19  that he did with regard to those two controls.  All right?  All

20  right.  Thank you.

21          We're going to have a video deposition presentation,

22  I believe.  Is that correct, Mr. Bridges?  Or -- Mr. Wakefield,

23  are you ready to play the deposition?

24          MR. WAKEFIELD:  I hope so, Your Honor.  Let me check

25  with the team.  I got a thumbs up, so I believe we are.

1       THE COURT:  All right.  Let's go ahead with that,

2  please.

3       NOTE:  Portions the testimony of CHRISTOPHER SABEC

4  by videotape are played; at the conclusion of which the case

5  continues as follows:

6       THE COURT:  Could you turn that off for a minute?

7  Turn that off.

8       Can I see counsel at the sidebar.

9       NOTE:  A side-bar discussion is had between the Court

10  and counsel out of the hearing of the jury as follows:

11  AT SIDE BAR

12       THE COURT:  I struck all that notification that went

13  out in the deposition.

14       MR. ALLAN:  That all was out this morning.

15       THE COURT:  That is all out.

16       MR. WAKEFIELD:  Which point?

17       MR. ALLAN:  Anything about "this is our lawsuit."

18       THE COURT:  I struck all that.

19       MR. BRIDGES:  He is -- let's go check with --

20       THE COURT:  It's out, and that's all that is left is

21  what I considered to be --

22       MR. WAKEFIELD:  My apologies for that.  There was a

23  scramble to cut back there.  I understood it had all been done

24  correctly, and I apologize for that.

25       THE COURT:  I don't think there is anything in the

1    second volume but further notifications to third parties, and I

2    don't think that's relevant at all.  So I struck it for that

3    reason.

4           And I will just tell them that the last notice to

5    that third party they saw shouldn't be considered, and our

6    video is over.

7           MR. WAKEFIELD:  Okay.

8           MR. ALLAN:  Thank you, Your Honor.

9           MR. REILLY:  Thank you, Your Honor.

10          NOTE:  The side-bar discussion is concluded;

11   whereupon the case continues before the jury as follows:

12   BEFORE THE JURY

13          THE COURT:  All right.  That last segment, that last

14   minute-and-a-half that you heard about a third party being

15   notified about the lawsuit -- these things are being done kind

16   of quickly before trial rulings are being made.  I had struck

17   that last testimony as irrelevant to our lawsuit.  And so, you

18   are not to consider it.

19          So that's the end of our video presentation of this

20   gentleman.

21          And we need to talk about one other matter.  So can

22   we take like a ten-minute recess?  Does that work?

23          All right.  Thank you.  Then you are excused.

24          NOTE:  At this point the jury leaves the courtroom;

25   whereupon the case continues as follows:

1   JURY OUT

2           THE COURT:  All right.  Did counsel find the area

3   where Mr. Cadenhead was -- have a seat --

4           MR. KELLEY:  If we can wait a moment and retrieve

5   Mr. Caracappa, because he is the one dealing with that.

6           MR. ALLAN:  Your Honor, I do have a bench memo that I

7   can hand up to you beforehand.

8           THE COURT:  Okay.

9           MR. ALLAN:  And for Your Honor, I have got two

10  options concerning the portions of the deposition that we spoke

11  about.  I am sorry --

12          In terms of the 30(b)(6) issue we discussed before

13  the video, Your Honor, I have copies of the depositions where

14  it's highlighted where Mr. Carothers doesn't know.  I have the

15  exact same highlighted copy for counsel.  I can hand that to

16  you if you'd like, or I can hand you a un-highlighted copy.

17          THE COURT:  Okay.  Yeah, when Joe gets back, let's

18  hand that up to me.

19          Joe, would you take the materials from Mr. Allan and

20  send them my way, please.

21          MR. ALLAN:  I am also including, Your Honor, the

22  amended 30(b)(6) notice and Mr. Carothers' -- the topics on

23  which he is designated is set forth in one of the first pages

24  of his deposition.

25          THE COURT:  Okay.  All right.  But let's discuss the

1    breadth of the Cadenhead testimony first.

2              And, Mr. Bridges, you wanted to look at the

3    transcript of the deposition and --

4              MR. BRIDGES:  Yes, Your Honor.

5              THE COURT:  And you and Mr. Caracappa have had a

6    chance to --

7              MR. BRIDGES:  I have got one extra copy of the

8    deposition here.

9              THE COURT:  And, of course, now we have heard the

10   testimony of Mr. Sabec where he says that he and Mr. Cadenhead

11   had talked, and that Randy had said that he would not forward

12   the notices with settlements because he believed that the DMCA

13   precludes that settlement language, and it's Cox's policy not

14   to forward them as a result.

15             MR. BRIDGES:  That's correct, Your Honor.  I think it

16   was at 18:34 in the deposition.  The testimony was about Cox's

17   policy as conveyed by Mr. Cadenhead.

18             THE COURT:  I'm sorry, what page?

19             MR. BRIDGES:  Well, I'm sorry.  I'm going from the

20   timestamp because I was watching it on the video, but that's

21   the Sabec -- I am not referring to the Cadenhead deposition

22   right now.  I'm talking about the Sabec video we just saw.

23             On page 41 of this transcript it's a reference to the

24   fact that Cox did not want to do business with Rightscorp.  And

25   bearing in mind that I think this was part of the theme that

1    Mr. Steele established in his testimony, that they were looking

2    for a business relationship.  And these were business

3    negotiations, and maybe things were subject to negotiation.

4           Well, Mr. Cadenhead was the point person for the

5    discussions of the business relationship, and he was asked or

6    he testified about not wanting a business relationship and the

7    like.

8           THE COURT:  Okay.

9           MR. BRIDGES:  And I think --

10          THE COURT:  I haven't heard -- I'm not sure that's

11   objected to.  And those are not the subject of the exhibits

12   that BMG seeks to have excluded.  It's the reference to Randy

13   is the one that made the decision not to forward these on.

14          MR. BRIDGES:  Right.  So a couple of things.  I can

15   go through what I think --

16          THE COURT:  You need to listen to me.  I realize the

17   way you want to do things -- and I asked you a question a

18   second ago where in the transcript is the reference, and you

19   went off on the deposition.

20          So tell me where you believe Mr. Cadenhead provided

21   information that he was not merely relying on the DMCA not

22   allowing settlements and, as a result, Cox's policy was not to

23   forward them in the deposition.

24          MR. BRIDGES:  Page 172 there is a reference to

25   rejection of the business proposal.  And, Your Honor, I

1    apologize if I spoke too soon.  So I do apologize for that.

2            THE COURT:  I don't know.  You know, I was taught

3    when a judge asks a question, you answer the question, and then

4    you try and amplify on it to make your point, but answer --

5            MR. BRIDGES:  Page 172, Your Honor.

6            THE COURT:  Yes.

7            MR. BRIDGES:  Rejected the business proposal.  And

8    page 187, that's a little bit different, that relates to the

9    Dashboard.  You are asking about notices.

10           Page 83, Your Honor, and --

11           THE COURT:  I'm sorry, what was the second?  Oh, you

12   withdrew that?  I'm trying to read as you're talking.

13           MR. BRIDGES:  Okay.  I will slow down.

14           THE COURT:  I see it on 172.  What else is it?

15           MR. BRIDGES:  Rejecting -- page 83.  And I caution

16   you, Your Honor, we're very aware of the Court's ruling about

17   the words "extortion" and "blackmail," but this was -- if you

18   look at page 83, these notices were improper for a variety of

19   reasons.  And on page 83 he in his deposition refers to -- that

20   they were improper because they were extortionate or blackmail.

