UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                          :
             Plaintiffs,         :
                                : Case No. 1:14-cv-1611
     vs.                         :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
             Defendants.         :
--------------------------------:
```

VOLUME  7  (P.M. portion)

TRIAL TRANSCRIPT

December 10, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

Anneliese J. Thomson  OCR-USDC/EDVA  (703)299-8595

1    APPEARANCES:

2

     COUNSEL FOR THE PLAINTIFFS:
3
     Michael J. Allan
4    John M. Caracappa
     Jeremy D. Engle
5    Paul Gennari
     Margaret P. Kammerud
6    William G. Pecau
     Stephanie L. Roberts
7    Jeffrey M. Theodore
     Roger E. Warin
8    STEPTOE & JOHNSON LLP
     1330 Connecticut Avenue, N.W.
9    Washington, D.C.   20036

10
     Walter D. Kelley, Jr.,
11   HAUSFELD LLP
     Suite 650
12   1700 K Street N.W.
     Washington, D.C.   20006

13

14
     COUNSEL FOR THE DEFENDANTS:
15
     Andrew P. Bridges
16   Guinevere L. Jobson
     Jedediah Wakefield
17   FENWICK & WEST LLP
     555 California Street, 12th Floor
18   San Francisco, CA 94194

19   Brian D. Buckley
     FENWICK & WEST LLP
20   1191 2nd Avenue, 10th Floor
     Seattle, WA  98101
21
     Craig C. Reilly
22   CRAIG C. REILLY, ESQ.
     111 Oronoco Street
23   Alexandria, VA 22314

24

25

1490

1 <u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

| | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>WITNESSES ON BEHALF OF</u><br><u>THE DEFENDANT</u>: | | | | |
| Randall J. Cadenhead<br>  (Resumed) | | 1492 | 1500 | |
| Matthew Edwin Carothers | 1505 | 1522 | | |
| Christopher Thomas Rucinski | 1549 | 1592 | | |

```
 1                    A F T E R N O O N   S E S S I O N

 2                          (Jury out.)

 3            THE COURT:  All right.  Anything before we get our

 4    jury?  Ms. Jobson?

 5            MS. JOBSON:  Yes, please.  One minor housekeeping

 6    issue.  There were a couple of documents that came in with the

 7    Sabec, the Christopher Sabec video.

 8            THE COURT:  Okay.

 9            MS. JOBSON:  We've agreed on them.  I believe there's

10    no objection.  I'd like to move them into evidence.

11            THE COURT:  All right.  Certainly.

12            MS. JOBSON:  They are DTX 0387, DTX 0390, DTX 0393,

13    DTX 0395, and DTX 0396.

14            THE COURT:  All right.  Thank you, Ms. Jobson.

15            Do you need copies of those now?

16            THE CLERK:  Me?

17            THE COURT:  Yeah.

18            THE CLERK:  I think I have them.

19            MS. JOBSON:  I believe you have them.

20            THE COURT:  Okay.  All right.  Good.  All right.

21    Thank you.  It's just different methods of putting the exhibits

22    in, and, you know, I've got concerns making sure we get the

23    record correct.

