1834

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                         :
             Plaintiffs,        :
                                : Case No. 1:14-cv-1611
      vs.                       :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
             Defendants.        :
--------------------------------:
```

VOLUME  9 (A.M. portion)

TRIAL TRANSCRIPT

December 15, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

<u>APPEARANCES</u>:

COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.  20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

## INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| WILLIAM LEHR | | |
| | DIRECT | 1863 |
| | CROSS | 1880 |
| | REDIRECT | 1893 |
| STEPHEN NOWLIS | | |
| | DIRECT | 1895 |
| | CROSS | 1916 |
| | REDIRECT | 1944 |
| ROBERT BARDWELL | | |
| | DIRECT | 1946 |

1837

1          NOTE:  The December 15, 2015 portion of the case

2     begins in the absence of the jury as follows:

3     JURY OUT

4          THE COURT:  All right.  Good morning.  I see everyone

5     is here.  I hope you had a good weekend and a good Monday.

6          I appreciate the work that you did on the jury

7     instructions.  I got back here last evening and went through

8     them.

9          I'll tell you, generally I stuck to the O'Malley

10    instructions to the extent that I could, including using their

11    instructions on direct and contributory and vicarious

12    liability.

13         I have fashioned some instructions on some of the

14    unique parts of the case regarding spoliation and instructions

15    on the legal arguments, so I will have those for you later

16    today.

17         I'm not sure what your -- what you would like to

18    accomplish in the next couple of minutes.  I'm still struggling

19    a little bit with the mitigation instruction, the statutory

20    damages instruction as to whether I should put in the

21    deterrence and penalty language in that statutory damages

22    figure.

23         So I will hear anything you would like to say on

24    that, and anything else you want to tell me this morning based

25    on the briefs that you submitted.

1    And I will give you an opportunity after I get the

2    package to you today to make further final argument and make

3    exceptions to my instructions.

4    All right.

5    MR. PECAU:  Your Honor --

6    THE COURT:  Yes, sir.

7    MR. PECAU:  -- I just want to make a quick

8    preliminary statement with regard to the -- Cox's approach to

9    this that raises great concern for us.

10    If you look, for example, at their memorandum, what

11    they're-- and particularly, for example, just page 3.  What

12    they are constantly rearguing and what they want to argue to

13    the jury is contrary to your judge's order in your summary

14    judgment memorandum and opinion.  And this causes us great

15    concern that they are going to --

16    THE COURT:  Well, what's the specific --

17    MR. PECAU:  Okay.  For example, Your Honor, if you

18    look at page 3, Cox states, "plaintiffs have not submitted any

19    evidence of an actual upload by a user of the Cox Internet

20    service to another Internet user."

21    This is precisely the same argument they keep

22    bringing up over and over again, and precisely the same

23    argument Your Honor has found as a matter of law has no

24    validity.

25    So what they're basically saying is everything

1    Rightscorp has done, the jury should disregard.

2            THE COURT:  Okay.  I have ruled on that and I have

3    ruled -- I have fashioned the instructions so that that burden

4    is not on BMG.

5            What else would you like to talk about?

6            MR. PECAU:  All right.  So our concern is that they

7    are going to try to in their closing argument make these same

8    kinds of arguments.  Again, you see it all the way through -- I

9    can point out a number of other instances.  And we don't want

10   to be jumping every time they do this in their closing

11   argument.

12           So that was the one concern I wanted to bring to Your

13   Honor's attention.

14           THE COURT:  Okay.  Mr. Bridges.

15           MR. BRIDGES:  Your Honor, I will respond, and I am

16   going to not respond to the sort of process criticism that

17   opposing counsel voiced because I don't think it is useful.

18           The context of this is that they want an instruction

19   specifically about an inference from making available.  We

20   understand the Court's position --

21           THE COURT:  I am not giving them the making available

22   instruction.  I have ruled it wasn't -- I don't believe that

23   Hotaling was good law, and I am not giving it.  I cut it out of

24   the instructions.  So it's not part of the case.

25           MR. BRIDGES:  Sorry.  My only other comment on that

1  is that the Court generally gives an instruction in general

2  about circumstantial evidence.  That instruction alone would be

3  appropriate rather than some specific instruction on this.

4          I am sorry, Your Honor.  One thing I wasn't clear on

5  what you said earlier about occasion to make exceptions to the

6  jury instructions.

7          THE COURT:  Yeah.  I will pull the final package

8  together.  I think your idea that we instruct the jury today

9  and have closing arguments tomorrow is a good one, as long as

10 we are still going to have the four witnesses and it is going

11 to take up at least the morning.

12         So once you get the final instructions, I will give

13 you a chance to put on the record any criticisms and/or

14 suggestions.  And so, we will deal with it one more time later

15 in the day after you see what I have done to the fine work that

16 you all did on coming up with instructions that assist you in

17 your advocacy.

18         MR. BRIDGES:  Thank you, Your Honor.  In that case, I

19 don't think -- unless the Court has questions, I don't think we

20 need to burden the Court's time.

21         THE COURT:  Well, the innocent infringement, where

22 does that fit?

23         MR. BRIDGES:  It fits, Your Honor -- it's up to the

24 jury to decide the range of statutory damages that applies.

25 They have cited one case that implies that innocent infringer

1   status is not available here.  That case actually specifically

2   pertains to a separate section of the Copyright Act saying that

3   omission of a copyright notice has an effect on innocent

4   infringement, and the M. Kramer case they cited bears on that

5   and it does not bear on the general determination of innocence.

6          The question is, I think appropriate for the jury

7   here to consider, whether taking into account all of the facts

8   in the testimony and the evidence that the jury has heard they

9   believe that Cox did not intend to infringe copyright law.

10  That maybe that was a byproduct of its decision not to handle

11  these types of notices.

12         But I think it is certainly open for the jury to

13  conclude on these facts that if Cox is liable for infringement,

14  it was innocent because it didn't believe that providing an ISP

15  service with general purpose uses and getting the sorts of

16  noncompliance from Rightscorp gave it obligations.

17         This opens up the whole discussion that we don't need

18  to go into now about the role of the Sony line of cases and the

19  like on general purpose ISP services.  This is not Napster.

20  This is not a flea market, like Fonovisa.  This is a plain

21  vanilla and strong argument that we intend to press at every

22  opportunity, that this is non-infringing.

23         So for the jury not to hear or not to be allowed to

24  decide on the facts that even if it is infringing, it's

25  innocent, I think would be a miscarriage of justice.  I think

1842

1   they are entitled to make that decision.  And if they choose

2   not to, fine.  But I think they are entitled to.

3           THE COURT:  Okay.  All right.  Let me ask you one

4   more -- do you want to respond to that, Mr. Theodore?

5           MR. THEODORE:  I would like to address all the points

6   you raised, deterrence, mitigation, and innocence.

7           THE COURT:  Okay.  Then hold on one second.

8           I allowed testimony about what other ISPs were doing

9   with regard to these notices and that several were not

10  forwarding notices if they contained settlement language.  And

11  I did that because I thought that it went to willfulness

12  because I thought that there was going to be -- or I thought

13  there was going to be testimony that Cox was aware that other

14  ISPs were not forwarding those notices to customers.  And I

15  don't recall that coming into the case.

16          So I am -- what's your recollection?

17          MR. BRIDGES:  Your Honor, we felt constrained --

18  Mr. Cadenhead absolutely would have testified to that, but it

19  was our understanding that the Court would not let him go

20  there.  If -- I wish we could have had him go there, Your

21  Honor, because he participated personally in the Copyright

22  Alert System negotiations and learned a lot about the industry

23  in those negotiations.

24          And it was his understanding, Your Honor, that Cox

25  was the only ISP at the time to terminate people.  And there

1843

1    was, I believe, discussion with certainly CenturyLink and

2    possibly other ISPs, I don't recall specifically, about

3    Rightscorp's notices.

4           If you recall, there was the famous e-mail in this

5    case, the F the DMCA e-mail, the underlying e-mail of the whole

6    thread was CenturyLink bringing Rightscorp to Cox's attention

7    about Rightscorp's notices.  Now, that e-mail was about the

8    volume of notices.  But, Your Honor, we just felt -- by the

9    Court's rulings.  We felt totally constrained on that front,

10   and we were trying not to get too close to the edge lest we

11   annoy the Court.

12          THE COURT:  Okay.  The intersection of the legal

13   opinion and his testimony may have precluded that in any event.

14          All right.  So where are you now on the fact that

15   there is no testimony that Cox was aware at the time it made

16   the decision to not forward the notices with regard to what

17   other ISPs were doing?

18          MR. BRIDGES:  Your Honor, we --

19          THE COURT:  What use, if any, do you intend -- I

20   mean, the continued examination reflects that they're -- you

21   know, that obviously Rightscorp has signed up and gotten

22   compliance from a vast amount of the industry to include the

23   settlement in the notices, but --

24          MR. BRIDGES:  Your Honor, I'm not sure the testimony

25   shows that Rightscorp has secured compliance with a vast amount

1844

1    of the industry.  If you look at the list of ISPs --

2           THE COURT:  Well, he also said there were 300 others

3    that had signed up.

4           MR. BRIDGES:  That's right, Your Honor.  The state of

5    Maine appears twice on that list.  It is not known to be a

6    great ISP.  It includes small ISPs.  It includes colleges as

7    ISPs.  It's -- there are lots of ISPs out there, and their

8    coverage, I think, is -- at least the last statistic I saw was

9    about 15 percent or something like that.  And some of them do

10   appear to edit out and maybe forward edited notices that Cox

11   believes is not appropriate to do.

12          So I think it's the wrong impression to say that it

13   has gotten the vast majority.

14          THE COURT:  Well, it includes -- I guess Comcast is

15   the only other -- is the biggest one of them.

16          MR. BRIDGES:  AT&T, Verizon, Cablevision --

17          THE COURT:  I understand they are not right.

18          MR. BRIDGES:  They are not.

19          THE COURT:  As far as Rightscorp is aware.  Because

20   the testimony that I heard is they -- the only way he knows

21   whether somebody is complying is if he gets a settlement offer,

22   which, you know, makes sense if you don't have a relationship

23   with the ISP.

24          MR. BRIDGES:  Well, Your Honor, that -- maybe that

25   was an explanation, but we got direct answers to direct

1    questions.  Does AT&T still ignore your notices?  There was a

2    direct question, direct answer.  That question repeated itself

3    across AT&T, Verizon, Cablevision -- I can't recall.  It's in

4    the trial transcript, and it was clear in the deposition.

5         THE COURT:  So you intend to use it in your closing

6    argument?

7         MR. BRIDGES:  I believe we do, Your Honor.

8         THE COURT:  Okay.  All right.

9         MR. BRIDGES:  But I think all of this goes to -- the

10   bottom line is Cox -- the jury has heard that Cox was willing

11   to process these notices if Rightscorp would just change them,

12   and it wasn't willing to act on these notices for good reason.

13   And I think based on that, a jury can certainly say that this

14   is not willful infringement by Cox.  And again --

15        THE COURT:  I agree that that argument is a clean

16   argument and doesn't even involve whether -- whatever third

17   parties were doing.  That can be a separate consideration.

18        Okay.  Thank you.

19        MR. BRIDGES:  Thank you, Your Honor.

20        THE COURT:  Mr. Theodore.

21        MR. THEODORE:  So let me start with the innocence

22   issue since that's what you were talking about with

23   Mr. Bridges, and then I will move on to the deterrence and the

24   mitigation questions that you asked about.

25        THE COURT:  All in five minutes or less.

1    MR. THEODORE:  I will try to be very quick, Your

2    Honor.

3         So I think there are two critical points on the

4    innocence question.  And the first is that he is conflating --

5    Mr. Bridges is leaving really no space between willful

6    infringement and innocent infringement.  Almost everything

7    Mr. Bridges says goes to the difference between just normal

8    infringement and willful infringement.

9         To show innocent infringement, Your Honor, and it is

10   their burden, it is the defendants' burden to show innocent

11   infringement, you have to affirmatively show that you did not

12   know that the works themselves were copyrighted.

13        There's no evidence in the record here that Cox

14   didn't know that the 1,397 works at issue were copyrighted.

15   There's been no dispute on that point.  There is just no

16   evidence whatever.

17        And on that basis, we don't think there's any grounds

18   for an innocence instruction.  Everything that Mr. Bridges said

19   is a reason that it's normal infringement, rather than willful,

20   but it doesn't go to innocence.

21        And then just briefly regarding all of his points

22   about the Copyright Alert System and Mr. Cadenhead's testimony.

23   I think -- you know, one of the reasons we argued that that

24   stuff should be excluded, and I think one of the reasons you

25   granted that motion -- well, I will let you tell us why you

1   granted it, but it is all hearsay.  That there was no -- you

2   know, they didn't take any actual discovery as to what all

3   these other ISPs did.  So it's improper for Mr. Cadenhead to

4   speak about what they did, essentially on speculation and

5   hearsay.

6          And similar thing is true as to Mr. Steele's

7   testimony.  He may have answered Mr. Bridges questions, but I

8   think he made very clear that the reason he was able to answer

9   those questions was an inference he made based on what was

10  happening with the Rightscorp notices.

11         So then in terms of the statutory damages, getting

12  back to the questions you originally asked, the -- we think

13  that a penalty and a deterrence instruction are both quite

14  appropriate here.  Those appear -- all that language appears in

15  the model instructions, the Eleventh Circuit, the Seventh

16  Circuit, the Ninth Circuit instructions.  Those are standard

17  parts of the statutory damages instruction.

18         The Fourth Circuit in the Superior Builders case had

19  an extensive -- specifically approved an extensive and specific

20  deterrent instruction, which we essentially reproduce in our

21  proposed instructions.  And we think that a deterrence and a

22  penalty instruction is especially appropriate in light of the

23  facts that we have shown in this case.

24         What we have shown is essentially that Cox had

25  complete indifference, complete indifference to copyright

1848

1   violations because it wanted to preserve the revenue associated

2   with repeat infringing subscribers.  And I think those are the

3   exact circumstances, consistent over years, years at a time,

4   and I think those are the exact circumstances in which a

5   deterrence instruction, a penalty instruction are appropriate.

6   That's why deterrence and penalty are in the statute, are in

7   the Copyright Act.

8           THE COURT:  Okay.  Thank you.

9           MR. THEODORE:  And if I could just briefly address

10  mitigation.

11          THE COURT:  Yes, sir.

12          MR. THEODORE:  I think the key point here is that

13  they have not put on a mitigation case.  So the first thing --

14          THE COURT:  Well, it is an affirmative defense.

15          MR. THEODORE:  It is an affirmative defense.

16          THE COURT:  So they are going to say, I assume, you

17  failed to mitigate by taking the settlement notices out, the

18  settlement terms out of the notice.  That's what I would

19  expect -- and so, what's your answer to that?

20          MR. THEODORE:  So I think there are three responses

21  to that, Your Honor.  First of all, on mitigation, it's not

22  enough to just say, oh, you should have mitigated it.  The

23  defendants' burden is to show the amount, the amount that

24  mitigation would have reduced their damages.  We cite, I think,

25  four cases on that in our brief.

1     And there is no evidence whatsoever in the record as

2  to the amount of mitigation here.  It's not appropriate just to

3  sort of send this off to the jury in a vague, free-floating way

4  without any evidence as to what they should be doing.

5     THE COURT:  Aren't they going to argue that every

6  dollar that you could -- might have collected is mitigated

7  because of the failure to take the settlements out?

8     MR. THEODORE:  I don't think there is any basis in

9  the record to argue that.  Because as Mr. Bridges just said,

10  let's say we had taken the settlements out and we credit

11  everything they say, all they would have done is processed our

12  notices.

13     And we know, we know that 90 percent -- and probably

14  it would have been higher for Rightscorp given that it was a

15  higher volume sender -- 90 percent of the notices that are sent

16  by copyright holders to Cox, absolutely nothing happens.

17     So I think there is no basis to say, okay, it is

18  100 percent.  And they have put in no evidence whatsoever as to

19  the amount of damages.

20     Then I think the second point on this, Your Honor, is

21  that taking out the settlement language isn't really proper,

22  isn't really proper mitigation.  When we think about

23  mitigation, it's you've been injured.  Now, go to the hospital,

24  reduce your injury, something like that.  That's not what we're

25  talking about here.  The taking out the settlement language

1850

1    doesn't go to reducing injury, it goes to the injury itself.

2            And I think there is pretty clear mitigation law that

3    people don't have to give up their rights.  The mitigation

4    doctrine doesn't require people to give up their rights.  And

5    BMG was entitled to ask for settlements from people who stole

6    its copyrights.  I mean, that is something that BMG is entitled

7    to do.

8            Now, Cox could choose what it wanted to do with those

9    settlements, but BMG is not required to give -- Cox could do

10   what it wants with those notices, but BMG is not required to

11   give up its right to ask for a settlement in order to avoid a

12   mitigation instruction.

13           And then finally, the third thing is, even if a

14   mitigation instruction were appropriate here, the freestanding,

15   like long-form mitigation instruction that they have is

16   inappropriate in this context.  In this context at most -- and

17   just to be clear, Your Honor, we think that mitigation has no

18   relationship to statutory damages.  I understand that you

19   disagree with that.

20           At most, mitigation is one consideration and one

21   factor in the statutory damages analysis.  It is not

22   appropriate to have a whole independent page on mitigation as a

23   free-floating defense when at most it should be a line in the

24   statutory damages instruction.

25           THE COURT:  Thank you.  Mr. Bridges.

1851

1    MR. BRIDGES:  He has given me a lot to respond to.  I
2  will try to do so very quickly, Your Honor.
3    First, on the question of innocent infringement.  I
4  ask the Court to look at our citations in our jury
5  instructions.  I try to stick to the statute whenever possible.
6  And Mr. Theodore just said that innocent infringement applies
7  only when there is no knowledge of copyrighted works.
8    That is not the statute, Your Honor.  Our jury
9  instruction comes from the statute.  It is a question of to
10  what extent the defendant may know it to be an infringement.
11  So that's that issue.
12    On deterrence.  We don't believe, Your Honor, it's
13  appropriate for the Court to pull particular factors out from
14  the factors listed in the statutory damages instruction and to
15  give them a separate instruction.  And so, it's inappropriate
16  on that.  Deterrence is okay as a factor, but it shouldn't be
17  teased out as a doubling down.
18    Second, the question about penalty is an interesting
19  one because the Court -- this Court said, and I've forgotten
