UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                          :
              Plaintiffs,        :
                                : Case No. 1:14-cv-1611
      vs.                        :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
              Defendants.        :
--------------------------------:
```

VOLUME  9 (P.M. portion)

TRIAL TRANSCRIPT

December 15, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:


COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| ROBERT BARDWELL | | |
| | DIRECT | 1977 |
| | CROSS | 1983 |
| | REDIRECT | 1992 |
| TERRENCE McGARTY | | |
| | DIRECT | 1993 |
| | CROSS | 2025 |
| | REDIRECT | 2053 |

1    NOTE:  The afternoon portion of the case on December

2  15, 2015, begins in the absence of the jury as follow:

3  JURY OUT

4    THE COURT:  All right.  Are we ready for our jury?

5    All right.  Thank you for that.  It's so much fun

6  seeing your old law clerks.  And fortunately they're all doing

7  great.  There's just nothing like it.  It's terrific.

8    Joe, let's get our jury.

9    NOTE:  At this point the jury returns to the

10  courtroom; whereupon the case continues as follows:

11  JURY IN

12    THE COURT:  All right, please be seated.

13    Do we have a witness?

14    MR. CARACAPPA:  Dr. Bardwell.

15    ROBERT BARDWELL, recalled by counsel for the

16  plaintiff, having been previously duly sworn, continues to

17  testify and states as follows:

18    DIRECT EXAMINATION

19  BY MR. CARACAPPA: (Continuing)

20  Q.   Dr. Bardwell, good afternoon.  How are you?

21  A.   Good afternoon, Mr. Caracappa.

22  Q.   If I could continue my questions.  We're almost done.

23    Dr. Bardwell, this is a document that we talked about

24  the last time you were here as well.  Do you recall that?

25  A.   I do.

R. Bardwell - Direct

1978

1   Q.   Could you explain this document, please.

2   A.   Well, this is essentially a summary of the findings.  And

3   it shows the little total number of IP addresses and

4   infringements in the first row, 104,090 IP addresses.  Sharing

5   songs, 1,847,516 times.  As recorded on the Rightscorp

6   database.

7   Q.   And just to be clear, those are 104,000 different Cox

8   subscribers that are accused of infringement; is that right?

9   A.   Different IP addresses, yes.

10  Q.   Okay, thank you.

11  A.   And then of those, 42,790 are IP addresses that usually

12  share multiple songs, but only on one day.  And those are all

13  repeat infringers that don't need to be verified because they

14  occur all at once.  Those constitute 132,704 infractions.

15       And then the last row are the results from the

16  probability model, and it found that 60,706 of the accounts

17  could be verified, and those were responsible for 1,640,416

18  instances of sharing songs recorded in the Rightscorp database.

19  Q.   We've been going back and forth between the Rightscorp

20  data and the Cox data, and I just want to be clear, what data

21  does this summary exhibit relate to?

22  A.   This is the Rightscorp data.

23  Q.   This has nothing to do with the 122 pieces of data that

24  Cox provided, right?

25  A.   That's correct.  The 122 is just confirmation of the

1    results of the model presented in the last row.

2    Q.   Would you say this 60,000 number is an overestimate or an

3    underestimate of the number of verified accounts that commit

4    multiple acts of infringement over a period of time?

5    A.   You know, as we saw lots of evidence, for instance those

6    122 accounts, all of those are repeat infringing accounts, only

7    75 percent of them are verified by the model.

8            So that's just an indication that it's definitely an

9    underestimate.

10   Q.   So to the extent that Dr. Lehr uses this 60,000 number,

11   that's an underestimate, right?

12   A.   That's correct.

13   Q.   Of the 104,090 counts of infringement, how many were Cox

14   able to verify?

15   A.   So these are accounts, infringing accounts.  Their data

16   verified 122 of them, everyone that they provided data on.

17   Q.   Did they provide you or BMG with data on any other

18   accounts?

19   A.   They did not.

20   Q.   There was some testimony earlier about how in your

21   original report this 60,706 number was, I think, 68,000.  Do

22   you recall that?

23   A.   I do.

24   Q.   And can you explain the discrepancy between those two

25   numbers?

1   A.   Yeah.  It is my understanding that the songs that were

2   asserted in the case changed.  And so, it was necessary for me

3   to remove some of the infringements.

4   Q.   I want to talk for a minute about the 122 accounts that

5   Cox provided information with respect to.  All right?

6   A.   Very good.

7   Q.   Karl, can you pull up transcript 1674.

8        And you read Dr. Sullivan's testimony, correct?

9   A.   I did.

10  Q.   Okay.  The question from Cox to Dr. Sullivan was, "So,

11  have you compared the results of the model, various models that

12  Dr. Bardwell presented?"

13       And Dr. Sullivan says in the third sentence -- Karl,

14  if you could highlight this -- "He," meaning Dr. Bardwell, "has

15  only done that for 122, roughly 122 IP addresses out of what he

16  views to be approximately 60,000 different accounts."

17       Do you recall that?

18  A.   I do.

19  Q.   Let's go to the transcript at 1676.

20       And then for emphasis, counsel says, "Again,

21  Dr. Sullivan, Dr. Bardwell hand picked to provide to you that

22  subset, right?"  And then Dr. Sullivan says, "That's right."

23       Do you see that?

24  A.   I do.

25  Q.   And did you read that testimony?

1    A.    I did.

2    Q.    And finally, again, "Out of 60,000, these are the ones

3    he," meaning you, Dr. Bardwell, "chose to demonstrate, right?"

4    A.    That's what he said.

5    Q.    Did you hand pick those 122 records?

6    A.    No.  They were provided to me by Cox.

7    Q.    So Cox hand picked them, right?

8    A.    That's correct.

9    Q.    And is it fair to say that you asked for all the records

10   associated with the subscribers accused of infringement in this

11   case?

12   A.    From my earliest involvement I asked for all of the data,

13   yes, to confirm repeat infringing accounts.

14   Q.    And did Cox have those records?

15   A.    It's my understanding they --

16          MR. WAKEFIELD:  Objection, lacks foundation.

17          THE COURT:  Sustained.

18   BY MR. CARACAPPA: (Continuing)

19   Q.    Do you know whether Cox had those records?

20   A.    It's my understanding at some point they didn't.

21   Q.    Thank you.  If Cox had produced those records that you had

22   requested, how, if at all, would it affect your analysis?

23   A.    Well, probably I wouldn't be here because you would have

24   the data and you could tell if they were repeat infringing

25   accounts.

1  Q.   And you wouldn't have to do probabilities, you would just

2  look, right?

3  A.   That's the difference.  You know, we don't have that

4  telltale sign, indicator of repeat infringing accounts, so we

5  have to build a probability model to determine if we have --

6  the evidence we do have is adequate to confirm that some of

7  them are repeat infringing accounts.

8         I would still like to be here because then I could do

9  a much more thorough job vetting my model, but I wouldn't be

10 necessary.

11 Q.   So of the 122 that you did have, how did that compare to

12 the probability model that you built?

13 A.   Well, the model was either correctly, the verification --

14 the accounts we verified were confirmed to be verified.  Some

15 of the accounts that were -- all 122 are verified by Cox to be

16 repeat infringing accounts.  75 percent of them I -- my model,

17 both the conservative and the revised model, identified them as

18 verified accounts.

19        The other 25 percent, the model didn't have enough

20 evidence to verify them.  And that's part of the conservatism

21 of the model, both models, the revised model and the

22 conservative model.

23 Q.   So again, is it fair to say that those 122 proved to you

24 that your model underestimated the number of repeat

25 infringements?

1983

1    A.    Certainly.

2              MR. CARACAPPA:   Thank you.  Pass the witness, Your

3    Honor.

4              THE COURT:  All right, thank you.

5              Cross-examination, Mr. Wakefield.

6              MR. WAKEFIELD:   Thank you, Your Honor.

7         CROSS-EXAMINATION

8    BY MR. WAKEFIELD:

9    Q.    And good afternoon, Dr. Bardwell.

10   A.    Good afternoon, Mr. Wakefield.

11   Q.    If Cox still had the name of every account holder going

12   back to the beginning of time, it wouldn't tell you that that

13   person did anything with a particular computer, would it?

14   A.    I'm not sure I understand your question.

15   Q.    You were saying it would have been -- it would have been

16   nice if there had been additional records beyond the 122 that

17   were involved in this case.  But my question is, even if you

18   know who the account holder is and you have that record, you

19   still don't know that that account holder was operating a

20   computer and making any song available, downloading a song, or

21   uploading a song?  You don't know that that person did it, do

22   you?

23   A.    And you mean the identity of the person, per se, specific

24   person?

25   Q.    Right.

1   A.   No, my model only addresses the repeat infringing

2   accounts.

3   Q.   The account.

4   A.   Correct.

5   Q.   Not whether the person to whom that account is assigned

6   and who pays the bill actually did anything?

7   A.   That's correct.  But I misstated that.  It also is -- the

8   results are almost identical, we can confirm almost the same

9   results for a specific computer, not just the account.

10  Q.   Right.  And that computer could be a computer that is

11  infected with malware, right?

12  A.   I suppose, yes.

13  Q.   You testified to that a couple days ago.  That computer

14  could belong to a neighbor of an account holder?

15  A.   I suppose that's possible.

16  Q.   Okay.  You spoke about probability versus statistics, and

17  I want to just try to understand that a little bit better.

18        In assessing probability, I've often heard people

19  refer to coins or sometimes poker chips, they can be one color

20  or another.  Have you heard that one?

21  A.   Yes.

22  Q.   So if you have 100 poker chips and they can either be red

23  or blue, and you have a 90 percent probability for that set of

24  poker chips that they're red, there are 100 of them, does that

25  mean that ten are blue?

1  A.   I'm not sure I understand the --

2  Q.   All right.

3  A.   Yeah.  Do you mean you have red chips and blue chips?

4  Q.   Right.  They're solid red or solid blue, so there's no

5  flipping in this one.

6  A.   And you're saying we have 90 --

7  Q.   You have 100.

8  A.   90 of which are red and ten of which are blue?

9  Q.   Well, if you have a 90 percent probability for that set of

10  100, would ten of them be blue?

11  A.   90 percent chance, if I pick one at random it's red, then

12  I would expect 90 of them to be red and ten to be blue,

13  correct.

14  Q.   Okay, thank you.  It's like --

15  A.   I've just got to make sure I understand you, this poker

16  game we're playing.

17  Q.   And in this case, you are not using the data you

18  analyzed -- let me ask it this differently.

19        You're not using a sample of data to then make

20  predictions about other data in this case; isn't that right?

21  A.   That's correct.

22  Q.   Okay.  I want to understand something you said earlier

23  about the code.  Mr. Sullivan pointed out after your first

24  report and before your second report that he felt the code

25  didn't work, do you remember that?

1   A.   I do.

2   Q.   And then you had a chance to respond to that in a further

3   report?

4   A.   Yes.

5   Q.   And then you had your deposition taken, do you remember?

6   A.   I do.

7   Q.   And at that time you said you did not personally supervise

8   the actual writing of that code, that R code, right?

9   A.   I think that was a misunderstanding about the question.

10  So I supervised it.  I was interpreting your question meaning

11  did I, you know, sit, watch over their shoulder as my staff

12  wrote it.  No, I do not do that.  But I supervise both the

13  design and the testing and the implementation of it, yeah.

14  Q.   Okay.  And at the time of your deposition, you had not

15  personally run the R code, your people on your team had done

16  that?

17  A.   That's correct.

18  Q.   Okay.  And even after we pointed out the issue, you had

19  not seen it run as of the time of your deposition?

20  A.   Well, I've seen it run many times.  I don't watch it, it

21  takes two hours to run.  And I'm not there watching it run, but

22  I'm very frequently working with my team while they're running

23  new iterations and reporting results.

24          So I can't say -- I don't even know how you would see

25  it run, frankly.  But it's kind of a weird image.  The computer

1  just sits there for two hours working very hard --

2  Q.   Okay.

3  A.   -- to produce all the results.

4  Q.   But you testified you personally had not run the code

5  yourself?

6  A.   That's correct.

7  Q.   Okay.  And now you've asked people to verify it, two other

8  people I believe you testified?

9  A.   Yes.

10 Q.   But did you -- as you sit here now, have you now run the

11 code yourself?

12 A.   No, I have not.

13 Q.   If we can pull up PDX 6, which is the demonstrative you

14 used today, and go to page 4.  Let's go to the next page,

15 please.

16        So I just want to understand what is being

17 represented here.  You've broken out the song codes now into

18 different artists' names; is that right?

19 A.   That's correct.

20 Q.   So you have Frank Ocean, Kanye, Bruno Mars, and some

21 others there?

22 A.   Correct.

23 Q.   And this is -- your analysis concludes this is one

24 subscriber's account; is that right?

25 A.   Yes, it verifies this is a repeat infringing account at

1 over 97 percent probability.

2 Q. Okay. And so this -- assuming it is one person using the

3 account, this one person had an observation of The Notorious

4 B.I.G. on September 21, September 30, October 1, and

5 October 22; is that right?

6 A. Yes. And also, what, the 25th. And then again on

7 November 16, 17th, and December 1, and again on December 30.

8 Q. All right. This would indicate that if Rightscorp is

9 making observations on this account, it sees The Notorious

10 B.I.G. music there being made available or on a computer on

11 October 22, and then it disappears on the 23rd, and there are

12 two different songs that appear on that computer; is that

13 right?

14 A. Is that a question? Yeah. Is that correct? No, I think

15 that's incorrect. The information you're providing about the

16 songs is correct, but the characterization that they disappear

17 from the computer is, I believe, not correct.

18        So as I testified earlier, what this indicates is

19 that Rightscorp made a make available request to that computer

20 on the days we just mentioned for the torrent that included the

21 N. B.I.G. song that is recorded there. All it means on any

22 other day that that -- that we don't have red squares under

23 that N. B.I.G. column, it just means either making a request

24 the song wasn't available or there was no request made.

25        So this pattern could also -- and I think from my

1   understanding it's as or more likely that the absence of the

2   N. B.I.G. song were days that the rights torrent software

3   didn't request that song in one of its queries, and instead it

4   randomly selects torrents to pick.

5          And so, on that next first gap that you mentioned,

6   instead of like the songs not being there and they are replaced

7   by Kid Cudi, the -- my understanding is perhaps a more likely

8   scenario is that on those two days where we have the Kid Cudi

9   song shared, the Rightscorp program requests those songs to be

10  made available and doesn't request the N. B.I.G. songs to be

11  made available.

12  Q.   You never looked at the Rightscorp code that makes the

13  requests?

14  A.   I did not.

15  Q.   You just looked at the data set that it produced?

16  A.   That's correct.  Sorry.

17  Q.   Okay.  The other possibility is if Rightscorp had been

18  looking for that work, that that would mean this person,

19  assuming it is one person, decided to share Notorious B.I.G.

20  and then decided to stop and decided to share -- go into their

21  computer and share Kid Cudi and not Notorious B.I.G. for a

22  couple days, and then stopped sharing Kid Cudi and start

23  sharing Notorious B.I.G., and then a few days later all of a

24  sudden share Frank Ocean for one day and then stop?

25  A.   That also seems possible, yes.

1   Q.   Okay.  But you have no expertise in how people actually

2   use BitTorrent, that's not --

3   A.   None outside of the education I have gotten in this case.

4   Q.   Okay.  I think in your summary there was a total of about

5   104,000 accused accounts that you then went to verify?

6   A.   Accused?  You mean -- I called them suspected.

7   Q.   Suspected, yeah.

8   A.   I certainly didn't accuse them.

9   Q.   Okay.  Suspected accounts.  And --

10  A.   And not in the sense that they were suspects, just that

11  they might be accounts and I was verifying them.

12  Q.   Okay.  They might be accounts.  Are you aware that at the

13  outset of this case there was an allegation that there were

14  over 200,000 repeat infringing subscriber accounts?

15  A.   Well, I know the numbers have changed a lot.  As I said, I

16  received 15 million records.  I ended up analyzing just under 2

17  million.  So many of the -- much of the data was eliminated

18  from my analysis.

19  Q.   So there was, speaking of that, that data, you analyzed

20  about 1.8 million ultimately?

21  A.   Yeah.  Correct.

22  Q.   1.8 million records.  But there were 7.6 million notices

23  from BMG to Cox in this case, were you aware of that?

24  A.   No, I don't.  I am not familiar with that number.

25  Q.   Assuming that's the case, do you have any idea what

1  happened to the other millions and millions of records that you

2  didn't analyze?

3  A.    As I said, I don't have any information about that.

4  Q.    Okay.  So Cox provided some customer account information.

5  Were you aware that Cox had other customer account information

6  for the period of time after this lawsuit?

7  A.    After --

8  Q.    After the date of the lawsuit?

9  A.    No, I don't think I have any information about that.

10  Q.    In your original analysis you included notices that were

11  sent both before and after the filing date of this lawsuit?

12  A.    That's correct.

13  Q.    And those included BMG notices?

14  A.    Correct.

15  Q.    All right.

16  A.    But those weren't Cox data, those were Rightscorp data

17  that I had.

18  Q.    Right.  But were you aware that Cox had customer

19  information from around the time of the lawsuit going forward?

20  A.    I don't have any information about that.

21         MR. CARACAPPA:  Your Honor, objection.

22         THE COURT:  Asked and answered.  I will allow it.

23  BY MR. WAKEFIELD: (Continuing)

24  Q.    And then are you also aware that BMG then decided to drop

25  those claims for the period of time where there was customer

R. Bardwell - Redirect

1992

1    information and only pursue claims for the earlier period of

2    time?

3    A.    I have no information about that.

4                MR. WAKEFIELD:  Nothing further.  Thank you.

5                THE COURT:  Thank you.  Any redirect?

6                MR. CARACAPPA:  Your Honor, if I can have ten

7    seconds?

8                THE COURT:  Certainly.

9                MR. CARACAPPA:  Thank you.

10        REDIRECT EXAMINATION

11   BY MR. CARACAPPA:

12   Q.    Dr. Bardwell, you were asked a question about the

13   7.6 million Rightscorp notices.  Do you recall that?

14   A.    I do.

15   Q.    Do you know if that includes BMG songs not in this

16   lawsuit?

17   A.    I really don't have any information about that data.

18   Q.    Do you know if -- do you have any idea what that

19   information is about?

20   A.    No, I don't.

21                MR. CARACAPPA:  Okay.  Thank you.  No further

22   questions, Your Honor.

23                THE COURT:  All right.  May Dr. Bardwell be excused

24   now?  You are excused with our thanks, sir.

25                MR. CARACAPPA:  Yes.

T. McGarty - Direct

1993

1     THE COURT:  Have a good afternoon.

2     THE WITNESS:  Thank you.

3     THE COURT:  Thank you.

4     NOTE:  The witness stood down.

5     THE COURT:  All right.  Next witness.

6     MR. CARACAPPA:  Yeah.  Sorry.  BMG calls Dr. -- I

7  always mispronounce your name.  Dr. McGarty.

8     NOTE:  The witness is sworn.

9     THE COURT:  Good afternoon.

10     THE WITNESS:  Good afternoon.

11     TERRENCE McGARTY, called by counsel for the

12  plaintiff, first being duly sworn, testifies and states:

13     DIRECT EXAMINATION

14  BY MR. ALLAN:

15  Q.   Good afternoon, Dr. McGarty.

16  A.   Good afternoon.

17  Q.   Could you state your full name for the record.

18  A.   Terrence McGarty.

19  Q.   Thank you.  Could you tell the jury a little bit about

20  yourself.

21  A.   I was born in New York City.  And my father was a police

22  officer and my grandfather was a police officer, so I come from

23  a fairly interesting background.

24     I went to college in New York, Manhattan College,

25  where I received my Bachelor's degree in electrical

1    engineering.  And then went on to MIT where I received three

2    degrees, Ph.D. in electrical engineering and computer science,

3    a Master's, and a degree in electrical engineering.

4    Q.   Are you currently in the Internet and telecommunications

5    business?

6    A.   Currently in the international --

7    Q.   Internet.

8    A.   Internet?  At the current time, no.  We have moved into

9    other areas.

10   Q.   Okay.  Have you spent time in your profession in the

11   Internet and telecommunications space?

12   A.   Yeah.  I started in the Internet space probably in 1975 in

13   the early days when the Defense Department had a division

14   called ARPA --

15   Q.   What is that?

16   A.   Advanced Research Project Agency.  And at that time there

17   were two principals, the head of the group called Bob Kahn and

18   Vint Cerf.  Both I think got President's Award for their work

19   on developing the Internet.

20        And I had come down from MIT because I had been on

21   the teaching and research staff, and my job was to put up the

22   first two international connections for what was to become the

23   Internet.  One went to the UK in Goonhilly, and one went to

24   Trondheim in Norway.

25   Q.   So what's the relationship between ARPA and the Internet?

1    A.    In the '70s the early days of what we now see as the

2    Internet was an attempt to connect many different computers

3    together in those days at universities so that users could do

4    what we are doing today, so that they could communicate back

5    and forth to one another over a very large network.  And the

6    Defense Department funded this effort.  And we developed the

7    early versions of what we now call IP protocol.  That came out

8    about '74, '75 in original papers.  And we were implementing

9    those during that period of the '70s.

10   Q.    Great.  Dr. McGarty, I would like to show you -- I will

11   hand you first a witness binder, if I may.

12   A.    Thank you.

13   Q.    Dr. McGarty, could you turn to DTX 3436.

14   A.    Yes, sir.

15   Q.    Do you recognize this document?

16   A.    Yes, that's my CV.

17   Q.    Okay.  Is it true and accurate?

18   A.    It appears to be.

19         MR. ALLAN:  Your Honor, I would move Dr. McGarty's CV

20   into evidence.

21         THE COURT:  Any objection?

22         MR. BUCKLEY:  No objection.

23         THE COURT:  All right.  It is received.

24         MR. ALLAN:  Can we pull that up, please.

25   BY MR. ALLAN: (Continuing)

T. McGarty - Direct

1996

1   Q.   So, Dr. McGarty, after your work at -- or dealing with

2   ARPA, tell us a little bit more about your work experience,

3   please.

4   A.   I left Washington about '80 and went up to New York where

5   I went to work at Warner Cable.  It now is Time Warner Cable.

6   And my responsibility there was in building what Warner had as

7   a two-way interactive cable system.  We were providing two-way

8   voice, video, and data over a cable system, and it was the

9   early days of what we now see as interactive cable.

10  Q.   So how, if at all, was your role involved in the

11  operational aspect of it?

12  A.   I was the group president in that area.  I was responsible

13  for putting together the architecture, the system design,

14  functional specifications, putting together the operating

15  system, integrating it together on a test platform, and then

16  deploying it and testing it with customers on an operating

17  network.

18  Q.   Thank you.  After you left Warner, what was your next

19  role?

20  A.   After Warner, I moved on to NYNEX, which is now Verizon.

21  I was there from '86 to '92.  First three years I was the head

22  of research and development.  And the second three years I was

23  senior vice-president and acted as the chief operating officer

24  of the cellular company, which is now Verizon Wireless.

25  Q.   Thank you.  Tell the jury a little bit about what you did

T. McGarty - Direct

1997

1   as the head of R&D in that portion of your work.

2   A.   As a head of R&D I was responsible for the development of

3   advanced service platforms and support efforts and new products

4   for NYNEX.  We did network management systems, advanced network

5   management systems.  We worked on deploying Internet protocol

6   based systems, Internet type systems to a network in New York

7   state called NYSERNet.

8            We did multimedia communications, some of the early

9   stuff that now is received by everybody in their day-to-day

10  computers, but we were trying the first stages of making that

11  work.  And we also developed sophisticated software platforms

12  for customer service and support systems.

13  Q.   You mentioned network management.  What do you mean by

