2117

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

--------------------------------:
                                :
BMG RIGHTS MANAGEMENT (US) LLC,  :
et al.,                         :
                Plaintiffs,      :
                                : Case No. 1:14-cv-1611
        vs.                      :
                                :
                                :
COX ENTERPRISES, INC., et al.,   :
                Defendants.       :
--------------------------------:

VOLUME 10

TRIAL TRANSCRIPT

December 16, 2015

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:


COUNSEL FOR THE PLAINTIFFS:

Michael J. Allan
John M. Caracappa
Jeremy D. Engle
Paul Gennari
Margaret P. Kammerud
William G. Pecau
Stephanie L. Roberts
Jeffrey M. Theodore
Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.   20036


Walter D. Kelley, Jr.,
HAUSFELD LLP
Suite 650
1700 K Street N.W.
Washington, D.C.   20006


COUNSEL FOR THE DEFENDANTS:

Andrew P. Bridges
Guinevere L. Jobson
Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94194

Brian D. Buckley
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA  98101

Craig C. Reilly
CRAIG C. REILLY, ESQ.
111 Oronoco Street
Alexandria, VA 22314

INDEX

WITNESS                          EXAMINATION      PAGE




CLOSING ARGUMENTS BY:

    MR. WARIN                                     2153
    MR. WAKEFIELD                                 2197
    MR. BUCKLEY                                   2233
    MR. WARIN                                     2251


COURT'S JURY INSTRUCTIONS

    THE COURT                                     2134

1          NOTE:  The December 16, 2015 portion of the case

2     begins in the absence of the jury as follows:

3     JURY OUT

4          THE COURT:  All right.  Good morning.  I see everyone

5     is here.  So let's -- I think we still have a couple jurors who

6     haven't arrived, but Joe will check on that.

7          So let's do our -- any final objections you want to

8     make to the jury instructions.  And as I think I pointed out

9     last evening, I'm not interested in rearguing the instructions,

10    but I am interested in any other thoughts.  So --

11         MR. PECAU:  Your Honor, you also asked the parties to

12    review your jury instructions for suggestions of apparent

13    wording errors.

14         THE COURT:  Correct.

15         MR. PECAU:  And the parties have exchanged those

16    things.  I'm happy to point out to Your Honor that we have

17    actually agreed on some of them.  So if Your Honor would like,

18    I am going to send this over to you.  These are BMG's suggested

19    changes.

20         MR. WAKEFIELD:  Are those all of them, or are the

21    agreed ones?

22         MR. PECAU:  Those are all of them.  I am going to

23    explain to the judge which ones I think you guys agreed to.

24         Your Honor, I believe Cox has agreed to our proposed

25    changes in instruction 33, which is willfulness, and

1    instruction 34, with the -- I believe the caveat on the

2    willfulness is that they don't believe that there should be an

3    instruction of that sort.

4            Then with regards to the other three, Your Honor,

5    instruction 19, that's the Digital Millennium Copyright Act,

6    you'll see in the last line it referred to an affirmative

7    defense, which is the first reference to an affirmative

8    defense.  And then in the line before, it just refers to

9    defenses.

10           So I think that that would cause confusion to the

11   jury as to what an affirmative defense is.

12           And then, Your Honor, we think that the last -- the

13   words, "it must be disregarded," it's not clear what that's

14   referring to.  So we think the simplest and clearest thing to

15   the jury is that, you know, the DMCA is not a defense.

16           And in particular, Your Honor, we think that the

17   ambiguous reference in the second part of it, you know, the

18   jurors might think that there can't be any reference to the

19   DMCA.  And, obviously, the DMCA is all the way through this.

20   It's used as a synonym for copyright infringement.

21           And Your Honor knows that a core part of our argument

22   is that what Cox did with the DMCA is part of the whole Cox

23   effort not to properly address copyright infringement.

24           THE COURT:  All right.  I understand that one.  Go

25   ahead.

1          MR. PECAU:  Okay.  And then the next one, Your Honor,

2     is on spoliation.  Our suggested change is basically to have

3     the second part parallel the first and indicate that they

4     didn't do their duty as well, and that's why they are in the

5     spoliation part.

6          So, Your Honor, we just tried to indicate what we

7     thought your intent was.

8          THE COURT:  Yeah.

9          MR. PECAU:  And then finally, on instruction 29, that

10    correction was only added to indicate that the -- to define

11    scope -- as to be the scope defined by BMG in terms of its

12    agency.  Which again, we thought that was Your Honor's intent,

13    and we put in those three words.

14         THE COURT:  Okay.

15         MR. PECAU:  Thank you.

16         MR. BRIDGES:  Good morning, Your Honor.  A couple of

17    things.  First, I thought that we had agreement on a wording

18    change in instruction number 1 also.

19         MR. PECAU:  Oh, yes.  I apologize if I didn't say

20    that, Your Honor.

21         THE COURT:  General instruction number 1?

22         MR. BRIDGES:  That's right.

23         MR. PECAU:  Did you give --

24         MR. BRIDGES:  Right, it's in the one we have sent up

25    with some tabs.  It's basically saying the lawyers will refer

1    to some governing law.  I think that makes sense.

2              THE COURT:  Yes, I will make that change.

3              MR. BRIDGES:  Let me go through, if I may, BMG's

4    suggestions first, and then I'll come back to some of Cox's.

5              We disagree with their proposed revision to

6    instruction 19.  The fact is the Fourth Circuit in CoStar spoke

7    clearly that the DMCA is irrelevant to whether there is

8    infringement.  The statute makes it clear that the DMCA cannot

9    be used against a defendant in any way.  And we think that this

10   instruction should stay the same.

11             THE COURT:  Okay.

12             MR. BRIDGES:  Instruction number 20.  What they've

13   sought to add, I believe, was not in Judge Anderson's order.

14   This is on spoliation.  We think that there could have been a

15   lot stronger language used about Rightscorp's and BMG's

16   spoliation that occurred in this case, but we think this should

17   stay the same.

18             Instruction 29, we think that the added language is

19   superfluous.  That should stay the same.

20             On instruction 33, we do object to the instruction as

21   a whole.  I want to make that clear.  But if the Court is going

22   to give the instruction, we think that the wording change by

23   plaintiffs is appropriate.

24             We do agree to the change -- the plaintiff's change

25   in 34, we think that was just a mistake.

1              Let me go through some of the other issues for the

2    record.  On spoliation, we understand the Court wants to give

3    this one.  We do object.  We do think that Cox 12 is the

4    appropriate instruction as well.  So we have offered 12.  The

5    Court has refused it.  We do object to 20.

6              And in instruction number 22, I know that this comes

7    from O'Malley, Your Honor, but it actually miscites the

8    statute.  Point 3 should be "distribute copies or

9    phonorecords."

10             THE COURT:  Hold on.  Hold on.  If you want me to --

11             MR. BRIDGES:  Yeah.

12             THE COURT:  Where is 22 different than the statute?

13             MR. BRIDGES:  The word in the statute, Your Honor, is

14   "phonorecords," not "sound recordings."  And phonorecords are

15   defined in section 101 as material objects.  And I think you

16   understand the sensitivity to that point.

17             And I don't know why O'Malley has this.  I assume it

18   is because phonorecords is not a commonly understood term, but

19   it is defined as a material object.  And that's different from

20   recordings.

21             So we do object to that and we -- that's the one

22   change that should happen there.

23             On 20 --

24             THE COURT:  23.

25             MR. BRIDGES:  23, 24, the reference to the number of

1    works.  I believe we agreed to take out the word "infringed" in

2    23, is that correct, Mr. Pecau?  I think there's a word

3    "infringed" on the second line.  I thought the parties agreed

4    that should come out.

5         MR. PECAU:  Yes, Your Honor, I'm sorry, I missed that

6    one.  We do agree to taking out the word "infringed" in 23.

7         MR. BRIDGES:  That improves that a lot.  I would just

8    say that Cox's objections to 23 and 24, Your Honor, are that

9    the Court appears to foreclose the jury from considering the

10   compilation limitation on statutory damages.  There was

11   evidence of a number of compilations at issue here.  We

12   understand the Court has rejected Cox's compilation

13   instruction, so we object to these for failing to --

14        THE COURT:  Go back to 23 for a minute to make sure

15   that I'm -- so you want this to read that "BMG contends that

16   Cox is contributorily and vicariously liable for the

17   infringement of the works by users of Cox Internet service"?

18        MR. BRIDGES:  That's correct, Your Honor.

19        THE COURT:  All right, that's fine.

20        MR. BRIDGES:  Okay.  And then I've made the

21   compilation points.

22        THE COURT:  Right.

23        MR. BRIDGES:  And then we don't believe that

24   section -- sorry, that instruction 25 appropriately tracks the

25   statute.  So we object to 25.  We have offered Cox 13 on direct

1    versus secondary, and Cox 14 on direct.  And we understand the

2    Court's rejection of our proposals.

3            Instruction 26 on contributory infringement, a couple

4    of things.  First, looking at the classic standard as this

5    instruction sets it out, the third point should be that with

6    the knowledge in the second point "Cox induced, caused, or

7    materially contributed to such infringing activity."  There

8    should be a connection between that knowledge.

9            THE COURT:  Well, it says "and."

10           MR. BRIDGES:  That's right, Your Honor, but those

11   could be considered separate and not something operating in

12   tandem, and that's the concern.

13           If one goes back to the Gershwin case in the Second

14   Circuit where it all began, I'm quite sure the Court said "with

15   knowledge."

16           But a more major concern here is that I know this

17   comes from O'Malley, if you look at that second sentence that

18   begins "with certain exceptions," the Court has not explained

19   to the jury what those exceptions are.  And the major exception

20   is the interplay between Sony and Grokster that the Court has

21   heard from us about a number of times.  I understand the

22   Court's rejection of it.

23           But we do object to this instruction for failing to

24   account for the staple article of commerce doctrine in Sony and

25   the Sony/Grokster interplay.  And we would tender our

1    instruction 16.

2              I do note that O'Malley does provide a specific

3    instruction on that point, but I understand the Court has

4    rejected it.

5              On 27, willful blindness.  We appreciate the fact

6    that the client -- that the Court accepted this language over

7    the Island Second Circuit language.  We do object to this

8    altogether.  We don't think that a willful blindness

9    instruction is appropriate in the circumstances and for these

10   theories.  And we object to even this formulation.  It's better

11   than the other, but this is still objectionable.

12             On vicarious, we do think that this misstates the law

13   in a couple of ways.  It talks about vicarious infringement

14   rather than vicarious liability, that's more of a nit.

15             But something that's very important is in the second

16   prong of this, the Court has omitted the words "obvious and

17   direct" that exist in the Fourth Circuit's leading case of

18   Nelson-Salabes.  "Obvious and direct" is part of the case law.

19             CoStar said only "direct," but to leave all of that

20   wording out we think is improper.  We object to this, and would

21   urge the Court to use Cox 17.

22             Instruction number 31.  The Court's instructions are

23   unclear about the burden of proof on damages.  And as O'Malley

24   says at section 160:89 in referring to the Seventh Circuit's

25   instructions, particularly 12.8.1 of the Seventh Circuit, there

1   should be a statement that BMG has the burden of proof on

2   damages.

3            On statutory damages, 32, I won't repeat myself, but

4   we do object to this one.  It is unclear about the burden of

5   proof, which I've just mentioned.  Also, it does not account

6   for compilations.  So we object to this instruction and would

7   offer Cox 23.

8            Instruction 33, we object to this because the way the

9   Court sets out the standard of willfulness here is virtually no

10  different from a standard that applies to ordinary contributory

11  infringement.  First, the contributory infringement is know or

12  should have known.  And willful blindness is part of should

13  have known.

14           Here it's knowing reckless disregard or willfully

15  blind.  It essentially repeats the standard for contributory,

16  and it's inappropriate to say that all contributory

17  infringement is willful.  So we object to this on that basis.

18           We also object to the omission of an innocent

19  infringer instruction, and Cox tenders its number 24 for that

20  purpose.

21           Then I believe that carries me through Cox's

22  objections and proffers, Your Honor.

23           THE COURT:  All right, thank you.

24           MR. BRIDGES:  Thank you.

25           MR. PECAU:  Your Honor, just quickly.  We think that

2129

1    the changes in -- Cox's proposed changes to 19, 28, and 32 are

2    substantive, they are not errors.  So we just want to bring

3    that to your attention.  I assume Your Honor does not want any

4    argument on this, so I will not argue any of the things that

5    plaintiffs raised.

6           Mr. Theodore will just list for preservation purposes

7    our objections, Your Honor.

8           THE COURT:  All right, thank you.

9           MR. THEODORE:  I'm sorry, I'm going to try to do this

10   very quickly, Your Honor.  So obviously we discussed mitigation

11   extensively yesterday.  We object to the mitigation

12   instruction, and we'll just incorporate our remarks yesterday

13   and in the brief.

14          Similarly, making available and the inference for

15   making available, again, we discussed this extensively during

16   summary judgment, we will incorporate our summary judgment

17   arguments.  And, you know, we proposed our 24 and our 25 on

18   these points on making available and the inference for making

19   available.

20          On advice of counsel and opinions as to the law, we

21   felt that a stronger instruction, particularly as to

22   Mr. Cadenhead, was appropriate given his testimony.  And,

23   again, you know, we briefed this and there was extensive

24   discussion on the record.  So we will just incorporate that by

25   reference.  And I think our instruction 15 is what we felt

1    should have been issued there.

2            Then we felt that there should have been our Superior

3    Forum Builders deterrence instruction, which is a case from the

4    Fourth Circuit, instruction under number 36, we felt should be

5    issued.

6            And then finally on spoliation, we don't feel that

7    any spoliation instruction is appropriate as to BMG or

8    Rightscorp under Rule 37.  And again, we briefed this

9    extensively, so we won't repeat it.

10           THE COURT:  Okay.  All right.  Thank you.

11           All right.  Well, obviously we'll correct the errors

12   in 1, 33, and 34, and 31.  I lost it now.

13           And I will add a sentence to 31 identifying the fact

14   that BMG has the burden of proof in proving damages by a

15   preponderance of the evidence.

16           The remainder of the requested changes I am not going

17   to make.  Well, let me -- I am not going to change the

18   spoliation.  And for the reasons that Judge Anderson's order

19   was a little opaque on the requirement, and I thought that

20   language was a little too strong.  But your exception is noted.

21           The agency, I will make the changes to Instruction 29

22   to make that clearer.

23           And so, I think those are the -- there was one other

24   modification, I think, at 23 where we will take "infringed" out

25   of 23.

 1             So I will make those changes.  It will take us a

 2    couple minutes.  How's our --

 3             MR. PECAU:  Your Honor --

 4             THE COURT:  Yes, sir.

 5             MR. PECAU:  Your Honor, just two things.  One is,

 6    just for the record, we would like to have an exception to your

 7    change in 31, adding the burden of proof on the statutory

 8    damages.

 9             THE COURT:  You don't think that's the law?

10             MR. PECAU:  No, Your Honor.  I think that once we

11    prove liability, it's just up to the jury.  There is no burden

12    in terms of what the statutory damages are.  That's just -- I

13    mean, our burden is to show liability.  And then in terms of

14    statutory damages, it's up for the jury to determine that

15    themselves.  It's not a matter of us having a burden one way or

16    the other, Your Honor.

17             THE COURT:  How does the jury weigh how much -- and

18    you're going to put forth evidence and suggest what statutory

19    damage award -- what it should look like?

20             MR. PECAU:  That's correct.  And I assume that the

21    defense will as well.  And then it's just up to the jury, it

22    isn't a burden one way or the other, it's just up to a jury to

23    decide that.  And I don't believe that any of the forms

24    regarding statutory damages refers to a burden on one party or

25    the other.  And it just doesn't seem to be appropriate in the

```
 1    scheme of things that there would be a burden there, Your
 2    Honor.
 3              THE COURT:  Yeah.  All right.  I will look at that.
 4              MR. PECAU:  Okay.  And just one other housekeeping
 5    thing.  Mr. Allan had mentioned this yesterday, that there was
 6    a string, I think, of e-mails, and we wanted to add just one
 7    more to close the loop.
 8              THE COURT:  All right.  Mr. Bridges, do you want to
 9    respond to the burden on damages?  Is that what you --
10              MR. BRIDGES:  Yes, Your Honor.  Seventh Circuit
11    instruction 12.8.1 mentioned in O'Malley, 160:89, expressly
12    refers to plaintiff having a burden of proof, and then offers
13    an actual damages option and a statutory damages option.
14              It's always been a part of a plaintiff's burden to
15    prove damages, Your Honor.
16              THE COURT:  All right.  Thank you.
17              Mr. Allan -- okay.
18              MR. PECAU:  I'm sorry, Your Honor.  If you look at
19    that, it's referring to actual damages as opposed to statutory
20    damages.
21              THE COURT:  Okay.  All right.  I will look at it.
22              MR. BRIDGES:  If it is convenient, Your Honor, I have
23    a copy of it.  I can hand it up to the Court.
24              THE COURT:  Whatever you want to do.  I have got
25    O'Malley in the back.
```

2133

1              Yes, sir, Mr. Allan.

2              MR. ALLAN:  Good morning, Your Honor.  Just very

3    briefly.  If you recall yesterday you introduced DTX 408.  I

4    indicated that there was a responsive e-mail.  And you

5    suggested the Court might be interested in receiving it.  I

6    have got a copy here.  It is PX 5004.

7              MR. BUCKLEY:  Your Honor, we have no --

8              THE COURT:  You would like to move that into evidence

9    under the completeness doctrine, fairness and completeness

10   doctrine?

11             MR. ALLAN:  Yes, please, Your Honor.

12             MR. BUCKLEY:  We have no objection, Your Honor.

13             THE COURT:  Okay.  All right, thank you.  It will be

14   received then.

15             All right.  Give us a couple minutes to make those

16   changes and we'll back and I will read the instructions.

17             Do we have all our jurors, Joe?

18             COURT SECURITY OFFICER:  Yes, sir.

19             THE COURT:  What's the parties' position on allowing

20   the additional jurors to deliberate?

21             MR. WARIN:  Your Honor, BMG would like to thank them

22   for their service and excuse them.

23             THE COURT:  Okay.

24             MR. WAKEFIELD:  I guess we don't have anything to

25   say.  We think they've put in a lot of hard work and should

1    participate, but I understand.

2              THE COURT:  Okay.  All right.  Well, let's take a

3    short recess.  We will make the changes that we've identified,

4    and we'll come back out and read the instructions and go right

5    into closing.  We will probably take a break after the opening

6    portion of BMG's closing.  All right.  That probably is a good

7    breaking time.

8              All right.  Thank you all.  We're in recess.

9              NOTE:  At this point a recess is taken; at the

10   conclusion of which the case continues in the absence of the

11   jury as follow:

12   JURY OUT

13             THE COURT:  All right.  Anything else before we get

14   our jury?

15             Okay, Joe, let's get the jury, please.

16             NOTE:  At this point the jury returns to the

17   courtroom; whereupon the case continues as follows:

18   JURY IN

19             THE COURT:  All right, please be seated.

20             Good morning, ladies and gentlemen.  Thank you for

21   coming in.

22             Once again, we've been working out here, but we had a

23   few things, more things we needed to discuss before we could

24   begin our closing arguments and instructions.  But we're there

25   now.

1          So I am going to -- it's always a good news/bad news

2   thing.  The bad news is I'm going to read the instructions to

3   you.  I'm not -- I wasn't a drama major in college, and I'll do

4   the best I can to get through them.  And I will read them from

5   the pages so that I don't incorrectly paraphrase them.

6          The good news is that you will have copies to refer

7   to when you go back into the jury room.

8          All right.  So now that you have heard the evidence

9   and argument, it's my duty to instruct you about the applicable

10  law.  It's your duty to follow the law as I will state it.  You

11  must apply the law to the facts as you find them from the

12  evidence in the case.  Do not single out one instruction as

13  stating the law, but consider the instructions as a whole.  Do

14  not be concerned about the wisdom of any rule of law stated by

15  me.  You must follow and apply the law.

16         The lawyers will refer to some of the governing rules

17  of law in their arguments.  If there is any difference between

18  the law stated by counsel and these instructions, you must

19  follow my instructions.

20         Nothing that I say in these instructions indicates

21  that I have an opinion about the facts.  You, not I, have the

22  duty to determine the facts.

23         You must perform your duties as jurors without bias

24  or prejudice as to any party.  The law does not permit you to

25  be controlled by sympathy, prejudice, or public opinion.  All

1    parties expect that you will carefully and impartially consider

2    all the evidence, follow the law as it is now being given to

3    you, and reach a just verdict regardless of the consequences.

4         Unless you are otherwise instructed, evidence in this

5    case consists of the sworn testimony of the witnesses

6    regardless of who called the witness, all exhibits received in

7    evidence regardless of who may have produced them, and all

8    facts and events that may have been admitted or stipulated to.

9         Statements and arguments by the lawyers are not

10   evidence.  The lawyers are not witnesses.  What they have said

11   in their opening statements or will say in their closing

12   arguments, and at other times, is intended to help you

13   understand the evidence, but it is not evidence.

14        However, when lawyers on both sides stipulate or

15   agree on the existence of a fact, unless otherwise instructed,

16   you must accept the stipulation and regard that fact as proved.

17        Any evidence to which I have sustained an objection

18   and evidence that I have ordered stricken must be entirely

19   disregarded.

20        If a lawyer asks a question containing an assertion

21   of fact, you may not consider the assertion as evidence of that

22   fact.  The lawyer's questions and statements are not evidence.

23        During the trial I may sometimes ask a witness

24   questions.  Please do not think I have a opinion about the

25   subject matter of my questions.  I may ask a question simply to

2137

1   clarify a matter, not to help one side or to harm another side.

2          Remember at all times that you are the sole judges of

3   the facts.

4          It's my duty to caution or warn an attorney who does

5   something I believe is not in keeping with the rules of

6   evidence or procedure.  You are not to draw any inference

7   against the side I may caution or warn during the trial.

8          Testimony and exhibits may be admitted into evidence

9   during a trial only if they meet certain criteria or standards.

10  It's a lawyer's duty to object when the other side offers

11  testimony or an exhibit that the lawyer believes is not

12  properly admissible under the rules of law.  Only by offering a

13  an objection can a lawyer request and obtain a ruling from me

14  on the admissibility of the evidence being offered by the other

15  side.

16         You should not be influenced against any lawyer or

17  the lawyer's client because the lawyer has made objections.

18         Do not attempt to interpret my rulings on objections

19  as somehow indicating how I think you should decide this case.

20  I'm simply making a ruling on a legal question.

21         There is nothing particularly different in the way

22  that a juror should consider the evidence in a trial from that

23  in which any reasonable and careful person would deal with any

24  important question that must be resolved by examining facts,

25  opinions, and evidence.  You are expected to use your good

1    sense in considering and evaluating the evidence in the case.

2    Use the evidence only for those purposes for which it has been

3    received, and give the evidence a reasonable and fair

4    construction in light of your common knowledge of the natural

5    tendencies and inclinations of human beings.

6            Any reference by the Court or by counsel to matters

7    of testimony -- if any reference by the Court or by counsel to

8    any matters of testimony or exhibits does not coincide with

9    your own recollection of that evidence, it's your recollection

10   which should control during your deliberations and not the

11   statements of the Court or of counsel.

12           You are the sole judges of the evidence.

13           Sometimes evidence may be admitted for a limited

14   purpose and not generally for all purposes.  You will recall

15   that during this trial I may have instructed you that I

16   admitted certain evidence for a limited purpose.  You must

17   consider this evidence only for the limited purpose for which

18   it was admitted.

19           The plaintiff, BMG, has the burden in a civil case

20   such as this to prove every essential element of plaintiff's

21   claim by a preponderance of the evidence.  If plaintiff, BMG,

22   should fail to establish any essential element of plaintiff's

23   claim by a preponderance of the evidence, you should find for

24   Cox as to that claim.

25           The defendant, Cox, has the burden of establishing

2139

1    the essential elements of a certain affirmative defense, and I

2    will explain that to you shortly.

3            To "establish by a preponderance of the evidence"

4    means evidence which, as a whole, shows that the facts sought

5    to be proved is more probable than not.

6            In other words, a preponderance of the evidence means

7    such evidence that, when considered and compared with the

8    evidence opposed to it, has more convincing force and produces

9    in your minds belief that what is sought to be proved is more

10   likely true than not true.  The standard does not require proof

11   as to absolute certainty, since proof of an absolute certainty

12   is seldom possible in any case.

