UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| BMG RIGHTS MANAGEMENT )<br>(US) LLC, and ROUND HILL )<br>MUSIC LP, )<br> )<br> )<br>       Plaintiffs, )<br> )<br>   v.    ) <br> )<br>COX COMMUNICATIONS, INC., )<br>COXCOM, LLC )<br> )<br>       Defendants. )<br> ) | Case No.  1:14-cv-1611 (LO/JFA) |

**BRIEF IN SUPPORT OF BMG'S
MOTION FOR A PERMANENT INJUNCTION**

After a two week trial, the jury found that Cox willfully contributed to the infringement of over a thousand BMG copyrighted songs and awarded $25 million in damages. Now, more than a month later, Cox's network continues to be the site of massive, ongoing infringement of BMG's copyrights. This ongoing infringement inflicts irreparable harm on BMG. The unlimited and potentially infinite dissemination of BMG's music via BitTorrent deprives BMG and its songwriters of control over the distribution of their musical compositions, displaces an unknowable number of legitimate sales, undermines and competes with sales through legitimate channels, and cannot be remedied by money damages. For this reason, the Copyright Act contemplates injunctive relief to prevent continued infringement. The Court should issue a permanent injunction preventing Cox from contributing to its users' infringement of BMG's copyrighted works.

**BACKGROUND**

BMG brought this suit to address Cox's willful and knowing contribution to millions of instances of infringement of BMG works by its subscribers. BMG and its agent Rightscorp told Cox again and again of the rampant infringement of BMG's copyrighted works on Cox's network — through millions of infringement notices, summary emails, and an online "dashboard" where Cox could access all of the infringement data in one place. Tr. at 220, 335-336, 340-341, 687-688, 768-769, 799-800, 893. Yet, Cox did nothing while its network was used to infringe. It never even looked at the dashboard. Tr. at 1415-16. It ignored the summary emails. Tr. at 1483-1485. And it reprogrammed its abuse tracking software so that BMG's notices would not even enter its mail server. PX1622.0010.

The refusal to act on BMG's notices reflected Cox's policy of tolerating infringement on its network. Cox implemented an abuse tracking system and graduated response procedure that, as BMG's expert testified, was "deliberately configured not to lose customers from terminations and maybe to shield customers from any concerns regarding copyright violations." Tr. at 2024-25. Cox's system was designed to "look[] like it's doing something appropriate, but when you take a look at the end result, [] accomplish[] nothing." Tr, at 2060; *see also id*. at 2022 ("[T]he Cox system seems to act as if it is effective, but when you put in all of these hurdles and you take a look at the data that actually comes out of the system, it seems to be very ineffective in totality.").

The blocking of BMG's notices was only the first hurdle Cox put in place to do nothing about copyright infringement on its system. Through a series of policies such as daily hard limits on complaints, Cox avoided taking action in ninety percent of the instances in which it was informed of copyright infringement on its network. Tr. at 2017-18. Then, by imposing a fourteen step graduated response procedure, ignoring the vast majority of copyright infringement

notices, and considering only those notices within the most recent six months, Cox side stepped any meaningful action against repeat infringers other than to send repeated warnings. Tr. at 2010-2020; PXS005; PX1330.11. That not only allowed Cox's users to continue using the Cox network to infringe but "g[a]ve them the comfort that they [could] continue to violate [copyright] with impunity." Tr. at 2023.

In the rare circumstance that a repeat infringer did reach the "termination" stage of Cox's graduated response procedure, Cox's supposed policy of terminating the subscriber was a sham. First, Cox's policy was to "turn[] customers back on who have been terminated for DMCA complaints." PX1381.0001. As Cox's manager of abuse operations explained "DMCA = reactivate." PX1388.0001. Rather than "actually terminat[e] the service," Cox abuse staff " click[ed] Terminate and Update Ticket, which shows a Termination in the Customers Ticket History," while allowing the customer to remain online. PX2029.0001. The express purpose of this policy was to allow Cox to represent that it had terminated the repeat infringer and thereby "fulfilled the obligation of the DMCA safe harbor" while in fact retaining the customer and giving him a "clean slate" as to future infringement. PX1385.0001-0002.

