IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

AUG – 8 2016

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) ) |
| COX COMMUNICATIONS, INC., and COXCOM, LLC, | ) ) ) |
| *Defendants.* | ) ) |

Civil No. 1:14-cv-1611

Hon. Liam O'Grady

## Memorandum Opinion

This case presents the question of whether a conduit internet service provider may be held liable for the infringing activity of its subscribers based on the uploading and downloading of copyrighted musical works using BitTorrent, a peer-to-peer file sharing network. The plaintiff in this action, BMG Rights Management (US) LLC ("BMG"), seeks to hold Cox Communications, Inc. and CoxCom, LLC (collectively, "Cox") secondarily liable for the reproduction and distribution of 1,397 musical composition copyrights by users of Cox's high-speed internet service between February 2, 2012 and November 26, 2014. After a two-week trial, a jury found Cox not liable for vicarious infringement, but liable for willful contributory infringement. The jury awarded BMG $25 million in statutory damages.

Pending before the Court are the parties' post-trial motions. Cox moves for judgment as a matter of law or, alternatively, for a new trial. (Dkt. No. 760). BMG seeks judgment as a matter of law on its claim of vicarious infringement as well as permanent injunctive relief. (Dkt.

Nos. 759, 765). For the reasons that follow, the Court will deny all of the motions and enter final judgment in accordance with the verdict.

## I. BACKGROUND

This lawsuit is the latest in a years-long initiative by copyright holders to enlist the courts in the effort to curb the rampant infringement made possible by peer-to-peer file sharing on the internet. Peer-to-peer file sharing emerged in the late 1990s, most famously with Napster. In 2001, the music industry successfully enjoined Napster, *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001); *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002), but technology continued to evolve and in its place came programs like KaZaA, Morpheus, Grokster, eDonkey, and iMesh. *See In re Charter Commc'ns, Subpoena Enforcement Matter*, 393 F.3d 771, 773 (8th Cir. 2005); *Recording Indus. of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1231–32 (D.C. Cir. 2003). A suit against Grokster and StreamCast, two peer-to-peer software distributors, reached the Supreme Court in 2005, *see Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), and resulted in Grokster closing its doors and StreamCast being permanently enjoined.

Despite nominal successes over the years, online piracy continues to grow. Today, the most popular vehicle is BitTorrent, a protocol that allows individual computers, called "peers," to communicate and transfer information directly using an internet connection. At a high level, the process of acquiring a file—in this case, a musical work—using BitTorrent goes something like this. An individual can visit a website (The Pirate Bay or Kickass Torrents, for example) and search a directory of .torrent files. The .torrent file does not contain the work. It contains information about what is available to be distributed, including the name of the file(s) in the

torrent payload, the SHA-1 hash of the torrent, and a tracker address.[1] If a .torrent file appears to represent the desired work, the user downloads the file and opens it while running the BitTorrent client. The client connects to the tracker, which provides a list of peers trading in that torrent—called a "swarm." The user is then connected to the peers and begins requesting pieces of the file.

BitTorrent allows users to download different pieces of a single file from multiple users, called "seeds," simultaneously rather than from a single source. This is an innovation that reduces bandwidth costs and increases efficiency. Once the user has downloaded all of the individual pieces, the client reassembles them into one complete file. An additional innovation of BitTorrent is that it allows users to begin uploading to other peers as soon as any piece of the file has been downloaded. In other words, a peer can be downloading and uploading a file simultaneously.

Although this case only involves the use of BitTorrent to acquire musical works, BitTorrent can be used to acquire nearly any type of file. While it can be and is used for legal purposes, *see Grokster, Ltd.*, 545 U.S. at 920, it also fosters a staggering amount of infringement. *See, e.g.*, NetNames, *Sizing the Piracy Universe* 18 (Sept. 2013) ("Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month, a total of 204.9m users."); *id.* at 30 ("Thus out of all non-pornographic files located, 99.97% of content was infringing."); Envisional Ltd., *Technical Report: An Estimate of Infringing Use of the Internet* 4–5 (Jan. 2011) ("An in-depth analysis of the most popular 10,000

---

[1] As explained by BMG's expert at trial, the hash value is "a series of numbers and letters" that creates "a digital fingerprint . . . for a file that's created using a mathematical formula that was originally developed by the U.S. government for the specific purpose of identifying content and being able to authenticate content." Tr. at 274. "[B]ecause the algorithm runs against the contents of a file and the output, the SHA-1 value is based on those contents, if anything changes in the file, you will get a different SHA-1." *Id.*

pieces of content managed by PublicBT found: . . . 2.9% was music content—all of which was copyrighted and shared illegitimately.").

The widespread use of BitTorrent and the ease with which copyrighted works are duplicated makes the prospect of going after individual users for direct infringement an unappealing option for rights holders.[2] *See Grokster, Ltd.*, 545 U.S. at 930 ("When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected works effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement."); Mark A. Lemley & R. Anthony Reese, *Reducing Digital Copyright Infringement Without Restricting Innovation*, 56 Stan. L. Rev. 1345, 1377–78 (2004). As peer-to-peer file sharing has evolved and removed the need for distribution intermediaries—a Napster, for example—rights holders have shifted their focus to a new type of defendant. As evidenced by this lawsuit, rights holders are attempting to expand the universe of culpable characters to include intermediaries that provide the means to infringe and may promise a more global solution to the problem. *See* Jane C. Ginsburg, *User-Generated Content Sites and Section 512 of the Copyright Act, in* Copyright Enforcement and the Internet 183, 183–84 (2010) ("This does not mean that dissemination intermediaries have vanished from the copyright landscape, but rather that we have new kinds of intermediaries who do not themselves distribute

---

[2] The music industry did undertake a highly publicized effort to hold individual users liable for direct infringement. *See Charter Commc'ns, Inc.*, 393 F.3d at 774. Those lawsuits not only presented an obvious public relations problem, but also did little to stem infringement. *See* Randal C. Picker, *Copyright as Entry Policy: The Case of Digital Distribution*, 47 Antitrust Bull. 423, 442 (2002) ("[C]hasing individual consumers is time consuming and is a teaspoon solution to an ocean problem."). The prospect of suing individuals also became more difficult following decisions from the D.C. and Eighth Circuits holding that the Digital Millennium Copyright Act's subpoena provision, 17 U.S.C. § 512(h), is not applicable to conduit service providers. *See Charter Commc'ns*, 393 F.3d 771; *Recording Indus. of Am.*, 351 F.3d 1229.

copyrighted content but give their customers the means to make works available to the public."); Alfred C. Yen, *Torts and the Construction of Inducement and Contributory Liability in* Amazon *and* Visa, 32 Colum. J.L. & Arts 513, 517 (2009) ("These suits have included claims against file sharing services, Internet auction sites, age verification services, search engines and credit card companies." (footnotes omitted)).

The role of internet service providers ("ISPs") in the piracy problem and their potential liability for it is by no means a new topic. As early as the mid-1990s, it became apparent that the day-to-day operations of ISPs may render them liable for user infringement under existing copyright doctrine. In a seminal case, a California district court held that Netcom On-line Communication Services, Inc., then "one of the largest providers of Internet access in the United States," could face secondary liability for its subscribers' infringement. *Religious Tech. Ctr. v. Netcom On–line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1366, 1373–76 (N.D. Cal. 1995). Following that decision, Congress enacted the Digital Millennium Copyright Act ("DMCA"), which sought to strike a balance "between the interests of ISPs in avoiding liability for infringing use of their services and the interest of copyright owners in protecting their intellectual property and minimizing online piracy."[3] *Charter Commc'ns, Inc.*, 393 F.3d at 773. In return for a certain amount of cooperation, ISPs would enjoy the protection of four liability-limiting safe harbors. To be eligible, an ISP must, for example, "adopt[] and reasonably implement[], and inform[] subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

---

[3] It was Title II of the DMCA, titled the Online Copyright Infringement Liability Limitation Act, that addressed ISP liability.

Cox is a conduit service provider. It provides approximately 4.5 million customers in the United States with a connection (or a "pipeline") to the internet. Cox's relationship with its subscribers is governed by its Acceptable Use Policy ("AUP"). The AUP reserves the right to suspend or terminate customers who "use the Service to post, copy, transmit, or disseminate any content that infringes the patents, copyrights, trade secrets, trademark, moral rights, or proprietary rights of any party." PX-1343.0002. With respect to infringement, Cox is the gatekeeper of the network over which data is transferred.[4]

Cox has a group of employees, aptly named the Abuse Group, dedicated to eradicating abuse on its network and addressing violations of its AUP.[5] In order to claim the protection of the DMCA, Cox provides an email address, <abuse@cox.net>, to copyright holders and their authorized agents for the receipt of notifications of alleged infringement.[6] Cox requires that the notifications contain certain pieces of information—identification of the copyrighted work and a statement that the complaining party has a good faith belief that the use of the material is unauthorized, for example. Upon receiving such notification, Cox states that it will either

_____

[4] Not all ISPs are made the same, and it is equally important to note what Cox is not. Cox does not create or distribute peer-to-peer software. It does not host any of the websites that index .torrent files. It does not store infringing content on servers, nor can it control what customers store on their computers. As a result, it has no ability to remove or take down infringing content. Cox can and does undertake traffic analysis, which can show the volume of BitTorrent use on its network or by an individual user, but Cox does not know the particulars of the data being shared. It is Cox users, not Cox, who initiate transfers of copyrighted works over Cox's network.

[5] At some point, the group was rebranded the Customer Safety Department. Both names appear in the exhibits and trial testimony.

[6] The DMCA's so-called "notice and take down" provisions are not referenced in the conduit service provider safe harbor applicable to Cox. *Compare* 17 U.S.C. § 512(c)(3), *with id.* § 512(a). By definition, conduit service providers are unable to remove specific infringing content. But all ISPs must reasonably implement a repeat-infringer policy to remain eligible for a safe harbor. Because of that, Cox has established a notification policy under which rights holders may submit notifications of infringement.

"[r]emove or disable access to the material that is alleged to be infringing" or "[t]ake reasonable steps to promptly notify the subscriber that it has removed or disabled access to the material." PX-1343.0021. To assist in this task, Cox created an automated system—CATS (Cox Abuse Tracking System)—that processes the notifications received. Notifications are transformed into "tickets" and from there, they enter Cox's graduated response system.

The graduated response system is essentially a thirteen-strike policy. No action is taken on receipt of a subscriber's first notice. The second, third, fourth, fifth, sixth, and seventh notices generate an email to the subscriber warning that if Cox "continues to receive infringement claims such as this one concerning your use of our service, we will suspend your account and disable your connection until you confirm you have removed the infringing material." On the eighth and ninth notices, Cox limits a subscriber's internet access to a single webpage containing a warning. The customer can self-reactivate by clicking an acknowledgement. On the tenth and eleventh notices, Cox suspends service and requires the subscriber to call a support technician. The technician explains the reason for the suspension, advises removal of the allegedly infringing file, and then reactivates service. On the twelfth notice, the subscriber is suspended and directed to specialized technicians. On the thirteenth notice, the subscriber is again suspended and this time considered for termination.

On the basis of this policy, Cox asserted a safe harbor as an affirmative defense to its possible liability in this case. As noted, however, Congress reserved its safe harbors for ISPs who hold up their end of the bargain. Unfortunately for Cox, the record was replete with evidence that foreclosed any assertion by Cox that it had reasonably implemented a repeat-infringer policy. For instance, there were several features of Cox's policy that remained unwritten. Cox limits the number of notices it will process in a day. The default is 200 per

copyright holder or agent. Any notice received beyond the limit is closed, and it is not counted in the graduated response escalation. Additionally, Cox counts only one notice per subscriber per day. In other words, if a subscriber generates ten notices in a day, they are "rolled up" into a single ticket. Cox also implemented its graduated response system on a rolling six-month basis, which meant that if a customer did not hit termination review within six months, the count would start over. There was also evidence that when Cox took the step to terminate a customer, they would be reactivated the very next day or shortly thereafter. A reactivated customer would then begin anew in the graduated response system, starting from zero. *See* PX-1378.0001 ("This is to be an unwritten semi-policy. . . . We do not talk about it or give the subscriber any indication that reactivating them is normal. . . This only pertains to DMCA violations. It does not pertain to spammers, hackers, etc."). Even when Cox began terminating customers "for real," *see* PX-1329, repeat infringers were routinely spared termination. Jason Zabek, the former head of Cox's Abuse Group, summed up Cox's general sentiment toward its obligations best in an email exclaiming: "f the dmca!!!" PX-1340.0002. Without a safe harbor, the Court and the parties were left to apply the nebulous doctrines of secondary copyright liability to the digital world.

BMG is a music publishing company that owns, co-owns, and administers musical composition copyrights with the aim of maximizing profits from their commercial exploitation. BMG and its artists depend on the royalty payments made each time a work is purchased, downloaded, streamed, played on the radio, or incorporated in a television show or movie. For obvious reasons, BitTorrent poses a significant threat to BMG and the music industry as a

whole.[7]  In an effort to protect its rights and its revenue stream, BMG enlisted the help of

Rightscorp, Inc. (formerly known as Digital Rights Corp.).

