**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| BMG RIGHTS MANAGEMENT<br>(US) LLC, and ROUND HILL<br>MUSIC LP<br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>COX COMMUNICATIONS, INC.,<br>COXCOM, LLC<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　Case No.  1:14-cv-1611(LO/JFA)<br>)<br>)<br>)<br>)<br>) |

## BRIEF IN SUPPORT OF BMG'S MOTION FOR ATTORNEYS' FEES AND COSTS

After more than a year of hard-fought litigation, a jury found that Cox is a serial, willful contributory copyright infringer.  Cox pretended to have an effective system for acting on the millions of infringement notices it received from a host of different copyright holders.  Instead, Cox systematically blocked, deleted, and ignored the notices so that its paying customers could continue to infringe.

Cox sought to inoculate itself against liability for this infringement through a sham DMCA defense.  Cox pretended to terminate repeat infringers so that it could claim a "safe harbor" in court, but in fact reactivated them so that it would not lose the revenue associated with their accounts.  Throughout this litigation – from its interrogatory responses, to its expert reports, to its summary judgment papers, to its closing argument – Cox claimed to have terminated hundreds of subscribers for copyright infringement.  Those claims were false.

Cox attempted to obscure its actual practices through deception, litigation gamesmanship, and massive discovery obstructionism.  Cox often gave misleading and even patently false discovery responses to straightforward discovery requests, giving the false impression it had a robust DMCA policy.  Meanwhile, Cox's attorneys refused to produce key documents, disrupted

depositions, and offered up unqualified Rule 30(b)(6) witnesses – all while attempting to re-direct discovery into a sideshow regarding Rightscorp's dealings with customers of other ISPs. Cox then advanced a plethora of baseless and unreasonable defenses, which would require departing from forty years of copyright law and which Cox continued to argue long after they had been rejected by the Court.  These scorched earth tactics drove up the cost of litigation and appear to have been part of a calculated strategy to build a moat around Cox's sham system for handling infringement on its network.  Of all the copyright holders victimized by Cox's practices, only BMG sought to uncover Cox's actual practices and hold it accountable.

This is exactly the sort of case where a Court should award fees and expenses.  *See Kirtsaeng v. John Wiley & Sons*, 136 S. Ct. 1979, 1985 (2016) (relevant factors are "frivolousness, motivation, objective unreasonableness, and . . . considerations of compensation and deterrence").  Cox is a willful infringer that spent years crafting a sham DMCA "safe harbor" defense.  Once in litigation, Cox not only asserted that sham defense to the Court but paired it with a host of baseless legal arguments and constant efforts to prevent discovery into its actual practices and procedures for handling infringement on its network.  Cox – not BMG – should bear the cost of its infringement and of its litigation tactics.  This Court should award a "fully compensatory" fee.  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

## BACKGROUND

### A.    Cox Willfully Contributes to the Infringement of Copyrighted Music

Between February 2012 and November 2014, tens of thousands of Cox high-speed internet users uploaded and downloaded millions of copies of BMG songs via BitTorrent. BMG's agent Rightscorp used a computer software system to monitor this infringement and then told Cox of the infringement in notices, summary emails, and an interactive electronic dashboard

containing details of every single infringement.  *See, e.g.*, Dkt. 709 at 220:13-19; Dkt. 717 at 689:2-692:3, 768:25-769:15, PX-2119; DTX-2080; PXS-0004.  But Cox refused to act on the notices, the emails, and the dashboard and continued to allow its users to infringe BMG's copyrighted works.  Dkt. 727 at 1475:8-18, 1483:4-1486; Dkt. 728 at1493:24-1494:11.

Cox's treatment of BMG notices was part of its broader policy of allowing infringement on its network so that it could preserve the revenue associated with infringing subscribers' accounts.  Told of millions and millions of instances of infringement by a wide range of copyright holders – 16 million during the February 2012 to November 2014 time period at issue in this litigation – Cox devised a computerized system for handling infringement notices (known as CATS) that "looks like it's doing something appropriate, but . . . accomplishes nothing."  Dkt. 750 at 2060:21-24.  In order to "ignore the bulk of DMCA notices," PX-2022.0001, Cox blocked or blacklisted many copyright holders, limited others to two hundred notices per day, ignored the first notice directed to any given subscriber, rolled multiple notices into one, ignored all notices older than six months, and would not even consider a subscriber for termination until he or she was the subject of fourteen notices within a six month period.  PX1614.7; PX1610.11-13; PX1330.11; Dkt. 703 at 4-6; Dkt. 794 at 7-8.  The effect of Cox's system was to "shield customers from any concerns regarding copyright violations" and "give them the comfort that they [could] continue to violate [copyright] with impunity."  Dkt. 750 at 2023:4-2025:7.

Rather than act to prevent infringement, Cox planned to invoke the DMCA's "safe harbor" defense to liability.  PX 2068.0001; PX 1378.0001; PX 2029.0001.  But the safe harbor required termination of repeat infringers in appropriate circumstances.  *See* 17 U.S.C. § 512(i).  And Cox did not want to terminate subscribers, who were worth more than $100 a month on average.  Dkt. 721 at 1090-94.  As Cox's Senior Lead Abuse Engineer explained, "for DMCA –

we don't want to lo[]se the revenue."  PX 1355.0001; *see also* PX 1358.0001.

To claim the safe harbor without losing profitable subscribers, Cox implemented a sham termination policy under which "DMCA Terms are not really "terminations."  PX 2060.0001. Cox pretended to terminate repeat infringers so that it would be able to claim safe harbor in court but actually reactivated those subscribers with a "clean slate" so that they could continue to infringe.  PX 2068.0001; PX 1378.0001.  Jason Zabek, Cox's abuse group manager and executive responsible for handling infringement on Cox's network, instructed his team that "DMCA = reactivate."  PX 1388.0001; PX 1382.0001 ("in 99% of the cases we are going to turn the customer back on").  "[T]o receive protection under the sa[f]e harbor," Cox leadership had their staff "just click[] Terminate and Update Ticket, which shows a Termination in the Customer's Ticket History" without "actually terminating the service."  PX 2029.0001; PX 1827 ("just use the AUP and call it a termination").  Approving reactivation of a "habitual abuser" who was "terminated" multiple times, Zabek stated "we need the customers."  PX 1984.0001.

Eventually, Cox simply did not terminate subscribers for copyright infringement.  Cox went from "terminating" 15.5 infringing subscribers a month (all reactivated) to terminating less than one a month, almost all (if not all) of whom were excessive bandwidth users or had failed to pay their bills on time.  *See* PX1610.25-27; Dkt. 324 at 16; Dkt. 398 at 11.  Cox continued its policy that "we didn't want to lose the revenue . . . but if the gross bandwidth abusers are costing us way more than we are making from them, it makes sense to terminate" – "that's supposed to be the driver, that they cost more than we make from them."  PX 1358.0001; *see also* PX-1446.0001 ("This Customer pays us over $400/month and if we terminate their internet service, they will likely cancel the rest of their services.").  Cox did not terminate profitable infringers of

whom its abuse staff observed:  "well aware of his actions" and has had "years of doing this,"

"knows 'it's his fault,'" and "will likely fail again."  PX 2589; PX 2036; PX-1453.

