**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **BMG RIGHTS MANAGEMENT** | ) | |
| **(US) LLC, and ROUND HILL** | ) | |
| **MUSIC LP** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:14-cv-1611(LO/JFA) |
| | ) | |
| **COX COMMUNICATIONS, INC.,** | ) | |
| **COXCOM, LLC** | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF MICAHEL J. ALLAN IN SUPPORT OF PLAINTIFF BMG'S**
**PETITION FOR ATTORNEYS' FEES AND EXPENSES**

I, Michael J. Allan, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am a partner in the law firm of Steptoe & Johnson LLP ("Steptoe"), counsel of

record for Plaintiff BMG Rights Management (US) LLC ("BMG").  I am admitted to practice in

the District of Columbia, New York and South Carolina (inactive).  I submit this declaration in

support of BMG's petition for an award of attorneys' fees and expenses.  I was lead counsel for

BMG in this matter and oversaw the work done by all Steptoe attorneys and staff.  I have

personal knowledge of the matters described in this declaration.

**A.     Overview of the Litigation**

2.     BMG retained Steptoe to address the ongoing infringement of its copyrights on

the Cox network.  In preparation for the filing, several Steptoe lawyers worked diligently to

review data collected by BMG's agent, Rightscorp, to support its claims in the case.  In addition,

we worked with BMG to conduct pre-suit analysis of the voluminous copyrights that were

infringed on the Cox network.

3.     On November 26, 2014, Steptoe filed a complaint against Cox on behalf of BMG, for contributory infringement and vicarious infringement of BMG's copyrights.

4.     Anticipating the burden and volume of discovery, both Parties sought an expansion of the discovery schedule.  Cox noted the scope of this case early on and "respectfully submit[ted] that the central discovery issues in this unusual case are unprecedented and as yet unpredictable" and the "case also is extraordinary in scope – for a copyright infringement case in particular."  Dkt. 42 at 3; Dkt. 44 at 8.  Further noting the "enormous" "scale of th[e] alleged infringement" – including millions of incidents of infringement alleged, hundreds of thousands of repeat infringers responsible, and more than one thousand copyrights at issue – Cox explained that "this case far exceeds the routine case in scope and substantive legal and factual issues."  Dkt. 44 at 1-3.

5.     In its brief supporting a discovery extension, Cox described the complexity of the factual and legal issues in this "exceptional case" and the extraordinary discovery issues that it would entail.  Dkt. 44 at 6.  Cox explained that this case was extraordinary due to the number of works at issue, that experts were needed to review the source code, and the voluminous document production.  Dkt. 44 at 8-9.  Because Cox sought discovery of Rightscorp's computer system while BMG sought discovery of Cox's CATS system for handling infringement notices, "this action present[ed] the unusual circumstance in which each side [sought] to take source code discovery from each other," which "add[ed] a layer of complexity . . . not found in most cases."  Dkt. 44 at 8.  The Parties' "numerous requests for voluminous document production" further "render[ed] this case exceptional."  Dkt. 44 at 10-11.

6.     The Court agreed to extend the discovery deadlines so that Parties could most efficiently sequence discovery, with sufficient time for document production to occur before fact

witness depositions and expert discovery to follow fact discovery.  Dkt. 42 at 4-5; Dkt. 44 at 11-12; Dkt. 49 at 1.

7.      Discovery commenced on March 11, 2015 when the Court issued its initial scheduling order.  Discovery was substantial.  Cox served 125 documents requests on BMG and 86 on its agent Rightscorp.

8.      Cox sought to focus the litigation on "Rightscorp's [alleged] business model for 'monetizing' copyright infringement" rather than Cox's own willful contributions to its subscribers' copyright infringement.  Dkt. 95 at 10.  To this end, Cox demanded extraordinary discovery of Rightscorp, reaching all of its operations and every aspect of its business.  Cox took the position that "all documents related to Rightscorp are relevant."  Dkt. 108 at 4.

9.      Cox sought virtually all Rightscorp related documents.  *See e.g.,* Exhibits 8-10; Dkt. 136-1.

10.      Cox demanded a broad range of documents from Rightscorp touching nearly every aspect of the small company.  For example, Cox demanded all documents relating to BMG and Rightscorp's interactions with other internet service providers and their customers, including "all communications with alleged infringers and other non-Cox service providers" and "documents in relation to other ISPs," even though Rightscorp never had any interaction with a single Cox subscriber (the consequence of Cox's refusal to forward any Rightscorp notices).  Dkt. 92 at 6; *see also* Exhibit 8 at 6; Exhibit 10 at 6.  Cox sought communications, call logs, phone scripts, employee handbooks, audio recordings, and other material that had nothing to do with Cox subscribers or infringement on the Cox network.  *See, e.g.*, Dkt. 95; Dkt. 136; Dkt. 191; Exhibit 8 at 8, 12; Exhibit 9 at 6.

11.     Ironically, many of these Rightscorp communications demanded by Cox contained the same personally identifiable information of other ISPs' customers that Cox refused to produce regarding the repeat infringers on its own network that were the subject of this litigation.

12.     BMG regarded much of this material as irrelevant – and it was ultimately excluded from trial.  Dkt. 691.  Nonetheless, BMG did its best to comply with Cox's requests. To reduce the expense of document review, Steptoe used its Complex Litigation & Discovery Center, located in Rockville, Maryland to conduct initial reviews.  Through this facility, Steptoe employs contract attorneys at significantly reduced billing rates to conduct legal review of documents and electronically stored information (ESI).

13.     Cox's discovery of Rightscorp was overly broad and unrelenting.  Cox repeatedly moved to compel additional Rightscorp-related information.  After serving three separate document subpoenas to Rightscorp, one corporate deposition subpoena of Rightscorp, and two deposition subpoenas for officers of Rightscorp, Cox filed four separate motions to compel seeking additional material relating to Rightscorp.  The motions to compel included Rightscorp's interaction with non-Cox subscribers and other ISPs – in stark contrast with its refusal (described below) to produce subscriber information relating to its own direct infringing customers.  Dkt. Nos. 92, 95, 136, 191.  Cox also took extensive deposition discovery of Rightcorp and each of its three principals.   In the end, Cox deposed Rightscorp's CEO, Christopher Sabec, over three days.  Messrs. Steele and Boswell were each deposed twice.

