# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, and ROUND HILL MUSIC LP,<br><br>Plaintiffs,<br><br>v.<br><br>COX COMMUNICATIONS, INC., and COXCOM, LLC,<br><br>Defendants. | Civil No. 1:14-cv-1611<br><br>Hon. Liam O'Grady |

## MEMORANDUM OPINION

After an extended litigation battle and a two-week trial, a jury found Defendants Cox Communications, Inc. and Coxcom, LLC ("Cox") liable for willful contributory copyright infringement. The jury awarded Plaintiff BMG Rights Management ("BMG") $25 million in damages, and the Court denied both parties' post-trial motions for relief. (Dkt. No. 794). Now pending before the Court are the parties' motions for costs and attorney's fees. Specifically, BMG has filed for attorney's fees and costs against Cox, (Dkt. Nos. 819, 827) and Cox, in turn, has filed for fees and costs against Round Hill Music LP ("Round Hill") (Dkt. Nos. 822, 836). For the reasons that follow, BMG's motions are hereby GRANTED IN PART and DENIED IN PART. Cox's motions are hereby DENIED.

### I. BACKGROUND

The facts of this case have been set forth in the Court's previous memorandum opinions, and will only be summarized briefly here. *See* Dkt. Nos. 703, 794. Defendant Cox provides high-speed internet services to customers nationwide. Plaintiffs BMG and Round Hill are the

putative owners or administrators of approximately 1,400 musical composition copyrights. Plaintiffs initially alleged that Cox's subscribers were using peer-to-peer ("P2P") file sharing to illegally upload and download copyrighted music files. The parties' dispute came to a head in October 2014, when BMG and Round Hill brought claims of contributory copyright infringement and vicarious copyright infringement against Cox.

After a lengthy period of discovery, the parties filed cross-motions for summary judgment in September 2015. These motions raised two primary questions: (1) do plaintiffs own the copyrights at issue?; and (2) is Cox eligible for the DMCA safe-harbor defense under §512(i) of the DMCA? *See* 17 U.S.C. § 512(i). MSJ Mem. Op. at 9 (Dkt. No. 703). On the ownership issue, the Court ruled in favor of BMG, finding that it had conclusively established ownership of the asserted copyrights. With regard to Round Hill, however, the Court found that the company was hired "to provide services related to copyrights it did not own and that this employment did not result in any assignment of rights to Plaintiff." *Id.* at 23 (internal citations and quotations omitted). Accordingly, the Court dismissed Round Hill from the case because it did not have statutory standing to bring the infringement action.

As for the DMCA issue, the Court found that Cox had not reasonably implemented a repeat infringer policy as required to receive the protections of the DMCA. Specifically, the evidence showed that Cox did not terminate access for repeat infringers under appropriate circumstances, and that, before 2012, the company had an informal policy of consistently reinstating infringing users. *See id.* at 31–42. Cox continued these actions in spite of the fact that it "had knowledge that at least some of its account holders were intentionally and repeatedly infringing." *Id.* at 42. As such, the Court granted BMG's motion for summary judgment and denied Cox's corresponding motion for the protections of the DMCA safe-harbor.

2

The case culminated a two-week jury trial in December 2015. On December 17, 2015, the jury found that Cox was liable for contributory infringement, but that it was not liable for vicarious infringement. *See* Dkt. No. 754. It awarded BMG $25 million in statutory damages. After this victory, BMG sought a permanent injunction to prevent Cox from future infringement. It also sought judgment as a matter of law on its vicarious infringement claim. Cox responded with its own motion for judgment as a matter of law, or alternatively, for a new trial. In a Memorandum Opinion dated August 8, 2016, the Court denied all of the parties' post-trial motions and entered a final judgment on the verdict. Post-Trial Mem. Op. at 2, Dkt. No. 794. Cox filed its notice of appeal on August 19, 2016.

All that remain before the Court are the parties' motions for attorney's fees and costs. The law firm of Steptoe & Johnson LLP and local counsel Hausfeld LLP represented both BMG and Round Hill in this action. Fenwick & West LLP and the Law Offices of Craig C. Reilly represented Cox. BMG has moved to recover on its bill of costs (Dkt. No. 819), and its motion for attorney's fees (Dkt. No. 827). In support of those motions, BMG submitted declarations from Michael J. Allan, Walter D. Kelley, N. Thomas Connally, III, Stephanie Roberts, and Jeremy D. Engle, as well as detailed billing records and an itemized bill of costs. Relying on its success in dismissing Round Hill as a plaintiff, Cox has also filed a bill of costs (Dkt. No. 822) and a motion for attorney's fees (Dkt. No. 836). In support, it has filed similar documentation, including declarations from Jedediah Wakefield, Craig C. Reilly, and Andrew P. Bridges.

## II. BMG'S MOTION FOR ATTORNEY'S FEES

Despite the Supreme Court's admonition that applications for attorney's fees "should not result in a second major litigation," the petitions in this case have generated hundreds of pages of filings and now present an array of legal questions for the court to consider in awarding fees and

3

costs. *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1988 (2016) (internal quotations and citations omitted). After setting forth the general legal standard for awarding fees under § 505, the Court will address the discrete legal questions raised by the parties' respective motions. Upon consideration of the parties' briefing and the relevant caselaw, the Court will GRANT BMG's motion for attorney's fees, but reduce the requested fee award by 20%. Relatedly, the Court will DENY BMG's motion as it relates to nontaxable litigation expenses. Next, it will GRANT BMG's bill of costs, but will exclude certain costs and reduce it by 10%. Finally, the Court will DENY Cox's motions for attorney's fees and costs in full because it is not a "prevailing party" under § 505.

### A.   Legal Standard

Section 505 of the Copyright Act of 1976 provides that "the court in its discretion may allow the recovery of full costs . . . [and] a reasonable attorney's fee to the prevailing party as part of the costs . . ." 17 U.S.C. § 505. Interpreting this statute, the Supreme Court has explained that prevailing plaintiffs and prevailing defendants are equally eligible to receive fee awards. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). That said, fees are not awarded as a matter of right, and courts "must make a . . . particularized, case-by-case assessment" when deciding whether they should be awarded. *Kirtsaeng*, 136 S. Ct. at 1985. The key principle underlying this assessment is whether awarding fees would further the essential goals of the Copyright Act by "enriching the general public through access to creative works." *Fogerty*, 510 U.S. at 527.

The Fourth Circuit has provided the following factors for district courts to consider when deciding whether or not to award fees: (1) the motivation of the parties; (2) the objective reasonableness of the parties' legal and factual positions; (3) the need to advance considerations

4

of compensation and deterrence; and (4) any other relevant factor. *Rosciszewski v. Arete Associates, Inc.*, 1 F.3d 225, 234 (4th Cir. 1993); *see also Kirtsaeng*, 136 S.Ct. at 1985 (listing similar non-exclusive factors).  Of these factors, "objective reasonableness" is often given more weight than other considerations; however, it is not the controlling factor, and courts should consider the circumstances of the case as a whole in making its decision. *See Kirtsaeng*, 136 S. Ct. at 1988.  At the end of the day, the trial court maintains broad discretion in awarding fees. *Id.*

Once a court has determined that a fee award is appropriate, it must then use the lodestar method to determine the amount to be awarded. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002) (stating that, in assessing fees, "the lodestar figure has, as its name suggests, become the guiding light").  Once calculated, there is "a strong presumption that the lodestar represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (internal quotation marks omitted).

The Fourth Circuit employs a three-step methodology in calculating the appropriate fee award.  "First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013).  In determining the reasonable number of hours and a reasonable rate, the court should consider the twelve-factors set out in *Johnson v. Georgia Highway Express Inc.*:

> (1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

488 F.2d 714, 717–19 (5th Cir.1974).[1]

After the lodestar figure is calculated, "the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *McAfee*, 738 F.3d at 88. Finally, the court "award[s] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.* This three-step process determines the final amount of fees to which the prevailing party is entitled.

### B. BMG is Entitled to Fees

BMG seeks a total of $10,479,335.08 in attorney's fees. As an initial matter, the parties do not dispute that BMG is a "prevailing party" under § 505. The Supreme Court has defined a prevailing party as "a party in whose favor a judgement is rendered, regardless of the amount of damages awarded . . ." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 603 (2001). Although it did not succeed on all of its claims, BMG was awarded a $25 million jury verdict and Cox was found liable for willful contributory infringement. This favorable verdict plainly satisfies the "prevailing party" standard.