21           And what is interesting, Your Honor, is the question

22   here.  "You concluded that Rightscorp's notices" -- this is at

23   the bottom of page 82.  "You concluded that because the

24   Rightscorp notices had a demand for payment, they were not

25   proper take-down notices; is that correct?  Answer:  I'm sorry,

1    I think your question said I concluded they were not proper.

2    Proper is one word I would use, yes, or improper is one word I

3    would use.

4           "What's another word you would use?  Answer:   In

5    discussions within Cox, I believe I probably used the word

6    "extortionate' or even potentially akin to blackmail.

7           "Question:  Is blackmail a legal term?  No.

8           "Is extortion a legal term?  No."

9           So here he was not opining on the law.  He was

10   saying, these notices feel like extortion and blackmail to us.

11   And that's -- and that's right.  He is not going to say that

12   from the stand, Your Honor, we have got him on that.  But this

13   shows this was part of a broader business issue.

14          And again, the DMCA is out of the case, and he's

15   talking about considerations that are not in the DMCA.

16          THE COURT:  Okay.  No, we're talking about legal

17   opinions here.

18          Mr. Caracappa, where do you say that Mr. Cadenhead

19   limited his reasons for not forwarding the notices on to the

20   DMCA?

21          MR. CARACAPPA:  Your Honor, I will refer you to the

22   same pages that Mr. Bridges just did, and I will put what

23   Mr. Bridges said into context.  If you can start on page 83,

24   and you can look on page 84 and 85, Mr. Cadenhead clearly says,

25   the reason we ignored these notices is because they contained

1318

1    settlement demands and they are, therefore, outside the spirit

2    of the DMCA.

3            THE COURT:  Well, did you ever say that's the only

4    reason?

5            MR. CARACAPPA:  Your Honor, we have been looking

6    through the deposition testimony for the past hour.  There is a

7    couple of places -- and we can submit them to the Court.  I

8    recall asking Mr. Cadenhead, is that the only reason?  And he

9    basically said yes.

10           Now, I don't recall whether he said yes, but his

11   entire testimony is that these notices can be ignored because

12   they have settlement demands.  When we sought discovery from

13   Cox, we said, all right, if you're relying on the spirit of the

14   DMCA, well, then we need to understand exactly what you think

15   the spirit of the DMCA is.

16           And they said, we are going to waive privilege only

17   with respect to settlement demands.  And we asked for

18   privileged documents outside that scope, and we were denied

19   that request.

20           Mr. Cadenhead has never been offered as a business

21   person.  There are hundreds of entries on their privilege log

22   with Mr. Cadenhead as an author.  Almost every document has a

23   redaction in it.  So Mr. Cadenhead is not being asked to

24   testify and has never been offered in his business capacity.

25   It has always been in his legal capacity.

1        THE COURT:  Well, do they have to identify that?  I

2   mean, where were they required to say if he was not going to be

3   offered as providing opinions of counsel, what notice was Cox

4   required to give?

5        MR. CARACAPPA:  I don't know of any.  But Cox can't

6   put him up to testify on business issues and shield every

7   single e-mail from Mr. Cadenhead on issues that it says, well,

8   in this correspondence he had his legal hat on, so we're going

9   to be able to redact it.  But here he is going to have his

10  business hat on, and he is going to be able to explain to the

11  jury as a businessman what Cox did.

12        Having a lawyer on the stand, we believe, explaining

13  what Cox did is an implication that it is legal advice.  Are

14  they not going to say that Mr. Cadenhead was an in-house

15  counsel at Cox?

16        I mean, having an in-house counsel from Cox explain

17  what his position was, I think a reasonable jury could say,

18  well, if it was from their lawyer, they must have had a legal

19  basis to ignore the notices.  And the Court, we believe, has

20  already concluded that there is no legal basis to ignore those

21  notices.

22        THE COURT:  Well, that's one of the issues that right

23  now the jury thinks that they are going to be ruling on,

24  whether the settlement offers were reasonable.  As I said a

25  little earlier, the way the case has come in so far, Cox is

1    relying on the words "settlement," the existence of the

2    settlement information as their defense against at least, you

3    know -- as a total defense, I think, but at least as to whether

4    they willfully infringed for purposes of damages.  And that

5    Cadenhead gave notice that he told people not to forward them

6    is certainly relevant to that willfulness issue if he believed

7    that the settlements were against the spirit of the DMCA.

8          But he can't give -- when you say that Cox waived as

9    to settlement, what do you mean by that?  You mean, so they

10   provided these e-mails that I have now, or what did you take

11   that to mean?

12         MR. CARACAPPA:  During the course of discovery they

13   relied on certain documents, they produced certain documents.

14   They produced certain documents after the close of discovery,

15   which is a different issue, but the documents they produced

16   during discovery, we moved to compel a waiver of the advice of

17   counsel and spirit of the DMCA.  And we said, look, if you're

18   going to rely on the spirit of the DMCA, we need to know what

19   you think falls within the spirit of the DMCA and what falls

20   outside the spirit of the DMCA.

21         Cox said, no, the only thing we're waiving on is that

22   letters or notices with term -- with settlement demands are

23   outside the scope.  You don't need to know anything else.  You

24   don't need to know anything about how we're protecting our

25   customers because we don't want them to go to links.

1    We were prevented from getting any documents on those

2    issues.  And when we moved to compel, Cox said, we are -- the

3    advice of counsel, and I'll quote, "the advice that Cox is

4    relying on is Mr. Cadenhead's advice that the notices that

5    contain settlement demands are not within the spirit of the

6    DMCA."

7    That's the advice.  And that's what Cox said at the

8    hearing transcript on July 17, 2015, 15:20 to 22.

9    THE COURT:  All right.  So now we have testimony of

10   Mr.  Sabec about his discussion with Cadenhead where he's

11   provided exactly that information.  And I'm not sure if I'm

12   getting different signals.  Mr. Kelley suggested that he just

13   wants these e-mails eliminated, and you seem to be saying that

14   you want Cadenhead to be excluded as a witness.  And so where

15   are you there?

16   MR. CARACAPPA:  Well, it guess it depends upon what

17   Mr. Cadenhead is going to say.  If they are putting

18   Mr. Cadenhead up, who is a lawyer, and he is going to say,

19   regardless of what hat he was wearing when he made the

20   decision, that here are all the things and here -- that are in

21   the notice or notices and here is the reason why I rejected

22   them, because that's coming from a lawyer, a jury can

23   reasonably conclude, well, that's their lawyer and that's a --

24   it's reasonable to rely on advice from your lawyer.

25   THE COURT:  All right.  The jury is -- well, there's

1    a connection there that can't be made in the posture of the

2    case.  But the jury has already been told it wasn't in the

3    spirit of the DMCA, the settlement offers were improper, that

4    this demand for $150,000, if you, you know, don't listen to us,

5    you're subject to that kind of penalty, the jury already has

6    all of that.  That's come in in your case and you're the one

7    that wanted the substance of the notices to come in and argued

8    that because it was electronic, the entire document -- so

9    that's all in there.

10                MR. CARACAPPA:  Yes.

11                THE COURT:  So Cadenhead and Cox have taken the

12   position that all that is reason to reject the notices.  So if

13   he says that, are you going to be popping up and down if he

14   limits his testimony to what's in those notices?

15                MR. KELLEY:  Your Honor, I think I can thread the

16   needle here.  Obviously, he and Mr. Sabec, as you heard in

17   this, and also as Mr. Steele testified, they had a back and

18   forth.

19                THE COURT:  Right.

20                MR. KELLEY:  They had one phone call and a back and

21   forth e-mail exchange.  We don't object to testimony about the

22   back and forth e-mail exchange.  That's each of them staking

23   out their position.