24            All right, Greg, let's get our jury.

25                          (Jury present.)
```

1          THE COURT:  I think we're missing a couple of people.

2     There we go.

3          All right.  Please have a seat.

4          Mr. Kelley?

5          RANDALL J. CADENHEAD, DEFENDANTS' WITNESS,

6               PREVIOUSLY SWORN, RESUMED

7               CROSS-EXAMINATION (Cont'd.)

8     BY MR. KELLEY:

9     Q.   All right.  Good afternoon, Mr. Cadenhead.

10    A.   Good afternoon.

11    Q.   When we left off, we were talking about a series of

12    letters and e-mails that you had received from Rightscorp

13    notifying you of the ever-increasing counts of infringements

14    and repeat infringers.  Do you remember that?

15    A.   I do.

16    Q.   Let's do one more.

17    A.   Okay.

18    Q.   And this is one Mr. Bridges introduced in your direct.

19    A.   Yes.

20    Q.   If you would pull up DTX 2094.002.

21    A.   Yes.

22    Q.   There we go.  Sorry about that.

23          Okay.  Do you have it in front of you?

24    A.   Yes, sir.

25    Q.   And I believe you identified this as a letter that you

R. Cadenhead - Cross                                              1493

1   got, or e-mail, rather --

2   A.    Yes.

3   Q.    -- maybe e-mail letter that you got late one night.

4   A.    Yes.

5   Q.    Okay.  Take a look, if you would, at the second paragraph

6   of that.

7   A.    Yes.

8   Q.    Now, this was just the latest in a series of letters that

9   you had gotten about infringement on the Rightscorp network,

10  right?

11  A.    Well, it's one of a series of e-mailed letters that I got

12  that day, yes.

13  Q.    All right.  Take a look -- now, we pulled this up, and

14  this is as of November 24, 2013.

15  A.    Yes.

16  Q.    Okay.  How many notices does Rightscorp say that it sent

17  to Cox between -- I think it says between July 26, 2013, and

18  November 24, 2013?

19  A.    That's in the second paragraph, and it says, "We have sent

20  1,036,902 infringement notices to you."

21  Q.    And how many repeat infringers do we have?

22  A.    13,145.

23  Q.    Okay.  Thank you.

24        Now, with all of these various e-mails and letters

25  and stuff that we've looked at, Cox didn't investigate any of

R. Cadenhead - Cross                                                  1494

1   the data presented in those letters about infringements taking

2   place on its network, did it?

3   A.   I think I've testified to my review of the list that was

4   attached to one of the certified letters that came in.

5   Q.   So other than your review, though, nothing, nothing

6   further was done with that information?

7   A.   That's correct.

8   Q.   And Cox didn't advise any of the subscribers identified in

9   all this data that they had been accused of copyright

10  infringement, did they?

11  A.   That's correct.

12  Q.   And are you aware that subscribers get sued for illegal

13  file sharing?

14  A.   I am indeed.

15  Q.   And, in fact, Cox gets subpoenas related to that, doesn't

16  it?

17  A.   A great many.

18  Q.   But Cox didn't advise any of its subscribers that were

19  identified by Rightscorp of the fact that they were potentially

20  on -- that there was a chance they were going to be sued?

21  A.   We didn't process any of the notices.

22  Q.   Okay.  And Cox didn't use any of this information to stop

23  further infringements, did it?

24  A.   We didn't process them at all.

25  Q.   Right.  So you didn't use it to stop further

1    infringements?

2    A.    Yeah.  We were still trying -- well, we were waiting for

3    Rightscorp.

4    Q.    All right.  Let's turn our attention now to another e-mail

5    that Mr. Bridges covered.  I'm going to give you the PX

6    version.  It's PX 2452.  It's already been admitted.

7    A.    Okay.

8    Q.    And if you would, just that first page right there.

9    A.    Okay.

10   Q.    First of all, can you tell me -- this is kind of a

11   compendium document of e-mails.  Can you tell me what was going

12   on with this?

13   A.    This was part of an exchange of e-mail messages and we

14   also had some telephone conversations with Christopher Sabec in

15   the June to August timeframe of 2011.

16   Q.    And so you and Mr. Sabec had some back-and-forth about the

17   notices?

18   A.    Yes.

19   Q.    Okay.

20   A.    Actually, it started out about subpoenas to us and evolved

21   into his bringing up notices.

22   Q.    All right.  And this e-mail that we have pulled up here is

23   the last e-mail in the thread, or at least the thread between

24   you and Mr. Sabec?

25   A.    I don't recall for sure.  I'll take your word for it if

1   you want to go ahead.

2   Q.   All right.  It's not important.

3           If we can blow up the third, fourth, fifth, sixth,

4   and seventh paragraphs?  I'm not sure I narrowed it down

5   terribly, but -- all right.

6           Now, in this e-mail that you received from Mr. Sabec,

7   he advised you about the notices and the fact that they, at

8   least in his opinion, constituted actual notice of illegal

9   activity; is that correct?

10          MR. BRIDGES:  Your Honor, this is testimony about

11  what appears to be legal opinion expressed in a letter.

12          THE COURT:  It's what Sabec is stating.  It's not

13  legal.  Overruled.  I've already given an instruction on this.

14  I don't think we need to keep reminding the jury.  Go ahead.

15  BY MR. KELLEY:

16  Q.   Okay.  Do you see the words "actual notice" there?

17  A.   I do.

18  Q.   Okay.  And let's skip on down.  Could you read the next

19  paragraph?

20  A.   "Here is the important point for you to understand:  Our

21  notices put Cox at risk of losing its safe harbor.  And if Cox

22  has no safe harbor under the DMCA, then it is liable for the

23  infringements under the theory (well-tested in the courts) of

24  vicarious infringement.  This is as a result of section 512(i),

25  which requires every ISP (including conduits) to have adopted

R. Cadenhead - Cross                                              1497

1  and implemented a policy under which repeat infringers are

2  disconnected.  We are building a huge body of evidence that Cox

3  has numerous repeat infringers."

4  Q.   Okay.  Would you read the next paragraph?

5  A.   "You can ignore the notices.  The DMCA does not have

6  contain any specific requirement that you forward them."

7  Q.   Okay.  And then the next one?

8  A.   "But you cannot not ignore section 512(i), and we intend

9  to test you on it.  If you ignore the fact that repeat

10 infringers are continuing to use Cox's facilities, then Cox

11 fails the 512(i) test.  Is that an outcome with which you are

12 comfortable?"

13 Q.   And then there's one last paragraph there, Karl, that we

14 don't quite have up.  There we go.

15         And then the final paragraph, Mr. Cadenhead, and I

16 promise this is it.

17 A.   That's good.

18         "We would much prefer to work in a cooperative manner

19 with Cox, and it is easier for you if we do things that way,

20 but we will press the issue for the benefit of our copyright

21 holders."

22 Q.   So did you understand from this e-mail that Rightscorp and

23 its clients intended to press Cox on taking action on the

24 notices that it had received of infringement?

25         That's what it says, doesn't it?

R. Cadenhead - Cross                                          1498

1   A.   It says that -- it talks a lot about law, and I'm not here

2   to do that, so --

3   Q.   Right.  But it says that we intend to test you on it.  Do

4   you see that?

5   A.   "And we intend to test you on it."  It does, indeed.

6   Q.   And it also says, "We will press the issue for the benefit

7   of our copyright holders."

8            Does it not?

9   A.   Yes.

10  Q.   Now, this was a fight that Cox wanted, wasn't it?

11  A.   I'm sorry?

12  Q.   Didn't Cox want this fight over the notices and taking

13  care of infringement?  No?

14  A.   No, sir.

15  Q.   All right.  Let's put up PX 1392, which was admitted

16  previously.  Look at the first e-mail, the last paragraph of

17  the first e-mail.

18            This is an e-mail from Jason Zabek, isn't it?

19  A.   Yes.

20  Q.   Read to the jury what that last paragraph says.

21  A.   "I really hope they push this and threaten to sue us.  We

22  have all our ducks in a row on DMCA and I would dig going to

23  court and either shoving it in their face or destroying the

24  DMCA."

25  Q.   All right.  Let's put up Exhibit 13 -- Plaintiff's 1315,

R. Cadenhead - Cross                                              1499

1   the first e-mail.

2            All right.  And this is also from Mr. Zabek, isn't

3   it?

4   A.   Yes.  This is one I was copied on.

5   Q.   Yeah.

6   A.   I was on the To list.

7   Q.   You anticipated my question.  You were copied on this one,

8   right?

9   A.   Yes, this one.  I was.  Thank you.

10  Q.   Okay.  Would you read that -- those three lines to the

11  jury?

12  A.   "Roger that.  I tell you, I kind of hope they do.  This is

13  a fight we want.  Thank you as always for your support."

14  Q.   And then finally, if you would put up PX 1318, redacted?

15           Take a look at that, the first e-mail that's been

16  redacted.  I'll give you a moment.  They're passing one up to

17  you.

18  A.   Oh, good.  Thank you.

19  Q.   Read the second line of that e-mail to the jury, if you

20  would.

21  A.   "I say let them sue.  It will be a great case for Cox.  If

22  we lose, the press will still be good."

23  Q.   Mr. Zabek got his wish, didn't he?

24  A.   Well --

25           MR. BRIDGES:  Objection, Your Honor.

1          THE COURT:  Sustained.

2          MR. KELLEY:  All right.  Pass the witness.

3          THE COURT:  All right.  Redirect?

4                    REDIRECT EXAMINATION

5   BY MR. BRIDGES:

6   Q.   Mr. Cadenhead --

7   A.   Yes, sir.

8   Q.   -- Mr. Kelley showed you a series of communications from

9   Mark McAlister, those letters with those notices attached,

10  right?

11  A.   Yes.

12  Q.   And he just showed you right now an e-mail that Rightscorp

13  sent on behalf of BMG in parallel with notices or e-mails sent

14  on behalf of six other copyright holders just as you were going

15  into retirement, correct?

16  A.   Yes.  I remember, yes.

17  Q.   Before Mr. McAlister sent those letters and before the

18  e-mail that Mr. Kelley just showed you, what had Cox told

19  Rightscorp about Rightscorp's notices?

20  A.   Well, we had from the very beginning communicated that

21  their notices containing demands for payment weren't

22  acceptable, nor was the fact that they were insisting on us

23  enforcing the notices by suspending or redirecting service.

24  Q.   And what did Cox tell Rightscorp about what Cox would do

25  if Rightscorp took those offensive parts out of the notices?

1   A.   We told them that we would accept them and we'd work with

2   them on volume control.

3   Q.   Thank you.

4        Another point:  All those e-mails that Mr. Kelley

5   showed you earlier about terminations and reactivations and

6   timing and things like that, do you recall those?

7   A.   I do.

8   Q.   Were any of those e-mails about notices from Rightscorp?

9   A.   No.

10  Q.   Were any of those e-mails about the plaintiff in this

11  case, BMG?

12  A.   No.

13       MR. BRIDGES:  I pass the witness, Your Honor.

14       THE COURT:  All right.  Can Mr. Cadenhead be excused?

15       MR. KELLEY:  As far as we're concerned, yes.

16       THE COURT:  All right.

17       MR. BRIDGES:  Yes.

18       THE COURT:  Mr. Cadenhead, you're excused with our

19  thanks, sir.

20       THE WITNESS:  Thank you.

21       THE COURT:  And please don't discuss the testimony

22  you've given with any other fact witnesses until our trial is

23  over.  And have a safe trip home, sir.

24       THE WITNESS:  Thank you.

25                    (Witness excused.)

1502

1       MR. WARIN:  Your Honor, may we approach for a moment?

2       THE COURT:  Yes, sir.

3       (Sidebar on the record.)

4       MR. WARIN:  Your Honor, the testimony that

5  Mr. Bridges raised with Mr. Cadenhead raised a problem of the

6  sword and shield with respect to the attorney/client privilege.

7  Given the way that there was a selective narrow waiver of the

8  privilege, it was repeatedly asserted with respect to matters

9  that were the subject of his testimony today.  Let me give you

10 an example.  There was testimony --

11      THE COURT:  Tell me where you're going with this

12 before --

13      MR. WARIN:  I would, I would like an instruction

14 telling the jury to disregard the testimony with respect to

15 Cox's dealings with other media companies and with respect to

16 his calculations.  I have here a whole pile of e-mails that,

17 the first one of which starts with an e-mail from someone

18 representing other media companies, and it's followed by page

19 after page after page of redaction for privilege.

20      So by allowing him to elicit that testimony, he's

21 using that as a sword, that by asserting the privilege here,

22 he's using it as a shield.  So that's the first topic.

23      Let me identify these for the record so it's clear.

24 These are Cox documents, BMG00208754.  That's Issue No. 1.

25      Do you want me to let Mr. Bridges address that one

1    first?

2            THE COURT:  No, go ahead.  How many have you got?

3    Have you got three?

4            MR. WARIN:  I've got two issues.

5            THE COURT:  Two.

6            MR. WARIN:  And here are additional documents.  This

7    is a document again from the Record Industry Association to

8    Mr. Cadenhead talking about the number of notices that they had

9    sent in in the month of June, almost 6,000, and it's a

10   discussion about Cox's graduated response program, which he

11   talked about, and then assertion of a privilege with Mr. Beck.

12           Here's another notice with respect to a notice here

13   again from other industry groups, and again redacted, redacted,

14   redacted, and this one talks about the hard limit, and this one

15   is from Universal Studios, and they're talking about 3,700 in a

16   day from Universal Studios, and yet they redacted all

17   communications about that.

18           Here's another one in 2014 again from the Record

19   Industry Association, wanting to increase their limit.

20   Redacted, redacted.

21           So he's elicited testimony to try to create a

22   favorable impression that everything was hunky-dory with these

23   other claims and yet kept the documents from us.  So that's

24   topic No. 1.

25           THE COURT:  All right.  Mr. Bridges?

1    MR. BRIDGES:  Your Honor, I don't think that's -- I

2  don't quite understand what the concern is.  He was

3  representing Cox externally --

4    THE COURT:  Well, these are all -- have his name

5  embedded.  These are all personal e-mails.

6    MR. BRIDGES:  That's right, but the waiver was

7  regarding the types of notices --

8    THE COURT:  Let's do this:  Is this going to be the

9  subject of further testimony this afternoon?

10    MR. WARIN:  I don't think so.

11    MR. BRIDGES:  I don't think so, Your Honor.

12    THE COURT:  All right, then let's do this:  Let's

13  talk about this at 5:30, okay?

14    MR. WARIN:  That would be fine, Your Honor.

15    MR. BRIDGES:  Could we please have copies of that?

16    MR. WARIN:  I'll be happy to give them the numbers.

17    MR. BRIDGES:  Thank you.

18    THE COURT:  Thank you.

19    MR. BRIDGES:  I'm actually going to go back to the

20  home base, but I can try to arrange to be back here later today

21  at whatever time the Court wants.

22    THE COURT:  I don't want to interrupt the jury any

23  further, so it would be at the end of the trial day.

24    MR. BRIDGES:  I'll come back.

25    MR. WARIN:  Thank you, Your Honor.

1          THE COURT:  All right, thank you.

2          (End of sidebar.)

3          THE COURT:  All right, next witness?

4          MS. JOBSON:  Cox calls Mr. Matt Carothers.

5          THE COURT:  All right.

6       MATTHEW EDWIN CAROTHERS, DEFENDANTS' WITNESS, SWORN

7          THE COURT:  Greg, if you could grab those binders?

8   I'm sorry, I didn't see you giving, giving out the water there.

9          MS. JOBSON:  I think we've got one more binder for

10  the clerk.

11         THE COURT:  Yeah.

12         THE WITNESS:  Thank you.

13         MS. JOBSON:  Thank you.

14         THE COURT:  Thank.

15                    DIRECT EXAMINATION

16  BY MS. JOBSON:

17  Q.   Mr. Carothers, can you please state your name for the

18  record.

19  A.   Matthew Edwin Carothers.

20  Q.   What is your educational background?

21  A.   I studied computer science at the University of Oklahoma.

22  Q.   Do you have a graduate degree?

23  A.   I do not.

24  Q.   What is your current job title?

25  A.   I am Cox's principal security architect.

M. Carothers - Direct                                          1506

1   Q.   How long have you worked at Cox?

2   A.   About 14-1/2 years.

3   Q.   When did you start at Cox?

4   A.   April of 2001.

5   Q.   What was your job when you first started at Cox in 2001?

6   A.   I started out as a network engineer.

7   Q.   What did you do as a network engineer?

8   A.   Primarily I built systems related to provisioning of our

9   business services.

10  Q.   Anything else?

11  A.   I did a little bit of security work.  At the time, we had

12  outsourced our ISP services to a third party called At Home,

13  and they handled most of our abuse desk work, but we did have

14  some areas where we had our own ISP service.

15  Q.   And did you do any abuse work at that time?

16  A.   At that time, it consisted of taking in complaint e-mails

17  and forwarding them off to our local markets for handling.

18  Q.   What do you mean by local markets?

19  A.   The company was much more decentralized at the time, and

20  so our local areas where we have service, each different city

21  where we had service had a lot of autonomy.

22  Q.   And this was back in the 2001 time frame?

23  A.   Yes.

24  Q.   Did you ever begin to have a bigger role in dealing with

25  abuse issues at Cox?

1    A.    Yes.  In late 2001, the company At Home that had

2    outsourced our ISP services went bankrupt, and so we had about

3    six months to build an entire ISP.

4    Q.    And at that point, did you become more involved in dealing

5    with abuse issues?

6    A.    Yes.  At that point, I was the Abuse Department.

7    Q.    At any point, did you leave the Abuse Department?

8    A.    I left the Abuse Department in March of 2007.

9    Q.    And why is that?

10   A.    We had a reorganization, and the team was split off

11   between operational roles and engineering roles, and I went

12   over to the engineering side.

13   Q.    And is that where you currently are at Cox?

14   A.    No.  We've had a few more reorgs since then, and we have a

15   dedicated Security Team.

16   Q.    And you said that you are the principal security

17   architect; is that right?

18   A.    Yes.  I am Cox's principal security architect.

19   Q.    And in your role as principal security architect, do you

20   have any interaction with the Abuse Department?

21   A.    Yes.  I serve as an advisory role for the Abuse

22   Department.  I research new threats, and I build new tools for

23   them to help them address issues.

24   Q.    About how often do you communicate with people in the

25   Abuse Department in your role today as principal security

1   architect?

2   A.   I see them daily because they're in offices next to mine,

3   but business dealings probably once a week.

4   Q.   I think you mentioned before you might research new

5   security issues to help out the Abuse Department.  Can you tell

6   us what you mean by that?

7   A.   Yes.  A big part of the Customer Safety Department's

8   mission is protecting customers from malware, which is

9   malicious software that criminals get and infect customer PCs

10  with, so I do a lot of research in terms of detecting new

11  threats and figuring out how to fix those.

12  Q.   More broadly speaking, in your current role as principal

13  security architect, what are your job duties?

14  A.   In addition to researching new threats and building new

15  tools, I am also Cox's liaison to a number of industry groups

16  and government groups such as the Department of Homeland

17  Security and the Federal Communications Commission, and I am

18  also Cox's liaison to our Legal Department, the Regulatory

19  Affairs Department.

20  Q.   You mentioned you are involved in security industry

21  groups.  What kind of things do you do with these security

22  industry groups?

23  A.   Well, there's a lot of collaborative research that goes on

24  between different companies around security.  In particular,

25  we're part of an FBI working group that is focused on taking

1    down botnets.  A botnet is a network of compromised computers

2    that have been gathered together under a hacker's control.  So

3    we've participated in several of those FBI operations over the

4    years.

5    Q.   And how long have you been involved in these security

6    industry groups?

7    A.   Since I've started really.

8    Q.   Are you familiar with what BitTorrent is?

9    A.   I am.

10   Q.   Have you ever personally used BitTorrent?

11   A.   I have.

12   Q.   What for?

13   A.   I have downloaded Linux distributions with it.  Linux is a

14   free open source operating system.  I also use it in my job

15   function occasionally to download security-related tools.

16   Q.   And do you have an understanding of how others might use

17   BitTorrent?

18   A.   I do.

19   Q.   What is that understanding?

20   A.   It could be used for anything that involves transferring

21   data across the Internet.  There are video services that use

22   BitTorrent as their distribution.  There are video game

23   companies that use BitTorrent to distribute their products.

24   Q.   You mentioned earlier that you started the Abuse

25   Department at Cox.  Can you remind us when that was?

M. Carothers - Direct                                              1510

1   A.    That was late 2001.

2   Q.    What was the purpose of the Abuse Department at that time?

3   A.    At the time, we were still focused on just forwarding the

4   complaints off to the local markets, where someone local to the

5   customer would handle the issue.

6   Q.    And do you understand that the Abuse Department might at

7   some point become called something else?

8   A.    Yes.  We eventually called it the Customer Safety

9   Department.  In the -- in the beginning when the department was

10  founded, it was more focused on enforcing the Acceptable Use

11  Policy.  As threats have evolved, though, we've reached a point

12  where a lot of the offenders are actually victims.  Their PCs

13  have been infected with malware, and it's a criminal

14  controlling the customer's PC causing it to do bad things.  So

15  in that spirit, we now call it the Customer Safety Department.

16  Q.    And are they sometimes used interchangeably in documents

17  and conversation?

18  A.    Yes.  Abuse is still the industry standard term for it,

19  and abuse at whatever domainname.com is still the standard

20  mailbox that ISPs have for that.

21  Q.    And going back to 2001, what kind of complaints did the

22  Abuse Department handle back then?

23  A.    Back then, it was primarily spam.  We had issues with

24  customers who would send out spam e-mails, and we had issues

25  with customers receiving spam in their own in boxes and

M. Carothers - Direct                                          1511

1    complaining to us about that.

2    Q.    I think you mentioned back in 2001 that you were the Abuse

3    Department.  Is that right?

4    A.    That's correct.

5    Q.    Did that change at some point?

6    A.    It did.  Fortunately, over the next few months as we built

7    our ISP, I was able to hire six people.

8    Q.    And who did you hire?

9    A.    Well, among others, I hired Jason Zabek and I hired

10   Joe Sikes.

11   Q.    How did you otherwise build the department?

12   A.    Yes.  I also wrote a system called the Cox Abuse Tracking

13   System, or CATS.

14   Q.    And what was the purpose of building CATS?

15   A.    CATS allows us to automate the process of handling abuse

16   complaints.

17   Q.    I'd like you to turn in your binder to DTX 1095.  Are you

18   with me?

19   A.    Yes.

20   Q.    Does this look familiar to you?

21   A.    It does.

22   Q.    What is it?

23   A.    It's a slideshow that I prepared many years ago explaining

24   exactly what CATS is.

25             MS. JOBSON:  Your Honor, I'd like to move this into

M. Carothers - Direct                                          1512

1   evidence.

2             THE COURT:  Any objection?

3             MR. ALLAN:  No objection, Your Honor.

4             THE COURT:  All right, it's received.

5             MS. JOBSON:  Can we pull up DTX 1095?  Fantastic.

6   Q.   So could you walk us through a little bit about what CATS

7   does?

8   A.   Sure.  CATS allows a small number of people to do a lot of

9   work.  It primarily does that by grouping together all of the

10  complaints about a particular issue into something that we call

11  a ticket.  So, for example, if a customer sends out a million

12  spam e-mails and a thousand people complain about that spam, we

13  don't want to read all thousand of those e-mails, so CATS takes

14  all thousand of them, figures out the customer in question,

15  figures out that it is a spam complaint, and then puts it all

16  together into one ticket.

17  Q.   And who developed CATS?

18  A.   I did.

19  Q.   Did you write the code for the original CATS?

20  A.   I did.

21  Q.   Did CATS evolve over time?

22  A.   It did.  The original iteration of CATS was just an

23  automated way to forward off complaints to our local markets,

24  but it eventually evolved into a full-fledged ticketing system.

25  Q.   What do you mean by a full-fledged ticketing system?

M. Carothers - Direct                                              1513

1   A.   A ticketing system allows us to group related complaints

2   together.  It allows us to keep a historical record of all the

3   incidents that a particular customer has had.  It allows us to

4   store notes on what we've done in a particular case, and it

5   allows us to automate as much of our process as possible, for

6   instance, looking up who the customer is or figuring out what

7   type of complaint it is.

8   Q.   Do you have an understanding of whether CATS functions

9   generally in that manner today?

10  A.   Yes, it does.

11  Q.   Is CATS separate from ICOMS?

12  A.   Yes.

13  Q.   Do you have an understanding of what ICOMS is?

14  A.   Yes.  ICOMS is our billing system.

15  Q.   And those are separate systems?

16  A.   They are.

17  Q.   And once CATS creates a ticket in its system, does it ever

18  delete that ticket?

19  A.   It does not.

20  Q.   Once CATS creates a ticket, what happens?

21  A.   Once the ticket is created, it performs as much of the

22  procedure as possible up to and including taking automated

23  action.  It can send warning e-mails to customers.  It can

24  actually even take them offline in an automated fashion.

25  Q.   And is that included for complaints of copyright

1    infringement?

2    A.    It is.

3    Q.    A moment ago, you mentioned customer-facing action.  Are

4    you aware of any instances where CATS does not take a

5    customer-facing action on a given complaint?

6    A.    Yes.  There are two such cases.  One is the daily rate

7    limits that we apply to senders, and the other is what we call

8    hold for more.

9    Q.    Let's start with the hold for more.  Can you explain what

10   that is, please?

11   A.    Yes.  For the specific case of a copyright infringement

12   complaint, we don't take a customer-facing action on the first

13   complaint.  We create the ticket, and we store it, but we don't

14   send the customer a warning on the first complaint.

15   Q.    Why is that?

16   A.    There are two reasons for that.  One, we had hundreds of

17   confirmed cases of false allegations, meaning that we got a

18   copyright complaint against a Cox IP address that never had a

19   customer on it and could not possibly have had a customer on

20   it.

21         The second is that we saw no statistical difference

22   between repeat complaint rates against customers who did

23   receive a warning versus those who didn't receive a warning.

24   Q.    And you also mentioned, I think it was daily limit.

25   What's that?

1   A.   That's how we smooth out the spikes in our load.  So, for

2   example, if we have a complainant who has 7,000 complaints to

3   send to us and we know that our call center can only handle

4   1,000, we want to receive 1,000 a day for seven days rather

5   than getting 7,000 on the first day and then none for the rest

6   of the week.  This allows us to be fair to all of the

7   complainants, because it means that one complainant can't shove

8   the other out of the way, and it means that we can more

9   effectively handle all of the volume from any one particular

10  complainant because they're not overwhelming us on one day and

11  then leaving nothing to do for the rest of the days.

12  Q.   At the time you developed CATS, did you have an

13  understanding of whether or how other ISPs were processing

14  abuse complaints, including complaints of copyright

15  infringement?

16  A.   Yes.

17  Q.   And how did you gain that understanding?

18  A.   By speaking with other ISPs.  ISP abuse departments are a

19  pretty tight-knit group.

20          MR. ALLAN:  Your Honor, I think this might be

21  hearsay.

22          THE COURT:  It sounds like it.  You can't, you can't

23  testify about what other people told you.  All right?

24          THE WITNESS:  Okay.

25          THE COURT:  Thank you.

1          MS. JOBSON:  May he testify about his understanding

2    of other ISPs' activities?

3          No?  Okay.  I'll move on.

4    Q.   In your current job as principal security architect, do

5    you use any tools to detect security threats on the Cox

6    network?

7    A.   Yes, we use several of them.  One is called Damballa,

8    which detects malware.  Another is called Helios, which is

9    another malware detection tool, and another is called Procera.

10   Q.   What's Procera?

11   A.   Procera is what's called a deep-packet inspection tool.

12   Q.   What is a deep-packet inspection tool?

13   A.   It looks at network traffic going back and forth across

14   our network, identifies broadly what type of traffic it is, and

15   then stores statistics about what that traffic is.

16   Q.   Are you aware of the types of information that Procera

17   DPI -- or can we call it DPI, short for deep-packet inspection?

18   A.   Yes.

19   Q.   Does that make sense?

20          Okay.  Are you aware of the types of information that

21   the Procera DPI analyzes and records?

22   A.   Yes.

23   Q.   Are you aware of the types of searches that someone at Cox

24   could do using its DPI tool?

25   A.   Yes.

M. Carothers - Direct                                          1517

1    Q.   In your experience, how accurate are the statistics of the

2    Cox's Procera DPI tool?

3    A.   It varies widely.  So in some of our markets, particularly

4    our smaller ones, we have good coverage.  In some of our larger

5    markets, the Procera platform has not kept up with growth, and

6    so it's overwhelmed, and in some areas, it's not able to fully

7    store all of the statistics just because there's too much data.

8    Another issue is that it can't always be 100 percent accurate

9    in identifying every protocol.

10   Q.   What do you mean by full coverage?

11   A.   So some areas of our network don't have Procera plumbed

12   into them.

13   Q.   What does that mean?

14   A.   The way it works is that copies of subscriber traffic are

15   sent to the Procera devices for analysis, but in some areas, we

16   don't have enough Procera devices to handle all of the traffic,

17   and so some of that subscriber traffic is never sent to Procera

18   for analysis.

19   Q.   I think you also mentioned that, that Cox's DPI tool has

20   trouble identifying every protocol; is that right?

21   A.   Yes, that's correct.

22   Q.   What does that mean?

23   A.   A lot of traffic is encrypted, especially these days after

24   the Snowden revelations and all the concern that people have

25   about the NSA.  When traffic is encrypted, it's essentially

M. Carothers - Direct                                                1518

1   password protected, so the intended recipient is the only

2   person who can see what's inside that packet.

3   Q.   And in your experience, what types of traffic are