20  which case it was, said that there should be -- the statutory
21  damages do have a relationship to actual damages.
22    Under their view, all infringement deserves a penalty
23  in statutory damages.  What's left for willfulness then?  And I
24  think that describing penalty as part of ordinary statutory
25  damages is different from deterrence.  And I understand some

1852

1    courts have said that, but I think they may be confusing

2    ordinary -- the ordinary range with the willful range.

3            In terms of the notices from what Mr. Cadenhead

4    learned from other ISPs about their practices, Mr. Theodore

5    said that's hearsay.  We wouldn't have been offering it for the

6    truth of the matter asserted.  We would have been offering it

7    for what Cox heard and understood.  That's just not hearsay.

8            THE COURT:  Okay.  Well, I mean, I think I ruled on

9    that, actually that it was hearsay because it was being offered

10   for the truth of it at an earlier hearing.

11           MR. BRIDGES:  Right.  But part of the point is it

12   goes to what Cox understood its practices were in the industry

13   context.

14           THE COURT:  State of mind, right.

15           MR. BRIDGES:  Right.  And I have to say, Your Honor,

16   a very good place to look, it's a case that the Fourth Circuit

17   cited in CoStar, and it's a Seventh Circuit case, Doe versus

18   GTE, about contributory infringement of an ISP like Cox.  And

19   that case basically explains why ISPs like Cox are not

20   contributorily liable under the Sony doctrine.  We have circled

21   around this, you don't want to hear it again, but there is

22   ample reason for Cox to believe that as an ISP doing what

23   normal ISPs do, it's protected.

24           The last point on mitigation.  Mr. Theodore said,

25   well, defendants have to prove a specific amount of money.

1853

1   Well, that's fine in an actual damages case where we're talking

2   about real money.  We're talking about magic money in statutory

3   damages, Your Honor, to begin with.  And I think the point

4   is -- because it's conjured up from a variety of factors and it

5   doesn't get tethered to anything.

6           Well, if that's the case, I think the Court's

7   questions about, well, maybe there would not have been this

8   problem at all from dollar one if BMG had mitigated by fixing

9   the notices -- Your Honor, Mr. Theodore said that the plaintiff

10  shouldn't have to give up its right in mitigation.  It doesn't

11  have a right to commandeer Cox's service to force Cox to

12  communicate the way it wants Cox to communicate.  It always has

13  the right to send 512(h) subpoenas, always has the right to sue

14  individuals.

15          The question is here, if BMG going back three years

16  ago had sent those notices, the infringements very likely would

17  have stopped.  And that's what mitigation is about.  It's

18  trying to get the offending behavior stopped through the

19  graduated response process.  It is not about, oh, giving up

20  your right to get money through the system.

21          So those are my arguments, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MR. THEODORE:  Do you want to hear further from me,

24  Your Honor?

25          THE COURT:  No, you're fine.  Thank you.

1854

1          MR. THEODORE:  All right.  Thank you, Your Honor.

2          THE COURT:  Thank you.  All right.  This answers my

3    questions that I had coming out.

4          How is our jury doing, Joe?

5          COURT SECURITY GUARD:  All here.

6          THE COURT:  They're all here?  All right.

7          MR. PECAU:  Your Honor, just a couple of housekeeping

8    matters.

9          THE COURT:  Yes, sir.

10          MR. PECAU:  Your Honor, there are a number of things

11   that were brought up earlier that have to do with the witnesses

12   that are coming -- I'm sorry -- that have to do with, you know,

13   the evidence in this case and the witnesses coming up, and I

14   would just like to bring them to Your Honor's attention.

15          THE COURT:  Please do.

16          MR. PECAU:  So one, Cox claims that there are a

17   number of documents that are self-authenticating.  We disagree.

18   And both parties are prepared to argue that.

19          We have the Rule 50 motion that BMG would like to

20   make.

21          There are also issues --

22          THE COURT:  And I've read that and I'll take it

23   under -- I'll deny it without prejudice at this time.

24          MR. PECAU:  Okay, thank you, Your Honor.  And then

25   there are also issues with regard to Mr. Bardwell.  And Cox is

1    also seeking to bar Mr. McGarty's testimony.

2           So certainly with respect, the self-authenticating

3    documents, I think, Your Honor, we could argue later, but I

4    think it would be appropriate to address the Bardwell and

5    McGarty issues that Cox has raised.

6           THE COURT:  Go ahead.

7           MR. PECAU:  I'm not going to do it, Your Honor.

8           THE COURT:  You're the MC?  All right.

9           MR. BRIDGES:  One quick point, Your Honor, in light

10   of the denial of plaintiff's JMOL without prejudice.  If the

11   Court later decides to entertain it, could we await the Court's

12   direction to file a response?

13          THE COURT:  Yes, sir.

14          MR. BRIDGES:  Thank you, Your Honor.

15          THE COURT:  All right, Mr. Allan.

16          MR. ALLAN:  Your Honor, good morning.

17          THE COURT:  Good morning.

18          MR. ALLAN:  We intend to call Dr. McGarty as a

19   rebuttal expert.  Your ruling on the motion, on the Daubert

20   motion indicated Dr. McGarty's testimony may be relevant to

21   rebut assertions regarding Cox's operations.  That's exactly

22   what we intend to use him for.

23          THE COURT:  Tell me, what is he going to say?

24          MR. ALLAN:  He is going to say -- essentially what

25   he's going to do is rebut Mr. Cadenhead's testimony that the

1   system was 96 percent effective.  As you recall, that testimony

2   was very effective, we made an objection to it, you noted our

3   exception.  They first tried to bring that testimony in through

4   Mr. Rosenblatt, then it was excluded.  Your Honor let it in.

5          Mr. McGarty addresses this issue specifically in his

6   reports, and he ought to be able to come in and say, that's not

7   true.  That the system is not effective and operationally it

8   doesn't work the way it works.

9          And all of the reasons that Mr. Bridges just

10  enunciated to the Court that, you know, had Rightscorp simply

11  taken out the settlement language three years ago, all that

12  infringement would have stopped, all of that is premised on the

13  96 percent statistic which is unsupported.  Dr. McGarty ought

14  to be able to come in and rebut that.  And that's precisely

15  what we intend to have him do.

16         THE COURT:  Okay.  I think that's highly relevant.

17  And for the record, anybody want to oppose that, Mr. Buckley?

18         MR. BUCKLEY:  Your Honor, we just asked for clarity

19  on what he was going to testify to and rebut, and they wouldn't

20  share that with us.  That's the first we've heard that.  So on

21  that basis, no objection.

22         We do have objections to Dr. Lehr's testimony, and I

23  think he's the first witness.

24         THE COURT:  Okay.  And what's the objection to

25  Dr. Lehr's testimony?

1857

1          MR. BUCKLEY:  Dr. Lehr is going to testify --

2    Dr. Lehr is going to testify to points that he testified to on

3    direct and that they asked Dr. Sullivan in cross.  And based on

4    the slides --

5          THE COURT:  Is Dr. Lehr in the courtroom?

6          MR. WARIN:  No, Your Honor, he's in the witness room.

7          THE COURT:  All right.  Thank you, Mr. Warin.

8          MR. BUCKLEY:  Dr. Bardwell is here in case we get to

9    the point where we are talking about him.

10          THE COURT:  Okay.  He's just left.  Okay.

11          MR. BUCKLEY:  They're going to have -- according to

12    the slides we were given, they're going to have Dr. Lehr repeat

13    the calculation that he did of lifetime subscriber value times

14    60,000 subscribers, and then they're going to have him talk

15    about what they asked Dr. Sullivan on the stand about, well,

16    what if the number is 3,000 instead of 5,000.  And he said, you

17    know, then you get a figure of 240 million or something.

18          So as it's -- as far as I can tell, it's all

19    testimony that's already in the record, and so we have

20    questions about what it is he's rebutting.

21          THE COURT:  Good morning, Mr. Warin.

22          MR. WARIN:  Good morning, Your Honor, how are you?

23          THE COURT:  Good.

24          MR. WARIN:  We expect Dr. Lehr's testimony to be

25    short.  We heard at length from Dr. Sullivan on Friday and

1   Mr. Mencher criticizing Dr. Lehr's calculations, his

2   methodology, the accuracy of his numbers that he used from Cox.

3   We believe that's perfectly appropriate testimony, he was here,

4   he heard that testimony.  To come back and say, you've heard

5   Dr. Sullivan's criticism of your calculations, your

6   methodology, your conclusions, and he made the following

7   criticisms, X, Y, Z.  Do you agree with those?  Why not?

8            And so, that's basically what he's doing, is he's

9   responding to the specific criticisms that Sullivan made of

10  what he did and saying why now, having heard Sullivan's

11  testimony, he disagrees with Sullivan and adheres to his

12  original calculations.

13           THE COURT:  I think that's permissible.  And,

14  Mr. Buckley, if you think they're getting far afield and that

15  they are just testifying about matters that they brought up to

16  Dr. Sullivan and it also is not -- doesn't go to the

17  criticisms, then you can raise an objection at that time.

18           MR. BUCKLEY:  Thank you, Your Honor.

19           THE COURT:  All right.  Who else, what other

20  objection is there?

21           MR. WAKEFIELD:  Your Honor, one other issue with

22  respect to Dr. Bardwell.

23           THE COURT:  Yes, sir.

24           MR. WAKEFIELD:  The plaintiff apparently wants to

25  introduce the actual names of the 123 subscribers as an exhibit

1   with personal information.  They have now agreed to redact the

2   addresses and last names, but there's no dispute that there was

3   personal information provided for 123 subscribers.  It seems

4   cumulative of that.

5           THE COURT:  That was in a prior exhibit?  I don't --

6           MR. WAKEFIELD:  There's no exhibit with the names of

7   the people.  And that's what they want to put in.

8           THE COURT:  Just the fact that there were 122 people

9   has come in so far.

10          MR. WAKEFIELD:  And they want to put in all of their

11  documents showing who they are essentially, but blacking out

12  parts of their personal information.

13          I don't see how that's relevant to anything.  There's

14  no question that those came in and it's even -- you know, I

15  don't know what kind of sleuth things someone could to in the

16  public record to harass people, but it just seems unnecessary.

17          THE COURT:  Well, if they don't have their addresses

18  or last names, it's a little harder than it might otherwise be

19  when perhaps the list was drawn.

20          All right.  Thank you, Mr. Wakefield.

21          Good morning, Mr. Caracappa.

22          MR. CARACAPPA:  Good morning, Your Honor.

23          THE COURT:  Why do you want to put in an exhibit with

24  the actual partial names?

25          MR. CARACAPPA:  So they objected to a number of our

1860

1   exhibits, and that was one of them.  We went back, we redacted

2   out most of the information.  We don't have any intent to use

3   it.  We just need the number that there were 122, that's all.

4         So we don't intend to use it or introduce it or

5   submit it into evidence.  If anything, we were going to use it

6   as a demonstrative, that's all.

7         THE COURT:  Okay.  All right.  So that takes care of

8   that.

9         MR. CARACAPPA:  Is it that the only objection?

10        MR. WAKEFIELD:  Well, sorry.  There were some

11   additional new documents that they apparently want to use in

12   the Nowlis direct.

13        It looks like, the Court will recall, when Mr.

14   Negretti was being cross-examined, plaintiffs had found some

15   advertising materials, more recent advertising materials

16   promoting speed.  Those weren't discussed or cited in his

17   report.  So I don't know that that's proper even on rebuttal.

18        THE COURT:  Well, they were all Cox documents, and

19   you had extensive testimony about the latest, greatest mega

20   offering from Cox, whatever it was called, Giga something or

21   other, so I think that that's all fair game.

22        MR. WAKEFIELD:  Giga something or other is right,

23   Your Honor.  So then we will withdraw the objections to those.

24        THE COURT:  Well, I'll note your exception.

25        MR. WAKEFIELD:  Yeah.

1       THE COURT:  But I understand.

2       MR. WAKEFIELD:  Thanks.

3       THE COURT:  All right.  Do you need time to

4  reshuffle, or can we get our jury --

5       MS. JOBSON:  I have one item, if I might.

6       THE COURT:  Ms. Jobson.

7       MS. JOBSON:  I believe Mr. Pecau mentioned some

8  self-authenticating documents and judicial admissions, and I

9  think we can go over those later so we can get started today.

10      But one thing that would be helpful for us in terms

11  of organizing, I think both sides have agreed on a method of

12  organizing the binders that will be sent back to the jury, and

13  we wanted to make sure that that was acceptable to Your Honor.

14      THE COURT:  Yeah, that was fine.  Thank you.  That

15  makes good sense, and I appreciate the work that you did to get

16  that together yesterday.

17      MS. JOBSON:  Okay.  So you have discussed with

18  Ms. Pack --

19      THE COURT:  Yeah, last evening.  So I think we're all

20  on all fours with that one.  That was great.

21      MS. JOBSON:  Great.  Wonderful.  Thank you.

22      THE COURT:  Thank you.  Mr. Pecau.

23      MR. PECAU:  Your Honor, I think we just need about a

24  minute-and-a-half for the reshuffling and then we'll be ready

25  to go.

1862

1    THE COURT:  All right, then let's take a brief recess
2  and we'll come back and we'll get our jury.

3    All right, we're in recess.

4    NOTE:  At this point a recess is taken; at the
5  conclusion of which the case continues in the absence of the
6  jury as follow:

7  JURY OUT

8    THE COURT:  All right.  Ready for our jury?

9    MR. WARIN:  We are, Your Honor.

10    THE COURT:  Joe, let's get our jury, please.

11    NOTE:  At this point the jury returns to the
12  courtroom; whereupon the case continues as follows:

13  JURY IN

14    THE COURT:  All right, please be seated.

15    Good morning, ladies and gentlemen.  I hope you had a
16  terrific weekend.  The weather certainly cooperated.  And
17  yesterday as well.

18    And give me a nod of heads that you didn't do any
19  research or investigation or talk to anybody about the case.
20  All right, great.  Thank you very much.

21    All right.  As I said on Friday, we will begin the
22  rebuttal evidence at this time by BMG.

23    Mr. Warin.

24    MR. WARIN:  Thank you, Your Honor.  Your Honor, for
25  our first rebuttal witness we will call Dr. William Lehr.

1    THE COURT:  Dr. Lehr has been previously sworn.

2    Good morning, sir.

3    THE WITNESS:  Good morning.

4    THE COURT:  All right.  Please, whenever you are

5 ready.  All right.

6    WILLIAM LEHR, recalled by counsel for the plaintiff,

7 having been previously duly sworn, testifies and states:

8    DIRECT EXAMINATION

9 BY MR. WARIN:

10 Q.   Good morning, Dr. Lehr.

11 A.   Good morning.

12 Q.   All right.  You were here on Friday afternoon, correct?

13 A.   Yes, I was.

14 Q.   All right.  And did you listen to the testimony of

15 Dr. Ryan Sullivan?

16 A.   Yes, I did.

17 Q.   Do you know Dr. Sullivan?

18 A.   I do not know him personally, no.

19 Q.   All right.  Dr. Sullivan criticized some of your

20 conclusions and methodologies, correct?

21 A.   Yes, he did.

22 Q.   In your report and your earlier testimony you said that

23 you did not believe it was possible to accurately value BMG's

24 lost sales as a result of the alleged infringement of BMG songs

25 by Cox subscribers, correct?

1   A.   Yes, I did.  In addition to the methodological problems,

2   there is a number of data issues that in this case make it

3   fundamentally, I believe, impossible to do that.

4   Q.   Did Dr. Sullivan agree with you on that?

5   A.   No, he did not.

6   Q.   All right.  Did Dr. Sullivan attempt to calculate the

7   value of the lost sales of BMG songs as a result of

8   infringement by Cox subscribers?

9   A.   Yes, he did.

10  Q.   All right.  I would like to show, if you could, Karl,

11  demonstrative Exhibit No. 35 from Dr. Sullivan's testimony.

12           All right.  Do you see that on the screen?

13  A.   Yes, I do.

14  Q.   All right.  And in the harm to BMG, Dr. Sullivan has a

15  number here of $815,979, which I believe was his effort to do

16  what you said wasn't possible, which is calculate the lost

17  value of the sales to BMG, correct?

18  A.   Yes.  I said I don't believe it's possible to come up with

19  a reasonable and accurate, reliable estimate of that.

20  Q.   Would you explain to us why that is?

21  A.   Well, first, as I said, there's a lot of methodological

22  issues that you would have to confront in doing this.  But if

23  you don't have the right data, you basically just can't even

24  get out of the starting gate.  And in this matter, significant

25  pieces of data that you really have to have just isn't

1    available in this matter.

2    Q.   What data is that that you think would be necessary to

3    project a reasonable calculation of BMG's lost sales?

4    A.   Well, the first thing that you would need to do, and

5    Dr. Sullivan tries to do, is come up with the number of illegal

6    copies that are out there in the marketplace that are competing

7    with the legal sales of BMG's content.  And the data to come up

8    with such an estimate just doesn't exist.

9         What exists is some data about a subset of Cox

10   subscribers and whether or not they were running BitTorrent.

11   And when they were running BitTorrent for part of the time

12   those subscribers were observed, whether or not there were

13   copyrighted materials on their computers.

14        From that data, you just don't know how many times

15   illegal copies may have been uploaded or shared from those Cox

16   subscribers that were identified in the data.

17        And so without that, you know, it could have been,

18   you know, 1,000, 2,000, or 3,000 times or whatever, those files

19   would have been uploaded or downloaded.  There is just no basis

20   for estimating that unless one wants to make, you know, ad hoc,

21   arbitrary assumptions that aren't supported with evidence in

22   this case.

23   Q.   All right.  Is there any other reason why you believe it

24   is impossible to accurately calculate BMG's lost sales as a

25   result of the infringement on the Cox network?

W. Lehr - Direct

1866

1   A.   Well, in addition to the problem with not knowing how many

2   illegal copies would be competing with the legal copies, you

3   don't know anything about the behavior of those Cox subscribers

4   and about others that may have acquired illegal copies from

5   Cox, what they would have purchased and what they would have

6   been willing to pay had they purchased it.

7         For example, you know, if they downloaded an illegal

8   copy, would they have --

9         MR. BUCKLEY:  Your Honor, this is beyond the scope of

10  this expert's testimony.

11        THE COURT:  Overruled.  I am going to allow it.

12  A.   If they had purchased those illegal copies, would they --

13  if they hadn't been able to get those illegal copies, would

14  they have instead purchased a physical CD?  Okay.  Or would

15  they have downloaded a file?  Or would they have purchased more

16  streaming music?  There is not evidence in this case, you know,

17  unless you want to make some arbitrary assumptions.  Like for

18  example, physical sales don't matter at all.  That's an

19  assumption that Dr. Sullivan makes.  I don't think there is

20  support in this case or in the literature that would allow one

21  to say that illegal sales don't cannibalize or substitute for

22  legal sales of physical media.  So that's an example.

23  BY MR. WARIN: (Continuing)

24  Q.   So physical media, what do you mean?

25  A.   CDs, for example.  You know, a user says, I downloaded

1    this, I have it, I don't need to now buy the physical CD.

2    Dr. Sullivan in his analysis says that's not a way in which BMG

3    would have lost revenue.  And I just don't think there is any

4    evidentiary basis for making that assumption.

5    Q.   Any other reasons why you continue to believe that it is

6    impossible to estimate accurately the amount of lost sales as a

7    result of BMG's works being infringed on the Cox network?

8    A.   Well, my original direct testimony I also mentioned that

9    their -- you know, trying to compete with illegal copies

10   distorts and limits the business models of the legal rights

11   holders.

12          So the pricing that BMG might have been able to

13   realize in its legal sales of the goods, the business models it

14   might have wanted to pursue, all of these things would have

15   been affected by competing with illegal sales.  And there is

16   just no good way to estimate that in this case, and it would be

17   a difficult thing to undertake even in a general sense.

18   Q.   All right.  I would like to move on.  We have talked about