14  that?

15  A.   Network management is a broad term that I've used over and

16  over again in multiple systems I've operated.  It's basically

17  the facilities that go out and measure what is happening in the

18  network, what is working properly, what is not working

19  properly, what we have to activate, what we have to deactivate,

20  what we provision, what we have to repair.

21           So it's all of the operational functions associated

22  with running a network.

23  Q.   Thank you.  And did you testify earlier that you were the

24  chief operating officer of the wireless company?

25  A.   That's correct.

T. McGarty - Direct

1998

1  Q.   Tell us a little bit about that.

2  A.   Well, as the head of operations on the wireless side, I

3  had responsibility for now running the billing systems and the

4  network management systems and the customer service systems and

5  all of the operation elements of -- at that time NYNEX Mobile.

6  I think we had probably upwards of, and I may get it wrong,

7  several -- you know, almost 800,000 subscribers in New York and

8  New England.

9         And so, I had to deploy all of the new digital

10 networks that we were putting in.  We had some early stages of

11 data networks.  And we had to make sure that our customer

12 service and billing systems were put in place because in those

13 days we were getting millions of records a day out of each cell

14 tower for each telephone call.

15        So if anybody remembers the early days of cellular,

16 you actually got a bill every month for every call.  And we had

17 to process all of those calls and all of those bills.  And

18 customers would call in and say, I didn't make that call.  So

19 we had to have customer service to be able to make sure we

20 dealt with those concerns.  So very heavily customer oriented.

21 Q.   So just looking at your CV here, I see Telemarc Group.

22 What is that?

23 A.   Telemarc is a small company that -- we do technology

24 investments and management.  So after NYNEX, I decided I wanted

25 to start companies up.

T. McGarty - Direct

1999

1        So I have a group of associates that we have worked

2   with over the years, and we have done a couple of dozen or so

3   start-ups over that period of time.  Probably the largest was a

4   company called Zephyr, which I created.

5   Q.   What is that?

6   A.   In 1995 to 2005.  It was the largest ISP and fiber optic

7   backbone company in central and eastern Europe.  We covered

8   about 20 countries.  My office was in Prague.  I had an office

9   in Moscow, which I probably couldn't do now as well.  I was in

10  Warsaw, Germany, France, Austria, Italy, Hungary, Greece.  And

11  so we were pretty much in all central and eastern Europe.

12  Q.   So how did Zephyr compare to a traditional ISP like Cox?

13  A.   We were a little bit of Cox and a little bit of something

14  else.  We had a major fiber backbone network so that we had our

15  own fiber, and we connected from Bulgaria, Romania, all the way

16  through to Frankfurt in Germany, and then north and south and

17  up to Moscow.

18        So one part was broad fiber backbone network.  And

19  the other part, for example, in cities like Prague, we actually

20  had a local service where we provided ISP to consumers, we

21  provided telephone service, and we even had some small video

22  service capabilities in those days.

23        So we were a major ISP in Poland and the Czech

24  Republic and Slovakia.

25  Q.   What was your role at Zephyr?

T. McGarty - Direct

2000

1  A.   I was the one that founded the company.  I ran it on a

2  day-to-day basis.  I had an office both in New Jersey and

3  primarily in Prague.

4  Q.   Dr. McGarty, have you got any teaching experience,

5  higher-education teaching experience?

6  A.   Yes, I was on the faculty of MIT from '69 through '75,

7  faculty and research staff.  I returned '89 to '91.  And when I

8  sold off my company in Europe, I returned pro bono from 2005 to

9  2012.

10         I also was on the faculty at GW down here in

11  Washington.  I was on the faculty at the business school at

12  Columbia where I taught telecommunications, finance, and

13  policy.  And I had a similar position at NYU Poly in New York

14  in the early '90s.

15         MR. ALLAN:  Thank you.  Your Honor, at this point we

16  would offer Dr. McGarty as an expert in the design and

17  implementation of Internet telecommunications networks,

18  including IP data networks in the operations of companies that

19  use such networks.

20         THE COURT:  Any objection?

21         MR. BUCKLEY:  That seems a little broader than maybe

22  what he spoke to, telecommunications generally.  I take

23  exception to the way it was described.

24         THE COURT:  All right.  I'll allow it.  I think he

25  has covered that much ground in the initial questions and

1    through his resumé.  Clearly he's been involved in a series of

2    different areas surrounding the Internet and its building and

3    structure.  So I'll allow him to be qualified to give his

4    opinion on those matters.

5           Thank you.

6           MR. ALLAN:  Very good.  Thank you, Your Honor.

7    BY MR. ALLAN: (Continuing)

8    Q.   Dr. McGarty, could you tell the jury what you were asked

9    to do in this case.

10   A.   I was asked to do two general tasks.  One was to examine

11   Cox's CATS system for copyright infringement focus, not all of

12   the parts of CATS system.  And determine its capabilities with

13   regards to dealing with copyright infringement notices.

14          And secondly, I was asked to specifically look at the

15   operational and logistical capabilities of that system to

16   handle Rightscorp infringement notices.

17   Q.   Very good.  And what types of materials did you look at in

18   forming your opinion?

19   A.   I had a wide variety of material that I looked at.  I

20   looked at depositions.  I looked at operational documents that

21   were provided to me through Cox, such as implementation plans,

22   specific values associated with those implementation plans.  I

23   looked at e-mails.

24          I looked at interrogatories that were provided by

25   Cox.  And I also looked at some of the trial transcript for the

1    trial up through Mr. Carothers, I believe, last week.

2    Q.   You've reviewed the trial transcript of this, in this

3    case?

4    A.   I did, yes.

5    Q.   Very good.  How about the AUP or the M&P?

6    A.   I've looked also at a variety of other Cox material which

7    included the AUP, which is the user policy that Cox has.  I've

8    looked at Cox Web sites and other material.

9    Q.   Thank you.  I would like you to flip in your book, if you

10   could, to what should be the first tab, PX 1344.

11   A.   1344?

12   Q.   1344.

13   A.   Okay.

14   Q.   Are you with me?

15   A.   I'm trying.  I have 1343.  Ah, I see it.  Yes.

16   Q.   Okay.  Do you recognize this document?

17   A.   Yeah, this -- yes, I do.

18   Q.   And is this one of the technical documents you looked at

19   provided by Cox?

20   A.   Yes, it is.

21            MR. ALLAN:  I would move this into evidence, Your

22   Honor.

23            THE COURT:  Any objection?

24            MR. BUCKLEY:  Can we have a sidebar?

25            THE COURT:  Yes, sir.

2003

1          MR. BUCKLEY:  Actually, Your Honor, you know what, no

2    objection.

3          THE COURT:  Okay, it's received.

4          MR. ALLAN:  Thank you, Your Honor.

5    BY MR. ALLAN: (Continuing)

6    Q.   Dr. McGarty, tell us what this document is.

7    A.   This document is entitled CATS Abuse Automation System

8    Implementation Plan, and it is dated March 22, 2010.  And this

9    is an -- the way I read it, it's an implementation plan of what

10   the CATS system should do.

11         I've written a lot of functional specifications in

12   system documents, in requirements documents, and generally

13   these are the things that you have that says, this is what your

14   system should do and kind of how it should do it.  It's not a

15   coding document.  It's a document that says, you know, if it

16   does these things, then it's doing the right stuff per the

17   document.

18   Q.   And how did you use this document, Dr. McGarty, in forming

19   your opinion?

20   A.   Well, I examined the document to understand how the system

21   is architected.  And a lot of what I do is architecture work.

22   I mean, I'm at the top level and I want to know what goes into

23   what and what are the pieces.

24         So I used this document first to understand the

25   architectural structure of the system, what are its components

1    and elements, how they communicated with each other, what they

2    were supposed to do as, for example, copyright infringement

3    notices were sent to the system.  And, you know, where was

4    stuff stored and how did that storage kind of work and, you

5    know, what were the operator terminals going to look at.

6           And this document provides at a fairly high but

7    detailed level, in my opinion, a reasonable description of the

8    system.

9    Q.  Okay, thank you, Dr. McGarty.  Could you summarize your

10   opinions in this case for the jury.

11   A.   Yes.  Simply, the first opinion is with results to the

12   Rightscorp infringement notices, I felt that this system, the

13   CATS system for copyright infringement notices can reasonably

14   in an operational and logistical manner be received and

15   processed through the system.

16          The second opinion is that as I started to look

17   through the system and the design here and then the

18   specifications that they put in to make the design work,

19   frankly, what happens is that the system looks like it's doing

20   things, but what comes out the end is very little.  The system

21   as it gets configured by Cox may put a lot of stuff in, but

22   nothing ever comes out the other end.

23          So the ultimate infringements are not fully and

24   adequately processed.

25   Q.   Okay.  We'll talk about all that in detail in a moment.

1          Before we get into the specifics of all that, did you

2    arrive at an opinion as to whether Cox Communications and

3    CoxCom can control infringement on their network?

4    A.   Yes, I did.

5    Q.   What is that opinion?

6    A.   Well, two parts.  One is that Cox has an AUP, a user

7    policy, and it seems to me fairly clear, which says, don't

8    infringe on copyrights and, oh, by the way, if you do, we have

9    the right to suspend you or terminate you or take some action

10   if that infringement persists above a level.  Okay.

11          So it on the surface says, we have the right to take

12   action if you infringe.

13          The second part of it is that I was reading

14   Mr. Vredenburg's testimony from last week, and they actually

15   have the ability to do it with the push of a button.

16   Q.   What do you mean?

17   A.   So if there's somebody who is infringing, they just push

18   the button, the AUP goes into the modem, and off they go.

19          So they have both the right and the ability to take

20   action.

21   Q.   Thank you.  I want to switch gears a little bit and talk

22   about the Rightscorp notices.

23          What is your understanding of what Cox did with

24   respect to the Rightscorp notices?

25   A.   My understanding from, you know, the various materials

T. McGarty - Direct

2006

1  that I have is that they just took them and threw them in the

2  trash can.  They blacklisted them.  And they blacklisted them

3  before it got anywhere near the system.

4         So it sort of came in, there was a router.  They

5  said, ah, this is Rightscorp, throw it into a black hole

6  somewhere.  And it wasn't even sent back to Rightscorp.  So it

7  just was trash-canned.

8  Q.  What's your understanding as to why Cox chose to blacklist

9  Rightscorp's notices?

10  A.  Again, my reading of the material is that there was a

11  settlement notice that Cox objected to on the Rightscorp

12  notices.

13  Q.  Okay.  And can you tell us from an operational perspective

14  what blacklisting means practically?

15  A.  Blacklisting, at least with regards to the Rightscorp

16  application, means that the notice doesn't even get into the

17  system.  It's stopped at the front and just don't even come in

18  here.  So you go off into some black hole in space and never

19  return.  And it stops you from ever having the claim go into

20  the system effectively.

21  Q.  And what's your understanding as to how Cox actually

22  blacklisted -- I mean, from an operational perspective, what

23  did they do with those notices?

24  A.  From my understanding reading the record, is that they

25  prevented Rightscorp e-mails from even entering the Cox e-mail

1    server.  So they would just when they -- probably hit the

2    router before that, the router read it as a message from

3    Rightscorp, and then off it went to nowhere.

4    Q.   Do you have an opinion as to what types of things Cox

5    could have done with Rightscorp's notices from an operational

6    standpoint?

7    A.   Yeah, I think so.  You know, having been on the

8    operational side of this before, what it could do -- well, it

9    could have accepted the notices, but Cox didn't want to do

10   that.  So the first option was it could have just taken the

11   notices and sent them forward.  They didn't do that.

12         They could have taken the notice, stripped off the

13   settlement offer, and sent that forward, if they objected to

14   those words.

15         They could have stripped out the data that related to

16   the infringement and then put it in a Cox format and sent that

17   forward.

18         Or they could have at least taken the data into the

19   system and put it somewhere until they figured out what to do

20   with it.

21         So -- but instead they just went, goodbye, off it

22   went.

23   Q.   So what information have you reviewed that form the basis

24   for the opinion you just gave?

25   A.   I've reviewed various information on e-mails.  I've

1   reviewed documentation that indicated that -- from Mr. Zabek's

2   group and the Abuse Group that those e-mails were just not even

3   to go into the system and went off into a dead zone.

4   Q.   Have you evaluated, again, from an operational

5   perspective, what would have happened to Rightscorp's notices

6   had Cox actually processed them through the system and treated

7   them like the same as other complainants that Cox dealt with?

8   A.   As I indicated before in my general opinion, it appeared

9   to me based upon my analysis of the Cox system that what would

10  happen is that very few of these infringement notices ever got

11  to the system where they could be acted upon.  And once acted

12  upon, very few of them resulted in anything.

13       So, quite frankly, even if Rightscorp's notices had

14  gone through in some shape or form, given the configuration

15  they had that system in at the time, more than likely very

16  little would have gotten through and been acted upon anyhow.

17  Q.   So tell us a little bit about the configuration you're

18  talking about.  How was the system configured to prevent very

19  few of the notices from actually moving through?

20  A.   The way I understand it from the documents that have been

21  presented to me, there seemed to be a bunch of hurdles that

22  these things have to go through.

23       For example, blacklisted is a big hurdle.  I mean, if

24  you're blacklisted, you don't even start.  So all of those get

25  thrown to the side.

T. McGarty - Direct

1          But then the second hurdle is we're only going to

2     only accept, say, 200 notices per day per entity.  Okay?  And

3     so what if you have 300?  What if you have 500?  What if you

4     have a thousand?  What happens to the ones that exceed 200?

5     They kind of lay around, but I can't figure out whether they

6     ever really got processed.

7          Then the next hurdle that you have to go through is

8     one where they only accept, I believe, one notice per day per

9     subscriber.  So if you have a subscriber who is, you know,

10    aggressively downloading copyrighted material, and you only get

11    one notice for that day, you may have missed a lot of other

12    notices.

13         So there are these types of hurdles that you go

14    through that were put in configurations in the system, you

15    could configure it differently, but they were configured

16    specifically to make certain that a lot of stuff came in and

17    little, if anything, came out and went into what they call

18    their graduated response system.

19    Q.   So let me just make sure I understand.  So when you're

20    talking about configuring the system, can these hurdles be

21    changed?

22    A.   The system design allows you -- the design is a reasonable

23    design, but then what they do is they put these configurations

24    in.  So you could, number one, not blacklist anybody, so all

25    this stuff comes in.

1          Or you could take the 200 limit, make it 300, 400,

2   500, a thousand.  So, I mean, you know, that's another way in

3   which you make it easier to get across these hurdles.

4          And you can say, well, you know, if somebody is

5   really infringing, maybe that's really somebody you want to

6   take a look at.  So you may get rid of that one infringement

7   per day per customer rule.

8          So, yes, just in that front portion there's a lot of

9   things you can do to be more vigilant in terms of the

10  infringement notices that come through.

11  Q.   So how does the system, the system for dealing with

12  infringement notices at Cox, how does that work for notices

13  once they clear these hurdles you just mentioned, the

14  blacklisting, the 200 daily limit, and the one limit per

15  subscriber per day.  What happens next?

16  A.   At that point it goes into this graduated response system.

17  And it's like a 13-step program.  The first step, well, we

18  won't pay attention to the first time you get an infringement

19  notice.  And then two, three, four, five, six, seven, we'll

20  send you a little e-mail warning that you've made a problem.

21  And then slowly we'll increase the warnings to suspensions, and

22  maybe by the time we get to the 13th level, we'll consider you

23  for termination.

24          So it's a very long process that is like another set

25  of hurdles.  All right.  It's many, many steps with the chance

1    of, first of all, the message even getting to that point being

2    fairly low, but by the time you've gotten to that point,

3    getting up all these additional rungs of the ladder becomes

4    extremely problematic.

5    Q.   So what's your understanding of this six-month rolling

6    window we've heard testimony about?  Does that fit in here?

7    A.   That's sort of the next thing.  And that is that Cox has a

8    six-month rolling -- moving average window.  This window sort

9    of moves along so that if you had your 12 violations and now

10   your 13th comes in on the back end of that window, that's

11   dropped.  So you don't go to 13, you may go down to 11 or 10 or

12   sometimes even lower.

13           And the problem with the six-month rolling window --

14   again, that's another item which could be changed, you could

15   make it a longer term.  But the point is that the six-month

16   rolling window starts to throw out at the back end chronic

17   violators of copyright infringement.

18   Q.   Well, is it your understanding that if you don't get 13

19   steps within that six-month rolling window, that the counter

20   resets?

21   A.   Yes, it is.

22   Q.   What evidence, if any, Dr. McGarty, have you seen that

23   shows the effect of Cox's system to deal with infringement

24   notices in practice?

25   A.   I've seen some material in the interrogatories that Cox

T. McGarty - Direct

2012

1   provided, and I have used some of that information to make some

2   calculations.

3   Q.   Okay.  Could you flip in your book, please, Dr. McGarty,

4   to PXS 005.

5   A.   PXS 005.  Okay.  I have that.

6   Q.   Do you recognize this document?

7   A.   That document is -- yes, I do.

8   Q.   And what is your understanding of what this document is?

9   Without getting into the details of it --

10  A.   I'm sorry.

11  Q.   -- just describe generally what it is.

12  A.   Generally this document is just copying materials from

13  Interrogatories 5 and 8 on to a single table.

14  Q.   Interrogatories -- interrogatory answers provided by Cox?

15  A.   Answered and provided by Cox, that's correct.

16         MR. ALLAN:  I would move PXS 005 into evidence, Your

17  Honor.

18         THE COURT:  Any objection?

19         MR. BUCKLEY:  Foundation.  Did he prepare this?

20         MR. ALLAN:  We can have a sidebar if you would like,

21  Your Honor.

22         MR. BUCKLEY:  Or you could ask him.

23         THE COURT:  This exhibit?

24         MR. ALLAN:  Yeah.

25  BY MR. ALLAN: (Continuing)

2013

1   Q.   Is this exhibit prepared from interrogatory answers that

2   you are familiar with?

3   A.   Yes, it was.

4   Q.   Can you tell us how it was prepared.

5   A.   Well, what I did was I took the tables in the two

6   interrogatories and I just copied the columns, column one --

7   well, Warnings, Suspensions, and Terminations.  That data was

8   copied into there, that's from one interrogatory.

9          And then from the other interrogatory I copied

10  Notices in CATS, Deleted Notices Not Stored in CATS, and

11  Auto-Closed into the second triad of columns.

12         THE COURT:  It will be admitted.

13         MR. ALLAN:  Thank you.  If you would pull that up,

14  please.  Thank you, Karl.

15  BY MR. ALLAN: (Continuing)

16  Q.   So I just want to make sure I understand the two

17  interrogatories.  Could you explain -- I guess let's start with

18  the top three, Warnings, Suspensions, and Terminations.  Could

19  you tell us what these three columns represent.

20  A.   I am going to have to switch to my reading glasses because

21  as you get to a certain age, you can't do both of these.

22  Q.   Fair enough.

23  A.   I apologize to the Court and folks.

24  Q.   I understand.

25  A.   The first three columns are Warnings, Suspensions, and

2014

1    Terminations.  Warnings are basically an e-mail sent to the

2    subscriber that says there has been a complaint on copyright.

3    Q.   Sorry, go ahead, please.

4    A.   Okay.  There has been a complaint on copyright.

5         Suspensions are when they send them into a concept

6    they call, I believe, a walled garden where you have to talk to

7    somebody.

8         And termination is when I gather something really

9    happens.

10        So those are those three columns.

11   Q.   Okay.  And where did you compile the data that is

12   comprised in these three columns?  Where did you acquire that?

13   A.   I acquired it from the interrogatories.

14   Q.   From the interrogatories provided by Cox?

15   A.   That's correct.

16   Q.   Can we -- you take that down, please, Karl.

17        Now, let's go to just the Total column.  How did you

18   come up with the Total column?

19   A.   All I did in the Total column there was to take Warning,

20   Suspensions, and Terminations and added them up.  It's the

21   total number.

22   Q.   Okay.  Very good.  And if we could just go back, Karl, and

23   just show the date range, please.  Thank you.

24        And what's the significance of this date range,

25   Dr. McGarty?

1    A.    Oh, this is the period in which we are having this trial

2    discussion about.

3    Q.    Okay.

4    A.    So it is the active period.

5    Q.    Okay.

6    A.    February 2012 through October 2014.

7    Q.    Very good.   Thank you.   All right.   So that information,

8    the suspension, the warning, and the termination data during

9    this time frame was provided by Cox in the interrogatory

10   answers?

11   A.    Yes.

12   Q.    Now, could you walk us through the next set of columns

13   here beginning with Notices in CATS, and include totals in

14   that.

15   A.    The next three columns are -- one is Notices in CATS.

16   These are the notices that were introduced at that front end of

17   CATS where you now have all these hurdles that you have to go

18   over.

19         Deleted Notices are ones that got through the e-mail

20   router I guess but said, no, we're not going to deal with you

21   because these are blacklisted.   These do not include the

22   Rightscorp notices which were stopped even before they got to

23   the e-mail server.   Okay.

24         And then the Auto-Closed Notices are a de minimis set

25   of things that are added on.

2016

1  Q.   Okay.

2  A.   And as before, I added the three columns together so that

3  the totals represent the sum of those three columns.

4  Q.   Okay.  Very good.  Can we -- why don't we just take a

5  month for an example.  Let's go with May of 2014.

6          If you could just do that whole row, Karl.

7  A.   I would try July.  That's a pretty good one.

8  Q.   July, whatever one you'd like.

9  A.   Yeah, looks good.

10  Q.   Dr. McGarty, so we have got the July data here pulled up.

11  Can you walk us through what this information tells you.

12  A.   Sure.  In July, if you take a look at the July number -- I

13  can see with these glasses -- there were 91,482 sent into CATS,

14  260,750 blacklisted in CATS.  0.  For a total of 352,232.

15  Q.   So that's the total on the right-hand side highlighted in

16  yellow?

17  A.   It's -- yeah, it's under the Total down here, just before

18  the Percentage column.

19  Q.   Okay.  Very good.

20  A.   Okay.  And that represents the total number of

21  infringement notices that kind of came into the system.  Some

22  made it through or partially through, and the rest of them

23  didn't get there.

24          It does not include, as I said before, the Rightscorp

25  notices that were just spun off even before it got there.

1  Q.   So let's just make sure we're talking about the same

2  thing.  So the 352,000 --

3  A.   Correct.

4  Q.   -- is it your understanding that that's all the

5  infringement notices sent to Cox in July of 2014 by all

6  copyright complainants not including Rightscorp?