13           In determining whether any fact in issue has been

14   proved by a preponderance of the evidence, unless otherwise

15   instructed, you may consider the testimony of all witnesses

16   regardless of who may have called them, all exhibits received

17   in evidence regardless of may have produced them.

18           You may have heard the term "proof beyond a

19   reasonable doubt."  This is a stricter standard applicable only

20   in criminal cases.  It does not apply in civil cases such as

21   this.  And, therefore, you should put it out of your minds.

22           Generally speaking, there are two types of evidence

23   presented during a trial, direct and circumstantial.  Direct

24   evidence is the testimony of a person who asserts or claims to

25   have actual knowledge of a fact, such as an eyewitness.

2140

1          Indirect or circumstantial evidence is proof of a

2    chain of facts and circumstances indicating the existence or

3    nonexistence of a fact.

4          The law generally makes no distinction between the

5    weight or value to be given to either direct or circumstantial

6    evidence.  A greater degree of certainty is not required of

7    circumstantial evidence.  You are required to find the facts in

8    accordance with the preponderance of all the evidence in the

9    case, both direct and circumstantial.

10          You are to consider only the evidence in the case.

11    However, you are not limited to the statements of the

12    witnesses.  You may draw from the facts you find have been

13    proved such reasonable inferences as seem justified in light of

14    your experience.

15          Inferences are deductions or conclusions that reason

16    and common sense lead you to draw from the facts established by

17    the evidence in the case.

18          You are the sole judges of the credibility of the

19    witnesses and the weight their testimony deserves.  You may be

20    guided by the appearance and conduct of a witness, by the

21    manner in which a witness testifies, or by the character of the

22    testimony given, or by the evidence contrary to the testimony.

23          You should carefully examine all the testimony given,

24    the circumstances under which each witness has testified, and

25    every matter in evidence tending to show whether a witness is

1    worthy of belief.

2            Consider each witness' intelligence, motive, and

3    state of mind, and demeanor or manner while testifying.

4    Consider the witness' ability to observe the matters as to

5    which that witness has testified, and whether the witness

6    impresses you as having an accurate recollection of these

7    matters.

8            Also, consider any relation each witness may have to

9    either side of the case, the manner in which each witness might

10   be affected by the verdict, and the extent to which the

11   testimony of each witness is either supported or contradicted

12   by other evidence.

13           Inconsistencies or discrepancies in the testimony of

14   a witness or between the testimony of different witnesses may

15   or may not cause you to discredit such testimony.  Two or more

16   persons seeing an event may see or hear it differently.

17           In weighing the evidence of a discrepancy, always

18   consider whether it pertains to a matter of importance or an

19   unimportant detail, and whether the discrepancy results from

20   innocent error or from intentional falsehood.

21           After making your own judgment, you will give the

22   testimony of each witness such weight, if any, that you think

23   it deserves.  In short, you may accept or reject the testimony

24   of any witness in whole or in part.

25           In addition, the weight of the evidence is not

2142

1   necessarily determined by the number of witnesses testifying to

2   the existence or nonexistence of any fact.  You may find that

3   the testimony of a small number of witnesses as to any fact is

4   more credible than the testimony of a larger number of

5   witnesses to the contrary.

6           A witness may be discredited or impeached by

7   contradictory evidence, or by evidence that at some other time

8   the witness had said or done something or has failed to say or

9   do something that is inconsistent with the witness' present

10  testimony.

11          If you believe any witness has been impeached, and

12  thus discredited, you may give the testimony of that witness

13  such credibility, if any, that you think it deserves.

14          If a witness is shown knowingly to have testified

15  falsely about any material matter, you have a right to distrust

16  such witness' other testimony, and you may reject all the

17  testimony of that witness or give it such credibility as you

18  think it deserves.

19          An act or omission is knowingly done if the act is

20  done voluntarily and intentionally and not because of a mistake

21  or accident or other innocent reason.

22          The rules of evidence ordinarily do not permit

23  witnesses to testify as to opinions or conclusions.  There is

24  an exception to this rule for expert witnesses.  An expert

25  witness is a person who by education and experience has become

1    expert in some art, science, profession, or calling.  Expert

2    witnesses may state their opinions as to matters in which they

3    profess to be an expert, and may also state their reasons for

4    their opinions.

5            You should consider each expert opinion received in

6    evidence in this case and give it such weight as you think it

7    deserves.  If you should decide the opinion of an expert

8    witness is not based upon sufficient education and experience,

9    or if you should conclude the reasons given in support of the

10   opinion are not sound, or if you feel the expert is outweighed

11   by -- expert's opinion is outweighed by other evidence, you my

12   disregard the opinion entirely.

13           During the trial certain testimony has been presented

14   to you by way of deposition.  The deposition consisted of sworn

15   recorded answers to questions asked of the witnesses in advance

16   of the trial by attorneys for the parties to the case.  The

17   testimony of a witness who for some reason is not present to

18   testify from the witness stand may be presented in writing

19   under oath or in a videotaped presentation.  Such testimony is

20   entitled to the same consideration and is to be judged as to

21   credibility, weighed, and otherwise considered by you insofar

22   as possible in the same way as if the witness had been present

23   and had testified from the witness stand.

24           Each party has introduced into evidence certain

25   interrogatories, that is questions, together with answers,

2144

1    signed and sworn to by the other party.  The party is bound by

2    the sworn answers.

3           By introducing an opposing party's answers to

4    interrogatories, the introducing party does not bind itself to

5    those answers.  The introducing party may challenge the

6    opposing parties' answers in whole or in any part or may offer

7    contrary evidence.

8           You have heard testimony in this case from certain

9    witnesses who are lawyers, Mr. Hauprich, Mr. Cadenhead, and

10   Mr. Sabec.  You have also seen documents in this case that

11   discuss and take different positions about the law.  The law is

12   what I tell you it is in these instructions.  It's not what has

13   been stated in any document from either party, in any testimony

14   by any lay or attorney witness, or in any statements by the

15   attorneys in the case.

16          You have heard some testimony and seen some documents

17   that refer to the Digital Millennium Copyright Act, commonly

18   known as the DMCA.  The DMCA provides that an Internet

19   provider, commonly referred to as an ISP, like Cox, may have a

20   defense to liability for contributory or vicarious copyright

21   infringement arising from the use of its services for

22   infringement by its subscribers.  This defense is often

23   referred to as a safe harbor.

24          The DMCA is not a defense in this case and must be

25   disregarded.

1           Cox sought information regarding historical versions

2    of the Rightscorp source code that were in place between

3    February of 2012 and November of 2014.  Those versions of

4    Rightscorp's source code were not saved by Rightscorp.

5    Rightscorp was required to save those earlier versions because

6    it believed that litigation was likely, and the operation and

7    the accuracy of Rightscorp's system is material evidence.  You

8    may, but are not required to, consider the absence of earlier

9    versions of that code in considering the issue of infringement.

10          BMG sought Cox records identifying the Cox

11   subscribers who had been assigned the IP addresses identified

12   by Rightscorp.  Cox did not save that information after this

13   lawsuit was filed in November of 2014.  You may, but are not

14   required to, consider Cox's failure to preserve this material

15   evidence that would have allowed the parties to identify Cox

16   customers who were assigned specific IP addresses.

17          I am sending the exhibits that you have received in

18   evidence during the trial to you after you retire for

19   deliberations.  And there also will be an index of how those

20   exhibits were sponsored by different witnesses, or were

21   self-authenticating, to assist you in going through the

22   evidence itself.

23          A copyright is the exclusive right to copy.  The

24   owner of the copyright has the exclusive right to reproduce the

25   copyrighted work, prepare derivative works based upon the

2146

1    copyrighted work, distribute copies or phonorecords of the

2    copyrighted work to the public by sale or other transfer of

3    ownership, or by rental, lease, or lending.

4           It has the right to perform publicly a copyrighted

5    literary work, musical work, dramatic work, choreographic work,

6    pantomime work, or motion picture; display publicly a

7    copyrighted literary work, music work, dramatic work,

8    choreographic work, pantomime work, pictorial work, graphic

9    work, sculptural work, or the individual images of a motion

10   picture.

11          The term "owner" includes the author of the work, an

12   assignee, an exclusive licensee.  This case involves one kind

13   of authorship, namely musical compositions, which include music

14   and lyrics.

15          In this case BMG contends that Cox is contributorily

16   and vicariously liable for the infringement of 1,397 BMG

17   copyrighted musical works by users of Cox's Internet service.

18          BMG has already established that it is the owner of

19   the 1,397 musical composition works at issue in this case.  And

20   BMG has also established that the copyright in each of these

21   works is valid.

22          In order to prove contributory or vicarious copyright

23   infringement, BMG first must establish by a preponderance of

24   the evidence that users of Cox's Internet service used that

25   service to infringe BMG's copyrighted works.  BMG is not

2147

1    required to prove the specific identities of the infringing

2    users.

3            A copyright owner's exclusive right to distribute,

4    reproduce, and copy its copyrighted work is infringed by the

5    downloading or uploading of the copyrighted work without

6    authorization.

7            If you find that users of Cox's Internet service

8    uploaded or downloaded BMG's copyrighted works, then BMG has

9    established that users of Cox's Internet service have infringed

10   BMG's copyrighted works.

11           A copyright may be infringed by contributory

12   infringing.  With certain exceptions, a person is liable for

13   copyright infringement by another if the person knows or should

14   have known of the infringing activity and induces, causes, or

15   materially contributes to the activity.

16           Plaintiff has the burden of proving each of the

17   following by a preponderance of the evidence.  First, that

18   there was direct infringement of BMG's copyrighted works by

19   users of Cox's Internet service.

20           And second, that Cox knew or should have known of

21   such infringing activity.

22           And third, that Cox induced, caused, or materially

23   contributed to such infringing activity.

24           In copyright law, willful blindness is considered to

25   be knowledge.  Cox would be found to have acted with willful

1    blindness if it was aware of a high probability that Cox users

2    were infringing BMG's copyrights but consciously avoided

3    confirming that fact.

4          A copyright may also be infringed by vicariously

5    infringing.  A person is liable for copyright infringement by

6    another if the person has a financial interest in the right and

7    ability to supervise the infringing activity, whether or not

8    the person knew of the infringement.

9          In order to prove vicarious copyright infringement,

10   BMG has the burden of proving each of the following by a

11   preponderance of the evidence.  First, that there was direct

12   infringement of BMG's copyrighted works by users of Cox's

13   Internet service.

14         Second, that Cox had a direct financial interest in

15   such infringing activity.

16         And third, that Cox had the right and ability to

17   supervise such infringing activity.

18         Rightscorp is BMG's agent.  Any act or omission of

19   Rightscorp within the scope of Rightscorp's authority granted

20   by BMG is considered to be an act or omission by BMG.

21         The fact that I am instructing you as to the proper

22   measure of damages should not be considered as indicating any

23   view of mine as to which party is entitled to your verdict in

24   this case.  Instructions as to the measure of damages are given

25   for your guidance only in the event that you should find in

favor of the plaintiff from a preponderance of the evidence in the case in accordance with the other instructions.

If you find that Cox is liable for contributory infringement, or if you find Cox is liable for vicarious infringement, then you should consider the amount of money to award BMG.

If you find that Cox is neither liable for contributory or vicarious infringement, you should not consider this issue.

BMG seeks an award of statutory damages under the Copyright Act.  Statutory damages are damages that are established by Congress in the Copyright Act because actual damages in copyright cases are often difficult to establish with precision.  The purposes are to compensate the copyright owner, penalize the infringer, and deter future copyright law violations.

The amount awarded must be between 750 and $30,000 for each copyrighted work that you found to be infringed.  If BMG proves that Cox acted willfully in contributorily or vicariously infringing BMG's copyrights, you may, but are not required to, increase the statutory damage award to a sum as high as $150,000 per copyrighted work.

You should award as statutory damages an amount that you find to be fair under the circumstances.  In determining the appropriate amount to award, you may consider the following

1    factors:  The profits that Cox earned because of the

2    infringement; the expenses Cox saved because of the

3    infringement; the revenues that BMG lost because of the

4    infringement; the difficulty of proving BMG's damages; the

5    circumstances of the infringement; whether Cox acted willfully

6    or intentionally in contributorily or vicariously infringing

7    BMG's copyrights; deterrence of future infringement; and the

8    amount of harm, in the form of monetary loss, that BMG could

9    reasonably have avoided but for the failure to mitigate

10   damages, if you find that BMG did fail to mitigate.

11           You should award statutory damages whether or not

12   there is evidence of the actual damage suffered by BMG, and

13   your statutory damage award need not be based on the actual

14   damages suffered by BMG.

15           Cox's contributory or vicarious infringement is

16   considered willful if BMG proves by a preponderance of the

17   evidence that Cox had knowledge that its subscribers' actions

18   constituted infringement of BMG's copyrights, acted with

19   reckless disregard for the infringement of BMG's copyrights, or

20   was willfully blind to the infringement of BMG's copyrights.

21           In this case, Cox asserts the affirmative defense of

22   failure to mitigate damages.  Cox must prove each element of

23   this defense by a preponderance of the evidence.

24           Plaintiff has a duty to use reasonable efforts to

25   mitigate damages.  To "mitigate" means to avoid or reduce

2151

1    damages.

2          The defendant has the burden of proving by a

3    preponderance of the evidence, one, that the plaintiff, BMG,

4    failed to use reasonable efforts to mitigate damages; and, two,

5    the amount by which damages would have been mitigated.

6          You must follow these rules while deliberating and

7    returning your verdict.  First, when you go to the jury room,

8    you must select a foreperson.  The foreperson will preside over

9    your discussions and speak for you here in court.

10          Second, it is your duty as jurors to discuss this

11    case with one another in the jury and try to reach an

12    agreement.

13          Each of you must make your own conscientious

14    decision, but only after you've considered all the evidence,

15    discussed it fully with the other jurors, and listened to the

16    views of the other jurors.

17          Do not be afraid to change your opinions if you -- if

18    the discussion persuades you that you should, but do not make a

19    decision simply because other jurors think it is right or

20    simply to reach a verdict.  Remember at all times that you are

21    judges of the facts, and your sole interest is to seek the

22    truth from the evidence in the case.

23          Third, if you need to communicate with me during your

24    deliberations, you may send a note to me through Joe signed by

25    one or more of the jurors.  I will respond as soon as possible

1    either in writing or orally here in open court.  Remember that

2    you should not tell anyone, including me, how your votes stand

3    numerically.

4            Fourth, your verdict must be based solely on the

5    evidence and the law that I have given you in these

6    instructions.  The verdict must be unanimous.  Nothing I have

7    said or done is intended to suggest to you what your verdict

8    should be, that's entirely for you to decide.

9            Finally, the verdict form is simply the written

10   notice of the decision that you reach in this case.  A form has

11   been prepared for you which breaks out direct infringement,

12   contributory infringement, vicarious infringement, and asks you

13   to check a box "yes" or "no."  And if you check the box "yes"

14   for direct and either contributory or vicarious liability, then

15   you must also fill in the amount of damages that you believe

16   are appropriate under the statutory damages instruction.

17           You will have this form with you in the jury room.

18   And when each of you has agreed on the verdict, your foreperson

19   will fill in the form, sign, and date it, and advise Joe that

20   you have reached a verdict and are ready to return to the

21   courtroom.

22           All right.  Any need for a sidebar on the

23   instructions as I have read them now?

24           MR. PECAU:  No, Your Honor.

25           MR. BRIDGES:  No, Your Honor.

1          THE COURT:  Okay.  All right.  Then let's begin our

2    closing arguments then.

3          While Mr. Warin is getting ready, I forgot to ask

4    whether you had obeyed my instructions one last time and not

5    done any investigation or research or talked to anybody?  Thank

6    you very much.

7          All right.  Mr. Warin, whenever you are ready, sir.

8          MR. WARIN:  The first thing I would like to do is say

9    thank you.  We have been together now for two weeks, spent a

10   lot of time studying and hearing testimony about things that

11   probably aren't in our everyday experience.  It has been

12   obvious that you have paid close attention, all of you have

13   taken notes, and on behalf of my client I would like to thank

14   you.

15         I would also like to thank my colleagues who worked

16   with us and our client representative, Rhonda Blakey, who is

17   here today.  This an important case to BMG, and that's the

18   reason it has brought it.  And I'm going to walk through why

19   they feel it is important to them and to the songwriters that

20   they represent.

21         We believe that the evidence that you've heard over

22   the last two weeks establishes convincingly that Cox is

23   responsible for widespread, pervasive infringement of BMG's

24   patent -- copyrights, excuse me.

25         Cox facilitated the illegal copyright infringement on

1    its network when it, number one, knew about it; number two,

2    profited from it; number three, had the legal right and ability

3    to supervise the illegal activity; number four, materially

4    contributed to it.

5           So those are the elements you have just heard the

6    judge describe that would impose liability on Cox.

7           You have heard some testimony about who is Cox.  Cox

8    is a very successful business.  They have more than 4.5 million

9    subscribers.  In 2014 their revenue from residential services

10   they were providing was $8 billion, with $3.1 billion in

11   profit.

12          They had a profit margin, as you heard Dr. Lehr

13   testify, with respect to their high-speed Internet services of

14   96.6 percent.

15          BMG.  BMG represents songwriters, and they help them

16   protect their copyrights.  And you have just heard the judge

17   describe what a copyright is.  It's a protection provided by

18   law to the owner of a copyright allowing that individual or

19   entity the exclusive right to reproduce, distribute, perform,

20   or display the copyrighted works.

21          There is no dispute that BMG has the right to pursue

22   those rights on behalf of the songwriters of the 1,397 songs

23   that you've been hearing about.

24          Songwriters, like all of us, are entitled to be paid.

25   How do they get paid?  Songwriters get paid when their songs

1    are played at a concert, when they are played on the radio,

2    when they are CDs, when they are streaming on iTunes or

3    Spotify.

4            But when Cox Internet users illegally copy their

5    songs, songwriters get nothing for them.  And that illegal

6    copying competes with the legitimate sales where they are

7    trying to make money.

8            You heard as our very first witness from the

9    president of BMG, Laurent Hubert.  He described what his job is

10   and the representation they have of the songwriters.  He

11   indicated he represents more than 15,000 artists, and that his

12   job is to help the songwriters get paid for their work.  Which

13   is what this lawsuit is all about.

14           You heard that his testimony, this is quoting from

15   his testimony, "Our primary goal is to enforce the copyrights

16   and making sure those copyrights become valuable.  We remit

17   between 75 and 95 percent of the royalties to the writer.  I

18   never authorized BitTorrent platform to use the copyrights."

19           And so, this is brought on behalf of those

20   songwriters, and 75 to 95 percent of whatever you may award

21   will go to the songwriters.

22           You also heard the testimony of Keith Hauprich.  Mr.

23   Hauprich was also at BMG, and he talked to you a little bit

24   about the problem that resulted in this lawsuit starting.  That

25   music piracy is a huge problem for songwriters, not just BMG

2156

1    songwriters, but others.  That once a song is on BitTorrent,

2    there is no longer the ability to control it.  It's out there.

3    The owner of that, that has the exclusive right to control it,

4    has lost that control.

5         Suing individuals, that may be the individual

6    subscribers, hasn't worked.  And you have heard testimony about

7    some people that have done that.

8         The fact of the matter is, that a songwriter that is

9    trying to make money from the legal sales of their product

10   can't compete with free music, their same songs that are being

11   provided over the Internet on BitTorrent.

12        The $20 settlement offer that you heard BMG had in

13   its notice letters was meant to be a fair, reasonable, and

14   meaningful way to resolve the problem.  And I'm going to talk

15   about that.  Because you heard the testimony about how BMG and

16   Rightscorp thought that was a win/win situation.

17        We're not suggesting that every copyright infringer

18   on Cox's network knew it was illegal, but how is one of the

19   ways they're going to find out it's illegal?  Is if their

20   service provider, Cox, passes on the notices they get from the

21   copyright owners telling them that what they're doing is

22   illegal.  That didn't happen here with any of the BMG notices.

23        So as long as the work is out there and being copied

24   and copied and copied again, there's constant theft.

25        Now, you heard a bit about BitTorrent.  Boy, I'm not

1   going to spend any more time talking to you about the

2   technical, legal, or engineering aspects of BitTorrent.  I

3   think it was pretty obvious that the testimony -- I'm going to

4   run through some of the exhibits -- are that Cox subscribers

5   are engaged in illegal copyright infringement, and Cox knows

6   it.  And that copyright infringement is frequently on

7   BitTorrent.  And they're getting these songs, they're

8   downloading and uploading these songs without paying for them.

9           You've heard about where they get these songs, about

10  these sites that they can go to once they've got the BitTorrent

11  protocol established.  ThePirateBay, KickassTorrents, where

12  they list the songs that are available to be able to go on once

13  you've got the BitTorrent software to go out and grab those

14  songs for free.

15          You've seen how it spreads like a virus.  That once

16  the uploading and downloading starts, it's impossible to stop,

17  much like a virus.  It just keeps spreading and spreading, and

18  the uploading and downloading is constant.

19          You've heard a little bit about the experts.  It's

20  not a situation where you have to take a lawyer's word for it.

21  This is an exhibit, this was introduced in evidence during

22  Dr. Lehr's testimony.  And let me read from it.  "At a minimum,

23  99.24 percent of the top 10,000 files managed by the PublicBT

24  tracker were copyrighted material."

25          This is not an exhibit prepared for litigation.  This

1    was an industry study as to what was happening on BitTorrent.

2            And while it may be, and you heard from Cox in their

3    opening, that there can be legitimate uses, that's not the

4    predominant.  It's not what's happening on BitTorrent.  This

5    independent group that studied it said 99 percent were

6    copyright infringement, illegal copying.

7            That same report said, "of all unique visitors to

8    torrent portals in January of 2013, it is estimated that

9    96.28 percent sought infringing content during the month, a

10   total of 204 million users."

11           So 96 percent of the people using BitTorrent in

12   January 2013 went there to engage in illegal copying and

13   stealing of music.  Not my words.  The words of experts that

14   weren't hired for this lawsuit, that were industry publications

15   that were widely available before this lawsuit ever began.

16           So we believe that there's widespread, rampant

17   copyright infringement on the Cox network.  And I'm going to

18   walk you through some Cox documents and e-mails that show you

19   that not only was it happening, but Cox knew it was happening.

20           The judge just explained to you what BMG's burden is,

21   by a preponderance of the evidence.  Step one, we proved direct

22   infringement of BMG's songs by users of the Cox Internet

23   service.  We think there's overwhelming proof of that, that's

24   step one.

25           Step two, Cox is liable for contributory infringement

1    by Cox users or vicarious infringement by Cox users.  Which

2    means that Cox doesn't have to be the one itself that is doing

3    the illegal copying, but it has same liability as if it were if

4    it's liable for contributory infringement or vicarious

5    infringement.

6            Let's talk about direct copyright infringement.  We

7    believe that the evidence has proved that Cox's Internet

8    service, that users of Cox's Internet services uploaded and

9    downloaded BMG's copyrighted works.

10           In terms of what we believe we've proved, and in

11   order to establish contributory infringement -- because,

12   remember, there are two aspects.  Cox can be liable if they're

13   guilty of contributory infringement or vicarious infringement.

14   We don't have to prove that they're liable for both.  We think

15   we have, and I'm going to walk you through why we think that

16   is, but if you conclude that they're liable for one or the

17   other, then they're liable.

18           So let's walk you through what you've just heard from

19   the judge we have the obligation to prove, and we feel we have

20   proven with respect to contributory infringement.  That Cox

21   knew its users were infringing BMG's copyrighted works, and

22   that Cox materially contributed to the infringing activity.

23   That's from the instructions the judge read to you.

24           Knowledge.  Cox knew.  Well, what does that mean?  As

25   you've just heard from the judge, that Cox knew or should have

1    known of the widespread copyright infringement by its owners.

2    So knew or should have known is the instruction you'll be

3    taking back with you.

4            Finally, that Cox knew or should have known of the

5    infringement of BMG's songs.

6            Finally, by trashing BMG's notices without ever

7    opening them, and we'll go through that, or keeping a copy, Cox

8    deliberately chose to be willfully blind to the infringement of

9    BMG's songs.

10           So either it knew, should have known, or were

11   willfully blind, meet the knowledge requirement of contributory

12   infringement.