Later, Cox ceased sham terminations and implemented a "termination review" process under which only 21 subscribers were terminated — the vast majority of whom were bandwidth abusers or failed to pay their bills on time — while known, acknowledged infringers were permitted to remain online. PX2589.0001, PX2036.0001, Dkt. 703 at 37-42. Notwithstanding its nominal policies regarding termination, Cox's policy throughout this period was that only if repeat infringers "are costing us way more than we are making from them, it makes sense to terminate." PX1358. Otherwise, "every terminated Customer becomes lost revenue and a potential Detractor to our Net Promoter Score." PX1354.0002.

After hearing all of the evidence, the jury found that Cox willfully contributed to the infringement of BMG's copyrighted works. Since that verdict, infringement of BMG's copyrights has continued on Cox's network, and BMG's agent Rightscorp has continued to detect massive infringement of BMG's copyrighted works. Through Rightscorp, BMG has continued to notify Cox of the infringement and continues to receive no response from Cox. Counsel for BMG asked Cox what changes it was making to its handling of infringement notices, but Cox would only say that it is "analyzing all aspects of its process and procedures." Exs. 1-2.

Rightscorp's pre- and post-trial observations of infringement vastly underestimate the volume of infringement on Cox's network because Rightscorp cannot detect every infringer or the number of times that a file has been shared. Tr. at 390-391, 884-85. Nonetheless, those ongoing infringements will displace a substantial volume of legitimate sales from which BMG and its songwriters would have realized revenue. It is impossible to quantify those lost sales without knowing the full scope of the infringement – which by its nature is necessarily unknown. Tr. at 1066, 1118-19, 1864-66. Meanwhile, the need to compete with free copies of its own works undermines BMG's pricing and business models. Tr. at 1067, 1867. Thus, BMG seeks a permanent injunction to prevent Cox from continuing to contribute to infringement of BMG's copyrights.

**ARGUMENT**

The Copyright Act authorizes courts to issue "injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502. Injunctive relief is appropriate where a plaintiff has suffered an irreparable injury for which monetary damages are an inadequate remedy, where the balance of hardships between plaintiff and defendant

warrants equitable relief, and where the public interest is not disserved by a permanent injunction. *See eBay v. MercExchange*, 547 U.S. 388, 391 (2006).

## I. THE CONTINUED SHARING OF BMG'S COPYRIGHTED WORKS BY COX USERS INFLICTS IRREPARABLE HARM ON BMG

The sharing of BMG's copyrighted works — sharing that Rightscorp continues to detect on Cox's network even after a $25 million jury verdict — is a quintessential example of an irreparable injury. "Irreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights," which "damages at law will not remedy." *Christopher Phelps & Associates v. Galloway*, 492 F.3d 532, 544 (4th Cir 2007). Here, the online sharing of BMG's copyrighted works via BitTorrent results in a potentially infinite — and unquantifiable — volume of infringement. BMG suffers complete loss of control over its intellectual property and damages that even Cox's expert admits cannot be quantified with precision.

First, the viral nature of BitTorrent file sharing means that continued infringement results in an enormous and irreparable injury to the copyright owner. "Each time an illegal copy of one of Plaintiffs' copyrighted works is downloaded," it may "be used to spawn countless derivative infringing copies. This inflicts exponential harm on Plaintiffs' exclusive rights." *Arista Records v. Lime Wire*, 2010 Wl 10031251, at *4 (S.D.N.Y. Aug. 9, 2010). That amounts to "virtually unstoppable infringement of copyright" — a "continued vulnerability" that "damages cannot address" and which "causes irreparable harm." *Id*. (quoting *Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1073 (D. Ariz. 2006). As a result of file sharing, BMG's "copyrighted works have and [will] continue to become irreparably exposed to infringement on a tremendous scale." *Metro-Goldwyn-Mayer Studios v. Grokster*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007).

Finding irreparable harm in another BitTorrent case, another District Court has observed that it follows from "the way in which [the] system works." *Columbia Pictures Industries v. Fung*, No. 06-cv-5578, Dkt. 551 at 3 (C.D. Cal. Aug. 5, 2013). Because "users automatically and simultaneously further distribute the [copyrighted] work to innumerable others" as "an unprotected digital copy . . . that those end-users can further distribute indefinitely will," allowing the works to be "unstoppably and near-instantaneously infringed throughout the computer-literate world," the harm is irreparable. *Id*.

Second, as BMG's economic expert Dr. Lehr explained, file sharing over BitTorrent undermines BMG's business by depriving it of control over its works and forcing it to compete with its own content available for free. "Trying to compete with illegal copies distorts and limits the business models of the legal rights holders. So the pricing that BMG might have been able to realize in its legal sales of the goods, the business models it might have wanted to pursue, all of these things would have been affected by competing with illegal sales." Tr. at 1867.