Rightscorp monitors BitTorrent for peers offering its clients' copyrighted works.  As will

be described in more detail below, Rightscorp records the peers' Internet Protocol ("IP")

addresses and then generates notices to the ISPs providing internet access to the respective IP

addresses.  Rightscorp asks the ISP to forward the notice to the subscriber associated with the IP

address.[8]  The notices contain the name of the copyright owner, the name of the copyrighted

work, the subscriber's IP address and port, the hash value, a time stamp, and a statement under

penalty of perjury that Rightscorp is an authorized agent and that the information in the notice is

true and accurate.  What makes Rightscorp controversial is that its notices also contain a

settlement offer.  The notice advises that its client—here, BMG—is entitled to monetary

damages for copyright infringement, but that Rightscorp is authorized to "offer a settlement

solution that . . . is reasonable for everyone."  DTX-69.  The subscriber can access the settlement

offer by clicking on an embedded link and can then pay $20 or $30 (the amount has increased

over time) in return for a release from potential legal liability for the single instance of observed

activity recorded in the notice.

---

[7]  There is some disagreement in the literature as to the exact economic impact of illegal file sharing on the music industry.  While it is intuitive that the availability of free copies results in displaced sales and impacts pricing structures, quantifying those effects is difficult.  For instance, how many BitTorrent users who download a copyrighted work would have otherwise purchased it legally?  There are also intangibles.  For instance, what effect do diminished returns have on artist incentives to create new work?  Even without an exact figure, most agree that the impact has been huge, with estimates ranging in the billions of dollars.  As BMG's general counsel testified, "You can't compete with free."  Tr. at 460.

[8]  Only the ISP knows the identity of the subscriber associated with an IP address. Rightscorp compares the IP address to the American Registry for Internet Numbers to determine which ISP controls the peer's IP address.  ISPs maintain a log that tracks the subscriber assigned an IP address at a particular date and time.

This was an attractive proposal to BMG on multiple levels. The notices served the purpose of notifying ISPs of infringing activity on their networks. The settlement language educated individuals that real consequences may follow copyright infringement. And the revenue generated by the notices would both subsidize the high cost of monitoring the internet for infringement and provide an additional source of income for BMG's artists whose work was being duplicated indiscriminately on the internet.

What BMG found innovative, Cox found extortionate. In Cox's view, a settlement demand was premature at best because a notification alone cannot establish infringement. As a policy, Cox will not forward or process notices that contain settlement language, for fear of giving the demand its imprimatur. When Cox began receiving notices from Rightscorp in the spring of 2011, Cox notified Rightscorp that the notices would be processed if and when the settlement language was removed. Cox never considered removing the settlement language or using an alternative vehicle to alert subscribers to the activity observed. Rightscorp likewise never considered complying with Cox's multiple requests to remove the settlement language.

During this early dialogue, Rightscorp also provided Cox a username and password that would give Cox access to its "dashboard"—a real-time compilation of every notice generated by Rightscorp corresponding to a Cox IP address. For instance, Cox would be able to see that Rightscorp sent Cox 13,217 notices regarding a single Cox IP address over an 103-day period. In addition to the dashboard, Rightscorp sent Cox summary reports—termed "repeat infringer reports" or "repeat infringer notifications"—that identified the Cox IP addresses Rightscorp believed to be the worst offenders. The summaries would range from IP addresses with as few as two notices to as many as 20,630.

In the fall of 2011, Rightscorp was still sending Cox large volumes of notices containing

settlement language. Cox took the step to blacklist Rightscorp. As explained by a Cox email,

blacklisting went a step beyond its earlier decision to not process the notices. It meant that Cox's

email client would "silently -delete- the email messages without any parsing/ticketing/etc. As

soon as [the client] recognizes the From: address in the headers as blacklisted, [the client]

delete[s] the message without retrieving it's [sic] msg body." PX-1427.0001. Rightscorp signed

BMG as a client in December 2011—after the blacklisting was in effect. Thus, for the

approximately 1.8 million notices Rightscorp sent to Cox on BMG's behalf during the period

relevant to this lawsuit, Cox received exactly zero.[9]

Despite the blacklisting, Rightscorp continued to generate the dashboard and provide Cox

access instructions. Rightscorp also continued to send Cox summary letters both by mail and

email on a weekly basis. A November 2013 letter, for example, informed Cox that Rightscorp

had sent 1,036,902 notices to Cox over a four-month period and had identified 13,145 "repeat

infringers." PX-1677.0002. No one at Cox ever accessed the dashboard, and no action was

taken in response to the letters. Randy Cadenhead, Cox's privacy counsel, testified that he

reviewed one of the letters, but after spotting one anomaly in the data decided not to consider

them further or direct anyone else to do so.[10]

On November 26, 2014, BMG sued Cox alleging vicarious and contributory infringement

of 1,397 musical composition copyrights based on the reproduction and distribution of the works

---

[9] Rightscorp actually sent many more millions of notices to Cox during the relevant time
period, but BMG chose to focus on only 1.8 million of those at trial.

[10] The letter identified a single IP address as having infringed more than 60 times over
the course of a minute—an impossible feat.

over Cox's network.[11]  As relief, BMG sought injunctive relief and statutory damages under 17

U.S.C. § 504(c).  At the close of discovery, the parties cross-moved for summary judgment.  The

Court granted both motions in part, but permitted BMG's claims of secondary infringement to

proceed to trial.  After a two-week trial, the jury found Cox liable for willful contributory

infringement and awarded BMG $25 million in damages.  The jury found Cox not liable for

vicarious infringement.

## II. DISCUSSION

### A.   Cox's Renewed Motion for Judgment as a Matter of Law

Cox renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil

Procedure 50(b) on three grounds: (1) BMG failed to show direct infringement; (2) BMG failed

to provide evidence of Cox's liability for contributory infringement; and (3) BMG failed to

adduce evidence of willfulness.

### 1.   Standard of Review

On a renewed motion for judgment as a matter of law, a court must affirm a verdict "[i]f,

viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence

for a reasonable jury to have found in the non-moving party's favor." *First Union Commercial

Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005) (alteration omitted).  If, by

contrast, "the only conclusion a reasonable trier of fact could draw from the evidence is in favor

of the moving party," it must grant the motion. *Figg v. Shroeder*, 312 F.3d 625, 635 (4th Cir.

2002).

---

[11]  1,397 reflects the number of musical composition copyrights at issue after the Court
granted Cox summary judgment on the issue of former-plaintiff Round Hill Music, LP's
ownership of certain other copyrights.

2. <u>Direct Infringement</u>

Secondary liability may only arise on proof of underlying infringement. "A direct infringer has . . . been characterized as one who trespasses into the copyright owner's exclusive domain established in § 106 . . . ." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (internal quotations and alterations omitted). BMG alleged users of Cox's internet service violated its exclusive rights to distribute and reproduce by uploading and downloading its works using BitTorrent. *See* 17 U.S.C. § 106(1) & (3). Cox challenges the evidence of both.

a. *Evidence of Rightscorp's System at Trial*

At trial, both parties presented extensive evidence of how BitTorrent operates, and BMG presented evidence of the prevalence of infringement on BitTorrent. But all of BMG's evidence of infringement by Cox users came from Rightscorp. As a result, a large focus of the trial was on the operation of Rightscorp's software and what it can and cannot detect.

Without delving into every detail, Rightscorp's software operates as follows. It searches torrent directories for .torrent files that appear to represent a client's work. When a possible match is identified, Rightscorp downloads the .torrent file and then, using the BitTorrent protocol, downloads the torrent from a swarm. It then listens to verify that the file downloaded is the copyrighted work. On confirmation, Rightscorp adds the torrent and its hash value to a database. Because the hash corresponds to the specific contents in the torrent, Rightscorp can assume that peers offering a torrent with the same hash value also have the copyrighted work.

Next, Rightscorp reaches out to individual peers trading in that torrent payload and gathers certain information from them. This interaction was termed the "handshake" at trial, and the Court adopts that term for ease of reference. During the handshake, Rightscorp records the hash value, the peer's port and IP address combination, the bitfield, and the date and time. The

bitfield message indicates what percentage of the torrent payload the peer has. If a peer indicates that it has 100% bitfield, Rightscorp assumes the user has the complete copyrighted work.[12] At this point, Rightscorp does not download anything from the peer. It stops at recording the information obtained during the handshake interaction. Rightscorp then runs a program that generates a notice of infringement for every instance in which a peer was offering 100% of the payload. The system generates one notice per day per work observed at a particular IP address/port combination.[13]

Although Rightscorp does not download a copy of a work every time it generates a notice (due to the tremendous amount of bandwidth and storage that would require), Rightscorp does have sampling software. Between February and August of 2014, Rightscorp downloaded approximately 150,000 complete copies of the works at issue from individual peers using Cox IP addresses that had previously been identified as offering the works for download. Rightscorp then used music identification software to confirm that the files downloaded were copies of the copyrighted works.

At trial, Cox probed multiple grounds on which to doubt Rightscorp's system. First, Rightscorp does not use version control software and, as a result, there is no complete historical version of Rightscorp's code for any period of time relevant to this suit. The only code that remains is a partial version of the 2013 code, which Rightscorp had produced to BMG's expert in anticipation of litigation. Beyond that, the evidence of Rightscorp's operation was the testimony of Rightscorp's code developer and other employees and the 2015 code, which post-

---

[12] Using a 100% threshold is important because a torrent payload can contain multiple files and a single file is generally split and downloaded piece by piece.

[13] That means that if Rightscorp returned to the same peer on a different day and that peer was still offering the same work, an additional notice would issue.

dated the lawsuit. Moreover, many of the processes that are now automated were once performed manually, and there was no written record of how those manual processes were performed.

Cox's expert also identified flaws in the data produced by Rightscorp's code. For example, he identified 800 instances in which Rightscorp purported to download a BMG work that was in fact something else entirely. In one instance, Rightscorp generated a notice for a Grateful Dead song that was in actuality an article about a Grateful Dead performance. He also identified 9,000 redundant copies in the samples Rightscorp downloaded. There was also evidence that Rightscorp sent duplicative notices for a period of time, and there were seemingly random spikes in the volume of notices that Rightscorp sent Cox. For example, in late 2014, near the time the lawsuit was filed, Rightscorp sent Cox more than 100,000 notices in a single day.

Cox also questioned whether the threshold at which Rightscorp generated notices was a 100% bitfield threshold, as had been claimed, or was actually something much lower. It was undisputed that in December 2014, shortly after this lawsuit was filed, Rightscorp changed the threshold and began generating notices when a peer was detected to be offering anything above 10% of the torrent payload. The code underlying this function was dated December 2, 2014, but Cox elicited testimony that the date could have been altered and that the 10% functionality could have been run manually during the relevant time period. Using a lower threshold would not only result in more notices, but also decrease accuracy.

Cox also stressed what Rightscorp's software cannot detect. It has no ability to detect what is being transmitted between other peers. Rightscorp itself is what is called a "leecher." It only downloads. It does not upload to other peers. Thus, Rightscorp did not generate any data

15

showing Cox IP addresses downloading BMG's works. Cox also emphasized that Rightscorp cannot identify individuals, only IP addresses. That is, Rightscorp can only know with certainty that Cox provided the internet access to the computer engaged in the allegedly infringing activity, but it cannot know with certainty that the actor was a Cox subscriber. Each Cox subscriber is assigned a modem with an IP address, but commonly subscribers will use Wi-Fi routers to open that connection to others—a household or a coffee shop, for example. If Wi-Fi is not password-protected, it can be accessed by anyone in the vicinity.

Finally, Cox's expert criticized what Rightscorp could, but does not, detect. Following the handshake between peers in a BitTorrent exchange, the requesting peer sends an "unchoke" message to the peer with the file to begin the uploading process. Under certain circumstances, a peer may remain "choked" and not send the requested pieces of the file. Rightscorp did not take the additional step of recording the choke/unchoke interaction to confirm that a peer was set to share the file.

This evidence did not go unanswered by BMG. Greg Boswell, Rightscorp's sole code developer, testified that he did not use version control software because Rightscorp's code development was not a collaborative process. Rightscorp employees, including Mr. Boswell, also testified in detail as to the operation of the Rightscorp system and the timeline of how it was developed. BMG's expert testified that she compared the partial 2013 code with the 2015 code and found no significant differences in the code's core functionalities.

BMG's experts also responded at length to the deficiencies in the Rightscorp data identified by Cox. Even taking into account the errors, one expert testified that "the accuracy rate is still well over 99 percent." Tr. at 356. The same expert also testified that she ran a live test of Rightscorp's ability to detect infringing activity in 2013. With BMG's permission, she

16

used BitTorrent to download and upload BMG works. She then compared her data with Rightscorp's and confirmed that Rightscorp had accurately detected her activity and generated notices based on it. She also testified that, at least once, a Cox IP address uploaded portions of a file to her. A second expert analyzed Rightscorp's data and found a very high probability that Rightscorp's data captured repeated activity by the same Cox users or subscribers.