As the Court held on summary judgment, this "record strip[s] Cox of any innocence" and

"make[s] clear that it was Cox's policy to intentionally circumvent the DMCA."  Dkt. 703 at 35-

36.  Cox's own abuse manager Zabek put it:  "F . . . the dmca!!!"  Intending to mount a sham

safe harbor defense, Cox ignored every single one of BMG's infringement notices.  Zabek

"really hope[d] [that Rightscorp would] push this and threaten to sue us" and "would dig going

to court and either shoving it in there [sic] face or destroying the DMCA."  PX-1392.0001.

**B.      Cox Knew Discovery Would be Extensive and Obstructed Discovery into its Procedures for Handling Infringement**

BMG filed suit in November 2014.  Allan Decl. ¶ 3.  Seeking an expansion of the

discovery schedule, Cox argued that the "enormous" "scale of th[e] alleged infringement" and

"the complexity of the factual and legal issues" in this "exceptional case" would raise "unique

and extraordinary discovery issues."  Allan Decl. ¶¶ 4, 5; Dkt. 42 at 1; Dkt. 44 at 1-3, 6.  Cox

explained that "that discovery . . . w[ould] be voluminous and highly technical" regarding

Rightscorp's system for detecting copyright infringement, the millions of notices of infringement

at issue, and Cox's processes for handling such notices.  Dkt. 42 at 3.  Because Cox sought

discovery of Rightscorp's computer system while BMG sought discovery of Cox's CATS system

for handling infringement notices, "this action present[ed] the unusual circumstance in which

each side [sought] to take source code discovery from each other."  Allan Decl. ¶ 5; Dkt. 44 at 8.

Meanwhile, the Parties' "numerous requests for voluminous document production" further

"render[ed] this case exceptional."  Allan Decl. ¶ 5; Dkt. 44 at 10-11.

Once discovery commenced, however, Cox refused to comply with its discovery

obligations, interfered with BMG's efforts to develop its case, and forced near constant

discovery litigation, beginning with a refusal to provide even basic financial information.  Allan Decl. ¶¶ 11, 13-18.  The major thrust, however, of Cox's discovery practice was to impede BMG's efforts to understand Cox's copyright infringement procedures and to hide Cox's practice of reactivating supposedly "terminated" repeat infringers.  Cox served sworn interrogatory responses in which it claimed to have terminated hundreds of subscribers who were not in fact terminated and who never lost their internet service.  Allan Decl. ¶ 30; PX-1610.0023-0027.  In those same responses, Cox also failed to reveal other policies, such as its "blacklisting" of many copyright holders, despite having been asked to "[d]escribe in detail, any policies and/or procedures concerning, referring, or relating to, [y]our process and protocol for reviewing, receiving and handling DMCA Notices."  PX-1610.10.  Cox did not serve further interrogatory responses containing critical detail until well after BMG had deposed key Cox personnel.  Allan Decl. ¶ 30; PX-1614.7, 9; PX-1622.9-11, 16.

Cox also failed to identify millions of infringement notices that it received but deleted in response to BMG's interrogatory asking Cox to identify the number of infringement notices it received.  Allan Decl. ¶ 31.  In response to BMG's interrogatory, Cox misleadingly identified only infringement notices that it accepted into CATS.  Allan Decl. ¶ 31; PX1610.0015-0017.  Cox's response gave the impression that it took substantive action on a much greater proportion of infringement notices than it actually did.  Allan Decl. ¶ 31.  Only after BMG confronted Cox with evidence that Cox had received many more infringement notices that it had identified, did Cox concede that it had excluded infringement notices that Cox had auto-deleted, such as notices from blacklisted claimants.  Allan Decl. ¶ 31.  Over four months after Cox's response was due, Cox finally supplemented its answer to include the millions of deleted notices.  Allan Decl. ¶ 31; PX.1622.0013-0016.

Cox also sought to delay or avoid production of critical documents concerning its handling of copyright infringement.  Allan Decl. ¶ 21.  Cox refused to produce CATS ticket histories or other records that document the actions (or lack thereof) it took against repeat infringers.  Allan Decl. ¶ 21.  When BMG moved to compel, Cox pointed to a 4,000 page log buried in its production, which it claimed consisted of customer service notes for all customers terminated as a result of copyright infringement.  Allan Decl. ¶ 21.  Cox characterized this as the "information that . . . Plaintiffs would find the most pertinent and useful."  Dkt. 180 at 4.  In fact, Cox had produced the information Cox thought would be useful *to its own defense* – records of (sham) terminations that it planned to invoke when claiming to satisfy the eligibility requirements for a DMCA "safe harbor."  *See* 17 U.S.C. § 512(i); Dkt. 510 at 49:16-20.  Cox did not produce records of subscribers that it did not terminate and on which BMG might rely to show that no DMCA safe harbor would apply.

Without complete and proper records, BMG had to fall back on the time-consuming task of piecing together subscriber histories from internal Cox emails and those scattered CATS records that made it into Cox's production (such as where a CATS screenshot had been pasted into an internal Cox email).  Allan Decl. ¶ 22.  Cox made even this more difficult by redacting ICOMS and CATS ticket ID numbers from many of the emails it produced.  Allan Decl. ¶ 23.  That substantially impeded BMG's ability to collate different records by subscriber, trace subscriber histories, and demonstrate that Cox abuse staff repeatedly allowed the most egregious habitual abusers to remain online though they ignored repeated admonitions to stop infringing.

Cox also delayed production of key documents until late in the discovery period – slowing BMG's ability to discover Cox's actual policies and preventing BMG from using many emails and other documents in key fact witness depositions.  Allan Decl. ¶ 24.  In a March 4,

2015, motion to extend the discovery deadline, Cox represented that it would produce documents on a rolling basis, with its production substantially complete by May 7.  Dkt. 42 at 4, 42-1 at 2.  But by the end of March, Cox had produced less than 10 documents.  Allan Decl. ¶ 25.  In correspondence, Cox's counsel described this as their "rolling production."  Dkt. 60-3.  Only after BMG moved to compel did Cox agree to make document productions on a weekly basis going forward.  Allan Decl. ¶ 25; Dkt. 65.

Nonetheless, Cox did not meet the substantial completion deadline, even after receiving a further extension to May 14.  Allan Decl. ¶ 26.  Many important documents were not produced until after crucial depositions of Cox's abuse staff and 30(b)(6) witnesses, which took place in May and early June.  Allan Decl. ¶¶ 26, 27.  Cox continued to produce documents throughout the discovery period and into the end of August – well after the conclusion of fact witness depositions and even after expert discovery.  Allan Decl. ¶ 26.  For example, Cox delayed producing network management reports reflecting the volume of BitTorrent traffic on its network.  Allan Decl. ¶ 28.  Cox had promised to produce these reports by May 14, 2015.  Allan Decl. ¶ 28; Dkt. 66 ¶ 5(c).  But Cox produced only thirteen such reports and failed to produce many of the documents that were described by its own witnesses in their depositions.  Allan Decl. ¶ 28; Dkt. 184 at 6-7.  When BMG moved to compel, Cox denied that these documents existed.  Allan Decl. ¶ 28; Dkt. 180 at 9-12.  It did not produce the materials until the Court granted BMG's motion, by which time it was too late to use them in depositions or incorporate them into expert reports.  Allan Decl. ¶ 28.