14.     Despite seeking a mass of information relating to Rightscorp and other ISPs, Cox was less forthcoming with its own discovery responses.  Cox sought to inhibit BMG's discovery into its internal practices throughout the case and engaged in a pattern obstructionist behavior

that forced BMG to brief unnecessary motions to compel and consistently increased the time and effort required to litigate the case.

15.     For example, Cox refused to produce even basic financial information, causing BMG to move to compel.  Only then did Cox agree to produce certain financial information. Dkt. 56 at 6.  Had Cox simply agreed to produce its financial data, BMG would have been spared the expense of an unnecessary motion to compel.

16.     Though a major theme of Cox's defense would be that BMG failed to prove that Cox subscribers were sharing BMG songs, as opposed to third parties poaching open wireless networks, Cox aggressively resisted BMG's efforts to obtain discovery about its own infringing subscribers.  Cox refused to identify subscribers associated with infringing IP addresses, thereby depriving BMG of all subscriber/user information beyond the Cox IP address (identified by Rightscorp) at which the infringement took place.  *See* Dkt. 72.

17.     When BMG moved to compel the subscriber identities for the top 250 infringing IP addresses, Cox argued that it could not disclose subscriber information under the Cable Privacy Act (while at the same time demanding that BMG disclose personally identifiable information regarding subscribers of other ISPs with whom Rightscorp had interacted).  Cox further argued that BMG should be made to file "John Doe" lawsuits against the various Cox subscribers who were infringing BMG's works (though the impracticability of suits against hundreds of thousands of direct infringers is the very purpose of secondary liability).  Dkt. 74 at 2-3.

18.     Judge Anderson ordered Cox to produce the identities of the top 250 infringing IP addresses.  Dkt. 78.  Cox then moved for a "clarification" of the order, in which it sought to evade the order by becoming the gatekeeper for subscriber objections.  Cox sought authority to

refuse production of information relating to those subscribers who had informed Cox that they objected to the production of their information.  Dkt. Nos. 86, 101.  Judge Anderson ordered Cox to produce those subscribers' information.  Dkt. 115.

19.     It was only in its reply brief in support of this "clarification" that Cox disclosed that it had continued to destroy its DHCP records of the subscribers to whom each IP address had been assigned on a given date after six months.  Dkt. 107 at 4-6; *see also* Dkt. 101 at 4-6.  Thus, six months into the litigation all records of the subscribers assigned to infringing IP addresses during the time period at issue had been destroyed.

20.     Cox also identified the subscribers *presently* assigned to the IP addresses and instructed those subscribers to file objections to the disclosure of their information.  *See* Exhibit 1 at 4.  Because Cox assigns IP addresses dynamically, at least some of these subscribers may have been different than those assigned the IP addresses at the time Rightscorp detected infringement.  Cox's conduct ensured not only that BMG was unable to obtain information about infringing subscribers even after briefing and arguing multiple discovery motions but that BMG and the Court were forced to respond to a flood of letters from Cox subscribers denying the infringement or even that they were Cox customers during the relevant time period.  *See* Dkt Nos. 82, 84, 85, 88, 89, 90, 118, 119, 122, 123, 124, 125.  The identification of Cox's subscribers was used to support the opinion of BMG's expert statistician.  Dkt. 723 at 977:22-978:18.

21.     Cox also resisted production of key documents regarding its procedures for handling copyright infringement.  Cox refused to produce CATS ticket histories or other records of its handling of repeat infringers.  When BMG moved to compel, Cox pointed to a 4,000 page log buried in its production that contained no explanatory information or context.  Cox characterized this as the "information that . . . Plaintiffs would find the most pertinent and

useful." Dkt. 180 at 4.  As became clear after BMG had time to study the log and ask questions about it at deposition, Cox had actually produced the information Cox thought would be useful *to its own defense* – records of (sham) terminations that it planned to invoke when claiming to satisfy the eligibility requirements for a DMCA "safe harbor."  Dkt. 510 at 49:16-20.  Thus, Cox succeeded in denying BMG discovery related to those repeat infringers whom it had decided not to terminate, notwithstanding its plan to argue that it terminated in "appropriate" circumstances for purposes of the DMCA.

22.     The absence of proper records forced BMG to piece together subscriber histories from internal Cox emails and scattered CATS records that made it into Cox's production.  Often this occurred where a CATS screenshot was pasted into an internal Cox email and then included in Cox's general documents production.

23.     Cox made this process more difficult by redacting ICOMS and CATS ticket ID numbers from many of the emails it produced.  *See e.g.,* Dkt. 317, Exhibit 44 (submitted on CD). That substantially impeded BMG's ability to collate different records by subscriber, trace subscriber histories, and demonstrate that Cox abuse staff repeatedly allowed the most egregious habitual abusers to remain online though they ignored repeated admonitions to stop infringing.

24.     Cox also delayed production of those documents it did produce.  In their initial discovery plan, the Parties had agreed that document production "shall be on a rolling basis, and document productions shall be substantially complete by May 7, 2015," prior to the start of fact witness depositions.  Dkt. 42-1 at 2.

25.     However, Cox did not produce its documents on this schedule.  By the end of March, Cox had produced only a handful of documents.  In response to queries from BMG's counsel, Cox explained that its "rolling production has begun" and that it "will have more

documents to produce this week." But Cox produced only two more documents. Dkt. 60 at 3. Only after BMG moved to compel did Cox agree to make weekly productions going forward.

26.     To give Cox more time, BMG agreed to extend the substantial completion date for document discovery until May 14. Dkt. 66. But Cox failed to comply with that deadline as well, producing over 13,000 pages after the revised substantial completion date. Cox also continued to produce documents until the end of discovery. Cox's document production after the substantial completion date was as follows:

| May 18, 2015 | COX_BMG00209881 - COX_BMG00212387 |
| May 19, 2015 | COX_BMG00212388 to COX_BMG00212423 |
| May 27, 2015 | COX_BMG00212424 to COX_BMG00218143 |
| May 28, 2015 | COX_BMG00218144 to COX_BMG00219137 |
| June 1, 2015 | COX_BMG00219138 to COX_BMG00219625 |
| June 12, 2015 | COX_BMG00219626 |
| July 2, 2015 | COX_BMG00219627 to COX_BMG00219638 |
| July 7, 2015 | COX_BMG00219639 to COX_BMG00219644 |
| July 8, 2015 | COX_BMG00219645 |
| July 13 2015 | COX_BMG00219646 - COX_BMG00219680 |
| July 14 2015 | COX_BMG00219681 -COX_BMG00220551 |
| July 21, 2015 | COX_BMG00220552 - COX_BMG00220570 |
| July 24, 2015 | COX_BMG00220571–COX_BMG00220573 |
| July 27, 2015 | COX_BMG00220574 |
| August 6, 2015 | COX_BMG00220575 – COX_BMG00220578 |
| August 7, 2015 | COX_BMG00220579 - COX_BMG00220586 |
| August 12, 2015 | COX_BMG00220587–COX_BMG00222104 |
| August 14, 2015 | COX_BMG00222105–COX_BMG00223159 |
| August 15, 2015 | COX_BMG00223160–COX_BMG00223257 |
| August 20, 2015 | COX_BMG00223258 –COX_BMG00223275 |