Beyond this initial concession, Cox relies on *Kirtsaeng* to argue that, because its positions were objectively reasonable and served to clarify an important and novel area of the law, its litigation ultimately advanced the interests of the Copyright Act. Therefore, when weighed with the other *Rosciszewski* factors, Cox asserts that BMG should not be entitled to any attorney's fees. The Court disagrees for two reasons. First, although Cox appropriately

---

[1] As discussed in *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013), the Supreme Court has emphasized the "important virtues" of the lodestar method as the presumptive method for calculating fees. *Perdue v. Kenny*, 559 U.S. 542, 550-51 (2010). As such, the *Johnson* factors may still inform the Court's fee analysis, but many of them are subsumed by the lodestar figure, and departures from this figure are only appropriate in "rare circumstances." *Id.* at 554.

defended its novel legal position in the abstract, it also made specific arguments that were objectively unreasonable as a matter of fact and of law.  Second, the remaining *Rosciszewski* factors all cut against Cox.  Together, these considerations dictate the conclusion that BMG is entitled to fees.

### 1.    Objective Reasonableness

The Court acknowledges the importance of Cox's overall defense in light of the complex legal issues at play in this case.  It further recognizes that neither party embodied a perfect model of civility or reasonableness in this case, particularly in the discovery phase of the litigation.[2] That recognition, however, does not extend to Cox's positions with regard to its DMCA defense, which lacked a basis in fact and was therefore objectively unreasonable.

The objective reasonableness of a party's position is an important factor in deciding whether to award fees.  *See Kirtsaeng*, 136 S. Ct. at 1988.  In a hard-fought litigation battle such as this one, discovery disputes and fierce briefing are to be expected, and they should not be held too harshly against either party.  Nonetheless, there are a few instances in which Cox's advocacy crossed the line of objective reasonableness.  In particular, both Cox's attempts to obscure its practice of reinstating infringing customers, and its subsequent assertions of a deeply flawed DMCA defense evince a meritless litigation position that Cox vigorously defended.

BMG highlights a number of Cox's alleged discovery abuses in its briefing.  Of these, four serve as useful examples of Cox's attempts to obstruct BMG from obtaining facts regarding its actual DMCA-related abuse practices.  First, Cox provided an unqualified 30(b)(6) witness who did not have knowledge of the company's abuse practices, despite the fact that those practices were a principal subject of BMG's inquiry.  *See* Allan Decl. ¶ 43, Ex. 4 at 45:18–46:20.

---

[2] Both parties were sanctioned for abuses during the course of discovery.  *See* Sept. 18, 2015 Order, Dkt. No. 290 (granting Defendants' motion for sanctions); *see also* Oct. 9, 2015 Order, Dkt. No. 381 (granting Plaintiffs' motion for evidentiary sanctions).

Second, Cox's Senior Lead Abuse Manager, Joseph Sikes, revealed a selective recollection of the term "soft termination." *See* Allan Decl. ¶ 40, Ex. 2 at 191:20–192:3, 192:15–193:10. Specifically, almost immediately after stating that he was "not familiar with that term", Mr. Sikes was presented with evidence showing that he had personally used the term in instant-message conversations. *Id.* Only after being confronted with that evidence did Mr. Sikes explain what a "soft termination" meant. *Id.* Third, Cox significantly delayed the production of documents relating to its abuse policy. *See* Allan Decl. ¶¶ 21–26. Finally, Cox submitted a declaration from Mr. Roseblatt who bluntly attempted to categorize Cox's soft terminations and customer reinstatements as "occasional variations" in spite of the overwhelming evidence to the contrary. Roseblatt Decl. ¶ 118 (Dkt. No. 390).

Eventually, these factual issues came to a head in the legal dispute over Cox's DMCA defense at the summary judgement phase. Although Cox's DMCA defense cannot be categorized as frivolous or in bad faith, the Court found that "[t]he record conclusively establishes that before the fall of 2012, Cox did not implement its repeat infringer policy. Instead, Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA's requirements." Mem. Op. at 31 (Dkt. No. 703). The evidence supporting this conclusion was overwhelming, and it included "smoking gun" email conversations. *See generally id.* at 31–42 (detailing the evidence of Cox's informal policies to reinstate infringing users). The most memorable of these contained Cox's own abuse manager stating: "F . . . the dmca!!!" *See* BMG's Mem. in Supp. Fees at 5 (quoting PX-1392.0001). Therefore, although Cox's defensive arguments may have been reasonable as an abstract legal theory, when viewed in light of the actual facts of the case, they evince an objectively unreasonable litigation position that was nonetheless vigorously defended.

## 2. The Parties' Motivation

The parties' motivation is determined by a variety of factors, including the nature of the infringement and any bad faith by the defendant. *Rosciszewski*, 1 F.3d at 234. Along those lines, courts have noted that willful infringement "is an important factor favoring an award of fees." *Historical Research v. Cabral*, 80 F.3d 377, 379 (9th Cir. 1996). In part, this is because "defendants must not be able to sneer in the face of copyright owners and copyright laws", and willful acts suggest that deterrence is necessary to prevent further violations. *Cable/Home Comm'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990) (internal quotations omitted). As such, courts frequently award fees where willfulness was an element of liability. *Id.*; *see also Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 498 (4th Cir. 1996). Indeed, Cox can only cite to one case in which the jury found willful infringement but the court did not award fees. *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 463–64 (D. Md. 2004).[3]

Cox's willfulness cannot seriously be contested. As the Court has previously noted, the jury was appropriately instructed that BMG needed to establish "by a preponderance of the evidence that Cox had knowledge that its subscribers' actions constituted infringement of BMG's copyrights, acted with reckless disregard for the infringement of BMG's copyrights, or was willfully blind to the infringement of BMG's copyrights." Post-Trial Mem. Op. at 32 (Dkt. No. 794). As detailed in the post-trial Memorandum Opinion, the jury had ample evidence to support its finding of willfulness, and it did so unequivocally in its verdict. *See id.* In other words, the jury found that Cox knew, or should have known, that its behavior was wrong and

---

[3] This was a pre-*Kirtsaeng* case that appears to have applied a very strict reasonableness standard in its fee evaluation. The court noted that, because the defendant's position was not "frivolous" and was not of "absolute insignificance," it was therefore reasonable and did not support a fees award. *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 463 (D. Md. 2004).

continued in spite of that awareness. Therefore, its motivations can be seriously questioned, and fees are appropriate in order to deter future violations.

### 3.    Deterrence and Compensation

Deterrence considerations blend into each of the *Rosciszewski* factors. Put into more direct terms, however, the jury found that Cox engaged in a willful and large-scale practice of contributory infringement and, as a result, Cox should be incentivized to change its behavior. *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, No. CIV.A. 1:07-CV-491, 2009 WL 3423848, at *3 (E.D. Va. Oct. 16, 2009) ("[A]warding attorney's fees and costs in copyright infringement actions likely will have a deterrent effect on present and future infringers."). As a practical matter, this change in behavior could take the form of a more robust and effective DMCA program, or perhaps a different response to infringement notices from companies like Rightscorp. However Cox decides to address its users' repeat infringement, it is clear that the company should be given a proper financial incentive to change its policies and procedures. For a company as large and as profitable as Cox, responsibility for attorney's fees will help to initiate that change and deter future violations.

As for compensation, Cox argues that the jury verdict is sufficient compensation and that any attorney's fees would "amount to a double recovery." Cox Opp'n at 18. This argument misses the mark. Indeed, Cox's position is foreclosed by the language of the Copyright Act itself, which allows prevailing parties to recover both fees and costs. 18 U.S.C. § 505. The statute contemplates three separate inquiries: (1) liability; (2) fees; and (3) costs. In this case, the jury did not know how much it cost to litigate this case and it was not instructed to consider attorney's fees in its verdict. As such, finding that the verdict fully remunerated BMG would undermine the separate fees and costs inquiries, which were designed to compensate parties for

their enforcement of infringement laws, and which are a basis for recovery apart from the statutory penalties available under the Copyright Act.

In this case, the jury awarded $25 million in damages for infringement. Separately, BMG incurred more than $10 million in attorney's fees. Therefore, without an attorney's fees award, the cost of litigating this case would erode approximately 40% of the verdict. *See Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1230 (7th Cir. 1991) ("[Appellant] maintains that an award of fees would be punitive because the plaintiffs already have been made more than whole by the court's award of damages. We find no merit in this argument."); *see also* Final Order, *Oracle USA v. Rimini Street*, No. 2-10-cv-106 (D. Nev. Sept. 21, 2016) (awarding approximately $28 million in fees in addition to a verdict of approximately $50 million). As such, the Court finds that a fees award is necessary to properly compensate BMG for its litigation expenses.