24                What we object to is, number one, all the internal

25   communications where Mr. Cadenhead is telling them, do this, do

1    that, because of the DMCA.

2              THE COURT:  Right.

3              MR. KELLEY:  And then now coming in and offering

4    additional reasons.  And what makes the cross-examination so

5    hard is to show that he never had any other reasons other than

6    the DMCA, I have to reveal the DMCA correspondence.

7              So that's the conundrum that I face in terms of

8    crossing.  If the cross is limited to the back and forth and

9    what they said to each other and how'd you -- you know, what

10   was your impression of it, then that's fine.

11             THE COURT:  All right, Mr. Bridges.

12             MR. BRIDGES:  Your Honor, one of the things that the

13   testimony will show is that Rightscorp tried to get into Cox

14   about four or five different ways.  They heard from Cox when

15   the notices came in.  And then they went to a senior executive.

16   Then they went to somebody else.  And then went to somebody

17   else.  And their internal e-mails about what the communications

18   are back to Rightscorp.  So that's the reason for internal

19   e-mails.

20             But I think it would be worthwhile if I could explain

21   the documents at issue since I think that's what's at issue

22   here.

23             THE COURT:  Yeah, I've looked at them.

24             MR. BRIDGES:  Okay.  The one that they've objected to

25   is Mr. Cadenhead started getting notices as he was going off

1    into retirement.  And so he was forwarding a batch that he got

2    at 1:00 in the morning on a Sunday to Ms. Trickey, who was

3    another lawyer, basically saying, here they are.

4           Now, yes, he was giving her what he had thought about

5    them, but the point is he was conveying them because they were

6    going to be on her watch.

7           There's direction from Mr. Cadenhead about blocking

8    SEGTech.  That was a direction.  It shows what his instruction

9    was.

10          There is one e-mail from Rightscorp to Cox that they

11   don't want.  They say it maybe lacks foundation or something

12   like that, but -- these, Your Honor, are -- we're not -- we

13   don't want Mr. Cadenhead to be opining about the law.  That's

14   out of the case.  We just need for him as Cox's principal

15   person making these decisions to be able to explain it.

16          Thank you, Your Honor.

17          THE COURT:  All right.  I'm going to strike the

18   e-mails and also the exhibit which was objected to because of

19   the motion in limine 3, the deposition Exhibit 27, which is --

20   oh, it's DTX 0143.

21          I'll allow Cadenhead to testify about the business

22   end of the decisions he made.  He's not going to go into

23   matters which did not -- which were not discussed in the

24   deposition, so he's limited to talking about what his belief

25   was at the time, which was the DMCA precludes settlements.

1      I think it's fair game for him to go into the fact

2  that the particulars of the notices and -- that I just went

3  over are included within that decision.  But he's not going to

4  start making other justifications if they haven't been

5  disclosed.

6      This is a tough issue, I understand that, why the

7  parties have staked out the positions they have, but it's --

8  you know, it is powerful to have Cadenhead e-mails which are

9  providing legal advice when he hasn't been offered as a Cox

10  witness to testify on the opinion of counsel.

11      So that's my ruling.  Your exception is noted.  I

12  don't know where you want to go -- whether you want to call him

13  next or you want to call somebody else.  But let's take five

14  minutes and come back and get our jury back.

15      All right.  We are in recess.

16      NOTE:  At this point a recess is taken; at the

17  conclusion of which the case continues in the absence of the

18  jury as follows:

19  JURY OUT

20      THE COURT:  Is Mr. Cadenhead going to be the next

21  witness?

22      MR. BRIDGES:  Yes, Your Honor.  I believe he will.

23      THE COURT:  And have you had an opportunity to

24  discuss with him what we've just been talking about?

25      MR. BRIDGES:  Briefly.  We've tried to make it clear.

```
 1              THE COURT:  Okay.
 2              MR. BRIDGES:  It's a fast instruction to him on short
 3    notice, so I will do my best, and if he starts to go a place he
 4    shouldn't go, then I'll try to do something to keep it from
 5    happening, Your Honor.
 6              THE COURT:  All right.  Thank you.
 7              MR. BRIDGES:  May I ask one question of
 8    clarification?  On the e-mails, one exhibit on that list was
 9    the cover e-mail to Linda Trickey forwarding seven other
10    e-mails.  I assume that those seven e-mails are okay?  They
11    were attachments.  They were all notices from Rightscorp.
12              THE COURT:  Yes.
13              MR. KELLEY:  The -- I don't -- I think some of them
14    are not BMG.  They're other clients.
15              MR. BRIDGES:  That's exactly right, and that's going
16    to be part of the point, Your Honor.
17              THE COURT:  And what's the point you're trying to
18    make with that?
19              MR. KELLEY:  I do have a problem with it then.
20              MR. BRIDGES:  They were seven e-mails, four e-mails
21    the exact same minute as the BMG e-mail that came in at one in
22    the morning, a flurry of e-mails all saying exactly the same
23    thing.  They were form letters, and it goes to what
24    Mr. Cadenhead's understanding was of those e-mails themselves.
25              There were five -- seven e-mails at one in the
```

1   morning over a five-minute period, all saying the same thing.

2            THE COURT:  All from Rightscorp?

3            MR. BRIDGES:  From Rightscorp.

4            THE COURT:  To Cox?

5            I'm sorry, then I don't understand what you just

6   said.

7            MR. KELLEY:  They're all from Rightscorp, but they're

8   not on behalf of BMG copyrights.  They're various clients,

9   other clients of Rightscorp.

10           THE COURT:  Okay.  I'll permit that.

11           MR. BRIDGES:  Thank you, Your Honor.

12           THE COURT:  All right, Joe, let's get our jury.

13  JURY IN

14           THE COURT:  All right, please be seated.  So let me

15  update you on our schedule.  I know that you're interested in

16  that.  Tonight I'm going to have to break at 5:25 because at

17  5:30, I have a conference call with other judges about a

18  hearing I have next Monday in Richmond.  It's a Court of

19  Appeals-type issue, where the hearing's been set for quite a

20  long period of time.

21           So we're not going to finish the evidence this week,

22  I do not believe.  The lawyers are working as hard as they can

23  to get the case to you as soon as they can, but we're probably

24  not going to finish the evidence at -- I could be, I could be

25  pleasantly surprised.  I don't think so based on their

1328

1    estimates.  And as I said, they're working hard to get the

2    case -- the evidence to you.

3             So we won't sit on Monday.  On Friday, I have the

4    same situation I had last Friday, where I've got a 9:00 docket

5    and a 10:00 docket.  I'm stripping it down to bare essentials,

6    so I'm going to try and do better about having us begin at

7    10:30 than I did last Friday.  You know, the unexpected stuff

8    happens a lot, but I think I can get us going by 10:30 on

9    Friday morning.

10            So if we don't finish, we'll continue the testimony

11   on Tuesday, and I don't expect that it will go beyond Tuesday

12   and Wednesday of next week to get the evidence to you, and

13   we'll work real hard to make sure that gets done.  All right?

14            All right, thank you.

15            All right, next witness, Mr. Bridges?

16            MR. BRIDGES:  Your Honor, Cox calls Randy Cadenhead.

17            THE COURT:  All right, thank you.

18        RANDALL J. CADENHEAD, DEFENDANTS' WITNESS, SWORN

19                      DIRECT EXAMINATION

20   BY MR. BRIDGES:

21   Q.   Good afternoon, Mr. Cadenhead.

22   A.   Good afternoon.

23   Q.   Please state your full name.

24   A.   Randall J. Cadenhead.

25   Q.   Where do you live?

R. Cadenhead - Direct

1329

1   A.   I live in Decatur, Georgia, which is just outside of

2   Atlanta.

3   Q.   I'd like to ask you a few questions about your background

4   before you arrived at Cox Communications.