4   encrypted?

5   A.   Many protocols are encrypted.  Ones that stand out are

6   encrypted Web browsing and BitTorrent.

7   Q.   Speaking broadly, what types of traffic can Cox's DPI tool

8   detect on the Cox network?  I think you mentioned a bunch of

9   protocols.  What are some other examples?

10  A.   Streaming video is a big one.  That's actually the top

11  driver on a network.  That's things like Netflix, Hulu, and

12  YouTube.  Of course, there's Web browsing, there's e-mail, all

13  kinds of stuff.

14  Q.   And I think you mentioned this earlier but just to be

15  clear, is BitTorrent a type of traffic that Cox's DPI tool

16  could detect on its network?

17  A.   Yes.

18  Q.   Can Cox's DPI tool detect the contents of encrypted

19  BitTorrent traffic on Cox's network?

20  A.   No, it cannot.

21  Q.   What about unencrypted BitTorrent traffic?

22  A.   No.  Procera doesn't have that capability, and even if it

23  did, we wouldn't use it in that manner because that would be a

24  huge violation of our customers' privacy, and it's my

25  understanding that it's probably illegal as well.

1    Q.   Could Cox use its DPI tool to determine the volume of

2    BitTorrent traffic on its network?

3    A.   Yes.

4    Q.   What about the content of BitTorrent traffic on its

5    network?

6    A.   No.

7    Q.   More specifically, could Cox use its DPI tool to detect

8    whether someone was using BitTorrent for sharing, for example,

9    music or movies?

10   A.   No.

11   Q.   Could Cox use its DPI tool to detect what files a person

12   uploads using BitTorrent?

13   A.   No.

14   Q.   What about what files a person downloads using BitTorrent?

15   A.   No.

16   Q.   Could Cox use its DPI tool to detect what Web sites a

17   person visits on its network?

18            MR. ALLAN:  Objection, Your Honor.  These are all

19   leading questions.

20            THE COURT:  Yep, they are.  Sustained.  Let's not

21   lead now.

22   BY MS. JOBSON:

23   Q.   In your current role, do you ever use Cox's DPI tool to

24   learn about traffic on its network?

25   A.   I do not.

1    Q.    Why not?

2    A.    It's not relevant to my job function.

3    Q.    Do you know what NetFlow is?

4    A.    I do.

5    Q.    What is it?

6    A.    It is a traffic summary.  It gives us a little bit of

7    information about network traffic, gives us the source IP and

8    the destination IP.  It doesn't give us any of the contents of

9    the packets, and because of the volume of this NetFlow data, we

10   only look at one out of every thousand flows.

11   Q.    What do you mean by one out of every thousand flows?

12   A.    A flow is a connection across the Internet, and we only

13   export one out of every thousand of them from our routers for

14   analysis.

15   Q.    What kind of analysis can you do with the NetFlow data

16   that you have?

17   A.    We can get very broad statistics by simply taking the

18   number of bites sent and received and multiplying it by

19   thousands, multiplying it by a thousand.  We can sort of guess

20   at how much traffic that we're seeing.  It's particularly

21   useful for protecting customers against what's called a denial

22   of service attack, which is essentially just flooding the

23   customer with so many packets that it overwhelms their service.

24   Q.    Does NetFlow distinguish between different types of

25   traffic?

M. Carothers - Direct                                          1521

1   A.    It does not.

2   Q.    Could Cox use its DPI tool or NetFlow or any other tool to

3   stop subscribers from sharing files?

4   A.    It is technically possible for us to shut down all of

5   BitTorrent.  We can't detect an individual file, but it's

6   technically possible to shut down all of BitTorrent.  However,

7   we would not do so because that would make the FCC very angry

8   at us.  Comcast did this some years ago and got hugely fined.

9   It resulted in the FCC's ruling on something called net

10  neutrality, meaning that ISPs are not allowed to interfere in

11  traffic.

12  Q.   Are there any tools that Cox could use to stop its

13  subscribers from sharing an individual file?

14  A.    There are not.  And if there were, frankly, we wouldn't

15  use them because we're not the police.  We're not a judge.

16  We're not a jury.  It's not our place to determine whether a

17  subscriber is breaking the law.

18            THE COURT:  Just answer the question, all right?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  All right.  Your opinion is your opinion,

21  and you answer the questions that are being asked of you.  All

22  right, sir?

23            THE WITNESS:  Yes, sir.

24            THE COURT:  All right.  Thank you.

25            Go ahead.

M. Carothers - Cross                                                      1522

1   BY MS. JOBSON:

2   Q.   I think the question was, are there any tools that Cox

3   could use to stop its subscribers from sharing an individual

4   file?

5   A.   The answer is no.

6           MS. JOBSON:   Pass the witness.

7                         CROSS-EXAMINATION

8   BY MR. ALLAN:

9   Q.   Good afternoon, Mr. Carothers.

10  A.   Good afternoon, Mr. Allan.

11  Q.   You mentioned BitTorrent in your direct examination.

12  Would you say that Jason Zabek has more involvement in the

13  day-to-day operations of the Abuse Department and the knowledge

14  of how BitTorrent is used by Cox subscribers than you?

15  A.   No.  He does have more involvement in the day-to-day

16  running of the Abuse Department, but he doesn't have the level

17  of knowledge that I have when it comes to Procera and DPI and

18  BitTorrent.

19  Q.   But he does have more knowledge with respect to dealing

20  with complaints of copyright infringement than you do, correct?

21  A.   Yes.

22  Q.   Can we pull up PX 1373, Karl?

23          The bottom e-mail here is an e-mail from Jason

24  Zabek -- this is already admitted, Your Honor -- Jason Zabek to

25  Terran Williams, and at the bottom, he says, "99 percent of

M. Carothers - Cross                                          1523

1   DMCA violations is from people using P2P on purpose and not

2   trojan activity," correct?

3   A.    I do see that.  All right.

4   Q.    I want to ask you couple questions about Procera.

5         You can take that down.

6         Cox uses Procera's deep-packet inspection tool to

7   monitor its Internet traffic, correct?

8   A.    Correct.

9   Q.    And Procera's deep-packet inspection tool permits Cox to

10  understand the volume of BitTorrent traffic on the network;

11  isn't that right?

12  A.    That's true.

13  Q.    And Cox can monitor the amount of BitTorrent traffic that

14  a specific subscriber uses on a particular day, right?

15  A.    Yes.

16  Q.    Can we pull up PX 1432, please, Karl?

17        Mr. Carothers, when CATS forwards a notice of

18  infringement or a warning to its subscribers, there's an e-mail

19  notice from the company that's attached at the outset, correct?

20  A.    Yes.

21  Q.    That's something you programmed into the system yourself?

22  A.    Yes.

23  Q.    Okay.  And Mr. Vredenburg, who was here the other day,

24  testified that this is, in fact, a copy of the notice, the

25  e-mail that the company sends attaching the notice of

M. Carothers - Cross                                                   1524

1   infringement to the back.  Do you agree with that?

2   A.   Yes, that looks correct.

3   Q.   I want to direct your attention to the third paragraph,

4   where it says, "As an Internet service provider, Cox is

5   responsible, under the Digital Millennium Copyright Act, to

6   advise when we receive a notice asserting infringement by you."

7        Do you see that?

8   A.   I see that.

9   Q.   And this is conveyed to subscribers through CATS that

10  are -- that receive a DMCA notice that makes it through Cox's

11  system, correct?

12  A.   Yes.

13  Q.   And you agree with that.  Cox is responsible to advise

14  when -- to advise its subscribers when it receives a notice

15  asserting infringement, right?

16        MS. JOBSON:  Objection.

17        THE COURT:  Overruled.  I'll allow it.  Go ahead,

18  answer the question.

19        THE WITNESS:  I'm sorry, repeat the question?

20  BY MR. ALLAN:

21  Q.   Sure.  So you agree with this, do you not, this is what

22  you tell -- the company tells subscribers that it received DMCA

23  notices, that Cox is responsible to advise its subscribers when

24  it receives a notice asserting infringement, copyright

25  infringement?

1    A.    I personally don't have an opinion on that.  That was the

2    letter that was written by our legal counsel.

3    Q.    Well, this is programmed into your system that you

4    programmed in to send out.

5    A.    I don't control the content, and Jason Zabek doesn't

6    control the content of the form letters.  The form letters have

7    to be approved by the Legal Department.

8    Q.    Okay.  Below it, it says, "We are also required to take

9    appropriate action if further claims are received that you do

10   not resolve," correct?

11   A.    Yes, it says that.

12   Q.    And it also says in the paragraph below that, "We have a

13   duty to take progressive steps when we receive complaints of

14   infringement," correct?

15   A.    Yes, I see that.

16             MR. ALLAN:  Do you have 1320?

17             I don't think this is admitted yet, so --

18   Q.    Mr. Carothers, do you recognize this?

19   A.    Yes.  I saw this during my prep work for one of my

20   depositions.

21   Q.    Okay.  And what is it?

22   A.    It is a Q&A for CSRs when speaking to a subscriber.

23             MR. ALLAN:  Your Honor, I'd move this into evidence.

24             THE COURT:  Any objection?

25             MS. JOBSON:  No, Your Honor.

1            THE COURT:  All right, it's received.

2            MR. ALLAN:  Could we pull this up, Karl?  1320 PX.

3    Yes, sir.

4    Q.   I'm going to direct your attention to -- well, before we

5    get to that, this is a Q&A for folks at Cox to respond to

6    telephone calls from people that have received DMCA complaints,

7    correct?

8    A.   That's my understanding, yes.

9    Q.   Okay.  And there's a reference here if the customer calls

10   in that copyright infringement is a violation of our AUP and

11   federal law.  Do you see that?

12   A.   I see that.

13   Q.   And it states that Cox did not generate the infringement

14   notice.  We are simply following our responsibility of

15   forwarding it on to you.  Correct?

16   A.   Correct.

17   Q.   That's what Cox believes and tells its subscribers, right?

18   A.   That's what it says here, but again, that was the opinion

19   of our Legal Department, not mine personally.

20   Q.   Well, that's what the company's position was, right?

21   A.   Yes.

22            THE COURT:  That's what's in the official Cox

23   document.  He said he's not involved in the legal end of

24   things --

25            MR. ALLAN:  Right.

1          THE COURT:  -- and is just reading what you're

2    showing him.

3          MR. ALLAN:  Very good, Your Honor.

4    Q.   One more direction on this document, Mr. Carothers.  On

5    the next page, do you see the section that begins, "What this

6    means"?

7    A.   Yes.

8    Q.   Could you read that for the jury, please?

9    A.   "What this means (in basic English) is that for Cox to not

10   be held liable for subscribers who infringe a copyright while

11   the material is transported through Cox's system, we must have

12   a policy that provides for termination of service in

13   appropriate circumstances for repeat infringers."

14   Q.   Thank you.

15         Mr. Carothers, do you remember having a -- arranging

16   an Abuse Team meeting a few years ago with Mr. Sikes and

17   Mr. Zabek and some other folks to discuss issues with

18   addressing DMCA complaints?

19   A.   I've had many such meetings.

20   Q.   Okay.  Could we pull up -- actually, I want to make sure

21   that this is admitted.  Bear with me one moment, Mr. Carothers.

22         I actually don't believe this is admitted yet.

23         Do you see this, Mr. Carothers?

24   A.   I do.

25   Q.   This is an e-mail chain between you and Mr. Sikes at the

M. Carothers - Cross                                                1528

1    top and then you and the Abuse Team at the bottom?

2    A.    Yes.

3              MR. ALLAN:  I move this into evidence, Your Honor.

4              THE COURT:  Any objection?

5              MS. JOBSON:  No, Your Honor.

6              THE COURT:  All right, it's received.

7              MR. ALLAN:  Thank you, Your Honor.

8              So could we pull up PX 2022, please?  Thank you.

9    Q.    So starting at the bottom, Mr. Carothers, this is an

10   e-mail from you to the Abuse Team asking that any topics be

11   sent to discuss on today's DAB abuse call.  Do you see that?

12   A.    I do.

13   Q.    And then the top e-mail, Mr. Sikes responds and he

14   says, "Hey, Matt!  Here are some topics I am interested in."

15   He says, "Abuse life after DMCA.  Could we really ignore the

16   bulk of DMCA notices?"  Do you see that?

17   A.    I see that.

18   Q.    What's the date and time of this e-mail?

19   A.    It is January 12, 2010.

20             MR. ALLAN:  Could we go to PX 1332?

21             MS. JOBSON:  I have no objection.

22             MR. ALLAN:  Okay.  Your Honor, we believe this is

23   admitted, and Ms. Jobson has no objection, but I just want to

24   make sure.

25             MS. JOBSON:  No objection.

1          THE COURT:  All right, it's received.

2          MR. ALLAN:  Thank you.

3   Q.   Mr. Carothers, you've -- this is an e-mail from you to, to

4   your Abuse Team.  Do you see that?

5   A.   Yes.

6   Q.   And this is just a couple of hours after the e-mail we saw

7   from Mr. Sikes, when he asks you, "Could we really ignore the

8   bulk of DMCA notices," right?

9   A.   Several hours, yes, but it's the same day.

10  Q.   Very good.  And you indicate these are Abuse Team meeting

11  minutes in the subject line of this e-mail, right?

12  A.   Yes.

13  Q.   And the attendees are Mr. Sikes and Mr. Zabek and some

14  other folks as well?

15  A.   Yes.

16  Q.   And in the e-mail, you say, "DMCA -- we are getting

17  crushed.  Suspension limits being hit early in the day."

18          Do you see that?

19  A.   Yes.

20  Q.   And there's a reference here to a chart with a number of

21  increased complaint counts, showing a steady increase year over

22  year of DMCA complaints.

23  A.   That's correct.

24  Q.   And then toward the middle of the e-mail, you

25  indicate, "We are taking some steps to try and stem the flow."

M. Carothers - Cross                                              1530

1   Do you see that?

2   A.   Yes.

3   Q.   And then it looks like you list some of those steps that

4   you're taking to try to stem the flow of DMCA complaints below

5   that.  Is that right?

6   A.   No.  It's not to stem the flow of complaints.  It's to

7   smooth out the spikes in the volume.  We still want to receive

8   the same number of complaints, but we want to get them day over

9   day with the daily suspension limit that's mentioned in here,

10  and also adding extra steps to the self-reactivation feature

11  allows us to deflect some of the calls.

12  Q.   Mr. Carothers, smoothing out the spikes isn't written here

13  anywhere, is it?

14  A.   No, but I'm the one that wrote the e-mail, and I

15  understand what I was talking about.

16  Q.   I understand.  But you don't -- the words "smoothing out

17  the spikes" aren't in this e-mail.  In fact, what it says is

18  you're taking steps to try to stem the flow, and the first step

19  you take is to allow two self-reactivations in the walled

20  garden before requiring a call-in.

21  A.   Yes.

22  Q.   And the second step you take is to ignore auto close, the

23  first complaint against each customer, right?

24  A.   Yes.

25  Q.   And then the third step you take to stem the flow of DMCA

M. Carothers - Cross                                        1531

1   complaints is implementing a hard limit for all senders, and

2   you indicate that we only have hard limits on specific

3   high-volume senders.  Moving forward, all senders will be

4   subjected to a daily volume limit.  Any notices over that limit

5   will be automatically closed with a response back to the

6   sender.

7           Correct?

8   A.   Yes.  You'll notice that in the --

9           THE COURT:  I'm sorry --

10          THE WITNESS:  Oh, sorry.

11          THE COURT:  You answer the questions yes or no if you

12  can.  If you can't answer it, just say, I can't answer the

13  question that you've asked me, and if your counsel wants you to

14  discuss it further, then you'll have that opportunity on

15  redirect, but just --

16          THE WITNESS:  Okay.

17          THE COURT:  -- listen to the question and just answer

18  the question, please, sir.

19          MR. ALLAN:  Thank you, Your Honor.

20  Q.   Once the daily limit is reached, Mr. Carothers, does Cox

21  still process the notices?

22  A.   Yes.

23  Q.   And, but process really has nothing to do with informing a

24  subscriber that they're the subject of an infringement notice,

25  does it?

1  A.   No, but it does inform the complainant of the limit so

2  that they can resend it the next day.

3  Q.   Well, do you remember the definition of "process" that you

4  gave me at your deposition?

5  A.   I don't.

6  Q.   I asked you, "Then what do you mean when you say process

7  them?  What does the company do?"

8        You gave the following answer:  "The abuse tracking

9  system takes the notice in and handles it, but the automated

10 action that it takes is not to send the notice to the customer.

11 It's to close the ticket and respond back to the complainant,

12 letting them know that the complaint was not processed."

13 A.   Yes.

14 Q.   Now, CATS, the way you designed CATS, Mr. Carothers, was

15 to automate suspensions, right?

16 A.   To automate all abuse actions, not just suspensions.

17 Q.   Okay.  But it certainly does automate suspensions?

18 A.   It does.

19 Q.   And there are two ways it does that, right?  With the

20 soft-walled garden in which a subscriber can self-reactivate?

21 A.   Yes.

22 Q.   And a hard-walled garden in which a reactivation can be

23 done by someone in Atlanta, right?

24 A.   Someone in customer care or someone in Atlanta, yes.

25 Q.   Someone in -- okay.  Very good.

1            But CATS doesn't automate the terminations, does it?

2   A.    That's correct.  It does not.

3   Q.    That's done by the Technical Operations Center, the 2.5

4   folks?

5   A.    Yes.

6   Q.    With supervision from Mr. Zabek and Mr. Sikes; is that

7   right?

8   A.    I'm not familiar enough with the day-to-day current

9   operations to say whether it's supervised by Mr. Zabek.  I

10  would say that he's probably consulted.

11  Q.    Okay.  Termination is really just another suspension,

12  isn't it, Mr. Carothers?

13  A.    No.

14  Q.    Okay.  Let me show you PX 1827.  Yes, this is admitted.

15  Yes, thank you.

16           Mr. Carothers, I'm showing you what looks to be a

17  chat between Brent Beck and Harry Spriggs, and Mr. Beck asks --

18  he's got process questions at the top, "To help me understand

19  something.  Termination.  What happens to the actual service

20  and modem?"

21           Do you see that?

22  A.    I see that.

23  Q.    And Mr. Spriggs responds, "Same as what happens with a

24  regular suspension.  It used to be that we completely removed

25  all HSI" -- which stands for high-speed Internet services --

M. Carothers - Cross                                              1534

1   "but since so many of them were just getting reactivated the

2   next day, and because it's such a huge pain to re-add services

3   once they've been removed, Jason gave us the go-ahead to just

4   use the AUP and call it a termination."

5           Correct?

6   A.   Yes.  That is what it says.

7   Q.   Can we go to PX 2003?

8           Mr. Carothers, I've handed you PX 2003.  Do you see

9   that?

10  A.   I do.

11  Q.   Okay.  I want to direct your attention to the bottom of

12  the e-mail with Mr. Zabek, where he states, "Remember that we

13  must terminate to receive protection under the Safe Harbor

14  Amendment."  Do you see that?

15  A.   Yes.

16  Q.   And then let's go up to the e-mail right above that from

17  Mr. Beck, and he responds, "So that leaves the customer's

18  service intact then."

19          And then Mr. Sikes responds -- oh, I'm sorry, I

20  skipped one.  I apologize, Mr. Carothers.

21          So we started with the bottom one, "Remember that we

22  must terminate to receive protection."

23          And then Mr. Sikes responds, "Yep, right.  We sure

24  do.  But I don't believe that TOC is actually terminating the

25  service, completely removing it in ICOMS?"

M. Carothers - Cross                                                1535

1    And ICOMS, you just testified to, is the payment

2    database, correct?

3    A.   Right.

4    Q.   "They are just clicking terminate and update ticket, which

5    shows a termination in the customer's ticket history."  Right?

6    A.   Yes.

7    Q.   So basically, it just creates a record of a terminated

8    customer, but the customer is not really being terminated,

9    right?

10   A.   Not correct, no.

11   Q.   Well, that's what this document says, doesn't it,

12   Mr. Carothers?

13   A.   There's --

14        MS. JOBSON:  Objection.  Lacks foundation.

15        THE COURT:  Well, I mean, he can read the document,

16   and if he agrees that those are the words in the document, then

17   he should say yes.  If those aren't the words in the document,

18   then he can say no.

19   BY MR. ALLAN:

20   Q.   Is that what the document says, Mr. Carothers?

21   A.   That is what the document says.

22   Q.   Thank you.

23        Now, Mr. Carothers, at your deposition, you were the

24   corporate witness for Cox on a number of different topics; is

25   that right?

M. Carothers - Cross                                              1536

1   A.   Yes.

2   Q.   And what that means was that the company put you up to

3   testify on a number of topics as though you were speaking on

4   behalf of the company itself?

5   A.   Yes.

6   Q.   And I asked you several questions about Rightscorp,

7   correct?

8   A.   Yes.

9   Q.   And it's true, isn't it, that Cox never, never even

10  considered forwarding Rightscorp's notices without the

11  settlement offer?

12  A.   No, not to my knowledge.

13  Q.   And Cox never considered extracting out the settlement

14  language from Rightscorp's notices?

15  A.   No.  We wouldn't have altered it before forwarding it.

16  Q.   And Cox never considered forwarding the notice in an

17  amended way of some sort that didn't include the settlement

18  language?

19  A.   No.

20  Q.   And Cox never considered generating a separate notice to

21  inform subscribers consistent with Cox's responsibilities and

22  duties that they had been notifying subscribers that they'd

23  been the subject of an infringement notice?

24  A.   No.  We did not consider creating a separate process.

25  Q.   I'm going to hand you PX 1340, Mr. Carothers.  I believe

M. Carothers - Cross                                           1537

1   this is admitted into evidence.

2           You've seen this, Mr. Carothers?

3   A.   Yes.

4   Q.   This is the e-mail where Mr. Zabek is saying F the DMCA,

5   and Mr. Sikes is saying F Rightscorp, right?

6   A.   Yes.

7   Q.   And at the very top here, you send an e-mail to those two

8   gentlemen, and you say, "Sorry to be Paranoid Panda here, but

9   please stop sending out e-mails saying F the law or F some

10  company.  If we get sued, those e-mails are discoverable and

11  would not look good in court."

12  A.   Yes.

13  Q.   You didn't tell them to knock it off because Cox is more

14  respectful as a company, did you?

15  A.   No.  Those are not my words.

16  Q.   And you didn't say, stop saying these words because, you

17  know, we, Cox, have an obligation to treat and respect

18  copyright infringement notices?

19  A.   That's correct.

20           MS. JOBSON:  Objection.  Argumentative.

21           THE COURT:  Overruled.

22  BY MR. ALLAN:

23  Q.   And you didn't say, stop saying e-mails like this because

24  we, Cox, respect the DMCA?

25  A.   Nope, I did not say that.

M. Carothers - Cross                                            1538

1   Q.   And what you did was you told them to stop simply because

2   it might be discoverable and you might look bad in court,

3   right?

4   A.   Those are my words, yes.

5   Q.   A couple other things I wanted to go through from your

6   deposition.  Again, you were the corporate witness on a number

7   of topics.  We've talked a lot about the current iteration of

8   the residential abuse ticket handling procedures in this case,

9   and I asked you if you knew who is responsible for developing

10  and preparing that current iteration.  You didn't know, did

11  you?

12  A.   I don't recall exactly what my answer was, but if that's

13  what I said in my deposition, then I won't argue with you.

14  Q.   And I also asked you if you knew why the TOC work force

15  was reduced to four people in 2011, and you didn't know the

16  answer to that, either, did you?

17  A.   Actually, I did know the answer to that when it was

18  reasked in my second deposition.

19  Q.   Well, I have a question and answer here:  "Why did the

20  company reduce the staffing in terms of the number of employees

21  that the TOC had in 2011?"

22       You gave an answer, "I don't know"?

23       THE COURT:  Well, if he answered it in a subsequent

24  deposition, as he appears to have said, then that has been

25  supplemented, hasn't it, Mr. Allen?

M. Carothers - Cross                                           1539

1          MR. ALLAN:  It has, Your Honor.  I'm just not aware

2    of that answer.

3          THE COURT:  All right.  Well, you have a copy of the

4    second deposition.

5          MR. ALLAN:  I do.

6          THE COURT:  If you're not going to use it, then we'll

7    take him at his word that it was supplemented.

8          MR. ALLAN:  Fair enough.  Fair enough, Your Honor.

9    Q.   I asked you, "So as the corporate witness, you don't know

10   when the soft termination protocol was put in place?"

11         And you answered, "That is correct"; is that right?

12   A.   That's correct.

13   Q.   And I asked you -- I said, "You, as the corporate designee

14   don't know why the soft termination was put in place?"

15         Do you remember what your answer was?

16   A.   I had never seen the phrase "soft termination."

17   Q.   You on behalf of the company had never seen the phrase

18   "soft termination"?

19   A.   I had not.

20   Q.   All right.  "And you as the corporate designee didn't know

21   who was involved in the decision to implement a soft

22   termination?"

23         You said, "That is correct"?

24   A.   Correct.

25   Q.   And I asked you -- I said, "You as the corporate designee

1  don't know whether the soft termination protocol is still in

2  place?"

3          You said, "No, I don't," right?

4          And I also asked you, "Since you've been out of the

5  Abuse Department since 2007, only serving in an advisory role,"

6  which you testified to today, I asked you if Mr. Zabek and

7  Mr. Sikes would have more understanding of the day-to-day

8  operations at that department than you.

9          Do you remember what your answer was?

10 A.  Yes, they would.

11         MR. ALLAN:  Thank you.  Nothing further.

12         THE COURT:  All righty.  Redirect?

13         MS. JOBSON:  No, Your Honor.

14         THE COURT:  All right.  May Mr. Carothers be excused?

15                         (No response.)

16         THE COURT:  All right.  You're excused with our

17 thanks, sir.  Please don't discuss the testimony you've given

18 today until our trial is over, all right?

19         THE WITNESS:  Thank you, sir.

20         THE COURT:  All right.  Have a good day.

21                         (Witness excused.)

22         THE COURT:  Next witness?

23         MR. WAKEFIELD:  Your Honor, the defense is going to

24 be calling Mr. Christopher Rucinski.  We've got some disputes

25 about his slides.

1541

1    Is this still something you want to discuss?

2    MR. CARACAPPA:  I think so, yes.

3    THE COURT:  All right.  Then why don't we take our

4    mid-afternoon break a little early so that you don't have to

5    listen to that noise.  We'll hopefully come back around,

6    probably around 25 after, all right?  Thank you.

7                      (Jury out.)

8    THE COURT:  All right, what's our dispute?

9    MR. BUCKLEY:  Your Honor, if I can, would you like to

10   see a copy of the slides?

11   THE COURT:  I would, yeah.

12   MR. BUCKLEY:  And then I also, I sent this to counsel

13   earlier.  I prepared just a short table that has the slide and

14   then the support for the slide, so that as we go one by one.

15   There are only four, I think.

16   THE COURT:  Okay.  Great.  Thank you.

17   MR. BUCKLEY:  And, Your Honor, I did provide this to

18   counsel earlier today, but it also memorializes two different

19   phone calls we had last night.

20   THE COURT:  All right.

21   MR. BUCKLEY:  It's just the substance of what we

22   talked about last night.

23   THE COURT:  And the slides themselves, when were they

24   produced?

25   MR. BUCKLEY:  Last night by the 7:00 deadline.

1542

1    THE COURT:  All right.  All right.  So which ones are

2  objected to?

3    MR. CARACAPPA:  Yes, Your Honor.  So --

4    THE COURT:  Slide 1.

5    MR. CARACAPPA:  Well, slide 1 says how BitTorrent

6  works, and Mr. Rucinski was not and did not talk about how

7  BitTorrent worked in his report.  That was Mr. Rosenblatt.  I

8  understand that counsel said that Mr. Rucinski is going to talk

9  about this with respect to the 10 percent, which he did talk

10  about in his report.  So if that's the purpose of the slide,

11  we're fine with it as long as it's limited to what's in his

12  report.

13    MR. BUCKLEY:  Your Honor, Mr. Rucinski's entire

14  report is about how BitTorrent works.  It's about how their

15  system works with BitTorrent.  I could read every heading and

16  it relates to BitTorrent.  That's how the Rightscorp system

17  works.  It monitors BitTorrent's swarms, and the whole reason

18  we retained Mr. Rucinski was to talk about that.

19    THE COURT:  Mr. Caracappa?

20    MR. CARACAPPA:  He does talk about how the Rightscorp

21  system works, but I'll note paragraph 8 of Mr. Rucinski's

22  opening report, he says, "Rather than reintroduce the

23  BitTorrent policy necessary for this section, I incorporate by

24  reference the section entitled, "Salient Aspects of BitTorrent

25  from William Rosenblatt's Report."

1    THE COURT:  Well, did you depose him on the issue on

2  his -- on testimony about BitTorrent and how -- well, how

3  Rightscorp used -- identified the BitTorrent infringing works

4  or, yeah, how the system worked to identify the infringing

5  works in the BitTorrent cloud, or whatever it's called?

6    MR. CARACAPPA:  We did, Your Honor, and again, we

7  don't have an objection to Mr. Rucinski talking about the

8  Rightscorp system, but when we asked him to talk about

9  BitTorrent in general, he said, well, I'm going to rely on

10  Mr. Rosenblatt.

11    And we said, "Well, we've never seen you -- we've

12  never seen anyone incorporate someone else's report in his own

13  report."

14    He said, "Well, I saw it the night before, and I

15  could talk about that stuff, too, but it is in his report."

16    So it's the bait and switch.  We have two experts to

17  talk about this, and we can decide which one at trial we're

18  going to call, and we think that's what they're doing here.

19  Again, we don't have a problem if he talks about the Rightscorp

20  system.

21    THE COURT:  Isn't that the relevance --

22    MR. BUCKLEY:  I'm sorry, Your Honor.

23    THE COURT:  Mr. Buckley, is there any problem with

24  that, limiting his testimony to how the Rightscorp system

25  identifies infringing activity on BitTorrent?

1    MR. BUCKLEY:  Probably not.  I think maybe we're all

2  saying the same thing.  So this slide is actually

3  Ms. Frederiksen-Cross's slide, and what he was going to do was

4  when he starts to talk about some of the details of BitTorrent

5  and he's using termination like peers and other things, he was

6  going to put her slide back up and spend a minute, two minutes

7  just giving the jury a refresher on how BitTorrent works.

8    And to be fair, what he said was, I'm not going to

9  repeat how BitTorrent works.  We have another expert who's

10  already talked about it, so I'm not going to spend ten pages