19   the first part of your testimony that Dr. Sullivan criticized,

20   which is your view that it's impossible to determine the value

21   of the lost sales of BMG songs as a result of the infringement

22   of the Cox network.

23          I would now like to talk about the economic benefit

24   to Cox, which was another part of your original testimony and

25   your report, and it was something that Dr. Sullivan, when he

1    was here on Friday, criticized.

2              Were you here for that criticism?

3    A.   Yes, I was.

4    Q.   All right.  Now, I would like to -- did Dr. Sullivan come

5    up with his own number competing with yours as to the benefit

6    to Cox of the illegal sales or copying or uploading and

7    downloading of BMG songs on the Cox network?

8    A.   Yes, he argued that he had what he said was an estimate of

9    the maximum possible economic benefit that BMG could have

10   realized.

11   Q.   And so, Dr. Sullivan, as I understand, upper bound benefit

12   to Cox, which is what we are talking about --

13   A.   Yes.

14   Q.   -- his number was what?

15   A.   Well, he said that the maximum benefit upper bound was

16   $2,145,585.  Which, you know, is essentially just the same as

17   the revenue benefit that BMG would have been harmed by.  And I

18   have already explained why I don't think that upper line

19   estimate makes no sense.

20             But to say that the harm that BMG would have

21   experienced in its sales, upper bounds the business value to

22   Cox of having infringing subscribers on its networks, just

23   makes no sense to me as a matter of economic analysis.

24             BMG is principally in the business of selling songs,

25   and Cox is principally in the business and realizes its profits

1   in selling cable services to cable subscribers, and there is no

2   reason that I can think that would suggest that the potential

3   harm to BMG would provide any kind of upper bound estimate of

4   the benefit to Cox.

5   Q.   Right.  You did calculate the benefit to Cox of what you

6   felt was an appropriate measure of the value of the infringing

7   customers to Cox, correct?

8   A.   Yes.

9   Q.   All right.  If we could have on the screen PDX 007.

10          Now, I believe this was a display that you used

11  showing how you calculated the value of an individual

12  subscriber to Cox, correct?

13  A.   Yes.

14  Q.   All right.  And then you used this number, it says for one

15  subscriber, to calculate the value of the infringing

16  subscribers to Cox, correct?

17  A.   Yes.  I mean, you -- that is certainly what this number

18  allows you to do, yes.

19  Q.   All right.  And when Dr. Sullivan was here on Friday, he

20  criticized your calculations here, correct?

21  A.   Yes.

22  Q.   All right.  Why don't we walk through the various

23  criticisms that he made of your calculations and methodology.

24          Now, what was the first criticism that you recall

25  that he made of your calculations and methodology?

1    A.   Well, what this estimate is, it's an estimate of what is

2    the value to Cox of retaining a subscriber or attracting a

3    subscriber, or some relatively small number of subscribers

4    relative to the size of Cox's business.

5            And it takes into account what those subscribers

6    actually contribute to Cox's bottom line.  And because the

7    typical subscriber purchases multiple services from Cox, when

8    they purchase the high-speed Internet service, and because

9    that's convenient and beneficial to both Cox and those

10   subscribers, I looked at what the typical subscriber pays.  And

11   that takes account of the fact that the average subscriber,

12   80 percent of, I think, the Cox subscribers purchase at least

13   two services, and a very significant number purchase all three.

14           So I took account of the revenues and profits

15   associated with those, that that subscriber or a subscriber

16   contributes to Cox's bottom line.

17           Dr. Sullivan argued that I should have ignored any

18   revenues or profits contribution associated with the

19   subscribers' purchase of video and telephone services.

20   Q.   Do you agree with that?

21   A.   I do not agree with that.

22   Q.   Why not?

23   A.   Because as I explained in my direct testimony and I was

24   talking about right now, the typical subscriber purchases more

25   services.  Cox knows this.  This is the way the business is

1   marketed.  Customers who purchase more services get a discount

2   on those services.  The data that was provided by Cox to

3   provide the estimates in this reflect those discounts.

4           And so, to have ignored those would have just, I

5   think, been, you know, inappropriate and wouldn't have captured

6   the benefit Cox realizes from having these subscribers who as

7   part of what they are doing when they are Cox subscribers is

8   engaging and infringing activity, would be a mistake.

9   Q.   That was the first criticism.  Did Dr. Sullivan make any

10  other criticisms of your calculations?

11  A.   He always challenged me on the data I used for the life

12  span of a typical customer, and he cited some other data.  The

13  data I used was data that had been validated in deposition by

14  Mr. Negretti and was part of an exhibit that I saw shown in the

15  proceeding several times while I was listening to testimony

16  earlier in the week.

17  Q.   And the life span you used was 5.6 years, correct?

18  A.   Yes, I used the life span of 5.6 years.

19  Q.   Did he criticize your use of a profit margin at all in

20  making this calculation?

21  A.   Yes, that was another significant criticism that he made

22  of the analysis I did.  What I looked at for the profit margin

23  using the data from Cox's financial documents was what's called

24  the contribution margin.  And that's taking the revenues and

25  taking off the product direct costs, those costs that are

1 directly attributable to offering that service.  And that would

2 vary when you add or subtract marginal subscribers.

3         He said what I should have done is have chosen

4 another number that was also on those sheets that is referred

5 to as the controllable margin.  That is actually what the text

6 on the Cox documents calls it.  And what that does is that

7 actually --

8 Q.   Let me stop you.  So you used one number --

9 A.   Yes.

10 Q.   -- from Cox's actual documents, and he said you should

11 have used another number; is that right?

12 A.   That's right.

13 Q.   Please continue.

14 A.   It turns out on a percentage terms for the data service,

15 the contribution margin is 96.6 percent for the Internet

16 service, and that number is comparable to estimates that have

17 been provided in the trade press and by the investment

18 community, you know, for other publicly traded cable companies.

19 So it is one that I think is consistent with the data in Cox's

20 own data.

21         The number he said I should have used is, again, it's

22 called the controllable margin.  That number is like

23 68.1 percent.  So lower, because it includes additional costs.

24 And the additional costs it includes are operating expenses,

25 and those operating expenses are things like network

1   maintenance, sales, and marketing.  There are some other line

2   items in there.

3          And the question about whether or not those costs

4   should be included or not in estimating the value of

5   incremental subscribers is whether or not those costs would

6   significantly change if you added or subtracted an individual

7   subscriber.

8          And I -- you know, understanding how this business

9   operates and what those costs were, I determined that they do

10  not, are not likely to change, and so it would have been

11  inappropriate to have included them and to have used the

12  68.1 percent margin.

13         And later when I heard Mr. Mencher testify, he's a

14  financial analyst from Cox, he said this is the right data, you

15  know, this is the right cost revenue data, internal data.  You

16  know, I'm not reading something that has errors in it.  It is

17  from Cox.  And he admitted that networks still need to be

18  maintained when you add and subtract a few subscribers.  You

19  still need field service people.  That the bulk, almost all, if

20  not all of those expenses wouldn't change if you add or

21  subtract a few subscribers.

22         You know, you still need guys to be out there.  You

23  know, if a tree falls on a line, you have to have someone out

24  there to fix that line.  And it doesn't matter whether or not

25  that line is actually providing service to any subscribers in

1    that neighborhood.  As long as you are in that neighborhood,

2    you need that.  And if you are adding and subtracting a few

3    subscribers, you are still in that neighborhood, so you still

4    have those costs.  So it would have been --

5              MR. BUCKLEY:  Your Honor, is there a question?

6              THE COURT:  There was a question.  And he is

7    explaining why he used a particular line item and not another.

8    So I will allow it.

9              But let's focus the questions a little more, if you

10   would.

11   BY MR. WARIN: (Continuing)

12   Q.   Do you believe, as a result of hearing Mr. Mencher's

13   testimony and Dr. Sullivan's testimony, that you used the wrong

14   number for the proper factor for Cox?

15   A.   No, I do not.  I think it is still appropriate to have

16   used the 96.6 percent incremental contribution margin as the

17   profit contribution of an individual subscriber to Cox's bottom

18   line, and not the 68.1 percent that Dr. Sullivan recommended.

19   Q.   Now, even though you believe you used the right number, I

20   have asked you to do the calculation using Dr. Sullivan's

21   number, haven't I?

22   A.   Yes.

23   Q.   All right.  I would like to show the next slide, please,

24   Karl.

25              All right.  Would you tell us what this slide

W. Lehr - Direct

1875

1    displays.

2    A.   What this slide shows is my calculation, which I still

3    conclude is the right economic analysis.  And then over to the

4    right it says, but if I were to include those additional costs,

5    those operating expenses and deduct them from the revenues for

6    the service, that would reduce the contribution each subscriber

7    would make per month.  And what that would do is it would

8    reduce that amount from $98 to $65.

9         And that then would reduce -- you know, you are

10   getting $65 instead of $98 a month over the life span of that

11   subscriber.  And so, that would reduce the estimate of the

12   value of the subscriber to $3,525.

13   Q.   All right.  Did Dr. Sullivan do that calculation on Friday

14   when he was here?

15   A.   No.

16   Q.   So this is a calculation you have done using the number he

17   suggested, correct?

18   A.   Yes.

19   Q.   All right.  Now, your number, 5,294, is there any industry

20   data that is available that would indicate how that number

21   compares with industry averages for the value of a customer?

22   A.   Well, in my original testimony I did look at some other

23   data.  And so, one of the other ways one could think about how

24   you might get to a number like this is look at financial

25   transactions, merger and acquisition activity, announced deals

1   that get reported in the trade press.

2          And so those articles will often say, you know, cable

3   company A is buying some assets from cable company B, and they

4   are paying some large number for those assets, and that's going

5   to involve, you know, some number of subscribers.

6          So you can take that reported value and divide it by

7   those numbers of subscribers and you come up with an estimate

8   of what did those companies think, you know, was the value of

9   acquiring that number of subscribers and put it on a per

10   subscriber basis.

11          I looked at a number of transactions from 2012 and

12   those values --

13          MR. BUCKLEY:  Improper rebuttal, Your Honor.

14          THE COURT:  Approach the bench, please.

15          NOTE:  A side-bar discussion is had between the Court

16   and counsel out of the hearing of the jury as follows:

17   AT SIDE BAR

18          THE COURT:  Where is this coming from?

19          MR. WARIN:  He had in his report earlier that his

20   value of 5,200, which he prepared for litigation, based upon

21   Cox's numbers, estimated a value of a customer is consistent

22   with industry data by other cable companies when they value a

23   customer when they are making an acquisition.

24          THE COURT:  So it was in his Rule 26 report?

25          MR. WARIN:  Yes.

1    MR. BUCKLEY:  Your Honor, it was.  And Dr. Sullivan

2    rebutted it at that point.  They didn't bring it out in direct.

3    And Dr. Sullivan's response to his lifetime subscriber value

4    number was he used the wrong profit margin, not -- it's not

5    related to transactions that --

6        MR. WARIN:  But to show he used the right number, he

7    can show others used the number.

8        THE COURT:  Okay.  I will allow it.  Thank you.  Your

9    exception is noted.

10       MR. BUCKLEY:  Thank you.

11       NOTE:  The side-bar discussion is concluded;

12   whereupon the case continues before the jury as follows:

13   BEFORE THE JURY

14       THE COURT:  You accurately recognized him as being

15   the leader of the group here.  Go ahead.

16       MR. WARIN:  If he's not ready, we're not ready.

17       THE COURT:  All right.

18   BY MR. WARIN: (Continuing)

19   Q.   All set?  Dr. Lehr, I think I was asking you whether or

20   not your number of 52 -- $5,294 is consistent with other

21   valuations as to the value of a customer in the Internet and

22   cable space, and you were answering when we approached.

23   A.   Sorry.  I was explaining that I did look at a number of

24   transactions, it was part of my original report that came up

25   with the estimate of 5,294.  And these were not talking about

W. Lehr - Direct

1878

1   acquiring Cox assets.  These were talking about acquiring other

2   cable assets amongst other cable companies.

3          And for those transactions, there was a range of

4   value between 4 and $6,000 when you do that calculation, value

5   of the transaction divided by the number of subscribers

6   involved.  It comes out to 4 to $6,000.

7   Q.   All right.  Now, the number that I asked you to calculate

8   was the profit -- excuse me, the value of a customer using

9   Dr. Sullivan's number with respect to the net profit, correct?

10  That's the 3,500?

11  A.   Well, it wasn't -- it was the controllable margin, which

12  is Cox's controllable margin.  It is not Dr. Sullivan's, it's

13  the one he said I should have used.  And I get a lower number,

14  it's 3,525.

15  Q.   Did you do a calculation using Dr. Sullivan's lower number

16  that you don't agree with with respect to the lifetime value of

17  a Cox Internet subscriber?

18  A.   Well, in my -- I did.  In my earlier testimony I had said,

19  you know, rounding this to like $5,000, you know, if there were

20  60,000 infringing subscribers, then 60,000 times 5,000 is 300

21  million.  And that was, that's an estimate of the financial

22  benefit that Cox derives from having those infringing, 60,000

23  infringing subscribers if you think the value is about $5,000.

24  Q.   Have you prepared a slide that demonstrates the

25  comparison?

W. Lehr - Direct

1879

1     A.    I have, because that --

2     Q.    Can you tell us what this slide displays?

3     A.    Yeah, the calculation I did was approximate.  So I said it

4     was about 300 million.  It turns out it's 317,640,000 if you

5     actually multiple out all the digits.

6            If you do that same calculation applied to the 3,525,

7     the number is lower, but it's $211,500,000.

8     Q.    All right.  So taking into account Dr. Sullivan's

9     criticism with respect to the profit margin you used, if you

10    used his recommended profit margin of 68.7 and multiplied it

11    times 60,000 repeat infringers, the value to Cox would be what?

12    A.    211,500,000.  And, you know, that's still a very

13    significant number.  And prior to doing my analysis, if the

14    financial data had said that the contribution margin -- I mean,

15    the contribution margin, the right one said that the value was

16    3,525, then this would have been my final estimate.

17           But I still think the 317 million is a more accurate

18    estimate.

19    Q.    All right.  You mentioned this briefly, but just let me

20    cover it with one last question or two.  You were here also on

21    Friday for Mr. Mencher's testimony, correct?

22    A.    Yes.

23    Q.    All right.  Did anything that Mr. Mencher said about the

24    profitability of Cox and value of individual subscribers change

25    your view as to the conclusions you reached?

1   A.   No.  It reaffirmed them because, you know, it made me more

2   confident that I fully understood what the data was and how I

3   was using it.

4           MR. WARIN:  All right.  We have no further questions.

5           THE COURT:  All right.  Cross-examination,

6   Mr. Buckley.

7       CROSS-EXAMINATION

8   BY MR. BUCKLEY:

9   Q.   Good morning, Dr. Lehr.

10  A.   Good morning.

11  Q.   Nice to see you.  So, Dr. Lehr, you've testified now twice

12  about your lifetime subscriber value calculation, right?

13  A.   Yes.

14  Q.   And that lifetime subscriber value, that's the value of

15  any Cox subscriber, right?

16  A.   It's the value -- it's an estimate of the value of an

17  average subscriber.  And my testimony actually explained that I

18  thought it was an underestimate of the value of infringing

19  subscribers.  But because there wasn't data available in this

20  case to estimate the additional value of having infringing

21  subscribers, I used the average value.

22  Q.   Okay.  But this value, in your original calculation it was

23  $5,200 or $5,300 roughly, right?

24  A.   Yes.

25  Q.   And that's the value of a subscriber whether that

1    subscriber is an infringer or not?

2    A.   That's an estimate of the average value of a subscriber,

3    yes.

4    Q.   And the reason you're focussed on that lifetime subscriber

5    value is that your view is if Cox were to terminate a

6    subscriber, it's going to -- Cox is going to lose some or all

7    of that value, right?

8    A.   Well, if Cox terminated a subscriber, it would lose that

9    value, but it's a value of Cox having subscribers on its

10   network and potentially attracting subscribers to its network

11   which it does in the normal course of its business, they would

12   be worth $5,294.

13   Q.   Right.  But the reason it's relevant here and to your

14   testimony is that if Cox were to terminate one of those folks,

15   they're going to lose some or all of that value, right?

16   A.   Well, the reason it's relevant I believe in this testimony

17   is it captures the financial benefit that Cox derives from

18   having infringing subscribers on its network.

19   Q.   Well, not infringing subscribers, subscribers generally.

20   I think that's what you just said.

21   A.   Well, no, I said -- I'm using it as an estimate because

22   it's the only estimate I have data with which to estimate of

23   the infringing subscribers.  It also turns out it would be a

24   reasonable estimate for the average subscriber given the data

25   that's in this case.  I think the infringing subscribers, the

1   evidence shows are even more valuable to Cox.

2   Q.   And the idea is if Cox were to terminate some or all of

3   those infringing subscribers as you've called them, they're

4   going to lose some or all of that lifetime value?

5   A.   Right.  So, for example, if it no longer had those 60,000

6   subscribers on their network, then it would lose the revenue

7   and it would lose the costs associated with handling those

8   subscribers.

9          Now, those 60,000 subscribers, if it lost them, I'm

10  not anticipating they would lose them all in a single market.

11  Because if they were to lose them all in a single market, that

12  might be, oh, they're getting out of some state, for example.

13         I don't know, as I sit here right now, that probably

14  wouldn't be all the subscribers they have in any state, but it

15  might be how many subscribers they have in a town.

16         Were they to do that, then there might be some

17  operating expenses, for example, that were included in the

18  controllable margin that I didn't include.

19         But were it to lose that level of subscribers, yeah,

20  it would lose 60,000 times 5,000, or about $300 million of

21  financial benefit.

22  Q.   And you originally calculated the lifetime subscriber

23  value as $5,300, and now you've used Dr. Sullivan's profit

24  margin and you've calculated a value of $3,500, right?

25  A.   At the direction of counsel, yes.

1    Q.   Okay.  But your position is that the specific number

2    doesn't matter very much, whether it's 3,500 or 5,300, when you

3    multiple it by 60,000, it still gives you a big number, right?

4    A.   No.  The number absolutely matters.  And the number ought

5    to be informed by the data.  And I used the data and I

6    explained how I used the data.  I think that had the data been

7    different -- like, for example, I didn't know what Cox's data

8    is, it's a privately held company.  Until they gave me their

9    financial data, I couldn't have come up with this number.  I

10   could have said, I think it's going to be like this because

11   it's probably like other publicly-traded cable companies.  But

12   the data shows what it is, and that shows that it's $5,294 when

13   you use the data that was actually in this case.  That is a

14   large number.