7  A.   That's what I am led to believe by the interrogatory.

8  Q.   Okay.  Very good.  Now, take us to the front part, if you

9  would.

10  A.   In the same way you go through these numbers, July of

11  2014, 24,404 received warnings, those little e-mails.  2,801

12  had to call somebody up to get reactivated or the equivalent.

13  And one person was terminated.  Okay.

14  Q.   Okay.

15  A.   And that was for a sum of 27,206.  So these were actions

16  that the system took.

17          Now, all those infringement notices were sent in, but

18  it resulted in 27,206 actions.

19  Q.   Okay.  Now, talk to us about these two columns, these two

20  rows on the right, the Percentage of DMCA Complaints on the far

21  right and then the --

22  A.   Okay.  If you take, if you take the number of things that

23  were acted upon and divide it by the total number that were

24  submitted, only 7.72 percent of what was submitted got acted

25  upon.  All right.

2018

1          You subtract that from 100 percent, that meant that
2  92.28 percent didn't get acted upon.

3          So these notices went in and were not acted upon.
4  Q.   Now, when you say "not acted upon," what do you mean?
5  A.   Well, it meant that they went in as valid infringement
6  notices, and that the system had to do something with them.
7  That's the way Cox describes the system.  And the system seems
8  to have only done something with about 7.7 percent of the
9  complaints that were sent to it.
10 Q.   So what happened to the other 92.28 percent of complaints
11 that were sent to Cox in July of 2014?
12 A.   They apparently were never acted upon.  They fell by the
13 wayside as the hurdles got jumped over.
14 Q.   Do you know whether or not any of the Cox subscribers that
15 were the subject of those 92.28 percent of those notices
16 learned that they were the subject of infringement notices?
17 A.   I do not.
18 Q.   Do you know whether or not these notices were just
19 ignored?
20 A.   No.
21 Q.   Is it your understanding that they were just ignored?
22 A.   I am sorry, I didn't hear what you said.  Do I know that
23 they were ignored?  The system --
24          MR. BUCKLEY:  Speculation, Your Honor.
25          THE COURT:  He has rephrased his own question and he

1   is answering a different question now, and I am going to allow

2   him to answer the question.

3          THE WITNESS:  I am sorry.  Could you repeat the

4   question?

5   BY MR. ALLAN: (Continuing)

6   Q.   What is your understanding of what happened to these other

7   notices, the 92 percent of these notices?

8          THE COURT:  If you have one.

9   Q.   If you have one.

10  A.   They were ignored.

11  Q.   How was it that Cox was able to ignore so many of these

12  notices?

13  A.   Their system was configured to deliberately do that.  They

14  put enough hurdles in there that you could not get through the

15  other end with these notices, or at least that's my evaluation

16  based upon looking at the documents, the materials, and the

17  data.

18  Q.   Thank you.  You indicated you had reviewed some

19  deposition or -- sorry, some trial testimony in this case?

20  A.   Yes, I have.

21  Q.   Did you review Mr. Cadenhead's testimony?

22  A.   Yes, I did.

23  Q.   Are you aware of any testimony he gave concerning the fact

24  that he believed that his system, that this system was

25  effective?

1   A.   Yes, I saw that.

2   Q.   What was your -- what do you recall of that testimony?

3   A.   I recall he said something to the amount of 96 percent

4   effective, something in that range, if I recall the number.

5   And that was in his testimony a week ago.

6   Q.   Very good.  Actually, before we go to that, Karl, if you

7   could pull these out.

8        These numbers in the far right column, Dr. McGarty,

9   are they all fairly consistent in terms of the percentages of

10  notices that Cox didn't do anything with?

11  A.   On average it looks like the number is 90, almost

12  90 percent are sort of disregarded.

13  Q.   Very good.  Could we pull up what I believe is in

14  evidence, DTX 141, please, Karl.  If we could shoot over to

15  number 14 of that, please.

16  A.   I am sorry?

17  Q.   It's number DTX 141, Dr. McGarty.

18  A.   I have that.  And page --

19  Q.   It is page number 14.

20  A.   -- 14.  Okay.  I have that.  Thank you.

21  Q.   And do you recall in your review of the testimony

22  Mr. Cadenhead talking about this slide?

23  A.   Yes, I do.

24  Q.   And what's your understanding of Mr. Cadenhead's testimony

25  on this?

2021

1  A.   My understanding is he made a statement that it's

2  96 percent effective.  But when I look at the numbers that were

3  provided to me in the Cox interrogatories, which as an

4  interrogatory I can rely upon those numbers because that was

5  the representation made by Cox, I'm getting the impression that

6  roughly 90 percent of the notices are just outright ignored.

7         So I have serious concerns as to the validity of this

8  number.

9  Q.   So do you agree with Mr. Cadenhead that the system is

10 96 percent effective at reducing infringement?

11 A.   There is no basis -- it flies in the face of the numbers

12 that I have before me that were provided by Cox over and over

13 again, over a long period of time.  And there is no source or

14 critical references as to where this information ever came

15 from.  So it just appears.

16 Q.   So are you aware of any source material in your review of

17 any of the records that support these figures?

18 A.   Support Mr. Cadenhead's representation?

19 Q.   Correct.

20 A.   I have not been able to find any information.

21 Q.   And why is it that there would be a disconnect?  Why is it

22 that Mr. Cadenhead's answers or view of the effectiveness of

23 the system can't be accurate given the interrogatory answers?

24         MR. BUCKLEY:  Leading.

25         THE COURT:  It is leading.

T. McGarty - Direct

2022

1          THE WITNESS:  I am sorry?

2          THE COURT:  Rephrase the question.

3          MR. ALLAN:  I'll rephrase, Your Honor.

4   BY MR. ALLAN: (Continuing)

5   Q.   Do you have an opinion -- or what, if any, opinion do you

6   have concerning whether this figure, the 96 percent

7   effectiveness, can exist at the same time the interrogatory

8   data exists?  I mean, can they be mutually exclusive or can

9   they relate?

10  A.   I -- my opinion is that this is totally inconsistent with

11  the facts that I have in evidence, and I have no way to justify

12  this number at all.

13  Q.   Having -- do you have an opinion as to whether the Cox

14  system is effective in any way?

15  A.   My opinion is, as I said earlier, is that the Cox system

16  seems to act as if it is effective, but when you put in all of

17  these hurdles and you take a look at the data that actually

18  comes out of the system, it seems to be very ineffective in

19  totality.

20  Q.   Are you aware of Mr. Cadenhead's testimony on educating

21  subscribers about infringement?

22  A.   I am sorry, on --

23  Q.   Educating subscribers.

24  A.   Yes, I am.

25  Q.   And what does the data you've looked at, including the

T. McGarty - Direct

2023

1   interrogatory answers, what does that tell you about the level

2   of education Cox provides to its subscribers about

3   infringement?

4   A.   I think if you are disregarding almost 90 percent of the

5   violations, that is not a good means of education.  I think you

6   should inform the violators as quickly as possible and

7   repeatedly that they are violating and not give them the

8   comfort that they can continue to violate with impunity.

9   Q.   Have you seen any other evidence in your review of the

10  materials or the trial transcript -- let me rephrase that.

11       What other evidence have you seen in your review of

12  the trial transcripts and the evidence that would suggest that

13  Cox's system is not effective at addressing infringement?

14  A.   I have looked at some of the evidence that Mr. Vredenburg

15  had last week where there was a multiple infringer, I believe

16  28 times over some period of time, and he just, this particular

17  individual just managed to infringe and infringe and

18  infringe --

19       MR. BUCKLEY:  Your Honor, legal opinion.

20       THE COURT:  No, overruled.  Go ahead.

21       THE WITNESS:  May I continue, Your Honor?

22       THE COURT:  Yes, sir.

23       THE WITNESS:  Okay.  I am sorry, you tried my eyes.

24  My hearing also gets to go.

25       THE COURT:  I'm sorry.

T. McGarty - Direct

2024

1        THE WITNESS:  And I still have my teeth.

2        So I -- could you repeat the question?

3  BY MR. ALLAN:  (Continuing)

4  Q.   Sure.  What other evidence other than the interrogatories

5  have you seen in reviewing the trial evidence and that sort of

6  thing --

7  A.   Right -- this is the Mr. Vredenburg discussion about the

8  repetitive copyright abuser where I think there were about 28

9  different abuses over a period of time and he was never

10  proceeded to ultimate termination.

11  Q.   And how does that factor into your opinion in this case?

12  A.   Well, you know, it -- when I looked at that and I said,

13  well, gee, maybe this fellow also had another 90 percent that

14  we never got to see, or even probably more than that because we

15  only caught him once a day.  So this is a guy that I kind of

16  see speeding down the highway every single day and we only

17  catch him because we're looking on Thursday.

18        So the system, that being a classic example, seems to

19  lack in the effectiveness it is supposed to have to be able to

20  deter multiple violators.

21  Q.   Dr. McGarty, do you have an opinion overall as to the

22  design and the implementation of Cox's system to address

23  copyright infringement on its network?

24  A.   Just to sort of rephrase and give that opinion -- because

25  the system was designed so it can do a lot of things.  So the

1    design permits it to store as many infringements per day as

2    possible, but when it's configured with the types of hurdle

3    levels that we're talking about, the net result is it doesn't

4    accomplish anything that it was set out to do.  That it was

5    almost deliberately configured not to lose customers from

6    terminations and maybe to shield customers from any concerns

7    regarding copyright violations.

8              MR. ALLAN:  Thank you, Dr. McGarty.  Pass the

9    witness.

10             THE WITNESS:  Thank you.

11             THE COURT:  All right.  Cross-examination.

12        CROSS EXAMINATION

13   BY MR. BUCKLEY:

14   Q.   Good afternoon, Dr. McGarty.  We haven't met.  My name is

15   Brian Buckley.

16   A.   And I am sorry, counselor, but you will have to speak up

17   because your voice is very soft and I can't hear it.

18   Q.   I will do my very best.

19   A.   I would appreciate it.

20   Q.   Dr. McGarty, you are charging an hourly rate, I assume,

21   for your work in this case?

22   A.   Again, I really can't hear you.  I am terribly sorry.

23   Q.   Are you charging an hourly rate for your work in this

24   case?

25   A.   Yes, I am.

1    Q.    What is your rate?

2    A.    650 an hour.

3    Q.    And roughly how many hours do you estimate you have spent?

4    A.    I have billed this year about 125,000.  And generally what

5    I do with that money is I send it to both Columbia and Memorial

6    Sloan-Kettering for cancer research.

7    Q.    My question was just how much.

8    A.    Okay.  125,000, I believe, so far this year.

9    Q.    At $650 an hour?

10   A.    That's correct.

11   Q.    That work was all performed by you or do you have --

12   A.    I am the only one.

13   Q.    Michael, can we please pull up document PX 1344.

14   A.    Do I have those in this book?

15   Q.    You do.  This was one that Mr. Allan asked you about on

16   direct.  It is PX 1344.

17   A.    Okay.  1344?

18   Q.    Yes.

19   A.    Okay.  This is the implementation plan.

20   Q.    Yes.  And, Dr. McGarty, it's also on the screen if that

21   helps.

22   A.    No, I'm going to have to work off of this.  I'm sorry.

23   Q.    Okay.  So this -- you testified that this was one of the

24   documents that you reviewed to help you understand how CATS

25   works, right?

1  A.   That's correct.

2  Q.   Michael, could you advance to the page that ends in 3180,

3  please.

4        Michael, could you please highlight that paragraph

5  that says Document Summary?

6        Do you see that paragraph, Dr. McGarty, that says

7  Document Summary?

8  A.   Yes, I do.

9  Q.   I am going to read that first sentence.  "This document

10 provides a detailed description of the hardware, software, and

11 security configuration components of CATS abuse system being

12 deployed to automate analysis and ticketing for all Internet

13 abuse complaints for Charter Internet services."

14        Do you see that?

15 A.   That's what it says, correct.

16 Q.   Are you familiar with Charter?

17 A.   I am very familiar with Charter.

18 Q.   What is Charter?

19 A.   Charter is another cable television company which I

20 believe uses the Cox CATS system as well.

21 Q.   Okay.  So you were aware this was a Charter document?

22 A.   It's a mix between Charter and Cox, and it was represented

23 to me to be a document for CATS.

24 Q.   It was represented to you to be a document for CATS?

25 A.   On the front here, Cox document.  The CATS system here.

1    Q.   So are you aware that Charter has actually licensed the

2    CATS system from Cox?

3    A.   I was, I believe, familiar with that.

4    Q.   Okay.

5    A.   So this was a Cox system that Charter has licensed.

6    Q.   Right.

7    A.   Okay.

8    Q.   But this document, is it your understanding this is a

9    Charter document?

10   A.   This document has a mishmosh of Charter and Cox all over

11   it.  So I don't know who it's with.

12   Q.   Okay.  So you don't know whether this relates to Cox's

13   implementation of CATS as opposed to Charter's implementation

14   of CATS?

15   A.   Well, in my experience, if Cox built the system and then

16   licensed it to Charter, then it was Cox's system licensed to

17   Charter.

18   Q.   Okay.  Yeah, but my question was different.  You don't

19   know whether this document relates to Cox's implementation of

20   CATS as opposed to Charter's implementation of CATS?

21   A.   All I know, if I'm answering your question properly, is

22   that this was the Cox system licensed, I guess, to Charter if

23   you say so.

24   Q.   Okay.  You don't know one way or the other?

25   A.   No.

T. McGarty - Cross

2029

1    Q.    Are you aware that in 2012 Charter told Rightscorp it

2    wouldn't process its notices?

3    A.    No.

4    Q.    Were you aware that Charter repeated that in 2013, told

5    Rightscorp, we won't take your notices?

6    A.    No, sir.

7    Q.    Have you ever seen any communications from Charter to

8    Rightscorp?

9    A.    No, sir.

10   Q.    Any communications from Charter to BMG?

11   A.    No, sir.

12   Q.    Are you aware that there are other ISPs who don't process

13   Rightscorp's notices?

14           MR. ALLAN:  Objection, Your Honor, scope.

15           THE COURT:  Yeah.

16           MR. ALLAN:  This wasn't covered at all in --

17           THE COURT:  Yes.  Sustained.

18   BY MR. BUCKLEY: (Continuing)

19   Q.    So, Dr. McGarty, you've talked a lot about Cox's system

20   for handling copyright complaints, right?

21   A.    Yes.

22   Q.    The CATS system?

23   A.    Yes.

24   Q.    And then you've also talked about CATS -- or Cox's

25   graduated response system which is related to CATS, right?

1    A.    Yes.

2    Q.    And for the graduated response system, did you say that

3    you reviewed Cox's methods and procedures document, do you

4    remember that?

5    A.    It was a document -- several documents on the graduated

6    response system over a period of time where I think they may

7    have gone from a maximum 11 to a maximum of 13.  And I would

8    have to go back and re-examine those documents, but, yes, I've

9    seen those.

10   Q.    So prior to this case, had you ever evaluated a graduated

11   response system?

12   A.    I don't know if I've ever seen that as a term of art.  So,

13   I mean, I know in various systems that I've had, for example,

14   on billing, we would have a graduated response where if the --

15   the patient.  Whereas the customer did not pay within 30 days,

16   we would do something, and then 45 days.

17         So I've seen graduated responses, if that's the type

18   of question you're asking.

19   Q.    Well, my question was more specific to copyright

20   complaints.  Had you ever --

21   A.    No.

22   Q.    Okay.  You hadn't previously evaluated --

23   A.    No, sir.

24   Q.    It's really important that you let me finish my question.

25   A.    I'm sorry.

T. McGarty - Cross

2031

1   Q.   And I'll let you finish your answer so we don't talk over

2   each other.

3   A.   Yes, sir.

4   Q.   Okay.  So had you ever helped develop a system for

5   responding to copyright complaints?

6   A.   No, sir.

7   Q.   You testified a little about Rightscorp, right?

8   Rightscorp?

9   A.   Yes.

10  Q.   Do you have an understanding of how Rightscorp's system

11  works?

12          MR. ALLAN:  Objection.

13  A.   I have general information about -- I'm sorry.

14          THE COURT:  What was the objection?

15          MR. ALLAN:  Beyond the scope.

16          THE COURT:  No, I'll allow the question.  He talked

17  about having studied the Rightscorp system, and we'll see where

18  you're going.  Let's go.

19  BY MR. BUCKLEY: (Continuing)

20  Q.   I'm sorry.  My question was just do you have an

21  understanding of how Rightscorp's system works?

22  A.   I have a general understanding of how the Rightscorp

23  system works from their material and from testimony last week

24  at trial.

25  Q.   Did you actually evaluate the reliability of the

T. McGarty - Cross

2032

1    Rightscorp system?

2    A.    No, sir.

3    Q.    Okay.  Did you evaluate the reliability of the Rightscorp

4    notices?

5    A.    No, sir.

6    Q.    Do you know how the notices are generated?

7    A.    I'm familiar with the testimony of -- from testimony how

8    it's allegedly generated.  I have no personal firsthand

9    knowledge as to how it is generated.

10   Q.    Okay.  Do you understand from listening to the testimony

11   that what the Rightscorp system does is it observes data

12   associated with IP addresses, like a date, a port, a file name,

13   that sort of thing?

14   A.    As I indicated, I have no personal firsthand knowledge of

15   how Rightscorp functions.

16   Q.    Okay.  Do you know whether Rightscorp is able to identify

17   the person associated with a particular IP address?

18   A.    That I'm familiar with.  That you can get an IP address

19   and a port address and other addresses.  To determine what

20   individual is involved requires the participation of the ISP

21   who has that information.

22   Q.    Okay.  So but Rightscorp doesn't know?

23   A.    No, sir, not to my knowledge.

24   Q.    Is it consistent with your understanding that what the

25   Rightscorp system is doing is observing folks using BitTorrent?

T. McGarty - Cross

2033

1   A.   That is my understanding of how Rightscorp functions, yes,

2   sir.

3   Q.   Okay.  And the notices themselves are allegations of

4   infringement or allegations of BitTorrent use, right?

5   A.   I don't -- I cannot make a statement one way or another as

6   to the veracity of that allegation.

7   Q.   Okay.  And you wouldn't -- you also wouldn't offer an

8   opinion as to whether those notices are proof of copyright

9   infringement?

10  A.   I'm not testifying -- I'm testifying purely on operational

11  issues on the Cox side.

12  Q.   You know -- you're familiar with open WiFi, that concept?

13  A.   Very much so.

14        MR. ALLAN:  Objection, Your Honor.  This is far

15  beyond the scope.

16        THE COURT:  Yeah, way outside.  Sustained.

17  BY MR. BUCKLEY: (Continuing)

18  Q.   Are you offering any opinion on what a repeat infringer

19  is?

20  A.   Am I -- what a repeat infringer is?

21  Q.   Yes.

22  A.   I can only say what it means in plain words.

23  Q.   Are you offering an expert opinion on that?

24  A.   No, sir.

25  Q.   Are you offering any expert opinion on the appropriate

1   circumstances for terminating a repeat infringer?

2   A.   No, sir.

3   Q.   Are you aware that Cox does occasionally terminate

4   subscribers for receiving multiple infringement notices?

5   A.   I believe the evidence I showed just previously

6   demonstrates that Cox does terminate, yes, sir.

7   Q.   Are you aware of any other ISPs that do that?

8   A.   I have no knowledge of other ISPs.

9   Q.   Dr. McGarty, let's look at your exhibit, the chart you

10  prepared, which is PXS 0005.

11  A.   Which one is that, sir?

12  Q.   It's the chart that you prepared from the interrogatories.

13  A.   Yes, sir.

14  Q.   And you said that the data that's reflected here came from

15  Cox's Interrogatories No. 5 and 8, right?

16  A.   That's correct.

17  Q.   Michael, could can we pull up Interrogatory 8, too,

18  please.  Interrogatory 8, yes, which I believe is document PX

19  1610.

20        So this is hard to see, Dr. McGarty, and it's hard

21  for me to see too.

22  A.   This is at a focal length which works with nothing I have

23  the left in my eyes.

24  Q.   Yes.  And I'm having to do the same thing.  So I'm going

25  to have Michael expand a couple of these pieces here.

2035

1    A.    I see.

2    Q.    So down in the corner, Michael, if you could bring up

3    Dr. McGarty's chart first down here so we can see it.

4          So, Dr. McGarty, you focussed on the time frame from

5    February 2012 through October 2014; is that right?

6    A.    That's correct.

7    Q.    And you've got the data tallied up there from the

8    interrogatory?

9    A.    That's correct.

10   Q.    Then if you can go back, Michael, go back to the range for

11   2010.

12         And, Dr. McGarty, you didn't include the Cox data

13   from the year 2010; is that right?

14   A.    No, I just focussed on February 2012 to 2014.

15   Q.    Can you expand that over, Michael, for all the columns

16   there?

17         In the interrogatory, Dr. McGarty, you see there were

18   also -- there's data for 2010 for Warning, Suspensions,

19   Terminations, right?

20   A.    Yes, I'm aware of that data as well.

21   Q.    Okay.  And there are quite a few more terminations

22   involved there?

23   A.    I understand that.

24   Q.    Okay.  And then you also didn't include the data for 2011;

25   is that right?

1   A.   No, sir, I did not.

2   Q.   Okay.  Can you pull up that next page, Michael.

3        That carries over to the next page.  There's a column

4   for Terminations, there are quite a few more terminations in

5   that -- in those columns too, right?

6   A.   That's correct.

7   Q.   Okay.  And then at the end you cut it off at October 2014,

8   but there was additional data in the interrogatory, right?

9        If you can bring up the one in the upper right

10  corner, Michael, please.  Thank you.

11       You see there's some data at the end there after

12  October 2014 that you didn't include?

13  A.   I'm just trying -- I'm sorry, hold on.  I see 2013.  You

14  said 2015?  I see 2015, that's right.  I guess after the suit

15  was filed suddenly it jumps up again.

16  Q.   Those rows at the end.  What's your understanding when the

17  suit was filed?

18  A.   Wasn't the suit filed at the end of 2014 with Cox?

19  Q.   Yeah.  Do you know when?

20  A.   I think it was October, November time frame.

21  Q.   But you didn't include this data here, right?

22  A.   No, I didn't.  I just went to that date.

23  Q.   Okay.  So let's go back to your chart, please, Michael.

24       So, Dr. McGarty, you've got the columns for Warnings,

25  Suspensions, Terminations.  You looked at part of the data, but

1    not all of the Cox data, there was more that we just looked at?

2    A.    There's data prior to that and there's data subsequent to

3    this time period, you're correct.

4    Q.    Did you add up all of the data that was provided in

5    Interrogatory 8 to determine how many total warnings are at

6    issue?

7    A.    Not in this chart, no, I didn't.

8    Q.    Did you do that for suspensions?

9    A.    No, I did not.

10   Q.    Did you do that for terminations?

11   A.    No, I did not.

12   Q.    So in your chart, Dr. McGarty, you've got a column -- can

13   you expand the column titles, please, headings.

14           You have a column -- there's a column that says

15   Notices in CATS, right?

16   A.    Yes.

17   Q.    And then another that says Deleted Notices Not Stored in

18   CATS, do you see that?

19   A.    Correct.

20   Q.    Are you familiar from your review of Cox's graduated

21   response, are you familiar with the concept of hold for more?

22   A.    I've seen that concept in those documents, yes.

23   Q.    What's your understanding of that concept?

24   A.    It's held for more infringement complaints.

25   Q.    Okay.  So the notice comes in?

1    A.    And you hold it for a period of time.

2    Q.    And wait to see if there's a second complaint?

3    A.    That's right.

4    Q.    Okay.  Do you know or is it your understanding that the

5    hold for more would be included in the Deleted Notices column?

6    A.    I'm not familiar with that, no.

7    Q.    You don't know one way or the other?

8    A.    No.

9    Q.    Did you ask?

10   A.    I read the -- all I did was read the interrogatory in its

11   detail.  We discussed it.  And the way it's described in the

12   interrogatory is that it's blacklisted.  And I assumed the term

13   consistent with other blacklisting terms.

14   Q.    So if a notice is held for more, do you know whether a

15   CATS ticket is created for it?

16   A.    A ticket in the system?

17   Q.    Uh-huh.

18   A.    The ticket is created in the database, in the MySQL

19   database.

20   Q.    Okay.  So then presumably a hold for more ticket would not

21   be included in the Deleted Notices column?

22   A.    I'm not certain.

23   Q.    You talked about the concept of hard limits?

24   A.    Yes, sir.

25   Q.    That's where if a certain number of notices come in from a