13           And finally, as proof of that, and we'll go through

14   that, not only did Cox not open or look at the notices that we

15   sent to them, but they didn't look at the summaries and try to

16   find out, is what BMG is alleging here accurate?  Are our

17   subscribers infringing these songs to the extent that BMG is

18   alleging?  They didn't go out and check those summaries.

19           And they didn't even bother to open the Dashboard,

20   which would allow them to go day by day, look at every single

21   infringement notice that BMG has sent, look at the time, date,

22   place, who supposedly did it, what was the song that was

23   stolen.  Didn't bother to look.  Kept their eyes closed.  The

24   ultimate proof of willful blindness.

25           Now, here's willful blindness, this is what the judge

2161

1    just instructed you.  In copyright law, willful blindness is

2    considered to be knowledge.  Cox acted with willful blindness

3    if it was aware of a high probability that Cox users were

4    infringing BMG's copyrighted works but consciously avoided

5    confirming that fact.

6           They get the notices.  They don't look at the

7    notices.  They trash them.  They get the summaries of the

8    repeat infringers listing how many they are, what the ports

9    are.  They don't look at those.  They get the Dashboard.  They

10   don't look at those.  The very definition of willful blindness.

11          Material contribution.  That's another aspect of

12   contributory infringement that we have to prove.  And we

13   believe we've done it overwhelmingly.  Cox materially

14   contributed to the infringement by, number one, providing

15   Internet service, making the infringement possible, and

16   refusing to terminate known infringers.

17          All of those are without dispute, and I'll walk you

18   through the evidence that shows that.

19          Now, with respect to vicarious liability.  I've now

20   switched gears, I started talking about contributory liability,

21   and now I'm talking about vicarious.  Recall that Cox can be

22   liable on either.  We think they're liable on both.

23          The first thing, we believe that BMG has proven that

24   Cox has the right and ability to supervise the infringing

25   activity.

1            Now, keep in mind for this one, even though we've

2    proven that Cox knew, should have known, or willfully blind,

3    for vicarious liability you don't have to prove that Cox knew,

4    should have known, or was willfully blind.  It's not part of

5    the elements of that liability.  All we have to prove is that

6    Cox had the right and ability to supervise the infringing

7    activity.

8            We believe that Cox's Authorized Use Policy, which

9    you heard talked about, gave them the right and ability to

10   supervise the infringing activity.  And I'm going to walk you

11   through that.

12           And finally, that Cox had a financial interest in the

13   infringing activity.  And we think the testimony you've heard,

14   not just from Dr. Lehr, but from Cox itself, and the e-mails

15   that Cox employees were writing at the time, overwhelmingly

16   demonstrate that Cox had a financial, a direct financial

17   interest in keeping repeat infringers.

18           You may recall in my opening statement I showed you

19   some of those slides.  I'm going to show you some more.

20           Let me apologize ahead of time, there's been a lot of

21   evidence in this case.  I would love to show you absolutely

22   every e-mail that we've got that confirms that.  I'll probably

23   jump into warp speed as I'm going through, and I'll try to slow

24   down a little bit, so I may need to glaze over some of those

25   quickly, but you'll have every one of them.

2163

1           You don't need to take my word for it as a summary.

2    You're going to have all of those e-mails from Cox employees

3    proving that Cox had a direct financial interest.  And that's

4    the reason they didn't terminate repeat infringers that they

5    knew about.

6           The right and ability to supervise.  I mentioned that

7    the Authorized Use Policy gave them that.  And you've seen

8    that, and I'll show it to you in a second.  It makes it very

9    clear that when you subscribe to Cox, you enter into a

10   contract.  That contract has certain rules associated with it.

11   One of those rules is you won't engage in copyright

12   infringement on our network.  And if you do, we can throw you

13   off.

14          And you heard the Cox witnesses say, those are their

15   rules.  The problem is, they never enforced their rules,

16   specifically with respect to our works.

17          But let's go out a little further.  The Cox CATS

18   system, that gives them the ability, and you heard the

19   testimony about it, to supervise and control the infringing

20   activity on its network.  They can keep track of who these

21   infringement notices are coming in from and who their

22   subscribers are that are engaging in that.

23          But instead of actually doing something about it, Cox

24   did everything it could to keep the infringers as subscribers.

25   Why?  To keep the revenue coming in.

```
 1              So we believe the evidence has overwhelmingly
 2    established that Cox had a direct financial interest in
 3    allowing the infringement.  Let's walk through.  Number one,
 4    they wanted to keep the revenue from infringing subscribers by
 5    refusing to terminate them.
 6              Number two, as you've seen from the Nowlis survey and
 7    from Cox's own internal documents, they were advertising
 8    high-speed downloading of music as a way to attract, to draw
 9    customers to their Internet service.
10              Third, to minimize the cost of dealing with
11    infringement.  You're going to see evidence, and I'll walk you
12    through it, as the number of complaints of copyright
13    infringement were going up, what was Cox's response?  Number
14    one, cut staff by 75 percent who is handling it.  And number
15    two, put in hurdle after hurdle after hurdle so we don't
16    actually have to read the notices or do anything about it.
17              And finally, you saw the evidence about Cox wanting
18    to upgrade so they could charge more for higher band use of
19    people that wanted to download music.  Where are they going to
20    do that?  High-speed BitTorrent downloading of music, free
21    stealing of our clients' music.  And Cox was advertising that
22    as a draw to get customers.
23              You've seen a lot of references in the documents here
24    with respect to the DMCA, Digital Millennium Copyright Act.
25    You've just heard the judge instruct you that that defense is
```

1    not available to Cox and must be disregarded.

2           Let's walk through why we believe we're entitled to

3    statutory damages here.  Statutory damages are damages

4    established by Congress in the Copyright Act because actual

5    damages in copyright cases are often difficult to establish

6    with precision.  These are the exact words you just heard the

7    judge speak, and they will be in the jury instructions you will

8    take back with you.

9           The purposes of statutory damages are to compensate

10   the copyright holder, to penalize the infringer, and to deter

11   future copyright violations.

12          The judge also instructed you that your statutory

13   damage award need not be based upon actual damages suffered by

14   BMG.

15          So this is not like an intersectional collision case

16   where if you find liability, you find out what their medical

17   specials were and what their injuries are.  We're in the

18   statutory damages situation.  The judge has instructed you on

19   the factors.  I've quoted some of them in this slide here.

20          Now, willful infringement, you heard about that.

21   Because under statutory damages, if somebody is engaged in

22   copyright infringement, vicarious or contributory, but it was

23   inadvertent, it wasn't intentional, it wasn't willful, then the

24   maximum amount you can get is $30,000 per copyright.

25          So if you multiple 30,000 times the 1,375 copyrights

1    here, it's a pretty big number.  But that's if you're engaged

2    in what I would call innocent or nondeliberate or nonwillful

3    infringement.

4            The Court and the Congress has said that if you're

5    engaged in willful infringement, you can be subject to up to

6    $150,000 per copyright work.

7            What does that mean?  Cox's contributory or vicarious

8    liability is considered willful if BMG proves by a

9    preponderance of the evidence that Cox had knowledge that its

10   subscribers' actions constituted infringement of BMG's

11   copyrights and acted with reckless disregard for the

12   infringement of BMG's copyright works or was willfully blind to

13   the infringement of BMG's copyrights.

14           You saw a lot of e-mails.  You heard a lot of

15   testimony.  Did you see a single e-mail from a Cox

16   representative, we think that this stealing on our network is

17   horrible?  Cox recognized that it was illegal.  But did you see

18   any e-mail or hear any testimony, we think we need to do steps

19   to eliminate, to eradicate this stealing that's going on on our

20   network?  No.

21           That suggests reckless disregard for the stealing

22   that's going on on their network that they know about.

23           Let's go further.  Cox is entitled -- I mean, excuse

24   me, BMG is entitled to statutory damages because Cox earned

25   enormous profits.  How?  By turning a blind eye to the

1   infringement on the network and by refusing to terminate repeat

2   infringers.

3          A substantial award is necessary to deter Cox from

4   future wrongful conduct.  We believe that the evidence

5   established that Cox acted willfully and intentionally to

6   violate BMG's copyrights, and we believe that another factor

7   suggesting a fairly significant award of statutory damages is

8   the massive worldwide scope of the infringement.  This isn't

9   like somebody going down and copying one CD in their basement

10  and stealing it.  Once their users go down and start uploading

11  and downloading BMG songs on BitTorrent, like I say, it spreads

12  like a virus.

13         Direct infringement.  Let's walk through the evidence

14  that we believe we have established of direct infringement of

15  our copyrighted works on the Cox network.  First, you have

16  heard lots of testimony that there were massive, widespread

17  infringement by Cox users as evidenced by the millions of

18  notices, millions of notices from copyright holders other than

19  BMG.  And I'm going to walk you through documents going back to

20  2010 or whatever.

21         Before Rightscorp ever sent its first notice, Cox is

22  getting millions of notices from other copyright holders saying

23  that there's massive copyright infringement going on, massive

24  stealing of copyrighted works on its network, all before they

25  got their first notice from BMG.

1            Secondly, Cox subscribers admitted to the

2    infringement.  And I'm going to walk you through some documents

3    where it's acknowledged that the Cox subscriber admits, yeah, I

4    was engaged, I was engaged in stealing.  I'm going to show you

5    an e-mail that confirms that.

6            Cox employees knew about and acknowledged the

7    infringement, and you're going to see e-mails, some of which I

8    talked about in my opening statement.

9            With that background, with the damage that's being

10   done to BMG and its songwriters, BMG hired Rightscorp, which

11   identified millions of instances of infringement of the BMG

12   copyrighted works here by Cox users.

13           So you heard how the Rightscorp system worked.  It

14   identified these songs that were out there being infringed by

15   specific Cox users.  They didn't know their name, but they knew

16   the terminal.  And they notified Cox about them.

17           Rightscorp downloaded more than 700,000 illegal

18   copies of songs from Cox users, 150,000 of them -- and I'll get

19   to that in a minute -- are the very songs that are at issue in

20   the lawsuit.  The proof is in the pudding as to how the

21   Rightscorp system worked.  They actually got the infringed song

22   from a Cox subscriber.

23           More proof of that is that you've heard a lot of

24   testimony that Cox offered to "process" the Rightscorp notices

25   if the settlement language was removed.  Well, what better

2169

1    evidence is there, if Cox had any doubt that the notices were

2    accurate or that they were not accurately identifying

3    infringement by Cox subscribers of the BMG works in question,

4    why would they offer to "process" them?

5            This argument that something is wrong with the code

6    came up only after this lawsuit happened.  Because with respect

7    to all the notices that they did process, and we'll talk about

8    that in a minute, there was no going back and checking the

9    code.  There was no requirement that the infringer be

10   "adjudicated" as being an infringer.

11           Cox had substantial data that it could have checked

12   if it wanted to as to the songs that were being infringed, who

13   was doing it, when, and for how long and how much.

14           And why do I say that?  You heard a lot of testimony

15   about the unique nature of the hash tag.  The hash value is on

16   each infringed song on the torrent.  You heard

17   Ms. Frederiksen-Cross complain how that worked, and how it's

18   the equivalent of a fingerprint that allows you to know exactly

19   what song is being copied or recognized on a Cox user's

20   terminal.

21           They also explained to you how in addition to the

22   fingerprint, that the song itself was at first listened to and

23   then later audio computer verified that fingerprint was in fact

24   one of the copyrighted songs.  And when they were going through

25   the process of copying them, that's one of the things -- or

1    notifying them, that's one of the things they did.

2              Here she is, Barbara Frederiksen-Cross, great

3    credentials, 40 years doing this, very patient woman, explained

4    carefully how the BitTorrent system worked.  It was a

5    complicated, detailed explanation.  But the most important part

6    of her testimony was not the explanation, the technical

7    explanation as to how it worked, was her conclusion that "with

8    respect to the code that I reviewed," and that's the Rightscorp

9    code that Cox has been criticizing, "and the data I reviewed,

10   it's my opinion that the system by and large was very accurate,

11   and that it's effective with respect to the types of sampling

12   that it does."

13             I mentioned the downloading, 150,000 copies of the

14   1,397 songs that are at issue.  The fact that Rightscorp was

15   able to actually go out and get a copy of that infringed song

16   from a Cox subscriber is the proof in the pudding that

17   Rightscorp's system worked in terms of identifying the

18   infringed songs.

19             So we believe that BMG has proven infringement of its

20   copyrights on a massive scale on the copyright network.  There

21   have been 1.8 million detections of illegal uploading and

22   downloading.  Rightscorp has downloaded, as I said, 700,000

23   songs.  150,000 of them are the ones here.

24             You've heard the testimony from Barbara

25   Frederiksen-Cross who studied and tested the Rightscorp system

2171

1    and concluded that it was accurate and accurately detected

2    infringement of the songs at issue.  Cox didn't question the

3    accuracy of those notices at the time.  And, in fact, they

4    offered to process them if we just took out the settlement

5    language.  And I'll talk about that in a minute.

6          And if Cox had any question about the accuracy of it,

7    once it got a notice, if it chose to not ignore them and to do

8    something about it, it could have actually tried itself to

9    verify whether or not the information was accurate.  And it

10   didn't do that either.  It didn't do anything.

11         In fact, Cox not only didn't do anything, but it

12   destroyed the records that would allow us as we got into this

13   lawsuit to confirm who the subscriber was.

14         We were trying to identify how many repeat infringers

15   there were.  And we had a number that was in excess of 100,000.

16   One of the ways to identify the repeat infringer, because we

17   had the port number but not the subscriber, was to go to Cox

18   records and say, well, okay, who was the subscriber?  Did the

19   subscriber change over time from that IP address?

20         Well, couldn't do it, that's the only reason you

21   heard Dr. Bardwell here, is because Cox didn't have those

22   records.  At one time they did, but they didn't have them when

23   it was time to check it out to make sure that the repeat

24   infringers we had identified were in fact repeat infringers.

25   And so, I am going to talk about that.

1            But Dr. Bardwell was able to get the 122 copies,

2    records of the over 100,000 that he requested, and confirm that

3    in fact the IP address had remained with a subscriber during

4    the period of time, and that was a repeat infringer.

5            So let's talk about the notices.  Okay.  Rightscorp's

6    notices identified precisely -- and I'm going to walk through

7    it, the activities, the illegal activities that were going on

8    on the Cox network.  They gave the date, time, song, IP

9    address, under oath, under penalty.

10           Now, if you go back, this is where Cox said, if you

11   have a complaint that someone on our network is engaging in

12   copyright infringement, send it to abuse@cox.net.  So they told

13   us where to send it, which is where we send it.  And then they

14   said what's got to be in the notice.

15           So let's look at what has to be in the notice.  These

16   are Cox's requirements.  They had six requirements.  You heard

17   two of Cox's witness, Mr. Zabek and their counsel, their

18   retired counsel, come in and testify that every one of those

19   requirements that Cox posted -- you want to tell us about a

20   copyright infringement notice, meet these requirements, the

21   last one of which is swearing under penalty of perjury as to

22   what you're telling us.  No question that the BMG notices met

23   all six of those.  Don't take my word for it.  Take the word

24   from two Cox witnesses who said they met all six of these

25   requirements.

1        So if they met these requirements, why didn't Cox --

2   what's the reason, the excuse, that Cox gave for not doing

3   anything about it?  Well, it's this settlement language.

4   Because in addition to providing every bit of information,

5   time, date, place, IP port, song, et cetera, the Rightscorp

6   notice had in it a settlement offer.  You've heard a lot about

7   it.  You've heard Cox criticize the settlement offer.

8        But you also heard the testimony from BMG and

9   Rightscorp as to why they had a settlement offer in there.

10  They offered a quick, out-of-court resolution to inexpensively

11  and efficiently get rid of what was an obvious infringement, an

12  obvious law violation.

13       So rather than having to file a John Doe lawsuit, try

14  to get a subpoena to find out who it was, drag them into court,

15  incur all the time, expense, and legal fees, they said, look,

16  we've got this information, we caught you, we have the

17  information as to when you copyright infringed our songs, and

18  we're willing to reach a settlement with you and give you a

19  release.

20       From BMG's point of view, and you heard the

21  testimony, they thought that was a win/win/win situation.  That

22  they are able to do something about illegal piracy of their

23  songs on the network.  The infringer is told there are

24  consequences to your actions, so that if you continue to do it,

25  you're going to continue to have liability here.  But we're

2174

1    able to reach a resolution with you for a fairly modest amount.

2          And it's a win situation for Cox because they know

3    that this infringement is going on, and it gives them a way to

4    deal with something that Cox itself had said is a violation of

5    the terms of our agreement.  The terms of our agreement was,

6    you shouldn't use, you can't use the Cox Internet service for

7    infringing on copyrights.

8          So Cox now has evidence of that and it gives them a

9    way to enforce their Authorized Use Program, which is to try to

10   deal with what was a fairly massive problem of copyright

11   infringement on its network.  As you heard, win/win/win.

12         It wasn't viewed that way by Cox.  They made fun of

13   it, they ridiculed it, and they disregarded it.  Because if you

14   look at this e-mail, this is in 2014, "Sources like Rightscorp

15   are blacklisted with us.  We silently delete the e-mail

16   messages without any parsing, ticketing, et cetera.  We delete

17   the message without retrieving its message body."

18         So here's what they did.  You heard the testimony

19   from the Cox people.  They set up their server so that it

20   wouldn't even get in to them.  There'd be no indication that

21   they got the notice.  It was blocked at the server level.  You

22   just read the e-mail that confirmed that.

23         So Rightscorp is sending these notices.  It'd be one

24   thing -- we don't think it's a proper response -- if they

25   actually took them in and kept records of the notices that they

1   received from Rightscorp.  They didn't do that.  Blocked at the

2   front door, in the trash can, kept no record of a single

3   Rightscorp notice after they established that procedure.  Talk

4   about willful blindness.

5          I mean, they may not have liked our notices, and

6   we'll walk through this, but like our notices or not, they

7   really didn't have the ability to totally ignore them.

8          But let's get past the infringement notices.  And

9   they complain about the vast number of them.  No question that

10  BMG sent a lot of notices.  Why did they send a lot of notices?

11  Because they had observed massive copyright infringement on the

12  network.  That's why they sent a lot of notices.

13         But they did more than that because the preference

14  was not to be where we are today, but to find a cooperative way

15  to solve this problem.  So they sent, in addition to the

16  notices, they sent summaries that would list the major repeat

17  infringers that they had identified on the Cox network.  These

18  were summaries.

19         So Cox could have, if they didn't like the notice

20  with the settlement language, looked at the summaries, which

21  identified the people on their network that were repeatedly

22  engaging in copyright infringement, they could have looked at

23  the summaries and sent notices to the people that they knew

24  were their subscribers that had those IP addresses.

25         The monthly summaries that were sent, for example,

1    this one to Mr. Cadenhead, and he agreed he looked at it but

2    didn't do anything with it, that would have allowed them to

3    take responsibility in a way for the copyright infringement

4    that was going on on their network.  Didn't do it.

5            It was more than that though.  And let's take a look

6    at what Mr. Cadenhead got in that letter I just showed you.

7    Take a look at the first few -- excuse me -- I'll go back --

8    the first few notices that are there.  We're not talking about

9    minor numbers of infringements.  The first one there, 20,000.

10   The second one there, 18,000.  The third one there, 15,000.

11   The next one there, 12,000.

12           This list goes down and down.  These are the number

13   of times that the Rightscorp software has detected an

14   infringement of a patent -- excuse me -- a copyright that they

15   were enforcing.

16           Did Cox say, gee, that first 20, those people look

17   like they're doing nothing but copyright infringement on our

18   network?  We better contact those people to see what's going on

19   because it likes like they're violating our contract, which

20   says, you shall not, you cannot engage in copyright

21   infringement on our network or else we're going to throw you

22   off.  Is that what they did?  Closed a blind eye.  Didn't do

23   anything with this.

24           The same thing with the Dashboard.  You heard about

25   the Dashboard.  So we've got the notices themselves.  We've now

2177

1    got the summaries and the Dashboard.  The Dashboard would have

2    allowed anyone from Cox to go back and look at any individual

3    notice.  It was comprehensive.  It had each of the notices with

4    respect to each of the infringements.

5            If Cox was really interested in paying attention to

6    copyright infringement on their network, it could have gone to

7    the Dashboard, free of charge, password protected.  Go in

8    there, see which of your subscribers is engaging in copyright

9    infringement with respect to the BMG songs.  Didn't do that.

10           Mr. Cadenhead honestly admitted, no, didn't even open

11   it.  Didn't look at it, didn't instruct anyone to look at it.

12           All right.  So when faced with that, Mr. Steele knew,

13   Rightscorp knew that they weren't sending on their notices

14   because of the settlement language.  And they got back to them

15   and they said, please pass on the report.  What was the report?

16   The one I just showed you.  The summary listing of all the

17   things.  "Pass it on to your boss and have him call me to

18   discuss your proposed solution to these Cox customers who are

19   repeatedly infringing our copyrights.  The industry now has

20   years of data to prove that cease and desist notices you offer

21   to send have no effect."

22           So the cease and desist notice is the notice without

23   the settlement language, "please don't do it again."  The

24   industry had years of data that that wasn't working.  It was

25   not eliminating copyright infringement.

1             It's like my mother telling me, don't cross the block

2    in the middle of the street, do it at the intersection.  But I

3    do it.  And I get the warning, and I do it again.  And I get

4    the warning, and I do it again.  And nothing happens.  I'm

5    being taught that despite what my mother said, it's okay to

6    cross the street in the middle.

7             If all you send is warnings, with no consequences,

8    you are reinforcing and seeming to turn a blind eye and a wink

9    and an endorsement of the illegal conduct that you're

10   supposedly warning about.  And if you look, that's what Cox did

11   for years and still does with respect to these copyright

12   infringement notices.

13            Warnings with no consequences, no teeth.  That's why

14   Rightscorp went to the system of trying to put some teeth in

15   the warning.  Let's see if we can get these people to realize

16   they have legal liability when they engage in illegal conduct.

17   And if they realize there's some consequences to that, and we

18   have a settlement with them and they pay some money, that has a

19   better chance of deterring and stopping the conduct than just

20   sending a letter, a warning letter that has no teeth.

21            So you can see that Rightscorp is interested in

22   finding a reasonable solution, which is exactly the last line,

23   "Our request is easy to implement and reasonable."  Yet we have

24   been vilified because we wouldn't take the settlement language

25   out as though it's some really horrible thing to offer to

2179

1    settle with somebody who is operating against the law.

2            Keep in mind that the notices that Rightscorp wanted

3    to send and wanted Cox to send were to people that it had

4    detected engaging in illegal conduct on the Cox network.

5    Illegal copyright infringement.  Illegal stealing of those.

6    That's who Rightscorp wanted to send the notices to.  And the

7    fact that it said it should have some teeth in the settlement

8    offer, they thought would help make it effective.

9            This was the reaction to that letter of can we work

10   things out.  This is Mr. Zabek internally.  You can see up in

11   the right-hand corner.  "Has anyone else dealt with Digital

12   Rights Corporation -- Rightscorp?  They offer settlements to

13   people so that they don't have to sue them.  Oh, sorry, I just

14   laughed a little.  I told them, no thanks.  The dude sends me

15   these instructions for Cox, and after I get done laughing, I

16   wrote them back.  Just wonder if anyone has dealt with these

17   tools also and what you did.  I really wish to push this --

18   excuse me -- I really hope they push this and threaten to sue

19   us.  We have all of our ducks in a row on DMCA, and I would dig

20   going to court and either shoving it in their face or

21   destroying the DMCA."

22           You've already been told by the judge that Cox does

23   not have a DMCA defense here.

24           Let's go on further.  Again, the same people involved

25   in the handling, the people that Cox put in charge of enforcing

2180

1    copyright infringement, Sikes, Zabek, Carothers, the others.

2    So they go on and confirm.  "So we actually do not accept any

3    complaints from DRC Digital Rights Corp and have blacklisted

4    them sending notices to abuse.com."  And then the last line,

5    which I am not going to read.

6              But it makes it very clear what the attitude of the

7    people at Cox who were responsible for enforcing the law and

8    responsible for enforcing their responsibilities, the attitude

9    that they displayed toward BMG's notices and to the people that

10   were working with them on those notices.