Courts have consistently found that this amounts to irreparable harm. By allowing "an entire universe of copyrighted content" to be made "available for unending infringement," Cox has "compromised" BMG's "power to control [its] rights." *Grokster*, 518 F. Supp. 2d at 1218. "It is axiomatic that the availability of free infringing copies of Plaintiffs' works through defendants' websites irreparably undermines the growing legitimate market for consumers to purchase access to the same works." *Fung*, No. 06-cv-5578, Dkt. 551 at 4 (C.D. Cal. Aug. 5, 2013).

Finally, BMG has suffered irreparable harm because its lost sales and the damage to its business model is not quantifiable and thus cannot be remedied by money damages. *See Phelps*, 492 F.3d at 544 (finding monetary damages an inadequate remedy where "the calculation of

future damages and profits . . . would entail a substantial amount of speculation and guesswork"). As Dr. Lehr explained, "it's not possible in the context of the literature to accurately estimate or come up with a single estimate of what that harm is for the industry, and it's impossible in the context of an individual rights holder." Tr. at 1058.

Here, the parties do not even know how many times BMG's copyrighted works have been uploaded and downloaded by Cox's own users, much less the number of further infringements by internet users who downloaded from Cox subscribers. Tr. at 390-391, 884-85; *see also* Tr. at 1775 ("Q. Dr. Sullivan, you don't know precisely the number of uploads and downloads of BMG songs or pieces of them by a Cox subscriber given the available data in this case; isn't that correct? A. That is correct."). And without "know[ing] how many times illegal copies may have been uploaded or shared from . . . Cox subscribers . . . there is just no basis for estimating" "BMG's lost sales" "unless one wants to make . . . ad hoc, arbitrary assumptions that aren't supported with evidence." Tr. at 1864-66. That gives rise to irreparable harm. *See Disney Enterprises v. Delane*, 446 F. Supp. 2d 402, 408 (D. Md. 2006) ("[T]here is no way to know how many times this content has been accessed and downloaded. . . . [B]ecause of the nature of his Web site and trackers, further infringements are a continuing threat, making remedies at law insufficient to compensate for Plaintiffs' injuries.").

Nor is there any good way to estimate the effect of Cox users' infringement on BMG's pricing and business model. Tr. at 1867. As Dr. Lehr explained, there is no available data to measure or way to model the effect on BMG caused by the loss of control of its copyrights. Tr. at 1067. Even Cox's own expert has conceded that it is impossible to quantify the damages attributable to uploads and downloads by Cox users in this litigation with precision, though he purports to calculate an upper bound based on the false assumption that the Rightscorp

observations constitute the entire universe of infringement. Tr. at 1686 ("it's not possible to calculate a precise amount").

And even if BMG's injury could be quantified, the "multiplicity of infringements" makes it impossible for BMG to recover damages from Cox's own users, much less those responsible "for the inevitable derivative infringements that [will] occur . . . when copyrighted content acquired as a result of [Cox's contributory infringement] is further distributed." *Fung*, No. 06-cv-5578, Dkt. 551 at 5.

For these reasons, Courts have consistently found that damages attributable to contributory infringement through online file sharing "cannot be reliably estimated." *In re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir. 2003).

## II. THE BALANCE OF HARDSHIPS STRONGLY FAVORS INJUNCTIVE RELIEF

In contrast to the enormous, irreparable harm that continued BitTorrent file sharing inflicts on BMG, there is no cognizable harm to Cox from putting a stop to the infringement of BMG's copyrighted works via its network. Cox has been adjudged a willful, knowing copyright infringer who materially contributes to the infringement on its network. And a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Cadence Design Systems v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997); *see also John Wiley & Sons v. Williams*, No. 12-cv-0079, 2012 WL 5438917, at *3 (S.D.N.Y. Nov. 5, 2012) (issuing injunction where "the only hardship defendants will suffer is the inability to engage in further unlawful activity").

The equites especially favor an injunction against a secondary copyright infringer that has continued its willful misconduct unabated so that, "absent an injunction directing Defendants to prevent infringement of Plaintiffs' works, it is highly likely that Defendants' existing users and

new users would continue to use Defendants' system to infringe Plaintiffs' copyrights." *Fung*, No. 06-cv-5578, Dkt. 551 at 7. That is the case here, where the infringement of BMG's works continues on Cox's network more than a month after Cox was found guilty of willful contributory copyright infringement.