With respect to Cox's 10% bitfield theory, Rightscorp employees testified that they used a 100% bitfield threshold for the entire relevant period, that the change was not implemented until December 2014, and that manually running the 10% functionality would not have been practicable. They also explained that the catalyst behind the change was the increasing use of "lazy bitfield" by clients—a tactic that allows peers to underreport bitfield so as to avoid detection. BMG's expert also testified that she had observed nothing that indicated the 10% functionality was in operation before December 2014.

In response to Cox's open Wi-Fi theme, BMG pointed to portions of Cox's AUP that requires subscribers to secure their Wi-Fi networks and explicitly assigns responsibility to subscribers for all data transmitted from their IP address.[14] On cross-examination, Mr. Cadenhead testified that Cox would hold a subscriber responsible for the activity of a child

---

[14] Specifically, the AUP provides: (1) "You may be held responsible for any misuse of the Service that occurs through your account or IP address, even if the misuse was inadvertent. You must therefore take precautions to ensure that others do not gain unauthorized access to the Service or misuse of the Service, including conduct in violation of this AUP."; (2) "You are solely responsible for the security of any device connected to the Service, including any data stored on that device. . . . You are responsible for enabling the security of any wireless (Wi-Fi) networks connected to the Service. Any wireless network installed by the customer or a Cox representative that is unsecured or 'open' and connected to the Cox network is prohibited. You authorize Cox to use technology to detect unsecured wireless networks associated with your use of the Service. If Cox determines that you are using the Service via an unsecured wireless network, Cox will notify you to enable the Security on the Wi-Fi device."; and (3) "You are solely responsible for any information that is transmitted from your IP address . . . ." PX-1343.

returning home from college and accessing the household's Wi-Fi connection. There was also testimony that Cox provides subscribers with a router that has a password and requires customers who use their own router to enable password protection.

      b.    *Whether BMG Established Direct Infringement*

Cox argues that BMG's distribution claim fails from the outset because the only evidence of peers connected to Cox IP addresses distributing BMG's works was to Rightscorp. Because Rightscorp was acting as an authorized agent of BMG, Cox submits that evidence cannot be the basis of the distribution claim. The Court disagrees. "Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work." *Arista Records LLC v. Lime Grp. LLC*, No. 06-cv-5936, 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) (collecting cases). The testimony at trial was that BMG authorized Rightscorp in an investigative capacity as part of BMG's effort to stop infringement of its copyrights. Thus, the evidence that Cox IP addresses uploaded over 100,000 copies of BMG's works to Rightscorp can form the basis of a distribution claim.

Predicting BMG's well-founded response that there was at the very least overwhelming indirect evidence of distribution by Cox users over its network, Cox asserts that the "evidence at trial negated even that." (Dkt. No. 763, at 10). In support, Cox directs the Court to a single piece of evidence: Rightscorp's failure to record the unchoke signal. On that basis, Cox concludes that Rightscorp's 1.8 million observations of peers connected through Cox IP addresses indicating they had a complete BMG work to share were not confirmed offers to upload. And if that is true, the observations are not even circumstantial evidence of distribution.

Of course, Cox presented no additional testimony that choking is a common occurrence, and the evidence at trial indicated the opposite. There was extensive testimony about

18

BitTorrent—both the vast scale on which it operates and its functionality. The jury heard multiple explanations of how swarms operate and the simultaneous uploading and downloading that BitTorrent facilitates. The jury also heard detailed descriptions of what the Rightscorp software detects during the handshake—including the bitfield and the torrent's unique hash value. While Cox's expert testified that Rightscorp could have gathered *more* information, his testimony did not deprive the 1.8 million observations of their significant evidentiary value. The jury also had proof of Cox IP addresses uploading more than 100,000 copies of BMG's works against which to weigh the choking testimony. In sum, the single piece of testimony on which Cox relies does not require that judgment be directed in its favor.

Cox also argues that BMG's evidence of reproduction failed because at most BMG established that Cox users possessed BMG works. There was no evidence as to how those works were acquired, much less that they were acquired by download over Cox's network. Cox is correct. Somewhat curiously, BMG did not attempt to gather this evidence from the list of Cox subscribers BMG received during discovery. Nonetheless, viewing the evidence at trial in the light most favorable to BMG, the Court finds there was sufficient evidence from which a reasonable jury could find Cox users violated BMG's reproduction right.

Accordingly, the Court denies Cox's motion on this ground.

3.    Contributory Infringement

Cox next argues that BMG did not establish Cox's secondary liability for the infringement on its network.

a.    *The Framework*

Cox contends that there are two possible avenues to contributory liability and BMG did not establish either one. First, Cox submits the evidence at trial established that Cox's internet

19

service is capable of substantial noninfringing uses, which should have generally immunized Cox from liability for contributory infringement under the Supreme Court's decision in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1987). Second, Cox submits that the only way BMG could have circumvented the *Sony* safe harbor would have been to establish inducement under the Supreme Court's more recent decision in *Metro–Goldwyn– Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). But BMG failed to allege, prove, or request the submission of an inducement instruction to the jury. In response, BMG argues that Cox reads *Sony* and *Grokster* too broadly, and that Cox was rightfully held liable based on evidence of its knowledge of specific infringing activity and continued material contribution to that infringement. The Court agrees.

"Contributory copyright infringement is a form of secondary liability with roots in the tort-law concepts of enterprise liability and imputed intent." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794–95 (9th Cir. 2007). "Under a theory of contributory infringement, 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another' is liable for the infringement, too." *CoStar Grp., Inc.*, 373 F.3d at 550 (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see also Grokster, Ltd.*, 545 U.S. at 930 ("One infringes contributorily by intentionally inducing or encouraging direct infringement . . . ." (citing *Gerswhin*, 443 F.2d at 1162)).

The Supreme Court first reached the secondary liability of a technology provider in *Sony*. There, copyright holders sought to hold Sony liable for infringement committed by end users of its Betamax video tape recorders ("VTRs"). The Court distinguished prior contributory copyright infringement cases that had involved "an ongoing relationship between the direct

20

infringer and the contributory infringer at the time the infringing conduct occurred." 464 U.S. at

437. By contrast, "[t]he only contact between Sony and the users of the Betamax [VTR] . . .

occurred at the moment of sale," and thus, "plainly d[id] not fall in that category." *Id.* at 438–39.

There was likewise no evidence that any user of the VTR had been influenced or encouraged to

make copies by Sony's advertisements. Thus, the only possible basis for liability was Sony's

sale of "equipment with constructive knowledge of the fact that their customers may use that

equipment to make unauthorized copies of copyrighted material." *Id.* at 439; *see also Grokster,

Ltd.*, 545 U.S. at 931 ("[T]he only conceivable basis for imposing liability was on a theory of

contributory infringement arising from its sale of VCRs to consumers with knowledge that some

would use them to infringe.").

      The Court found the closest analogy for such a theory in patent law's staple article of

commerce doctrine, which precludes contributory patent infringement based on "the sale of a

staple article or commodity of commerce suitable for noninfringing use." *Sony*, 464 U.S. at 440

(internal quotation marks omitted). "The doctrine was devised to identify instances in which it

may be presumed from distribution of an article in commerce that the distributor intended the

article to be used to infringe another's patent, and so may justly be held liable for that

infringement." *Grokster, Ltd.*, 545 U.S. at 932. "Conversely, the doctrine absolves the

equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits

liability to instances of more acute fault than the mere understanding that some of one's products

will be misused." *Id.* at 932–33. That balance protects the public's interest in access to dual-use

products.

      Borrowing that scheme, the *Sony* Court held "the sale of copying equipment, like the sale

of other articles of commerce, does not constitute contributory infringement if the product is

widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442. Because the VTR was capable of such uses, "Sony's sale of such equipment to the general public d[id] not constitute contributory infringement." *Id.* at 456.

The Supreme Court returned to the question of "under what circumstances the distributor of a product capable of both lawful and unlawful use is liable for acts of copyright infringement by third parties using the product" nearly two decades later in *Grokster*. 545 U.S. at 918–19. There, a group of copyright holders sued two distributors of peer-to-peer software. Below, the Ninth Circuit found the software was capable of substantial noninfringing uses and read *Sony* as protecting the distributors from liability absent evidence of knowledge of specific infringement and material contribution.[15] Finding insufficient evidence of knowledge in the record, the Ninth Circuit affirmed the district court's entry of summary judgment in the distributors' favor. The Supreme Court granted review.

Because the decision below had turned on *Sony*, the Court began there. The Court explained that "the Court of Appeals misapplied *Sony*, which it read as limiting secondary liability quite beyond the circumstances to which the case applied." *Id.* at 933. The Court expounded:

> *Sony* barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement. The Ninth Circuit has read *Sony*'s limitation to mean that whenever a product is capable of substantial lawful use, the producer can never be held contributorily liable for third parties' infringing use of it; it read the rule as being this broad, even when an actual purpose to cause infringing use is shown by evidence independent of design and distribution of the product, unless the

---

[15] While the Ninth Circuit read *Sony* as requiring a higher showing of knowledge to establish liability, the Seventh Circuit had reached a different interpretation of *Sony*. *See In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003).

distributors had "specific knowledge of infringement at a time at which they contributed to the infringement, and failed to act upon that information." . . . .

This view of *Sony*, however, was error, converting the case from one about liability resting on imputed intent to one about liability on any theory. Because *Sony* did not displace other theories of secondary liability, and because we find below that it was error to grant summary judgment to the companies on MGM's inducement claim, we do not revisit *Sony* further . . . to add a more quantified description of the point of balance between protection and commerce when liability rests solely on distribution with knowledge that unlawful use will occur. It is enough to note that the Ninth Circuit's judgment rested on an erroneous understanding of *Sony* and to leave further consideration of the *Sony* rule for a day when that may be required.

*Id.* at 933–34 (citation omitted).

The Court then turned to the copyright holders' inducement claim. Under an inducement theory, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 936–37. On that theory, "the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use." *Id.* at 941 n.13. After *Sony* and *Grokster*, a defendant may be contributorily liable for the distribution of a product or service if it has no (or very little) legal use or if it was designed or distributed with the intent that it be used for infringing purposes.

As noted, Cox and BMG disagree on the state of law post-*Grokster*. Throughout this litigation, the Court has taken the position that *Sony* is not the broad bar to liability that Cox paints it to be. Rather, the Court reads *Sony* as precluding the imputation of fault based solely on "the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Id.* at 933. Had that been BMG's claim, it would have failed. There can be no dispute, and the evidence at trial established, that the internet has an untold number of legal uses far beyond what is at issue here. Thus, Cox's "equivocal conduct"

23

of providing internet access that supplies the means to infringe would not, standing alone, be contributory infringement. *Id.* at 932; Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 Geo. L.J. 1833, 1874 (2000) (noting that after *Sony* "the imposition of contributory liability for the simple provision of Internet services [was] highly unlikely").

But that is not the claim BMG made. BMG's claim goes beyond design choice or the mere provision of a service and therefore it goes beyond *Sony. See Visa Int'l Serv. Ass'n*, 494 F.3d at 795 n.3 (noting that *Sony* did not apply to a contributory infringement claim against Visa despite the fact that it was undisputed that "the 'product' of credit card services is []capable of substantial and commercially significant noninfringing uses"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007) (rejecting Google's claim that *Sony* barred contributory liability because the plaintiff "ha[d] not based its claim of infringement on the design of Google's search engine and the *Sony* rule does not immunize Google from other sources of contributory liability"); *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1232 (C.D. Cal. 2007) ("Distributors of products capable of substantial noninfringing uses are often vulnerable to lawsuits for contributory infringement, and injunctions regulating how such products may be subsequently distributed (as opposed to a total ban) have been upheld."). Instead, BMG focused on Cox's conduct in relation to the operation of its service. Specifically, BMG claimed that Cox ignored specific notices of infringing activity and continued to provide material support to its users' infringement of BMG works despite its ability to suspend or terminate customers with the push of a button. *Cf. Ellison v. Robertson*, 357 F.3d 1072, 1077–78 (9th Cir. 2004) (allowing contributory infringement claim against AOL to go forward); *Religious*

24

*Tech. Ctr.*, 907 F. Supp. at 1365 (N.D. Cal. 1995) (finding an ISP may be liable for contributory infringement for failing to act after receiving adequate notice of user infringement).