Having delayed or avoided production of documents, Cox and its counsel acted to impede BMG's efforts and ability to obtain meaningful testimony from the abuse group personnel who had knowledge of its procedures for handling copyright infringement, with among other things,

extensive and disruptive objections.  Allan Decl. ¶¶ 38-39.  For example, at the depositions of just six abuse employees – Jason Zabek, Joe Sikes, Brent Beck, Matt Carothers, Randy Cadenhead, and Roger Vredenberg – counsel for Cox made a total of almost 3000 objections, including almost 1300 "foundation" objections, almost 1400 "vague and ambiguous" objections, almost 900 "speculation" objections, and almost 400"argumentative" objections.  Allan Decl. ¶¶ 38-39.  Full transcripts of the depositions of Sikes, Zabek and Carothers, with the objections highlighted, are attached to the Allan Declaration.  Allan Exhs. 2-5.

Cox's witnesses themselves evaded questions or were not forthcoming in their answers. When asked, "What's a soft termination," Cox's Senior Lead Abuse Engineer Joseph Sikes responded "I'm not familiar with that term.  I don't use that, that's not my, that's not something I'd say."  Allan Decl. ¶ 40.  After BMG counsel showed him documents in which he used that terminology, he admitted that a "soft termination" was one in which the subscriber was reactivated.  Allan Decl. ¶ 40.

Cox also refused to present a qualified Rule 30(b)(6) deponent regarding its copyright policies and procedures.  Allan Decl. ¶ 43.  Cox did not name a current member of its abuse department.  *Id.*  And its designee Matt Carothers was unprepared to discuss Cox's procedures for handling infringement notices or its policies for warning, suspending, and terminating repeat infringers.  *Id.*  Mr. Carothers admitted that Mr. Zabek, the abuse department head, would be the best source of answers to these questions.  *Id.*  Incredibly, Mr. Carothers never spoke with Mr. Zabek to prepare for his deposition.  *Id.*  And Cox refused to designate Mr. Zabek or another knowledgeable deponent.  *Id.*

Rather than allow testimony from its own percipient witnesses, Cox sought to substitute the palliative testimony of its expert William Rosenblatt.  Allan Decl. ¶ 41.  Cox had Mr.

Rosenblatt "interview" the relevant Cox witnesses and provide an alternspin explain and re-characterize damaging emails sent by Mr. Zabek and Mr. Sikes.  Allan Decl. ¶ 41.  For example, he flatly, and incorrectly, denied that Cox reactivated subscribers terminated for copyright infringement.  Allan Decl. ¶ 41; Dkt. 390 ¶ 118.  Cox's plan was to have Mr. Rosenblatt testify about Cox's procedures while making Mr. Zabek and Mr. Sikes unavailable for trial.

Cox also obstructed BMG's efforts to take discovery regarding its supposed "advice of counsel" defense, by which it sought to justify its actions.  Allan Decl. ¶ 32.  In late April, Cox responded to BMG's interrogatory on this point by stating that it "has not asserted an 'advice of counsel' defense and therefore does not at this time expect to rely on any legal opinion of counsel as a defense."  Allan Decl. ¶ 32.  Two weeks later, when seeking to extend the document production deadline to May 14, Cox told the Court that it would inform BMG "before May 8, 2015 . . . whether [it] intends to rely on an advice-of-counsel defense" and that, if so, "all responsive privileged documents . . . will be produced by May 14, 2015."  Allan Decl. ¶ 33; Dkt. 66 at 3.  No such information was forthcoming by May 14.  Allan Decl. ¶ 33.

Instead, on May 26, Cox amended its interrogatory response to identify 108 documents it would "rely on . . . that constitute or reflect legal opinions of counsel."  Allan Decl. ¶ 34.  Cox then proceeded to produce numerous additional "advice of counsel" documents on the last day of discovery and identified them as purported legal opinions only in amended interrogatory responses served on August 24, two weeks after the close of discovery.  Allan Decl. ¶ 34.  At the same time, Cox never amended its interrogatory responses to identify "advice of counsel" as a defense and refused to answer a standard contention interrogatory asking Cox to explain how its purported "reliance on an opinion of counsel" relates to the claims and defenses at issue in this litigation.  Allan Decl. ¶ 35.

**C.      Cox Attempts to Focus Discovery on Rightscorp's Conduct Rather Than Its Own**

At the same time it blocked discovery into its own policies and procedures, Cox sought to divert the focus of the litigation from its own willful contributory copyright infringement to Rightscorp's system and "Rightscorp's [alleged] business model for 'monetizing' copyright infringement."  Dkt. 95 at 10.  Cox demanded enormous discovery regarding Rightscorp and took the position that "all documents related to Rightscorp are relevant."  Dkt. 108 at 4.

To this end, Cox sought every single document in BMG's possession related to Rightscorp and served voluminous discovery on Rightscorp itself.  Allan Decl. ¶¶ 9, 10.  Though Rightscorp never had any interaction with a single Cox subscriber (the consequence of Cox's refusal to forward any Rightscorp notices), Cox requested all documents relating to all BMG and Rightscorp interactions with other internet service providers and their subscribers, including "all communications with alleged infringers and other non-Cox service providers" and "documents in relation to other ISPs."  Allan Decl. ¶ 10;  Dkt. 92 at 6.  Cox sought communications, call logs (containing the same personal information of subscribers of other ISPs that Cox had objected to producing for its own subscribers), phone scripts, handbooks, audio recordings, and other material that had nothing to do with Cox subscribers or infringement on the Cox network.  Allan Decl. ¶ 10.  Cox filed four separate motions to compel seeking additional material regarding Rightscorp's interaction with non-Cox subscribers and other ISPs.  Dkt. Nos. 92, 95, 136, 191.  Allan Decl. ¶ 13.

Cox's behavior magnified the already massive burden of discovery in this litigation.  BMG drafted briefs relating to approximately 50 discovery or sanctions motions and took or defended 28 fact witness depositions and 11 expert depositions over thirty-six days.  Allan Decl. ¶¶ 45, 35.