27.     Cox's delays interfered with BMG's ability to use documents in depositions, hindering its ability to develop its case. BMG was required to digest new information that it continued to receive throughout the discovery period and to prepare for trial with deposition transcripts that did not reflect the full scope of the documentary evidence.

28.     For example, Cox refused to produce its Procera network traffic reports, which detailed the volume of Bittorrent traffic on its network.  *See* Dkt. 389-46. When seeking its extension of the substantial completion deadline, Cox had promised to produce these reports by May 14, 2015.  Dkt. 66 ¶ 5(c).  Instead, Cox produced only thirteen such reports and denied that the remainder existed even though they had been described by its own witnesses in their depositions.  Dkt. 180 at 9-12; Dkt. 184 at 6-7.  Cox produced these documents only after Judge Anderson granted BMG's motion to compel.  By the time BMG received them in late August, it was too late to use them in depositions or expert reports.

29.     When BMG sought additional depositions in which to use Cox's late-produced documents, Cox argued that BMG had "made a strategic decision to frontload their depositions and depose CCI . . . early in the discovery process."  Dkt. 142 at 1.

30.     Cox engaged in similar behavior in its interrogatory responses.  Cox served sworn interrogatory responses in which it claimed to have terminated hundreds of subscribers who were not in fact terminated and who never lost their internet service.  PX-1610.0023-0027.  In those same interrogatory responses, Cox also failed to reveal other policies, such as its "blacklisting" of many copyright holders, despite having been asked to "[d]escribe in detail, any policies and/or procedures concerning, referring, or relating to, [y]our process and protocol for reviewing, receiving and handling DMCA Notices."  PX-1610.10.  Cox did not serve further interrogatory responses containing critical detail until well after BMG had deposed key Cox personnel.  PX-1614.7, 9; PX-1622.9-11, 16.

31.     Cox also failed to identify millions of infringement notices that it received but deleted in response to BMG's interrogatory asking Cox to identify the number of infringement notices it received.  In response to BMG's interrogatory, Cox misleadingly identified only

infringement notices that it accepted into CATS.  PX1610.0015-0017.  Cox's response gave the impression that it took substantive action on a much greater proportion of infringement notices than it actually did.  Only after BMG confronted Cox with evidence that Cox had received many more infringement notices that it had identified, did Cox concede that it had excluded infringement notices that Cox had auto-deleted, such as notices from blacklisted claimants.  Over four months after Cox's response was due, Cox finally supplemented its answer to include the millions of deleted notices.  PX.1622.0013-0016.

32.     Cox attempted to advance a supposed "advice of counsel" defense while refusing to produce both related document discovery and interrogatory responses.  In late April, Cox served interrogatory responses in which it stated that it "has not asserted an 'advice of counsel' defense and therefore does not at this time expect to rely on any legal opinion of counsel as a defense."  Dkt. 574-23.

33.     Two weeks later, when seeking to extend the document production deadline to May 14, Cox told the Court that it would inform BMG "before May 8, 2015 . . . whether [it] intends to rely on an advice-of-counsel defense" and that, if so, "all responsive privileged documents . . . will be produced by May 14, 2015."  Dkt 66 at 3.

34.     It was not until May 26, that Cox amended its interrogatory response to identify 108 documents it would "rely on . . . that constitute or reflect legal opinions of counsel."  Dkt. 574-24.  Cox then proceeded to produce hundreds of additional "advice of counsel" documents on the last day of discovery and identified them as purported legal opinions only in amended interrogatory responses served on August 24, two weeks after the close of discovery.

35.     Cox never amended its interrogatory responses to identify "advice of counsel" as a defense and refused to answer a standard contention interrogatory asking Cox to explain how

its purported "reliance on an opinion of counsel" relates to the claims and defenses at issue in this litigation.  Exhibit 11 at 4-5. In addition to document discovery, BMG took or defended 36 depositions of 28 witnesses, which amounted to approximately 270 hours of deposition testimony.  The deponents included 17 fact witnesses and corporate designees and 11 expert witnesses.

36.     Only one BMG attorney attended most depositions and never more than two.  By contrast, Cox had three or four attorneys plus an expert witness attending many depositions and sometimes more.  For example, six people (Andrew  Bridges, David  Hayes, Ciara Mittan and Armen Nercessian from Fenwick & West, Scott Lerman and expert William Rosenblatt) attended Greg Boswell's deposition on July 3, 2015; four attorneys from Fenwick & West (Bridges, Hayes, Mittan, Nercessian) and an expert (Rosenblatt) attended Robert Steele's deposition on June 11, 2015; three people from Fenwick & West (two attorneys and one summer associate) and two experts (Rosenblatt and Rucinski) attended Robert Steele's and Greg Boswell's depositions on July 29, 2015.  Four Cox attorneys (Bridges, Jobson, Hayes, and Nercessian) attended the deposition of BMG's expert Ralph Oman on August 10, 2015.  Cox's expert William Rosenblatt attended at least five depositions in the case.

37.     The depositions of Cox personnel were the subject of substantial objections.  At the depositions of the six abuse-related employees who gave testimony in the case –Jason Zabek, Joe Sikes, Brent Beck, Matt Carothers, Randy Cadenhead, and Roger Vredenberg – counsel for Cox made a total of almost 3,000 objections, including almost 1,300 "foundation" objections, almost 1,400 "vague and ambiguous" objections, almost 900 "speculation" objections, and almost 400 "argumentative" objections.

38.    Copies of the deposition transcripts of Messrs. Sikes, Zabek and Carothers, which objections highlighted, are attached as Exhibits 2-5.