### 4.    Other Factors

Each of the factors above strongly suggest that awarding fees here would "further the policies of the Copyright Act." *Fogerty*, 510 U.S. at 527. Moreover, "[i]n determining the need for compensation, the Court may analyze the relative size of the parties as well as the ability of a party to be assessed with fees to pay the assessment." *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, No. CIV.A. 1:07-CV-491, 2009 WL 3423848, at *3 (E.D. Va. Oct. 16, 2009). Cox is a massive company with $18 billion in annual revenue.[4] It fought this lawsuit with vigor every step of the way, and it spared no expense in doing so. In fighting back, BMG took huge risk and ultimately expended more than $10 million in attorney's fees.

In the end, BMG was successful in asserting its copyrights. Nonetheless, the prospect of bringing suit against Cox and incurring millions of dollars in attorney's fees will likely deter

---

[4] The Court takes judicial notice of Cox's reported annual revenue, which is publicly available on Cox's website. *See* Financial Information, financials.coxenterprises.com (last visited Jan. 27, 2017).

other potential plaintiffs from seeking to enforce their rights. In order to continue to promote the vindication of individuals' copyrights, therefore, BMG (and others like it) should be rewarded for facing up against willful infringers with deep pockets.

### B. Lodestar

Having determined that BMG is eligible for fees, the Court's analysis turns to the lodestar calculation. The legal disputes over the reasonableness of the hourly rates and the hours spent on the case will be addressed first, followed by a table detailing the rates and hours calculated for each individual attorney and paralegal.

#### 1. Hourly Rate

In general, the fee applicant has the duty to "submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "In addition to the attorney's own affidavits, the fees applicant must produce satisfactory 'specific evidence of the prevailing market rates in the relevant community' for the type of work for which he seeks an award." *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987)). Specific evidence in this context will often take the form of "affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community." *Robinson v. Equifax Information Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009); *see also Blum v. Stetson*, 465 U.S. 886, 895 n.11 (stating that the fee applicant has the burden "to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."). "The relevant market for determining the prevailing rate is ordinarily the community in which the

12

court where the action is prosecuted sits." *Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).

BMG draws support for the reasonableness of its claimed rates from three main sources. First, it cites the affidavits from three separate attorneys that explain the detailed and complex nature of the attorneys' work on this case. These affidavits also show that the rates are customary for this kind of litigation, and that, where they exceeded the customary amount, they have been reduced to comport with the customary rates of attorneys in the Alexandria area. Second, BMG points to affidavits from Craig Reilly (Cox's local counsel) in previous cases supporting the reasonableness of similar rates in analogous cases. Third, BMG cites to the matrix set forth in *Vienna Metro* (and the cases adopting that matrix) to show that courts have previously accepted analogous rates. Fees Opinion, *Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10-cv-502, Dkt. 263 (E.D. Va. Aug. 24, 2011) (hereinafter *"Vienna Metro"*).

The *Vienna Metro* matrix is reproduced below.

| 2011 Range of Hourly Rates in Northern Virginia | | | | | |
|---|---|---|---|---|---|
| Paralegal | 1-3 [years of experience] | 4-7 [years of experience] | 8-10 [years of experience] | 11-19 [years of experience] | 20+ [years of experience] |
| $130-350 | $250-435 | $350-600 | $465-640 | $520-770 | $505-820 |

*Id.* at 12. Notably, the Matrix was created by Cox's own attorney, Mr. Reilly, who "surveyed the rates offered by Northern Virginia firms capable of handling [that] type of complex litigation." *Id.* (citing the Declaration of Craig Reilly). Since the *Vienna Metro* decision, at least three other opinions in this district have found the Matrix to be persuasive evidence of an appropriate range for the rates of attorneys engaged in complex litigation in Northern Virginia. *See, e.g.*, *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-CV-525, 2014 WL 6685440, at *4 (E.D. Va. Nov. 25, 2014); *Taylor v. Republic Servs., Inc.*, No. 1:12-CV-00523-GBL, 2014 WL

13

325169, at *5 (E.D. Va. Jan. 29, 2014); *Mitile, Ltd. v. Hasbro, Inc.*, No. 1:13CV451, 2013 WL 5525685, at *1 (E.D. Va. Oct. 4, 2013). As such, because the rates claimed by BMG fall within this range, BMG urges the Court to accept them as reasonable.

Cox responds with two principal arguments. First, it argues that *Vienna Metro* is inapplicable because it dealt with a contractual fee-shifting provision rather than the award of attorney's fees under § 505. Building on that argument, Cox asserts that the fee structure adopted by the court in *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.* is a more appropriate template for this case. 152 F. Supp. 3d 503 (E.D. Va. 2015). In particular, Cox points out that *Humphreys* is more recent than *Vienna Metro*, and it is a copyright case that assessed fees under § 505.

The Court rejects the argument that *Vienna Metro* is uniquely applicable to contractual attorney's fees cases. As a starting point, there is nothing in *Vienna Metro* that would limit the Matrix to fees in contract-based fee petitions. In addition, it is now taken for granted that "fee-shifting statutes' similar language is 'a strong indication' that they are to be interpreted alike." *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759 (1989). The fee inquiry is also materially equivalent for contract-based attorney's fees petitions, which also rely on the reasonableness inquiries of the lodestar method to assess fees. *Nautical Girl LLC v. Polaris Investments Ltd.*, No. CIV.A. ELH-10-3564, 2011 WL 6411082, at *1 (D. Md. Dec. 19, 2011) ("Notably, cases decided under the lodestar approach can 'provide helpful guidance' in contractual fee-shifting cases.") (internal citations omitted). Indeed, some of the cases that have adopted *Vienna Metro* were statutory rather than contractual fee-shifting provisions. *See, e.g.*, *Taylor*, 2014 WL 325169, at *5.

Cox's second argument requires more consideration, as it highlights an apparent tension between two recent cases from this court: *Humphreys* and *Vienna Metro*. As the Supreme Court has recognized, "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum*, 465 U.S. at 895 n.11. Indeed, a litany of factors may influence what constitutes a reasonable fee, and "[t]he amount of the fee . . . must be determined on the facts of each case." *Eckerhart*, 461 U.S. at 429. With this in mind, the tension between the two cases is significantly reduced when viewed with an eye towards the facts of those cases rather than their ultimate conclusions.

In particular, the Court in *Humphreys* weighed two key factors that distinguish it from *Vienna Metro* and from the instant case. First, in *Humphreys* the Court was presented with a dramatic difference in the rates claimed by two sets of counsel. The Court wrote:

> It is instructive to contrast Finnegan's rates with the rates charged by the Northern Virginia lawyers in this case. The Northwestern defendants' local counsel, Craig Reilly, charges $350/hour, and the Penrose defendants' attorneys charge $375–390/hour. The Lessard defendants have provided no evidence for why the services provided by their Washington, D.C. attorneys should be valued so much higher [more than $700/hour] than the services provided by their Virginia co-counsel.

*Humphreys*, 152 F. Supp. 3d at 520 n.26. Thus, while the Court found that local counsel's rates represented an accurate picture of legal market in Northern Virginia, the higher rates claimed by defendants could only be supported by national averages, which the Court found to be unpersuasive evidence. *Id.* at 519 (refuting defendants citation to "data from a national survey for billing rates for firms with more than 150 full time intellectual property lawyers"). That difference in rates simply is not present in this case. In fact, the Declaration of Walter Kelley explains that, in its fee application, BMG discounted the rates it actually paid Hausfeld in order

to fall within the *Vienna Metro* Matrix. *See* Kelley Decl. ¶ 6–7 (Dkt. No. 830). After that reduction, local counsel's rates are almost exactly the same as those charged by Steptoe.