5   A.   Okay.

6   Q.   Could you please describe your educational history?

7   A.   I went to the University of Georgia for undergraduate

8   school, and then I went to the same school for law school and

9   graduated in 1979.

10  Q.   What did you do after law school?

11  A.   I worked for a year and a half in a law firm in Atlanta,

12  and then I took a job working for Southern Bell, which

13  eventually came Bell South and is now part of AT&T again.

14  Q.   What work did you do there?

15  A.   Most of my work -- I did a variety of legal work, but most

16  of it centered around the Yellow Pages business.

17  Q.   What kind of issues did you address with the Yellow Pages

18  business?

19  A.   A whole variety of things.  I was associate general

20  counsel.  But they included work on copyright issues and also

21  work on new ways to present the Yellow Pages in an electronic

22  format.  I think we were trying to invent Google.

23  Q.   If only it had.

24           When did you go to work at Cox?

25  A.   I retired from Bell South in 2002, and I joined -- the

R. Cadenhead - Direct

1330

1    next year, I joined Cox.

2    Q.   How did you get hired to work at Cox?

3    A.   I had -- in a professional world, I had done work with the

4    general counsel at the time for Cox.  They had had a

5    privacy-related problem, and in an area that I was familiar

6    with, and so I gave them some advice, and after I retired, he

7    called me one day and he said they were looking for someone to

8    work in the privacy area, and there I went.

9    Q.   What position did you take at Cox?

10   A.   Well, I was the privacy department for Cox.  I was the

11   first person to have a role at all at Cox regarding privacy.

12   Q.   Did Cox have a privacy officer at the time?

13   A.   No, they didn't, and, in fact, I could have had the

14   title "privacy officer," but it wasn't as common as privacy

15   counsel at the time, so --

16   Q.   What were your duties and activities at Cox as privacy

17   counsel?

18   A.   Well, as the privacy department, it was to assure that

19   customer information was protected from any abuse internally,

20   especially any abuse externally, and it was also to help

21   educate the customers about how best to protect their own

22   information.

23   Q.   Why was it important to protect -- to inform customers

24   about how to protect information?

25   A.   We forget about the fact today, even though it's not been

K. Cadenhead - Direct

1331

1   that long, that people were just beginning to use the Internet

2   in a serious way, and the Internet is -- well, it reflects our

3   world, and so it has some dangerous places and some risks

4   associated with it, and one of my responsibilities was to work

5   on ways for customers to avoid those risks.

6   Q.   As privacy counsel, what role did you have regarding the

7   handling of subpoenas?

8   A.   I had responsibility for developing a system that could

9   manage a large number of subpoenas for customer information,

10  and then I, I helped refine that, I put together methods and

11  procedures, and then I did some management of it.

12  Q.   What types of subpoenas did Cox receive?

13  A.   Most of the subpoenas that we handled in the group that we

14  set up for this purpose were subpoenas for customer records.

15  The -- you don't have telephone numbers and telephone books for

16  the Internet; you have IP addresses; and those are relatively

17  invisible in the day-to-day world; and so we had to have people

18  in place -- when an IP address information would be subpoenaed,

19  we had to have people in place who could gather that

20  information and respond to the subpoenas.

21  Q.   When you worked at Cox, roughly how many subpoenas did Cox

22  handle on a given year?

23  A.   It grew to tens of thousands of subpoenas for customer

24  records.

25  Q.   How important to Cox is customer privacy?

R. Cadenhead - Direct

1332

1    A.    It's central to our relationship with the customer, our

2    commitment to the customer, and to our -- well, our compliance

3    with regulatory requirements as well.  It's a primary function

4    of what makes up customer trust.

5    Q.    How does Cox handle customer information?

6    A.    We have an extensive -- well, let me stop for a second.  I

7    say "we have."  I forget I'm retired, and I hope you'll

8    understand, but we have an extensive data security organization

9    that I spent a good bit of my time working in.

10   Q.    And what ways did Cox try to protect customer information?

11   A.    We certainly did a great deal in terms of data security.

12   We did a great deal in terms of customer education because

13   without the customer's cooperation, it's immensely harder.  We

14   also dealt with risks to the network that might find -- worm

15   their way in, if you will, into our systems and gather customer

16   information.  Those are some examples.

17   Q.    How long did you work at Cox?

18   A.    For ten years.

19   Q.    Why did you leave Cox?

20   A.    My father retired at 59, and that was a goal of mine, and

21   I was fortunate enough to be able to do it, so --

22   Q.    How have you been spending your time in retirement?

23   A.    Well, I sail a lot.  I have a grandson now, and I also

24   teach some at Emory Law School.

25   Q.    What do you teach at Emory Law School?

1    A.    I teach public interest practice.  That's students who are

2    interested in careers and advocacy for public causes, nonprofit

3    work, legal aid, serving the poor, things of that nature.

4    Q.    I'd like to ask you a bit about the customer safety

5    team --

6    A.    Okay.

7    Q.    -- at Cox.

8          Are you familiar with a group called a customer

9    safety team?

10   A.    Yes, indeed.

11   Q.    What other names has it had?

12   A.    In the early years, it was called the abuse team or in

13   some cases the customer abuse team, which had the wrong

14   connotation, and so it ultimately was changed to customer

15   safety, which I think is a better term.

16   Q.    What was the overall purpose of the team?

17   A.    They served two goals.  One was to protect the network,

18   because that's fundamental, and so they had a great deal of

19   engineer capacity, Internet safety materials, equipment,

20   monitoring that they did; and the second, the second was to

21   help the customer protect him- or herself over the Internet.

22          So this was a team of people whose -- actually, the

23   largest portion of their work were in customer interactions for

24   that kind of purpose.

25   Q.    What standards did the team apply in the customer safety

R. Cadenhead - Direct

1334

1   team?

2   A.   Our relationships with customers, first of all, were

3   governed by the terms of use and the authorized use policy, the

4   authorized user policy, which is the AUP, and those are

5   documents that I had a hand in preparing, and they set up the

6   terms of our relationship with customers.  So they were to

7   enforce that -- those, and then also coincident with that, we

8   would develop -- I worked on methods and procedures for their

9   handling of things, and, of course, they had a great deal of

10  technical material and manuals and things of that nature that

11  they handled.

12  Q.   Is the AUP also referred to as the Acceptable Use Policy?

13  A.   Thank you.  I'm sorry, I've been away a couple of years.

14  Thank you.

15  Q.   What was the overall point of the AUP?

16  A.   It's we -- it was our established relationship with the

17  customer as to what they could -- what they were allowed to do

18  with their Internet service.

19  Q.   How did Cox communicate the Acceptable Use Policy to its

20  customers?

21  A.   One of my responsibilities was to make sure that customers

22  did, in fact, have access to that.  We sent it to every

23  customer every year, and then we also posted it on our Web site

24  and made mention of it in materials to customers -- online

25  materials to customers at times.

R. Cadenhead - Direct

1335

1    Q.   For whose benefit did Cox create the Acceptable Use

2    Policy?

3    A.   It was our -- it was the document that established our

4    relationship with our customer.  It was for the two of us.

5    Q.   What are some of the issues that the customer safety team

6    faced when you were at Cox?