11  doing the same thing.

12    THE COURT:  Is that controversial?

13    MR. CARACAPPA:  No, Your Honor.  Again, if that's all

14  he's going to do, we don't have a problem.

15    THE COURT:  I think we're all --

16    MR. BUCKLEY:  We're all saying the same thing.

17    THE COURT:  We're okay there.

18    How about slide 2?

19    MR. CARACAPPA:  Slide 2 wasn't in his expert report,

20  Your Honor, and I don't think those are -- these are not

21  artists in the case.

22    THE COURT:  They're not what?

23    MR. CARACAPPA:  They're not artists in the case, so

24  they're not on the list of asserted copyrights.

25    MR. BUCKLEY:  Your Honor, this was discussed by

1    Mr. Rucinski in his MSJ declaration, but more to the point,

2    this is just a blow-up from the infractions table that they put

3    in, and this is just to illustrate what the jury has already

4    heard a little bit about, that there are days when there are

5    multiple notices sent for the same file.  And again, this is a

6    minute of his testimony.

7            THE COURT:  Well, and it's already been testified to.

8    I can't remember who said it, but I know it's been the subject

9    of testimony.

10           All right, that will be allowed.

11           MR. CARACAPPA:  I don't think there's an issue with

12   respect to 2 and 3.

13           MR. BUCKLEY:  That was 2 we just talked about.

14           THE COURT:  That was 2.

15           MR. CARACAPPA:  I'm sorry, 3 and 4.  I don't think

16   there's an issue.

17           THE COURT:  Okay.

18           MR. CARACAPPA:  3 and 4 are slightly different than

19   what's in his expert report, but we understand that the case

20   has been changing, so these are just updated numbers.

21           THE COURT:  Okay.

22           MR. CARACAPPA:  And same thing with respect to -- you

23   don't have numbers on the slide -- and then we're fine with 5,

24   too.

25           6 and 7 we just feel are more detailed than anything

1   in Mr. Rucinski's expert report, and he didn't talk about a

2   day-by-day analysis.  He has a chart that talks about the

3   overall numbers but nothing at this level of detail.

4           THE COURT:  This is the -- entitled, "The Number of

5   Notices Sent to Cox Per Day"?

6           MR. BUCKLEY:  Right.

7           MR. CARACAPPA:  Yes.

8           MR. BUCKLEY:  And there are two that are titled that

9   way, and, Your Honor, it's literally the same data from the

10  three slides before, just blown up to show two time periods,

11  and again, we will be through these slides in two minutes.

12          THE COURT:  Well, I mean --

13          MR. BUCKLEY:  It's to illustrate that there were time

14  periods when there were significant -- relevant time periods

15  when there were significant spikes in the amount of notices

16  being sent on a daily basis.

17          THE COURT:  All right.  There's been a lot of

18  testimony about that as well, so we'll allow them.

19          MR. CARACAPPA:  Okay.  Thank you, Your Honor.

20          THE COURT:  Anything else?

21          MR. BUCKLEY:  I think you had objections to a couple

22  of the exhibits, too.

23          MR. CARACAPPA:  Right.

24          Yes, Your Honor.  Again, these were BitTorrent

25  exhibits that were not cited in Mr. Rucinski's report.

1    MR. BUCKLEY:  So these are -- there are two

2  documents, and I can show them to you if you want to see them,

3  but they just talk about the BitTorrent protocol and the

4  specifications.  He did reference them again via Mr. Rosenblatt

5  because we were going to have Mr. Rosenblatt talk about

6  BitTorrent.  The reason that we -- we don't have to offer these

7  if you don't think it's worth it.

8    The reason we were going to is that there's a lot of

9  technical terminology, and when the jury goes back, they may

10  want to have something to look at, and one of these things is a

11  wiki that says, here is what a peer is, here is what a leecher

12  is.  So I actually thought it might be useful.

13    THE COURT:  All right.  They won't come in unless

14  you-all agree that you want the jury to have them at some

15  stage, but if they're not part of the report, and, you know,

16  that -- allowing Mr. Rucinski to testify generally about

17  BitTorrent is one thing, but having him testify about the

18  technical aspects of it without having given notice that he was

19  going to do that is beyond the scope of the Rule 26 disclosure

20  requirements.

21    What else?

22    MR. BUCKLEY:  Then I think the last one is we had

23  identified the amended complaint as an exhibit because he

24  relied on it in his report and referenced some data that was in

25  it.  I don't know exactly what the objection is to that other

1    than it references Round Hill that's no longer part of the

2    case.

3              MR. CARACAPPA:  He didn't rely on it in his report at

4    all, Your Honor.  That was the objection.  It was in the -- he

5    addressed it in his declaration to the summary judgment motion,

6    but it was not in his report.

7              MR. BUCKLEY:  You're absolutely right.  I stand

8    corrected.  He referenced it in his summary judgment

9    declaration.  He's absolutely right.

10             THE COURT:  Well, how does that get him --

11             MR. BUCKLEY:  The data that he's going to -- it

12   underlines one of the slides.  He can talk about that

13   generally.  It doesn't have to come in as an exhibit if that's

14   the issue.

15             THE COURT:  Okay.  Then I won't permit that exhibit,

16   either.

17             MR. CARACAPPA:  Thank you, Your Honor.

18             MR. BUCKLEY:  Thank you, Your Honor.

19             THE COURT:  All right.  All right.  Then let's take

20   our recess.  We'll probably come back at 3:30.  All right?

21             MR. CARACAPPA:  Yes, Your Honor.

22             THE COURT:  All right.  We're in recess.

23             (Recess from 3:17 p.m., until 3:34 p.m.)

24                       (Jury out.)

25             THE COURT:  All right.  Are we ready for our jury?

C. Rucinski - Direct                                           1549

1            MR. BUCKLEY:  Yes.

2            THE COURT:  All right, Greg, would you get our jury,

3    please, sir?

4                         (Jury present.)

5            THE COURT:  All right, please be seated.

6            Mr. Buckley, next witness?

7            MR. BUCKLEY:  Your Honor, the defense calls

8    Christopher Rucinski.

9            THE COURT:  All right.

10      CHRISTOPHER THOMAS RUCINSKI, DEFENDANTS' WITNESS, SWORN

11                        DIRECT EXAMINATION

12   BY MR. BUCKLEY:

13   Q.   Good afternoon, Mr. Rucinski.  Are you situated there?

14   A.   I am.

15   Q.   Can you please state your full name for the record?

16   A.   My full name is Christopher Thomas Rucinski.

17   Q.   And can you tell the jury what you were asked to do in

18   this case?

19   A.   What I was asked to do in this case was evaluate the

20   reliability of both the Rightscorp system and the notices that

21   that system generated.

22   Q.   And you performed that work?

23   A.   I did.

24   Q.   And you reached opinions about the reliability of the

25   Rightscorp system of notices?

1    A.    Yes, I did.

2    Q.    Let's start talking a little bit about your background.

3    Could you tell the jury your education, please?

4    A.    Sure.  So for my undergraduate degree, I got a computer

5    science bachelor's from Princeton University, and then in 2015,

6    I was certified as a forensic examiner through the GIAC, which

7    is the, I think, Global something Assurance.  There's an

8    acronym to look up for that.

9    Q.    And be sure to keep your voice up so the jury can hear

10   you.

11   A.    Sure.  Thank you.

12   Q.    And, I'm sorry, you said your degree was in?

13   A.    It is in computer science.

14   Q.    Are you a coder yourself?  Do you do any software coding?

15   A.    Yeah, a lot.

16   Q.    Can you tell the jury about that?

17   A.    Sure.  Most of the software development that I've done has

18   been in the Java programming language.  In fact, the earliest I

19   was programming in Java was in high school, where I took a few

20   computer science classes there, and then a lot of casework that

21   I've done in my employment has also been in Java, and I've had

22   some other employment related to Java programming as well.

23   Q.    Okay.  And since you mentioned your employment, could you

24   give us a brief overview of your job history?

25   A.    Sure.  So one company I worked at where I programmed in

C. Rucinski - Direct                                              1551

1   Java was a startup called Scvngr, and their whole game was that

2   they wanted to make a scavenger hunt so you could play on your

3   smartphone, so there I was developing an Android app.  Android

4   apps are programmed to Java.

5            Immediately after graduating from college, I started

6   working at Elysium Digital, which is a litigation consulting

7   firm, so we support all sorts of litigation and pre-litigation

8   matters where there's some aspect of technology involved.

9            Elysium Digital was then acquired by a company --

10  this year by a company called Stroz Friedberg, and they do a

11  similar sort of thing.  They're more on the side of sort of

12  collecting artifacts from computers, where a sample case that

13  they might do is where an employer thinks an employee has

14  stolen information from them upon their departure, and they

15  will analyze the artifacts that were on that employee's laptop

16  to demonstrate what actually occurred on that laptop.

17           Stroz Freidberg acquired Elysium mostly for their

18  patent practice, which is something that they didn't really do.

19  Q.   So let me take you back for a minute.  So you said you

20  joined Elysium in what year?

21  A.   That was in 2010, after I graduated from college.

22  Q.   Okay.  And when you were at Elysium, what were your

23  general responsibilities?  What did you do in your job?

24  A.   Well, generally, it was all sorts of casework.  For the

25  most part, it was reviewing source code that was at issue in

1    some sort of litigation.  So a lot of that was patent

2    litigation, so if one company sued another over potential

3    patent infringement, we would get source code for whichever

4    side we were working for and evaluate or help the attorneys to

5    come to an understanding about how the source code related to

6    the patents in that case.

7    Q.    Okay.  And then you said Elysium was acquired by Stroz

8    Friedberg when?

9    A.    That was in, that was August 1 of 2015.

10   Q.    And did your responsibilities or job duties change after

11   the acquisition?

12   A.    For the most part, they stayed the same.  I did receive a

13   promotion to director at that point in Stroz Friedberg, and I

14   acquired two more direct reports after that.

15   Q.    How many direct reports do you have today?

16   A.    Currently, I have eight.

17   Q.    And can you describe generally what does your team do?

18   What do the members of your team do?

19   A.    Sure.  So two of them, their background is more related to

20   artifact collection.  That's sort of the general line of work

21   that Stroz Friedberg was in before they acquired Elysium.  So

22   most of their work is related to imaging laptops, like,

23   acquiring information from laptops and figuring out what

24   happens over some period of time.

25           The other six of my direct reports have a background

C. Rucinski - Direct                                                              1553

1   more similar to mine, which is strictly computer science, and

2   their work is mostly geared towards source code analysis.

3   Q.   Mr. Rucinski, what do you consider your expertise?

4   A.   I consider my expertise to be in computer software code

5   and data analysis as well as forensic evidence collection.

6   Q.   And do you have experience in other cases that are similar

7   to this one?

8   A.   Sure.  There's a number of cases I've worked on where Java

9   source code has been the primary issue in the case or the

10  primary analysis that I have performed.  A lot of those cases

11  have related to source code for Android applications in the

12  Android system, which itself has a lot of Java components in

13  it.  Some of those cases have also involved JSP, which is sort

14  of Java code that runs on a server, and there were probably

15  between 10 and 15 of those, such cases that I worked on.

16  Q.   Mr. Rucinski, you and I have the same problem, which is

17  our voices trail off, so can you keep your voice up so we can

18  make sure the jury is hearing you?

19  A.   Sure.  Can I adjust this?

20  Q.   Thank you.  You're also tall, which doesn't help.  Thank

21  you.

22          If I could, I'd like to show the witness what we've

23  marked as DTX 3481.

24          Can you look at what we've marked at DTX 3481 and

25  tell me if you've seen that before?

C. Rucinski - Direct                                                      1554

1   A.    I have.

2   Q.    What is it?

3   A.    It appears to be my up-to-date CV.

4   Q.    And I was just going to ask, it's up to date?  It's

5   current?

6   A.    Yes, I believe it is.

7          MR. BUCKLEY:  We'd offer it into evidence, Your

8   Honor.

9          THE COURT:  Any objection?

10         MR. CARACAPPA:  No objection, Your Honor.

11         THE COURT:  It's received.

12  BY MR. BUCKLEY:

13  Q.    Can you describe generally the materials that you reviewed

14  as part of your work in this case?

15  A.    Sure.  So these materials include the Rightscorp source

16  code that was produced, the data that was produced from

17  Rightscorp.  I also reviewed deposition transcripts and

18  transcripts from this trial.  I also attended three depositions

19  for this case:  the second deposition of Mr. Boswell, the

20  second deposition of Mr. Steele, and the deposition of

21  Ms. Frederiksen-Cross.  I believe I also saw briefs that were

22  exchanged between the parties over the course of this

23  litigation and other documents related to the case.

24  Q.    Do you know how, approximately how many hours you have

25  personally spent analyzing the Rightscorp code and data?

1   A.    Personally?  I think that would be around 300 hours.

2   Q.    And how about other members of your team?

3   A.    So there were two other people that assisted me in my work

4   on this case.  One was named Scott; one was Rafiq.  They both

5   spent probably 200 hours.  That's 200 hours each.

6   Q.    In addition to the work that you did?

7   A.    That's correct.

8          MR. BUCKLEY:  Your Honor, at this time, we'd offer

9   Mr. Rucinski as an expert in computer source code and data

10  analysis and digital evidence collection.

11         THE COURT:  Any objection?

12         MR. CARACAPPA:  Computer source code we don't have a

13  problem with, Your Honor.  Data analysis and digital evidence

14  collection, I'm not sure I heard enough.

15         THE COURT:  All right, why don't you ask him about

16  that, data collection.

17         MR. BUCKLEY:  Certainly.

18  Q.    So, Mr. Rucinski, can you talk a little more about your

19  experience with data analysis specifically?

20  A.    Data analysis specifically.  So one of the program

21  languages I'm familiar with is SQL, which is also a program

22  language that is at issue in this case.

23         THE COURT:  I'm sorry, what was the name of the

24  program?

25         THE WITNESS:  It's a programming language called SQL.

C. Rucinski - Direct                                                          1556

1    It's spelled S-Q-L.

2             THE COURT:  Okay.  I saw it in your resume.  Okay.

3             THE WITNESS:  So that's where most of my data

4    analysis experience comes from.

5    BY MR. BUCKLEY:

6    Q.    Okay.  And what does the term "data analysis" mean to you?

7    A.    Sure.  So I guess I would distinguish it from source code

8    analysis because source code analysis is really figuring out

9    how a software system operates, and data analysis is more

10   looking at data that already exists and figuring out, you know,

11   what sort of conclusions you can draw from that data and how

12   that data is related or intended to be used.

13   Q.    And did the work that you did at Elysium for five years,

14   did it relate at least in part to data analysis?

15   A.    Yeah.  I've used SQL on other cases as well, for instance.

16   Q.    And your current responsibilities, is data analysis a part

17   of those responsibilities?

18   A.    Yeah.  As it comes up on cases, that's something I would

19   do.

20   Q.    And that's something you did in this case, right?

21   A.    Absolutely.

22   Q.    How about digital evidence collection?  Can you speak to

23   that in your experience?

24   A.    Sure.  So the certification I received in 2015, that was

25   mostly related to artifacts on Windows computers, but a

C. Rucinski - Direct                                              1557

1  substantial part of that certification material related to how

2  to preserve evidence from computer systems and the appropriate

3  actions to take when dealing with that evidence and handing it

4  off to different parties.

5  Q.   And I think you spoke to this, but can you give an example

6  of the type of engagement you might be retained for that would

7  involve digital evidence collection?

8  A.   Sure.  So the example I gave earlier was, say, an employee

9  leaves an employer on not the best terms and the employer

10  thinks that employee had stolen data.  So one thing they might

11  do is hire the company that I work for to figure out based on

12  the artifacts, like the files and other information that are

13  still left on that employee's computer, what actually happened

14  over time, and just reconstruct sort of a timeline of what we

15  can gather from that information.

16  Q.   And your current responsibilities in the engagements you

17  work on involve those sorts of issues, right?

18  A.   Yeah.  I'm managing at least one case, maybe two, I guess,

19  right now where two of my direct reports are doing different --

20  they're performing different sorts of work for cases just like

21  that where there's an issue where we're imaging employee

22  laptops, where we're collecting the data off those laptops and

23  figuring out what that data actually means.

24        MR. BUCKLEY:  Your Honor, we re-offer Mr. Rucinski.

25        THE COURT:  All right.  Any objection now?

C. Rucinski - Direct                                              1558

1          MR. CARACAPPA:  No objection, Your Honor.

2          THE COURT:  All right.  He'll be permitted.

3          MR. BUCKLEY:  Thank you.

4          THE COURT:  I was wrong about that term of that

5    software.  I was looking at a different word in your resume,

6    which is S-c-v-n-g-r.

7          THE WITNESS:  Oh, yeah.  That's Scvngr.  It didn't

8    have any vowels in its name.

9          THE COURT:  Okay.  All right.

10   BY MR. BUCKLEY:

11   Q.   So just so the jury knows what we're talking about, this

12   is the app company that you worked for that you referenced?

13   A.   Yeah, this is the startup I worked for.  That was an

14   internship after junior year of college.

15   Q.   And Scvngr is spelled without any vowels?

16   A.   Yes.

17         THE COURT:  I'm sorry for that aside there.

18         MR. BUCKLEY:  Okay.  It's interesting.

19         THE COURT:  I had been mistaken.  Go ahead.

20         MR. BUCKLEY:  Thank you, Your Honor.

21   Q.   So, Mr. Rucinski, let's talk about -- you said you

22   reviewed the Rightscorp code in this case, right?

23   A.   I did.

24   Q.   Okay.  Let's talk about your receipt of the Rightscorp

25   code.  So first of all, when were you first engaged in work in

1    this case?

2    A.    That would be April of 2015.

3    Q.    And when did you first receive portions of the Rightscorp

4    code?

5    A.    The first time we received source code from Rightscorp

6    would have been at the end, or towards the end of May 2015.

7    Q.    2015?

8    A.    2015.

9    Q.    And when you received that first portion of the code, what

10   did you conclude from it?

11   A.    So the first conclusion was after having looked at it, we

12   didn't have a complete system to analyze.  There were

13   references to other files that I understood would be important

14   to the system, and so what I did was through counsel asked

15   Rightscorp to produce more source code so that I could conduct

16   a full analysis of their system.

17   Q.    And did you receive additional source code?

18   A.    Over the next about six or seven weeks after that, we

19   received different portions of the Rightscorp source code over

20   time, where it was sort of an iterative process where we would

21   receive some more and then notice that perhaps we needed some

22   more to do a complete analysis, and we'd receive another drop

23   of code after that.

24            So over the course of six or seven weeks, we received

25   about a half-dozen or so source code productions.

1   Q.    Did you say about a half-dozen?

2   A.    About a half-dozen.

3   Q.    Did you ever receive a full version of the Rightscorp

4   code?

5   A.    I wouldn't say that I have.

6   Q.    And can you explain that?

7   A.    Sure.  So I think -- like, when I think of a version of

8   source code, I'm thinking of something like Windows 7 or

9   Windows 10.  It's a software product that has, has a number

10  associated with it where we know -- thank you -- where we know

11  that that software was operative for some period of time.

12          So for the Rightscorp system -- first of all, there's

13  no such notion as a Rightscorp 1.0 or Rightscorp with any

14  number after it.  So the source code that I received in 2015

15  was over the course of six or seven weeks, and I will

16  acknowledge that it seems like for each source code production

17  I got, that seemed to be the source code that was operative at

18  that time, but all together over the course of six or seven

19  weeks, I don't have a snapshot of the Rightscorp system to

20  analyze.

21  Q.    In your experience, is the way you received the Rightscorp

22  code, is that typical?

23  A.    I wouldn't say it's typical.  Depending on the case,

24  sometimes we get a whole version produced all at once.  Other

25  times we will sometimes get a partial production and then get

C. Rucinski - Direct                                          1561

1    multiple productions after that, but even in that case, the

2    additional source code we get is related to a specific version

3    of the system.  So even though we get it over time, we can say

4    that that source code was related to this version that operated

5    over a certain time period or a specific point in time.

6    Q.   And do you know whether the Rightscorp source code changed

7    over time?

8    A.   My understanding is that it did.

9    Q.   And what's that based on?

10   A.   Mostly -- well, it's based on two things.  The first is

11   that I also received some source code production from

12   Rightscorp that related to the operation of the system in 2013,

13   but I've also seen deposition transcripts from Mr. Boswell,

14   who's Rightscorp's lead developer, who stated something to the

15   effect that he was changing the source code on a daily basis as

16   he was developing it.

17   Q.   So given the way you received the source code, were you

18   able to analyze the entire Rightscorp system?

19   A.   The only way I was able to analyze the system was by

20   granting the favorable assumption that, for instance, for the

21   2015 production, that all that code operated together at one

22   instant in time.

23   Q.   And again, that's just an assumption.  You don't know

24   that?

25   A.   I don't know that, and my understanding is I can't know

C. Rucinski - Direct                                              1562

1   that because there are no historical versions that have been

2   preserved.

3   Q.   And the code that you received in June and July of this

4   year, was that everything you needed to see to analyze the code

5   or to analyze the system?

6   A.   It was not.

7   Q.   Were there other things you requested?

8   A.   Yeah.  In particular, there were a few database tables

9   that I wanted to see because those database tables held the

10  actual records that were generated by the software, and so in

11  order to verify that the software is working correctly, I

12  wanted to see some of those tables.  I did get some, but I did

13  not get all the tables that I requested.

14  Q.   And in addition to the 2015 Rightscorp code that you've

15  talked about, did you receive any older portions of the

16  Rightscorp code?

17  A.   Yes.  I think I alluded to that a bit earlier.  There was

18  a production, I believe I received it around July 15 or 16, and

19  that production was related to two partial versions of the

20  Rightscorp system in 2013.

21  Q.   And when did you -- you issued an expert report in this

22  case, an initial expert report, right?

23  A.   I did.

24  Q.   And what was the date on that?

25  A.   I submitted that on July 10, 2015.

C. Rucinski - Direct                                              1563

1    Q.    And when did you receive this -- these pieces of the older

2    code that you just talked about?

3    A.    I believe it was on July 15 and 16, so five and six days

4    after.

5    Q.    And then did you subsequently issue a supplemental report?

6    A.    I did, yes.

7    Q.    And what was the date on that?

8    A.    That was submitted on July 31, 2015.

9    Q.    So the code related -- the 2013 code that you saw, did

10   that tell you how the Rightscorp system operated in 2013?

11   A.    I couldn't tell how the whole system operated based on

12   just that source code.

13   Q.    Can you elaborate on that a bit?  Do you understand the

14   different parts of the Rightscorp system, at least as

15   Rightscorp describes it?

16   A.    Sure.  I can break it down by part.

17   Q.    Please.

18   A.    So the five parts that we've heard about, the first one is

19   related to the actual acquisition from copyrights holders of

20   the songs that the Rightscorp system is going to monitor.  So

21   that's the first part.  My understanding from deposition

22   testimony is that in 2013, that was a manual process, and my

23   understanding is also that there was no documentation of that

24   manual process.

25            The second aspect of the Rightscorp system was that

C. Rucinski - Direct                                          1564

1  upon finding a song in a particular torrent, the Rightscorp

2  system would then try and check if that song was a song that

3  the Rightscorp system thinks it is based on the file name.  My

4  understanding is that in 2013, that process was also a manual

5  process and that there's also no documentation of that process.

6         The third aspect is actually observing behavior on

7  Rightscorp's -- or, I'm sorry -- on BitTorrent's swarms, and

8  there was some source code produced for that.  There was a

9  historical version of Test5.java produced and a few other

10 files.

11        The fourth aspect of the system is the actual

12 generation of notices based on the observations that the

13 Rightscorp system made, and there was no source code produced

14 for that in 2013.

15        And then the final aspect of the system is

16 potentially for some of the notices, downloading actual samples

17 of the files at issue.  For the 2013 production, there was a

18 historical version of the SampleIt2.java produced, but my

19 understanding from deposition testimony is also that that code

20 was not executed in 2013.

21 Q.   Okay.  So the five components you've talked about, how

22 many were represented in the 2013 code?

23 A.   Of those five components, I received source code

24 production for two of them, and for only one of them was that

25 code actually operative at that time.

1  Q.   And did you receive anything else in addition to the

2  historical code you already talked about, any other files or

3  code?

4  A.   Yeah.  There were a few other files that were produced,

5  and they were files that, I understand, again, from deposition

6  testimony from Mr. Boswell, that they were just test files he

7  was using.  So, for instance, there was a file called

8  Test2.java, and that was, my understanding is, his way of

9  exploring the different messages that were sent between peers

10 over the BitTorrent protocol.  And there were other files

11 produced like that as well.

12 Q.   And you described those as test files.  What does that

13 mean?

14 A.   So this is from Mr. Boswell's testimony.  My understanding

15 is that he meant that to mean these were files that wouldn't

16 actually be part of the system but were just for his own

17 exploration to figure out how things worked so that he could

18 potentially incorporate parts of those explorations into the

19 system.

20 Q.   So I want to shift gears and talk about version control,

21 which the jury has heard a little bit about.

22 A.   Okay.

23 Q.   Are you familiar with version control programs?

24 A.   Sure.  The one I'm most familiar with is Git, which is a

25 free, open source version control program.

1  Q.    You were here on Tuesday, and you heard Mr. Boswell

2  testify, right?

3  A.    I did.

4  Q.    And did you hear him reference something called GitHub?

5  A.    Yes.

6  Q.    Are Git and GitHub the same thing?

7  A.    They're not.  So Git is the version control program that

8  you can run in order to keep track of the versions of your

9  software or other documents that you want to maintain different

10 versions of.  GitHub is a Web site that you can post freely any

11 repositories that you have created for Git.  So if you're

12 managing your software in Git, you can then share it with the

13 world, say it's an open source project, over GitHub.

14         But you don't have to use GitHub to use Git.  You can

15 use Git just on your private computer to maintain versions of

16 software that you don't want to share with anybody.  You don't

17 even need to be connected to the Internet to use Git.

18 Q.    Are there benefits to using version control?

19 A.    Yeah.  The primary benefit is that you effectively give

20 yourself a time machine where you can go back in time and see

21 how a previous version of your source code worked in its

22 entirety.

23 Q.    Can you elaborate on that a bit?

24 A.    Sure.  So a reason you might want to do that, for

25 instance, I use Git when I'm doing all sorts of things.

C. Rucinski - Direct                                          1567

1   Whenever I'm maintaining source code, or even for this case, I

2   was maintaining versions of my expert reports in Git as I was

3   writing them.  Just in case, for instance, with the expert

4   report, if I maybe delete a paragraph and realize a few days

5   later, oh, I actually really wanted that paragraph back, I

6   could go back in time and see exactly what paragraph I had

7   written and then extract information out.

8            In terms of software development, one way that this

9   comes up is maybe I see the data that my software is producing,

10  and I look back on it and see, well, gosh, a year ago, there

11  was this data that was produced, and it doesn't seem right.  So

12  I need to figure out why that happened, but I've changed the

13  source code since then, so how can I figure it out?

14           If I'm maintaining my software with version control,

15  I can just go back in time, recreate the system as it was

16  exactly at that point in time, and figure out exactly what the

17  problem was.

18  Q.   Is there any burden to using a version control system?

19  A.   So the first aspect of that is Git is free.  There are

20  other free examples.  There is sort of a bit of an

21  administrative cost to just learning how to use it, but, you

22  know, these are open source programs, and they're designed to

23  be used, so there's a lot of documentation to figure out how to

24  use them.

25           Once you figure out how to actually use them, it

C. Rucinski - Direct                                               1568

1  probably takes you maybe a minute or two per day, and it's just

2  at the end of the day, you say these are the source code files

3  that I've changed, maybe I add a comment about what the changes

4  were that I made, and then you just run the command, and the

5  system takes care of it for you.

6  Q.   It's been suggested that maybe version control is only

7  used for large projects with lots of developers.  Do you agree

8  with that?

9  A.   No.  I've used it for my own personal projects.  For