15          If the data had been different and it had showed that

16   my calculation of 5,294 was actually the 3,500 you get, using

17   the data appropriately, then it would still be a large number.

18   So that is true.

19          But it is not correct to say that my testimony is

20   that that 3,500 is a better estimate or more appropriate use of

21   the data in the context of this case.

22   Q.   Yeah, and that's not what I said.  So rather than

23   re-testify, and let's focus on what I'm asking.

24          What I said was, you're testifying today that even if

25   you used the 3,500 and Dr. Sullivan's numbers, when you

1   multiple it by 60,000, you still get a big number, right.

2   A.   Yes.

3   Q.   That's what you said on direct.

4   A.   Sorry, sorry, yes, you still get a big number.

5   Q.   It's a big number, right?

6   A.   Yes, it's still a very --

7   Q.   Whether you use 5,200 or 3,500, when you multiple it by

8   60,000, you get a big number?

9   A.   You get a big number, but you had earlier said it doesn't

10  matter --

11         THE COURT:  Let's not argue back and forth.  It's a

12  big number.  You've testified a minute ago that it was.

13         Go ahead, Mr. Buckley.  Next question.

14  BY MR. BUCKLEY:  (Continuing)

15  Q.   So, Dr. Lehr, how many subscribers does Cox terminate

16  based on copyright notices every year?

17  A.   As I sit here right now, I don't know, but I think I've

18  seen some testimony that, you know, it is quite a small number.

19  It's nowhere near $60,000.

20         MR. WARIN:  Your Honor, may we approach?

21         THE COURT:  Yes.

22         NOTE:  A side-bar discussion is had between the Court

23  and counsel out of the hearing of the jury as follows:

24  AT SIDE BAR

25         MR. WARIN:  The witness just said, "I don't know."

1   And I want to make sure we don't have any testimony from Mr.

2   Buckley that is not supported by testimony of a witness as to

3   how many they terminate because of copyright infringement.

4          THE COURT:  So is your next question going to be,

5   would it surprise you to know that Cox terminated --

6          MR. BUCKLEY:  No, I'm going to ask whether he knows

7   how many they terminated in 2012, 2013, 2014.  I am going to

8   ask him some questions about the churn rate that he calculated.

9          MR. WARIN:  Churn rate is okay.  He said, I don't

10  know how many they terminated because of copyright

11  infringement, and I think --

12         THE COURT:  He said he thinks it's a small number.

13         MR. WARIN:  Right.  So I think we leave it at that.

14  If he wants to go to churn rate, I'm okay.

15         MR. BUCKLEY:  Okay.

16         THE COURT:  Thank you.

17         NOTE:  The side-bar discussion is concluded;

18  whereupon the case continues before the jury as follows:

19  BEFORE THE JURY

20  BY MR. BUCKLEY: (Continuing)

21  Q.   Sorry, Dr. Lehr.  So do you know how many subscribers Cox

22  terminated based on copyright notices in 2012?

23         MR. WARIN:  Objection, asked and answered, Your

24  Honor.

25         THE COURT:  Overruled.

1  A.   No, I don't know precisely, but I believe I've seen

2  evidence that says that it's substantially less -- it's nowhere

3  near 60,000.

4  BY MR. BUCKLEY: (Continuing)

5  Q.   Okay.  But you don't know the number?

6  A.   Not precisely, no.

7  Q.   Okay. How about for 2013?

8  A.   No.

9  Q.   How about 2014?

10  A.   The same answer.  I mean, I know it's been -- I've seen

11  evidence that says it's quite a small number, but I don't know

12  precisely.

13  Q.   And you've said more than once and then you said the last

14  time you testified, you don't have an opinion about how many

15  people Cox should have terminated?

16  A.   That's correct.

17  Q.   Dr. Lehr, in your testimony, and again, we saw it today on

18  the slide, you've used a number of 60,000 people, right?

19  A.   Yes.

20  Q.   Those are 60,000 Cox account holders?

21  A.   Those are -- the evidence I've seen in this case says

22  those are 60,000 identified repeat infringers.  So they're a

23  subset of the total number of infringers on Cox's network.

24  But, you know, that's the number that testimony in this case

25  has said are the number of ones that could be identified as

1    repeat infringers.

2    Q.    Okay.  So you anticipated my next question.  Where did

3    that 60,000 number come from?

4    A.    I believe that's the conclusion from Dr. Bardwell's

5    analysis.

6    Q.    You believe?

7    A.    As I sit here right now, that he analyzed the Rightscorp

8    data and identified 60,000 repeat infringers in that data

9    which, as I've explained, is a subset of the total infringers.

10   So it's, you know, an absolute lower bound on the number of

11   possible infringers.

12   Q.    Dr. Lehr, my question is just where does the 60,000 come

13   from?  You didn't calculate it, right?

14   A.    That's right.

15   Q.    Right.  And you said you think it came from Dr. Bardwell's

16   testimony, right?

17   A.    As I sit here right now, I believe it came from

18   Dr. Bardwell's testimony, yes.

19   Q.    Are you aware of any other source than Dr. Bardwell?

20   A.    Well, I imagine that it comes from --

21   Q.    The question is, are you aware of any other source than

22   Dr. Bardwell for the 60,000 number?

23   A.    I'm confused in trying to answer this question as to what

24   constitutes evidence.

25            THE COURT:  Just say you don't understand the

1888

1    question.

2          THE WITNESS:  I don't understand the question.

3    BY MR. BUCKLEY: (Continuing)

4    Q.   The 60,000 number that you've used in your analysis that

5    you multiplied by your lifetime subscriber value, I just want

6    to know where you got that number.  You said you didn't

7    calculate it.  You said you think it came from Dr. Bardwell.

8    Is there some other source that supports the 60,000?  Can you

9    answer that yes or no?

10   A.   I don't believe there's another source that I've seen that

11   does that.

12   Q.   Thank you, that's all I was asking.  Thank you.

13          MR. WARIN:  Your Honor, may we approach?

14          THE COURT:  No.

15          MR. WARIN:  The 60,000 issue was not a criticism --

16          THE COURT:  Hold on.

17          MR. BUCKLEY:  Wait, didn't --

18          THE COURT:  Approach then.

19          NOTE:  A side-bar discussion is had between the Court

20   and counsel out of the hearing of the jury as follows:

21   AT SIDE BAR

22          THE COURT:  Don't start blurting stuff out.  That's

23   not good.

24          MR. WARIN:  I'm sorry, Your Honor.

25          THE COURT:  Okay.  What's your --

1     MR. WARIN:  The 60,000 number was not a criticism

2  that Dr. Sullivan made of Dr. Lehr.  So he did not in his

3  direct testimony today go into whether the 60,000 was valid or

4  not.  All he did today was respond to the specific criticisms

5  of Dr. Sullivan and identified them.

6     They're now trying to get into another area that was

7  not covered by direct.

8     THE COURT:  Okay.

9     MR. BUCKLEY:  Your Honor, he got up today --

10    THE COURT:  So the objection is beyond the scope?

11    MR. WARIN:  Yes.

12    MR. BUCKLEY:  He put up a slide that said the

13  economic benefit to Cox is $317 million.  And there's two

14  inputs to that, subscriber value and the 60,000.  I have asked

15  him about it.  He said he didn't know where it came from.  I've

16  got one or two more questions and I'll let it go.

17    THE COURT:  Well, you've been going back and forth

18  with him.  What are your other questions?

19    I mean, I've allowed you -- he has testified he

20  thinks it's Bardwell.  Otherwise he doesn't --

21    MR. BUCKLEY:  I'm not going to ask anymore about

22  where the number came from.

23    THE COURT:  Okay.  What else do you want to ask

24  about?  It's beyond the scope of direct.  So why is it

25  relevant?

1     MR. BUCKLEY:  Well, it's embedded in his --

2     THE COURT:  That's why I was --

3     MR. BUCKLEY:  -- the universe of what --

4     THE COURT:  Okay.  I'm at fault.

5     MR. BUCKLEY:  I talked over the judge.

6     THE COURT:  So what are your additional questions on

7  the 60,000 subject, or are you moving on?

8     MR. BUCKLEY:  This is about his analysis, not

9  generally.  The 60,000 is embedded in his opinion.

10    THE COURT:  Correct.

11    MR. BUCKLEY:  That we should have terminated more

12  people than we did, and I think I'm entitled to ask him about

13  that.  That's what he has just gotten him to testify about.

14    THE COURT:  You asked him already whether he had done

15  any analysis -- on whether he had made -- whether he had an

16  opinion on whether Cox should have terminated, and he said no.

17    MR. BUCKLEY:  He said no.  I would like to ask, I

18  would like him to confirm again he didn't know who those people

19  are and neither does Rightscorp.  So this 60,000 that we are

20  supposed to terminate --

21    THE COURT:  That is totally irrelevant based on my

22  rulings.  So let's move on to some other subject.

23    MR. BUCKLEY:  Okay.  Thank you, Your Honor.

24    THE COURT:  Thank you.

25    NOTE:  The side-bar discussion is concluded;

1  whereupon the case continues before the jury as follows:

2  BEFORE THE JURY

3  BY MR. BUCKLEY: (Continuing)

4  Q.   Dr. Lehr, one of the inputs for your lifetime subscriber

5  value calculation was churn, right?

6  A.   Well, the life span which is related to churn.

7          THE COURT:  Well, answer yes or no if you can.  And

8  we'll get through this a little more quickly.

9          THE WITNESS:  Sorry.  Yes, indirectly.

10  BY MR. BUCKLEY: (Continuing)

11  Q.   Okay.  And maybe I misheard, I actually thought you used

12  the term "churn" and I thought maybe you even had a slide that

13  referenced it.  But can you describe what churn is?

14  A.   Well, churn is the rate at which subscribers are leaving

15  your network.

16  Q.   Okay.  And that was part of -- that was one of the inputs

17  to your calculations, right?

18  A.   As I explained, I used a life span, and that's what I

19  meant when I said indirectly, churn and life span can be

20  related.

21  Q.   So what data did you look at to calculate life span?

22  A.   So the data I calculated for life span, there was an

23  exhibit that Mr. Negretti testified to, and I believe it was

24  shown at trial here several times, that actually showed that

25  the customer life span of the average Cox subscriber was

1    increasing over time and was 67 months.  And 67 months is

2    5.6 years.  And so, that was attested to at Mr. Negretti's

3    deposition.  That was the exhibit.  That was where I got my

4    estimate of the life span.

5    Q.   And did you focus on life span for high-speed Internet

6    subscribers specifically or subscriber life span generally?

7    A.   Well, the subscribers I focus on is the subscribers, the

8    high-speed Internet subscribers.  And the life span data I had

9    was the data that Mr. Negretti used.  And as I sit here right

10   now, I don't remember if that exhibit or if his deposition

11   testimony was limited to subscribers that as one of the

12   services they purchased was broadband Internet services.

13   Q.   So for high-speed Internet you're aware that Cox

14   terminated 1.76 million subscribers in 2014?

15              MR. WARIN:  Objection, Your Honor.

16   Q.   Disconnected their service.

17              MR. WARIN:  Beyond the scope.

18              THE COURT:  Overruled.  I'll allow it.

19   A.   I don't know that specific number, but I believe the

20   source of it, Dr. Sullivan in his rebuttal report referenced a

21   Cox document.  I went and looked at the actual Cox document and

22   it has a bunch of numbers, it has two lines of disconnects on

23   it.  And it's unclear what exactly that data refers to and why

24   there would be two lines there and why the right one to focus

25   on would be the one that was actually higher in terms of

1    disconnects.  He took the higher disconnect, and that's all he

2    reported in his report.

3         Now, that's a different Cox document.  I don't

4    understand the providence of it, and I don't recall any

5    deposition testimony from Cox as to what that document was

6    actually about.

7         So the document I used --

8         THE COURT:  All right.  All right.  Next question.

9    BY MR. BUCKLEY: (Continuing)

10   Q.   Dr. Lehr, what was the lower disconnect number in that

11   document?

12   A.   I don't recall as I sit here.

13   Q.   Okay.

14   A.   If you pull the document, I can show you.

15   Q.   But you do know that Dr. Sullivan looked at that data and

16   relied on it in his report and you looked at it too?

17   A.   He cited it in his report, and I was not aware of that

18   document until I saw his report.

19        MR. BUCKLEY:  Thank you, Your Honor.  No further

20   questions.

21        THE COURT:  All right.  Redirect?

22   REDIRECT EXAMINATION

23   BY MR. WARIN:

24   Q.   You were just asked questions about the 67 months that you

25   used in making your calculation as to the average duration of a

1   Cox customer?

2   A.   Yes.

3   Q.   I would like to have Karl pull up Exhibit PX 1515, please.

4        Could you tell us what this is.

5   A.   Yes.  This is the document that Mr. Negretti testified to.

6   And if you look at the bottom line it says, "Average tenure in

7   months as Cox customers," and it is going up, as I said.  And

8   the number I used for 2014 was 67.  It is that lower number in

9   the far right.  So this is the document I relied on.

10  Q.   Was this a number you calculated or is this a Cox

11  document?

12  A.   This is a Cox document.

13       MR. WARIN:  No further questions.

14       THE COURT:  All right.  May Dr. Lehr be excused?

15       MR. WARIN:  Yes, Your Honor.

16       THE COURT:  All right.  You are excused, Dr. Lehr.

17  Thank you, sir.

18       THE WITNESS:  Thank you.

19       NOTE:  The witness stood down.

20       THE COURT:  All right.  Next witness.

21       MR. PECAU:  Your Honor, BMG calls Dr. Nowlis back to

22  the stand.

23       THE COURT:  Good morning.

24       THE WITNESS:  Good morning.

25       STEPHEN NOWLIS, a witness recalled by counsel for the

1   plaintiff, having been previously sworn, testifies and states:

2        DIRECT EXAMINATION

3   BY MR. PECAU:

4   Q.   Good morning, Dr. Nowlis.

5   A.   Good morning.

6   Q.   You are here to respond to certain criticisms that

7   Mr. Poret made to your Cox subscriber survey; is that right?

8   A.   That is correct.

9   Q.   All right.  And did you do -- did you read Dr. Poret's

10  transcript concerning his criticisms?

11  A.   Yes, I did.

12  Q.   Did you read any other testimony in this case?

13  A.   Let's see.  I read Mr. Negretti's testimony, Mr. Hubert,

14  and Mr. Hauprich's testimony.

15  Q.   All right.  And did you look at the exhibits as well that

16  they introduced?

17  A.   Yes.

18  Q.   All right.  Now, Mr. Poret testified how he personally

19  would respond to the questions in the Cox subscriber survey

20  that you conducted.  Is this how a survey should -- expert

21  should analyze a survey?

22        MR. WAKEFIELD:  Objection, leading.

23        THE COURT:  It's leading.  Rephrase the question.

24        MR. PECAU:  Sure.

25  BY MR. PECAU: (Continuing)

1   Q.   Mr. Poret testified how he personally would respond to

2   questions in the Cox subscriber survey that you conducted.  Do

3   you have an opinion whether or not that is how a survey expert

4   should analyze a survey?

5   A.   I do have an opinion about that.

6   Q.   What's that?

7   A.   Yes, I do have an opinion about that.

8   Q.   Could you tell us what your opinion is.

9   A.   Yes, certainly.  My opinion is that that's not appropriate

10  to do it that way.  The whole purpose of doing a consumer

11  survey is to find out what consumers think.  So we look at what

12  the respondents think.

13       It is not appropriate for Mr. Poret to say what he

14  personally would do, just like it wouldn't be appropriate for

15  me to say how I would personally answer the question.  It is

16  completely irrelevant.  It is subjective.  I try to take an

17  objective approach and see what the respondents themselves

18  said.

19  Q.   When you say "subjective," what do you mean by that?

20  A.   I mean it is subjective in the sense it is not following

21  basic survey design principles, which is what a survey expert

22  should do, is design a survey properly, analyze the responses

23  of the survey respondents, look at what they said.  Not to

24  imagine what myself or Mr. Poret or any one individual would

25  say.

1    Q.    All right.  Did you review the research that Mr. Poret did

2    to form his criticism?

3    A.    I did, yes.

4    Q.    All right.  Do you have any opinion about the research

5    that he did?

6    A.    I do.  I do, yes.

7    Q.    What is your opinion on that?

8    A.    Well, I remember part of what he did was he -- it was

9    quite surprising to me.  He made some comments about -- you

10   know, he was testifying about BitTorrent, but he didn't do any

11   research on BitTorrent.  He did not find out how people use it.

12   He didn't go to the sites that I used in my survey.  He didn't

13   try to find out which of the sites were popular or not.  I did

14   all of that and I took it very seriously and very carefully,

15   and Mr. Poret just completely ignored that in his approach.

16   Q.    And do you have any opinion how that affected the

17   criticisms that he made of your survey?

18   A.    Yes, I absolutely do.  I think that, for example, when

19   Mr. Poret was criticizing one of my questions about -- that had

20   some examples or it defined the question about what BitTorrent

21   was, Mr. Poret didn't know what those sites were.  He didn't

22   know that, in fact, those are the three most popular BitTorrent

23   sites out there.

24           So, therefore, somebody, a respondent seeing that

25   question would think, oh, those are popular BitTorrent sites if

1    they know -- if they use BitTorrent, they would say "yes,"

2    otherwise they wouldn't know what that means.  And Mr. Poret

3    didn't even go about to try to determine that.

4    Q.   And what sites are you referring to?

5    A.   I am referring to the sites that were in my survey

6    question that were ThePirateBay, Kickass Torrents, and

7    Torrentz.

8    Q.   All right.  Now, Cox's counsel asked Mr. Poret to pretend

9    that respondents only read part of the question that was posed

10   to them.  Do you have an opinion whether or not pretending a

11   question to be something other than was actually asked was

12   something that a survey expert would typically do?

13          MR. WAKEFIELD:  Objection, leading, and

14   mischaracterizes the testimony.

15          THE COURT:  Overruled.  Go ahead and answer it if you

16   can.

17   A.   Sure.  I mean, right.  It absolutely does not make sense

18   for a survey expert to pretend that somebody did something.  It

19   doesn't make any sense.  What we are supposed to do, what I

20   have a Ph.D. in, what I teach my students to do, is look at the

21   questions and see how people responded.  But to go through this

22   pretend world of, well, let's pretend they did this, let's

23   pretend they did that, without any basis for any of that

24   pretending, is just completely the wrong approach.

25   BY MR. PECAU: (Continuing)

1   Q.   Well, do you have an opinion whether or not Mr. Poret's

2   criticism was legitimate that a respondent would immediately

3   stop reading anything after the bolded portion of the options

4   you presented your respondents?

5   A.   That is absolutely not true.  I have done thousands of

6   surveys.  I have analyzed thousands of surveys.  This is what I

7   do for a living.  And to pretend that somebody would only read

8   something in bold, it makes absolutely no sense.  I have never

9   seen any study that would support this whole idea.

10          I have even seen Mr. Poret's own surveys.  He bolds

11  certain things.  Yes, I bold certain things.  This is what

12  people do as a technique to make a survey readable.  But I have

13  never seen anybody say, well, let's just assume people are

14  going to read the thing in bold and ignore everything else.

15  That's a pretend world, not the real world.

16  Q.   Well, can you tell me if your survey had any controls to

17  make sure that respondents were paying attention to what they

18  were doing?

19  A.   Absolutely they did.  Again, we talked about this before.

20  I thought very carefully about each of my questions and I did

21  have a specific question about that.  The question was -- I

22  believe it was, there is numbers below, number 1, 2, 3, and 4,

23  please click on the number 4 to continue with this survey.

24          So they had to make sure they followed that

25  instruction.  If they didn't follow it, they would have been

1    terminated if they were just kind goofing around.

2    Q.   All right.  Did you have any other questions that

3    indicated to you whether or not respondents were paying

4    attention in responding to your survey questions?

5    A.   Yes, I had a number of them.  In my screener questions,

6    for example, I had a question about, well, do you subscribe to

7    an Internet service?  If they said yes, they moved forward.  If

8    they were just randomly clicking on things, they would have

9    been stopped because they could have said something else.

10           I had another question about do you subscribe to Cox?

11   And there were a whole bunch of other options there.  If they

12   were just randomly clicking on things, they most likely would

13   have been stopped there because Cox was only one out of many

14   responses.

15           So I had many ways to make sure that the person