1    complainant when they hit a particular limit, the notices above

2    that limit aren't processed, right?

3    A.    That's correct.

4    Q.    Do you know whether hard limit notices are included in the

5    Deleted Notices column?

6    A.    I don't know.

7    Q.    You don't know?

8    A.    No.

9    Q.    So you don't know whether tickets are created for those

10   notices?

11   A.    The system seems to have the capability to create a data

12   record in the file for those tickets, but they don't seem to be

13   acted upon in terms of the cumulative response.

14   Q.    Okay.  But what you don't know is whether they --

15   A.    I don't know the specifics.

16   Q.    -- turn into a ticket or not?

17   A.    No.

18   Q.    And then you used -- so can you expand back out from the

19   table, Michael?  Let's see the whole chart if we could.

20   Thanks.

21          And then, Dr. McGarty, you used the numbers in these

22   various columns and you came up with these percentages on the

23   right over here, right?

24   A.    Yes, sir.

25   Q.    Are you a mathematician?

1    A.    Am I mathematician?

2    Q.    Yeah.  Is that your expertise?

3    A.    Surprisingly, my first book was on Stochastic Systems and

4    State Estimation, which is pure mathematics from MIT, so -- and

5    my minor was in mathematics at MIT.  And everything I do is

6    circling around mathematics.

7    Q.    So that's why you were asked to do the math in this table?

8    A.    I do this every day of my life, yes.

9    Q.    I'm just wondering whether this was the expertise you

10   brought to bear or whether someone else --

11   A.    Doing the columns and adding?

12   Q.    Yeah.

13   A.    Yes, I know how to use Excel.

14   Q.    Let's go back to this column that's titled Deleted Notices

15   Not Stored in CATS.

16   A.    Correct.

17   Q.    Do you know -- so there's a number of months here and then

18   there's a total at the bottom, it looks like it's about -- I'm

19   having the same eyesight problems.

20   A.    It's almost 3 million.

21   Q.    4.6 million it looks like.

22   A.    Oh, the total.  Oh, that number, yes, 4. -- sorry.

23   Q.    I think it's 4.6 million.

24   A.    We're going to go do this all day, I apologize.

25   4.7 million.  Now I can't see the jury.

T. McGarty - Cross

2041

1   Q.   What percentage of those, of that 4.6 million notices are

2   Rightscorp notices?

3   A.   None.

4   Q.   How do you know that?

5   A.   There was a correspondence I had seen in an e-mail back

6   in, I think, November of 2011 from one of the people in the

7   Abuse Group that basically it seems to configure it so that

8   when the e-mail from Rightscorp comes in, there's a router in

9   front of the e-mail server, it reads the address as Rightscorp,

10  and then sends it off to Neverland.  And only the ones that are

11  allowed to go through end up in the e-mail server.

12  Q.   And you're basing that on an e-mail from 2011 you say?

13  A.   Yes, one of the inside people.  I think that's when I saw

14  it.

15  Q.   And do you know whether that's still in effect?

16  A.   I don't know.

17  Q.   Do you know that Rightscorp claims to have sent Cox over

18  22 million notices?

19  A.   I have no idea.

20  Q.   Okay.  So you don't know for a fact whether there are any

21  Rightscorp notices in that figure, do you?

22  A.   In this particular time period?

23  Q.   Right.

24  A.   Cox may have changed its procedures.  So --

25  Q.   Do you know whether there are other blacklisted entities

1   that are reflected in this Deleted Notices column?

2   A.   It was characterized as such I believe in the

3   interrogatory.

4   Q.   That these, in fact, reflect --

5   A.   Some blacklisted, yes.

6   Q.   -- entities that have been blacklisted?

7   A.   Yeah.  But what they do is apparently they come through

8   the router and into the e-mail system, so Cox accepts them, but

9   then doesn't do anything with them.

10  Q.   Okay.  But these are entities that Cox has blacklisted?

11  A.   Yes.

12  Q.   That's your understanding?

13  A.   Yes.

14  Q.   Have you heard of a company CEG TEK, C-E-G T-E-K?

15  A.   I'm sorry.  CEG TEK?

16  Q.   CEG TEK, C-E-G T-E-K.

17  A.   No, sir.

18          MR. ALLAN:  Objection, Your Honor, scope.

19          THE COURT:  Do you want to approach the bench on

20  this?

21          MR. BUCKLEY:  I'm just asking him about what this

22  column means and what the numbers mean.  It's his chart and he

23  testified about it under oath.

24          THE COURT:  Is this your last question on the

25  subject?

2043

1            MR. BUCKLEY:  On CEG TEK?  He said he wasn't familiar

2   with CEG TEK, so yes.

3            THE COURT:  Okay.

4   BY MR. BUCKLEY: (Continuing)

5   Q.   Okay.  So you know -- okay.  So this column reflects

6   entities that were blacklisted.  Do you know why any of those

7   entities were blacklisted?

8   A.   No, sir.

9   Q.   Do you know whether they're still blacklisted?

10  A.   No, sir.

11  Q.   Did you ask?

12  A.   No, sir.

13  Q.   Does this chart just reflect notices related to copyright

14  abuse?

15  A.   I'm sorry.

16  Q.   Do the numbers on this chart just reflect notices related

17  to copyright?

18  A.   That's the way the interrogatory phrased it, correct.

19  Q.   Okay.  But you understand Cox gets other types of notices

20  too?

21  A.   Absolutely.

22  Q.   But they're not reflected here?

23  A.   Not the way the representation was made to me in reading

24  that particular interrogatory.

25  Q.   So you testified on direct that you have an understanding

1   of why Cox chose to blacklist Rightscorp, right?

2   A.   Yes.

3   Q.   And that's because Rightscorp's notices included

4   settlement language?

5   A.   That's what I testified to.

6   Q.   And you suggested, Dr. McGarty, that Cox could have just

7   taken those notices and taken the settlement language out of

8   them, right?

9   A.   Yes.

10   Q.   Michael, could you please pull up DTX 69.

11        Dr. McGarty, this is a Rightscorp notice that is

12   already in evidence.  It is DTX 69.

13        Do you see that language right at the top?  "Note to

14   ISP, please forward the entire notice."

15        Have you seen that before?

16   A.   Yes, I have seen this.

17   Q.   Do you know if Rightscorp ever gave Cox permission to

18   modify its notices?

19   A.   I have no idea.

20   Q.   Do you know if BMG ever gave Cox permission to notify its

21   notices?

22   A.   I have no idea.

23   Q.   Are you aware that Cox repeatedly asked Rightscorp to

24   modify its own notices?

25   A.   I am not familiar with that.

T. McGarty - Cross

2045

1   Q.   Do you understand that Rightscorp's business model depends

2   on consumers contacting Rightscorp in response to notices like

3   this?

4          MR. ALLAN:  Objection.

5   A.   I am not aware of details of Rightscorp's --

6          THE COURT:  Overruled.

7   Q.   I'm sorry?

8          THE COURT:  He said he is not aware.

9   A.   I am not aware.

10  BY MR. BUCKLEY: (Continuing)

11  Q.   Dr. McGarty, on direct you talked about some testimony

12  from Roger Vredenburg, who is a Cox employee, right?

13  A.   Correct.

14  Q.   And he was asked about an example of a Cox subscriber

15  where there were different instances of complaints of various

16  sorts, right?

17  A.   That's correct.

18  Q.   And those weren't all copyright-related complaints, right?

19  A.   No, there were -- he had a various set of collection.  He

20  had copy other, which is a copyright, and then a whole bunch of

21  other things were in there as well.

22  Q.   And those copy other complaints, what that reflects is

23  that this individual was using BitTorrent, right?

24  A.   I am sorry, what the copy other reflects is --

25  Q.   As I asked you before, what those notices reflect is that

1   that individual was using -- or somebody at that IP address was

2   using BitTorrent?

3   A.   Somebody at that IP address had a copyright violation

4   filed.

5   Q.   Right.

6   A.   They could use BitTorrent or other peer-to-peer systems, I

7   would assume.   I don't know whether Rightscorp solely monitors

8   BitTorrent and not the others.   So I am not in a position to

9   opine that it's solely BitTorrent.

10   Q.   Okay.   That's fair.   So what those notices reflect is that

11   some computer associated with that IP address was using some

12   kind of file sharing program that Rightscorp monitors?

13   A.   That's correct.

14   Q.   Cox can't block a person's access to BitTorrent, right?

15   A.   No.

16   Q.   You feel pretty strongly about that?

17   A.   I feel very strongly about that.

18   Q.   Is that related to this notion of net neutrality?

19   A.   I am a very strong proponent of net neutrality from that

20   perspective.

21   Q.   In fact, I think once you said net neutrality is simply

22   that the carrier shall not in any way look at my data or

23   discriminate in my transmissions based solely on its content,

24   right?

25          MR. ALLAN:   Objection, Your Honor.   Scope.

T. McGarty - Cross

2047

1          THE COURT:  Sustained.

2          MR. BUCKLEY:  Well, Your Honor, he just said --

3          THE COURT:  Come to the bench.

4          THE WITNESS:  Is that it?

5          THE COURT:  No, we are going to have a little

6    conference.

7          THE WITNESS:  What do I do?

8          NOTE:  A side-bar discussion is had between the Court

9    and counsel out of the hearing of the jury as follows:

10   AT SIDE BAR

11         THE COURT:  All right.  So we got out the information

12   that he understands that BitTorrent can't be sued.

13         MR. BUCKLEY:  No, no, no.  That Cox can't block

14   somebody's access to BitTorrent.

15         THE COURT:  Right.  So he said that.  So, I'm sorry,

16   I misspoke.  He has already testified to that.  So where are

17   you going now?

18         MR. BUCKLEY:  I've got a couple more questions on

19   that front.  I won't take it very far, but he has got -- he is

20   very outspoken and has published on the fact that ISPs are not

21   supposed to block BitTorrent or look at what their customers

22   are doing.

23         THE COURT:  This case is not about blocking

24   BitTorrent, right?

25         MR. BUCKLEY:  They have made this case all about

1    BitTorrent being -- equating to infringement, and created the

2    suggestion that Cox should do something about that and

3    supervision, and we have the right to rebut those things.

4              THE COURT:  Okay.

5              MR. ALLAN:  Your Honor, we didn't discuss net

6    neutrality on his direct examination.  We didn't discuss

7    ability to block BitTorrent or block particular Web sites.

8    This is completely outside the scope of his direct examination,

9    and it is wholly irrelevant to the case.

10             The question in the case is what they did with

11   respect -- or didn't do with respect to the notices of

12   infringement that were sent to them.  And it's clear with

13   respect to the issue of Rightscorp that they did nothing.

14             And so, I don't think it's appropriate

15   cross-examination and testimony for this witness.

16             And one related issue, because we keep going outside

17   the scope on the cross-examination here.  The testimony you

18   elicited from the -- on the ticket, he kept saying it was

19   Rightscorp information.  None of that was Rightscorp

20   information.  Rightscorp notices haven't been addressed at all.

21             And so, there is a lot of misleading questions going

22   on here, Your Honor.

23             MR. BUCKLEY:  Which I'm sure you will point out on

24   redirect.

25             THE COURT:  You will clean that up on redirect.

1            You know, the allegation from day one that Cox's

2    failure to use the DMCA or to use any system to stop

3    infringers, infringing customers by using the BitTorrent, has

4    never been about whether BMG had the authority -- had the

5    authority to close down BitTorrent.  It has been Cox's ability

6    and -- you know, I know we are running right into the jury

7    instruction on supervision, but the supervision is over its own

8    customers.

9            And so, how does this testimony about what may or may

10   not be permissible with regard to the BitTorrent site have

11   anything to do with that?

12           MR. BUCKLEY:  That's two separate issues.

13           THE COURT:  Do you want to discuss with your

14   client -- you can't both be talking.  I can hear both -- half

15   of what each of you are saying, and none of it in total.  So

16   you need a minute to confer?  Take a minute.

17           MR. BUCKLEY:  So, Your Honor, there are two issues.

18   The first relates to BitTorrent specifically.  They had every

19   expert and witness they could say BitTorrent is used for

20   99 percent infringing activity.

21           THE COURT:  Okay.

22           MR. BUCKLEY:  So they have created this impression

23   that there is a bunch of BitTorrent activity on the Cox

24   network.  They have created this impression for the jury.  We

25   know there is all this bad stuff going on, and the implication

1    is we should do something about it.

2            They have now put up this expert to talk about how

3    crappy their system is.  He has a very strong opinion that

4    there isn't anything we can do about BitTorrent.  I think it is

5    fair to round out the BitTorrent story through him.  All I may

6    need to do -- I can ask one more question, should we block

7    BitTorrent.

8            Then there is a separate question of our ability to

9    supervise, and it is the ability to supervise infringing

10   activity.  And all I want to ask him is, do you think we should

11   be looking at our customers' data?  Because their expert is

12   going to say no.

13           And that does go to our ability to figure out what

14   people are actually doing on our network.  Even the guy that

15   they have talked about through Mr. Vredenburg, nobody knows

16   what he was actually doing.

17           THE COURT:  It's completely misleading on what the

18   case is about.  It is not about whether you are permitted to

19   look at your own customers' data.

20           It's the fact that you got notices saying that

21   somebody else had looked at the data, that they believed there

22   was infringing activity, indicating that your customers had

23   used a BitTorrent site to illegally upload or download

24   infringing material.  So --

25           MR. BUCKLEY:  And we were just supposed to take them

1  at their word on it and shut them off, shut the subscriber off

2  without any ability to look into that, figure out whether it is

3  true or not?

4         MR. ALLAN:  That's what they do with everyone, Your

5  Honor.  I mean, this argument just doesn't make any sense.

6         THE COURT:  That is a complete side show.  So

7  objection sustained.  Your exception is noted.

8         MR. BUCKLEY:  Okay.  Thank you, Your Honor.

9         NOTE:  The side-bar discussion is concluded;

10  whereupon the case continues before the jury as follows:

11  BEFORE THE JURY

12         THE COURT:  So we were talking behind your back that

13  entire time.  All right.  I just wanted to let you know there.

14         THE WITNESS:  Thank you.  I couldn't hear it anyhow,

15  so don't worry.

16         THE COURT:  Go ahead.

17         MR. BUCKLEY:  Can I ask my one follow-up question to

18  make sure I got --

19         THE COURT:  No, we're done.  Move on to your next

20  topic, please.

21         MR. BUCKLEY:  Okay.  All right.

22  BY MR. BUCKLEY: (Continuing)

23  Q.   Dr. McGarty, just a couple of quick questions about CATS.

24  Did you actually look at the CATS source code?

25  A.   The Cox source code?

1   Q.   The CATS source code.

2   A.   CATS source code?  No, sir.

3   Q.   Are you aware that it was produced in this case?

4   A.   I read the testimony at the beginning of

5   Frederiksen-Cross, I believe, and she examined that.  I am not

6   capable of doing that.

7   Q.   Do you know why Cox -- when you testified before about the

8   hard limits that applied, do you know why Cox chose particular

9   hard limits rather than others?

10  A.   No, sir.

11  Q.   Are you aware that Cox works with some rights holders and

12  negotiates those hard limits?

13  A.   I am familiar that Cox had conversations with some rights

14  holders about the numbers.  It is not clear to me whether those

15  were negotiated as I would use the term "negotiated."

16  Q.   Okay.  You just don't know one way or the other?

17  A.   I know the numbers were there.  I know they were the

18  result of conversations.  I don't know if that would, in my

19  view, be a typical negotiations.

20  Q.   Dr. McGarty, you said on direct that Cox has the ability

21  to control its subscribers' activity because it can terminate

22  their Internet access, right?

23  A.   That's correct.

24  Q.   That's the nature of the control?

25  A.   You turn off the modem that turns off the access.

1   Q.   And that's true of every ISP, right?

2   A.   To my knowledge, that's -- yes, that's -- that's an

3   interesting question.  If I -- may I speak towards it to try to

4   resolve an answer?

5   Q.   Let me ask it differently.

6   A.   Excuse me.

7   Q.   Let me ask it differently.

8   A.   Okay.

9   Q.   Is that true of every, what you call, traditional ISP like

10  Cox?

11  A.   To my knowledge, it's true of every cable company that

12  provides DOCSIS-based ISP services.

13  Q.   That the way to control a subscriber --

14  A.   That's correct.

15  Q.   -- is to turn off their Internet?

16  A.   That's correct.

17          MR. BUCKLEY:  Thank you.  No further questions, Your

18  Honor.

19          THE WITNESS:  Thank you.

20          THE COURT:  Redirect?

21          MR. ALLAN:  Yes, Your Honor.  Thank you.  Can we pull

22  up, Karl, PXS 005, 005 PXS?

23      REDIRECT EXAMINATION

24  BY MR. ALLAN:

25  Q.   Just going back to this exhibit, Dr. McGarty.  Mr. Buckley

2054

1    asked you several questions about Deleted Notice Not Stored in

2    CATS.  Do you see that?

3    A.   Yes, I see that.

4    Q.   What's your understanding of what's contained within that

5    column?

6    A.   I think it would be useful maybe to go to the document

7    itself and see exactly how Cox characterized it.  Can I do

8    that?

9    Q.   Can we pull up -- it's PX 1622 in your book, Dr. McGarty.

10   A.   Which one?

11   Q.   PX 1622.

12   A.   23.

13   Q.   22.

14   A.   1622.

15   Q.   Yes, sir.

16   A.   Hold on.  I have 1610.  1622.

17   Q.   That's it right there.  1622.

18   A.   1622.  Okay.

19   Q.   Okay.  Let's go to page 12, if we could, Karl.

20   A.   Okay.

21   Q.   And just to orient you, this is kind of split between two

22   different pages, between 12 and 13.

23        Does this -- maybe you can read for the jury the

24   sentence beginning, "E-mail notices received."

25        Do you see that third line?

T. McGarty - Redirect

2055

1  A.   Yes.  "E-mail notices received at abuse@cox.net that

2  relate to alleged copyright infringement are handled in one of

3  two ways.  If the sender is not blacklisted, the notice is

4  entered into the Cox CATS system; the second column in the

5  table below reflects those notices."

6          And that's the columns that says notices in CATS.

7  Q.   Okay.

8  A.   "If the sender is blacklisted, the e-mail notice is

9  automatically deleted and not entered into the CATS system,

10  with the exception explained below."

11          So if it is blacklisted, it doesn't go into the CATS

12  system, with an exception.

13  Q.   Okay.

14  A.   Okay.  "The third column in the table reflects those

15  notices."

16          So those notices are blacklisted notices that

17  apparently go nowhere except for what is described

18  subsequently.

19          "Cox only has data for those automatically deleted

20  notices beginning in mid-May 2010."

21          Again, if you look at the original table, there is no

22  notices for them at all because they were gone.

23  Q.   Just pause one moment for me, Dr. McGarty.  I want to

24  highlight this next sentence, Karl, beginning, "The figures in

25  the third column."

T. McGarty - Redirect

2056

1        Could you read that for the jury, please,

2   Dr. McGarty.

3   A.   Which one now?

4   Q.   The sentence beginning, "The figures" --

5   A.   "The figures in the third column in the table below do not

6   reflect e-mail notices that were not received at abuse@cox.net

7   because those notices were blocked by Cox at the mail server."

8        I believe that refers to the Rightscorp notices that

9   the front end just sends them off to nowhere.

10  Q.   Okay.  So is that the portion of the interrogatory answer

11  that leads you to believe --

12  A.   That's one of them, that's correct.

13  Q.   Very good.  And in this sentence you just read, is it your

14  understanding that that is referring to the third column being

15  Deleted Notices Not Stored in CATS?

16  A.   That's correct.

17  Q.   Okay.  And just so -- again, so we are all very clear,

18  what is your understanding of what all of this data in here

19  shows?

20        And if you could just drop down and show a little bit

21  of the chart, please, Karl.

22        Who are the complainants that are providing -- that

23  are sending in these notices?

24  A.   Who are the complainants who are providing these notices?

25  Q.   Right.

1          MR. BUCKLEY:  Foundation.

2          MR. ALLAN:  Let me rephrase, Your Honor.

3    BY MR. ALLAN: (Continuing)

4    Q.   Do you have an understanding as to whether this chart

5    contains the data for all of the complainants, copyright

6    complainants that have sent copyright notices to Cox other than

7    Rightscorp?

8    A.   To my knowledge, Rightscorp was the only one blocked from

9    even getting into it, but I don't know if Cox had similarly

10   blocked other complainants in a way it blocked Rightscorp.

11   Q.   So there may have been other companies blocked at the

12   server level?

13   A.   Yes.

14   Q.   Mr. Buckley asked you some questions about the Rightscorp

15   system.  Were you asked to evaluate the Rightscorp system at

16   all?

17   A.   Not at all.

18   Q.   Do you have an opinion on the Rightscorp system?

19   A.   I have no adequate knowledge and no ability to make an

20   opinion.

21   Q.   And just while we are on this, he also asked you whether

22   hold for more is stored in the Deleted Notices Not Stored in

23   CATS.  Have you seen anything -- what, if anything, have you

24   seen in the interrogatory answers that indicate that would be

25   the case?

1   A.   I see nothing to indicate that to be the case.

2   Q.   Do you under -- is it your understanding that the CATS

3   system can create a ticket for a notice of infringement that is

4   not otherwise acted on?

5   A.   I am sorry --

6   Q.   Let me rephrase the question.  Do you have an

7   understanding as to whether the CATS system can create a ticket

8   for a notice of infringement that might get filtered out

9   through one of the hurdles you mentioned in your direct

10  examination?

11  A.   My understanding is that the CATS system cannot do that,

12  no.

13  Q.   Do you have an understanding as to what Cox -- how Cox

14  defines the term "process"?

15  A.   Defines the term "process"?

16  Q.   Correct.

17  A.   In what context?

18  Q.   Are you familiar with Mr. Carothers' testimony in this

19  case?

20  A.   Yes, I am.

21  Q.   Do you have an understanding as to whether he testified

22  that process means not process?

23  A.   I have seen those e-mails --

24          MR. BUCKLEY:  Your Honor, mischaracterizes --

25          THE COURT:  Overruled.  You can answer the question.

1    A.   I have seen those e-mails go back and forth.  I think I --

2    yes, I do.

3    BY MR. ALLAN: (Continuing)

4    Q.   On cross-examination Mr. Buckley also showed you a number

5    of terminations in the 2010 and 2011 time frame.  Do you recall

6    that?

7    A.   That's correct, yes.

8    Q.   Do you have an understanding as to whether those were

9    actually real terminations of subscribers?

10   A.   I've seen information going back and forth in e-mails that

11   there was a habit of terminating, and then turning the customer

12   back on again, and recording that as a termination, but never

13   really doing so.

14   Q.   Let me hand you PX 1456, if I may.

15   A.   1456.

16   Q.   If you could pull that up, Karl.

17        This is already admitted, Your Honor.

18        Dr. McGarty, do you recall this as the ticketing

19   document you were asked about on cross-examination?

20   A.   Yes, I've seen this.

21   Q.   And Mr. Buckley asked you some questions about whether

22   this document contained ticketing information on Rightscorp

23   notices, do you remember that?

24   A.   Yes, I do.

25   Q.   Do you know whether or not any of the notices or any of

1    the tickets that were created here were created based on

2    Rightscorp notices?

3    A.   I believe at that time Rightscorp had already been

4    blacklisted and wasn't going into the system.

5    Q.   And again, looking at this ticketing history with all the

6    Sent Warnings DMCA -- if we can scroll down on that, Karl,

7    please.

8            How, if at all, does this impact your opinion in the

9    case?

10   A.   This is a multiple repeated offender that just keeps

11   offending and offending and never seems to reach an end.  And

12   some of the offenses are significant.

13           And the other thing is that some of the levels to

14   which this is raised are just Send Warning, Send Warning, Send

15   Warning.

16           So given after all of these offenses, you would think

17   you would get something more than a severe warning.

18   Q.   So what does this document tell you, if anything, about

19   the design and the implementation of Cox's system to address

20   copyright infringement on its network?

21   A.   It reaffirms my assessment right at the beginning that

22   what Cox has is a system that kind of looks like it's doing

23   something appropriate, but when you take a look at the end

24   result, it accomplishes nothing.  And that's my summary.

25           MR. ALLAN:  Very good.  Nothing further, Your Honor.