11             Another one.  As a result of that bad language that

12   you saw in that last one, Mr. Carothers said, "Sorry to be

13   Paranoid Panda here, but please stop sending out e-mails saying

14   F the law or F some company.  If we get sued, those e-mails are

15   discoverable and would not look good in court."

16             So I think that Cox knew that there were certain

17   consequences of its actions, and decided to ignore them.

18             And what did Cox tell its subscribers was Cox's

19   responsibility?  Because Cox did send notices to some

20   subscribers.

21             Now, we have seen and you heard Dr. McGarty testify

22   yesterday that they sent notices, but didn't follow-up on them.

23   They didn't have any teeth.  That's after they failed to use.

24   But when they did send a notice, not from BMG, but from the

25   millions of other people -- and they sent very few of them --

1    but when they did send a notice, what do those notices say?

2    "As an Internet service provider, Cox is responsible under the

3    Digital Millennium Copyright Act, DMCA, to advise when we

4    receive a notice asserting an infringement by you."

5           So this is what Cox is telling its subscribers who

6    have been accused of infringement.  We have a responsibility to

7    advise when we receive a notice asserting an infringement by

8    you.

9           BMG sent scores, hundreds, thousands, millions of

10   notices.  And despite what Cox felt or was telling its

11   subscribers was its responsibility, it didn't tell any of its

12   subscribers about the notices that it was receiving of

13   infringement of the BMG copyrights.

14          Cox had an obligation to do something.  If they

15   didn't want to send on our notices with the settlement

16   language, which we think were appropriate and reasonable, they

17   didn't have to.  But they couldn't do nothing.

18          They could have forwarded our notice.  They could

19   have removed the settlement language and forwarded the notice

20   without the settlement language.  If that was the only reason

21   they weren't forwarding it -- and that's the testimony you have

22   heard, the only reason we weren't forwarding it was because of

23   the settlement language.  And I'm going to talk to you in a

24   minute about what forwarding means because that's actually not

25   what they said.

1          Or if they didn't like our language at all, even if

2     the settlement language is stripped out of it, they could have

3     sent their own notice.  Or they could have reviewed the

4     Dashboard and the summaries that we were sending them and sent

5     some other notice.  An e-mail, hey, Roger, we just got this

6     notice that you've infringed these copyrights.  It's against

7     the law to infringe copyrights.  What have you got to say?

8     They could have done that.  Didn't do any of those things.

9          So even if they didn't like our letters, even if they

10    didn't like our settlement language, we don't believe that they

11    had the option to blacklist us, to destroy the notices, to do

12    nothing with the notices of infringement that we told them --

13    particularly since their language that they said to their

14    policyholders was -- not their policyholders, their

15    subscribers -- was that we've got an obligation to let you know

16    about this.

17         Now, what about this, remove the settlement language?

18    If you only do that, we will -- and here's what they said.

19    These are exhibits at the time, and you see the exhibit number.

20    "Please remove the links to the settlement offers from your

21    notices and we will gladly process them."

22         Does that say, we will forward the notice of

23    infringement to our subscriber that you've caught infringing?

24    No.  We will process them.  Very important.

25         The next one, "We will accept your DMCA complaints as

2183

1    long as they don't have the settlement offer."  So we will

2    accept them.

3          Does that say, we will send the infringing subscriber

4    your notice?  No.  Or any notice?

5          What does the last one say?  "Cox stands ready to

6    process your notices consistent with the manner applied to all

7    other DMCA-related notices."

8          All right.  So that's what they're telling people,

9    we'll treat you just like everybody else if you take out the

10   settlement language.

11         Well, you heard from Dr. McGarty yesterday how they

12   were treating everybody else.  They had a hard cap of 200 per

13   day per claimant.  The first notice was ignored.  Only one

14   notice was sent per day for the alleged copyright infringer.

15   All notices more than six months were ignored.

16         So if they're going to "process" them like they did

17   the other notices, they're going to put them through this first

18   series of hurdles, which you heard Dr. McGarty talk about,

19   eliminates 90 percent of the notices.  They aren't passed on to

20   the policy holder.  And then once you get past that and you see

21   it, no notice of infringement sent to the subscriber.

22         Process.  You heard a Cox witness who came in here

23   live basically say, process means not to process.  "The abuse

24   tracking system takes the notice in and handles it, but the

25   automated action that it takes is to not send the notice to the

1   customer.  It's to close the ticket and respond back to the

2   claimant, letting them know that the complaint was not

3   processed."

4           Contributory infringement.  You see the standards

5   there.  Cox has actual knowledge.  Let's go through these very

6   quickly.

7           They know that BitTorrent is used for only one thing.

8   Jason Zabek, the head of the Abuse Unit, "and I should know."

9           Next notice, "99 percent of DMCA violations are from

10  people using peer-to-peer on purpose."  Jason Zabek, internal.

11  Cox knows about it.  They have knowledge of the use of their

12  network.

13          This is their tracking.  They keep track of how their

14  subscribers use the network.  You saw this before.  The average

15  Cox subscriber spends 21 hours per month BitTorrent,

16  peer-to-peer.  What is peer-to-peer used for?  What is

17  BitTorrent used for?  99 percent illegal copying.

18          But the high-speed users, it's even worse that.  The

19  high-speed users, 100 hours per month, three hours per day

20  spent on peer-to-peer downloading of illegal copies.  Cox knew

21  this.  This is their own data.

22          They have got e-mails saying this.  Take a look at

23  this.  "The customer is well aware of his actions and is upset

24  that 'after years of doing this' he is now getting caught."

25          I told you, Cox customers knew they were doing it and

1    were upset about it when they got caught.  If they had sent the

2    Rightscorp notices, more of them would have gotten caught

3    earlier and maybe reached a settlement and stopped it.

4            Another example, "I am not concerned about the DMCA."

5    These are the people that are responsible for enforcing it.

6            "This customer is doing this on purpose."  I told you

7    that Cox knew what its customers were doing, and this is their

8    internal e-mails showing they knew what they were doing.

9            "They just want to steal stuff."  This is Cox talking

10   about repeat infringers that they know about on their network

11   and saying they just want to steal stuff.

12           So we believe that we've clearly met the standard,

13   that Cox knew or should have known of infringement of BMG's

14   copyrights, the notices, the summary letters, the Dashboards,

15   their own internal e-mails.  Cox was willfully blind to what

16   was going on.

17           An example of this letter, which I showed you just a

18   minute ago, if you look at the bottom half of that letter, "As

19   an Internet service provider, Cox is responsible under the

20   Digital Millennium Copyright Act to advise you."

21           And then later, "We are also required, not just to

22   advise you, we are also required to take appropriate action if

23   further claims are received that you do not resolve."

24           So obligation number one that Cox tells its

25   subscribers that it has is to notify them when they're told

1    about a copyright infringement.

2           Obligation number two that Cox tells its subscribers

3    that it has is they have to take appropriate action if further

4    claims are received that are not resolved.

5           So in 2010, what did Cox do?  2010 saw a spike in

6    notices.  Here is some data.  And one of the first things you

7    see is Mr. Zabek, the guy that is in charge of this unit,

8    saying, "could we really ignore the bulk of DMCA notices?"

9           Well, you'll see that they did just that.  Beginning

10   in 2010, they implemented a scheme to ignore 90 percent of the

11   notices of copyright infringement that they were getting from

12   other copyright holders, and 100 percent of the copyright

13   notices they are getting from BMG.  And here are the

14   statistics.

15          If you look at this internal e-mail in January of

16   2010, you would see that the notices in 2009 were 672,000

17   notices of copyright infringement, illegal activity from other

18   copyright holders that Cox got notice of.  And they expect that

19   number to be 1.1 million in 2010.  At this point, none of those

20   are BMG notices.  The opening sentence of that was, "DMCA,

21   we're getting crushed."  Those are the numbers.  That's what

22   they expect for 2010.

23          So here is a summary of some of the notices.  20,000

24   notices from Media, 15,000 from Universal, 9,000 from RIAA.

25          And here you see what they did to deal with it.  They

1    cut staff.  They put in additional hurdles.  These are the

2    limits they imposed when they saw this spike.  And then you're

3    going to see the next e-mail, which is going to be the cutting

4    staff.

5            So they had blacklisting -- all of these hurdles that

6    you heard yesterday from Dr. McGarty, but then -- and here is

7    how one of the hurdles works.  This is somebody who had all of

8    these notices, but they drop out after six months.  So this

9    person had 11 notices, 11 violations, but only five notices.

10   And then 13 violations and only six notices.  Because they're

11   dropping off everything to the left because it is more than 6

12   months.  That was their system to avoid dealing with this

13   stuff.

14           But as the percentage of DMCA complaints goes up, you

15   heard Dr. McGarty's testimony yesterday, 90, almost 90 percent,

16   88.97 were ignored, were not treated, where no notice goes out

17   that is having any effect with respect to their policy holder.

18           And you see the usual language, "If the rights

19   holders, the people who are sending in these notices, want to

20   do something about, they should give us money to hire them,"

21   and they make a comment that I am not going to read with

22   respect to what they thought about the federal law dealing with

23   this.

24           Here is another one, what they think about the

25   artists who are sending in these notices.  The same kind of

2188

1   language.

2          Here is an example of the -- a notice, 29 notices,

3   warnings only.  29 notices that actually filtered through all

4   these things of a copyright infringement, not from DMCA, not

5   from -- or BMG, not from Rightscorp, but from other people, and

6   this person only got warnings, was never terminated.  You see

7   some examples of some of them.

8          So what happens?  The copyright complaints go up, the

9   staff goes down.  I am about to show you some e-mails.

10         In April of 2011, they cut staff.  They used to have

11  at one point 14 people.  Then they have the four remaining

12  technicians that were not even dedicated full-time to this.  If

13  you look at this e-mail, this is almost a 75 percent reduction

14  in Abuse.  Complaints are going up.  To make more money, Cox

15  lowers the number and reduces by 75 percent the number of

16  people that are supposed to be dealing with them.

17         So we believe that the record clearly establishes

18  they ignored, they reactivated, they gave clean slates, and

19  they falsified documents.  And here are some examples of --

20  you're going to see some of these about activate/reactivate

21  them.  We have shown these to you before.  They shut them down

22  and they immediately reactivate them.  "You are able to

23  reactivate them."

24         So we believe all of that shows that there is

25  material contribution on Cox's part.  I apologize for going

1  through these too quickly.  You will have every one of these

2  exhibits back there.  Some of them you saw before either with

3  witnesses or in my opening statement.

4        And this is an example of Cox knowing about a

5  habitual user.  "Yeah, he was terminated twice and turned back

6  on.  I suspended him again since no e-mail address."  So

7  terminated twice.  What does it take to get terminated twice

8  and turned back on?  Does it take 28 separate notices?  We just

9  went through some examples as to how that was working.

10        And what's the reaction from Mr. Zabek?  "It is fine,

11  we need the customers."

12        So let's talk a little bit about that.  We -- they're

13  saying that they must keep the customers to get the DMCA

14  protection.  The judge has already told you they don't have the

15  DMCA protection.  They are talking about once you get

16  terminated, you get right back on.

17        The DMCA's termination -- this is what I am talking

18  about fraudulent.  Look at this one.  "DMCA's terms are not

19  really terminations any longer."

20        So what do they do?  "This is not the official thing,

21  and don't tell the customers about it."  Keep it quiet.

22        So we've shown you all the elements of direct

23  infringement, of contributory infringement, and now I'm going

24  to walk you through very quickly the elements of vicarious

25  infringement.  This had to do with the Cox right and ability to

2190

1    supervise the infringing activity, and that they have a

2    financial interest.

3         The AUP, Authorized Use Policy, gives them the right.

4    Here it is.  "Immediate suspension or termination if you

5    violate intellectual property."  You can't violate copyright

6    laws under this thing.  That gives them the right and ability

7    to terminate people who are engaging in this activity.  No

8    debate about that.

9         And this is not a question of Cox having to come in

10   and read your e-mails or read what you're doing on the

11   Internet.  We've never suggested that.

12        What we've suggested is that when you get a notice of

13   a copyright holder telling you that one of your people is

14   infringing, at that point you have an obligation to do

15   something.  Give them a notice, look into it, enforce your

16   policy.

17        And it was really very simple, push a button.  That's

18   what you heard.

19        Now, the financial interest.  You've seen these

20   reasons why Cox has a financial interest in keeping repeat

21   infringers.  They have a strong incentive to tolerate and

22   materially contribute to infringement in order to retain.  They

23   want to sell more expensive, high-priced properties or

24   services, like Gigablast.

25        And this is from their own survey.  Cox does a market

1   survey as to what their customers want.  This says that, if you

2   read it here, "two-thirds currently source music from online

3   music services, and half get their music from friends or

4   peer-to-peer."  We've already established what that means.

5         But Cox knows it because look at the next page.

6   "Free methods, such as downloading for free, burning songs from

7   friends' CDs, and stealing songs online."

8         Cox surveyed its own customers.  This was the result

9   of their survey of their own customers.

10         This was Dr. Nowlis' survey.  That it's a draw to

11   people to subscribe to Cox, the ability to steal music down

12   high-speed loading from sites like BitTorrent and others.

13         Cox has a financial interest.  Let's run through

14   these very quickly.  "Customers' third termination.  I'm sure

15   what Jason would say, reactivate."

16         Another one, very simple.  "DMCA means reactivate.

17   You can make him wait a day, if you want."

18         More evidence.  "We don't want to lose revenue.  It's

19   kind of an under-the-table procedure to preserve revenues."

20   Direct financial interest in keeping repeat infringers.

21         More examples -- and I can't read all of them to you,

22   but you can see they are trying to keep it quiet, they are

23   trying to keep it internal.

24         Let's go through these very quickly.  You can read

25   them as I am popping through them.  I'm not going to read them

1      all for you because you will have them in your notebook.

2              This talks about 99 percent of the cases they turn

3      back on.  And sometimes when they turn them off, they continue

4      to charge them for the service that they don't have anymore.

5              So customers -- here is how Cox refers to its

6      customers.  Here it is, it's amazing.  RGUs, revenue generating

7      units.  Exactly what Dr. Lehr said.

8              So this shows a direct financial interest.  And they

9      engage in these soft terminations, which really had no effect

10     at all because they really weren't terminations.  They create

11     false documents.

12             Now, you've heard about some of the arguments that

13     Cox has made.  I'm going to run through these very quickly.

14     That Rightscorp only identified 10 percent of the bitfield.

15             Well, the testimony was that didn't happen during the

16     time in question.  I cited the testimony here.  You can read it

17     for yourself.  That 10 percent bitfield search took place only

18     after the litigation in question here.

19             The next thing you talked about, you've seen the

20     vans, people are stealing WiFi.  We don't know who the

21     subscriber is.  Legally irrelevant.

22             But more importantly, here is just one -- nine slides

23     that were in Cox's opening.  But Jason Zabek said, "here is my

24     take, there is no one out there sitting in a van downloading

25     movies."

1           So Cox itself had documents indicating that the nine

2   or ten slides that you saw in the opening were not what's

3   happening out there.  And you have seen no proof as to how many

4   people were out there doing that.

5           But what difference does it make?  Well, the Court

6   has told you.  Here is an instruction, jury instruction number

7   25, go look at it.  "BMG is not required to prove the specific

8   identities of the infringing users."  That was the instruction

9   the judge gave you.

10          So we heard 11 slides in the opening about, we

11  couldn't tell if it was the teenage boy at home.  We couldn't

12  tell if it's a person sitting in a van.  We couldn't tell if --

13  legally irrelevant.  It has nothing to do with this case.  Just

14  a distraction.

15          Cox's other arguments have no merit.  They suggest

16  that Dr. Bardwell hand-picked the documents.  You have already

17  heard the testimony that it was Cox that hand-picked the

18  documents.  We can go through that later.

19          You heard testimony that the Rightscorp code doesn't

20  work.  Here is the evidence that shows that it does.

21          And one of the things that you heard is that 300 ISPs

22  accept the Rightscorp notice.  There was some suggestion that

23  they are a rogue outfit and nobody accepts it.  You heard the

24  testimony that 300 do.

25          Let's talk about for a moment statutory damages, and

1    I will be very quick.  You just heard this.  "Statutory damages

2    are established by Congress and the Copyright Act because

3    actual damages in copyright cases are often difficult to

4    establish with precision."  That's the instruction you just

5    heard from the judge.

6              This is the reason.  These infringements that you

7    heard Dr. Lehr talk about are like a virus going out.  The

8    ability to prove how many infringements there are, how many

9    lost sales there are, is not something that can be calculated

10   with a reasonable degree of economic certainty.

11             But what the copyright law recognizes is that

12   statutory damages don't have to be based upon that.  And in

13   fact, you can see the purpose are to compensate the copyright

14   holder, penalize the infringer, deter future copyright

15   violations.

16             "Your statutory damages award need not be based upon

17   the actual damages by BMG," that was the instruction you just

18   heard from the judge a moment ago.

19             These are the factors that you will consider.  I'm

20   not going to read them.  They're going to be in your book.  The

21   judge will -- has already instructed you on them.  You can read

22   them and read them with care.  But you can see that some of the

23   factors that I have just highlighted are in this list of

24   factors that you should consider in awarding statutory damages.

25             You heard Dr. Lehr say that the benefit to Cox of the

1    60,000 repeat infringers was more than $300 million.  That's

2    more than we're asking for.  The statutory cap that we would

3    ask for, even if you gave the maximum amount of $150,000 per

4    copyright, would be about $200,000.  So we're not asking for an

5    amount as large as the number that Dr. Lehr had.  It's an

6    amount less than that, and probably less than $200 million.

7            But we believe you can get to a fairly high number

8    because we believe the evidence established that Cox willfully

9    violated our copyrights and that you need to have a reasonably

10   high award to deter the kind of conduct that we've demonstrated

11   Cox engaged in here.

12           Cox needs to make enforcement of people's rights a

13   priority.  They need to be -- their priorities need to be

14   realigned.  Cox does not take copyright infringement by its

15   subscribers seriously.  The result of this jury verdict will be

16   to show them that they need to take it seriously.

17           I would like to thank you again for all your hard

18   work.  I will have a few minutes to address you after you hear

19   from Cox's counsel.  I went on for a long time.  I'll have a

20   few more minutes.  I need a drink of water.  It's probably a

21   good time for a break, as the judge had said.

22           A lot to cover, couldn't cover it all, but I again

23   thank you very much for your attention.

24           THE COURT:  All right.  Let's take a ten-minute

25   break, and then we'll hear from defendant, Cox.  And then we

2196

1    will have rebuttal testimony, as Mr. Warin had said, and then

2    we'll send you back.

3            So let's take ten minutes right now.  You are

4    excused.  Thank you.

5            NOTE:  At this point the jury leaves the courtroom;

6    whereupon the case continues as follows:

7    JURY OUT

8            THE COURT:  So just so I'm clear, you want this index

9    to go back with the evidence in the case; is that right?

10           Mr. Reilly, I think you -- the index that you --

11           MR. REILLY:  Yes, this is -- the parties went through

12   this to correlate the witnesses whose testimony was associated

13   with each of the exhibits just as a cross-reference.  But

14   again, each finder, defense exhibits, plaintiff's exhibits,

15   will go back.

16           THE COURT:  All right.  I don't have any objection to

17   that.

18           MR. REILLY:  We did want to get your approval to it.

19           THE COURT:  No, I think that's great.

20           All right.  We're in recess, ten minutes.

21           NOTE:  At this point a recess is taken; at the

22   conclusion of which the case continues in the absence of the

23   jury as follows as follows:

24   JURY OUT

25           THE COURT:  All right.  Are we ready for -- all

1    right, Joe, let's get our jury.

2    JURY IN

3           THE COURT:  All right.  Please be seated.

4           Mr. Wakefield?

5           MR. WAKEFIELD:  Thank you, Your Honor.

6           THE COURT:  Go ahead.

7           MR. WAKEFIELD:  Welcome back, ladies and gentlemen,

8    and I want to join Mr. Warin's expression of thanks to all of

9    you.  I, too, have seen you taking notes and working hard and

10   paying close attention, and on behalf of Cox and our whole

11   team, we really appreciate your service and the hard work

12   you're doing.

13          In our opening statement, I said there was a critical

14   fact in this case and a critical event, and that was Cox's

15   refusal to be a part of a scheme to get payments from its

16   customers based on unproven accusations, and the evidence came

17   in and showed that that is what happened, but Cox stood up for

18   its customers against those demands because the demands

19   themselves didn't prove infringement.

20          This whole relationship, if you can call it that,

21   began not through any business channel, not through outreach by

22   a company saying we have a new business model, a new technology

23   we want to discuss with you.  It began with automated

24   electronic notices being sent in to Cox, all of which were the

25   same, all of which began by saying to Cox, "Forward this entire

1    notice."

2            And then the notice that Cox was supposed to send to

3    customers said, "Your ISP has forwarded you this notice, and it

4    is not spam."  And that was because they were getting ready to

5    send a whole lot of notices and they wanted Cox to vouch for

6    them and to join in the implicit threat that those notices had,

7    that Cox was going to cut off people's Internet access if they

8    didn't comply and pay money to this company that Cox had at the

9    time never heard of.

10            And there were explicit threats in those notices tied

11   to the threat of loss of Internet access, and then a link where

12   the subscriber could click and type in their name, all their

13   personal information, address, e-mail address, provide their

14   credit card information, and then they would be in Rightscorp's

15   hands.

16            And if they thought they had settled everything by

17   paying that amount, they would very often be wrong because

18   Rightscorp had a practice of every time it detected any

19   observation with its system, it would generate a new e-mail

20   even if it was seeing the same thing.  Even if everything it

21   had seen it had seen in one minute on one computer, it would

22   send dozens of e-mails, 45 e-mails at a time, hundreds of

23   e-mails.  So a consumer getting this might pay 10, 20, 30

24   dollars, think they've resolved something, and they would be

25   wrong.  They would have just made the first payment on an

1    installment plan to Rightscorp.

2           And Mr. Warin said if we were offering to process

3    these notices without the settlement demands in them, that

4    means we must have believed that they were valid and that they

5    proved infringement.

6           Not true.  There's a big difference from letting

7    someone know, hey, somebody says you did something and I'm

8    letting you know about it, big difference between that and

9    saying somebody says you did something and I'm going to shut

10   off your service that you pay for with me unless you pay them.

11   That's what Rightscorp and BMG wanted from Cox from the

12   beginning, and those settlement demands went up.

13          And they didn't just want Cox to forward those

14   demands.  They wanted Cox to suspend the infringers until they

15   paid, not just suspend until they acknowledged that they had

16   solved the problem, that they weren't going to do what they

17   were doing, that they had secured their network, but suspend

18   until Rightscorp said they paid.

19          And they offered to sweeten the pot to cut Cox in on

20   that action.  "We'll share some money with you," they said.

21   "This can be a line item, a new revenue line item, getting

22   money from allegations of copyright infringement."

23          From the very beginning, Cox made its position clear.

24   It had an existing policy that it wouldn't participate in this

25   kind of a scheme.  It said on March 9, 2011, right in the same

1    week it got the first notice, "Cox does not accept nor process

2    infringement notices which contain settlement offers," but in

3    that same e-mail, it said, "Remove the links to the settlement

4    offers, and we will gladly process them."

5           And it didn't just say it would process them.  It

6    said it would forward them.  Mr. Warin suggested that we

7    vaguely said we would process, but Cox said, "We will forward

8    them," in June 2011.

9           And again in September of 2011, Cox again said,

10   "Remove the notices, and we'll forward them, but with these

11   settlement demands in the notices, we won't do it, and that is

12   our policy."

13          But Cox has always remained ready to accept notices

14   without these settlement demands in them, as Mr. Steele

15   testified.  Cox never withdrew that offer.  It has always been

16   out there, but Rightscorp wasn't interested in it.  Rightscorp

17   did not want Cox to forward notices without settlement offers.

18   According to Mr. Steele's testimony again, "I don't believe we

19   said that."  This is the president of the company.

20          So back then, they said, "Forward our notices.  Note

21   to the ISP:  Do not change this notice.  Forward the whole

22   notice."

23          Now, they say, why didn't Cox just strip out the

24   settlement offers and forward our notices?

25          It's inconsistent.  That's what they said at the

1   time, and they never shifted their position.  What they wanted

2   to do was shift the burden of dealing with what Mr. Warin

3   called a global problem, a huge problem that no single company

4   can address, no single American ISP can address.  It's global.