Here, Cox has the tools to act against infringers on its network. Cox's CATS system for handling infringement complaints was designed to be powerful tool for monitoring and acting on infringement but has been configured so that "it doesn't accomplish anything that it was set out to do." Tr. at 2024-25. Cox's abuse staff have the power to turn off infringing subscribers with the push of a button. Tr. at 849-850, 2005. Cox's deep packet inspection tool allows Cox to monitor the volume of BitTorrent traffic on its network, including the amount of BitTorrent traffic that a specific subscriber uses on a particular day. Tr. at 1523. And Cox's cooperation is essential in combating copyright infringement. Dr. Lehr explained that without Cox's participation, the things that BMG can do to deter infringers are "all very expensive and they don't work very well." Tr. at 1102. Thus, the balance of hardships strongly favors injunctive relief.

Nonetheless, BMG has proposed an extremely limited injunction that imposes minimal burden on Cox and is less exacting than many other injunctions that have been approved in the context of secondary copyright infringement. In particular, BMG's proposed injunction requires only that Cox act where it knows or should know of infringement on its system and imposes none of the affirmative monitoring duties that have been approved by other courts. *See, e.g., A&M Records v. Napster*, 284 F.3d 1091, 1095-97 (9th Cir. 2002) (upholding injunction requiring that "Napster . . . must continually search [its] index" for infringing context on the ground that "Napster must affirmatively use its ability to patrol its system and preclude access to

potentially infringing files"); *Columbia Pictures Industries v. Fung*, 710 F.3d 1020, 1048 (9th Cir. 2013) (appropriate to require defendant "to have a mechanism in place to ensure that he is not facilitating the infringement of [named] titles").

The proposed injunction contemplates that BMG will provide Cox with notice not only of the works at issue but of specific instances of infringement and the IP addresses at which the works are being shared. At that point, Cox has "the duty to disable access to the offending content." *Napster*, 284 F.3d at 1096. By contrast, in Napster, the Ninth Circuit upheld and injunction requiring that "Napster must do everything feasible to block files from its system which contain noticed works." *Id*. at 1098 (emphasis added).

Requiring Cox to prevent further use of its network for infringement by specified infringers at identified IP addresses imposes no undue burden on Cox and is narrowly tailored to reduce the enormous and irreparable harm that BMG suffers from infringement over Cox's network.

### III. THE PUBLIC INTEREST IS SERVED BY AN INJUNCTION

Finally, "the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. On the contrary, permanent injunctions in copyright cases "protect copyrighted material and encourage compliance with federal law." *Wiley*, 2012 WL 5438917, at *3. "There is greater public benefit in securing the integrity of Plaintiffs' copyrights than in allowing [the Defendant] to make Plaintiffs' copyrighted material available to the public." *Delane*, 446 F. Supp. 2d at 408. Particularly faced with a willful copyright infringer such as Cox, "the public interest will be served [through] a permanent injunction" that "will protect Plaintiffs' copyrights against increased and unrestrained infringement." *Fung*, No. 06-cv-5578, Dkt. 551 at 10. "The

public interest is served by upholding copyright protections" against a willful copyright infringer such as Cox. *Arista Records*, 2010 WL 10031251, at *5.

## CONCLUSION

For the foregoing reasons, the Court should grant BMG's motion for a permanent injunction.

January 26, 2016                              Respectfully submitted,

/s/ *Jeremy D. Engle*
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
Paul Gennari (VSB No. 46890)
pgennari@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel: (202) 540-7157
Fax: (202) 540-7201

*Of Counsel*
Michael J. Allan (admitted *pro hac vice*)
William G. Pecau (admitted *pro hac vice*)
John M. Caracappa (admitted *pro hac vice*)
Roger E. Warin (admitted *pro hac vice*)
Jeffrey M. Theodore (admitted *pro hac vice*)
Stephanie L. Roberts (admitted *pro hac vice*)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

  I hereby certify that on January 26, 2016, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com

           /s/ *Jeremy D. Engle*
           Jeremy D. Engle (VSB No. 72919)
           jengle@steptoe.com
           STEPTOE & JOHNSON, LLP
           1330 Connecticut Ave, NW
           Washington, DC 20036
           Tel.: (202) 429-3000
           Fax: (202) 429-3902