Such a claim is possible here because, unlike in *Sony*, Cox maintains an ongoing relationship with users of its service. Sony's last point of contact with users of the VTR was at the point of sale.[16]  *See Sony*, 464 U.S. at 437 (distinguishing cases "involving an ongoing relationship between the direct infringer and the contributory infringer at the time the infringing conduct occurred"). An ongoing relationship between a defendant and direct infringers presents a potential for culpability quite beyond distribution or design.[17]  Other courts have similarly relied on this distinction in rejecting *Sony* as a complete defense to contributory infringement. *See, e.g., Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011) (rejecting defendants' reliance on substantial noninfringing uses because "the defendants were aware of the specific infringement at issue and had a continuing relationship with users"); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009) (rejecting defendants invocation of *Sony* as a complete defense and finding noninfringing uses "immaterial" where there was an ongoing relationship with users); *CoStar Grp. Inc. v. LoopNet,*

---

[16]  Likewise, in *Grokster*, the district court noted that "[i]f either Defendant closed their doors and deactivated all computers within their control, users of their products could continue sharing files with little or no interruption." *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 259 F. Supp. 2d 1029, 1041 (C.D. Cal. 2003), *aff'd*, 380 F.3d 1154 (9th Cir. 2004), *vacated and remanded*, 545 U.S. 913 (2005).

[17]  The distinction the Court draws is not between products and services. Nor is it that whenever a defendant is involved beyond manufacture and distribution of a product or service, *Sony* has no application. *Sony* provides a safe harbor from imputing culpability for mere distribution of a product or service that has commercially significant lawful uses and in doing so ensures that copyright holders cannot gain "effective control over the sale of that item" by way of indirect liability. *Sony*, 464 U.S. at 441. *Sony* does not, in the Court's view, immunize the same defendant from liability when it maintains an ongoing relationship with users, knows of specific infringement, and continues to provide material assistance in the face of that knowledge.

*Inc.*, 164 F. Supp. 2d 688, 706 (D. Md. 2001) ("In the current case, unlike *Sony*, LoopNet

maintained control over access to the site and could deny access or block materials after gaining

knowledge of infringement."), *aff'd*, 373 F.3d 544 (4th Cir. 2004).

Cox also argues that if *Sony* does not provide immunity, the *Grokster* Court made clear

that BMG's only path to liability was through an inducement claim. The Court again disagrees.

It bears noting that adopting Cox's reading of *Sony* and *Grokster* would greatly simplify this area

of the law. *Sony* would be a complete bar to contributory infringement whenever a defendant's

product or service is capable of commercially significant noninfringing uses, and that safe harbor

would be removed for only a distinct subset—those that actively induce infringement. But that

framework cuts contributory liability too drastically and is beyond the Supreme Court's

instruction.[18] *See Grokster, Ltd.*, 545 U.S. at 934–35 (stating that *Sony* "was never meant to

foreclose rules of fault-based liability derived from the common law"); *id.* at 934 ("*Sony* did not

displace other theories of secondary liability . . . ."); *see also Amazon.com, Inc.*, 508 F.3d at 1170

n.11 ("[T]he Supreme Court in *Grokster* did not suggest that a court must find inducement in

order to impose contributory liability under common law principles."); *Visa Int'l Serv. Ass'n*,

494 F.3d at 796 n.5 (noting "the *Grokster* court focused primarily on an 'inducement' theory

rather than a 'material contribution' theory"); *see also* Stacey Dogan, *Principled Standards vs.*

*Boundless Discretion: A Tale of Two Approaches to Intermediary Trademark Liability Online*,

37 Colum. J.L. & Arts 503, 509 (2014) ("With *Sony* insulating one-time sellers of mixed-use

---

[18] Of course, if Cox's reading is endorsed on appeal, BMG's victory at trial will be short-lived. BMG has not pursued an inducement claim. BMG conceded on summary judgment that there was no evidence Cox intentionally induced infringement, and, at the close of trial, BMG did not propose an inducement instruction. In a footnote to its opposition brief, BMG asserts for the first time that "[t]he evidence did show that Cox induced infringement." (Dkt. No. 775, at 6 n.4). That is far too little and far too late.

products and *Grokster* condemning those who act with a purpose of infringement, the final

principle of secondary liability grapples with the obligations of those parties who act with neutral

motives, but whose ongoing relationships with users give them the power to reduce or eliminate

infringement as it occurs. . . . Liability can result if a defendant either blinds itself to

infringement or fails to take reasonable efforts to respond to notice of infringement.").[19]  On this

rationale, the Court permitted BMG to go forward on its claims and attempt to prove that Cox

had knowledge that users of its internet service were infringing BMG's copyrights and that Cox

materially contributed to that infringement.

      b.   *Knowledge*

In a footnote, Cox challenges BMG's evidence of knowledge.  The proper standard of

knowledge has also been the topic of much discussion in this litigation.  The Fourth Circuit has

said a contributory infringer is one "with knowledge of the infringing activity."  *CoStar Grp.,*

*Inc.*, 373 F.3d at 550 (quoting *Gershwin*, 443 F.2d at 1162).  But the meaning of knowledge has

not always been clearly articulated in the case law.  Most prominently, after years of going back

and forth, the Ninth Circuit has settled on a standard of actual knowledge in the online context.

Other courts endorse a broader, objective standard both in and out of the digital world.  *See, e.g.,*

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir.2010) ("The knowledge standard is an

---

[19] The Court does not read Justice Ginsburg's concurrence in *Grokster* to state otherwise. She began by explaining: "Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops) or on distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses," citing *Sony. Grokster, Ltd.,* 545 U.S. at 942 (Ginsburg, J., concurring).  The Ninth Circuit has interpreted the first part of Justice Ginsburg's formulation to include both inducement and material contribution.  *See Amazon.com*, 508 F.3d at 1170 & n.11 (concluding that its previously recognized "tests for contributory liability are consistent with the rule set forth in *Grokster*"); *see also Visa Int'l Serv. Ass'n*, 494 F.3d at 795 (stating that it "understand[s] these several criteria to be non-contradictory variations on the same basic test").

objective one; contributory infringement liability is imposed on persons who 'know *or have reason to know*' of the direct infringement." (citation omitted)); *CoStar Grp. Inc.*, 164 F. Supp. 2d at 707 ("[I]n order to prove its claim [of contributory infringement], CoStar needs to establish that the notice it gave to LoopNet comprised at least constructive knowledge of specific infringing activity which LoopNet materially contributed to or induced by its alleged failure to halt the activity."). Professor Goldstein explains it as a spectrum:

> The closer the defendant's acts are to the directly infringing activity, the stronger the inference that the defendant knew of the activity; if the defendant's activities are relatively close to the directly infringing acts, the plaintiff may meet the knowledge requirement by showing that, although the defendant lacked actual knowledge of the infringement, he knew of facts that would have prompted a reasonable person to inquire into whether infringement was occurring. Indeed, in cases where the defendant's activities are closely connected to those of the direct infringer, the defendant's knowledge of the infringement may be so self-evident that the court will not even address the knowledge requirement separately. But where the defendant's activities are relatively distant from those of the direct infringer, inquiry notice may not suffice, and the plaintiff may be required to show that the defendant actually knew of the directly infringing conduct.

Paul Goldstein, Goldstein on Copyright § 8.1, at 8:9–8:10 (2014 Supp.).

The Court charged the jury that BMG must establish that "Cox knew or should have known of [the] infringing activity [that is, direct infringement of BMG's copyrighted works by users of Cox's internet service]." Tr. at 2147; *see also* 3B Kevin F. O'Malley *et al.*, Fed. Jury Practice & Instructions § 160:29 (6th ed. 2015). The Court further charged the jury that knowledge is established if Cox acted with willful blindness—that is, "if it was aware of a high probability that Cox users were infringing BMG's copyrights but consciously avoided confirming that fact." Tr. at 2148; *see also Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013) ("Willful blindness of specific facts would establish knowledge for contributory liability."); *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally.").

There was a significant amount of evidence of Cox's general knowledge of infringement on its network. Cox received notices from other copyright holders complaining of infringement. Cox knew from its traffic analysis that subscribers were using BitTorrent. *See, e.g.*, PX-1412.0005. There was evidence from industry reports that the overwhelming majority of traffic on BitTorrent was infringing, and emails among members of the Abuse Group indicated Cox's knowledge of that fact. PX-2067.0001 ("Bittorrent is used for one thing only . . . and I would know. ;-)"); PX-1373.0001 ("99% of DMCA violations is from people using P2P on purpose and not Trojan activity.").

While generalized knowledge of infringement occurring on its network is not sufficient standing alone, it did provide the backdrop for Cox's decision to continuously ignore and take no action in response to the 1.8 million notices, weekly letters, and dashboard from Rightscorp.[20] There was also evidence that Cox had configured its graduated response system in such a way as to reduce both the total number of notices that entered the system and the amount of customer-facing action that may be required. Moreover, internal Cox communications, which were admitted over Cox's objection, signaled that Cox's decision not to process Rightscorp's notices may have been due to more than just the presence of the settlement language and instead reflected a general disdain for any enforcement responsibilities.

---

[20] At trial, Cox asked why it would deliberately blind itself to knowledge of infringement of BMG's works while it was simultaneously processing and taking action on infringement notices from numerous other copyright holders. Cox emphasized that its graduated response policy was highly effective in curbing infringement—asserting that 96% of the infringement stopped within five notices. In rebuttal, BMG's expert, Dr. McGarty, testified that Cox took no action on approximately 90% of the notices it received. He concluded that "[Cox's system] was almost deliberately configured not to lose customers from terminations and maybe to shield customers from any concerns regarding copyright violations." Tr. at 2025.

In response, Cox asserts that it cannot be charged with any more knowledge than the notices would have conveyed had they been received. Because the notices (and the data in the dashboard and the letters) were mere allegations, Cox argues they could not have imparted knowledge of infringement. There is a distinction between notice of conduct and knowledge that the conduct in fact amounted to unlawful infringement. *See generally* Laura A. Heymann, *Knowing How to Know: Secondary Liability for Speech* (manuscript at 6–7) (on file with author) (examining how courts and commentators have answered the question of whether knowledge in this context "means simply 'knowledge of the activity, which is later proved to be infringing' or 'knowledge of the infringing nature of the activity'"). "Nevertheless, courts have held that the knowledge element for contributory infringement is met in those cases where a party has been *notified* of specific infringing uses of its technology and fails to act to prevent such uses, or willfully blinds itself to such infringing uses." Mark Bartholomew, *Copyright, Trademark and Secondary Liability After* Grokster, 32 Colum. J.L. & Arts 445, 456 (2009) (emphasis added) (internal quotations and alteration omitted) (citing cases). While Cox would have the Court adopt a perfect knowledge standard, it is not required. *See Jalbert v. Grautski*, 554 F. Supp. 2d 57, 68 (D. Mass. 2008) ("Although the defendant must have knowledge of the infringing activity, 'the defendant need only have known of the direct infringer's activities, and need not have reached the legal conclusion that those activities infringed a copyrighted work.'" (quoting Paul Goldstein, Goldstein on Copyright, § 8.1 n.1 (2005)); *see also Elsevier Ltd. v. Chitka, Inc.*, 826 F. Supp. 2d 398, 402 (D. Mass. 2011). The jury could reasonably conclude that Rightscorp captured infringing activity on Cox's network, and that had Cox received the notices they would have satisfied the knowledge requirement.

In sum, there was sufficient evidence that Cox deliberately looked the other way and, at minimum, had reason to know that its users were infringing BMG's works.

        c.    *Material Contribution*

Finally, Cox asserts that BMG could not establish material contribution by its provision of a service that is capable of substantial noninfringing uses. Having already rejected Cox's *Sony* argument, the Court need not address material contribution at length. There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that Cox had the means to withhold that assistance upon learning of specific infringing activity. *Compare Amazon.com*, 508 F.3d at 1172 ("[S]ervices or products that facilitate access to websites throughout the world can significantly magnify the effects of otherwise immaterial infringing activities."), *and id.* ("There is no dispute that Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access in fringing materials. We cannot discount the effect of such a service on copyright owners, even though Google's assistance is available to all websites, not just infringing ones."), *with Visa Int'l Serv. Ass'n*, 494 F.3d at 799–800 (finding Visa's services distinguishable from other intermediaries that increase the ability to infringe, including "*high-speed connections* allowing for the rapid transfer of high-resolution image files" and "powerful search engines," because Visa "do[es] not provide users the tools to locate infringing material, nor does any infringing material ever reside on or *pass through any network* or computer [Visa] operate[s]" (emphasis added)).

In sum, the Court finds, viewing the evidence in the light most favorable to BMG, there was sufficient evidence for a reasonable jury to hold Cox responsible for the infringement of BMG's copyrights on its network. Whether or not Cox's effort to protect its customers from

Rightscorp was noble or well-intentioned, Cox could not also turn a blind eye to specific

infringement occurring on its network. In reaching this conclusion, the Court acknowledges that

the application of traditional contributory infringement to large intermediaries like Cox

magnifies the uncertainties in this area of the law and raises the specter of undesirable

consequences that may follow.[21]  This case may provide the vehicle for consideration of those

questions.