- 11 -

**D.  Cox Advances a Multitude of Baseless and Unreasonable Arguments and Defenses**

Once discovery was complete, Cox asserted that "no evidence supports any element of Plaintiffs' claims" and moved for summary judgment on almost every aspect of and issue in the case.  Dkt. 346 at 1.  To squeeze every possible argument into its brief, Cox compressed the line-spacing in violation of the Local Rules.  When caught, Cox claimed that it was confused about the meaning of "double-spaced," Dkt. 333 at 2, though every single document Cox filed through the first eight months of litigation maintained proper line spacing.  *See* Dkt. 334 at 1.[1]

Many of the arguments that Cox packed into its brief would have required a fundamental re-writing of copyright law.  Cox asserted that only transfers of physical copies, not electronic or online file sharing, can infringe a copyright holder's distribution right; that evidence gathered by investigators cannot be used to establish infringement; that Rightscorp's exemplary downloads of infringing files from Cox users tainted BMG with unclean hands; that *Metro-Goldwyn-Mayer Studios v. Grokster*, 545 U.S. 913 (2005), silently overruled forty years of contributory infringement law; and that BMG was required to have Cox "account holders . . . adjudged infringer[s] of any asserted work" before filing a contributory infringement suit.  Dkt. 346 at 9-11, 19, 29.  As this Court and the Copyright Office have observed, Cox's arguments are ones "courts have routinely rejected," have "no support," amount to "extreme position[s]" adopted by "no court in the United States," and "would undermine a key purpose of secondary liability claims" while making it "'impossible to enforce rights in [a] protected work effectively against all direct infringers.'"  Dkt. 703 at 44-46, 57, 69-70; REGISTER OF COPYRIGHTS, THE MAKING

---

[1] Cox also shrunk the page margins of its brief to less than the "one inch" expressly required by Local Rule 7(f)(3).  *See* Dkt. 306 at, *e.g.*, page 1 lines 4, 13-15, 22, & 23.

AVAILABLE RIGHT IN THE UNITED STATES, (Feb. 2016) at 20 available at

http://www.copyright.gov/docs/making_available/.

BMG moved for summary judgment on two issues – its ownership of the copyrights in suit and Cox's DMCA safe harbor defense.  In response, Cox denied almost every fact on which the motion was based though many were taken verbatim from Cox's interrogatory responses and internal policy and procedure documents.  Dkt. 398 at 3-12.  Cox continued to deny its policy of reactivating purportedly terminated repeat infringers and even caused its abuse manager – who had instructed his staff that "DMCA = reactivate" – to submit a sworn declaration that "termination is *termination*."  Dkt. 397 at 18.  Cox also refused to recognize BMG's ownership of copyrights where BMG was listed as a claimant on the registration.  Dkt. 398 at 25-26.

The Court denied Cox's summary judgment motion in its entirety and granted BMG's, except as to the copyrights owned by co-plaintiff Round Hill.  Dkt. 703.  It also granted BMG's motion *in limine* to exclude a mass of irrelevant evidence, including Rightscorp's interactions with customers of other ISPs that BMG had produced in response to Cox's demands.

Nonetheless, Cox continued to re-raise and re-argue many of these issues throughout trial.[2]  And, it continued to try to make Rightscorp the center of the trial, notwithstanding the Court's exclusion of irrelevant derogatory and inflammatory information about Rightscorp and its business practices.  Cox violated the Court's order excluding prejudicial portions of the deposition transcript of Christopher Sabec, and played it for the jury.  Dkt at 725 at 1311-12.

At the same time, Cox continued to do everything possible to prevent BMG from presenting evidence of Cox's practices for handling infringement on its network.  Cox refused to

---

[2] *See, e.g.*, Dkt. 306 at 17, 21, 24; Dkt. 398 at 15-16; Dkt. 709 at 138, 145-46; Dkt. 721 at 1133-34; Dkt. 724 at 1154; Dkt. 727 at 1384; Dkt. 750 at 2098, 2111; Dkt. 751 at 2126, 2272, 2274-75.

make its abuse managers Zabek and Sikes available to BMG.  Allan Decl. ¶ 43.  Cox also sought to quash BMG's subpoena to Roger Vredenberg, the one Cox witness with direct knowledge of Cox's practices who resided within the Court's subpoena power.  Dkt. 686.

Cox's told its story through a retired attorney, who was unfamiliar with Cox's actual practices, such as reactivating "terminated" subscribers and giving them a clean slate.  Dkt. 727 at 1435-43, 1447-49, 1460.  He testified that "a termination is a termination," that the difference between "soft" and "hard" termination was only a matter of procedure, and that Cox's "graduated response" to infringement did not ignore notices of infringement older than six months.  Dkt. 727 at 1385-86, 1456-57.  Cox told the jury that it would have forwarded Rightscorp's notices if they had not contained settlement offers, though it would have forwarded no more than 200 per day.  Dkt. 751 at 2200.  And Cox's attorneys told the jury that Cox had terminated 556 subscribers, though the vast majority had been reactivated or were never truly terminated at all.  Dkt. 751 at 2208.  Despite Cox's gamesmanship, the jury found that Cox committed willful contributory copyright infringement and awarded $25 million in damages.

## LEGAL STANDARD

The Copyright Act permits a prevailing party to recover its "full costs," including a "reasonable attorney's fee," where awarding fees would be "faithful to the purposes of the Copyright Act."  17 U.S.C. § 505; *Fogerty v. Fantasy*, 510 U.S. 517, 534-35 & n.19 (1994). "Several nonexclusive factors" inform the decision to award fees.  *Kirtsaeng v. John Wiley & Sons*, 136 S. Ct. 1979, 1985 (2016).  District courts must consider:  (1) the "motivation of the parties," including any "finding of willful infringement;" (2) "the objective reasonableness of the legal and factual positions advanced;" (3) "the need in particular circumstances to advance considerations of compensation and deterrence;" and (4) "any other relevant factor presented." *Rosciszewski v. Arete Associates*, 1 F.3d 225, 234 (4th Cir. 1993); *see also Kirtsaeng*, 136 S. Ct.

at 1985 ("not[in]g with approval . . . 'frivolousness, motivation, objective unreasonableness, and

. . . considerations of compensation and deterrence'").

Where recovery of fees is appropriate, a district court then determines a "reasonable" fee.

The so-called "lodestar" of this analysis is the product obtained "by multiplying a reasonable

hourly rate by the number of hours reasonably expended on the litigation." *Eastern Associated

Coal Corp. v. Director, Office of Workers' Compensation Programs*, 724 F.3d 561, 570 (4th Cir.

2013). "The lodestar amount is presumptively reasonable." *Id.* The Supreme Court has

"established a 'strong presumption' that the lodestar represents the 'reasonable' fee." *Burlington

v. Dague*, 505 U.S. 557, 562 (1992) (citations omitted).

## ARGUMENT

## I.   BMG IS THE PREVAILING PARTY

BMG prevailed in this case and obtained a $25 million jury verdict for willful copyright

infringement. *See Buckhannon Board & Care Home v. West Virginia Deptartment of Health and

Human Resources*, 532 U.S. 598, 603 (2001) ("prevailing party" is the "party in whose favor a

judgment is rendered" – the "one who has been awarded some relief by the court").

## II.   THE COURT SHOULD AWARD BMG ITS FEES

All of the factors the Fourth Circuit identified in *Rosciszewski* favor an award of fees in

this case, and a fee award will serve the purposes of the Copyright Act. Cox is a willful infringer

against whom BMG brought successful suit to vindicate its copyrights. As the Court observed in

its summary judgment decision, the "record strip[s] Cox of any innocence" and "make[s] clear

that it was Cox's policy to intentionally circumvent the DMCA." Dkt. 703 at 35-36.