39.    Cox's constant objections substantially increased the cost of discovery, necessarily increasing the time and expense of depositions and developing the facts.  For example, Cox's repeated speaking objections at the deposition of its expert William Rosenblatt made it necessary for BMG to file a motion seeking additional deposition time (which Cox opposed) and then travel to New York for an additional three hours of deposition time after Magistrate Judge Anderson granted its motion.  *See* Dkt. 233 at 5:25-6:2 ("It took 20 pages in the middle of that deposition, and you objected to 85 percent of the questions."); Dkt. 198 (Order granting 3 additional hours of deposition time).

40.    Cox's witnesses themselves evaded questions or were not forthcoming in their answers.  When asked, "What's a soft termination," Cox's Senior Lead Abuse Engineer Joseph Sikes responded "I'm not familiar with that term.  I don't use that, that's not my, that's not something I'd say."  Exhibit 2 at 191:20-192:3.  After BMG counsel showed him documents in which he used that terminology, he admitted that a "soft termination" was one in which the subscriber was reactivated.  Exhibit 2 at 192:5-196:6.

41.    Rather than allow testimony from its own percipient witnesses, Cox sought to substitute the palliative testimony of its expert William Rosenblatt.  Cox had Mr. Rosenblatt "interview" the relevant Cox witnesses and provide an alternative history of Cox's abuse procedures.  Mr. Rosenblatt attempted to explain and re-characterize damaging emails sent by Mr. Zabek and Mr. Sikes.  For example, he flatly denied that Cox reactivated subscribers terminated for copyright infringement.  Exhibit 12 at  24:12-25:7, 34:14-35:4, 37:1-11, 40:10-42:2.  Though Mr. Rosenblatt claimed to have reviewed every document Cox produced, he

testified incorrectly that all of Cox's "terminations" were for at least six months and denied that Cox would reactivate "terminated" subscribers' accounts within two days.  Exhibit 12 at 24:12-25:7, 34:14-35:4, 37:1-11, 40:10-42:2.

42.     Cox also unnecessarily increased the cost of litigation by attempting to have Mr. Rosenblatt offer expert testimony on practically every factual and legal issue in the case.   Mr. Rosenblatt submitted multiple expert reports and a lengthy affidavit in support of Cox's motion for summary judgment.  This Court ultimately excluded much of Mr. Rosenblatt's proposed testimony, Dkt. No. 691at ¶ 19, after observing that reading Mr. Rosenblatt's opinion is "almost like reading Nimmer or Menell or Goldstein on copyright law. . . ."  *See* Dkt. No. 509 at 3.

43.     Cox also refused BMG's requests that it provide a knowledgeable Rule 30(b)(6) deponent concerning Cox's policies and procedures for handling copyright infringement.  Cox's witness, Matthew Carothers, made clear on the record that he had no knowledge of Cox's practices, policies, and procedures and was not prepared to testify on those matters.  Instead, he testified that Cox's abuse manager Jason Zabek would be the most qualified witness.  Exhibit 4 at 22:20-23:1, 45:18-46:20.   Mr. Carothers failed to even speak with Mr. Zabek in preparation for his first deposition.  Exhibit 4 at 16:14-20.   He was wholly unprepared to provide corporate testimony on these key topics.  After Mr. Carothers's testimony, BMG repeatedly requested that Cox designate a knowledgeable or prepared witness to testify on these matters on behalf of the corporation, but counsel for Cox refused to do so.

44.     Cox's obstinate and improper conduct substantially increased the cost of discovery.  BMG was required to file or defend a host of unnecessary motions to compel, far beyond what would have been required by good faith litigation.  In addition, Cox's late production of documents and deposition obstructionism substantially complicated BMG's case

development and increased the amount of time BMG spent analyzing transcripts and documents and building its case.

45.     Ultimately, the parties briefed over 50 motions, involving approximately 1,500 pages of briefing.

46.     Cox's improper conduct was not limited to discovery.  In an attempt to circumvent the page limits on summary judgment briefing, Cox used less than double spacing for its brief.  Even after BMG raised the issue with Cox, Cox refused to file a proper brief, requiring BMG to file a motion to strike the brief, which the Court granted.  *See* Dkt. 335, (ordering Cox to re-file its brief within the proper page limits).

47.     Cox also attempted to submit extra summary judgment briefing through the Electronic Frontier Foundation ("EFF"), who sought to file an "amicus" brief for summary judgment.  Cox failed to disclose that its attorneys in this litigation – including its lead attorney, Mr. Bridges – serve on EFF's advisory board.  After learning of Cox's attorneys' connections with EFF, BMG opposed EFF's motion seeking leave file its amicus brief.  The Court denied EFF's motion.  Dkt. 509 at 32-33.

**B.     The Steptoe Attorneys and Professionals who Worked on this Case**

48.     Steptoe is a multi-disciplinary law firm with more than 500 lawyers and other professionals across the United States and worldwide.   Steptoe's intellectual property practice represents clients across a wide range of industries in copyright, trademark, trade secret as well as patent litigation and prosecution work.   Our intellectual property lawyers are based in Washington, New York, Palo Alto and Chicago and regularly appear in courts throughout the country, as well as within the Eastern District of Virginia.

49.     The Steptoe team representing BMG in this case was primarily based in Washington, D.C. and consisted of a number of talented lawyers, most of whom I have worked

with on other litigation matters.   As the case proceeded, additional team members were added as needed to assist as the burdens of discovery and increased motion practice.  By the end of discovery, there were multiple outstanding discovery motions at any given time.  Pre-trial motion practice included two summary judgment motions addressing every aspect of the case, multiple sanctions motions seeking dismissal, thirteen motions *in limine*, eight *Daubert* motions, and all of the ancillary papers such as declarations, exhibits, sealing motions, etc. associated with motions practice.  Many of the motions proceeded simultaneously, requiring parallel efforts and substantial staffing.

50.     Below, I describe the Steptoe attorneys and other professionals who worked on the case along with their qualifications and experience.

<u>Michael J. Allan</u>

51.     I received my J.D from Syracuse University College of Law in 1998, and my B.A. from Hamilton College in 1995.  I am an active member of the bars of New York and the District of Columbia, and am inactive in South Carolina.  I am also admitted to several federal District and Appellate Courts, including the Federal and Second Circuit Courts of Appeal, the District Court for the District of Columbia and the Southern, Northern and Eastern Districts of New York.  I have also been admitted *pro hac vice* to District Courts throughout the country.