Second, the *Vienna Metro* case presented a higher level of complication, as well as a different litigation posture, from *Humphreys*. In particular, *Humphreys* was resolved at summary judgment on a basic question of copyright law and therefore did not require the parties to address the difficult and specialized judgment calls (or time commitment) required by trial. *Id.* at 508. By contrast, plaintiff's counsel (Kirkland & Ellis) in *Vienna Metro* needed to prepare for a four-day trial that included twelve subpoenaed witnesses, six motions in limine, and more than 1,000 trial exhibits. *Vienna Metro*, Dkt. No. 283 at 9. Not only does this make *Vienna Metro* a more complex case logistically, but it also tied up Kirkland's resources, increased their opportunity costs, and likely allowed them to negotiate for a higher rate. *See Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009) (citing *Barber v. Kimbrell's Inc.*, 557 F.2d 216, 226 n.28 (4th Cir. 1978)) (noting that opportunity costs can factor into an attorney's hourly rate). The complexity of the case even led the Court to note that the defendant's "method of trying the case further expanded the amount of time and labor utilized by Plaintiff's litigation team." *Vienna Metro*, Dkt. No. 283 at 9.

To emphasize the complexity of *Vienna Metro* as compared to *Humphreys*, it is also worth noting that there were three separate sets of defendants in *Humphreys*. This would have presented the opportunity for a joint defense group to coordinate motions or otherwise allocate work. By contrast, Kirkland worked alone in its representation of *Vienna Metro* and successfully prosecuted claims surrounding a $100 million development project. Further, it is instructive that the defendant in *Vienna Metro* claimed more than $4 million in fees, while no defendant in *Humphreys* claimed attorney's fees in excess of $1.5 million. Although this difference in claims

16

is certainly not decisive, it supports the conclusion that the need for a high-stakes trial litigation law firm in *Vienna Metro* would have properly commanded a higher rate than the joint-defense posture in *Humphreys*.

These same distinctions apply with magnified force to this case. The parties agree that this case was complex, hard-fought, and presented novel issues of law. *See* Cox Opp'n at 2 (Dkt. No. 851) (discussing the "importance" and the "novelty of legal issues" presented to the Court); *see also* BMG Mem in Supp. at 25 (Dkt. No. 828) ("The difficulty and complexity of this case justify premium hourly rates."). Indeed, it is difficult to dispute this assessment of the case, which raised difficult issues of first impression and which, like *Vienna Metro*, ultimately required a full trial to resolve. The case depended on sophisticated counsel, and as such, the Court finds that the *Vienna Metro* Matrix for complex civil litigation supplies an appropriate range of fees here.

This conclusion is supported by additional evidence from BMG. Most prominent among this evidence is Mr. Reilly's Declaration in a 2014 case in this District, which states that "complex, intellectual property litigation involving complex, software copyright infringement" demands higher rates. Engle Decl. Ex. B, Dkt. No. 868-2 at ¶ 20 ("2014 Reilly Decl."). This prior submission from Cox's own respected local counsel is bolstered by BMG's affidavits from experienced attorneys like N. Thomas Connally III, who has been practicing law in Northern Virginia for 23 years, and who confirms that Steptoe's rates are reasonable in this case. *See Robinson*, 560 F.3d at 245 (explaining that affidavits from local attorneys with relevant experience are [e]xamples of the type of specific evidence that we have held sufficient to verify the prevailing market rates."). In light of this evidence, the Court concludes that the rates claimed by BMG are reasonable. A chart detailing these rates can be found below.

## 2.   Number of Hours

The hours claimed by BMG's attorneys are largely reasonable for a case of this

complexity and magnitude.  The reasonableness of these hours is enhanced by the fact that

Michael Allan has used his billing judgment to eliminate almost $1 million in fees from the total

tally.  *See* BMG's Mem. in Supp. at 26–27; Allan Decl. ¶¶ 103–107.  Nonetheless, an additional

10% reduction in the total claimed fee is warranted for instances of block billing, vague entries,

and duplicative work.  *See Am. Bird Conservancy v. U.S. Fish & Wildlife Serv.*, 110 F. Supp. 3d

655, 675 (E.D. Va. 2015) ("[I]nadequate documentation is a proper basis for reducing a fee

award because it prevents an accurate determination of the reasonableness of the time expended

in a case.") (internal alterations and quotations omitted).

To begin, it is worth repeating a passage from *Humphreys* regarding the billing practices

of large law firms:

> Large law firms often task far more attorneys than is necessary in a lawsuit like
> this.  Indeed, in this case, a litigation team of sixteen individuals worked on behalf
> of one group of defendants.  With such a large litigation team, the number of
> hours billed grows rapidly.  If multiple lawyers assigned to the case all read a
> memorandum or meet to confer about the status of the case, each lawyer bills time
> and there is a risk of duplicative effort.  Put another way, this case could have
> been fully and fairly litigated with each party devoting no more than two
> experienced, competent lawyers to the case.

*Humphreys*, 152 F. Supp. 3d at 527.  In other words, large law firms are often hired to cinch

every belt, tighten every suspender, and scrutinize every Bluebook citation.  But while this may

be expected in the context of large law firms, it is not necessarily "reasonable" in the legal sense,

and oftentimes a more focused expenditure of hours from fewer attorneys could have achieved

the same task with the same results.

With that in mind, the Court finds that the hours expended on this case were duplicative

in many instances.  The most telling evidence of this is the fact that 13 attorneys worked on the

case, with each attorney billing between 400–2,200 hours.[5]  This included five partners, three of counsel, and five associates.  In addition, four separate paralegals contributed to the work tally.  In light of these numbers, BMG's argument that this case was "leanly staffed and litigated" is overstated. *See* Mem. in Supp. at 27.  With this many cooks in the kitchen, it would have been impossible to conduct basic case management without some degree of duplicative efforts.  Even the process of keeping 13 attorneys apprised of case developments has a level of transactional costs that cannot be easily measured.

For example, consider the team meetings that occurred on November 11–12, 2015.  Every attorney except for Mr. Engle attended meetings or "confer[red] with" the team on these days.[6]  This was a busy period with the team preparing for trial, and the billing entries all list multiple tasks for each attorney.  This makes it difficult to determine precisely how long the meetings lasted.  However, even if we assume that the meetings took up only one hour of each attorney's time, these meetings would have accumulated almost $7,000 in fees.  Similarly, the three-hour summary judgment hearing on October 30, 2015 would have accrued approximately $15,000 in fees because eight attorneys attended.  These tallies do not strike the Court as reasonable.  BMG authorized a large litigation team and, having done so, the impetus now shifts to BMG to demonstrate why this work could not have been accomplished by fewer attorneys.  On the current record, it has not done so, and therefore a reduction in the total fee is warranted.  *In re Outsidewall Tire Litig.*, 748 F. Supp. 2d 557, 565 (E.D. Va. 2010) (noting that a fee

---

[5] This does not include the additional attorneys that worked a "de minimis" amount of time and whose time entries were discounted in their entirety. *See* BMG Mem. in Supp. at 26; Allan Decl. ¶ 103.

[6] It is not entirely clear whether Ms. McKenzie was at the team meetings.  Her billing entries indicates that she "attend[ed] to various case inquiries and provide[d] assistance to team"; on November 12, she similarly "assist[ed] with misc. team inquiries." *See* Allan Decl., Ex. 6 at 193, Dkt. No. 829-6.  Considering the rest of her team was in team meetings, it seems reasonable to conclude that her "assistance" with "misc. inquiries" and other requests was likewise related to those meetings.

applicant "bears the burden of establishing by clear and convincing evidence the amount of a reasonable fee in the circumstances").

The time entries surrounding the eight attorneys who attended the summary judgment hearing on October 30, 2016 provide concrete examples of the parties' duplicative efforts. [7] BMG has not offered any explanation for why the presence of eight attorneys was either reasonable or necessary. *See id.* Courts have recognized that there are certain circumstances where "a lawyer who has worked on the case and will be working on it subsequently may need to observe argument to judge how to proceed later" or "because their assistance is or may be needed by the lawyer arguing the case." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286–87 (9th Cir. 2004). But this principle does not extend to every member of a trial team, and BMG has not offered any explanation for why this day of billing was reasonable. *See Fross v. Cty. of Allegheny*, 848 F. Supp. 2d 547, 555 (W.D. Pa. 2012) ("Although Attorneys Strassburger and Rose no doubt wished to be at the argument to witness the culmination of their efforts on this case, the client would not ordinarily pay for their presence."); *Tanco v. Haslam*, No. 3:13-cv-1159, 2016 WL 1171058, at *7 (M.D. Tenn. Mar. 25, 2016) ("While perhaps desirable, it was not *necessary* for so many attorneys to travel to and participate in meetings, moots and oral arguments. An excellent result was achieved for the client, but one that at times could likely have been achieved with the billing discipline that a fee-paying client would have demanded."); *Roe v. Saenz*, No. 97-cv-529, 2000 WL 33128689, at *2 (E.D. Cal. Nov. 20, 2000). As such, a reduction is warranted for this duplicative billing.