7    A.   We -- and I'll say "we" because part of my responsibility

8    was to help manage that group.  We dealt with network dangers

9    on a daily basis.  Denial of service attacks is one particular

10   example, and those are situations in which -- most often they

11   are situations in which you're flooded with so many

12   communications at once coming in from one or more sources that

13   you can't handle them.  It's like all your phones ringing at

14   once or something like that, and you can't answer them.  And

15   what it does very often is it triggers safety mechanisms in the

16   computers that make them shut down so no one can use the

17   service, and that's one example.

18        We also dealt with viruses that might attack our

19   systems and also viruses that -- and other threats that might

20   affect customers.  For instance, there were often -- we dealt

21   constantly with spam-type messages which would come in and

22   would say, we're from Bank of America.  Please send us -- we've

23   lost your record, or something.  Please send us your log-in and

24   password in response to this e-mail.

25        And we worked very hard to block those and also to

R. Cadenhead - Direct

1336

1   educate customers not to do that sort of thing.

2   Q.   What other types of threats did the customer service team

3   address?  Can you think of others?

4   A.   There are so many.

5   Q.   What about physical threats?

6   A.   Yes.  There were physical threats in the form of physical

7   threats to the network, to our facilities, so we had to

8   coordinate with other groups for those.  There were physical

9   threats to individuals in the company and also to customers,

10  and so we spent time dealing with those kinds of things as

11  well.

12  Q.   What role did the customer safety team have regarding

13  allegations of copyright infringement?

14  A.   As time passed, in some measures, that actually became 90

15  percent of their work.  They, they were the -- they established

16  the systems to receive notices from copyright holders, to

17  process and track those, to forward them to customers, and then

18  most importantly really, to interact with the customers, to try

19  and deal with whatever was causing them to receive these

20  notices.

21  Q.   I'd like to ask a little bit about the staffing --

22  A.   Okay.

23  Q.   -- of the customer safety team.

24       Who's on the customer safety team?  What kinds of

25  persons or jobs are those?

K. Cadenhead - Direct

1337

1   A.    It was led in the headquarters operation by a group of

2   engineers, appropriately, because it's a very technical

3   business.  There were also a number of customer facing,

4   customer service, if you will, individuals at two levels who

5   were trained to help the customer address the kinds of issues

6   that were affecting them.

7           They might call up because their Internet service

8   just didn't work, but they also might call up and did very

9   often because they had received a take-down notice, a notice of

10  infringement of a copyright, and didn't understand what it was

11  or why they had gotten it and, most importantly, what to do to

12  deal with it.

13  Q.    Who headed the customer safety group when you were at

14  Cox -- when you arrived at Cox?

15  A.    Okay.  When I first came to Cox, thank you, Matt Carothers

16  headed the organization, and he's actually the person who

17  established the computer system that we developed, first of its

18  kind, to manage the notices that were coming in.

19  Q.    With whom in the customer safety group did you primarily

20  interact?

21  A.    I dealt with each -- I dealt with each of the headquarters

22  people, in the headquarters -- the engineers in the

23  headquarters team on a regular basis, fairly often.

24  Q.    What training or information was available to members of

25  the customer safety team in performing their jobs?

K. Cadenhead - Direct

1338

1   A.   Well, apart from the knowledge and experience it took just

2   technically, I developed -- with their assistance, I developed

3   methods and procedures for handling many of the issues that

4   they, that they had.  I also developed some of the materials,

5   many of the materials that they would share with customers

6   about how to fix issues that were causing things like these

7   notices that came in.

8   Q.   Can you give some examples of different interactions that

9   you had with the team, things that they called on you for over

10  the time?

11  A.   I never -- they were good at their job, first of all, and

12  they were the best ones to deal one-on-one with customers, so I

13  never interacted with a specific customer.  That was their job,

14  and they did it well.

15          What I did was set standards, policies for the level

16  of response, the type of response, really, that they would have

17  in given situations.

18  Q.   Can you give examples of particular types of standards?

19  A.   Yes.  As we were -- talking about the copyright

20  infringement area, as we were working on our graduated response

21  program with its various steps and the like, they would come to

22  me with their experience and try and get some insight into how

23  to make the system work more effectively, and so I would, I

24  would set the policy that said that, for instance, the first

25  online interaction that a customer might have would be an image

K. Cadenhead - Direct

1339

1  on their browser screen, and they could click out of that, and

2  that would be -- and that's what we called a, a soft walled

3  garden, which is just an image on the screen.  They could see

4  that and click, and it would go away.

5          And then the next thing they would see would be a --

6  the same screen, and it would say the next time a notice came

7  in, they would see that and say, "You need to call us.  You've

8  got a problem."

9  Q.   I'll get to that whole process in a little bit.

10  A.   Okay.  Thank you.

11  Q.   Thank you.  I think you used the term "graduated response

12  process."  What does that mean?

13  A.   That's a long way of saying a step-by-step process that

14  escalates the level of interaction that we have with a customer

15  when the same issue keeps coming up.

16  Q.   Can you give me a general overview -- and I'll get to some

17  specifics later --

18  A.   Okay.

19  Q.   -- but can you give me a general overview of Cox's process

20  of handling copyright accusations?

21  A.   Yes, I can.  As the -- in the early years, the notices

22  that we received were infrequent, but the peer-to-peer file

23  exchange world began to develop, and so notices came in more

24  and more, and we, with the great assistance of Matt Carothers,

25  began to develop this graduated response program where it

R. Cadenhead - Direct

1340

1 wasn't enough just to send on to the customer the information

2 that we received, but rather, we developed materials to send to

3 the customer, and the whole purpose of the process, which it

4 sounds like you're going to get to, but the whole purpose of

5 the process was to address with the customer the issue and

6 whatever was causing it, to get the customer to correct the

7 problem.

8         Is that --

9 Q.   Thank you.

10 A.   Okay.

11 Q.   What values did Cox try to build into the process?

12 A.   We were kind of in the middle.  We were providing the on

13 ramp to the Internet for the customers without -- we had no

14 control over where they went, but what we had in terms of

15 values in addressing the customer concerning these issues were

16 first concern about the growing problem of copyright

17 infringement on the Internet.

18         These were the years, it's not that long ago now, but

19 these were a different time, when it was a little more Wild

20 West on the Internet, and there were some people taking

21 advantage of new programs and the like, and we recognized that

22 and the importance of dealing with it in a lot of ways, and

23 maybe we'll get to those, but that was the first value.

24         The second value was respect for the customer.  The

25 third value was educating the customer, because again, there

R. Cadenhead - Direct

1341

1   were a lot of people then and really still are today who don't

2   quite understand some of the dangers on the Internet.

3            And so we were trying to use those standards, those

4   values to -- not to just leave things as they were, but to make

5   things better.

6   Q.   What technology did Cox use to implement its procedures?

7   A.   I mentioned the work that Matt Carothers had done in

8   developing a computer system.  Not very few -- just a very few

9   years ago, let's say five or six, there were still Internet

10  providers who received notices from copyright holders claiming

11  infringement that came in by mail, postal mail, sometimes by

12  fax, and they would manually handle those, put them perhaps in

13  a spreadsheet, and then manually mail them to the customer, and

14  we knew that wasn't going to work, and we were fortunate enough

15  to have Matt, and he spent the time to develop the CATS system,

16  Customer Abuse -- pardon that term -- Tracking System, and it

17  was a computer system that was established to receive the

18  e-mails that would come in with notices into an e-mail address,

19  electronically read them, track the receipt of them, and also

20  track what -- take other databases and determine what customer

21  that was relating to, put that information in the customer's

22  file, and then go so far as to forward on the information, the

23  notice, to the customer, with a cover message.

24           It was very effective, and actually over the years,

25  we actually licensed that program to some other ISPs for their

K. Cadenhead - Direct

1342

1  use to get them out of the 20th Century.