10 instance, there was an Android application I developed a year

11 or two ago, and that was just me working on that Android

12 application, and I used Git for that project just so I had a

13 record of all the changes that I had made.

14 Q.   Do you use it at Scvngr, with no vowels?

15 A.   Yes.  Yes, I did.  There I was working with one other

16 developer, and at that point in time, I wasn't that familiar

17 with Git, and neither was the guy I was working with, but in

18 the first day or two, the CEO came in and said, guys, we really

19 need to use this because, you know, otherwise, we're just kind

20 of groping in the dark to figure out what we've been doing over

21 time.  So from day one, you need to do this.

22          So we learned how to use Git, and then after we

23 learned how to also develop for the Android framework, we

24 checked in our first versions to get, you know, the first data

25 we started developing.

1    Q.   And did that get in the way of your development work?

2    A.   No.  It actually made it better, and the reason for that

3    was twofold.  The first is that it made -- it forced us to be

4    disciplined about the changes we were making and the

5    documentation about the changes we were making, and also, you

6    know, I did find bugs in my programs that I had made.  I could

7    go back in time and see, well, I had made this assumption when

8    I programmed this file, but now that assumption isn't true any

9    longer, and I can see this change and fix it now.

10   Q.   And you said you used Git in this case, right?

11   A.   I did to maintain versions of my expert reports.

12   Q.   Okay.  Can you think of any reason not to use version

13   control?

14   A.   Well, so I discussed the cost and the benefit.  In my

15   opinion, the cost of using a version control system is trivial,

16   and the benefit is that you get a really easy way to maintain

17   versions of whatever documents that you're working on.  So the

18   only reason I can think of is if you didn't value maintaining

19   versions of whatever documents you're maintaining.

20   Q.   All right.  So let's shift gears again.  Let's talk about

21   Rightscorp's system and your opinions with respect to the

22   system.  What's your understanding of the number of Rightscorp

23   notices that are now at issue in this case?

24   A.   Now at issue in this case?  I believe there are about 1.8

25   million notices at issue.

1   Q.    And when were those notices sent, approximately?

2   A.    I believe they were sent in the time span between February

3   2012 and November 2014.

4   Q.    And you understand that November 2014 is when the lawsuit

5   was filed?

6   A.    Yes, that's my understanding.

7   Q.    In your expert opinion, Mr. Rucinski, are there issues

8   with the reliability of the Rightscorp notices?

9   A.    Yes.

10  Q.    Can you describe those?

11  A.    Sure.  The first issue is that, as I've alluded to, we

12  don't have the source code for -- we don't have one version of

13  the source code for any of the notices over this time period

14  from February 2012 to 2014.  So there's a record of some of

15  those notices, but I can't tell you exactly how they were

16  generated.  In particular, I mean, the source code I received

17  in 2015, which is the most complete version of the Rightscorp

18  system over some period of time, is outside of this time span

19  from 2012 to 2014.

20  Q.    And that affects all 1.8 million notices, right?

21  A.    Yes, it does.

22  Q.    So other than what you've just talked about, are there

23  other issues that affect the reliability of the notices?

24  A.    Yes.  So for approximately 1.4 million of the 1.8, the

25  only information that the Rightscorp system obtained from peers

1    and BitTorrent swarms was information about the bitfield, which

2    is a way for a peer to represent to another peer which pieces

3    of the torrent payload they currently possess.

4    Q.    And so -- and the reliability issue is that the system

5    only collected information from the bitfield?

6    A.    Right.  It collected nothing more than that.

7    Q.    Can you elaborate on that?

8    A.    Sure.  Maybe I could give a refresher quickly about how

9    BitTorrent works?

10   Q.    Please.

11   A.    Okay.  So let's suppose that I run a BitTorrent program on

12   my computer and I connect to the swarm.  And recall that the

13   swarm is just a collection of peers that are potentially

14   sharing parts of files for a particular torrent payload.

15        So when my peer enters the swarm, the first thing it

16   gets from each of the other peers is a bitfield, and that

17   bitfield represents which pieces of the torrent payload the

18   other peers have.  Now, you might think that's a little weird

19   that you just get the bitfield at the beginning.  If those

20   peers get additional pieces of the torrent payload, they can

21   send another message over the BitTorrent protocol called a has

22   message, indicating which piece they have just acquired.

23        So after my peer has entered the swarm, there are

24   potentially many peers in the swarm.  So now my peer has to

25   figure out which other peers it wants to communicate with and

C. Rucinski - Direct                                                1572

1    potentially share files.

2          So, for instance, my peer might see that this other

3    peer, based on the bitfield, has a lot of pieces that I don't

4    have, so maybe I want to communicate with that peer.  Maybe it

5    sees a second peer and I see that my peer has a lot of pieces

6    that that peer doesn't have, so maybe I want to communicate

7    with that peer because it can benefit from talking with me.

8          So the way this happens is my peer would express

9    interest in a particular peer and say, hey, I want to share

10   some pieces of the file with you, and that peer might respond

11   and say, okay, let's share pieces.

12   Q.   So you're talking about peers and communicating and

13   sharing.  It sounds like you're talking about people doing

14   this.

15   A.   Right.  So the analogy -- it's easier to sort of explain

16   with people, but obviously, it's just computers communicating

17   with one another on the network.

18   Q.   And so in the scenario you've just described, can a peer

19   indicate that it is not willing to share?

20   A.   Sure.  In fact, sort of the BitTorrent lingo, there's a

21   word for that called a leecher, and that's a peer that only

22   endeavors to receive pieces but never share with anybody else

23   in the swarm.

24   Q.   And is Rightscorp a leecher?

25   A.   Yeah, by definition.  Their system only collects pieces of

C. Rucinski - Direct                                           1573

1   files from the swarm.  It only downloads, and it never uploads

2   any pieces to other peers in the swarm.

3   Q.   All right.  So thank you for the refresher.  It was good

4   for me, too.

5          So when we go back to -- going back to the issue of

6   the reliability of the Rightscorp notices, how does that play

7   into the reliability issues you identified?

8   A.   Sure.  So I had said that for 1.4 million of those 1.8

9   million notices, the issue was that nothing more was collected

10  than the bitfield.  So one additional piece of information that

11  could have been collected was the message from those peers that

12  indicated that they wanted to share.

13         The messages over the BitTorrent protocol for this,

14  like for my peer, if I express interest in another peer in

15  sharing with them, I send an interested message, and then that

16  peer can reciprocate and send an unchoke message, which

17  indicates that it's willing to give me pieces.

18         So the Rightscorp system could have maintained

19  records of those unchoke messages from peers, but it stopped at

20  just getting the bitfield information.

21  Q.   How difficult would it have been for the Rightscorp system

22  to take that extra step?

23  A.   Well, it's just, it's just one extra step.  I don't think

24  it would be very difficult at all.  In fact, as I alluded to

25  earlier, there was some experimental test code that had been

C. Rucinski - Direct                                              1574

1    produced from the 2013 period, and that code actually had all

2    of the BitTorrent messages laid out, and so really it would

3    just be adding stuff to the system that says after I get the

4    bitfield, let me just wait around a little bit longer, express

5    some interest in the peer, and see it if reciprocates, and they

6    can record that action.

7    Q.   And that extra step would just confirm that the peer was

8    actually willing to share what it had?

9    A.   Yeah, that's what it would confirm.

10   Q.   If you were asked to write code for that step, could you

11   do it?

12   A.   Sure.  Java is my most proficient programming language,

13   and the system is written in Java, so yeah.

14   Q.   How long would it take you?

15   A.   Well, I'd probably spend about a day just sort of

16   experimenting and making sure I understood how things worked.

17   Then maybe I'd spend another day or two coming up with sort of

18   a prototype system, and then after that, I'd probably test it

19   for another day or two, and I'd do the testing sort of separate

20   from the system in operation just as good practice.  Then after

21   I tested it, I would spend probably a day just polishing it up

22   and making sure that it was really ready for the production

23   environment.

24        So all in all, I guess it's about a week.

25   Q.   All right.  So you -- again, back to your testimony that

C. Rucinski - Direct                                                    1575

1    for 1.4 million of the notices, the system just collects

2    information from the bitfield.  What other steps could it have

3    taken other than what you've just identified?

4    A.   So the other step that the Rightscorp system could have

5    taken for those notices is to also actually download a file

6    from the peer that it had identified.

7    Q.   And is that what's been referred to as the SampleIt2

8    function?

9    A.   Yes.  In the Rightscorp system, that is programming -- or

10   a file that has source code in it that's purpose is to download

11   specific files at specific torrent payloads for specific peers.

12   Q.   And when do you understand that Rightscorp started

13   sampling?

14   A.   I believe at least related to the issues in this case,

15   that happened in February -- or started in February 2014 and

16   ended in August 2014.

17   Q.   And do you know if there was any sampling in 2012?

18   A.   My understanding is that there was not.

19   Q.   Do you know if there was any sampling in 2013?

20   A.   My understanding is that there was not then, either.

21   Q.   The sampling that you have seen that did occur, were there

22   issues with the sample?

23   A.   Yeah, there were.

24   Q.   Can you talk about that?

25   A.   Sure.  So the first issue is recall that the sampling

C. Rucinski - Direct                                              1576

1    occurred in the 2014 time period, and I have no production of

2    any source code from the Rightscorp system during that time

3    period, so I can't evaluate how those samples were created even

4    if I have some sort of record that indicates some information

5    about them.

6    Q.   Are there any other issues you observed with the sampling

7    that Rightscorp did?

8    A.   Sure.  So Rightscorp produced some of the samples to me,

9    and I found some errors in the samples.  In particular,

10   sometimes the Rightscorp system would think that it would be

11   downloading a music file, but it instead would grab a file that

12   wasn't a music file.  So it would grab a PDF or an image and

13   associate it with that music file.

14   Q.   How many examples did you see of that issue?

15   A.   So I found approximately 800 examples where the Rightscorp

16   system would have been expected to download a music file but it

17   downloaded some other type of file.

18   Q.   And do you know if any of those misidentified files

19   resulted in notices being sent?

20   A.   Sure.  So there is one example of an image that I found

21   where that image was actually downloaded 11 times.  It was for

22   the same file in the same torrent payload, but related to that

23   specific file in that specific torrent payload, there were 190

24   notices generated.

25   Q.   So this was an image that was misidentified as a song?

C. Rucinski - Direct                                          1577

1   A.   Right.   The system was designed to download a song to

2   verify this observation of potential infringement and instead

3   downloaded an image.

4   Q.   Did you identify any other issues with the sampling that

5   Rightscorp did?

6   A.   Yes.   So in the samples that Rightscorp produced and the

7   samples that they have cited that are still at issue in this

8   case, there's a number of samples that are redundant, and what

9   I mean by that is they really only need to download a single

10  sample for each observation of a file in a particular torrent

11  payload, but sometimes they downloaded multiple samples from

12  that particular instance because the software is sort of

13  designed to just pick some of those records to download from,

14  and sometimes it downloads more than once.

15        So all in all, there were approximately 9,000 such

16  redundant samples that were downloaded.

17  Q.   All right.   So we've talked now about sampling.   Are there

18  any other reasons to question the reliability of the Rightscorp

19  notices in your opinion?

20  A.   Yes, there are.

21  Q.   Can you elaborate?

22  A.   Sure.   I think the 10 percent bitfield functionality has

23  already been discussed, so that's, that's really the issue

24  there.

25  Q.   Yeah.   So the jury has heard a little bit about the 10

C. Rucinski - Direct                                                    1578

1    percent bitfield, but could you explain what it means?

2    A.   Sure.  So I already explained how the Rightscorp system

3    looks at the bitfields that are returned from the different

4    peers, and when the system does this, it always maintains a

5    record for each bitfield even if that bitfield in the version I

6    already discussed, even if that bitfield has less than 100

7    percent of the pieces represented.

8           So the 10 percent functionality looks back at those

9    records, and for the records that indicate that as little as 10

10   percent of the bit- -- sorry, of the torrent payload was

11   represented in the bitfield, then the system will flag those

12   particular peers as notices should be sent out to those peers.

13   Q.   Would it help to see a slide as we're talking about this

14   to illustrate it?

15   A.   Sure, yeah.

16   Q.   Can we get slide 1, Michael, please?

17          So, Mr. Rucinski, this was a slide that was actually

18   prepared by plaintiff's expert, Ms. Frederiksen-Cross?

19   A.   Yes.

20   Q.   And you've seen it before?

21   A.   I have, yeah.

22   Q.   What does this slide show?

23   A.   So generally the slide shows a swarm, where there are

24   multiple peers in the swarm, and you can see that different

25   peers in the swarm have different percentages of the torrent

C. Rucinski - Direct                                          1579

1   payload.  So, for instance, peer 2, it has two of the sort of

2   quadrants filled in for the green music symbol there, so it has

3   50 percent of that torrent payload, or has represented that.

4            Peer 3 represents that it has 100 percent of the

5   torrent payload, and, for instance -- did I say peer 6?  I

6   meant peer 3 over there.  But peer 6 has 25 percent of the

7   BitTorrent payload represented in the bitfield.

8   Q.   And peer 3 has 100 percent?

9   A.   I'm sorry, peer 3, yeah, does have 100 percent.

10  Q.   So if the 10 percent threshold is turned on in the

11  Rightscorp system, which peers on this diagram will be

12  identified as infringers?

13  A.   So it would be all the peers in this diagram, and that's

14  because each and every one of these peers possesses at least 10

15  percent of the BitTorrent payload as represented in the

16  bitfield that it sends to the Rightscorp system.

17  Q.   And the Rightscorp system will send notices to all of

18  these peers?

19  A.   Yes, after it makes that observation.

20  Q.   But it's possible, isn't it, for the torrent payload to

21  include not just copyrighted songs, but other things, too?

22  A.   Sure.  So torrent payloads can contain any sorts of files.

23  It can contain music or texts or PDFs or images or movies.  It

24  can also, you know, I think an example that maybe has been

25  already brought up in this case is discographies of music can

C. Rucinski - Direct                                          1580

1    be shared as well.

2             So the issue here is that if you look at peer 6, even

3    though the Rightscorp system will check whether it has at least

4    10 percent of the bit-, 10 percent of the bitfield representing

5    10 percent of the torrent payload, it doesn't check whether

6    those pieces of the torrent payload correspond to the files

7    that are at issue that the Rightscorp system is trying to

8    monitor.

9             So even in the case of a discography, if the

10   Rightscorp system is only looking to monitor certain songs,

11   there's a possibility that it will generate notices for a peer

12   that has never represented that it had any of those songs in

13   the torrent payload.

14   Q.   So for peer 6, it has more than 10 percent.  It's got 25

15   percent of the payload, right?

16   A.   That's right.

17   Q.   It will be identified as an infringer, right?

18   A.   Yes.  If the 10 percent functionality is turned on, yeah.

19   Q.   Even if no part of that 25 percent corresponds to a

20   copyrighted song?

21   A.   The Rightscorp system does not check that, so yes.

22   Q.   What if there's more than one copyrighted song in the

23   payload?  How does that affect notices?

24   A.   Sure.  So when a peer is identified as a peer that notices

25   should be sent to, there's one notice sent for each song that

C. Rucinski - Direct                                                    1581

1   is monitored in the torrent payload.

2   Q.   Again, even if the portion that peer has doesn't

3   correspond to any of those songs?

4   A.   That's right.  And the 10 percent example, if that's

5   turned on, that would be the case.

6   Q.   All right.  So when the 10 percent is turned on, what's

7   the ultimate effect of that?

8   A.   Overall, it means that more peers will be identified as

9   peers that notices should be sent to, so more notices will be

10  sent.

11  Q.   More notices will be sent?

12  A.   More notices, yeah.

13  Q.   How many more?

14  A.   I can't say for sure.  It could be a lot.  I don't know.

15  Q.   In your expert opinion, does the 10 percent -- how does

16  the 10 percent threshold affect the reliability of the

17  Rightscorp system?

18  A.   Well, it makes it less reliable.  That's a pretty good

19  reason why -- I mean, if people are getting notices for songs

20  that they never represent anything about possession, that makes

21  the system unreliable.

22  Q.   Could Rightscorp have confirmed that the 10 percent in the

23  bitfield corresponds to a copyrighted work or song?

24  A.   Sure.  All that information necessary to do that is in the

25  .torrent file that you need in order to connect to the swarm.

1   In fact, that's how certain BitTorrent programs will allow

2   users to select that they want to download only specific files

3   from the torrent payload.

4   Q.   So you can determine which pieces correspond to which

5   songs?

6   A.   Yeah, from the information in the .torrent file.

7   Q.   But Rightscorp system doesn't do that?

8   A.   It doesn't.

9   Q.   Could it have done that?

10  A.   Yeah, it could have.

11  Q.   How hard would that have been?

12  A.   It would not be hard.  In fact, there are already certain

13  portions of the Rightscorp code that I've seen that already

14  make this calculation.  For instance, I think we've talked at

15  least a little bit about the verification sort of songs where

16  the Rightscorp system wants to check that the song that it

17  thinks is in the torrent payload is actually the song that it

18  purports to be.  So in order to do that, it needs to download

19  that specific song from that specific torrent payload, and to

20  do that, it needs to download the specific pieces.

21         So there's already code in the Rightscorp system that

22  says, calculate for me the pieces that correspond to this

23  specific file.

24  Q.   Is that what we've heard referred to as the SampleIt3

25  function?

1    A.    Yes.   That's a file that has that arithmetic in it.

2    Q.    So you could use that same basic function to address the

3    10 percent issue?

4    A.    Yeah.   You just do that same calculation, and instead of

5    downloading the file, you just check if the pieces in the

6    bitfield correspond to that particular file that you're

7    interested in.

8    Q.    How is the 10 percent bitfield implemented?

9    A.    Right.   So I alluded to this a little earlier, and recall

10   that the Rightscorp system maintains a record of each bitfield

11   that it receives, even if that bitfield is -- well, it doesn't

12   matter what percentage.   It always maintains a record of it.

13          So the way the 10 percent is implemented is there are

14   two files.   The first file is FullFileBeing.txt, and this is a

15   file that looks back at the records of the bitfields and then

16   identifies particular bitfields and the peers associated with

17   them that should have a notice or multiple notices generated if

18   the percentage is above 10 percent.

19          There's also a second file which calls that first

20   one.   It calls the 10 percent functionality, and that is

21   basically a way to automate that 10 percent functionality so

22   that it executes approximately every 15 minutes or so.

23   Q.    What is that second file called?

24   A.    I believe it's FullFileFix.txt.

25   Q.    And you said that automates the stored procedure?

C. Rucinski - Direct                                              1584

1    A.    Yeah.  The stored procedure is the 10 percent

2    functionality.  That's the first file I talked about.

3    Q.    Can it also be run manually?

4    A.    Yes.  The 10 percent functionality, the file implementing

5    the 10 percent functionality can also be run manually from sort

6    of a console that a user could use.

7    Q.    Okay.  So the automation of it can be turned on and off?

8    A.    Yeah, that's right.  In fact, I believe Mr. Boswell,

9    Rightscorp's lead software developer, has testified to that.

10   Q.    All right.  So these two files you've talked about,

11   FullFilesBeing and FullFileFix -- I think I have those right --

12   when did you receive those?

13   A.    So FullFileBeing.txt, that's the one I received on July 8,

14   2015.  You recall that's the one that implements the 10 percent

15   functionality.  And that was two days before my first expert

16   report was due.

17          And then FullFileFix.txt that automates the first

18   file, I received that on July 9, the day before my first expert

19   report was due.

20   Q.    And based on the code you had seen up to that point from

21   Rightscorp, did you know those two files existed?

22   A.    I didn't, and that's a little unintuitive, but in the

23   Rightscorp system, there were no reference to these files, and

24   the reason for that is because they were implemented sort of on

25   the side to look back at data that had already been created,

C. Rucinski - Direct                                                    1585

1    and so there weren't any references, and so the only way that I

2    was -- that I became aware of them was from deposition

3    testimony.

4    Q.   Would there have been any way for you to know those files

5    existed?

6    A.   There were no references in the code, so no.

7    Q.   And you understand, Mr. Rucinski, that one of those two

8    files, FullFilesFix, has a date in the file, right?

9    A.   Yes, that's my understanding.

10   Q.   Do you remember what that date is?

11   A.   I believe it's December 2, 2014.

12   Q.   What does that date in the file mean?

13   A.   So that date is interpreted by the database program that

14   runs the automation, so that database program will look at this

15   file and say, okay, is my system clock date after this date?

16   And if so, then I'll run this automation every 15 minutes.

17   Q.   Okay.  So it's just a message to the database?

18   A.   It's, it's an instruction to the database that the

19   database interprets.

20   Q.   Thank you.

21        All right.  So we've talked about the reliability

22   issues you identified with Rightscorp's detection of alleged

23   infringement.  Let's shift now to how those detections turn

24   into notices, okay?

25   A.   Sure.

C. Rucinski - Direct                                               1586

1    Q.    So in the 2015 version of the Rightscorp codes you

2    received, how were the notices generated?

3    A.    So generally the way this happens is recall that the

4    Rightscorp system identifies peers for notices to be sent to,

5    and then for each work that is monitored in that, in the

6    corresponding torrent, it will send one notice per work.

7    Q.    That's for the current -- that's for the 2015 version of

8    the code?

9    A.    For the 2015 version, yes.

10   Q.    How were notices generated during the, what we've called

11   the relevant time period, February 2012 through November 2014?

12   A.    Right.  So I don't know because I've never seen source

13   code that was in production over that time period.

14   Q.    Okay.  So you don't know how notices were generated in

15   2012?

16   A.    I don't.

17   Q.    And you don't know how notices were generated in 2013?

18   A.    No, I don't.

19   Q.    But you said before you did get some files from 2013,

20   right?

21   A.    Right.  There was some source code production in 2013, but

22   none of the files produced related to the generation of the

23   notices.

24   Q.    And you don't know how notices were generated in 2014?

25   A.    No, I don't.

C. Rucinski - Direct                                              1587

1   Q.   Are there reliability issues with how the Rightscorp

2   system sends notices over time?

3   A.   Yeah.  And I think this is best illustrated by an example.

4   So in the 2015 version of the code, so suppose that there's

5   someone who puts a file in, in the torrent and then connects to

6   a BitTorrent swarm, a single file, and then they go on vacation

7   for, say, 30 days.  While they're gone, if the Rightscorp

8   system is monitoring them, that person could potentially

9   receive a notice of infringement each and every day.

10            In the 2015 version, it's true that there's only one

11  notice per day per IP address per file name, but still, you

12  know, on day one, the system checks for a certain circumstance,

13  and then day two observes the same circumstance, sends a second

14  notice, on day three, sends a third.  When that person comes

15  back from vacation, they potentially have 30 notices, each

16  asking for $20, and that's all for observing the same

17  circumstance.

18  Q.   Okay.  So that's how the system currently works, where

19  it's one notice per day?

20  A.   Well, that's the 2015 version that was produced earlier.

21  Q.   I apologize, the 2015 version that you've seen, that's how

22  it works.  It's one notice per day.

23  A.   Yes.

24  Q.   Did it always operate that day?

25  A.   No.  My understanding is it didn't.

C. Rucinski - Direct                                          1588

1   Q.   And how do you know that?

2   A.   I've seen specific notices, specific sets of notices that

3   were generated in 2012 where those notices were sent over the

4   course of one day, and that was to the same peer for the same

5   file from the same torrent.

6   Q.   And did you prepare a slide that helps illustrate that?

7   A.   Yeah, there's an example.

8   Q.   Michael, could we have slide 2, please?

9        What does that slide show, Mr. Rucinski?

10  A.   So this is an example, the particular IP address here is

11  actually from the amended complaint, I believe, and I think it

12  was also mentioned in Mr. Steele's testimony at this trial, and

13  what I'm showing here is -- it's a little difficult for me to

14  see the column heading, so I'll try and refer to them by number

15  as well.  So, for instance, in the first column you are in,

16  this is the torrent hash, so this is the unique identifier for

17  the torrent that's at issue here.

18       The artist is the artist that the Rightscorp system

19  has associated with the file at issue.  The title is the title.

20  The file name is the file name.  The IP address -- thank you --

21  is the IP address of the computer that the notice was sent for.

22  The port is a further identifier for the computer.  The iDate

23  field is the date that the circumstance was observed by the

24  Rightscorp system, and then the e-mail date -- and I apologize

25  for the way this is laid out; these are just the exact columns

1   as they're spelled in the database -- the e-mail date is when

2   the notice was actually sent.

3           So if we could zoom back out?  So you'll see that

4   each of these, what, six rows, the torrent hash is the same,

5   the artist is the same, title is the same, the file name is the

6   same, the IP and port are the same, the iDate is the same, and

7   the e-mail date is the same.  So all six of these notices were

8   sent to the same IP address in the same port for the same file

9   from the same torrent.

10  Q.   On the same day?

11  A.   On the same day.

12  Q.   And do you know when that -- when did that change from

13  doing it this way to the way that it apparently does it today?

14  A.   I don't know because I don't have a record of that change.

15  Q.   Mr. Rucinski, have you analyzed the volumes of notices

16  that Rightscorp sent to Cox over time?

17  A.   Yes, I've taken a look at those as well.

18  Q.   And do you have some slides illustrating that?

19  A.   I do.

20  Q.   I think it's slide 3, please, Michael.

21          What does this slide show?

22  A.   So this first slide, the data that went into creating

23  this, this is for every record of a notice that was sent in the

24  database that I received up until November 26, 2014.  And this

25  was just a cumulative graph over time.  So all of these were

1   sent to Cox from Rightscorp, but there's no further filtering

2   on it.

3   Q.   No further filtering on it?

4   A.   No further filtering.

5   Q.   Could we look at the next slide, please?

6   A.   So this slide is just an overlay of the previous slide,

7   but the green area we have here, this is for the same set of

8   notices.  This is just the notices that were sent from

9   Rightscorp to Cox on behalf of BMG.

10  Q.   Okay.  And this is a little hard to see.  I just want to

11  make sure, what are the numbers on the left side there for

12  people whose eyesight is like mine?

13  A.   Yeah.  So this scale is by 2 million, and the top is 12

14  million.

15  Q.   Thank you.

16          Next slide, please, Michael?

17          And what does this show?

18  A.   So this slide, the data input here, this is also, you

19  know, operating on the same data all the records of the notices

20  except this has been filtered to only include the notices that

21  are associated with the asserted works that are currently in

22  this case.

23  Q.   Next slide, please?

24          So what does this slide show?

25  A.   This slide is a rehash of that first slide, so again, this

1    is all the records of the notices that were sent but no further

2    filtering beyond that, and this is just organized by day rather

3    than cumulatively over time.

4    Q.   There are some pretty significant spikes on this chart,

5    right?

6    A.   Yeah.  There's a few that exceed 100,000 notices on a

7    single day.

8    Q.   100,000 in a day?

9    A.   Yeah, that's right.

10   Q.   And it looks like a number of those are near the end of

11   2014.  Is that right?

12   A.   Yes, that's correct.

13   Q.   Is that right before the lawsuit was filed?

14   A.   That's my understanding, yeah.

15   Q.   Okay.  And the next slide?

16        And what does this slide show, please?

17   A.   So this shows the, sort of the increase in volume that