16   taking the survey was taking it seriously, answering the way

17   that they thought was appropriate, but not just goofing around.

18   Q.   All right.  And when you say "stopped," what do you mean

19   by that?

20   A.   I mean if they were -- you know, for example, if they

21   didn't click on the number 4, they would have been terminated

22   from the survey.  They would have ended the survey.  They would

23   not have finished it.  They would not have been a part of my

24   over 300 respondents that I got to the end.

25   Q.   Okay.  Well, what about the "don't know/unsure" options in

S. Nowlis - Direct

1901

1  your survey?  How did that fit into Mr. Poret's analysis, if

2  you know?

3  A.    Well, Mr. Poret pretended I didn't even ask that in his

4  responses when he was criticizing my survey.  I spent a lot of

5  careful attention having a don't know or unsure response.  I

6  told the respondent, it's okay to say that, please say that if

7  you don't have an opinion.  Please don't guess.

8           I had these instructions in my survey, as I do with

9  surveys, to again make sure people really have an opinion and

10  are thinking about this carefully.

11           Mr. Poret in his pretend world again just assumed --

12  just kind of ignored the fact that I did that.  And I did that

13  again on purpose because that's an important principle that I

14  follow.

15  Q.    All right.  So does it tell you anything as a social

16  scientist and a survey expert, anything about Mr. Poret's

17  analysis that he did not refer to the don't know responses or

18  unsure responses that were a part of your questions essay

19  concerning BitTorrent usage and the main questions concerning

20  whether BitTorrent usage was a reason for Cox subscribers to

21  subscribe to Cox?

22           MR. WAKEFIELD:  Objection, leading.

23           THE COURT:  It is leading, and it was also really

24  confusing.  So why don't you break it.

25           MR. PECAU:  I guess I should do a better job.

1    THE COURT:  Let's try to break it up a little bit, if

2  you would.

3    MR. PECAU:  Okay.  Thank you, Your Honor.

4  BY MR. PECAU: (Continuing)

5  Q.   The fact that Mr. Poret was living in this pretend world

6  that you described, does that tell you anything about Poret's

7  analysis?

8  A.   It tells me that he is not following social scientific

9  principles in clearly analyzing a survey.  You are supposed to

10  say, oh, these are the principles, this is -- I am going to

11  analyze my survey, did I follow those principles or not.  He

12  ignored the fact that I did, in fact, did respond to those

13  principles.  Why would he do something like this?  I was at a

14  loss to think about this.

15    I mean, I thought -- I know Mr. Poret has a law

16  degree.  He does not have a Ph.D.  He does not study these --

17  he doesn't have any formal training in these things.  That was

18  my only thought about why he would ignore all the hard work and

19  all the things that I did objectively, and instead just live in

20  this fantasy world about things that I didn't do.

21  Q.   Okay.  Now, Mr. Poret spoke about the availability of free

22  copyrighted music on the Internet.  In your opinion, can you

23  tell us whether or not that was in any way germane to your

24  survey?

25  A.   Well, it wasn't really.  And because I want to remind

1   everybody, I asked a question and I said -- I was talking about

2   downloading or uploading free digital music through sites such

3   as ThePirateBay, et cetera.  These are BitTorrent sites.  So I

4   wasn't just talking about free music in general.  My question

5   was about free music through BitTorrent sites.

6          So just focusing on the free part without focusing on

7   the BitTorrent part, which was part of my question, it doesn't

8   make sense.

9   Q.   All right.  Well, let me direct you to the free music that

10  he did refer to.  What evidence did Mr. Poret provide about the

11  amount and type of free music that was available on the

12  Internet?

13  A.   The amount, really nothing.  I mean, he didn't talk about

14  the amount of free music on the Web at all.  And the type --

15  from what I recall, he talked about a couple of, you know,

16  random bands here and there that might put something on the

17  Internet for free, but the vast majority of what he referred to

18  were bands that nobody has ever really heard of.

19  Q.   Now, did you actually take a look at the articles that he

20  cited to support his testimony about free music?

21  A.   Yes, I looked very carefully at those articles,

22  absolutely.

23  Q.   All right.  Can we bring up article DTX 2361, and go to

24  page 2, please.

25          Well, let's go to page 1 first so the jury can see

1  what --

2           Is this one of the articles that Mr. Poret addressed

3  in his testimony and that you looked at?

4  A.   Yes, Mr. Poret himself brought this to everybody's

5  attention.

6  Q.   All right.  And what does this article say about the kind

7  of music available on free sites?  Is that in here anywhere?

8  A.   Yes, it's on the next page.  So there's a -- I can sort of

9  summarize it by the second paragraph on the second sentence.

10  Okay.  So it says, "Most of the sites are void of familiar,

11  mainstream artists, such as Ed Sheeran and the infamous

12  T. Swift, Taylor Swift, but if you look in the right places,

13  you'll still probably manage to find a few select hits from a

14  couple of big names."

15           So Mr. Poret brought this out to try to support his

16  argument.  But, again, if you read carefully the article, you

17  will find out it happens every now and then, but it is very

18  rare.

19  Q.   All right.  Now, can you tell me whether or not Mr. Poret

20  refers to any evidence that there is any significant BitTorrent

21  music traffic that is noninfringing?

22  A.   He did not.  Again, he sort of ignored this whole issue of

23  BitTorrent in his testimony, whereas I thought very carefully

24  about it.

25  Q.   All right.  Did you do any research?

1  A.   I did, absolutely.

2  Q.   What did you find about the amount of infringing music on

3  BitTorrent sites?

4        MR. WAKEFIELD:  Your Honor, improper rebuttal,

5  nothing to do with anything Mr. Poret testified about.

6        THE COURT:  Approach the bench, please.

7        NOTE:  A side-bar discussion is had between the Court

8  and counsel out of the hearing of the jury as follows:

9  AT SIDE BAR

10        THE COURT:  I don't remember what Poret said.

11        MR. WAKEFIELD:  I think the foundation that counsel

12  just laid was Mr. Poret didn't say anything about BitTorrent

13  and whether it's -- the percentage of it that is legal, right?

14  Because he didn't talk about it at all on his direct or cross.

15  And now he is saying, but you did some other research, so

16  basically let's do a whole new direct.

17        It's not rebuttal.

18        MR. PECAU:  Well, Your Honor, I mean, this is showing

19  precisely why what Mr. Poret did was ridiculous, and that why

20  the questions asked --

21        THE COURT:  What can he testify that's in evidence

22  about the percentage of BitTorrent users who are downloading

23  infringing music?

24        MR. PECAU:  All right.  As you allowed him to testify

25  before, Your Honor, and with regard to the NetNames and

1  Envisional studies that are in evidence, that he is just going

2  to say that, you know, he did the research, he found out

3  virtually all that stuff -- that's the only question I am going

4  to ask him about this.

5          THE COURT:  Okay.  I am going to allow it.

6          MR. PECAU:  Thank you, Your Honor.

7          MR. BUCKLEY:  Thank you, Your Honor.

8          NOTE:  The side-bar discussion is concluded;

9  whereupon the case continues before the jury as follows:

10  BEFORE THE JURY

11  A.   What I found was there were a couple of reports that I

12  found, studies that found that almost all of the music

13  available on BitTorrent sites is infringing music.

14  BY MR. PECAU: (Continuing)

15  Q.   All right.  Now, can you tell us just the names of those

16  studies?

17  A.   Sure.  One of them -- I am trying to remember.  One of

18  them was called, I think, the Envisional study, and one of them

19  was called the NetNames study.

20  Q.   Okay.  Thank you.  Now, Mr. Poret also criticized the

21  controls that you used in your study.  Do you have an opinion

22  whether his criticism was justified?

23  A.   I do have an opinion.

24  Q.   Can you tell us what it is.

25  A.   Certainly.  It's not at all justified.  His criticisms of

S. Nowlis - Direct

1907

1   my control shows to me just a lack of understanding about what

2   a control is supposed to.

3           What I did with my control is, remember, I had -- my

4   control question was part of really my main question about why

5   do people subscribe to Cox.  And I found out that about

6   70 percent of people said one of the reasons they subscribe to

7   Cox is so they can download music through BitTorrent sites.

8   And I needed a control question in there to kind of measure the

9   amount of noise that could be in that response.

10          And I actually had two control questions.  I wanted

11  to be very careful and very conservative in my analysis.  And

12  the control questions were supposed to pick up yea saying,

13  people that would say "yes" to just about anything.  I found

14  about 10 percent of people said yes to a question about avatar,

15  and three percent said yes to a question about calculating

16  radioactive decay rates.  I used that as my amount of noise.

17  It is a proper approach.  I subtracted it from the result of

18  people that were talking about getting music from BitTorrent,

19  and that's how I came up with my net result.

20  Q.   All right.  And can we look at PDX 0003 for a second,

21  please.

22          Are these the net results you are referring to,

23  Dr. Nowlis?

24  A.   Yes.

25  Q.   All right.  And can you explain to us just quickly how

1  your control worked in these results.

2  A.   Sure.  So if you see the 70.4 percent, these are people

3  who use BitTorrent for free music, say, it's a reason.  I took

4  out 10.8 percent.  So 70.4 minus 10.8 equals 59.6.  The 10.8

5  was the measure of noise that I got from looking at people

6  using avatars.

7  Q.   All right.  Now, I believe Mr. Poret also criticized your

8  survey because you did not compare the draw to Cox versus the

9  draw to other ISPs of downloading or uploading through

10 BitTorrent sites free music.  Do you recall that testimony?

11 A.   I do, yes.

12 Q.   All right.  And do you believe that that was a legitimate

13 criticism?

14 A.   Not at all.

15 Q.   And why is that?

16 A.   Well, I mean, to me that tells me that Mr. Poret just

17 doesn't have a good understanding of basic marketing

18 principles.

19 Q.   And why is that?

20 A.   Well, I -- well, just first of all, again, you know, I'm a

21 marketing professor, I have a Ph.D. in the topic, and what is

22 an important marketing principle that Mr. Poret doesn't

23 understand?  The marketing principle is what do marketers do?

24 They study consumers, they try to gain insights from people

25 about what would draw them to use their product or service.

S. Nowlis - Direct

1909

1   So Cox would do something like this, would be to

2   measure what would cause somebody to be drawn to their Web

3   site, and then they could advertise something like this as an

4   important draw for them.

5   That's the principle that I looked at because that's

6   the standard approach in the marketing world.  And the fact

7   that Mr. Poret didn't buy into that, again to me tells me he

8   doesn't understand basic marketing principles.

9   Q.   Well, how is that approach reflected in your survey -- in

10   your survey?

11   A.   Sure.  Well, again, my key question was about a reason why

12   you would do something.  A reason why you would subscribe to

13   Cox.  A reason is, you know, what would draw you, what would

14   draw you to go to Cox.  Which is, again, what a marketer would

15   do research to find out, what are those reasons, what are those

16   draws.  And then it would use those in its advertising to, in

17   fact, try to get people to draw them.

18   Q.   Well, did you see any evidence in Cox's advertising of

19   those basic marketing principles at work?

20   A.   Absolutely.

21   Q.   And can you tell us what they were.

22   A.   I found it very, very interesting, very informative to me

23   that when I saw Cox's own advertising, they talked a lot

24   about -- really the thing they focussed on most when they were

25   talking about Internet speed was downloading music.  That was

S. Nowlis - Direct

1910

1  in their own advertising.  And I noticed that there.

2  Q.  Now, was there any Cox marketer that discussed why they

3  referred to downloading music in their, in Cox's advertising?

4  A.  Well, Mr. Negretti testified about this.  He's in charge

5  of marketing at Cox, and he did mention, he was talking about

6  the different types of advertisements that they use.

7  Q.  And did he testify about the messages in Cox's advertising

8  and why they had particular messages in Cox's advertising?

9  A.  Yes, from what I recall he said that they were looking for

10  highly-valued benefits, and those were the benefits that they

11  could use from their research to draw people to Cox.  And

12  again, their own advertising talks about downloading music.

13  Q.  All right.  Now, you're referring to their downloading --

14  their advertising.  Let me show you one.  Let me show you

15  PX 5001.

16  A.  Okay.

17  Q.  And I think it's on page 5 of PX 5001.  Can we go there,

18  Karl.  Yes.

19       Does this Cox ad reflect the basic marketing

20  principles that you were discussing?

21  A.  Absolutely.  Quite amazing, in fact.

22  Q.  And how does it do it?

23  A.  Sure.  It says, "How Will You Live the Gig Life?"  They're

24  promoting this new product that they came up, its marketers

25  have new products all the time.  They do research, they try to

S. Nowlis - Direct

1911

1    find what's important to people, what would draw them to a

2    particular service.  This is the service they're focus focusing

3    on.

4            And notice what it says here, it says, "download 100

5    tunes in three seconds."  Again, this is Cox's own advertising.

6    And I know that marketers who come up with advertising focus on

7    message that they think would draw someone to their service.

8    Q.  All right.  Now, you mentioned that these messages are

9    based on the research that a company might do; is that correct?

10   A.  Absolutely.

11   Q.  And did you look at Cox's research?

12   A.  Yes, for sure.

13   Q.  And did you find any research that was consistent with

14   your results?

15   A.  Absolutely, I did.

16   Q.  Okay.  Let's pull up PX 1404.

17           Okay.  Do you recognize PX 1404?

18           MR. WAKEFIELD:  Your Honor, I don't believe this was

19   cited in the expert's Rule 26 disclosures.

20           MR. PECAU:  I think it is.  Yes, Your Honor, it's in

21   his reply report.

22           THE COURT:  All right.  You may proceed.  Thank you.

23           MR. PECAU:  Thank you.

24   BY MR. PECAU: (Continuing)

25   Q.  Let me show you PX 1404.  Is this Cox research that you

1  would look at in preparing your opinions?

2  A.   Yes.

3  Q.   All right.  And can you point to -- let's look at

4  page 1404-9.  Any of these results that you are relying upon?

5  A.   Yes.  Very interesting.  Again, just to remind everybody,

6  this is Cox's own research.  They do research, marketers do

7  research.  Why do they do research?  They want to find out

8  what's important to people, what draws people to their service.

9          So what I found was quite interesting is you'll

10  notice that 26 percent of the respondents to their own survey

11  said that digital music obtained from friends or peer-to-peer

12  Web sites -- and I think the question is kind up above that, if

13  you could kind of go back to the question, I think you just

14  took a section out of it.  Right.  The Music Sources that they

15  used.  Right.  So for Music Sources, 26 percent use digital

16  music obtained from friends or peer-to-peer Web sites.  Like

17  BitTorrent, for example.

18  Q.   And why is that significant for -- in connection with the

19  research that you did?

20  A.   Because it's very consistent with my results.  My results

21  are finding that, yes, people do say a reason for them to

22  subscribe to Cox is the use of these P2P services like

23  BitTorrent.  And here you see Cox's own research saying that

24  that's an important source of their customers.

25  Q.   All right.  And let's go to PX 1404-13.  Is anything in

1  this, in these results that you believe are pertinent to your

2  survey?

3  A.   Absolutely.  So I found it quite fascinating that again

4  Cox's own research, their customers when they're talking about

5  what is important in the choice of music, that we see that

6  30 percent say facilitating music sharing through P2P sites

7  like BitTorrent.  It's the same idea.

8       So again, it supports my finding that Cox's own

9  research is finding something very similar to what my own

10  finding is.

11  Q.   Okay.  And I'll just ask you about one more results in the

12  study.  And let's go to 1404, page 51, please.

13       Now, can you tell us on this page what might be

14  significant to the results of your study?

15  A.   Well, this is a really interesting result.  At the top,

16  the second sentence, it says, "in addition to the acquisition

17  methods shown below, about 1 in 6, 17 percent, claim to acquire

18  methods through some free method such as downloading for free,

19  burning songs from friends' CDs, and stealing songs online."

20       Cox's own research found this, 17 percent.  And it's

21  very interesting because you may recall my own results found

22  that about 16 percent, 16, 17 percent, said they engaged in

23  this type of activity.  Cox's own research shows something very

24  similar.

25  Q.   All right.  Now, are there any other survey results that

1   you've seen cited in articles that also support your findings?

2   A.   Yes.

3   Q.   All right.  Let's get DTX 2362.

4            And can you tell us the names, another article that

5   you read that referred to survey results?

6   A.   Sure.  It was this article, it's in this article, it's on

7   one of the pages from this article.

8   Q.   And that was in a Billboard --

9   A.   It was in a Billboard article.  And do you want me to tell

10  you what it found?

11  Q.   Well, why don't you tell us what it found and I'll have

12  you then identify it.

13  A.   Okay.  It talked about -- it mentioned other studies that

14  had been done that looked at the prevalence of people sharing

15  music on P2P services.

16  Q.   And what were those specific findings?

17  A.   It was about -- one study found I believe that the number

18  was 20 percent.  Another study found it was 19 percent.  As you

19  may recall, my study that I found said it was about 16 percent

20  of people sharing music through the P2P sites.

21           And the reason why I bring all this up and I think

22  it's very important to bring it up is it shows -- I think Mr.

23  Poret's criticisms are completely unfounded because my results

24  are supported by this other research.

25           So if people are ignoring my questions and just not

1  paying attention and just goofing around, why would I have

2  gotten a 16 percent result that's so similar to these other

3  results that have been found by other sources.

4  Q.   All right.  Let me show you what's been marked for

5  identification as DTX 2362.  Can you tell me what this is.

6  A.   Yes, this is an article from Billboard.

7         MR. PECAU:  Your Honor, I offer this article into

8  evidence.

9         MR. WAKEFIELD:  Objection, Your Honor, it's hearsay,

10  not an academic study.

11         THE COURT:  What was the second half of your

12  objection?

13         MR. WAKEFIELD:  It's not an academic study, it's just

14  an article in Billboard Magazine.

15         THE COURT:  I'll sustain the objection.  Let's move

16  on.

17         MR. PECAU:  All right.

18  BY MR. PECAU: (Continuing)

19  Q.   And so what were the results in your -- so at the bottom,

20  at the end of the day, what were the percentage of Cox

21  subscribers that you believe said that they use BitTorrent

22  sites to download free digital music?

23  A.   Right.  That was 16.1 percent.

24  Q.   Right.  And how many of those -- and what percentage of

25  all Cox subscribers believe that that was -- said that that was

1    a reason that they subscribed to Cox?

2    A.    It is about 10 percent.  One out of ten.

3              MR. PECAU:  Pass the witness, Your Honor.

4              THE COURT:  All right, thank you.

5    CROSS-EXAMINATION

6    BY MR. WAKEFIELD:

7    Q.    Good afternoon, Dr. Nowlis.  I don't think we've met.  My

8    name is Jed Wakefield.

9    A.    Hello.

10   Q.    Or actually good morning, it's still morning.

11             Where should we start?  Let's talk about the

12   questions themselves that Mr. Poret had discussed and you had

13   just responded to again from your survey.

14             You mentioned the use of bold, do you remember that

15   in those questions?

16   A.    Yes.

17   Q.    And you put those in, I believe you said, to make them

18   readable, for readability?

19   A.    I, just like everybody else I've ever seen conducting a

20   survey, bold certain sections.  And the reason for doing that

21   is to improve the readability of the survey, yes.

22   Q.    You only put certain things in bold, right?

23   A.    Certainly, that's --

24   Q.    Not everything?

25   A.    Sorry, go ahead.

S. Nowlis - Cross

1917