```
 1              THE COURT:  All right.  Thank you, Dr. McGarty,
 2     you're excused with our thanks, sir.
 3              Have a good evening.
 4              THE WITNESS:  Thank you, sir.
 5              NOTE:  The witness stood down.
 6              MR. ALLAN:  Your Honor, we have no further witnesses.
 7     If we could confer, just there might be some housekeeping
 8     matters we can -- we may need to deal with.
 9              HE COURT:  I'm sorry.
10              MR. ALLAN:  We have no further witnesses, Your Honor.
11     So there may be some housekeeping issues we can deal with.
12              THE COURT:  All right, let's take 15 minutes and
13     we'll come back and see where we are.
14              All right, thank you.
15              NOTE:  At this point the jury leaves the courtroom;
16     whereupon the case continues as follows:
17     JURY OUT
18              THE COURT:  All right.  We'll take a break and let
19     you do that.
20              I'm also continuing to struggle with the mitigation
21     instruction.  And certainly Dr. McGarty's testimony went to
22     that, but I had already been concerned about how Cox could
23     prove that BMG, through not forwarding -- not taking the
24     settlement clause out of the notices, what calculation there
25     could be as to how the jury could reduce any award that it
```

1    believed was appropriate under the statutory damage regime.

2           And, of course, Dr. McGarty's testimony is, I think,

3    right on point to what I've struggled with, is, you know, the

4    notices weren't going through regardless of whether they were

5    blacklisted or not.  And if the settlement clause had been

6    removed, then only a small number of notices would have gotten

7    through.

8           So I'll give you a chance to talk about and then I

9    would like to hear your comments when we come back.  So let's

10   take 15 minutes, we'll come back at 10 of 5, and we'll probably

11   not do closing instructions to the jury tonight.  That would

12   mean we would keep them -- well, let's see how we go when I

13   come back.  So we're going to take 15 minutes.

14          We're in recess.

15          NOTE:  At this point a recess is taken; at the

16   conclusion of which the case continues in the absence of the

17   jury as follows:

18   JURY OUT

19          THE COURT:  Okay.  Do we have -- is BMG done with its

20   rebuttal case, and do you have additional matters to discuss

21   or --

22          MR. KELLEY:  We've got, I think it's housekeeping on

23   both sides.

24          THE COURT:  Okay.  Well, let's --

25          MR. KELLEY:  We've got exhibits.  They want to

2063

1   introduce exhibits; we want to introduce.  I just want to make

2   sure it didn't get lost in the stampede to close.

3          THE COURT:  Okay.  Well, it looks like to me we're

4   going to spend the next half an hour talking about jury

5   instructions because I want to hear any further comments you

6   want to make on mitigation, and then I've got to get a final

7   package to you, then I've got to give you 10 or 15 minutes to

8   look at it, and then I've got to give you time to make your

9   objections.

10          So why don't you -- you know, there's no reason to

11   keep the jury around, and then I won't get the instructions

12   started until 5:30, and they'll take a half an hour or so.  So

13   let's let the jury go now if the evidence is concluded and tell

14   them we'll do the instructions and the closing tomorrow.

15          Does that work for everybody?  Is there any reason

16   that we need the jury to hear anything else?

17                    (No response.)

18          THE COURT:  Okay.  Then, Joe, let's get our jury out

19   here, and let me let them go.

20          MR. BRIDGES:  Your Honor, while they're coming in,

21   when would you want us to make our JMOL?

22          THE COURT:  Yeah, I'll let you do that tonight as

23   well.

24          MR. BRIDGES:  Okay.  Thank you.

25   JURY IN

2064