5            But what they wanted to do was shift the burden to

6   what they call the infringer.  They wanted to shift the cost to

7   the infringer, but the problem is they don't know that that

8   person they're sending a notice to is an infringer, and all Cox

9   knew is that they were accused of something.

10           Mr. Warin pointed out that they said we wanted a

11  cooperative solution, and they said that in their letters, but

12  what was that cooperative solution?  "Don't change our notices,

13  not a word.  Your customers are going to give us their personal

14  information, including their credit cards.  We're going to take

15  over your relationship with the customers, whose trust you have

16  earned.  They're going to give us our credit card information.

17  We're going to decide when you turn on or off their service to

18  your customers."  That was the cooperative solution.

19           And they made threats:  "If you don't, we could turn

20  up the e-mail.  We're going to bury you in e-mail."  But, they

21  said, "It's in your interest."

22           Well, as we explained in the beginning and as the

23  evidence showed, Cox said no to this scheme, and one of the

24  main reasons it said no is that a mere notice doesn't tell you

25  who did something.  This isn't the question of whether they

 1    have to prove who each person is to prove direct infringement,

 2    but the question is was Cox reasonable in saying, "We're not

 3    going to be part of a plan to make people pay you money when we

 4    don't know that that person owes you any money."

 5          And everyone in this case admits that you don't know

 6    just because an account belongs to a subscriber, that that

 7    person, that account holder did anything.  It could be anyone

 8    in range:  at the coffee shop, at the home.

 9          Mr. Sabec said, "We don't know who this person is."

10    Mr. Boswell said, "All we know is it's a Cox IP address.  We

11    don't know the person, absolutely not."  He acknowledged it

12    could be a neighbor.  He acknowledged it could be anyone in

13    range of a WiFi system that has a password.  He acknowledged at

14    a coffee shop, it could be any number of people.

15          Mr. Steele also said, "We don't know who was using

16    the subscriber's computer.  We just know it's an IP address."

17          Ms. Frederiksen-Cross, the software expert, admitted

18    Rightscorp didn't know and Cox didn't know who specifically

19    within a household or a neighborhood is accessing an account.

20          And Mr. Bardwell built this whole model, this whole

21    probability model, but it's just telling you whether he thinks

22    whether an account is associated with certain patterns.  It

23    doesn't tell you that the account holder is the person who did

24    anything.  As he admitted, it could be someone else with access

25    to the IP address.  It could be a guest in a home.  It could be

2203

1    a neighbor.  It could be a computer that has been infected with

2    malware that someone else has taken control of without the

3    account holder even knowing it.

4         And the other problem that was apparent from the

5    beginning and that the evidence in this case came in and showed

6    very clearly is that Rightscorp overcounted these allegations,

7    these accusations in order to send more and more and more

8    e-mails.  They would send one notice per day for any IP and

9    port combination, and that was later.  That's what he said.

10   One work detected, for ten days, they would send ten separate

11   e-mails for the exact same thing.

12        But not only that, but there was a time when they

13   were sending multiple notices to go out in a single day,

14   sometimes thousands in a single day, and that was the

15   information that Cox had when it made the decision that it

16   wasn't going to forward all of these notices and that it wasn't

17   interested in being a part of this plan.  It was getting

18   thousands of notices for the same thing.

19        And Ms. Frederiksen-Cross acknowledged the same

20   thing, that it could generate multiple notices.

21        And so what that means, if there was one CD that had

22   been put on a computer by someone, we don't know it's an

23   account holder, Rightscorp would ping it day in and day out,

24   day in and day out, and send 12 e-mails for that one CD's worth

25   of music every single day, sometimes more than once a day, but

1    assuming they just did it once a day, that would be between

2    3,600 and 10,800 dollars in demands, in hundreds of e-mails

3    sent to one person.

4            And the evidence showed that they overcounted songs.

5    They sent multiple notices for the same song on the same IP

6    address, in this case the ZZ Top one we showed you as an

7    example.

8            The attachment to the roll-up report, or what they

9    called the repeat infringer letter, showed them generating 45

10   e-mails in a single minute for a single IP address.  Instead of

11   sending one e-mail that says, we've detected the following

12   problems, they would send 45 separate e-mails, and that's

13   because the more notices they send, the more chance they think

14   they have of getting paid.  As Mr. Boswell admitted, "The more

15   e-mails that go out, the more likely you are someone will pay."

16           So why did Cox blacklist Rightscorp?  Was it because

17   Cox didn't want to know about any allegations of infringement?

18   No.  And the evidence we'll talk about shows Cox worked with

19   major rights owners cooperatively to address this problem.  It

20   can't solve this global problem, but it does its best and it

21   works with these companies.

22           So why did it blacklist Rightscorp?  Because of the

23   fundamental concept of fairness, because accusations are not

24   proof of infringement, as Mr. Cadenhead said.  "We didn't want

25   to do what we thought was unfair to our customers, because

1    leaping from an assumption that there's infringement to

2    demanding payment and making Cox enforce that just didn't seem

3    right."

4            And threats like these were not a cooperative

5    solution.  This is part of a document that Mr. Warin put out,

6    and it has unfortunate language, but the frustration was with

7    Rightscorp, DRC, Digital Rightscorp, and the nature of their

8    business plan.

9            There were other options available to Rightscorp and

10   BMG from the beginning.  There were two tracks that Cox has for

11   working with rights owners.  There's the graduated response

12   system, and there are subpoenas to get subscriber information

13   if someone wants to go after them, try to settle with them, get

14   money from them, or sue them.

15           The graduated response system was a system that Cox

16   created voluntarily on its own years before Rightscorp even

17   existed, and it was a system, not perfect and not perfect in

18   its execution, but it was a system that worked.  It was a

19   system that by and large was effective and that you will see

20   and you've heard was 96 percent effective at causing people to

21   stop receiving notices after five contacts.

22           There's been a lot of focus on termination and

23   whether when you get to those few people who didn't get the

24   message by the end of the process about whether the company and

25   certain employees were doing the right thing, and we'll talk

1    about that, but most of the time, people would just stop.

2         And think about it.  Of course they would.  They're

3    getting e-mails.  Maybe they don't see the first couple of

4    e-mails.  They get a suspension to click through, but

5    eventually they've got to pick up the phone and ask to get

6    their Internet service back on, and that means they know

7    someone could see what's happening on their computer, and if

8    they don't understand what it is, they can fix it.  They can

9    work with people, technical support people to secure their

10   wireless network if they don't know how to do that, figure out

11   if someone else in their household is up to something, and if

12   there's someone who's actually been sharing music, maybe they

13   know better, maybe they don't, they now know, wow, someone

14   could see what I'm doing, I'm going to stop, and that happened

15   96 percent of the time with just five contacts, so the system

16   was working.

17        But if people wanted to go after someone, if they had

18   identified a really problem person or account like some of the

19   few that Mr. Warin focused on with 22,000 e-mails having been

20   sent to them, they can do -- they can take action.  They own

21   the copyright.  They have the right to go after someone.  They

22   can ask for that customer's information immediately, instead of

23   just saying, I want you to terminate everyone on this list,

24   including hundreds of people for whom they only had two

25   notices, just two, and they wanted us to terminate every one of

1      them.

2            They could have subpoenaed that information.  They

3      could have contacted those people directly, and if they wanted

4      money, they could have negotiated that, but that's not Cox's

5      role, to extract money out of its customers for other people.

6            And Rightscorp and BMG knew they had this available

7      from their own, from Rightscorp's own correspondence.  When we

8      don't get cooperation from ISPs, we have other legal remedies.

9      We serve subpoenas, and they've been held valid, to conduit

10     ISPs.  That's a company like Cox.  We don't host content.

11     We're not running Web sites.  Cox is merely a connection to the

12     Internet, and they can subpoena information from companies like

13     that and find out who their subscribers were.

14           And they said they can also sue people if they want

15     to, and they could have, but they never did that here.  They

16     never took that perfectly reasonable step that they knew was

17     available to them to serve a subpoena and get contact

18     information themselves.  That's what Mr. Sabec admitted.

19           The graduated response system, as I mentioned and

20     Mr. Cadenhead discussed, was effective.  Half of the people

21     seemed to change behavior without receiving a notice, and what

22     does that mean?  It means, as Mr. Carothers testified, they're

23     often false notices or one-off events that just would go away.

24           So without sending a notice, there would be a blip,

25     maybe someone else used the WiFi one day and went away.  If

1   there were two, they would send them, more than half of those

2   would stop, and by five, 96 percent had stopped.  By nine, it

3   was almost 100 percent had stopped.  It was the rare case that

4   had to go to the termination phase.

5          And there's been a suggestion that Cox was just

6   ignoring these notices.  It wasn't.  It sent -- and its

7   discovery responses in evidence show this -- over

8   one-and-a-half million warnings, it suspended 221,000 times,

9   and it terminated 556 times.

10         Now, you heard from Mr. McGarty saying, "Well, no,

11  not really.  It just looked that way.  They ignored 90

12  percent."

13         It's not true, and you can look at the evidence and

14  see that that's not true, and here's why it's not true.  He did

15  two things wrong.  First, he included notices that were

16  blacklisted.  So the question is what would have happened to

17  Rightscorp if they had gone to Cox and said, okay, we'll remove

18  these settlement demands?  Then they would have not been

19  blacklisted, and they would have been put into the Cox system.

20         But Mr. McGarty is saying, "Well, I just looked at

21  all the e-mails received, including from the other people like

22  Rightscorp who were blacklisted, and considered them ignored to

23  adjust the numbers to make it look like Cox's system was

24  ineffective."  That's not right.

25         And the other thing he did is he said, "I'm going to

1   assume that it's ignored if a notice came in and there wasn't a

2   customer-facing action."  So in other words, if ten notices

3   come in, he expects to see, well, there are ten contacts.

4          That doesn't make any sense.  If you're a, let's say,

5   a property manager for an apartment building and you come into

6   work and you've got five voicemails of somebody complaining

7   about a dog that's barking, you pick up the phone and you call

8   that tenant and you say, "What's up with your dog?  It's

9   barking.  I've got a bunch of complaints."

10          You don't have to pick up the phone and call that

11   person five separate times just because you got five messages.

12          And what Cox did is it had a -- this CATS system, and

13   it would roll up messages and contact people about multiple

14   issues at one time.  So you see 2.9 million notices, 836,000

15   contacts.  It doesn't mean they're ignoring a third of those

16   notices.  They weren't ignoring the notices.  They were dealing

17   with them and working with customers.

18          And regarding blacklisting, Cox worked with those

19   blacklisted entities, as it offered to here with Rightscorp.

20   As Mr. Cadenhead said, there was a company called CEG TEK that

21   was blacklisted.  It was sending settlement demands, and after

22   talking with Cox, they agreed to change the notices, and then

23   the company accepted them, forwarded them, and processed them.

24          And Cox tried to work with Rightscorp, too, but

25   Rightscorp wasn't interested.

1          There's also -- there was a claim from Mr. McGarty

2     that all these notices were just deleted or ignored.  That is

3     only true with respect to the blacklisted Rightscorp notices,

4     and Rightscorp knew that was happening because Cox told them we

5     will not accept these notices from the beginning.

6          But the other system, the other notices in CATS are

7     not ignored.  They're saved in that system, and they are never

8     deleted.

9          Mr. McGarty acknowledged these numbers for the

10    limited period of time he looked at.  There was 836,000

11    customer-facing actions based on 2.9 million notices accepted

12    into CATS.  And again, you can have one contact with a customer

13    about multiple complaints.  That's just a normal and sound

14    business practice.

15         Why not take a separate action for every complaint,

16    as Mr. McGarty seems to suggest?  Because that's not how the

17    system works, as Mr. Carothers testified.  "CATS allows a small

18    number of people to do a lot of work, and it primarily does

19    that by grouping together all the complaints about a particular

20    issue into something we call a ticket, and a ticketing system

21    allows us to group related complaints together, and it allows

22    us to keep a historical record of all the incidents that a

23    particular customer had."

24         They weren't ignoring all of these notices.  They

25    were dealing with them and dealing with customers.

1          The hold for more, as Mr. Carothers testified, was

2    reasonable because they had hundreds of confirmed cases of

3    false allegations, meaning they got copyright complaints that

4    turned out not to be valid.

5          But Mr. McGarty noted those aren't ignored.  They're

6    not deleted.  If a notice is put into that hold-for-more

7    process, there's a ticket created, it's stored in the database,

8    and it's not deleted.

9          And then Mr. McGarty suggested that the daily limit

10   thing was unreasonable, that the daily limit was a reasonable

11   way for one company to deal with lots of different rights

12   owners and give them all equal respect based on the volume of

13   rights they needed to manage.  They were concerned about a

14   system getting overloaded, and they wanted to manage the flow.

15         But they work with major rights owners to change

16   those limits:  the Recording Industry Association of America, a

17   major -- a representative of lots of other companies -- with

18   Sony, with MediaSentry, was all Mr. Cadenhead's testimony, and

19   that could have been worked out with Rightscorp, too, if they

20   had been interested.

21         There is still a process for those notices.  They are

22   not deleted.  They're not ignored.  They are taken -- the

23   company -- Cox goes to those rights owners and discusses it

24   with them and works things out.

25         And Cox tried to work with Rightscorp.  If Rightscorp

2212

1    had fixed its notices, it could have negotiated daily limits

2    because it represents multiple rights holders, and there would

3    be a record in CATS for every notice, including all these

4    one-ticket things, the first notices for hold for more, and

5    complaints above the daily limit.  They would all be preserved

6    with all the customer account information in it if they had

7    used the system that Cox already had in place long before

8    Rightscorp even first started creating its code to send all

9    these e-mails.

10           And Cox does a lot to do the things that BMG and

11   Rightscorp have said that they care about:  educating people,

12   working with people, getting them to understand the problem,

13   the graduated response program, complying with subpoenas are

14   obviously there, but they provide educational programs that you

15   heard about from Mr. Cadenhead, information on the Web site so

16   people could learn about this issue.  They cooperate with many

17   rights owners, and they also fight a huge number of other

18   problems on the Internet.

19           Copyright infringement is a big global problem, but

20   it's not the only problem.  There's hacking.  There's security

21   problems.  There's spam.  There's denial of service attacks.

22   There's viruses and malware that can take control of people's

23   accounts, that can take their credit card information, that can

24   wreak havoc on people, and Cox is dealing with all of those

25   problems.  It works with the FBI, it works with the Department

1    of Homeland Security, and it tries to balance all of these

2    issues.

3            Now, there are those cases when somebody goes through

4    the process and it's time to terminate, and there have been

5    some e-mails and some chats between employees, mostly Mr. Zabek

6    and his colleagues, about termination, reactivation, and

7    connecting those things to revenue.  People have said, we need

8    the revenue.  We need the customers.  We've all seen those

9    e-mails.

10           Those e-mails reflect bad judgment.  They reflect bad

11   decisions.  I think they're offensive, but they're not Cox's

12   policy, and they are not about this case.  Not one of those

13   e-mails was about a BMG notice, not about a situation with

14   Rightscorp at all.  They're not about the response to

15   Rightscorp or BMG.

16           Cox's response to Rightscorp, which is what the issue

17   here is in this case, was not about revenue.  It was about the

18   unfairness of demanding payment based on unproven accusations.

19           And Cox has worked to improve its process, as you

20   heard from Mr. Vredenburg:  "When we terminate somebody, we

21   don't turn them back on.  What we do now is we go through the

22   final suspensions, we tell the customer, 'All right, we're

23   going to talk to you twice, and on the next -- third

24   suspension, you're done.'  We terminate them.  We don't even

25   talk to them."

2214

1          But Rightscorp and BMG were not interested in

2   cooperation, in educating customers, or a genuine solution.

3   They say that, but their actions speak louder than words.  They

4   wanted to avoid having to prove infringement.  They didn't want

5   to have to subpoena people and prove their case against

6   individuals who could deny it and say, "It wasn't me."

7          And they instead just wanted to send e-mails, but

8   they knew that not only Cox but every major American ISP,

9   Internet service provider, was not processing their notice.

10  That was true back in 2011.  It was true in June 2013, well

11  before this lawsuit, when Rightscorp gave an update to BMG, the

12  plaintiff in this case, saying here are some ISPs that ignore

13  your notices.

14         They knew Cox was ignoring them.  They knew Cox had

15  blacklisted them.  They also knew that Comcast, Verizon, AT&T,

16  Cablevision, Clearwire, Frontier, major Internet service

17  providers throughout this country were saying no to this plan.

18         And there's another thing.  What did BMG itself, the

19  corporation, do other than hand this process out, outsource it

20  to Rightscorp?  Nothing.  You heard from Mr. Hubert.  "What

21  effort have you made to reach out to somebody at Cox?"

22         "None."

23         Instead, they sent notices, knowing no one would

24  accept them, as Mr. Sabec said.  He knew this wasn't going to

25  work.  And they just cranked up the volume and escalated the

1    number of notices.  They sent a flood of notices day after day,

2    knowing, again, that they weren't being read.

3          They even had code designed, and this is in evidence,

4    that specifically let them set a maximum number of e-mails to

5    send just to Cox at a sitting that could go up to 50.  So

6    Mr. Steele had this control panel on his computer to decide how

7    many notices to send anytime he sat down at a computer.

8          Rightscorp and BMG engineered this lawsuit over three

9    years, and now here we are, and you get to decide things, and

10   there's a decision process that the jury instructions take you

11   through.

12         First, the deciding if there has been proof of direct

13   infringement, and if the answer is no, if BMG hasn't met its

14   burden of proof, then you're done.

15         If there is direct infringement, there's still a

16   question of whether Cox is responsible for it legally under

17   either contributory liability or vicarious liability.

18         And then there's damages only if you answer yes to

19   either contributory or vicarious.

20         But before we get to that bit of the law, there was a

21   jury instruction that the Court read to you that's important.

22   You've seen a lot of documents from Day One in this case about

23   this law called the DMCA, and Mr. Warin put up some documents

24   specifically where people are saying we have a responsibility

25   under this DMCA and other people are saying it's not in the

1   spirit of the DMCA and that's not allowed under the DMCA, and

2   all of that must be disregarded.  The DMCA is not an issue in

3   this case, and that's what the Court instructed you.

4          On to direct infringement.  The question you will be

5   asked to decide is has BMG proven that users of Cox Internet

6   Service used that service, used the Cox service, to infringe

7   BMG copyrighted works by uploading or downloading?

8          The evidence in this case did not prove that.  The

9   Rightscorp system doesn't detect downloads by users on the Cox

10  network.  It doesn't detect uploads from one peer to another on

11  the Cox network.  It doesn't actually detect whether the song

12  is really available, and it's not really able to determine that

13  the song is actually there at all.

14         So first, the system doesn't prove uploads or

15  downloads.  As Mr. Boswell said, "Unless we are one of the

16  people sharing it, unless they're participating in sharing,

17  they don't have information about two peers uploading or

18  downloading on the Cox network."

19         As Mr. Bardwell said, "An observation in the

20  Rightscorp records doesn't show an upload or download.  It's

21  just a data entry."

22         The system also fails to confirm that a song is

23  really available.  What it does is it looks for this thing

24  called the bitfield, a series of numbers, and

25  Ms. Frederiksen-Cross talked about that and so did

1    Mr. Rucinski, and she also talked about a handshake that would

2    make sure that, yes, that song is really available, but she

3    left out an important step which Mr. Rucinski testified about.

4          The step 1 is the handshake.  Step 2 is an exchange

5    of code, something called a choke that Mr. Rucinski talked

6    about, to determine that the file is -- that the person on the

7    network is actually willing to share a song or part of a

8    payload, whatever that is.

9          If no, there's no exchange.  There's no upload or

10   download that occurs.  Only if the answer is yes can there be

11   an upload or download of that torrent payload.

12         So the handshake that they measured is only part of

13   the process.  They didn't get all the data they needed to

14   actually show that there was an upload.

15         Ms. Frederiksen-Cross explained that the system can

16   be -- BitTorrent's system can be configured so someone is just

17   a leech or leecher, someone who just gets things but doesn't

18   share them with others, but the system failed to detect if

19   that's what was happening.

20         And this is true for 1.4 million at least of the 1.8

21   million records in the Rightscorp data.  All they got for the

22   vast majority of these was the bitfield.

23         As Mr. Rucinski testified, if a computer expresses an

24   interest with another peer in sharing, it sends an interested

25   message, and then there is this unchoke message.  This is a

2218

1    separate thing from the handshake.  But Rightscorp stopped

2    short of getting that information and doesn't have that

3    information.

4            And the other problem with Rightscorp's system is

5    that it doesn't confirm that the computer really has the song.

6    It only confirms that pieces of a payload are available.

7            And we talked about this in the opening statement,

8    and you've heard about it, that torrent payloads are

9    essentially containers, and they can be loaded with authorized

10   or unauthorized content, legal or illegal, and a torrent user

11   could download a portion or all of the payload.

12           Mr. Boswell confirmed this.  You can choose part of

13   the payload you want to download.

14           And this is where the 10 percent bitfield becomes

15   important.  Mr. Warin again put up the code that shows that an

16   automation of this 10 percent process was written later, right

17   after the lawsuit was filed, that it was -- that there's a date

18   in that file, but this was a process that was always available

19   on a manual process.

20           Mr. Boswell testified that the 10 percent procedure

21   could always be run manually, and that 10 percent was

22   compatible with older versions of the code.  It always had the

23   ability to be set to just look at 10 percent, to increase the

24   number of e-mails going out.  And Rightscorp employees used

25   manual processes throughout this time.

1         So we don't know that they were always using 100

2    percent, and neither does Mr. Boswell.  He wasn't there running

3    the software.  He just wrote the code.

4         And then there's the problem with the samples they

5    collected.  First of all, they have no samples before February

6    2014.  That's well into the period for which they're claiming

7    infringement, two out of three years, no samples, and the

8    samples reveal inaccuracies.  Mr. Boswell acknowledged you can

9    send a notice with no sample and you can also do a sample

10   without any notice.  It doesn't prove that a notice was sent to

11   somebody who actually had that file on a computer.  These are

12   separate events in the system.

13        And Mr. Rucinski pointed out all kinds of flaws,

14   including repeated downloading of the same sample rather than

15   going to people who actually got the notices and confirming

16   that they had that particular song or payload available.

17        And there were images misidentified as songs in these

18   samples for which notices were sent out.  There was this

19   article about the Grateful Dead that generated an infringement

20   notice because they thought it was a song.

21        But the fundamental issue is that the code from this

22   period of time is gone, and the Court gave an instruction on

23   this, that Rightscorp was required to save those earlier

24   versions because it believed litigation was likely, and the

25   operation and accuracy of that system is material evidence.  So

1    they destroyed material evidence knowing there was going to be

2    a lawsuit.

3            Ms. Frederiksen-Cross said there should have been

4    version control.  It's not always required if you're just

5    experimenting with something, but they weren't experimenting

6    with something; they were getting ready to sue.  And she says

7    she can't know for sure what happened in earlier versions of

8    the code because you would need a time machine, but as

9    Mr. Rucinski puts out, that's what version control lets you do,

10   lets you go back and see at this point in time, what was the

11   code doing?  No one knows.  It's gone.

12           So all this evidence came from Rightscorp's system.

13   No other source.

14           They talked about other account holder information

15   that they didn't have, but they did get 122 account holder

16   names, and did they subpoena any of them to testify?  Did they

17   subpoena any of them for depositions and say, was it you?  Did

18   you have this stuff on your computer?  Did we hear from any of

19   those 122 people?  Not one.

20           Instead, they just rely on the software, the code's

21   been erased, and there's all kinds of problems with it.  So the

22   question of whether -- is -- have they met their burden of

23   proving direct infringement?  The answer is no.

24           But let's move on to the next part of the question,

25   is there contributory or vicarious liability, assuming that

1    they have proven direct infringement?  And the Court's

2    instruction there is that BMG has the burden of proving, one,

3    that there was direct infringement, so obviously, that's the

4    threshold; two, that Cox knew or should have known of that

5    infringing activity; and three, that Cox induced, caused, or

6    materially contributed to the infringing activity.

7           So first, did BMG prove that Cox knew or should have

8    known of direct infringement of BMG's works?  The fact is that

9    Cox didn't know about infringement of BMG's copyrights.  There

10   was a process in place where it could have received notices,

11   and it invited Rightscorp to work with them, but mere

12   accusations, whether they come in in a Dashboard, if they come

13   in in a letter, if they come in in a million e-mails, don't

14   prove that there was infringement, and they don't let you know

15   the fact there was infringement.