    4.    <u>Willfulness</u>

Cox also challenges the jury's finding of willfulness. Cox largely takes issue with the

willfulness standard on the ground that it does not require evidence beyond what is required to

establish ordinary contributory infringement. The jury was charged that BMG must establish

"by a preponderance of the evidence that Cox had knowledge that its subscribers' actions

constituted infringement of BMG's copyrights, acted with reckless disregard for the infringement

of BMG's copyrights, or was willfully blind to the infringement of BMG's copyrights." Tr. at

2150. That is an accurate reflection of where the law stands. *See Lyons P'ship, L.P. v. Morris*

*Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) ("Although the Copyright Act does not define

willful infringement, other circuits have held that infringement is willful if the defendant has

knowledge, either actual or constructive, that its actions constitute an infringement or recklessly

disregards a copyright holder's rights." (internal quotations and citations omitted)); *see also*

*Island Software Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) ("To

---

[21] *See, e.g.*, Alfred C. Yen, *Third-Party Copyright Liability After* Grokster, 91 Minn. L. Rev. 184, 213–14 (2006); Lemley & Reese, *supra*, 56 Stan. L. Rev. at 1349–50 ("The fundamental difficulty is that while courts can make decisions about direct infringement on a case-by-case basis, lawsuits based on indirect liability sweep together both socially beneficial and socially harmful uses of a program or service, either permitting both uses or condemning both."); *id.* at 1380–81, 1385–87; Neal Kumar Katyal, *Criminal Law in Cyberspace*, 149 U. Pa. L. Rev. 1003, 1007–08 (2001).

prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."). Cox provides no argument for what additional evidence should have been required, and the Court declines the invitation to craft a new standard.[22] *See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) ("Appellants object that under this formulation, a finding of willfulness requires proof of no element beyond those of contributory copyright infringement. But appellants do not explain what additional element should be required. The district court's formulation accurately reflected the law."). For the reasons already explained, there was sufficient evidence for the jury to find Cox was aware of the infringing activity and that it acted recklessly or with deliberate disregard.

## B.   Cox's Motion for a New Trial

Cox moves in the alternative for a new trial pursuant to Rule 59, having identified numerous grounds of potential error committed by the Court.

### 1.   Standard of Review

On a motion for a new trial, "the district court must set aside the verdict and grant a new trial if . . . (1) the verdict is against the clear weight of evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (internal quotations and alteration omitted).

---

[22] At the hearing on this motion, Cox's counsel conceded that this is "a problem in the law" that is "not . . . unique to this courtroom." (Dkt. No. 792, Tr. at 25–26.) He confirmed: "I don't have any answer to that." (*Id.* at 26.)

2.    Jury Instructions

Cox believes the Court erred in charging the jury on direct infringement, contributory

infringement, statutory damages, the relevance of the DMCA, and the destruction of evidence.

While a trial court has broad discretion in putting together jury instructions, the instructions

must, "taken as a whole, adequately state the controlling law." *Teague v. Bakker*, 35 F.3d 978,

985 (4th Cir. 1994).

a.    *Direct Infringement*

Cox identifies multiple deficiencies in the Court's instruction on copyright

infringement—Instruction 25. The Fourth Circuit has directed that "a single instruction to a jury

may not be judged in artificial isolation, but must be viewed in the context of the overall charge."

*Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011). Here, that requires beginning with Instruction

22, which defined a copyright for the jury. In that instruction, the Court identified the six

exclusive rights of a copyright holder, including the rights of reproduction and distribution. That

language largely tracked the statutory definitions in § 106.

Instruction 25 then explained to the jury that "[i]n order to prove contributory or

vicarious copyright infringement, BMG first must establish by a preponderance of the evidence

that users of Cox's internet service used that service to infringe BMG's copyrighted works." Tr.

at 2146. It then explained: "A copyright owner's exclusive right to distribute, reproduce, and

copy its copyrighted work is infringed by the downloading or uploading of the copyrighted work

without authorization." *Id.* at 2147. And finally, the Court instructed, "If you find that users of

Cox's internet service uploaded or downloaded BMG's copyrighted works, then BMG has

established that users of Cox's internet service have infringed BMG's copyrighted works." *Id.*

34

Cox contends it was error not to track the statutory language of the distribution and reproduction rights in Instruction 25.  But the Court finds it sufficient that Instruction 22 used the statutory language to define the exclusive rights protected by a copyright.  Shortly thereafter, Instruction 25 incorporated by reference those "exclusive right[s]" and went on to explain how they may be infringed within the context of this case.

Cox next argues that the final sentence of Instruction 25 left the jury free to find infringement based on entirely lawful downloads of BMG's works and that the Court should have included the phrase, "without authorization from the copyright owner."  Because the preceding sentence instructed that infringement occurs only by action taken "without authorization," the Court disagrees that it was necessary to repeat the phrase in the next sentence. Cox also argues that the instruction did not require the jury to find the direct infringers acted while using Cox's service.  But the instruction stated that BMG had to prove by a preponderance of the evidence "that users of Cox's internet service *used that service* to infringe BMG's copyrighted works."  *Id.* at 2146 (emphasis added).

Finally, Cox asserts that the inclusion of the term "upload" is inconsistent with the Court's earlier finding that merely making a work available does not violate the distribution right.  That suggestion is contrary to both the evidence presented to the jury and the case law. *See, e.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) ("Both uploading and downloading copyrighted material are infringing acts.  The former violates the copyright holder's right to distribution, the latter the right to reproduction."); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013–14 (9th Cir. 2001) ("[H]ere the evidence establishes that a majority of Napster users use the service to download and upload copyrighted music . . . .  And

35

by doing that, it constitutes—the uses constitute direct infringement of plaintiffs' musical compositions, recordings.").

In the end, the instruction may not have been structured in the exact way Cox would have liked, but the instruction did not permit the jury to find infringement on any ground other than what is permitted by law.

### b.   *Contributory Infringement*

The Court gave the following instruction on contributory infringement:

> A copyright may be infringed by contributory infringing.   With certain exceptions, a person is liable for copyright infringement by another if the person knows or should have known of the infringing activity and induces, causes, or materially contributes to the activity.  Plaintiff has the burden of proving each of the following by a preponderance of the evidence.  First, that there was direct infringement of BMG's copyrighted works by users of Cox's internet service. And second, that Cox knew or should have known of such infringing activity. And third, that Cox induced, caused, or materially contributed to such infringing activity.

Tr. at 2147; *see also* 3B Kevin F. O'Malley *et al.*, Fed. Jury Practice & Instructions § 160:29 (6th ed. 2015).

The Court denied Cox's requests to include a *Sony* instruction and a *Grokster* inducement instruction.  For the reasons already explained at length, the Court did not believe either was relevant to the case and that narrowing the instruction was appropriate.  What resulted was, in the Court's view, a correct statement of the law applicable to BMG's claims.

### c.   *Statutory Damages*

Cox "highlights" just four of the "numerous ways" that the statutory damages instruction failed. (Dkt. No. 763, at 16).  Cox first faults the Court for not including a compilation instruction.  The Copyright Act permits copyright owners to elect "an award of statutory damages for all infringements involved in the action, with respect to any *one work*, for which any

36

one infringer is liable." 17 U.S.C. § 504(c)(1) (emphasis added).  The Act also provides that "all parts of a compilation . . . constitute one work."[23]  *Id.*  Based on that language, Cox asked the Court to instruct the jury that "BMG is entitled to only one award of statutory damages for each of BMG's copyrighted works that Cox infringed.  All the parts of a compilation (such as an album of songs) constitute one work." (Dkt. No. 681, at 36).  Instead, the Court's instruction stated, "The amount awarded must be between [$]750 and $30,000 for each copyrighted work that you found to be infringed."  Tr. at 2149.  Cox asserts that the evidence established that "multiple works BMG asserted were parts of a compilation," (Dkt. No. 763, at 17), and therefore it was error not to include the requested instruction.

The circuits are split as to how to determine what constitutes "one work" for purposes of statutory damages calculations.  Some courts apply a "functional [test], with the focus on whether each expression . . . has an independent economic value and is, in itself, viable." *Gamma Audio & Video, Inc. v. Een-Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993).  Other courts, most prominently the Second Circuit, look to "whether the plaintiff—the copyright holder— issued its works separately, or together as a unit." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 142 (2d Cir. 2010).

The Fourth Circuit has not explicitly staked out a position, but in *Xoom Inc. v. Imageline, Inc.*, 323 F.3d 279 (4th Cir. 2003), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), the court held that a plaintiff could receive only two statutory damages awards where the plaintiff had issued its numerous clip-art images in two CD collections.  Another court in this district has read *Xoom* as "largely consistent" with the Second

---

[23]  A "compilation" is "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.

Circuit's position. *See Tattoo Art, Inc. v. Tat Int'l, LLC*, 794 F. Supp. 2d 634, 653 (E.D. Va.

2011). Indeed, the Second Circuit cited *Xoom* as in line with its interpretation of the statute. *See*

*Bryant*, 603 F.3d at 141 n.6. Accordingly, the Court looks to the evidence at trial of how BMG

issued its works in determining whether it was error to withhold the instruction.

Laurent Hubert, the head of creative and marketing at BMG, testified on cross-

examination that nine of the works at issue were published and registered together as an album.

Tr. at 186–87. Keith Hauprich, BMG's deputy general counsel, testified that BMG also issued

each work individually:

> Q:    Where can someone—if they wanted to legally purchase these
>       compositions, where could they do that?
>
> A:    There's a variety of digital service providers and authorized retailers.
>
> Q:    And they can be purchased individually?
>
> A:    Yes.
>
> Q:    And do you know whether or not every one of these compositions is, in
>       fact, available for purchase or downloading individually?
>
> A:    Yes, they are.

*Id.* at 457. On cross, Mr. Hauprich was asked if he was aware that "all parts of a compilation

shall count as one work for statutory damages." *Id.* at 490. Mr. Hauprich agreed with the

premise, but disputed the relevance of that standard to BMG's works at issue. *Id.* at 491. Thus,

the evidence was that at least some of the works at issue were registered as a compilation and

published as an album, but that BMG had also issued *all* of the works separately.

Under similar circumstances, courts have held plaintiffs are entitled to a per-work

recovery, regardless of the fact that at one time the same work was published as part of an album.

*See, e.g., Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 721–22 (S.D.N.Y. 2014);

*Arista Records LLC v. Lime Grp. LLC*, No. 06-cv-5936, 2011 WL 1311771, at *2–3 (S.D.N.Y. Apr. 4, 2011). The Court agrees that "[n]othing in the Copyright Act bars a plaintiff from recovering a statutory damage award for a sound recording [or musical composition] issued as an individual track, simply because that plaintiff, at some point in time, also included that sound recording [or composition] as part of an album or other compilation." *Arista Records LLC*, 2011 WL 1311771, at *3. There was no evidence that BMG issued any of the works in album form only.[24] *Cf. Bryant*, 603 F.3d at 141 ("Here, it is the copyright holders who issued their works as 'compilations'; they chose to issue Albums."). The only evidence was to the contrary. Therefore, the Court believes the narrowing of the instruction was appropriate.

Cox next takes issue with the Court's failure to instruct the jury that "[t]he conduct of the parties" is a relevant factor in determining the appropriate award. That language derives from caselaw outside of this circuit. *See Bryant*, 603 F.3d at 144. Nonetheless, Cox contends it was error to exclude it because the jury could have considered BMG's failure to cooperate with Cox. What Cox omits is the fact that BMG's conduct was made relevant by the Court's instruction that the jury could consider BMG's failure to mitigate as a relevant factor. The jury had sufficient leeway to consider the actions of BMG and its agent in assessing damages.

The third alleged error was the Court's rejection of Cox's innocent infringement instruction. Section 504 provides that an award of statutory damages may be reduced "to a sum of not less than $200" if "the infringer sustains the burden of proving . . . that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright." 17 U.S.C. § 504(c)(2). Cox contends the absence of the instruction necessarily

---

[24] Evidence that BMG registered certain works together is insufficient. *See Xoom*, 323 F.3d at 285 n.8.

resulted in the jury believing the statutory floor for damages was $750 per work instead of $200. The Court did not believe an innocence instruction was available to Cox based on the evidence presented at trial. Nor does it appear Cox was prejudiced by the absence of the instruction, as the jury found Cox liable for willful infringement and landed on a number well above the statutory minimum award.

Finally, Cox challenges the instruction on willfulness. For the reasons already stated, the instruction was a correct restatement of the law.

### d. *Spoliation*

Cox protests both the Court's "anemic" spoliation instruction and its failure to impose an additional evidentiary sanction, such as dismissal or the preclusion of evidence, in response to BMG's failure to preserve evidence of how Rightscorp's system operated prior to July 2015. The Court addresses these arguments together.

Before trial, Cox moved for evidentiary sanctions. In a thoughtful order, Magistrate Judge Anderson correctly found that the manner in which Rightscorp identified suspected infringement was material evidence and that, since at least early 2013, BMG had a duty to preserve that evidence. He concluded "that by altering the source code, deleting portions of the source code, and by overwriting portions of the source code without maintaining a record of those alterations, deletions, or overwrites, material information was intentionally destroyed and it was not lost through inadvertence or mistake." (Dkt. No. 447, at 4).