Yet, enormous resources were expended to mount BMG's technologically complex case

necessary to prove copyright infringement via online file sharing and to untangle Cox's CATS

system and *ad hoc* practices for handling infringement. Cox inflated those costs through

scorched earth litigation tactics, massive discovery obstructionism, and repeated re-litigation of unreasonable legal positions long after they had been rejected by the Court.  Absent a fee award, the costs of litigation will consume much of the value of the jury's verdict.

The enormous expense of litigating against infringers such as Cox explains why rights holders so rarely bring suit to vindicate their copyrights despite the massive volume of online infringement.  Allowing successful plaintiffs to recoup the cost of litigation is essential if copyright holders are to be "encouraged to litigate meritorious claims of infringement."  *Fogerty*, 510 U.S. at 527.  Cox, not BMG, should bear the litigation costs made necessary by its willful infringement and by its conduct of this litigation.

### A.     The Parties' Motivations Support Awarding Fees

After a ten-day trial, an impartial jury found that Cox was a willful copyright infringer. The evidence overwhelmingly supported the jury's finding.  *See* Dkt. 775 at 7-13.

Cox's willfulness "weighs heavily in favor of awarding attorney's fees."  *Superior Form Builders v. Dan Chase Taxidermy Supply*, 881 F. Supp. 1021, 1024 (E.D. Va. 1994); *see also Rosciszewski*, 1 F.3d at 234 ("a finding of willful infringement or bad faith on the part of the opposing party may be considered by the district court" but is not required to award fees).  "A finding of willful infringement will support an award of attorney's fees."  *Chi-Boy Music v. Charlie Club*, 930 F.2d 1224, 1230 (7th Cir. 1991) (district court "properly awarded attorney's fees" where "the record fully supports the court's finding of willfulness").

Cox combined its willful infringement with a bad faith attempt to inoculate itself against liability for that infringement:  a sham termination policy it would use to claim a DMCA safe harbor defense.  Well aware that Cox was allowing repeat infringers – "habitual abuser[s]" – to continue to use its network to infringe, Cox's abuse department "h[e]ld on to every subscriber we can" but *pretended* to terminate repeat infringers so that, if sued, it could claim "to be in

compliance with [the] safe harbor." PX-1984.0001; PX 1378.0001. Cox's planned to claim to satisfy the DMCA safe harbor's termination requirement by pointing to "terminations" in court while in fact reactivating those repeat infringing subscribers with a "clean slate." PX-2068.0001. In many instances, Cox did not even "actually terminat[e] the service" but "just click[ed] Terminate and Update Ticket, which shows a Termination in the Customers Ticket History." PX-2029.0001. Armed with its sham DMCA safe harbor defense, Cox's abuse chief Jason Zabek said litigation is "a fight I want" and looked forward to "shoving it in [the copyright holder's] face." PX-1315.0001-02; PX-1392.0001.

By contrast, BMG sought to work with Cox to tackle the widespread infringement on its network. Dkt, 714 at 473; Dkt. 717 at 687-89, 698-99. When those efforts were rebuffed, BMG brought suit to vindicate its rights under the Copyright Act. Dkt. 709 at 164:3-6; PX1309.0001. That purpose "to vindicate rights provided by Congress in the Copyright Act" supports awarding fees. *See EMI April Music v. White*, 618 F. Supp. 2d 497, 512 (E.D. Va. 2009). "Plaintiffs should be encouraged to bring such actions where their patient and thorough efforts to try to work with an infringer have been flatly rebuffed." *Id*. The contrast between Cox's willful infringement and BMG's effort to vindicate its copyrights weighs strongly in favor of an award of fees.

### B.    The Reasonableness of BMG's Positions and the Unreasonableness of Cox's Conduct Favor a Fee Award

Each party's conduct in this litigation comported with its underlying motivations. The objective reasonableness of BMG's position is obvious from the results. *See Diamond Star Building Corp. v. Sussex Co. Builders*, 21 F.3d 59, 61 (4th Cir. 1994) (position objectively reasonable where it "was also meritorious"). By contrast, Cox adopted and persisted in a litany

of unreasonable positions long after they had been rejected by the Court.  That behavior has

"substantial weight" in favor of a fee award.  *Kirtsaeng*, slip op. at 1, 10-11.

*Sham DMCA defense*.  First, Cox tried to put its sham DMCA safe harbor plan into

effect.  Cox maintained that it "vigorously and reasonably implement[ed]" a repeat infringer

termination policy, even asserting that the Court should grant it summary judgment on the basis

of the DMCA safe harbor.  Dkt. 398 at 14, 22.  Cox filed sworn interrogatory responses claiming

to have terminated hundreds of subscribers and followed up with sworn declarations asserting

that "Termination is *termination*."  PX-1610.0023-27; Dkt. 397 ¶ 19.  In fact, the vast majority of

those subscribers were promptly reactivated or never had their service disconnected at all.  *See*

PX-2029; PX-1388, PX-1382.

Rather than acknowledge the truth about its policy of sham termination, Cox put forward

a 30(b)(6) witness with no knowledge of its procedures.  Allan Decl. ¶ 43; Dkt.  746 at 1-2.

Cox's fact witnesses were evasive when asked about the sham terminations at their depositions.

Allan Decl. ¶ 40.  Cox sought to insulate them from the jury by having its purported expert

William Rosenblatt re-interpret their emails and speak on their behalf.  Allan Decl. ¶ 41.  Though

Mr. Rosenblatt claimed to have reviewed every document Cox produced, he testified incorrectly

that all of Cox's "terminations" were for at least six months and denied that Cox would

reactivate "terminated" subscribers' accounts within two days.  Allan Decl. ¶ 41.  At summary

judgment, Cox denied reactivating repeat infringers (along with many other facts about its

policies that it had no genuine, good faith basis to dispute).  *See* Dkt. 398 at 8 ¶¶ 38-43.  Through

the end of trial, Cox continued to argue that it had terminated hundreds of subscribers for

copyright infringement without acknowledging that the vast majority of these "terminations"

were fraudulent.  Dkt. 751 at 2208.  Cox's sworn claim to have terminated hundreds of

subscribers was beyond unreasonable:  it was false.  Dkt. 703 at 30-42.

*Unreasonable non-infringement arguments*.  Cox's merits arguments regarding direct and contributory infringement were no more reasonable.  Cox argued that electronic copies are not "material objects" and that online file sharing does not satisfy the "transactional" element of the Copyright Act.  "No court in the United States . . . has adopted this extreme position."  REGISTER OF COPYRIGHTS, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES, (Feb. 2016) at 20 available at http://www.copyright.gov/docs/making_available/.  Cox argued that evidence gathering by investigators cannot establish infringement and even constitutes unclean hands – though "courts have routinely rejected [the] argument" and Cox had no case law support of its own.  *See* Dkt. 346 at 10, 29; Dkt. 703 at 45, 69-70.