52.     I am a member of the Litigation and Intellectual Property departments at Steptoe and currently head Steptoe's Copyright and Entertainment practice group.   In addition, I co-Chair Steptoe's Trademark practice.  I have a broad litigation focused practice that involves the prosecution and defense of trademark, copyright, trade secret, false advertising, publicity rights, and patent claims.  I have appeared as lead counsel on intellectual property cases throughout the country, before the International Trade Commission and the Trademark Trial and Appeal Board.

53.     I served as the lead partner on this case and was closely involved in the supervision of the various Steptoe team members working on this case.  Given the scope and breadth of the case, I was assisted with case oversight and attorney supervision by John Caracappa and Will Pecau.  I oversaw the litigation strategy and the implementation of that strategy.  Specifically, I coordinated all aspects of the written and fact discovery, and conducted a number of important fact and expert depositions.  I was also closely involved in the extensive motions practice beginning in fact discovery and through trial.  I also worked closely with various BMG experts and in challenging and deposing various Cox experts.  I oversaw all aspects of trial, oversaw trial roles among Steptoe lawyers and Walter Kelley, prepared and examined witnesses and prepared and argued several motions during and after trial.

<u>Roger E. Warin</u>

54.     Roger Warin received his undergraduate degree in 1967 from Creighton University and his J.D. from Georgetown University in 1970.  He is admitted to the bars of the State of Nebraska and the District of Columbia.  He has been admitted to practice before numerous federal trial and appellate courts, including the United States Courts of Appeals for the Second, Third, Fourth, Fifth, Sixth, Seventh, Eight, Eleventh, District of Columbia and Federal Circuits, and the United States Supreme Court.  During the 1970-71 term Mr. Warin was a law clerk to the Honorable Oliver Gasch of the United States District Court for the District of Columbia.

55.     For more than 40 years, Mr. Warin has successfully handled a wide range of complex commercial litigation matters and appeared in courts throughout the United States as well as in various arbitral forums.  His cases have involved securities fraud, the Racketeer Influenced and Corrupt Organizations Act, libel, trademark, products liability, directors' and officers' liability, voting rights, employment discrimination, attorneys' fees, First Amendment,

legal malpractice and other professional liability, negligence, real estate, surety, construction, environmental, toxic tort, and insurance coverage claims.  He has represented dozens of national law firms in defense of legal malpractice and professional negligence claims and in connection with a wide range of attorneys' fees disputes.  Mr. Warin has held a wide variety of firm management positions and is Chairman Emeritus of the firm.

56.     Mr. Warin joined the BMG team in the lead up to trial to provide strategic counsel and to present the opening and closing arguments.  He also examined witnesses and was involved in all aspects of trial strategy.  Mr. Warin is a highly experienced litigator and his expertise was a significant contribution to the case.

<u>William Pecau</u>

57.     William Pecau received his J.D. from Vanderbilt University Law School in 1976. In 1973 he received his B.A. from the University of the South.  Mr. Pecau is admitted to practice in the District of Columbia, New York, and California.  He is admitted to the United States Supreme Court, the Courts of Appeals for the Second, Fourth, Ninth, and Federal Circuits.  He is also admitted to the United States District Courts for the Northern District of California, Colorado, the Southern District of New York, the Eastern District of New York, the Western District of New York, and the Eastern District of Wisconsin.

58.     Mr. Pecau is co-chair of Steptoe's Trademark practice group.  He litigates diverse trademark, false advertising, copyright, and patent cases on behalf of plaintiffs and defendants. As lead trial counsel, Mr. Pecau has represented clients before many federal trial and appellate courts in the United States in some of the most significant intellectual property cases of the last 30 years.

59.     Before joining Steptoe, Mr. Pecau was a partner at Pennie & Edmonds, one of the largest intellectual property law firms in the United States, representing clients in several noteworthy cases as first chair.

60.     Mr. Pecau was involved in pre-litigation assessment and in litigation strategy.  He worked on expert reports and discovery and oversaw much of the brief writing.  At trial, Mr. Pecau prepared fact and expert witnesses to testify, examined BMG and Cox witnesses, oversaw preparation of the jury instructions, and presented arguments.

### John M. Caracappa

61.     Mr. Caracappa received his J.D. from Franklin Pierce Law Center in 1998 and his B.S. from State University of New York at Buffalo in 1995.  He is admitted to practice before the bars of the District of Columbia, New York, several United States District Courts, the United States Court of Appeals for the Federal Circuit, and the Patent and Trademark Office.

62.     Mr. Caracappa chairs Steptoe's Intellectual Property Group and is a seasoned first-chair litigator who regularly appears before district courts across the country.  With over 15 years of experience, Mr. Caracappa has appeared in in more than 25 Section 337 ITC cases and 50 patent cases in federal courts.

63.     Mr. Caracappa was heavily involved in the litigation and worked extensively on the source code and other technical IP issues relating to Rightscorp's system for identifying infringement and Cox's CATS system for handling infringement on its network.  He took and defended depositions, oversaw expert reports, and argued a majority of the discovery motions. He was involved in all aspects of trial, including examining witnesses and presenting argument.

### Paul A. Gennari

64.     Mr. Gennari received his J.D. in 1999 from University at Buffalo School of Law, the State University of New York.  He received his B.S. *cum laude* from the University of

Massachusetts, Amherst in 1986 and his M.S. in Mechanical Engineering in 1988.  He is a member of the Bars of Massachusetts, New York, the District of Columbia, and Virginia.

65.     Mr. Gennari was of counsel to the firm and a member of the Intellectual Property Group.  His practice included litigation and counseling regarding intellectual property matters. He has represented numerous Fortune 500 companies in patent infringement and trade secret litigation involving a variety of technologies.

66.     Mr. Genari had a major role in discovery and was extensively involved in working with technical fact and expert witnesses.  He took several depositions, prepared witnesses, drafted briefs, and assisted at trial with witness preparation and argument.

<u>Jeffrey M. Theodore</u>

67.     Mr. Theodore received his J.D. from Harvard Law School in 2006 and his A.B. from Harvard College in 2003.  Mr. Theodore is a member of the District of Columbia and Maryland bars and is admitted to practice before the United States Supreme Court, the United States Courts of Appeals for the Third, Fourth, Sixth, and Federal Circuits, and the United States District Courts for the District of Maryland and the District of the District of Columbia.