More generally, from October 27-30, nearly every attorney's time entries contain some version of "team meeting and trial prep"; "moot summary judgment arguments"; or "prepare for

---

[7] Attorneys Pecau, Warin, Allen, Engle, Roberts, Mazgaj, Guo, and McKenzie all attended the hearing. *See* Allan Decl. Ex. 6.

summary judgment argument." *See generally* Allan Decl. Ex. 6 (Dkt. No. 829-6). Putting aside

the vagueness issues for a moment, these entries suggest a high level of duplicative efforts. It is

not obvious what "prepar[ing] for hearing" entails, and it is further unclear why each of the eight

attorneys needed to perform what appears on paper to be the same "preparation." This is not to

suggest that the attorneys were not working diligently on the task at hand, but the Court is not

able to tell from the records whether this work was reasonably necessary.

Furthermore, Cox identifies 164.75 hours of vague billing entries "that do not disclose

the nature, volume, or relevance of the documents frustrate any attempt to assess the

reasonableness of the time devoted to that task." *Route Triple Seven Ltd., P'ship v. Total*

*Hockey, Inc.*, 127 F. Supp 3d 607, 621 (E.D. Va. 2015); *see* Bridges Decl. ¶ 32, Ex. 17 (Dkt. No.

852-17). The Court does not agree that all of the entries identified by Cox are vague. For

example, on March 3, 2015, Mr. Caracappa's spent 3.25 hours on "[m]eeting with R. Steele;

phone call with experts; edits to discovery plan." *Id.* at 2. Although this is not a perfectly

detailed entry, it provides enough information for the Court to assess that Mr. Caracappa

communicated with Rightscorp's Chief Technical Officer, spoke with other experts, and

provided his thoughts on a plan for proceeding with complicated discovery. A basic common-

sense understanding of trial preparation allows the Court to determine that these activities were

reasonable, and therefore they cannot be categorized as vague for the purpose of discounting

attorney's fees.

On the other hand, many of the other entries "frustrate any attempt to assess the

reasonableness of the time devoted to that task." *Route Triple Seven Ltd.*, 127 F. Supp 3d at 621.

For example, on August 3, 2015, Mr. Warin spent a half hour "[r]eview[ing] case materials."

Bridges Decl. ¶ 32, Ex. 17 at 3 (Dkt. No. 852-17). In a case as complicated and protracted as this

one, the term "case materials" could mean any one of a hundred categories of documents, and the Court therefore cannot assess whether this time was spent reasonably or not. As such, this time entry falls into the category of "preparation" and "team meeting" entries that surrounded the summary judgment hearing, and which can be properly categorized as vague.

All told, the Court recognizes the practical issues with a court-imposed requirement for highly-detailed billing entries, especially when clients do not necessarily demand the same level of specificity. Attorneys are understandably occupied when preparing for trial, and they may not always have a perfect recollection of what tasks they completed throughout the day (or the week). Therefore, upon final consideration of the vague and duplicative time entries submitted by BMG, the Court will assess a 10% reduction on the total fees claimed.

### 3.    Unrelated Claims

With a final lodestar number calculated, the next step is to "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *McAfee*, 738 F.3d at 88. In some cases, even motions that parties never filed can qualify for fees. *See In re Gen. Motors Corp.*, 110 F.3d 1003, 1021 (4th Cir. 1997) (granting attorney's fees for work on a writ of mandamus that was never filed). Hence, at this stage of the lodestar inquiry, "entitlement to fees for one aspect of a protracted litigation does not turn narrowly on whether the party prevailed on that particular matter, but whether a separate claim or, as here, a separate proceeding is so unrelated as to justify treating it as a "separate lawsuit[ ]." *Plyler v. Evatt*, 902 F.2d 273, 280 (4th Cir. 1990) (citing *Hensley*, 461 U.S. at 435). In other words, in order to qualify for a reduction on this basis, the party must lose its "prevailing party" status as to a distinct portion of the case. *See id.*

Cox's examples of purportedly "unrelated" issues do not come close to reaching this standard. They include work completed for: (1) an unsuccessful motion to quash a subpoena for

22

Robert Steele of Rightscorp; (2) an attempt to depose a Cox employee named Martin Mathews; (3) research related to Cox Enterprises, an affiliated company that was ultimately dismissed as a defendant; (4) projects and motions regarding Ralph Oman, whose testimony the Court excluded; and (5) projects related to two expert witnesses on the issue of vicarious liability. *See* Cox Opp'n at 24. All of these discrete legal issues related to BMG's broader claims of contributory infringement, and Cox does not offer any reasoned distinction that would suggest otherwise. Depositions of relevant witnesses, work on expert reports, and investigation of subsidiaries as potential defendants are all reasonably within the scope of this litigation. As such, because this work was not meaningfully distinct, the fact that BMG lost on these issues does not alter its fee award. *Plyler*, 902 F.2d 273, 280.

### 4.   Degree of Success

At the final step of the lodestar method, the Court "award[s] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *McAfee*, 738 F.3d at 88. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. at 435. Furthermore, in cases that involve a "common core of facts" and "related legal theories," it will be difficult to "divide the hours on a claim by claim basis." *Id.* In those cases, the focus should be more generally on the attorney's work and overall success rather than a critical assessment of each argument. *Id.*

In this case, BMG established liability for willful contributory infringement, proved copyright infringement of 1,397 copyrights, and obtained $25 million in statutory damages. In most respects, this can be viewed as a highly successful result. On the other hand, BMG failed in its vicarious liability claims and its motion for injunctive relief. In particular, BMG devoted a

considerable amount of resources to its vicarious liability claims, and it likely would have received a larger award if that legal theory had been accepted by the jury.

Despite the fact that they provide separate bases for liability, "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn". *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984). In delineating the two theories, the Supreme Court has explained, "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (internal citations omitted). In this case, the Court found that "the jury had a substantial basis on which to conclude that Cox did not maintain an obvious and direct financial interest in the infringement of BMG's works on its network." Post-Trial Mem. Op. at 54. The Court therefore entered a verdict in favor of Cox on the issue of vicarious infringement.

Nonetheless, the similarities between the two claims are significant. BMG correctly notes that both of these claims "required BMG to prove direct infringement, were subject to Cox's key DMCA defense, required an exploration of Cox's handling of infringement, and were subject to the same statutory damages analysis." BMG Reply in Supp. Fees Pet. at 14 (Dkt. No. 868). Therefore, BMG's litigation strategy did not have to shift much in order to encompass both theories of liability. Indeed, the evidence of the financial benefit Cox derived from its customers' BitTorrent usage also helped to support a finding of willfulness in the contributory infringement claims. *See* Post-Trial Mem. Op. at 54. As such, the Court finds that the inclusion of this theory did not significantly raise the legal costs associated with BMG's case. As such, only a minimal reduction is warranted.

In addition, BMG sought post-trial relief in the form of a motion for a permanent injunction.[8]  The Court denied the motion, finding that BMG's proposed injunctive relief would pose far more questions than it would answer.  *See* Post-Trial Mem. Op. at 55–63.  When combined with the vicarious liability failure, the unsuccessful claim for injunctive relief means that the result of the case for BMG should be properly understood as something less than "excellent results."  In light of these two minor setbacks in its prosecution of this case, the Court will reduce BMG's lodestar figure by 10%.

The Court's analysis and its calculations are reflected in the table below.

---

[8] BMG notes that it does not seek compensation for post-verdict work, including the injunction papers.  BMG Reply in Supp. Fees. Pet. at 13 n.7.  Nonetheless, the Amended Complaint seeks injunctive relief that BMG was not awarded and therefore this failure can be considered in determining BMG's "degree of success."  Am. Compl. ¶ 45 (Dkt. No. 16).