2  Q.   When was CATS created?

3  A.   It's around 2004.

4  Q.   And what do you understand to be the reasons why Cox

5  developed it?

6  A.   Cox, and in particular, I guess I'll use myself as an

7  example, recognized the growing issue about copyright

8  infringement on the Internet, it was something that we wanted

9  to try and do something about.  There were regulatory reasons

10  that our hands were a little tied.  We were also -- it was

11  really important that we not interfere with the customer's use

12  of the Internet.  That was sacrosanct.  So we tried to find

13  ways to try and work on this.

14          I actually reached out and spent a good deal of time

15  with industry representatives from the recording industry and

16  the motion picture industry, and we explored -- I shared

17  information about our system and how it worked and what kind of

18  results we were getting, and then we began to explore ideas

19  about how we might make some progress.

20  Q.   I'd like to move forward a little bit to around 2010,

21  thereabouts.

22  A.   Okay.

23  Q.   What was the environment that you experienced at Cox and

24  on behalf of Cox between ISPs and entertainment companies

25  around that time?

K. Cadenhead - Direct

1   A.   We certainly were in different industries, but we had

2   similar interests.  Among those, we had much the same

3   customers, and we also had -- we in the ISP world had an

4   interest in making sure that the Internet was a reasonably safe

5   place for people to go and to use, and the recording

6   industry -- I'll call them the recording industry -- was also

7   beginning to experiment with Internet solutions, if you will,

8   to offering their products.  So it was -- it was a wary time

9   but also a valuable beginning of conversations.

10  Q.   What do you remember about Cox's graduated response

11  process in that time around 2010?

12  A.   Well, I have a general idea of -- and I could describe it

13  to you, but the specific details are probably a little, a

14  little fuzzy.

15  Q.   What would help you refresh your recollection about those

16  details?

17  A.   Well, I did a -- probably the best thing is that I did a

18  presentation to some of the industry group people and also to

19  other ISPs and in our company, too, that outlined our process

20  and the way it worked.

21  Q.   Could you please look at Exhibit DTX 0141?

22  A.   Okay.

23  Q.   Can you please identify what the exhibit is?

24  A.   Actually, this is a copy of a version of one of the

25  presentations that I presented internally and externally about

1    how we did graduated response at the time.

2    Q.   Who prepared it?

3    A.   Oh, I did.

4    Q.   And is it -- did it contain accurate details to the best

5    of your recollection about the process as it existed then?

6    A.   Oh, yeah, yes.  Definitely.

7              MR. BRIDGES:  Your Honor, I would offer Exhibit

8    DTX 0141.

9              MR. KELLEY:  No objection.

10             THE COURT:  Received.

11   BY MR. BRIDGES:

12   Q.   Mr. Cadenhead, I'll ask you to take me through this

13   document and explain to me what each of these is.  If we could

14   please go to the next page?

15   A.   Okay.  This page lists the things we looked for in notices

16   that we received from copyright holders when we received a

17   take-down notice to forward on to customers.  These are the

18   things that we looked for.  For instance, there weren't many

19   physical signatures because we were moving to an electronic

20   world, but we wanted an electronic signature or a digital

21   signature, which is a better version of that.

22             We also needed, of course, information about what

23   copyrighted work was in question, and then we, of course,

24   needed to know what material they said was infringing so that

25   when we forwarded, this customer would know what we were

K. Cadenhead - Direct

1345

1    talking about, and then information that would help us -- that

2    would allow us to figure out which customer we were dealing

3    with, and I think I described that IP address that is a

4    computer term but gets translated in our systems into customer

5    information.

6           And then, of course, this is drawn out of the DMCA

7    statute, but we also included information that this really

8    was -- that they had a good faith belief that this was

9    infringing and also that the notification itself was accurate,

10   which is a pretty straightforward concept.

11          So this was -- what we were trying to do in this

12   presentation was share what we had pulled together as a model

13   and what we concluded was an effective model for how to manage

14   this.  So that's what that page describes.

15   Q.   Can you please turn to the next page?

16   A.   Yes.  It's -- there we go.  That's, that's my next page.

17          This is a copy of the cover e-mail that we would send

18   to customers when we received more than one notice, which made

19   us aware that this might be a repeat infringing customer.  So

20   we would send this e-mail along with the notice about the

21   infringement and asking that it be taken down.  And this is

22   our -- it's a little wordy, I'm sorry to say, but it's our

23   information that goes to the customer to help them understand.

24          So it starts off, "Notice of copyright infringement."

25   Then it says, "We've received a notice claiming that you are

K. Cadenhead - Direct

1346

1  infringing on a copyright.  The complaint is included.  We want

2  you to review it.  If it's valid, remove the material" -- or

3  disable access to it, which is another way to describe it, and

4  then let them know that we're sending this because it's our

5  responsibility and that we're required to take appropriate

6  action, if necessary, if you don't resolve it.

7          A little talk about responsibility, which makes --

8  which is important, something we have stressed, and then if you

9  get -- continue to receive notices like this, there is the risk

10 that we'll suspend your account and disable your Internet

11 connection until the problem is solved, and then referencing

12 them to an Internet page that we put up that has a lot more

13 information about the problem, the issue, how it can be

14 resolved for customers, and these came up, have come up --

15 still come up in a number of different ways that we can

16 describe.

17 Q.   And what did Cox inform customers about its ability to

18 monitor or control in this notice?

19 A.   In this notice, we make sure that we tell people what we

20 tell them in our privacy policy, and that is, we don't know

21 where you go on the Internet, it's not our business, and we

22 make that very clear to the customer, but we do -- when we hear

23 from copyright holders, we take steps to deal with it.

24 Q.   Let's go to the next page, please.

25 A.   Okay.  Okay.  I can't read that, but I have a page here.

1347

1   Q.   I'll try to blow it up.

2   A.   So I'll try to tell you what it says.

3        I don't think it will help.  And it's just a

4   presentation, and I prepared it, though I'm not that good at

5   it.  But what it says is basically the same thing it says in

6   the e-mail that we just discussed.

7   Q.   What is this reference to "walled garden suspension"?

8   A.   Ah, okay.  Well, this -- I mentioned earlier the idea of

9   the walled garden, and that is, we could take a page, and when

10  the customer goes to their Internet browser, Explorer or

11  whatever it may be, the page they will see initially is a page

12  from Cox, and it's -- we called it a walled garden, I don't

13  know why, but that's what they would see.

14       It has the same kind of information, pretty much the

15  same wording, in fact, and the customer would be faced with

16  that when they went to the, went to the Internet.

17       We used that if -- as a second step, or also if we

18  didn't happen to have, like, a customer's e-mail address to

19  send them the e-mail, we would just go and post this up for

20  them.

21  Q.   Let me ask you to look at the next page.

22  A.   Oh, good.

23  Q.   All right.  Can you explain what these numbers reflect in

24  the two different columns and why they differ?

25  A.   Ah, yes.  This is what I was trying to say.  Surprisingly,

1  in the period in which we're talking about, even Cox didn't

2  have an e-mail address for most of its customers at the time,

3  and that was true for a lot of businesses, and it's changed,

4  and it's a good thing, but because of that, we had two separate

5  means of graduating the steps that we had to interact with

6  customers when we had these problems.  One was, of course, with

7  the e-mail address, and then the other was if we didn't.

8           So I'll go through the list with you for an e-mail

9  address first, if that's what you'd like.

10 Q.   Please.

11 A.   The first notice that we would receive for a customer, we

12 would put into our system, mark it that the customer had one

13 notice received, and hold it.  We'd keep a record of that.