18   occurred towards the end of 2011, where before this time

19   period, there were generally something on the order of hundreds

20   of notices that were sent, and then it spikes up to this, you

21   know, several thousand thereafter.

22   Q.   Yeah.  And some of these spikes, how many notices does

23   that represent in a day?

24   A.   Yeah.  So there are some spikes where it's over 20,000,

25   for instance.

C. Rucinski - Cross                                                    1592

1    Q.    Thank you.  That's fine for the slides.

2          So, Mr. Rucinski, in summary, in your expert opinion,

3    is the Rightscorp's system reliable?

4    A.    Based on what I've seen, no.

5    Q.    And are the Rightscorp notices reliable evidence of

6    infringement?

7    A.    Again, based on what I've seen, no, I don't think so.

8          MR. BUCKLEY:  Thank you.

9          Pass the witness, Your Honor.

10         THE COURT:  All right, thank you.

11         Mr. Caracappa, cross-examination?

12         MR. CARACAPPA:  Thank you, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. CARACAPPA:

15   Q.    Mr. Rucinski, how are you?

16   A.    Good.  How are you?

17   Q.    We've met before, right?

18   A.    We have.

19   Q.    I took your deposition?

20   A.    Yes, I remember.

21   Q.    Okay.  How much do you make an hour?

22   A.    How much do I make an hour?

23   Q.    Yes.  I'll rephrase the question.  What's your hourly

24   rate?

25   A.    Right.  So the company I work for is compensated at $340

C. Rucinski - Cross                                                    1593

1    an hour for my time on this case.

2    Q.    And that's Elysium Digital?

3    A.    Well, Elysium was acquired by Stroz Friedberg, so I guess

4    it depends on the time period, but the rate that either company

5    was compensated hasn't changed.

6    Q.    Do you know how much Elysium Digital/Stroz Friedberg has

7    been paid for its work on this case to date?

8    A.    I don't know the exact number, but it's probably just a

9    little bit less than $200,000.

10   Q.    Okay.  You submitted an updated CV; is that right?

11   A.    I did.

12   Q.    Okay.  And you graduated from college in 2010; is that

13   right?

14   A.    That's correct.

15   Q.    Five years ago?

16   A.    Yeah.

17   Q.    Okay.  The code at issue in this case is Java and SQL,

18   right?

19   A.    Yeah.  I guess JSP -- I mean, you could consider that a

20   subset of Java, but generally, those are the languages

21   involved.

22   Q.    JSP, okay.

23   A.    Yeah.

24   Q.    And you have about ten years' experience with Java/JSP?

25   A.    Yeah, writing and analyzing.

1    Q.    Have you ever written any articles on Java?

2    A.    No, none that were published.

3    Q.    Or JSP?

4    A.    No.

5    Q.    Or SQL?

6    A.    No.

7    Q.    Have you ever written any articles on code?

8    A.    None that were published.

9    Q.    Have you ever written any articles on evidence collection?

10   A.    No, none that were published.

11   Q.    I believe you said you received something, my notes are

12   unclear, the certificate of digital evidence collection in

13   2015; is that right?

14   A.    Yeah.  That was in April.

15   Q.    In April.  Is that before you were retained or after you

16   were retained?

17   A.    That was before.

18   Q.    Before.  How long before?

19   A.    I don't remember.  I mean, I was retained at the end of

20   April, and the certification was around the end of April, also.

21   Q.    So you received --

22   A.    So it was probably about the same time actually.

23   Q.    About the same time?

24   A.    Yeah.

25   Q.    Okay.  You were retained by Cox's counsel in this case,

C. Rucinski - Cross                                                      1595

1  right?

2  A.    Yeah, by Fenwick & West.

3  Q.    And you were retained to rebut Ms. Frederiksen-Cross's

4  opinions that the Rightscorp system was accurate and reliable,

5  correct?

6  A.    I mean, that's generally true, but in April, that report

7  hadn't been issued, so we were just retained to work on the

8  case.

9  Q.    Okay.  In connection with that engagement, you prepared

10 two reports, I think you testified to?

11 A.    That's correct.

12 Q.    And Cox's counsel assisted you with preparing those

13 reports, right?

14 A.    Yeah.

15 Q.    Ms. Frederiksen-Cross opined on the Rightscorp system and

16 how it worked, right?

17 A.    She did.

18 Q.    And when it comes to that system, you and

19 Ms. Frederiksen-Cross actually agree on a fair amount, right?

20 A.    Yeah, we agree on certain things.

21 Q.    You agree generally on how Test5.java works, right?

22 A.    Yeah.

23 Q.    You agree that sometime during the relevant time period,

24 the process was manual, right?

25 A.    I'm sorry, the process?

1  Q.    Strike that.

2          You talked about the Rightscorp system as in five

3  parts, right?

4  A.    Yeah, I characterized it that way.

5  Q.    And that's how Ms. Frederiksen-Cross characterized it,

6  too, right?

7  A.    That's why I characterized it as five parts.  That would

8  be easier to understand.

9  Q.    And also Mr. Boswell, right?

10  A.    I was only here for part of his testimony, so I'm not

11  sure.

12  Q.    Were you here for Ms. Frederiksen-Cross's testimony?

13  A.    I was not.

14  Q.    You talked about the source code production, right, and

15  how it was produced over various times throughout the discovery

16  period; is that right?

17  A.    That's right.

18  Q.    And that was because oftentimes, you said you needed

19  additional code, right?

20  A.    Well, when we asked for more production, more code was

21  produced, but not necessarily as part of the same version we

22  had previously received, yes.

23  Q.    You don't have any indication that Rightscorp

24  intentionally withheld code from you, do you?

25  A.    No, I can't say they intentionally withheld anything.

C. Rucinski - Cross                                                    1597

1    Q.   Okay.  So if Rightscorp had the code, it's your

2    understanding they gave it to you, right?

3              MR. BUCKLEY:  Your Honor, it requires him to

4    speculate as to what they had.

5              THE COURT:  Sustained.

6    BY MR. CARACAPPA:

7    Q.   Okay.  You compared the Rightscorp system to Windows 7 and

8    Windows 10, right?

9    A.   Well, I compared it in that it was different because there

10   was no established version for any period of time.

11   Q.   But the Rightscorp system is not really like a Windows, is

12   it?  I mean, you can't buy it in a box at Home Depot, right?

13   A.   Well, you can't, but it's a software system, and even

14   software systems that are maintained internally can have

15   version numbers.

16   Q.   It's a software system that is developed and written using

17   XPS software; is that right?

18   A.   I'm sorry, XPS software?

19   Q.   Yes.  Have you ever heard of that?

20   A.   Are you referring perhaps to XP, which Mr. Boswell

21   testified about?

22   Q.   I am, yes.

23   A.   Okay.

24   Q.   XP programming, right?

25   A.   Well, let me just clarify.  It's not a type of software.

C. Rucinski - Cross                                                    1598

1    It's more programming methodology, which I understand is a

2    subset of agile programming.  Mr. Boswell did testify that he

3    is an adherent of this way of programming.

4    Q.   And XP programming, oftentimes you don't use revision

5    control, right?

6    A.   I think Mr. Boswell and I might disagree about this a

7    little bit because, like, I even found a reference in one of my

8    expert reports that talked about agile programming and how

9    revision control is important even in that case.

10   Q.   At your deposition, I asked you if you had any experience

11   with XP programming, and you said you didn't, right?

12   A.   I wouldn't say I'm in adherence to that method of

13   programming, no.

14   Q.   I'd like to talk for a minute about some historical

15   versions of the code, all right?

16   A.   Okay.

17   Q.   You analyzed certain portions of the code as it was

18   produced over time, as we discussed, right?

19   A.   Yes.

20   Q.   All right.  And in your supplemental report, you

21   classified some of the code as RCV1, right?

22   A.   That's right.

23   Q.   And RCV1 had modification dates ranging from September 3,

24   2011, to April 1, 2013, right?

25   A.   I don't remember, but I'll take your word for it if it's

C. Rucinski - Cross                                                1599

1    in my report.

2    Q.    Okay.  It is.  Thank you, sir.

3          And you classified certain portions of the code as

4    RCV2, right?

5    A.    Yes.

6    Q.    And RCV2 had a modification of September 9, 2013, right?

7    A.    I'll again take your word for it if it's in my report.

8    Q.    And then in your supplemental report, while you do note

9    some differences, you say that they operate in substantially

10   the same ways, right?

11   A.    Could we clarify the -- the issue I'm having with that is

12   I don't think that applies to the entire Rightscorp system for

13   either of those productions.  Those productions were only part

14   of the Rightscorp system.  So for the pieces that were

15   produced, I believe there were some in my expert report that I

16   said did operate in substantially a similar way to the 2015

17   production.

18   Q.    That's what -- I properly characterized what was written

19   in your report, correct?

20   A.    As long as you're agreeing with what I just said, sure.

21   Q.    You also analyzed the RC current, right?

22   A.    That's what I referred to in my report, yes.

23   Q.    All right.  And RC current was produced prior to July 15,

24   2015, right?

25   A.    The only issue I'm thinking about there was -- and

C. Rucinski - Cross                                                1600

1    granted, I don't think this was really relevant to the

2    analysis, but there was some code produced related to the

3    accounting aspects of the Rightscorp software, and I think that

4    was produced in early August.

5    Q.   But that's not relevant here to this analysis, right?

6    A.   Yeah.  So apart from that, yeah, I think everything was

7    produced before then.

8    Q.   Okay.  And that's -- I can quote your supplemental report

9    if you'd like.

10   A.   Please.

11   Q.   Okay.  It says, "I will refer to code that was produced by

12   Rightscorp before July 15, 2015, or that otherwise appears to

13   relate to the most recent version of Rightscorp's source code

14   that has been produced as RC current."

15        Okay?

16   A.   Sure.

17   Q.   All right.  And then in your supplemental report, again

18   noting some differences, you state that RC1 and RC2 operate in

19   substantially the same way as RC current, right?

20   A.   Yes.  Though, again, I just want to clarify that.  That's

21   not the whole Rightscorp system.  Those are only the portions

22   that were produced.

23   Q.   The portions that you analyzed, you say, operate in

24   substantially the same way, right?

25   A.   As the 2015 production.

1    Q.    Thank you.

2          Can you put up Rucinski 1?

3          Brian, what was the exhibit that you went over with

4    Mr. Rucinski, the demonstrative?  The graphic?

5          MR. BUCKLEY:  Oh, the graphic?  That's it.

6          MR. CARACAPPA:  Thank you.

7    Q.    Sir, I've heard a lot of "mays" and "possibles" when you

8    talked about this.  This is the demonstrative you used to talk

9    about the 10 percent bitfield, right?

10   A.    Yes, it's a demonstrative.

11   Q.    Okay.  At your deposition, you said you've seen no

12   evidence that the 10 percent bitfield code was run during the

13   relevant time period, right?

14   A.    I don't think I had seen evidence one way or another on

15   that.

16   Q.    Okay.  And at your deposition, you said you had not seen

17   any evidence that it was run during the relevant time period,

18   right?

19   A.    I think that's right.  There was some evidence that that

20   could have indicated it, but I was never able to see it.

21   Q.    One of the five parts you talked about was the acquisition

22   of copyrights.  Do you recall that?

23   A.    Yes.

24   Q.    And you testified that some of that was done manually,

25   right?

C. Rucinski - Cross                                                      1602

1   A.    That's my understanding.

2   Q.    That means by a person, right?

3   A.    Yeah, a person entering in stuff into a spreadsheet or

4   table by hand.

5   Q.    Well, there's going to be no code if a person does it

6   manually, right?

7   A.    If that's -- well, there could be code that wasn't in

8   operation, but if that's how they're doing it, I mean, that

9   would be a way to do it at that time, sure.

10  Q.    It would be?

11  A.    You could do it that way.

12  Q.    Okay.  And then you talked about how the ingestion process

13  was also at some point done manually, and if they did it with a

14  person, it's possible there wouldn't be any code, right?

15  A.    That's true.

16  Q.    I think you talked about the number of notices that are at

17  issue in this case.  Do you recall that?

18  A.    Yes.

19  Q.    And there are -- I don't have the exact number, but I

20  think it's 1,847,000-something, right?

21  A.    I don't know if I can agree to a number with "something"

22  at the end, but it's approximately 1.8 million.

23  Q.    Approximately 1.8 million.

24  A.    Okay.

25  Q.    How many notices in your expert report did you say were

1   not accurate?

2   A.   So the, the notices at issue in this case have changed

3   over time, so I actually don't remember in my expert reports

4   what I said about the numbers.  They've changed.

5   Q.   Do you remember the number of notices that you identified

6   as being inaccurate?

7   A.   I think in my reports, I talk at least about all the

8   source code that wasn't produced at those times, and that's

9   definitely applicable to all of the notices, so --

10  Q.   That's not the question I asked, sir.  I asked you in your

11  expert report, did you discuss the number of notices that you

12  analyzed that were inaccurate?

13  A.   I don't think I wrote down a number if that's your

14  question.

15  Q.   Well, you talked about a couple here today.  How many of

16  these notices?

17  A.   Well, so let me just clarify.  So this example was taken

18  from an example that has been used in the amended complaint.

19  The works here, like ZZ Top, for instance, is not an artist

20  that is currently one of the asserted works.  So I think this

21  is outside the scope of my opinion for this trial.

22  Q.   Okay.  So these are -- you're not testifying about these

23  notices?

24  A.   Well, I testified that they exist and they're reflective

25  of how the system worked, but I just want to make sure that

C. Rucinski - Cross                                                      1604

1  you're not -- I mean, if you're talking about notices in that

2  1.8 million, I just want to clarify these are not in those

3  notices.

4  Q.   Oh, these are not in the 1.8 million?

5  A.   No, they're not.

6  Q.   Did you identify any notices in your expert report in the

7  1.8 million that were inaccurate?

8  A.   So I don't know how to answer that question because I

9  don't know what the set of notices was at that time and at this

10  time because they've changed.  I can talk a little bit about

11  how recently they've changed if you like.

12  Q.   How many notices have you seen that are inaccurate?

13  A.   You're referring to the actual e-mails?

14  Q.   Sir, I'm referring to the notices, right?  You have -- I

15  have on the screen, it says, "Notices sent for same file

16  multiple times a day."

17          And when I heard you testify, the implication was

18  that this was a way that you determined that the code was

19  inaccurate.  Now, I could be wrong.  That's what I heard.  So

20  now I'm trying to understand of the 1.8 million notices, how

21  many of those notices have you seen that indicated to you that

22  the system was inaccurate?

23  A.   I believe all of them are not generated by a reliable

24  system, so I don't think any of them are reliable.

25  Q.   Have you pointed out any single notice that you think is

1   inaccurate?

2   A.   Single notice.  Well, I referred to 190 such notices that

3   were generated for samples where an image was downloaded, so I

4   don't know if that's close enough.

5   Q.   190?

6   A.   190.

7   Q.   Okay.  And then you talk about the full files.  You said

8   that 800 were inaccurate, right?

9   A.   I'm sorry, the full files?

10  Q.   Yeah.  I'll take a step back.

11  A.   Okay.

12  Q.   I'm moving on from the notices.

13  A.   Okay.

14  Q.   And we talked about how SampleIt2 downloads a sample of

15  the work, right?

16  A.   Yes.

17  Q.   And SampleIt2 downloaded in this case -- strike that.

18           SampleIt2 downloaded approximately 700,000 samples,

19  right?

20  A.   Yes, I received two hard drives with approximately 700,000

21  samples on it.

22  Q.   And you testified that 800 were inaccurate, right?

23  A.   Yes, in the sense that, you know, there was a file

24  download that was not a song.

25  Q.   Do you know if Cox ever asked to see the Rightscorp source

1  code in 2012?

2  A.   Do I know if Cox ever asked?  I have no idea.

3  Q.   Do you know if Cox ever asked to see the Rightscorp source

4  code in 2013?

5  A.   I don't know.

6  Q.   Do you know if Cox ever asked to see the Rightscorp source

7  code in 2014?

8  A.   I don't know.

9  Q.   Do you know if ever outside the context of this litigation

10 Cox challenged the accuracy of the Rightscorp source code?

11 A.   I don't know.

12 Q.   Dr. -- I'm sorry, Mr. Rucinski, are you aware that Cox

13 offered to forward on the Rightscorp notices if Rightscorp took

14 out what it considered to be a demand for payment?

15 A.   I think I had read some court documents to that effect,

16 yeah.

17 Q.   Okay.  Were you here for Mr. Boswell's testimony?

18 A.   Right here?

19 Q.   Not on the witness stand but in the courtroom.

20 A.   I was referring to Boswell being here.  I was here for the

21 second day.

22 Q.   You were here for the second day.

23 A.   Yeah.

24 Q.   And you heard Mr. Boswell testify that the 10 percent

25 source code was not used during the relevant time period,

1   right?

2   A.    If that was his testimony, I heard it.

3   Q.    Mr. Rucinski, you were not here for Ms. Frederiksen-Cross,

4   right?

5   A.    I was not, no.

6   Q.    And you didn't see her give the presentation to the jury

7   about how the code worked, right?

8   A.    I didn't see the presentation, but I did review her

9   slides, and I also reviewed the trial transcript for that.

10  Q.    You reviewed her slides?

11  A.    Yeah.

12  Q.    And a trial transcript?

13  A.    That's correct.

14  Q.    And that's how you knew that she testified, right?

15  A.    I don't think that was the only way, but it was a way to

16  know, yes.

17  Q.    Okay.  How else did you know she testified?

18  A.    I believe counsel told me that she testified.

19  Q.    Anything else?

20  A.    No.

21  Q.    Okay.  Well, isn't that what Ms. Frederiksen-Cross did

22  with the Rightscorp source code?  She didn't just look at the

23  code.  She also spoke to Mr. Boswell, right?

24            MR. BUCKLEY:  Requires him to speculate, Your Honor.

25            THE COURT:  Overruled.  He says he read the

C. Rucinski - Cross                                                    1608

1    transcript, so we'll see if he recalls.

2              THE WITNESS:  Well, at the very least in her expert

3    reports, I think she mentioned she spoke to Mr. Boswell.

4    BY MR. CARACAPPA:

5    Q.   And she spoke to Mr. Steele?

6    A.   I believe that's also disclosed in at least one of her

7    reports.

8    Q.   And she looked at the Dashboard?

9    A.   I believe that's also disclosed in one of her expert

10   reports.

11   Q.   And she tested the Rightscorp system, right?

12   A.   Yes.  She ran a test where I believe it was just a couple

13   files where she shared them over BitTorrent and checked if the

14   Rightscorp system maintained a record of it.

15   Q.   She ran a test, right, sir?

16   A.   She ran a test.

17   Q.   You didn't speak to Mr. Boswell, did you?

18   A.   No, not directly.

19   Q.   You didn't speak to Mr. Steele?

20   A.   No.

21   Q.   You didn't log onto the Dashboard?

22   A.   I did not.

23   Q.   In fact, you didn't even know you could log onto the

24   Dashboard, did you?

25   A.   It wasn't presented as an option for my analysis, no.

C. Rucinski - Cross                                                      1609

1   Q.   And in your expert report, you don't talk about any tests

2   that you've run, right?

3   A.   Sorry, I have to think back.  That's a broad question.  I

4   mean, it depends what you mean by test.  I mean, I tested the

5   samples, for instance, so there were tests run there.  There

6   were probably others.  I was looking to verify, you know, the

7   reliability.

8   Q.   You didn't run a test like Ms. Frederiksen-Cross did, did

9   you?

10  A.   Well, that would have required me to ask Rightscorp to

11  monitor something I was doing, and, you know, I don't think I

12  have the blessing of BMG to share their copyrights, for

13  instance.

14  Q.   Sir, just yes or no.  You didn't run a test like the test

15  run by Ms. Frederiksen-Cross, right?

16  A.   I did not run that test.

17          MR. CARACAPPA:  Thank you.  Your Honor, no further

18  questions.

19          THE COURT:  Any redirect?

20          MR. BUCKLEY:  No redirect, Your Honor.

21          THE COURT:  All right.  May Mr. Rucinski be excused?

22          MR. BUCKLEY:  Yes.

23          THE COURT:  All right.  You're excused with our

24  thanks, sir.  Please don't discuss the testimony you've given

25  with anyone until our trial is over, all right?

1    THE WITNESS:  I will not.  Thank you, Your Honor.

2    THE COURT:  All right, thank you.

3                    (Witness excused.)

4    THE COURT:  All right, next witness?

5    MR. BUCKLEY:  So, Your Honor, could we have a brief

6  sidebar?

7    THE COURT:  Yes, sir.

8    (Sidebar on the record.)

9    MR. WARIN:  Your Honor.  I think I know the topic,

10  and I suspect this may not be brief.

11    MR. BUCKLEY:  Let me preview it.  Dr. Sullivan is

12  next.  He is our damages guy.  We weren't going to call him

13  today in light of events.  We have him here.  We can start, but

14  they just got his exhibits and demonstratives, so we haven't

15  even had a chance to talk about them.

16    So one option would be I know we have some argument

17  to do.  We could do that.  We can let the jury go home early

18  tonight, come in and start tomorrow, and I will continue with a

19  few witnesses tomorrow, Dr. Sullivan and Mr. Mencher, and then

20  we're done.

21    Or I can put Dr. Sullivan up now, we can do some

22  background, do a little bit of preliminary stuff, but it will

23  definitely carry over until tomorrow.

24    THE COURT:  Do you have deposition testimony, any

25  more --

1      MR. BUCKLEY:  No, Your Honor, because the objection

2  you sustained was all of the testimony.  So there's nothing

3  else to do with that.

4      THE COURT:  All right.

5      MR. WARIN:  Your Honor, you're going to see a rare

6  moment of agreement.  I think that Mr. Buckley originally

7  proposed about let's have argument on some of the other issues

8  and have Dr. Sullivan come tomorrow, because we just got these

9  today.  They gave them to us early, we got them at 1:00 today,

10  but there are problems with both the demonstratives and the

11  exhibits that will have to be resolved.  We haven't met and

12  conferred about that.

13      So I think that's a sensible solution.

14      THE COURT:  Do you want to use them in the first

15  portion of his testimony?

16      MR. BUCKLEY:  There are some that are going to come

17  up pretty quickly.  We won't get very far.

18      THE COURT:  The only problem is I have a docket

19  tomorrow morning at nine, and I'm not going to be free until

20  10:30.

21      MR. BUCKLEY:  Okay.

22      THE COURT:  And then we're going to have a discussion

23  about these, so we'd better let the jury come back at 11:00.

24  Does that give us time to do that in the morning?

25      MR. WARIN:  That would.  We actually may want to have

1612

1    a discussion about some of Dr. Sullivan tonight before.

2              THE COURT:  Oh, I'm assuming that you are going to

3    confer.

4              MR. WARIN:  No, no, I actually meant with the Court.

5              THE COURT:  With us right now.

6              MR. WARIN:  Let me give you an example.

7              THE COURT:  No, no, don't give me examples now.

8              MR. WARIN:  All right.

9              MR. BUCKLEY:  But I'm happy to --

10                       (Laughter.)

11             MR. BUCKLEY:  I'm happy to do that.  We can talk

12   about it now.

13             THE COURT:  See how far we can get.

14             Okay.  All right.  I'll bring the jury back at 11:00

15   tomorrow.

16             MR. BUCKLEY:  Thank you, Your Honor.

17             MR. WARIN:  Thank you, Your Honor.

18             THE COURT:  Okay.

19             (End of sidebar.)

20             THE COURT:  All right.  We have some matters to

21   discuss, so rather than have you sit around for what's probably

22   a good half an hour, I'm going to release you for the day.  And

23   as I said briefly the other day, I've got a docket tomorrow

24   morning starting at nine that will go until about, it may go

25   between 10:30 and 11:00.  So I ask you to come back at eleven

1   tomorrow, and we'll continue hearing the testimony at that

2   time.

3           And just for your -- I know you're interest is that

4   defendants are close to completing their -- or will be close to

5   completing their evidence tomorrow and their defense of the

6   case.

7           We're not going to finish before next week, and as I

8   indicated before -- we're not going to finish this week, and as

9   I indicated, I'm still committed to going down to Richmond on

10  Monday.  So we'll -- I'll have a better idea of what's going to

11  happen on Tuesday once we get through tomorrow's testimony, and

12  I'll let you know then.

13          All right.  But you're excused at this time until

14  11:00 tomorrow, and please don't discuss the case or do any

15  investigation or research.  Thank you very much.  Have a good

16  evening.

17                          (Jury out.)

18          THE COURT:  Okay.  Have a seat.  So we have -- was

19  Mr. Bridges going to do that other argument on the sword and

20  the shield, or, Mr. Buckley, are you going to do that, or

21  Ms. Jobson?

22          MR. BUCKLEY:  So, Your Honor, we are still trying to

23  gather the documents.

24          THE COURT:  I thought Mr. Warin gave them to -- the

25  numbers --

1    MR. BUCKLEY:  Well, he gave -- it was the numbers.

2  They're not all trial exhibits, and so we're having to pull

3  them by Bates number, but if he's got the copies, I'm happy to

4  just try to do it on the fly if you like.

5    THE COURT:  Okay.  Let's try, see how far we get.

6    Mr. Warin, why don't you -- I know you explained your

7  position partially with some documents, but why don't you start

8  over because I'm sure I missed something.

9    MR. WARIN:  I'd be happy to, Your Honor.  When

10 Mr. Cadenhead was testifying this morning, Mr. Bridges elicited

11 testimony from him with respect to Cox's dealings with other

12 media companies in terms of how many notices they had in and

13 how they were able to reach agreements with them, and

14 everything was copacetic with that other group of rights

15 holders, who were also sending in notices to Cox with respect

16 to infringement of their rights.

17    During the course of discovery -- and so he --

18    THE COURT:  Mr. Bridges is now here.  We just

19 started, Mr. Bridges --

20    MR. BRIDGES:  Great.  Thank you, Your Honor.

21    THE COURT:  -- and your colleague was good enough to

22 say he'd do the best that he could until you came.

23    MR. WARIN:  So that testimony was elicited, and it

24 was beyond anything we'd talked about with respect to ahead of

25 time -- with respect to Mr. Cadenhead's testimony.  As you

1    know, we had no objection to his testifying about his dealings

2    with Mr. Steele or with Rightscorp, but this is dealing with

3    others, and these -- some of the documents we were provided,

4    beginning with No. BMG 0208754, they're a series of multiple

5    documents, and they begin, for example, on September 13, 2010,

6    the time period that Mr. Cadenhead was talking about, and

7    there's a notice here from Marianne Grant from the Motion

8    Picture Association of America to Mr. Cadenhead about the,

9    quote, current notice program, and it indicates that she is

10   representing apparently Fox, NBC, Paramount, Warner, RIAA --

11   which is the Recording Industry of America -- Disney, and Sony,

12   and there were multiple correspondence internally, e-mails back

13   and forth between Mr. Cadenhead and Mr. Zabek, between

14   Mr. Cadenhead and Cox Abuse, between Mr. Cadenhead and Mr. Beck

15   and Mr. Sikes and others, and Mr. Cadenhead and Mr. Beck, all

16   of which are redacted and privileged.

17         And so the topic is being discussed about what

18   they're going to do with notices from other rights holders.

19   Mr. Cadenhead testified about that this morning, yet during

20   discovery, all of those were withheld on the basis of

21   privilege, and so that's why I made the notion sword-shield.

22         Now, there's another exhibit --

23         MR. BUCKLEY:  Your Honor, just one thing:  So this

24   particular document has a very unique technical issue with it

25   that's different than the other ones that I can explain if you

1    like.

2           THE COURT:  Let Mr. Warin finish, and then you can

3    address them.

4           MR. WARIN:  So about that same time, there is an

5    e-mail to Mr. Cadenhead from Victoria Sheckler from the

6    Recording Industry Association of America with copies to

7    others.  It's about the Cox graduated response program, and she

8    is talking about how many notices the industry, this is the

9    industry, RIAA will get, and she talks about the fact, quote,

10   our records indicate we have sent Cox on average 6,000 notices

11   per month.  This is in 2010.

12          And then there's an e-mail from Mr. Cadenhead to

13   Mr. Beck and then an e-mail back from Mr. Beck to Mr. Cadenhead

14   on that same topic.  It's part of the same string.  Redacted.

15   So we have no idea as to what, if anything, was going on.  Yet,

16   Mr. Cadenhead was allowed to testify to that.

17          Similar, there was an e-mail that is dated April 12,

18   2012.  Actually, it begins -- let me go earlier, April 12,

19   2012, from Brent Beck to data ops CATS.  "We have a hard limit

20   of 200 a day for Universal's complaints to us, but we have been

21   seeing quite a bit more than that coming in.  In general, it

22   isn't really a big deal.  We create closed tickets once the

23   limit is exceeded, but this complaint in particular has had

24   daily volumes as high as 3,700 plus.  Does that seem excessive

25   to you?"

1      And then e-mail from Mr. Sikes:  "Yeah, this does

2  seem excessive."

3      But in between, there are e-mails to Mr. Cadenhead,

4  to Mr. Sikes, Mr. Beck, all redacted on the basis of privilege,

5  all dealing with the same topic as to their hard cap, which he

6  testified to, about their dealings with other rights holders,

7  particularly those in the Motion Picture Industry, which he

8  testified about.

9      And then on another notice, April 15, 2013, actually

10 begins April 12, 2013, it's talking about the same topic.  It's

11 talking about the notice limit, and there are five separate

12 e-mails back and forth between Mr. Cadenhead and others --

13 Ms. Trickey, Mr. Zabek, Mr. Sikes -- all redacted, although

14 it's clear from the first e-mail that they produced to us that

15 they're on that same topic.

16     And then finally, there's another one involving

17 Mr. Beck again having to do with some of the same topics.

18     So our concern is that Mr. Cadenhead, testimony was

19 elicited from him talking about how other people had some

20 notices, how many they were, and how they were very reasonable

21 in dealing with Cox, and they imposed hard limits, and then

22 they relaxed some of them, but virtually all of the e-mails

23 dealing with those topics that were contemporaneous at the time

24 internal within Cox were marked privilege and weren't provided

25 to us.

1618