```
1    Q.   Not everything?

2    A.   That's correct.  I put certain things in -- I underline

3    certain things --

4              THE COURT:  Doctor, this is cross-examination and

5    he's asking yes or no questions.  And if you can answer "yes"

6    or "no," then that should be your response, please.

7              THE WITNESS:  Okay.  I'm sorry, Your Honor.

8    BY MR. WAKEFIELD:  (Continuing)

9    Q.   Okay.  Have you ever heard of people putting things in

10   bold for emphasis?

11   A.   Yes.

12   Q.   Do you search, personally do you search for things on the

13   Internet?

14   A.   Yes.

15   Q.   Do you send and receive e-mail?

16   A.   I do.

17   Q.   Do you shop online?

18   A.   Yes.

19   Q.   Okay.  And you were able to answer all of those questions

20   without me giving you any examples of Web sites or services

21   that you use to do those things; isn't that right?

22   A.   Yes.

23   Q.   Okay.  And in your survey questions, those were the parts

24   that you put in bold, the look for -- the search online, the

25   shop online, the search, right?  You put those parts of your
```

1   questions in bold, not the things that came after the words

2   "such as," correct?

3   A.   Can we put them up on the screen and I can show you

4   exactly what I put in bold.

5   Q.   Sure, why don't we go ahead and put your actual screen

6   shots from Appendix C.  Let me just go to those real quick.

7   Here we go.

8        So let's -- this is one of the screening questions,

9   and why don't we start with this.

10       So this is your survey before you get to the

11   questions about particular Internet activities, you ask people

12   if they get certain services in their current residence,

13   correct?

14   A.   Yes.

15   Q.   And the first is television service, right?

16   A.   On this one.  They were randomized, but the one you're

17   seeing it was first.

18   Q.   Right.  So these might have appeared in different orders?

19   A.   Yes.

20   Q.   Okay.  But on this screen shot the first is television

21   service, right?

22   A.   Yes.

23   Q.   And you put that in bold?

24   A.   Yes.

25   Q.   And then home telephone service, you put that part in

1  bold?

2  A.   Yes.

3  Q.   And magazine subscription service, you put that in bold?

4  A.   Yes.

5  Q.   And Internet service, you put that in bold?

6  A.   Yes.

7  Q.   And then after that you have a space and a dash and a

8  space, and then you say "such as," right?

9  A.   Yes.

10  Q.   Okay.  And "such as" can mean, for instance, or for

11  example, right?

12  A.   It means what it says, it says "such as."

13  Q.   All right.  But "such as," "such as" can mean for example?

14  A.   To you?  Are you asking me does it mean that to you?

15  Q.   I'm asking you for your understanding of the word.  Does

16  "such as" mean for example or for instance?

17  A.   To me it means "such as," that's why I used those words.

18  Q.   And it can't be -- there's no equivalent expression in the

19  English language in your view?

20  A.   I came up with "such as" because I thought those were the

21  right words to use.

22  Q.   Okay.  So if someone is taking this survey and they know

23  they have TV service at their home, and they know they have a

24  home telephone service, and they know they subscribe to some

25  magazines, would they need to read your "such as" information

1   to correctly answer these with a "yes"?

2   A.   When people -- when I design a question, I'm assuming

3   people read everything.

4   Q.   Okay.  But would they need to to understand these?

5        Let me give you an example.  If someone has TV

6   service and they're asked, which of the following services, and

7   they see TV service, can't they just say "yes" correctly?

8   A.   I don't know what you mean by "correctly"?  Correctly is

9   up to the respondent to answer.

10  Q.   Okay.

11  A.   That's their answer.

12  Q.   So it's up to the respondent.  And if the respondent knows

13  they get TV, home phone, and magazine subscriptions and

14  Internet service, they could answer "yes" to all of these

15  without reading the examples?

16  A.   Well, again, I'm assuming people read everything.

17  Q.   That's your assumption?

18  A.   It's not just my assumption.  That's what I read, the

19  thousands of surveys I've ever seen and observed, make the same

20  assumption.

21  Q.   Let's look at the magazine subscriptions example.  You

22  said, such as a subscription to magazines on fashion, news,

23  interior decoration, or health," right?

24  A.   Yes, I did.

25  Q.   Okay.  So assuming that the respondent, as you assume,

S. Nowlis - Cross

1921

1  reads every word, if they subscribe to Dog Fancy magazine,

2  would it be a correct answer for them to say "yes"?

3  A.   I'm still not sure what you mean by "correct."  Again,

4  I'll just stop there.  I'll stop there.

5  Q.   Would you expect that a consumer who knows they subscribe

6  to a magazine, but it's Dog Fancy magazine, would say "yes, no,

7  or don't know/unsure" in response to the magazine subscription

8  service question?

9  A.   I don't expect -- I expect the person to answer how he or

10 she would answer it, that's what I expect.

11 Q.   Okay.  So if that person would answer it by saying, "yeah,

12 Dog Fancy is a magazine," they would say "yes"?

13 A.   In your hypothetical, you're saying that if they said,

14 "yes," I agree they would say "yes."

15 Q.   Okay.  Even though Dog Fancy is not a magazine about

16 fashion, news, interior decoration, or health?

17 A.   But I think your example was I am supposed to assume they

18 said "yes," would they have said "yes," I'm saying they would

19 "yes" because you told me to assume they would say "yes."

20 Q.   Okay.  What would you expect a consumer to do if they

21 subscribe to Dog Fancy Magazine and they are given this

22 question about magazine subscription service?

23 A.   I think you asked me this before about what do I expect

24 out of people.  I expect that people read the question as it is

25 written and will answer it the way that they think is the right

1   way to answer it.

2   Q.   And however they answer it would be fine, right?  It

3   wouldn't matter?

4   A.   Well, that's exactly why you do a survey because you are

5   looking at how respondents would answer, not how I would answer

6   it.  That's why I design my surveys that way.

7   Q.   If you wanted to find out if someone subscribed only to

8   fashion news, interior decoration, or health magazines as

9   opposed to something like Field & Stream or Guns & Ammo or Golf

10  or Sailing, would this be the question you would use?

11  A.   I am sorry, I didn't follow that.

12  Q.   If you wanted to find out if someone taking this survey

13  subscribed to a magazine that doesn't fit within the categories

14  you list in your examples, is this the kind of question you

15  would ask?

16  A.   What do you mean by "doesn't fit"?

17  Q.   Well, Dog Fancy is not about fashion, news, interior

18  decoration, or health, right?  It's about dogs.

19  A.   Okay.  I understand what you are saying, yeah.

20  Q.   Okay.  And so, if you wanted to find out if someone got

21  magazines about fashion news, interior decoration, or health

22  specifically as opposed to other kinds of magazines, would this

23  be the question you would ask?

24  A.   You mean, when my question is such as subscription to

25  these different magazines, what am I asking?  Is that what you

1  are asking me?

2  Q.   No.  I'm asking if you would use this kind of question --

3  A.   Okay.

4  Q.   -- the one about magazine subscriptions, if you wanted to

5  find out if someone used a magazine, subscribed to a magazine

6  that was specifically about fashion, news, interior decoration,

7  or health.

8  A.   Well, again, I said "such as" because I wanted people to

9  think about what that would mean for them.

10       I also want to point out that we are focusing in on a

11  question that doesn't have any bearing on what happens later

12  on.  If they said magazine subscription, they would be

13  eliminated from the survey.  So however they answer, "yes, no,

14  or I don't know," it doesn't matter to me because they would be

15  kicked out of the survey anyway.  I am just bringing that up.

16  Q.   I was not asking about this in terms of its effectiveness

17  as a screening question.  I was asking about the pattern that

18  you built into your questions when you put parts in bold and

19  then a space and then a "such as."

20       I guess what I am getting at is, would you expect

21  people to scrutinize each example and think about the

22  relationships between those examples and use that as a limiting

23  factor on whether they subscribed to a magazine?

24  A.   I would expect -- again, I think you have asked me this

25  before, but I would expect the respondent to answer the way

S. Nowlis - Cross

1924

1  that the respondent answers when they read this question.

2  Q.  Okay.

3       THE COURT:  Let's move on.

4  Q.  Let's move on.  Why don't we go to the actual question

5  about Internet activities, this next one, on page C-11?

6       And this was, again, one of your screening questions

7  to see if people would then qualify to go into the main survey,

8  right?

9       This is the "which, if any, of the following Internet

10  activities do you personally do."

11  A.  That is a screener question, that is correct.

12  Q.  So in the first one, play online games, do you have any

13  opinion about whether people taking this survey would read each

14  of your examples and think about the relationship between each

15  example and use that to limit their answer to play online

16  games?

17  A.  Do I have an expectation about how somebody would read

18  this question?

19  Q.  Right.

20  A.  I have an expectation that they would read it and

21  interpret it in the way that they thought was accurate.

22  Q.  Okay.  And so, if they just thought, each of these are

23  just online games, so if I play an online game, my answer is

24  "yes," that would be a legitimate answer for that person?

25  A.  If they read the whole question --

1  Q.   Yes.

2  A.   -- and at the end of the day, after they read that

3  question with all the words to it and they knew they had a

4  "don't know" response, "unsure," if they didn't know what I was

5  talking about, and they answered it with "yes, no, or don't

6  know," that's again fine for them to answer however they would

7  answer it.  That's the purpose of the survey, see how

8  respondents would answer to my questions.

9  Q.   Okay.  And so, if someone played an online game that is

10  different than League of Legends, World of Warcraft, or

11  Minecraft, but is nonetheless an online game, if they

12  interpreted those as examples of online games, a correct answer

13  for them would be "yes," right?  They read the whole thing?

14  A.   If they read it as "such as, et cetera," and it was an

15  online game that they were familiar with and they knew what the

16  question meant, then they could say "yes."  That's their

17  freedom.

18  Q.   All right.  So in the question of "download or upload free

19  digital music" where you cite sites -- through sites such as

20  ThePirateBay, Kickass Torrents, and Torrentz, if a person

21  downloaded or uploaded free digital music through Amazon,

22  iTunes or YouTube, and saw these examples and said, well, I

23  don't use these, but I use other sites for uploading and

24  downloading free digital music, and they read your example,

25  that would be a correct answer for them to say "yes, I do,"

1  right?

2  A.   No.  We talked about this before.  What these -- these

3  are -- this is defining the question.  These are BitTorrent

4  sites.  We talked a lot about this before.  These are the three

5  most popular BitTorrent sites, and that's what this question is

6  about.

7  Q.   Before this project, you had never heard of any of these

8  sites?

9  A.   I believe that's true, but during the course of the

10  project I certainly did a lot of research.

11  Q.   You had heard of iTunes from Apple Computer?

12  A.   Before this research, yes.

13  Q.   Yes.

14  A.   I would say so, for sure.

15  Q.   Apple computer is, in your words, the company with the

16  largest capitalization in the world?  It is a big, successful

17  company?

18  A.   I know it is big and successful.  I think -- are you

19  referring to the question below which talks about iTunes, that

20  one that says "purchase digital music"?

21  Q.   That was the one where you gave an example of purchasing

22  digital music, right?

23  A.   Yes.  It's in there, sure.

24  Q.   iTunes also lets you get free digital music, doesn't it?

25  A.   My understanding is it does, sure.

1  Q.   Amazon let's you get free digital music, doesn't it?

2  A.   Yes.

3  Q.   And you didn't offer any specific question response for

4  the screening question or your test question about downloading

5  free digital music through Amazon or iTunes, did you?

6  A.   I did not, because that wasn't the purpose of my survey.

7  Q.   Okay.  You weren't interested in whether people download

8  or upload free digital music if they do it legally?

9  A.   I mean, the question I asked was do they do this through

10  BitTorrent sites.  I analyze the results, and then later on I

11  look at the percentage of people using BitTorrent sites for

12  infringing music.

13  Q.   Okay.  Can we jump to 2361.  Let's see.  I think it was

14  DTX 2361.  This is one of the documents you talked about today.

15           And while we are pulling that up, that was an

16  article -- sorry, we have got double numbering.  Let me just

17  take that down.

18           In any event, I believe there was an article, a

19  Digital Trends article that you were asked about during your

20  examination that mentioned some sites for getting free digital

21  music.  And I believe in your examination today you commented

22  on them being bands that fewer people had heard of, more

23  obscure stuff.  Do you remember that.

24  A.   I do.

25  Q.   Okay.  But one of the sites listed in the Digital Trends

1    magazine about legal, free music downloads mentioned Amazon.

2    Do you remember that?

3    A.    I guess -- are you showing it to me right now?

4    Q.    I am afraid I am not because we have a little technical

5    glitch.  But Amazon, you would agree, is not an obscure Web

6    site, is it?

7    A.    For what?

8    Q.    Well, lots of people have heard of Amazon?

9    A.    People have heard of Amazon, sure.

10   Q.    And Amazon has ways to download movies, it has a movie

11   service, right?

12   A.    To download movies?  I guess.  I am not sure, but I will

13   take your word for it.

14   Q.    All right.  Have you heard of Amazon Prime?

15   A.    Yes.

16   Q.    And people with Amazon Prime memberships get a bunch of

17   free movies and music if they have that annual membership in

18   the free shipping program with Amazon.  Are you aware of that?

19   A.    I believe that's true.

20   Q.    And you have heard of Starbucks, haven't you?

21   A.    Yes.

22   Q.    And are you aware that Starbucks has a pick of the week

23   promotion where you get a free iTunes song?

24   A.    I am not aware of that, but I take your word for it.

25   Q.    Okay.  I would like to talk about your choice not to do a

1  control group.  In other words, not to do the same survey to

2  find out if the results would be any different for other ISPs.

3  Do you remember that?  That was one of Mr. Poret's criticisms.

4  A.    I do.

5  Q.    All right.  And you rejected that here today.  Is it fair

6  to say you didn't try to find out in your research whether

7  there is any difference between how subscribers to other ISPs

8  would answer these questions?

9  A.    I didn't look at differences and I explained why.

10  Q.    Right.  So if one wanted to know if there is anything

11  different about Cox and why people subscribe to Cox as opposed

12  to other ISPs, it would be reasonable in that case to do a

13  control for non-Cox subscribers if you wanted to find that out?

14  A.    Well, I did have a control, I just want to point -- I had

15  two controls.

16  Q.    Right.  But you didn't control for non-Cox subscribers at

17  all, right?

18  A.    I only -- my survey was focussed only on Cox subscribers.

19  That was the purpose of my survey, to look at them.

20  Q.    So you have no way of knowing if the results would be any

21  different for AT&T or Verizon or Comcast?

22  A.    That's true.  I don't know that.

23  Q.    You did mention though that there was some advertising --

24  you pointed to some recent advertising that Cox does that talks

25  about speed.  Do you remember that?

1    A.    Yes, absolutely.

2    Q.    Did you consider the advertising that any other ISPs do?

3    A.    I don't remember that coming up in Mr. Negretti's

4    testimony.  I think he talked about Cox's advertising, and

5    that's what I looked at.

6    Q.    Okay.  You did -- and you looked specifically at

7    advertising about speed and references to downloading songs; is

8    that right?

9    A.    I remember again, as I pointed out earlier, that there was

10   definitely a big mention of downloading music as a benefit to

11   subscribing to Cox that Mr. Negretti pointed out.

12   Q.    And you think that supports your conclusion that people

13   are drawn to Cox Internet service by the ability to do that

14   specific thing, download songs?

15   A.    Absolutely.

16   Q.    Okay.

17   A.    Absolutely.

18   Q.    If we could get 3568.

19             Dr. Nowlis, you have in front of you --

20             MR. PECAU:  Your Honor, I object to the introduction

21   of this exhibit.  It has nothing to do with Dr. Nowlis'

22   testimony.

23             THE COURT:  Relevance?

24             MR. PECAU:  Relevance.

25             THE COURT:  All right.  Let's approach the side bar.

1       NOTE:  A side-bar discussion is had between the Court

2   and counsel out of the hearing of the jury as follows:

3   AT SIDE BAR

4       THE COURT:  Why is this relevant?

5       MR. WAKEFIELD:  Okay.  So first, Dr. Nowlis never

6   talked about any of the advertising that came out.  And that

7   was, frankly, not even produced in discovery that Mr. Negretti

8   was asked about.

9       Now he is relying on it to say it supports his

10  conclusion because we mentioned songs and speed.  And I want to

11  cross-examine him about the fact that songs are a standard

12  measurement of download capabilities by government bodies and

13  by all of Cox's competitors.  And it doesn't in any way suggest

14  that Cox is uniquely trying to position itself for anything

15  illegal or unauthorized.

16      And we didn't disclose these earlier because we

17  didn't even know until-- first of all, we didn't know until

18  Negretti that these documents were going to be used in the

19  case.  We didn't know that Nowlis was going to be talking about

20  them until late last night.

21      I think it's reasonable for the jury to understand

22  that there is no difference here about how other ISPs promote

23  speed, and that these are standard metrics.  It's like quarter

24  mile times for cars, 0 to 60 time, we're not saying go speed,

25  it's just about the capability of the network.

S. Nowlis - Cross

1932

1    THE COURT:  Doesn't he say that he doesn't -- he

2  didn't do any investigation to see what anybody else does,

3  right?

4    MR. WAKEFIELD:  But this is part of impeaching him on

5  that.  That had he done this, he would have seen that there is

6  nothing unique about Cox --

7    THE COURT:  You're going to impeach him on something

8  that he said he didn't know anything about?

9    MR. WAKEFIELD:  Well, that he should have considered,

10  that he should have considered.  Because he is saying that this

11  is gotcha evidence that we talk about speed.  And we could have

12  put more in our case about that had it not been something that

13  was used -- specifically speed and songs, had it been even

14  produced in discovery, but it wasn't.

15    MR. PECAU:  Your Honor, can I address that?

16    THE COURT:  Yeah.

17    MR. PECAU:  Okay.  So there are two things that they

18  are raising.  One is the evidence.  We could have gone through,

19  as we did with Mr. Negretti, a number of Cox ads that are in

20  evidence.  In fact, every Cox ad in evidence refers to

21  downloading music.

22    And they don't use it just as a metric.  And in fact,

23  what they do use for it is exactly what Mr. Negretti testified

24  they use it for, as a messaging to drive people.  This has

25  nothing to do --

1    THE COURT:  It is a marketing approach.

2    MR. PECAU:  Right.

3    THE COURT:  So the issue then is should Mr. Wakefield

4  be able to ask him, were you aware that everybody else in the

5  industry uses speed as a marketing tool to attract customers,

6  right?  Is that what you want out of this?

7    MR. WAKEFIELD:  Yes.

8    MR. PECAU:  This doesn't --

9    MR. WAKEFIELD:  That they use speed and downloading

10 copyrighted materials, legally, but downloading music and

11 movies and books as measures of speeds.

12    THE COURT:  But he doesn't know.  I mean, I think the

13 first question is legitimate.  You can ask him whether he knows

14 one way or the other, but I don't think you need to go further

15 than that.

16    MR. WAKEFIELD:  I do think it would be fair to use

17 for impeachment on this point, to show him a couple of

18 advertisements from other ISPs.

19    THE COURT:  I'm not going to allow that.  Your

20 exception is noted.

21    MR. PECAU:  Thank you, Your Honor.

22    MR. BUCKLEY:  Thank you.

23    THE COURT:  But you can him ask him that one

24 question, and you don't need the document to do that.

25    NOTE:  The side-bar discussion is concluded;

S. Nowlis - Cross

1934

1    whereupon the case continues before the jury as follows:

2    BEFORE THE JURY

3    BY MR. WAKEFIELD: (Continuing)

4    Q.    Dr. Nowlis, are you aware that other ISPs, like XFINITY

5    from Comcast, Verizon, and AT&T promote their service and the

6    speed of their service by referring to downloading movies and

7    music quickly?

8    A.    I can't think of a specific example of that off the top of

9    my head.

10   Q.    Did you do anything in your research -- you said you

11   looked at some advertising for Cox.  Did you look at whether

12   Cox's advertising is any different than other ISPs that are

13   talking about the speed and performance of their services?

14   A.    I may have done that in the past, but again, nothing

15   springs to mind sitting here right now.

16   Q.    Would it surprise you to know that other ISPs talk about

17   how many songs you can download in a minute or even seconds?

18   A.    Do you have something for me to look at in that regard?

19   Is that what you're asking me?

20             MR. PECAU:  I object.  I mean --

21             THE COURT:  So you don't know, is that the answer?

22             THE WITNESS:  I don't know.

23             THE COURT:  All right.  Then let's move on.

24             MR. WAKEFIELD:  Okay.

25   BY MR. WAKEFIELD: (Continuing)

1    Q.    You mentioned -- at one point you mentioned sharing, and

2    you assumed that it was relating to file sharing on BitTorrent.

3    Do you remember that?

4    A.    In --

5    Q.    There were some documents and advertising that talked

6    about sharing?

7    A.    Can you tell me which ones specifically so I make sure I'm

8    on the right page with you.

9    Q.    Let me look at my notes.  I think it might have been in

10   PX 1404 at 13.  Can we get that.

11         Well, let me just ask you this.  We don't need the

12   exhibit.  Are you aware that iTunes offers sharing of music and

13   movies?

14   A.    Personally am I aware of that?  I don't think so.  I'm not

15   saying it doesn't exist, but it does not ring a bell for me.

16   Q.    And that there's a sharing option when you're using iTunes

17   so that other people in your household --

18         MR. PECAU:  Objection, Your Honor, assuming facts not

19   in evidence.  It's unrelated to --

20         THE COURT:  I'll sustain the objection to this

21   question.  You've got your exhibit now on the screen.  Do you

22   want to ask any questions about it.

23         MR. WAKEFIELD:  Yeah.  Actually it is --

24   BY MR. WAKEFIELD: (Continuing)

25   Q.    Right.  So this was one of the surveys you talked about.

S. Nowlis - Cross

1936

1    This was the percentage of people saying "a factor is important

2    in the choice to use an online music service."  And you

3    mentioned specifically the reference to sharing.

4    A.    I did, that is correct.

5    Q.    But you're aware, aren't you, that online music services

6    allow sharing legally with people who are using the service,

7    aren't you?

8    A.    You're telling me to go with the idea --