```
 1              THE COURT:  All right.  Please be seated.

 2              All right.  That concludes the evidence in the case,

 3    so I'm going to let you go now.  We've got some -- we'll be

 4    here for another 40 minutes talking about different legal

 5    issues, and I don't -- I think I might have said that I would

 6    try and give you the instructions tonight, but I don't want to

 7    keep you late to do that.

 8              So tomorrow morning, you'll hear my instructions to

 9    you on the law, and then the parties will make their closing

10    arguments, and then we'll get the evidence back to you, and as

11    we talked a couple of weeks ago, you'll select a foreperson and

12    begin to deliberate.  So I expect that you'll have the case for

13    deliberations, you know, tomorrow lunchtime or there around,

14    okay?

15              So again, it's very important that you go home and

16    enjoy the evening, not discuss the testimony with anyone, and

17    also not do any research or investigation, all right?  Thank

18    you so much.  You're excused for the evening.

19    JURY OUT

20              THE COURT:  All right.  Have a seat.

21              Before I forget, we need -- you need to decide

22    whether you want to allow the additional alternate jurors to

23    deliberate, and if both parties agree, I'm happy to let them

24    deliberate.  I'm sure they would like to deliberate, but if

25    either side objects, then we'll go down to the original six who
```

1    are still with us.  Well, we'll see what happens tomorrow

2    morning, but right now they're with us.  So you can talk about

3    that.

4            So how -- do you want to do the -- let's do the

5    mitigation first.  Mr. Theodore?

6            MR. THEODORE:  So, Your Honor, I think we've heard

7    unrebutted testimony that at least for the vast majority of

8    notices, when they go into -- when they're sent to Cox, nothing

9    happens, and for Rightscorp notices, because of the volume of

10   them and the 200 hard limit, that number is going to be even

11   higher.

12           So based on that, there's no factual basis for a

13   mitigation instruction here, and on top of that, on top of

14   that, there's no calculation and there's no basis for

15   calculating the amount of what mitigation might be.

16           Now, what's being mitigated is the portion of

17   statutory damages that relates to actual damages.  Now, we have

18   heard a calculation of actual damages, and we had our

19   objections to it, and it went into evidence, but there's been

20   no, no suggestion whatsoever as to the calculation of

21   mitigation.

22           Third, and this goes to the -- sort of the essence of

23   mitigation itself, is that Cox, not BMG, is in the best

24   position to deal with the settlement language in the notices.

25   Cox could have removed the settlement language if it wanted to,

1    but not only that, we didn't just send settlement -- copyright

2    infringement notices containing settlement language.  There is

3    also the weekly roll ups.  There's also the Dashboard.

4            Cox had this information in all sorts of ways, not

5    including the settlement language.  It was there.  It was there

6    in a machine-readable way that they could have looked at, and

7    they were the ones who chose to do nothing with it.  We

8    provided the information to them without the settlement

9    language, and they chose to do nothing.  So for them then to

10   come back and say, oh, we failed to mitigate our damages by

11   taking out the settlement language, I just don't think that

12   there's a factual basis for that.

13           And finally, even if mitigation is properly in this

14   case, it's not properly in as a stand-alone defense jury

15   instruction.  It's at most one little piece of the actual

16   damages factor in the statutory damage instruction.  It's

17   completely disproportionate to its significance and its role in

18   the case to pull it out into its own giant instruction that

19   improperly magnifies and emphasizes it for the jury far beyond

20   what's justified by the evidence.

21           THE COURT:  Okay.  Thank you.

22           MR. WAKEFIELD:  Your Honor, there are two paths that

23   the evidence has shown were available to BMG and Rightscorp to

24   mitigate this damage, and instead of following those paths,

25   they sat there for three years and let a machine send literally

2067

1    tens of millions of e-mails, knowing they weren't being

2    received.

3           The testimony that I think gave the Court some pause

4    today from Dr. McGarty was a suggestion that, well, if they had

5    gone through, upwards of 88.9 percent of them would have gone

6    nowhere.  That is not what the data showed that Mr. McGarty

7    reviewed.  What he did is he combined other blacklisted people.

8           If Rightscorp had fixed its notices and sent them

9    along, they wouldn't have been in that new column of

10   4.6 million notices that give him the 90 percent.  The evidence

11   shows that when people went into the CATS system, which

12   Rightscorp would have been able to do had they cured the

13   defects in their notices, the system did work.  There's

14   evidence, and they'll -- obviously, we're going to fight about

15   it in closing arguments, and the jury may fight about it back

16   when they're deliberating, but the evidence showed that within

17   receiving five notices, 96 percent of the time, the accounts

18   stopped receiving complaints because people would say, oh,

19   there's a problem on my system, I'm going to stop this, or I'm

20   going to stop my kid, or I'm going to secure my WiFi, and they

21   knew they could be seen with what they were doing.  It makes

22   sense that they would stop.  That system was available to them,

23   and there's, you know, competing evidence to argue, but there's

24   definitely evidence to support that instruction.

25          The other path that was available, and the evidence

2068

1    shows this, is that Rightscorp knew about and did, in fact, use

2    subpoenas and John Doe lawsuits to go after the egregious

3    people and could have done that here but didn't.

4          And more generally, Mr. Hubert testified he never

5    picked up the phone.  He never reached out.  He never contacted

6    us at all.  It was all outsourced to Rightscorp to just send

7    notices, and I think given that, the jury could find that there

8    was a failure to mitigate, and failure to mitigate, for the

9    reasons we put in our jury instructions briefing, can be a

10   stand-alone defense to statutory damages, not just a factor,

11   and one that can eliminate the recovery of damages in

12   appropriate cases.  So that's why it needs to be, in our view,

13   a stand-alone defense.

14         THE COURT:  Okay.  Thank you.

15         MR. THEODORE:  So let's say that all the Rightscorp

16   notices had gone into the system.  200 a day times 365 days

17   times 3 years, that's about 200,000 notices.  That's about 1

18   percent.  At maximum, 1 percent of the Rightscorp notices would

19   have been acted on under their system, completely ignoring the

20   settlement offers.

21         So the suggestion that if we just removed the

22   settlement offers, that something would have happened, there's

23   no factual basis.  Their interrogatory responses, and just the

24   part of the interrogatory response relating to the 200 hard

25   limit, shows that there is no basis for a mitigation

1   instruction.

2          Now, Mr. Wakefield referred to the 96 percent, and I

3   think we've had a fair amount of discussion on it, but I think

4   for this purpose, it's pretty clear that the 96 percent doesn't

5   show what they're claiming the 96 percent does.  The 96 percent

6   is just sort of the rolling average of how many people get to

7   what level of the graduated response within six months, but

8   when you're cutting out 90 percent of the notices and you're

9   cutting off -- and you're dropping off all infringements at the

10  back of the six months, the fact that people, that 96 percent

11  only get to level 5 doesn't really show you what's happening in

12  terms of how much they're infringing.  It's not actual evidence

13  of how effective their system is.

14         And I think finally, the critical thing here is that

15  it's not appropriate for Cox to construct a scheme to ignore

16  notices and then turn around and say, oh, unless you play by

17  the rules of our scheme and give up your right to ask for

18  settlements, that you haven't mitigated your damages.  I mean,

19  that turns things fundamentally upside down.

20         THE COURT:  Well, during the break, I actually was --

21  I did the math that you just did here, and it is -- actually, I

22  thought it was -- it's far less than 1 percent, but it is a

23  calculate-able, quantitative amount that the jury could

24  consider.  There's also the testimony about how Cox worked with

25  customers and if they wanted -- you know, pled for more than

1    200, there's some evidence that they would be allowed to get

2    400 notices through, and I think that testimony got in.  There

3    was the RIAA testimony where there was negotiations.  I didn't

4    see any final number, but there were negotiations.

5              So what are you going to say now?

6              MR. THEODORE:  Well, I understand that.  I understand

7    where you're coming from on that, Your Honor, but I don't think

8    it changes the fundamental point that, one, the vast

9    majority -- I mean, the vast majority of what they're talking

10   about still would have been ignored.  The effect that they are

11   going to claim for mitigation, the effect that they are

12   claiming for mitigation essentially would not have occurred.

13   You can pull out some teeny little pinprick amount, but the

14   effect they're asking for isn't a real effect in this case.

15             THE COURT:  Well, that's argument to the jury.

16   That's for the jury to decide what they wish to do.  I'm going

17   to give a stripped-down Ninth Circuit instruction on the

18   mitigation, just the elements and the burden, and then the

19   reason that a separate instruction is necessary is it's the

20   only affirmative defense that Cox has, so -- sit down.

21             So I think that it's appropriate to identify the fact

22   that it is an affirmative defense and that they have the

23   burden, and that doesn't come through if all you're doing is

24   adding it as one of the factors for statutory damages, which I

25   also have done, all right?

1          So your exception is noted, but -- so housekeeping

2   matters, let's talk about those.

3          MR. REILLY:  Your Honor, I have a very simple one, if

4   I may.

5          THE COURT:  Yes, sir.

6          MR. REILLY:  The parties noted that we had either

7   misstated or it had been mis-transcribed two of the exhibit

8   numbers that the parties agree have been admitted based on your

9   rulings, and I talked with Mr. Linnell, and he thought the best

10  way to correct this would simply be to read it into the record.

11         THE COURT:  That's fine.

12         MR. REILLY:  And hopefully Ms. Thomson will

13  accommodate us.

14         At page 1414, line 6, an exhibit was recorded as

15  DTX 0113, but the parties agree it should be DTX 0133, which

16  you had admitted.

17         THE COURT:  Okay.

18         MR. REILLY:  And at page 776, at lines 6 through 12,

19  an exhibit was identified as -- sorry, this is PX 2389, and the

20  parties agree it was admitted as and should be referred to as

21  2839.

22         And I'll further report it took six lawyers, three

23  paralegals, all the king's horses and all the king's men to

24  find two transcription errors in 2,000 pages of trial exhibits.

25         THE COURT:  That's not bad.

2072

1           MR. REILLY:  So your staff is doing a great job.

2           THE COURT:  Thank you.

3           MR. REILLY:  Thank you, Your Honor.

4           THE COURT:  Ms. Jobson.

5           MS. JOBSON:  Good afternoon, Your Honor.  The

6    defendant had provided last week some proposed

7    self-authenticating documents to the Court.  I have an updated

8    binder because through the course of some negotiations with

9    counsel, we've adjusted things.

10          THE COURT:  Are there still objections to some of

11   these?

12          MS. JOBSON:  Yes.

13          THE COURT:  Okay.  So I need to see them.  Thank you.

14   All right.

15          MS. JOBSON:  And I thought it might make sense, Your

16   Honor, to start actually towards the back.  There's a group of

17   documents that we may be able to treat together, starting with

18   DTX SC0068.  I think in your binder, the documents are all in

19   blue.

20          THE COURT:  Okay.

21          MS. JOBSON:  These are printouts of source code that

22   we'd like to move into the record.  I believe plaintiffs would

23   want it to be under seal, which we are amenable to.  These are

24   modules --

25          THE COURT:  Rightscorp?

1          MS. JOBSON:  Rightscorp's source code, yes.

2          The first one, 0068, is the test5 module, the

3    Infringement Finder that Ms. Frederiksen-Cross discussed,

4    Mr. Boswell discussed, Mr. Steele discussed, and Mr. Rucinski

5    discussed, and I believe Mr. Bardwell relied on this, the

6    output from this module for his analysis.

7          THE COURT:  What's the objection to this one?

8          MR. KELLEY:  Your Honor, it's basically a foreign

9    language.  You know, in fact, you heard Mr. McGarty say not

10   even he speaks Java.  And so what you've got is, is you don't

11   have any witness who's sat down and gone through it and said,

12   okay, here's how it runs, and look at this and look at this.

13   It's just throwing stuff in that nobody understands.

14         THE COURT:  Is this for the appellate record, or what

15   use are you going to make of this?  Why is it relevant, I

16   guess?  I mean, it has been testified about, and, you know, it

17   would have been authenticated if BMG's witness had been asked

18   about whether this was, in fact, what she reviewed, and so I

19   get that part, but where -- what's -- why?

20         MS. JOBSON:  So there's a couple specific things.  On

21   the next module, which is SC0230, this one represents the 10

22   percent code, the 10 percent bitfield, and the jury may be able

23   to see right in the middle where that 10 percent is

24   implemented.  Actually, about two-thirds of the way down.

25         And then in the following module, DTX SC0272, which

1    is the experimental code from 2013, which describes Boswell

2    experimenting with the different messages from BitTorrent,

3    you'll see at the very bottom some of those messages, including

4    "KEEP_ALIVE," and then on the next page, the

5    "PeerProtocol.INTERESTED," the "PeerProtocol.NOT INTERESTED,"

6    the "PeerProtocol.HAVE," and the "PeerProtocol.BITFIELD."

7         These were all things that Ms. Barbara

8    Frederiksen-Cross alluded to in her deposition -- or in her

9    trial testimony and that Mr. Rucinski also discussed in his

10   testimony, and it may be useful for the jury to peruse through

11   this code to see what they can see from it.

12        THE COURT:  Well, is Cox in its closing argument

13   going to comment on what this information means and how it

14   should be considered by the jury?

15        MR. BUCKLEY:  Your Honor, could I propose a

16   compromise?  The short answer to that is we might.  Test2.java

17   and the two files that implement the bitfield, the language in

18   those documents has implications that we might argue from.  I

19   think that's less true of test5.  The jury heard a lot about

20   it, and we've got some folks with some IT capability who I

21   suppose might want to look at it.  I don't think test5 is as

22   important, but test2 and the two 10 percent files matter.

23        THE COURT:  Yeah, but the point is that although

24   they're authenticated in respect to the fact that they

25   represent code, there was no testimony surrounding it.

2075

1          MR. BUCKLEY:  There was significant testimony,

2    actually.  Both Ms. Frederiksen-Cross and Mr. Rucinski

3    testified about test2, and a number of witnesses, including the

4    Rightscorp folks, testified about the two files, the 10 percent

5    bitfield files.

6          THE COURT:  All right.  What's BMG's response to

7    that?

8          MR. KELLEY:  There was general testimony about what

9    the code does, but nobody sat there and, you know, in essence,

10   put the code on the screen and said, okay, here's how it works,

11   and go through it line by line.  In essence, what they want to

12   do is they want to stick it up there and then say, you know,

13   they say 2013 functions the same way as 2015.  Well, look at

14   it.  It doesn't look the same.

15         THE COURT:  Yeah.  All right.  I'm not going to let

16   those exhibits in.  Your exception is noted.  The testimony

17   will be the testimony that we heard, and, you know, the 10

18   percent issue has been -- there's been testimony about that

19   from several witnesses.  So this is utterly confusing, No. 1,

20   and also, as Mr. Kelley said, nobody has identified where in

21   here they -- any expert was relying with any specificity, and,

22   therefore, just pointing to different areas in the document

23   without them having been sponsored in some more particular

24   fashion is improper.  So I'm going to exclude those.  Exception

25   is noted.

2076

1              What's the next one?

2              MS. JOBSON:  Okay.  We go to, move to DTX 0076.  This

3    is an internal e-mail between Mr. Hauprich at BMG and

4    Mr. Steele -- sorry, not internal, but between Mr. Hauprich and

5    BMG.

6              THE COURT:  Okay.  I'm sorry, DTX --

7              MS. JOBSON:  DTX 0076.

8              THE COURT:  All right.  I didn't hear.

9              MS. JOBSON:  Sorry.  E-mail between Mr. Hauprich at

10   BMG and Mr. Steele in the course of their business

11   relationship.

12             THE COURT:  All right.  What's the objection?

13             MR. KELLEY:  I've got multiple problems with this.

14   No. 1, I don't see why it's relevant.  It doesn't involve any

15   of the copyrights at issue.  It's outside the relevant

16   timeframe.  If you'll note, it's January of 2015, and it's also

17   got the hearsay in it from some customer calls somebody -- I

18   guess this Ashley Villone, communicating something, and then

19   it's passed up the chain.  But the main thing is I don't see

20   what it has to do with anything in the case.

21             THE COURT:  All right.  I'll let it in.  Exception is

22   noted.

23             Next one.

24             MS. JOBSON:  Thank you.  I will move to the next one

25   in the binder, DTX 0077.  This one is a 2014 e-mail between

1    Mr. Hauprich at BMG and Mr. Steele in the course of their

2    business interactions.

3              THE COURT:  Hold on.  I've got a 78.  Are you saying

4    there's a 77?

5              MS. JOBSON:  77.  If it's not in your binder, you're

6    welcome to have mine.

7              THE COURT:  Well, let me look a second time because I

8    can lose anything and not find lots of stuff.

9              No, I don't have that one.

10             MS. JOBSON:  May I pass you mine?

11             THE COURT:  Yes, please do.  I have an 87, but it's

12   77.

13             MS. JOBSON:  77.

14             THE COURT:  Okay.  And I have a 717, but I don't have

15   a 77.

16             Okay.  I'm with you.

17             MS. JOBSON:  We'll get to those.  So this one again,

18   Your Honor, is a 2014 e-mail between Mr. Hauprich at BMG and

19   Mr. Steele in the course of their business relationship.

20             THE COURT:  All right.  And the reason for the

21   objection?

22             MR. KELLEY:  Again, I don't see what it has to do

23   with anything, but I also don't see that it hurts.  So we

24   withdraw our objection to this.

25             THE COURT:  All right.  It's received.

2078

1          MS. JOBSON:  Thank you.

2          The next one I have is DTX 078.

3          THE COURT:  Okay.

4          MS. JOBSON:  Which is a sample settlement receipt

5   generated as part of the Rightscorp system, which

6   Ms. Frederiksen-Cross, I understand, talked about the part of

7   the Rightscorp system that generated these notices -- these

8   receipts.

9          THE COURT:  So this is an example of a customer

10  responding to the notice and providing --

11         MS. JOBSON:  I think the top of the document provides

12  useful:  the Liability Release & Settlement Receipt generated

13  by the Rightscorp system.  You'll see in the second paragraph

14  below the chart, it has, "forever discharges Robert Steele."

15  So we understand this to be a sample exemplar as generated by

16  the system at issue.

17         THE COURT:  Okay.  What's the objection?

18         MR. KELLEY:  It's not an actual notice.  It's just an

19  exemplar.  With that caveat, we have no objection.

20         THE COURT:  All right, it's received.

21         MS. JOBSON:  The next one I have is DTX 0245.

22         THE COURT:  All right, gotcha.

23         MS. JOBSON:  This one, you'll see at the top 2013,

24  "Staff Meeting Notes," and towards the bottom is referenced

25  "Keith/Legal," which we understand to be Mr. Hauprich, these

1    being notes from a meeting as part of the general.

2              THE COURT:  Okay.  Objection?

3              MR. KELLEY:  Mr. Hauprich, who was here, could have

4    been asked about this.  He wasn't.  He testified in his

5    deposition about it and said he didn't think that this was

6    correct.  I have the excerpts of the deposition, the

7    representation here about Bruno Mars, and that's who Bruno is.

8              And so you've got multiple levels of hearsay.  As

9    near as I can tell from the deposition, Bruno tells somebody

10   who manages Bruno, who tells somebody at BMG, and it kind of

11   works its way into the chain.  Mr. Hauprich could have been

12   asked about this and clarified his doubts as to its veracity in

13   the notes but was not.  Like I said, I have the deposition

14   testimony here.

15             THE COURT:  I think he was asked about it, right,

16   generally?  Was he asked about there were some artists who

17   didn't want Rightscorp to send notices out?  Didn't I remember

18   some testimony about that, or did I strike that for some --

19             MR. KELLEY:  I don't remember that coming in, but

20   there's been so much.  And I definitely don't -- there wasn't

21   any discussion about this specific document which deals with

22   Bruno Mars and KOL, who I think to be Kings of Leon.

23             THE COURT:  Okay.

24             MS. JOBSON:  Your Honor, the point that Mr. Kelley

25   raises is a similar point as with many of the e-mails from

2080

1   Jason Zabek and within the team, that they are back and forth

2   and not necessarily reflective, and those, I believe, are

3   mostly, for the most part in the record.

4            THE COURT:  All right.  Well, I'm not going to -- I'm

5   going to exclude this one because there were doubts raised in

6   the deposition as to the reliability of the information in the

7   document itself.  So that's out.

8            Next one?

9            MS. JOBSON:  DTX 0408.  This again is an internal

10  e-mail between Mr. Sabec and Mr. Steele in 2014.

11           THE COURT:  Okay.  DTX what?

12           MS. JOBSON:  My apologies, 0408.

13           THE COURT:  Okay.  I don't -- well, let me make sure,

14  because I just found DTX 77.

15           MS. JOBSON:  Ah.

16           THE COURT:  I don't have that one, so if I could have

17  your copy to look at for a minute?

18           MS. JOBSON:  Certainly.

19           THE COURT:  I'm sorry, did you say 408?

20           MS. JOBSON:  Yes.

21           THE COURT:  I do have it; I apologize.  Give that

22  back to Ms. Jobson.  Thank you.  I'm worse than Dr. McGarty.

23           All right.  Go ahead.

24           MS. JOBSON:  So again, Your Honor, this one is an

25  e-mail between Mr. Sabec and Mr. Steele from 2013 referencing

1  Mr. Cadenhead and the notices at issue in this case.

2          MR. KELLEY:  I don't see anything about

3  Mr. Cadenhead.  Am I on the right one?

4          MS. JOBSON:  Um-hum, Mr. Cadenhead.