16          If I accuse Mr. Buckley of stealing my cell phone,

17   you don't know that's true, and if I say it a million times,

18   you still don't know it's true, even if I put it in some

19   software.  Millions of mass e-mails sent after Cox said it

20   would not accept them don't create knowledge.

21          And BMG had plenty of options to work with Cox,

22   instead, chose to just keep sending those e-mails and wait for

23   three years for this lawsuit.

24          And they also don't give -- the notices don't give

25   knowledge of infringement because Cox can't know whether

1    they're true.  It can't go in and spy on its customers.  It

2    can't technically or legally inspect what people send or

3    receive on the Internet, as Mr. Carothers explained, and it

4    can't tell if someone is sending movies or music or legal

5    files.

6              But the real question is, did the e-mails, notices,

7    the data, whether it's in a Dashboard or a letter, did they

8    give Cox knowledge of infringement?  And the interesting thing

9    to remember here is that they dumped 7.6 million e-mail notices

10   on Cox just for BMG alone, and far more across the board.  And

11   the question is, does this onslaught of data tell you about

12   specific infringement of BMG's copyrights?

13             Now that they've had time to prepare this case,

14   they've gone in and narrowed and cherry-picked certain pieces

15   of this information, and they're saying, well, you knew about

16   that, but that's not what they were saying at the time.  They

17   were saying, deal with all of these notices, terminate all of

18   these customers, hundreds of thousands of them, we want you to

19   terminate.  That's what they were telling us.

20             And they won't stand by the claims that they made

21   over all that time.  They sent 7.6 million notices just for

22   BMG.  There are only 1.8 million involved in the case, still a

23   lot, but 5.8 million notices just disappeared.  We were

24   supposed to act on all of them according to them, but more than

25   75 percent of them are just gone.  Where did they go?  They

1    haven't said.

2           What does BMG know about the accuracy of this system,

3    where 75 percent of the notices they themselves won't stand

4    behind?  Well, he measures it by subscribers remitting

5    settlement fees and signing off on releases.  He doesn't know

6    anything about the system being accurate.

7           But let's use that metric.  How accurate -- using

8    that model, how accurate is the Rightscorp system?  Well,

9    according to Mr. Steele, they've sent over 50 million e-mails,

10   and they've settled under -- or about 250,000 of those.  That's

11   less than 1/2 of 1 percent.

12          So Cox wasn't being willfully blind.  It didn't have

13   notice of actual infringement.  It refused to do business with

14   Rightscorp out of legitimate concern and not out of any effort

15   to avoid learning information.  It repeatedly offered to accept

16   those notices, but Rightscorp refused.

17          And the law doesn't require, doesn't require Cox to

18   work with Rightscorp.  It doesn't give Rightscorp the power to

19   dictate how other businesses will accept complaints.

20          So has BMG proven that Cox knew or should have known

21   of direct infringement?  It has not, but assume they have.  The

22   next part of the question is, did BMG prove that Cox induced,

23   caused, or materially contributed to that infringement of BMG's

24   works?

25          It didn't.  Cox doesn't operate BitTorrent.  It

2224

1   doesn't encourage people to illegally share music.  There's no
2   evidence of that.  It is a conduit, a pipeline to the Internet.
3           The Internet is the world, represented
4   electronically.  What people do out there is up to them, but
5   Cox merely provides a connection.  It doesn't run a site like
6   Napster in the old days or ThePirateBay.  It has nothing to do
7   with that any more than AT&T and Cablevision.  All these are
8   just conduits, pipes that connect you to a service that can be
9   used for all kinds of legitimate things.
10          It doesn't encourage, though.  It has this Acceptable
11  Use Policy.  They keep saying that represents something bad on
12  our part, on Cox's part, but they have a policy telling people
13  you shouldn't do this, doesn't encourage it.
14          So what's their smoking gun evidence of a material
15  contribution?  How do they show that we really wanted people to
16  infringe?  We promote high speed Internet, they say.  That's
17  suspicious.  You can download things really fast with high
18  speed Internet.
19          Well, promoting high speed Internet isn't a material
20  contribution to anything.  It's what every Internet company in
21  America does.  Every Internet company in the world knows that
22  high speed benefits everybody.  It benefits all of you, whether
23  you're watching Netflix or just trying to send an e-mail and
24  it's slow.  You've got to get through all your e-mail on a slow
25  connection, it's a nightmare.

1          Consumers demand speed for legal activities.

2   Families across America are watching Netflix, they're watching

3   Amazon movies, they're listening to music on Pandora and

4   Spotify.  It's legal.  And they're downloading music, which is

5   legal.  It's legal when it's free, also, from legal, free

6   sites.  Authorized free music is perfectly legal, and you can

7   get it from Starbucks' pick of the weeks, from Amazon, and from

8   a host of other legitimate mainstream companies, as

9   Mr. Negretti explained.

10          And Cox isn't alone in promoting itself with speed.

11  Other ISPs do the same thing.

12          They also have talked about some evidence discussing

13  sharing, as if when Cox talks about sharing in its advertising,

14  it's talking about illegal peer-to-peer file sharing on

15  BitTorrent.

16          Not the case.  All of these mainstream providers now

17  offer sharing.  You can share your song list with these

18  services.  You can share movies with other people in your home.

19  You can share from one device in your home to another.  There's

20  all kinds of uses of sharing that are not illegal peer-to-peer

21  file sharing on BitTorrent.

22          No one chooses an ISP for BitTorrent.  Mr. Negretti,

23  who talks to customers day in and day out, goes to their homes,

24  has never heard that the ability to download or upload music

25  using BitTorrent is a reason for choosing Cox, but even if it

1   is, even if 5 percent or 10 percent of people out there did

2   that, Cox isn't materially contributing to those activities.

3   It's simply providing a neutral connection to the Internet,

4   which we all need.

5          So did BMG prove that Cox induced, caused, or

6   materially contributed?  It did not.

7          That then takes us to the next question of vicarious

8   liability.  There the standard is, has BMG proven there was

9   direct infringement?  Again, a threshold question.  They have

10  to prove that Cox had a direct financial interest in that

11  infringing activity and that Cox had a right and ability to

12  supervise the infringing activity.  Not just generally to

13  supervise, but to supervise the infringing activity.

14         And Mr. Warin talked about this, but he didn't

15  mention direct financial interest.  He just talked about

16  financial interest.

17         And their theory is, well, you've got some customers,

18  like most businesses, you don't want to lose them, so you have

19  a direct financial interest in anything they do on the

20  Internet.

21         That's not a direct financial interest.  So BMG

22  hasn't proven that.

23         Cox doesn't operate or have a financial interest in

24  any of these peer-to-peer sites.  It partners with legitimate

25  companies like Pandora and Rhapsody, but it gets a flat fee

2227

1      from subscribers month in, month out.  It doesn't get added

2      money for unauthorized use.  It doesn't have an interest in

3      that kind of thing.

4             And most of the demand for its high speed service,

5      which, you know, Cox can charge for, just like every other

6      Internet company, is for legal video streaming.  That's the

7      rage.  That's what's going on, and every ISP promotes it.

8             They point to this survey from Dr. Nowlis.  It

9      doesn't prove anything.  It's supposed to be a survey about

10     why -- whether people use BitTorrent but didn't ask them about

11     BitTorrent.

12            People were answering questions about legal, free

13     downloading and uploading, which you can do on iTunes and

14     Amazon and anything else, and uploading.  People can upload

15     their music to YouTube, like Mr. Poret said he does with his

16     kids' videos of their music.

17            These results just show that people were listing

18     things they do, not why they choose an Internet company.  And

19     he used no control for other ISPs, so he can't say, well,

20     there's something special about Cox.  There's no evidence that

21     this data would have been any different with Comcast or Verizon

22     or AT&T.  There's no control group.

23            And the questions themselves, this is a guy who says,

24     "I carefully think about every word," a guy with a lot of

25     experience.  The questions themselves were so carefully

2228

1    designed to cause people to understand that they don't need to

2    read the examples, and to see that they are just examples, they

3    say "such as," which means for instance or for example, and

4    they don't need to go and look at those examples and think, Ah,

5    let's see, do I get free music from a site like those?  I'm not

6    sure.

7            The whole survey was engineered to get a result for

8    this case.  It's not a legitimate survey.

9            But infringement is contrary to Cox's financial

10   interest.  It's not in its interest.  Cox pays a lot of money

11   for content.  It's a cable TV company.  If people are getting

12   free, unlicensed content, that's not in Cox's interest.  As

13   Mr. Negretti said, that's not in their interest, not from an

14   unlicensed source.

15           And you heard from Mr. Mencher, they have a whole

16   advertising business that sells cable TV advertising.  People

17   stopped subscribing to TV because they got free content; Cox

18   doesn't get advertising revenue.  It's not in its interest to

19   promote or encourage infringement.

20           And he has never -- he knows the finances of the

21   company.  He's involved in the financial discussions at the

22   company.  Mr. Mencher is not aware of any discussions about

23   trying to retain a customer despite infringement to hold on to

24   revenue.  In his 20 years at Cox, he's never heard of anyone

25   saying that.

1          And the notion that having to terminate someone would

2    be a material financial thing that affects the company's

3    financial interest is just not supported by the evidence.  The

4    churn rate document that their own expert relied on shows Cox

5    disconnecting 1.7 million subscribers in 2014.  A handful of

6    added terminations wouldn't move the dial.  So there's no

7    direct financial interest.

8          And Rightscorp itself said this would -- reducing

9    this problem would actually help Cox.  It's not in their

10   interest to encourage it.

11         So did BMG prove a direct financial interest in

12   infringement of BMG's works?  Absolutely not.

13         Next, did they prove that Cox had a right and an

14   ability to supervise infringing activity?  And just think about

15   what that means.  Does your Internet company supervise what you

16   do?  "Supervise" is to observe and direct the execution of a

17   task, to direct someone's work or activities.

18         Again, no ISP supervises what people do.  They just

19   provide a connection.  The best argument they have is, well,

20   you can turn somebody off.  You can completely shut off the

21   service, but all it is is a pipe.  It's just a conduit.  And

22   like other companies that simply connect you to a service, they

23   can all turn you off.  The power company can shut off your

24   power.  The phone company could shut off your phone, probably

25   with the flip of a switch, but they don't control who you call

1   on the phone or what you say, and the power company doesn't

2   control and supervise when you have a light bulb on.  That's up

3   to you, the account holder.  It's not something in the control

4   of the company that provides you these services.

5          And the same is true of Internet companies.  They

6   don't supervise what you do.

7          There's also no ability to go after BitTorrent itself

8   and other peer-to-peer networks.  It's not legal to do so, as

9   Rightscorp itself says.

10          What an Internet service provider does is essentially

11  provide a connection, an on ramp to the world.  It doesn't

12  supervise where you go once you get out there on the Internet

13  any more than the company that provides you a driveway decides

14  where you go once you get out on the highway and where you

15  travel, and where you can go on the Internet is even broader.

16          So did they prove that Cox had a right and ability to

17  supervise?  They did not.

18          So that's the end of the liability phase, but before

19  I pass things over to my colleague, Mr. Buckley, I just want to

20  wrap up with some concluding thoughts.  It's very clear that

21  Cox -- there's no evidence that Cox promoted or helped or

22  encouraged copying.  It wasn't perfect in every case of

23  terminating a number of people, but it never promoted or

24  encouraged copying.  Maybe gave people a few times a few too

25  many chances, but none of them had to do with BMG's rights.

1    None of them had to do with this case.

2         It doesn't have the right or ability to supervise

3    people.  It worked hard to educate customers and help address a

4    global problem.  And the real issue is that there's just a

5    fundamental difference between how Cox looks at its customers

6    and how BMG looks at the world.

7         You heard from Dr. Bardwell, that he's actually --

8    when he says it's a subscriber, he's really just talking about

9    a node on a network.  He said it was a mistake to call that a

10   person, to ascribe personhood to that node, but Cox knows that

11   there are people out there.  Its subscribers are people.

12   They're people who need to use the Internet in their daily

13   lives.  And they wanted us to just cut off 60,000 people from

14   the Internet based on their say-so alone.

15        That's not how things are supposed to work.  An

16   accusation isn't proof of infringement; it's just an

17   accusation.

18        And really there's two different approaches to

19   dealing with this problem.  As Mr. Warin said, once something

20   is out there on BitTorrent, it's like a virus; you can't stop

21   it.

22        And if Cox shut off 60,000 people, that problem would

23   be out there just as much as it is now.  It would be true if

24   Cox shut off every single one of its subscribers in this

25   country.  These files are out there.  They're coming from

1    around the world.  He said it himself:  It's a global problem.

2           But, so what can companies do?  Well, there's a right

3    way to go about dealing with it and there's a wrong way, and

4    the right way is to do what Rightscorp and BMG say they want to

5    do but don't actually do.  It is to try to work with people and

6    educate them, to inform them about the problem, to let them

7    know about alternatives and try to move them onto those

8    legitimate services, to work with industry groups and

9    government agencies and other Internet companies and with

10   rights owners, and that's what Cox has tried to do consistently

11   as this problem has grown globally, as more and more people get

12   on the Internet around the world.

13          Cox is a 100-year-old family business, and it's tried

14   to do things the right way.  It has grown the right way.  It

15   wasn't always perfect in the way it handled things, but it

16   tried to be constructive and do the right thing about this

17   problem.

18          There's also a wrong way to go about this problem.

19   That would be sending millions of e-mails knowing that they're

20   not going to be read for the same thing again and again and

21   just sitting back and turning on a piece of software that just

22   pumps out spam at people, trying to shift the burden, as

23   Mr. Hauprich said, to ordinary consumers to pay for their

24   enforcement efforts just based on an accusation, cutting off

25   their access to the Internet just based on that accusation,

1    cutting off their access to their work, to their family, to the

2    things they need to do until they pay based on that accusation.

3              That's not the right way to do things, and planning

4    this lawsuit while erasing evidence is not the right way to do

5    things, but that's the path that BMG chose.  That's the path

6    that Rightscorp chose.  That's their business model.

7              And they brought this lawsuit as a test of that

8    model, but they failed the test.  They haven't proven direct

9    infringement.  They haven't proven vicarious infringement.

10   They haven't proven contributory infringement.  They can't

11   prove their case, and they're not entitled to any damages.

12             With that said, we always have to talk about damages,

13   and that's where I will hand things over to my colleague,

14   Mr. Buckley.  Thank you very much for your attention.

15             MR. BUCKLEY:  Good afternoon.

16             As Mr. Wakefield explained, we don't believe you

17   should find Cox liable for unproven infringement by unknown

18   people on its network, but if you do find Cox liable, we're

19   required to talk about the measure of damages.

20             And you heard Mr. Warin tell you in his argument that

21   BMG's made a decision and they're pursuing statutory damages

22   rather than actual damages, and the critical point with respect

23   to statutory damages is it's not based on the number of

24   infringements at issue, and you've heard a lot of different

25   infringement numbers throughout the course of this case, but

2234

1    for statutory damages, they're entitled to one award for each

2    copyrighted work that was infringed.  One award for each work

3    infringed.

4            So the first question you-all have to answer is did

5    BMG prove infringement of any of the specific works at issue?

6    And on this point, BMG has adopted a very deliberate strategy,

7    which is not to focus on any particular song and show you how

8    that particular song was infringed.  Mr. Warin spoke for over

9    an hour, and he didn't tell you about any copyrighted work in

10   this case, and he didn't show you how that copyrighted work had

11   been infringed.

12           What's the approach they've taken instead?  They've

13   shown you summaries.  They've shown you tables.  You're going

14   to go back to the jury room and you're going to have binders

15   full of exhibits that you're supposed to wade through, and what

16   do those summaries and tables tell you?

17           Well, here's one example.  You've got registration

18   numbers, you've got song titles, artist names, then you've got

19   a column of samples and a column of e-mailed infractions, which

20   I presume is notices.  This column of notices, you don't know

21   when any of those notices were sent.  They could have been sent

22   anytime in the relevant time period.  You don't know how any of

23   those notices were sent, and why not?  Because the system that

24   was used to send those notices is gone.  They were required to

25   preserve it because it was material evidence and they were

1    preparing to sue Cox, and they destroyed it.

2          You don't know how any of these notices here relate

3    to any of these samples, if they do.  You heard Mr. Rucinski

4    tell you that of the 1.8 million notices in this case, 1.4

5    million of them, about 80 percent, weren't associated with

6    sampling at all.

7          You don't know when these samples were collected or

8    how they were collected, and why don't you know that?  Because

9    the system used to collect these samples is also gone.  They

10   were required to preserve it; they didn't preserve it.  So --

11   and we also know the sampling, of course, was far from perfect,

12   and Mr. Wakefield talked about that.

13         So BMG either wants you to look at all of this

14   information and just assume that they've proven what, in fact,

15   they haven't proven, or BMG wants you to go back into the jury

16   room and do its work for it.  They want you to sort through all

17   of this hodgepodge of data from all these different sources and

18   go work by work and determine whether "Promises in the Dark" by

19   Pat Benatar has been infringed in this case.

20         You do not have to accept that strategy.  You are

21   free to find that BMG didn't prove its case on a work-by-work

22   basis.  You're free to find that they proved it as to some

23   works and not to others.  You're free to find that they proved

24   it for a percentage of the works and not all of the works.

25         The important thing is it's their burden.  It's

2236

1    squarely BMG's burden to show you how every one of these
2    copyrighted works was infringed if it wants a statutory damage
3    award for each of those works.

4          So let's assume that you find that BMG has, in fact,
5    met that burden.  What's the next question?  The next question
6    is how much to award for each of the copyrighted works that you
7    find they proved was infringed, and the copyright statute
8    provides a framework for that.  The standard range for damages
9    is $750 to $30,000 per work infringed.

10         Now, you heard Mr. Warin talk about willfulness, and
11   it is true that if you were to find that Cox willfully engaged
12   in copyright infringement here, you can expand the damages
13   range from $750 up to $150,000 per work infringed, but that
14   decision is up to you, and you're going to see this in the
15   instruction the judge gave you.  This is the statutory damages
16   instruction, and it's in the list of instructions you're going
17   to receive.  If BMG proves that Cox acted willfully, you may
18   but are not required to increase the statutory damage award to
19   a sum as high as $150,000 per copyrighted work.

20         So let's talk for a moment about willfulness.  I'm
21   not going to repeat the things Mr. Wakefield told you, but we
22   know it's undisputed that Cox blacklisted Rightscorp's notices,
23   and for very good reasons that Mr. Wakefield explained.

24         So it's also undisputed Cox wasn't aware of BMG's
25   copyrighted works, so to prove willfulness, they're relying

2237

1    instead on this concept of willful blindness.  And again, not

2    to retread the ground that Mr. Wakefield talked about, but it

3    is not willful blindness to refuse to participate in a business

4    scheme that has nothing to do with curbing copyright

5    infringement and everything to do with profiting from threats.

6          It is not willful blindness to refuse to take action

7    on notices that aren't proof of anything, and you've heard

8    witness after witness tell you these notices in and of

9    themselves don't prove anything.  That's not willful blindness.

10   As to Rightscorp and BMG, Cox was not willfully blind in this

11   case.

12         So if you're going to award damages, if you find that

13   they've proven their case, they've proved particular works

14   infringe, you ought to award damages in the standard range from

15   $750 to $30,000 per work.

16         So what are the guides that you can look to to

17   determine where you fall, where your award ought to fall in

18   this range?  You're going to see from the instructions you

19   receive the overarching consideration for you is what is just

20   and fair, just and fair, but there are a number of different

21   considerations that you can look at, and they're listed in the

22   statutory damages instruction, and one of the important

23   considerations is what actual harm did BMG suffer as a result

24   of the alleged infringement.  That's one consideration.

25         So we called an expert that you heard from,

1    Dr. Sullivan, and he testified at some length that he undertook

2    a very detailed analysis of that question, the actual damages

3    question.  He calculated the maximum damages that BMG could

4    have proven if it had chosen instead to pursue actual damages

5    rather than statutory damages, and you'll remember that in

6    doing his calculation, Dr. Sullivan drew every assumption and

7    every inference in BMG's favor.  Let me remind you what he

8    assumed.

9           So the first thing that Dr. Sullivan assumed was that

10   the Rightscorp data are reliable and accurate.  Well, we know

11   that's not true.  We've seen lots of evidence to suggest that

12   they're not reliable or accurate at all, and we could have

13   tested that further if the systems that generated all of this

14   data had not been destroyed.

15          He also assumed that every observation in the

16   Rightscorp data, you heard him talk about that, every

17   observation in the Rightscorp data he assumed was an act of

18   infringement.

19          Let me take a step back and just remind you, an

20   observation in the Rightscorp data doesn't mean they saw a song

21   sitting there.  All that means is they looked out at a

22   bitfield, they got some information from that bitfield.  It

23   doesn't mean there's a song there.  It's just an observation,

24   and Dr. Bardwell confirmed that.

25          But what Dr. Sullivan assumed was every one of those

2239

1    observations was an act of infringement, and we know that

2    overstates the data in at least two material ways.  First of

3    all, Dr. Sullivan used the number of 2.4 million records.

4    Well, we know that number is lower now.  It's now 1.8 million

5    records.  Dr. Sullivan didn't go back and revise his numbers.

6    He just decided to give BMG more credit than it deserves for

7    the evidence that it's presented.  So he used 2.4 million

8    records.

9            We also know those numbers are overstated because the

10   Rightscorp records include multiple observations of the same

11   thing over and over, thousands of times, sometimes, according

12   to Mr. Boswell, thousands of times in the same day.

13           But Dr. Sullivan gave BMG credit for all of that.  He

14   took into account every record in the Rightscorp data, treated

15   it as an infringement.

16           He assumed that Cox is liable for infringing the

17   works at issue.  Well, you know we strongly disagree with that,

18   but that was an assumption that Dr. Sullivan accepted and said,

19   "All right.  I'm going to assume that there's liability here,

20   and then I'm going to calculate damages."

21           And he also assumed that every alleged infringement

22   would displace a legal sale.  You heard him testify, you might

23   recall, he testified there's evidence to the contrary.  There's

24   evidence that file sharing and purchasing music are just two

25   different channels for music, but he assumed in BMG's favor

2240

1  that for each of the alleged infringement, there was a 1:1

2  ratio.  Each infringement would have resulted in a sale.

3          So then he took all 2.4 million Rightscorp

4  observations and treated them as downloads, and there was a

5  fair amount of discussion with Dr. Sullivan about this, and the

6  important point which Dr. Sullivan made is that treating each

7  of these observations as a download is also dramatically in

8  BMG's favor for several reasons.

9          First of all, there's no evidence of any download in

10 this case, none.  That's what Mr. Wakefield talked about.

11 Second, if he had treated them as uploads, they would have had

12 no economic effect on BMG at all, and the reason for that is

13 that the odds that all of the separate uploaded little pieces

14 that would be necessary to facilitate a download by somebody

15 else, the odds that all of those pieces came from Cox

16 subscribers is, to use Dr. Sullivan's words, itty-bitty.  Do

17 you remember he said that?

18          And here's his slide.  Look at the odds.  There are

19 19 decimal points before you even get to the number.  It is

20 effectively impossible that all of the pieces of one file all

21 came from Cox subscribers or Cox IP addresses.

22          So by treating every Rightscorp observation as a

23 download that displaced a legal sale, then Dr. Sullivan gave

24 BMG full credit for all of the Rightscorp data.

25          And remember, the observations in the Rightscorp data

2241

1    are the only evidence of infringement in this case, the only

2    evidence.  We think it's exceptionally poor evidence, but it's

3    all BMG's offered you.

4           So what did Dr. Sullivan do?  He assumed that every

5    one of those downloads, he assumed they were downloads, every

6    one of those observations in the data, 2.4 million of them,

7    would have translated into a sale, and he took BMG's data on a

8    work-by-work basis, unlike what BMG itself has done,

9    Dr. Sullivan went on a work-by-work basis, and he looked at how

10   BMG actually sells those songs and how those songs are

11   distributed between digital downloads and initiated streams.

12          He came up with those figures, and then he used those

13   figures to calculate BMG's revenue associated with streaming

14   revenue, downloads revenue, and he came up with the total

15   revenue figure associated with the alleged infringements in

16   this case, assuming those infringements had instead been legal

17   sales.