Judge Anderson then turned to the question of the appropriate remedy. He rejected Cox's suggestion of dismissal. He also rejected Cox's request for the preclusion of evidence relating to the operation of the Rightscorp system prior to 2015, because "that suggested remedy would in all likelihood result in the dismissal of [BMG's] claims for damages and it fails to take into

40

consideration the other potential avenues available to understand and test the accuracy of Rightscorp's system." (*Id.*). Judge Anderson then outlined what was available to Cox—the current version of the source code, the portion of the code as it existed in 2013, and the ability to depose the person who created the source code and made the changes. There were deficiencies in each. For instance, Judge Anderson felt Cox had "made a strong showing that the deposition testimony provided by Rightscorp is a poor substitute for a documented, historical version of the Rightscorp system." (*Id.*).

Ultimately, Judge Anderson landed on a jury instruction as the appropriate sanction.[25] He recommended that the Court "should consider" instructing the jury that BMG failed to preserve material information; that the jury is not to assume that the Rightscorp system operated the same way between 2012 and 2014 as it did in 2015; that BMG must present sufficient evidence for the jury to determine whether the Rightscorp system accurately identified infringements; and that "the jury should take into consideration that the plaintiffs failed to comply with their obligations to preserve material evidence by documenting the changes made to the Rightscorp system during the relevant time period." (*Id.* at 6). He concluded his Order with this: "The District Judge will make the ultimate decision whether an evidentiary sanction is appropriate and, if so, what the sanction should be given the evidence presented." (*Id.*).

Neither party challenged Judge Anderson's order. Instead, Cox filed a motion asking the Court to enforce Judge Anderson's order by dismissing the case. The Court denied the motion, and issued an order explaining that the Court agreed with Judge Anderson's finding of spoliation and would fashion an appropriate jury instruction after hearing the evidence presented at trial.

---

[25] Cox reads Judge Anderson's order as recommending both a jury instruction *and* an additional evidentiary sanction. The Court disagrees with that reading. Regardless, Judge Anderson made clear that the ultimate decision would be in this Court's discretion.

41

The Order also gave Cox leave to identify the spoliation issue in its opening statement. At the close of trial, the Court gave a spoliation instruction that was a step below Judge Anderson's in severity. For instance, Judge Anderson recommended that the jury be told they *should* consider BMG's failure, and the Court instead instructed the jury that they may, but are not required to, consider the absence of earlier versions of the code.

Cox believes the Court erred under both Federal Rule of Civil Procedure 37 and Fourth Circuit caselaw. On December 2, 2015, the first day of trial, amended Rule 37 went into effect. As amended, it provides that in cases where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it" and another party is prejudiced thereby, a court may "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If there is an additional finding that "the party that lost the information acted with the intent to deprive another party of the information's use in the litigation," *id.* 37(e)(2), the rule authorizes the use of "specified and very severe measures to address or deter failures to preserve electronically stored information." *Id.* Advisory Committee Note (2015). Those include "presum[ing] the lost information was unfavorable to the party; . . . instructing the jury that it may or must presume the information was unfavorable to the party; or . . . dismiss[ing] the action or enter[ing] a default judgment." *Id.* 37(e)(2).

Judge Anderson made a finding of intentionality. Such a finding, however, "does not require a court to adopt any of the measures listed in subdivision (e)(2)." *Id.* Advisory Committee Note (2015). The Advisory Committee Notes instructs that "[t]he remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when . . . lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the

loss." *Id.* Here, the Court employed two measures contemplated by the Advisory Committee: "permitting [Cox] to present evidence and argument to the jury regarding the loss of information" and "giving the jury [an] instruction[] to assist in its evaluation of such evidence or argument." *Id.* While Cox clearly feels stronger action was warranted, the Court believes the lesser measures were sufficient after having considered all of the evidence adduced on this issue at trial.

Nor does the Court agree with Cox that Fourth Circuit caselaw required a harsher sanction. District courts have "broad discretion" in imposing sanctions where spoliation occurs. *Turner v. United States*, 736 F.3d 274, 281 (4th Cir. 2013). Dismissal is reserved for only the most egregious circumstances. Here, Judge Anderson concluded that the preclusion of evidence would have likely been the equivalent of dismissal, and thus properly rejected that as a remedy in this case. Spoliation instructions can take many forms and range in degrees of severity. The Court is satisfied the instruction given alerted the jury to the fact of spoliation, identified the missing evidence, and permitted them to consider that fact in their deliberations. It thereby "serve[d] the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). That is especially the case here, given Judge Anderson's separate finding of Cox's own failure to preserve relevant evidence in this lawsuit. (Dkt. No. 381.)

e.    *Relevance of the DMCA*

Finally, Cox contends that the Court's instruction on the DMCA was highly prejudicial. Everyone agrees that the DMCA is "irrelevant to determining what constitutes a prima facie case of copyright infringement." *CoStar Grp., Inc.*, 373 F.3d at 555. The effect of a safe harbor is to limit the remedies available against a party otherwise found liable for copyright infringement.

43

The Court ruled before trial that Cox was not eligible for a safe harbor, leaving the jury to determine Cox's liability.

Before trial, the Court instructed counsel not to refer to its prior rulings, but the Court also indicated that the DMCA was an inextricable part of the course of dealing between Cox, Rightscorp, and BMG, and the framework in which this case arose. The Court explained that it would likely be necessary to the jury's understanding of the case "to identify the construction of the DMCA, including the fact that it has a safe harbor provision, and that's why [BMG] sent out notices, and those notices were not forwarded by Cox because they were reasonable or not reasonable." (Dkt. No. 704, Tr. at 54). The centrality of the DMCA to the story underlying the case was reflected by the fact that the term was embedded in numerous documents admitted at trial. For instance, Cox's standard notice to subscribers sent upon receipt of an infringement notification explained, "As an Internet Service Provider, Cox is responsible, under the Digital Millennium Copyright Act ('DMCA'), to advise when we receive a notice asserting infringement by you." PX-1432. In short, its mention was largely unavoidable.

Given that, the Court agreed with Cox that it was necessary to instruct the jury as to the relevance of the DMCA to its ultimate task. Over BMG's objection, the Court gave the following instruction:

> You have heard some testimony and seen some documents that refer to the Digital Millennium Copyright Act, commonly known by its initials "DMCA." The DMCA provides that an internet service provider (commonly referred to as an "ISP") like Cox may have a defense to liability for contributory or vicarious copyright infringement arising from the use of its services for infringement by its subscribers. This defense is often referred to as a "safe harbor."
>
> The DMCA is not a defense in this case and must be disregarded.

Tr. at 2145. Cox argues the instruction was insufficient because it failed to state that the safe harbor provisions are optional and irrelevant to determining liability. The Court disagrees that

the differences in language between Cox's proposed instruction and that given to the jury were so material as to warrant a new trial. The jury was instructed to disregard the DMCA, and the Court presumes the jury followed that instruction.[26]

### 3. Evidentiary Rulings

Cox also asserts that evidentiary errors in the admission and rejection of certain pieces of evidence justify a new trial. "[D]istrict court[s] [are] fully empowered to reverse . . . evidentiary rulings post-trial and to reconsider that evidence's effect on the trial." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 194 (4th Cir. 2000). But "[u]nless justice requires otherwise, no error in admitting or excluding evidence" is grounds to grant a new trial. Fed. R. Civ. P. 61. "Thus, it is only errors that cause substantial harm to the moving party that justify a new trial, and errors that are not prejudicial do not necessitate a new trial." *Bennet v. R&L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 539 (E.D. Va. 2010).

To the extent they have not already been discussed, the Court takes each error alleged by Cox in turn.

### a. *Evidence of Rightscorp's Business Practices*

Over Cox's objection, the Court granted BMG's motion *in limine* to exclude certain evidence about Rightscorp's business practices, including a phone script purportedly used by Rightscorp agents when collecting settlement payments. Cox submits the script "confirmed" its suspicions about Rightscorp's business model and it amounted to an admission by Rightscorp (and thus BMG) that most file sharing is a result of an unsecured wireless network.

---

[26] Later in its motion, Cox argues that by permitting discussion of the DMCA during trial, Cox was prejudiced and the jury was likely to equate the lack of safe harbor with liability. For the reasons already stated, excising the DMCA from the trial in its entirety was impossible and any resulting prejudice suffered was cured by instructing the jury not to consider the safe harbor in assessing Cox's liability.

The script was properly excluded under Rule 403. A suggested script for phone calls between Rightscorp and subscribers of other ISPs of which Cox was unaware at the time it decided to blacklist Rightscorp's notices had minimal probative value to the issues before the jury. Nor was Cox's need for the evidence great. *See Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014) (instructing courts to consider "the proponent's need for admission of the evidence in the full evidentiary context of the case"). Cox fully explored the reasons it disapproved of Rightscorp's business model at the time it made the decision not to process, and later to blacklist, Rightscorp's notices. Cox also overstates the relevance of the script to its open Wi-Fi theme. At most, the script acknowledges that individuals may raise open Wi-Fi as an explanation for the BitTorrent activity observed by Rightscorp. Despite the fact that Cox itself holds subscribers responsible for all data transmitted from a subscriber's IP address—whether password-protected or not—the Court permitted Cox to present evidence on the prevalence of Wi-Fi generally and the effect that open Wi-Fi may have on Rightscorp's ability to detect infringement by a Cox *subscriber*. The script would not have added to that testimony significantly. On the other side of the scale was the significant danger of unfair prejudice and jury confusion. Those well-founded concerns substantially outweighed any probative value.

Cox also criticizes the Court's exclusion of a recording of a Rightscorp employee and letters to Rightscorp from the offices of state attorneys general. Cox submits both were relevant to its unclean hands defense and could have been used to impeach Rightscorp witnesses. The Court rejected Cox's unclean hands defense on summary judgment, making it irrelevant at trial. While the evidence may have had impeachment value, it was likewise substantially outweighed by the danger of prejudice and confusion.

        b.    *Mr. Cadenhead's Testimony*

Randy Cadenhead served as Cox's privacy counsel for much of the relevant time period. Notably, he was the one who made the decision not to process Rightscorp notices. The Court limited certain aspects of Mr. Cadenhead's testimony, including: his belief that Rightscorp's notices were outside the "spirit of the DMCA"; any reference to Rightscorp using terms like copyright troll, extortionist, blackmailer, and so on; internal Cox emails regarding other blacklisted entities and that referred to Rightscorp as "the blackmail company"; and emails from Mr. Cadenhead expressing his belief that Rightscorp notices did not comply with the DMCA because they include extortionate and inaccurate language and that the DMCA take-down notice provisions do not apply to Cox because it does not store data on its servers. Cox asserts the Court's rulings precluded it from telling the jury the complete story as to why it refused to process notices with settlement demands.

Even assuming the Court's limitations were error, however, Cox has not shown that they affected its substantial rights. Mr. Cadenhead testified, among other things, about Cox's policy of not accepting notices with settlement demands; Cox's cooperation with other rights holders regarding their notices, subpoenas, and John Doe lawsuits; Cox's consistent rejection of notices that included settlement demands; Cox's interactions with other companies that had included settlement language prior to Rightscorp; Cox's interactions with Rightscorp; and the reasons underlying his decision not to accept Rightscorp notices. The Court also admitted multiple emails and letters between Rightscorp and Cox that told the story of the relationship in some detail. *See, e.g.*, DTX-1245 (stating in a letter from Mr. Cadenhead that Cox's "graduated response system is extensive and robust" and that "settlement demands . . . are outside the scope of the DMCA"); DTX-395 (stating in an email from Mr. Cadenhead that Cox's "position is

longstanding and fully within the law"); *id.* (stating in an email from Mr. Cadenhead that Rightscorp notices "do not relate to matters subject to the DMCA. Further, the DMCA permits take down requests, but does not cover demands for payment. As such, it is Cox policy not to accept or to forward notices such as those sent to us by your firm."); DTX-2489 (stating in an email from Mr. Cadenhead that "Cox stands ready to process [Rightscorp's] notices consistent with the manner applied to all other DMCA related notices. [Cox] requires, however, that such notices comport to the terms of the DMCA and not contain extraneous threats or demands. We have previously explained our legal basis for this position."). And other emails made clear Cox's belief that the settlement demands were improper.

      c.    *Explanation of Cox's Graduated Response System*

Cox next contends the Court's rulings improperly limited evidence of the Copyright Alert System ("CAS"), other ISP's copyright practices, and the effectiveness of Cox's graduated response system. Cox argues this was relevant to countering BMG's assertions of willfulness and willful blindness. Testimony about or documents explaining the CAS, a system in which neither Cox nor BMG participates, and testimony about how other ISPs handle infringement notifications, of which there was no competent evidence, was not relevant and well beyond the scope of the issues on trial. Moreover, even assuming error, Cox did not suffer substantial harm. The Court permitted testimony about the operation of Cox's graduated response system generally and about its purported effectiveness in stopping infringement. For example, a chart admitted into evidence asserted that 96% of alleged infringers on Cox's network stopped after receiving five notices. *See* DTX-141. There was also testimony that Cox was an industry leader in this arena.