Cox also argued that it could be liable for infringement only by named account holders as opposed to "someone in the subscriber's household" and that, before proceeding against Cox, BMG needed to identify each account holder by name (though Cox had destroyed the DHCP logs containing subscriber information) and have those individual Cox "account holders . . . adjudged infringer[s] of any asserted work."  Dkt. 346 at 9-10, 19.  As the Court recognized, this "would undermine a key purpose of secondary liability claims," which is to create a remedy where practical difficulties make it "'impossible to enforce rights in the protected work effectively against all direct infringers.'"  Dkt. 703 at 44 (quoting *Grokster*, 545 U.S. at 529-30); *see also In re Aimster Copyright Litigation*, 334 F.3d 643, 645 (7th Cir. 2003).

Finally, Cox persisted in arguing that the Supreme Court's decision in *Grokster* silently overruled the longstanding *Gershwin Publishing v. Columbia Artists Management*, 443 F.2d 1159, 1162 (2d Cir. 1971), standard for contributory infringement and limited contributory infringement liability to affirmative inducement.  As the Court held, there is "no support for

Cox's reading of *Grokster*," which has been rejected by every court to address it.  Dkt. 703 at 57; *see also* 3 *Nimmer on Copyright* § 12.04(A)(4)(b), (5)(a).

*Dishonest factual claims.*  When it did move beyond these legal smokescreens, Cox's few attempts to defend its actual conduct were deeply misleading.  In its closing, Cox insisted that it would have forwarded Rightscorp's notices had Rightscorp removed the settlement language.  Dkt. 751 at 2200.  But Cox would not have forwarded Rightscorp's notices absent settlement language:  had Rightscorp's notices gone into Cox's system fewer than one percent would have been forwarded to subscribers.  Dkt. 750 at 2068, 2069.  Cox also claimed that its system for handling infringement was "96 percent effective at causing people to stop receiving notices after five contacts."  Dkt. 751 at 2205.  But Cox never made any study of the further conduct of those subscribers who received five (or fewer) notices nor performed any analysis of whether they stopped infringing.  Cox's 96% statistic showed only that 96% of infringers never advanced past level five of its graduated response *regardless of how much they infringed* – thanks to Cox's notice filtering procedures and six-month rolling window for counting notices.  Dkt. 725 at 1355.

Cox turned "open wifi" into a theme of its opening and closing.  Cox repeatedly showed a demonstrative with wifi "poachers" parked in a van torrenting music over a stranger's internet connection.  Dkt. 709 at 146; Dkt. 750 at 2202, 2207, 2247.  But Cox offered no evidence in trial of anyone using a subscriber's open wifi to steal music or even any significant subscriber open wifi use on the Cox network.  Even Cox's own abuse manager had dismissed the idea of widespread infringement by non-subscribers – "[h]ere is my take, there is no one out there sitting in a van downloading movies" – and described open wifi as a convenient way for infringers to disclaim responsibility for their infringement.  PX-2310; *see* PX-2183 ("they can always claim 'Open Wi-fi' in court if they need to. That might work. ;-)").  By the time Cox subscribers were

eligible to be considered for termination, they had been instructed to password-protect their wifi at least six times.  Cox's open wifi defense was a sham.

Cox also made a host of misleading claims about Rightscorp in an effort to distract from its own willful infringement Cox strongly implied that something was wrong with Rightscorp's system because, of "7.6 million notices" sent on behalf of BMG, "there are only 1.8 million involved in this case."  Dkt. 751 at 2222.  Cox was aware that the "missing" notices related to works not in suit and had nothing to with the accuracy of Rightscorp's system.  But it told the jury that "5.8 million notices just disappeared . . . Where did they go?  They haven't said" and asked "What does BMG know about the accuracy of this system, where 75 percent of the notices they themselves won't stand behind?"  Dkt. 751 at 2222-23.

*Persistence in unreasonable positions*.  Cox persisted in re-litigating these and other issues over and over, well beyond what was needed to preserve them for appeal.  This scorched earth effort to litigate and re-litigate every aspect of the case, long after decisions by the Court, was a hallmark of Cox's strategy.  Cox made its arguments about wifi poaching, named account holders, and individual court judgments again and again.[3]  It claimed to have terminated 556 subscribers for copyright infringement long after court had found that those "terminations" were an "absolute mirage."  Dkt. 751 at 2208; Dkt. 703 at 35.  Cox re-argued its re-interpretation of *Sony* and *Grokster* near constantly, even after the Court disposed of Cox's position on summary judgment.

As this Court said of similar conduct in the *Superior Builders* case, "defendants persisted in their position . . . and continued to contest every aspect of the case, whether such argument was tenable or not.  The court had to review repeatedly its previous legal rulings with defense

---

[3] Dkt. 709 at 138, 145-46; Dkt. 724 at 1154, 1177; Dkt. 727 at 1384, 1404.

counsel.  Because the legal and factual positions of defendants were not objectively reasonable, particularly after the court denied summary judgment, this factor also weighs in favor of a fee award."  *Superior Form Builders*, 881 F. Supp. at 1024.

    **C.**    **Fee-Shifting Will Compensate BMG and Deter Further Infringement by Cox**

Cox's behavior also implicates the compensatory and deterrent purposes of fee shifting. "Awarding attorney's fees and costs in copy infringement actions likely will have a deterrent effect on present and future infringers."  *Quantum Systems Integrators v. Sprint Nextel Corp.*, 2009 WL 3423848, *3 (E.D. Va. Oct. 16, 2009).  Meanwhile, "encourage[ing] and reward[in]g [successful plaintiffs] who prevent copyright infringement . . . [and] [a]warding attorney's fees in copyright infringement situations can only promote this interest."  *Id.*  These considerations are especially weighty here.

Compensating successful plaintiffs is critical in the BitTorrent context, where the massive volume of on online copyright infringement far exceeds the ability of copyright holders to protect their rights.  Evidence in this litigation showed that Cox is a willful contributor to copyright infringement extending far beyond the BMG copyrights at issue.  Cox ignored millions of infringement notices from other copyright holders through application of the very policies and procedures that the jury found to be willful contributory copyright infringement.  PX1622.0013-16.  Yet, Cox has been sued only by BMG and Round Hill.

The reason is the enormous cost of online copyright infringement litigation.  Absent a fee award, the cost of litigating this case will eat up much of even a sizeable jury award.  Fee-shifting is essential to fully compensate BMG and to "encourage[] [rights holders] to litigate meritorious claims of infringement."  *Fogerty*, 510 U.S. at 527; *see also Superior Form Builders*, 881 F. Supp. at 1025 ("plaintiff deserves to be compensated for his attorney's fees" where "it was very costly . . . to prosecute an intellectual property case").

An award of fees is also essential to deter Cox, which has attempted to take advantage of the financial disincentive to sue.  Rather than act against known repeat infringers, Cox stonewalled rights holders on the theory:  "let them sue."  PX1319.0001.  Once in litigation, Cox sought to immunize its willful infringement and deter future challenges to its conduct through a sham "safe harbor" defense and scorched-earth tactics that further increased the cost of litigation.  Cox forced BMG to litigate and re-litigate every conceivable issue and engaged in a campaign of massive discovery obstructionism to drive up the cost of litigation and obscure its willful infringement.  Placing the cost of its litigation strategy (and of its infringement) on Cox is the only way to deter Cox and others from engaging in similar behavior going forward.