68.     Mr. Theodore is of counsel to Steptoe and has extensive experience representing domestic and international clients on both the plaintiff and defense sides of complex commercial and intellectual property disputes.  Mr. Theodore has argued appeals in federal and state appellate courts and has been trial counsel in bench and jury trials, and has experience before many different arbitral bodies.  Mr. Theodore also has significant experience litigating constitutional claims under the Contract Clause, Commerce Clause, Takings Clause, and Due Process Clause.

69.     Mr. Theodore joined the team at the close of discovery and deposed an expert witness.  He was then responsible for BMG's briefing and papers on both parties' summary

judgment motions and argued BMG's safe harbor motion.  Mr. Theodore also drafted or

supervised the drafting of several motions *in limine* and *Daubert* motions along with

infringement and damages jury instructions.  Mr. Theodore was extensively involved in all

aspects of trial, including trial strategy, presenting argument, and preparing and examining

witnesses.

<u>Jeremy D. Engle</u>

70.     Mr. Engle received his J.D., *magna cum laude,* from Washington and Lee

University School of Law in 2006.  He received his B.S in 1999 from Indiana University of

Pennsylvania.  Mr. Engle is admitted to the Bars of the District of Columbia and Virginia and is

admitted to the United States District Courts for the District of Columbia and the Eastern District

of Virginia and the U.S. Court of Appeals for the Tenth Circuit.  He is a former Honors Attorney

at the United States Department of Justice.

71.     Mr. Engle is of counsel to the firm (he was a senior associate at the time of trial)

and is an experienced commercial litigator, on both the plaintiff and defense side.  Mr. Engle has

jury trial experience and appellate experience in both state and federal courts.  He has particular

experience in litigating before the District Court for the Eastern District of Virginia, often

serving as local counsel.

72.     Mr. Engle joined the team prior to filing the complaint, served as local counsel,

and was extensively involved in litigation strategy.  He oversaw discovery, took and defended

depositions, worked with expert witnesses, and was heavily involved in brief writing.  He argued

discovery motions, motions *in limine*, and *Daubert* motions and was involved in all aspects of

trial preparation and trial, including witness and cross-examination preparation.

<u>Margaret Kammerud</u>

73.     Margaret Kammerud received her J.D. from the University of Pennsylvania law School in 2007, where she was Order of the Coif.  She received her B.A. and M.A. from Stanford University in 1999.  She was a law clerk to the Hon. Gene E.K. Pratter, United States District Court, Eastern District of Pennsylvania.  Ms. Kammerud is a member of the California and Georgia Bars.

74.     Ms. Kammerud is of counsel in Steptoe's Palo Alto office, where she is a member of the Intellectual Property Group.  Ms. Kammerud represents clients in courts throughout the United States and is experienced with all phases of litigation, from case initiation through jury and bench trials, post-trial proceedings, and appeals.

75.     Ms. Kammerud joined the team in late July 2015.  She was heavily involved in briefing Cox's serial sanctions motions regarding the Rightscorp source code and briefing motions *in limine* and *Daubert* motion.  She assisted with trial preparation and all aspects of trial. In particular, she played the lead trial management role for BMG's trial team and oversaw and led the daily meet and confers with Cox's attorneys during trial.  Ms. Kammerud also presented argument and prepared witnesses during trial.

<u>Stephanie L. Roberts</u>

76.     Stephanie Roberts received her J.D. from the John Marshall School of Law in 2008, where she was Staff Editor, *The Review of Intellectual Property Law*.  She received her B.S. in Mechanical Engineering from the University of Texas at Austin in 1996.  Ms. Roberts is admitted to the Bars of the District of Columbia and Illinois, the United States Court of Appeals for the Federal Circuit, and the United States Patent and Trademark Office.

77.     Ms. Roberts is an associate in Steptoe's Intellectual Property Group, who has experience litigating patent, copyright, trademark, and trade dress cases.

78.     Ms. Roberts was extensively involved in the pre-suit investigation and preparation of the complaint.  She oversaw establishment of chain of title for the BMG copyrights at issue and was responsible for Rightscorp-related production and discovery.  Ms. Roberts drafted briefs, met and conferred with opposing counsel, prepared witnesses and defended and took depositions.  She was involved in trial preparation and all aspects of trial, including preparation of technical fact and expert witnesses, preparing the cross-examinations of witnesses, and meeting and conferring on issues with opposing counsel during the trial.

<u>David L. Hecht</u>

79.     David Hecht received his J.D. from Fordham University School of Law.  He received his B.S. from Rutgers University School of Engineering in 2004 and his M.B.A. from Rutgers University School of Business in 2005.  Mr. Hecht is admitted to the Bars of New Jersey and New York, as well as the United States District Courts for the Districts of Delaware, New Jersey, the Eastern District of New York, the Southern District of New York, and the Eastern District of Texas.

80.     Mr. Hecht is an associate in Steptoe's New York office, where he is a member of the Intellectual Property Group.  Mr. Hecht worked with expert witnesses, assisted in brief writing, and provided research and document review.

<u>Matthew Mazgaj</u>

81.     Matthew Mazgaj received his J.D. from Georgetown University Law Center in 2012.  He received his B.A. from Washington & Jefferson College in 2009.  Mr. Mazgaj is a member of the Bars of the District of Columbia, New York, the U.S. District Court for the District of Columbia, and the Wampanoag Tribe of Gay Head (Aquinnah) Tribal Court.  Mr. Mazgaj was an associate in Steptoe's Litigation Department.

82.     Throughout the litigation, Mr. Mazgaj assisted in deposition preparation and brief writing, provided research and document review, and was involved in preparing trial exhibits. He was engaged in trial preparation, and he assisted in all aspects of trial.

<u>Li Guo</u>

83.     Li Guo received her J.D. from The George Washington University School of Law in 2013.  She received her B.S. in Applied Chemistry from Peking University in 2001 and her Ph.D. in Chemistry from the University of Rochester in 2008.  Ms. Guo is admitted to practice before the Bars of the District of Columbia, New York, and the US Patent & Trademark Office. Ms. Guo is an associate and is a member of the Intellectual Property Group.

84.     Ms. Guo was involved in discovery and assisted in brief writing, deposition preparation and document review.  She provided research, was involved in preparing trial exhibits, and assisted in all aspects of trial preparation and trial.

<u>Elizabeth McKenzie</u>

85.     Elizabeth McKenzie received her J.D. from Brooklyn Law School in 2013.  She received her B.A. from New York University in 2008.  She is admitted to the Bars of the District of Columbia, New York, and New Jersey.