### 5.   Final Lodestar Table

| Attorney | Law Firm | Years Experience | Hourly Rate Claimed | Vienna Metro Range | Hours Claimed | Individual Lodestar Calculation |
|---|---|---|---|---|---|---|
| Roger E. Warin | Steptoe | 46 | $821.75 | $505-820 | 404.1 | $332,069.75 |
| William G. Pecau | Steptoe | 40 | $799.90 | $505-820 | 959.99 | $767,892.00 |
| Michael J. Allan | Steptoe | 18 | $686.85 | $505-770 | 1,992.74 | $1,368,710.03 |
| John M. Caracappa | Steptoe | 18 | $736.25 | $505-770 | 1,197.00 | $881,291.15 |
| Paul A. Gennari | Steptoe | 17 | $669.75 | $505-770 | 1,696.59 | $1,136,291.15 |
| Jeffrey M. Theodore | Steptoe | 10 | $639.35 | $465-640 | 759.56 | $485,621.49 |
| Jeremy D. Engle | Steptoe | 10 | $646.00 | $465-640 | 2,040.50 | $1,318,165.58 |
| Margaret Kammerud | Steptoe | 9 | $636.50 | $465-640 | 704.34 | $448,312.41 |
| Stephanie L. Roberts | Steptoe | 8 | $631.75 | $465-640 | 2,179.98 | $1,377,202.37 |
| David L. Hecht | Steptoe | 8 | $631.75 | $465-640 | 495.00 | $312,716.25 |
| Matthew Mazgaj | Steptoe | 4 | $489.25 | $350-600 | 984.02 | $481,429.34 |
| Li Guo | Steptoe | 3 | $431.30 | $250-435 | 1,652.40 | $712,680.12 |
| Elizabeth McKenzie | Steptoe | 3 | $424.65 | $250-435 | 1,823.44 | $774,322.10 |
| Manual Rios | Steptoe | Paralegal | $292.60 | $130-350 | 821.88 | $240,482.09 |
| Kenneth MacPhail | Steptoe | Paralegal | $251.75 | $130-350 | 383.18 | $96,464.31 |
| Jonathan Huie | Steptoe | Paralegal | $228.00 | $130-350 | 632.97 | $144,317.16 |
| James A. Noetzel | Steptoe | Paralegal | $141.55 | $130-350 | 344.43 | $48,754.07 |
| Document Review | Steptoe | | | | 608.31 | $106,094.10 |
| IT/Technical Support | Steptoe | | | | 339.68 | $129,800.29 |
| Walter D. Kelley, Jr. | Hausfeld | 35 | $820 | $505-$820 | 532.90 | $436,978.00 |
| Jarrett Schindler | Hausfeld | Law Clerk[9] | $260 | N/A | 174.1 | $45,266.00 |
| | | | | | | |
| Total | | | | | | $11,644,859.91 |
| Total Claimed after Steptoe Discounts | | | | | | $10,479,335.08 |
| **Grand Total with 20% Discount** | | | | | | **$8,383,468.06** |

---

[9] Mr. Schindler cannot properly be categorized as an attorney because he was not admitted to the bar of any state while the litigation took place. However, his hourly rate falls within the acceptable rates for a paralegal and he is the only other person that lent any assistance to Mr. Kelley. Therefore, the Court will not disturb his claimed rate.

### III. BMG'S MOTION FOR EXPENSES

In its Motion for Attorney's fees, BMG also seeks $2,920,643.76 in nontaxable expenses such as travel costs, expert witness fees, and legal research costs that fall outside the purview of 28 U.S.C. §§ 1821[10] and 1920[11]. Cox challenges the legal basis for these claims and opposes them in full. The Court agrees with Cox that these fees are not recoverable under 17 U.S.C. § 505 and therefore DENIES BMG's motion with respect to these expenses.

There is a circuit split on the issue of whether non-taxable fees are recoverable under § 505. In support of its motion, BMG cites a Ninth Circuit case which "hold[s] that district courts may award otherwise non-taxable costs, including those that lie outside the scope of § 1920, under § 505." *Twentieth Century Fox Fil Corp. v. Entertainment Distributing*, 429 F.3d 869, 885 (9th Cir. 2005); *accord Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 458 (7th Cir. 2001). The Ninth Circuit reasoned that limiting the recovery of costs to only those available in § 1920 would effectively read the term "full costs" out of the Copyright Act and render it superfluous. *Twentieth Century Fox*, 429 F.3d at 855. Therefore, because "statutes should not be construed to make surplusage of any provision", the court found that expert fees were available under § 505. *Id.* (internal quotations and citations omitted).

The Eighth and Eleventh Circuits have disagreed, holding that § 505 does not "permit the recovery of expert witness fees beyond the limitations specified in 28 U.S.C. §§ 1920 and 1821." *Artisan Contractors Ass'n of Am., Inc. v. Frontier Ins. Co.*, 275 F.3d 1038, 1039 (11th Cir. 2001); *accord Pinkham v. Camex, Inc.*, 84 F.3d 292, 295 (8th Cir. 1996).[12] These decisions

---

[10] 28 U.S.C. § 1821 sets a cap of $40 per day for witness fees. The expert witness fees in this case vastly exceed this amount. *See* BMG's Mem. in Supp. at 28–29.

[11] 28 U.S.C. § 1920 sets forth six categories of expenditures that may be properly taxed as costs.

[12] When faced with the same question, district courts in this circuit have agreed with the Eighth and Eleventh Circuit. *See Arista Records, LLC v. Gaines*, 635 F. Supp. 2d 414, 418–19 (E.D.N.C. 2009); *Humphreys*, 152 F. Supp. 3d at 524–25.

relied on a plain reading of the Supreme Court's instruction that: "[a]ny argument that a federal court is empowered to exceed the limitations explicitly set out in §§ 1920 and 1821 without plain evidence of congressional intent to supersede those sections ignores our longstanding practice of construing statutes *in pari materia*." *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). Therefore, because § 505 does not mention witness fees, travel expenses, or any other non-taxable fees, the Eighth and Eleventh Circuits did not find the "plain evidence" necessary to displace the provisions of §§ 1820 and 1921.

In light of the Supreme Court's guidance, the Court finds the holdings of the Eighth and Eleventh Circuits to be persuasive. *Crawford*, 482 U.S. at 445. *Crawford* was clear in its instruction that "absent *explicit* statutory or contractual authorization for the taxation of the expenses of a litigant's witnesses as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." *Id.* (emphasis added). Although there is reasonable debate over the proper interpretation of the word "full" in § 505, that term is certainly not *explicit* in authorizing witness fees or any other non-taxable costs. If it wanted to, Congress could have easily inserted language allowing for the recovery of any category of costs, however, it chose not to, and the Court will not *implicitly* read those terms into the statute.[13]

In any case, as the Court in *Humphreys* explained, "the term 'full' has another possible non-superfluous meaning: it could refer to the degree of costs recoverable under §§ 1821 and § 1920." *Humphreys*, 152 F. Supp. 3d at 524–25. In other words, it could mean that a full percentage of every cost available under existing statutes is made available for prevailing parties under § 505. Therefore, the term can be more properly categorized as ambiguous rather than

---

[13] For example, the Voting Rights Act provides that, "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, *reasonable expert fees, and other reasonable litigation expenses as part of the costs*." 52 U.S.C. § 10310(e) (emphasis added).

superfluous.  In light of this alternative definition, and without "explicit statutory or contractual authorization" to the contrary,  the Court declines to award fees beyond those allowed for in 28 U.S.C. §§ 1821 and 1920.  *Crawford*, 482 U.S. at 445.  BMG's motion for nontaxable expenses is DENIED.

## IV. BMG'S BILL OF COSTS

BMG has submitted a bill of costs totaling $180,138.59.  These costs fall into three basic categories: (1) clerk fees, including *pro hac vice* applications; (2) trial and deposition transcripts and related fees; and (3) fees for exemplification and copies of transcripts and trial exhibits.  Cox has attacked nearly every aspect of the bill.  In large part, the Court finds Cox's arguments to be unconvincing.  Nonetheless, the Court will deduct the transcription fees that BMG and Cox agreed to split, and it will reduce the rest of the cost award by 10%, consistent with BMG's "degree of success."

After a final judgment, the Federal Rules provide that costs "should be allowed the prevailing party."  Fed. R. Civ. P. 54(d)(1).  The categories of allowable costs are set forth in 28 U.S.C. § 1920.  They are:

> **(1)** Fees of the clerk and marshal;
> **(2)** Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> **(3)** Fees and disbursements for printing and witnesses;
> **(4)** Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> **(5)** Docket fees under section 1923 of this title;
> **(6)** Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.  Though bound to these categories, the Court has "considerable discretion" in awarding costs. *Fells v. Virginia Dep't of Transp.*, 605 F. Supp. 2d 740, 742 (E.D. Va. 2009) (citing *Constantino v. S/T Achilles*, 580 F.2d 121, 123 (4th Cir. 1978).  However, costs "should

be limited to those 'reasonably necessary at the time.'" *Id.* (citing *LaVay Corp. v. Dominion Fed. Savings & Loan*, 830 F.2d 522, 528 (4th Cir. 1987). BMG's seeks to collect under three of the categories enumerated in § 1920. Each of these will be addressed in turn.