14          When we received a second notice, we would send the

15 customer an e-mail, and so that's the second step in our

16 process.  One was to receive a notice or notices, and then the

17 second step was to send an e-mail warning to the customer.

18          The third step fell into two parts, and you'll see

19 that here:  suspend and suspend Tier 2 contact.  Those are the

20 walled gardens.  So the first time that they saw a walled

21 garden, they would be able to click through that and go on

22 about their business, and you'll see here that we allowed them

23 to do that twice.

24          Then if that didn't get the customer's attention, and

25 it, frankly, almost always did, we would block the customer

K. Cadenhead - Direct

1349

1    from being able to go anywhere on the Internet other than our

2    site until they called us and they talked to one of our

3    customer safety team members, who were trained to spend however

4    long it took to get the customer's attention.

5         And then finally, if the customer still didn't get

6    it, didn't fix the problem, didn't change the behavior that was

7    causing the problem, we entered the termination stage.  And we

8    worked with the customer.  We told them this was their last

9    chance, sometimes we told them more than once that this was

10   their last chance, but when it was clear that that wasn't going

11   to solve the problem, we would terminate the account.

12        And at the time I did this presentation, which was

13   2010, we had terminated 60 customers for just these kind of

14   problems.

15        Now, on the other side of the page, you'll see a

16   different set of things that doesn't have e-mail, and that's

17   because sometimes we didn't have an e-mail address, and if that

18   was the case, we would just go straight to the soft walled

19   garden that I talked about.  We'd just post the information

20   right up on their Internet page -- their browser page.

21   Q.   What -- there's an asterisk here at "Termination."  It

22   says, "Subject to abuse override."  Could you explain what that

23   is, please?

24   A.   Sure.  I referenced that.  What I meant by that was what I

25   said, sometimes it took more than once.  Sometimes it took a

R. Cadenhead - Direct

1350

1    few times, a good number of times on occasion to become

2    convinced that we had a customer that just didn't get it or

3    wasn't willing to go out and fix whatever was causing the

4    problem, like an open WiFi network, and if that occurred, we

5    would tell the customer, you know, if this happens again,

6    you're likely to be terminated.

7            And eventually, if we were -- if the customer service

8    person in customer safety was convinced that it was time, then

9    the customer got terminated.  It wasn't something we wanted to

10   do, but we did.  It was the right thing to do.

11   Q.   Please turn to the next page.

12   A.   Okay.

13   Q.   Explain this page of your presentation back in 2010.

14   A.   We were able to, as I said before, use the CATS system to

15   automate the process a lot.  If we had a -- technically, if we

16   had a customer who was Internet and telephone, a manual step

17   had to occur in the process before we could actually suspend or

18   terminate the service, so there was a manual step, and you'll

19   see that referenced there.

20           I've discussed how we track it.  And then you'll see

21   here, "No termination without multiple Tier 2 contacts."  That

22   was just a fail-safe measure to make sure that the first time

23   that a customer was told by a customer service rep, you know,

24   you're going to get terminated for this, wanted to make sure

25   that that customer service rep wasn't acting out of hand.  So

1351

1   we would make sure that at least two termination-level

2   interactions occurred before we pulled the plug.

3   Q.   Please turn to the next page, Mr. Cadenhead.

4   A.   Okay.  This is a sample, blurred out on purpose, of how we

5   would track the receipt of notices in the CATS system that came

6   in electronically, and that's really what that's about.

7   Q.   And not all of these are copyright, right?  There's

8   something there that's hard to read.

9   A.   Yeah.  Well, we received other kinds of claims into the

10  CATS system that, that weren't necessarily at all copyright

11  related, but they were very rare.

12  Q.   Let's turn to the next page, please.

13  A.   Okay.  This is a sample page, again blurred out, of a

14  specific customer's record in the CATS system, and you'll see

15  here kind of down at the bottom of the page, there are four

16  lines in one segment, and that -- those were four notices that

17  that customer had received, and it would have records about

18  dates of those notices, and we would be able also to put in a

19  little information that would help us address those.

20  Q.   Thank you.  Please go to the next page.

21  A.   Okay.  Good.  I mentioned that, let's see, the DMCA was

22  passed in around 1999, and it took a few years for notices to

23  really start to come in, but we started tracking them in about

24  2002, and you'll see how much they grew in a relatively short

25  period of time in terms of numbers, and this was -- I did this

R. Cadenhead - Direct

1352

1   work in 2010, and you can see by that time, actually the slide

2   says 1,100,000 notices in one year, and that's, actually turned

3   out to be, for that year turned out to be 1,200,000 notices,

4   and it's grown since then.

5          At that point in time, there were, as I said, still

6   some substantial ISPs that did not have the kind of ability to

7   manage this process the way we had developed it.

8   Q.   Let's go to the next page.

9   A.   Okay.  This contains the same information.  It's just a

10  graphical version of the information to show the growth that

11  had occurred in notices.

12  Q.   Please go to the next page.

13  A.   Okay.  Ah, yes.  This, this slide indicates the amount of

14  work for the safety team, or, if you will, the abuse team, that

15  they had to deal with for copyright infringement issues.  I

16  mentioned that we occasionally got other kinds of tickets in

17  through CATS, but 90 percent of them were take-down notices,

18  these copyright infringement notices, and 90 percent of the

19  calls that came in, because we would post those to customers,

20  were abuse calls.

21          Interestingly, the system seemed to work, because 30

22  percent would pick up the phone and call and reach our Tier 2

23  higher-level service rep the first time they were suspended,

24  that click-through walled garden.  And then just the second --

25  the last talks about how many reps we had available at that

1    time to deal with these issues.  It was a lot of work, but

2    important work.

3    Q.    Please turn to the next page.

4    A.    Yes.

5    Q.    Please explain what these -- what this slide was as you

6    prepared it in 2010.

7    A.    Okay.  In a given month, we would receive 100,000 notices

8    a month from copyright holders alleging that a customer had

9    infringed their copyright and asking that the, that the

10   material be taken down.  In this particular month that I pulled

11   the information for, which was January, I believe, of 2010, we

12   suspended 8,000 customers, and then I added the note that we

13   had a baseline standard that a copyright holder, which is what

14   the sender is, could only send us 200 notices a day.

15   Q.    Why was that?

16   A.    We were concerned about two things.  We wanted to make

17   sure that the system didn't get overloaded by one copyright

18   holder to the exclusion of all of them that were reaching out

19   to us, and so we tried to manage the flow in, but we also

20   wanted to make sure that we had the staff to answer the calls

21   that resulted from these notices.  That's that 30 percent

22   number that I referenced just a minute ago.

23          So what we were trying to do was manage flow.

24   Q.    Was that number -- or how much flexibility did Cox have on

25   that point?

K. Cadenhead - Direct

1354

A.   A lot actually.  The next page sort of, sort of points to

that.  We started as a baseline that a copyright holder, we

could only accept about 200 a day.  We communicated with a lot

of copyright holders, and occasionally, some would reach out to

us.  Sony reached out to me in person and said, our situation

is a little different.  We're Sony, but we have a bunch of

record labels under us, and so we're different.

        And they were right, and we gave them higher numbers,

and they found those acceptable.

Q.   Who is MediaSentry listed in this?

A.   MediaSentry was a company that helped manage notices for

some -- for a number of, actually, copyright holders.  You'll

see the bottom the Recording Industry Association of America,

which is RIAA, also was sending notices on behalf of actual

copyright holders under their umbrella.

Q.   Please turn to the next page.

A.   Okay.

        MR. KELLEY:  Your Honor, before we go there -- if you

could take that down for a moment? -- we'd like to have a

sidebar, if we could, about the last two slides.

        THE COURT:  Okay.