```
 1              So that's the first topic.  There's another one I'll
 2   get to in a moment.
 3              THE COURT:  Okay.
 4              MR. BUCKLEY:  Can I use the documents?  Because we
 5   still haven't found --
 6              MR. WARIN:  You may.
 7              MR. BUCKLEY:  Thank you.
 8              All right.  So the first document is the one on the
 9   front that says "Merged E-mail."  Joe Sikes is one of the Cox
10   employees.  He had a policy, which was his own policy, the way
11   he stored e-mail was he would periodically take all of the
12   e-mails in his inbox and merge them into a Word file.  So this
13   is a document -- this actually isn't even the whole thing.
14   It's about 200 pages long, but what it is is a series of
15   e-mails between different people on different topics, all
16   merged together into one giant document.
17              Mr. Caracappa and I had 15 conversations probably
18   about this because it's a mess and it's hard for everybody to
19   deal with.  So it's actually not true that all of these are
20   part of the same conversation, and that's why this particular
21   document is in a different category.  I don't even know, I'd
22   have to go pull this and see what these different conversations
23   are about, but they're probably not even between the same
24   people.  He literally took like a year's worth of e-mail and
25   pasted it into one Word file.  So this one is in a different
```

1    category, and it's hard to assess what these things are without

2    looking at them.

3            THE COURT:  That's what, September 2010?

4            MR. BUCKLEY:  Well, I don't know.  I don't even know

5    which one internally he was looking at.  That's the September

6    one, September 2010.  Okay.

7            Yeah.  So the first one I'm looking at is a

8    conversation about somebody's wedding.  You can look at it.

9    It's a whole bunch of different e-mails on different topics,

10   and unfortunately, it's just a function of the way these

11   e-mails were collected and produced.

12           THE COURT:  Okay.

13           MR. BUCKLEY:  With respect to the other e-mails, so

14   the -- we did not waive privilege for all purposes in this

15   case.  As you know, we waived it for a very limited purpose,

16   which was to allow Mr. Cadenhead to talk about why he advised

17   rejecting the Rightscorp notices.  There are lots of other --

18           THE COURT:  I know.  That's what Mr. Warin says the

19   problem is.  If you had produced the documents, because you

20   knew Cadenhead was going to testify about how he handled other

21   copyright holders, then he wouldn't have a problem.

22           MR. BUCKLEY:  Well, but, Your Honor, we didn't waive

23   privilege for all purposes.  We have lots of documents that we

24   withheld on privilege grounds, just as they did.  And we had a

25   discussion with Judge Anderson about this.  They actually

1   brought a motion to expand the scope of the waiver.  We

2   resisted that.  He denied their motion, sided with us, and said

3   the waiver is like this and there are documents that are within

4   the waiver, but there are lots of documents we withheld on

5   privilege grounds.

6          So the issue here is did Mr. -- and I apologize, I

7   was not here for the testimony, but did Mr. Cadenhead say

8   something today about interactions with other rights holders,

9   which, of course, aren't privileged.  How he's talking to the

10  Motion Picture Industry or Universal, those aren't privileged

11  communications.

12         THE COURT:  Right.

13         MR. BUCKLEY:  Did he say something about that that

14  implicated legal advice or implicated something that we've

15  withheld as privilege and that we're trying to use as a sword,

16  because that's the issue, right?  He's afraid that there's

17  something we have shielded that we're now trying to use as a

18  sword.  We suspect that didn't happen.

19         THE COURT:  What Mr. Warin is saying is that there

20  may be inconsistencies between what he's said in privileged

21  documents and what he said on the stand, and BMG can't test

22  that because they don't have those documents, right?

23         MR. WARIN:  Yes.

24         THE COURT:  He's not quarreling with whether there

25  was a privilege -- he doesn't -- I don't think he believes that

1    there's any documents that were withheld between Mr. Cadenhead

2    and MPAA or RIAA.  It's what did he say internally about them

3    which might be inconsistent, right?

4              MR. WARIN:  That's correct, Your Honor.

5              MR. BUCKLEY:  I think that's right, but again, we

6    only have -- that's true on all sorts of communications, right?

7    There are privileged things that both sides have withheld that

8    the other side doesn't get to see.

9              THE COURT:  That's the shield and the sword.

10             MR. BUCKLEY:  Right.  But you only have the sword and

11   shield problem if we're trying to use something as a sword,

12   something that we shielded.  So if all he talked about today

13   was the facts of communications he had with third parties that

14   are not privileged, then --

15             THE COURT:  That's the sword.  That's damaging to

16   BMG's theory that Cox ignored all of the notices and goes to

17   your -- it helps your case, right?  So isn't that the shield --

18   isn't that the sword?

19             The shield is BMG can't test the accuracy of the

20   testimony because it doesn't have the documents because you

21   shielded them from production.  That's the way my brain works,

22   so tell me where I'm wrong.

23             MR. BUCKLEY:  I think that is the argument, but

24   again, I think where it breaks down is if he's just testifying

25   about facts, about interactions with third parties, then where

1   is -- what I'm having trouble seeing --

2          THE COURT:  Isn't that why we have a court?  Isn't

3   that why we have a jury, is to determine issues of fact and

4   what's the truth and what's not?

5          MR. BUCKLEY:  But is the -- so is the idea that --

6   and again, I'm just going blank, you're right, I haven't seen

7   the documents -- but if the idea is he said, I have this

8   conversation with the Motion Picture Industry, and then he's

9   got an e-mail internally where he e-mails Joe Sikes and says, I

10  didn't have a conversation with the Motion Picture Industry?

11         THE COURT:  He said, I told him that we're going to

12  work with them, they complained, I have no intention of doing

13  anything, I said to them, we're going to screw them just like

14  we're screwing everybody else, you know, hypothetically.

15         MR. BUCKLEY:  Hypothetically, right.

16         THE COURT:  So that's, that's what BMG wants to test,

17  and they can't do that.

18         MR. BUCKLEY:  So if it's specific to the documents

19  he's identified, what we can do -- we may already have some of

20  them.  We can get you unredacted versions, and you can look at

21  them.

22         THE COURT:  Let's identify them and see whether

23  they're, in fact -- that you've claimed privilege on relevant

24  documents.  That would be the place to start.

25         MR. BUCKLEY:  And I guess the question is how far

1623

 1    along are we in finding the unredacted versions?

 2              MS. JOBSON:  I have now -- I'll stand up.

 3              Sort of mid-project, but I think we've got printouts

 4    of the redacted versions and the unredacted versions, and I'm

 5    going through the exercise where I'm putting brackets in blue

 6    on the unredacted versions of the portions that had been

 7    redacted.

 8              THE COURT:  Okay.

 9              MS. JOBSON:  I could probably finish that in the next

10    ten minutes or so.

11              THE COURT:  That's wonderful.

12              MS. JOBSON:  I'll carry on.

13              MR. BUCKLEY:  Some dinnertime reading for you?

14              THE COURT:  Yeah, absolutely.

15              All right, Mr. Warin, issue No. 2.

16              MR. WARIN:  And, Your Honor, we weren't -- I think

17    it's understood we weren't claiming that they falsely asserted

18    privilege.

19              THE COURT:  No.  It's just that now that this

20    testimony came out, it changes, you know, that's -- trials are

21    all about moving parts.

22              MR. WARIN:  And even if we were to get the documents

23    now, he's gone.

24              THE COURT:  He's gone, right.

25              MR. WARIN:  He's been released.

1624

1     THE COURT:  We haven't talked about the remedy if it

2  turns out to be a problem.

3     MR. WARIN:  Right.  The second one is there is an

4  e-mail dated August 5, 2010, and you may recall that

5  Mr. Cadenhead testified about a speech that he gave about how

6  successful Cox had been in terms of handling the notices and

7  they'd been successful in 97 percent of the time.  This is an

8  issue that Mr. Allan raised earlier.

9     THE COURT:  96.

10    MR. WARIN:  96, as to whether or not the foundation,

11  and he said that took place sometime, the information was

12  gathered sometime in 2010.

13    There's an e-mail that was produced in 2010,

14  August 5, that it's from Mr. Cadenhead, and it's to the Abuse

15  Team, and it is entitled "DMCA statistics," "DMCA statistics."

16  "Brent pulled these stats for me.  I thought they'd be of

17  interest to the general group.  We will likely see more than

18  million notices this year."

19    So that's the beginning of the thing, and then you go

20  down the string, and the next e-mail is marked privileged for

21  Mr. Cadenhead, and then two full pages that we can't even see

22  what's on them marked privileged, and then an e-mail from

23  Mr. Beck to Mr. Cadenhead with the same caption, "DMCA" -- it's

24  all part of a string, "DMCA Statistics," again, marked redacted

25  for privileged, and then another one later on that same day,

1  "DMCA Statistics," redacted for privilege, and then finally

2  another one at 4:21 that day, "DMCA Statistics."

3          So we were allowed to hear the testimony from

4  Mr. Cadenhead, who himself didn't gather the statistics, didn't

5  have the foundation for gathering it, but he was still allowed

6  to give the testimony because he gave a speech in 2010, but our

7  ability to cross-examine him --

8          THE COURT:  I let it in because he's monitoring the

9  statistics.

10          MR. WARIN:  All right.  Fair enough.

11          THE COURT:  And it's part of his responsibility, so I

12  thought it was close enough where he should be allowed to

13  testify about it.

14          MR. WARIN:  Understood, Your Honor.  But the

15  beginning of this e-mail is on that same topic, which is the

16  statistics, and they're asserting privilege after privilege

17  after privilege and not allowing us to get the underlying data.

18  We don't even get the attachment that had the statistics at the

19  same time that he's testifying on the 96 percent.

20          THE COURT:  All right.  So the same argument.  Do you

21  want to find it and see if there's a problem?

22          MR. BUCKLEY:  We'll find it.  And if we can find the

23  attachment, we'll do that too.  We produced 40,000 documents,

24  so it's possible they got separated.  We'll find it.

25          THE COURT:  All right.  You find it.  Great.

1    MR. BUCKLEY:  I'm sorry, can we get the document

2    number again?

3    MR. WARIN:  Sure.  Actually, I think I may have a

4    copy of this one.

5    MR. BUCKLEY:  Thank you.

6    THE COURT:  That can be homework for you.

7    MR. WARIN:  This is the one I gave you earlier.

8    That's another copy of the same one I gave you earlier.

9    MS. JOBSON:  We want an attachment for this one?

10   MR. BUCKLEY:  If there is one.

11   Thank you.

12   MR. WARIN:  Thank you.

13   THE COURT:  All right.  And we can take this up in

14   the -- if -- you know, get it to me when you can get it to me.

15   You know, I'll be here for a couple hours, but if not, get it

16   to me in the morning.

17   MR. BUCKLEY:  Thank you.  Yeah, because if we leave

18   now, Your Honor, we may not be able to get back in.

19   THE COURT:  You won't get back in, you're right.

20   MR. BUCKLEY:  Ms. Jobson has some of it now that we

21   can give to you.

22   THE COURT:  Okay.  Yeah, I'm happy to take whatever

23   you have now, and I'll look at it tomorrow morning.  I'll look

24   at the rest of it.  That's fine.  That's not a problem.

25   Okay.  So the exhibits for Sullivan, you haven't had

1  a chance to go through them, but you had talked about

2  possibly -- was that, was that -- those are the two matters you

3  wanted to discuss, Mr. Warin?

4          MR. WARIN:  Yes.  And I think since we just got these

5  and I haven't really studied them, we probably should meet and

6  confer on the exhibits and demonstratives.

7          THE COURT:  Okay.

8          MR. WARIN:  But I do think there's some issues that

9  we can get out of the way today --

10          THE COURT:  All right.

11          MR. WARIN:  -- which has to do with the scope of his

12  testimony.

13          I have Dr. Sullivan's report here in front of me, and

14  I just want to make sure that we don't get in trouble tomorrow

15  when he starts testimony.  And this doesn't have to do with the

16  exhibits, but it has to do with the scope of his testimony.

17          On page 3 of his report under methodology, and it

18  continues onto page 4, Dr. Sullivan states, "I understand" --

19          MR. BUCKLEY:  Just a second.  Your Honor?

20          THE COURT:  Yes.

21          MR. BUCKLEY:  Dr. Sullivan is in the courtroom.

22          THE COURT:  Oh.

23          MR. BUCKLEY:  Would you mind going out, please, sir?

24          MR. WARIN:  Thank you.  Sorry.

25          THE COURT:  Yeah, thank you, Mr. Buckley.

1    For future reference, Dr. Sullivan, when somebody

2  starts discussing your report and you're sitting in the back

3  and you haven't really been identified, volunteer the fact that

4  you're here so -- because there are some courts where if there

5  had been a rule on witnesses and you sat in there without

6  saying anything and nobody saw you, an irascible judge might

7  disqualify you from testifying.  So it can be -- depending on

8  where you are, it can be a really important issue.

9    All right, sir?

10    DR. SULLIVAN:  Very good.  Thank you.

11    THE COURT:  All right.  Thank you.

12    MR. WARIN:  I'll begin again, Your Honor.  On page 3

13  of Dr. Sullivan's report under 1.3, methodology, and it

14  continues through page 4, Dr. Sullivan is giving legal

15  opinions.  "I understand that in copyright infringement

16  litigation, copyright law provides for damages to a prevailing

17  party in one of two ways."

18    Then he goes on and gives the one of two ways, which

19  we don't agree with in terms of his statement.

20    On the next page he states, "For statutory damages, I

21  understand that copyright law provides a range of values and

22  leaves the court the discretion to determine the just amount,"

23  and he talks about calculating injury to the copyright holders

24  as the proper measure and cites a half a dozen cases, legal

25  decisions.

1      Again, we don't agree with that.  That's something

2 that's going to come up in the charging conference, and I just

3 wanted to make sure we didn't get on a slippery slope with

4 Dr. Sullivan tomorrow testifying as a lawyer as to what the law

5 is when he's not been qualified as that.  So that's the first

6 issue.

7      The second issue has to do with later on in his

8 report, on page 17 and 18.  He starts giving what I would call

9 engineering or technical testimony with respect to spoofs,

10 decoys, corruptions, and then he talks about the unreliability

11 of the Rightscorp system and the unreliability of the

12 fingerprint system, and the question as to whether or not the

13 music is authorized, and for all of that testimony, if you look

14 at footnotes No. 75, 76, 79, 80, 81, 82, 83, 84, he relies upon

15 interviews with Mr. Rosenblatt.

16      No. 1, I believe they are beyond the scope of his

17 expertise.  No. 2, he's relying upon Mr. Rosenblatt to give

18 technical testimony as to how the Rightscorp system works.

19 It's inappropriate testimony for an economist, and so I just

20 don't want to be sitting here tomorrow starting to hear that

21 testimony and having to jump up.  That's why I wanted to raise

22 it tonight.

23      THE COURT:  Okay.

24      MR. BUCKLEY:  Your Honor, Dr. Sullivan will not give

25 legal testimony, obviously.  He provided some background, and I

1630

1    think he should at least be able to say, I calculated actual

2    damages because I understand that might be related to the

3    statutory damages inquiry, but he's not going to talk about

4    copyright law.  I'm not going to ask him about cases.

5         And on the technical stuff, I'll look at these

6    footnotes.  I don't have his report with me.  I'll look at

7    them.  He's not going to talking about BitTorrent.  They've

8    heard plenty about that.  I don't think he's going to get into

9    areas that even relate to Rosenblatt's report that I can think

10   of right now, but I'll look at that.  I understand the concern.

11        THE COURT:  Okay.  I think that's very wise.  I don't

12   think that testimony is admissible from him.  The legal is

13   clearly not.  I mean, you can ask him a hypothetical which says

14   if you were, you know, if he were instructed to identify actual

15   damages, do you have an opinion on whether that's possible in

16   this case, and do it that way.  I think that's permissible

17   under the rules.

18        MR. BUCKLEY:  Certainly.  And I may be able to do

19   that without even having to mention statutory damages.  It

20   doesn't really matter.  He was here to do an actual damages

21   calculation, and we can argue from that later.

22        THE COURT:  All right.

23        MR. BUCKLEY:  So I'll be careful.

24        THE COURT:  Okay.  Good.

25        And then you guys are going to look at the --

1    MR. WARIN:  We will meet and confer on the actual

2    exhibits and the demonstratives.  We do have -- let me just

3    highlight.  I'll give Mr. Buckley a highlight as well.  There

4    is a chart in the demonstratives that -- here it is here.  It

5    has assumptions, and the first assumption is with a big

6    question mark:  "BMG owns copyrights to all the works at

7    issue?"  That's not a question mark.  The Court's decided.

8    To allow that demonstrative to be displayed to the jury

9    suggests there is a question about that when there isn't.  This

10   is just one I happened to spot when I was going through.

11   MR. BUCKLEY:  The question marks are coming out.

12   THE COURT:  Okay.  That's a good idea.  Good.  All

13   right.  Well, continue to work on that.

14   MR. WARIN:  And is it correct we just have two more

15   witnesses?

16   MR. BUCKLEY:  I believe so, Dr. Sullivan and

17   Mr. Mencher.  Not seeing my client here, I'm a little worried

18   about getting out over my skis, but I think that's true, and we

19   are really hoping to be done tomorrow.

20   THE COURT:  Okay.  Then Tuesday morning, we'll do any

21   rebuttal case.  We'll keep it to a focused rebuttal case and

22   try and get this case to the jury on Tuesday.

23   That -- which reminds me that we haven't talked about

24   jury instructions --

25   MR. BUCKLEY:  I was just going to ask.

1    THE COURT:  -- and I'm going to give you the weekend

2  to -- I mean, I use O'Malley instructions for general

3  instructions.  There are by my count, you know, four or five at

4  least instructions which are specific to the infringement, and

5  I have looked at your instructions, and I realize you've got

6  some differences there.

7    So what I need for you to get me by, you know,

8  Monday, I'll be back from -- hopefully, I'll be back from

9  Richmond mid-afternoon.  I'd very much appreciate your legal

10  positions in a short memo, you know, as detailed as you want to

11  make it, citing the case law that you believe supports your

12  position, and then we'll still have a jury instruction

13  conference, which I hope won't -- you know, where we can, where

14  we can talk about why somebody's right and somebody's wrong.

15  I'll give you certainly the opportunity to make sure the record

16  is clear that you have preserved objections, and we'll do

17  that -- I guess we'll do that Tuesday, and I'll rule on that,

18  and then we'll go into closing arguments.  Okay?

19    Mr. Reilly?

20    MR. REILLY:  Yes, Your Honor.  With respect to the --

21  any written positions on the jury instructions, if I can speak

22  from here?

23    THE WITNESS:  Yes.

24    MR. REILLY:  Would you like those filed on the ECF

25  system as well as delivered to chambers?