9            THE COURT:  The question was, are you aware of --

10           THE WITNESS:  I'm not.  I'm not saying it doesn't

11   exist.  I'm just not aware of it.

12   BY MR. WAKEFIELD: (Continuing)

13   Q.    Okay.  When you read this reference to facilitates music

14   sharing in something that people want in a choice of an online

15   music service, were you assuming that that means illegal or

16   unauthorized sharing?

17   A.    Well, I know that you can share music with BitTorrent P2P

18   sites, so that's -- when I saw that, that's what comes to mind

19   for me.

20   Q.    That's what comes to mind for you.  This was a study about

21   a proposed deal with a company call Rhapsody.  Have you heard

22   of Rhapsody?

23   A.    Well, I heard about it in the context of this study.

24   Q.    Did you do anything to examine whether services like

25   Rhapsody let people share their music choices with other

1    subscribers of those services?

2    A.   I don't think I did, no.

3    Q.   Okay.  In that same document actually -- pull it back up.

4           You mentioned a 17 percent, one in six -- it's not in

5    this question, but you mentioned one in six get music for free.

6           Do you remember that part of it?

7    A.   Are you reading the whole sentence right now, or are you

8    just giving me parts of it?

9    Q.   It's just parts of it.  Let me go to 1404.  One moment.

10          So it was the page ending in 624 of this same

11   exhibit.  Can we pull that up?  Okay, I think we're there.

12          So you called this out in your testimony earlier

13   today about one in six of the people in this subgroup, which

14   were called the Echo Boomers, that one in six of those claim to

15   acquire music through some free method.  Do you see that?

16   A.   Right.  And it says -- do you want me to read the whole

17   sentence?

18   Q.   No, I'm just focusing you on the 17 percent, that includes

19   people who, as this survey showed, steal songs online, right?

20   A.   Yeah, steal online, yes, you're right.

21   Q.   It would also include people who get music through other

22   free methods?

23   A.   Yes, it says, "free methods, burning songs and stealing

24   songs," that's correct.

25   Q.   Okay.  So you don't know that the 17 percent of this

S. Nowlis - Cross

1938

1    subgroup of this study steal songs?  You know that some amount

2    of that 17 percent does?

3    A.    That is true.  It fits with my earlier result, that's why

4    I was talking about it.

5    Q.    It could be 80 percent of that one in six, or it could be

6    1 percent, you don't know?

7    A.    That's correct, I don't know, I just know it fits with my

8    finding.

9    Q.    All right.  So you don't know what percent of the one in

10   six go to Starbucks and get free iTunes gift cards?

11            MR. PECAU:  Objection, Your Honor.

12            THE COURT:  Overruled.

13   A.    I don't know that, that is correct.

14   BY MR. WAKEFIELD: (Continuing)

15   Q.    You talked about your controls, your control questions

16   earlier and how you got to the 70.4 percent.  Do you remember

17   that?

18   A.    Yes.

19   Q.    And am I correct that that was people who had said that

20   they -- people who said "yes" to the upload or download free

21   music part, and then who said that was a reason why they

22   subscribed to Cox?  All right.  So it was -- the 70 percent was

23   of the people who had said "yes" to that screening question

24   about free music?

25   A.    I'm confused by your question.  I'm sorry.

S. Nowlis - Cross

1939

1   Q.    What was the 70 percent of?

2   A.    The 70 percent?

3   Q.    Yes, 70.4 percent.

4   A.    What was that number?

5   Q.    What was it a percent of?

6   A.    This was a percent of people who do the activity.

7   Q.    Okay.  So the people who do the activity, upload or

8   download?

9   A.    Free digital music through sites such as the ThePirateBay,

10  KickassTorrents, and Torrentz.

11  Q.    Okay.  So the percent of those people who then went on to

12  answer the test question was, which is, is this a reason why,

13  right, 70 percent of the people said, "yes, this is a reason

14  why," right?

15  A.    Right, to that question, to the final question.

16  Q.    And if you take the control question on calculating

17  radioactive decay rates and you take the people who said, "yes,

18  I do that," and then you look at how many took the question

19  about is this a reason why you subscribed to Cox, what

20  percentage of those people said yes?

21  A.    I am not sure I'm following you.

22  Q.    Okay.  Well, let's look at -- so there are people who were

23  asked to calculate radioactive decay rates, right, in the

24  screening questions?

25  A.    There was a whole question there.

S. Nowlis - Cross

1940

1  Q.   Yeah, that whole question.

2  A.   If you want me to reread the question, I'll do that for

3  you.

4  Q.   I don't think that's necessary.  Just in shorthand I'll

5  call that the radioactive decay question.  We know we're

6  talking about your whole question with your examples.  Okay?

7  A.   Okay.

8  Q.   Trying to move it along.

9  A.   Sure.

10  Q.   So for the -- people were asked the radioactive decay

11  question, do you do this.  And if you took the people who said

12  "yes" to that question, and then you looked at how many of

13  those said "yes, this is a reason why I subscribe to Cox," what

14  percentage was that?

15  A.   I'm not sure.  I don't know.  I don't even know if I could

16  calculate that.

17  Q.   Well, it's just eight out of ten, isn't it?

18       MR. PECAU:  Objection.

19       THE COURT:  Overruled.  This is cross-examination.

20  A.   Again, I don't know.  I'm not sure what you're getting at.

21  You saw my calculations that I did and I stand behind those

22  calculations.

23  Q.   Let's get DTX 3576.

24       THE COURT:  Mr. Wakefield, how much more do you have

25  on cross?

1        MR. WAKEFIELD:  Maybe five minutes.

2        THE COURT:  Okay.

3   BY MR. WAKEFIELD: (Continuing)

4   Q.   Okay.  Dr. Nowlis, do you have 3576 in front of you?

5   A.   Yes.

6   Q.   Okay.  You produced data in electronic form, the results

7   of your --

8        MR. PECAU:  Objection, Your Honor.

9   Q.   -- survey, correct?

10       MR. PECAU:  I don't believe we were given a copy of

11  this beforehand.  Were we?

12       THE COURT:  When, this morning?

13       MR. PECAU:  Anytime, ever.

14       THE COURT:  All right, approach the bench, please.

15       Ladies and gentlemen, let's take about a ten-minute

16  recess now.

17       NOTE:  At this point the jury leaves the courtroom;

18  whereupon the case continues as follows:

19  JURY OUT

20       THE COURT:  So the objection is this is a document

21  that he hadn't seen?

22       MR. WAKEFIELD:  It's his own spreadsheet.  It's just

23  drilling down into what has been produced electronically.  It's

24  his own data, and we just sorted it by the people who said

25  "yes."

1       MR. PECAU:  Well --

2       THE COURT:  Do you recognize the data in here,

3   Dr. Nowlis?

4       THE WITNESS:  Not necessarily in this format.  I

5   believe that he did submit -- additional analysis was done on

6   this, which I never did, and I couldn't verify it at this

7   point.

8       MR. PECAU:  Your Honor, this is precisely what they

9   did with their own expert, Mr. Poret.  I mean --

10      THE COURT:  All right, the objection is sustained.

11      MR. WAKEFIELD:  So, Your Honor, I don't have to use a

12  new document, I can just ask him to walk through.  He came here

13  in rebuttal and said, again, that there was this 70 percent

14  result.  And I think it's fair to say what results he gets

15  applying that methodology to the control questions if he did it

16  the same way.

17      And I have -- we can pull up the spreadsheet

18  electronically and he can look at it as he produced it to us as

19  well.  But I think it's fair impeachment, Your Honor.

20      MR. PECAU:  Your Honor, can I address that?

21      THE COURT:  Yes.

22      MR. PECAU:  Your Honor, it isn't fair impeachment.

23  And the reason it isn't fair impeachment is because all

24  Dr. Nowlis testified to is how the control worked in the

25  question that he asked.

1    This has nothing to do with the question he asked or

2    the control that he used.  This is something completely

3    different, which was never disclosed in their expert report.

4    And this is just trying -- this isn't fair cross-examination.

5    I mean, he hasn't -- Dr. Nowlis hasn't analyzed his survey

6    results, which are quite voluminous, to look at it in a

7    completely different way.  And to have him to do it on the fly

8    and to rely on Mr. Poret's calculations is completely unfair.

9          THE COURT:  All right.  Mr. Wakefield.

10         MR. WAKEFIELD:  So, Your Honor, I don't think it's --

11   he just, again, said, I took the number of people who said they

12   do that activity, and then I figured out how many of them said

13   "yes" to the question.  And I'm just walking him through the

14   fact that if you did that with his people who were asked about

15   decay rates and avatars, that the percentages would be about

16   the same or higher.

17         THE COURT:  All right.  The same ruling as I had last

18   week, this will be excluded.  And your exception is noted.

19         MR. WAKEFIELD:  Thank you, Your Honor.

20         THE COURT:  All right, let's take ten minutes.

21         NOTE:  At this point a recess is taken; at the

22   conclusion of which the case continues in the absence of the

23   jury as follows:

24   JURY OUT

25         THE COURT:  All right.  Let's get our jury, Joe.

1    JURY IN

2           THE COURT:  All right.  Please be seated.

3           Mr. Wakefield?

4           MR. WAKEFIELD:  Thank you, Your Honor.

5    Q.   Dr. Nowlis, I only have one further question -- well,

6    perhaps two:  Your survey ultimately was getting at whether the

7    ability to upload and download free music through particular

8    BitTorrent sites was a draw to Cox's Internet service, right?

9    It was about BitTorrent?

10   A.   It was about BitTorrent, yes.

11   Q.   Okay.  And nowhere in this survey did you use the word

12   "BitTorrent" in any of your questions, correct?

13   A.   Yes.

14          MR. WAKEFIELD:  Okay.  Thank you.

15          THE COURT:  All right.  Redirect?

16          MR. PECAU:  Just a couple of questions, Your Honor.

17                      REDIRECT EXAMINATION

18   BY MR. PECAU:

19   Q.   Dr. Nowlis, as a marketing expert, if a person pays for a

20   membership like Amazon Prime, do you have an opinion whether or

21   not that person is getting the services that come with his

22   membership for free?

23   A.   You said if someone subscribes to Amazon Prime, would they

24   get things for free as part of that membership?

25   Q.   Yeah, if they're paying for it.

1  A.   Well, then it's not free, because if they're paying a

2  certain fee for it, it's not technically free.

3  Q.   Okay.  And your main question asked the respondents, you

4  know, which, if any, of the following are reasons that you

5  subscribe to Cox, why you subscribe to Cox Internet service,

6  and the main option was, that we've been talking about,

7  download or upload free digital music through sites such as

8  ThePirateBay, Kickass Torrents, and Torrentz, et cetera.

9          Do you recall that?

10 A.   Yes.

11 Q.   All right.  Do you know if someone can upload through

12 Amazon or iTunes music?

13 A.   I don't believe they can.

14         MR. PECAU:  Okay.  No further questions, Your Honor.

15         THE COURT:  All right.

16         MR. WAKEFIELD:  One recross?

17         THE COURT:  No, we're done.

18         All right.  Thank you, sir.  You're done and excused.

19 Have a good day.

20         THE WITNESS:  Thank you, Your Honor.

21                 (Witness excused.)

22         THE COURT:  All right.  Next witness?

23         MR. CARACAPPA:  Thank you, Your Honor.  BMG calls

24 Dr. Robert Bardwell.

25         THE COURT:  Go ahead.

R. Bardwell - Direct

1946

                ROBERT BARDWELL, PH.D., PLAINTIFF'S WITNESS,

                     PREVIOUSLY SWORN, RECALLED

                          DIRECT EXAMINATION

BY MR. CARACAPPA:

Q.   Dr. Bardwell, good afternoon.  How are you?

A.   Good afternoon, Mr. Caracappa.

Q.   Dr. Bardwell, did you read Dr. Sullivan's testimony?

A.   I did.

Q.   Did you feel that Dr. Sullivan properly represented to the

jury your model or your analysis?

A.   Absolutely not.

Q.   Dr. Sullivan was qualified as an expert in statistics.  Do

you recall that?

A.   I do.

Q.   Do you recall whether he was declared as an expert in

probability?

A.   He was not.

Q.   And you were declared as both an expert in statistics and

probability, correct?

A.   That's correct.

Q.   And how, if at all, is that relevant here?

A.   Well, it's extremely relevant.  The model that I prepared

and, in fact, the only model that could be prepared in this

case is a probability model, and throughout his testimony and

his reports, Dr. Sullivan only opines about my model as if it's

R. Bardwell - Direct

1947

1   a statistical model and, as such, misrepresents it or

2   misunderstands it.

3   Q.   Can you please explain the differences between a

4   statistical model and a probability model?

5   A.   Yes.   So a probability model is -- has to be applied and

6   is typically applied when you don't have data that addresses

7   the outcome in question.   So a good example is, say, when I

8   analyzed the first Colorado lottery.   They had essentially a

9   Powerball lottery.   You don't have outcomes of multiple

10  lotteries at the time.   It was the first lottery in the state.

11          What you need to do -- what you have to do is build a

12  probability model that lets you predict the results, because my

13  job is to ensure that the state doesn't lose money by paying

14  out too much and people who participate in the lottery don't --

15  you know, get a fair shake in terms of their winnings.

16          So, for instance, in that, I think it was a five-ball

17  Powerball lottery, I can compute that there's one ticket in

18  5,006,386, I think, will be a winning ticket.   So using --

19  that's with no data.   Actually, there's some data there in that

20  there is the design of the game.   So there's information about

21  how the game is designed.   There's 1 through 59 on each of the

22  balls.   There are five balls.   So you have that data that

23  designs the lottery, but you don't have any experimental data.

24  But you can build a probability model that will tell you the

25  outcome.

R. Bardwell - Direct

1948

1  Q.   Dr. Sullivan used some examples of the cost of houses.  Do

2  you recall that?

3  A.   I do.

4  Q.   Do those examples have any applicability here?

5  A.   None whatsoever in the way that he tried to apply them.

6  So his model is something like we look at house prices in an

7  area.  We investigate the relationship of those house prices to

8  different characteristics of houses, square footage and so

9  forth, and then we could build a model, and that's what

10  economists often do and statisticians.  We could build a model

11  that would allow us to estimate the house -- the price of a

12  house with those given characteristics.

13         There's a big difference there, though, because in

14  that case, you have data about house prices, the outcomes in

15  question.  You build a model, and then you can apply it to

16  members of that area -- houses in that area.

17         In this case and in the lottery case, we don't have

18  that kind of data.  In this case, we don't have data showing

19  the subscribership to IP addresses over time that would allow

20  us to verify that those are repeat infringements on those

21  accounts.

22  Q.   Now, you did have data for 122 Cox subscribers, right?

23  A.   That's right.

24  Q.   We'll talk about that later, but you didn't have the data

25  for the other over 100,000 Cox subscribers that have been

R. Bardwell - Direct

1949

1   accused of infringing, right?

2   A.   That's correct.

3   Q.   And the point of your probability model was to do what?

4   A.   Well, if we had had the data, if Cox had been able to

5   produce the data that would verify the assignment of IP

6   addresses to subscribers over time, there would be no need for

7   a probability model.  That data itself would tell you if these

8   are repeat infringements by single subscribers.

9   Q.   We were talking about this yesterday, and I was trying to

10  understand the difference between a statistician and a

11  probabilist, which is someone who is an expert in

12  probabilities, right?

13  A.   Yes.

14  Q.   One example we used was flipping a coin.  Let's say we

15  have a fair coin.  What does a fair coin mean?

16  A.   You know, so we're all familiar with this.  So we have a

17  coin with a head on one side and a tail on the other, and

18  they're used even at the start of football games, right?  You

19  flip it.  You -- the assumption is they'll be 50 percent in the

20  long run, 50 percent heads and 50 percent tails.

21  Q.   Let's say I take that coin and I flip it ten times and all

22  ten times there's a head.  What would a statistician say is

23  going to be on the eleventh flip?

24  A.   Yeah.  So taking Dr. Sullivan's approach, we would say

25  that the average occurrence of a head is 100 percent, so we

R. Bardwell - Direct

1950

1    would expect the next flip to be 100 percent heads.

2    Q.   And what would someone who is an expert in probability

3    say?

4    A.   All of us would say if we know that it's a coin with a

5    head and a tail, we would flip it the next time, and we would

6    say it has 50 percent chance coming up heads and 50 percent

7    chance coming up tails.

8    Q.   Dr. Bardwell, Dr. Sullivan testified that you created a

9    statistical model to identify Cox subscribers.  Do you recall

10   reading that?

11   A.   I do.

12   Q.   Is that correct?

13   A.   It's not correct at all.

14   Q.   Can you please explain?

15   A.   Yeah.  I think of the -- a really good example of a case

16   that's similar to this, very similar, and has -- it maybe is a

17   little bit easier to understand because we have lots of

18   Internet technology going on as well as the probability theory,

19   but the murder case that I worked on in, for Boulder.  That was

20   a cold case that was reopened on the basis of a probability

21   model I built, and that case is very similar to the data and

22   the model that I built in this case.

23        In that case, there were 30 pellets from a shotgun

24   shell that were found on the body of the victim, and there was

25   a shotgun shell found in the vest, hunting vest of the suspect,

R. Bardwell - Direct

1951

1    and the FBI took pellets from each of those sources and did a

2    chemical analysis on them to determine was there a

3    characteristic fingerprint or signature in the distribution of

4    the different metals in the pellets from the murder scene and

5    the pellets that were found on the suspect.

6            And so this -- and it's very similar here because

7    here we have a signature that's defined by port, songs that are

8    shared, the pattern of sharing over time, and in that case, we

9    had distribution of metals.  So they had, I believe, there were

10   eight metals, but lead, tin, silver, antimony, bismuth, copper,

11   arsenic, I believe.

12           And what I showed is that -- and in this case -- in

13   that case, the only model that one could construct is, that had

14   any validity is a probability model because the only data that

15   would answer the question is a confession, and the question is,

16   is the suspect guilty?  Are these shells -- is the shell at the

17   murder scene and the shell on the suspect the same, from the

18   same source?

19           And by the -- by creating a probability model, I

20   could show that there was a very remote chance that these two

21   shells did not come from the same source.

22   Q.   Did Dr. Sullivan talk about probability models at all?

23   A.   He did not.

24   Q.   Did Dr. Sullivan prepare a probability model?

25   A.   You know, Dr. Sullivan in everything that he's produced

1  did no analysis of any data, prepared no model, probabilistic

2  or statistical, did no analysis.  I mean, all he's testified to

3  and presented is his eyeballing of my exhibits and telling us

4  that they don't look to him like repeat infringements.

5  Q.   He has a number of criticisms of you and your models.

6  First he says that all the factors, you treated them all

7  independently.  Do you recall that testimony?

8  A.   I do.

9  Q.   And is that true?

10  A.   You know, it's always a difficult -- I mean, I have the

11  curse of being a mathematician, and I often put people to sleep

12  or it's -- it's a hard field to give people any confidence that

13  I'm making sense, but the fact is he's right in one sense.  You

14  need to use conditional probabilities in a Markov model, and I

15  can show you a little bit of what that means, but he's

16  completely wrong in his statement and his claim that I applied

17  incorrectly and treat the probabilities as independent.

18       So I, you know, if you -- my derivation of the Markov

19  model is from the very first to the last, it's a derivation of

20  conditional probabilities.

21  Q.   Karl, can you pull up PX 1640, please?

22       Dr. Bardwell, how, if at all, does this relate to

23  Dr. Sullivan's criticisms of the factors you analyzed?

24  A.   Well, I'll do, try to do a little bit of interpreting.

25  I'm not expecting people to digest it.  This is the document

R. Bardwell - Direct

1953

1    that presents the derivation of the mathematics behind my

2    model, but you can see that the very first, the title of the

3    document is formulas for -- and I'll just read it as a

4    mathematician would read it -- formulas for the probability,

5    that's what the P means, that we have the same subscriber

6    between two infringements, and the bar, that pipe, that

7    vertical line means conditioned on.

8            This is a -- this is -- the whole derivation here is

9    conditional probabilities -- conditioned on that the gap

10   between two infringements is t days, and the plus or minus just

11   means we either do or we don't have the same port and we either

12   do or we don't have the same songs.

13           And if we could just page through here, there's only

14   three pages, these are the computations -- the second page is

15   the computation of the transition probabilities, and then on

16   the third page, we have the results, and you can see in the

17   middle there, those are the results.  So this is the four

18   probabilities we were trying to compute.

19           And this is, this is actually, if you look at my

20   computer code, I can show you where this is.  We just calculate

21   this for all almost 2 million records in that data set.  We

22   say, well, what's the probability between this infringement and

23   the next one that it was the same subscriber or not given that

24   they had the same music and the same port or if they didn't,

25   and given that the space between the two infringements was

R. Bardwell - Direct

1954

1    t days apart.

2            MR. CARACAPPA:  Your Honor, at this time, we'd like

3    to move into evidence PX 1640.

4            THE COURT:  Any objection?

5            MR. WAKEFIELD:  No objection.

6            THE COURT:  It's received.

7    BY MR. CARACAPPA:

8    Q.   Dr. Bardwell, Dr. Sullivan also criticizes you for not

9    having an error rate.  Do you recall that criticism?

10   A.   I do.

11   Q.   Do you agree with that criticism?

12   A.   No.  I -- and I think it's alarming to me that he says

13   that, as he must, as he represents himself as an expert, must

14   know that we've done -- I've presented at least three different

15   analyses of error and done a very thorough job of that, and he

16   has done no analysis at all.

17   Q.   Karl, can you pull up PDX 6, slide 1, please?

18           Dr. Bardwell, how, if at all, does this relate to

19   your error rate?

20   A.   So I submitted an initial report, and Dr. Sullivan

21   responded to it, and he made some suggestions and changes in my

22   parameter estimation method and in the model.  And so then I

23   authored a reply report which was backed with a lot of analyses

24   that we submitted detailed documentation of, including the

25   code, and this is the summary table from the reply report.

R. Bardwell - Direct

1955

1    So -- and basically -- so basically the reply report

2    is all about errors, controlling and measuring the sensitivity

3    of the results of the model to the changes that Dr. Sullivan

4    suggested in his report.

5    So the first two columns, which have the title