5          MR. KELLEY:  Oh, there he is.  "Weekly roll-ups were

6  going to Cadenhead."  Our problem with this one is context.  I

7  mean, it would have been okay if they had brought it up with

8  Mr. Steele, and, in fact, something along these lines was

9  brought up.  I'm not sure what it means or what it says.  It's

10  awfully cryptic and has frowny faces that I don't really quite

11  understand the import of.

12          THE COURT:  I guess it could go to the fact that

13  Cadenhead was staying on top of the numbers that were --

14          MR. KELLEY:  Well, this is between Steele and Sabec,

15  so this is purely internal Rightscorp thing, and we saw those

16  letters going to Mr. Cadenhead and Mr. --

17          THE COURT:  All right.  I'll allow it.  It's

18  received.

19          MS. JOBSON:  Thank you, Your Honor.  Next I've got

20  DTX 0687.  I'll wait until we've located it.

21          THE COURT:  I've got that one.

22          MS. JOBSON:  Oh, okay.  Great.  This one again is an

23  internal e-mail between individuals at BMG in late 2011

24  generated in the course of their business and contemplating the

25  Rightscorp business model.  0687.

1          THE COURT:  Okay.  Mr. Kelley?

2          MR. KELLEY:  Once again, it's a context matter,

3    although this one is not as bad as the other one.  It could

4    have been brought up with Mr. Hauprich when he was here and

5    able to testify.

6          THE COURT:  Yeah.  I mean, "I am intrigued by this.

7    The only point I made to Gregg . . . is the precedent of a $10

8    charge for an infringement.  Is this a possible exposure for

9    us?"

10          Yeah, I'm going to -- I'm not going to admit 687, and

11    your exception is noted.

12          MS. JOBSON:  All right.  The next one I have is 0717.

13          MR. BRIDGES:  DTX?

14          MS. JOBSON:  Yes, it's DTX 0717.

15          THE COURT:  All right, I have that.

16          MS. JOBSON:  Okay, great.  This one again is a 2013

17    e-mail, internal to BMG.  This goes to the state of mind of how

18    they were planning to enforce copyrights through Rightscorp.

19          If you'll scroll down to -- I guess it's not

20    scrolling, turning to the second page there, you'll see that

21    the earlier e-mail in the chain is with Mr. Christopher Sabec.

22          MR. KELLEY:  It looks to me like this is a business

23    deal they were contemplating, not one that was done.  You see

24    up in the top e-mail, "What if we give him everything and

25    should a client object, they will rescind the notice sent to

1    the user and refund their dollars."

2         My understanding of this is, is that they were

3    talking about the entire catalog, expanding what they looked

4    at, as opposed to enforcement of these particular copyrights.

5         THE COURT:  So why is this relevant?

6         MS. JOBSON:  Your Honor, it goes to their business

7    dealings with Digital Rightscorp and enforcement of the

8    copyrights through Digital Rightscorp.

9         THE COURT:  Okay.  I'm not going to permit the

10   document.  Your exception is noted.  You know, this is an

11   ongoing negotiation, and there was significant testimony about

12   it, and this could have been raised to clear up what is being

13   talked about here, but as with the information that is in this

14   e-mail, it's -- I agree with Mr. Kelley that it looked like

15   ideas just being bounced back and forth about how to handle the

16   business end, and so it's more confusing, and it doesn't settle

17   any issues.

18        So go ahead, next one.

19        MS. JOBSON:  The next one I have, Your Honor, is DTX

20   0947.001, and it goes together with the following document,

21   .002.

22        MR. KELLEY:  I had the wrong number.  I have it.

23        MS. JOBSON:  Great.  Are we all together?  Sorry.

24        THE COURT:  Yes, I'm there.

25        MS. JOBSON:  This one is a 2013 e-mail, and if you

1    look at them together, the two documents, .002 and .001, you'll

2    see it's BMG forwarding communications to Digital Rightscorp

3    concerning whether or not -- I believe it's Clearwire was

4    accepting Rightscorp's notices.

5            THE COURT:  Okay.  Why is that relevant?  Why hasn't

6    that been ruled on, at least the subject matter of it, already?

7            MS. JOBSON:  I believe it was earlier in the case we

8    brought this to Your Honor's attention, and at the time, we had

9    not yet opened the door to this type of evidence, and now it

10   has been opened, and we'd like to move this into evidence on

11   that basis.

12           THE COURT:  Okay.  Mr. Kelley?

13           MR. KELLEY:  Your Honor, the e-mail attaches an

14   opinion letter from the Davis Wright Tremaine firm.  That's the

15   .002, and that -- I mean, we've been very careful here about

16   everybody's opinion letters, but this thing is chockablock full

17   of legal analysis from somebody who isn't here.

18           THE COURT:  Yeah.  The import of these two documents

19   is, the fact that there's a legal opinion from Davis Wright --

20           MS. JOBSON:  Your Honor, I would actually want to add

21   one thing:  Not so much the content of the legal opinion, but

22   the fact that Rightscorp was on notice and understood that

23   other ISPs were not accepting its notices.

24           THE COURT:  Well, all right.  And as we -- well, I

25   let that testimony in, and there was testimony about numbers,

1   but I'm certainly not about to let in an opinion letter from a

2   third-party law firm from a third-party entity when there has

3   been no opinion by Cox as to the same issue.  So your exception

4   is noted.

5           MS. JOBSON:  Moving on to DTX 3553.SAMPLE.

6           THE COURT:  I'm there.

7           MS. JOBSON:  This one is a sample from the hard drive

8   that was produced as part of this litigation.  Ms. Barbara

9   Frederiksen-Cross discussed the samples generally that were

10  drawn from this hard drive that was produced, as well as

11  Mr. Bardwell and Mr. Rucinski.

12          THE COURT:  And the relevance?

13          MS. JOBSON:  Your Honor, this goes to the samples

14  that were collected and suggested as part of the samples that

15  Rightscorp took to verify the infringements that it claimed to

16  have detected on Cox's network.

17          THE COURT:  Okay.  So get -- give me more reference.

18          MS. JOBSON:  So you'll, you'll recall that -- you'll

19  recall that the Rightscorp software at a certain point after

20  having generated notices downloaded samples.

21          THE COURT:  Right.

22          MS. JOBSON:  And this is an example of one of the

23  samples that was perhaps meant to verify a song, but it's not a

24  song.

25          THE COURT:  It was one of the improper notices,

2086

1  notices that were not actual infringements of copyright

2  material.

3          MS. JOBSON:  It's a sample that was downloaded --

4          THE COURT:  Right.

5          MS. JOBSON:  -- and produced in discovery.

6          THE COURT:  Okay.  Mr. Kelley?

7          MR. KELLEY:  Again, the issue is the lack of a

8  sponsor.  Ms. Frederiksen-Cross could have been asked about

9  this and put it in.  Instead, what's going to happen is the

10  jury is going to have in its exhibits a completely unidentified

11  article about something that happened with the Grateful Dead in

12  England in 1972.  How they're going to make head nor hair of

13  this, I have no idea.

14          MS. JOBSON:  Mr. Rucinski actually testified,

15  discussed this sample specifically, I believe.

16          THE COURT:  Okay.  I'll let it in.

17          MS. JOBSON:  Okay.  And this is -- the next one may

18  be our -- no, not our last one, I'm sorry.  DTX 3559.  This is

19  the privilege log of Ms. Barbara Frederiksen-Cross, and this

20  one, we believe, goes to the state of mind regarding

21  Rightscorp's and BMG's knowledge that they had a duty to

22  preserve the Rightscorp software.  As you'll see, the dates

23  begin back in 2013.

24          MR. KELLEY:  It's not the date that the lawyers

25  generated.  That was the date of the document.  And I thought,

I thought the duty to preserve had already been resolved.

MS. JOBSON: And Judge Anderson did rely on this particular document in his --

THE COURT: Yeah, I'm not going to -- your exception is noted. I'm not going to let this document in. It's just that there's no -- this has been litigated. Judge Anderson has made his ruling. I've got a spoliation instruction that says that documents were not -- that the software system -- that the source code was overridden, and that as a result, Cox was unable to test the infringement.

So I guess I could identify the dates, but if you -- that's -- the dates are not in the instruction. So if you want me to add the dates that Judge Anderson actually has in his opinion, I believe, doesn't he have -- then I'll do that, all right?

MS. JOBSON: Thank you, Your Honor.

THE COURT: But I'm not going to let this underlying document in, okay?

MS. JOBSON: Thank you.

THE COURT: All right.

MS. JOBSON: I've got one more document that I believe is just sort of a -- we had some confusion about.

THE COURT: Okay. It's not in here?

MS. JOBSON: No. I have a copy for you right here. My apologies. We're just cleaning up our exhibit list amongst

1    ourselves.

2          My understanding is that this particular document was

3    associated with testimony in Mr. Christopher Sabec's videotape

4    that was played but that the videotape was stopped, and so that

5    the surrounding testimony didn't come in, but there had been no

6    objection to the document.

7          THE COURT:  Okay.  The document is not coming in,

8    either.  My ruling was that I wasn't going to get into the who

9    published what about what suit and who said, commented to the

10   news about any, about whether the suit was valid or invalid or

11   people tried to make, you know, some marketing material out of

12   it.  I find all that's irrelevant, and so your exception is

13   noted.  I'm going to exclude the document as well.

14         MS. JOBSON:  Okay.  And did you have any additional

15   documents, or should we move into the self-authenticating

16   documents?  I don't have any documents -- or, sorry, the

17   judicial admissions.

18         MR. KELLEY:  Sorry to tag team in Mr. Allan, but he

19   has one here that I'm not familiar with.

20         THE COURT:  Sure.

21         MS. JOBSON:  I don't know that I am, either.  Or is

22   this the one you handed me earlier?

23         MR. KELLEY:  No, I'm not sure what he's doing.

24         MR. ALLAN:  This is a quick question about one you've

25   already admitted, Your Honor.  DTX 408 was just admitted.  This

1   is the one where Mr. Sabec and Mr. Steele are testifying, are

2   stating in an e-mail, "There is going to be a problem."  I

3   think there is another e-mail that follows up on this that

4   explains, oh, there's actually not a problem, and if this is

5   going to come in, Your Honor, we'd like that one to come in as

6   well from a fairness perspective.

7           We don't have that here.  And my memory -- we've seen

8   a lot of e-mails, so if it pleases the Court, if we could check

9   on that tonight and, if there is such an e-mail, move it in

10   tomorrow?

11          THE COURT:  Yeah, it sounds like it would be

12   admissible on that basis, so see if you were dreaming about it

13   or whether it exists, and we'll consider that in the morning.

14          MR. ALLAN:  Sadly, I have dreamt about e-mails in

15   this case, Your Honor.

16          THE COURT:  Yeah.

17          MS. JOBSON:  I understand completely.

18          Oh, you have another one?

19          MR. KELLEY:  We have two.  I'd like to move two

20   judicial admissions, if that's okay.

21          MS. JOBSON:  Sure.

22          MR. KELLEY:  This is PX 2170 is the number, and it's

23   some back-and-forth between Mr. Zabek and Mr. Sikes, and it

24   deals with the reduction in force.  I think the really

25   pertinent one is at the bottom of the second page, below the

1    redacted for privilege.  And it says it was sent on 01 Mars.

2    For some reason or another, this gets translated into French,

3    I'm not sure why, but anyway, it has to do with the reduction

4    in force that has been talked about a lot within the abuse

5    staff and how they ended up quite shorthanded.

6            MS. JOBSON:  Your Honor, this document is dated from

7    back in March 2011 for one, and counsel had the opportunity to

8    ask Mr. Sikes and Mr. Zabek about this in their deposition, and

9    I don't believe they did.  It's not marked as a deposition

10   exhibit, and it lacks context that they could have gotten from

11   deposition if they were wanting to ask about it then.

12           THE COURT:  Well, it is during the period of the

13   reduction that was testified about, right?  Didn't they -- I

14   think --

15           MR. KELLEY:  Your Honor, it's about the reduction

16   itself.

17           THE COURT:  All right.  Okay.

18           MS. JOBSON:  It isn't relevant to the notices at

19   issue.

20           THE COURT:  No, but it goes to the theory that Cox

21   was reducing their abuse staff and that maybe that wasn't

22   such -- that wasn't appropriate.  So I'll let the document in.

23   Your exception is noted.

24           What's the other one?

25           MR. KELLEY:  The final one that we have is PX 1837,

1    and again, these are e-mails between Mr. Zabek and the Abuse

2    Team, and it has to do with the limit on how many they will

3    accept and then what happens with, you know, the letters and

4    stuff that they send out.

5          MS. JOBSON:  This one again totally lacks context and

6    was not, as far as I can tell, asked about in deposition of

7    Mr. Zabek.

8          THE COURT:  Well, why wasn't it asked?  Why didn't

9    you use it?  Did you just find it or something?

10         MR. KELLEY:  I don't know.  It's probably an innocent

11   oversight.

12         THE COURT:  Yeah.

13         MR. KELLEY:  It addresses things that have been

14   discussed rather extensively in the course of the trial

15   testimony.

16         THE COURT:  Well, I think it is --

17         MS. JOBSON:  From back in 2010.

18         MR. KELLEY:  Mr. Allan pointed out that Mr. Cadenhead

19   did testify rather extensively about 2010.

20         THE COURT:  Yeah.  All right.  I'm going to let it

21   in.  Exception is noted.

22         MS. JOBSON:  Should we move on to judicial

23   admissions?

24         THE COURT:  Certainly.

25         MS. JOBSON:  I think for many of these, we actually

1    reached agreement, though the first one in my binder -- which I

2    believe you have binders from Friday?

3              THE COURT:  Yes.  Okay.  I'm with you.

4              MS. JOBSON:  So the first tab is from docket No. 652,

5    plaintiff's reply in support of their motion to exclude

6    Dr. Sullivan.  We've redacted quite a bit, and I believe one of

7    the issues counsel had with this is that the redactions were

8    maybe confusing.  We had offered to extract the relevant

9    statements, but I'm not sure that we ever reached agreement on

10   that one.

11             THE COURT:  So where does this come from?

12             MR. KELLEY:  This is a brief.

13             MS. JOBSON:  This is their reply in support of their

14   motion to exclude Dr. Sullivan, and there are some relevant

15   statements about the functioning of the Rightscorp code and

16   what it does and doesn't do.

17             THE COURT:  All right.  No, I'm not going to admit an

18   argument in brief when we've had two weeks of testimony about

19   this subject, and the jury should be focusing on that

20   testimony.

21             Are these all reply briefs?

22             MS. JOBSON:  No.

23             THE COURT:  I mean, all briefs?

24             MS. JOBSON:  No, Your Honor.

25             THE COURT:  Okay.

1          MS. JOBSON:  We have RFAs, RFAs 4, 6, 8, 10, 17, and

2     20, and I think we're good on that one.  There was no

3     objection.

4          THE COURT:  Okay.

5          MS. JOBSON:  Same thing with the interrogatory

6     responses, 5 and 7.  I believe we agreed on the -- that these

7     are fine as redacted.

8          THE COURT:  All right.

9          MS. JOBSON:  Same thing with interrogatory responses

10    No. 9 and 19.

11         THE COURT:  Okay.  Got all those.

12         MS. JOBSON:  And then the last document you have is

13    the complaint, also redacted.  The portions we have not

14    redacted go to plaintiff accusing Cox of having over 200,000

15    repeat infringers and that it was willfully blind because it

16    refused to terminate those.  However, over the course of time,

17    most of those allegations have slipped away, and this goes to

18    the reliability of the Rightscorp software.

19         THE COURT:  How does it go to the -- Mr. Kelley, go

20    ahead.

21         MR. KELLEY:  Yeah.  First of all, the case has

22    changed rather dramatically in its scope since it was filed.

23    We're missing a plaintiff.  There have been a whole bunch of

24    copyrights that haven't been at issue.  And I've never seen --

25    and I've seen a few things -- actually in a judicial admission

2094

1   context introducing stray facts out of a pleading and putting

2   the pleading in.  I mean, if they want to put the entire

3   complaint in, that might be something we could talk about, but

4   just cherry-picking a stray fact is not what a judicial

5   admission is about.

6          And I did a little Fourth Circuit research, and they

7   talked about a judicial admission being an intentional and

8   unambiguous waiver that releases the opposing party from its

9   burden to prove facts necessary to establish the waived

10  conclusion of law.

11         This seems to be like some kind of impeachment, like,

12  you didn't get it right initially, lawyers, when you wrote it,

13  and even though the case is changed, we are going to try to

14  hang it around your neck.

15         THE COURT:  Yeah, that's not -- the redacted

16  complaint is not -- or amended complaint is not a judicial

17  admission, so I'll not allow it.  Your exception is noted.

18         MS. JOBSON:  I don't believe we have anything further

19  on these two.

20         THE COURT:  Okay.

21         MS. JOBSON:  Mr. Kelley?

22         MR. KELLEY:  I think that's it for us.

23         THE COURT:  Okay.  All right.  Well, it's not fair to

24  give you five minutes to look at the jury instructions when I

25  still don't have them prepared, but they'll be prepared in a

1   few minutes, and so would you still prefer me to give the jury

2   instructions before closing arguments?  Is that the way you

3   would prefer me to do it when we've got -- all right.  Yeah.

4              MR. KELLEY:  We do.

5              THE COURT:  Yeah.

6              MR. KELLEY:  It gives us the ability to point things

7   out to the jury.

8              THE COURT:  Okay.  Well, I see by nod of heads that

9   counsel for Cox agrees.  So that gives us a little bit of a --

10  well, maybe it's better.  I'll give you an opportunity to argue

11  them in the morning at 9:00, but likely, they won't be changing

12  a whole lot at this stage after you've already submitted your

13  written briefing on the subject, and the fact that I use the

14  O'Malley instructions, frankly, it's an opportunity for you to

15  tell me that there's something in there that is wrong.

16             And I -- my theory on jury instructions, just so you

17  know where I'm coming from, is that I give the framework.  I

18  don't give instructions that in any way direct a jury's

19  attention to one issue or one element of an analysis, and so

20  that's why I use O'Malley is I find they're pretty neutral, and

21  they give latitude for argument, which is where I think that

22  that should lay.  So I don't think there's much in there -- I

23  mean, there's a lot there -- there's a lot missing from what

24  you want me to give, but I don't think there's anything in

25  there that's contrary to law, but I certainly want you to point

1    out to me things like, you know, whether I'm going to, you

2    know, give a contributory infringement instruction that

3    includes the non-infringing uses, I'm not, but that's -- I

4    think you're protected on that, but if you want to make a

5    record, you know, regarding the *Sony* case and how it applies,

6    certainly I want the record to be clear.

7            So I think we can do that fairly quickly, and then

8    hopefully that gives you time to prepare any additional slides

9    you may want to use in your presentations to the jury.  So does

10   that work?

11           MR. KELLEY:  Yeah, I believe so.

12           Roger, is that good with you?

13           MR. WARIN:  I think that's fine, Your Honor.  Will we

14   also get the verdict form that you intend to use tonight?

15           THE COURT:  Yeah.  And we haven't talked about that

16   at all, and there was a comment on it.  I'm going to give the

17   BMG verdict form.  I find that it's clear, that the underlying

18   issues of infringement and contributory and vicarious

19   infringement are all included in other instructions, and that

20   there's no need to go through the special verdict form that Cox

21   has suggested.  So my intent is to give the BMG form, and I may

22   take that you can't give us any more than $209 million out as

23   not necessary, but otherwise, I intend to use it, and again,

24   I'll give you an opportunity to make formal objections to that

25   in the morning.

1        MR. WARIN:  And what were you planning to do with

2   respect to the motions?  I know --

3        THE COURT:  Yeah.

4        MR. WARIN:  -- Mr. Bridges has a motion to make, and

5   we have one as well.

6        THE COURT:  Yes, I'll hear those now.  So -- hold on.

7        All right.  Mr. Bridges?

8        MR. BRIDGES:  Your Honor, I know it's late, so I'll

9   try to be quick.  This case has finally become at the end of

10  all evidence crystal clear, and if this were a fox hunt, the

11  plaintiffs have been chasing a squirrel.  The Court took the

12  DMCA out of this case a while back, and plaintiffs have tried

13  to prove over and over and over just one thing:  that Cox

14  didn't have a good repeat infringer termination policy.  That's

15  what their entire case has been about.

16       And section 512(l) of The Copyright Act says if

17  there's no safe harbor, that doesn't weigh against a defendant

18  on the substantive claims.

19       What they have failed to do is actually to pay

20  attention to the elements of copyright infringement.  Let's

21  start with contributory, at the heart of it.  It's in one who

22  with knowledge of the infringing activity, induces, causes, or

23  materially contributes.  That's the classic formulation, and

24  the sort of material contribution focus is exactly what the

25  *Sony* case was about, and *Sony* and other cases have said, and

1    *Grokster* in Justice Ginsberg's concurrence where she discusses

2    it, says, well, to get there, your product -- you cannot be

3    liable under that prong if your product or service is capable

4    of substantial non-infringing use.  I know you've heard of this

5    a number of times.

6         Well, the fact is, it's clearly capable.  So they

7    should have been making a *Grokster* case of intent to get around

8    the *Sony* substantial non-infringing use limitation.

9         They could have made a *Grokster* case, but they --

10   they could have tried to do it, but there's no evidence of a

11   *Grokster* claim, that satisfies a *Grokster* claim, and they

12   didn't even try.  At the summary judgment level, Your Honor,

13   they said -- they admitted that they had no evidence of intent.

14   That standard under *Grokster* is intentional inducement through

15   clear expression or other affirmative steps taken to foster

16   infringement.

17        There's none of that here.  So with a

18   non-infringing -- with a service with substantial

19   non-infringing use, their failure to make the intent case

20   causes a complete failure of proof on contributory.

21        Now, let's move to vicarious.  The question is, is an

22   ordinary ISP relationship the kind of relationship that

23   supports vicarious liability?  The answer is no.

24        Mr. Pecau spoke wrongly the other day when he said

25   that after *Gershwin*, it's not about relationships.  Vicarious

2099