18          What did he do next?  Again, he took BMG's data.

19   Now, unlike Dr. Lehr, he didn't make assumptions from other

20   data, he didn't fill in the gaps themselves.  He took BMG's

21   data, and he calculated profit, and again, from BMG's data, the

22   total lost profit had every alleged infringement resulted in a

23   sale would have been $815,000 total during the damages period.

24          Now, BMG has suggested to you that that number is

25   low, and there was some questioning of Dr. Sullivan to make it

2242

1   sound like that trivialized the work at issue.  I suggest to

2   you that number actually makes sense.

3          What Dr. Sullivan told you was that during the

4   relevant period, the average price for a digital download was

5   $1.17 per song, and the highest streaming price during that

6   period for the most popular songs at issue -- I guarantee you

7   when you look at the list, not all the songs in this case are

8   among the most popular -- for the most popular songs at issue

9   was about 84 cents.  Music is becoming increasingly inexpensive

10  and increasingly easy to obtain, and all of us who buy music

11  intuitively know that to be true.

12         And the relatively low amounts involved here are also

13  reflected in BMG's own actions.  You heard from Mr. Hauprich

14  from BMG that until they entered into their agreement with

15  Rightscorp, they had taken no steps to address illegal file

16  sharing.  None.  He said we didn't have a solution; we didn't

17  do anything about it.

18         If this was as big a deal as they want to make it

19  seem, don't you think BMG would have taken some sort of action?

20  Instead, they did nothing until they had the Rightscorp scheme

21  to take advantage of.

22         So that is why -- that's why these figures, the

23  revenue figures and the profit figures that Dr. Sullivan came

24  up with, are maximum numbers.  He admitted you can't come up

25  with one precise number within the range, but you can come up

1  with a maximum.  If you draw every assumption in BMG's favor,
2  you can come up with a maximum.  That's the maximum profit they
3  could have realized if every one of these alleged infringements
4  was a sale.
5       Now, interestingly, plaintiffs themselves didn't
6  retain a damage expert.  The closest they came was Dr. Lehr,
7  but he told you he didn't do any calculation of BMG's lost
8  profit.  He didn't do any calculation of BMG's lost revenue.
9  In fact, he didn't do any calculation of harm to BMG at all.
10       And we know he had full access to BMG's data.  He's
11  their expert.  And I asked him, you heard me ask him,
12  "Did you ask for any information from BMG that you didn't
13  receive?"
14       And he said, "No."
15       So he could have done exactly what Dr. Sullivan did,
16  but he didn't, probably because he knew the number wasn't going
17  to be very big.  So what did he do instead?  He did his
18  lifetime subscriber value calculation, which you heard him
19  describe to you twice, and he admitted that it doesn't
20  calculate the value to Cox of infringement on its network, not
21  the value of infringement, which might have potentially been
22  relevant.  Instead, he just calculated the value of a Cox
23  subscriber, and not an infringing subscriber and not just an
24  Internet subscriber, any average Cox subscriber.
25       And then he assumed that if Cox were to terminate one

2244

1    of those subscribers, it would lose the entire lifetime value

2    of that subscriber.  Whether it terminated that person on Day

3    One or three years after they'd been a customer or five years

4    after they'd been a customer, Cox would lose the whole ball of

5    wax, which I think we all know makes no sense.

6            And he also assumed that Cox makes 90 cents on every

7    dollar off of those customers, and you heard Dr. Sullivan and

8    Mr. Mencher tell you that's just not true and also doesn't make

9    much sense.

10           So then Dr. Lehr assumed, and he said it was

11   apparently based on Dr. Bardwell's model but he didn't stand by

12   this figure, that Cox should have terminated 60,000 people's

13   Internet access, 60,000 people, and presumably not just their

14   Internet access because he also included cable and telephone.

15   So supposedly, Cox should have terminated Internet, cable,

16   telephone to 60,000 people.  Some of you probably live in towns

17   where the population is less than 60,000.

18           But Cox was supposed to turn that off based on

19   Rightscorp's say-so, without any proof that any of these

20   account holders -- remember, there are people associated with

21   these accounts -- that any of these account holders had done

22   anything wrong.

23           And why is that 60,000 figure important?  Because

24   Dr. Lehr then multiplied it by his lifetime subscriber value to

25   get huge numbers, and you heard me and him get into a little

1    bit about that.  His low number, his conservative number was

2    $211 million.  And you heard Mr. Warin tell you today that the

3    high end number was $300 million, which is even outside the

4    statutory damages range.

5          I ask you to please not abandon your common sense.

6    The benefit to Cox from some people using BitTorrent on its

7    network is not $211 million.  It's not $300 million.  In fact,

8    Dr. Sullivan actually addressed the benefit to Cox, and what he

9    did was try to address the benefit to Cox of an infringement on

10   the network, not of having subscribers generally, not of being

11   in the ISP business, but of infringement on its network, and

12   what Dr. Sullivan explained was it's illogical to assume that

13   Cox is going to get more benefit from a group of infringers

14   downloading free music -- it's not going to get more benefit

15   from that than the maximum amount those same people would pay

16   BMG for the same music.

17         So what Dr. Sullivan said was, again, drawing every

18   inference in BMG's favor, he assumed that the maximum benefit

19   to Cox was the same as the maximum loss to BMG, and that's

20   $2.1 million.

21         So only Dr. Sullivan attempted any calculation of the

22   actual harm in this case to BMG or the benefit to Cox as a

23   result of the alleged infringement.

24         And its calculations, which are summarized here, are

25   uncontradicted.  The maximum harm to BMG, revenue number 2.1

1    million, profit number 815,000, maximum benefit to Cox,

2    2.1 million.

3            And in considering your statutory damages award,

4    you're going to see on the instruction you can take into

5    account actual harm.  You are not required to nor should you

6    ignore the magnitude of the actual harm in this case, and there

7    it is.

8            Now, Mr. Warin -- Mr. Warin also talked a lot about

9    deterrence, and BMG is asking you for a huge damages award in

10   order to deter future conduct by Cox.  So what is it that BMG

11   is seeking to deter?  Does it want Cox to take copyright

12   notices seriously?  Well, Cox does that, developed a

13   state-of-the-art system that it licenses to other ISPs, and the

14   whole point of that system is to take in notices from third

15   parties and process them.  And it works.  We process millions

16   of notices from lots of sophisticated rights holders:

17   Universal, RIAA.  Mr. Warin himself referred to those in his

18   argument.

19           Does BMG want Cox to terminate more subscribers?

20   Well, that's contrary to what they've told you in this trial.

21   What BMG's representatives told you was they want to educate

22   consumers, and ultimately, they're just trying to stop

23   infringement.

24           Well, Cox does that, too, and again, it works.

25   Termination is rarely necessary.  People just need a little

1    help.  Sometimes there's a mistake or somebody else is using

2    their WiFi or they just need somebody to talk them through how

3    to change their password.

4         Does BMG want Cox to block or limit BitTorrent?

5    You've heard an awful lot in this case about BitTorrent and

6    what percentage of it is used for illegal activity, what

7    percentage of it is legal.

8         What's the point?  Are they asking us to block

9    BitTorrent?  We can't.  Their own witnesses said that.

10   Dr. McGarty told you that from the stand yesterday.  We can't

11   block BitTorrent.  Comcast tried that in 2008, and the FCC

12   said, no, you can't do that.  ISPs don't get to choose which

13   content is okay and which content isn't.

14        Does BMG want Cox to process Rightscorp's notices?

15   Well, we've consistently told them we'll do that.  All they

16   have to do is remove the settlement language.  But what Cox is

17   not going to do is expose its consumers to threats and to

18   bullying based on nothing more than accusations.  We're going

19   to stand by our customers, and if you were a Cox customer,

20   you'd want us to do that, too.

21        So what's the deterrent effect here?  You didn't

22   really hear much explanation of that.  There is no deterrent

23   effect.  What BMG is asking you to do is punish Cox.  It's just

24   punishment.  And the desire to punish Cox is reflected in BMG's

25   numbers.

2248

1              In the context of this case, $211 million is absurd.

2     You need to ask yourself, is Cox worthy of that kind of

3     punishment because it refused to engage in this sort of a

4     scheme because it insisted on protecting its customers?  Is

5     that worthy of punishment?  It's up to you to decide.

6              So the third question you need to ask is did BMG

7     mitigate its damages?  This is the final piece of the damages

8     puzzle, and as the judge instructed you and you'll see in the

9     instructions, BMG has a duty to mitigate its damages, and

10    "mitigate" is just a fancy word for reduce.

11             So what could it have done?  Well, one point worth

12    reiterating, and it's a point that Mr. Warin made, is that

13    their assertion is that BitTorrent is a virus, it's a global

14    problem, and once these songs are out there, it's impossible to

15    get them back.  I guarantee you when you look at this list of

16    copyrighted works, you're going to conclude that most or all

17    were out on BitTorrent long before they ever reached out to

18    Cox, long before they ever brought this lawsuit.

19             So if it's true that this is a virus and once it's

20    out, you can't rein it in, that's not Cox's problem, and

21    there's also nothing Cox can do about it, but they're trying to

22    hold us responsible for that.

23             What else did they do?  Once they started

24    communicating with Cox, once they were apparently collecting

25    all of this data, 22 million, 30 million, whatever it is,

1    however many records, all of this data about what was going on

2    in the Cox network, what did they do?  They sat on their hands

3    for three years.  They secretly planned this lawsuit while

4    apparently this virus was replicating all over the place.

5           So what could they have done?  If Rightscorp had

6    simply revised its notices to conform to Cox's policy, we would

7    have processed, accepted every one of those notices, just like

8    we do for every other sophisticated rights holder that

9    cooperates with us.

10          They insist that Cox should have revised the notices.

11   Those aren't our notices; they're Rightscorp's notices.

12   They're in the best position to revise those, and not only is

13   it not our obligation to do that, as you're going to see from

14   the instruction, it's their legal duty to mitigate their

15   damages.  It's not our job to save them from themselves.

16          And Mr. Warin made an interesting comment, saying

17   that had we let more of their notices through, more people

18   would have stopped the infringing conduct sooner.  Exactly.

19   That's our point.  Had you just revised your notices, we would

20   have processed them, and as Mr. Wakefield discussed, 96 percent

21   of the time after five notices, the problem stops.

22          So if BMG's real goal is to curb copyright

23   infringement, as it told you, and if its real goal is to

24   educate customers, as it told you, the very best way to

25   accomplish both of those goals would have been to cooperate

2250

1    with Cox.  That's what we do with lots of other folks every

2    day, millions of notices, and you are free to consider that

3    when you award statutory damages.  You're free to consider that

4    had BMG and Rightscorp just revised their notices, as much as

5    96 percent of the infringement they're suing for in this case

6    would have been resolved years ago.

7             So what's the final question?  Here are the three

8    things we've just talked about.  The final question for you is

9    what damages award -- what damage award is fair and just?  And

10   you have a pretty rare and remarkable opportunity in front of

11   you.  You actually get to administer justice.  You get to

12   decide for yourself what feels fair.

13            And we hope -- Cox hopes that if you find that Cox is

14   liable and you find that a damages award is reasonable or

15   required, that you will also find that a damages award that

16   bears no relation to the actual harm suffered, that bears no

17   relation to the realities of music consumption, that bears no

18   relation to Cox's true motives, that bears no relation to the

19   Internet rules and to the relationships between ISPs and their

20   customers, that a damages award like that isn't appropriate and

21   isn't fair.

22            So if you do decide to award damages, Cox requests

23   that you award the statutory minimum of $750 for the 1,397

24   works at issue, which is approximately $1.1 million.  That also

25   happens to be roughly equivalent to BMG's lost profit plus

1    interest.

2          So I want to echo Mr. Wakefield's thanks on behalf of

3    myself, on behalf of our team, on behalf of Cox for your

4    attention, your patience, your sacrifice, it's been a long

5    haul, but most importantly, for the important work that you're

6    getting ready to go do in that jury room.  Thanks very much.

7          THE COURT:  All right.  Thank you.

8          Do you-all need a break before we do rebuttal, or are

9    you okay to go forward with the rebuttal?  Okay.  We're okay?

10          All right.  Mr. Warin?

11          MR. WARIN:  I'm having a difficult time reconciling

12    what I've just heard from Mr. Buckley and what I've just heard

13    from Mr. Wakefield.  Mr. Buckley said that the interrogatories

14    that Cox gave, their own answers under oath when we asked them

15    as to questions about how many people they terminated, that

16    they said they terminated 556.

17          You didn't hear a single witness during this entire

18    trial come in here and testify, a single Cox witness come in

19    here and say that they terminated a single, a single customer

20    for copyright infringement.  Yet, you just heard Mr. Wakefield

21    quoting Cox's own answers to interrogatories saying it was 556.

22          But then I heard Mr. Buckley say, "Termination is

23    rarely necessary" -- I wrote it down -- "because our system

24    works."

25          So either they're saying we terminate a lot or

1    termination is rarely necessary.  And then you hear them

2    saying, well, that's because our system works 96 percent of the

3    time for people that get at least five notices.

4            Is that a system that works?  Because the people that

5    get notices are only about 10 percent of the notices that are

6    sent in.  And then by the fifth notice, they supposedly stopped

7    doing it?  Well, you saw example after example after example

8    where that just wasn't true.

9            But let's talk about terminations because let's go

10   back to Mr. Buckley's number, and I'd like to show you -- if I

11   could, Karl -- slide 102.  It's an e-mail from Jason Zabek,

12   okay?  And it talks about, "As long as the process of warnings,

13   suspensions, then termination is followed, we can turn the

14   customer back on and start the DMCA count over again."

15           So is this one of the terminations that Mr. Wakefield

16   is counting when he says there's 500?

17           Let's go to another one, Karl.  Let's go to slide 85.

18           The top of it, "We must terminate to receive

19   protection under the safe harbor amendment."  And then down at

20   the bottom, "But I don't believe the TOC is actually

21   terminating the service, completely removing it in ICOMs.

22   They're just clicking Terminate and Update Ticket, which shows

23   a termination in the customer's history."

24           This is the way Cox keeps records.  Did Mr. Wakefield

25   or did any witness in there say that 581 had to do with

1    copyright infringements or any one of the examples we gave or

2    was it spam or denial of service?  I'm sure that Cox will cut

3    off service to somebody who's stealing their signal or who's

4    spamming them, providing service, all illegal, contrary to

5    their authorized-use policy.

6           But when somebody is stealing from us, they don't cut

7    them off.  They keep them going, and they create false records

8    and come in here to court and give you false numbers from their

9    own interrogatories supposedly under oath, without having a

10   single witness on that witness stand say that they had

11   terminated a single customer for copyright infringement, ours

12   or anybody else's.

13          Who didn't you hear from?  Could we go to slide

14   No. 4 -- 5?

15          I heard two people thrown under the bus about 15

16   minutes ago.  Cox's lawyers threw Mr. Zabek and Mr. Sikes under

17   the bus.  Now, neither of them were here to testify live.  The

18   only thing you saw was snippets of a videotaped deposition.

19          And you heard Mr. Wakefield say they behaved badly.

20   They did, and he was seeming to suggest that that wasn't Cox

21   behaving badly.

22          Well, who is Mr. Zabek?  He's the head of their Abuse

23   Unit.  He's the person Cox put in charge of copyright

24   infringement.

25          Mr. Sikes wasn't here as a live witness.  Cox could

1   have brought him and didn't.  What did you hear from a witness

2   on the stand?  He got promoted.

3          So the two people that were dealing with the

4   copyright notices, they just threw them under the bus here ten

5   minutes ago, trying to blame the middleman, if you will, while

6   somebody up there, the wizard, is making money from their

7   conduct, and they're trying to back away from it.

8          Well, they were put in charge of it.  Cox put them in

9   charge of it.  They sent e-mails.  "We've got to keep these

10  customers so we get the profit.  We've got to fake terminate

11  them.  We've got to terminate and reactivate."

12         Those e-mails were sent not on one day, not on one

13  year.  I showed you e-mail after e-mail after e-mail going for

14  a four-year period.

15         So they threw them under the bus.  Well, I think Cox

16  is responsible for the people that they put in charge of this,

17  and I think that you should hold Cox responsible.

18         Cox said, we didn't know because we didn't open the

19  notices.  Let's look at willful blindness, No. 18, please.

20         This is jury instruction No. 27.  You're going to

21  have it back with you.  Cox said, oh, we didn't know.

22         Have you seen that cartoon with the three monkeys:

23  Hear no evil, see no evil, speak no evil?  That's Cox's

24  approach with respect to the DMC -- with respect to the BMG

25  notices, but the law says that willful blindness is considered

1    knowledge.  Cox acted with willful blindness if it was aware of

2    a high probability that Cox users were infringing BMG's

3    copyrights but consciously avoided confirming that fact.

4            Did they think that BMG was just sending them the

5    notices for the fun of it?  They said, well, why don't -- they

6    talked about a dog and a dog barking next door, and why don't

7    you just call up and see what it is?

8            Well, they knew who these subscribers were that we

9    were sending the notices on.  If they had any doubt about the

10   adequacy of our notice as to whether it was accurate, whether

11   that customer was completely being charged falsely or whether

12   they were actually infringing, they knew who the customer was.

13   We didn't.  They could have called them up and said, hey, we

14   got this notice accusing you of these things.

15           Now, you heard that it's improper because BMG wanted

16   to terminate people based upon accusations that weren't proven.

17   Well, in BMG's mind, they were proven because they had gone in,

18   actually captured the date, song, place when the infringement

19   took place, so from their point of view, weren't coming.

20           But they said, no, we couldn't do that.  That

21   wouldn't be fair to our customers.  Yet, Mr. Wakefield said, we

22   terminated 581 customers with accusations only from other

23   Internet service providers.

24           So which is it?  Did they terminate 581 based upon

25   accusations, or did they not terminate any?  And you've heard

2256

1    both stories, when Cox is doing the Pontius Pilate here today

2    and throwing Zabek and Sikes under the bus.

3            They talked about a right and ability to supervise,

4    if you look at slide 21, and you heard from Mr. Wakefield:  We

5    can't look at people's Internets.  We're not looking over their

6    shoulder.

7            We're not asking them to do that.  We never asked

8    them to do that.  This is not the CIA or the NSA.  They have

9    law violators on their network.

10           I'm kind of a music nut.  I go to a lot of concerts,

11   kind of crazy.  Let me give you this situation:  I go to Wolf

12   Trap or Verizon Center or Jiffy Lube, and I go in there and I

13   pay an admission ticket.  They control -- just like the pipe,

14   just like the Internet, the Cox subscribers -- they control

15   that arena.

16           I go in there and somebody steals my purse or my

17   wallet, and I report it to the people in charge and say,

18   somebody stole my purse or wallet, and it's him (indicating).

19           And you know what?  I not only pointed it out to him,

20   but I've got a picture of him because I took a cell phone

21   number, and they say, go away.  Forget about it.  And I do that

22   again, and they say, go away.  Forget about it.

23           Well, that's what's happening on Cox's network.

24   Repeatedly, people are stealing.  Cox is told about it, and

25   they say to rights holders, go away.  Forget about it.  They

1    have, just like the security police at Jiffy Lube or Wolf Trap

2    or Verizon Center, have the ability to supervise because

3    somebody paid an admission ticket to get in there, just like

4    you pay an admission ticket to get on the Cox network, and

5    there's illegal conduct on there, and it was reported, and a

6    picture of it was taken as to who the offender was, and yet

7    time and time and time again, they ignore it.

8            And just like if that happened to you or me at one of

9    those arenas, maybe the first time the arena said, well, we

10   didn't steal your purse.  We didn't steal your wallet.  But by

11   time after time after time, they do nothing, they are

12   materially contributing to the conduct of those thieves there.

13           Same thing happened here.  They questioned our

14   software.  You know, we've got some very talented folks in this

15   courtroom today on both sides of the aisle, and they can make a

16   lot of questions, but I always believe the proof is in the

17   pudding.

18           If you can put up 33, we -- these are 150,000 copies

19   of the actual song.  Proof's in the pudding.  The Rightscorp

20   software identified the song.  Ms. Frederiksen-Cross said, "I'm

21   going to check to see if it works."  She was detected as

22   infringing.  And we have the actual songs.

23           Now, what did you hear about that?  Well, not every

24   one of those packages is complete.  How about this?  The

25   brochure.  They gave the impression that the Rightscorp system

2258

1    didn't work because occasionally they copied a brochure.

2            Well, did they tell you that there were 70,000 and

3    only 800 did the -- came out, so less than 1/10 of 1 percent,

4    which means that 99.9 percent what was there was the record --

5    700,000, excuse me -- 700,000.  So 99.1 percent, the actual

6    song was there.

7            What happened?  Actually, from the beginning, the

8    actual song was there, because the torrent, the hash mark

9    identified the song as being there.

10           How did they end up with the brochure?  Because when

11   they went to copy, the torrent had more than the song.  It had

12   the brochure, may have had the album cover, but that didn't

13   prove that the song wasn't there because the original

14   identification indicated that it was there.

15           My colleague pointed out that I said 70,000 versus

16   700,000, and I need to correct another number.  Earlier I was

17   talking about damages when I was up here the last time.  I said

18   200,000.  It was 200 million.  So I have trouble -- I'm a

19   history major.  I have trouble with numbers sometimes, so I

20   apologize for that.

21           Let's go on with respect to what Rightscorp and BMG

22   did.  If we could have No. 50?

23           We're saying that they had an obligation to do

24   something.  They say that because the settlement language was

25   in there, they didn't have to do anything, but they said they

1    would forward it.

2            Now here, once again, I was paying careful attention

3    and I wrote down what each, Mr. Buckley and Mr. Wakefield,

4    said.  Mr. Wakefield said that we told BMG that we would

5    forward their notices.  I wrote it down.

6            It's not what Mr. Buckley said.  Mr. Buckley, and I

7    wrote it down twice, twice said, "We would process your

8    notices."

9            Mr. Wakefield claimed that there's an exhibit that

10   would show that they would forward it, but when I was up here

11   the last time -- 52, Karl -- I showed you the exact exhibits,

12   and I quoted exactly what they said, and they didn't say they

13   would forward them.  They said they would accept them or

14   process them.

15           So again, we have two different lawyers from Cox

16   today, one of them saying, without showing you an exhibit, that

17   they would forward them; the other one saying they would

18   process them.  And I already showed you what "process" means.

19   "Process" means no process.  It means you go into a dark hole.

20   And you heard Dr. McGarty talk about that.

21           Let's talk about 67.  When the spike came out, when

22   they started getting all these notices from other people, what

23   did they do about that?  Well, Mr. -- this is the very first

24   e-mail when they see the spike, from Jason Zabek, the witness

25   you didn't see in person, said, "Could we really ignore the

1   bulk of DMCA notices?"

2          And the answer was yes.  They put in place all their

3   hurdles, all their hurdles that kept you from getting even to

4   the graduated response program, and then once you got the

5   graduated response program, it's notice, first notice ignored;

6   second notice, click and you're reactivated; third notice,

7   click and you're reactivated; fourth notice, click and you're

8   reactivated; fifth notice, click and you're reactivated.

9          It wasn't until the 11th or 12th notice that you even

10  talked to a person, and then guess what?  That wasn't good

11  enough.  They changed it a year and a half later so it wasn't

12  until the 13th or 14th notice before you actually talked to

13  somebody.

14         And then you know what happened?  They would, quote,

15  fake terminate you.  I showed you the documents, not my

16  documents, Cox's internal documents by the people that Cox put

17  in charge of this program.

18         And yet when the internal documents show fraud, show

19  that they're pretending and they're creating records that say

20  someone is terminated and it's not the truth, and then you hear

21  argument today from their lawyers that they were terminated, it

22  raises a very serious question.

23         Now, you heard the criticism of Rightscorp because

24  they made a business proposition to Cox, and the business

25  proposition was, look, we send out these notices.  They're

1    settlement notices.  We don't sue people.  We get their

2    attention.  First it was 10 bucks, and then it was 20 bucks and

3    30 bucks.  And, Cox, we know that that may involve some effort

4    on your part, so we're willing to share some of those

5    settlement amounts with you.

6              And Cox said, no, we won't do it, because we would

7    never do it.

8              Well, look at 74.  This is again Mr. Zabek, and I'm

9    not going to read the first part of it because you've already

10   seen it:  "Ya, we told each copyright holder to limit them" --

11   limit the number of notices -- "or give us the money to hire

12   people."