### d.    *Other ISP Responses to Rightscorp*

The Court excluded letters from other ISPs to Rightscorp, which Cox contends would

have (1) demonstrated "Rightcorp's intransigence and willful ignoring of defects in its system

and notices in the face of legal rebuttals and factual challenges by other ISPs responding to

similar notices," (2) demonstrated "the likelihood of systematic flaws in Rightscorp's system,"

and (3) buttressed Mr. Cadenhead's testimony regarding Cox's rationale in rejecting the notices.

(Dkt. No. 763, at 25).  The Court permitted testimony generally about how many other ISPs were

accepting or rejecting Rightscorp's notices.  The Court also admitted a Rightscorp presentation

that contained a slide titled, "Some of the ISPs That Ignore Your Notices."  DTX-474.  The slide

named twelve ISPs, in addition to Cox, and included names like Comcast, Verizon, and AT&T.

*Id.*  Thus, the jury was not left with the impression that Cox was an outlier or that Rightscorp

was without notice that other ISPs were not processing its notices.  Rightscorp employees also

testified to the fact that Rightscorp could have removed the settlement language but nonetheless

refused to do so.  The excluded letters from other ISPs were written by counsel and contained

extensive legal analysis of the DMCA and contributory and vicarious copyright infringement.  In

light of the other evidence supplying the jury the same basic information, the probative value of

the letters was outweighed by the real risk of prejudice and confusion.

### e.    *Mr. Rosenblatt's Testimony*

Cox submits that the Court's exclusion of its expert, William Rosenblatt, was improper

because he "would have offered a favorable comparison of Cox's graduated response process to

those of other ISPs and to the CAS."  (Dkt. No. 763, at 26).  Cox argues this error was

compounded by the fact that the Court permitted BMG's expert, Dr. Terrence McGarty, to

testify. Cox contends the Court's ruling resulted in the jury hearing "an unbalanced presentation of expert testimony about Cox's policies, procedures, and actions." *Id.*

The majority of Mr. Rosenblatt's expert report was dedicated to whether Cox fell within a DMCA safe harbor, and thus became largely irrelevant after summary judgment. (Dkt. No. 510, Tr. at 3 (noting that Mr. Rosenblatt's opinion was the equivalent of "reading Nimmer or Menell or Goldstein on copyright law" and that it would not be admissible testimony at trial)). Mr. Rosenblatt also had opinions on other ISP's practices and the CAS, which the Court excluded. As already noted, the Court found the CAS irrelevant, and Mr. Rosenblatt had no personal or specialized knowledge of other ISP's practices. He never worked for an ISP, he had no knowledge about the internal implementation of other ISP's copyright policies (which, as this case demonstrates, can depart dramatically in practice from what is reflected in written policies), and he had never spoken to anyone at other ISPs regarding how they handle infringement notifications. Dr. McGarty's rebuttal testimony, which was limited to rebutting Mr. Cadenhead's assertions that Cox's graduated response system was 96% effective in stopping infringement, did not create a sufficient imbalance of expert testimony such as would warrant a new trial.[27]

      f.    *References to Infringement*

Cox next argues that the Court allowed "pervasive wrongful references to infringement" throughout the trial and that the "unbridled use of the term allowed the jury to conclude falsely that the references were to actual, proved infringements." (Dkt. No. 763, at 28). The Court

---

[27] Before BMG's rebuttal case began, Cox raised the issue of Dr. McGarty's testimony. BMG explained that Dr. McGarty would rebut Cox's assertions that its graduated response system was effective. Cox explained that its objection to Dr. McGarty's testimony had been based on a need for "clarity on what he was going to testify to and rebut, and [BMG] wouldn't share that with us. . . . So on that basis [identified by BMG], no objection." Tr. at 1856. Cox did not assert that the exclusion of Mr. Rosenblatt's testimony should also have resulted in the exclusion of Dr. McGarty.

instructed the jury during trial that the ultimate decision of whether infringement had occurred was a legal conclusion solely in their purview. *See* Tr. at 338 ("Infringement is one of the issues that you'll resolve on the basis of the testimony and the facts in the law that I give you[.] . . . [Y]ou'll be making the ultimate decision."). Cox also had the opportunity to, and did in fact, cross BMG witnesses on their usage of the term: "Q: When you say 'infringement,' you don't mean as a court might instruct a jury on what infringement is, right? A: Yea, I do not. Q: All right. And what you're really referring to is an observation that appears in the Rightscorp infractions table? A: Correct." *Id.* at 984–85. And at the close of trial, the Court addressed the fact that the jury had "seen documents . . . that discuss and take different positions about the law." *Id.* at 2144. In the closing instructions, the Court directed the jury that "[t]he law is what I tell you it is in these instructions. It's not what has been stated in any document from either party, in any testimony by any lay or attorney witness, or in any statements by the attorneys in this case." *Id.* Accordingly, the Court finds any prejudice was sufficiently cured.

g.   *Rightscorp Notices*

Cox next complains that the Court erred in admitting Rightscorp's notices without a limiting instruction. The Court concluded that the notices were not inadmissible hearsay over Cox's objection and rejected the need for a limiting instruction that the notices should not be equated with infringement. As the Court explained when it made its ruling, the jury would decide what weight to give the data contained in the notices and whether it was competent evidence of infringement of BMG's works on Cox's network. The Court did set certain boundaries, *see* Tr. at 239 (noting that BMG's expert was "not going to be testifying about whether [the notices] are infringement or not"), and the Court did not permit BMG to come into court and stack two million notices in front of the jury as Cox feared it might, *see* Tr. at 61. And

as already noted, the Court interrupted BMG's expert testimony on the notices to instruct the jury of the distinction between the expert's use of the term infringement and the jury's ultimate decision. Thus, the notices were properly admitted and no substantial prejudice resulted.

      h.    *Industry Reports and Dr. Karaganis's Testimony*

      The Court admitted two highly relevant reports over Cox's hearsay objections as compilations generally relied on by persons in particular occupations pursuant to Rule 803(17). *See* PX-2429, DTX-308. The reports studied the number of BitTorrent users and the contents of its traffic. Both reports concluded that nearly all content transferred using BitTorrent was infringing. They were admitted through the testimony of BMG's expert, Dr. William Lehr.[28] Dr. Lehr, testified that "[t]here were two . . . studies in particular that . . . were widely cited in the industry and used by a lot of folks. There was a study in 2011 by Envisional and a study in 2013 referred to as the NetNames study . . . and those two studies . . . were . . . the most substantial published publicly available studies analyzing what's actually in BitTorrent traffic." Tr. at 1096. He also testified that he was familiar with the studies before he began work on this case and that they are the type of studies generally relied on by economists in his field.

      Cox argues that it was prejudiced by BMG's experts' reliance on the reports because the Court had excluded Cox's expert, Dr. Joseph Karaganis, who "would have described extensive literature criticizing those industry-sponsored reports and providing much-needed context for the jury to properly evaluate the reliability of those reports." (Dkt. No. 763, at 26). Dr. Karaganis's expertise was proffered by Cox for one principal purpose: to rebut Dr. Lehr's possible testimony "that piracy is bad" and its "harm to the copyright industry generally." (Dkt. No. 676, Tr. at 23).

---

[28] The Court had earlier permitted BMG's expert Stephen Nowlis to testify that he relied on the reports and certain pieces of information within the reports were revealed in his testimony, but the Court ruled that they were not admissible through his testimony. Tr. at 666.

Because the Court ruled that Dr. Lehr could not testify to such matters, Cox agreed that the need for Dr. Karaganis's testimony was, as a general matter, eliminated. (*Id.* at 23 ("[I]f Dr. Lehr is not going to be able to testify that piracy is bad, then we don't need Dr. Karaganis to say the opposite, so he's out."). Moreover, the Court preserved Cox's ability to raise the need for Dr. Karaganis's testimony at trial should it become necessary. In its opposition, BMG asserts that "Cox never again raised the need for Mr. Karaganis to testify—about the Envisional and NetNames reports or anything else." (Dkt. No. 775, at 30). Cox does not dispute that assertion in its reply.

### i.   *Internal Cox Emails*

In a final paragraph, Cox contends the Court improperly admitted at least thirty of BMG's exhibits containing internal Cox emails about Cox's handling of infringement notifications and Cox's implementation of its copyright policy. Cox submits the emails were irrelevant to BMG's claims of infringement, especially in light of the Court's ruling that Cox was not entitled to a safe-harbor defense. Much of Cox's defense at trial was dedicated to the proposition that had Rightscorp removed the settlement language, BMG's notices would have been processed along with all of the other notices that Cox accepts and handles so well. BMG was well within its right to put on evidence that suggested otherwise. The emails were relevant, and they survived Rule 403 balancing.

In sum, the Court finds Cox has not identified any ground that would warrant a new trial and its motion is denied.

## C.   BMG's Renewed Motion for Judgment as a Matter of Law

BMG renews its motion for judgment as a matter of law on its vicarious infringement claim. This motion warrants considerably less discussion than its counterpart. In addition to

evidence of direct infringement, vicarious infringement requires "the right and ability to supervise the infringing activity" and "an obvious and direct financial interest" in the infringing activity. *Nelson–Sabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002).

As Cox notes, "[a]bundant evidence supported the jury's decision in favor of Cox." (Dkt. No. 773, at 1). In particular, there was extensive evidence rebutting BMG's assertion of a direct financial interest, including: Cox's use of a flat monthly fee, the impact of infringement on Cox's ability to sell licensed content, *Rightscorp's* repeated assertions that infringement on the network financially harmed Cox, testimony from Cox's marketing director on the reasons subscribers choose an ISP and cancel subscriptions, and Cox's internal marketing research. Thus, the jury had a substantial basis on which to conclude that Cox did not maintain an obvious and direct financial interest in the infringement of BMG's works on its network.

BMG submits that its evidence of Cox's financial interest was undisputed. In that regard, BMG relies heavily on a survey conducted by Dr. Stephen Nowlis that purported to show that nearly 10% of Cox subscribers subscribed to Cox in order to use BitTorrent sites and share music. Cox effectively undermined numerous aspects the survey, including the methodology used and the conclusions drawn. The jury was well within its right to give the survey very little, if any, weight at all. Moreover, BMG's reliance on internal Cox documents referencing the fact that a certain percentage of its subscribers use peer-to-peer software to acquire music does not, without more, establish that those same subscribers were drawn to Cox's service on that basis or that Cox has a financial interest in that activity. The same is true of Cox advertisements that promoted fast download speeds. In addition to the fact that high speed is a concern of virtually all consumers in selecting internet service, the jury did not have to accept BMG's explanation that Cox was referring to *illegal* transmissions. There was plenty of testimony about the

numerous legal ways to acquire music via the internet—including downloading music from iTunes and streaming music through applications like Pandora or Spotify.

On this ground alone, BMG cannot make the requisite showing that, viewing the evidence in the light most favorable to Cox, no reasonable jury could reach a conclusion other than the one suggested by BMG. Accordingly, the motion is denied.

## D.    BMG's Motion for a Permanent Injunction

Based on the jury's finding of willful contributory infringement, BMG moves for the entry of a permanent injunction pursuant to § 502 of the Copyright Act. Cox opposes the motion on multiple grounds. The Court agrees with Cox that BMG failed to meet its burden and will deny the motion.

"[T]o obtain a permanent injunction in any type of case, including a patent or copyright case:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). An injunction is an extraordinary remedy and one that does not "automatically follow[] a determination that a copyright has been infringed." *eBay Inc.*, 547 U.S. at 392–93. Even if a plaintiff makes the requisite four-part showing, the decision to grant an injunction "still remains in the equitable discretion of the court." *Christopher Phelps & Assocs., LLC*, 492 F.3d at 543 (internal quotation marks omitted).

At the outset, the Court notes that BMG's brief in support of an injunction relied heavily on a statement of fact that was not true. Specifically, BMG alleged that, following the jury

verdict, Cox had continued to ignore Rightscorp's detection of "massive infringement" on its

network. In pertinent part, BMG's brief stated:

- "Now, more than a month [after trial], Cox's network continues to be the site of massive, ongoing infringement of BMG's copyrights. This ongoing infringement inflicts irreparable harm on BMG." (Dkt. No. 765, at 1).

- "Since that verdict, infringement of BMG's copyrights has continued on Cox's network, and BMG's agent Rightscorp has continued to detect massive infringement of BMG's copyrighted works. Through Rightscorp, BMG has continued to notify Cox of the infringement and continues to receive no response from Cox." (*Id.* at 4).

- "The sharing of BMG's copyrighted works—sharing that Rightscorp continues to detect on Cox's network even after a $25 million jury verdict—is a quintessential example of an irreparable injury." (*Id.* at 5).