## III.   THE COURT SHOULD AWARD BMG ITS FULL COSTS AND FEES

Because fee-shifting is appropriate, the next step is to determine the proper fee.  "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," which "will include compensation for all hours reasonably expended at market rates in the relevant community."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983); *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).[4]  Thus, the "guiding light of [] fee-shifting jurisprudence" is "the 'lodestar figure'" – "the product of reasonable hours times a reasonable rate."  *City of Burlington*, 505 U.S. at 559, 562.  There is a "strong presumption that the lodestar represents the reasonable fee."  *Id*. at 562; *see also Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1672 (2010).  The "lodestar method . . . roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."  *Perdue*, 130 S. Ct. at 1672.

---

[4] "Principles construing what constitutes a 'reasonable fee' apply uniformly to federal fee-shifting statutes."  *Eastern Associated Coal*, 724 F.3d at 570 n.3; *see also Fogerty*, 510 U.S. at 534 (applying *Hensley* to fee-shifting under the Copyright Act).

**A.      Steptoe's Adjusted Rates Are Reasonable and Comport with those Prevailing in the Market**

Reasonable rates are those that prevail within the relevant legal community for lawyers of similar skill, experience, and reputation.  *See Perdue*, 130 S. Ct. at 1672; *Blum v. Stenson*, 465 U.S. 886, 895 & n.11, 898 (1984).  The inquiry is "best guided by what attorneys earn from paying clients for similar services in similar circumstances.  While evidence of fees paid to attorneys of comparable skill in similar circumstances is relevant, so too is the rate actually charged by the petitioning attorneys."  *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).  Here, BMG seeks a fee award based on hourly rates that are discounted from Steptoe's normal market rates and that are consistent with the prevailing rates in this District.

The ability to command rates in the marketplace demonstrates that they are reasonable. *See Rum Creek*, 31 F.3d at 175 ("[M]arket rates may be proved by the rate which clients normally and willingly pay the petitioning attorneys.").  BMG has calculated its fee request by applying a five percent discount to Steptoe & Johnson's minimum hourly rates in 2015. Steptoe's rates are based on market conditions and are regularly charged to and paid by Steptoe's clients in the normal course of business.  Imposing a five percent discount on the lowest of Steptoe's customary rates ensures that the hourly rates BMG has requested are reasonable and consistent with the rates that Steptoe commands in the marketplace.

In fact, the Fairfax County Circuit Court recently held that Steptoe's rates – without any discount – are reasonable.  *See*, Declaration of Jeremy Engle, September 30, 2016.  Steptoe's discounted rates also fall within the range of rates that this Court found reasonable in *Vienna Metro v. Pulte Home Corp.*, No. 10-cv-502, Dkt. 263 (E.D. Va. Aug. 24, 2011).  In *Vienna Metro*, Craig C. Reilly, an experienced litigator in this Court who serves as Cox's local counsel in this matter, performed a survey and prepared a detailed chart of market rates in 2010 and

2011.  *Id*. at 12.  The Court concluded that Mr. Reilly was an "expert[] . . . familiar with . . .

practice in the Eastern District of Virginia" and that his chart accurately reflected prevailing rates

in this District."  *Id*. at 11.  In subsequent cases, this Court has found repeatedly that the *Vienna*

*Metro* rates reflect prevailing market rates in the Alexandria Division.  *See Taylor v. Republic*

*Services*, 2014 WL 325169 (E.D. Va. Jan. 29, 2014); *Mitile v. Hasbro*, No. 1:13-cv-451, 2013

WL 5525685 (E.D. Va. Oct. 3, 2103); *Tech Systems v. Pyles,* No. 1:12-cv-374, Dk. 157 at 11

(E.D. Va. Aug. 6, 2013).

   Steptoe's rates are thus well within current prevailing market rates in the Northern

Virginia legal community.  Accompanying this fee petition is a declaration from an experienced

local practitioner with knowledge of the legal market.  *See Robinson v. Equifax Information*

*Services*, 560 F.3d 235, 245 (4th Cir. 2009) ("[A]ffidavits of other local lawyers who are familiar

both with the skills of the fee applicants and more generally with the type of work in the relevant

community" are "[e]xamples of the type of specific evidence that we have held sufficient to

verify the prevailing market rates.").  N. Thomas Connally III is a partner in the McLean,

Virginia office of Hogan Lovells and has practiced law in Northern Virginia for 23 years.

Connally Decl. ¶ 1.  He confirms that Steptoe's rates are reasonable and consistent with rates

prevailing in the market today.  Connally Decl.  ¶¶ 5-14.

   The difficulty and complexity of this case justify premium hourly rates.  According to

Cox, this is an "exceptional case" that "is extraordinary in scope" – involving a "layer of

complexity . . . not found in most cases."  Dkt. 42 at 1, 3; Dkt. 44 at 6, 8.  This litigation involved

unique technical issues arising from Rightscorp's computerized method of identifying

infringement, the hundreds of thousands of infringers identifiable only by IP address, and Cox's

complex CATS system for managing repeat infringers on its network.  As a result, the case

involved "voluminous and highly technical" discovery.  Dkt. 42 at 3, 44 at 8.  Counsel for BMG

had to prepare, present, and cross-examine fact and expert witnesses on highly technical matters

rarely implicated by copyright litigation.

At the same time, the case raised complex issues regarding the scope of secondary

copyright liability and the DMCA's "safe harbor" defenses – all compounded by the scope of the

infringement at issue.  BMG proved millions of infringements of nearly 1,400 copyrights by

countless Cox subscribers.  As Cox put it, "this case far exceeds the routine case in scope and

substantive legal and factual issues."  Dkt. 44 at 1-3.  Few counsel have the combination of

copyright and technical expertise necessary to take such a case from complaint to verdict in little

over a year, and a fee award should be consistent with the rates they command in the market.

> **B.     The Hours Requested Are Reasonable Given the Scope and Intensity of the
> Litigation and Reflect the Proper Exercise of Billing Judgment**

The complexity and scope of this litigation required not only skilled counsel but also the

devotion of substantial time and effort in discovery, pre-trial motions practice, and at trial.  Allan

Decl.  ¶ 50.  To determine the reasonable hours required to win this case, BMG's lead counsel

Michael Allan reviewed all of the hours recorded by Steptoe time-keepers.  Through the

aggressive exercise of billing judgment Mr. Allan eliminated all of the following categories of

time entries:

- All time entries from attorneys and paralegals who billed fewer than 100 hours to the case as well as all time recorded by an attorney who left the firm before the complaint was filed.  These entries total more than 500 hours valued at approximately $240,000. Allan Decl. ¶ 103.

- All time devoted to the case by research librarians, totaling 65.75 hours worth almost $20,000.  Allan Decl. ¶ 104.