86.     Ms. McKenzie was an associate in the Intellectual Property Group, where her practice focused primarily on the prosecution and defense of trademark, trade dress, copyright, unfair competition, and other intellectual property claims.

87.     Ms. McKenzie assisted with a number of pre-filing tasks.  After filing, she was involved in document review, provided research, and assisted in brief writing and deposition preparation.  She prepared the trial exhibit list and assisted with trial preparation and trial.

<u>Other Professionals</u>

88.     Numerous paralegals and other litigation assistants contributed services to the successful prosecution of this case.  Individual non-legal personnel for whom fees are sought include Manual Rios, Kenneth MacPhail, Jonathan Huie, and James A. Noetzel.

89.     To manage costs, first-level document review in this case was performed by a team of ten contract attorneys, supervised by Christine Moon, a 2006 graduate of Wake Forest University School of Law, at Steptoe's Complex Litigation & Discovery Center.  The document review time totaled 675.9 hours.   This first-level review concerned a review of documents Cox produced to BMG, and BMG documents for production to Cox.

90.     BMG also had significant litigation support from various individuals in Steptoe's Information and Technology Department regarding the extensive electronic discovery in this case – BMG searched hundreds of gigabytes of data.  This support totaled 493 hours.

91.     Steptoe also worked with two co-counsel on this matter.  Walter Kelley, a partner at Hausfeld and former United States District Court Judge in this Court.  In addition, Michael Crain, an Athens, Georgia based music and entertainment lawyer, represented BMG on this case.

**C.     Steptoe's Rates and Billing Practices**

92.     Steptoe charges for its legal services based on set hourly rates.  These rates are set at the beginning of each calendar year for every lawyer, paralegal, and other timekeeper and are based on the market for legal services.  Steptoe's rates are based on market research and knowledge and are consistent with those of other firms comparable to Steptoe.  Steptoe calibrates its rates to the market based on head-to-head head competition, knowledge of rates charged by our competitors, and surveys of law firms.  Steptoe's rates are premised upon prompt payment and therefore do not include any compensation for delay.

93.     The rates for each individual timekeeper are a function of his or her level of experience, reputation, and practice area.  They are consistent with market rates charged by similarly experienced attorneys and other legal staff performing similar work.

94.     I calculated BMG's fee request in this matter by applying a five percent discount to Steptoe's minimum rate for each timekeeper in the case.  In addition, I reduced the rates of Margaret Kammerud and David Hecht, attorneys in offices outside Washington, D.C., to the rates of timekeepers in the D.C. office with a similar level of experience and expertise.  I also exercised discretion to reduce the rate for Roger Warin.  Mr. Warin's normal minimum rate in 2015 was $1005.00 per hour.  I have reduced his rate to $865.00 per hour (prior to the 5% reduction applied to all timekeepers) for the purposes of this fee petition.

95.     With these adjustments, Steptoe & Johnson's rates are consistent with the prevailing market rates in the Eastern District of Virginia for firms similar to Steptoe in terms of size, qualifications, and ability to handle a complex case such as this one.  The following chart compares the requested rates for each timekeeper with the high end 2011 rates for attorneys of equivalent experience found reasonable in *Vienna Metro LLC v. Pulte Home Corp*., Case 1:10-cv-502 (E.D.V.A. 2011).  *See* Exhibit 6 to this Declaration at 1.

96.     The rate matrix approved in *Vienna Metro* was created by Craig C. Reilly, local counsel for Cox in this case.  I have examined the *Vienna Metro* rates and agree with Mr. Reilly that they are reasonable for work of this level of sophistication in this jurisdiction.

97.     Comparison of the 2015 rates sought by Steptoe and the rates in the 2011 *Vienna Metro* decision show that, the lodestar using Steptoe's rates is 3 percent lower than the lodestar calculated using the upper end of the *Vienna Metro* matrix for 2011.  Those charts are attached as Exhibit 6, at 1.

98.    These comparisons used the rates contained in the matrix for 2011. It is customary for billing rates to increase from year to year and it is reasonable to expect that billing rates for the firms surveyed by Mr. Reilly have increased. *Vienna Metro* included rates for 2010 and 2011. The 2011 rates are higher by as much as fourteen percent from the 2010 rates. Without taking any projected increase into account, the rates found reasonable in Northern Virginia in 2011 are in the same range as Steptoe's 2015 rates requested in this litigation.

99.    Steptoe requires that all attorneys and other timekeepers contemporaneously record the time they spend on each client matter and have that time entered into our computerized billing system. The normal practice for billing professionals is to record all activities on a client matter in one daily entry with the total time for the day recorded. This method of time recordation is acceptable to the firm's regular clients.

100.    Our accounting staff prints from our computer system billing summaries for each matter that include all the time for timekeepers and expenses charged to that matter. Using these computer-generated summaries, the billing partner reviews the time spent, the services performed, and the expenses incurred on the matter. The billing partner edits the time and deletes charges for time or expenses which in the billing partner's judgment should not be billed. The billing partner, with the assistance of others working on the matter, may make additional edits to supplement or clarify the time descriptions, correct spelling or grammatical errors, or eliminate time and expenses that were attributed to the case erroneously.

101.    In this case, Steptoe's time was recorded in accordance with the firm's normal practices described above. The time reflected in the time descriptions was also reviewed and edited in the manner described above. I reviewed each time entry recorded for this matter and exercised billing judgment as described more fully below.

102.     I have exercised billing judgment to eliminate time spent on work that was even arguably duplicative, excessive, unnecessary, or lacking in sufficient detail.

103.     For purposes of this fee petition, we are not seeking recovery of the time for individuals whose contribution to the case was *de minimis* in terms of hours.  I made the decision to eliminate the time of all attorneys and paralegals who contributed fewer than 100 hours to the case despite the fact that significant legal services that advanced the case were performed within the 100 hours.  I also decided to eliminate completely the time of Harvey Geller, a former Steptoe of counsel who was involved initially but left the firm before the complaint was filed. Even though the efforts of these individuals was productive and contributed value to the representation, over 500 hours valued at almost $240,000.00 is not being sought in this petition due to these decisions.

104.     I also removed all the time for research librarians even though they were able to locate pertinent information for the prosecution of the case more efficiently and economically than the attorneys who requested the information.  This removed 65.75 hours from the petition, valued at $19,084.80.