### A.     Clerk Fees

Cox challenges nine of BMG's *pro hac vice* applications. These filing fees are imposed by the Clerk, are they are therefore permitted to be taxed under § 1920(1). *See Synergestic Int'l, LLC v. Korman*, No. CIV. 2:05CV49, 2007 WL 517676, at \*2 (E.D. Va. Feb 8, 2007). The fact that there were nine applications does not alter this analysis. In light of the complexities of this case, it was reasonable for BMG to employ a large litigation team. Although there were some duplicative efforts inherent in a team of this size (discussed *infra*), it would be improper for the Court to go so far as to limit the number of attorneys who are authorized to appear in the case. Indeed, Cox had at least 11 *pro hac vice* applications in its own right. Given the approximate numerical equivalence in applications, it is unusual that Cox would even challenge this $675.00 in total *pro hac vice* applications. In fact, Cox likely could have saved more money in attorney's fees by simply leaving that page out of its brief.

### B.     Trial and Deposition-Related Fees

Transcripts "necessarily obtained for use in the case" are recoverable as costs under § 1920(2). *See Bd. of Directors, Water's Edge v. Anden Grp.*, 135 F.R.D. 129, 135 (E.D. Va. 1991). Cox attacks the transcription fees as unnecessary, arguing that "BMG must show that it *needed* these transcripts and *used* them in the case." Cox Br. in Opp'n to Costs at 5 (Dkt. No. 859) (emphasis in original). This argument distorts the rule, which does not place a burden on the prevailing party to show that it actually *used* the transcripts in order to recover their costs. Instead, the moving party must only show that the transcripts "appeared reasonably necessary for

preparation for the trial at the time taken." *See Bd. of Directors, Water's Edge*, 135 F.R.D. at 131.

The Court finds that the cost of 12 of BMG's 13 pre-trial transcripts was reasonably necessary under § 1920(2).[14]   Many of the pre-trial rulings in this case were given from the bench, and instead of a full written opinion, the Court's orders only cited "the reasons stated from the bench" as the basis for the ruling. *See, e.g.*, Dkt. Nos. 63, 115–117, 154 –156, 168. Therefore, in order to precisely identify both the Court's rulings and its analysis, it was entirely reasonable for BMG to obtain transcripts of those hearings so that it could prepare both for subsequent motions hearings and for trial. The fact that some excerpts of these transcripts may not have been specifically relevant does not factor into the Court's analysis. Indeed, it would likely take more effort to review and redact a transcript than it would to reproduce the hearing in full. Therefore, the Court rejects Cox's challenge to the BMG's transcription fees.

This reasoning does not extend to the same-day trial transcripts in this case. It is generally true that attorneys in a jury trial may properly obtain daily transcripts of the court proceedings in order to develop their trial strategy. *See U.S. ex rel. Davis v. U.S. Training Ctr., Inc.*, 829 F. Supp. 2d 329, 332 (E.D. Va. 2011). Here, however, the parties agreed to split the costs of daily transcripts before trial. *See* Cox Opp'n to Costs, Ex. A (Dkt. No. 859-1). Although the parties in *Ex Rel. Davis* had a similar agreement, other courts have approved of systems for sharing the cost of daily trial transcripts. *See Thomas v. Duralite Co.*, 524 F.2d 577, 590 (3d Cir. 1975) (finding that it was proper for the district court to exclude costs incurred for daily transcripts because the "parties had agreed to share the expense for this service").

---

[14] BMG does not seek to recover the costs of the October 23, 2015 hearing in which the Court denied Electronic Frontier Foundation's motion to appear as amicus. *See* BMG's Mem. in Supp. Fees at 4, Dkt. No. 820.

The Court finds the holding of the Third Circuit to be appropriate here. In a litigation battle as fierce as this one, parties should be rewarded for compromising on basic procedural agreements that mitigate the costs on either side. Accordingly, the Court will exercise its discretion and deduct $17,037.75 (BMG's portion of the transcription costs) from the bill of costs.[15]

### C.    Fees for Exemplification and Copies

Cox also challenges the following copying costs: (1) costs for copyright certificates; (2) electronic file conversion costs; and (3) trial exhibit costs. The Court finds these challenges to be without merit.

For the copyright certificates, Cox concedes that they are a taxable cost, but asserts that because BMG did not produce "the actual invoice detailing the costs and fees charged by the Copyright Office per certificate," it may not recover for these costs. *See* Cox Opp'n to Fees at 8. This argument borders on frivolous. BMG submitted detailed records of its internal accounting to show what it paid for each copyright certificate. Moreover, basic mathematics illustrates that 926 copyright certificates (one for each of the infringed copyrights) multiplied by $40 per certificate (the price charged by the Copyright Office) yields a total of $37,040.00, which is precisely the amount that BMG is seeking. Cox challenged BMG to prove ownership on each and every one of these copyrights instead of agreeing to a stipulated sample set. It cannot now turn around and seek to punish BMG for rising to its challenge and producing copies of each certificate.

Cox's arguments regarding the electronic file conversion costs are more reasonable, but they are nonetheless rejected. The Fourth Circuit has held that the costs associated with

---

[15] There is no merit to Cox's arguments regarding BMG's deposition costs. *See Francisco v. Verizon S., Inc.*, 272 F.R.D. 436, 442 (E.D. Va. 2011); *Ford v. Zalco Realty Inc.*, 708 F. Supp. 2d 558, 562 (E.D. Va. 2010). The Court will therefore exercise its discretion in awarding these costs to BMG in full.

"converting electronic files to non-editable formats, and burning the files onto discs" are taxable under § 1920(4). *Country Vintner of N. Carolina, LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 259 (4th Cir. 2013). On the other hand, this holding does not extend to costs associated with ESI processing, such as flattening and indexing electronic data, unitizing electronic documents, and bates-stamping documents. *Id.* at 258. In analyzing similar issues, courts have also excluded metadata extraction and generating OCR to create searchable text as non-taxable costs. *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10CV910 LMB/TRJ, 2013 WL 1192947, at *7 (E.D. Va. Mar. 21, 2013) (excluding metadata extraction); *Intellectual Ventures I*, 2015 WL 7283108 at *9 (excluding OCR processing and bates stamping).

In light of the increasingly technology-driven nature of document production, the line between "converting electronic files to non-editable formats, and burning the files onto discs" on the one hand, and non-taxable costs like bates stamping, on the other, is often blurred. No doubt, the modern "copying" of electronic documents encompasses some work that was not contemplated when § 1920 was originally drafted. Indeed, as a practical matter, electronic copying requires employees to run the appropriate systems and monitor document productions. Individuals must also coordinate with vendors and clients and troubleshoot technological errors. Some portion of the fees related to this work therefore must be included in the term "copying" in order to properly compensate the prevailing party under Rule 54(d).

BMG does not seek costs for any category of activity that can be distinguished from the interpretation of "making copies" that was accepted by *Country Vintner*. The costs that Cox highlights as non-taxable are mostly associated with coordinating production efforts within the litigation team. For example, Cox highlights billing entries in which Adam Wehler "[c]ommunicate[s] with M. Rios; download[s] Defendant's Exhibits to Summary Judgment

motion from Fenwick's FTP server." *See* Cox Opp'n to Fees at 11. The act of downloading

something from a server fits within the term "copying" as defined in *Country Vintner* because, in

a literal sense, it is "a reproduction of an original work". 718 F.3d 258–259.

As for the other portions of this entry, the Court finds that they relate to coordinating the

acts of copying and producing documents and cannot be reasonably segregated as non-taxable

costs. With the advent of electronically stored information, the costs of "copying" can no longer

be cabined to a price-per-page calculation. The process of downloading, categorizing, and

preparing files for transfer necessarily requires some degree of coordination and oversight. And

while courts are able to categorically exclude discrete activities like "metadata scrubbing" or

"bates stamping", it is impossible to fully extract the human element from the process of copying

electronically stored data. As such, the Court declines to deduct these human costs, which it

finds are inexorably intertwined with the copying of electronic data.