        (Sidebar on the record.)

        THE COURT:  Yes, sir.

        MR. ALLAN:  Your Honor, I believe there is a motion

in limine limiting Mr. Rosenblatt and, I believe, Cox employees

1   from making this very point, that it's effective, in fact, 96

2   percent stop by five notices, because the testimony, the

3   evidence on it is very flawed.  They filter out a whole bunch

4   of these notices, and so there's -- having them say they don't

5   give any notices after five -- 96 percent stop after five is

6   wholly misleading because there's 90 percent of the notices

7   that they completely ignore.

8           And Mr. Cadenhead is a lawyer.  He's going far beyond

9   the scope of his, of his knowledge and clearly far beyond what

10  Mr. Carothers did as a 30(b)(6) witness, because we didn't have

11  any of this information.

12          MR. BRIDGES:  Your Honor, that's perfectly subject to

13  cross-examination.  These notice numbers show that they may be

14  lower than other numbers and maybe explain why some get held

15  for more and the like, but the fact is these numbers went down.

16  The, the interactions with the high-level staff were down at

17  the very endpoint of the process, and that, and that the

18  drop-off from one notice to two notices to three to four, this

19  is, I think, relevant, and I think that this is part of the

20  presentation he was making in the industry in 2010.

21          MR. WAKEFIELD:  Can I make a point as well?  That

22  order came out in connection with in the context of the DMCA

23  being out.  Then as this case has come in, the whole thing has

24  been about Cox being guilty with respect to its treatment of

25  Rightscorp, which -- as to which no notice in graduate response

1356

1    issues ever occurred, because if you look at how we treated

2    others, you can infer, you know, bad content.

3          And I had understood your Court's comment being that,

4    well, now they're going to need to put on evidence about how

5    many terminations they did.

6          THE COURT:  Well, I did say I would allow evidence of

7    terminations, and I think it's necessary and proper because of

8    the theory of the plaintiff's case.  I'm going to allow this

9    in, and you can cross-examine him.  Well, we'll wait and see

10   what happens with cross-examination.

11         Is Cadenhead going to talk about the fact that none

12   of these policies were actually implemented?  Was he aware of

13   that or not?

14         MR. BRIDGES:  Well, Your Honor, I think that's a

15   subject of -- we're staying -- to answer your question, first

16   of all, we're staying away from the DMCA, all right?  But we

17   are talking about a gradual response process.  He has already

18   testified that the termination is subject to abuse override,

19   and he will discuss what accounts for different outcomes based

20   on his knowledge supervising the system.

21         THE COURT:  So you're going to set him up for all the

22   e-mails that talk about the DMCA and we're not going to do this

23   and we're not going to do that?

24         MR. BRIDGES:  I don't know that we're going to get

25   there necessarily, Your Honor.  I mean, he did supervise that

K. Cadenhead - Direct

1357

1    employee.

2              MR. ALLAN:  Your Honor, this makes the point as to

3    why the 30(b)(6) deposition of Matt Carothers and the fact that

4    he knew nothing about anything is so important, because we're

5    marching people in here now that are telling us things that the

6    company didn't testify to, and if you look at that deposition

7    transcript, I think it's startling how much he didn't know.

8              I don't know how many times we've seen

9    Matt Carothers, who's the most amazing witness in the world,

10   you know, he developed this amazing system, well, he didn't

11   know anything about anything, and now we're prejudiced, having

12   to cross-examine witnesses, learning information about their

13   system for the very first time.

14             THE COURT:  Well, you had this document, right, this

15   exhibit?

16             MR. ALLAN:  We did, Your Honor.  We did, but the

17   company is obligated to provide a witness knowledgeable to

18   speak on this issue.

19             THE COURT:  That's a separate issue because I

20   think -- was Cadenhead deposed on the exhibit?

21             MR. ALLAN:  I don't remember.

22             MR. KELLEY:  I don't believe so.

23             MR. BRIDGES:  I don't think so, but he was deposed

24   partly as a 30(b)(6) and partly as a personal witness.  He was

25   wide open.

R. Cadenhead - Direct

1358

1    MR. ALLAN:  He was not a 30(b)(6) on the policies,
2  Your Honor, on how they deal with any of these issues.
3    MR. BRIDGES:  Well, my point is he was also deposed
4  in -- the deposition was personal capacity with the company.
5    THE COURT:  All right.  I'm going to let the jury go.
6  I've got a Court of Appeals judge that's going to come on the
7  phone at 5:30, and I need to be there.
8    MR. ALLAN:  Thank you.
9    MR. BRIDGES:  Do you think there will be time for me
10 to get through the last two slides before we break tonight?
11   THE COURT:  What time is it?
12   MR. ALLAN:  It's getting late.
13   THE COURT:  Yeah.  No, let's break.
14   MR. ALLAN:  Thank you, Your Honor.
15   (End of sidebar.)
16   THE COURT:  All right.  We're going to break for
17 tonight and come back in the morning at 9:00.  We'll continue
18 the testimony at that time.  And please, don't discuss the case
19 with anybody and don't do any research or investigation.
20   I hope you have a good evening.  We'll see you
21 tomorrow at nine.  Thank you.
22   A JUROR:  Thank you.
23 JURY OUT
24   THE COURT:  All right.  Let's be prepared at 8:45
25 tomorrow morning to discuss the matters that Mr. Allan has

1  raised and also if we want to revisit the issues that we

2  discussed at sidebar at that time.  Is there anything else?  Do

3  you have more deposition designation stuff to give me?

4           MR. WAKEFIELD:  I'm actually not sure what's been

5  happening back at the ranch.

6           THE COURT:  Okay.  Well, I'll be back in chambers,

7  obviously, for a while.

8           Anything else we need to discuss?

9           MR. KELLEY:  No.

10          THE COURT:  Okay.  Then I'll --

11          MR. WAKEFIELD:  Actually, one thing very briefly.  If

12 I heard correctly, I think I -- I think I heard counsel

13 indicate some concern about Mr. Zabek testifying and a

14 representation that we had said he was never going to testify.

15 I believe he was on our "may call" list and that we did not --

16 in fact, Mr. Buckley, I think, several days ago said he was

17 going to be called.  I think that's on the record.

18          THE COURT:  All right.  Well, you try and work that

19 out.

20          At the beginning of the case -- and sometimes it

21 works, sometimes it doesn't -- but I -- you know, the whole

22 idea by asking you-all to bring issues to me before or at the

23 end of the day was so that we wouldn't have some of the delays

24 we had today with the jury.  So let's keep that in mind.

25          And if, you know -- a warning to all counsel:  No

1360

1   more slipups about what's been disclosed and what hasn't been

2   disclosed and -- because there are going to be consequences.

3   So let's be real careful about that for the rest of the case,

4   all right?

5           MR. WAKEFIELD:  Thank you, Your Honor.

6           MR. BRIDGES:  Thank you, Your Honor.

7           THE COURT:  All right.  Then we're in recess.

8           All right.  Mr. Cadenhead, you're in the middle of

9   your testimony, so please don't discuss the testimony you've

10  given so far with anyone, all right?

11          THE WITNESS:  Yes, Your Honor.  Thank you.

12          THE COURT:  See you tomorrow.  Thank you.

13          NOTE:  The December 9, 2015 portion of the case is

14  concluded.

15      -------------------------------------------------

16

17

18          We certify that the foregoing is a true and

19      accurate transcription of our stenographic notes.

20

21              /s/  Norman B. Linnell
               _____
22              Norman B. Linnell, RPR, CM, VCE, FCRR

23              /s/  Anneliese J. Thomson
               _____
24              Anneliese J. Thomson, RDR, CRR

25