```
 1              THE COURT:  Yes, absolutely.

 2              MR. BUCKLEY:  And by what time would you like, Your

 3  Honor?

 4              THE COURT:  You know, I won't be back from Richmond

 5  until two.  So if you can get it to me by two, and everybody

 6  working on the case is here in the courtroom, so we probably

 7  won't -- well, no, we'll be tied up.  So -- but if you can get

 8  it to me by two on Monday, that will be great.  Okay?

 9              All right.  Anything else we need to talk about?

10              MR. WARIN:  Not that I'm aware of, Your Honor.

11              THE COURT:  Okay.  Ms. Jobson?

12              MR. BUCKLEY:  Your Honor, are you going to limit the

13  time for closing?

14              THE COURT:  Ten minutes apiece.

15                        (Laughter.)

16              MR. BUCKLEY:  Just going to click through 200 slides

17  as fast as we can.

18              THE COURT:  Nothing I've done trying to limit the

19  testimony has worked, so why would I start now?

20                        (Laughter.)

21              THE COURT:  How much do you want?  I mean, you may

22  not know that at this stage.  You've got the weekend to think

23  about it, but they shouldn't be any longer than the openings,

24  you know, an hour.

25              MR. WARIN:  I was thinking maybe 15 minutes longer
```

1634

1  than the opening?

2          MR. BUCKLEY:  Yeah, maybe.

3          THE COURT:  Seventy-five minutes apiece, really?

4          MR. WARIN:  Yeah.

5          THE COURT:  Okay.  You will risk losing the jury,

6  unless you're in really spellbinding form.

7          MR. WARIN:  That seldom happens recently, at least

8  recently.  It used to, but not so much any more.

9          THE COURT:  Judge Trenga is -- recalls your dear days

10 together fondly, so he --

11         MR. WARIN:  That was back when I could cast a spell,

12 Your Honor.

13         THE COURT:  Well, yeah.  All right.  If you need 75

14 minutes, take 75 minutes.

15         And you want to preserve some of that?

16         MR. WARIN:  Yeah.

17         THE COURT:  Total.

18         MR. WARIN:  I'll have to save some if I want it.  If

19 I use it all up, I'm done.

20         THE COURT:  Okay.

21         MR. BUCKLEY:  Could we ask one last question on the

22 closing?

23         THE COURT:  Yes, sir.

24         MR. BUCKLEY:  We had contemplated having

25 Mr. Wakefield handle liability and I might handle damages.  Is

1   that okay?

2            THE COURT:  Yeah, that's fine.

3            MR. BUCKLEY:  Okay.  Thank you.

4            THE COURT:  Absolutely.  All right, anything else

5   tonight?

6                        (No response.)

7            THE COURT:  All right, thank you-all.  We'll see you

8   tomorrow.  Like I said, I hope I'm out -- I'm done at 10:30,

9   and so maybe at 10:45 we can plan on handling any of these

10  issues that arise from the slides.  Okay?

11           MR. WARIN:  Thank you, Your Honor.

12           MR. ALLAN:  Thank you, Your Honor.

13           MR. BUCKLEY:  Thank you.

14           THE COURT:  All right.  Good.  Have a good evening.

15  We're in recess.

16   (Recess from 5:18 p.m., until 10:45 a.m., December 11, 2015.)

17

18                 CERTIFICATE OF THE REPORTER

19       I certify that the foregoing is a correct transcript of

20  the record of proceedings in the above-entitled matter.

21

22

23                            _____/s/_____
                                     Anneliese J. Thomson

24

25