6    Bardwell Report, show the results from my initial report, and

7    just to cut to the chase, the conclusion is that 95 percent of

8    the infringements are found to be in verified accounts.  In

9    other words, they're shown to be repeat infringements by one

10   subscriber.

11   The other two groups of columns, the Revised

12   Parameters and Conservative Model, are both what a

13   mathematician would call a sensitivity analysis to understand

14   how sensitive the findings of the model are to changes in the

15   model.  So Dr. Sullivan suggested we make some changes -- I

16   make some changes in how I estimated parameters.  That model

17   with those revised parameter estimates are presented in the

18   middle two columns, and they -- those changes actually

19   increased the percent of verified accounts by 1 percent, so

20   from 95 to 96 percent.

21   And then finally, Dr. Sullivan suggested some changes

22   to the structure of the model, which I don't agree are

23   appropriate, but it's good to test those things to make sure

24   the model is robust.  That's another -- I love that term.  It

25   means, hey, you've got a piece of mathematics that's going to

1   give you the right answer even if a lot of things -- even if

2   you don't have a lot of things quite right or some things are

3   changed.

4            So here we try a really pretty radical test of the

5   model, restructuring it and using the revised parameters, and

6   it only lowers the percentage of verified infringements 4

7   percent, to 91 percent.

8   Q.   So if I understand you correctly, you prepared three

9   models, and they all came in with around the same percentage:

10  95, 96, and 91, right?

11  A.   That's correct.

12  Q.   Dr. Bardwell, Dr. Sullivan also says that you assumed

13  conclusions and then prepared a model that forced the results.

14  Do you recall that testimony?

15  A.   I do.

16  Q.   And do you agree with it?

17  A.   No.  And I think it's egregious that he characterizes it

18  that way, because he has all the documentation in our code and

19  in the data and all of the results we have that show the

20  methodical process of a data-driven analysis.  This was a

21  scientific investigation of the data to determine whether we

22  could verify repeat infringements, and there was no way in

23  which it was driven -- I mean, he never points out how it could

24  have been driven by attempting to change the results or aim for

25  certain results.

R. Bardwell - Direct

1   Q.   Dr. Sullivan then says that your software doesn't work.

2   Do you recall reading that testimony?

3   A.   I do.

4   Q.   Do you agree with that testimony?

5   A.   No.  And again, I really find his testimony alarming,

6   because I -- you know, you have to decide, and there's two

7   experts, but frankly, it's a tremendous fabrication.

8   Q.   Can you please explain?

9   A.   Yeah.  I mean, I own a software -- my other business is a

10  software development firm.  I work with 10 to 20 software

11  developers all the time, designing projects, monitoring those

12  projects, we have sophisticated tracking systems.  I mean, this

13  is my life.

14         And we routinely, we have to produce reproducible

15  code with our projects, and we did that, and Dr. Sullivan's

16  initial report said, well, he couldn't run the code.  We went

17  through, to great lengths testing and retesting that the code

18  ran without any problems.

19         After he continued to make those claims, we actually

20  took the exact same package of code and data that we provided

21  to Dr. Sullivan and gave it to two analysts on our team who

22  have nothing to do with this project, no other instructions.

23  Both of them came back in -- it takes over two hours to run the

24  software, but in a few hours, having been able to run the

25  code --

R. Bardwell - Direct

1958

1    MR. WAKEFIELD:  Objection, Your Honor.

2    THE COURT:  I'm sorry, there's an objection.

3    MR. WAKEFIELD:  None of this new analysis was

4    disclosed.

5    THE COURT:  Overruled.

6    Go ahead, finish your answer.

7    THE WITNESS:  So those were independent -- I mean, I

8    was concerned, and frankly, you know, anybody who uses a

9    computer knows software is a complicated environment, and it's

10   prone to error.

11   So we're very error -- we're very conscious about any

12   kind of flaws that could exist in our software, so that was

13   just to double-check, and that really indicates to me that -- I

14   don't know what to say.  I can't understand why someone who

15   represents himself and his company to be of the caliber

16   Dr. Sullivan does can't run code that's easily runable and

17   doesn't ask, if he can't run the code and he wants to, why

18   didn't he contact us?  We could have helped him set it up very

19   quickly.

20   THE COURT:  Next question.

21   MR. CARACAPPA:  Karl, could you pull up PX 1772?

22   Q.   Dr. Bardwell, what is PX 1772?

23   A.   Well, this is the first page of the initial -- the code

24   that was paired and submitted with my initial report.

25   Q.   Karl, let's blow up that stamp.

R. Bardwell - Direct

1959

1        Dr. Bardwell, do you know whether this code was used

2   at your deposition?

3   A.    It was presented there as an exhibit, yeah.

4   Q.    Did they ever ask you questions about how to run the code?

5   A.    No.

6   Q.    Did they ever say, we can't run it.  Can you step us

7   through it because we don't know how it works?

8   A.    No.  No, they did not.

9   Q.    The analysts that you had run the code to confirm that it,

10  in fact, worked, did they get it to work?

11  A.    Immediately.

12  Q.    Dr. Sullivan says that you're utilizing unreliable data.

13  Do you recall that?

14  A.    Yeah, I do.

15  Q.    Is that criticism warranted?

16  A.    No.  Again, Dr. Sullivan doesn't provide any explanation

17  of what he means by that, but I would think if --

18          THE COURT:  Okay.  Wait for the next question.

19          THE WITNESS:  Thank you.

20  BY MR. CARACAPPA:

21  Q.    Could you please explain?

22  A.    Yeah.  The data that -- I mentioned this before.  This is

23  an exceptionally rich, a large and consistent data set.  It's

24  computer-generated.  I've dealt with, you know, hundreds of

25  data sets, and I have never encountered one that was this --

R. Bardwell - Direct

1960

1   took this little work to get, to prepare and to be able to deal

2   with.

3           And I -- you know, my father, I said, was a

4   statistician, and when I got my Ph.D., he said, much to my

5   chagrin, that I'm going to spend 95 percent of my time

6   preparing the data, which I didn't think sounded very

7   glamorous, but that's absolutely the case.  95 percent of what

8   we do is getting rid of outliers, cleaning data, mapping

9   fields, so that things are reliable enough so when you analyze

10  things, you don't have garbage in and you get good results.

11          This data, as I mentioned before, we had to delete a

12  few duplicates.  There's no other code that had to be written

13  to clean this data.  So it really is the most exceptional data

14  set I've seen.

15  Q.   Dr. Sullivan then says that the model was statistically

16  biased.  Do you recall reading that testimony?

17  A.   I do.

18  Q.   Do you agree?

19  A.   No.  And again, I find this really alarming, because

20  "bias" is a technical term.  It sounds like the guy knows what

21  he's talking about, but bias -- so bias means, for a

22  statistician, that's a term of art, so it means that the data

23  has a characteristic that it will not give you the correct

24  answer.  It will give you an answer that's a little bit too

25  high or a lot too high or a little bit too low, whereas we

1  assume that if we -- and that averages tend to be correct in

2  the long run, that's the way science is, most statistics is

3  built, is that it assumes that we have unbiased data.

4        And so Dr. Sullivan makes this claim about the data.

5  He doesn't explain what he means by that or why that would

6  occur.

7        And if I were to -- I tried to think about what could

8  he mean, and so maybe we have the Rightscorp program is

9  selectively just picking infringements, where the songs are the

10  same and the ports are the same, to give the illusion that

11  these are repeat infringements when they're not.

12        But all of the examples that Dr. Sullivan presents

13  belie that manipulation because they're all examples of how

14  scattered the song distributions are and how much other things

15  change.

16        So, you know, if Rightscorp was trying to cook the

17  books, they did a pretty lousy job of it.

18  Q.   I'm going to get to some of Dr. Sullivan's slides in a

19  minute, but I'd like to ask you just a couple more questions.

20  Dr. Sullivan said that you did not use a scientific model.  Do

21  you recall reading that testimony?

22  A.   I do.

23  Q.   Is the model that you used a scientific model?

24  A.   Yeah.  In the context of Dr. Sullivan did no analysis,

25  presented no model except for his eyeballing of the data, you

1    know, we spent, I think, over a thousand hours examining the

2    data.  This was a very data-driven -- first, it was

3    research-driven.  We researched how the Internet file sharing

4    works.

5           We built a model, you know, in the -- in every

6    project, a probability model has to start this way.  With the

7    shotgun shell evidence, they flew me to Winchester's factory to

8    see how shot shells were produced so I could create a model, a

9    reliable model about how do these different alloys get mixed up

10   in pellets.

11          So we studied the Internet; we built a model; then we

12   ran the data.  We looked at the data and the results, and we

13   continually improved the model so that it was more faithful to

14   the Internet file sharing we're observing.

15          So it's the picture of scientific method.  That's

16   where you have a hypothesis, you build a model, you test it,

17   then you adjust it so that it's a better representation of

18   reality.

19   Q.   Karl, let's pull up PDX 6, please.

20          Dr. Bardwell, I'd like to show you an exhibit that

21   Dr. Sullivan used.  Do you recall this exhibit?

22   A.   I do.

23   Q.   Do you think that this is a fair presentation of the

24   evidence in this case?

25   A.   No, I do not.

1  Q.   Please explain.

2  A.   So this chart is a record of file sharing by this single

3  IP address that's listed in the header, and each row represents

4  a date on which files were shared, and each column represents a

5  different song that was shared, and this data was produced to

6  Dr. Sullivan in one of the exhibits in my original report, and

7  he -- his presentation in his report and at trial was that the

8  pattern, he just kind of eyeballs it and he discusses that the

9  pattern there doesn't look to him like it should be repeat

10  infringements on one, by one subscriber, and in spite of the

11  fact that my -- and he says my model is unreliable because my

12  model verified this as a single subscriber account, but one of

13  the things -- there's two really misleading things about this.

14          One is the way it's presented is visually intended to

15  imply that there's kind of random file sharing, which is not

16  the case, as I'll demonstrate, but what's the most concerning

17  to me is I devoted a whole page in my reply report to explain

18  to Dr. Sullivan why this example, which he says doesn't look

19  like it should be a repeat subscriber, is, you know,

20  mathematically very clear that it is, because the port that was

21  used throughout all of these is so rare that it constitutes a

22  very unique fingerprint for every one of these sharing events.

23          And he doesn't -- he didn't present that at trial.

24  He just presented testimony, ah, it looks messy, and

25  Dr. Bardwell decides it's one subscriber.  He doesn't mention

1 that every one of these events has a fingerprint that almost

2 uniquely identifies it.

3          But moreover, even the data that he did present on

4 the song distribution is misleading because he looks like, oh,

5 gee, they just kind of randomly pick songs, but if you really

6 look at this in the context of all songs, this person is just

7 sharing 35 out of over 11,000 songs.  So in reality, if I look

8 at the whole range of songs, which is what is intended to be on

9 the width of the chart now, we see that all of these events are

10 in a very few of those 11,000 songs.

11 Q.   So over time then from 9/21/2013 to 3/13/2014, this single

12 account is sharing these same songs over and over and over

13 again; is that right?

14 A.   That's correct.

15 Q.   And that's what this document is attempting to

16 demonstrate?

17 A.   Right.  And so it shows that not only is the port

18 extremely rare, but among all songs, this collection of songs

19 this person is -- or this account is sharing is also very

20 distinctive.

21 Q.   I think you said Dr. Sullivan used this to show to the

22 jury that this was random; is that right?

23 A.   Yeah.  He wanted to say my model said -- he says it's

24 obvious my model is unreliable because it verifies this as an

25 account with repeat infringements, when, in fact, we can see

R. Bardwell - Direct

1965

1   that the sharing is erratic.

2   Q.   Let's arrange them by song.

3   A.   So the other pattern in addition to that, it's a very

4   select group of songs, it's a very rare port, in addition, when

5   we group them by song, we can see that this person is sharing a

6   whole group of songs by Frank Ocean, on three days songs by

7   Kanye West, two days a group of songs by Bruno Mars, and so

8   forth.

9        So there you see that, in fact, even underneath the

10  changes in the song profile, there is consistency.

11  Q.   And the red just represents the instances that Rightscorp

12  detects the sharing; is that right?

13  A.   Yes.  So each of these red blocks, that is equivalent to

14  one row in the Rightscorp data.  When I get to that row, I say,

15  okay, that's this song by Frank Ocean shared on 11/11/2013, and

16  I fill in that red block, or that's the result of the data that

17  I gave -- produced to Dr. Sullivan on this account.

18  Q.   What does the white represent?

19  A.   Well, the white, it represents the absence of a record in

20  the Rightscorp data.  It doesn't represent an absence of that

21  song being shared.  So we don't know on 11 /16 whether those

22  same Frank Ocean songs were shared or whether the Rightscorp

23  data just didn't pull that torrent that day.

24        So what we do know is the songs were offered for

25  sharing on these days.  What we don't know is how many other

R. Bardwell - Direct

1966

1   days how many other songs were also offered for sharing.

2   Q.   Did Dr. Sullivan do the same type of thing with respect to

3   IP address 184.179.78.208?

4   A.   Yes.  And so -- and this again was a -- this data came

5   from an exhibit that I produced with my original report, and

6   Dr. Sullivan again in his report said, oh, this is another

7   example of why Dr. Bardwell's model is unreliable, because he

8   verifies this account and it obviously shouldn't be verified.

9          But -- and he -- and I again responded with almost a

10   page-long description of why it is and should be verified using

11   the Markov model, which as a statistician, he should have

12   understood, but he failed to mention, I believe, in his

13   testimony the most crucial thing, that this was also a unique,

14   very unique port.  This port only -- the chance of another

15   subscriber getting this port and sharing music is less than 16

16   in a million.  So it's such a unique fingerprint -- that port's

17   fingerprint is on every one of these events.

18   Q.   Let's look at the number of songs being shared by this IP

19   address on this port in the context of all the potential.

20   A.   Right.  So that -- there are 66 songs, again, out of the

21   total 11,000 songs.  That, in addition to the port, is also a

22   characteristic fingerprint of this sharing history that links

23   these events.

24   Q.   So this is the same IP address on the same port sharing

25   these same songs from 2/7/2013 to 2/19/2015, almost two years,

R. Bardwell - Direct

1967

1    right?

2    A.    Right.

3    Q.    Thank you.

4    A.    Yes.  This was -- this example was presented as one of

5    the -- I believe it was the account with the longest history of

6    sharing.

7    Q.    And let's also look at the songs arranged by song.  It

8    looks a lot less random.

9    A.    By artist, yes.  So we have the Beatles on four days, a

10   whole -- the same set of songs.  Similarly, on eight days,

11   there's a series of songs by the Black Eyed Peas, and so forth.

12   So arranged this way, it's much clearer that this is consistent

13   with one person sharing a library of -- their library of music

14   than it would be for a bunch of people sharing libraries of

15   music.

16   Q.    Just so we're clear, according to this document,

17   Rightscorp detected that the person at this IP address was

18   sharing these Beatles songs on 6/26/2013, right?

19   A.    That's correct.

20   Q.    And then it detected that they were those same songs again

21   on 1/31/2014?

22   A.    Correct.

23   Q.    And again on 2/20/2014?

24   A.    Correct.

25   Q.    And 5/6/2014?

R. Bardwell - Direct

1968

1  A.   Correct.

2  Q.   Let's talk a little bit about some of the charts that

3  Dr. Sullivan used with respect to the 122 subscribers, okay?

4  A.   Very good.

5  Q.   We talked earlier about how you didn't have any data and

6  that's why you had to build your probability model.  Do you

7  recall that?

8  A.   Right.  I just want to be clear.  The reason -- part of

9  the reason I brought up the shotgun shell case is because,

10  obviously, I did have some data, right?  I had the Rightscorp

11  data, but it's important that the Rightscorp data does not tell

12  us the -- who is the subscriber on an account.  That's the

13  question at hand.

14       Just like the shotgun shell data, I had data, I had a

15  lot of data from the FBI about the composition of these pellets

16  from the murder scene and the suspect, but that didn't tell me

17  if he was -- guilt or innocence.  It didn't tell me whether

18  those two shells should be matched.

19       So in the same way, we have data about the behavior

20  of these infringements that will help us tell whether they're a

21  match, but we don't have that key piece of evidence which could

22  make it a statistical model.  Do we have the account

23  assignments for subscribers?  We don't.

24  Q.   Do you know who would have that information?

25  A.   Except for this 122.

R. Bardwell - Direct

1969

1    Q.   Do you know who would have the information with respect to

2    the Cox subscribers?  Do you know who would be associated with

3    a particular IP address?

4    A.   Well, obviously, at some point, Cox knows because they

5    bill their subscribers.

6    Q.   Thank you.

7          So let's take a look at the selection of the 122

8    pieces of data that Dr. Sullivan focuses on first, all right?

9    A.   Um-hum.

10   Q.   He selects out, I think, 10 of those 122 here?

11   A.   Yes.

12   Q.   And then he selects out more of the 122 here?

13   A.   Yeah.  There's 11 here, um-hum.

14   Q.   And then more, right?

15   A.   That's correct.  And his demonstration that -- what he's

16   trying to convince the fact finders of is that my model is

17   inconsistent, because in the first slide, the revised model

18   actually verified those accounts -- if we could go back one

19   more?  Could we go to -- yeah.

20          So in this -- the first slide, he's saying, okay, the

21   black bar is above the 95 percent.  So the revised model

22   verified all those accounts, and my conservative model didn't.

23          Well, that's not really a surprise.  The conservative

24   model was meant to be conservative.  It was built to see, gee,

25   how low could we be?  If we really wanted to guard against any

1    potential errors we might make, we still got 91 percent

2    verified accounts, but how did we get a lower amount?  Some

3    weren't verified that were previously verified.

4            Does that mean that -- I just want to be really

5    clear.  When we don't verify an account, that doesn't mean

6    we're saying the account is not a repeat infringing account.

7    That's not at all what it's saying.  It's just saying that the

8    evidence, the pattern in the data is not strong enough to give

9    us a 95, a very high threshold, a 95 percent probability that

10   we can verify the account.  So we're not wrong when we don't

11   verify an account; we're just conservative.

12           So if you use my number of 91 to 96 percent verified

13   accounts, you can be assured that that's a conservative, i.e.,

14   lower than the actual number.

15   Q.   We talked about the 60,000 of verified accounts, right?

16   A.   That's correct.

17   Q.   And what that means is that's the floor, right?

18   A.   It's about almost 61,000, and yes, you can be guaranteed

19   the number is higher than that.

20   Q.   Okay.  Thank you.

21           So back to Dr. Sullivan's representation of those

22   122, he talks about some here --

23   A.   And then here he's trying to say, well, gee, you can just

24   see there's -- the values go up and down, but you -- again, the

25   conservative model was meant to kind of take a sledge hammer to

R. Bardwell - Direct

1971

1    my model and do whatever damage we could to it and see, gee,

2    does it still click?  Does it still give us similar results?

3            You can see, yes, it lowered the results.  These are

4    also unique accounts because these are all accounts with long

5    infringing history.  So they're the ones that are the hardest

6    to verify.  So we do get this behavior.

7            But the thing that -- again, I'm concerned about

8    Dr. Sullivan's approach, because here he's cherry-picking.

9    We've got 122.  This is the only 122 accounts that we actually

10   have data that tells us if they're repeat infringers.

11           So Cox provided the identity of the account holders

12   for the entire period, verified every one of these 122

13   accounts.  So what does Dr. Sullivan do?  He cherry-picks 25

14   percent of them, shows you those, and says, see, the model is

15   unreliable.

16           But if we could go to the next slide, this is a

17   picture of all of those 122.  So you can see 75 percent of the

18   accounts -- the conservative and the revised model, those are

19   all on the right.  The results were very close, sometimes, I

20   mean, indistinguishable, and 75 percent of them come up with

21   the same results in terms of verification.

22           And then if we -- I think we can highlight the ones

23   that -- or remove the ones that Dr. Sullivan cherry-picked, and

24   you can see he picked ones that give a very misleading

25   impression about this result.  So that to me, the overwhelming

1972

1   evidence is this is a very strong verification of my model

2   results, and instead, Dr. Sullivan is trying to cherry-pick it

3   to say, well, the results are a little erratic, so we don't

4   know.

5   Q.   Okay.  Dr. Bardwell, I'd like to talk for a few minutes

6   about the 122 accounts that you actually had, all right?

7              THE COURT:  You know what?  Let's break now for

8   lunch.  It sounds like you're moving into something a little

9   bit different.

10             MR. CARACAPPA:  Yes.  Thank you.

11             THE COURT:  So I have a conflict during the

12  lunchtime, so we're going to take a little longer lunch than

13  normal.  So we're going to come back at 2:30, and we'll

14  continue testimony at that time, all right?

15             Then you're excused.  Enjoy your lunch.  Thank you.

16  JURY OUT

17             THE COURT:  All right.  My apologies for the extra

18  delay.  We'll come back at 2:30 and continue testimony.

19             And, of course, you're in the middle of your

20  testimony, so don't discuss what you've testified to so far

21  with anybody.  All right, Doctor?

22             THE WITNESS:  All right.

23             THE COURT:  All right.  Thank you.

24             All right.  We're in recess.

25             THE WITNESS:  Thank you, Your Honor.

1973

1     NOTE:  The morning portion of the proceedings on

2  December 15, 2015, are concluded.

3     --------------------------------------------------

4

5

6

7

8

9

10

11

12

13

14

15

16     We certify that the foregoing is a true and

17  accurate transcription of our stenographic notes.

18

19

20  /s/  Norman B. Linnell

    Norman B. Linnell, RPR, CM, VCE, FCRR

21

22  /s/  Anneliese J. Thomson

    Anneliese J. Thomson, RDR, CRR

23

24

25