```
 1    is about relationships, and the two elements of vicarious

 2    points to the types of relationships for which vicarious

 3    liability is appropriate.

 4            And the Fourth Circuit standard is the correct

 5    standard, and the standard in Nelson-Salabes comes straight

 6    from Shapiro-Bernstein in the Second Circuit, which is a

 7    seminal one.  It is when an obvious and direct financial

 8    interest, obvious and direct financial interest, is coupled

 9    with a right and ability to supervise the infringing activity.

10    Those are the elements.

11            Now, Mr. Nowlis gave a terribly flawed survey trying

12    to address some esoteric issue of draw, but what he was talking

13    about is certainly not an obvious and direct financial

14    interest.  They like to use Ninth Circuit language that isn't

15    about interest, it's about benefit, and there's a big

16    difference between a financial interest in something and a

17    financial benefit from something.

18            When I fly here on Delta Airlines, I have a real

19    financial benefit from Delta Airlines, because I make money by

20    flying places and doing work, but I don't have a financial

21    interest in Delta Airlines.  This is an important difference,

22    and the Fourth Circuit standard is financial interest, direct

23    financial interest in CoStar, obvious and direct financial

24    interest in the leading case of the Fourth Circuit,

25    Nelson-Salabes.  So they don't meet that standard.
```

2100

1          It's vicarious.  And the Fourth Circuit is not about

2     control.  It's not about the ability to terminate doing

3     business with someone.  Otherwise, every business relationship

4     would be a vicarious liability relationship, because you have a

5     benefit from being in a relationship to somebody and you can

6     always supervise them by terminating the relationship.

7          So it doesn't -- this doesn't fly under vicarious,

8     either.

9          On direct, a couple of details.  Testimony came out

10    about -- let's go back to the whole making available thing, and

11    we appreciate the ruling on making available.  It turns out

12    that Rightscorp did not even detect whether the peer computers

13    at the other end were offering the files.  Their --

14    Mr. Rucinski talked about, I think, an unchoke signal, and

15    Rightscorp didn't even look for that signal, and that's how

16    BitTorrent clients say, we have it to offer.  Rightscorp didn't

17    even look for it.

18         And so their reliance on circumstantial evidence,

19    because, well, there must have been transmissions, they weren't

20    even looking for real sharing.

21         In the summary judgment opinion, the Court expressed

22    the view that BMG had not authorized Rightscorp to initiate

23    transmissions.  Well, we've gotten testimony from Mr. Hauprich,

24    I believe, that, in fact, BMG had authorized Rightscorp to

25    collect evidence of infringement.  The way it was doing it was

1    by initiating transmissions.

2            There is no distribution by any standard to the

3    public by any type of transaction.  So they are really locked

4    out on Section 106(3).  That leaves the only remaining

5    underlying infringement that could sustain this case as

6    violations of the reproduction right by Cox subscribers.  The

7    problem is, Your Honor, that possession at some point connected

8    to the network doesn't tell us how they got it.  So they can't

9    establish and Rightscorp admitted it can't observe downloads.

10    It doesn't know when downloads occur.  So there is nothing to

11    connect the dots.  So their fall-back on all of this, Your

12    Honor, is, well, circumstantial evidence.

13            Well, Your Honor, they did get the names and

14    addresses and contact information of 122 people.  They said

15    early on that they weren't really planning to use them, and I

16    think it's wrong to suggest that somebody with access to real

17    information says, well, we won't use that information because

18    we'll just sit back and say, must have happened.

19            Your Honor, that's not an appropriate use of

20    circumstantial evidence here.  So they haven't met the

21    contributory standard under Supreme Court and Fourth Circuit

22    law.  They haven't met the vicarious standard under Fourth

23    Circuit law.  They haven't met 106(3).  They haven't met

24    106(1).  We think this case -- this isn't just a pro forma

25    motion, Your Honor.  We think this case is absolutely suited

1    for judgment as a matter of law in Cox's favor.  Thank you.

2         THE COURT:  Thank you.

3         MR. PECAU:  Your Honor, I'll be very quick.  We've

4    gone over this many times in the summary judgment arguments,

5    and again, they're arguing that this is a *Sony* case or a

6    *Grokster* case.  It isn't, as Your Honor had found.  Unlike

7    those cases, Cox has had specific evidence of specific

8    infringements on its networks.  It's gotten millions of

9    notices.  Completely different type of case.

10        So, Your Honor, I'm just going to quickly go through

11   contributory infringement and vicarious liability, and I'm not

12   going to spend much time on it.  Okay.  First of all --

13        THE COURT:  Spend whatever time you think you need

14   to.

15        MR. PECAU:  All right.  Well, Your Honor, first of

16   all, in terms of contributory infringement, as Your Honor

17   knows, there are two elements to it.  The first is knowledge.

18   And, Your Honor, we have the notices which satisfy everything

19   that's in the DMCA, satisfy everything Cox relied upon, that

20   were done under penalty of perjury, that not only had the IP

21   address, the port number, the title of the song, and the hash

22   value.  All these things gave Cox notice.

23        Now, you know it's the same thing if I get a

24   notice -- I think somebody talked about the IRS.  The IRS sends

25   me a notice, puts it in my hand, and I just let it drop.  You

1   have notice under the law.

2            In addition to that, Your Honor, it's willful

3   blindness.  All of what Cox has done, as the evidence has

4   shown, is, is concocting a system that is designed so that they

5   don't have to deal with infringement.  And, you know, they do

6   it, as Mr. McGarty -- Dr. McGarty testified, it's a very well

7   thought out, very sophisticated system to pretend to do

8   something but, in fact, do nothing.

9            And Dr. McGarty went through all the steps that they

10  do, so that you have millions of infringement, and over a

11  two-year period, you have, you know, half a dozen, I mean, some

12  incredibly low number, and I believe the evidence also

13  indicates that there are other reasons why Cox might have,

14  might have terminated those people.  So clearly knowledge, Your

15  Honor.

16           Then the question is, you know, is there a material

17  contribution.  Your Honor, I think the evidence is overwhelming

18  that Cox provides the site and facilities that allow these

19  repeat infringers to access, access these BitTorrent sites so

20  they can repeatedly infringe.  Under *Fonovisa*, *Napster*, all of

21  these cases, that gives them material contribution.

22           And in addition to that, we have actual evidence that

23  Cox knew of repeat infringers, that people that they call

24  habitual users, and even if somebody who infringes 29 times is

25  caught 29 times, that's not a habitual user.  They have found

2104

1    habitual users, and what does Cox do?  It pretends to terminate

2    them and lets them go or doesn't terminate them at all.  That

3    is a material contribution to actual infringement.

4            Okay.  Let's talk about vicarious liability.  Yes,

5    Your Honor, there is a relationship that is involved, but what

6    the law has evolved to, and it evolved back in the 1960s and

7    certainly was confirmed in *Gershwin* and every single case that

8    has looked at it since, that it isn't a matter of parent-child

9    or an agent and principal.  What it is is that you have to have

10   the right to control, and here there couldn't be stronger

11   evidence of the right to control.

12           Not only do you have the AUP policy that is a

13   contract which Cox says that if you don't -- if you are

14   infringing, we have the right to terminate you.  In fact, if

15   you plan on infringing, you shouldn't even sign up.  And in

16   fact, their whole false CATS system is based on that premise.

17           And Mr. Vredenburg testified, well, you know, yeah, I

18   can control them, I could suspend them by pushing this button.

19   Well, they don't push the button that often, but they certainly

20   have the right to do it, and looking at those tickets, when

21   these things come up, that they're supervising what's going on

22   in their network, they know that all this infringement is going

23   on.  And this isn't just general knowledge like in *Sony* and

24   *Grokster*.  These are specific instances that they recognize are

25   copyright offenses.

1               And the thing is is that the whole nature of this

2     thing and how you find not just Rightscorp, but everybody else,

3     how they find infringement, as brought out in Mr. McGarty's

4     testimony, I think on his cross-examination, this is

5     electronically done.  You have the BitTorrent sites, thus, the

6     way these BitTorrent sites actually work, that they have to

7     have unique fingerprints so that the BitTorrent can go

8     together, but what that means is because of those unique

9     fingerprints, that means that you can actually identify it.

10    That's why the certainty in addition to all the things that

11    are, that are required in these notices, the certainty that

12    there is infringement is at an extremely high level.

13              So let's go to -- so they have the ability to

14    control.  They have the right to control.  Let's talk about the

15    obvious and direct financial interest, and that really comes

16    in -- I think the strongest evidence is in two parts.  The

17    first part is Dr. Nowlis, whose survey is totally

18    uncontroverted.  Cox could have done their own survey.  They

19    could -- and they could have, they could have tried to show

20    that, in fact, you know, a sizable portion, one out of ten of

21    their customers found that being able to download or upload

22    free digital music through sites such as ThePirateBay,

23    KickassTorrents, and Torrentz, etc., was a reason that they

24    subscribed to Cox.  That shows draw.

25              And as Mr. Negretti so eloquently testified, that

1   benefits, people are driven to pay more for their service, pay

2   more for speed to get certain benefits, and the benefit that

3   they're getting is all this free music out there on BitTorrent,

4   and people recognize that this is, this is a great opportunity

5   for you.  This enhances the value of Cox, and Cox recognized

6   it.  Its own research shows that there's a lot of peer-to-peer

7   activity, and if you look at their ads, every single ad that

8   talked about any activity talked about downloading music.

9           Well, Cox isn't stupid enough to say, well, you know,

10  you can download illegal music, but when you see what they're

11  actually advertising, that you can download 100 songs from

12  iTunes in three seconds -- I mean, they didn't say that.  You

13  can download 100 songs in three seconds, I think the

14  implication is clear where you can get 100 songs or where

15  somebody would want to download 100 songs in three seconds.  I

16  mean, that's $129 in three seconds if you actually went through

17  someplace like iTunes.

18          I think the clear hidden message is that you can go

19  to BitTorrent or another peer-to-peer site with your friends

20  and you can download a ton of music.

21          And if there's any doubt about that, they also in

22  their Gigablast -- when they're talking about speed on their

23  Web site, even today they're talking about sharing, Your Honor,

24  and I think it's pretty clear what sharing they're talking

25  about.  What they're selling is a fiberoptic cable going into a

1    person's home, and what they're saying is that we're giving you

2    enough speed so that somebody in your home can be sharing,

3    sharing music -- and they have the file with the music symbol

4    on it -- can be sharing music, and you can be doing whatever

5    you want to do.

6         Now, what you might want to do is that if you're in

7    that kind of household, you might be downloading music through

8    BitTorrent yourself, or you might be using Netflix, but clearly

9    the implication is that a household can have someone in there

10   sharing music and that is an enhanced value.  That's a benefit

11   that you can get.

12        That is a direct financial interest.  The case law

13   couldn't be clearer that that is the kind of interest that is a

14   direct value.

15        Now, in addition to that, Your Honor, not only do we

16   have Dr. Nowlis's survey, we have Cox's own advertisements that

17   they're using to draw people in because they can download

18   music, what we have is the internal e-mails in Cox, and what do

19   those internal e-mails say?  Not one, not two, but many of

20   them, they say, we're not going to get rid of these known

21   infringers because these folks are giving us a financial

22   benefit.  We're getting, what, $280 or 400 bucks from these

23   folks, and we're not going to get rid of them because we are

24   getting a financial interest.

25        Your Honor, we don't have to connect the dots.  Cox

1    itself, its internal people, the people who are responsible for

2    enforcing copyright infringement on the Cox network, they

3    connect the dots for us.  They show what that direct financial

4    interest is.

5         Okay.  The last thing that Mr. Bridges talked about,

6    you know, is this idea that there's no evidence of direct

7    infringement.  Your Honor, we've spoken about this when we made

8    our own motion for a directed verdict, but I'll be just quick

9    about it.  So what is the evidence that there's actual

10   uploading and downloading here?

11        Well, first of all, uploading and downloading, the

12   cases are clear in *Napster*, I think *Aimster* in the Seventh

13   Circuit, that if you're uploading and downloading, you're doing

14   two things.  You are copying in violation of a copyright

15   owner's rights, and you're distributing music in violation of a

16   copyright owner's rights.

17        And, Your Honor, I think that the evidence couldn't

18   be clearer that there's a lot of uploading and downloading

19   specifically identified by Rightscorp using the fingerprint,

20   the hash values that show infringement.

21        Now, also the fact that these hash values have

22   common -- are the same hash values for multiple Cox

23   subscribers, that shows that they're uploading and downloading

24   the same thing.  And as Your Honor has pointed out in your

25   memorandum on motion for summary judgment, the way BitTorrent

1    works is that as soon as you, as soon as you get on that system

2    and you, and you start getting the music you're stealing,

3    you're starting to pump out that music to other people, those

4    files to other people, that's uploading and downloading.

5            So I think the evidence couldn't be clearer what was

6    going on and that, and that Rightscorp through all the

7    testimony in here had actually found that.

8            Now, we've spent a lot of time talking about making

9    available, and, Your Honor, you know, because the

10   circumstantial evidence is such surrounding what's going on,

11   you know, it's really sort of a red herring.  I mean, as

12   *Londonshire* showed and I think the *Howell* case discussed, that,

13   yeah, if you put in evidence that, you know -- for example, if

14   I go to a church, right, and I put my -- if I have a bunch of

15   notices I put down and I don't see anybody taking it, I've made

16   that thing available for distribution.

17           That's what's *Hotaling* was talking about, even in the

18   narrow reading of *Hotaling* and *Londonshire* and *Howell*, and what

19   *Londonshire* and *Howell* said when they're discussing *Hotaling* is

20   what the Fourth Circuit was really saying was if you do

21   everything up to the point of making available, you put your

22   file publicly for people to steal from, the circumstances

23   around that, a jury can find that there was actual

24   distribution.

25           And the circumstances in *Londonshire* and *Howell*,

1    which dealt with this kind of case, was that the nature of

2    BitTorrent, what happens with BitTorrent, what are all the

3    circumstances that are surrounding it, and, Your Honor, I think

4    there's so much evidence in this case that a jury could find

5    that once they detected that available for uploading and

6    downloading, that actual distribution was the likely thing to

7    have occurred.

8         In addition, Your Honor, there's plenty of evidence

9    that Barbara Frederiksen-Cross talked about and the Rightscorp

10   people talked about that not only did Rightscorp detect what

11   was going on through these, through these hash values, but it,

12   in fact, once it -- in I think it was 150,000 cases, once it

13   detected what was going on with respect to the works at issue,

14   it actually downloaded those files, which confirmed that there

15   was actual infringement by users of the Cox system.

16        And, Your Honor, so if you, if you see all the

17   elements, both in terms of the evidence that there was actual

18   infringement by users of the Cox Internet service, if you look

19   at each one of the elements of contributory infringement and

20   vicarious liability, Your Honor, there's more than enough

21   evidence for the jury to decide whether there is infringement

22   in this case.

23        Thank you, Your Honor.

24        THE COURT:  All right.  Thank you, Mr. Pecau.

25        Mr. Bridges?

1          MR. BRIDGES:  Your Honor, I think I discerned,

2     believe it or not, one point of agreement between counsel, and

3     that's that this is not a *Grokster* case.  It's not a *Grokster*

4     case.  They haven't been arguing the *Grokster* elements at all.

5     So I think we can confine the debate.

6          They have made their bed in the material contribution

7     prong of contributory, and they say *Sony* doesn't apply.  *Sony*

8     doesn't apply because, oh, there's lots of knowledge, there's

9     bad stuff here.

10          *Sony* was a case where the court said it doesn't

11     matter whether *Sony* has constructive knowledge.  Even with

12     constructive knowledge, it would not be liable.

13          So I'm content.  I think the boundaries are clear.

14     It's not a *Grokster* case.  Is it a material contribution case,

15     and if so, what's the effect of *Sony*?

16          Now, I'm hoping that our time together these couple

17     of weeks, I hope you've gained a couple of impressions about

18     our approach under the law.  We start with the statutes, with

19     the language of the statutes.  We apply them specifically and

20     clearly, and then we go to the Supreme Court, and the two

21     elephants in the room in this case are *Sony* and *Grokster*.

22          And we talk about *Sony* and *Grokster*.  They've got to

23     go one way or the other, or they can try both, but they've got

24     to meet the standard after *Sony* or they've got to meet the

25     *Grokster* standard.  They're not trying the *Grokster* standard.

1         So, you know, it's the statute, then the Supreme

2    Court, and then where there's not enough guidance or not

3    sufficient -- or the Supreme Court hasn't spoken, we go to the

4    Fourth Circuit, and if the Fourth Circuit hasn't spoken, we go

5    to other circuits.  I'm not citing you to district court cases

6    because, Your Honor, this is a tough area of the law, and many

7    facts -- many cases are made in bizarre circumstances with

8    pretty unsavory defendants.

9         There's a number of default judgment-type rulings out

10   there, and, and a lot of district courts just sort of grab at

11   what they can grab, because it's hard and judges don't have

12   much time, and so the district court cases are all over the

13   map, and they're citing some district court cases, sure, but

14   we're going statute, Supreme Court, Fourth Circuit.

15        Under all of those guideposts, they don't make

16   contributory or vicarious.  Their draw they're pulling out from

17   cases that have bubbled up from the Ninth Circuit, there's no

18   draw jurisprudence in the Fourth Circuit.

19        And, you know, I don't think I need to go back into

20   the underlying direct infringement, but they just haven't made

21   a case because theirs is a statistics case.  It's not a reality

22   case.

23        And, Your Honor, the other thing I think it's

24   appropriate to insist on is proof and not just must be true

25   because we've got 1.8 million of something.

1          Thank you, Your Honor.

2          THE COURT:  All right.  Thank you.

3          MR. PECAU:  Your Honor, do you want me to address --

4   I think we've covered this.

5          THE COURT:  No, we're done.  I've heard enough

6   argument.  All right.

7          Well, I'm going to deny the JMOL, you know, for the

8   reasons that I addressed in the summary judgment opinion, but

9   also as again the evidence has conformed, and I think the jury

10  has evidence of each one of the prongs necessary to prove

11  direct, vicarious, and contributory infringement, and, you

12  know, if the Fourth Circuit or the Supreme Court wants to look

13  at this under the lens of the *Sony* case, then there's, you

14  know, decisions that I've made that are going to be revisited.

15         So let's -- but I, you know, I've made, I've made my

16  bed.  I think I did what I think I was required to do given the

17  type of case this is, and so certainly your exception is noted,

18  and the record is preserved.

19         And go ahead, Mr. Allan.

20         MR. ALLAN:  Thank you, Your Honor.  Obviously, it's

21  getting late now, it's 6:25, but I would like just on behalf of

22  BMG to formally bring our Rule 50 motion again as well.  We've

23  submitted it on the papers.

24         THE COURT:  You did.

25         MR. ALLAN:  And Mr. Pecau very ably stole my thunder

1   with the argument that I would have presented to the Court.

2   I'm happy to address any of those issues again further, but I

3   would like to on one particular issue just direct the Court's

4   attention to the first prong of vicarious in the right and

5   ability to supervise the infringing activity.

6          I don't think there is any factual dispute on that

7   issue, Your Honor.  I don't think there's any factual dispute

8   that they have an AUP, which is the contract with the

9   subscribers, that very clearly gives them the right to shut off

10  or suspend or take action with respect to copyright

11  infringement, which is a prohibited activity under that very

12  contract, the contract that Cox wrote and forces every

13  subscriber to, in fact, adhere to before they go onto the

14  network and use the service.

15         And then on the ability side, the CATS system that

16  Mr. Carothers testified to and Mr. Cadenhead had testified to

17  and Mr. Vredenburg came and testified to is as simple as

18  pushing a button to suspend or terminate someone from the

19  Internet, that is the ability portion of right and ability.

20         So when you have those two facts coming together, and

21  there is no factual dispute on that, I think that we have

22  proven right and ability to supervise as a matter of law, and I

23  think that is something that the jury need not decide.  I don't

24  think any reasonable jury could conclude otherwise.

25         I'm certainly happy to address other issues, but

2115

1    given the time and the fact that it's all been briefed and

2    argued, I'd just formally renew our motion in full on Rule 50.

3              THE COURT:  All right.  Thank you, Mr. Allan.

4              I think I said I was going to deny it presently, and,

5    you know, I'm going to let the jury decide each and every one

6    of these issues.  I'll revisit them down the road if I'm

7    convinced that I need to, but I think that there's been -- you

8    know, the jury, you know, they now have had testimony about the

9    supervision, and, you know, they can decide to believe any and

10   all or none of any witness's testimony, and so I don't want to

11   take that -- and they are factual issues, and there has been,

12   you know, some -- I can't remember what it is, but there has

13   been some examination on it.  So I'm not going to grant summary

14   judgment on those limited areas.

15             So tomorrow let's take ten minutes each and give me

16   your best -- I mean, give me what you think you need to give me

17   to preserve your record.  If we've got "not" when there should

18   be "is" in an instruction, then please let me know, and we'll

19   try and correct those type of errors, and I'll read the

20   instructions first, and we'll go from there.  All right?

21             Anything else tonight?

22             MR. BRIDGES:  I assume we're about to get a copy of

23   the --

24             THE COURT:  Yes.  Yeah, if you'll wait for just a --

25   I've amended this spoliation to add the dates, but we'll be

2116

1    back in five minutes with that, if you can hang loose.  Thank

2    you.

3              MR. BRIDGES:  Thank you.

4              THE COURT:  We're in recess.

5              NOTE:  The December 15, 2015 portion of the case is

6    concluded.

7         --------------------------------------------------

8

9

10

11

12

13

14

15                    CERTIFICATE OF THE REPORTER

16

17

18         We certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter.

19

20                              _____
                                            /s/
21                                 Anneliese J. Thomson

22                              _____
                                            /s/
23                                 Norman B. Linnell

24

25