13             So you hear from their lawyers that they would never

14   think about, you know, asking anybody for money on this, and

15   yet Mr. Zabek said, we told them -- and these are the copyright

16   holders, not just us, but all the rest of them -- that we're

17   going to cap them.  We're not going to process more than 200 a

18   day.  We're going to put them in this graduated response system

19   that leads to nowhere, and if they don't like it, they should

20   give Cox the money to process this.

21             While they're doing that, you heard about -- did you

22   hear Mr. Wakefield or Mr. Buckley talk about spike in numbers,

23   cut of staff?  If you would, go to 79.

24             This was in 2001, after the numbers are starting up,

25   before they got their first Rightscorp number, reducing the

1    staff that's responsible for this by 75 percent.  That's not a

2    decision made by a low-level person.  Those kind of staffing

3    decisions are made at the highest levels of the company with

4    respect to what kind of budget you're going to commit to

5    handling these kind of complaints.  And what was their response

6    as the number of complaints were coming up?  Cut the budget by

7    75 percent.

8            They claimed, oh, we had all this great cooperation

9    from these other people:  Universal, Warner Brothers, whatever.

10   Well, you heard Mr. Zabek testify that Warner Brothers is one

11   of his clients, and they aren't processing their notice.

12           Did you see a representative from RCIA come up to

13   this stand and testify that they were happy with the way Cox

14   was treating them?  Did you hear a representative from Warner

15   Brothers?  Did you hear anybody other than a lawyer who retired

16   from Cox three years ago say that, oh, they were okay with our

17   caps, we were able to work out the caps?

18           So -- and Mr. Steele said that Warner Brothers is a

19   client of theirs, and so that was one of the ones that

20   supposedly is playing ball with Cox, but there was testimony

21   under oath that Warner Brothers is a Rightscorp client.  So I

22   presume that if they continued to have the settlement notice in

23   there, they're being blackballed just like everything else.

24           Slide 95, please, Karl.

25           No question that Cox had economic incentive.  No

1    question that they knew about stealing on their network.  You

2    don't have to just rely on Zabek and Sikes because we have that

3    other stealing e-mail.

4            This is the marketing survey that they did

5    themselves, and they're talking about downloading the sites,

6    and they say, "'free' method such as downloading for free,

7    burning songs from friends' CDs, and 'stealing' songs online."

8    BitTorrent, PirateBay, Kickass Torrent.

9            Cox knows its average subscriber spends 21 hours a

10   month on BitTorrent, they know that the high-use people spend

11   103 hours per month, and they know that from their own customer

12   survey, that one of the reasons they're doing it is to steal

13   free music.

14           We've been faulted throughout that we can't prove

15   every repeat infringer.

16           Karl, No. 126.

17           That's because Cox destroyed the evidence.  We start

18   sending in these notices, you can see it in March of 2011, and

19   the notices are very detailed.  You see what they are.  There's

20   no doubt that when the notice comes in, it only has an IP

21   address.  It also has the song and the date and all the rest of

22   it, but it doesn't know who the subscriber is.

23           Well, who does know who the subscriber is?  Cox.

24   Yet, as you can see here, and the judge has given you

25   instruction on it, Cox deleted those.  So the only reason you

2264

1    heard Mr. Bardwell here is because he was testifying about

2    repeat infringers and his analysis he did of repeat infringers.

3    If Cox had maintained those records of their own customers, he

4    wouldn't have had to go through a probability analysis of who

5    the repeat infringers were because that data would have been

6    known and available through Cox.

7             Finally, you heard the van.  I was surprised that we

8    see the van again.  No. 110.  People could be stealing WiFi.  I

9    want you to go back when you look at this jury instruction

10   No. 25.  "BMG is not required to prove the specific identities

11   of the infringing users."  That was an instruction you heard

12   from the judge.  You don't have to take my word for it, you're

13   going to have the written instructions, and so I was stunned

14   when I saw that that's being trooped out, that we don't know if

15   it's a guy in a van or it's the kid home from college or the

16   neighbor just doing it.

17            Talk about damages.  We believe that substantial

18   damages should be awarded here.  If you take some of the

19   numbers here, take even the low-end number of non-willful

20   statutory damages, that's $30,000, the high end of that, per

21   copyrighted work.  Multiply that times 1,375, and that comes up

22   with a pretty big number.  If you believe that Cox engaged in

23   willful blindness and willful conduct here, the number gets

24   substantially greater.  So 1,397 songs times an amount that

25   could be as much as $150,000 per song.

2265

1          I sit here as I'm closing and think about the injury

2    that these rights holders have had and others.  I recognize

3    that Cox may not be the only one that's involved in this, but

4    if this jury returns the verdict we think it should, it will be

5    noticed, and it will be an important step in eliminating

6    Internet piracy.

7          You've heard suggestions that other ISPs aren't

8    cooperating, but you heard the number that 300 now play ball

9    with Rightscorp.  So we would hope that when you deliberate, we

10   trust you will do the right thing.  We think it should be a

11   fair award, but as Mr. Buckley pointed out, we are not required

12   to seek the injury to BMG and its rights holders because the

13   Copyright Act says in situations like this, it's almost

14   impossible to calculate.  That's exactly what Dr. Lehr said

15   twice on the stand.

16         And because of that, Congress said you could get

17   statutory damages, and they say that among the things you can

18   do in awarding statutory damages is consider the deterrent

19   effect that a significant verdict will have.  And so we would

20   ask you to consider that.  And they say you can also

21   consider -- and read the jury instruction -- a penalty for the

22   outrageous willful conduct that we believe has been

23   demonstrated.

24         Thank you for your attention.  I don't envy you

25   having to spend a few more hours with us, but thanks again for

```
 1    your time.  You've been remarkably patient and attentive.
 2    Thank you.
 3            THE COURT:  All right.  Thank you, Mr. Warin.
 4            All right.  Well, that's the end of our closing
 5    instructions.  The -- going forward, you'll go back in a
 6    minute, and you will have lunch on your own.  I'm not going to
 7    ask you when you're going to have lunch.  You have lunch on
 8    your own, but remember, you only deliberate when all of you are
 9    present.
10            You can either go out to lunch, you can get lunch and
11    bring it back, whatever you want to do, and you can deliberate
12    throughout the afternoon and, obviously, tomorrow, and the
13    objective here is we'll give you as much time as you believe
14    you need to make the important decisions that you're being
15    asked to make.
16            I won't, you know, want you to stay much longer than
17    5:30 because we lose staff by close to -- between 5:30 and 6:00
18    because people are looking to go home.  So, but you --
19    obviously, if you have questions, as I've said, you know, you
20    write those down, and Joe will get them to me, and we'll
21    consider them, and we'll respond to you either by written
22    response or by bringing you out here and talking to you-all in
23    open court.
24            You may have understood how the jury selection
25    process went.  We selected six and then we selected four
```

1    alternates because I wanted to make sure that we had at least

2    six jurors who would be deliberating at the end of the day, and

3    so I'm going to have to excuse four of you who were selected as

4    alternates, but I want to -- and it's one of the more

5    unpleasant things that I have to do because I know that you've

6    sat through all of this testimony and you'd like to be part of

7    the deliberations.  I'm sure that your fellow jurors will let

8    you know how it turns out if you leave them contact

9    information.

10           But I also would ask you not -- the alternates, that

11   you not do anything to make it impossible for you to come back

12   if there is a, you know, if one of the jurors gets ill or has a

13   family emergency.  We may call upon you to come back and

14   substitute for that regular juror.  So please, for the next

15   couple of days, please don't do anything like investigating or

16   do research which would make it impossible to bring you back as

17   a juror.

18           So the alternate jurors are Mr. Main, Ms. Harley,

19   Mr. Mindock, and Mr. Barker.  So I'm going to ask that you be

20   dismissed at this time as all the jurors are going back to the

21   jury room, and that the jurors who remain not begin to discuss

22   the case until our alternates have left the room.

23           All right.  Thank you-all so much, especially the

24   alternates, and we'll wait to hear from you.  All right.

25   You're all excused.  Thank you.

2268

1                    (Alternate Jurors excused.)

2    JURY OUT

3            THE COURT:  Anything we need to discuss right now?

4                    (No response.)

5            THE COURT:  All right.

6            MR. WARIN:  Your Honor, I'd only ask one question.

7    We've got a lot of people here, and I'm sure some of them would

8    like to go home.

9            THE COURT:  All right.

10           MR. WARIN:  I think most will stay this afternoon,

11   but if we don't have a verdict this afternoon, I want to just

12   know your preference with respect to who you would like here in

13   case there would be questions from the jury or whatever.

14           THE COURT:  I just need one person who can answer,

15   has authority to answer the questions, and I understand that,

16   you know, you may need to narrow the group, and that's fine

17   with me.  You know, as long as you -- well, you know, we'll get

18   a question out here.  If we do, I make copies of it.  I bring

19   them into the courtroom for you to consider, and there's time

20   built in for you to call colleagues if you need to about any

21   issue if somebody's not here to talk to them personally.

22           MR. WARIN:  Great.  Thank you.  I think some of our

23   folks would like to get a decent night's sleep.

24           THE COURT:  Yeah, I fully understand, and I'm all for

25   that.  Our West Coasters, they can, I guess, at least go back

1    to the hotel and maybe hit the fitness center or something,

2    right?  So -- but, you know, have somebody available if and

3    when we do get a note and, of course, if we get a verdict.

4           I'm going to let them go at 5:30 unless they tell me

5    that they're very close to reaching a decision.  Then we'll let

6    them deliberate a little longer.  I'll ask them -- I'll tell

7    them, communicate with them that they can come back in the

8    morning at 9:00, or if they want to start at 9:30, they can do

9    that.  I don't bring them out to give them any further

10   instructions about that.

11          And, you know, Joe will be the go-between, and

12   he'll -- I'm not sure where he is right now, but he'll be the

13   go-between and let us know if they're coming back at 9:00 or

14   9:30, and, you know, they know that they're not allowed to

15   deliberate until all of them are present.  So I won't bring

16   them back formally at 9:00 tomorrow morning and expect you-all

17   to be here so that you're -- they know that you're, you know,

18   all heavily involved.  So that's why I don't do that.

19          So all right.

20          MR. WARIN:  Thank you, Your Honor.

21          THE COURT:  Then we're in recess until we get further

22   word from our jury.  All right.  Thank you.

23          MR. WAKEFIELD:  Thank you, Your Honor.

24          NOTE:  At this point, 1:38 p.m., a recess is taken;

25   whereupon at 4:02 p.m. the Court and counsel meet in the

2270

1   absence of the jury as follows:

2   JURY OUT

3            THE COURT:  All right.  So we have our first

4   question.  "Please define materially contributed as stated in

5   instruction number 26."

6            And I'll hear your ideas on what you think we should

7   do.  Mr. Pecau.

8            MR. PECAU:  Your Honor, we suggest that the Court

9   provide the jury with our proposed jury instruction number 30,

10  which addressed the elements of contributory infringement.  And

11  in particular, addressed what a material contribution was.

12           And, Your Honor, it was our proposed number 30.  And

13  our proposal was, "Cox materially contributed to its users'

14  infringing activity if it provided the sites and facilities for

15  the infringing activity or the means for its users to access

16  infringing copies of BMG's copyrighted works."

17           Your Honor, the authority that we rely on appears

18  below, it's the Napster case, the Fonovisa case in the Ninth

19  Circuit, Ellison v. Robertson for access, and also Perfect 10

20  also access to the infringing works.

21           I would be happy to discuss those cases further if

22  you would like, Your Honor.

23           THE COURT:  Well, I mean, obviously you tailored the

24  instruction to the facts of this case, which is what I had

25  problems with.  As I say, my first attempt at these

1  instructions is not to direct them to make any findings through

2  the instructions.

3         So if you want to direct me to the closest case you

4  think supports that proposition and factually may be closest, I

5  am happy to look at it.  I had not looked at material

6  contribution carefully.

7         MR. PECAU:  All right.  Well, Your Honor, I think

8  there are two cases.  Because if you see, our proposed

9  instruction says "two parts."

10        So the cases I would direct Your Honor's attention to

11 first are the Ninth Circuit case on <u>Fonovisa v. Cherry Auction</u>.

12 And that's one of the flea market cases, Your Honor.  And that

13 talks about the sites and facilities.

14        I think the <u>Ellison v. Robertson</u> case, that's the AOL

15 case, Your Honor, in which there was infringing material and

16 AOL gave access to it.  And the Court in the Ninth Circuit said

17 that was sufficient for a material contribution.

18        I think those are probably the two cases most on

19 point.  And obviously the other two cases we've cited we

20 believe address these issues as well.

21        THE COURT:  All right, thank you.

22        Mr. Bridges.

23        MR. BRIDGES:  Thank you, Your Honor.  You are going

24 to hear something from me that I think you've heard from me

25 before.  Southern District of New York, <u>Barnes & Noble .com</u>, at

1    least says what a material contribution is not.  And it is not

2    the provision of a service that is capable of substantial

3    noninfringing uses.

4            And it follows Arista versus Lime Group, and it's

5    also tracking what the Seventh Circuit said in the definition

6    of contributory infringement in that provision that I offered

7    the Court earlier.

8            And just a second, I'll come up with it again

9    briefly.  It is -- this goes back to the "with certain

10   exceptions" language at the beginning of the -- this is

11   O'Malley, 160:29.  "With certain exceptions, a person is liable

12   for copyright infringement by another if the person knows or

13   should have known of the infringing activity and induces,

14   causes, or materially contributes to the activity."

15           And then in -- O'Malley then goes on to give

16   examples, the form from the Seventh Circuit, Seventh Circuit

17   Model Instruction 12.6.2.  And comment number four says,

18   "Substantial Noninfringing Uses.  If the case involves the

19   issue as to whether the defendant's product or service is

20   capable of substantial noninfringing uses, the jury may need

21   additional instructions based on Grokster.  If defendant's

22   service has substantial noninfringing uses, you may not hold

23   the defendant liable unless the defendant promoted the use of

24   its service in a way that infringed plaintiff's copyrights."

25           There we are, Your Honor.  That's the problem with

2273

1    material contribution, and that's what Sony is about, and

2    Barnes & Noble in the Southern District of New York explains

3    that.

4              Fonovisa and Napster, Your Honor, don't address the

5    Sony limitation properly, that's the problem.  Sony is the law

6    of the land.

7              THE COURT:  Okay.

8              MR. PECAU:  Your Honor, neither Grokster nor Sony is

9    applicable here because of the first part of the material

10   contribution, which is the actual and specific knowledge.

11             And all the cases that have followed Grokster, and

12   Grokster itself pointed out that the issue of secondary

13   infringement, the common law secondary infringement has not --

14   has not been changed.

15             I mean, the thing -- the key element is not whether

16   the article is in the stream of commerce.  The key issue is

17   whether the defendant is given specific knowledge, has specific

18   knowledge, or in this case materially blind, but has knowledge

19   of the actual infringing activities.  Not just general

20   knowledge, not that their facilities could be misused, but

21   actual specific knowledge.

22             And that's what takes this out of the Sony and

23   Grokster line of cases.  All the cases since Grokster have

24   recognized that distinction, Your Honor.

25             Your Honor, my colleague pointed out that in Napster

2274

1   they actually addressed the specific issue and found that Sony
2   was not applicable.
3         THE COURT:  Okay.  Do you want to tell him anything
4   else, Mr. Theodore?
5         MR. PECAU:  Well, Your Honor --
6         THE COURT:  The rules kind of loosen up when we're in
7   this position.
8         MR. THEODORE:  I think we cited this language in our
9   jury instructions brief, Your Honor.
10         The exact argument essentially about Sony --
11   obviously, Napster predated Grokster.  But on the Sony
12   question, the exact argument that because Napster had
13   substantial noninfringing uses under Sony, there could be no
14   material contribution, that argument was advanced in Napster.
15   And what the Ninth Circuit said was that Sony was of limited
16   utility because this isn't a stream of commerce case.  This
17   isn't a case where the article has been placed into stream of
18   commerce and the defendant has lost control over the article.
19   There is actual control and knowledge in this case.
20         So the Sony question is not really the issue.
21         THE COURT:  Okay.  Thank you.
22         All right, Mr. Bridges, last word.
23         MR. BRIDGES:  Your Honor, Napster was the Ninth
24   Circuit case that predated Grokster.  And in Grokster, Justice
25   Ginsberg -- first of all, it was a unanimous decision, but

2275

1   there were two different concurrences, but Justice Ginsberg's

2   concurrence was the more copyright favorable of the two

3   concurrences.  And at 545 U.S. 913 at 942 she said, "liability

4   under" -- actually, let me go back.  "Liability under our

5   jurisprudence may be predicated on actively encouraging or

6   inducing infringement through specific acts, as the Court's

7   opinion develops, or on distributing a product distributees use

8   to infringe copyrights, if the product is not capable of

9   substantial or commercially significant noninfringing uses."

10          That's the Supreme Court talking about the two

11   branches.  Barnes & Nobel, as I said, in the Southern District

12   of New York.

13          In Grokster, and I realize this is complicated and

14   maybe we didn't explain it well earlier when the Court rejected

15   our Grokster argument, Grokster really moved, shifted

16   contributory from knowledge to intent basis.

17          And Sony talked about constructive knowledge the

18   whole time.  But when the Supreme Court in Grokster talked

19   about Sony, it recast Sony as an intent case, not as a

20   knowledge case.

21          And the Supreme Court said this at page 942,

22   "Accordingly, just as Sony did not find intentional inducement,

23   despite the knowledge of the VCR manufacturer that its device

24   could be used to infringe, mere knowledge of infringing

25   potential or of actual infringing uses would not be enough here

1    to subject a distributor to liability.  Nor would ordinary acts

2    incident to product distribution, such as offering customers

3    technical support or product updates, support liability in

4    themselves."

5         There you have it.  And Mr. Theodore tried to

6    distinguish Sony on what he calls the stream of commerce, which

7    means it goes out there with no ongoing relationship.

8         Your Honor, the Fourth Circuit, I deal with statutes,

9    Supreme Court, Fourth Circuit --

10        THE COURT:  CoStar, I know.  And I reread Grokster

11   this morning before court just really based on what you had

12   talked about yesterday.

13        MR. BRIDGES:  Thank you.  The one thing I'll point

14   out is CoStar refers in its discussion of contributory --

15   CoStar in the Fourth Circuit was really a direct infringement

16   case, but it was distinguishing between direct and

17   contributory.  In discussing contributory, it cited to a

18   Seventh Circuit case, Doe versus GTE Corp.  And Doe versus GET

19   Corp described the application of the Sony doctrine to

20   services, specifically to ISP services, just like Cox.  And it

21   made it clear that ISP services like Cox are not liable for

22   contributory infringement on this basis.

23        And that drew in turn upon Judge Posner's admirable

24   exposition of contributory infringement in the Aimster decision

25   in the Seventh Circuit where he went on for several pages

1    explicitly rejecting the recording industry's argument that

2    <u>Sony</u> didn't protect services.  And he said, something to the

3    effect of, that would be a dangerous argument.

4           So, Your Honor, it's all clear.  And I'm sorry if we

5    didn't make it clear enough to the Court earlier, but that's

6    where the law is.

7           So if there is an instruction to be given on material

8    contribution, Your Honor, it's that the single point to make is

9    that it does not cover provision of a service that is capable

10   of substantial noninfringing uses.

11          Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. THEODORE:  Can I address --

14          THE COURT:  Yeah, I will give you the last word.

15          MR. THEODORE:  Your Honor, <u>Grokster</u> was also a stream

16   of commerce case.  And what is interesting, if you listen

17   closely to what Mr. Bridges said, he was talking about

18   potential uses, could have known.

19          What we have in this case is actual knowledge.

20   Cox -- or we'll find out if the jury found it or not, but we

21   have asked the jury to find actual knowledge.  Cox knew what

22   was happening on its service.

23          It's not like Sony selling VCRs where you don't

24   really know what the specific people are doing specifically

25   with them.  Or Grokster putting its software out in the market

2278

1  and not really knowing what people are using it for.

2         What happened in Grokster was the Court tried to

3  apply the Sony doctrine to stream of commerce.  And you had six

4  judges who split 3/3 on the Sony question of whether there were

5  substantial noninfringing uses.  But the nine justice said,

6  okay, well, even in the stream of commerce context, even if you

7  don't -- even if you can't have constructive knowledge through

8  the substantial noninfringing uses, you still get it if you

9  have active inducement.

10         So that's -- and I think as Your Honor held in the

11  summary judgment decision, that's not the circumstance we're in

12  here.  We're still in the Gershwin, the core of contributory

13  infringement Gershwin circumstance, which was relied on and

14  reaffirmed by the Supreme Court in Grokster.

15         And then just to address CoStar and Doe versus GTE.

16  As Mr. Bridges acknowledged, CoStar was a direct case

17  referencing contributory, but what he didn't acknowledge is

18  that what it was referencing in Doe versus GTE was absolute

19  obiter dicta.  GTE, the Doe versus GTE case was actually a

20  question -- was a state law claim case.  It was originally

21  brought in state court, it was actually improperly removed to

22  federal court, although nobody noticed at the time.  And the

23  question was whether the Communications Decency Act prempted

24  certain state law claims.

25         In the course of that discussion, I think there is

1    one or two sort of stray sentences just with Judge Easterbrook

2    commenting vaguely on secondary copyright law.  I don't think

3    -- I don't think that there was any sort of clear holding, as

4    Mr. Bridges described it.  And I think actually there's a

5    qualification even in his two sentences of dicta, there is a

6    qualification as to actual knowledge.

7            So I don't think that Doe versus GTE supports their

8    point.

9            THE COURT:  Okay.  All right.  Let me go back and

10   look a little bit.

11           MR. WAKEFIELD:  One slightly different point since

12   we're all chiming in.

13           THE COURT:  Yes, sir.

14           MR. WAKEFIELD:  I don't think any of the cases on

15   which plaintiff relies involved a product or service that

16   essentially functions as a general staple of commerce the way

17   access to the Internet does.  And it is dangerous to take cases

18   that involved particular dedicated facilities, like Napster,

19   that were the equivalent of the dance hall moved into a virtual

20   space, and to say that that kind of instruction should apply in

21   a case where you're merely providing connect to a world wild

22   global network used for everything.

23           And similarly -- so both the means to access cases

24   and the site and facilities cases, certainly nothing in the

25   Fourth Circuit and nothing from the Supreme Court has ever said

1    that simple ISP services should be brought within that line of

2    cases.

3            And I think our position is, like a lot of concepts,

4    when you get into the nitty-gritty of jury instructions, they

5    are sometimes challenging and jurors have to work it out.  But

6    I don't think any further instruction is appropriate.

7            MR. PECAU:  Your Honor --

8            MR. BRIDGES:  If I --

9            MR. WAKEFIELD:  Other than the one we proposed.

10           THE COURT:  I'm done.

11           MR. WAKEFIELD:  Okay.

12           THE COURT:  Thank you very much.  You could argue

13   this all day.  You all know copyright law a lot better than I

14   do as a generalist.

15           The case went forward because I don't believe that in

16   this set of facts with the claims, the nature of the claims

17   being the actual knowledge type case, that Grokster and Sony

18   precluded contributory or vicarious liability from moving

19   forward or infringement in general.  So that's why we're all

20   here.

21           So I haven't changed my opinion on that,

22   notwithstanding the fine arguments that I have heard for a

23   couple of times now.

24           I frankly think that I ought to give an instruction

25   which just says to use the words as you understand them in the

1    ordinary everyday definition.

2          But I will look at the cases that BMG has asked me to

3    look at to see whether their instruction is appropriate under

4    this case.  And I will get something back to you shortly.

5          I will look at the cases first, I will get something

6    back to you.  And whatever I do, you are probably going to have

7    exceptions to it, so I will just note for the record that you

8    both have preserved your exceptions to whatever ruling I make.

9          All right.  Okay.  Thank you.  We're in recess.

10         NOTE:  At this point a recess is taken; whereupon no

11   further proceedings are heard and the December 16, 2015 portion

12   of the case is concluded.

13         --------------------------------------------------

14

15

16

17         We certify that the foregoing is a true and

18      accurate transcription of our stenographic notes.

19

20
             /s/  Norman B. Linnell
21           Norman B. Linnell, RPR, CM, VCE, FCRR

22
             /s/  Anneliese J. Thomson
23           Anneliese J. Thomson, RDR, CRR

24

25