- "The equites [sic] especially favor an injunction against a secondary copyright infringer that has continued its willful misconduct unabated, so that absent an injunction directing Defendants to prevent infringement of Plaintiffs' works, it is highly likely that Defendants' existing users and new users would contribute to use Defendants' system to infringe Plaintiffs' copyrights. That is the case here, where the infringement of BMG's works continues on Cox's network more than a month after Cox was found guilty of willful contributory copyright infringement." (*Id.* at 9 (internal quotations and citation omitted)).

In fact, Cox provided notice to BMG shortly after trial that Rightscorp was no longer

blacklisted. Despite that, neither Rightscorp nor BMG submitted *any* infringement notifications

to Cox. After receiving BMG's brief stating otherwise, Cox asked for clarification as to the basis

for BMG's claim. In response, counsel to BMG stated, "[P]rompted by your email, we called

Rightscorp and learned that, contrary to our understanding, Rightscorp had temporarily

suspended the sending of BMG copyright infringement notices to Cox." (Dkt. No. 774, Ex. 1).

BMG notified the Court by letter of its gaffe and asserts in its reply brief that the "error in stating

that Rightscorp was sending notices . . . [does not] lessen the irreparable harm." (Dkt. No. 778,

at 10). As discussed below, this highlights the difficulty of fashioning an injunction in which

Rightscorp is an essential entity.

The detail, or lack thereof, found in BMG's proposed injunction gives the Court even greater pause. Under BMG's proposed injunction, Cox would be "enjoined from knowingly and materially contributing to the unauthorized copying, uploading, downloading, transmitting, or distributing by others using its network of any musical composition in which BMG owns or controls an exclusive right under the United States Copyright Act." (Dkt. No. 765, Ex. 1). This is essentially an order to Cox not to violate the law and it fails Rule 65(d)'s requirement that an injunction "state its terms specifically[] and describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d); *see also Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 767 (4th Cir. 1998) ("This is the sort of go-thy-way-and-sin-no-more provision which we [previously] invalidated . . . ." (citing *Davis v. Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322, 1328 (4th Cir. 1986)), *judgment vacated*, 527 U.S. 1031 (1999). The Fourth Circuit has cautioned that "[t]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 459 (4th Cir. 2000) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)); *see also E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841–42 (7th Cir. 2013) (noting that vagueness concerns "are rooted in basic principles of due process"). Thus, "[i]n all cases, the injunction's wording should plainly delineate the scope of the proscribed *conduct*." 5-14 Nimmer on Copyright § 14.06 (emphasis added).

The proposed injunction is severely lacking in conduct-based instruction. The only *conduct* (as opposed to a legal standard) identified is that Cox is to notify subscribers of certain information within BMG's notices within two days of receipt and then, within seven days, Cox

must "inform BMG in writing of (a) the identity of and contact information (including, if available, email address, postal address, and telephone number) of the Cox subscriber assigned the IP address identified in the Notice at the date and time specified in the Notice and (b) the action Cox has taken to prevent or limit further infringement of the BMG Copyrighted Work identified in the Notice." (Dkt. No. 765, Ex. 1). The Court addresses the latter two requirements in reverse order.

BMG has no suggestions for what it means to require Cox "to prevent or limit further infringement." Picking two verbs without any additional detail as to what they might mean in practice is wholly insufficient. *Cf. Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (noting that the entered injunction "uses a collection of verbs to prohibit [defendant] from engaging in certain conduct, but ultimately it fails to detail what the conduct is"). Moreover, BMG poses "prevent" and "limit" in the disjunctive. Which is it? Prevent means "[t]o stop from happening; to hinder or impede." Black's Law Dictionary (10th ed. 2014). Perhaps that means terminate subscribers. But to "limit" means "to stop or prevent an increase in (something); to keep (something) from becoming greater; to prevent (something) from being larger, longer, more, etc.; to place a limit on the size or extent (of something); to stop (someone) from having or doing more; to place a limit on (someone)." Merriam-Webster Learner's Dictionary (2015); *see also* Black's Law Dictionary (10th ed. 2014) (defining a "limit" as "[a] restriction or restraint," "[a] boundary or defining line," and "[t]he extent of power, right, or authority"). Perhaps that means there are other lesser avenues available to Cox.

In its response, Cox identifies only a handful of the multitudes of questions that this language would require answering:

> Is Cox required to suspend accused infringers, or simply terminate them upon one notice, or after the second notice? What if BMG sends ten notices for one IP

address in one hour, or one minute?  If the injunction requires termination of "repeat" infringing subscribers in appropriate circumstances, when is a subscriber a "repeat" infringer, and what are the "appropriate circumstances" for termination?  Does the order permit or require suspension before termination?  Can Cox warn the account holder first?  Is Cox permitted to give customers an opportunity to respond to the accusations against them, or is it required to terminate accused infringers and provide them no redress?  If the subscriber denies the accusation, what process will exist to adjudicate the accusation by BMG?  Can Cox implement a counter-notice process such as the DMCA provides for storage providers?  What if, for example, the subscriber's computer was infected with malware, the user's network password was stolen, or a neighbor or guest accessed the user's account?

(Dkt. No. 774, at 12).  These questions are well-founded.

In addition to asking the Court to set Cox's business practices, injunctive relief would almost certainly require oversight of Rightscorp's practices as well.  Yet, the proposed injunction is entirely silent on that front.  For instance, for a period of time following the lawsuit Rightscorp adopted a 10% bitfield notice generation threshold.  BMG stated at the hearing that it would not object to the Court requiring a 100% bitfield threshold, but that is just one example.  What other changes might be made to Rightscorp's software?  There was also evidence that Rightscorp sent duplicative notices sometimes in the thousands.  Should Cox be required to act on every single one of those notices?  In short, if the baseline is that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed," this injunction fails.  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047–48 (9th Cir. 2013); *see also S.E.C. v. Smyth*, 420 F.3d 1225, 1233 (11th Cir. 2005) ("An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law.").

BMG responds that the injunction gives Cox the necessary "flexibility" to comply.  As the Ninth Circuit has noted, there is an understandable "desire to build flexibility into the injunction.  But Rule 65(d), overall, prefers certainty to flexibility." *Columbia Pictures Indus.,*

*Inc.*, 710 F.3d at 1048. BMG also argues that "Cox cannot escape injunctive relief by complaining that it is too difficult for it to stop willfully contributing to copyright infringement." (Dkt. No. 778 at 10). The Court agrees that Cox could not complain of the cost or burden of following an order that complied with Rule 65, but as drafted BMG's injunction does not.

BMG cites numerous cases and instructs the Court that other courts have imposed similarly broad injunctions in analogous cases. These cases are analogous to the extent that they involve peer-to-peer file sharing, but none involved an intermediary in Cox's position. Napster operated a closed system on which it was possible to "locate infringing material listed on its search indices" and prevent access to those files. *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002). Lime Wire was a peer-to-peer software and therefore could "disabl[e] the searching, downloading, uploading, file trading and/or distribution functionality," "establish[] default settings . . . that block the sharing of unauthorized media files," and so on. *Arista Records LLC v. Lime Wire LLC*, No. 06-cv-5936, 2010 WL 10031251, at *7 (S.D.N.Y. Aug. 9, 2010). Likewise, StreamCast, another software provider, could "reduce [the software's] infringing capabilities, while preserving its core noninfringing functionality" by doing things like creating and distributing a filter to the public and encouraging end-users to upgrade their software. *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1232 (C.D. Cal. 2007). Fung was an individual operator of torrent sites, and the injunction could be tailored to the availability of copyrighted works listed on the torrent sites. *Columbia Pictures Indus., Inc.*, No. 2:06-cv-5574, Dkt. No. 551 (C.D. Cal. Aug. 5, 2013). And in cases involving individual users of BitTorrent, courts enjoin defendants from using the internet for the purpose of downloading copyrighted works, while preserving their access to other uses of the internet. *See, e.g., John Wiley & Sons, Inc. v. Williams*, No. 12-cv-79, 2012 WL 5438917, at *3 (S.D.N.Y.

Nov. 5, 2012); *Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1075

(D. Ariz. 2006); *BMG Music v. Gonzalez*, No. 03-cv-6276, 2005 WL 106592, at *2 (N.D. Ill.

Jan. 7, 2005), *aff'd*, 430 F.3d 888 (7th Cir.). These cases highlight the need for care in crafting

injunctions to reach only the illegality and to preserve, to the extent possible, legal uses.[29] If

anything, a review of these injunctions reaffirmed the Court's view that BMG's proposed

injunction is wholly deficient.

BMG would also like the Court to order Cox to hand over the identity, email address,

mailing address, and telephone number of every subscriber that BMG identifies. In an attempt to

justify this subpoena provision, BMG's counsel asserted a need for transparency. Specifically,

BMG needs to be able to track what Cox is doing in response to its complaints. Quite obviously,

if that were the reason, there would be numerous ways to anonymize subscribers and still track

Cox's actions. There certainly would never be a need for an email address, mailing address, and

telephone number. When asked, counsel conceded that the information would be given to

Rightscorp "[a]nd in terms of what they do with that information, I mean, it's reasonable for

someone to find out if somebody is infringing, to see if they can stop them from infringing . . . .

But you would have the usual br[akes] on anybody abusing that sort of information." (Dkt. No.

792, Tr. at 34). What those "usual brakes" are is not clear. What is clear is that none of them

appear in the proposed injunction.[30]

---

[29] BMG asserts that it "has proposed an extremely limited injunction that imposes
minimal burden on Cox and is less exacting than many other injunctions that have been approved
in the context of secondary copyright infringement." (Dkt. No. 766, at 9). BMG seems to
believe that in the world of injunctions flexibility means freedom, but the opposite is true.

[30] BMG also makes much of the fact that the proposed injunction does not require Cox to
forward the notices *with* the settlement language. That is somewhat disingenuous given that
BMG would require Cox to provide detailed customer information with absolutely no limits on
its use. There would be no need for Cox to forward the settlement language because Rightscorp

The Court might attempt to narrow the broad injunction were BMG able to make the requisite showing that permanent injunctive relief is warranted here. Even assuming BMG can demonstrate irreparable harm and the inadequacy of monetary damages, the balance of hardships and the public interest do not support entering an injunction.

The burden on Cox outweighs the impact on BMG of denying the injunction. As noted, Cox's burden of complying with the proposed injunction is substantial. In its brief, BMG asserts that Cox's burden would be minimal because CATS gives staff "the power to turn off infringing subscribers with the push of a button" and "Cox's deep packet inspection tool allows Cox to monitor the volume of BitTorrent on its network, including the amount of BitTorrent traffic that a specific subscriber uses on a particular day." (Dkt. No. 765, at 9). And in its reply, BMG says deep packet inspection is an example of a "tool[] that Cox has to act against ongoing infringement on its network without even resorting to termination." (Dkt. No. 778 at 14). This leads directly back to all of the questions listed above—namely, which is it? Perhaps, as BMG suggests, Cox could require a subscriber to remove BitTorrent from their computers in order to remain on the network. Aside from the obvious point that this does not appear in the injunction, there was minimal testimony about deep packet inspection or its viability as a court-ordered solution here.

For its part, BMG waited years to bring this lawsuit. The Court does not question the harm BMG suffers each time a work becomes available on BitTorrent, but BMG has not sufficiently articulated how maintaining its years-long status quo outweighs the burden it wishes to place on Cox. Additionally, BMG's liberal sprinkling of the word "willful" in its briefing does not shift the balance. An injunction is not a punitive remedy.

---

would be able to contact Cox subscribers directly, without having to wait for them to reach out after receiving the notice.

Finally, BMG has not shown that it is possible to craft an injunction that would not disserve the public interest. The relief requested would have a substantial spillover effect far beyond the parties to this lawsuit. While there is without a doubt a significant public benefit in reducing copyright infringement, BMG has not demonstrated to the Court's satisfaction that such a reduction here would not come at the expense of other nontrivial interests, including privacy and access to the internet. In the cases cited by BMG, it was possible to tailor an injunction to accommodate both interests. BMG has not shown how those competing interests would be protected here. In the face of that uncertainty and the weighty interests hanging in the balance, injunctive relief is inappropriate. *Cf. Perfect 10, Inc. v. Google, Inc.*, No. 04-cv-9484, 2010 WL 9479060, at *14 (C.D. Cal. July 30, 2010) ("[G]iven the overbroad nature of [Plaintiff's] requested relief in its Proposed Order and the potential for such an injunction to limit the free exchange of information on the internet, the balance of the equities and the public interest weigh in favor of Google."), *aff'd*, 653 F.3d 976 (9th Cir. 2011); *see also Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) ("A court should not impose an injunction lightly, as it is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." (internal quotations omitted)).

### III. CONCLUSION

For the reasons stated, Cox's Renewed Motion for Judgment as a Matter of Law, or, in the Alternative for a New Trial (Dkt. No. 760) is **DENIED**. BMG's Renewed Motion for Judgment as a Matter of Law (Dkt. No. 759) and Motion for a Permanent Injunction (Dkt. No. 765) are **DENIED**. An appropriate order shall issue.

August 8, 2016
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

63