- Time judged to be arguably duplicative, excessive, or unnecessary, time that team members who joined the case after filing devoted to learning the case or familiarizing themselves with the applicable law, and time attributable to travel or all time that exceeded a set number of hours in a day, amounting to 787.44 hours, worth over

$460,000.  Allan Decl. ¶ 105.

- Time devoted to issues specific to Round Hill, amounting to 373 hours valued at $208,243.20.  Allan Decl. ¶ 106.

- All time after the verdict.  Allan Decl. ¶ 107.

After these reductions BMG further reduced the remaining time to account for block billing as well as any excessive or duplicative entries that Mr. Allan's review may have missed.  Allan Decl. ¶ 113.

The remaining 20,020 hours are quite reasonable given the extraordinary pace and scope of this litigation, which involved:

- Numerous discovery requests and discovery into the source code of two sophisticated computer systems.

- 36 depositions of 28 witnesses for approximately 270 hours.

- Preparation of 6 expert reports by 6 experts and response to 5 reports by 5 Cox experts followed by expert depositions.

- Establishing title to nearly 1,400 copyrighted works.

- Cross-motions for summary judgment regarding ownership of the almost 1,400 copyrighted works, DMCA safe harbor, direct infringement, secondary copyright liability, unclean hands, mitigation of damages, all resulting in a seventy-page, published summary judgment decision.

- Briefing of over 50 motions.

- Preparation for cross-examination of 7 witnesses listed on Cox's exhibit list.

- Ten days of trial involving 16 witnesses.

- Three substantial post-trial motions.

Mr. Kelley, who was co-counsel to Steptoe, is also submitting his fees and expenses, as shown in the September 30, 2016 Declaration of Walter Kelley ("Kelley Decl.").  Mr. Kelley is seeking $482,244 in fees and $2,771.48 in expenses.  Kelley Decl. ¶¶ 8-9.

Given the scale of the litigation, BMG leanly staffed and litigated this case.  For example,

BMG sent only one attorney to most depositions and never more than two.  By contrast, Cox had

sent six people to one deposition.  Allan Decl. ¶ 36.  Cox's vexatious behavior inflated the time

and expense associated with the litigation.  "Being largely responsible for the amount of

[BMG's] attorney's fees, it is only fair that [Cox] bear the cost of their actions by paying those

fees."  *Superior Form Builders*, 881 F. Supp. at 1025.  BMG's hours are quite reasonable given

scope, speed, scale, and intensity with which this case was litigated and the roadblocks that Cox

attempted to erect.  BMG's fee request reflects the aggressive use of billing judgment to ensure

that it seeks no extraneous or unnecessary time.  The Court should approve this request so that

BMG obtains a "fully compensatory fee."  *Hensley*, 461 U.S. at 435.[5]

### C.      BMG Is Entitled to Recover Its Expenses, Including Expert Witness Fees

The Copyright Act permits awards not only of fees but of "full costs."  17 U.S.C. § 505.

The statute's use of the term "full costs" means that "district courts may award otherwise non-

taxable costs, including those that lie outside the scope of [28 U.S.C.] § 1920, under § 505."

*Twentieth Century Fox Film Corp. v. Entertainment Distributing*, 429 F.3d 869, 885 (9th Cir.

2005).[6]  Those include travel costs, expert witness fees, and legal research costs.  *Perfect 10 v.*

*Giganews*, No. CV 11-07098, 2015 WL 1746484, at *6 (C.D. Cal. Mar. 24, 2015).

---

[5] It is unclear whether the twelve (non-exclusive) factors described in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), remain applicable in the wake of *Perdue*, 559 U.S. at 542.  *See McAfee v. Boczar*, 738 F.3d 81, 89-90 (4th Cir. 2013).  Regardless, "to the extent that any of the *Johnson* factors has already been incorporated into the lodestar analysis, we do not consider those factors a second time."  *Id*. at 89.  Here, each *Johnson* factor is reflected in the lodestar analysis and each supports a fully compensatory award.  *See Pfieffer v. Schmidt Baking Co*., No. CIV. CCB-11-3307, 2014 WL 1291814, at *5 (D. Md. Mar. 28, 2014) ("find[ing] no need to adjust the lodestar amount.").

[6] There is a Circuit split on the question of whether the term "full costs" in Section 505 allows cost not taxable under 18 U.S.C. § 1920.  But Courts must give effect to the plain meaning of the term "full costs" and to the contrast in language between the specific costs listed in Section 1920 and the use of the term "full costs" in Section 505.  The term "full costs" in Section 505 would have no effect if limited to those costs already available via Section 1920.

The costs BMG requests are reasonable.  BMG attorneys purchased the cheapest airfare available, including non-refundable tickets where available.  Similarly, BMG's experts spent far less than their Cox counterparts.  For example, Cox's damages expert Ryan Sullivan billed more than $1.3 million before trial.  Dkt. 733 at 1737:17-25.  Cox's all-purpose expert William Rosenblatt billed between $400,000 – $500,000 prior to his first deposition.  In contrast, BMG's damages expert, William Lehr, and expert Terry McGarty, who analyzed Cox's CATS system, and their support staff, charged approximately $1.1 million through trial. Allan Decl. ¶ 125.  And a substantial portion of BMG's expert fees – those attributable to its statistical expert Robert Bardwell – were necessary only because Cox had destroyed its DHCP records of subscriber IP address assignments.  The Court should "fully compensat[e]" BMG by awarding its "full costs." *Hensley*, 461 U.S. at 435; 19 U.S.C. § 505.

## CONCLUSION

For the foregoing reason, the Court should award BMG $10,479,335.08 in fees and $2,920,643.76 in expenses.

<div style="margin-left: 40%">

Respectfully submitted,

/s/ Jeremy D. Engle

Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902

Walter D. Kelley, Jr. (VSB No. 21622)
HAUSFELD, LLP
1700 K Street, NW
Washington, DC 20006
Tel:  (202) 540-7157
Fax:  (202) 540-7201

</div>

*Of Counsel*
Michael J. Allan (admitted *pro hac vice*)
William G. Pecau (admitted *pro hac vice*)
John M. Caracappa (admitted *pro hac vice*)
Roger E. Warin (admitted *pro hac vice*)
Jeffrey M. Theodore (admitted *pro hac vice*)
Stephanie L. Roberts (admitted *pro hac vice*)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Michael O. Crain
Crain Law Group, LLC
The Bottleworks
297 Prince Avenue, Suite 24
Athens, Georgia  30601
Tel. (706) 548-0970
Fax: (706) 369-8869

*Counsel for Plaintiffs*

Date:  September 30, 2016

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2016, I electronically filed a true and correct copy of the foregoing using the Court's CM/ECF system, which then sent a notification of such filing (NEF) to all counsel of record:

Craig C. Reilly (VSB No. 20942)
craig.reilly@ccreillylaw.com

/s/ Jeremy D. Engle
Jeremy D. Engle (VSB No. 72919)
jengle@steptoe.com
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave, NW
Washington, DC 20036
Tel.:  (202) 429-3000
Fax:  (202) 429-3902