105.     In addition to the across the board decisions reflected above, I have eliminated 787.44 hours, valued at $461,558.33 on an entry by entry basis by eliminating or reducing time that, in my opinion and based on my knowledge of the case and the individuals involved, was either redundant or excessive for the purposes of shifting fees under 17 U.S.C. § 505.  This includes for example time spent educating new team members on the case, reducing time charged that seemed excessive given the task performed, or when the time exceeded a reasonable number of hours in the day.  Finally, I also eliminated time attributable to travel.

106.     I eliminated time focused on Round Hill.  An example of this would be the defense of a deposition of a Round Hill witness or work devoted to ownership of the Round Hill copyrights.  This eliminated 373 hours valued at $208,243.20.

107.     I also excluded all time incurred after the date of the verdict.

108.     Throughout my review of time entries and this fee petition, I erred on the side of exclusion if there was any question as to how much time should be excluded.

109.     In addition, we worked as co-counsel with Michael Crain Of the Crain Law Group.  Mr. Crain primarily assisted in the review and analysis of BMG's copyrights and the voluminous documents evidencing ownership.   He also attended trial and assisted with witness preparation.   Mr. Crain incurred over $300,000 in fees in this case, none of which BMG is seeking as reimbursement through this fee petition.

110.     Summary charts of the time being sought and the time excluded are attached as Exhibit 6, at 4 and Exhibit 7.

111.     After all of these deductions and the reductions in rates, the total hours sought are 20,020.08 with a lodestar of $11,107,878.97.

112.     The time descriptions of Steptoe & Johnson individuals involved in this matter reflecting the hours sought for each timekeeper are attached as Exhibit 6 at 5-274.

113.     I then further reduced the amount requested in the petition after the reductions outlined above by a further 10 percent in an abundance of caution and to reflect Steptoe's block billing procedures.  Applying this reduction yields a lodestar of $9,997,091.08.

114.     This fee request includes hours entered through December 17, 2015, the date of the verdict.

### D.      Expenses

115.     I have reviewed records reflecting the expenses incurred by Steptoe & Johnson in this case.  BMG filed a Bill of Costs on September 30, 2016 seeking taxation of $180,138.59 in taxable costs.  Plaintiff seeks $2,918,872.28 in nontaxable litigation expenses, which I verify were necessary and reasonable and were incurred by the firm and posted to this case over the course of the litigation.  The categories of expenses sought are described below, and itemized on the chart attached as Exhibit 6, at 275.  Invoices for any particular expense or category of expenses are available upon request.

116.     BMG seeks reimbursement for the cost of the Relativity Database hosting in the amount of $31,346.24.  Relativity is litigation document management software that was used to manage, sort, search, and review the hundreds of thousands of documents collected and produced in this litigation.  The use of the Relativity database was necessary for the proper conduct of the litigation and the expense was reasonably incurred.

117.     BMG seeks reimbursement for the reasonable litigation expense for online information and research.  This includes charges for Lexis and Westlaw as well as Bloomberg and PACER.  Use of these services greatly reduced attorney time in performing legal and factual research.  BMG incurred $196,106.54 in online research costs, which was reasonable and necessary to successfully prosecute the case.

118.     BMG counsel necessarily had to travel for depositions and client meetings.  The travel expense included airfare, train, rental car and hotel expenses and totals $60,719.04.  BMG purchased non-refundable tickets where available.  BMG is not seeking reimbursement for the cost of meals while on travel.

119.    BMG incurred $11,597.73 in reasonable delivery charges.  This includes the cost of postage, Federal Express, local messenger delivery (including delivery of chambers copies of pleadings) and other overnight delivery services.

120.    BMG seeks reimbursement for $7,372.38 in local transportation costs including taxis (both local and on travel), parking, and public transportation charges.

121.    BMG seeks $112,641.61 in reasonable copying expenses.  This includes printing, color copies, photocopies, and outside vendor charges to copy documents from BMG for attorney review and production.

122.    BMG incurred $963.50 in subpoena fees to compel witness testimony at trial and for deposition.

123.    BMG incurred $53,560.20 in deposition expenses not covered in the Bill of Costs. This includes the cost of videotaping depositions, the use of RealTime services during the deposition, and rough drafts.  Rough drafts were essential given the fast pace of litigation, and video was necessary because many Cox witnesses were outside the jurisdiction of the Court.

124.    BMG employed the services of several experts to support its claim for copyright infringement.  Each of these experts provided reasonable and necessary services, as described below.

125.    Terrence McGarty and William Lehr provided expert opinion testimony regarding the workings of Cox's CATS system and Cox's profits from infringement and economic incentive to tolerate infringement on its network.  Their charges, including charges for support personnel at Analysis Group, Inc., who assisted with analysis of Cox's financial and technical documents totaled $1,106,370.66.

126.    Stephen Nowlis, who designed and supervised a survey showing that a substantial portion of Cox's customers value the ability to use Cox's network to infringe charged $172,112.75 for his services.  Applied Marketing Science, which conducted the survey, charged a total of $41,692.75.

127.    Barbara Fredrickson-Cross provided expert testimony on regarding the Rightscorp and CATS systems and her services were billed through Johnson-Laird, Inc., totaling $354,736.85.

128.    Robert Bardwell, through Teklicon, provided expert testimony at a cost of $543,025.49.  Dr. Bardwell's work confirmed that many instances of infringement at a given IP address related to the same Cox subscriber, an effort made necessary by Cox's decision to destroy its DHCP logs of IP address assignment.

129.    Ralph Oman provided expert opinion regarding the DMCA's regime for infringement notices at a cost of $27,411.00 and a cost of $6,192.00 for his support staff.

130.    BMG retained DecisonQuest to conduct a mock trial and provide trial support at a cost of $193,023.54.

131.    The total cost for expert services for which BMG seeks reimbursement is $2,444,565.04.

132.    I have exercised billing judgment to not seek reimbursement for several categories of reasonable litigation expenses totaling $141,112.06.  This includes the cost of Drop Box rental fees (which enabled efficient and economical sharing of documents between counsel and the client and experts), miscellaneous computer and Internet access fees, all staff overtime, all meals (both on travel, overtime, and during trial), publications, office and other supplies (including supplies needed to conduct the trial), personal mileage and other miscellaneous travel

expenses, duplicating supplies, lodging expenses for the trial team during trial and the cost of a

trial work room to allow the team to prepare each day's testimony and prepare exhibits.


      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on:  September 30, 2016

                               /s/ Michael J. Allan
                                 Michael J. Allan