This leaves the copying of the trial exhibits, which the Court also finds to be a reasonable

cost. Copying and printing costs that are necessary to litigate a case are recoverable. *See Bd. of

Directors, Water's Edge*, 135 F.R.D. at 137 ("Costs for copies of exhibits may be awarded where

such copies were necessarily obtained for use in the case."). The question therefore becomes one

of necessity. Cox's primary argument is that it was not necessary for BMG to create a full paper

set of documents because the parties had agreed to exchange all proposed trial exhibits

electronically. Cox Opp'n to Fees at 12. The Court is not inclined to impose such a strict

interpretation of § 1920. As this Court has previously noted, exhibits need not be made part of

the record in order to be deemed necessary for the purposes of recovering costs. *See Francisco*,

272 F.R.D. at 445. In this case, it is enough that counsel used the exhibits both in trial and in its

efforts to prepare witnesses.

In addition to the full proposed-exhibit set of paper copies, BMG needed to print paper copies of all trial exhibits for Cox, the Court, and the witnesses. Although Cox claims that BMG's expenditure on these exhibits was unreasonable, it has no evidence to support that blanket assertion. In contrast, BMG has submitted detailed billing records to show that it did, in fact, spend more than $33,000 on paper versions of the admitted exhibits. On its face, this appears to be a large number. However, it serves to remember that Cox insisted that BMG produce original copyright certificates for each of the copyrights at issue in this case. Moreover, though the numbers may be large, Cox has not given any reason for the Court to doubt the accuracy of BMG's invoices or the integrity of its declarant, Stephanie Roberts. Therefore, costs of copying exhibits will be awarded in full.

In sum, the Court will deduct $17,037.75 from BMG's total costs of $180,138.59, resulting in a total of $163,100.84. For the reasons discussed above, the Court will also reduce BMG's costs by 10% to account for its failure on the vicarious liability claim and its motion for injunctive relief. *See McKnight v. Circuit City Stores, Inc.*, 14 F. App'x 147, 156 (4th Cir. 2001) (approving the district court's "partial costs award based on the partial success of" the party's appeal). In total, the Court awards BMG $146,790.76 in costs.

### IV. COX'S MOTION FOR ATTORNEY'S FEES AND COSTS

Cox's entitlement to fees turns on the Court's definition of a "prevailing party" under § 505. While there is no doubt as to BMG's status as a victor in this case, the parties dispute Cox's position vis-à-vis Round Hill. Their arguments raise the question of whether the Court's dismissal of Round Hill without prejudice on the grounds of statutory standing grants Cox prevailing party status under § 505. The Court finds that it does not, and it therefore DENIES Cox's motions for attorney's fees and costs.

35

This question can be resolved on a plain reading of the statute, which contemplates a single prevailing party. 17 U.S.C. § 505 (allowing for the Court to award fees to "*the* prevailing party"). Interpreting other fee statutes, both this Court and the Federal Circuit have agreed that "[f]or the purposes of costs and fees, there can be only one winner. A court must choose one, and only one, 'prevailing party.'" *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13CV0740, 2015 WL 7283108, at *2 (E.D. Va. Nov. 17, 2015) (citing *Shum v. Intel Corp.*, 629 F. 3d 1360, 1367 (Fed. Cir. 2010). In that sense, the "critical inquiry is . . . the nature of each party's 'respective successes' as they relate to the 'central issue' in the case." *Id.* The Federal Circuit explained this interpretation:

> Our conclusion that there can only be one prevailing party in a given case is reinforced by the use of the definite article "the" before "prevailing party." Alternatives like "a," "any," or "some" lead to phrases like "*a* prevailing party" and "*any* prevailing party." These hypothetical, unenacted versions of Rule 54 could be read to suggest that it is possible to have more than one prevailing party in an action. However, none of these theoretical alternatives is what Congress enacted.

*Shum v. Intel Corp.*, 629 F. 3d 1360, 1367 (Fed. Cir. 2010).

The Court is not convinced that this strict literal reading of the statute would apply in all contexts. Indeed, there are many well-cited cases in which multiple plaintiffs or multiple defendants have received fee awards; *Roscisewski* itself was a decision in which two groups of defendants prevailed. 1 F.3d at 227. In addition, when separate causes of action are consolidated for trial, contain counterclaims, or implead separate defendants, it might be possible for a defendant to prevail against one party, but to lose against another. *See, e.g., Modick v. Carvel Stores of N.Y., Inc.*, 209 F. Supp. 361, 363 (S.D.N.Y. 1962) ("The consolidation of separate causes of action involving separate plaintiffs for trial purposes does not free a losing

plaintiff from the duty of paying costs simply because another one of the plaintiffs was successful.").

When courts award fees to multiple "prevailing parties," however, those parties appear on the same side of a single cause of action. *See, e.g.*, *Rosciszewski*, 1 F.3d at 227. By way of illustration, the *Modick* decision contained "various plaintiffs [with] different causes of action involving different sets of facts." 209 F. Supp. at 363. In that case, the separate suits were combined in the same case in a way that allowed the court to award against some plaintiffs but not others. *Id.* In most cases, however, the "prevailing parties" will be either be all plaintiffs or all defendants in a given action. *See, e.g.*, *Bonnes v. Long*, 651 F.2d 214, 218 (4th Cir. 1981) (finding that "[i]t was error . . . for the district court to conclude that the plaintiffs were not prevailing parties.").

In that sense, the Court reads § 505 to mean that only one *side* of a cause of action may prevail. This understanding fits neatly into our adversarial judicial system, which requires a "case or controversy" so that courts may pick a clear winner from one side of the "v." *See* U.S. Const. art III, § 2, cl. 1. It also comports with cases like *Cramer* in which the Fourth Circuit awarded fees to defendants despite the fact that the plaintiff "enjoyed [some] measure of success [on his] ERISA claim." *Cramer v. Crestar Fin. Corp.*, 67 F.3d 294 (4th Cir. 1995). This holding, along with *Intellectual Ventures I*, *Shum*, and others like them, contemplates a search for a single winner.

In this case, BMG is that winner. BMG and Round Hill were represented by the same counsel and brought the same claims against Cox in a unified complaint. These were not separate causes of action consolidated for "the convenience of parties and the Court," but were instead a product of the same wrongful acts by Cox, and were unified by an intertwined set of

37

facts. *Modick*, 209 F. Supp. at 363. Cox litigated against both plaintiffs without filing any counterclaims or impleading any additional parties. After a prolonged lawsuit, Cox lost a $25 million dollar jury verdict.

In comparison, the non-prejudicial dismissal of Round Hill is something far less than triumphant. This conclusion is amplified because the preclusive effect of the Court's decision would likely be contested and limited in any future judicial proceeding. [16] As such, another Round Hill affiliate (the one with legal ownership of the copyrights) could still bring the exact same case against Cox. In fact, Round Hill itself could likely bring another lawsuit on a similar set of facts if it affected a proper transfer of full copyright ownership. In sum, although Cox successfully obtained a dismissal against Round Hill, it still lost a $25 million jury verdict. This loss precludes the Court from awarding it fees and costs as a "prevailing party" under § 505.

### V. CONCLUSION

In conclusion, the Court **GRANTS IN PART** and **DENIES IN PART** BMG's Motion for Attorney's Fees. The motion is **DENIED** to the extent it seeks nontaxable expenses. After applying a 20% discount for improper billing entries and a reduced degree of success, the motion is **GRANTED** as to $8,383,468.06 in attorney's fees.

BMG's bill of costs is similarly **GRANTED IN PART** and **DENIED IN PART**. The motion is **DENIED** with regard to transcription fees that the parties agreed to split before trial. The remaining costs are reduced by 10% for the claims on which BMG did not succeed, but otherwise **GRANTED** for a total of $146,790.76

---

[16] In large part, the parties' briefing focuses on the issue of whether a dismissal without prejudice on statutory standing grounds can be the basis for "prevailing party" status under any circumstances. The Court does not reach this question in its analysis, but it is worth noting that, *even if* Cox were a "prevailing party," the without-prejudice categorization of Round Hill's dismissal would likely temper the "degree of success" that Cox enjoyed.

Because Cox is not a prevailing party under 17 U.S.C. § 505, each of its motions for fees and costs are **DENIED** in full.

An appropriate order shall issue.

_____
Liam O'Grady
United States District Judge

February 14, 2017
Alexandria, Virginia